PAGES 1 – 34

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

| | | |
|---|---|---|
| APPLE, INC. A CALIFORNIA CORPORATION, | ) ) ) | |
| PLAINTIFF, | ) ) | |
| VS. | ) ) | NO. C 08-03251 WHA |
| PSYSTAR CORPORATION, | ) ) | SAN FRANCISCO, CALIFORNIA |
| DEFENDANT. | ) ) ) | THURSDAY NOVEMBER 6, 2008 |
| PSYSTAR CORPORATION, | ) ) | |
| COUNTERCLAIMANT, | ) ) | |
| VS. | ) ) | |
| APPLE, INC. A CALIFORNIA CORPORATION, | ) ) ) | |
| COUNTERDEFENDANT. | ) ) | |

## TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

**FOR PLAINTIFF AND**          TOWNSEND AND TOWNSEND AND CREW, LLP
**COUNTERDEFENDANT**           TWO EMBARCADERO CENTER, 8TH FLOOR
                               SAN FRANCISCO, CALIFORNIA  94111
                        BY:  **JAMES G. GILLILAND, JR. ESQUIRE**
                             **MEGAN CHUNG, ESQUIRE**
                             **MEHRNAZ BOROUMAND SMITH, ESQUIRE**

(FURTHER APPEARANCES ON FOLLOWING PAGE)

*REPORTED BY:*  JOAN MARIE COLUMBINI, CSR 5435, RPR
                OFFICIAL COURT REPORTER, U.S. DISTRICT COURT

Dockets.Justia.com

1  **APPEARANCES (CONTINUED):**

2

 **FOR DEFENDANT AND**         CARR & FERRELL, LLP
3                              2200 GENG ROAD
                              PALO ALTO, CALIFORNIA  94303
4                     BY:  **ROBERT JOSEPH YORIO, ESQUIRE**
                          **COLBY B. SPRINGER, ESQUIRE**
5                          **CHRISTOPHER PAUL GREWE, ESQUIRE**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      **PROCEEDINGS; THURSDAY, NOVEMBER 6, 2008**

2

3           **MR. GILLILAND:**  GOOD AFTERNOON, YOUR HONOR.  JIM

4  GILLILAND, MEGAN CHUNG, AND MEHRNAZ BOROUMAND SMITH FROM

5  TOWNSEND AND TOWNSEND AND CREW FOR PLAINTIFF AND MOVING PARTY

6  APPLE.  ALSO PRESENT TODAY ARE DAN COOPERMAN AS GENERAL COUNSEL

7  OF APPLE AND CARLENE CLAUS (PHONETIC), DIRECTOR OF LITIGATION.

8           **THE COURT:**  WHERE ARE THEY?  WELCOME.  HAVE A SEAT.

9           **MR. SPRINGER:**  COLBY SPRINGER AND ROBERT YORIO AND

10 CHRISTOPHER GREWE FOR DEFENDANT AND COUNTERCLAIMANT PSYSTAR

11 CORPORATION AND MR. PEDRAZA, CEO OF PSYSTAR CORPORATION.

12          **THE COURT:**  WHICH ONE IS HE?

13          YOUR NAME IS WHAT?

14      **MR. PEDRAZA:**  RUDY PEDRAZA.

15      **THE COURT:**  OKAY.  HAVE A SEAT.  THIS IS A MOTION BY

16 APPLE --

17          **MR. GILLILAND:**  YES, YOUR HONOR.

18          **THE COURT:**  -- TO DISMISS A COUNTERCLAIM.

19          PLEASE GO AHEAD.

20          **MR. GILLILAND:**  THANK YOU.  YES, YOUR HONOR.

21          THIS IS APPLE'S MOTION TO DISMISS THE FEDERAL AND

22 STATE ANTITRUST AND UNFAIR COMPETITION COUNTERCLAIMS OF

23 PSYSTAR.  PSYSTAR ASSEMBLES AND SELLS COMPUTERS THAT USE THE

24 WINDOWS, LINUX OR MACINTOSH OPERATING SYSTEMS.  IT SELLS THEM

25 IN COMPETITION WITH APPLE, INCLUDING THE ONES WITH THE MAC

1  OPERATING SYSTEM.  IN FACT, IT ORIGINALLY CALLED ITS COMPUTERS

2  THE OPEN MAC.  THEN IT CHANGED THEM TO OPEN COMPUTER AND SELLS

3  THEM IN COMPETITION WITH APPLE.

4            HOWEVER, PSYSTAR DOES NOT HAVE A LICENSE TO USE THE

5  MACINTOSH OPERATING SYSTEM.  THAT IS PROPRIETARY SOFTWARE OF

6  APPLE'S, AND, CONSEQUENTLY, APPLE FILED A COPYRIGHT

7  INFRINGEMENT ACTION HERE WITH COPYRIGHT INFRINGEMENT AND OTHER

8  CAUSES OF ACTION.

9            PSYSTAR NOW HAS COUNTERCLAIMED ASSERTING THAT

10  APPLE'S REFUSAL TO LICENSE ITS PROPRIETARY SOFTWARE TO A

11  COMPETITOR VIOLATES THE FEDERAL AND STATE ANTITRUST LAWS.

12            THERE'S NO DISPUTE HERE, I THINK THAT THE

13  COUNTERCLAIMS, THEIR SUCCESS DEPENDS UPON PSYSTAR'S ABILITY TO

14  ALLEGE AND PROVE A SINGLE BRAND RELEVANT PRODUCT MARKET.

15  SPECIFICALLY, THEY CLAIM THAT THE RELEVANT MARKET IS THE MARKET

16  FOR THE MACINTOSH OPERATING SYSTEM.  HOWEVER, WE THINK, ON THE

17  FACE OF THE COUNTERCLAIMS, THEY NEED TO BE DISMISSED FOR TWO

18  REASONS.

19            FIRST, THE COUNTERCLAIMS THEMSELVES CONTRADICT THE

20  ALLEGATION THAT THERE IS A SINGLE BRAND RELEVANT MARKET.

21  SECOND, THE ONLY TIME WHEN THERE CAN BE SUCH A MARKET, THE

22  AFTERMARKET CONTEXT, DOES NOT EXIST IN THIS CASE.

23            NOW, AS THE COURT KNOWS, THE SUPREME COURT A YEAR OR

24  SO AGO IN THE *TWOMBLY* CASE SAID IN ANTITRUST ACTIONS THE

25  ALLEGATIONS MUST BE PLAUSIBLE, AND HERE THERE CAN BE NO

1 PLAUSIBLE SINGLE BRAND RELEVANT MARKET LIMITED TO THE MACINTOSH

2 OPERATING SYSTEM.

3          THE LAW IS CLEAR THAT IT'S POSSIBLE TO HAVE A MOTION

4 TO DISMISS AN ANTITRUST CLAIM.

5          THE *TWOMBLY* CASE ITSELF GRANTED A MOTION TO DISMISS

6 ON THE PLEADINGS.  THE NINTH CIRCUIT IN *TANAKA VERSUS USC*

7 DISMISSED A CASE ON THE PLEADINGS WHERE THE PLAINTIFF ALLEGED

8 THAT THERE WAS A MARKET LIMITED TO WOMEN'S SOCCER AT UCLA,

9 DESPITE THE FACT THAT IN THE COMPLAINT ITSELF, IT SHOWED THAT

10 THERE WAS COMPETITION WITHIN THE PAC TEN AND, IN FACT, IN THE

11 ENTIRE NCAA FOR WOMEN'S SOCCER.

12          LIKEWISE, JUST A COUPLE OF WEEKS AGO, IN THE SECOND

13 CIRCUIT, IN THE *CHAPMAN VERSUS NEW YORK STATE DIVISION FOR*

14 *YOUTH*, SECOND CIRCUIT, AFFIRMED DISMISSAL OF AN ANTITRUST CASE

15 IN WHICH THE PLAINTIFF ALLEGED A RELEVANT MARKET FOR RESTRAINT

16 TRAINING SERVICES TO PRIVATE CHILDCARE PROVIDERS IN THE STATE

17 OF NEW YORK; AND, YET, THE ALLEGATION IN THE COMPLAINT ITSELF

18 SHOWED THE PLAINTIFF COMPETED IN A BROADER MARKET.  AND BECAUSE

19 THERE WERE SUCH CONTRADICTORY ALLEGATIONS IN THE COMPLAINT

20 ITSELF, THE SECOND CIRCUIT SAID, WE ARE GOING TO AFFIRM THE

21 DISMISSAL OF THE COMPLAINT THERE.

22          IN OUR BRIEF -- AND WE HAVE SUBMITTED MANY OTHER

23 CASES SHOWING THAT SINGLE BRAND MARKETS ARE SIMPLY ALMOST NEVER

24 AFFIRMED.  WHETHER THE BRAND IS FROM -- EVEN IF IT'S A SPECIAL

25 OR A UNIQUE BRAND FROM ROLEX WATCHES TO FIAT CARS, TO UGG BRAND

1 BOOTS AND BRIGHTON BRAND PURSES, FROM DREYER'S ICE CREAM TO A

2 YALE EDUCATION; IN ALL THOSE CASES, THE COURT AFFIRMED THERE

3 WAS NO SUCH THING AS A SINGLE BRAND MARKET.  YET, HERE

4 PSYSTAR'S COUNTERCLAIMS ARE BASED ENTIRELY ON THE ALLEGATION

5 THAT THERE IS A SINGLE BRAND MARKET.

6         WHAT PSYSTAR COUNTERS WITH IS POINTING TO THE NINTH

7 CIRCUIT DECISION IN *NEWCAL VERSUS IKON*, AND THAT IS AN

8 AFTERMARKET CASE.  IKON IS A BRAND OF PHOTOCOPIERS, AND THE

9 CASE INVOLVED A QUESTION OF WHETHER THE PLAINTIFF AND THE

10 DEFENDANT COULD COMPETE IN THE MARKET FOR EXTENDING THE LEASES

11 FOR THE IKON BRAND PHOTOCOPIERS.

12         IN THAT INSTANCE, THE COURT, FOLLOWING THE SUPREME

13 COURT IN *KODAK VERSUS IMAGE TECHNICAL SERVICES* SAID, WELL, THIS

14 WAS ONE OF THOSE RARE CIRCUMSTANCES WHERE THE CUSTOMER'S

15 ALREADY LOCKED IN, YOU'VE ALREADY MADE A BIG INVESTMENT IN

16 THEIR PHOTOCOPY MACHINES, SO THERE CAN BE A MARKET LIMITED TO

17 THE MARKET FOR FINANCING AND SERVICES AND PARTS FOR IKON BRAND

18 PHOTOCOPIERS.

19         BUT THIS CASE, THE ALLEGATIONS IN THE COUNTERCLAIMS

20 HERE ARE NOT AN AFTERMARKET CASE.  THE COMPETITION THAT'S

21 ALLEGED HERE OCCURS IN THE PRIMARY MARKET FOR COMPUTERS.  THE

22 COMPETITION OCCURS WHEN ONE GOES INTO BEST BUY OR CIRCUIT CITY

23 OR GOES ON LINE AND TRIES TO BUY A COMPUTER MADE BY

24 HEWLETT-PACKARD OR DELL OR SONY OR APPLE OR PSYSTAR.  THOSE

25 COMPUTERS ALL COMPETE WITH ONE ANOTHER, AND THE OPERATING

1  SYSTEMS THEY RUN, WINDOWS, LINUX AND MACINTOSH OPERATING

2  SYSTEMS, THEY ALL COMPETE WITH ONE ANOTHER AS WELL.

3         IN FACT, PSYSTAR ADMITS THE EXISTENCE OF THAT

4  COMPETITION IN ITS COUNTERCLAIMS.  THAT'S WHY WE FILED THIS

5  MOTION TO DISMISS.

6         MOST TELLINGLY, YOUR HONOR, PSYSTAR DESCRIBES ITS

7  OWN BUSINESS AS MEETING CUSTOMER PREFERENCES AS THEY CHOOSE

8  BETWEEN PERSONAL COMPUTERS THAT RUN WINDOWS OR LINUX OR THE MAC

9  OS.  THIS IS WHAT PARAGRAPH 15 OF THE COUNTERCLAIM SAYS:

10         "PSYSTAR MANUFACTURES AND DISTRIBUTES COMPUTERS

11         TAILORED TO CUSTOMER CHOOSING.  AS A PART OF ITS

12         DEVOTION TO SUPPORTING CUSTOMER CHOICE, PSYSTAR

13         SUPPORTS A WIDE RANGE OF OPERATING SYSTEMS, INCLUDING

14         MICROSOFT WINDOWS XP AND XP 64-BIT, WINDOWS VISTA AND

15         VISTA 64-BIT, LINUX, AND THE MAC OS.  PSYSTAR

16         GENERALLY REFERS TO THIS CUSTOM-TAILORED LINE OF

17         COMPUTERS AS OPEN COMPUTERS."

18         THAT'S PARAGRAPH 15 FROM THE COUNTERCLAIMS.

19         SO, PSYSTAR IS ADMITTING THAT CUSTOMERS CHOOSE

20  BETWEEN ITS OWN COMPUTERS BASED UPON THE OPERATING SYSTEMS THAT

21  IT OFFERS AS COMPETITIVE CHOICES AMONG ONE ANOTHER.  IF THEY

22  ARE CHOICES AVAILABLE TO THE SAME CUSTOMERS FROM THE SAME

23  SUPPLIER, THEN THEY ARE COMPETING, AND THEY NEED TO BE IN THE

24  SAME RELEVANT PRODUCT MARKET.

25         MOREOVER, PSYSTAR ADMITS THAT OPERATING SYSTEMS,

1  OPERATING SYSTEMS SOFTWARE, PERFORMS THE SAME FUNCTIONS.

2          PARAGRAPH 18 OF THE COUNTERCLAIM SAYS, QUOTE:

3          "OPERATING SYSTEMS LIKE THE MAC OS CONTROL AND

4      DIRECT THE INTERACTION BETWEEN SOFTWARE APPLICATIONS,

5      SUCH AS WORD PROCESSORS, INTERNET BROWSERS, AND

6      APPLICATIONS, AND THE CENTRAL PROCESSING UNIT OF THE

7      COMPUTER AND ITS VARIOUS HARDWARE COMPONENTS."

8          THEY ALLEGE ESSENTIALLY THE SAME THING IN

9  PARAGRAPH 21 OF THE COUNTERCLAIMS.

10         WE SUBMIT UNDER *TWOMBLY*, YOUR HONOR, IT'S SIMPLY NOT

11 PLAUSIBLE TO ADMIT THAT OPERATING SYSTEMS ALL SERVE THE SAME

12 PURPOSE.  TO ADMIT THAT THEY ARE ALL SOLD BY PSYSTAR ON THE

13 SAME COMPUTERS, TO THE SAME CUSTOMERS, THROUGH THE SAME LINE OF

14 COMMERCE, AND THEN TO CLAIM THEY ARE NOT IN THE SAME RELEVANT

15 PRODUCT MARKET.

16         OF COURSE, THIS IS A MOTION TO DISMISS, AND THE

17 COURT IS REQUIRED TO ACCEPT THE PLAINTIFF'S ALLEGATIONS AS

18 TRUE.  BUT THE LAW IS CLEAR THAT YOU ARE NOT REQUIRED TO

19 SUBMIT -- TO ACCEPT CONTRADICTORY ALLEGATIONS AS TRUE, AND WE

20 CITE RELEVANT LAW IN OUR BRIEF TO THAT EFFECT, THAT WHEN THE

21 ALLEGATIONS THEMSELVES CONTRADICT ONE ANOTHER, THEN THE COURT

22 IS NOT REQUIRED TO ACCEPT ALL OF THEM AS TRUE.  THEY CAN'T ALL

23 BE TRUE.  THEY CONTRADICT ONE ANOTHER.

24         PSYSTAR TRIES TO ADVANCE ITS SINGLE BRAND RELEVANT

25 MARKET ARGUMENT THREE WAYS.  FIRST, IT SAYS, LOOK AT APPLE'S

ADVERTISING; IT SHOWS THAT APPLE IS UNIQUE, IT'S COOL, IT'S SPECIAL, EVERYBODY LOVES THE MAC.

AND SINCE PSYSTAR REFERENCED THIS ADVERTISING CAMPAIGN, THE LAW SAYS THAT AS LONG AS THERE'S NO DISPUTE ABOUT WHAT IS IN THE DOCUMENTS, THAT THE COURT IS ENTITLED TO CONSIDER THEM. SO WE HAVE SUBMITTED ON DVD AND IN WRITING THE TEXT OF THE ADVERTISEMENTS. AND SOME OF THEM ARE VERY COOL TO WATCH. I ENCOURAGE THE COURT TO DO THAT IF YOU HAVE A CHANCE.

BUT THE DIFFERENT ADS, THE FIRST ONES THEY REFER TO, DON'T TALK ABOUT THE OPERATING SYSTEMS AT ALL. THE OTHER ONES, WHAT'S CALLED THE GET-A-MAC CAMPAIGN, EXPLICITLY SHOW APPLE COMPARING THE CAPABILITIES OF ITS MACINTOSH COMPUTER WITH WINDOWS-BASED COMPUTERS. THAT'S THE ENTIRE PURPOSE FOR THE ADVERTISING CAMPAIGN. THEY TALK ABOUT FEATURES AND FUNCTIONS AND EASE OF USE AND WHAT MAKES ONE SPECIAL AND THE OTHER LESS DESIRABLE TO CONSUMERS. BUT THAT'S PRECISELY WHAT IS THE DEFINITION OF "COMPETITION," COMPARING YOUR PRODUCT DIRECTLY TO THE COMPETING PRODUCT.

SO PSYSTAR HAS INVITED THE COURT TO LOOK AT THOSE ADVERTISEMENTS. WE DO AS WELL. WE THINK THEY PROVE THAT THE MAC AND WINDOWS ARE IN DIRECT COMPETITION WITH ONE ANOTHER.

SECOND, PSYSTAR SAYS THAT -- IT ALLEGES THAT THE PRICE OF A MAC BOOK OR A MAC BOOK PRO, WHICH ARE THE NOTEBOOK COMPUTERS FROM APPLE, THAT THAT COMPUTER IS MORE EXPENSIVE THAN A SIMILAR COMPUTER FROM DELL, AND, BASICALLY, IT'S TRYING TO

1 ARGUE THAT THERE'S A LACK OF CROSS ELASTICITY OF DEMAND BECAUSE

2 THE PRICES ARE DIFFERENT.  BUT THE ALLEGATIONS DON'T HELP

3 PSYSTAR AT ALL BECAUSE THEY ARE TALKING ABOUT THE PRICE OF THE

4 COMPUTERS THEMSELVES, FULLY LOADED WITH THEIR GRAPHICS CARDS

5 AND THEIR SOFTWARE AND THEIR APPLICATION SOFTWARE, AND, YET,

6 THE ALLEGATION IN THE COUNTERCLAIM IS THAT THE MARKET IS

7 LIMITED TO THE OPERATING SYSTEM, THE MAC OS.

8         THERE'S NOTHING IN THE COMPLAINT ABOUT THE PRICE OF

9 THE MAC OS VERSUS THE PRICE OF THE WINDOWS, AND THERE'S A

10 REASON FOR THAT.

11         PSYSTAR CANNOT ALLEGE THAT.  IT COULD NOT ALLEGE

12 THAT THERE IS A DIFFERENCE BETWEEN THEM -- AND IT WON'T ALLEGE

13 THEM EVEN GIVEN -- ALLEGE THAT EVEN GIVEN THE CHANCE, BECAUSE

14 IF ONE WERE TO GO TO BEST BUY.COM AND GO ON TO THE WEBSITE AND

15 LOOK AT SOFTWARE, YOU WOULD FIND OUT THE PRICE OF A LICENSE FOR

16 A MAC OS LEOPARD UPGRADE IS VIRTUALLY THE SAME AS THE PRICE FOR

17 A WINDOWS VISTA UPGRADE, $129.  THAT'S BECAUSE THEY COMPETE

18 DIRECTLY WITH ONE ANOTHER.

19         SO THE ALLEGATIONS ABOUT THE PRICE OF THE COMPUTERS

20 DON'T HELP SAVE PSYSTAR'S CLAIM THAT THERE'S A SINGLE BRAND

21 RELEVANT MARKET.

22         FINALLY, PSYSTAR SAYS, WELL, IN A CASE EIGHT YEARS

23 AGO, IN 2000, IN *UNITED STATES VERSUS MICROSOFT*, THE COURT

24 THERE FOUND AS A MATTER OF FACT THAT THE MACINTOSH OPERATING

25 SYSTEM SHOULD NOT BE INCLUDED IN THE SAME MARKET AS THE WINDOWS

1  OPERATING SYSTEM.  THAT IS TRUE.  THAT WAS THE FINDING THE

2  COURT MADE AT THE TIME.

3          IT'S IMPORTANT TO REMEMBER, HOWEVER, THAT EIGHT

4  YEARS AGO, ALMOST A LIFETIME IN THIS BUSINESS, THE MACINTOSH

5  OPERATING SYSTEM DID NOT WORK ON INTEL MICROPROCESSORS.  APPLE

6  USED THE POWER PC INSTEAD OF THE INTEL MICROPROCESSORS.  NOW

7  THE MAC OS RUNS ON INTEL.  AND, IN FACT, THE RELEVANT MARKET

8  THAT WAS CHOSEN IN THE *UNITED STATES VERSUS MICROSOFT* CASE WAS

9  THE MARKET FOR INTEL OPERATING SYSTEMS FOR INTEL-COMPATIBLE

10 PERSONAL COMPUTERS.  OPERATING SYSTEMS FOR INTEL-COMPATIBLE

11 PERSONAL COMPUTERS.  THAT IS THE PLAUSIBLE RELEVANT MARKET THAT

12 WAS USED IN THAT CASE.

13          IF THAT DEFINITION WERE USED HERE, THEN THE MAC OS

14 WOULD BE IN THAT MARKET, TOGETHER WITH WINDOWS AND LINUX, AND

15 APPLE'S SHARE WOULD BE LESS THAN TEN PERCENT.

16          SO THE OLD *U.S. VERSUS MICROSOFT* CASE ALSO DOES NOT

17 HELP.

18          SO, ULTIMATELY, THE ALLEGATIONS IN PSYSTAR'S

19 COUNTERCLAIMS CONTRADICT ITS DEFINITION OF A SINGLE BRAND

20 RELEVANT MARKET.  WITHOUT A SINGLE BRAND RELEVANT MARKET,

21 PSYSTAR CANNOT ALLEGE THAT APPLE HAS MARKET POWER.  ALL OF

22 PSYSTAR'S CLAIMS REQUIRE APPLE TO HAVE MARKET POWER, ATTEMPTED

23 MONOPOLIZATION, TYING, EXCLUSIVE DEALING.  IN ORDER FOR THOSE

24 TO BE AN ANTITRUST VIOLATION, APPLE HAS TO HAVE MARKET POWER.

25 IN ORDER FOR US TO HAVE MARKET POWER, IT HAS TO BE A SINGLE

1  BRAND MARKET, AND SINCE IT CANNOT BE, BASED ON THESE

2  ALLEGATIONS, THE COUNTERCLAIM SHOULD BE DISMISSED.

3       MAY I ANSWER ANY QUESTIONS, YOUR HONOR?

4       **THE COURT:**  NO, I'LL SAVE ANY QUESTIONS FOR LATER.

5       **MR. GILLILAND:**  THANK YOU.

6       **THE COURT:**  ALL RIGHT.  LET'S HEAR FROM THE OTHER

7  SIDE.

8       **MR. SPRINGER:**  THANK YOU, YOUR HONOR.  I WOULD LIKE

9  TO ADDRESS FIRST THE ISSUE OF THE SINGLE PRODUCT MARKET, AND

10 THEN I WOULD LIKE TO TURN TO THE DISCUSSION OF *TWOMBLY* AND THE

11 PROPER PLEADING STANDARD IN LIGHT OF THAT SINGLE PRODUCT

12 MARKET.

13      COUNSEL FOR APPLE CONTENDS THERE CANNOT BE A SINGLE

14 PRODUCT MARKET, AND THAT IS SIMPLY INCORRECT.  AS AN INITIAL

15 MATTER, AND AS THE COURT IS WELL AWARE, MARKET DEFINITION IS A

16 QUESTION OF FACT FOR THE JURY.  THIS WAS RECOGNIZED BY THE

17 *FORSYTH* COURT IN THE NINTH CIRCUIT, AND IT WAS REAFFIRMED JUST

18 RECENTLY IN AUGUST OF THIS YEAR BY THE *THEME PROMOTIONS* CASE.

19      IN THE *THEME PROMOTIONS* CASE, THERE WAS A DECISION

20 ON HOW TO FIND THE MARKET WITH RESPECT TO, AMONG OTHER THINGS,

21 THE SSNIP TEST, AND ALSO A REFERENCE TO THE *ORACLE* DECISION,

22 JUDGE VAUGHN WALKER'S DECISION, WHICH WAS BY AND LARGE ALL

23 ABOUT DEFINING THE RELEVANT MARKET.

24      THE *ORACLE* DECISION RECOGNIZED THERE IS NO BRIGHT

25 LINE TEST FOR DEFINING MARKETS.  THAT IS PROBABLY NO MORE TRUE

1  IN ANY INDUSTRY THAN IT IS SOFTWARE.

2          ONE THING I DO AGREE WITH COUNSEL FOR APPLE ABOUT.

3  TEN YEARS IN THE SOFTWARE MARKET IS NOTHING SHORT OF A

4  LIFETIME.  MANY THINGS CHANGE IN TWO TO THREE YEARS, MUCH LESS

5  TEN.  DEFINING A MARKET IN A SOFTWARE CASE SUCH AS THIS IS VERY

6  DIFFICULT.

7          WE DO DISCUSS THE SSNIP TEST, WHICH I'LL GO BACK TO

8  WHEN WE DISCUSS *BELL ATLANTIC VERSUS TWOMBLY*.  THE COURT IN

9  *ORACLE* SAID MARKET DEFINITION IS A DIFFICULT TASK; WHILE THERE

10 IS A CONCERN ON ONE END WITH RESPECT TO A SINGLE PRODUCT

11 MARKET, THERE'S EQUALLY CAUTION WITH RESPECT TO DEFINING AN

12 OVERLY BROAD MARKET THAT IS OVERLY EXCLUSIVE OF PRODUCTS THAT

13 ARE NOT NECESSARILY IN THAT MARKET.

14         SO WITH RESPECT TO DEFINING THAT SINGLE PRODUCT

15 MARKET, WE DO DISCUSS THE SSNIP TEST.  THAT IS FOUND IN OUR

16 COMPLAINT AT PARAGRAPHS 36 THROUGH 38 AND THEN 43 THROUGH 45.

17         WE ALSO DISCUSS IN THE COMPLAINT -- OR, I'M SORRY,

18 IN OUR COUNTER CLAIMS, THE ISSUE -- THE *U.S. VERSUS MICROSOFT*

19 DECISION WHICH WAS REFERENCED BY COUNSEL FOR APPLE.

20         IN THAT CASE, AND AS APPEARS IN THE MICROSOFT

21 DECISION, THE FINDERS OF FACT FOUND THAT THE MAC OS AND THE

22 WINDOWS OS WERE NOT INTERCHANGEABLE OPERATING SYSTEMS.  AGAIN,

23 MUCH HAS CHANGED SINCE EVEN THEN.  THE MARKET HAS CHANGED.

24 IT'S NOW A POWER PC VERSUS INTEL MARKET.  THERE'S BEEN A NUMBER

25 OF EVOLUTIONS, A NUMBER OF CHANGES TO THE MARKET.  ALL THIS

1 PROVES IS THAT THE PRESUMPTIONS WE MIGHT HAVE ABOUT A MARKET,

2 YOU KNOW, TEN YEARS AGO, HAVE CLEARLY CHANGED.

3 　　　　THIS IS A DECISION WHICH IS NOT BEST ADDRESSED IN A

4 12(B)(6) MOTION TO DISMISS.  THIS IS A DECISION THAT NEEDS TO

5 GO TO A JURY AFTER DISCOVERY SO THE RELEVANT MARKET CAN BE

6 PROPERLY DEFINED.

7 　　　　NOTWITHSTANDING THAT AND TURNING TO THE ISSUE THAT

8 YOU CANNOT HAVE A SINGLE PRODUCT MARKET, AGAIN, PSYSTAR

9 CONTENDS -- THAT CONTENTION IS SIMPLY DIRECTLY IN *BUSHIE VERSUS*

10 *STENOCORD* CASE OUT OF THE NINTH CIRCUIT.  NINTH CIRCUIT FOUND A

11 SINGLE MANUFACTURER'S PRODUCTS MIGHT BE FOUND TO COMPRISE BY

12 THEMSELVES A RELEVANT MARKET FOR THE PURPOSES OF A

13 MONOPOLIZATION CLAIM.

14 　　　　**THE COURT:**  WHEN WAS THAT DECISION?

15 　　　　**MR. SPRINGER:**  THAT CAME OUT -- THAT WAS THE NINTH

16 CIRCUIT IN 1972, AND THAT IS STILL GOOD LAW TODAY.

17 　　　　**THE COURT:**  THERE'S BEEN THE *KODAK* CASE AND SOME

18 OTHER CASES SINCE THAT DECISION.

19 　　　　**MR. SPRINGER:**  YOU ARE ABSOLUTELY CORRECT, YOUR

20 HONOR, WITH RESPECT TO *KODAK*.  I'LL DISCUSS THAT FOR A MOMENT.

21 　　　　*KODAK* IS AN AFTERMARKET CASE.  THIS IS NOT AN

22 AFTERMARKET CASE.  GRANTED, WE DID REFERENCE IN OUR OPPOSITION

23 TO THEIR MOTION TO DISMISS THE *NEWCAL* CASE.  WHAT WE WERE NOT

24 RELYING ON *NEWCAL* FOR THE PREMISE OF AN APPLE'S MARKET, AS

25 COUNSEL FOR APPLE POINTED OUT IN THEIR REPLY PAPERS, THERE IS A

1 DIFFERENCE BETWEEN AN AFTERMARKET AND A SUBMARKET.  WE ARE

2 CONCERNED WITH THE SUBMARKET.

3 　　　　OUR RELIANCE UPON THE *NEWCAL* CASE WAS MORE WITH

4 RESPECT TO ISSUES CONCERNING THE FACT THAT AN ANTITRUST CLAIM

5 THAT CAN RESTRICT THE CLAIM TO A SINGLE BRAND, AS IS IN THE

6 CASE LIKE AN AFTERMARKET CASE LIKE *NEWCAL*, BUT AT THE SAME TIME

7 THERE IS NO PER SE RULE AGAINST RECOGNIZING A SUBMARKET THAT

8 MIGHT BE THAT SINGLE PRODUCT MARKET.

9 　　　　ALSO ADDRESSED IN THE *NEWCAL* CASE, WHICH I THINK IS,

10 YOU KNOW, AGAIN IMPORTANT HERE WITH RESPECT TO DEFINING THE

11 MARKET, IS THAT ISSUES OF FACTUAL DISAGREEMENT, AND THERE ARE

12 CLEARLY ISSUES OF FACTUAL DISAGREEMENT HERE WITH RESPECT TO

13 WHAT CONSTITUTES THE RELEVANT MARKET, ISSUES OF FACTUAL

14 DISAGREEMENT ARE NOT APPROPRIATE FOR A 12(B)(6) DISMISSAL,

15 ESPECIALLY IN LIGHT OF THE FACT THIS WAS A JURY QUESTION, AS

16 WAS FOUND IN *TIME PROMOTIONS*, GOING BACK TO THE ISSUE OF THE

17 *BUSHI VERSUS STENOCORD* DECISION.

18 　　　　**THE COURT:**  LET ME ASK THE BIGGER PICTURE FOR A

19 SECOND.  HOW DO YOU SAY THE NAME?

20 　　　　**MR. SPRINGER:**  "SIGH-STAR."

21 　　　　**THE COURT:**  WHAT HAPPENED TO THE P?

22 　　　　**MR. SPRINGER:**  P IS SILENT.

23 　　　　**THE COURT:**  ALL RIGHT.  PSYSTAR.

24 　　　　SO PSYSTAR IS SELLING COMPUTERS THAT USE THE APPLE

25 OPERATING SYSTEM?

1    **MR. SPRINGER:**  PSYSTAR IS SELLING COMPUTERS THAT ARE

2   CAPABLE OF USING THE MAC OS, CORRECT.

3    **THE COURT:**  WHEN YOU REVIEW -- NOT REVIEW, BUT WHEN

4   PSYSTAR SELLS THEM, IT DOESN'T HAVE THE OPERATING SYSTEM ON IT.

5    **MR. SPRINGER:**  EVERY OPERATING SYSTEM THAT IS

6   OPERATING ON A PSYSTAR COMPUTER HAS BEEN LEGALLY PURCHASED.  IT

7   IS EITHER AN OFF-THE-SHELF COPY OR PURCHASED ON LINE.  THE

8   DIFFERENCE HERE IS PSYSTAR --

9    **THE COURT:**  I THOUGHT APPLE SAID THAT THE -- YOU

10  CAN'T GET THE OPERATING SYSTEM EXCEPT THROUGH A LICENSE TO USE

11  IT WITH VERY SPECIFIED EQUIPMENT.

12    **MR. SPRINGER:**  YOU CAN WALK INTO AN APPLE STORE AND

13  BUY THE APPLE MAC OS OPERATING SYSTEM.  THE MAC OS OPERATING

14  SYSTEM HAS BEEN DESIGNED IN SUCH A WAY IT WILL NOT OPERATE ON

15  WHAT WE REFER TO IN OUR COUNTERCLAIM, IT WILL NOT OPERATE ON

16  ANYTHING OTHER THAN APPLE-LABELED COMPUTER HARDWARE.  THERE IS

17  SPECIFIC CODE PUT INTO THE MAC OS THAT PREVENTS IT FROM

18  OPERATING ON ANYTHING OTHER THAN APPLE-LABELED COMPUTER

19  HARDWARE.

20    **THE COURT:**  IF THAT'S TRUE, HOW DO YOU SELL YOUR

21  COMPUTERS USING THE OS SYSTEM?

22    **MR. SPRINGER:**  PSYSTAR SELLS COMPUTERS THAT USE A

23  LEGITIMATELY PURCHASED MAC OS COPY FROM AN APPLE STORE, FROM ON

24  LINE, BUT THEY HAVE ALSO DEVELOPED THEIR OWN CODE THAT ALLOWS

25  IT TO OPERATE ON A NON-APPLE-LABELED COMPUTER SYSTEM.

1      **THE COURT:**  SO IT OVERRIDES THOSE, THAT EMBEDDED

2   CODE, THAT IT SOMEHOW GETS AROUND IT?

3      **MR. SPRINGER:**  IN A VERY SIMPLISTIC ANSWER, YES.

4   YES, IT BASICALLY -- IT BRIDGES THE GAP THAT PREVENTS MAC OS

5   FROM RUNNING ON ANYTHING OTHER THAN APPLE-LABELED COMPUTER

6   HARDWARE IN THAT PSYSTAR HAS DEVELOPED SOMETHING NEW THAT

7   ALLOWS THAT MAC OS TO OPERATE ON SOMETHING OTHER THAN THE

8   APPLE-LABELED COMPUTER HARDWARE.  THAT OBVIOUSLY INTRODUCES AN

9   ELEMENT OF COMPETITION WITH APPLE WHICH PREVIOUSLY WAS THE ONLY

10  MANUFACTURER, THE ONLY SELLER OF APPLE-LABELED HARDWARE OR

11  COMPUTER SYSTEM THAT WAS CAPABLE OF OPERATING THE MAC OS.

12      SO PSYSTAR'S ISSUE, TO CORRECT A STATEMENT OF

13  COUNSEL FOR APPLE, PSYSTAR DOESN'T HAVE AN ISSUE WITH APPLE

14  REFUSING TO LICENSE.  YOU CAN WALK INTO ANY STORE AND BUY A

15  COPY OF THE MAC OS.  THE ISSUE IS -- PSYSTAR'S ISSUE MORE

16  SPECIFICALLY WITH APPLE IS THEIR ANTI-COMPETITIVE CONDUCT.

17      **THE COURT:**  BUT IF THEY DON'T AGREE THAT THE OS

18  SYSTEM COMPETES WITH THE MICROSOFT SYSTEM AND LINUX SYSTEM AND

19  VARIOUS OTHER OPERATING SYSTEMS --

20      **MR. SPRINGER:**  THE VARIOUS OPERATING SYSTEMS THAT

21  ARE OUT THERE, CORRECT, THEY DO PROVIDE AT SOME LEVEL, SOME

22  FUNDAMENTAL LEVEL, SIMILAR FUNCTIONALITY, BUT THE ANALYSIS WITH

23  RESPECT TO WHAT CONSTITUTES THE RELEVANT MARKET GOES FAR BEYOND

24  JUST WHAT CONSTITUTES SIMILAR FUNCTIONALITY.

25      GOING BACK TO THE *STENOCORD* DECISION, ONE OF THE

1  KEYSTONES THEY ADDRESSED IN THAT DECISION WITH RESPECT TO

2  FINDING A SINGLE PRODUCT MARKET WAS THAT THE PRODUCT AT ISSUE

3  IN THAT CASE WAS SO UNIQUE AND SO DOMINANT IN THE MARKET THAT

4  IT ALLOWED FOR THEM TO DEFINE A SINGLE PRODUCT MARKET.

5          THERE'S OTHER CASES AS WELL FROM THE SUPREME COURT.

6  FOR EXAMPLE, ONE OF THE *DUPONT* DECISIONS IN 1957, THAT FOUND

7  THAT THE SAME PAINT IN FABRIC PURCHASED BY ONE ENTITY

8  CONSTITUTED ACTUALLY A DIFFERENT MARKET WHEN THE EXACT SAME

9  PRODUCTS WERE PURCHASED BY ANOTHER ENTITY.  SO NOT ONLY CAN YOU

10 HAVE A SINGLE PRODUCT MARKET, IT CAN ACTUALLY BE THE SAME

11 PRODUCT IN DIFFERENT MARKETS.

12         THESE ARE TWO CASES WHICH ARE ON VARIOUS ENDS OF THE

13 EXTREME -- I'M SORRY -- DIFFERENT ENDS OF THE SPECTRUM, WHICH

14 IS, AGAIN, WHY THE RELEVANT MARKET QUESTION IS A QUESTION FOR

15 THE JURY.

16         AS COUNSEL FOR APPLE APPROPRIATELY POINTS OUT, THE

17 ALLEGATIONS MUST BE ASSUMED AS TRUE, AND THERE IS THE PLAUSIBLE

18 ISSUE AS WELL, BUT PLAUSIBILITY WITH RESPECT TO *TWOMBLY* IS

19 NOT -- PLAUSIBLE SHOULD NOT BE CONFUSED WITH PROBABILITY.  WE

20 DON'T HAVE TO GIVE ORDERS OR TAKE BETS ON WHAT ARE THE CHANCES

21 THIS CLAIM WILL SURVIVE *TWOMBLY*.  IF ANYTHING, JUST RAISED THE

22 BAR, QUITE FRANKLY, WHAT WAS AN INSUFFICIENT PLEADING STANDARD.

23 ALL IT DOES IS REQUIRE MORE THAN LABELS AND CONCLUSIONS;

24 WHEREAS, IN THE PAST, UNDER THE OLD NOTICE PLEADINGS STANDARD,

25 A COMPLAINANT COULD SIMPLY GO IN AND BASICALLY TAKE A FORM BOOK

1 AND SAY, I NEED TO ALLEGE X, Y, Z, DROP THAT INTO A PLEADING,

2 AND THEY SATISFIED THE PLEADING REQUIREMENT.

3          *TWOMBLY* RAISES THE BAR.  *TWOMBLY*, TO A CERTAIN

4 DEGREE, IS MUCH ADO ABOUT NOTHING.  IN THIS CASE, PSYSTAR'S

5 COUNTERCLAIM IS VERY FACT SPECIFIC.  IT MAKES A NUMBER OF

6 ALLEGATIONS WITH RESPECT TO NOT ONLY THE SSNIP TEST, BUT ALSO

7 WITH RESPECT TO -- IT DEFINES THE APPROPRIATE MARKETS, BUT IT

8 ALSO DOES SO IN THE CONTEXT OF USING LANGUAGE FROM APPLE'S OWN

9 COMPLAINT, DISCUSSING THE DIFFERENTIATION OF THE MAC OS VERSUS

10 THE OTHER OPERATING SYSTEMS THAT MIGHT EXIST ON THE MARKET.

11          SO, IN THAT SENSE, WHILE THERE ARE DIFFERENT

12 OPERATING SYSTEMS ON THE MARKET, WE DON'T DENY THERE'S THE

13 MAC OS, THERE'S THE WINDOWS OPERATING SYSTEMS, THERE'S ALSO

14 LINUX AND A NUMBER OF OTHER OPERATING SYSTEMS.  THE MAC OS IS

15 SO UNIQUE, IS SO DIFFERENTIATED, AND APPLE HAS EVIDENCED THIS

16 IN BASICALLY PROSELYTIZING, THIS NOT ONLY WITH RESPECT TO THEIR

17 ADVERTISING, BUT ALSO WITH RESPECT TO ITS PRICING MECHANISMS,

18 AND ALSO WITH RESPECT TO ITS CUSTOMER BASE.

19          APPLE ENJOYS A CUSTOMER BASE AND A DEGREE OF

20 CUSTOMER LOYALTY THAT IS, QUITE FRANKLY, UNHEARD OF ANY IN

21 OTHER INDUSTRY.  APPLE HAS ROUTINELY BEEN RECOGNIZED YEAR AFTER

22 YEAR AFTER YEAR AS HAVING ONE OF THE MOST LOYAL CUSTOMER BASES.

23 IT'S BECAUSE THEY KEEP COMING BACK TO THIS VERY UNIQUE, VERY

24 DISTINCT, VERY SPECIAL PRODUCT IN THE MAC OS.  APPLE USERS

25 WOULD NEVER BE CAUGHT DEAD, QUITE FRANKLY, SWITCHING OVER TO

1 ANOTHER OPERATING SYSTEM, AND THIS IS ANOTHER ASPECT THEY

2 ADVERTISE HEAVILY.

3          **THE COURT:**  THERE ARE PEOPLE THAT LIKE A FORD PICKUP

4 TRUCK THAT WOULDN'T BE CAUGHT DEAD IN A CHEVY.  I DON'T THINK

5 ANYBODY IS GOING TO SAY FORD AND CHEVY -- THAT ANYBODY HAS A

6 MONOPOLY ON THE PICKUP TRUCK MARKET.

7          **MR. SPRINGER:**  I APPRECIATE THE ANALOGY, BUT THE

8 REALITY IS, IN GOING BACK TO THE *ORACLE* DECISION, FORD AND

9 CHEVY PICKUP TRUCKS ARE TWO VERY DISTINCT MARKETS.

10          **THE COURT:**  WHAT IS SO SPECIAL ABOUT THE SOFTWARE

11 VERSUS OTHER KINDS OF PRODUCTS?

12          **MR. SPRINGER:**  WELL, LOOKING AT APPLE'S OWN

13 COMPLAINT, THEY TALK ABOUT THE MAC OS.  IF YOU WILL ALLOW ME

14 JUST ONE SECOND?  THEY TALK ABOUT MAC COMPUTERS BEING FAMOUS

15 FOR EASE OF USE, INNOVATIVE INDUSTRIAL DESIGN -- I'M SORRY.

16 THAT'S PARAGRAPH THREE OF THEIR COMPLAINT.

17          PARAGRAPH FOUR OF THE COMPLAINT, THEY TALK ABOUT THE

18 TENTH GENERATION OF THEIR OPERATING SYSTEM.

19          "MAC OS X REVOLUTIONIZED OPERATING SYSTEM

20          ARCHITECTURE, ADDING EXTRAORDINARY CAPABILITIES,

21          SPEED AND STABILITY.  APPLE'S MOST RECENT VERSION OF

22          THE MAC OS X, VERSION 10.5, KNOW AS LEOPARD, HAS BEEN

23          DESCRIBED BY REVIEWERS AS, 'VISUALLY STUNNING,'

24          'POWERFUL, POLISHED AND CAREFULLY CONCEIVED,' AND

25          'ELEGANT'."

1        **THE COURT:**  SLOW DOWN JUST A LITTLE.

2        **MR. SPRINGER:**  I APOLOGIZE.

3        OTHER REVIEWERS HAVE SAID -- AND THIS IS AGAIN FROM

4  PARAGRAPH FOUR OF THEIR COMPLAINT.  OTHER REVIEWERS HAVE SAID,

5  QUOTE:

6      "THE GRACE OF LEOPARD'S INTERFACE ELEMENTS MAKES

7      PRODUCTIVITY MORE PLEASURABLE WITH A MAC, ALL THE

8      RESULT OF YEARS OF HARD, DILIGENT WORK BY THE

9      DEVELOPMENT TEAMS AT APPLE," UNQUOTE.

10      GOING TO PARAGRAPH FIVE, THEY TALK ABOUT THE MAC OS

11  COMBINING THE USE OF COLOR, TRANSPARENCY, ANIMATION TOGETHER

12  WITH THE OVERALL ARRANGEMENT AND SET UP OF VARIOUS ICONS IN A

13  UNIQUE AND CREATIVE MANNER.

14      "IN ADDITION, THE FINDER TOOLBAR CONTAINING THE

15      FAMOUS APPLE MARK IS COMBINED WITH A DISTINCTIVE

16      THREE-DIMENSIONAL APPLICATIONS BAR (OR DOCK) ON WHICH

17      VARIOUS ICONS RESIDE.  THE DISTINCTIVE NONFUNCTIONAL

18      COMBINATION OF ELEMENTS THAT MAKES UP THE MAC OS X

19      USER INTERFACE IS WELL-KNOWN TO CONSUMERS AND HAS

20      BECOME ASSOCIATED WITH APPLE MAC OS X LEOPARD."

21      THE REALITY IS APPLE TOUTS THE DISTINCTIVENESS OF

22  THIS OPERATING SYSTEM, AND THEN IN THE CONTEXT OF THIS MOTION

23  TO DISMISS, THEY SIMPLY SAY IT'S JUST ANOTHER PIECE OF

24  SOFTWARE.  THEY CAN'T HAVE IT BOTH WAYS.

25        **THE COURT:**  ALL RIGHT.  THANK YOU.

1    **MR. SPRINGER:**  THANK YOU.

2    **MR. GILLILAND:**  YOUR HONOR, VERY BRIEFLY.

3    IN MY HOUSE HALF OF THE REFRIGERATOR IS PEPSI AND

4    HALF IS COKE.  THAT DOESN'T MEAN THEY DON'T COMPETE WITH ONE

5    ANOTHER.

6    COUNSEL REFERS TO THE *DUPONT* CASE AND THE *UNITED*

7    *STATES VERSUS ORACLE* CASE.  WE QUOTE FROM BOTH OF THEM ON

8    PAGE 7 OF OUR REPLY BRIEF.

9    IN THE *DUPONT* CASE, THE SUPREME COURT SAID:

10    "THE POWER THAT, LET US SAY, AUTOMOBILE OR SOFT

11    DRINK MANUFACTURERS HAVE OVER THEIR TRADEMARK

12    PRODUCTS IS NOT THE POWER THAT MAKES AN ILLEGAL

13    MONOPOLY."

14    IN THE *ORACLE* CASE JUDGE WALKER SAID:

15    "JUDICIAL REJECTION OF MARKETS NARROWLY DEFINED

16    TO A SINGLE MANUFACTURER'S PRODUCT HAS BEEN EVEN MORE

17    PRONOUNCED THAN JUDICIAL SKEPTICISM ABOUT NARROWLY

18    DEFINED SUBMARKETS."

19    FINALLY, COUNSEL AGAIN MENTIONED THE SSNIP, SMALL

20    BUT SIGNIFICANT NON-TRANSITORY INCREASE IN PRICE, BUT HE DID

21    NOT TALK ABOUT THE PRICE OF THE OPERATING SYSTEMS.  THE

22    ALLEGATIONS IN THE COMPLAINT TO WHICH HE REFERRED THE COURT

23    TALK ABOUT THE PRICE OF THE COMPUTERS.  THAT DOES NOT HELP

24    ESTABLISH A SEPARATE SINGLE BRAND MARKET FOR THE OPERATING

25    SYSTEMS.

1          THAT'S ALL I HAVE, YOUR HONOR.

2          **THE COURT:**  ALL RIGHT.  WE NEED TO ADDRESS THE --

3    BECAUSE, REGARDLESS OF THE OUTCOME OF THIS MOTION, WE HAVE THE

4    OTHER COMPLAINT.  WE HAVE A CMC TODAY, RIGHT?

5          **MR. GILLILAND:**  YES, YOUR HONOR.  THAT'S CORRECT.

6          **THE COURT:**  ALL RIGHT.  I'VE READ YOUR STATEMENT.

7    LET'S TALK ABOUT DATES AND SO FORTH.  I WANT TO MAKE SURE THAT

8    EVERYONE KNOWS THAT MEGAN CHUNG WHO IS COUNSEL ON THIS SIDE WAS

9    MY LAW CLERK ABOUT FOUR YEARS AGO, FIVE YEARS AGO, SOMEWHERE IN

10   THERE.  I DON'T REGARD THAT AS ANY KIND OF A DISQUALIFICATION

11   ISSUE, BUT I WANT TO MAKE SURE YOU ARE AWARE OF THAT.

12          ARE YOU AWARE OF THAT ON YOUR SIDE?

13          **MR. SPRINGER:**  WE BECAME AWARE OF THIS ISSUE

14   YESTERDAY, YOUR HONOR, AND WE ARE AT THIS POINT STILL THINKING

15   ABOUT HOW WE WANT TO ADDRESS THAT ISSUE.

16          **THE COURT:**  WELL, WHAT'S THE PROBLEM?

17          **MR. SPRINGER:**  WHILE WE HAVE NO DOUBT THAT YOUR

18   HONOR WOULD HAVE NO BIAS ONE WAY OR THE OTHER, WE ARE NOT

19   SUGGESTING THAT IN ANY WAY, BASED ON THE GENERAL EXPERIENCE

20   THAT ANY LAW CLERK WOULD HAVE FOR ANY JUDGE, AND WE HAVE NO

21   REASON TO BELIEVE MS. CHUNG'S EXPERIENCE WAS DIFFERENT, AND IF

22   IT WAS, PLEASE FEEL FREE TO CORRECT ME, THAT SHE HAD SPECIAL

23   INSIGHT INTO THE DELIBERATION PROCESS, THE WAY YOUR POTENTIAL

24   THINKING WORKED WITH RESPECT TO HOW YOU LOOK AT VARIOUS

25   DIFFERENT ISSUES.

1       MS. CHUNG'S BIOGRAPHY ON THE TOWNSEND WEBSITE THAT

2  SHE WAS RESPONSIBLE FOR, QUOTE, "ALL OF THE PATENT, TRADEMARK

3  AND COPYRIGHT CASES" THAT WERE BEFORE YOUR BENCH.

4       WHILE OUR COUNTERCLAIM IS OBVIOUSLY AN ANTITRUST

5  ISSUE, APPLE'S CLAIMS RELATE SPECIFICALLY TO INTELLECTUAL

6  PROPERTY, NAMELY COPYRIGHT AND TRADEMARK.  SO, IN THAT SENSE,

7  MS. CHUNG MAY HAVE EFFECTIVELY WHAT IS INSIDE INFORMATION INTO

8  HOW YOUR HONOR'S MIND MIGHT WORK WITH RESPECT TO COMING TO A

9  CONCLUSION ON CERTAIN ISSUES.

10      **THE COURT:**  WELL, DO YOU -- ARE YOU SAYING THAT A

11  LAW CLERK CAN NEVER APPEAR BEFORE THE JUDGE THAT THEY WORKED

12  FOR?

13      **MR. SPRINGER:**  PERSONALLY, FOR MYSELF, YOUR HONOR, I

14  WOULD ASK -- I WOULD NEVER -- I'VE APPEARED BEFORE A JUDGE -- I

15  CLERKED FOR THE SUPERIOR COURT IN SANTA CLARA COUNTY, AND I

16  WOULD NEVER ASK A JUDGE BEFORE ME TO HEAR A CASE IN WHICH I WAS

17  INVOLVED.  THAT IS ME PERSONALLY.  AGAIN, I'M NOT SUGGESTING

18  YOUR HONOR WOULD HAVE ANY SORT OF BIAS ONE WAY OR ANOTHER, BUT

19  WE ARE DISCUSSING THE ISSUE OF MRS. CHUNG'S INVOLVEMENT IN THIS

20  CASE.

21      **THE COURT:**  HOW LONG DO YOU NEED TO MAKE UP YOUR

22  MIND ON THIS?

23      **MR. SPRINGER:**  WE CAN PROBABLY RESOLVE THIS IN THE

24  NEXT 24 HOURS, YOUR HONOR.

25      **THE COURT:**  ALL RIGHT.  WELL, IF YOU ARE GOING TO

1  MAKE A MOTION ON THIS, I'LL GIVE YOU UNTIL MONDAY AT NOON TO

2  MAKE ANY MOTION FOR RECUSAL, AND IF THAT IS MADE, THEN I WILL

3  HOLD UP ANY RULING ON THIS CASE, PENDING THE OUTCOME OF -- BUT

4  YOU SHOULD -- I WILL SAY I DON'T THINK IT'S A BASIS FOR

5  DISQUALIFICATION, AT LEAST IN TERMS OF HOW I FEEL IT WOULD HAVE

6  ANY EFFECT, BUT -- AND I KNOW WHAT THE NORMAL PRACTICE IS.  THE

7  NORMAL PRACTICE IS THAT A JUDGE, AT LEAST IN THIS DISTRICT, I

8  THINK COUNTRYWIDE, ROUTINELY HEAR CASES IN WHICH ONE OF THEIR

9  FORMER LAW CLERKS IS A PARTY -- OR COUNSEL, I MEAN.  BUT YOU

10 MIGHT FIND SOME CASE LAW I DON'T KNOW ABOUT.  IF IT IS A LEGAL

11 BASIS FOR DISQUALIFICATION, THEN, OF COURSE, I WILL HONOR THAT.

12         **MR. SPRINGER:**  AGAIN, WE HAVE NO DISAGREEMENT OR

13 WITH YOUR HONOR PRESIDING OVER THIS CASE.  AND, AGAIN, WE FOUND

14 ABOUT THIS LATE YESTERDAY.  IT DOES COME BACK TO AN ISSUE,

15 HOWEVER, THAT A GOOD 15, 20 YEARS AGO, WE DID -- OUR FIRM DID

16 PATENT WORK FOR APPLE, AND WE WERE REQUIRED TO MAKE CERTAIN

17 REPRESENTATIONS CONCERNING THAT INFORMATION, AND OTHER

18 ATTORNEYS AT OUR FIRM WHO, I GUESS, WORKED FOR APPLE MANY, MANY

19 YEARS AGO, IN THAT SAME TIMEFRAME WERE ALSO ASKED TO BE

20 DISQUALIFIED AND WALLED OFF FROM ANY INVOLVEMENT IN THE CASE.

21         **THE COURT:**  BUT LAWYERS ARE ONE THING.  THAT'S

22 BECAUSE OF CONFIDENTIAL INFORMATION AND DUTIES OF LOYALTY THAT

23 YOU HAD TO APPLE, I GUESS.

24         **MR. SPRINGER:**  ABSOLUTELY.

25         **THE COURT:**  BUT THERE'S NO WAY THAT MS. CHUNG EVER

1  WORKED ON THIS CASE, BECAUSE THIS CASE IS BRAND NEW, AND SHE

2  WAS HERE FOUR OR FIVE YEARS AGO.

3         **MR. SPRINGER:**  AS I SAID, YOUR HONOR --

4         **THE COURT:**  SO THIS CASE -- NO ONE WAS EVEN THINKING

5  ABOUT THIS CASE FOUR OR FIVE YEARS AGO.

6         **MR. SPRINGER:**  ABSOLUTELY, YOUR HONOR.  WE CAN

7  PROBABLY RESOLVE THIS.

8         **THE COURT:**  YOU THINK ABOUT IT.  BY MONDAY YOU

9  DECIDE IF YOU ARE GOING TO FILE THAT AT NOON.

10         ALL RIGHT.  NOW, ON THE ASSUMPTION THAT I'M GOING TO

11 STAY ON THIS CASE, LET ME GIVE YOU YOUR SCHEDULE.  IT'S GOING

12 TO BE PRETTY CLOSE TO WHAT YOU ASKED FOR, BUT IT WILL BE

13 SLIGHTLY DIFFERENT.  YOU SHOULD HAVE ALREADY MADE YOUR INITIAL

14 DISCLOSURES.  I'M NOT GOING TO GIVE YOU UNTIL NOVEMBER 30.  YOU

15 SHOULD HAVE ALREADY DONE THEM.  BUT I'LL GIVE YOU UNTIL

16 NOVEMBER 14TH TO MAKE YOUR INITIAL DISCLOSURES.  YOU SHOULD NOT

17 HAVE TAKEN IT UPON YOURSELF TO PRESUME YOU COULD JUST BLOW OFF

18 THE DEADLINES.

19         EXPLAIN TO ME WHY YOU DID THAT.

20         **MR. GILLILAND:**  YOUR HONOR, THE REASON THAT WE

21 DISCUSSED AMONG OURSELVES POSTPONING UNTIL THE END OF THE MONTH

22 WAS BECAUSE WE THOUGHT THERE MIGHT BE GUIDANCE AS TO WHETHER

23 THERE WERE OR WERE NOT ANTITRUST ISSUES IN THE CASE.

24         **THE COURT:**  YOU HAVE YOUR OWN CASE.

25         **MR. GILLILAND:**  YES.

1          **THE COURT:**  IS THAT GOING TO EVAPORATE EVEN IF THE

2   ANTITRUST GOES AWAY?

3          **MR. GILLILAND:**  ABSOLUTE NOT.

4          **THE COURT:**  YOU STILL HAVE YOUR OWN ISSUES, AND YOU

5   STILL HAVEN'T DISCLOSED.

6          **MR. GILLILAND:**  WE DO HAVE THE AFFIRMATIVE CASE,

7   YES, YOUR HONOR.

8          **THE COURT:**  WELL, NOVEMBER 14TH.

9          **MR. GILLILAND:**  WE WILL DO THAT.

10          **THE COURT:**  HAVE YOU HEARD THE IRON CURTAIN SPEECH?

11          **MR. GILLILAND:**  NO, SIR.

12          **MR. SPRINGER:**  NO, SIR.  I HAVE A FEELING WE'RE

13   ABOUT TO.

14          **THE COURT:**  YES.

15          WHAT DOES RULE 37(C) SAY?

16          **MR. SPRINGER:**  I WILL BE ON HONEST THAT I CAN'T TELL

17   YOU WHAT RULE 37(C) SAYS OFF THE TOP OF MY OF HEAD.

18          **THE COURT:**  I'LL TELL YOU WHAT IT SAYS.  I DIDN'T

19   MAKE THIS UP.  ARE THERE LAW STUDENTS HERE?  WHAT DOES

20   RULE 37(C) SAY?  SEE, THEY DON'T KNOW.  NOBODY KNOWS.  BUT LET

21   ME TELL YOU WHAT IT SAYS.

22          IT SAYS IF YOU DON'T DISCLOSE IT UNDER RULE 26 AND

23   YOU ARE REQUIRED TO, THEN YOU MAY NOT USE THAT ITEM OR USE THAT

24   WITNESS FOR MOTION, FOR TRIAL, FOR ANYTHING, PERIOD, UNLESS ONE

25   OF TWO THINGS IS SHOWN.  ONE, THAT IT WAS HARMLESS, AND, TWO --

1  OR, TWO, THIS IS OR, THAT THERE WAS A SUBSTANTIAL JUSTIFICATION

2  FOR A LATE DISCLOSURE.

3          NOW, AN EXAMPLE OF A LATE DISCLOSURE THAT'S

4  JUSTIFIED.  LET'S SAY HALFWAY THROUGH THE DISCOVERY PERIOD YOU

5  GET AN INTERROGATORY ANSWER FROM THE OTHER SIDE, AND, FOR THE

6  FIRST TIME IT PUTS YOU ON FAIR NOTICE OF SOME NEW ISSUE IN THE

7  CASE.  NO PROBLEM.  THEN YOU HAVE A REASONABLE PERIOD OF TIME

8  IN WHICH TO UPDATE YOUR DISCLOSURES TO SAY, TO MEET THIS NEW

9  ISSUE, HERE'S SOME ADDITIONAL DISCLOSURES.  THAT'S PERFECTLY

10 OKAY.  AN EXAMPLE OF HARMLESS.

11         LET'S SAY THAT ON NOVEMBER 15TH, WHICH IS ONE DAY

12 AFTER THIS CUTOFF, YOU MAKE A ONE-DAY LATE DISCLOSURE.

13 PROBABLY HARMLESS.  I'LL SAY "PROBABLY," BECAUSE AS SOON AS I

14 SAY ONE DAY IS OKAY, YOU START THINKING THAT ONE MONTH IS OKAY.

15 WRONG.

16         AS SOON AS DISCOVERY STARTS, AND PREJUDICE STARTS TO

17 SET IN, AND DEPOSITIONS START TO BE TAKEN, AND OTHER THINGS

18 CONTINUE, THE DAY COMES WHEN THERE'S TOO MUCH RELIANCE AND

19 PREJUDICE.  SO I DON'T KNOW WHERE THE CUTOFF IS.  IT DEPENDS ON

20 THE FACTS AND CIRCUMSTANCES.

21         WHAT I DO KNOW IS THIS, I DID WHAT YOU ARE DOING FOR

22 25 YEARS.  FOR ALMOST THE -- FOR THE ENTIRE TIME THIS WAS WHAT

23 WOULD HAPPEN:  I'D BE ABOUT TO TAKE A DEPOSITION, HALFWAY

24 THROUGH THE DISCOVERY PERIOD, AND THEN THE OTHER SIDE WOULD

25 DROP IN FRONT OF ME A STACK OF DOCUMENTS ANYWHERE FROM ONE TO

1  TWO INCHES AND SAY, HERE'S SOME ADDITIONAL DOCUMENTS; WE KNOW

2  YOU ALREADY HAVE ALL OF THESE, BUT WE FOUND THEM IN A DIFFERENT

3  FILE; THESE ARE JUST DUPLICATES; HERE YOU ARE; WE WANT TO MAKE

4  SURE WE ARE GOING TO LEAN OVER BACKWARDS.  I'D NEVER SEEN ANY

5  OF THEM.  NO ONE HAD PRODUCED THEM IN ANY FORM.  IT WAS ALWAYS

6  THE SAME SPEECH AND ALWAYS THE SAME RESULT.  IF I HAD HAD THOSE

7  IN THE EARLIER DEPOSITION, IT WOULD HAVE BEEN VERY USEFUL.

8         NOW, THAT PROBABLY STILL GOES ON BUT NOT AS MUCH IN

9  MY COURTROOM BECAUSE I MAKE THE IRON CURTAIN SPEECH.  THE IRON

10  CURTAIN SPEECH IS THIS:  ON NOVEMBER 15TH, WHICH IS ONE DAY

11  AFTER NOVEMBER 14TH, THE IRON CURTAIN COMES DOWN.  AND IF YOU

12  DISCLOSE SOMETHING ONE DAY LATE, THE BURDEN WILL BE ON YOU TO

13  SHOW IT'S HARMLESS OR THAT THERE IS A SUBSTANTIAL

14  JUSTIFICATION.  AND IF YOU DON'T, YOU CAN'T USE IT.

15         **MR. SPRINGER:**  UNDERSTOOD, YOUR HONOR.

16         **THE COURT:**  NOW, THE REASON I GIVE THIS SPEECH IS

17  WHEN I WAS FIRST ON THIS JOB AND WE WERE TRYING CASES, I HAD TO

18  EXCLUDE EVIDENCE UNDER RULE 37(C), BECAUSE, YOU SEE, THE

19  LAWYERS ALWAYS SAY, OH, HE'S A STICKLER, BUT ONE SIDE OR THE

20  OTHER ALWAYS STANDS UP AND SAYS, EXCLUDE IT.

21         IF YOU BOTH WANT TO AGREE -- IF YOU WERE TO AGREE

22  THIS WILL BE TRIAL BY AMBUSH AND THE RULES DON'T COUNT, I WILL

23  BE VERY GRATEFUL TO YOU BECAUSE I WOULDN'T HAVE TO ENFORCE A

24  THING.  I COULD NEVER GET TWO PEOPLE TO AGREE TO THAT, SO I

25  HAVE TO ENFORCE THE RULES AS THEY ARE, UNLESS YOU AGREE TO

1　RELAX THEM IN WRITING.

2　　　　BUT SINCE I HAVE BEEN GIVING THIS SPEECH, WHICH IS

3　NOW ABOUT SEVEN OR EIGHT YEARS, I HAVE NOTICED THAT THE LAWYERS

4　DO A PRETTY GOOD JOB ON THEIR DISCLOSURES, AND I DON'T HAVE TO

5　EXCLUDE VERY MANY ITEMS ANYMORE.  BUT I WILL HAVE NO PANGS OF

6　CONSCIENCE WITH YOU WALKING THROUGH THOSE DOORS WITH YOUR ARM

7　AROUND THE CLIENT EXPLAINING WHY THE BEST PIECE OF EVIDENCE

8　CANNOT COME INTO EVIDENCE ON ACCOUNT OF YOUR FAILURE TO

9　DISCLOSE IT.

10　　　　SO, THAT'S THE IRON CURTAIN SPEECH.  IT'S A BAD NAME

11　BECAUSE IT MAKES IT SOUND LIKE I'M A COMMUNIST, BUT I'M NOT.

12　IT'S JUST A GOOD ANALOGY.

13　　　　**MR. GILLILAND:**  OR PITTSBURGH STEELERS FAN.

14　　　　**THE COURT:**  NOW, WHO KNOWS WHERE THE TERM "IRON

15　CURTAIN" COMES FROM?

16　　　　**MR. SPRINGER:**  I BELIEVE IT WAS A SPEECH BY WINSTON

17　CHURCHILL, WAS IT NOT?

18　　　　**THE COURT:**  YES.  VERY GOOD.

19　　　　**MR. SPRINGER:**  HISTORY DEGREE WORKS FOR SOMETHING.

20　　　　**THE COURT:**  WHERE WAS THAT SPEECH GIVEN?

21　　　　**MR. SPRINGER:**  I BELIEVE -- I DO BELIEVE IT WAS AN

22　AMERICAN UNIVERSITY, WAS IT NOT?

23　　　　**THE COURT:**  YES, IT WAS.

24　　　　**MR. SPRINGER:**  AND I BELIEVE IT WAS --

25　　　　**THE COURT:**  THIS IS LIKE CASH CAB.  YOU CONTINUE ON,

1  YOU GET UP TO $300.

2          WHAT WAS THE UNIVERSITY?  WHAT STATE WAS IT IN?

3          **MR. SPRINGER:**  I BELIEVE IT WAS JOHN F. KENNEDY

4  SCHOOL OF --

5          **THE COURT:**  NO.

6          **MR. SPRINGER:**  ACTUALLY, I TAKE THAT BACK.

7          **THE COURT:**  JOHN F. KENNEDY SCHOOL DIDN'T EXIST

8  THEN.  HE WASN'T PRESIDENT YET.

9          **MR. SPRINGER:**  IT WAS -- I WANT TO SAY GEORGE

10  WASHINGTON, BUT I THINK THAT'S WRONG.

11          **THE COURT:**  IT WAS IN MISSOURI, AND I BLANKED ON THE

12  NAME OF THE COLLEGE.  IT'S A TINY LITTLE COLLEGE IN MISSOURI.

13  I KNEW IT WAS 1946.

14          ONE LAWYER ASKED ME ONE DAY, WAS I THERE?  I SAID,

15  HOW OLD DO YOU THINK I AM?  I WAS ONLY ONE YEAR OLD.

16          ALL RIGHT.  SO NOW I MADE MY SPEECH.  YOU ALL TAKE

17  IT TO HEART AND DO THE RIGHT THING.

18          OKAY.  NEXT DATE IS GOING TO BE LEAVE TO ADD ANY NEW

19  PARTIES OR PLEADING AMENDMENTS, MUST BE SOUGHT BY NOVEMBER 30.

20  FACT DISCOVERY CUTOFF WILL BE JUNE 26.  THAT'S THE DATE YOU

21  WANTED.

22          I'M GOING TO REVISE SLIGHTLY YOUR OTHER DATE.  THE

23  EXPERT REPORTS ARE DUE ALSO ON JUNE 26TH, BUT THERE'S A

24  SEQUENCING OF THEM SO THAT THE REBUTTAL REPORTS AND SO FORTH

25  COME AFTER THAT.

1        LAST DATE TO FILE FOR SUMMARY JUDGMENT IS GOING TO

2   HAVE TO BE -- YOU WANT IT ON SEPTEMBER 24.  I HAVE TO WORK

3   BACKWARDS FROM THE WAY YOU DID IT.  LET'S SEE.  AUGUST 20 IS

4   WHEN YOU HAVE TO FILE YOUR MOTIONS.

5        FINAL PRETRIAL CONFERENCE -- YOU WANT A TRIAL ON

6   NOVEMBER 9.  THAT'S FINE.  FINAL PRETRIAL WILL BE OCTOBER 26,

7   WHICH IS WHAT YOU WANTED.

8        IS THIS A JURY CASE?

9        **MR. GILLILAND:**  YES, YOUR HONOR.

10       **MR. SPRINGER:**  YES, YOUR HONOR.

11       **THE COURT:**  GREAT.  JURY CASE.

12       AND ON ADR, WHAT DID YOU ASK ME TO DO?

13       **MR. GILLILAND:**  WE'VE AGREED TO GO TO JAMS SOMETIME

14  BEFORE THE END OF JANUARY.

15       **THE COURT:**  YOU MEAN COMPLETE THE MEDIATION BY THE

16  END OF JANUARY?

17       **MR. GILLILAND:**  YES, SIR.

18       **THE COURT:**  ALL RIGHT.

19       **MR. SPRINGER:**  WE'VE AGREED ON A --

20       **THE COURT:**  I'LL PUT DOWN JAMS MEDIATION.  HAVE YOU

21  GOT SOMEBODY LINED UP ALREADY?

22       **MR. GILLILAND:**  WE HAVE GOTTEN OURSELVES ON JUDGE

23  WEINSTEIN'S CALENDAR.

24       **THE COURT:**  JAMS MEDIATION WILL BE COMPLETED BY

25  JANUARY 31.  ALL RIGHT.  THAT'S FINE WITH ME.  2009.  ANY OTHER

1 ISSUES YOU WANT ME TO DISCUSS OR TALK ABOUT TODAY?

2          **MR. GILLILAND:**  NO, SIR.

3          **MR. SPRINGER:**  I THINK THAT'S ALL.

4          **THE COURT:**  ALL RIGHT.  I WILL GET THIS CASE

5 MANAGEMENT ORDER OUT.

6          NOW, I WILL BE YOUR DISCOVERY REFEREE.  PLEASE READ

7 THOSE GUIDELINES.  DID YOU READ MY GUIDELINES ABOUT DISCOVERY?

8          **MR. GILLILAND:**  YES, WE HAVE.

9          **MR. SPRINGER:**  YES, SIR.

10          **THE COURT:**  ARE YOU LAWYERS GOING TO BEHAVE IN THIS

11 CASE?

12          **MR. GILLILAND:**  WE HAVE HAD A GREAT WORKING

13 RELATIONSHIP SO FAR, YOUR HONOR.  I DON'T ANTICIPATE ANY

14 PROBLEMS.

15          **THE COURT:**  YOU HAVEN'T DISCLOSED ANYTHING YET.

16          **MR. GILLILAND:**  THAT'S WHY IT'S SO PERFECT.

17          **MR. SPRINGER:**  WE DON'T WANT TO RUIN IT.

18          **THE COURT:**  ALL RIGHT.  WELL, THEN IF YOU DO HAVE A

19 DISPUTE, PLEASE READ THOSE GUIDELINES AND SEND IN A SHORT

20 THREE-PAGE LETTER.  I USUALLY GET IT RESOLVED VERY QUICKLY, AND

21 THEN I WORK HARD TO KEEP YOU ON TRACK.  I WILL WORK VERY HARD

22 ON THIS SCHEDULE.  I GET THE ORDERS OUT REASONABLY QUICK, BUT

23 THAT MEANS YOU'VE GOT TO WORK HARD, TOO.  I'M GIVING YOU MORE

24 OR LESS THE SCHEDULE THAT YOU WANT.

25          **MR. GILLILAND:**  YES, YOU DID.

1        **THE COURT:**  SO PLEASE STICK TO IT AND BE READY AND

2   DON'T ASK FOR ANY CONTINUANCES UNLESS THERE'S A VERY GOOD

3   REASON.  TRYING TO SETTLE THE CASE IS NEVER A GOOD REASON.  IF

4   THAT WERE ENOUGH, NO CASE WOULD EVER GO ANYWHERE.  SO YOU HAVE

5   TO DO TWO TRACKS; SETTLEMENT, LITIGATION.  WORK HARD ON BOTH OF

6   THEM.

7        BE READY TO GO TO TRIAL WHEN THE DAY COMES, BECAUSE

8   ALMOST ALWAYS I GET THE CASES TO TRIAL.  I THINK I'VE ONLY HAD

9   TO TRAIL THREE CASES IN NINE AND A HALF YEARS.  SO IT USUALLY

10  WORKS OUT THAT YOU WILL BE IN TRIAL ON THIS CASE ON NOVEMBER 9

11  OF NEXT YEAR UNLESS YOU SETTLE YOUR CASE.

12       **MR. GILLILAND:**  WE'LL BE READY, YOUR HONOR.

13       **THE COURT:**  ALL RIGHT.  YOU ALL MAYBE -- I'M JUST

14  GOING TO WAIT AND SEE ON WHAT YOU DO ON MONDAY AT NOON, AND IF

15  YOU DON'T, THEN I CAN'T PROMISE YOU I'LL HAVE AN ORDER NEXT

16  WEEK, BUT CERTAINLY THE FOLLOWING WEEK I WOULD HAVE AN ORDER ON

17  YOUR MOTION TO DISMISS.

18       OKAY.  THANK YOU, COUNSEL.

19       **MR. GILLILAND:**  THANK YOU FOR YOUR TIME, YOUR HONOR.

20       **THE COURT:**  YOU'RE MOST WELCOME.

21       (PROCEEDINGS ADJOURNED.)

22

23

24

25

1

2

3                    **<u>CERTIFICATE OF REPORTER</u>**

4          I, JOAN MARIE COLUMBINI, OFFICIAL REPORTER FOR THE

5    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

6    CERTIFY THAT THE FOREGOING PROCEEDINGS IN C 08-03251 WHA, APPLE

7    INC. V.PSYSTAR CORPORATION, WERE REPORTED BY ME, A CERTIFIED

8    SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY

9    DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL,

10   COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT

11   THE TIME OF FILING.

12          THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID

13   TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE

14   COURT FILE.

15

16                    S/ JOAN MARIE COLUMBINI

17              JOAN MARIE COLUMBINI, CSR 5435, RPR

18                 THURSDAY, NOVEMBER 13, 2008

19

20

21

22

23

24

25