United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

APPLE INC., a California corporation,

    Plaintiff,

  v.

PSYSTAR CORPORATION, a Florida corporation,

    Defendant.

No. C 08-03251 WHA

**ORDER GRANTING MOTION TO DISMISS COUNTERCLAIMS**

## INTRODUCTION

Plaintiff Apple Inc. brought this lawsuit against defendant Psystar Corporation asserting copyright and trademark violations related to Psystar's alleged use of Apple's operating system. Psystar filed counterclaims against Apple alleging violations of federal and state antitrust laws. Apple moved to dismiss Psystar's antitrust counterclaims. For the reasons stated below, Apple's motion to dismiss the counterclaims is **GRANTED**.

## STATEMENT

Apple Inc. manufacturers and markets the Macintosh Computer and the OS X Operating System ("Mac OS"). Operating systems like Mac OS control and direct the interaction between software applications such as word processors and internet browsers, and the central processing unit and the various hardware in a computer. Apple is the exclusive manufacturer and master licensor of Mac OS (Countercl. ¶ 14, 18, 21).

Psystar manufacturers and distributes a tailored line of computers called Open Computers. Psystar's Open Computers support a wide range of operating systems including Mac OS, Microsoft Windows XP and XP 64-bit, Windows Vista and Vista 64-bit and Linux 32 and 64-bit kernels. Psystar allows its customers to choose the operating system on the computers they purchase (Countercl. ¶ 15).

Numerous companies manufacturer entire computer hardware systems, including (but not limited to) Dell, Acer, Lenovo, Sony and Hewlett-Packard. In addition, numerous companies manufacture and sell components — such as hard drives, processors and graphics processing cards — used by those computer manufacturers (Countercl. ¶ 22–25).

The counterclaim, however, identifies no companies other than Apple and Psystar that currently sell computers compatible with Mac OS. Apple manufacturers an exclusive line of hardware systems that support Mac OS, including the Mac Pro, the Mac Mini, the MacBook the MacBook Air, the MacBook Pro, and the iMac. The counterclaim alleges that, by virtue of Apple's End User License Agreement and other anti-competitive conduct, consumers wishing to use Mac OS have no alternative to the Apple-label computer hardware systems. The counterclaim alleges that there is no compelling technological reason why other manufacturers could not produce computer hardware systems capable of hosting, executing and running MAC OS, and that, but for the exclusionary conduct of Apple, such third parties could and would assemble hardware components capable of running Mac OS (Countercl. ¶¶ 25–28).

The counterclaim avers that there exist two relevant markets. The first alleged market consists of one product: Mac OS. The complaint asserts that Apple's Mac OS is not reasonably interchangeable with other operating systems such as Microsoft Windows and therefore comprises its own market. The second alleged market consists of computer hardware systems capable of executing Mac OS. The counterclaim avers that, through its anti-competitive conduct, Apple's exclusive line of computer hardware systems dominate the market for Mac OS-capable computer hardware systems (Countercl. ¶ 17).

Psystar offers several (related) allegations in support of its claim that Mac OS constitutes an independent market. *First*, Psystar alleges that Apple has undertaken extensive

advertising campaigns — including the "think different" campaign and the "get a Mac" campaign — to define the Mac OS as a product separate and distinct from other operating systems, and that through those efforts customers and merchants have come to recognize Mac OS as a separate and distinct market (Compl. ¶¶ 30–35). *Second*, the counterclaim avers that, across the spectrum of the Apple-label computer line, Apple computers with traditional computer components are significantly more expensive than similarly configured computers with comparable (or superior) hardware sold by other computer companies utilizing operating systems other than Mac OS, such as Windows. The counterclaim further asserts that "[n]otwithstanding the consistent upward differentiation in price across a broad spectrum . . . Apple is known for its 'market performance and brand leadership' . . . [and] is 'well known for its passionate and dedicated consumer base.'" Psystar avers that Apple "has made a conscious and successful effort to create inelasticity of demand through product differentiation in its Mac OS," and that there in fact exists an "insufficient" cross-elasticity of demand. Psystar alleges that Apple's customers would not consider any other operating system to be a reasonably interchangeable alternative (Countercl. ¶¶ 36–43). *Third*, the counterclaim alleges that a "small but significant non-transitory increase in price" ("SSNIP") would not result in a change in demand for Mac OS (Countercl. ¶ 44).

Psystar claims that Apple has utilized its monopoly power in the alleged "Mac OS market" — in which Apple is, by definition, the only participant — in order to dominate the market for Mac OS-capable computer hardware systems. Psystar alleges that Apple has engaged in various forms of anti-competitive conduct in order to "protect its valuable monopoly in the Mac OS market and, by extension, Apple-Labeled Computer Hardware Systems from potential threats." The counterclaim asserts that the following actions constitute the illegal tying of Mac OS to Apple-labeled computer systems, monopoly maintenance or other unlawful behavior (Countercl. ¶¶ 47, 63–64, 67, 72–73).

*First*, Psystar avers that Apple's End User License Agreement for the Mac OS specifically prohibits customers from installing the operating system on non-Apple computers. The license agreement states (Countercl. ¶ 61):

3

> 2. Permitted License Uses and Restrictions.
>
> A. <u>Single Use</u>. This license allows you to install, use and run (1) copy of the Apple Software on a single Apple-labeled computer at a time. You agree not to install, use or run the Apple Software on any non-Apple-Labeled computer or enable another to do so.

Customers, therefore, are contractually precluded from utilizing Mac OS on any computer hardware system that is not an Apple-labeled computer system (Countercl. ¶¶ 61–62, 65–66).

*Second*, Psystar avers that Apple has erected technical barriers that prevent Mac OS from operating on non-Apple computers. Apple, the counterclaim alleges, intentionally embeds code in Mac OS that causes the operating system to recognize any computer hardware system that is not an Apple computer. If Mac OS recognizes a non-Apple computer, Mac OS will not operate properly. The Mac OS will enter "kernel panic," meaning that the operating system believes that it has detected an internal and fatal error from which it can not recover, and discontinues operation. This renders the computer non-functional (Countercl. ¶¶ 58–59).

*Finally*, Psystar asserts that Apple had experimented with licensing its system software to other computer makers but has since abandoned the practice. In 1995, Apple launched a "Clone Program" under which it licensed Macintosh ROMs and system software to other computer makers, but Apple ended the program in 1997. Apple also purchased a computer hardware manufacturer capable of running Mac OS. Apple has since announced that it will not allow the use of Mac OS on anything other than an Apple computer (Compl. ¶¶ 49–57).

Psystar alleges that this conduct has caused harmful and anti-competitive effects in the marketplace (Compl. ¶¶ 68–77). Psystar asserts six claims for relief: (1) unlawful tying in violation of Section 1 of the Sherman Act, 15 U.S.C. 1; (2) monopoly maintenance in violation of Section 2 of the Sherman Act; (3) exclusive dealing in violation of Section 3 of the Clayton Act, 15 U.S.C. 14; (4) violations of California's Cartwright Act, Cal. Bus. & Prof. Code § 16700; (5) violations of California's unfair competition law, Cal. Bus. & Prof. Code § 17200,

4

and (6) violations of the common law of unfair competition. Apple moved to dismiss all claims.[1]

**ANALYSIS**

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. "All allegations of material fact are taken as true and construed in the light most favorable to plaintiff. However, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996). The Supreme Court recently clarified the pleading standard for Sherman Act Section 1 claims. *Bell Atlantic Corp. v. Twombly*, ___ U.S. ____, 127 S.Ct. 1955, 1964–65 (May 21, 2007). It reiterated that under Rule 8(a)(2), only a short and plain statement of the plaintiff's entitlement to relief is necessary. *Twombly*, 127 S.Ct. at 1964. It also acknowledged, however, that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 1964-1965 (citing *Papasan v. Allain*, 478 U.S. 265, 286, [] (1986)). The decision explained,

> stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.

*Id*. at 1965. *Twombly* did not require that pleadings prove the asserted claims or establish a probable violation, but it did require that pleadings set forth factual allegations sufficient to establish *plausible* grounds for an entitlement to relief.

**1. FEDERAL CLAIMS.**

Psystar asserted claims under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. Apple contends (1) that the relevant markets alleged in the counterclaim are neither legally nor factually plausible, and (2) that the antitrust laws do not require Apple to help its competitors compete by forcing it to enter unwanted licensing agreements with them.

---

[1] Apple requests that the Court take judicial notice of several documents. For the reasons that follow, this order resolves Apple's motion without recourse to those documents. The request is therefore moot.

5

### A. Market definition: Alleged "Mac OS" market.

As stated, Psystar asserted three federal claims: a tying claim under Section 1 of the Sherman Act, a monopoly-maintenance claim under Section 2 of the Sherman act, and an exclusive-dealing claim under Section 3 of the Clayton Act.[2] Each of these claims requires plaintiff to establish market power in a "relevant market." *See Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 42–43 (2006) (tying). *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (monopolization); *Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1169 (9th Cir. 1997) (exclusive dealing). The relevant-market inquiry does not differ for the three claims in any material respect. *See Newcal Industries, Inc. v. Ikon Office Solutions*, 513 F.3d 1038, 1044 n.3 (9th Cir. 2008) (standards the same under Sections 1 and 2); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 23 n.39 (1984) (standards the same under Sherman Act Section 1 and Clayton Act Section 3). "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Tanaka v. University of Southern California*, 252 F.3d 1059, 1063 (9th Cir. 2001) (citation omitted).

The parties dispute whether Psystar may rely on a relevant market comprised of a single brand of a product — a market consisting only of Apple's Mac OS but excluding other operating systems such as Microsoft's Windows. Apple asserts that the relevant markets alleged in the counterclaim are neither legally nor factually plausible. Psystar responds that market definition is normally a factual question, not to be decided at the pleading stage, and that single-brand markets are permissible.

The definition of an antitrust "relevant market" is typically a factual rather than a legal inquiry, but certain legal principles govern the definition. *Newcal Industries, Inc.*, 513 F.3d at 1045. Whether products are part of the same or different markets under antitrust law depends on whether consumers view those products as reasonable substitutes for each other and would switch among them in response to changes in relative prices:

---

[2] Psystar's tying claim arises under Section 1 of the Sherman Act. It is unclear how Section 1 is applicable, as Psystar alleges only single-firm anticompetitive conduct. Apple, however, does not challenge the counterclaim on this basis. In any event, courts also allow tying theories under Section 2, at least where there is monopolization or attempted monopolization.

6

> As the Supreme Court has instructed, "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." [*Brown Shoe v. United States*, 370 U.S. 294, 325 (1962)]. As such, the relevant market must include "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir.1989).

*Newcal Industries, Inc. v. Ikon Office Solutions*, 513 F.3d 1038, 1045 (9th Cir. 2008).

Psystar relies on *Newcal Industries*. That decision, plaintiff emphasizes, stated that "the law permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue (as in *Eastman Kodak*)." *Id*. at 1048. *Newcal Industries*, however, merely held that a market may be comprised of a single brand in the situation the Supreme Court addressed in *Kodak*: a derivative aftermarket for products related to or dependent on a specific company's products. As in *Kodak*, the *Newcal Industries* plaintiffs had, the decision explained,

> allege[d] the existence of two separate but related markets in intrabrand copier equipment and service. The first market [was] an initial market for copier leases and copier service, which (as the district court correctly found) is a competitive market in which IKON has no significant market power. The second market [was] a derivative aftermarket for replacement equipment, which include[d] markets for lease "buy outs" and for "lease-end service." *As in all three of the cited cases, the relevant market here [was] not the indisputably competitive market in which the consumers first shop for the primary product. It [was] an aftermarket in which the consumers claim that they should be able to shop for a secondary product* . . . . The complaint allege[d] that suppliers go through a different economic calculus when competing for consumers of replacement equipment and lease-end service than they do when competing for consumers of initial equipment leases and service contracts.

*Id*. at 1049 (emphasis added). Plaintiff Newcal and defendant IKON were in the copier-equipment business. The two companies competed both in the primary market for equipment leases and in the aftermarket for equipment upgrades. Newcal challenged certain contracts and practices which "shield[ed] IKON customers from competition in the aftermarkets for upgrade equipment and for lease-end services." *Newcal Industries, Inc.*, 513 F.3d at 1043–44. As in *Kodak*, the decision found that these single-brand aftermarkets constituted relevant antitrust markets. *Id*. at 1050. The decision simply did not address the situation for which Psystar cites

7

it — a primary or independent market alleged to be limited, by definition, to a single brand of a product.

Neither did *Kodak*. That decision, like this case, involved claims of tying and monopolization. *Eastman Kodak Company v. Image Technical Services, Inc.*, 504 U.S. 451, 459 (1992). The Eastman Kodak Company, the decision explained, manufactured and sold photocopiers and micrographic equipment. Kodak also sold service and replacement parts for its equipment. Plaintiffs were a group of independent service organizations that serviced Kodak's equipment. Plaintiffs challenged Kodak policies that made it more difficult for them to compete with Kodak in servicing Kodak equipment, including limiting the availability of Kodak parts. Plaintiffs alleged that Kodak unlawfully tied the sale of service for Kodak machines to the sale of Kodak-compatible parts, a market in which Kodak had monopoly power. *Id*. at 454–55. Kodak parts, the decision explained, were not compatible with competitors' machines, and vice versa. *Id*. at 546–47.

A principal issue was "whether a defendant's lack of market power in the primary equipment market precludes — as a matter of law — the possibility of market power in derivative aftermarkets." *Id*. at 455. The Supreme Court held that it does not. *Id*. at 472–77. The decision explained that, in some instances, a single brand of a product can constitute a separate market: "[b]ecause service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines." *Id*. at 482. Those single-brand markets, however, were "derivative aftermarkets." *Id*. at 455. *Kodak* found that single-brand aftermarkets — markets for parts and service for Kodak equipment — arose once customers have purchased and are "locked in" to Kodak photocopiers or equipment.

Here, in contrast, Psystar alleges not a single-brand aftermarket dependent on and derivative of a specific company's primary product but instead that a single brand of primary product (Apple's operating system) constitutes an independent market. Neither *Newcal*

8

*Industries* nor *Kodak* addressed such a situation. Psystar has cited no decision lending support to its single-brand product market theory.[3]

"In general, a manufacturer's own products do not themselves comprise a relevant product market . . . . [A] company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product." *Green Country Food Market, Inc. v. Bottling Group*, 371 F.3d 1275, 1282 (10th Cir. 2004). *See also Lambtek Yoghurt Machines v. Dreyer's Grand Ice Cream, Inc.*, 1997 WL 108718 at * 3 (N.D. Cal. 1997) (unpublished). Single-brand markets are, at a minimum, extremely rare. "Even where brand loyalty is intense, courts reject the argument that a single branded product constitutes a relevant market." *Green Country Food Market*, 371 F.3d at 1282. *See also*, *e.g.*, *Hack v. President and Fellows of Yale College*, 237 F.3d 81, 86 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz*, 534 U.S. 506; *Spahr v. Leegin Creative Leather Products, Inc.*, 2008 WL 3914461 at * 9–10 (E.D. Tenn. 2008); *Little Caesar Enterprises, Inc. v. Smith*, 34 F. Supp. 2d 459, 477 and n.30 (E.D. Mich. 1998); *Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 678–79 (S.D.N.Y. 1987). Antitrust markets consisting of just a single brand, however, are not *per se* prohibited; as stated, markets are defined by the "reasonable interchangeability" of use or the cross-elasticity of demand among products. In theory, it may be possible that, in rare and unforeseen circumstances, a relevant market may consist of only one brand of a product. Psystar's factual contentions therefore must be examined under *Twombly's* pleading standards to determine if Psystar has pled such a situation. The pleadings, however, fail to allege facts plausibly supporting the counterintuitive claim that Apple's operating system is so unique that it suffers *no* actual or potential competitors.

---

[3] Psystar's only other example of a single-brand market is *Digidyne Corp. v. Data General Corp.*, 734 F.2d 1336 (9th Cir. 1984). There, Data General manufactured a computer system called NOVA, which included a copyrighted NOVA operating system called RDOS. Plaintiffs sued on various antitrust theories, alleging that the RDOS operating system constituted its own relevant market. The Ninth Circuit agreed. The decision relied on the *per se* rule in tying cases and a presumption of market power when the tying product is copyrighted or patented. *Id*. at 1339–41. It also emphasized the presence of market imperfections such switching costs and customer "lock in." *Id*. at 1342–43. That decision, however, was implicitly overruled by *Illinois Tool Works v. Independent Ink, Inc.*, 547 U.S. 28 (2006), which rejected the *per se* rule in tying cases and the presumption of market power for copyrighted or patented products. Moreover, as explained below, unlike the situation addressed in *Digidyne*, Psystar's pleadings do not suggest market imperfections such as switching costs and customer "lock in."

9

Psystar alleges that the "market economics" favor its cause and that a "small but significant non-transitory increase in price" ("SSNIP") would not result in a change in demand for Mac OS. These conclusory allegations offers no support for Psystar's claims; they merely restate a commonly used test for market definition without providing any factual basis for the claim. As stated, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S.Ct. at 1964–65. Psystar also alleges that Apple computers, with Mac OS, cost more than similarly configured computers which utilize other operating systems. The import of the allegation is not self-evident. Although the *responsiveness* of one product to the price of another is at the heart of the market definition analysis, a mere price differential alone does not necessarily signal a distinct market. It is true that "[a] price differential between two products may reflect a low cross-elasticity of demand, if the higher priced product offers additional service for which consumers are willing to pay a premium." *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995). The mere existence of a price differential, however, does not necessarily mean that a product is unconstrained by competition:

> The 'market' which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. The market is composed of products that have reasonable interchangeability for the purpose for which they are produced — *price, use and qualities considered.*

*United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 406 (1956) (emphasis added). In *duPont*, the Supreme Court concluded that cellophane was in the same market as other flexible packaging materials despite costing two or three times more, because the products were reasonably interchangeable despite the price difference. *Id.* at 401. *See also AD/SAT v. Associated Press*, 181 F.3d 216, 228 (2nd Cir. 1999); *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 840 (2nd Cir. 1980). The price-differential allegation, alone, is inconclusive and must be considered in the context of the pleading as a whole.

The pleading as a whole does not allege facts that, if true, plausibly indicate that Mac OS is an independent, single-product market. The counterclaim itself explains that Mac OS performs the same functions as other operating systems (Countercl. ¶ 21):

> Operating systems — like the Mac OS — manage the interaction between various pieces of hardware such as a monitor or printer. The operating system also manages various software applications running on a computer device.

The counterclaim further avers that "[a] seemingly infinite list of manufacturers . . . construct entire hardware systems (i.e., computers) marketed and sold to the consumer" (Countercl. ¶ 22). Psystar's business model is predicated on a degree of interchangeability between computers utilizing Mac OS and other operating systems (Countercl. ¶ 15):

> Psystar manufacturers and distributes computers tailored to customer choosing. As a part of its devotion to supporting customer choice, Psystar supports a wide range of operating systems including Microsoft Windows XP and XP 64-bit, Windows Vista and Vista 64-bit, Linux (32 and 64-bit kernels), and Mac OS. Psystar generally refers to this custom tailored line of computers as Open Computers.

The counterclaim admits that market studies indicate that, although Apple computers with Mac OS enjoy strong brand recognition and loyalty, they are not *wholly* lacking in competition (Countercl. ¶ 38):

> [n]otwithstanding the consistent upward differentiation in price across a broad spectrum . . . by and between a Computer Hardware System without a Mac OS and a Apple-Labeled Computer Hardware System with the Mac OS, studies by Satmetrix Systems found that Apple is known for its "market performance and brand leadership" and that APPLE "far outranks its closest competitor."

Psystar fails to explain why these "competitor[s]" should be excluded from the definition of the relevant market.

Psystar also points to Apple's extensive advertising campaigns. Those advertising campaigns more plausibly support an inference contrary to that asserted in the counterclaim — vigorous advertising is a sign of competition, not a lack thereof. If Mac OS simply had no reasonable substitute, Apple's vigorous advertising would be wasted money. The advertising campaigns suggest a need to enhance brand recognition and lure consumers from a competitor.

The "brand leadership" and brand loyalty Psystar alleges, if true, suggest that Apple's efforts have borne fruit.

Indeed, Psystar's allegations are internally contradictory. Psystar alleges that Mac OS is, by definition, an independent and unique market. That is, Mac OS, by definition, admits no reasonable substitutes. Psystar further avers, however, that Apple engages in the alleged anti-competitive conduct "in order to protect its valuable monopoly in the Mac OS market and, by extension, Apple-Labeled Computer Hardware Systems *from potential competitive threats*," and that Apple's "unreasonable restraints on trade allow APPLE to maintain its monopoly position with respect to the Mac OS and Apple-Labeled Computer Hardware Systems submarket" (Countercl. ¶¶ 47, 72, 73, 75) (emphasis added). Apple must be "protect[ing] its valuable monopoly in the Mac OS market" from something; anticompetitve behavior may be constrained by potential competitive threats. Psystar admits that operating systems constitute a "market"—the counterclaim asserts that "there are substantial barriers to entry in the *market for operating systems*, including the Mac OS market" (Countercl. ¶ 20; emphasis added). If this order were to accept Psystar's proposed market definition, Apple would no doubt enjoy the protections of a "barrier to entry" into the alleged market far more daunting than the listed technical, financial and logistical barriers: Psystar's own definition of the relevant market. The circular nature of Psystar's market definition becomes unavoidable: Psystar "alleges that given the prevalence of the Mac OS in the Mac OS market, customers need a computer hardware system on which to operate the Mac OS," and that Apple leverages that "prevalence" to dominate the Mac OS compatible computer hardware market (Countercl. ¶ 96).

For the above-stated reasons, this order concludes that the counterclaim does not plausibly allege that Mac OS is an independent market.

**B. Market definition: Alleged "Mac OS-capable computers" market.**

As stated, the complaint alleges two relevant markets: Mac OS, and computer hardware systems which utilize Mac OS. All of Psystar's federal claims require the existence of these two distinct markets. Psystar has alleged tying, monopoly maintenance and exclusive dealing. The tying theory requires a plausible allegation that Apple tied sale of one market in which it

12

enjoys market power (the "tying market") to a product in a second, distinct market (the "tied market"). *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 35 (2006). Similarly, Psystar's Sherman Act Section 2 and Clayton Act Section 3 theories — if they differ from the tying theory — are also dependent on the existence of a distinct "submarket" or aftermarket because Psystar challenges only the maintenance of a monopoly in, or exclusion of competitors from, that alleged submarket or aftermarket.

Psystar alleges that, by tying or other exclusionary behavior, Apple seeks to dominate a distinct *aftermarket*, the market for Mac OS-compatible computer hardware systems. Relying on *Newcal*, Psystar specifically asserts that this market is not an independent, stand-alone product but rather is a "submarket [] that 'would not exist' without the primary market for the Mac OS and is thus 'wholly derivative from and dependent' on that market" (Opp. at 7).

*Newcal* found such a single-brand aftermarket to be properly pled. *Newcal*, however, distinguished two other appellate decisions which had found that *contractually created* aftermarkets could *not* be relevant antitrust markets. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997); *Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997). Applying *Kodak's* reasoning, *Newcal* held that, although the law permits an antitrust claimant to restrict the relevant market to *Kodak*-style single-brand aftermarkets, "the law prohibits an antitrust claimant from resting on market *power* that arises solely from contractual rights that customers knowingly and voluntarily gave to the defendant (as in *Queen City Pizza* and *Forsyth*)." *Newcal Industries, Inc.*, 513 F.3d at 1048 (emphasis in original). Psystar rests on precisely such a claim: the counterclaim alleges that, by its End User License Agreement and other means, Apple specifically restricts the use of Mac OS to Apple-labeled computer hardware systems. Customers, therefore, knowingly agree to the challenged restraint.[4]

---

[4] *Newcal* further explained that "in determining whether the defendant's market power falls in the *Queen City Pizza* category of contractually-created market power or in the *Eastman Kodak* category of economic market power, the law permits an inquiry into whether a consumer's selection of a particular brand in the competitive market is the functional equivalent of a contractual commitment, giving that brand an agreed-upon right to monopolize its consumers in an aftermarket. The law permits an inquiry into whether consumers entered into such 'contracts' knowing that they were agreeing to such a commitment." *Id*. at 1048–49. Here, no such functional-equivalent analysis is necessary: not only did customers purchase the alleged primary- and aftermarket-products at the same time, as a package, they entered and express agreement

13

In *Kodak*, the single-brand aftermarkets were distinct antitrust markets because, the decision found, customers did not adequately consider the total — or lifecycle — cost of the equipment, parts and service in their initial equipment purchase. Only after they were "locked in" to Kodak equipment were they forced to evaluate costs in the parts and service markets. Market imperfections such as information costs and switching costs prevented customers from doing so at the time of the original purchase or from imposing market discipline in the aftermarkets by switching among participants in the primary equipment market. *Eastman Kodak Company*, 504 U.S. at 464–78. The plaintiffs had also alleged that a market for the aftermarket service already existed (*i.e.*, firm other than Kodak already provided service for Kodak copiers) and that Kodak sought to restrain the participants in that market. Pre-existing markets and efforts to restrain or suppress that market both provide evidence that the tie is anti-competitive and offer courts guidance of what an efficient price may be. *See Verizon Communications, Inc. v. Trinko*, 540 U.S. 398, 409–10 (2004). Unlike in *Kodak* — where customers did not knowingly bind themselves to a single brand of the aftermarket and market imperfections (information costs and switching costs) prohibited customers from imposing market discipline in the *aftermarket* by switching among competitors in the *primary* market — here Apple asks its customers to purchase Mac OS knowing that it is to be used only with Apple computers (Compl. ¶ 28). It is certainly entitled to do so. *See Digital Equipment Corp. v. Uniq Digital Technologies, Inc.*, 73 F.3d 756, 762–63 (7th Cir. 1996). Psystar also asks the Court to create a non-existent market. This order declines to do so.

The aftermarket alleged here is more analogous to that addressed in *Forsyth*. That decision "reject[ed] the plaintiffs' attempt to limit the relevant market to acute care hospitals used by Humana insureds. The plaintiffs used Sunrise Hospital and obtained medical care from few other hospitals because of contractual provisions in their insurance policies. This tie-in defeats the plaintiffs' argument for a submarket consisting only of those hospitals Humana insureds actually used." *Forsyth*, 114 F.3d at 1476. Here, similarly, Apple customers must utilize Mac OS only in Apple-labeled computers because they agreed to do so when they

---

that the former could not be used beyond the latter.

14

purchased the product. As *Queen City Pizza* explained, "[a] court making a relevant market determination looks not to the contractual restraints assumed by a particular plaintiff when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general." *Queen City Pizza, Inc.*, 124 F.3d at 438. In *Queen City Pizza*, therefore, the "plaintiffs' acceptance of a franchise package that included purchase requirements and contractual restrictions is consistent with the existence of a competitive market in which franchises are valued, in part, according to the terms of the proposed franchise agreement and the availability of alternative franchise opportunities." *Id*. at 442.

Psystar also relies on two recent Northern District decisions in other litigation involving Apple. *In re Apple & AT&TM Antitrust Litigation*, C. 07-5152 JW, Dkt No. 144 (N.D. Cal. 2008) (Ware, J.) (slip op.); *Slattery v. Apple Computer, Inc.*, 2005 WL 2204981 (N.D. Cal. 2005) (Ware, J.) (unpublished). The former explained that Apple sold the iPhone, a handheld device that acts as a cellular telephone, among other functions. AT&T Mobility provided cellular voice and data services over its cellular network. *In re Apple & AT&TM Antitrust Litigation* concerned a challenge to an agreement that made AT&T Mobile the exclusive cellular service provider for the iPhone for five years, through 2012. As with other cellular service providers, customers who purchased an iPhone were required to sign a two-year service agreement with AT&TM. The plaintiffs alleged, *inter alia*, that due to the five-year exclusivity agreement (which was neither public nor disclosed to customers, although parts of it had been revealed publicly), customers were effectively "locked in" to AT&TM and would be forced to renew with AT&TM beyond the agreed-upon two year contract. *In re Apple & AT&TM Antitrust Litigation*, C. 07-5152 at 2–3, 5. The plaintiffs alleged "an aftermarket for iPhone voice and data services that 'would not exist' without the primary market for iPhones, and is thus 'wholly derivative from and dependent on the primary market.'" *Id*. at 14. The decision concluded,

> [e]ven though Apple rightly contends that Plaintiffs entered into two-year [AT&TM] service contracts at the time of purchase, Plaintiffs allege that the aftermarket includes the full five-year period during which they are bound to use AT&TM voice and data services, including the three years after the initial contract expiration, which is enforced by both technological and

15

> contractual means . . . . Plaintiffs are alleging that at the point of purchase and initiation of service, Defendants involuntarily impose on consumers a contract exclusivity restriction . . . for at least five years.

*Id*. at 15. The decision found that the undisclosed exclusivity agreement allowed the plaintiffs to plead a viable aftermarket. The decision is inapposite because Psystar does not allege any undisclosed exclusivity agreement; like the initial two-year service contract in *In re Apple & AT&TM Antitrust Litigation*, the aftermarket restriction in this case was fully disclosed and expressly agreed upon.

Psystar also relies on *Slattery v. Apple Computer, Inc.*, 2005 WL 2204981 (N.D. Cal. 2005) (Ware, J.) (unpublished). That decision was prior to *Newcal*, and it did not discuss the critical distinctions between *Newcal*, on the one hand, and decisions like *Queen City Pizza* and *Forsyth*, on the other, such as whether the market power in the alleged relevant market arose solely by contract or the functional equivalent thereof.

Finally, Psystar relies on *United States v. Microsoft Corp.*, 253 F.3d 34 (C.A.D.C. 2001). In *Microsoft*, the District Court had defined a relevant market consisting of "'the licensing of all Intel-compatible PC operating systems worldwide,' finding that there [were] 'currently no products — and . . . there [were] not likely to be any in the near future — that a significant percentage of computer users worldwide could substitute for [these operating systems] without incurring substantial costs.'" *Id*. at 52. The court of appeals affirmed the district court's factual findings. *Ibid*. Psystar argues that those findings aid its cause. Although some of those factual findings arguably support Psystar's claims,[5] others directly contradict it.[6] The district court made those factual findings nearly ten years ago and their continued applicability is far from certain. Moreover, although the decision found that Microsoft had attained a very large market share in the above-described operating system market, it did not

---

[5] For example, "[t]he District Court found that consumers would not switch from Windows to Mac OS in response to a substantial price increase because of the costs of acquiring the new hardware needed to run Mac OS (an Apple computer and peripherals) and compatible software applications, as well as because of the effort involved in learning the new system and transferring files to its format." *Id*. at 52.

[6] For example, "[t]he court also found the Apple system less appealing to consumers because it costs considerably more and supports fewer applications." *Ibid*.

16

limit the relevant market to a single brand or product, as Psystar seeks to do. The decision, similarly, did not address anticompetitive conduct targeted at a submarket or aftermarket defined with reference to a single brand of a product, as Psystar attempts to do. Rather, it addressed Microsoft's effort to utilize its operating system monopoly to gain monopoly power in "the browser market," a market that included Microsoft's Internet Explorer as well as competitors such as Netscape's Navigator. *United States v. Microsoft Corp.*, 87 F.Supp.2d 30, 45 (D.D.C. 2000). This order places no weight on the decision.

For the above-stated reasons, Psystar's claim that Mac OS-compatible computer hardware systems constitute a distinct submarket or aftermarket contravenes the pertinent legal standards, and Apple's motion to dismiss Psystar's federal counterclaims is therefore granted.

### 2. STATE CLAIMS.

Psystar's fourth claim for relief arises under California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700–16760. The Cartwright Act was patterned after Section 1 of the Sherman Act, and the pleading requirements under the two statutes are similar. *See Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1476–77 (9th Cir. 1986). Moreover, the Cartwright Act "does not address unilateral conduct." *Ibid*. Psystar's complaint fails to allege any concerted action or inter-firm agreement. Psystar asserts that the standards under the Cartwright Act are not necessarily contemporaneous with those under federal antitrust laws, but Psystar points to no relevant distinction between the standards. As stated, Psystar's counterclaim fails to plead relevant antitrust markets, and the counterclaim alleges only unilateral anticompetitive conduct. The Cartwright Act claim, therefore, must be dismissed.

Psystar's fifth claim for relief arises under California's unfair competition statute, Cal. Bus. & Prof. Code § 17200. That statute proscribes "any unlawful, unfair or fraudulent business act or practice." *Ibid*. Psystar asserts that Section 17200 is broader than the federal antitrust laws and proscribes not only violations of those laws but also "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cal-Tech Communications, Inc. v. Los Angeles*

*Cellular Telephone Co.*, 973 P.2d 527 (Cal. 1999). California courts, however, have held that "[i]f the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason — because it unreasonably restrains competition and harms consumers — the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers." *Cahvez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001). *See also RLH Industries, Inc. v. SBC Communications, Inc.*, 133 Cal. App. 4th 1277, 1286–87 (2005) (similar). Apart from its conclusory allegations regarding the "sweeping nature of section 17200" (Opp. at 14), Psystar fails to explain a relevant distinction in the standards. Psystar's section 17200 claim, therefore, must be dismissed.

Psystar's sixth claim for relief alleges violations of the common law of unfair competition. Psystar, however, fails to explain the pertinent standards for the cause of action or how its counterclaim satisfies them. Psystar cites, for example, *Aydin Corp. v. Loral Corp.*, 1981 WL 2178 (N.D. Cal. 1981) (Patel, J.) (unreported). That decision stated,

> [s]uch a common law cause of action does apparently exist in California . . . . This court, however, does not locate any California decisions delineating the elements of such a cause of action, nor does plaintiff direct the court to any . . . . As with Count III, this court is unwilling to find a cause of action where plaintiff fails to demonstrate either the illegality of the contract with Moyes or the bad faith of the state action. Therefore the court finds no tortious unfair competition in this case.

The remaining cases Psystar cites are similarly unenlightening (Opp. at 14–15). Psystar's sixth claim, therefore, is dismissed.

18

**CONCLUSION**

For all of the above-stated reasons, Apple's motion to dismiss Psystar's counterclaims is **GRANTED**. Psystar may move for leave to amend within twenty calendar days of the date of entry of this order. Any such motion should be accompanied by a proposed pleading and the motion should explain why the foregoing problems are overcome by the proposed pleading. Plaintiff must plead its best case. Failing such a motion, all inadequately pled claims will be dismissed without further leave to amend.

**IT IS SO ORDERED.**

Dated: November 18, 2008

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE