1  K.A.D. CAMARA (TX Bar No. 24062646/
   MA Bar No. 661087 – *Admitted Pro Hac Vice*)
2  camara@camarasibley.com
   KENT RADFORD (TX Bar No. 24027640 –
3  *Admitted Pro Hac Vice*)
   radford@camarasibley.com
4  CAMARA & SIBLEY LLP
   2339 University Boulevard
5  Houston, Texas 77005
   Telephone: (713) 893-7973
6  Facsimile:  (713) 583-1131

7  EUGENE ACTION (SBN 223023)
   eugeneaction@hotmail.com
8  1780 E. Barstow Ave., #5
   Fresno, California 93710
9  Telephone: (559) 283-9772
   Facsimile: (559) 642-2843

10

11
                  IN THE UNITED STATES DISTRICT COURT
12            FOR THE NORTHERN DISTRICT OF CALIFORNIA
                       SAN FRANCISCO DIVISION
13

14  APPLE INC., a California corporation,    | CASE NO. CV-08-03251-WHA

15           *Plaintiff*,
                                             | **PSYSTAR CORPORATION'S**
16  v.                                       | **MOTION FOR SUMMARY**
                                             | **JUDGMENT**
17  PSYSTAR CORPORATION,

18           *Defendants*.

19  AND RELATED COUNTERCLAIMS

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I. SUMMARY OF THE ARGUMENT ............................................................................. 1

   A. The Copyright and DMCA Claims ................................................................ 1

     1. Absence of infringement. ...................................................................... 1

     2. The limited effect on the industry of a judgment for Psystar in this case. ............................................................................................................. 3

   B. All Other Claims ............................................................................................. 4

II. COPYRIGHT CLAIMS .......................................................................................... 5

   A. Apple Sold Copies of OS X Leopard. ........................................................... 5

     1. Apple admits that it sold the physical DVDs on which OS X Leopard is written. ............................................................................... 5

     2. The Copyright Act defines the "owner of a copy" as the owner of the "material object . . . in which a work is fixed" — here, the DVD's that Apple admits it sold. .......................................................... 6

     3. Controlling Ninth Circuit law (*Wise*) and the most recent district court decision on point (*Vernor*) support the conclusion that Apple sold copies of OS X Leopard. ...................................................... 6

     4. *Wall Data*, *MAI*, and *Triad*, are not controlling law and, even if controlling, do not conflict with *Wise* or *Vernor* in this case. ............... 8

   B. Psystar Did Not Commit Copyright Infringement By Purchasing, Installing, And Reselling Copies of OS X Leopard. ...................................... 9

     1. 17 U.S.C. §§ 109 and 117 ..................................................................... 9

     2. *Lexmark* and the lack of copyright protection for functional works. .... 11

   C. Without Copyright Infringement, There Can Be No Violation of the DMCA Because Any Circumvention Does Not Result In Access To A Work Protected By Copyright. ...................................................................... 13

     1. Apple's Technological Protection Measure and Psystar's Circumvention ....................................................................................... 13

     2. Psystar Does Not Facilitate Infringement And Therefore Is Not Subject to DMCA Liability ................................................................. 16

     3. Apple's Technological Protection Measure Is Not Effective. ............... 19

   D. Apple's Attempt To Use Copyright To Enforce Its Tying Of OS X Leopard To Apple-Labeled Hardware Constitutes Copyright Misuse. ....................... 20

III. MOOTNESS ........................................................................................................ 24

   A. Apple Has Waived All Claims For Relief On The Non-Copyright

Causes of Action Except Claims For Nominative Damages And An
Appropriate Injunction. ...........................................................................24

B. An Appropriate Injunctions Is Limited To OS X Leopard.........................25

V. CONCLUSION ...............................................................................................26

# TABLE OF AUTHORITIES

**CASES**

*Alcatel USA, Inc. v. DGI Tech., Inc.* 166 F.3d 772 (5th Cir. 1999) ............................................... 23

*Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079 (9th Cir. 2005) .................................................. 22

*Assessment Technologies of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640 (7th Cir. 2003) ............... 3, 23

*Bergh v. State of Washington*, 535 F.2d 505 (9th Cir. 1976) ......................................................... 27

*Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178 (Fed. Cir. 2004) ................... 3, 18, 19, 24

*Condesa Del Mar, Inc. v. White Way Sign & Maintenance Co.*, 1987 WL 17474 (N.D. Ill. 1987) ............... 22

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) ................................................................. 26

*Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) ........................................ 23

*Krause v. Titleserv, Inc.*, 402 F.3d 119 (2d Cir. 2005) ................................................................ 7, 11

*Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970 (4th Cir. 1990) ............................................. 23

*MDC Data Centers v. I.B.M.*, 342 F. Supp. 502 (E.D. Pa. 1972) ................................................... 22

*MercExchange, LLC v. eBay, Inc.*, 500 F. Supp. 2d 556 (E.D. Va. 2007) ...................................... 26

*PGBA v. U.S.*, 389 F.3d 1219 (Fed. Cir. 2004) ............................................................................. 26

*Practice Mgmt. Info. Corp., v. American Medical Ass'n*, 121 F.3d 516 (9th Cir. 1997) ................. 23

*Qad, Inc. v. ALN Associates, Inc.*, 770 F.Supp. 1261 (N.D.Ill. 1991) ............................................ 22

*Realnetworks, Inc. v. DVD Copy Control Ass'n*, No. C-08-4548-MHP, 2009 WL 2475338 (N.D.Cal.2009) ........... 18

*Response of Carolina, Inc. v. Leasco Response, Inc.* 537 F.2d 1307 (11th Cir. 1976) ................. 22

*Shloss v. Sweeney*, 515 F.Supp.2d 1068 (N.D.Cal. 2007) ............................................................. 22

*SoftMan Products Co., LLC v. Adobe Systems, Inc.*, 171 F. Supp. 2d 1075 (C.D. Cal. 2001) ................ 8, 9

*Storage Technology Corp. v. Custom Hardware Engineering & Consulting, Inc. Storage Technology Corp. v. Custom Hardware Engineering & Consulting, Inc.*, 421 F.3d 1307 (Fed. Cir. 2005) ............... 20

*United States v. Rodriguez-Lara*, 421 F.3d 932 (9th Cir. 2005) ..................................................... 9

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001) .............................................. 16

**STATUTES**

17 U.S.C. § 101 .............................................................................................................. 1, 6, 9

17 U.S.C. § 109 .............................................................................................................. passim

17 U.SC. § 117..................................................................................................................passim

**OTHER AUTHORITIES**

Dan L. Burk, *Anticircumvention Misuse*, 50 UCLA L. Rev. 1095 (2003) ...................................... 16

Nimmer on Copyright (2003) .................................................................................................7, 11, 16

**TABLE OF EXHIBITS**

Ex. A       Leopard EULA

Ex. B       Snow Leopard EULA

Ex. C       Schiller Deposition Excerpts

Ex. D       Email From Steve Zellers

Ex. E       Van Vechten Deposition Excerpts

Ex. F       Culbert Deposition Excerpts

Ex. G       Patience Deposition Excerpts

Ex. H       Wright Deposition Excerpts

Ex. I       Code and Screenshot Showing Retrieval of Haiku and Declaration of Rudy Pedraza

Ex. J       Mansfield Deposition Excerpts

# MOTION FOR SUMMARY JUDGMENT

Psystar moves for summary judgment (1) that Apple take nothing on its claims under the Copyright Act and the Digital Millennium Copyright Act (DMCA), (2) that Apple take nothing on its trademark and trade-dress claims because Psystar's activities constitute nominative fair use, and (3) that these and all the state-law claims be dismissed as moot because Apple has waived any claim to non-nominal damages and Psystar will consent to pay nominal damages and submit to an injunction limited to OS X Leopard, which is the only appropriate injunction in this case.

## I. SUMMARY OF THE ARGUMENT

### A. The Copyright and DMCA Claims.

#### 1. Absence of infringement.

Apple sold the copies of OS X Leopard that Psystar installed on its computers and resold to its customers. The OS X Leopard "software license agreement" (herein after "EULA") states: "You own the media on which the Apple Software is recorded." And § 101 of the Copyright Act defines *copies* to mean that media, namely, the DVD on which OS X Leopard is recorded. 17 U.S.C. § 101 ("'Copies' are material objects . . . ."). Because Apple, according to the terms of its own software license agreement, sold the material objects on which OS X Leopard was fixed, it sold — not merely licensed — copies of OS X Leopard. Each time that Psystar bought a DVD containing OS X Leopard, Psystar became the owner of a copy of OS X Leopard.

Because Psystar owns the copies of OS X Leopard that it buys, §§ 109 and 117 of the Copyright Act come into play. Section 117 provides that "it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided . . . that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine." 17 U.SC. § 117. Accordingly, the steps that Psystar takes to get OS X Leopard to run on its computers do not constitute copyright infringement because those steps are "essential . . . in the utilization of the

computer program [OS X Leopard] in conjunction with a machine [the Psystar computer].”

Section 109, the “first-sale doctrine,” provides that “the owner of a particular copy . . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.” 17 U.S.C. § 109. Under § 109, Psystar is permitted to take the copies of OS X Leopard that it purchased and resell these copies to the buyers of Psystar computers. At each stage in its business process, Psystar falls within §§ 109 and 117: in installing OS X Leopard, Psystar is within § 117 because installation is necessary to the use of OS X Leopard on Psystar's computers; in selling OS X Leopard packaged with its computers, Psystar is within § 109; and in using a Psystar computer running OS X Leopard, Psystar's customers are in turn within § 117, since they, too, become owners of a copy of OS X Leopard.



Apple cannot assert claims under the DMCA for circumvention of a technological protection measure because such claims can be brought only when the circumvention is for the purpose of and has the effect of infringement. Circumvention alone is not a violation of the DMCA; only circumvention to gain unauthorized access to that which copyright protects is actionable. *See Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178, 1197–1203 (Fed. Cir. 2004)

(extended discussion). "17 U.S.C. § 1201 prohibits only forms of access that bear a reasonable relationship to the protections that the Copyright Act otherwise affords copyright owners." *Id.* at 1203. Because installing OS X Leopard on Psystar computers and reselling it packaged with those computers is not copyright infringement, any circumvention involved in doing this is not for the purpose of infringement and therefore does not violate the DMCA. ████████████████

████████████████████████████████████

███████████████████

Apple's attempt to use copyright claims to enforce its tying of OS X Leopard to Apple-labeled hardware constitutes copyright misuse. This is because Apple is asserting these claims "to obtain property protection . . . that copyright law clearly does not confer." *Assessment Technologies of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640, 647 (7th Cir. 2003) (Posner, J.). As to any infringements not already immunized by §§ 109 and 117 or *Lexmark*, copyright misuse bars Apple's claims.

### 2.   The limited effect on the industry of a judgment for Psystar in this case.

Apple could have avoided §§ 109 and 117 by licensing copies of OS X Leopard instead of selling them; in fact, in the Snow Leopard license agreement, Apple removed the language stating that "you own the media on which the Apple Software is recorded." We are not arguing that the author of a computer program *must* sell copies of that program, with the consequence that purchasers may do what Psystar has done here; we are arguing only that Apple, for whatever reason, perhaps acting on incomplete legal advice, *chose* to sell copies of its program, OS X Leopard, and that Apple should be held to this decision. Had Apple acted carefully, it would have licensed OS X Leopard subject to the condition that it not be used on non-Apple hardware. A judgment for Psystar here will have no lasting effect on the industry (or even on Apple) because anyone can avoid what Apple has here done by licensing copies instead of selling them.

**B.    All Other Claims.**

Psystar uses Apple's trademarks and trade dress to describe Apple's products, which Psystar resells.  This is nominative fair use.  It is not the basis for a claim for either trademark infringement or trade-dress infringement.  Just as the owner of a Honda Accord may describe the Accord he is reselling as a "Honda Accord" and may include pictures of the Accord in his advertisements (and just as the owner of a used-car dealership may do the same), Psystar, the owner of copies of OS X Leopard, may describe these copies as "Mac OS X Leopard" and may include pictures of OS X Leopard in its advertisements.   The harm at which the Lanham Act is addressed — a misrepresentation as to origin or sponsorship of the defendant's goods that confuses the public — is not present here because Psystar nowhere represents that OS X Leopard is its own product rather than Apple's.  Psystar's slogan itself disclaims any association with Apple: "It's not a Mac — it's for everyone."

Moreover, as to all the non-copyright claims, Apple has waived its claims for damages.  As to all the non-copyright claims, the only relief that Apple continues to seek is nominal damages and an injunction.  As to nominal damages, if this Court grants this motion for summary judgment in its entirety, then Psystar will happily pay nominal damages.  And as to an injunction, if this Court grants this motion for summary judgment in its entirety, then Psystar will happily submit to an appropriately tailored injunction.  Such an injunction, if any injunction is appropriate, should be limited to Psystar's allegedly illegal activities involving OS X Leopard, since it is only OS X Leopard that this case concerns.  Since neither Psystar nor Apple sells OS X Leopard any longer, it is no great burden for Psystar to agree to such an injunction.  And with such an injunction granted, there is no further relief for Apple to win at trial.

## II.    COPYRIGHT CLAIMS

### A.    Apple Sold Copies of OS X Leopard.

#### 1.    Apple admits that it sold the physical DVDs on which OS X Leopard is written.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████    Psystar purchased one such boxed DVD for each of the Psystar computers running OS X Leopard that it sold.  Each time that Psystar shipped a computer running OS X Leopard to an end user, it included one of the boxed DVD's with that computer. These facts are undisputed.  What is in dispute is whether, when Psystar buys a boxed DVD, it is thereby buying or merely licensing a copy of OS X Leopard.  The correct view is that Psystar bought a copy of OS X Leopard each time it bought one of Apple's boxed DVD's.

The boxed DVDs that Apple sold each contain a complete copy of OS X Leopard.  *See, e.g.,* Ex. C (Schiller Depo.) at 14:11–14:25.[1] ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

_____

**Q.**    ███████████████████████████████████████████

███████████████████████████████████

██ ████ ████████████████████████████████████████

████████████████████████████

██ ████ ███████████████████████████████████████████

████████████████████████████

████ ██ ████ █████████████████████████████████

██ ████ ██████████████████████████████████████████

████ ██ ████ ████████████████████████

████████████████████████

**2. The Copyright Act defines the "owner of a copy" as the owner of the "material object . . . in which a work is fixed" — here, the DVD's that Apple admits it sold.**

Under the Copyright Act, because Psystar owns the physical media on which a complete copy of OS X Leopard was written, Psystar owns a copy of OS X Leopard for purposes of §§ 109 and 117. Both of these sections apply to those who own copies of a copyrighted work: § 109 to "the owner of a particular copy"; and § 117 to "the owner of a copy." 17 U.S.C. §§ 109, 117. And the Copyright Act defines *copy* to mean the physical media on which a work is written:

> **"Copies" are material objects**, other than phonorecords, **in which a work is fixed** by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. **The term "copies" includes the material object**, other than a phonorecord, **in which the work is first fixed.**

17 U.S.C. § 101 (emphasis added). Because "material objects . . . in which a work is fixed" constitutes "copies" under § 101, the owner of such a material object is "the owner of a copy" and "the owner of a particular copy" under §§ 109 and 117.

It is of course true that "Apple and/or Apple's licensor(s) retain ownership of the Apple Software itself," as the OS X Leopard agreement goes on to state. Ex. A at 1. But this is only to say that, when Apple sells a copy of OS X Leopard, it is not selling OS X Leopard itself.

**3. Controlling Ninth Circuit law (*Wise*) and the most recent district court decision on point (*Vernor*) support the conclusion that Apple sold copies of OS X Leopard.**

The cases in this Circuit and elsewhere are in accord with Psystar's view that the sale of a material object on which a copyrighted work is written constitutes the sale of a particular copy of that copyrighted work. In *United States v. Wise*, 500 F.2d 1180, 1190 (9th Cir. 1977), the Ninth Circuit analyzed an agreement for exhibition of motion pictures and held that the agreement was a license because it "reserved title to the film prints in Universal, and required their return to Universal following the expiration of the contract term." Here, there is no similar reservation of title to the DVD (as opposed to the software itself) in Apple, and no requirement that a purchaser of a boxed

DVD ever return the DVD to Apple. Even where the physical medium was transferred subject to a set of promises not to further transfer it to others (a film print sold to actress Vanessa Redgrave) or even to promptly destroy the physical medium (film prints sold for salvage), the Ninth Circuit held that there had been a sale of a copy. *Id.* at 1192–94.

In *Vernor v Autodesk, Inc.*, 555 F. Supp. 2d 1164, 1170 (W.D. Wash. 2008), the most recent decision on point, the court summarized the Ninth Circuit's decision in *Wise*:

> In comparing the transactions found to be sales in Wise with those that were not, the critical factor is whether the transferee kept the copy acquired from the copyright holder. **When the film studios required that prints be returned, the court found no sale. When the studios did not require the transferee to return the prints, the court found a sale.** Even a complete prohibition on further transfer of the print (as in the Redgrave Contract), or a requirement that the print be salvaged or destroyed, was insufficient to negate a sale where the transferee was not required to return the print.

(emphasis added). Judge Jones reaffirmed this opinion, rendered in the context of a motion to dismiss, in a separate opinion on cross motions for summary judgment after extensive briefing and argument, including testimony by Professor Nimmer. *See Vernor v. Autodesk, Inc.*, No. C-07-1189-RAJ, 2009 WL 3187613 at *8 (W.D. Wash. 2009).

Here, there is no question that a buyer of a boxed OS X Leopard DVD may keep the DVD indefinitely. There is no requirement anywhere in the Apple agreement that requires such a buyer to return the DVD he bought to Apple. Accordingly, under *Vernor* and *Wise*, the sale of the DVD is the sale of a copy of OS X Leopard. At most, what Apple has created "is a 'sale with restrictions on use,' [which] is a sufficient basis to invoke the first sale doctrine." *Vernor*, 555 F. Supp. 2d at 1170–71; *see also Krause v. Titleserv, Inc.*, 402 F.3d 119, 122–24 (2d Cir. 2005) (concluding that a person with title to a physical copy is plainly an owner; contractual restrictions on use considered only as to persons who lack title); *SoftMan Products Co., LLC v. Adobe Systems, Inc.*, 171 F. Supp. 2d 1075, 1084–87 (C.D. Cal. 2001) (economic reality of transaction rather than label in agreement determines whether transaction is a sale; "In light of these indicia, many courts and commentators conclude that a 'shrinkwrap license' transaction is a sale of goods rather than a license.").

The fact that Apple calls the agreement accompanying OS X Leopard a "software license agreement" has no bearing on whether that agreement, in fact, results in a sale rather than a license. As the Central District of California explained, whether there was a sale depends on the terms of the agreement, not its label:

> **Merely labeling a transaction as a lease or license does not control. If a transaction involves a single payment giving the buyer an unlimited period in which it has the right to possession, the transaction is a sale.** In this situation, the buyer owns the copy regardless of the label the parties use for the contract. . . . The pertinent issue is whether, as in a lease, the user may be required to return the copy to the vendor after the expiration of a particular period. If not, the transaction conveyed not only possession, but also transferred ownership of the copy.

*SoftMan Prods. Co. v. Adobe Systems Inc.*, 171 F. Supp. 2d 1075, 1089 (C.D. Cal. 2001) (emphasis added). Because the OS X Leopard agreement gives the purchaser of a boxed DVD an indefinite right to posses the DVD — and even expressly states that the purchaser owns the DVD — that agreement results in a sale of a copy of OS X Leopard.

> **4.** ***Wall Data***, ***MAI***, **and** ***Triad***, **are not controlling law and, even if controlling, do not conflict with** ***Wise*** **or** ***Vernor*** **in this case.**

The *Vernor* court believed that the Ninth Circuit's decision in *Wise* was in conflict with three later Ninth Circuit decisions, *Wall Data*, *MAI*, and *Triad*, but that, in the face of such a conflict, it was bound by *Wise*. *See Vernor*, 2009 WL 3187613 at *11 ("The court must follow the oldest precedent among conflicting opinions from three-judge Ninth Circuit panels. *United States v. Rodriguez-Lara*, 421 F.3d 932, 943 (9th Cir. 2005)."). This is certainly true: to the extent Apple relies on *Wall Data*, *MAI*, or *Triad* to reach a different result than under *Vernor*, *Wise*, and *SoftMan*, this violates the rule in *Rodriguez-Lara* that the oldest panel decision of the Ninth Circuit controls. But this Court need not reach this question because even under *Wall Data*, *MAI*, and *Triad*, Apple sold the copies of OS X Leopard in its OS X Leopard DVD boxes.

*MAI* and *Triad* never expressly considered the question whether the agreements there at issue resulted in a license or sale of the software in question. In *MAI*, the defendant did not dispute that the software had been licensed. It disputed only whether its actions constituted "copying" under the

Copyright Act.  *See MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 517 (9th Cir. 1993)

So too in *Triad*: the defendant contested copying and asserted fair use, but did not claim to be an

owner rather than a licensee of particular copies.  *See Triad Systems Corp. v. Southeastern Express*

*Co.*, 64 F.3d 1330, 1335–36 (9th Cir. 1995).  Because neither *MAI* nor *Triad* considered whether a

particular resulted in a license or a sale, neither is relevant to the question whether Apple sold copies

of OS X Leopard.

   *Wall Data* does confront the question whether an agreement results in a license or a sale, but

even under the test in *Wall Data*, Apple's agreement results in a sale.  The *Wall Data* court held that

an agreement results in a license if the copyright owner clearly states that he is granting only a

license *to the copy of software*:

> Generally, **if the copyright owner makes it clear that she or he is granting only a license to the copy of software** and imposes significant restrictions on the purchaser's ability to redistribute or transfer that copy, **the purchaser is considered a licensee, not an owner**, of the software. In this case, as in MAI, the licensing agreement imposed severe restrictions on the Sheriff's Department's rights with respect to the software.

*Wall Data Inc. v. Los Angeles County Sheriff's Dep't*, 447 F.3d 769, 785 (9th Cir. 2006) (emphasis

added).  Here, Apple has not licensed the copy — meaning, under § 101, the material object on

which the copyrighted work is fixed — that it sold.  To the contrary, Apple's agreement expressly

states that the purchaser owns the copy: "You own the media on which the Apple software is

recorded."  Exhibit A at 1.  Thus, even under the rule in *Wall Data*, Apple sold copies of OS X

Leopard.

  **B.**  **Psystar Did Not Commit Copyright Infringement By Purchasing, Installing, And Reselling Copies of OS X Leopard.**

   **1.**  **17 U.S.C. §§ 109 and 117**

  OS X Leopard passes through Psystar in three steps: (1) Psystar purchases computer

components from vendors, including both computer hardware and copies of OS X Leopard from the

Apple Store or from resellers like Amazon or Best Buy, and assembles these, along with Psystar's

own software, into a Psystar computer that runs OS X Leopard; (2) Psystar sells this computer,

including all of its components, to an end user; and (3) the end user uses the computer, including OS X Leopard. In none of these steps is any copyright infringement going on. In step (1), Psystar's installation of OS X Leopard on the computers that it assembles is protected by § 117. In step (2), Psystar's sale of OS X Leopard as part of a Psystar computer is protected by § 109. And in step (3), the end user's use of OS X Leopard is protected by § 117 because it is now the end user who owns the copy of OS X Leopard that is installed on the computer in question.

Section 117 provides that it is not infringement for the owner of a copy of a computer program to take steps necessary to run that program on his computer:

> it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided . . . that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine.

17 U.S.C. § 117. Section 117 was put in place to prevent precisely the sort of problem that Psystar now faces, where the owner of a computer program has sold copies of that program but then wants to control what users do with those copies:

> Because the placement of a work into a computer is the preparation of a copy, **the law should provide that persons in rightful possession of copies of programs be able to use them freely without fear of exposure to copyright liability**. Obviously, creators, lessors, licensors, and vendors of copies of programs intend that they be used by their customers, so that rightful users would but rarely need a legal shield against potential copyright problems. **It is easy to imagine, however, a situation in which the copyright owner might desire, for good reason or none at all, to force a lawful owner or possessor of a copy to stop using a particular program. One who rightfully possesses a copy of a program, therefore, should be provided with a legal right to copy it to that extent which will permit its use by that possessor.**

*CONTU Final Report* at 13 (quoted in Nimmer § 8.08(b)(1)) (emphasis added).

Because any acts that would otherwise be infringement in the course of installing OS X Leopard on Psystar computers are necessary to get OS X Leopard to run on Psystar's computers, § 117 renders these acts not infringement. Courts have held that even such otherwise infringing activities as taking a program written for one operating system (DOS) and porting it to a different operating system (Windows) qualify as "essential" to the use of a program and therefore expressly

permitted by § 117. *See, e.g., Krause v. Titleserv, Inc.*, 402 F.3d 119, 125–26 (2d Cir. 2005). And the Second Circuit has held that even steps taken to increase a program's functionality — to add features, for example, or, here, to get OS X Leopard to work on a wider range of computers than simply Apple Macintoshes — qualify as necessary as that term is used in the law. *Krause*, 402 F.3d at 126–29 (rejecting narrow reading of "essential" as "absolutely necessary" in favor of broader "convenient, useful, appropriate, suitable, proper, or conducive to the end sought"). For the same reason, when the end user comes to be the owner of OS X Leopard after purchasing a Psystar system complete with a copy of OS X Leopard, the end user's use of OS X Leopard is protected by § 117.

Section 109 provides that the owner of a copyrighted work may not prevent the owner of a copy of that work from reselling his copy on to a third person. "[T]he owner of a particular copy . . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." 17 U.S.C. § 109. Accordingly, because Psystar purchases copies of OS X Leopard, § 109 gives Psystar the right to resell those copies to its own customers as part of a Psystar system. As the Ninth Circuit has explained:

> the first sale doctrine provides that where a copyright owner parts with title to a particular copy of his copyrighted work, he divests himself of his exclusive right to vend that particular copy. While the proprietor's other copyright rights (reprinting, copying, etc.) remain unimpaired, **the exclusive right to vend the transferred copy rests with the vendee, who is not restricted by statute from further transfers of that copy,** even though in breach of an agreement restricting its sale.

*Wise*, 550 F.2d at 1187 (emphasis added). Because Psystar bought copies of OS X Leopard, it is free to resell those copies to its end users.

### 2. *Lexmark* and the lack of copyright protection for functional works.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

The Sixth Circuit addressed precisely this issue in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004). In that case, Lexmark, a printer manufacturer, had set up its printers to use only Lexmark cartridges by having the cartridges send a code to the printer before the printer would operate. *See id.* at 530. The defendant broke the code and manufactured chips that would feed the code to Lexmark printers, allowing suppliers of cheaper printer cartridges to have their cartridges work with Lexmark printers. *See id.* at 530–31. Lexmark alleged copyright infringement and violations of the DMCA. *See id.* at 531.

The Sixth Circuit rejected Lexmark's copyright infringement claim because the Lexmark lockout code that the defendant used was being used purely for its necessary function of permitting a cartridge to interoperate with a Lexmark printer. The Sixth Circuit held a claim of infringement barred by the doctrines of merger and *scenes a faire*. *See id.* at 535–36 (collecting many cases). As the court put it:

> Generally speaking, "lock-out" codes fall on the functional-idea rather than the original-expression side of the copyright line. […] **To the extent compatibility requires that a particular code sequence be included in the component device to permit its use, the merger and scenes a faire doctrines generally preclude the code sequence from obtaining copyright protection.**

*Id.* at 536 (emphasis added). A lockout code, because it is functional, cannot be the basis for a claim of copyright infringement.

---

[3] AES is a particular encryption algorithm in wide use throughout the world. *256-bit* refers to the length of the key, which is simply an arbitrary sequence of bits, each of which is a 0 or a 1. By using standard numeric representations of characters in the alphabet, the haiku is converted into this 256-bit sequence of 0's and 1's that functions as the key.

For like reasons, Judge Feikens is correct that **a poem in the abstract could be copyrightable. But that does not mean that the poem receives copyright protection when it is used in the context of a lock-out code.** Similarly, a computer program may be protectable in the abstract but not generally entitled to protection when used necessarily as a lock-out device.

*Id.* at 544 (emphasis added).

**C.    Without Copyright Infringement, There Can Be No Violation of the DMCA Because Any Circumvention Does Not Result In Access To A Work Protected By Copyright.**

       **1.    Apple's Technological Protection Measure and Psystar's Circumvention**





## 2. Psystar Does Not Facilitate Infringement And Therefore Is Not Subject to DMCA Liability

The DMCA was created to protect against piracy of copyrighted works. *See, e.g.*, 3-12A Nimmer on Copyright § 12A.04 (2003); Dan L. Burk, *Anticircumvention Misuse*, 50 UCLA L. Rev. 1095, 1135 (2003). The Second Circuit described the motivating purpose of the DMCA: "Fearful [of] the ease with which pirates could copy and distribute a copyrightable work in digital form . . . Congress sought to combat copyright piracy in its earlier stages, before the work was even copied." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 435 (2d Cir. 2001).





The Senate Judiciary Committee expressly stated that the purpose of the DMCA is to "facilitate making available quickly and conveniently via the Internet the movies, music, software,

and literary works that are the fruit of American creative genius." S. Rep. No. 105-190, 105th Cong. 2d Sess. at 8 (May 11, 1998). The DMCA was not intended to block legitimate competition rather than to protect digital content from piracy. *See* 144 Cong. Rec. 2136.

The Federal Circuit, in its *Chamberlain* decision, established the distinction between property rights created by the Copyright Act, and liability protection created by the DMCA. *See Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178, 1193 (C.A.Fed. Ill. 2004) ("The essence of the DMCA's anticircumvention provisions is that §§ 1201(a), (b) establish causes of action for liability. They do not establish a new property right."); *Realnetworks, Inc. v. DVD Copy Control Ass'n*, No. C-08-4548-MHP, 2009 WL 2475338 (N.D.Cal.2009) (adopting *Chamberlain* view). This property–liability distinction follows from the text of the DMCA, which indicates that circumvention is not infringement. 17 U.S.C. § 1201(c)(1) ("Nothing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title.").

Under *Chamberlain*, "circumvention *is not* a new form of infringement but rather a new violation prohibiting actions or products that facilitate infringement." 381 F.3d 1178, 1197. The predicate analysis for any claim arising under the DMCA is a determination of whether the acts or devices complained of facilitate infringement of a protected work.

The specific rule announced by *Chamberlain* is:

---

[5] *See, e.g.,* Reply Brief in Support of Apple Inc.'s Motion to Dismiss at 8, Docket No. 146.

> A copyright owner seeking to impose liability on an accused circumventor must demonstrate a reasonable relationship between the circumvention at issue and a use relating to a property right for which the Copyright Act permits the copyright owner to withhold authorization - as well as notice that authorization was withheld. A copyright owner seeking to impose liability on an accused trafficker must demonstrate that the trafficker's device enables either copyright infringement or a prohibited circumvention.

381 F.3d 1178, 1204.



Even if we assume that Apple has an enforceable contractual right against the use of OS X Leopard on non-Apple hardware, the DMCA claims fail. The DMCA does not create new property rights. A contract cannot be used to create the requisite underlying infringement needed to trigger DMCA liability. *See Storage Technology Corp. v. Custom Hardware Engineering & Consulting, Inc. Storage Technology Corp. v. Custom Hardware Engineering & Consulting, Inc.*, 421 F.3d 1307, 1319 (Fed. Cir. 2005) ("Hence, there is no nexus between any possible infringement and the use of the circumvention devices. Rather, CHE's circumvention of GetKey only allows CHE to use portions of the copyrighted software that StorageTek wishes to restrict technologically. The activation of the maintenance code may violate StorageTek's contractual rights vis-à-vis its customers, but those rights are not the rights protected by copyright law.").

### 3. Apple's Technological Protection Measure Is Not Effective.



*Lexmark*, the Court addressed the exact issue of whether the DMCA would apply to a situation where the information needed to access a protected work was available:

> Because the statute refers to "control[ling] access to a work protected under this title," it does not naturally apply when the "work protected under this title" is otherwise accessible. Just as one would not say that a lock on the back door of a house "controls access" to a house whose front door does not contain a lock and **just as one would not say that a lock on any door of a house "controls access" to the house after its purchaser receives the key to the lock**, it does not make sense to say that this provision of the DMCA applies to otherwise-readily-accessible copyrighted works. *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 547 (C.A.6[th].2004) (emphasis added).

**D.      Apple's Attempt To Use Copyright To Enforce Its Tying Of OS X Leopard To Apple-Labeled Hardware Constitutes Copyright Misuse.**

Once Apple decided on its course of action with OS X, and sold copies of its software, it exhausted certain copyrights.  Under the first-sale doctrine, codified in 17 U.S.C. § 109, Apple

---

[6] *See, e.g.,* http://osxbook.com/book/bonus/chapter7/tpmdrmmyth/.

exhausted its right of distribution. Under 17 U.S.C. § 117, Apple exhausted its right of reproduction in those acts of its customers useful to the utilization of OS X Leopard on *any* machine. In this case, Apple certainly cannot lawfully restrict under copyright law the customer's choice of hardware because they sold, and did not lease, copies of OS X Leopard. The attempt to use copyright law to enforce such restrictions in these circumstances is an improper extension of copyright law to maintain a limited monopoly over the hardware that runs OS X Leopard, apart from any antitrust implications.[7]

Copyright misuse doctrine "forbids the use of the [copyright] to secure an exclusive right or limited monopoly not granted by the [Copyright] Office and which is contrary to public policy to grant." *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1090 (9th Cir. 2005) (citation omitted). The doctrine applies whenever copyright is "leveraged to undermine the Constitution's goal of promoting invention and creative expression." *Shloss v. Sweeney*, 515 F.Supp.2d 1068, 1080 (N.D.Cal. 2007) (internal citations omitted). The purpose of granting protective rights in computer software is to promote progress in the field. *See Qad, Inc. v. ALN Associates, Inc.*, 770 F.Supp. 1261, 1265 (N.D.Ill. 1991) ("Copyright protection must be perceived in terms of the public purpose behind the granting of the copyright. And the only purpose of granting a copyright to an author of computer software - as it is for the progenitors of other written material and patented inventions - is

---

[7] Apple's business model, and dominance in the desktop Unix market, presents that rarity of antitrust law – a technological tying case where the sole purpose of the technological mechanism is to tie two products together. *See Response of Carolina, Inc. v. Leasco Response, Inc.* 537 F.2d 1307, 1330 (11th Cir. 1976) ("In some instances, two products might be illegally tied through the technological relationship between them. If, for example, the systems software was designed to only be compatible with a specific hardware configuration, and that specific hardware configuration, because it is based on information held only by the seller, is only available from that seller, then a violation might be found."); *Condesa Del Mar, Inc. v. White Way Sign & Maintenance Co.,* 1987 WL 17474 at *2-*3 (N.D. Ill. 1987) ("The Court understands *Response of Carolina* to teach that it is illegal to design two products to be technologically tied for the sole purpose of tying the products rather than to achieve some technologically beneficial result."); *U.S. v. Microsoft Corp.*, 147 F.3d 935, 949-950 (citing *Response of Carolina*); *see also MDC Data Centers v. I.B.M.*, 342 F. Supp. 502, 504 (E.D. Pa. 1972) ("For anti-trust purposes, supplying an inoperable product which becomes useful only upon acceptance of another product or service from the same seller can amount to an unlawful tie-in.").

'to promote Progress' in that field.").

Unlike traditional property rights that are established to provide more efficient allocation and use of limited resources, copyrights are granted to provide incentives for authors to create. *See Harper & Row, Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 558 (1985). However, because copyrights confer upon their holder the collateral rights associated with enforcement of actionable causes, the court may impose equitable remedies to insure that copyrights and associated litigation are not used contrary to the established purpose. Anti-competitive uses of copyright, often involving license terms, are one such contrary purpose. *See Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 972 (4th Cir. 1990) (finding misuse in "[plaintff]'s attempt to use its copyright […] to control competition in an area outside the copyright"); *Practice Mgmt. Info. Corp., v. American Medical Ass'n*, 121 F.3d 516, 521 (9th Cir. 1997) (finding misuse when plaintiff "[conditioned] the license on [licensee]'s promise not to use competitors' products"); *Alcatel USA, Inc. v. DGI Tech., Inc.* 166 F.3d 772, 793 (5th Cir. 1999) (finding misuse where plaintiff sought "to obtain patent-like protection of its hardware — its microprocessor card — through the enforcement of its software copyright").

Copyright misuse complements, but does not supplant, antitrust:

The argument for applying copyright misuse beyond the bounds of antitrust, besides the fact that confined to antitrust the doctrine would be redundant, is that for a copyright owner to use an infringement suit to obtain property protection, here in data, that copyright law clearly does not confer, hoping to force a settlement or even achieve an outright victory over an opponent that may lack the resources or the legal sophistication to resist effectively, is an abuse of process.

*Assessment Technologies of WI, LLC v. WIREdata, Inc.* 350 F.3d 640, 647 (7th Cir. 2003)

Apple misuses their copyrights because they continue to prosecute (a) invalid claims of infringement against Psystar who lawfully purchased copies of OS X Leopard and is protected under 17 U.S.C. §§ 117 and 109; and (b) invalid DMCA claims based on alleged circumvention of a technological protection measure that was neither effective nor actionable since Psystar did not circumvent for the purpose of infringement, having already purchased copies of OS X Leopard. If

Apple mistakenly sold a product to the public under terms that extinguished that part of the bundle of copyrights it now seeks to assert, it should not be able leverage the legal system to shift the burden of their error to another party.

Apple has demonstrated its adroitness at many types of engineering. ███████



███████ F.3d 1178, 1201 (rejecting plaintiff's arguments that "would allow any manufacturer of any product to add a single copyrighted sentence or software fragment to its product, wrap the copyrighted material in a trivial 'encryption' scheme, and thereby gain the right to restrict consumers' rights to use its products in conjunction with competing products.").

Apple should not be able use copyright law to achieve the intended result of its legal engineering: to limit the hardware choices of customers of OS X Leopard and restrict competitors from providing hardware platforms that run OS X Leopard. Apple failed in its efforts to create an effective technology tie-in between OS X Leopard and Apple-labeled hardware. Apple further failed to craft an effective license limiting the scope of use of OS X to Apple-labeled hardware. The pursuit of copyright infringement and DMCA claims is Apple's last effort to achieve lock-in for its

products.  This is misuse.  Or perhaps Apple didn't fail, but always intended that the real enforcement mechanism is the weapon of engineered litigation, and not technology or contracts except as they form a part of that litigation scheme.  That would be extraordinary misuse.

### III.  MOOTNESS

**A.  Apple Has Waived All Claims For Relief On The Non-Copyright Causes of Action Except Claims For Nominative Damages And An Appropriate Injunction.**

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
██████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████

In ruling on Psystar's motion to compel, this Court based its decision on Apple's representation that it would not pursue actual damages in this case.

**Psystar also contends that Apple's profit margin information is relevant for Psystar's defenses to any claims for actual damages**, specifically Apple's trademark-infringement claims.  Psystar states that Apple had not yet made an election to limit its trademark claims to statutory damages.  Apple, however, represents that it seeks only injunctive relief for its trademark-infringement claims (Reply Br. 1).  As such, actual

damages are not at issue for the trademark claims and Psystar's argument on this point is moot.

Order at 4 (emphasis added). Although the order itself is limited to Apple's trademark claims, the same reasoning would apply to any claim in which Apple sought actual damages. This Court's ruling that Apple is not required to present profit-margin data (and Apple's decision not to present that data) should therefore bar Apple from seeking actual damages on any of its claims.

Setting the copyright claims aside, then, Apple is left with claims for injunctive relief only on its trademark, trade dress, and dilution claims and injunctive relief or nominative damages only on its state-law claims.

### B. An Appropriate Injunctions Is Limited To OS X Leopard.

No injunction at all is appropriate in this case because Apple cannot show an irreparable injury. *See, e.g., eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (requirements for injunction in the copyright context). Apple's failure to seek a temporary restraining order or preliminary injunction despite the fact that Psystar's allegedly illegal activities have been ongoing and, presumably, have been harming Apple for almost two years makes it almost impossible to credit Apple's claim that Psystar's business is doing Apple irreparable injury. *See, e.g., MercExchange, LLC v. eBay, Inc.*, 500 F. Supp. 2d 556, 573 (E.D. Va. 2007); *PGBA v. U.S.*, 389 F.3d 1219, 1229 (Fed. Cir. 2004) (no error to lower court for "consider[ing] [plaintiff]'s failure to seek a preliminary injunction as a factor weighing against a grant of injunctive relief").

Even if an injunction were appropriate, however, any such injunction should be limited to OS X Leopard and to Psystar products related to OS X Leopard. Any injunction in this case should not extend either to Apple's new Snow Leopard product or to Psystar's new products that incorporate or facilitate the use of Snow Leopard, since these are the subject of separate, pending litigation in the United States District Court for the Southern District of Florida. "When an injunction sought in one federal proceeding would interfere with another federal proceeding, considerations of comity require

more than the usual measure of restraint, and such injunctions should be granted only in the most unusual cases." *Bergh v. State of Washington*, 535 F.2d 505, 507 (9th Cir. 1976). A Leopard injunction would be easy to craft, and easy for Psystar to agree to, since neither Apple nor Psystar still sells any Leopard products. Indeed, this may moot the request for an injunction altogether.

## V. CONCLUSION

For the foregoing reasons, Psystar respectfully prays for summary judgment that Apple take nothing on its copyright infringement and DMCA claims, that briefing and argument be set on the appropriate scope of an injunction limited to OS X Leopard, and that the remaining Lanham Act and state-law claims be dismissed as moot.

Dated: October 8, 2009        Respectfully submitted,

CAMARA & SIBLEY LLP

By:    /s/ K.A.D. Camara_____
           K.A.D. Camara

*Attorneys for Defendant / Counterclaimant
Psystar Corporation*

**CERTIFICATE OF SERVICE**

I, Michael Wilson, declare I am employed in the City of Houston and County of Harris, Texas in the office of Camara & Sibley. I am over the age of eighteen and not a party to this action. My business address is Camara & Sibley, 2339 University Boulevard, Houston, Texas 77005.

I served the following document(s):

PSYSTAR CORPORATION'S MOTION FOR SUMMARY JUDGMENT
Case No. CV 08-03251 WHA

on the interested parties in this action by placing a true and correct copy thereof, on the above date, enclosed in a sealed envelope, following the ordinary business practice of Camara & Sibley LLP. I sent the document(s) to the following:

| James G. Gilliland, Jr.<br>TOWNSEND AND TOWNSEND AND CREW LLP<br>Two Embarcadero Center, 8th Floor<br>San Francisco, California 94111<br>Telephone: (415) 576-0200<br>Facsimile: (415) 576-0300 | email: jggilliland@townsend.com |
| --- | --- |

☐ [By First Class Mail] I am readily familiar with my employer's practice for collecting and processing documents for mailing with the United States Postal Service. On the date listed herein, following ordinary business practice, I served the within document(s) at my place of business, by placing a true copy thereof, enclosed in a sealed envelope, with postage thereon fully prepaid, for collection and mailing with the United States Postal Service where it would be deposited with the United States Postal Service that same day in the ordinary course of business.

☐ [By Overnight Courier] I caused each envelope to be delivered by a commercial carrier service for overnight delivery to the offices of the addressee(s).

☐ [By Hand] I directed each envelope to the party(ies) so designated on the service list to be delivered by courier this date.

☐ [By Facsimile Transmission] I caused said document to be sent by facsimile transmission to the fax number indicated for the party(ies) listed above.

☒ [By Electronic Transmission] I caused said document to be sent by electronic transmission to the e-mail address indicated for the party(ies) listed above via the court's ECF notification system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on October 8, 2009 at Houston, Texas.

*/s/ Michael Wilson*
Michael Wilson