K.A.D. CAMARA (TX Bar No. 24062646/
MA Bar No. 661087 – *Admitted Pro Hac Vice*)
camara@camarasibley.com
KENT RADFORD (TX Bar No. 24027640 –
*Admitted Pro Hac Vice*)
radford@camarasibley.com
CAMARA & SIBLEY LLP
2339 University Boulevard
Houston, Texas 77005
Telephone:  (713) 893-7973
Facsimile:   (713) 583-1131

EUGENE ACTION (SBN 223023)
eugeneaction@hotmail.com
1780 E. Barstow Ave., #5
Fresno, California 93710
Telephone: (559) 283-9772
Facsimile: (559) 642-2843

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| APPLE INC., a California corporation, | CASE NO. CV-08-03251-WHA |
| *Plaintiff*, | |
| v. | **PSYSTAR'S RESPONSE TO APPLE'S MOTION FOR SUMMARY JUDGMENT** |
| PSYSTAR CORPORATION, | |
| *Defendants*. | |
| AND RELATED COUNTERCLAIMS | |

**TABLE OF CONTENTS**

I.  TECHNICAL BACKGROUND ........................................................................ 1

II. BREACHES OF THE SLA DO NOT MAKE PSYSTAR LIABLE FOR
    COPYRIGHT INFRINGEMENT. .............................................................. 8

III. PSYSTAR DID NOT ENGAGE IN COPYRIGHT INFRINGEMENT ............................. 9

    A.  Psystar Does Not Violate Apple's Reproduction Right Because Of § 117
        And, In The Alternative, Fair Use .................................................. 10

    B.  Psystar Does Not Violate Apple's Distribution Right Because Of § 109. ................. 12

    C.  Psystar Does Not Violate Apple's Right To Create Derivative Works
        Because Psystar Does Not Create Derivative Works ...................................... 13

        1.  Installing multiple pieces of software on a computer does not create
            a set of derivative works ...................................................... 13

        2.  Apple's cases — *Dun & Bradstreet*, *Strohon*, and *Artic* — are
            inapposite because they concern defendants who modified the
            plaintiff's source code or object code, something that Psystar did not
            do. ............................................................................. 14

    D.  Psystar Owns The Copies Of OS X That It Buys ......................................... 16

    E.  Section 117 Applies To Psystar's Installation Of Copies Of OS X. ..................... 17

        1.  Psystar has not waived its § 117 defense ....................................... 17

        2.  Section 117 applies to Psystar even though Psystar installs copies of
            OS X for the ultimate purpose of resale to end users. .......................... 18

IV. PSYSTAR DID NOT VIOLATE THE DMCA. ................................................... 19

V.  COPYRIGHT MISUSE ...................................................................... 20

VI. MILLIONS TOO MUCH ..................................................................... 22

1
2

# TABLE OF AUTHORITIES

3

### CASES

*Apple Computer, Inc. v. Formula Int'l, Inc.*, 562 F. Supp. 775 (N.D. Cal. 1983) ----------------------- 18

*Apple Computer, Inc. v. Formula Int'l, Inc.*, 594 F. Supp. 617 (N.D. Cal. 1984) ------------------- 18, 19

*Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178 (7th Cir. 2004) ------------- 19

*Dun & Bradstreet Software Services, Inc. v. Grace Consulting, Inc.*, 307 F.3d 197 (3d Cir. 2002)ii, 14, 15

*Midway Mfg. Co. v. Artic Int'l, Inc.*, 704 F.2d 1009 (7th Cir. 1983) ----------------------------------ii, 14, 16

*Midway Mfg. Co. v. Strohon*, 564 F. Supp. 741 (N.D. Ill. 1983)------------------------------------------ii, 14, 16

*Practice Mgmt. Info. Corp. v. American Med. Ass'n, 121* F.3d 516 (9th Cir. 1997) -------------------- 20

*Realnetworks, Inc. v. DVD Copy Control Ass'n*, No. C-08-4548-MHP, 2009 WL 2475338 (N.D. Cal. 2009)-------------------------------------------------------------------------------------------------- 20

*Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) --------------------------- 12, 17

*Silverstein v. Penguin Putnam, Inc.* 368 F.3d 77 (2d Cir. 2004)-------------------------------------- 14

*Storage Technology Corp. v. Custom Hardware Engineering & Consulting Inc.*, 421 F.3d 1307 (Fed. Cir. 2005) ------------------------------------------------------------------------------------------- 20

*Sun Microsystems, Inc. v. Microsoft Corp.* 188 F.3d 1115 (9th Cir. 1999) --------------------------------9

*Torah Soft Ltd. v. Drosnin*, 136 F.Supp.2d 276 (S.D.N.Y.2001) --------------------------------------- 14

*Triad Systems Corp. v. Southeastern Exp. Co.* 64 F.3d 1330 (9th Cir. 1995) -------------------------- 21

*United States v. Wise*, 500 F.2d 1180 (9th Cir. 1977) ------------------------------------------------- 13

*Wall Data Inc. v. Los Angeles County Sheriff's Dep't*, 447 F.3d 769 (9th Cir. 2006) ------------------ 11

*Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734 (E.D. Mich. 2003) ------------------------ 15

### STATUTES

17 U.S.C. § 117------------------------------------------------------------------------------------------- 10

1

**TABLE OF EXHIBITS**

2    Ex. A         Expert report of John P. J. Kelly, Ph.D. ("Kelly Report")

3    Ex. B         Kevin Van Vechten Deposition

4    Ex. C         Rudy Pedraza Declaration

5    Ex. D         Email from Mike Culbert (APP_PSY0042750)

6    Ex. E         Email from Mike Smith (APP_PSY042734-5)

7    Ex. F         Second Supplemental Responses to Apple Inc.'s First Set of Interrogatories (No. 7,
                   10)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PSYSTAR'S RESPONSE TO
APPLE'S MOTION FOR SUMMARY JUDGMENT[1]**

Apple seeks summary judgment on its claims for copyright infringement and violation of the DMCA.  Apple does not seek summary judgment on its breach-of-contract claims, which are based on alleged breaches of the OS X Leopard Software License Agreement (SLA).  Apple focuses on its copyright claims because it wants to bury Psystar with the statutory damages laid out in the Copyright Act and the DMCA — penalties that reach up into the many millions of dollars in a case in which actual injury to Apple is doubtful and Apple has refused to permit discovery into that injury.  The practical question before this Court is whether it will put the bludgeon of statutory damages in the hands of copyright owners to enforce rights that the Copyright Act does not grant and that exist, if at all, solely by virtue of contract.

## I.     TECHNICAL BACKGROUND

Psystar develops software to enable OS X to run on non-Apple hardware.  Psystar's software interacts with OS X at its lowest level, the OS X xnu kernel ("Xnu").  A kernel (such as Xnu) provides an interface between higher-level software and underlying hardware resources, and serves to facilitate communications among the various programs a user might run on a computer.



---
[1]    Psystar appreciates the assistance of Christian Curtis, Jane Dryer, and the Brooklyn Law Incubator & Policy Clinic in the research and drafting of this response.







Since Darwin is open source, any member of the public can download the software and use it under the terms of Apple's and other parties' open-source licenses.[6]  Or they can buy a modified version of Darwin with the proprietary graphical user interface known as OS X:

While Darwin remains entirely open source, OS X is a hybrid compilation of open-source and closed-source software.

<hr />

[5]

[6]   *See* http://developer.apple.com/Darwin/



The construction of a kernel extension is not a hack.  It is something Apple knows about and

encourages.  Apple produces and distributes documentation and tools that help programmers with

enough technical skill develop new kernel extensions to extend the capabilities of OS X.  Anyone who purchases a copy of OS X has access to these tools, and they are also available for download on the Internet:[7]



---

[7] *See* http://developer.apple.com/technology/xcode.html.

Psystar makes use of Xnu's inherent architectural flexibility.  Psystar has written kernel extensions that allow Xnu to run on non-Apple computers. It is clear that Psystar is free to modify and distribute code that allows Darwin to run on non-Apple hardware.



## II.    BREACHES OF THE SLA DO NOT MAKE PSYSTAR LIABLE FOR COPYRIGHT INFRINGEMENT.

To prevail on its copyright claims, Apple must show that Psystar violated an exclusive right granted to Apple by the Copyright Act.  If Psystar has not violated any such right, then it does not matter, for purposes of analyzing a copyright claim, whether Psystar has violated the SLA.  This is because the breach of a promise in the SLA cannot convert an act that was not copyright infringement into one that is infringement; at most, breach of the SLA gives rise to a breach-of-contract claim.  Put another way, if Psystar's business activities do not invade Apple's rights under the Copyright Act, then Psystar does not need any license from Apple to engage in those activities and need not comply with the terms of any such license in order to avoid committing copyright infringement.

A license agreement can be relevant to determining whether a defendant has committed copyright infringement, but only if the defendant has first violated an exclusive right granted by the Copyright Act.  This is because a license can permit what would otherwise be a violation.  Moreover, even if the defendant has violated an exclusive right granted by the Copyright Act and has done so in violation of a license agreement, the defendant has not necessarily committed copyright infringement.  It is copyright infringement only if the term of the license that the defendant violated is a condition of the license, and not a mere covenant.  *See, e.g.*, *Sun Microsystems, Inc. v. Microsoft*

*Corp.* 188 F.3d 1115 (9th Cir. 1999).  A license agreement can only limit the copyright holder's

rights; it cannot expand them.



This Court need not reach the question whether Psystar violated the SLA because Psystar

does not rely on any license from Apple.  Psystar contends, instead, that its business activities do not

violate any exclusive right that the Copyright Act grants Apple.  Because Psystar does not invade

any of Apple's copyright rights, it does not need any license from Apple to avoid copyright

infringement.  This Court can safely ignore all those parts of Apple's motion for summary judgment

that rely on the SLA rather than the Copyright Act.

## III.    PSYSTAR DID NOT ENGAGE IN COPYRIGHT INFRINGEMENT

Apple contends that Psystar violated three of the exclusive rights granted by the Copyright

Act: the reproduction right; the distribution right; and the right to create derivative works.  *See* M. at

13–15; 17 U.S.C. § 106(1)–(3).

**A.      Psystar Does Not Violate Apple's Reproduction Right Because Of § 117 And, In The Alternative, Fair Use**

███████████████████████████████████████████████████████████

███████████████████████████████ These copies are made in the course of the

imaging process by which Psystar installs copies of Mac OS X on the computers that it sells to end

users.

*Unauthorized Copy One.* ████████████████████████████████

███████████████████████████████████████████████████████████

██████ This is not copyright infringement because it falls under 17 U.S.C. § 117.  When Psystar

installs a copy of OS X on its imaging-station computer, it is merely installing a copy of OS X that it

lawfully purchased, as permitted by § 117.  This would be entirely clear if Psystar were installing OS

X on the imaging-station computer directly from the OS X DVD.  Apple contends that installing OS

X on the imaging-station computer from the Mac Mini instead of from the OS X DVD transforms

this copying into copyright infringement.

Section 117 provides that "it is not an infringement for the owner of a copy of a computer

program to make . . . another copy or adaptation of that computer program . . . as an essential step in

the utilization of the computer program in conjunction with a machine."  When Psystar copies OS X

to the imaging-station computer, it is the lawful owner of a copy of OS X and is installing a copy of

OS X on a computer.  *See* Psystar's Motion for Summary Judgment at 5–9.  This is precisely what §

117 permits.  *See* Psystar's Motion for Summary Judgment at 9-11.

Section 117 nowhere requires that the copy that is installed on the computer be made directly

from the copy of a computer program that the owner owns.  Section 117 provides that the owner of a

DVD containing OS X Leopard, as the "owner of a copy of a computer program," can install OS X

Leopard on his computer.  It does not require that this installation be done directly from that DVD.

Installing from the DVD would be the ordinary course for an end user, of course, but it would be inefficient for Psystar, which installs OS X on many computers. Because Psystar owns one OS X DVD for every copy of OS X that it installs on its computers, the fact that it does these installations from a Mac Mini rather than directly from the OS X DVD does not defeat its § 117 right to install a copy of OS X.

Moreover, in the alternative, it is fair use for Psystar to install copies of OS X that it has a right, as an owner of one OS X DVD per Psystar computer, to install in a more efficient way than by inserting the DVD's in Psystar computers one by one. In *Wall Data*, the Ninth Circuit considered the Los Angeles Sheriff's Department's decision to install software on 6,007 computers when it had a license for only 3,663 computers. The Sheriff's Department claimed that this was fair use because it took steps to ensure that no more than 3,663 users were using the software at any time, even though the software was installed on 6,007 different computers. The Ninth Circuit rejected this claim of fair use, but stated that using imaging for 6,007 installations would not, in itself, be a problem:

> To be clear, we do not hold that a fair use defense is not available simply because the infringer uses technology to make efficient use of its licenses. The problematic aspect of the Sheriff's Department's use is that it took in excess of what it bargained for, not that it was technologically efficient. Thus, for example, **if the Sheriff's Department had saved time and money by hard drive imaging RUMBA software onto the number of computers for which it had licenses, its 'efficiency' would not create a problem**.

*Wall Data Inc. v. Los Angeles County Sheriff's Dep't*, 447 F.3d 769, 779 n.6 (9th Cir. 2006) (emphasis added).

*Unauthorized Copy Two*. ███████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████  This copying is not copyright infringement for the same reasons as apply to allegedly unauthorized copy one: § 117 permits Psystar to install copies of OS X that it buys on Psystar computers; and it is fair use to use an imaging station to make the

process of installation more efficient.

*Unauthorized Copy Three.* ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████ Copying a computer program into RAM as a result of installing and running that

program is precisely the copying that § 117 provides does not constitute copyright infringement for

an owner of a computer program.  As the Ninth Circuit explained, permitting copies like this was §

117's purpose:

> Section 117 was enacted on the recommendation of CONTU, which noted that
> "[b]ecause the placement of any copyrighted work into a computer is the preparation of
> a copy [since the program is loaded into the computer's memory], the law should
> provide that persons in rightful possession of copies of programs be able to use them
> freely without fear of exposure to copyright liability."  CONTU Report at 13.

*Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520 (9th Cir. 1992).

**B.      Psystar Does Not Violate Apple's Distribution Right Because Of § 109.**

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████ As discussed in the next section, Psystar does not agree that the addition of

Psystar's bootloader and kernel extensions constitutes a modification of OS X.  Instead, Psystar

contends that it is bundling OS X, unmodified, with Psystar's own interoperable software.  It is just

as though Psystar were selling computers with both OS X and Microsoft Word installed: it would not

be the case in that situation that Psystar had "modified" OS X to include Microsoft Word (or vice

versa); it would be appropriate to say, instead, that Psystar had bundled OS X with Microsoft Word

while modifying neither.

Stripped of the inaccurate "modification" description, Apple's allegation is that Psystar

violated its distribution right by selling a package consisting of (1) a Psystar computer, (2) a copy of

OS X, and (3) a copy of Psystar's bootloader and kernel extensions.  It is only (2), the resale of a

copy of OS X, that arguably could violate Apple's distribution right.  But the resale of a copy of OS X does not violate Apple's distribution right because resale of a copy by the owner of that copy is expressly permitted by § 109.  *See* Psystar's Motion for Summary Judgment at 11.  As the Ninth Circuit has explained:

> [T]he first sale doctrine provides that where a copyright owner parts with title to a particular copy of his copyrighted work, he divests himself of his exclusive right to vend that particular copy.  While the proprietor's other copyright rights (reprinting, copying, etc.) remain unimpaired, **the exclusive right to vend the transferred copy rests with the vendee, who is not restricted by statute from further transfers of that copy**, even though in breach of an agreement restricting its sale.

*United States v. Wise*, 500 F.2d 1180, 1187 (9th Cir. 1977) (emphasis added).

**C.    Psystar Does Not Violate Apple's Right To Create Derivative Works Because Psystar Does Not Create Derivative Works**

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████.  Psystar responds that adding to or replacing parts of OS X without modifying the OS X source or object code and solely as a result of installing on the same computer additional, separate software written by Psystar is not the creation of a derivative work of OS X.

**1.    Installing multiple pieces of software on a computer does not create a set of derivative works**

Apple's position is best refuted by *reductio ad absurdum*.  Apple claims, with respect to the bootloader, that replacing one program in Apple's operating system (the Apple bootloader) with a different software program written by a third party (the Psystar bootloader) is the creation of a derivative work of OS X.  But if this were so, then a user could not, for example, replace Apple's Internet browser, Safari, with Microsoft Internet Explorer, Mozilla Firefox, or Google Chrome without creating a derivative work.  Similarly, a user could not replace Apple's word-processing programs TextEdit or Pages with Microsoft Word or Corel WordPerfect without creating a

1   derivative work.  It cannot be the case that every time third-party software is installed on a computer,

2   the result is a new derivative work consisting in the combination of all the software on that particular

3   computer.

4       Another way of saying this is that the changes made by Psystar are entirely functional in

5   nature.  With the addition of Psystar's kernel extensions, OS X is extended to run on non-Apple

6   computers.  Functional changes to a compilation do not create a new works of authorship (a

7   necessary element in the creation of a derivative work). *See Silverstein v. Penguin Putnam, Inc.* 368

8   F.3d 77 (2d Cir. 2004) (*citing Torah Soft Ltd. v. Drosnin,* 136 F.Supp.2d 276, 287 (S.D.N.Y.2001)).

10          **2.    Apple's cases — *Dun & Bradstreet*, *Strohon*, and *Artic* — are inapposite**
11          **because they concern defendants who modified the plaintiff's source code**
            **or object code, something that Psystar did not do.**

12   ██████████████████████████████████████████████████████████████████████

13   ██████████████████████████████████████████████████████████████████████

14   ████.  Apple's first case, *Dun & Bradstreet*, involved a copyright owner who licensed the source

15   code of a suite of enterprise management programs (payroll preparers and the like) to large

16   companies.  *See Dun & Bradstreet Software Services, Inc. v. Grace Consulting, Inc.*, 307 F.3d 197

17   (3d Cir. 2002).  The defendant was a consultant that would come in and modify the source code of

18   the licensed programs to improve their operation for the licensee.  *See id.* at 202 ("Grace began

19   offering Millenium licensees Grace's 'Remain on Release' program, which provides Geac customers

20   with Grace's own version of Geac's W-2 program.").

21
22          This modification was 'large scale,' and included compilation, link editing, and testing
            of GMI W-2 software with the DBS code at customer sites, and modifying the Geac
23          program language code.  He [a Grace witness] further stated unequivocally that in
            fixing bugs and in adding features, Grace consultants have modified DBS's source
24          code.

25   *Id.* at 208–09.

26
27       Unlike the defendant in *Dun & Bradstreet*, Psystar did not have access to, much less did it

28   modify, the source code for Apple's OS X.  Psystar simply bought a copy of OS X off the shelf like

any other purchaser.  There is a difference between modifying someone else's program to create a new and improved version of that same program — a task that will typically require "modifying the . . . program language code," "compilation," and "link editing," *id.* — and using someone else's program in combination with your own.  If Microsoft were to gain access to OS X's source code and build in a better word processor, then sell the product as OS Eleven, advertising, like the defendant in *Dun & Bradstreet*, that customers should buy this instead of OS X, that might be the creation of a derivative work.  But if Microsoft merely installs Microsoft Word on top of OS X, this is simply the use of two programs together, not the creation of a derivative work.

After all, on the contrary view, would the result of installing Microsoft Word be a derivative work not only of Apple's OS X but also of Microsoft's Word?  The multiplication of derivative-work claims resulting from Apple's view as applied to an ordinary computer running third-party software from many different manufacturers would be bizarre.  Every major software company would need to cross-license its work with the owners of all other programs that it could expect to be installed on the same computer.  This is not the law.  Rather, the law is that installing two programs on the same computer does not create a derivative work even if the result of installing one program is to modify some of the ones and zeroes that make up the other program and even if one program's purpose is to improve or expand the total capabilities of the computer system.  *Cf. Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 769 (E.D. Mich. 2003) ("Even if the presence of an overlapping window could be said to change the appearance of the underlying window on a computer screen, the mere alteration of the manner in which an individual consumer's computer displays content sent by plaintiffs' websites does not create a 'derivative work.'").

Apple's other two cases both involve two video games from the 1980's, Galaxian and Pac-Man.  In *Strohon*, a district-court case from Illinois, the defendant sold physical ROM's (silicon chips) that could be plugged into a Pac-Man arcade game in place of some of the Pac-Man ROM's to

change the rules, add new levels, and otherwise make the game more exciting. *See Midway Mfg. Co. v. Strohon*, 564 F. Supp. 741, 744 (N.D. Ill. 1983). The defendant also included a kit for re-branding the Pac-Man game as Cute-See, replacing all the stickers on the arcade box that referred to Pac-Man with stickers that referred to Cute-See. *See id.* ("The CUTE-SEE graphics appear to be intended to cover the words 'PAC-MAN' wherever they appear on the cabinet."). In *Artic*, the defendant sold ROM's that simply made that Galaxian game faster and hence more challenging for players. *See Midway Mfg. Co. v. Artic Int'l, Inc.*, 704 F.2d 1009, 1013–14 (7th Cir. 1983).

Strohon* and *Artic* are like *Dun & Bradstreet* in that the defendant took a base of code made by the plaintiff and modified that code to make a new, upgraded version of the plaintiff's product that the defendant called his own. *Strohon* and *Artic* are OS Eleven cases. Neither case is analogous to the case at bar because, here, Psystar does not create a new and upgraded operating system; it merely installs its own code along with OS X. This code enhances the operation of the resulting computer, just as third-party drivers help a computer work with hardware like scanners or printers and just as third-party application software like Mozilla Firefox or Google Chrome or Microsoft Internet Explorer helps a computer to surf the web or do other tasks. But the fact that third-party code lets a computer do what it could not do before does not mean that installing that code creates a derivative work of the operating system. It is only when the third-party code creates a new version of the operating system, and not a separate and distinct program, that a derivative-work problem arises.

### D.     Psystar Owns The Copies Of OS X That It Buys.

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████     Because this issue

has been fully briefed in Psystar's Motion for Summary Judgment, Psystar will not reproduce its

arguments here.

**E.      Section 117 Applies To Psystar's Installation Of Copies Of OS X.**

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████.

**1.      Psystar has not waived its § 117 defense.**

Psystar has not waived its rights under § 117 because § 117 is a "limitation[] on [a copyright

owner's] exclusive rights." 17 U.S.C. §117. Thus, § 117 does not excuse unauthorized copying that

constitutes infringement but instead states that certain types of unauthorized copying *do not* infringe a

copyright owner's exclusive rights. As the Ninth Circuit explained in *Sega Enterprises Ltd. v.*

*Accolade, Inc.,* "[s]ection 117 defines a narrow category of copying that is lawful *per se*" and

"[s]ection 107, by contrast, establishes a *defense* [of fair use] to an otherwise valid claim of copyright

infringement." 977 F.2d 1510, 1521 (9th Cir. 1993) (emphasis in original). Accordingly, Psystar did

not need to raise § 117 as an affirmative defense.

However, to the extent that the court finds § 117 is an affirmative defense, Psystar has pled it.

The eighth affirmative defense states that Psystar has not "infringed any alleged copyright" in this

case.  Psystar Corporation's Answer to Apple Inc.'s First Amended Complaint, p. 18.  While not

mentioning the section by name, Psystar describes the substance of a § 117 defense: that a narrow

category of copying is lawful.

In any case, Psystar raised the substance of its § 117 argument at least as early as March 6, 2009 in its Second Supplemental Responses to Apple Inc.'s First Set of Interrogatories (*see* Rogs. # 7, 10), attached as Ex. F. This date was well before Apple conducted most of its depositions in this case and over six months before the dispositive-motions deadline. Apple's own Motion for Partial Summary Judgment demonstrates that Apple knew Psystar would argue this defense. Apple spent almost 10 percent of its motion space arguing against the merits of Psystar's § 117 defense. Apple cannot say they have been surprised or prejudiced by Psystar's assertion of § 117.

> **2. Section 117 applies to Psystar even though Psystar installs copies of OS X for the ultimate purpose of resale to end users.**

The only case that Apple offers in support of its argument that § 117 does not protect Psystar and its customers is a 1984 district-court case in which Apple beat Pineapple. In the *Formula* case, Apple obtained an injunction against a kit computer maker who included Apple software as part of the unassembled computer kits that it sold. *Formula I* is the district court's order on the application for an injunction. *See Apple Computer, Inc. v. Formula Int'l, Inc.*, 562 F. Supp. 775 (N.D. Cal. 1983). *Formula II* is the district court's order on a motion to enforce the injunction by contempt. *See Apple Computer, Inc. v. Formula Int'l, Inc.*, 594 F. Supp. 617 (N.D. Cal. 1984).

*Formula I* has nothing to do with § 117 at all. The case nowhere considers whether § 117 would protect the defendant's actions. Indeed, it is not clear whether the defendant owned legitimate copies of Apple's software or, instead, owned pirated copies, in which case § 117 would not apply. At issue was whether Apple's software programs were copyrightable expressive works or uncopyrightable ideas or algorithms. *See Formula I*, 562 F. Supp. at 778–83. This (except as to the haiku when used as a key) is not at issue in the case at bar.

*Formula II* considers whether purchasing a lawful copy of Apple software then copying that software not onto a computer, but onto silicon chips that can be plugged into a computer by the end user, is protected by § 117. The court held that this copying was not protected for two alternative

reasons: (1) because the imprinting on silicon chips is not for "internal use"; and (2) because the imprinting on silicon chips is not "an essential step" in using the computer program because the programs in question could be run from the original disk. *See Formula II*, 594 F. Supp. at 621–22.

Neither reason stated in *Formula II* is applicable to Psystar. Psystar does not sell kit computers; like Dell, it assembles complete computer systems and sells these working computers to end-users. Because Psystar installs Apple's software on its own computers as an essential step for the use of Apple's software on those computers, Psystar falls squarely within § 117. Even while the computers are at Psystar, Psystar can use them to run OS X. The installation is an "internal use."

Moreover, because OS X, unlike the Apple software at issue in *Formula II*, cannot be run from the disk, the installation of that software is an essential step in using OS X so that this installation falls within § 117. Psystar does not make a copy of OS X onto a separate component for later, external installation in a computer; it installs its copies of OS X onto working computers internally at Psystar.

**IV.    PSYSTAR DID NOT VIOLATE THE DMCA.**

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ Psystar responds that it did not violate the DMCA because (1) any circumvention did not facilitate infringement and therefore did not violate the DMCA, *see Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178 (7th Cir. 2004); *Realnetworks, Inc. v. DVD Copy Control Ass'n*, No. C-08-4548-MHP, 2009 WL 2475338 (N.D. Cal. 2009) (adopting *Chamberlain*); *Storage Technology Corp. v. Custom Hardware Engineering & Consulting Inc.*, 421 F.3d 1307 (Fed. Cir. 2005); and (2) Apple's anti-circumvention technology is wholly ineffective because the key has been publicly available on the Internet for years, *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 547 (6th Cir. 2004).

Because this issue has already been fully briefed in Psystar's Motion for Summary Judgment at 13–20 (incorporated by reference), Psystar will not repeat its arguments here.

## V.   COPYRIGHT MISUSE

Apple misstates the doctrine of copyright misuse.  First, neither proof of an antitrust violation nor a showing of market power is necessary to prevail on a defense of copyright misuse.  *See Practice Mgmt. Info. Corp. v. American Med. Ass'n, 121* F.3d 516, 521 (9th Cir. 1997) ("a defendant in a copyright infringement suit need not prove an antitrust violation to prevail on a copyright misuse defense").  Second, public policy underlying copyright strongly opposes a copyright owner using his copyrights to gain commercial control over products that are not protected under copyright law.  *In re Napster, Inc., Copyright Litigation,* 191 F. Supp. 2d 1087, 1105 (N.D. Cal. 2004) (noting that "unduly restrictive copyright licensing agreements" can constitute misuse).

The cases cited by Apple bear no resemblance to the issues at hand.  In *Bell Atlantic Business Systems Services, Inc. v. Hitachi Data Systems Corp.,* the court rejected the misuse defense because the defendant had alleged "no other basis for copyright misuse . . . [b]eyond the [dismissed] antitrust claims." 1995 WL 836331 at *11 (N.D. Cal.).  Similarly, in *Service & Training, Inc. v. Data General Corp.,* the court held that "even though 'a misuse need not be a violation of antitrust law in order to comprise an equitable defense to an infringement action,' appellants have offered no evidence" of copyright misuse beyond the previously rejected tying claim. 963 F.2d 680 (4th Cir. 1992).  Here, by contrast, Psystar does not offer recycled theories of antitrust violations.

Apple's contention that "courts have consistently upheld the license restrictions" found in the SLA is not supported by the two cases it cites (nevermind the irrelevance of this argument).  In fact, Apple's first case, *Triad Systems,* is an excellent case to support Psystar's position that the sale of software copies extinguishes certain copyrights in the copyright holder:

> Triad software customers are subject to three different contractual arrangements. From 1976 to 1985, Triad sold its software outright to customers ("Regime 1").  **Because**

**Regime 1 customers own their software, they have rights under the Copyright Act to make or authorize the making of copies in the operation of their computers. As a result, such copies are noninfringing, even if they are made by Southeastern in the course of servicing Regime 1 customers' computers**. Triad therefore concedes that Southeastern cannot be barred from making use of software owned by Regime 1 customers.

*Triad Systems Corp. v. Southeastern Exp. Co.* 64 F.3d 1330, 1333 (9th Cir. 1995) (emphasis added).

Apple's second case, *Microsoft Corp. v. BEC Computer Co., Inc.,* arose from the defendant's distribution of "stand-alone" copies of the licensed software, which the license prohibited, for less than the prices required in the license agreement. 818 F. Supp. 1313 (C.D. Cal. 1992). Because Psystar paid for every copy of OS X Leopard that it installed, *BEC Computer* is inapposite.

We now know from the record that Apple fully intended — with singular focus — to use copyright law to enforce the tethering of OS X to Apple hardware. Witness after witness presented by Apple testified to Apple's intention to implement certain technological features whose sole purpose is to provide offensive legal weaponry against any user that attempts to use OS X on non-Apple hardware:





VI.   MILLIONS TOO MUCH

We need not repeat the misuse arguments made in Psystar's Motion for Summary Judgment at 20–24 (incorporated by reference).  Instead, we simply and respectfully request that the Court deny Apples motion and provide Psystar the relief it deserves.  Psystar is a company not unlike many thousands of other small businesses that are the backbone of the American economy. Rudy and Robert Pedraza are the founders and, for the moment, remain the dedicated leaders of Psystar.  They are assisted by a small group of employees, many of whom are also family.  The Pedrazas are proud Cuban-Americans who embody the spirit of innovation and hard work of which all of us, as Americans, are so justly proud.

It should be clear from the papers that Apple has filed that Apple has spent millions of dollars pursuing this family business, trying to destroy them.[8]  The record is replete with Apple's admissions

---

[8]  The materials filed under seal in connection with Psystar's Motion for Summary Judgment should now be unsealed under Local Rule 79-5(d).   Under the Local Rules, Apple had five days to

that this entire suit is based on a fierce motive to protect Apple's market position by any means possible, legal or otherwise.  This Court should end this vexatious litigation.  It's been millions too much.

Dated:  October 22, 2009            Respectfully submitted,

                                    CAMARA & SIBLEY LLP


                                    By:    /s/ K.A.D. Camara_____
                                           K.A.D. Camara




                                    *Attorneys for Defendant / Counterclaimant*
                                    *Psystar Corporation*

_____

file a declaration stating good cause for keeping sealed those parts of Psystar's motion that Psystar filed under seal.  See Local Rule 79-5(d) ("Within five days thereafter [after the motion to seal is filed], the designating party must file with the Court and serve a declaration establishing that the designated information is sealable, and must lodge and serve a narrowly tailored proposed sealing order, or must withdraw the designation of confidentiality.  If the designating party does not file its responsive declaration as required by this subsection, the document or proposed filing will be made part of the public record.").  Apple never filed the required declaration.  Accordingly, Psystar respectfully requests that at least this part of the dispositive motions be immediately released to the public

1

**CERTIFICATE OF SERVICE**

2    I, Michael Wilson, declare I am employed in the City of Houston and County of Harris, Texas
in the office of Camara & Sibley.  I am over the age of eighteen and not a party to this action.  My
3    business address is Camara & Sibley, 2339 University Boulevard, Houston, Texas 77005.

4    I served the following document(s):

5    PSYSTAR'S RESPONSE TO APPLE'S MOTION FOR SUMMARY JUDGMENT
Case No. CV 08-03251 WHA
6

7    on the interested parties in this action by placing a true and correct copy thereof, on the above date,
enclosed in a sealed envelope, following the ordinary business practice of Camara & Sibley LLP.  I
sent the document(s) to the following:

8

9    | James G. Gilliland, Jr. | email:  jggilliland@townsend.com |
10   | TOWNSEND AND TOWNSEND AND CREW LLP<br>Two Embarcadero Center, 8th Floor<br>San Francisco, California 94111<br>Telephone:  (415) 576-0200<br>Facsimile:   (415) 576-0300 | |

11

12

13    ☐    [By First Class Mail]  I am readily familiar with my employer's practice for collecting
and processing documents for mailing with the United States Postal Service.  On the date listed herein,
14    following ordinary business practice, I served the within document(s) at my place of business, by
placing a true copy thereof, enclosed in a sealed envelope, with postage thereon fully prepaid, for
collection and mailing with the United States Postal Service where it would be deposited with the
15    United States Postal Service that same day in the ordinary course of business.

16    ☐    [By Overnight Courier]  I caused each envelope to be delivered by a commercial carrier
service for overnight delivery to the offices of the addressee(s).
17

☐    [By Hand]  I directed each envelope to the party(ies) so designated on the service list to
18    be delivered by courier this date.

19    ☐    [By Facsimile Transmission]  I caused said document to be sent by facsimile
transmission to the fax number indicated for the party(ies) listed above.
20

21    ☒    [By Electronic Transmission]  I caused said document to be sent by electronic
transmission to the e-mail address indicated for the party(ies) listed above via the court's ECF
notification system.
22

23    I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct, and that this declaration was executed on October 22, 2009 at Houston,
Texas.
24

25    */s/ Michael Wilson*
Michael Wilson

26

27

28