1   TOWNSEND AND TOWNSEND AND CREW LLP
    JAMES G. GILLILAND, JR. (State Bar No. 107988)
2   MEHRNAZ BOROUMAND SMITH (State Bar No. 197271)
    MEGAN M. CHUNG (State Bar No. 232044)
3   J. JEB B. OBLAK (State Bar No. 241384)
    Two Embarcadero Center Eighth Floor
4   San Francisco, CA  94111
    Telephone:  (415) 576-0200
5   Facsimile:  (415) 576-0300
    Email: jggilliland@townsend.com
6           mboroumand@townsend.com
            mmchung@townsend.com
7           jboblak@townsend.com

8   O'MELVENY & MYERS LLP
    GEORGE RILEY (State Bar No. 118304)
9   Two Embarcadero Center, 28th Floor
    San Francisco, CA  94111
10  Telephone:  (415) 984-8700
    Facsimile:  (415) 984-8701
11  Email: griley@omm.com

12  Attorneys for Plaintiff and Counterdefendant
    APPLE INC.

13

14              UNITED STATES DISTRICT COURT

15          FOR THE NORTHERN DISTRICT OF CALIFORNIA

16                 SAN FRANCISCO DIVISION

17

18  APPLE INC.,                          Case No. 08-3251 WHA

19          Plaintiff,                   **APPLE INC.'S OPPOSITION TO
                                         PSYSTAR CORPORATION'S MOTION
20       v.                              FOR SUMMARY JUDGMENT**

21  PSYSTAR CORPORATION, a Florida
    corporation,
22                                       Hearing Date:    November 12, 2009
            Defendant.                   Hearing Time:    2:00 p.m.
23                                       Courtroom:       9
    AND RELATED COUNTERCLAIMS.           Judge:           Hon. William Alsup
24                                       Trial Date:      January 11, 2010

25                  **PUBLIC VERSION
                     [REDACTED]**
26

27

28

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS ....................................................................................2

        A.      Apple's Software License Agreement ........................................................2

        B.      Psystar Copies And Modifies Mac OS X To Create A Psystar
                Computer.....................................................................................................3

        C.      Psystar Uses Apple's Trademarks And Trade Dress To
                Advertise Its Computers..............................................................................6

III.    ARGUMENT .........................................................................................................6

        A.      The First Sale Doctrine Does Not Excuse Psystar's Conduct.....................7

                1.      Psystar May Not Assert The First Sale Doctrine
                        Because It Is A Licensee, Not An Owner, Of
                        Mac OS X.........................................................................................7

                2.      Even If Psystar May Assert The First Sale Doctrine,
                        Psystar's Copying, Modification, And Distribution Of
                        Mac OS X Constitute Copyright Infringement ......................................11

        B.      Psystar's Copying Is Not Excused By The "Essential Step"
                Exception......................................................................................................12

                1.      Psystar May Not Assert A Section 117 Defense
                        Because It Is Not An "Owner" Of The Software..................................13

                2.      Psystar's Conduct Exceeds The Narrow Scope Of
                        Section 117's Essential Step Defense ..................................................13

        C.                                                                                          t
                Intrringement ...............................................................................................15

        D.      Apple Has Not Misused Its Copyrights ..............................................................17

        E.      Psystar Fails To Establish Any Defense To Apple's DMCA
                Claims ..........................................................................................................18

                1.      Psystar Concedes The Facts Establishing Its Liability
                        Under The DMCA...............................................................................19

                2.      Psystar's Legal Arguments Under The DMCA Are
                        Unavailing..........................................................................................19

                3.      Apple's Technological Protection Measures Are
                        Effective.............................................................................................22

        F.      Psystar Has Not Proven Nominative Fair Use Of Apple's

townsend.

# TABLE OF CONTENTS
(continued)

Page

Famous Trademarks ................................................................................23

G.   Apple's Remaining Claims Are Not Moot.........................................24

1.   Damages ...........................................................................24

2.   Apple Is Entitled To A Permanent Injunction.......................24

IV.   CONCLUSION ...............................................................................27

townsend.

# TABLE OF AUTHORITIES

Page

**CASES**

*321 Studios v. Metro-Goldwyn-Mayer Studios, Inc.*,
    307 F. Supp. 2d 1085 (N.D. Cal. 2004) ........................................................................ passim

*A&M Records, Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001)........................................................................................ 25, 26

*Abdul-Jabbar v. Gen. Motors Corp.*,
    85 F.3d 407 (9th Cir. 1996)................................................................................................ 24

*Abercrombie & Fitch Co. v. Moose Creek, Inc.*,
    486 F.3d 629 (9th Cir. 2007)............................................................................................... 27

*Adobe Sys. Inc. v. One Stop Micro, Inc.*,
    84 F. Supp. 2d 1086 (N.D. Cal. 2000) ........................................................................... 7, 8, 9

*Adobe Sys. Inc. v. Stargate Software Inc.*,
    216 F. Supp. 2d 1051 (N.D. Cal. 2002) ......................................................................... 7, 8, 9

*Ajaxo Inc. v. E*Trade Group, Inc.*,
    135 Cal. App. 4th 21 (Cal. App. 2005) ............................................................................. 24

*Alcatel USA, Inc. v. DGI Tech., Inc.*,
    166 F.3d 772 (5th Cir. 1999).......................................................................................... 17, 18

*Altera Corp. v. Clear Logic, Inc.*,
    424 F.3d 1079 (9th Cir. 2005)............................................................................................ 17

*Apple Computer, Inc. v. Formula Int'l, Inc.*,
    594 F. Supp. 617 (C.D. Cal. 1984), *aff'd* 725 F.2d 521 (9th Cir. 1984).................... 12, 15, 16

*Apple Inc. v. Psystar Corp.*,
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) ............................................................................ 17

*Assessment Techs. of WI, LLC v. WIREdata, Inc.*,
    350 F.3d 640 (7th Cir. 2003)............................................................................................. 17

*Atari Games Corp. v. Nintendo of America, Ltd.*,
    975 F. 2d 832 (Fed. Cir. 1992)........................................................................................... 16

*Aymes v. Bonelli*,
    47 F.3d 23 (2d Cir. 1995)................................................................................................... 14

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................................................................ 23

# TABLE OF AUTHORITIES
(continued)

Page

*Chamberlain Group, Inc. v. Skylink Techs., Inc.*,
    381 F.3d 1178 (Fed. Cir. 2004)............................................................................. 20

*Davidson & Assocs. v. Jung*,
    422 F.3d 630 (8th Cir. 2005)........................................................................... 18, 21

*Downing v. Abercrombie & Fitch Co.*,
    265 F.3d 994 (9th Cir. 2001)................................................................................ 24

*Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*,
    307 F.3d 197 (3d Cir. 2002)................................................................................. 16

*Evolution, Inc. v. SunTrust Bank*,
    342 F. Supp. 2d 943 (D. Kan. 2004) .................................................................... 14

*Foster Poultry Farms, Inc. v. Suntrust Bank*,
    No. 04-5513, 2008 WL 160960 (E.D. Cal. Jan. 14, 2008) ................................... 24

*Freeman v. Lasky, Haas & Cohler*,
    410 F.3d 1180 (9th Cir. 2005)............................................................................. 18

*Hampton v. Paramount Pictures Corp.*,
    279 F.2d 100 (9th Cir. 1960)............................................................................... 10

*Horphag Res. Ltd. v. Pellegrini*,
    337 F.3d 1036 (9th Cir. 2003)........................................................................ 23, 24

*In re Adbox, Inc.*,
    488 F.3d 836 (9th Cir. 2007)............................................................................... 12

*In re Psystar Corp.*,
    Case No. 09-19921 (S.D. Fl. 2009)...................................................................... 26

*Jorst v. D'Ambrosio Bros. Inv. Co.*,
    No. 00-03646, 2001 WL 969039 (N.D. Cal. Aug. 13, 2001) ............................... 12

*Krause v. Titleserv, Inc.*,
    402 F.3d 119 (2d Cir. 2005)........................................................................... 14, 15

*Lasercomb Am., Inc. v. Reynolds*,
    911 F.2d 970 (4th Cir. 1990)............................................................................... 17

*Lexmark Int'l Inc. v. Static Control Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004)........................................................... 15, 16, 20, 21

# TABLE OF AUTHORITIES
(continued)

Page

*MAI Systems Corp. v. Peak Computer, Inc.,*
991 F.2d 511 (9th Cir. 1993)....................................................................... 9, 11, 13

*Martone v. Burgess,*
No. 08-2379, 2008 WL 3916022 (N.D. Cal. Aug. 25, 2008) ................................. 24

*MDY Indus., LLC v. Blizzard Entm't, Inc.,*
616 F. Supp. 2d 958 (D. Ariz. 2009)........................................................................ 26

*MDY Indus., LLC v. Blizzard Entm't, Inc.,*
No. CV-06-2555, 2008 WL 2757357 (D. Ariz. July 14, 2008) ............................. 13

*Metro-Golden-Mayer Studios, Inc. v. Grokster, Ltd.,*
518 F. Supp. 2d 1197 (C.D. Cal. 2007).............................................................. 26, 27

*Midway Mfg. Co. v. Strohon,*
564 F. Supp. 741 (N.D. Ill. 1983) ...................................................................... 7, 14

*Mirage Editions, Inc. v. Albuquerque A.R.T. Co.,*
856 F.2d 1341 (9th Cir. 1988)............................................................................. 7, 11

*MySpace, Inc. v. Wallace,*
498 F. Supp. 2d. 1293 (C.D. Cal. 2007)................................................................... 26

*Nissan Fire & Marine Ins. Co. v. Fritz Co.,*
210 F.3d 1099 (9th Cir. 2000)................................................................................... 23

*Novell, Inc. v. Unicom Sales, Inc.,*
No. C-03-2785, 2004 WL 1839117 (N.D. Cal. 2004) .............................................. 8

*Pearl Inv., LLC v. Standard I/O, Inc.,*
257 F. Supp. 2d 326 (D. Me. 2003) .......................................................................... 23

*PGBA v. U.S.,*
389 F.3d 1219 (Fed. Cir. 2004).................................................................................. 25

*Practice Mgmt. Info. Corp., v. Am. Medical Ass'n,*
121 F.3d 516 (9th Cir. 1997)...................................................................................... 18

*Prof'l Real Estate Investors v. Columbia Pictures,*
508 U.S. 49, 113 S. Ct. 1920 (1993) ......................................................................... 18

*Qad, Inc. v. ALN Assoc., Inc.,*
770 F. Supp. 1261 (N.D. Ill. 1991), *aff'd* 974 F.2d 834 (7th Cir. 1992)................ 17

townsend.

# TABLE OF AUTHORITIES
(continued)

Page

*RealNetworks, Inc. v. DVD Copy Control Ass'n,*
__ F. Supp. 2d __, 2009 WL 2475338 (N.D. Cal. Aug. 11, 2009) ........................ 18, 19, 20, 22

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.,*
944 F.2d 597 (9th Cir. 1991)................................................................................................ 26

*Schloss v. Sweeney,*
515 F. Supp. 2d 1068 (N.D. Cal. 2007) ............................................................................... 17

*Serv. & Training, Inc. v. Data Gen. Corp.,*
963 F.2d 680 (4th Cir. 1992)................................................................................................... 8

*Silverstein v. Penguin Putnam, Inc.,*
368 F.3d 77 (2d Cir. 2004).................................................................................................... 25

*SimplexGrinell LP,*
2009 U.S. Dist. LEXIS 30657 (S.D.N.Y. Mar. 31, 2009) ..................................................... 25

*Sony Computer Entm't Am., Inc. v. Divineo, Inc.,*
457 F. Supp. 2d 957 (N.D. Cal. 2006) ........................................................................... 20, 22

*Stuart Weitzman, LLC v. Micro Computer Res., Inc.,*
510 F. Supp. 2d 1098 (S.D. Fla. 2007), *vacated on other grounds,* 542 F.3d 859 (11th
Cir. 2008) ............................................................................................................................. 14

*Taylor v. List,*
880 F.2d 1040 (9th Cir. 1989).............................................................................................. 24

*Triad Systems Corp. v. Southeastern Express Co.,*
64 F.3d 1330 (9th Cir. 1995)..................................................................................... 9, 13, 15

*United States v. Wise,*
550 F.2d 1180 (9th Cir. 1977)................................................................................................ 9, 10

*Universal City Studios, Inc. v. Corley,*
273 F.3d 429 (2d Cir. 2001)........................................................................................... passim

*Universal City Studios, Inc. v. Reimerdes,*
111 F. Supp. 2d 294 (S.D.N.Y. 2000).................................................................... 19, 22, 23

*Vernor v. Autodesk, Inc.,*
No. 07-1189, 2009 WL 3187613 (W.D. Wash. Sept. 30, 2009)......................................... 9, 10

*Vernor v. Autodesk, Inc.*
555 F. Supp. 2d 1164 (W.D. Wash. 2008)........................................................................ 9, 10

# TABLE OF AUTHORITIES
(continued)

Page

*Wall Data Inc. v. Los Angeles County Sheriff's Dept.*,
   447 F.3d 769 (9th Cir. 2006) ................................................................... 7, 9, 11, 13

**STATUTES**

15 U.S.C. § 1116 ............................................................................................. 25

17 U.S.C. § 101 ................................................................................................. 1

17 U.S.C. § 109 ................................................................................ 7, 8, 9, 11

17 U.S.C. § 117 ......................................................................................... passim

17 U.S.C. § 202 ................................................................................................. 8

17 U.S.C. § 502(a) ........................................................................................... 25

17 U.S.C. § 1201 ...................................................................................... passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8(c) .......................................................................................... 12

Final Report of the National Commission on New Technological Uses of Copyrighted
   Works (1978) ............................................................................................... 15

H.R. Rep. No. 105-551, pt. 2 (1998) ............................................................... 22

S. Rep. No. 105-190 (1998) ............................................................................. 20

## I.      INTRODUCTION

Psystar admits that it copies, modifies and distributes Apple's copyrighted software, Mac OS X, without Apple's consent. Psystar admits that it circumvents – also without Apple's consent – technological protection measures in Mac OS X in order to cause it to operate on computers that were not designed by Apple and for which the software was never intended. Thus, unless Psystar can demonstrate that its conduct falls within narrow exceptions to the statutes – and it cannot – Psystar has violated both the Copyright Act, 17 U.S.C. §§ 101, *et seq.*, and the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201, *et seq.*

Psystar attempts to defend against Apple's copyright infringement and DMCA claims by arguing that it is the "owner" of copies of Mac OS X and, therefore, can do with those copies as it pleases. This argument fails for two reasons. First, Psystar is not the owner; it is a licensee of Mac OS X, and Psystar's right to use the software is strictly limited by Apple's license. Second, even if, contrary to the facts, Psystar were an owner of a copy of Mac OS X, Psystar's infringing conduct exceeds the limited activities permitted by the "first sale" and "essential step" exceptions in the Copyright Act. 17 U.S.C. §§ 109 and 117. The law squarely prohibits Psystar from modifying, reproducing and distributing Apple's copyrighted software without Apple's permission, even if Psystar were deemed an owner of a particular copy. If Psystar's interpretation of these doctrines was correct, a customer who purchases a book, movie or music CD would be free to make and sell unlimited reproductions of that work and to publish and distribute derivative works all because the customer is the "owner" of a single copy. Such a result would completely eviscerate the copyright laws.

Psystar argues that even if it has infringed, Apple cannot enforce its copyrights because it has misused them. But Psystar has presented no evidence to support either ground for copyright misuse. First, there is no evidence that Apple has market power and has misused it, an issue already addressed earlier in this case. Second, Psystar offers no evidence – because none exists – that Apple has used its copyrights to subvert the goals of the Copyright Act.

Psystar's argument that it is not liable for trademark and trade dress infringement should similarly be rejected. Psystar admits that it uses Apple's trademarks and trade dress to promote

1 the sale of its infringing products, but asserts that its conduct is excused as "nominative fair use."

2 This is wrong.  Psystar has used Apple's marks in ways that far exceed what is "reasonably

3 necessary" to identify its products and has engaged in other conduct clearly intended to suggest

4 that its products are sponsored by Apple.

5          Despite its insistence that it has not infringed Apple's rights, Psystar nevertheless states

6 that it will stipulate to a permanent injunction and an award of nominal damages against it, and

7 then contends that the remainder of Apple's claims against it are moot.  The relief that Psystar

8 proposes is insufficient.  While Psystar's infringement should be enjoined, any injunction must be

9 broad enough to prohibit Psystar's continued unlawful conduct and protect Apple against the

10 recurrence of such conduct.  Furthermore, a trier of fact must determine whether Psystar must

11 disgorge its sales revenue, whether Psystar's infringement has been willful, and whether punitive

12 damages are appropriate.

13          As revealed by their simultaneous motions for summary judgment, Apple and Psystar

14 agree there are no material issues of fact regarding Apple's claims that Psystar has engaged in

15 copyright infringement and violated the DMCA.  As demonstrated below, and in Apple's motion

16 for summary judgment, the law and facts require entry of judgment in Apple's favor on those

17 claims.

18 **II.      STATEMENT OF FACTS**

19          The statement of facts Psystar includes in its motion is incomplete and misleading.

20 Moreover, when describing its own activities, Psystar's statement of facts is totally devoid of

21 citations to admissible evidence.  Nonetheless, the facts that are actually relevant to this case,

22 which are set forth below, are undisputed.

23          **A.      Apple's Software License Agreement**

24          It is uncontested that Apple sells boxes containing DVDs on which its copyrighted Mac

25 OS X software is written.  (Psystar Br. at 5.)  Apple includes a Software License Agreement

26 ("SLA") with its software that specifically states that "Apple and/or Apple's licensor(s) retain

27 ownership of the Apple Software itself."  (Psystar Br. at 6 and Ex. A at § 1.)  The SLA also states:

28

**townsend.**

1

BY USING THE APPLE SOFTWARE, YOU ARE AGREEING TO BE BOUND
BY THE TERMS OF THIS LICENSE.  IF YOU DO NOT AGREE TO THE
TERMS OF THIS LICENSE, DO NOT USE THE SOFTWARE.

2

3

(Psystar Br., Ex. A at Preamble.)  The SLA specifically restricts use of Mac OS X to Apple

4

computers (*id.* § 2.A.):

5

6

This License allows you to install, use and run one (1) copy of the Apple Software on
a single Apple-labeled computer as at time.  You agree not to install, use or run the
Apple Software on any non-Apple-labeled computer, or to enable others to do so.

7

8

The SLA also prohibits modification of Mac OS X (*id.* § 2.F) and the sale of any modified

9

versions of Mac OS X (*id.* § 3).

10

**B.     Psystar Copies And Modifies Mac OS X To Create A Psystar Computer**

11

Psystar purchases computer components from third parties and assembles them.  (Psystar

12

Br. at 9.)  Psystar then loads onto those computers Apple's Mac OS X software, which Psystar

13

modifies with its "own software" to "add features … to get OS X Leopard to work on a wider

14

range of computers than simply Apple Macintoshes."  (*Id.* at 9, 11.)

15

Psystar contends that it purchases a Mac OS X DVD at retail (the "Retail DVD Version")

16

for each computer it sells, and Psystar claims that it includes the Retail DVD Version with each

17

computer it ships to its customers.  (Psystar Br. at 9-10.)  But Psystar does not install the software

18

written on that Retail DVD Version onto each Psystar computer.  Instead, as illustrated below,

19

Psystar makes at least three infringing copies of Mac OS X during its manufacturing process and

20

never actually utilizes the Retail DVD Version that it allegedly includes with each computer.

21

///

22

///

23

///

24

///

25

///

26

///

27

///

28

///

**Psystar's Copying Process**



Psystar copies the hard drive of a Macintosh computer containing Mac OS X (as depicted above on the left side of the diagram) onto its "imaging station" computer (shown in the middle of the diagram). This is the first unlawful copy. Psystar then modifies this copy of Mac OS X to create a "master copy" that will run on non-Apple computers.[1] Psystar next uses "hard drive imaging" to install copies of its "master copy" of Mac OS X[2] from the imaging station onto each computer it assembles.[3] This is the second unlawful copy (a process repeated many times). Finally, every time Psystar turns on any of the Psystar computers running Mac OS X, which it

---

[1] Kelly Decl. ¶¶ 22-24; Chung Decl. Ex. 3 (Benavides Dep.) at 30:17-31:11; Ex. 8 at 89:19-91:20. This is not the copy of the software on the Retail DVD Version. (Boroumand Smith Decl. Ex. 1 (Roberto Pedraza Dep.) at 61:5-22.) Whenever possible Apple will refer to, and rely upon, evidence submitted with its own Motion for Summary Judgment, including the Declaration of John P. Kelly ("Kelly Decl.") and the Declaration of Megan Chung ("Chung Decl.") and the exhibits and testimony included with those declarations. Any additional evidence submitted in further opposition to this motion is attached to the Declaration of Mehrnaz Boroumand Smith in Opposition to Psystar's Motion for Summary Judgment ("Boroumand Smith Decl.").

[2] Psystar admits that it has made at least three "master copies," and Apple's expert has identified five distinct master copies. Chung Decl. Ex. 25. (Psystar's Responses to Court-Ordered Interrogatories 1-15) at Nos. 13-14; Kelly Decl. ¶¶ 15, 18, 25 and Table 2.

[3] Kelly Decl. ¶¶ 22-26; Chung Decl. Ex. 9 at 91:18-93:17.

1  does before shipping each computer, Psystar necessarily makes a separate modified copy of Mac

2  OS X in Random Access Memory, or "RAM."[4]  This is the third unlawful copy.

3      As this process shows, the Mac OS X software installed on Psystar computers is a different

4  copy of the software than the Retail DVD Version.  The installed version has been modified so

5  that it can run on Psystar's hardware.  Indeed, when Psystar demonstrated its manufacturing

6  process to Apple's expert, Dr. John Kelly, he confirmed that Psystar *never uses* the Retail DVD

7  Version Psystar claims to include with the computers it sells.[5]

8      It is undisputed that Psystar modifies Mac OS X and circumvents Apple's technological

9  protection measures so that Mac OS X is capable of running on Psystar computers.[6]  Psystar

10  agrees that Apple's expert, Dr. Kelly, "clearly describe[s]" Psystar's method for circumventing

11  Apple's security mechanism in Mac OS X.  (Psystar Br. at 15.)[7]



_____

[4] Kelly Decl. ¶ 28; Chung Decl. Ex. 18, Psystar Supp. Responses to Nos. 94-95.

[5] Kelly Decl. ¶ 20.  For a detailed description of Psystar's process, please see Apple's Motion for Summary Judgment at pages 7-9 and the referenced exhibits and testimony.  The versions of Mac OS X loaded onto the many Psystar computers Dr. Kelly has examined have been different from the Retail DVD Version Psystar ships with those computers.  Kelly Decl. ¶¶ 25-26; Chung Decl. Ex. 68.

[6] Kelly Decl. ¶¶ 4, 18; Chung Decl. Ex. 9 at 21:24-23:13; Ex. 23 at No. 10 (Psystar claims it "develop[ed] technology that would allow the Mac OS to run on a hardware platform other than that of an Apple-Labeled Computer Hardware System."); Exs. 51-54.

[7] Psystar repeatedly cites Dr. Kelly's expert report, but fails to provide the relevant portions of that report to the Court.  The sections of Dr. Kelly's report, cited by Psystar in its brief, are submitted as Exhibit 2 to the Boroumand Smith Declaration.

[8] Kelly Decl. ¶ 27a; Chung Decl. Ex. 5 at 98:11-23; Ex. 9 at 62:22-64:3.

[9] Chung Decl. Ex. 15 at 150:6-10; Kelly Decl. ¶ 17.

[10] Chung Decl. Ex. 5 at 98:11-23; Kelly Decl. ¶¶ 17 (Table 3), 27a.

[11] Kelly Decl. ¶¶ 27(b)-(e), (Table 4); Chung Decl. Ex. 24 at No. 21

APPLE INC.'S OPPOSITION TO PSYSTAR CORPORATION'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 08-3251 WHA                                                                      - 5 -

1  **C.   Psystar Uses Apple's Trademarks And Trade Dress To Advertise Its**
   **Computers**

2

3      When Psystar advertises and sells its computers running Mac OS X, it knowingly trades on

4  Apple's famous trademarks and its trade dress to deliberately target customers already interested

5  in buying an Apple computer.  In an obvious attempt to capitalize on Apple's goodwill, Psystar

6  first called its computer the "OpenMac."  (Psystar Answer ¶ 12.)  Psystar's advertisements

7  extensively use Apple's trade dress and Apple and Mac logos.[12]  More than 75 percent of Psystar's

8  text ads include an Apple trademark or trade name.[13]  In addition, Psystar uses Apple's word

9  marks APPLE and MAC in the address of certain pages within its website (the URL), such as

10 "www.Psystar.com/OpenMac."[14]  Also, Psystar created URLs that will deliberately attract people

11 seeking to buy an Apple computer.[15]  And Psystar purchased search terms from Google and

12 Yahoo! based upon Apple's marks and products, so that Google or Yahoo! users searching for an

13 Apple computer or Mac OS X are distracted, confused, and diverted by Psystar ads.[16]  Thus,

14 Psystar has deliberately targeted its advertising to consumers already interested in buying an

15 Apple computer.

16 **III.   ARGUMENT**

17     Psystar has presented no evidence to dispute that it copies, modifies, and distributes Mac

18 OS X without Apple's consent.  The facts set forth above, and in Apple's Motion for Summary

19 Judgment, establish that Psystar has infringed Apple's copyrights and trademarks and violated the

20 DMCA.  Psystar therefore relies on certain legal defenses, including the first sale and essential

21

22

23   [12] Boroumand Smith Decl. ¶¶ 4-6 & Exs. 3-5; Chung Decl. Ex. 50.

24   [13] Boroumand Smith Decl. ¶¶ 8-9 & Ex. 7.  For example, 25% percent of all text ad impressions
     used the headline of "$554 OSX Leopard Computer."  Leopard® is Apple's registered trademark.
     *Id.* at Ex. 7.

25
     [14] Boroumand Smith Decl. ¶¶ 8, 10 & Ex. 7.  This "OpenMac" URL was seen over 3.8 million
26   times according to the data produced by Psystar from Google's AdWords program.  *Id.*, Ex. 7.

27   [15] See, for example, "http://www.psystar.com/why_buy_a_used_apple_computer.html" or
     "http://www.psystar.com/looking_to_get_an_apple_computer.html."  Boroumand Smith Decl.
     ¶¶ 10-11 & Ex. 8.

28   [16] Boroumand Smith Decl. Exs. 5, 7-9, 10 at RFA Response Nos. 142-46, 148-52, 158.

townsend.

1  step doctrines, copyright misuse, and nominative fair use in an attempt to defend against Apple's

2  claims.  For the reasons set forth below, each of Psystar's arguments fails.

3    **A.     The First Sale Doctrine Does Not Excuse Psystar's Conduct**

4         Psystar cannot excuse its infringement of Apple's copyrights by relying on the "first sale"

5  doctrine.  The "first sale" rule, 17 U.S.C. § 109(a), only allows the owner of a "particular copy" to

6  "dispose of the possession of that copy."  This applies strictly to the "particular" physical copy as

7  "purchased *and nothing else*." *Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341,

8  1344 (9th Cir. 1988) (emphasis added).  "Section 109 does not authorize adaptation and

9  reproduction of a copyrighted work." *Midway Mfg. Co. v. Strohon*, 564 F. Supp. 741, 745 (N.D.

10  Ill. 1983).  Moreover, section 109 does not supersede the copyright holder's exclusive right to

11  create derivative works. *Mirage*, 856 F.2d at 1341, 1344; *Midway*, 564 F. Supp. at 741.  Psystar

12  argues that because it "owns" the DVD on which Mac OS X is written, it is entitled to (1) modify

13  Mac OS X and create derivative works, (2) make and distribute unlimited copies of Mac OS X,

14  and (3) circumvent Apple's technological protection measures.  Psystar's argument is profoundly

15  wrong.

16    **1.      Psystar May Not Assert The First Sale Doctrine Because It Is A**
            **Licensee, Not An Owner, Of Mac OS X**
17

18         By its terms, section 109(a) is limited to the "owner" – not the licensee – of a particular

19  copy.  As is typical in the software industry, Apple licenses its software to end users. *See Wall*

20  *Data Inc. v. Los Angeles County Sheriff's Dept.*, 447 F.3d 769, 786 n.9 (9th Cir. 2006) ("[T]he first

21  sale doctrine rarely applies in the software world because software is rarely 'sold.'"); *Adobe Sys.*

22  *Inc. v. Stargate Software Inc.*, 216 F. Supp. 2d 1051, 1059 (N.D. Cal. 2002) (noting how software

23  "fundamentally differs from more traditional forms of medium"); *Adobe Sys. Inc. v. One Stop*

24  *Micro, Inc.*, 84 F. Supp. 2d 1086, 1091-92 (N.D. Cal. 2000).  Psystar acknowledges that Apple,

25  when providing its software to users, expressly states that the Mac OS X software "is *licensed, not*

26  *sold, to you* by Apple Inc. ('Apple') for *use only under the terms of this License*, and Apple

27  reserves all rights not expressly granted to you." (SLA § 1 (emphasis added).)  This license

28  language also is featured on the outside of the packaging for Mac OS X, which states:

1   "**Important** Use of this product is subject to acceptance of the Software License Agreement(s)

2   included in this package.  Don't steal software.  www.apple.com."[17]

3         The SLA's express terms, which impose significant limitations and prohibitions on the use

4   and disposition of Apple's software, confirm that the purchasers of Mac OS X are licensees, not

5   owners, and therefore are not entitled to assert section 109 as a defense to infringement.  Among

6   the SLA's restrictions are (1) prohibitions against unauthorized uses of the software (SLA § 2A);

7   (2) prohibitions against renting, redistributing, or sub-licensing (SLA § 3);  (3) limitations on

8   transfer (SLA § 3); (4) limitations on copying the software (SLA §§ 2C and 2F);  (4) prohibitions

9   on modifying the software (SLA § 2F); (5) automatic termination in case of breach (SLA §5); and

10  (6) mandatory destruction of the software in case of breach (SLA § 5).  Such profound restrictions

11  are wholly inconsistent with Psystar's claimed "ownership" of the software and, instead,

12  conclusively identify a license transaction.  *See, e.g.*, *Stargate Software*, 216 F. Supp. 2d at 1057-

13  58 (finding that terms similar to the SLA "substantially and undeniably interfere[d] with . . . [the]

14  ability to distribute and/or convey title to the products in question"); *One Stop Micro*, 84 F. Supp.

15  2d at 1091-92 ("[N]umerous restrictions imposed by Adobe indicate a license rather than a sale

16  because they undeniably interfere with the reseller's ability to further distribute the software.");

17  *Novell, Inc. v. Unicom Sales, Inc.*, No. C-03-2785, 2004 WL 1839117, at *11 (N.D. Cal. 2004)

18  (reservation by copyright owner of all rights not expressly granted and automatic termination for

19  breach indicate a license).

20        Psystar quotes a single clause from the SLA providing that the licensee owns the "media

21  on which the Apple software is recorded," and argues that this somehow supports Psystar's

22  ownership of the software.  Psystar is wrong.  The plain meaning of this phrase is that Psystar

23  owns only the disk, not the software written upon it.  The Copyright Act makes clear that

24  "[o]wnership of a copyright, or of any of the exclusive rights under a copyright, is distinct from

25  ownership of any material object in which the work is embodied."  17 U.S.C. § 202.  Transfer of

26  the "material object" in which the work is "fixed" does not convey rights in the work itself.  *Id.*;

27  *see also Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 687 n.13 (4th Cir. 1992).

28        [17] Boroumand Smith Decl. ¶ 19.

1    *Vernor v. Autodesk* provides little support for Psystar's argument that it owns a copy of

2    Mac OS X and is therefore entitled to assert first sale and essential step defenses. *Vernor v.*

3    *Autodesk, Inc.* 555 F. Supp. 2d 1164 (W.D. Wash. 2008) ("*Vernor I*") and *Vernor v. Autodesk,*

4    *Inc.*, No. C07-1189, 2009 WL 3187613 (W.D. Wash. Sept. 30, 2009) ("*Vernor II*"). First, as the

5    *Vernor* court itself noted, its holding is inconsistent with recent Ninth Circuit case law finding that

6    software licenses precluded the defendants in those cases from asserting the first sale and essential

7    step doctrines: *Wall Data, Inc. v. Los Angeles County Sheriff's Department,* 447 F.3d 769 (9th

8    Cir. 2006), *Triad Systems Corp. v. Southeastern Express Co.,* 64 F.3d 1330 (9th Cir. 1995) and

9    *MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511 (9th Cir. 1993). The *Vernor* court

10   acknowledged that:

11              If the court were to apply this trio of precedent (the "*MAI* trio") to the
               license before it, it would conclude that Autodesk did not sell
12              AutoCAD copies to [the purchaser]. The terms of the Autodesk
               License are either indistinguishably similar to or more restrictive than
13              the licenses found not to be sales in the *MAI* trio.

14   *Vernor I,* 555 F. Supp. 2d at 1172. *Vernor* also is inconsistent with recent Northern District of

15   California case law. *See, e.g., Stargate Software,* 216 F. Supp. 2d at 1057-58; *One Stop Micro,* 84

16   F. Supp. 2d at 1091-92.

17              Furthermore, even if *Vernor* did apply, the holding is extremely narrow. The court found

18   that Mr. Vernor could resell on eBay the genuine AutoCAD software discs he had purchased. Mr.

19   Vernor did not modify the AutoCAD software; he did not create a master copy of the software to

20   use for mass duplication; he did not pre-install the AutoCAD software onto computers while

21   retaining the master copy; nor did he circumvent a technological protection measure to do all of

22   the above. None of these infringing activities is permitted by section 109, even if the infringer is

23   deemed an owner. Because Psystar does all of these things, *Vernor* does not immunize Psystar's

24   infringement.

25              Similarly, Psystar's argument that *United States v. Wise,* 550 F.2d 1180 (9th Cir. 1977),

26   the case on which *Vernor* primarily relies, excuses its actions, should be rejected. *Wise* addressed

27   whether the transfer of certain film reels and prints constituted sales. Psystar argues that under

28   *Vernor* and *Wise,* because a "buyer" of a Mac OS X DVD "may keep the DVD indefinitely," a

1    sale must have occurred.  (Psystar Br. at 7.)  This is factually incorrect,[18] and focuses on only a

2    single factor in the test applied in *Wise*.[19]  In determining whether a given transfer was to an owner

3    or a licensee, the *Wise* court considered multiple factors which establish that Apple licenses Mac

4    OS X.  Specifically, the court observed that (1) agreements with limitations on duplicating or

5    copying indicate a license; (2) agreements designated as licenses and transferring "only limited

6    rights" indicate a license; (3) reservation of right of title indicates a license; (4) agreements "not

7    phrased in terms of a license" indicate a sale; and (5) an upfront payment standing alone does not

8    establish a sale when considered in light of the entire agreement.

9         The only transaction the court in *Wise* determined was a "sale" was the so-called Redgrave

10   Contract (*Wise*, 550 F.2d at 1191-92), in which Warner Brothers gave actress Vanessa Redgrave a

11   print of "Camelot."  The Redgrave Contract nowhere stated that it was a license.  Instead it stated

12   that Redgrave "will pay [Warner Brothers] our cost for said print" and "[s]aid print is furnished for

13   your personal use and enjoyment and shall be retained in your possession at all times."  *Wise*, 550

14   F.2d at 1192.  The Redgrave Contract further had no termination or destruction provisions.  *Id.*[20]

15   By contrast, Apple's SLA states unequivocally that it is a license and includes destruction and

16   termination provisions.  *See also Hampton v. Paramount Pictures Corp.*, 279 F.2d at 103

17   (agreement is a license where rights are "expressly restricted" and the agreement is called a

18   "license" – *even if* there "was no requirement that outstanding prints and negatives were to be

19   returned").

20

---

21   [18] The Mac OS X SLA specifically provides that "Upon the termination of this License, you
22   shall cease all use of the Apple Software and destroy all copies, full or partial, of the Apple
     Software."  Chung Decl. Ex. 26 ¶ 5.

23   [19] The court in *Vernor* found that under *Wise*, "the critical factor" in determining whether a
     transaction is a sale or a license is "whether the transferee kept the copy acquired from the
24   copyright holder."  555 F. Supp. 2d at 1170.  The *Vernor* court failed to note, however, that the
     court in *Wise* cited a case where although there was no requirement that the purchaser of certain
25   film prints and negatives return the materials, "the agreement on its face [was] clearly a license."
     *Wise*, 550 F.2d at 1189 (discussing *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100 (9th Cir.
26   1960)).

27   [20] Neither did the agreement in *Vernor*.  There was a type of destruction provision but "the
     decision to accept Autodesk's destruction requirement [was] entirely in the control of the
28   licensee."  *Vernor*, 2009 WL 3187613 at *7.  Apple's licenses do not provide this freedom when
     its licensee's rights are terminated.

1

2. **Even If Psystar May Assert The First Sale Doctrine, Psystar's Copying, Modification, And Distribution Of Mac OS X Constitute Copyright Infringement**

2

3   Section 109(a) permits the owner of a "particular copy" of software to "sell or otherwise

4   dispose of possession of that copy" without the copyright owner's permission.  17 U.S.C. §

5   109(a); *Mirage*, 856 F.2d at 1344.  As discussed above, in the course of building its computers

6   Psystar makes three types of unauthorized copies from a single copy of Mac OS X that it

7   purchased at retail:  (1) Psystar copies Mac OS X from an Apple computer onto its non-Apple

8   "imaging station"; (2) Psystar then uses the imaging station to make multiple modified copies of

9   Mac OS X which it installs on every Psystar computer; and (3) Psystar makes an additional copy

10   of Mac OS X in RAM whenever it turns on its computers.  None of these copies is the "particular

11   copy" of Mac OS X that Psystar purchased.  *See, e.g.*, *MAI Sys. Corp.*, 991 F.2d at 518-19

12   (copying to RAM alone constitutes infringement); *see also Wall Data*, 447 F.3d at 775.  Thus,

13   even if Psystar were deemed the owner of the particular copies of Mac OS X that it purchased,

14   Psystar may not assert the first sale doctrine with respect to any of the unauthorized copies it

15   makes.

16   Furthermore, the undisputed facts establish that Psystar modifies every copy of Mac OS X

17   that it installs so that Mac OS X can run on Psystar's computers.  None of these modified copies is

18   permitted by section 109 because none constitutes the "particular copy" of Mac OS X that Psystar

19   purchased.  *Mirage*, 856 F.2d at 1344 (first sale doctrine did not apply to the defendant's sale of

20   prints that the defendant removed from a book it purchased and then framed and resold; "the

21   derivative works right, remains unimpaired and with the copyright proprietor").  Thus, even if

22   Psystar owns a particular copy of Mac OS X, it still has infringed Apple's copyrights by

23   modifying Mac OS X and creating multiple unauthorized derivative works.

24   Psystar's argument that it is absolved of liability for copyright infringement because it

25   allegedly purchases and redistributes a genuine Retail DVD Version of Mac OS X with each of its

26   computers should be rejected.  Psystar offers no evidence that it actually ships a Retail DVD

27   Version of Mac OS X with each of its computers, and its motion fails for this lack of admissible

28

1    evidence alone.[21]  Even assuming Psystar could prove that it included the Retail DVD Version

2    with each computer it shipped, Psystar would at most be entitled to assert the first sale doctrine

3    with respect to that particular copy of the Retail DVD Version.  As discussed above, Psystar is not

4    entitled to assert the first sale doctrine with respect to the three types of unauthorized copies and

5    any modified copies that Psystar makes, and all of these copies infringe Apple's copyrights.

6        **B.**     **Psystar's Copying Is Not Excused By The "Essential Step" Exception**

7        Psystar glosses over the clear limitations of the "essential step" rule, which establishes a

8    narrow exception to the general prohibition against unlawful copying of copyrighted works and

9    *further restricts distribution* of such copies.  *See* 17 U.S.C. § 117(a)-(b).  Psystar waived this

10    defense by not pleading it[22] and, in any event, it has no merit.  The "essential step" defense is

11    intended to ensure only that an owner-user of software can make a single copy of the software

12    program by loading it onto a computer and using it, or can transfer that "exact copy" without

13    violating copyright law.  *See* 17 U.S.C. § 117; *Apple Computer, Inc. v. Formula Int'l, Inc.*, 594 F.

14    Supp. 617, 621-22 (C.D. Cal. 1984), *aff'd* 725 F.2d 521 (9th Cir. 1984).  Nothing in the statute, or

15    cases interpreting it, suggests that section 117 immunizes Psystar's wholesale copying and

16    modification of Mac OS X for the purpose of distributing it for commercial gain on unauthorized

17    platforms to Apple's competitive disadvantage.

18

19

20

21

---

22    [21] Psystar has not produced, either in discovery to Apple or in support of this motion, evidence
that supports this assertion.  Indeed the documents produced in discovery indicate that far fewer

23    Mac OS X DVDs were acquired by Psystar than computers it sold.  Boroumand Smith Decl. ¶ 14.

24    [22] Psystar has waived section 117 as an affirmative defense because it did not plead the defense
in its Answer.  *Jorst v. D'Ambrosio Bros. Inv. Co.*, No. C00-03646, 2001 WL 969039, *9 (N.D.

25    Cal. Aug. 13, 2001) (citing Fed. R. Civ. P. 8(c)); *see also In re Adbox, Inc.*, 488 F.3d 836, 841 (9th
Cir. 2007).  Although the Court, in its discretion, may permit a defendant to raise an unpleaded

26    defense, the Court should do so only "where the delay does not prejudice the plaintiff."  *Jorst*,
2001 WL 969039, at *9.  Because the parties have proceeded through extensive litigation

27    "including the depositions of multiple witnesses" and dispositive motion practice, Apple will be
prejudiced if Psystar is permitted to raise a new, untimely defense.  *Id.*  Accordingly, Psystar

28    should not be permitted to assert a section 117 defense.  Certainly Psystar cannot obtain judgment
in its favor based upon a defense that it never pleaded.

1    **1.    Psystar May Not Assert A Section 117 Defense Because It Is Not An "Owner" Of The Software**

2

3    Psystar cannot invoke section 117 because, as discussed above, under clear Ninth Circuit

4    authority, Psystar is not an "owner" but a licensee of Mac OS X.  *See Wall Data*, 447 F.3d at 785.

5    Only a license is granted when "the copyright holder (1) makes clear that it is granting a license to

6    the copy of the software, and (2) imposes significant restrictions on the use or transfer of the copy

7    …."  *MDY Indus., LLC v. Blizzard Entm't, Inc.*, No. CV-06-2555, 2008 WL 2757357, at *8 (D.

8    Ariz. July 14, 2008) ("[L]icensees of a computer program do not 'own' their copy of the program

9    and therefore are not entitled to a section 117 defense.") (citing *Wall Data*, 447 F.3d at 785); *see*

10   *also MAI Sys. Corp.*, 991 F.2d at 518 (section 117 does not apply to a licensee); *Triad Sys. Corp.*,

11   64 F.3d at 1333 (section 117 applied when Triad sold software but did not apply when Triad

12   began to license its software).  The SLA could not be more clear that it is granting a license to use

13   the Mac OS X software, and the terms of that license impose "significant restrictions on [its] use

14   [and] transfer."  Accordingly, Psystar is not an "owner" and cannot invoke section 117 to justify

15   any of its conduct.

16   **2.    Psystar's Conduct Exceeds The Narrow Scope Of Section 117's Essential Step Defense**

17

18   Even if, despite *Wall Data*'s clear holding, Psystar could be considered an "owner of a

19   copy," section 117(a)'s narrow exception for copying that is essential to the *utilization* of software

20   does not authorize Psystar's mass reproduction and distribution of Mac OS X without Apple's

21   permission.  *See Wall Data*, 447 F.3d at 785-86 (holding that copying software onto multiple

22   computers via "hard drive imaging" is not an immunized "essential step" but, rather, an infringing

23   "matter of convenience").  Psystar concedes that section 117 only authorizes the "owner of a copy

24   of a computer program to take steps necessary to run that program on his computer."  (Psystar Br.

25   at 10.)  Yet, there is no dispute that Psystar is doing far more than what is necessary to use Mac

26   OS X when it copies, modifies, installs, and distributes Mac OS X with its computers.  None of

27   this is authorized by section 117.[23]

28

---

[23] Even if section 117 somehow applied to Psystar's mass reproduction and sale of Mac OS X

1   Furthermore, Psystar's conduct cannot be justified because section 117(b) explicitly

2   prohibits the transfer of computer programs that have been adapted without "the authorization of

3   the copyright owner." 17 U.S.C. § 117(b). Psystar indisputably *adapts* Mac OS X when adding,

4   deleting, and substituting kernel extensions to make Mac OS X operate on non-Apple hardware.[24]

5   Psystar admits it adds features "to increase [Mac OS X's] functionality." (Psystar Br. at 11

6   (Psystar takes "steps" to make Mac OS X "work on a wider range of computers than simply Apple

7   Macintoshes.").) Psystar also concedes that making software run on a different platform (or

8   "porting" the software, as Psystar characterizes it) requires making an adaptation under section

9   117. (Psystar Br. at 10-11.) Psystar then takes this adaptation and "resell[s] the package."[25]

10  Under section 117, "[a]daptations so prepared may be transferred only with the authorization of

11  the copyright owner." 17 U.S.C. § 117(b).[26] Because Apple has never authorized Psystar to copy

12  or adapt Mac OS X, Psystar is forbidden from transferring Apple's software and section 117

13  provides no defense.

14      Psystar argues that *Krause v. Titleserv, Inc.*, 402 F.3d 119 (2d Cir. 2005), somehow

15  indicates that section 117 would protect its unauthorized copying, modification, and distribution of

16  Mac OS X. To the contrary, the *Krause* court expressly recognized that section 117 permits the

17  owner to take only those steps necessary for the owner to enable the use for which the copyrighted

18

---

19  (and it does not), Psystar itself admits that the hard drive imaging step is not "essential" for
    Psystar's purposes. Rather, as Psystar states: "it's a time" issue, *i.e.*, a matter of convenience.
20  Chung Decl. Ex. 9 at 89:9-23.

21  [24] *See Evolution, Inc. v. SunTrust Bank*, 342 F. Supp. 2d 943, 957 (D. Kan. 2004) ("add[ing]
    desired features" is an adaptation and is not permitted when for commercial purposes); CONTU
22  Report, at 13 (adaptations include: converting from one computer language to another language
    and "add[ing] features to the program that were not present at the time of rightful acquisition").

23  [25] Chung Decl. Ex. 48.

24  [26] The legislative history and the case law are clear. *See* CONTU Report, at 13 ("[Adaptation]
    rights would necessarily be more private in nature than the right to load a program by copying it
25  and could only be exercised so long as they did not harm the interests of the copyright
    proprietor."); *Midway*, 564 F. Supp. at 745 (software modified or adapted under section 117
26  cannot be transferred); *cf. Aymes v. Bonelli*, 47 F.3d 23, 26 (2d Cir. 1995) (section 117 adaptation
    can be made only for "internal business needs" and cannot be transferred without express
27  authorization.); *Stuart Weitzman, LLC v. Micro Computer Res., Inc.*, 510 F. Supp. 2d 1098, 1109
    (S.D. Fla. 2007), *vacated on other grounds*, 542 F.3d 859 (11th Cir. 2008) (the "right to modify or
28  add features to the copy" exists "so long as the modifications do not disrupt [copyright holder's]
    interests as the purported copyright proprietor in the [copyrighted software].").

1    work was both sold and purchased.  *Id.* at 128.  As the SLA expressly provides, Mac OS X is sold

2    exclusively for use on Apple computers.  Psystar's copying and adaptation of Mac OS X are

3    directly contrary to that purpose.  Furthermore, the *Krause* court noted that the rights permitted

4    under section 117 "could 'only be exercised so long as they did not harm the interests of the

5    copyright proprietor.'"  *Id.* at 129 (quoting Final Report of the National Commission on New

6    Technological Uses of Copyrighted Works (1978) at 13, *available at* http://digital-law-

7    online.info/CONTU/PDF/index.html (hereinafter cited as the "CONTU Report")).  The court

8    stated that section 117 therefore would not apply "if the altered copy of [plaintiff's] work were to

9    be marketed by the owner of the copy."  *Id.* at 129.  Psystar modifies Mac OS X, markets the

10   modified copies of Mac OS X, and sells them in competition with Apple.  That activity is not

11   allowed by section 117 under any circumstance.  *See, e.g., Apple Computer, Inc. v. Formula Int'l,

12   Inc.*, 562 F. Supp. 775 (C.D. Cal. 1984), *aff'd* 725 F.2d 521 (9th Cir. 1984); *Apple Computer, Inc.

13   v. Formula, Int'l, Inc.,* 594 F. Supp. at 620 (rejecting arguments that section 117 authorized

14   creation and distribution of computer "kits" using copies of Apple's operating system software).



21   Psystar has infringed Apple's

22   copyrights with respect to "Mac OS, Mac OS X, Mac OS X version 10.5, and Mac OS X Server,

23   individual files constituting components of Mac OS, Mac OS X, Mac OS X version 10.5, and Mac

24   OS X Server, as well as various files constituting components of other Apple software and

25   firmware found on Apple labeled computers."  (Amended Complaint (Docket No. 38) ¶ 26.)

26        It is undisputed that an operating system, like Mac OS X, is entitled to copyright

27   protection.  *See, e.g., Triad Sys.*, 64 F.2d at 1333.  Indeed, in *Lexmark Int'l Inc. v. Static Control

28   Components, Inc.*, 387 F.3d 522 (6th Cir. 2004), the case upon which Psystar relies, the court

emphasized that unlike the printer lock-out code at issue in that case, Apple's operating system is precisely the type of creative expression entitled to copyright protection. *Id.* at 539.  The *Lexmark* court stated that *Apple Computer, Inc. v. Formula Int'l,* 725 F.2d at 525, which the plaintiff had cited, was distinguishable from *Lexmark*, noting that comparing Apple's operating system to the plaintiff's lock-out code was like comparing "the Sears Tower … to a lamppost." *Id.* Distinguishing Apple's operating software, the *Lexmark* court stated, "Given the nature of the Apple program, it would have been exceedingly difficult to say that practical alternative means of expression did not exist and indeed no defendant in the cases advanced that argument." *Id.*

*Atari Games Corp. v.*

*Nintendo of America, Ltd.*, 975 F. 2d 832, 840 (Fed. Cir. 1992) (holding that a software lockout mechanism consisting of "arbitrary programming instructions" arranged "in a unique sequence to create a purely arbitrary data stream" is protectable expression that is not purely functional); *see also Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 216 (3d Cir. 2002) (holding that the scope of copyright protection should be analyzed from the point of view of the creator and not the alleged infringer).



[28]

[27]

[28] Declaration of John P. J. Kelly Ph.D. in Opposition to Psystar's Motion for Summary Judgment ("Kelly Decl."), ¶ 2.

1

### D.   Apple Has Not Misused Its Copyrights

2       Although Psystar contends that Apple has misused its copyrights, Psystar has failed to

3   explain what Apple has done that allegedly constitutes copyright misuse.  Psystar does not contend

4   that the SLA provisions constitute copyright misuse; indeed, Psystar admits that Apple can

5   lawfully license its software for use only on non-Apple hardware.  (Psystar Br. at 3.)  While

6   Psystar's brief has a footnote citing a few early antitrust cases, it makes no effort whatsoever to

7   introduce evidence that Apple has acted in any anticompetitive way because there is no such

8   evidence.  (Psystar Br. at 21, n. 7.)  This Court already rejected Psystar's antitrust allegations,

9   stating: "Apple asks its customers to purchase Mac OS knowing that it is to be used only with

10   Apple computers.  It is certainly entitled to do so." *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d

11   1190, 1201 (N.D. Cal. 2008) (also available at Docket No. 33 at 14).

12       Rather, it appears Psystar is arguing that Apple has misused its copyrights by filing this

13   lawsuit and "continu[ing] to prosecute" allegedly invalid copyright infringement and DMCA

14   claims.  (Psystar Br. at 22; 23-24).  Psystar cites several cases, none of which support this baseless

15   assertion and all of which are factually distinguishable. *See Altera Corp. v. Clear Logic, Inc.*, 424

16   F.3d 1079, 1090 (9th Cir. 2005) (finding copyright misuse defense could not apply where the

17   plaintiff had not asserted copyright infringement claims); *Assessment Techs. of WI, LLC v.*

18   *WIREdata, Inc.,* 350 F.3d 640, 647-648 (7th Cir. 2003) (finding copyright misuse when plaintiff

19   asserted copyright infringement against defendant for seeking access to public data that was not

20   copyrighted); *Qad, Inc. v. ALN Assoc., Inc.*, 770 F. Supp. 1261, 1267-1270 (N.D. Ill. 1991), *aff'd*

21   974 F.2d 834 (7th Cir. 1992) (finding copyright misuse when the plaintiff alleged copying of

22   software that it had copied itself and in which it had no rights); *Schloss v. Sweeney*, 515 F. Supp.

23   2d 1068, 1079-81 (N.D. Cal. 2007) (refusing to grant motion to dismiss claim for copyright

24   misuse when defendant had no copyrights in medical records and other materials).[29]

25

26   [29] Psystar also refers to the *Lasercomb*, *Practice Management* and *Alcatel* cases – all of which involved license agreements that, unlike the one at issue here, limited competition and restrained

27   the development of creative works.  (Psystar Br. at 22.)  None of these cases supports Psystar's argument that Apple has engaged in copyright misuse by filing meritorious copyright infringement and DMCA claims against Psystar.  All three of these cases are distinguishable. *See Lasercomb*

28   *Am., Inc. v. Reynolds*, 911 F.2d 970, 978-79 (4th Cir. 1990) (copyright misuse found where license agreement prohibited defendant, its directors, officers and employees from assisting in any manner

As demonstrated above, Apple's copyright and DMCA claims are meritorious and their filing cannot constitute copyright misuse.  To the contrary, Apple has a constitutional right to enforce its copyrights in federal court unless the lawsuit is both objectively baseless and filed for an improper purpose.  *Prof'l Real Estate Investors v. Columbia Pictures*, 508 U.S. 49, 60-61, 113 S. Ct. 1920, 1928 (1993); *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1183-85 (9th Cir. 2005).  Psystar makes no attempt to prove either that this lawsuit is a sham or was filed for an improper purpose, and it is not.  Therefore, this lawsuit itself cannot be the basis for a claim of copyright misuse.[30]

**E.      Psystar Fails To Establish Any Defense To Apple's DMCA Claims**

To succeed on its DMCA circumvention (section 1201(a)(1)) and trafficking (sections 1201(a)(2) and 1201(b)) claims, Apple need only show that its technological protection measures prevent access to or copying of copyrighted material (here, Mac OS X) and that Psystar's circumvention technology facilitates access to or copying of the software.  *Davidson & Assocs. v. Jung*, 422 F.3d 630, 640 (8th Cir. 2005); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 441 (2d Cir. 2001); *RealNetworks,, Inc. v. DVD Copy Control Ass'n*, __ F. Supp. 2d __, 2009 WL 2475338 (N.D. Cal. Aug. 11, 2009); *321 Studios v. Metro-Goldwyn-Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1094 (N.D. Cal. 2004).  As set forth more fully in Apple's Motion for Summary Judgment, the facts entitling Apple to prevail on its DMCA claims are not in dispute.  (Apple's Summary Judgment Br. at 22-25.)  Apple embeds a "key" within its hardware that unlocks encrypted code and permits Mac OS X to boot up and run, measures very similar to those taken by the entertainment industry to prevent films and video games from being accessed on unauthorized platforms.  *See, e.g., Davidson*, 422 F.3d at 640-41 (CD key embedded in online video game

---

in the development of any kind of CAD software for 99 years); *Practice Mgmt. Info. Corp., v. Am. Medical Ass'n*, 121 F.3d 516, 520-21 (9th Cir. 1997) (copyright misuse found where license agreement was conditioned on agreement that licensee could use only licensor's coding system); *Alcatel USA, Inc. v. DGI Tech., Inc.*, 166 F.3d 772, 792-94 (5th Cir. 1999) (copyright misuse found where plaintiff asserted its copyright to prevent competition where customers were locked into a single supplier).

[30] Apple's Motion for Summary Judgment addresses other possible Psystar arguments, all of which fail to establish anything approaching copyright misuse under the law.  (*See* Apple's Summary Judgment Br. at 17-19.)

1   software was effective because it prohibited the games from playing on unauthorized web

2   servers); *Corley*, 273 F.3d at 444 (encryption technology with decryption keys embedded in

3   approved DVD player hardware prevented users from viewing the DVD "on a competing

4   platform"); *RealNetworks*, 2009 WL 2475338, at *62 (DVD decryption prevented copying or

5   playing DVDs on an unauthorized "hard drive or portable drive"). Psystar has violated the

6   DMCA because it has used and distributed software code, ███████████████████████

7   ███████████████████████████████ thus enabling the installation and

8   copying of Mac OS X on unauthorized hardware.

### 1.   Psystar Concedes The Facts Establishing Its Liability Under The DMCA

11      Psystar concedes the technical facts underlying Apple's DMCA claims, and admits that

12   Apple utilizes a technological measure that "includes decryption keys embedded in Apple

13   hardware and used to decrypt certain critical OS X Leopard software programs." (Psystar Br. at

14   13.) Psystar further admits the effectiveness of the Apple's lock and key mechanism, by

15   acknowledging that if the programs "cannot be decrypted, and therefore executed, the user cannot

16   access the graphical user interface of OS X Leopard and other features of the operating system."

17   (*Id.* at 14.) Psystar argues that Apple's expert, John Kelly, has "clearly described" the

18   "mechanism that Psystar uses to run OS X Leopard on non-Apple hardware" which "circumvents

19   Apple's technological protection measure." (*Id.*)

### 2.   Psystar's Legal Arguments Under The DMCA Are Unavailing

21      Despite these dispositive concessions, Psystar tries to evade the DMCA by arguing, first,

22   that Psystar does not "facilitate infringement" (Psystar Br. at 16-19); and, second, that Apple's

23   protection is ineffective because "instructions" for writing a program that decrypts the code may

24   be available on the Internet. (*Id.* at 19-20.) Each argument misstates both the law and the facts.

25      As a matter of law, Apple need not prove copyright infringement to succeed on its

26   circumvention and trafficking claims. *See* 17 U.S.C. § 1201; *Universal City Studios, Inc. v.*

27   *Reimerdes*, 111 F. Supp. 2d 294, 329 (S.D.N.Y. 2000) (overriding concern of the DMCA was

28   "promoting the distribution of copyrighted works in digital form while at the same time protecting

1    those works from piracy and *other violations of the exclusive rights* of copyright holders")

2    (emphasis added). It is irrelevant whether downstream customers use the trafficker's technology

3    to engage in infringing or, instead, "fair use" of the copyrighted work. *See RealNetworks,* 2009

4    WL 2475338, at *27 ("Fair use is not a defense to trafficking in products used to circumvent

5    effective technological measures that prevent unauthorized access to, or unauthorized copying of,

6    a copyrighted work"); *321 Studios,* 307 F. Supp. 2d at 1097 ("the downstream uses of the software

7    by the customers of 321, whether legal or illegal, are not relevant to determining whether 321

8    itself is violating the statute"); *Sony Computer Entm't Am., Inc. v. Divineo, Inc.,* 457 F. Supp. 2d

9    957, 965 (N.D. Cal. 2006) ("downstream customers' lawful or fair use of circumvention devices

10    does not relieve [defendant] from liability for trafficking in such devices under the DMCA"); *see*

11    *also Corley,* 273 F.3d at 443.

12        Requiring DMCA plaintiffs to prove copyright infringement would render the DMCA

13    superfluous and negate the very protections the statute was intended to promote. Apple need only

14    establish that its technological protection measures guard material that is "reasonably related" to

15    the interests that the Copyright Act was intended to protect. *See Chamberlain Group, Inc. v.*

16    *Skylink Techs., Inc.,* 381 F.3d 1178, 1195 (Fed. Cir. 2004).[31] Apple's protections undoubtedly

17    relate to interests protected by the Copyright Act because Mac OS X is a copyright-protected

18    work.

19        Psystar's emphasis on *Lexmark* illustrates the profound differences between that case and

20    Apple's claims. Mac OS X − which is filled with expressive content − could not be more different

21    than the simple code in *Lexmark* that merely checked the source of a printer cartridge. The

22    *Lexmark* court emphasized this important distinction: "Unlike the code underlying video games or

23    DVDs, 'using' or executing the Printer Engine Program does not in turn create any protected

24    expression." *Lexmark,* 387 F.3d at 548; *see also Chamberlain,* 381 F.3d at 1199 (noting that in

25    cases finding a DMCA violation, "the access alleged in all three cases was intertwined with a

26    ───────────────
27    [31] *See* S. Rep. No. 105-190, at 12 (1998). ("The prohibition in 1201(a)(1) is necessary because prior to this Act, the conduct of circumvention was never before made unlawful. The device limitation in 1201(a)(2) enforces this new prohibition on conduct. The copyright law has long forbidden copyright infringements, so no new prohibition was necessary. The device limitation in 1201(b) enforces the longstanding prohibitions on infringements.") (emphasis added).
28

1   protected right."). Like video games and movies, executing Apple's Mac OS X creates myriad

2   forms of protected expression, including a complex user interface and a variety of extraordinarily

3   creative utilities and programs. Thus, Apple's circumvention technology advances the DMCA's

4   goals of protecting copyrighted expression in "its most natural sense." *Lexmark*, 387 F.3d at 547;

5   *see also Davidson*, 422 F.3d at 629-30 (affirming summary judgment for DMCA plaintiff and

6   distinguishing *Lexmark*).[32]

7        Psystar also argues that the DMCA was intended to prevent "piracy," and that Apple, in

8   order to succeed on a DMCA claim, would have to establish that its technological protection

9   measures were designed to prevent someone from physically reproducing DVDs containing Mac

10  OS X. (Psystar Br. at 16.) But courts have refused to import any such requirement into the

11  DMCA. *321 Studio*, 307 F. Supp. 2d at 1096 (rejecting argument that because the circumvention

12  technology worked only with the "original DVDs," there could be no DMCA violation).

13       Psystar quotes Apple testimony in an attempt to create confusion over whether the Apple

14  encrypted binaries are access protections intended to prevent the use of Mac OS X on non-Apple

15  hardware or copy protections intended to prevent duplication. This is an irrelevant distinction

16  because both are entitled to DMCA protection. *Compare* 17 U.S.C. § 1201(a) (access protections)

17  *and* 17 U.S.C. § 1201(b) (copy protections); *see Corley*, 273 F.3d at 440-441. Furthermore,

18  Apple's technological protection measures are both access and copy controls because the purpose

19  and function of Apple's access-protection is to prevent unauthorized installation and running (*i.e.*,

20  copying) of Mac OS X on non-Apple hardware. *See 321 Studios*, 307 F. Supp. 2d at 1097 (though

21  defendant was "technically correct that CSS controls access to encrypted DVDs, the purpose of this

22  access control is to control copying of those DVDs, since encrypted DVDs cannot be copied unless

23  they are accessed"). While Mac OS X's protection mechanisms may not technically prevent the

24  literal duplication of the media (a futile act for the user if the software will not run on a computer),

25  they nonetheless stop copyright infringement by preventing the unauthorized installation and use

26  (and therefore access and copying) of Mac OS X. *Davidson*, 422 F.3d at 640-41.

27   _____

    [32] Furthermore, contrary to Psystar's argument, a DMCA plaintiff need not show that the
28  protection mechanism itself is copyrighted, only that the material behind the protective mechanism
    is protected.

### 3.   Apple's Technological Protection Measures Are Effective

Psystar's remaining argument that Apple's technological protection measures are not "effective" because of the alleged availability on the Internet of information related to decoding the mechanism, fails as a matter of law.  Courts have rejected this very argument as "spurious," since any technological protection measure necessarily must have been defeated before a DMCA claim can be asserted.  *See Corley*, 273 F.3d at 441-42; *Reimerdes*, 111 F. Supp. 2d at 318 (noting that it would "gut the statute" if the "use of the word 'effectively' means that the statute protects only successful or efficacious technological means of controlling access").  A security measure is "effective" if "its function is to control access" and "in the ordinary course of its operation," the protection mechanism prevents access to a copyrighted work.  17 U.S.C. § 1201(a)(3)(B); *Reimerdes*, 111 F. Supp. 2d at 318.[33]  To determine effectiveness, courts look to the technology's operation "at the level of the ordinary consumer."  *RealNetworks,* 2009 WL 2475338, at *17.  Even widespread publication on the Internet of keys to decode the protections does not deprive the copyright owner of the DMCA's legal protections.[34]

Apple employs a highly secure type of protection technology, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Kelly Decl. ¶ 11.)  But what matters more than the details of Apple's particular encryption scheme is the dispositive fact that in the ordinary course of operation, Apple's technological protection measures prevent the ordinary consumer from installing or running Mac OS X on non-Apple hardware.  *RealNetworks, Inc.,* 2009 WL 2475338, at *17 (test for effectiveness is whether the measure is effective against the

---

[33] The legislative history specifically states that "measures that can be deemed to 'effectively control access to a work' would be those based on encryption, scrambling, authentication, or some other measure which requires the use of a 'key' provided by a copyright owner to gain access to a work."  H.R. Rep. No. 105-551, pt. 2, at 39 (1998) (emphasis added).  This is exactly what Apple does:  Mac OS X requires a key and Apple provides this key to those who are authorized to use it.

[34] *See Reimerdes*, 111 F. Supp.2d at 317-18 (finding "indefensible as a matter of law" the argument that an encryption key was not effective because it was being distributed online); *see also 321 Studios*, 307 F. Supp. 2d at 1095 (this would be "equivalent to a claim that, since it is easy to find skeleton keys on the black market, a deadbolt is not an effective lock to a door"); *Divineo*, 457 F. Supp. 2d at 965 ("The fact that circumvention devices may be widely available does not mean that a technological measure is not, as the DMCA provides, effectively protecting the rights of copyright owners 'in the ordinary course of its operation.'").

townsend.

"ordinary consumer" or "average consumer"); *Reimerdes,* 111 F. Supp. 2d at 318 (finding a 40-bit encryption key embedded within authorized hardware effective); *Pearl Inv., LLC v. Standard I/O, Inc.*, 257 F. Supp. 2d 326, 350 (D. Me. 2003); *321 Studios*, 307 F. Supp. 2d at 1095.  Apple's witnesses testified without contradiction that Apple's technological protection mechanisms function to protect access to Mac OS X and prohibit installation on non-Apple hardware.  Indeed, Psystar's own pleadings concede this.[35]  (Am. Countercl. ¶¶ 33, 37-38; Psystar Br. at 16-17).

### F.  Psystar Has Not Proven Nominative Fair Use Of Apple's Famous Trademarks

Psystar briefly mentions in its "Summary of Argument" section (Psystar Br. at 4) – though without offering any supporting evidence or law – that its use of Apple's trademarks and trade dress constitutes nominative fair use.  Psystar has the burden to produce evidence in support of its motion for summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  Thus, to sustain its nominative fair use defense on summary judgment, Psystar was required to submit evidence that (1) it used Apple's trademarks to describe Apple's product and not Psystar's products, (2) the product referred to by Psystar "must not be readily identifiable without use of the mark," (3) Psystar used "only so much of the mark … as is reasonably necessary to identify the product" and (4) Psystar did "nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder."  *Horphag Res. Ltd. v. Pellegrini*, 337 F.3d 1036, 1041 (9th Cir. 2003).  Having submitted no evidence whatsoever on this issue, Psystar's motion on the trademark claims must be denied.  Apple can defeat the motion for summary judgment "without producing anything."[36]  *Nissan Fire*, 210 F.3d at 1103; *see also id.* at 1107 ("[A] nonmoving party

---

[35] Psystar, in a half-hearted attempt to create evidence to defeat Apple's claims submitted a half-page ambiguous, conclusory declaration from its CEO (a) attaching what is purported to be lines of code available on the Internet, (b) stating that the CEO "compiled and ran" that code, and (c) concluding that the CEO believes anyone could compile and run the code.  (Psystar's Ex. I.)  Setting aside the lack of foundation, authentication, or admissibility of the purported evidence, it is not at all clear what the declaration and attached documents (two of which were never produced in discovery) are intended to show.  They certainly do not contradict all the evidence in the record – including Psystar's own statements – that Apple's security mechanism will prevent the average consumer from accessing and installing Mac OS X in the ordinary course of operation.  (Chung Decl. Ex. 66 at PS006530, PS006532.)  Indeed, Psystar's CEO testified that it took him a couple of months to create the circumvention technology and other necessary modifications to Mac OS X.  (Boroumand Smith Decl. Ex. 11 at 27:9-18, 41:12-42:9.)

[36] Psystar's unsupported allegations of course cannot be the basis for summary judgment.  *See*

1   has no obligation to produce anything until the moving party has carried its initial burden of

2   production").[37]

3   **G.      Apple's Remaining Claims Are Not Moot**

4   **1.      Damages**

5     Psystar is correct that Apple intends to seek disgorgement of Psystar's ill-gotten gains from

6   its breach of Apple's SLA. However, Psystar's understanding of California law is wrong;

7   California permits recovery of defendant's unjust enrichment for breach of contract. *Ajaxo Inc. v.*

8   *E\*Trade Group, Inc.*, 135 Cal. App. 4th 21, 55 (Cal. App. 2005). As in *Ajaxo* and the federal

9   court cases that have applied *Ajaxo*, Psystar has benefitted by taking from Apple rights for which

10  it has not bargained, and which Apple has not granted, and has thus become unjustly enriched.

11  *Martone v. Burgess*, No. 08-2379, 2008 WL 3916022, at \*4 (N.D. Cal. Aug. 25, 2008) (restitution

12  an available remedy for breach of contract and for theft of trade secrets); *Foster Poultry Farms,*

13  *Inc. v. Suntrust Bank*, No. 04-5513, 2008 WL 160960, at \*49 (E.D. Cal. Jan. 14, 2008) ("Under

14  California law, disgorgement of improperly obtained profits is a remedy for breach of a contract

15  protecting trade secrets and proprietary confidential information."). Because Apple is entitled to

16  recovery of the amount by which Psystar has been unjustly enriched, Apple's damages claims are

17  not mooted by Psystar's willingness to stipulate to the award of nominal damages.

18  **2.      Apple Is Entitled To A Permanent Injunction**

19    Despite its assertion that it has not infringed Apple's copyrights, Psystar concedes that it

20  would submit to an "appropriately tailored injunction." (Psystar Br. at 4.) Psystar states that such

21  ――――――――――――――――――――――――――――――――――――――――――――――――

*Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

22
23  [37] Apple has ample evidence disproving Psystar's nominative fair use defense. First, Psystar
    used Apple's trademarks and trade dress to describe Psystar's products, not Apple's products, in
    its advertisements, especially in light of Psystar's modifications to Apple's Mac OS X operating
24  software. (*See* Boroumand Smith Decl. ¶¶ 4-7, Exs. 3-6.) Second, Psystar could have advertised
    its computers without showing Apple's trade dress and trademarks, like other computer
25  manufacturers who do not show Microsoft's operating system on their computers. (*See id.* ¶ 16,
    Ex. 12-13.) Third, there is genuine issue as to whether Psystar used only so much of the mark as is
26  reasonably necessary. (*See id.* ¶¶ 4-7, Exs. 3-6.) Fourth, Apple will introduce survey evidence at
    trial which establishes that Psystar's use of Apple's trademark and trade dress causes consumers to
27  think that Apple has given its permission to, or sponsored, Psystar. (*See id.* ¶ 17, Ex. 14.) When
    such factors are in dispute, the Ninth Circuit has refused to affirm summary judgment. *Downing*
28  *v. Abercrombie & Fitch Co.*, 265 F.3d 994, 1009 (9th Cir. 2001); *Abdul-Jabbar v. Gen. Motors*
    *Corp.*, 85 F.3d 407, 413 (9th Cir. 1996); *see also Horphag*, 337 F.3d at 1041.

**townsend.**

1  an injunction should be limited to "Psystar's allegedly illegal activities involving OS X Leopard"

2  . . . and "[s]ince neither Psystar nor Apple sells OS X Leopard any longer, it is no great burden for

3  Psystar to agree to an injunction." (*Id.*)  Apple agrees that a permanent injunction is appropriate in

4  this case, but an injunction limited to Mac OS X Leopard is manifestly insufficient, would not

5  alleviate the irreparable harm that Apple suffers as a result of Psystar's infringement, and could

6  encourage more infringement of Apple's copyrighted software by parties other than Psystar.

7  Apple is therefore entitled to broad permanent injunctive relief.

8       The law is clear:  Apple is entitled to injunctive relief broad enough to protect it from

9  continuing or recurring infringement.  17 U.S.C. § 502(a) ("injunction terms must prevent or

10  restrain infringement of a copyright"); 15 U.S.C. § 1116 ("injunction must prevent the violation of

11  any right of the registrant of a mark").  Psystar has advertised that regardless of this lawsuit, it

12  plans to continue selling computers that infringe Mac OS X.  Therefore, in order to ensure that

13  Apple's copyrights are no longer infringed and to avoid the harm that Apple will necessarily suffer

14  if Psystar is not stopped, the Court should permanently enjoin Psystar from selling its computers

15  with any version of Mac OS X or other Apple software for the following reasons.

16       First, if Psystar is not permanently enjoined from copying, modifying, and distributing

17  Mac OS X, it will essentially be granted a *de facto* compulsory license to continue these activities.

18  "In the copyright realm, it has been said that an injunction should be granted if denial would

19  amount to a forced license to use the creative works of another."  *See SimplexGrinell LP v.*

20  *Integrated Systems & Power, Inc.*, __ F. Supp. 2d __, 2009 WL 857504, at *23 (S.D.N.Y. Mar.

21  31, 2009) (quoting *Silverstein v. Penguin Putnam, Inc.*, 368 F.3d 77, 84 (2d Cir. 2004)); *see also*

22  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1029 (9th Cir. 2001) (rejecting compulsory

23  royalties and issuing injunctive relief because "[p]laintiffs would lose the power to control their

24  intellectual property").[38]

25

---

26    [38] There is no support for Psystar's notion that Apple is somehow less entitled to a permanent injunction because it did not seek a preliminary order.  *PGBA v. U.S.*, 389 F.3d 1219, 1232 (Fed.

27  Cir. 2004) stands only for the non-controversial proposition that the lower court in that case did not err in withholding injunctive relief.  Apple is entitled to injunctive relief.  There is no support for Psystar's notion that, because Apple did not move for a preliminary injunction, it is any less

28  entitled to a permanent one.

1    Second, Apple's integrated business model will be severely undermined if Psystar is not

2    permanently enjoined from infringing Apple's copyrights and circumventing its technological

3    protection measures. Nothing else will stop Psystar from continuing to sell unauthorized copies of

4    Apple software on non-Apple computers. There is little doubt that Psystar will use each release of

5    a new version of Mac OS X as a new opportunity to mass reproduce and distribute unauthorized

6    copies of Apple software. And, if the Court declines to grant a permanent injunction, other

7    software pirates, like Psystar, will argue that by simply purchasing a retail DVD version of Mac

8    OS X, they too are entitled to mass produce and sell software that Apple has spent many years and

9    hundreds of millions of dollars developing.

10    Third, the continued association of Apple with Psystar's problem-ridden computers and

11    business practices will seriously damage Apple's brand, reputation and goodwill. *MDY Indus.,*

12    *LLC v. Blizzard Entm't, Inc.*, 616 F. Supp. 2d 958, 974 (D. Ariz. 2009) (citing *Rent-A-Center, Inc.*

13    *v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("[I]ntangible

14    injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable

15    harm."); *MySpace, Inc. v. Wallace*, 498 F. Supp. 2d. 1293, 1305 (C.D. Cal. 2007) ("Harm to

16    business goodwill and reputation is unquantifiable and considered irreparable.")

17    Fourth, there is compelling evidence that Psystar will not be able to pay any statutory

18    damages resulting from Psystar's copyright infringement and DMCA violations – another factor

19    courts consider when determining whether to grant injunctive relief. *Metro-Golden-Mayer*

20    *Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1217 (C.D. Cal. 2007). Psystar has already

21    filed for bankruptcy once during the course of this litigation. *See In re Psystar Corp.*, Case No.

22    09-19921 (S.D. Fl. 2009). Moreover, there is evidence of continuing third party infringement due

23    to Psystar's induced and contributory infringement of Apple's copyrights. Such inducement

24    "greatly erodes [plaintiffs'] ability to enforce their exclusive rights." *Grokster*, 518 F. Supp. 2d. at

25    1217 (citing *A&M Records, Inc.*, 239 F.3d at 1029). Indeed, "the very need to file multiple

26    lawsuits as a consequence of [Psystar's] inducement is itself supportive of an irreparable harm

27

28

1   finding." *Grokster* at 1219.  The facts in this case clearly support the need for a broad permanent

2   injunction enjoining Psystar's copyright infringement and DMCA violations.[39]

3   **IV.   CONCLUSION**

4        For the foregoing reasons, as well as those set forth in Apple's Motion for Summary

5   Judgment, Psystar's Motion for Summary Judgment should be denied in its entirety.

6

7   DATED:  October 22, 2009         Respectfully submitted,

                                      TOWNSEND AND TOWNSEND AND CREW LLP

8

9

                                      By: */s/ James G. Gilliland, Jr.*

10                                       JAMES G. GILLILAND, JR.

11                                       Attorneys for Plaintiff and Counterdefendant

12                                       APPLE INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

---

[39] Moreover, there is a presumption of irreparable harm once a trademark owner establishes a likelihood of confusion. *Abercrombie & Fitch Co. v. Moose Creek, Inc.*, 486 F.3d 629, 634 (9th Cir. 2007).  Here Apple's uncontested survey evidence is clear; both Psystar's marketing of its computers running Mac OS X and the computers themselves are likely to confuse consumers into thinking that Apple is a sponsor of, or affiliated with, Psystar computers.  Boroumand Smith Decl. Ex. 14.

townsend.

**CERTIFICATE OF SERVICE**

I, Diane G. Sunnen, declare I am employed in the City and County of San Francisco, California in the office of a member of the bar of this court at whose direction this service was made. I am over the age of eighteen and not a party to this action. My business address is Townsend and Townsend and Crew LLP, Two Embarcadero Center, Eighth Floor, San Francisco, California, 94111.

I served the following documents exactly entitled: **APPLE INC.'S OPPOSITION TO PSYSTAR CORPORATION'S MOTION FOR SUMMARY JUDGMENT** on the interested parties in this action following the ordinary business practice of Townsend and Townsend and Crew LLP, as follows:

| | |
|---|---|
| K.A.D. Camara<br>Kent Radford<br>Camara & Sibley LLP<br>2339 University Boulevard<br>Houston, TX 77005<br>Phone: 713-893-7973<br>Fax: 713-583-1131<br>Email: camara@camarasibley.com | Eugene Action<br>1780 E. Barstow Avenue, #5<br>Fresno, CA 93710<br>Email: eugeneaction@hotmail.com |

☒ [By First Class Mail] I am readily familiar with my employer's practice for collecting and processing documents for mailing with the United States Postal Service. On the date listed herein, following ordinary business practice, I served the within document(s) at my place of business, by placing a true copy thereof, enclosed in a sealed envelope, with postage thereon fully prepaid, for collection and mailing with the United States Postal Service where it would be deposited with the United States Postal Service that same day in the ordinary course of business.

☐ [By Overnight Courier] I caused each envelope to be delivered by a commercial carrier service for overnight delivery to the offices of the addressee(s).

☐ [By Hand] I directed each envelope to the party(ies) so designated on the service list to be delivered by courier this date.

☐ [By Facsimile Transmission] I caused said document to be sent by facsimile transmission to the fax number indicated for the party(ies) listed above.

☒ [By Electronic Transmission] I caused said document to be sent by electronic transmission to the e-mail address indicated for the party(ies) listed above via the court's ECF notification system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on October 22, 2009, at San Francisco, California.

/s/ Diane G. Sunnen
**DIANE G. SUNNEN**