1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

APPLE INC.,

        Plaintiff,

  v.

PSYSTAR CORPORATION, a Florida
corporation,

        Defendant.

_____/

No. C 08-03251 WHA

**ORDER GRANTING MOTION
FOR PERMANENT INJUNCTION**

**INTRODUCTION**

      In this copyright-infringement action, plaintiff Apple Inc. moves for a permanent

injunction against defendant Psystar Corporation following summary judgment in its favor on

claims of copyright infringement and violations of the Digital Millennium Copyright Act

("DMCA").  For the reasons set forth below, Apple's motion is **GRANTED**.

**STATEMENT**

      Plaintiff Apple Inc. launched its Macintosh line of personal computers in 1984, and its Mac

OS X operating system in 2001.  Personal computers manufactured by Apple have included the

Mac Pro, iMac, Mac mini, MacBook, MacBook Air, and MacBook Pro.  Since the launch of Mac

OS X, Apple computers have been sold with Mac OS X pre-installed.  Mac OS X has also been

distributed on a standalone DVD, allowing customers to upgrade their Apple computers to newer

versions of Apple's operating system when they are released.

Mac OS X, whether pre-installed or on a DVD, is covered by a software license agreement that states that the software is "licensed, not sold to [the user] by Apple Inc. ("Apple") for use only under the terms of this License" (Chung Exh. 26 at ¶ 1).  Apple's license agreements restrict the use of Mac OS X to Apple computers, and prohibit customers from installing the operating system on non-Apple computers.  The license agreement, in relevant part, states (*id.* at ¶ 2):

> 2. **Permitted License Uses and Restrictions.**
>
> A.  <u>Single Use</u>.  This license allows you to install, use and run (1) copy of the Apple Software on a single Apple-labeled computer at a time.  You agree not to install, use or run the Apple Software on any non-Apple-Labeled computer or enable another to do so.
>
> *          *          *
>
> C.  You may make one copy of the Apple Software (excluding the Boot ROM code and other Apple firmware that is embedded or otherwise contained in Apple-labeled hardware) in machine-readable form for backup purposes only . . . .  Apple Boot ROM code and firmware is provided only for use on Apple-labeled hardware and you many not copy, modify or redistribute the Apple Boot ROM code or firmware, or any portions thereof.
>
> *          *          *
>
> F.  Except as and only to the extent permitted by applicable licensing terms governing use of the Open Sourced Components, or by applicable law, you may not copy, decompile, reverse engineer, disassemble, modify or create derivative works of the Apple Software or any part thereof.

The agreement also restricts redistribution and modifications to the software (*id.* at ¶ 3):

> 3. **Transfer.**  You may not rent, lease, lend, redistribute, or sublicense the Apple Software.  Subject to the restrictions set forth below, you may, however make a one-time permanent transfer of all of your license rights to the Apple Software (in its original form as provided by Apple) to another party, provided that:  (a) the transfer must include all of the Apple Software, including all its component parts (excluding Apple Boot ROM code and firmware), original media, printed materials and this License; (b) you do not retain any copies of the Apple Software, full or partial, including copies stored on a computer or other storage device; and © the party receiving the Apple Software reads and agrees to accept the terms and conditions of this License.  You may not rent, lease, redistribute, sublicense or transfer any Apple Software that has been modified or replaced under Section 2D above.

In sum, customers were contractually precluded from: (1) installing and running Mac OS X on any non-Apple computer system, (2) enabling others to install or run Mac OS X on any non-Apple

1    computer system, (3) modifying or creating derivative works of the software, and (4) transferring

2    the software to others except as expressly authorized by the license agreement.

3         In addition to the software license agreement, Apple obtained multiple copyright

4    registrations for its Mac OS X operating system.  Finally, to prevent Mac OS X from operating on

5    non-Apple computers, Apple integrated certain "lock-and-key" technological measures into its

6    software.  This involved the use of a kernel extension, which is software that is executed and

7    becomes part of the operating system when Mac OS X "boots up" on an Apple computer.  When

8    installed on an Apple computer, this kernel extension communicated with other kernel extensions

9    to locate decryption keys that allowed encrypted files to be decrypted, thereby enabling Mac OS X

10   to run properly.

11                          *          *          *

12        Defendant Psystar Corporation manufactured a line of non-Apple computers called Open

13   Computers (formally known as Open Mac and OpenPro).  Psystar modified Mac OS X to run on

14   these computers, and sold them to the public.

15        The following briefly describes the conduct at issue:  Psystar bought a DVD containing

16   Mac OS X and installed it onto an Apple Mac mini.  Next, Psystar copied Mac OS X from the Mac

17   mini onto a non-Apple computer, which was used as an "imaging station."  Once on the imaging

18   station, Mac OS X was modified.  Psystar replaced a part of Mac OS X called a "bootloader,"

19   which runs when a computer first turns on and locates and loads portions of the operating system

20   into random access memory.  Without a bootloader, Mac OS X would not operate.  Psystar also

21   disabled and/or removed Mac OS X kernel extension files and replaced them with other kernel

22   extension files.  Psystar's modifications enabled Mac OS X to run on its non-Apple computers.

23   This modified copy became the "master copy" that was used for mass reproduction and installation

24   onto other Psystar computers that were then offered and sold to the public.  Additionally, every

25   time Psystar computers running Mac OS X were turned on, additional copies of Mac OS X were

26   created as portions of the operating system were loaded into random access memory.

27                          *          *          *

28

United States District Court
For the Northern District of California

3

1    In its motion for summary judgment, Apple contended that Psystar's reproduction,

2    modification, and distribution of Mac OS X on non-Apple computers constituted direct and

3    contributory copyright infringement under the Copyright Act, and multiple violations of the

4    DMCA.  Psystar also moved for summary judgment on a number of affirmative defenses.

5    After full briefing and oral argument, Psystar was found liable for infringement of Apple's

6    copyrights in Mac OS X by violating Apple's exclusive reproduction right, distribution right, and

7    right to create derivative works (Dkt. No. 214 at 10).  Psystar was also found liable for

8    contributory copyright infringement by intentionally inducing and encouraging its customers to

9    directly infringe Apple's copyrights through its sale of unauthorized copies of Mac OS X to the

10   public (*Id.* at 10).[1]  Finally, Psystar was found liable for violating Sections 1201(a)(1), 1201(a)(2),

11   and 1201(b)(1) of the DMCA for circumvention and trafficking in circumvention devices (*Id.* at

12   13-14).  Each of Psystar's asserted defenses were rejected as either waived or without merit.

13   Following these rulings, the Court approved a stipulated agreement reached between the

14   parties dismissing all remaining non-copyright claims for trial, awarding damages in the amount of

15   $1,337,550, and awarding attorney's fees and costs in the amount of $1,337,500 (Dkt. No. 238).

16   As a result, all that remains to be decided in this action is Apple's motion for a permanent

17   injunction.  It is to this issue that this order now turns.

18                                   **ANALYSIS**

19   **I.    ENTITLEMENT TO INJUNCTIVE RELIEF**

20   Under the Copyright Act and the DMCA, a court is authorized to grant a permanent

21   injunction "on such terms as it may deem reasonable to prevent or restrain" further infringement of

22   a copyright or violation of the DMCA.  17 U.S.C. 502(a), 1203(b)(1).  Such relief, however, does

23   not automatically issue upon a finding of liability.  Rather, a plaintiff must show entitlement to a

24   permanent injunction by demonstrating: (1) that it has suffered an irreparable injury; (2) that

26   [1]  Psystar did not oppose Apple's claim of contributory infringement, which was

27   premised upon Psystar customers directly infringing Apple's copyrights when they "booted"
     their computers containing unauthorized copies of Mac OS X (*See* Dkt. Nos. 181, 195).  The
     Court agreed with Apple that the creation of an unauthorized copy of Mac OS X in random

28   access memory when Psystar customers turned on their computers was sufficient for
     contributory liability to attach (*See* Dkt. No. 214 at 10).

4

**United States District Court**
For the Northern District of California

1    remedies available at law, such as monetary damages, are inadequate to compensate for that injury;

2    (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in

3    equity is warranted; and (4) that the public interest would not be disserved by a permanent

4    injunction. *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006).

5            In its five-page opposition to Apple's motion for injunctive relief, Psystar fails to engage or

6    even mention the four *eBay* factors discussed in Apple's opening brief.  Instead, Psystar "argues

7    only that any injunction from this Court should not extend to [a particular Psystar software

8    product]" it claims was not litigated in this action (Dkt. No. 237 at 2).  Despite this apparent non-

9    opposition, the decision whether to grant or deny injunctive relief still rests within the equitable

10   discretion of the district courts, and such discretion "must be exercised consistent with traditional

11   principles of equity." *eBay*, 547 U.S. at 394.  Since the effect of injunctive relief can extend

12   beyond the parties to the litigation, the four *eBay* factors must be considered in turn.

13           **A.       IRREPARABLE HARM**

14           Except for trademark infringement claims, there is no presumption of irreparable harm with

15   respect to permanent injunctions. *Apple Inc. v. Psystar Corp.*, 2009 U.S. Dist. LEXIS 94019 at *9

16   (N.D. Cal. Sept. 22, 2009).  In run-of-the-mill copyright litigation, however, proof of such harm

17   stemming from infringement — such as harm to business reputation and market share — should

18   not be difficult to establish. *Ibid.* (citing *MGM Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d

19   1197, 1215 (C.D. Cal. 2007)).

20           Apple contends that it has suffered irreparable harm as a result of defendant's past

21   infringing and illegal acts, and will continue to suffer such harm absent injunctive relief.  Three

22   reasons are put forth to support this assertion:  (1) Psystar's illegal acts have irreparably harmed

23   and will continue to irreparably harm Apple's brand, business reputation, and goodwill; (2)

24   Psystar's illegal acts, if not enjoined, will irreparably harm Apple's competitive position and

25   market share; and (3) Psystar's illegal acts have enabled and will continue to enable third parties to

26   infringe Apple's copyrights.

27           Each provides compelling support for a finding of irreparable harm.  With respect to its

28   brand, business reputation, and goodwill, Apple has put forth significant evidence, undisputed by

United States District Court
For the Northern District of California

5

United States District Court

For the Northern District of California

1  Psystar, that its investment in and commitment to high standards of quality control and customer

2  service would be irreparably harmed if Psystar's illegal activities were allowed to continue.  As

3  one of many examples, Apple points to the decreased functionality and quality of Psystar's

4  installations of Mac OS X on non-Apple computers, and how Psystar's customers tend to attribute

5  such problems with the quality of Apple's operating system rather than Psystar's installation and

6  hardware (Dkt. No. 235 at 6; Lynde Decl. ¶ 22; Scott Decl. ¶ 5).  This harm to Apple's reputation

7  and goodwill, supported by compelling evidence, is sufficient to establish irreparable harm.

8  *Rent-a-Center, Inc. v. Canyon Television & Appliance*, 944 F.2d 597, 603 (9th Cir.1991).[2]

9         Additionally, allowing Psystar to continue to commit acts which have been found to

10  infringe Apple's copyrights in Mac OS X and violate the DMCA would irreparably harm the

11  competitive position and market share of Mac OS X.  Indeed, Apple's marketing campaign for

12  Mac OS X centers around promises of quality and customer support that Psystar does not provide

13  to its customers (Schiller Decl. ¶ 8; Lynde Decl. ¶ 22; Scott Decl. ¶ 5).  Because this harm to the

14  competitive position and market share of Mac OS X is difficult to quantify, this also supports a

15  finding of irreparable harm.  *See Rent-a-Center*, 944 F.2d at 603 (noting that damage that is

16  "difficult to calculate[] qualifies as irreparable harm").

17         Finally, Apple points to Psystar's brazen plans to continue trafficking in

18  anti-circumvention devices under the DMCA as evidence of irreparable harm (Dkt. No. 235 at 7;

19  Chung Decl. Exh. 5; Lynde Decl. ¶¶ 11–12, 34).  Because such trafficking has induced and would

20  continue to induce third parties — namely, Psystar customers — to infringe Apple's copyrights by

21  running Mac OS X on non-Apple computers, and such use would result in the same harms to

22  Apple's competitive position and reputation for quality as discussed above, this provides a third

23  layer of support for a finding of irreparable harm.

24         In sum, this factor tilts heavily towards granting injunctive relief.

25

26         [2] Apple's policy is to not provide customer support for unauthorized Mac OS X
    installations on non-Apple computers.  However, Psystar customers have repeatedly
27  contacted Apple to seek support for their unauthorized installations of Mac OS X.  Apple
    contends, and this order agrees, that this demonstrates that Psystar's activities irreparably
28  harm Apple's reputation for quality software and customer support (Schiller Decl. ¶ 8; Lynde
    Decl. ¶ 22; Scott Decl. ¶ 5).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

### B.   ADEQUACY OF LEGAL REMEDIES

District courts must ascertain whether remedies available at law, such as monetary damages, are inadequate to compensate for the injury suffered.  *eBay*, 547 U.S. at 391.  While Apple's claim that Psystar would be unable to pay *any* statutory damages is somewhat tempered by the stipulated agreement reached between both parties, Apple's remaining arguments still provide strong evidence that remedies at law would be inadequate.

*First*, whether Psystar will be able to pay its *stipulated* damages to Apple is highly suspect. Psystar's costs exceeded its revenues in 2008 and 2009, its financial statements reveal questionable assets (excluding the value Psystar attributes to its intellectual property), and it already filed for bankruptcy once during the course of this litigation (Lynde Decl. ¶¶ 36, 37). *Second*, the same evidence and rationale put forth by Apple to show irreparable harm support the conclusion that an award of damages would be inadequate, simply because the harm caused to Apple's reputation, goodwill, and brand is difficult, if not impossible, to quantify.  Moreover, monetary damages would not prevent Psystar from continuing to infringe Apple's copyrights and violate the DMCA in the future, and will not prevent third-parties from infringing Apple's copyrights; indeed, Psystar's actions throughout this litigation and statements at oral argument reveal a dogged determination to continue selling products that allow Mac OS X to be installed on non-Apple computers.

In sum, Apple has adequately shown that legal remedies are inadequate to compensate for the injuries it has suffered, and may continue to suffer, as a result of Psystar's illegal acts.

### C.   BALANCING OF THE HARDSHIPS

In determining whether injunctive relief is appropriate, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Klein v. City of San Clemente*, 584 F.3d 1196, 1199–1200 (9th Cir. 2009) (internal citation omitted).  Here, a permanent injunction in favor of Apple would serve the narrow purpose of "prevent[ing] or restrain[ing]" further infringement of Apple's copyrights and violations of the DMCA that were found at summary judgment.  17 U.S.C. 502(a), 1203(b)(1). Since Psystar does not (and cannot) claim any *legitimate* hardships as a result of being enjoined

7

1  from committing unlawful activities, and Apple would suffer irreparable and immeasurable harms

2  if an injunction were not issued, this factor weighs strongly in favor of Apple's motion.

3      **D.    EFFECT ON THE PUBLIC INTEREST**

4      Under the traditional four-factor test, district courts must consider to what extent the public

5  interest would be disserved by the issuance of a permanent injunction.  *eBay*, 547 U.S. at 391.  On

6  this issue, an examination of the interests underlying copyright law is instructive.

7      "The sole interest of the United States and the primary object in conferring the monopoly

8  [of copyright protection] lie in the general benefits derived by the public from the labors of

9  authors."  *Elvis Presley Enterprises, Inc. v. Passport Video,* 357 F.3d 896, 899 (9th Cir. 2004)

10  (quoting *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984)).  In

11  other words, the public receives a benefit when the legitimate rights of copyright holders are

12  vindicated.

13      Here, a permanent injunction reasonably tailored to the circumstances of this litigation

14  would serve no purpose other than to vindicate the legitimate rights of Apple in its copyrights.

15  Such equitable relief would not harm the interests of the public; rather, consistent with the policies

16  underlying copyright protection, an injunction preventing Psystar from continuing to commit

17  infringing and illegal, if not criminal, acts under the Copyright Act and DMCA would ensure that

18  the public will continue to benefit from the creative fruits of Apple's labor.  *Ibid.*; *see* 17 U.S.C.

19  506, 1204 (authorizing criminal sanctions for willful violations of the Copyright Act and DMCA

20  made for financial gain or commercial purposes).  Thus, this order finds that the public interest

21  would be promoted by the imposition of equitable relief.

22              *          *          *

23      Accordingly, since each *eBay* factor supports Apple's entitlement to injunctive relief, this

24  order now turns to the scope of the injunction that will issue.

25      **II.    SCOPE OF INJUNCTIVE RELIEF**

26      The terms if a permanent injunction must be "reasonable to prevent or restrain" further

27  infringement of a copyright or violation of the DMCA.  17 U.S.C. 502(a), 1203(b)(1).

28

**United States District Court** For the Northern District of California

8

In determining the scope of an injunction, a district court has broad latitude, and must balance the equities between the parties and give due regard to the public interest. *Geertson Seed Farms v. Johanns*, 570 F.3d 1130, 1136 (9th Cir. 2009) (internal citations omitted).

Apple seeks an order permanently enjoining Psystar from any of the following activities (Dkt No. 235 at 10):

1.   Infringing Apple's copyrights in Mac OS X;

2.   Manufacturing, distributing, preparing or using any non-Apple computer installed with a reproduction or derivative work of Mac OS X;

3.   Manufacturing, distributing, preparing or using any product that creates or facilitates the reproduction or modification of Mac OS X on non-Apple computers;

4.   Circumventing any technological protection measure in Mac OS X;

5.   Possessing any technology, product, device, component, or part thereof that has been used to circumvent any technological protection measure in Mac OS X, and requiring Psystar to destroy any technology, product, device, component, or part thereof in its custody or control that has been used to circumvent any technological protection measure in Mac OS X;

6.   Manufacturing, importing, offering to the public, providing, or otherwise trafficking in circumvention devices using, containing, or capable of generating Apple's decryption key, or any technology, product, service, device, component, or part thereof for use in circumventing any technological protection measure in Mac OS X; and

7.   Inducing, aiding, or assisting others in infringing Apple's copyrights in Mac OS X or in circumventing any technological protection measure in Mac OS X.

Psystar does not address any of these actions in particular.  Rather, Psystar's opposition focuses on two narrow issues: (1) whether the scope of the injunction should expressly exclude Snow Leopard, Apple's latest version of Mac OS X, and (2) whether the injunction should expressly exclude Rebel EFI, a Psystar product that it alleges "has not been litigated in this case, has not been the subject of discovery in this case, that is presently the subject of litigation in [Florida], that is comprised exclusively of Psystar software, that is not sold in conjunction with any hardware, and that is sold entirely apart from any copy of Mac OS X or any computer running Mac OS X" (Dkt. No. 237 at 2).

Before delving headlong into these inquiries, a brief discussion of the relevant differences between Apple's Snow Leopard and Psystar's Rebel EFI products is necessary.

9

United States District Court

For the Northern District of California

1    Since the launch of Apple's Mac OS X operating system in 2001, every major version of

2  Mac OS X released to the public has carried a different "big cat" name.  At the start of this

3  litigation, the then-current version of Mac OS X, version 10.5, carried the marketing moniker of

4  Leopard (*See* Dkt. No. 1).  Prior to Leopard, Apple used the names Cheetah, Puma, Jaguar,

5  Panther, and Tiger to describe or promote versions 10.0 through 10.4, respectively, of its computer

6  operating system.[3]  Snow Leopard (which is apparently a different cat altogether from the non-

7  snow variety) represents Apple's newest version of Mac OS X, version 10.6.  Like its

8  predecessors, Snow Leopard comes pre-installed on newly sold Apple computers, is available on a

9  standalone DVD (to allow customers to upgrade from a prior version of Mac OS X), and is a

10  software program that, either independently or as a derivative work of Mac OS X, qualifies for

11  protection under the Copyright Act and the DMCA (*See* Chung Decl. Ex. 6).  *See* 17 U.S.C. 101,

12  102 (defining the types of works subject to copyright protection).

13    Rebel EFI, by contrast, is *not* an Apple software product.  Rather, Rebel EFI is a Psystar

14  product that "consists solely of Psystar software available for sale and download through Psystar's

15  website" (Dkt. No. 237 at 4).  Further details on what exactly Rebel EFI does, however, are not

16  forthcoming in Psystar's opposition brief.  Indeed, only by cobbling together Psystar's various

17  legal arguments and vague factual assertions can it be reasonably inferred that Rebel EFI is a

18  software program, written by Psystar, that allows an individual to install and run Mac OS X Snow

19  Leopard on a non-Apple computer.[4]

20    **A.    SNOW LEOPARD**

21    In situations where there is a clear pattern of copyright infringement by the defendant, and

22  there is a threat that other copyrights of the plaintiff may be infringed by the defendant, an

23  injunction may be issued as to future works of the plaintiff as well as existing works (*i.e.*, as to

24  _____

25  [3]  http://en.wikipedia.org/wiki/Mac_OS_X.  Mac OS X started at version 10.0, hence the roman numeral "X"  Apple's prior operating system, unsurprisingly, was Mac OS 9.

26  [4]  This order also notes, for the sake of clarity in the record, that at the time this order
27  was filed, news outlets had already reported that Psystar was no longer selling computers with Mac OS X pre-installed.  This may help explain Psystar's apparent ambivalence towards injunctive relief in general, as well as its pointed efforts to exclude its mystery
28  product, Rebel EFI, from an injunction issued by this court.  All signs seem to indicate that Rebel EFI is the shining star of defendant's new software-based business model.

United States District Court

For the Northern District of California

1   litigated works as well as non-litigated works of like character).  *See Warner Bros. Records, Inc. v.*

2   *Brown*, 2008 U.S. Dist. LEXIS 95171 at *6 (N.D. Cal. Nov. 13, 2008) (citing *Princeton Univ.*

3   *Press v. Michigan Document Serv., Inc.*, 99 F.3d 1381, 1392- 93 (6th Cir. 1996) ("The weight of

4   authority supports the extension of injunctive relief to future works [in copyright actions].")); *Walt*

5   *Disney Co. v. Powell*, 897 F.2d 565, 568 (D.C. Cir. 1990).  This principle undoubtedly applies

6   here, as Psystar has been found liable of not only direct infringement of Apple's copyrights in

7   numerous releases of Mac OS X, but contributory infringement and multiple violations of the

8   DMCA related to Apple's protected works.  Additionally, a continuing threat to Apple's future

9   works — specifically, future versions of Mac OS X — is clearly evidenced by the very existence

10  of Psystar's Rebel EFI product, and Psystar's various tactical decisions over the course of this

11  litigation (*See* Dkt. Nos. 152, 237).

12        Apple's own actions, however, in hindering discovery with respect to Snow Leopard must

13  be considered in evaluating the equity of relief.  During the discovery period, Apple unilaterally

14  refused to allow discovery on Snow Leopard, which had yet to be released during the discovery

15  period, saying it was "irrelevant" to this action (Dkt. No. 152).  Once discovery had closed and

16  Snow Leopard was released to the public, however, Psystar immediately filed a separate action in

17  the United States District Court in the Southern District of Florida targeting Snow Leopard and its

18  Rebel EFI product.  Perhaps surprised by this move, Apple then petitioned to reopen discovery to

19  include Snow Leopard in this litigation.  That request — in light of Apple's prior efforts to keep

20  Snow Leopard *out* of this action — was denied.  The high-handed unilateral self-help by Apple

21  certainly smacked of trying to "have it both ways," and offended the undersigned's sense of fair

22  play.

23        Despite Apple's slick tactic, the weight of authority clearly favors the extension of a

24  permanent injunction to future copyrighted works.  The inclusion of future works within the scope

25  of an injunction ensures that litigation need not be needlessly replicated when the defendant's

26  infringing *acts* are the same, but the copyrighted work has changed.  Put differently, whether or

27  not Apple allowed Snow Leopard to be litigated in discovery, an injunctive decree can reach

28  beyond the four corners of the litigated copyrighted works to cover non-litigated items of similar

11

United States District Court

For the Northern District of California

character.  *See*, *e.g.*, *Walt Disney*, 897 F.2d at 568 (extending a permanent injunction to copyrighted characters that were not expressly litigated in the underlying action); *Brown*, 2008 U.S. Dist. LEXIS 95171 at *6 (extending an injunction to works that did not exist when the injunction was imposed).

In this light, Psystar's argument that extending the injunction to include Snow Leopard would somehow "undo" the Court's decision to leave Snow Leopard out of discovery, and decline to dismiss the action in Florida, is unpersuasive.

Finally, it must be noted that Psystar continues to grossly mischaracterize prior rulings in this case to justify their position on this issue.  At oral argument, Psystar asserted that the undersigned's striking of Apple witness Jacques Vidrine's testimony from discovery on September 4, 2009, indicated that Snow Leopard could never be protected by an injunction.  A brief glance at the record, however, shows that the Court's primary concern in striking Mr. Vidrine's testimony was to maintain the discovery deadline and the overall case schedule (without reaching any issues as to what would or would not be within the scope of a later injunction) (Dkt. No. 128).  Psystar cannot turn a bullet into a missile.  Apple has never been barred from introducing evidence or testimony regarding Snow Leopard in post-decree contempt proceedings.

Because a copyrighted work need not be included within the scope of discovery to fall within the scope of a permanent injunction, Snow Leopard will not be excluded from the scope of the injunction.  Rather, it will be *included* to the extent that it — and any other non-litigated Apple software programs of similar character to Mac OS X — qualifies as a protected work under the Copyright Act.

**B.    REBEL EFI**

Since the terms of an injunction must be "reasonable to prevent or restrain" further infringement of a copyright or violation of the DMCA, it follows that an injunction must be limited as "to restrain acts which are the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Orantes-Hernandez v. Thornburgh*, 919

United States District Court

For the Northern District of California

1    F.2d 549, 564 (9th Cir. 1990) (quoting *NLRB v. Express Pub. Co.*, 312 U.S. 426, 435 (1941)); 17

2    U.S.C. 502(a), 1203(b)(1).

3       Consistent with this standard, a permanent injunction against Psystar should, *at a minimum*,

4    encompass the acts found unlawful in this action. In other words, an injunction should at least

5    cover Psystar's acts constituting infringement of Apple's reproduction, distribution, and

6    derivative-work rights under the Copyright Act, Psystar's acts constituting contributory

7    infringement of Apple's reproduction right under the Copyright Act, and Psystar's acts violating

8    the anti-circumvention and anti-trafficking provisions of the DMCA, as found at summary

9    judgment (Dkt. No. 214).

10      Psystar does not dispute this legal standard (Dkt. No. 237 at 4). Instead, Psystar

11    concentrates its fire on obtaining an exclusion for its aforementioned Rebel EFI product from any

12    injunction issued by this order. Psystar advances three reasons for such an exclusion: (1) Rebel

13    EFI only works with Apple's Snow Leopard product, and Snow Leopard should be excluded from

14    the injunction; (2) the method by which Rebel EFI operates does not fall within "the same type or

15    class" of acts found to be infringing or unlawful in this action, and raises legal issues not litigated

16    by the parties; and (3) an injunction that does not exclude Rebel EFI would cause substantial

17    interference with the sovereignty of in the United States District Court in the Southern District of

18    Florida, where a separate action involving Rebel EFI is pending (Dkt. No. 237).

19      Since this order has already determined that an express exclusion for Snow Leopard is

20    improper, Psystar's first argument fails. With respect to Psystar's second argument that Rebel EFI

21    differs materially from this case in both fact and law, Psystar cites to no decisions where the terms

22    of an injunction under the Copyright Act or DMCA specifically excluded a non-litigated product

23    of the accused infringer. Instead, Psystar attempts to distinguish the decisions cited by Apple and

24    this order — such as *Walt Disney* — supporting the extension of injunctive relief to non-litigated

25    works of the copyright holder as being "cases where the additional, non-litigated conduct was the

26    same in all legally relevant respects to the actually litigated conduct" (Dkt. No. 237 at 5).

27      Psystar's argument belies even a casual reading of these decisions. *Walt Disney* and its

28    progeny addressed the issue of whether non-litigated copyrighted works *of the copyright holder*

should be included within the scope of a court's injunction. Here, Apple is the copyright holder whose rights have been asserted, and therefore *Walt Disney* is clearly applicable as to whether Snow Leopard should be included in an injunction. By contrast, Rebel EFI is a product of Psystar, the accused infringer in this case (*See* Dkt. No. 237 at 4). And whether a non-litigated act or product of an accused infringer falls within the ambit of an injunction goes to the *enforceability*, rather than the scope, of the injunction. *See In re Lorillard Tobacco Co.*, 370 F.3d 982, 986 (9th Cir. 2004) (noting that the three fundamental characteristics of an injunction are that it is directed to a party, *enforceable by contempt proceedings*, and designed to protect the substantive relief sought by a complaint in more than a temporary fashion) (citations omitted) (emphasis added).

In other words, distinguishing the *Walt Disney* line of decisions provides no protection to Psystar with respect to its own product, Rebel EFI. Whether Rebel EFI violates the terms of the injunction set forth in this order is a factual issue more appropriate for a contempt action. *See Jerry's Famous Deli, Inc. v. Papanicolaou*, 383 F.3d 998, 1001 (9th. Cir. 2004) (affirming a contempt order after factual findings by the district court indicated that the defendant violated a permanent injunction directed to prevent infringement of the plaintiff's trademarks).

Common sense also supports this distinction between the terms and enforceability of an injunction. As Psystar readily admits, Rebel EFI has not been litigated in this action and was not subject to discovery. Moreover, Psystar's opposition brief appears to purposefully avoid providing a straightforward description of what Rebel EFI actually *does* (*See* Dkt. No. 237). Thus, it is not only inappropriate, but impossible to determine on this record whether Rebel EFI falls within "the same type or class of unlawful acts" found at summary judgment. This order declines to "bless" a product about which it knows little of substance. Psystar's second argument is therefore rejected, and Psystar — if it continues to do so — sells Rebel EFI at its peril.

Finally, Psystar asserts that issuing an injunction without excluding Rebel EFI would "invade the jurisdiction of Judge Hoeveler of the United States District Court for the Southern District of Florida" (Dkt. 237 at 3). To support their argument, Psystar cites to *United States v. AMC Entertainment*, 549 F.3d 760, 770 (9th Cir. 2008), quoting in relevant part:

> [W]hen exercising its equitable powers to issue an injunction, a court must be mindful of any effect its decision might have outside its jurisdiction. Courts ordinarily should not award injunctive relief that would cause substantial interference with another court's sovereignty.

What Psystar conveniently omits, however, are the paragraphs immediately following the quoted language. As the remainder of the decision clearly explains, the district court's granting of a nationwide injunction in *AMC Entertainment* was improper because the injunctive relief directly conflicted with an *existing* decision by the Fifth Circuit, and circuit courts "expect [their] pronouncements [to] be the final word within the [c]ircuit's geographical area, subject only to *en banc* or Supreme Court review." *Id.* at 771.

Since neither the United States District Court for the Southern District of Florida nor the Eleventh Circuit Court of Appeals has issued any pronouncement on the legality of Rebel EFI under the Copyright Act or DMCA, Psystar's argument lacks merit. Moreover, as explained above, whether Rebel EFI or any future or non-litigated Psystar product violates the injunction issued by this order is a question more appropriate for contempt proceedings.

This order does note, however, that if such contempt proceedings are brought against Psystar, comity with respect to the action before Judge Hoeveler in Florida will be properly considered. This determination would, of course, also examine the harm that delay would cause Apple, the stage of the proceedings in the Florida case, and whether the record before the undersigned provides a more complete framework to do justice to the issues presented. But these questions are for another day.

In sum, Rebel EFI will not be expressly excluded from the terms of the injunction. It should be clear, however, that this ruling is without prejudice to Psystar bringing a new motion before the undersigned that includes real details about Rebel EFI, and opening itself up to formal discovery thereon. This would serve the purpose — akin to a post-injunction motion vetting a "design-around" in a patent action — of potentially vetting (or not vetting) a product like Rebel EFI under this order's decree. Moreover, Psystar may raise in such a motion any defenses it believes should apply to the factual circumstances of its new product, such as the 17 U.S.C. 117 defense raised in its opposition and at oral argument. Whether such a defense would be successful

on the merits, or face preclusion or other hurdles, this order cannot predict. What is certain,

however, is that until such a motion is brought, Psystar will be selling Rebel EFI at its peril, and

risks finding itself held in contempt if its new venture falls within the scope of the injunction.

**CONCLUSION**

Having concluded that a permanent injunction would be consistent with traditional

principles of equity, and having considered the four *eBay* factors to reach that determination, the

Court hereby finds that the following injunction is both equitable and reasonable to prevent or

restrain further infringement of Apple's copyrights or violations of the DMCA by Psystar under 17

U.S.C. 502(a) and 1203(b)(1).

IT IS HEREBY ORDERED that Apple's motion for a permanent injunction is **GRANTED**,

and defendant is permanently and immediately enjoined from:

1.  Copying, selling, offering to sell, distributing, or creating derivative works of plaintiff's copyrighted Mac OS X software without authorization from the copyright holder;

2.  Intentionally inducing, aiding, assisting, abetting, or encouraging any other person or entity to infringe plaintiff's copyrighted Mac OS X software;

3.  Circumventing any technological measure that effectively controls access to plaintiff's copyrighted Mac OS X software, including, but not limited to, the technological measure used by Apple to prevent unauthorized copying of Mac OS X on non-Apple computers;

4.  Manufacturing, importing, offering to the public, providing, or otherwise trafficking in any technology, product, service, device, component, or part thereof that is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to plaintiff's copyrighted Mac OS X software, including, but not limited to, the technological measure used by Apple to prevent unauthorized copying of Mac OS X on non-Apple computers;

5.  Manufacturing, importing, offering to the public, providing, or otherwise trafficking in any technology, product, service, device, component, or part thereof that is primarily designed or produced for the purpose of circumventing a technological measure that effectively protects the rights held by plaintiff under the Copyright Act with respect to its copyrighted Mac OS X software.

IT IS FURTHER ORDERED that:

1.  Defendant must bring its conduct into compliance with the injunction by midnight on December 31, 2009, *at the latest*. Defendant must *immediately* begin this process, and take the quickest path to compliance; thus, if compliance can be achieved within one hour after this order is filed, defendant shall reasonably see it done.

2.            Any contempt motion filed by plaintiff must be based upon violations of the injunction on or after January 1, 2010, subject to the exception below;

3.            Defendant shall not exploit the compliance period granted by this order to engage in defiant or unreasonable conduct, including (but not limited to) conducting a fire sale of infringing products or continuing to sell any non-litigated product whose legality under the injunction is legitimately in question.  Such products should be first "vetted" by defendant through the motion process mentioned in this order;

4.            Defendant shall *not* be insulated from contempt liability for any defiant or unreasonable conduct prior to January 1, 2010.  Furthermore, nothing in this order shall be construed as barring discovery into defendant's conduct prior to January 1, 2010;

5.            Defendant shall file and serve on plaintiff, by midnight on December 31, 2009, a report in writing and under oath detailing the manner in which defendant has complied with the injunction;

6.            Defendant must immediately destroy any technology, product, device, component, or part thereof in its custody or control that has been used to circumvent any technological protection measure that effectively controls access to plaintiff's copyrighted Mac OS X software, or effectively protects the rights held by plaintiff under the Copyright Act with respect to its copyrighted Mac OS X software;

7.            The undersigned expressly retains jurisdiction to enforce the judgment and permanent injunction pertaining to this action.

**IT IS SO ORDERED.**

Dated:  December 15, 2009.

WILLIAM ALSUP

UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California