Apple Inc. v. Psystar Corporation Doc. 265

Thomas J. Nolan, Esq. (SBN 48413)

Nolan, Armstrong & Barton, LLP

600 University Ave. \ Palo Alto, Ca. 94301
Tel. (650) 326-2980 Fax (650) 326-9704

Attorney for Defendant Robert Prevett

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, Plaintiff, vs. ROBERT PREVETT, Defendant. | No. C01-21069-JW<br>**ROBERT PREVETT'S MEMORANDUM ON DISGORGEMENT AND CIVIL PENALTIES FOR INSIDER TRADING**<br>Hearing Date: December 15, 2003<br>Time: 1:30 p.m. |



Dockets.Justia.com

# TABLE OF CONTENTS

______

______ **Page No.**


**TABLE OF CONTENTS** 1

**APPENDIX** 2

**INTRODUCTION** 4

**I. OVERVIEW OF EVIDENCE** 5

**II. FINANCIAL HISTORY AND CURRENT FINANCIAL STATUS** 8

**ARGUMENT** 13

- **I. The "Gain" Calculation Should Be Based on the Actual Profit Mr. Prevett Realized From the Material Non-Public Information** 13
  - **A. Gain Based on Difference Between March 6th Purchase Price And March 7th Public Date** 14
  - **B. Gain Based on Mr. Prevett's Profit From His 3/17 Sale Of Nvidia Stock** 15
  - **C. Gain Based on March 6th Purchase Price and March 10th Closing Price** 17
  - **D. The Gain Calculation Should Incorporate the Method Suggested in the PSLRA** 18
- **II. This Court Should Not Impose Civil Penalties** 20

**CONCLUSION** 22

## APPENDIX

| | |
|---|---|
| 3/6/00 - Robert Prevett's Purchase Price for 10,000 shares of Nvidia Stock | $629,769 |
| 3/7/00 - Opening Price for Nvidia Stock | $75.00/share |
| 3/10/00 - Closing Price for Nvidia Stock | $118.00/share |
| 3/17/00 - Sale Price for 5,000 Shares of Nvidia Stock Sold by Robert Prevett | $491,202 |

**A. Gain Based on Difference Between March 6th Purchase Price and March 7th Public Date**

| | |
|---|---|
| *3/6/00 Purchase Price* | *$629,769* |
| *Value @ 3/7/00 Open* | *$750,000* |
| *Total Gain* | *$120,231* |
| *Total Gain Less 5%* | ***$114,220*** |

**B. Gain Based On Mr. Prevett's Profit From His 3/17 Sale Of Nvidia Stock**

1. *Gain Using 3/17 Sale Price for all 10,000 Shares*

| | |
|---|---|
| *3/6/00 Purchase Price* | *$629,769* |
| *3/17/00 Sale Price (5,000 shares)* | *$491,202* |
| *3/17/00 Value (5,000 shares still holds)* | *$491,202* |
| *Total Gain* | *$352,635* |
| *Total Gain Less 5%* | ***$335,004*** |

2. *Gain Using a 50-day Moving Average for 5,000 Shares Still held*

| | |
|---|---|
| *3/6/00 Purchase Price* | *$629,769* |
| *3/17/00 Sale Price (5,000 shares)* | *$491,202* |
| *50-Day Moving Average (5,000 shares)* | *$360,000* |
| *Total Gain* | *$221,433* |
| *Total Gain Less 5% on 5,000 Shares Sold* | ***$196,873*** |

**C. Gain Based on March 6th Purchase Price and March 10th Closing Price**

*1. SEC's Proposal Using March 10th Closing Price*

| | |
|---|---|
| *3/6/00 Purchase Price* | *$629,769* |
| *Value at 3/10 Close* | *$1,180,000* |
| *Total Gain* | *$550,231* |
| *Total Gain Less 5%* | ***$522,720*** |

*2. Gain Using SEC's Expert's Event Study Apportioning Rise in Stock Price Due to X-Box Information*

| | |
|---|---|
| *3/6/00 Purchase Price* | *$629,769* |
| *66.2% Gain as of 3/10/00* | *$416,907* |
| *66.2% Less 5%* | ***$385,418*** |

**D. The Gain Calculation Should Incorporate the Method Suggested in the PSLRA**

1. *Gain Based on 90-day Mean Value from 3/10/00 to 6/10/00*

| | |
|---|---|
| *3/6/00 Purchase Price* | *$629,769* |
| *15 U.S.C. § 78u-4(e) 90-day mean value* | *$960,000* |
| *Total Gain* | ***$330,231*** |

2. *Gain Based on Mean Value from 3/10/00 to 3/28/00*

| | |
|---|---|
| *3/6/00 Purchase Price* | *$629,769* |
| *15 U.S.C. § 78u-4(e) 3/10 - 3/28/00 mean value* | *$1,020,000* |
| *Total Gain* | ***$390,231*** |

## INTRODUCTION

Mr. Prevett has been through two trials (one civil and one criminal) based on his purchase of Nvidia stock on March 6, 2000. He is now serving a five-month sentence in a federal correctional facility. The only remaining issue for this Court to determine is an appropriate remedy based on the "gain" realized by Mr. Prevett for his sole transgression.

______This Court is quite familar with the facts of this case. The events occured during a time in our history when the stock market was exhibiting "unbridled excuberance," as one Prudential analyst testified. The market reacted to the slightest information in a way never witnessed before. Indeed, all a company had to do was add "dot com" to its name and the stock soared. Nvidia was no different. It was touted in the industry as the up and coming 3D graphics chip company in Silicon Valley. Its employees were encoraged to purchase its stock and invest in the company. That is what Mr. Prevett did: He invested in Nvidia. His stock portfolio grew in large part because of the success of Nvidia.

Despite his growing portfolio Mr. Prevett lived a frugal life. His strict up bringing by his father, a retired police leuitenent, and his mother, a homemaker, taught him honest and good moral values. He continued to rent the same one-bedroom apartment in Sunnyvale and drive the same eleven-year-old car even though his net worth was in the millions. He is now married and the stepfather to two eleven-year-old girls. His assets have substantially declined, not only as a result of the declining stock market, but as the result of mounting legal fees.

This case presents unusual circumstances regarding Nvidia's stock movement the week of March 6, 2000. Even the Securities and Exchange Commission's ("SEC") expert found that news of Nvidia's X-Box deal with Microsoft was disseminated into the market causing the stock to spike on March 7th and again on March 10th. When the material information became public was hotly contested between the parties. Indeed, the evidence was compelling that the information was public on March 7th. It is Mr. Prevett's position the gain should be calculated using March 7th as the date the information became public. But if this Court were to adopt the SEC's position that the information became public on March 10th, the gain cannot be calculated based on a simple

difference between the purchase price on March 6 and the closing price on March 10th, as the SEC proposes. Given other factors in the market which caused the stock to rise, Mr. Prevett's gain should only be based on the rise due to the release of the "material" information in the market.

What follows is a brief overview of the trial testimony and alternative proposals for calculating Mr. Prevett's gain.

## I. **OVERVIEW OF EVIDENCE**[1]

______In March of 2000, Mr.Prevett was employed as an engineer at Nvidia. On the evening of March 5, 2000, Nvidia's CEO, Jensen Huang sent an email to "Everyone," which included over 400 Nvidia employees, stating that Nvidia had won the X-Box deal with Microsoft to design the graphic chip for the X-Box. On March 6, 2000, at approximately 11:05 a.m., Mr Prevett purchase 10,000 shares of Nvidia stock for a total purchase price of $629,769. On March 17, 2000, he sold 5,000 shares for $491,202. (See Declaration of Thomas J. Nolan "Nolan Dec.", Exhibit A). Mr. Prevett still holds the remaining 5,000 shares in his Charles Schwab account.

There was substantial evidence introduced at trial on the issue of when the information in Mr. Huang's email became public. On March 7th at approximately 4:30a.m., Hans Mosesmann, an analysts for Prudential Securities, released a note entitled *Nvidia Now in Position to X-Box Design Win, We Believe*. Hans Mosesmann testified that his note was distributed to Prudential brokers worldwide and additionally to other sources, such as Bloomberg News and American Express prior to 4:00 a.m. EST. At 7:00 a.m. EST, Hans Mosesmann held a conference call with Prudential brokers all over the world essentially informing them that he believed Nvidia had won the graphics chip design for the X-Box. Prior to the conference call, there was an exchange of e-mails between Hans Mosesmann and Jensen Huang on the evening of March 6, 2003 and the early morning hours of March 7, 2000. On March 6,

---

[1] Due to financial constraints, Mr.Prevett has not ordered a transcript of the trial testimony. The overview of evidence is based on Mr Prevett's counsel's best recollection of the testimony.

2000, at approximately 11:00 p.m., Jensen Huang had responded to Hans Mosesmann's e-mail asking him to confirm if Nvidia won the X-Box contract. Jensen Huang informed him that "rumors are true." Mosesmann responded to Jensen Huang's e-mail, sometime that morning after he held his morning call and before the market opened.

Hans Mosesmann testified at his SEC deposition, which was played for the jury, that he did not feel the need to revise his note based on what Jensen Huang had told him. He testified that his note had made public the material information contained in Jensen Huang's e-mail.

Alex Paul, an institutional investor who worked for New Salem Capital in 1999 and 2000 and followed the graphics chip industry, testified that, from an investor's standpoint, the material information contained in Jensen Huang's e-mail was that Nvidia had been awarded the graphic chip design for the X-box. Alex Paul had received a call from a Prudential broker before the market opened on March 7th telling him that Nvidia had won the X-Box graphic chip design. Since this had been a complete turnaround from Microsoft's position with GigaPixel, a company previously awarded the X-Box contract, the Prudential broker offered Alex Paul an opportunity to speak with Hans Mosesmann directly on the telephone. Alex Paul testified that he spoke with Hans Mosesmann sometime that morning after the market opened and Hans Mosesmann was quite confident in his words that Nvidia won the X-Box deal. Alex Paul also testified that when information like that is disseminated by Prudential to brokers throughout the world and its clients and other media sources it is "public information."

Jensen Huang, himself, admitted that "certainly by Tuesday morning everyone in the world knew that Nvidia had won the X-Box."

An EE Times article was released later that morning at approximately 11:28 a.m. EST entitled *Microsoft Pairs with Nvidia on X-Box Gaming Console*. In that article, the CEO of GigaPixel is quoted

as saying that he was informed by Microsoft that it was canceling the contract with GigaPixel and that Microsoft had decided to go with Nvidia. Other news articles were released that day, including a Reuter's article entitled *Nvidia Stock Soars on Chip Speculation*, a ZD Net article referencing the Reuter article, and a CNet news.com article entitled *Nvidia Chip Said to Power Microsoft Game Box*.

In addition, information that Nvidia would be added to the Midcap 400 index was released by S&P after the close of trading on March 6th.

The March 7th pre-market trading in Nvidia stock was abnormally active. Nvidia opened at $75 on March 7 from its close of $58.5 on March 6. The stock closed on March 7, 2000 at $83.31 - up approximately 24 points from the close on March 6, 2000.

On March 10, 2000, Bill Gates announced at the Games Developers Conference that Microsoft selected Nvidia for the X-Box graphics chip, unveiled the X-Box prototype and shared other details regarding the software development for the X-Box. Both Nvidia and Microsoft released their press releases.

On March 10th, Nvidia's stock price reached a high of $145 and closed at $118.

Professor Stephen Choi, an expert for the defense, conducted his own research to determine when the material information in the March 5th email became public. (See Nolan Dec., Exhibit B). In summary, he opined that the material information regarding Nvidia and X-Box was made public on March 7th. His opinion was based in large part on the strong positive market reaction and the "abnormal return" on March 7th. Professor Choi used the same event study methodology and underlying data used by Professor Lehn, the SEC's expert. The event study constructed a prediction of the expected price change which Nvidia would receive on a particular day based on Nvidia's general performance relative to the entire stock market in the past. The expected return was subtracted from the actual return Nvidia experienced on a particular day to obtain the "abnormal return." What accounts for the abnormal return

is a matter of subjectivity, in Professor Choi's opinion, which may be explained by news events. In Professor Choi's opinion the abnormal return on March 7th was substantially due to the release of news that Nvidia was going to supply the graphics chip for the X-Box. The information released into the market on March 7th was essentially the same material information contained in Mr. Huang's March 5th email, thus, making the material information "public" on March 7th.

Professor Choi opined that the stock movement on March 10th was due to new information not contained in the March 5th email. Specifically, Microsoft officially confirmed the deal with Nvidia, Bill Gates unveiled the specifications for the X-Box including a Direct X package unrelated to Nvidia, and overall displayed exuberance about the product. Hans Mosesmann described Gates' demonstration as "spectacular" in his March 13th Prudential note. Alex Paul testified that the jump in the stock on the 10th of March was due to Gates' performance at the Conference.

Kenneth Lehn, the SEC's expert, discussed his analysis using the same event study methodology as Professor Choi and stated his analysis showed, among other things, significant abnormal positive returns in Nvidia's stock on March 7th, 9th and 10th. (See Nolan Dec., Exhibit C). Although Professor Lehn concluded that the information contained in the Prudential note was "material and nonpublic before March 7th" (Nolan Dec, Exhibit C at 7), it was more "speculative" than the March 5th email. According to Professor Lehn, the information released to the market on March 10th was more akin to the material information contained in the March 5th email and, thus, made the information in the March 5th email "public" on March 10th. Professor Lehn also concluded that approximately 5% of the increase in Nvidia's stock on March 7th could be attributable to the S&P announcement.

## II. FINANCIAL HISTORY AND CURRENT FINANCIAL STATUS

Mr. Prevett has and continues to live a simple, non-extravagant life. His primary asset, up until the purchase of his current home with his wife in April of 2002, has been his stock holdings.

Over the last several years, however, Mr. Prevett's financial net worth has dwindled. Like many people who invested their money in stocks and mutual funds, Mr Prevett enjoyed the "bubble" of the1990's and suffered the crash of the 2000's. He is jobless. The equity in his house is encumbered with liens to pay his legal fees. He has supported himself and his family by using the savings he has left.

Robert Prevett began working at Nvidia in December of 1997. At that time, his salary was $123,585. His tax returns reflect the following income (including investment income) from 1997 to present:

**Adjusted Gross Income**

| | |
|---|---|
| 1997 | $ 120,761 |
| 1998 | $ 103,223 |
| 1999 | $ 228,996 |
| 2000 | $1,666,333 |
| 2001 | $1,590,665 |
| 2002 | $ 182,062 |
| 2003 | 0 |

Mr. Prevett has always lived frugally. His credit card expenses from 1997 until his marriage averaged roughly $600 per month. From 1991 until he married in 2002, he rented a small one-bedroom apartment in Sunnyvale, California. He did not own a cell phone or a computer until the last couple of years. He continues to drive the same 1990 Acura Legend he has owned for eleven years.

When Mr. Prevett started working at Nvidia in December 1997, he had been modestly investing in the stock market primarily holding stock in the companies that previously employed

him, while trading in a few high tech stocks and participating in a couple of mutual funds. His portfolio, in December of 1997, was valued at approximately $113,000. He had no other valuable assets.

In January of 1999, Nvidia became a publically held company. At that time, Mr. Prevett had begun diversifying his portfolio investing in more high tech stocks, as well as investment funds. He did not own Nvidia stock until May of 1999 when he began receiving shares of Nvidia through the employee stock option plan. He made a total of three market purchases of Nvidia, each for 10,000 shares: the first purchase was on October 4, 1999; the second purchase was on December 9, 1999; and the third purchase was on March 6, 2000. At the time he made the March 6th purchase, Mr. Prevett owned over 35,000 shares of Nvidia (over 20,000 shares were given to him through the company) valued at $2.2 million, comprising approximately 81% of his net portfolio value (as of the end of February 2000). Mr. Prevett sold 5,000 shares of Nvidia stock on March 17, 2000[2]. His net portfolio value at the end of March 2000 was $4.4 million of which Mr. Prevett's Nvidia holdings represented approximately 78%.

His financial success was due primarily to the Nvidia shares given to Mr. Prevett through the employee stock option plan – not as a result of repeated criminal conduct. As Nvidia dominated the industry, Mr. Prevett's portfolio value grew. He was able to purchase more stock by borrowing against the value of his Nvidia holdings. Essentially, he made "paper money" from "paper money." He held on to the Nvidia stocks as an investment, making only a few sales to avoid a margin call.

In December of 2000, Mr. Prevett was under investigation by the SEC. He voluntarily testified before the SEC in San Francisco without an attorney. On December 6, 2000, he also

---

[2] Prior to the March 17th sale, Mr. Prevett had one prior Nvidia sale of 5,400 shares on November 23, 1999 to lower his margin debt.

consented to freeze the assets in his Charles Schwab brokerage account which remains in effect today. He retains the right to purchase and sell securities in the account, but is not permitted to remove securities or dissipate any proceeds from the sale of securities. At the time Mr. Prevett consented to the freeze, the net portfolio value of his account was $2.1 million.

The value of the Charles Schwab account as of September 30, 2003 is approximately $ 1.3 million. (See Nolan Dec, Exhibit D).[3]

Below is a summary of Mr. Prevett's assets and liabilities as of April 20, 2003.[4]

**Assets, Liabilities, Income and Expenses as of**

| | **4/20/03** |
|---|---|
| **Unencumbered Assets** | |
| Bank Accounts | $2,115 |
| Brokerage Accounts less Margin debt | $753,630 |
| Automobiles: | |
| 1990 Acura | $3,400 |
| 1997 Mercedes | $15,250 |
| 1990 Lexus | $1,500 |
| Primary Residence | $1,832,000 |
| Household Items | $17,125 |
| WhipperSnapper Books (50% share) | $2,196 |
| **Encumbered Assets** | |
| Schwab Brokerage Account | $1,102,441 |
| **Total Assets** | $3,729,657 |
| **Liabilities** | |
| Mortgage Balance on House | ($1,312,500) |
| Home Equity Line of Credit | ($75,000) |
| Attorney Fees Due: | |

3 Since the September 30, 2003 statement, the SEC permitted Mr. Prevett to take funds out of the Charles Schwab account in order to pay for legal fees.

4 The asset and liability worksheet is based on the same data given to the U.S. Probation Department to prepare Mr. Prevett's presentence report. The figures used are substantailly the same today as on April 20, 2003.

| | |
|---|---|
| Nolan, Armstrong, & Barton | ($264,409) |
| Swanson & McNamara | ($27,590) |
| Unpaid Taxes Due | ($70,068) |
| **Total Liabilities** | ($1,749,567) |
| **Net Worth** | $1,980,090 |
| **Monthly Income** | |
| Salary/Wages (unemployed) | $0 |
| Dividends and Interest | $312 |
| **Total Monthly Income** | $312 |
| **Monthly Expenses** | |
| Mortgage | ($3,691) |
| Groceries | ($600) |
| Utilities | ($523) |
| Transportation | ($200) |
| Insurance | ($653) |
| Clothing | ($100) |
| Loan Payments (non-mortgage) | ($3,494) |
| Real Estate Tax | ($1,549) |
| Homeowner's Dues | ($104) |
| Grad School Tuition (Wendy) | ($1,715) |
| Other | ($1,177) |
| **Total Monthly Expenses** | ($13,806) |
| **Net Monthly Cash Flow** | ($13,494) |

## ARGUMENT

### I. THE "GAIN" CALCULATION SHOULD BE BASED ON THE ACTUAL PROFIT MR. PREVETT REALIZED FROM THE MATERIAL NON-PUBLIC INFORMATION

Profit in insider trading cases is calculated based on the gain the defendant realized from his use of the "material, non-public information." 15 U.S.C. § 78j & 78ff and 17 C.F.R. § 240.10b-5. A defendant's actual profit is the typical measure of disgorgement:

> Since disgorgement primarily serves to prevent unjust enrichment, the court may exercise its equitable power only over property causally related to the wrongdoing. The remedy may well be a key to the SEC's efforts to deter others from violating the securities law, but disgorgement may not be used punitively.

SEC v. First City Financial Corp., Ltd., 890 F.2d 1215, 1231 (D.C. Cir. 1989). Similarly, the penalties in insider trading enforcement cases, although discretionary, may not exceed three times the "profit gained." See 15 U.S.C. § 78u-l (" 'profit gained' . . .is the difference between the purchase or sale price of the security and the value of te security as measured by the trading price of the security a reasonable period after public dissemination of the nonpublic information.").

In the Private Securities Litigation Reform Act ("PSLRA"), Congress recognized that investor losses are often inflated by market forces having nothing to do with a defendant's particular behavior. In enacting the PSLRA, the Senate noted that such unrelated market forces should not be used to add to the damages awarded against defendants:

> Typically, in an action involving a fraudulent misstatement or omission, the investor's damages are presumed to be the difference between the price he or she paid for the security and the price of the security on the date the corrective information is disseminated to the market. *Between the time a misrepresentation is made and the time the market receives corrected information, however, the price of the security may rise or fall for reasons unrelated to the alleged fraud.* According to an analysis provided to the Securities Subcommittee, damages in securities litigation amount to approximately 27.7% of an investor's market loss. *Calculating damages based on the date corrective information is disclosed may substantially overestimate plaintiff's actual damages.* The Committee intends to rectify the uncertainty in calculating damages by providing a "bounce back" period, thereby limiting damages to those losses caused by fraud and not

by other market conditions.

Senate Report 104-98 at 20 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 699 (1995) (emphasis added).

The same rationale applies in actions brought by the SEC. The SEC's proposal that Mr. Prevett's "gain" should be based on a simple calculation of the difference between his purchase price on March 6th and the value of his shares at the close on March 10th does not correctly or accurately reflect the "gain" in this case. Given the unusual "bubble" in the stock market in March of 2000, the erratic market reaction of Nvidia stock the week of March 6th and Mr. Prevett's sale of only half the stock he purchased, a more sophistcated analysis is required to capture his gain. The following are reasonable alternatives.

### A. Gain Based on Difference Between March 6th Purchase Price and March 7th Public Date

| | |
|---|---|
| *3/6/00 Purchase Price* | *$629,769* |
| *Value @ 3/7/00 Open* | *$750,000* |
| *Total Gain* | *$120,231* |
| *Total Gain Less 5%* | ***$114,220*** |

In both Mr. Prevett's criminal trial and the SEC trial, when the information became "public" was a hotly contested and vigorously litigated issue. There was an abundance of evidence establishing that the material information was public on March 7th[5]. If this Court were to base Mr. Prevett's gain on the difference between the purchase price and the price of the stock once the

[5] Indeed, even the United States Attorney's Office conceded in its opposition to Mr. Prevett's Rule 29 motion that the information was public on March 7th *before the Goodys* traded, labeling it "fortuitous" for Mr. Prevett because it "defeat[ed] tipper liability." (See Court file for Gov't Opp. to Rule 29 Motion dated 2/11/03 at 4, fn. 1).

material information was public, it should be calculated based on the difference between what Mr. Prevett paid for the stock on March 6th ($629,769) and the value of 10,000 shares of Nvidia stock on the opening of March 7th ($750,000) -- the date and time the jury in both the criminal and civil trial determined it became public. The resulting gain is $120,231.

Based on the SEC's expert's testimony which this Court has heard in this case and in SEC v. Jack Lau, C 01-21067 JW, at least 5% should be deducted from that value due to Nvidia's addition to the S&P 400 Index. Five percent of $120,231 is $6011, resulting in a gain of $114,220.

**B. Gain Based On Mr. Prevett's Profit From His 3/17 Sale Of Nvidia Stock**

1. *Gain Using 3/17 Sale Price for all 10,000 Shares*

| | |
|---|---|
| *3/6/00 Purchase Price* | *$629,769* |
| *3/17/00 Sale Price (5,000 shares)* | *$491,202* |
| *3/17/00 Value (5,000 shares still holds)* | *$491,202* |
| *Total Gain* | *$352,635* |
| *Total Gain Less 5%* | ***$335,004*** |

In United States v. Atul Bhagat, Case No. CR 01-20173 RMW, another Nvidia insider trading case based on the March 5th email, Judge Whyte calculated the gain under an actual gain theory and stated, "I think if you're guilty of insider trading, the logical way to do it is to take what you paid from what you realized and that would be the loss." (Nolan Dec., Exhibit E).

In this case, Mr. Prevett sold only 5,000 shares out of the 10,000 he purchased on March 6; he sold the 5,000 shares on March 17. The actual sale price of the 5,000 shares is $491,202. (Nolan Dec., Exhibit A).

If the Court is inclined to place a "gain" calculation on the the remaining 5,000 shares Mr. Prevett still holds today, the shares could be valued as of the March 17th date. Thus, the total gain

for 10,000 shares on March 17, 2000 (assumining Mr. Prevett sold all the shares on that date at the same time), would be $352,936 (i.e., 2 x $491,202 deducted from $629,468). Five percent of $352,936 is $17,646. Deducting 5% from this total for the addition to the S&P Index the resulting gain is $335,290.

Using the March 17th date is entirely consistent with the letter and spirit of the "gain" calculation for purposes of assesing penalties in SEC enforcemnt cases. See 15 U.S.C. § 78u-l ("'profit gained' . . .is the difference between the purchase or sale price of the security and the value of te security as measured by the trading price of the security *a reasonable period after publc dissemination of the nonpublic information*.")(emphasis added). This is a fair and reasonable calculation of gain here.

*2. Gain Using a 50-day Moving Average for 5,000 Shares Still held*

| | |
|---|---|
| *3/6/00 Purchase Price* | *$629,769* |
| *3/17/00 Sale Price (5,000 shares)* | *$491,202* |
| *50-Day Moving Average (5,000 shares)* | *$360,000* |
| *Total Gain* | *$221,433* |
| *Total Gain Less 5% on 5,000 Shares Sold* | ***$196,873*** |

Alternatively, the 5,000 shares Mr. Prevett still holds could be valued based on a 50-day moving average over the last 50 days to get a more current value. The 50-day moving value for Nvidia stock ending on November 28, 2003 is approximately $18 per share. (Nolan Dec., Exhibit F). Since Mr. Prevett's 5,000 shares have split twice, the value as of November 28 is approximately $360,000. The total gain is $221,433 ([$491,202 + $360,000] - $629,769). Deducting 5% from the shares Mr. Prevett sold in March, the gain is $196,873.

### C. Gain Based on March 6th Purchase Price and March 10th Closing Price

*1. SEC's Proposal Using March 10th Closing Price*

| | |
|---|---|
| *3/6/00 Purchase Price* | *$629,769* |
| *Value at 3/10 Close* | *$1,180,000* |
| *Total Gain* | *$550,231* |
| *Total Gain Less 5%* | ***$522,720*** |

The SEC's position is that the material information became public on March 10th and proposes a simple method of subtracting the stock price on March 10th from the purchase price on March 6th. However, even the SEC's own expert's testimony and report demonstrates that *not all the movement in Nvidia's stock from March 6th until March 10th can be attributable to the release of material information on March 10th*. There was a progression of "abnormal returns" begining on March 7th until March 10th, while other increases in the stock price were "normal" with respect to the overall movement of the stock market.

*2. Gain Using SEC's Expert's Event Study Apportioning Rise in Stock Price Due to X-Box Information*

| | |
|---|---|
| *3/6/00 Purchase Price* | *$629,769* |
| *66.2% Gain as of 3/10/00* | *$416,907* |
| *66.2% Less 5%* | ***$385,418*** |

Exhibit 5 of Professor Lehn's report (Nolan Dec, Exhibit C) shows the cumulative abnormal returns for the week beginning March 6, 2000. For the first line of the data table, day 0 is 3/7/00; for the second line, day 0 is 3/10/00. The cumulative abnormal gain for 3/6 through 3/7 is 35.5%; this corresponds to the [-1,0] 3/7/00 event window. The cumulative abnormal gain for 3/6 through 3/8 is 35.3%; this corresponds to the [-1,+1] 3/7/00 event window. The cumulative abnormal gain for 3/9 through 3/10 is 30.9%; this corresponds to the [-1,0] 3/10/00 event window. The cumulative

abnormal gain for 3/8 through 3/10 is 30.7%; this corresponds to the [-2,0] 3/10/00 event window.

Given the four data points above, the cumulative abnormal gain for 3/6 through 3/10 can be calculated in two different ways -- both yeilding the same results. Adding the 3/6 through 3/7 gain of 35.5% to the 3/8 through 3/10 gain of 30.7% yields a 3/6 through 3/10 cumulative abnormal gain of 66.2%. Similarly, adding the 3/6 through 3/8 gain of 35.3% to the 3/9 through 3/10 gain of 30.9% also yields a 3/6 through 3/10 cumulative abnormal gain of 66.2%. That both approaches yielded 66.2% cumulative abnormal gain is expected given consistent and correct data in the table. *In short, the cumulative abnormal gain of 66.2% for 3/6/00 through 3/10/00 represents the gain that was above and beyond NVDA stock price movement due to the overall market movement.*

Mr. Prevett bought 10,000 shares of NVDA stock on 3/6/00 at a total cost of $629,769. According to Professor Lehn, the 66.2% cumulative abnormal gain represents the increase due to the release of material information. Thus, Mr. Prevett's investment of $629,769 grew by 66.2% as of March 10th due to the release of material information which caused an "abnormal" return. This results in a gain of $416,907. Of the 66.2% , according to Professor Lehn, 5% can be attributed to the addition to the S&P index. Thus, 61.2% of the purchase price represents the gain due to the X-Box informatin. The resulting gain is $385,418.

**D. The Gain Calculation Should Incorporate the Method Suggested in the PSLRA**

1. *Gain Based on 90-day Mean Value from 3/10/00 to 6/10/00*

| | |
|---|---|
| *3/6/00 Purchase Price* | *$629,769* |
| *15 U.S.C. § 78u-4(e)*<br>*90-day mean value* | *$960,000* |
| *Total Gain* | ***$330,231*** |

The PSLRA, while applicable to private litigants, has been adopted and used for guidance by other court's in fashioning an apprpriate gain calculation because a simple calculation based on

stock movement may overstate the actual gain. *See, e.g., United States v. Grabske*, 260 F. Supp.2d 866 (N.D. Cal. 2002); *United States v. Bakhit*, 218 F. Supp2d 1232 (C.D. Cal. 2002). The PSLRA provides:

> [I]n any private action . . . in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the differences between the purchase . . . price paid . . . by the plaintiff . . . and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the mistatement or omissoin that is the basis for the action is disseminated to the market.

15 U.S.C. § 78u-4(e).

Assuming the material information was public on March 10th, the 90-day mean from March 10 until June 10th was $96 per share resulting in a valuue of 960,000 for 10,000 shares. (Nolan Dec., Exhibit G). Deducting Mr. Prevett's purchase price of $628,769 from $960,000 rersults in a gain of $330,231.

2. *Gain Based on Mean Value from 3/10/00 to 3/28/00*

| | |
|---|---|
| *3/6/00 Purchase Price* | *$629,769* |
| *15 U.S.C. § 78u-4(e)*<br>*3/10 - 3/28/00 mean value* | *$1,020,000* |
| *Total Gain* | ***$390,231*** |

Alternatively, the mean could be calculated using a narrower window. In *Bakhit*, a securities fraud-on-the-market case, the court ended the window within which to calculate a mean price at the first drop in stock price that could be attributable to new negative information in the market. Here, Professor Choi states that on March 13th, Nvidia's stock reached a high of $149.25 and then quickly retreated 46% off this high by March 28, 2000. Based on his Nexis search, he did not find any new negative news to account for a decline until March 29, 2000 when Bloomberg News announced an upcoming $400 million offering of equity and debt by Nvidia. (See Nolan Dec., Exhibit B at 14).

Using the 28th of March as a cutoff, the mean stock price from March 10th until March 28th was $102 per share. The difference between the purchase price Mr. Prevett paid on March 6th ($629,769) and the mean price from March 10 until March 28th ($102 x 10,000 = $1,020,000) is $390,231.

## II. THIS COURT SHOULD NOT IMPOSE CIVIL PENALTIES

In making a penalty determination, courts examine a variety of factors. These include: (1) the egregiousness of the defendant's conduct (*See SEC v. Lipson*, 129 F. Supp. 2d 1148 (N.D. Ill. 2001), imposing maximum penalty on a corporate executive who made multiple unauthorized trades in his own company's stock, and engaged in such conduct even after receiving a letter from his attorney warning that the transactions might be improper, and then trying to involve his lawyers, accountants and family members in a cover-up); (2) whether the conduct was repeated or was an isolated incident (*See SEC v. Falbo*, 14 F. Supp. 2d 508, 529 (S.D.N.Y. 1998), allowing reduced penalty because defendant had no prior or subsequent insider trading violations, and his transactions only involved one company's securities); (3) the degree of scienter involved in the violation (*See SEC v. Yun*, 148 F. Supp. 2d 1287 (M.D. Fla. 2001), holding that low level of scienter - not provably intentional and repeated conduct - argued in part for imposition of reduced penalty); (4) whether the defendant is employed in the securities industry (*See SEC v. Falbo*, 14 F. Supp. 2d 508, 529 (S.D.N.Y. 1998), reducing penalty on two defendants in part because neither was employed in the securities industry); and (5) the defendant's net worth (*See SEC v. Rubin*, 1993 U.S. Dist. LEXIS 21112 (S.D.N.Y. 1993), imposing penalty of only $1,000 where defendant was impecunious; compare *SEC v. Yun*, 148 F. Supp. 2d 1287, 1297 (M.D. Fla. 2001) where court ordered disgorgement in the amount of $269,000, and ordered a penalty of $100,000 in light of defendants' family net worth of $7,100,000 and her individual net worth of $767,000).

Mr. Prevett is currently spending five months in prison for his sole transgression. He made a one-time purchase based on material non-public information. Rather than selling all the stock he purchased, he only sold half after the trading window opened and continues to hold the remaining 5,000 shares. He has been through two trials and has suffered tremendous shame and humiliation. He has personally accepted his resposibility before this Court when he was sentenced.

While Mr. Prevett once had substantial assets, they have substantiaally declined in value. He is now married and the step-father to two eleven-year-old-daughters. He has not been able to work since leaving Nvidia. His home is encumbered with liens to cover his legal fees. His wife has returned to school in the hopes of finding better employment upon graduation, but currently the family is living off of the income from their savings.

Mr. Prevett is still young enough to make a fresh start when he is released from prison. Whatever funds he has left after this case must enable him to support the family until he and his wife can work. We urge the Court to consider his family resposibilities, the fact that he is incarcerated for his actions, and he has no other trangressions with the law. He was a rank-and-file employee who made a mistake one day. A civil penalty is not necessary where he has already suffered so much.

**CONCLUSION**

Mr. Prevett should be ordered to disgorge his profits actually related to the increase in stock due to the release of material information and not to other factors overstating the value of Nvidia stock. We respectfully request that this Court not impose a civil penalty.

Dated: December 1, 2003

Respectfully submitted,

NOLAN, ARMSTRONG & BARTON, LLP

By /s Thomas J. Nolan
THOMAS J. NOLAN
Attorney for the Defendant
ROBERT PREVETT