Apple Inc. v. Psystar Corporation Doc. 285

ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
1020 MARSH ROAD
MENLO PARK, CA 94025
tel 650-614-7400
fax 650-614-7401
WWW.ORRICK.COM

December 1, 2003

William Sloan Coats
(650) 614-7390
wcoats@orrick.com

The Honorable Magistrate Judge Edward A. Infante, Special Master
JAMS
Two Embarcadero Center, Suite 1100
San Francisco, California 94111

Re: *Gracenote adv. MusicMatch*
(N.D. Cal. Case No. C 02-3162 CW) Re: MusicMatch's Request for In Camera Review of Attorney-Client Privileged Documents Withheld from Production.

Dear Magistrate Judge Infante:

MusicMatch is not entitled to an in camera review of Gracenote's privileged documents.[1] MusicMatch has not presented any evidence to support its specious claims of fraud. The reason it has not done so is apparent from a review of the deposition testimony on which MusicMatch purportedly relies: none of the evidence actually supports MusicMatch's assertions. MusicMatch's assertions are not different from any of the usual assertions made by infringing defendants who allege inequitable conduct in a patent case.

MusicMatch's chief allegation of "wrongdoing" is that

REDACTED

MusicMatch's claims to the contrary are not supported by the evidence, which is discussed below and submitted with this brief, but rather are based on conflating the distinct development efforts of Ty and Ann with the efforts of Ti Kan and Steve Scherf, and muddling up the dates of various key

[1] MusicMatch's request that the Special Master order Gracenote to log withheld documents, particularly documents relating to the prosecution of the '680 and '525 patents, is entirely specious. MusicMatch is well aware that Gracenote has not withheld any documents relating to the prosecution of the '680 and '525 patents (neither of which are asserted in the present action). Bill Coats, the lead attorney for Gracenote, signed and submitted to MusicMatch's attorneys a declaration stating as much. [Ramsey Decl., Ex. A] MusicMatch is also aware, yet likewise conceals, that Gracenote produced logs of all documents withheld pursuant to the attorney-client privilege.

Dockets.Justia.com

occurrences. Nonetheless, despite MusicMatch's failure to establish the prima facie case of common law fraud necessary to justify an <u>in camera</u> review of Gracenote's privileged documents, Gracenote does not object to the Special Master reviewing those documents so long as MusicMatch pays the cost of that review.[2]

## <u>No Prima Facie Fraud</u>

MusicMatch cannot pierce the attorney-client privilege or attorney work product doctrine by merely pointing to its own attorney-argument. Rather, it must present evidence sufficient to make a prima facie showing of the common law elements of fraud: (1) a knowing, willful, and intentional act of misrepresentation or omission before the PTO, (2) materiality of the misrepresentation or omission, and (3) actual reliance by the PTO upon the misrepresentation or omission. *Monon Corp. v. Stoughton Trailers, Inc.*, 169 F.R.D. 99 (1996).

MusicMatch does not even list those elements, much less offer any evidence that could support a prima facie showing.
are material (or even r REDACTED
MusicMatch does not attempt to show that XMCD and CDDB disclosed or practiced any particular claim of either asserted patent. Rather, the only thing MusicMatch has offered are unsupported, false statements and misleading soundbites, purposefully taken out of context from depositions.

In addition to failing to show materiality, MusicMatch also fails to show a knowing, willful, and intentional act of misrepresentation. MusicMatch simply makes the gigantic leap that because the irrelevant information was not "disclosed," it was a knowing, willful, and intentional omission. The evidence overwhelmingly demonstrates that XMCD and CDDB were not provided to the PTO because they were not material to the patentability of the inventions disclosed in the '192 and '593 patents.

---

[2] MusicMatch erroneously argues in footnote 3 that Gracenote has changed its position with respect to its limited waiver of the attorney-client privilege. As Gracenote previously admitted in 2001 long before this lawsuit, an honest mistake was made with respect to inventorship during the prosecution of the '680 patent (another Gracenote patent that was not asserted in this action). This error was discovered by Gracenote and publicly (and voluntarily) disclosed at that time in a complaint <u>filed by</u> Gracenote in the Northern District. To alleviate any suspicion that mistake may have aroused, Gracenote expressly waived any attorney-client privilege between Gracenote and Richard Gollhofer, the prosecuting attorney, regarding the prosecution of the '680 patent and its parent, the '525 patent. <u>Gracenote did not waive its attorney-client privilege as to any other patent</u>. The testimony of Mr. Golhoffer regarding that waiver, which MusicMatch cites, occurred during testimony about the '680 and '525 patents and did not pertain to the patents-in-suit. Regardless, the privilege is for Gracenote to waive, not Mr. Gollhofer.

**The Claimed Inventions**

To understand the error – and indeed, the disingenuousness – of MusicMatch's arguments, it is necessary to have a basic understanding of what the inventions in this case are, and are not. In order to help the Special Master gain such an understanding, Gracenote has submitted with this brief the Claim Construction briefs of both parties. [Ramsey Decl., Exs. B-D]

In sum, the inventions at issue in this case are novel systems and methods directed at expanding and enhancing the entertainment experience associated with musical and other recordings. Historically, the entertainment experience associated with musical recordings has been limited to listening to the music contained in the recording itself. In the latter half of the last century, the entertainment experience associated with musical recordings grew to include visual content, in the form of music videos. However, this form of entertainment has primarily been presented through broadcast media and the listener had no control over what visual content was experienced in conjunction with the music. The inventions of the patents at issue solve these problems, through novel application of Internet-related technologies, to enrich the experience associated with music recordings.

In particular, with the advent of new computer technologies and the Internet, users have begun to listen to traditional forms of recordings, such as CDs, on their computers or consumer electronic devices connected to the Internet. XMCD is one example of software that enabled computer users to play CDs on a computer that uses a UNIX operating system. Consumers have also embraced newer recording formats intended for use on computers and other Internet-connected devices, such as digital audio files (i.e., MP3s, etc.). As users began listening to recordings on computers, copyright holders of sound recordings recognized the opportunity to enhance the listening experience and began adding visual and other information to CDs or music files, which could then be viewed on the computer. A significant challenge loomed, however, in that the amount of information that could be included on the disc or in the digital file itself was limited. Further, once fixed in the media, the additional content could not be changed and was thus limited to content available at the time the media was created.

Inventors Ty Roberts and Ann Greenberg recognized these problems and conceived that the solution was to use the Internet to expand the available space in which to store and deliver visual content related to the musical recordings and to allow flexibility and variation in that content. Ty and Ann further conceived that the Internet could be used to collect data regarding what music consumers listen to and to target the delivery of visual content based on the consumers' listening habits.

DACTE

[Ramsey Decl., Ex. E] REDACTED

[Ramsey Decl., Ex. E]
The initial patent application was filed on April 15, 1997, not more than one year after any sale or offer for sale of the inventions of the '192 and '593 Patents.[3]

**CDDB And XMCD Are Not Material To Patentability Of The Claimed Inventions**

REDACTED

[Ramsey Decl., Exs. J (Response No. 1); K (10/12/02 Kan Depo., 13:10-12, 19:1-33:4)]

[Ramsey Decl., Ex. J (Response Nos. 6, 9, 12, 13)]

REDACTED

[Ramsey Decl., Exs. J (Response Nos. 13, 15); K (12/12/02 Kan Depo., 19:1-33:4)]

REDACTED

[Ramsey Decl., Exs. K (12/12/02 Kan Depo., 50:13-51:5, 54:9-58:6, 77:13-80:1); L(7/2/03 Scherf Depo., 30:15-31:25, 48:8-52:8, 140:2-144:25); O (9/11/03 Scherf Depo. 279:14-286:3, 324:17-332:7)]

---

[3] MusicMatch erroneously claims that Ty and Ann attempted to sell their inventions more than a year before the filing of the parent application. This is not true.

REDACTED

[Ramsey Decl., Exs. F (Roberts Depo., 32:10-37:24), H (Roberts 30(b)(6) Depo., 69:16-71:4), I (11/13/03 Greenberg Depo., 245:18-247:13), G (10/8/03 Greenberg Depo., 70:1-77:22)]

It is this recognition functionality that MusicMatch erroneously relies on as "practic[ing] the inventions disclosed in the patents." [MusicMatch's brief at fn. 7] The fatal flaw in this argument is that neither the '192 patent or '593 patent claim as an invention a music player, a database of CD information, music recognition or remote identification of a CD. Although those components are required by some of the claims of the patents, it does not matter how the recording or audio CD is recognized in order to practice the invention. Rather, Gracenote has patented novel combinations of elements in systems and methods for delivering dynamically changing entertainment content and for collecting and using data regarding what music consumers listen to. The inventive leap is in the *combination* of elements, of which the identification of a CD or other digital music is but one. Those combinations of elements, conceived and reduced to practice in the early years of the Internet, were not known in the art and were a major step forward in the technological and commercial ability to provide online music-related entertainment. The fact that one discrete embodiment of the identification element of those novel combinations of elements was known in the art simply has no implications for the validity or scope of the patent. *See Clearstream Wastewater Systems, Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1444 (Fed. Cir. 2000) ("It is well established in patent law that a claim may consist of all old elements . . . for it may be that the combination of the old elements is novel and patentable.").

REDACTED

Ramsey Decl., Exs. K (12/12/02 Kan Depo., 50:13-51:5, 54:9-58:6, 77:13-80:1); L (7/2/03 Scherf Depo., 30:15-31:25, 48:8-52:8, 140:2-144:25); O (9/11/03 Scherf Depo. 279:14-286:3, 324:17 '32:7, 338:24-339:20, 344:20-346:22)]

REDACTED

Ramsey Decl., Exs. K (12/12/02 Kan Depo., 50:13-51:5, 54:9-58:6, 77:13-80:1; 127:17-129:4); L (7/2/03 Scherf Depo., 30:15-31:25, 48:8-52:8, 140:2-144:25); O (9/11/03 Scherf Depo. 279:14-286:3, 324:17-332:7, 338:24-339:20; 396:12-398:13)]

REDACTED

*Laitram Corp. v. Cambridge Wire Cloth Co.*, 785 F.2d 292 (Fed. Cir. 1986) (holding no materiality; prior art reference did not anticipate or render obvious any of the patents at issue, and standard for materiality is whether prior art reference was important to *patentability* of the invention). Thus, Gracenote had no reason to disclose either XMCD or CDDB to the patent office.

REDACTED

[Ramsey Decl., Ex. M (Gollhofer 30(b)(6) Depo., 171:1-15)][4] As the patents themselves demonstrate, and as discussed above,

REDACTED

[Ramsey Decl., Ex. M (Gollhofer 30(b)(6) Depo., 157:19-25)]

MusicMatch's blatant attempt to deceive the Special Master is telling: MusicMatch's claims of fraud are purely fictitious.

**<u>Inventorship of the '680 Patent was Incorrect, Not "Fraudulent"</u>**

MusicMatch similarly attempts to invent fraud during the prosecution of the '680 patent where none exists. Gracenote previously waived the attorney-client privilege with respect to communications pertaining to the prosecution of the '680 patent in order to demonstrate beyond any shadow of a doubt that the incorrect naming of additional inventors was an honest mistake. Nonetheless, MusicMatch continues to make baseless and incorrect assertions regarding the '680 patent which Gracenote has no choice but to address. The depositions of the various witnesses, and other evidence produced in this case, establish the following facts:

One of the divisional applications off of the parent to the patents-in-suit (the '525 patent) became the '680 patent. The invention of the '680 patent is a very specific method used in conjunction with CD identification, known as fuzzy matching. That invention is wholly distinct and different

---

[4] REDACTED

[5] Not surprisingly, MusicMatch did not even question Mr. Gollhofer about

from the inventions of the '192 and '593 patents described above, although it could be used in conjunction with those inventions.

REDACTED

[Ramsey Decl., Ex. E]

[Ramsey Decl., Ex. N]

REDACTED

In 1998, Steve Scherf met Ty Roberts and Ann Greenberg. By 1999, Mr. Roberts' and Ms. Greenberg's company and Mr. Scherf's company had been acquired by the same investors and these three individuals were, at that point, working together at a new company formed by those investors that became Gracenote.[6] Around that time, Mr. Roberts and Mr. Scherf became aware of each other's inventions pertaining to fuzzy matching and the company's patent prosecution counsel—Richard Gollhofer—advised that Steve Scherf, and a third party named Ti Kan who worked with Mr. Scherf to conceive his invention, could be added as inventors to the application that eventually became the '680 Patent. When asked about his reasons for including Messrs Kan and Scherf, Mr. Gollhofer testified:

REDACTED

[Ramsey Decl., Ex. O (7/22/03 Gollhofer Depo., 81:20-82:2)]

REDACTED

[Ramsey Decl., Ex. O (7/22/03 Gollhofer Depo., 90:25-91:4].

[6] Mr. Scherf's partners, Ti Kan and Grahm Toal, never joined this entity as they both had other positions at the time their company was acquired. Thus, although Ti Kan performed occasional consulting services for Gracenote, he never "joined" the company as MusicMatch claims. Moreover, Ti Kan's XMCD player software belonged solely to Ti Kan and thus was not part of the acquisition.

[redacted] [Ramsey Decl., Exs. F (11/15/02 Roberts Depo., 145:17-147:25); P (9/11/03 Scherf Depo., 247:18-25, 272:20-273:5, 274:19-23); Q (9/16/03 Kan Depo., 302:18-307:7)] The law regarding who could be added as a co-inventor to an already-filed application was unclear at the time and Mr. Gollhofer testified that he relied on his interpretation of the law as it existed:

[redacted]

[Ramsey Decl., Ex. O (7/22/03 Gollhofer Depo., 83:2-24)].

Mr. Gollhofer further testified that [redacted] [Ramsey Decl., Ex. O (7/22/03 Gollhofer Depo., 174:5-9)].

[redacted]

Moreover, Messrs. Scherf and Kan have signed statements that their erroneous inclusion as named inventors on the '680 Patent occurred without any deceptive intention on the part of the applicant.

MusicMatch cannot provide any evidence of the necessary intent to defraud. Indeed, once Mr. Gollhofer determined that the inventorship was incorrect, Gracenote sought correction of the inventorship in court.

[Ramsey Decl., Ex. O (7/22/03 Gollhofer Depo., 176:12-17)].

The case settled, however, before the court could resolve the issue. MusicMatch does not address any of Mr. Gollhoffer's testimony because it refutes MusicMatch's argument that there was an intent to defraud the PTO. Instead, MusicMatch simply relies on its own attorney argument without providing any evidence to support it.

**<u>Gracenote Disclosed The Best Mode It Knew Of For Practicing The '680 Patent</u>**

In the same breath that MusicMatch argues Steve Scherf was fraudulently included —and therefore not an actual inventor—on the '680 patent, it argues Gracenote violated the best mode requirement because Scherf's computer code was not included in the patent application. What MusicMatch cannot show, however, is that at the time of the filing, Ty Roberts contemplated that Steve Scherf's code was in fact the best mode in which to practice the invention. *Glaxo v. Novopharm*, 52 F.3d 1043, 1050 (Fed. Cir. 1995) (best mode analysis considers inventor's state of mind at filing date versus the enablement requirement in light of a person of ordinary skill in the art). To the contrary, at the time that the original application was filed (April 15, 1997), Ty Roberts and Ann Greenberg did not even know Ti Kan or Steve Scherf, so they could not have known of Scherf's fuzzy matching code. There can therefore be no best mode violation because the test depends upon what the inventor knew *at the time of the filing*. *Chemcast Corp. v. Arco Industries Corp.*, 913 F.2d 923 (Fed. Cir. 1990). <u>The Patent Act does not require an inventor to "update" the best mode upon filing continuation applications, such as the divisional applications for the '192, '593, or '680 applications.</u> *See Transco Products, Inc v. Performance Contracting, Inc.*, 38 F.3d 551 (Fed. Cir. 1994) (holding no requirement to update best mode upon filing continuing applications, such as divisionals, because the relevant date is the date of the parent application).

Nor is disclosing the actual source code a prerequisite for meeting the best mode requirement. Rather, it is the *functions* of the code that are important and must be disclosed. *Fonar Corp. v. General Electric Co.*, 107 F.3d 1543 (Fed. Cir. 1997) ("As a general rule, where software constitutes part of a best mode of carrying out an invention, description of such a best mode is satisfied by a disclosure of the functions of the code."). Accordingly, all Ty Roberts was

required to disclose was the functionality of the source code and thus the code that was actually disclosed is irrelevant to any analysis of best mode.

Finally, there is no evidence that Steve Scherf's fuzzy matching code discloses a "better mode" of practicing the claimed invention than that of Ty Roberts. MusicMatch apparently relies on the fact that Gracenote uses Steve Scherf's code in its current software to support its claim that it is "better." However, the fact that Gracenote uses Scherf's code is because it is written for the UNIX operating system, and was already part of the CDDB server code that was acquired by Gracenote. Ty Roberts' fuzzy matching cod, on the other hand, was written for the Macintosh operating system. Accordingly, it would not have made sense to attempt to replace Steve Scherf's code with Ty Roberts' code in the Gracenote service and the fact that Gracenote uses Scherf's code is not evidence that it is somehow better.

For the above reasons, MusicMatch has not made a prima facie showing that the attorney-client privilege and work product doctrine should be pierced due to the crime-fraud exception. Accordingly, the Special Master should DENY MusicMatch's present request.

Respectfully submitted,

William Sloan Coats

William Sloan Coats
Orrick, Herrington & Sutcliffe, LLP
*Attorneys for Plaintiff and Counterclaim Defendant*
Gracenote, Inc.