Apple Inc. v. Doc.

Randall C. Creech, Cal. Bar # 65542
Creech, Liebow & Kraus
99 Almaden Boulevard, Eighth Floor
San Jose, CA 95113
Telephone: 408-993-9911
Facsimile: 408-993-1335

Attorneys for Defendant Olin Corporation

Keith M. Casto, Cal. Bar # 141279
Earl L. Hagström. Cal. Bar # 150958
Sedgwick, Detert, Moran & Arnold LLP
1 Embarcadero Center 18th Floor
San Francisco, CA 94111-3628
Telephone: 415-781-7900
Facsimile: 415-781-2635

Attorneys for Defendants Standard Fusee Corporation and Orion Safety Products

ORIGINAL FILED
NOV 21 2003
Richard W. Wieking
Clerk, U.S. District Court
Northern District of California
San Jose, California

E-FILING

ADR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

C03 05198 RMW PVT

GLEN WEBB and GAIL WEBB,

Plaintiffs,

vs.

OLIN CORPORATION, STANDARD FUSEE CORPORATION, ORION SAFETY PRODUCTS, SANTA CLARA VALLEY WATER DISTRICT, et al.,

Defendants.

THIS CASE RELATES TO:

C 03-01644 RMW
C 03-01645 RMW
C 03-01646 RMW
C 03-01647 RMW
C 03-01649 RMW
C 03-01650 RMW
C 03-01651 RMW
C 03-01652 RMW
C 03-01653 RMW

Case No. 103 CV 007546

**DEFENDANTS' OLIN CORPORATION'S AND STANDARD FUSEE CORPORATION'S NOTICE OF REMOVAL**

**JURY TRIAL DEMANDED**



Dockets.Justia.com

C 03-01654 RMW
C 03-01655 RMW
C 03-01656 RMW
C 03-01657 RMW
C 03-01658 RMW
C 03-01659 RMW
C 03-01660 RMW
C 03-01661 RMW
C 03-01662 RMW
C 03-01663 RMW
C 03-01664 RMW
C 03-01665 RMW
C 03-01666 RMW
C 03-01667 RMW
C 03-01668 RMW
C 03-01669 RMW
C 03-01670 RMW
C 03-01671 RMW
C 03-01672 RMW
C 03-01673 RMW
C 03-01674 RMW
C 03-01675 RMW
C 03-01677 RMW
C 03-01678 RMW
C 03-01679 RMW
C 03-01681 RMW
C 03-01682 RMW
C 03-01683 RMW
C 03-01684 RMW
C 03-01686 RMW
C 03-01842 RMW
C 03-01843 RMW
C 03-01844 RMW
C 03-01845 RMW
C 03-01847 RMW
C 03-01848 RMW
C 03-01852 RMW
C 03-01853 RMW
C 03-01854 RMW
C 03-01855 RMW
C 03-01856 RMW
C 03-01857 RMW
C 03-01860 RMW
C 03-01862 RMW
C 03-01864 RMW
C 03-01865 RMW
C 03-01897 RMW
C 03-01898 RMW
C 03-02003 RMW
C 03-02004 RMW
C 03-02005 RMW
C 03-02006 RMW
C 03-02008 RMW
C 03-02009 RMW
C 03-02010 RMW
C 03-02015 RMW
C 03-02017 RMW
C 03-02018 RMW
C 03-02019 RMW
C 03-02020 RMW
C 03-02021 RMW
C 03-02022 RMW

C 03-02023 RMW
C 03-02024 RMW
C 03-02025 RMW
C 03-02026 RMW
C 03-02027 RMW
C 03-02028 RMW
C 03-02029 RMW
C 03-02030 RMW
C 03-02031 RMW
C 03-02032 RMW
C 03-02033 RMW
C 03-02034 RMW
C 03-02036 RMW
C 03-02038 RMW
C 03-02039 RMW
C 03-02041 RMW
C 03-02043 RMW
C 03-02047 RMW
C 03-03195 RMW
C 03-03196 RMW
C 03-03197 RMW
C 03-03198 RMW
C 03-03199 RMW
C 03-03200 RMW
C 03-03201 RMW
C 03-03202 RMW
C 03-03203 RMW
C 03-03205 RMW
C 03-03206 RMW
C 03-03207 RMW
C 03-03208 RMW
C 03-03209 RMW
C 03-03210 RMW
C 03-03211 RMW

TO: THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION:

Pursuant to 28 U.S.C. § 1441, *et seq.*, Defendants Olin Corporation ("Olin") and Standard Fusee Corporation, d/b/a Orion Safety Products ("Standard Fusee") (sometimes collectively referred to as the "Removing Defendants") respectfully state:

BACKGROUND

1. This case is one among 34 newly-filed Complaints and Amended Complaints removed to the United States District Court for the Northern District of California, San Jose

Division by Olin and Standard Fusee.[1] This case and its 33 newly-filed counterparts add to a series of lawsuits (now numbering approximately 109 cases) asserting both class and individual claims filed by the law firm of Alexander, Hawes & Audet. Each of the previous 109 lawsuits was filed by the Alexander Plaintiffs in the Superior Court of California, County of Santa Clara and removed to this Court by the Removing Defendants.

2. Plaintiffs in each of those 109 previously filed and removed cases joined two individual defendants, Anne Lee and Yoshio Suekawa. Removing Defendants asserted that these individual defendants, Lee and Suekawa, were fraudulently joined for the purpose of defeating Removing Defendants' right to a federal forum. This Court agreed and, on July 17, 2003, issued an Order in three related cases, Daniels. No. C-03-01211; Hughes. No. C-03-01290 and Luian. No. C-03-01289, denying Plaintiffs' Motion to Remand, and holding that the complaints failed to state a cause of action against Lee or Suekawa. On approximately September 24, 2003, the Court issued an Order, pursuant to a Stipulation signed by all parties, dismissing without prejudice Lee and Suekawa from all related Alexander cases.

3. After Removing Defendants removed the first few related cases, the Alexander Plaintiffs in these previously filed 109 cases also either added or sought leave to add as a party defendant the Santa Clara Valley Water District ("SCVWD"). In its Order of July 17, 2003, relating to Daniels. Hughes. and Luian. *supra*, this Court also found the proposed joinder of SCVWD to have been "motivated primarily by an intent to defeat federal jurisdiction" and, in any event, that the plaintiffs' claims against the SCVWD were only "tangentially related" to the plaintiffs' claims against the Removing Defendants:

---

[1] Plaintiffs' Complaint refers to Standard Fusee Corporation and Orion Safety Products as two separate entities, however, Orion Safety Products is instead a fictitious name under which Standard Fusee Corporation conducts business. Hereinafter, this defendant will be referred to as "Standard Fusee".

> Essentially, plaintiffs' proposed cause of action against the Water District and its claims against Olin and Standard have only one thing in common: the fact that they both relate to the alleged potassium perchlorate contamination in Morgan Hill. Yet despite this one similarity, the claims against the Water District are not inherently connected with plaintiffs' claims against the present defendants. The claims against Olin and Standard focus on those defendants' alleged wrongdoing in creating and hiding the contamination, while the claims against the Water District involve that party's alleged failure to detect and remedy such contamination. In this sense, the claims are only tangentially related. The absence of the SCVWD will not prevent the just adjudication of plaintiffs' claims against Olin and Standard for the alleged wrongdoing - the true heart of this lawsuit.

Id., at §C(2), p. 17.

4. On September 24, 2003, the Removing Defendants filed in related case Albert Aguilar, Case No. C 03-01644 RMW, Defendants' Motion to Sever and Remand the Claims against the SCVWD in accordance with the Court's Order of July 17, 2003 in Daniels, Lujan, and Hughes. On approximately October 8, 2003, this Court issued an Order, pursuant to a Stipulation signed by all parties, providing that the Court's ruling on Defendants' Motion to Sever and Remand the Claims against the SCVWD filed in Aguilar. *supra*, would be binding in all other then pending Alexander cases in which the SCVWD had been joined as a defendant prior to removal. Plaintiffs subsequently affirmatively indicated that they do not oppose Defendants' Motion to Sever and Remand Claims against the SCVWD. *See* Plaintiffs' "Statement of Non Opposition, Pursuant to Local Rule 7-3(b), to Defendants' Motion to Sever and Remand Claims against the Santa Clara Valley Water District" filed on November 7, 2003 and Correspondence of R. Creech, dated November 3, 2003. On November 7, 2003, this Court issued its tentative ruling granting Defendants' Motion to Sever and Remand the Claims against the SCVWD.

5. Surprisingly, notwithstanding this Court's July 17, 2003 Order declining to allow the post-removal joinder of the SCVWD and the Alexander Plaintiffs' non-opposition to the

Removing Defendants' Motion to Sever and Remand in all previously pending related cases, Plaintiffs in this case and the remaining 33 newly-served actions have continued to file cases in state court asserting nearly identical claims against the SCVWD. Here, as in the 109 preceding similar lawsuits, the SCVWD has been fraudulently misjoined. Accordingly, the claims against it should be severed and remanded and its citizenship disregarded for the purpose of assessing whether diversity jurisdiction exists.

**ALLEGATIONS IN THIS LAWSUIT**

6. On approximately October 22, 2003, just days before filing their "Statement of Non-Opposition" to the Removing Defendants' Motion to Sever the SCVWD in Aguilar, the law firm of Alexander, Hawes & Audet filed on behalf of Plaintiffs Glen Webb and Gail Webb ("Plaintiffs"), this action ("the Lawsuit"), styled Glen Webb and Gail Webb v. Olin Corporation, et al., Case No. 103CV007546, in the Superior Court of California, Santa Clara County. As with numerous other related previous individual complaints filed by the law firm of Alexander, Hawes & Audet and removed to this Court, the Lawsuit purports to join the SCVWD as a Defendant.

7. The Lawsuit alleges that the Plaintiffs "have lived, are living and/or own real property" in the vicinity of a former flare manufacturing facility located in Morgan Hill, California. (Complaint; ¶¶ 1> 20). Plaintiffs allege that the Removing Defendants owned and/or operated the facility for the purpose of manufacturing safety flares from 1955 to approximately 1996 (Complaint, ¶¶ 6, 7). Plaintiffs further allege that as a result of the manufacturing processes employed at the facility, the facility discharged potassium perchlorate which has contaminated or threatens to contaminate the groundwater "in and around the [facility] and surrounding communities." (Complaint, ¶ 1).

8. The Lawsuit purports to assert various tort claims against the Removing Defendants. (Complaint, passim).[2]

9. Plaintiffs claim that they "have a substantial financial investment in [their] home" and that the alleged contamination has resulted in the loss of "all ability to sell, market or finance" their home. (Complaint, ¶¶2, 3). Elsewhere, Plaintiffs allege that they have "lost the value of Plaintiffs' home." (Complaint, ¶¶4, 39). Additionally, Plaintiffs request, *inter alia,* that "Defendants be ordered to remediate the groundwater contamination." (Complaint, ¶73).

10. Plaintiffs also seek to recover for their "severe and extreme emotional distress," "pain, discomfort, anxiety, fear, [and] worries" allegedly resulting from Plaintiffs' alleged potassium perchlorate exposures and diminution in property values. (Complaint, ¶¶61,62). Plaintiffs also allege that they are entitled to punitive damages (Complaint, "Sixth Cause of Action").

**THIS REMOVAL IS TIMELY & REMOVING DEFENDANTS HAVE COMPLIED WITH THE PROCEDURAL REQUIREMENTS OF 28 U.S.C. § 1446(a)**

11. Attached hereto as Exhibit A in compliance with 28 U.S.C. § 1446 (a) and incorporated herein by this reference is a copy of all process, pleadings, and orders served upon defendants to date in this action.

12. On October 24, 2003, Randall C. Creech, attorney for Olin, received on Olin's behalf a copy of the summons and the Complaint (see Exhibit A-1, attached). Service on Standard Fusee (see Exhibit A-2 attached) was also made the same day. The service date on fraudulently joined defendants should be disregarded for purposes of determining the timeliness

---

[2] Plaintiffs' six legal theories against the Removing Defendants are: "Negligence" (First Cause of Action); "Nuisance" (Second Cause of Action); "Intentional Infliction of Emotional Distress" (Third Cause of Action); "Trespass" (Fourth Cause of Action); "Equitable (Injunctive and/or Declaratory) Relief and Damages" (Fifth Cause of Action); and "Punitive Damages" (Sixth Cause of Action).

of removal petitions. *See, e.g.,* authorities cited in ¶ 31 below. Despite diligent efforts, Removing Defendants have been unable to determine the precise date of service of the Complaint on the Santa Clara Valley Water District ("SCVWD"), however, on information and belief, the service on the SCVWD was effected not earlier than October 22, 2003.

13. This Notice of Removal is timely under 28 U.S.C. § 1446(b) in that it is filed within thirty (30) days after the receipt by the first served Defendants through service, of a copy of the pleading setting forth the claims for relief upon which the Lawsuit is based. See Murphy Bros. v. Michael Pipe Stringing. Inc.. 526 U.S. 344 (1999) (the thirty day removal period does not begin to run until a defendant is formally served with the complaint).

**THIS COURT HAS ORIGINAL JURISDICTION OF THIS ACTION UNDER 28 U.S.C. § 1332(a) (DIVERSITY OF CITIZENSHIP)**

14. This action is a civil action over which this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a), and the Lawsuit is removable under 28 U.S.C. § 1441(a), because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and, excluding parties fraudulently joined, there is complete diversity of citizenship among the parties.

**CITIZENSHIP OF THE PLAINTIFFS**

15. Plaintiffs Glen Webb and Gail Webb are domiciled in and are citizens of the State of California for the purposes of diversity jurisdiction, pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1441. (Complaint, 1 5).

**DIVERSE CITIZENSHIP OF DEFENDANTS OLIN AND STANDARD FUSEE**

16. At the time this action was commenced, and at all times since, Defendant Olin was and has been a corporation organized and existing under the laws of the State of Virginia,

with its principal place of business in Connecticut. Therefore, for purposes of 28 U.S.C. § 1332 and 28 U.S.C. § 1441, Olin is a citizen of the States of Virginia and Connecticut.

17. At the time this action was commenced and at all times since, Defendant Standard Fusee Corporation, d/b/a Orion Safety Products, was and has been a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Maryland. Therefore, for purposes of 28 U.S.C. § 1332 and 28 U.S.C. § 1441, Defendant Standard Fusee Corporation, d/b/a Orion Safety Products, is a citizen of the States of Delaware and Maryland.

**THE CITIZENSHIP OF "JOHN DOE" DEFENDANTS IS IGNORED FOR PURPOSES OF DETERMINING DIVERSITY JURISDICTION**

18. Plaintiffs also have named in their Lawsuit "Does 1-50" as defendants. (Complaint, ¶ 10). Plaintiffs' Lawsuit is entirely silent as to the identity of these "Doe" defendants or their alleged relationship to Plaintiffs' claims in this Lawsuit. In the absence of such allegations, these "Doe" defendants should be ignored in assessing whether a claim is removable or whether their presence defeats diversity jurisdiction. 28 U.S.C. § 1441(a); McCabe v. General Foods Corp.. 811 F.2d 1336, 1339 (9th Cir. 1987).

**SCVWD HAS BEEN FRAUDULENTLY *MIS*JOINED AND PLAINTIFFS' CLAIMS AGAINST IT SHOULD BE SEVERED AND DISMISSED OR SEVERED AND REMANDED**

19. Like parties fraudulently joined to defeat diversity, the citizenship of parties that have been *mis*joined for the same improper purpose also must be disregarded. "Misjoinder may be just as fraudulent as the joinder of a resident defendant against whom a plaintiff has no possibility of a cause of action." Tapscott v. MS Dealer Service Corp.. 77 F.3d 1353, 1360 (11th Cir. 1996) (fraudulently *mis*joined defendant severed after removal; motion to remand denied), *abrogated on other grounds* (re aggregation of punitive damages to meet jurisdictional amount);

Pena v. McArthur. 889 F. Supp. 403 (E.D. Cal. 1994) (granting removing defendant's motion to sever improperly joined resident defendant).

20. Here, SCVWD is not a properly joined party. Federal Rule of Civil Procedure 20 provides, in pertinent part: "All persons . . . may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences *and* if any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20 (emphasis added). According to the plain language of Rule 20, the alleged existence of "common questions of law or fact" alone is insufficient to satisfy joinder requirements; "there must also exist some 'systematic pattern' or logical relation between the tortious events." Pena, 889 F. Supp. at 405 (citation omitted). In Pena. the Court held that joinder was improper as "[t]here were two distinct torts, committed by different defendants at different times, and . . . resulted in the invasion of separate legal interests." Id. Further, the complaint contained no allegations that the parties acted in concert or one defendant knew of the other defendant's misconduct. Id. As such, joinder was improper. Id. See also, Tele-Media Company of Western Connecticut v. Antidormi. 179 F.R.D. 75 (D. Conn. 1998) (holding that "[i]n the absence of any claim that the defendants conspired[3] or acted jointly, the same transaction requirement of Rule 20, even when read as broadly as possible, is plainly not satisfied"); Movie Systems, Inc. v. Abel. 99 F.R.D. 129 (D. Minn. 1983) (holding that joint action is necessary to meet the requirements under Rule 20 of the Federal Rules of Civil Procedure); Gruening v. Sucic. 89

[3] In ¶ 11 of the Complaint, under a topic heading styled "THE PARTIES," Plaintiffs make a conclusory allegation using the word "conspiracy." This allegation patently fails to state a claim for conspiracy, see e.g., Stanfield v. Starkey, 220 Cal.App.3d 59, 75 (1990). Moreover, paragraph 11 is so vague that it also fails to satisfy even Rule 8 notice pleading standards, much less the heightened particularity standards of Rule 9(b) that typically apply to attempted "conspiracy" claims.

F.R.D. 573 (E.D. Pa. 1981) (holding that defendants were misjoined, in part because the alleged misconduct of one defendant had no legal effect on the cause of action against the other defendant).

21. As in the prior Aguilar Complaint,[4] Plaintiffs here have purported to join the Santa Clara Valley Water District ("SCVWD") alleging that SCVWD is "the primary water resources agency for Santa Clara County" and is "the steward for its streams and creeks. . . ." (Complaint ¶ 30; Aguilar Complaint ¶ 32). Plaintiffs assert that the SCVWD has a duty "to prevent pollution of these water sources and to provide clean, safe water" to its customers. (Complaint ¶¶ 9, 30; Aguilar Complaint fflj 9; 32). The instant Complaint alleges that the Water District monitors water quality "at least on an annual basis through monitoring wells" throughout its service area. (Complaint ¶ 30; Aguilar Complaint ¶32). According to the Complaint, such monitoring permits the Water District to "discover adverse water quality trends before conditions become severe and intractable." (Complaint, ¶33; Aguilar Complaint ¶ 35).

22. The instant Complaint, like Aguilar. also alleges that the Water District has "ineffectively managed the groundwater basin" and its groundwater protection programs have been "ineffective in protecting the groundwater basin from contamination." (Complaint ¶31; Aguilar Complaint ¶ 33). The Complaint also claims that the Water District knew or should have known of the presence of the perchlorate at the Olin site; that "the groundwater basin in the area

---

[4] As discussed above, on November 7, 2003, Plaintiffs filed a Non-Opposition Statement in relation to Defendants' Motion to Sever and Remand Claims against the SCVWD in Aguilar and this Court issued a tentative ruling granting the Motion. The allegations against the SCVWD in Aguilar are indistinguishable from the allegations against it in Plaintiffs' proposed amended complaints in Daniels. Lujan and Hughes. The Court declined to grant Plaintiffs' leave to file those proposed amendments in its Order of July 17, 2003.

was polluted"; and that the spread of pollutants in the area would cause personal injury and property damage. (Complaint, ¶34; Aguilar Complaint ¶36).

23. Exhibit I to Plaintiffs' Motion to Remand in Daniels. Hughes and Lujan makes it clear that this alleged negligence of the SCVWD could not have occurred until very recently. The 1989 EPA site assessment of the Morgan Hill facility, reported in March 1990, found that:

- "[S]ampling was not necessary because of the low potential for release of contaminants to groundwater."
- "There is no contamination in the nearby municipal well attributable to the site."
- "Emergency removal does not appear to be necessary" because there "does not appear to be an immediate threat of human or environmental contamination."

Moreover, the instant Complaint has added a claim about post-January 2003 alleged "falsification" of reports of levels of perchlorate in well water by the SCVWD. (Complaint ¶ 104). In short, both the instant Complaint and the Aguilar Complaint charge Olin and Standard Fusee with polluting Plaintiffs' groundwater through actions and omissions occurring between 1955 and 1996. They charge the Water District with failing to take appropriate actions to detect and remediate the alleged pollution after it was detectable in the water, decades after the plant commenced operations.

24. As a matter of law, this does not constitute a single transaction or series of transactions as required for joinder under Rule 20. Instead, here, as in the Daniels. Hughes. Lujan and Aguilar Complaints before it:

> Essentially, plaintiffs' proposed cause of action against the Water District and its claims against Olin and Standard have only one thing in common: the fact that they both relate to the alleged potassium perchlorate contamination in Morgan Hill. Yet despite this one similarity the claims

> against the Water District are not inherently connected with plaintiffs' claims against the present defendants.[5]

July 17, 2003 Order at 17 in Daniels, Hughes and Lujan, Denying Motion to Remand. *See also* U.S. v. Green. 33 F.Supp 2d 203 (W.D.N.Y. 1998) (the government's alleged negligence during the cleanup was not the "same transaction or occurrence" as the original pollution.) The SCVWD is fraudulently misjoined under prior orders of this Court and the other legal authorities cited above, accordingly, its citizenship must be ignored for the purpose of assessing whether diversity jurisdiction exists.

25. Moreover, when viewed in light of the circumstances surrounding the late addition of SCVWD to this and numerous other related individual lawsuits removed both previously and simultaneously herewith, Plaintiffs' joinder of SCVWD as a sham defendant becomes more evident. *See* discussion above. Plaintiffs filing of this and related complaints only after Defendants' removal of earlier-filed cases can be interpreted as nothing more than "amendments . . . offered in bad faith in order to [attempt to] destroy removal jurisdiction." McCabe. 811 F.2d at 1340 (rejecting attempted post-removal amended complaint); July 17, 2003 Order at 16, denying Motion to Remand in Daniels. Hughes and Lujan. ("[P]laintiffs' posture in the procedural history of this case serves as a strong indicator that their present [attempt to add SCVWD] is motivated primarily by an intent to defeat federal jurisdiction over this action.")

**SCVWD SHOULD BE REALIGNED AS A PARTY PLAINTIFF**

26. Even if, hypothetically, SCVWD's belated *mis*joinder did not violate Rule 20 and even if Plaintiffs stated a claim against SCVWD, SCVWD should be aligned with the Plaintiffs,

---

[5] Paragraph 89 of the instant Complaint complains of SCVWD's handling of nitrate issues in relation to a study conducted between 1992 and 1996, while ¶ 94 complains of the SCVWD's handling of IBM/Fairchild TCE issues. Clearly, these allegations against the SCVWD are not even "tangentially related" to the claims against Olin and Standard Fusee.

and not the Removing Defendants. "The courts, not the parties, are responsible for aligning the parties according to their interests in the litigation." Continental Airlines, Inc. v. Goodyear Tire & Rubber Co., 819 F.2d 1519, 1523 (9th Cir. 1987) (citation and quotation omitted). "If the interests of a party named as a defendant coincide with those of the plaintiff in relation to the purpose of the lawsuit, the named defendant must be realigned as a plaintiff for jurisdictional purposes." Id. In evaluating a party's proper alignment in litigation, the court should "determine the issue of antagonism on the face of the pleadings and by the nature of the controversy." Glenmede Trust Co. v. Dow Chemical Co.. 384 F. Supp. 423, 429 (E.D. Pa. 1974). Here, clearly, if the SCVWD is antagonistic to any party in this case, it is not to the Plaintiffs, but to the Removing Defendants. Plaintiffs' Complaint demonstrates that both Plaintiffs and the SCVWD share the same interest in protecting the quality of the District's and Plaintiffs' drinking water. Complaint, ¶¶ 31, 32; see also. The Santa Clara Valley Water District Act, West's Annotated California Codes. Water District Appendix. Chapter 60. ("The Water District Act"), § 5(5). Once properly aligned as a party plaintiff, the citizenship of SCVWD does not defeat diversity. Hedges v. Rudeloff. 196 F. Supp. 475, 477 (S.D. Tex. 1961).

**THE AMOUNT IN CONTROVERSY EXCEEDS $75,000 EXCLUSIVE OF INTEREST AND COSTS**

27. Plaintiffs' Complaint, on its face, also demonstrates that Plaintiffs seek damages exceeding $75,000.00, thus meeting the jurisdictional minimum of 28 U.S.C. § 1332(a). Plaintiffs' Complaint alleges that after having made substantial financial commitment to purchase their property, the alleged contamination of Plaintiffs' drinking water has left Plaintiffs without any "ability to sell, market or finance" their now allegedly valueless home. (Complaint ¶¶ 2, 3, 4). In addition to alleging that they "lost the value of [their] home," see id, Plaintiffs

also seek remediation of their property, emotional distress damages and punitive damages. (Complaint ¶ ¶ 62, 73, 75, 76).

28. Each separate category of damages sought against the removing defendants is appropriately combined to meet the amount in controversy requirement. Hunter v. United Van Lines, 746 F.2d 635, 650-51 (9th Cir. 1984) ("When plaintiff joins several claims against the defendant, the general rule . . . is that the value of all the claims can be added together in determining whether the requisite jurisdictional amount exists."), quoting 14 C. Wright, A. Miller & E. Cooper, FEDERAL PRACTICE & PROCEDURE § 3704, at 412-13 (1975). Here, Plaintiffs' claim for property damages alleged, *standing alone,* meets the amount in controversy requirement *(see* ¶ 30 below and Exhibit B establishing amount in controversy for Plaintiffs based on assessed home value). The combination of all categories of damages alleged (loss of home value + remediation of property + emotional distress damages + punitive damages) sought by Plaintiffs certainly exceeds $75,000 exclusive of interest and costs.

29. The damages Plaintiffs seek to recover for the alleged complete diminution in value of their home itself exceeds $75,000. Records maintained by the Santa Clara County Tax Collector demonstrate that the home identified by the Plaintiffs in the Complaint has an assessed value in excess of $75,000. Plaintiffs have alleged ownership of property located at 14220 Sycamore Avenue, San Martin, California (Complaint, ¶ 5). The Santa Clara County Tax Collector has assessed the Full Cash Value of the land and improvements at this location to be $406,238. See Declaration of Randall C. Creech, attached hereto as Exhibit B. Based on the assessed value, Plaintiffs' claim that they "lost the value of [their] homes" is sufficient alone to satisfy the jurisdictional minimum.

30. Alleged loss of value of the Plaintiffs' home (see ¶ 30 above and Exhibit B), plus property remediation, plus alleged emotional distress damages plus punitive damages indisputably meets the $75,000 amount in controversy requirement of 28 U.S.C. § 1332.

**CONSENTS TO REMOVAL**

31. Consent to removal by the fraudulently joined defendants is not required, see e.g., Emrich v. Touche Ross & Co.. 846 F.2d 1190, 1193 , n.1 (9th Cir. 1988) (consent of "nominal, unknown or fraudulently joined" defendants not required). Removing Defendants have given written notice of the filing of this Notice of Removal to Counsel for Plaintiffs and have filed a copy of this Notice of Removal with the Circuit Court Clerk of the Superior Court for Santa Clara, County, California.

**JURY TRIAL DEMANDED**

32. Removing Defendants demand a trial by jury on all issues.

WHEREFORE, Removing Defendants Olin Corporation and Standard Fusee Corporation, d/b/a Orion Safety Products, give notice that the Lawsuit is removed from the Superior Court for Santa Clara County, California to the United States District Court for the Northern District of California, San Jose Division, for the exercise of jurisdiction over the Lawsuit as though the Lawsuit had originally been instituted in this Court.

Respectfully submitted,

CREECH, LIEBOW & KRAUS

By:_

' Randall C. Creech, Cal. Bar # 65542
Attorneys for Defendant Olin Corporation

SEDGWICK, DETERT, MORAN
& ARNOLD LLP

By:________________________________
Keith M. Casto, Cal. Bar. No. 141279
Earl L. Hagström, Cal. Bar. No. 150958

Attorneys for Defendants Standard Fusee Corporation d/b/a Orion Safety Products

DATED: November 18, 2003

Respectfully submitted,

SEDGWICK, DETERT, MORAN & ARNOLD LLP

By: ______________________

GARY A. SLOBODA
Attorneys for Defendant
STANDARD FUSEE COMPANY
d/b/a ORION SAFETY PRODUCTS

EXHIBITS

Exhibit A: Copy of all process, pleadings, and orders
A-1: Olin
A-2: Standard Fusee

Exhibit B: Declaration re Amount in controversy for Plaintiff based on assessed home value.

**EXHIBIT A**

Richard Alexander, Esq. (48432)
Jeffrey W. Rickard, Esq. (125180)
Ryan M. Hagan, Esq. (200850)
ALEXANDER, HAWES & AUDET, LLP
152 North Third Street, Suite 600
San Jose, CA 95112
Telephone: 408.289.1776
Facsimile: 408.287.1776

Attorneys for Plaintiffs

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| GLEN WEBB and GAIL WEBB,<br><br>Plaintiffs,<br><br>vs.<br><br>OLIN CORPORATION, a corporation; STANDARD FUSEE CORPORATION, a corporation; ORION SAFETY PRODUCTS, a corporation; SANTA CLARA VALLEY WATER DISTRICT; and DOES 1 through 50, inclusive,<br><br>Defendants. | CASE NO:<br><br>**COMPLAINT FOR:**<br><br>**(1) Negligence**<br>**(2) Nuisance**<br>(3) **Intentional Infliction of Emotional** Distress<br>**(4) Trespass**<br>(5) **Equitable (Injunctive and/or Declaratory) Relief and Damages**<br>(6) **Punitive Damages**<br>(7) **Equitable (Injunctive and/or Declaratory) Relief**<br>(8) **Failure to Discharge Mandatory Duty**<br><br>**AND**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs, GLEN WEBB and GAIL WEBB, (hereinafter "Plaintiff") allege as follows:

**NATURE OF THE CASE**

1. This action is brought to remedy Defendants' unlawful conduct directed at Plaintiff. The Plaintiff, like numerous current and previous residents and property owners at the affected "Olin Site" (as hereinafter alleged), has lived, is living, and/or owns property situated on a highly toxic groundwater plume of potassium perchlorate that is a direct result of Defendants' forty years of manufacturing highway flares containing potassium perchlorate, and dumping such

potassium perchlorate waste into the soil. Within a year of filing this complaint, Plaintiff discovered that Plaintiff's only groundwater source is located within the plume area contaminated with potassium perchlorate, which continues to migrate throughout the affected area. Defendants are responsible for the presence of the contamination, for allowing the toxic waste to remain in the community and fester, and for allowing potassium perchlorate to contaminate the groundwater in and around the Olin Site area and surrounding communities. Despite the fact that Defendants have known about the discharge of poisonous waste materials into the soil for some time, Plaintiff was left to discover the presence of the contamination only after the public was informed by the media in or around January 2003.

2. Plaintiff has a substantial financial investment in Plaintiff's home and real property located within the affected Olin Site and surrounding communities. Plaintiff purchased, built, or had Plaintiff's home built, to live peacefully and safely. Plaintiff had no knowledge that there was potassium perchlorate in the groundwater supplying the community or that Defendants had been dumping or discarding potassium perchlorate so it was allowed to migrate through the soil and into the groundwater aquifer that the community depends upon for water. Plaintiff had no knowledge that Plaintiff's home was built over a chemical dump.

3. Despite California's stringent environmental laws and standards, Defendants created a toxic waste site, left their waste in the soils and allowed it to infiltrate the groundwater system. Now, a toxic dump exists under the neighborhood homes, buildings, playgrounds, and places of business located within the affected Olin Site and surrounding communities, and it is uncertain as to the length of time which will be required for abatement of the contamination, if it can be abated at all. The Plaintiff's inalienable right to quietly enjoy the safety and security in owning property has been destroyed by Defendants' misconduct. Plaintiff is essentially a prisoner of the Olin Site, having lost all ability to sell, market, or finance.

4. The experts are now investigating the extent and scope of the potassium perchlorate contamination. The Defendants are involved in cleaning up the toxic waste for which they are legally responsible. The EPA has not filed a formal action against any of Defendants. Plaintiff fears for Plaintiff's own safety, and for the safety of Plaintiffs family. Neither the short

term nor the long term health effects of Plaintiff s exposure to potassium perchlorate through the contaminated groundwater is known at this point. Plaintiff must live each and every day with this knowledge that the sanctity of Plaintiff s community is continuously being invaded with a poisonous substance that has rendered the groundwater unusable. Plaintiff has lost the value of Plaintiff's home and real property, the safety of the environment, and now is confronted with the stigma that necessarily attaches to property which is located on or near a toxic waste site.

**THE PARTIES**

5. Plaintiffs, GLEN WEBB and GAIL WEBB, are individuals residing in 14220 Sycamore Avenue, San Martin, California. They own a home and real property which has been damaged by the presence of potassium perchlorate in the groundwater system in their community. Plaintiffs, GLEN WEBB and GAIL WEBB, own the residence located at 14220 Sycamore Avenue, San Martin, California.

6. Defendant Olin Corporation is a multi-national corporation with annual revenues in excess of $1 billion dollars, derived in part from the international sale of chemicals and munitions, including Winchester ammunition through the Winchester Arms Company. Defendant Olin Corporation is authorized to do business in the State of California and which, at all times relevant hereto, owned and operated a manufacturing facility located in the City of Morgan Hill, County of Santa Clara, State of California. That as part of the ongoing business of Defendant Olin Corporation, Olin was engaged in the process of manufacturing highway safety flares at said facility from 1955 to approximately 1996.

7. Defendant Standard Fusee Corporation was at all times relevant hereto, the lessee of the subject Olin property from 1988 to 1996 and manufactured flares on the Olin property at the Olin plant during that time period.

8. Defendant Orion Safety Products purchased the automotive and marine signal divisions of Olin Corporation in 1988, and is the world's largest manufacturer of emergency flares.

9. The Santa Clara Valley Water District (hereinafter "SCVWD") is the primary water resources agency for Santa Clara County, California, is the steward for its streams and creeks,

underground aquifers and district-built reservoirs and has a duty to prevent pollution of these water sources and to provide clean, safe water for homes and businesses.

10. DOES 1 to 50 are persons whose identities are unknown to Plaintiff at this time. Defendants DOES 1 to 50 are business entities controlled by, and/or agents of and/or employees of and/or affiliated with Defendants. Plaintiff is ignorant of the true names and capacities of the Defendants sued herein under the fictitious names DOES 1 to 50. They are sued herein pursuant to C.C.P. § 474. When Plaintiff becomes aware of the true names and capacities of the Defendants sued as DOES 1 to 50, Plaintiff will amend this Complaint to state their true names and capacities.

11. Each Defendant sued herein was the principal, agent, or employee of the other, and was acting within the scope of such agency or employment. Each Defendant sued herein was the co-conspirator of the other and was acting within the course and scope of a conspiracy formed amongst each of them. Each Defendant sued herein aided and abetted the other with the intent that each would be successful in their mutual endeavors. Each Defendant sued herein received money or property as a result of the conduct described herein without consideration therefore and/or with knowledge that the money or property was obtained as a result of the wrongful conduct described herein. Each entity Defendant sued herein is a shell organization, and is actually the alter ego of the other Defendants sued herein.

12. "OLIN," "Defendants," and/or "Defendant" as used in this Complaint refers to all Defendants as well as DOES 1 to 50.

**JURISDICTION AND VENUE**

13. This Court has jurisdiction over this action pursuant to California Code of Civil Procedure section 410.10.

14. Venue is proper in this Court pursuant to Code of Civil Procedure sections 395 and 395.5 in that Defendants breached their duties and because liability arises in the County of Santa Clara. Further the Defendants either maintain offices, transact business, have agents, are found, or reside, in the County of Santa Clara. Plaintiff is informed and believes that the unlawful misconduct took place in Santa Clara County at Olin Corporation's facility in Morgan

Hill in the State of California. Furthermore, many of the unlawful acts herein alleged were committed or perpetrated within the County of Santa Clara.

15. No portion of this Complaint is brought pursuant to federal law.

**POTASSIUM PERCHLORATE OVERVIEW**

16. At all relevant times, potassium perchlorate has been known to be an herbicide that is toxic to animals and people.

17. Potassium perchlorate's effect on thyroid function was discovered in 1952 and has been confirmed repeatedly since then. (Stanbury and Wyngaarden 1952; Kessler and Krunkemper 1966; Lampe, et al. 1967; Brown-Grant and Sherwood 1971; Gauss 1972; Mannisto 1979.)

18. Potassium perchlorate was first suspected as a carcinogen in 1966, when a long term study on the effects of potassium perchlorate in drinking water was reported. After two years of potassium perchlorate consumption, more than a third of potassium perchlorate-fed lab animals developed benign thyroid tumors, compared with none of the control animals. (Kessler and Krunkemper 1966.) Although potassium perchlorate does not directly cause cancer, potassium perchlorate-induced tumors result from changes in the thyroid caused by hormone interference. Similar effects are seen with other thyroid hormone disruptors. The severity of these precursor lesions have a dose response relationship (the more that is consumed, the greater the risk) and for that reason the EPA considers potassium perchlorate to be a probable carcinogen.

19. Studies in the 1950s showed that potassium perchlorate could pass through the placenta and it affected fetuses more seriously than adults. (Postel 1957; Brown-Grant and Sherwood 1971.) This is significant. Potassium perchlorate's risks are greater to children because of the relationship between maternal and fetal thyroid hormone levels and neurological development. Since the 1970s the consequences of depressed thyroid hormone levels on developing fetuses and infants have been known to be devastating and even temporary disruption of thyroid hormones can lead to permanent defects in the developing organism. In 1969 it was revealed that mild maternal hypothyroidism can cause reduced IQ in children. (Man and Jones

1969.) Thyroid hormones are crucial to proper development of many organ systems, including the nervous and reproductive systems (Porterfield 1994; Jannini 1995) and toxins that disrupt thyroid function can be expected to impact neurological developmental and increase the risk of mental retardation, vision, speech and hearing impairment, delayed reflex development, and impaired fine motor skills.

## FACTUAL ALLEGATIONS

20. This action is brought to remedy Defendants' unlawful conduct directed at Plaintiff. The Plaintiff, a property owner at the affected Olin Site, has lived, is living, and/or owns real property situated above a highly toxic groundwater plume of potassium perchlorate, that is a direct result of Defendants' forty years of manufacturing highway flares containing potassium perchlorate, and dumping such potassium perchlorate waste into the soil.

21. Within a year of filing this complaint, Plaintiff discovered that Plaintiff's only groundwater source is located in the plume area contaminated with potassium perchlorate, which continues to migrate throughout the affected area. Defendants are responsible for the presence of the contamination, for allowing the toxic waste to remain in the community and fester, and for allowing potassium perchlorate to contaminate the groundwater in and around the Olin Site area and surrounding communities. Despite the fact that Defendants have known about the discharge of poisonous waste materials into the soil for some time, Plaintiff was left to discover the presence of the contamination only after the public was informed by the media in or around January 2003.

22. It is common knowledge, and was well known to each of the Defendants, that the chemicals being dumped onto the soil and into the evaporation pond located on the Olin Site were and are dangerous to the surrounding communities, and in fact, a massive explosion occurred in the 1970's as a result of the Defendants' waste dumping on the Olin Site, which blew-out windows in numerous structures in the vicinity.

23. It is common knowledge, and was well known to each of the Defendants, that the Olin Site is located above a groundwater aquifer that supplies the drinking water to the Olin Site area and surrounding communities, nonetheless, the individual managers directed that the waste

potassium perchlorate be dumped onto the soil and into the evaporation pond on the Olin Site.

24. The Olin Corporation operated the facility from the 1950s until about March 1988 when Standard Fusee Corporation leased the facility from Olin. Highway flares and railroad flares are the main product manufactured by both Olin Corporation and Standard Fusee at the Olin Site.

25. In 1986, soil samples were taken along the northeastern boundary of the Olin Site. Two soil borings down to 16 feet below ground surface and one down to 11 feet below ground surface were drilled along the Olin Site's northern property line. A composite soil sample was taken from each boring and analyzed for 15 compounds, including potassium perchlorate. The results indicated a concentration of potassium perchlorate in the soil of up to one (1) part per million or one hundred (100) parts per billion.

26. At all relevant times, it was public knowledge that waste potassium perchlorate was dumped into an unlined evaporation pond located on the Olin site, and that such unlined evaporation pond was used from about 1951 to 1987. The evaporation pond, about 15 feet by 15 feet in size, is known to have received wastes from the cleaning process of the ignition material mixing bowls which were cleaned on site. This process consisted of boiling a solution of water and soda ash in the mixing bowls and discharging the liquid and ignition material residues, including potassium perchlorate, into the unlined evaporation pond.

27. In 1987, Olin closed the evaporation pond and in late 1987 or early 1988 the evaporation pond was drained and the bottom layer of soil was removed and spread out onto the adjacent field, creating a perchlorate leach field.

28. The Olin Site is located within a portion of the Las Llagas sub-basin in the southern leg of the Santa Clara Valley. The groundwater below the site is located within one unconfined aquifer, and flows from the northwest to the southeast, and is not stratified. The aquitards that exist in the aquifer are not extensive and do not prohibit the flow of groundwater to the lower portions of the aquifer, which is not protected from surface contaminants.

29. There is a municipal well within 300 feet of the site that is one of 12 wells in a blended water supply system for the City of Morgan Hill. The municipal water system supplies

water to thousands of people in the City of Morgan Hill area. This is separate and apart from approximately 2000 wells south of Morgan Hill and north of Gilroy

30. The Santa Clara Valley Water District ("SCVWD") is the primary water resources agency for Santa Clara County, California, is the steward for its streams and creeks, underground aquifers and district-built reservoirs and has a duty to prevent pollution of these water sources and to provide clean, safe water for homes and businesses. To accomplish this the SCVWD monitors groundwater quality at least on an annual basis through monitoring wells throughout the groundwater basin which are designed to monitor for common groundwater constituents and unnatural constituents including, but not limited to, organic solvents, gasoline additives, nitrates and chloride.

31. The SCVWD has a duty to ensure a safe and healthy supply of groundwater. The SCVWD manages the groundwater basin to fulfill the objectives of the District Act and its mission. The goal of these groundwater management efforts has been, and continues to be, to ensure that groundwater resources are sustained and protected. As part of the District's Global Governance Commitment adopted by the Board of Directors, the District will provide a healthy, clean, reliable, and affordable water supply that meets or exceeds all applicable water quality regulatory standards in a cost-effective manner. The District has ineffectively managed the groundwater basin to fulfill the objectives of the District Act and its mission to sustain and protect groundwater resources. Overall, the District's groundwater protection programs have been ineffective in protecting the groundwater basin from contamination.

32. In addition, the SCVWD has a duty to maintain groundwater basins and is legally authorized to collect revenues from well owners for the water they use. Such water usage is monitored by a meter that the SCVWD requires to be installed. In addition, the SCVWD through its Well Ordinance Program is responsible for issuing permits for wells and inspecting all well construction activities in Santa Clara County to make sure that wells do not threaten groundwater resources in the county.

33. By monitoring the quality of the groundwater basin, the District can discover adverse water quality trends before conditions become severe and intractable, so that timely

remedial action to prevent or correct costly damage can be implemented. In general, the District monitors groundwater quality to ensure that it meets water quality objectives for all designated beneficial uses, including municipal and domestic, agricultural, industrial service, and industrial process water supply uses.

34. At all relevant times, the SCVWD knew or should have known that potassium perchlorate was present in several monitoring wells and soil samples on or near the Olin Site, that the groundwater basin in the area was polluted, that the pollutants were spreading underground into the San Martin drinking water and that people, and particularly children were at risk for severe injuries caused by potassium perchlorate and that property damage was occurring and would occur with regard to the owners of all private property in the area.

35. Plaintiff has a substantial financial investment in the home and real property located within the affected Olin Site and surrounding communities. Plaintiff purchased, built, or had Plaintiff's home built so Plaintiff could live peacefully and safely. Plaintiff had no idea that there was potassium perchlorate in the groundwater supplying the community or that Defendants had been dumping or discarding potassium perchlorate so it was allowed to migrate through the soil and into the groundwater aquifer that the community depends upon for water. Plaintiff had no idea that Plaintiff's home was built over a chemical dump.

36. Despite California's stringent environmental laws and standards, Defendants created a toxic waste site, left their waste in the soils and allowed it to infiltrate the groundwater system. Now, a toxic dump exists under the neighborhood homes, buildings, playgrounds, and places of business located within the affected Olin Site and surrounding communities, and it is uncertain as to the length of time which will be required for abatement of the contamination, if it can be abated at all. Plaintiff is essentially a prisoner of the Olin Site, having lost all ability to sell, market, or finance.

37. The experts are now investigating the extent and scope of the potassium perchlorate contamination. The Defendants are involved in cleaning up the toxic waste for which they are legally responsible. The EPA has not filed a formal action against any of Defendants. Plaintiff now fears for Plaintiff's own safety, and for the safety of Plaintiffs family.

38. Neither the short term nor the long term heath effects of Plaintiff's exposure to potassium perchlorate through the contaminated groundwater is known at this point. Plaintiff must live each and every day with this knowledge that the sanctity of Plaintiffs community is continuously being invaded with a poisonous substance that has rendered the groundwater unusable.

39. Plaintiff has lost the value of Plaintiffs home, the safety of the environment, and now is confronted with the stigma that necessarily attaches to property which is located on or near a toxic waste site.

## FIRST CAUSE OF ACTION

### Negligence Against All Defendants

40. Plaintiff hereby incorporates by reference paragraphs 1 through 39 above as though fully set forth herein, and further alleges:

41. Plaintiff claims that Defendants were negligent.

42. At all times material herein, Defendants were under a duty to conduct its business of manufacturing highway flares with due and reasonable care imposed by law. Defendants were at all times relevant hereto under the strictest duty of care to conduct themselves in a non-negligent reasonable manner according to the reasonable product person standard.

43. Defendants violated this duty of due and reasonable care and said violation was despicable, wanton and reckless and calculated to cause grievous harm to the Plaintiff.

44. Plaintiff has in the past and will in the future sustain damages as a result of the negligence of the Defendants in their failure to contain and properly dispose of waste and by-products, including potassium perchlorate, from the manufacture of highway flares.

45. As a proximate result of the aforesaid carelessness and negligence of said Defendants, the aforesaid conduct caused severe injury to Plaintiff and thereby proximately caused Plaintiff to sustain damages and injuries as herein alleged.

**SECOND CAUSE OF ACTION**

**Nuisance Against All Defendants**

46. Plaintiff hereby incorporates by reference paragraphs 1 through 39 above as though fully set forth herein, and further alleges:

47. Plaintiff at all times herein mentioned has the inalienable right to own, enjoy, and use Plaintiff's residence and property without interference by other property owners such as Defendants who choose to undertake ultrahazardous activities on their land, and to not have that right impaired by the introduction into the groundwater system of toxic substances by Defendants.

48. Defendants, and each of them, have a public duty to conduct their business, and in particular the mass storage and disposal of hazardous toxic substances, in a manner that does not damage the public welfare and safety.

49. At all times mentioned herein the conduct of said Defendants caused hazardous substances and toxins, including potassium perchlorate to be discharged/disposed of into the soil and groundwater supply of the communities around the subject Olin Site. The substances penetrated the soil and contaminated the groundwater and have been distributed throughout the community as a result of being carried through the groundwater system.

50. The aforementioned discharges emanated from land upon which Defendants carried on activities in conjunction with the operation of their businesses, at all times mentioned herein, and for forty years prior thereto.

51. The aforementioned conduct of said Defendants constitutes a nuisance within the meaning of §3479 of the Civil Code in that it is injurious and/or offensive to the senses of Plaintiff, and/or interferes with Plaintiff's comfortable enjoyment of life, and/or of their property, and/or unlawfully obstructs the free use, in the customary manner, of Plaintiffs property including, but not limited to, all uses particular to residential living, recreation and work. The contamination and its concomitant spoliation of the community groundwater supply is a continuing and/or permanent nuisance which adversely impacts the use and/or value of Plaintiffs property.

52. As a direct and proximate result of said wrongful conduct, Plaintiff has suffered economic damages including, but not limited to, lost use of property, denial of useful and quiet enjoyment of property, diminution in the fair market value of property, impairment of the salability of property, and losses related to residual toxic contamination, which has caused said property to be stigmatized. Plaintiff alleges that said damages are in excess of the minimum jurisdictional amount of this Court to be set forth according to proof at trial.

53. As a further and direct proximate result of Defendants' wrongful conduct, the Plaintiff has suffered, and will continue to suffer, pain, discomfort, anxiety, fear, worries, stress, and mental and emotional distress, all to the Plaintiff's general damage in an amount to be set forth according to proof.

54. Unless the nuisance is abated, Plaintiff's property and rights of enjoyment will be progressively further diminished in value.

55. The nuisance is specially injurious to Plaintiff, in that Plaintiff is a property owner who has substantial equity, or has committed substantial financial resources toward the purchase and/or development of Plaintiff's respective property, without knowledge of the extent of damage, economic and otherwise, which would result from a toxic site. Plaintiff will be adversely affected by the nuisance unless and/or until it is abated.

56. The wrongful acts of Defendants were done maliciously, oppressively, and fraudulently, and Plaintiff is entitled to punitive and exemplary damages in an amount to be ascertained according to proof, which is appropriate to punish or set an example of Defendants.

## THIRD CAUSE OF ACTION

### Intentional Infliction of Emotional Distress Against All Defendants

57. Plaintiff hereby incorporates by reference paragraphs 1 through 39 above as though fully set forth herein, and further alleges:

58. Defendants' conduct in connection with the disposal of potassium perchlorate was done despite Defendants' knowledge that the potassium perchlorate was present and was known to be and were specifically designated as hazardous to human health. Defendants chose to place their interests in securing a profit from the manufacture of highway flares above the safety and

health of the affected community.

59. Defendants at all relevant times knew of the existence of Plaintiff and the affected community, knew that Plaintiff would be exposed to potassium perchlorate as a result of Defendants' conduct, and knew that the discovery of these facts by Plaintiff would necessarily cause Plaintiff to suffer injury, including severe emotional distress. Nevertheless, Defendants intentionally proceeded with their manufacture of highway flares and reckless disposal of waste and by-products, including potassium perchlorate.

60. Defendants' conduct in connection with the disposal of potassium perchlorate was undertaken with reckless disregard of the Plaintiff and the affected community.

61. As a direct and proximate result of Defendants' conduct alleged herein, Plaintiff suffers severe and extreme emotional distress.

62. As a further and direct proximate result of said wrongful conduct, Plaintiff has suffered, and will continue to suffer pain, discomfort, anxiety, fear, worries, stress, and mental and emotional distress, all to the Plaintiff's general damage in an amount to be set forth according to proof at trial.

63. The wrongful acts of Defendants were done maliciously, oppressively, and fraudulently, and Plaintiff is entitled to punitive and exemplary damages in an amount to be ascertained according to proof, which is appropriate to punish or set an example of Defendants.

**FOURTH CAUSE OF ACTION**

**Trespass Against Ail Defendants**

64. Plaintiff hereby incorporates by reference paragraphs 1 through 39 above as though fully set forth herein, and further alleges:

65. Plaintiff at all times herein mentioned, had interest and title in Plaintiff's property and the right to quiet and useful enjoyment thereof, as well as Plaintiff's surrounding living environment, including the groundwater.

66. As a direct and proximate result of the intentional, reckless, or negligent conduct of Defendants, and each of them, as alleged herein, the presence of potassium perchlorate has infiltrated the soil, which in turn contaminated the groundwater and has irreparably damaged

Plaintiff's interests in property and water.

67. As a direct and proximate result of said wrongful conduct, Plaintiff has suffered economic damages including, but not limited to, lost use of property, denial of useful and quiet enjoyment of property, diminution in the fair market value of property, impairment of the salability of property, and losses related to residual toxic contamination, which has caused said property to be stigmatized. Plaintiff alleges that said damages are in excess of the minimum jurisdictional amount of this Court to be set forth according to proof at trial.

68. As a further and direct proximate result of said wrongful conduct, the Plaintiff has suffered, and will continue to suffer, pain, discomfort, anxiety, fear, worries, stress, and mental and emotional distress, all to the Plaintiff's general damage in an amount to be set forth according to proof at trial.

69. As a direct and proximate result of Defendants' conduct alleged herein, Plaintiff suffers severe and extreme emotional distress.

70. Defendants' acts and omissions which constitute trespass as described herein were committed with malice, fraud and oppression thereby entitling Plaintiff to exemplary or punitive damages.

**FIFTH CAUSE OF ACTION**

**Equitable (Injunctive and/or Declaratory) Relief and Damages**

**Against All Defendants**

71. Plaintiff hereby incorporates by reference paragraphs 1 through 39 above as though fully set forth herein, and further alleges:

72. Plaintiff has no adequate remedy at law, rendering injunctive and other equitable relief appropriate in that damages cannot adequately compensate Plaintiff for the injuries suffered and threatened.

73. Accordingly, Plaintiff requests the following equitable relief:

a. That a judicial determination and declaration be made of the rights of Plaintiff and the corresponding responsibilities of Defendants; and

b. That the Defendants be ordered to remediate the groundwater

contamination as alleged herein.

74. Plaintiff is entitled to compensation for economic losses as provided under the Laws of the State of California.

**SIXTH CAUSE OF ACTION**

**Punitive Damages Against AH Defendants**

75. Plaintiffs hereby incorporates by reference paragraphs 1 through 39 above as though fully set forth herein, and further allege:

76. Defendants' actions were oppressive, malicious, grossly negligent, wilful and wanton and exhibit a callous disregard for Plaintiff's rights.

**SEVENTH CAUSE OF ACTION**

**Equitable (Injunctive and/or Declaratory) Relief Against SCVWD**

77. Plaintiffs hereby incorporate by reference paragraphs 1 through 39 above as though fully set forth herein, and further allege:

78. The Plaintiffs have no adequate remedy at law, rendering injunctive and other equitable relief appropriate in that damages cannot adequately compensate Plaintiffs for their inability to use their contaminated groundwater for household, business and/or agricultural purposes resulting from SCVWD's acts and/or omissions.

79. Accordingly, Plaintiffs request the following equitable relief:

a. That a judicial determination and declaration be made of the rights of the Plaintiffs and the corresponding rights and responsibilities of the SCVWD.

b. A Court order prohibiting SCVWD from further collecting any groundwater usage charge and/or groundwater well monitoring charge from Plaintiffs.

c. A Court declaration that the SCVWD failed to fulfill its duties under the District's Global Governance Commitment adopted by the Board of Directors, that the District will provide a healthy, clean, reliable, and affordable water supply that meets or exceeds all applicable water quality regulatory standards, according to proof.

## EIGHTH CAUSE OF ACTION

## Failure to Discharge Mandatory Duties

## Against the SCVWD

80. Plaintiffs hereby incorporates by reference paragraphs 1 through 39 above as though fully set forth herein, and further allege:

81. Within six months of the date this claim was served, claimant(s) first learned of perchlorate pollution of the well water in their community and affecting their property.

At all relevant times the Santa Clara Valley Water District [SCVWD]:

82. Was, and is, a governmental entity created for the object and purpose of providing "comprehensive water management for all beneficial uses," "to protect waters" and to "prevent the waste . . . of the water supply in the district." Santa Clara Valley Water District Act [hereinafter "SCVWDA"] Section 4.

83. Was empowered by law "to conserve .. and manage water for the present and future use within the district . . . for irrigation, domestic, . . . environmental, and all other beneficial uses . . . to prevent contamination, pollution or otherwise rendering unfit for beneficial use the surface and subsurface waters used or useful in the district, and to commence, maintain and defend actions and proceedings to prevent any such interference with the described waters as may endanger or damage the inhabitants, lands or use of water in . . .the district." SCVWDA Section 5.

84. Levied groundwater charges on the use of well water "in furtherance of the district activities in the protection and augmentation of the water supplies for users . . . which are necessary for the public health, welfare and safety of the people of this State." SCWVDA Section 26.3.

At all relevant times the Santa Clara Valley Water District [SCVWD], pursuant to its powers under the SCVWDA:

85. Has as its mission and goal to "manage the groundwater basin . . . to ensure that groundwater resources are sustained and protected" and in furtherance of that goal and mission to "identify and evaluate threatens to groundwater quality and prevent or mitigate contamination

associated with those threats." Santa Clara Valley Water District Groundwater Management Plan, July 2001 ["Plan"] p. 1;

86. Adopted a Global Governance Commitment providing that "the District will provide a healthy, clean, reliable, and affordable water supply that meets or exceeds all applicable water quality regulatory standards in a cost-effective manner." Plan, p. 4.

87. Managed, and manages, the groundwater of the Llagas Subbasin, one of three principles groundwater basins in the county which extends from Cochran Road south to the County's southern boundary. "The Llagas Subbasin is approximately 15 miles long, 3 miles wide at its northern boundary" It is a "series of interbedded clay layers" which transmits water "through the gravelly alluvial fans of streams in the deeper confined aquifer" and "filter water, making it suitable for drinking." Plan p. 11.

88. Monitored, and monitors, the water quality of the ground basin water "to ensure that it meets water quality objectives for all designated beneficial uses, including municipal and domestic, agricultural, industrial service and industrial process water supply uses." "By monitoring the quality of the groundwater basin, the District can discover adverse water quality trends before conditions become severe and intractable, so that timely remedial action to prevent or correct costly damage can be implemented." Plan p. 29.

89. Has monitored high levels of nitrate concentrations in groundwater samples in the Llagas Subbasin, which "are a particular concern for infants." Plan p. 30. Between 1992 and 1996 it conducted "an extensive study" the results of which are grossly misrepresented and understated by the District's conclusion that "nitrate concentrations in the Llagas Subbasin are generally increasing over time and that elevated concentrations still exist throughout the subbasin." Plan p. 40. The sources of nitrate loading in the Llagas Subbasin are fertilizer applications, animal waste and leach fields for septic tank systems, and human waste generation. Because of the slow movement of surface water to the water table, past practices "continue to contribute to increasing nitrate concentrations in the groundwater for several years or decades to come." Plan p. 40. Of the 4,000 wells in the southern portion of the District, 600 private wells were tested and more than half exceeded the federal safe drinking water standard for nitrate [45

mg/liter] in the Llagas Subbasin Plan. p. 41. The District claims it has been conducting "a comprehensive monitoring effort to track season, areal, and long-term trends in nitrate concentrations." Plan p. 42

At all relevant times the SCVWD has known or otherwise admitted that:

90. Where there is industrial use of chemicals, there are accidental spills and intentional dumping which pollute the air, soil, surface water and groundwater.

91. The District does not have to look far to find pollution of the aquifer because Santa Clara County leads the nation in EPA Superfund cleanup sites as a result of industrial chemicals being spilled or dumped.

92. All industries that produce chemical products, with very few exceptions, pollute the air, soil, surface water and groundwater until they are caught, e.g. Olin manufacturing of flares on Tennant Road.

93. Groundwater basins must be "aggressively protected from contamination and the threat of contamination" and this longstanding implicit policy of the District and commitment to the well users of Santa Clara County is now incorporated into the District's written statement of policy. Plan p. 64.

94. In 1981, a major underground fiberglass tank storing TCE at the IBM/Fairchild industrial manufacturing site on Cottle Road literally dissolved and gushed hundreds of gallons of toxic solvent into the groundwater of the Great Oaks Water Company causing widespread drinking water pollution. A subsequent study by the State of California showed that the rate of miscarriages for women who had consumed this solvent polluted well water was three [3] times the state average. As a result of that tragic event, "the District's attention focused on water quality of the groundwater basin." Plan p. 8. As a consequence the District recognized that the spilling and dumping of industrial chemicals and underground tank storage of pollutants "affect groundwater quality and that effective protection of the County's groundwater basin demanded a proactive approach" [Plan p. 55] and "the need for the District to be actively involved in ensuring that appropriate investigation and cleanup of sites was undertaken in a timely manner." Plan p. 59. By 1987 the District knew that more than 1,000 fuel leaks had been reported and began a

program of investigation and cleanup of releases from underground storage tanks. Id. The District provides "regulatory oversight on investigation and cleanup at UST sites where a release has occurred." Plan p. 57. For example, "if there is evidence of a leak or if contamination is detected . . . the District . . confirms the release, lists the site on the Leaking Underground Storage Tank Oversight Program database, and notifies the responsible party and the State Water Resources Control Board. The District then determines if the unauthorized release poses a threat to human health and safety, the environment, or water resources and, if necessary, a caseworker requests additional investigation and cleanup." Id. The District claims that it "has been at the forefront of several initiatives for improving the effectiveness and efficiency of our regulatory oversight efforts and the cost-effectiveness of corrective action while protecting human health, safety, the environment and water resources." Plan p. 56.

95. Storm water runoff carries pollution into the drinking water aquifer. Dry wells in particular "have been sites of illegal dumping of pollutants." In addition, all surface drainage, not just shallow drainage well receiving storm water, constitute a threat to water quality. "One dry well has a solvent plume more than 2,000 feet long and more than 200 feet deep in a recharge area of South County where the only source of drinking water is groundwater." Plan p. 50. The same is true for ponds of industrial waste which percolate into the aquifer, and only since 1991 has the District had a storm water infiltration policy to prevent pollution of drinking water and since 1993 property owners are prohibited from using dry wells which threaten groundwater quality. Plan pp. 50-51.

96. Abandoned wells serve as conduits that transport contaminants into the District's drinking water aquifers. Beginning "in the mid-1980s, the District . . .actively searched for and destroyed known active wells and abandoned wells . . .within known contamination plumes." Plan p. 52.

97. That specific "areas of the groundwater basin are particularly vulnerable to contamination" namely hazardous material storage sites. Plan p. 53. Beginning in 1989 the District collected data on hazardous material storage sites, wells and hydrogeology for the purpose of groundwater protection and claims that it has developed a countywide information

system to identity anu evaluate threats to groundwater quality trum hazardous material storage sites, underground storage tank sites and petroleum storage facilities. Plan p. 53. In order to "ensure prompt and adequate cleanup" of pollution to safeguard drinking water, the District claims it recognizes the necessity of "quickly locating contamination sources." Plan p. 54.

98. In 1990, a consultant hired by Olin to evaluate the closure of its chemical operation contacted the SCVWD to learn and identify the flow of groundwater at the Olin chemical operation on Tennant Road. The consultant was advised by the District that groundwater flowed from the northwest to the southeast and that in addition the nature of the soils in the basin readily allowed the passage of waters from the surface to the depths of the aquifer.

99. The SCVWD has had, and has, the duty to provide safe and healthy groundwater, to take affirmative action to provide clean, unpolluted well water, to aggressively investigate potential sources of pollution by industrial plants and actual sources of pollution by industrial operations in Santa Clara County, including locations known to Santa Clara County, the Santa Clara County Fire District and other agencies of individuals, businesses and corporations that have dumped chemicals that are toxic to people and animals on open ground, and to take all actions to prevent the dumping of industrial wastes that threaten drinking water in Santa Clara County.

100. As a result of the SCVWD having undertaken to perform actively all of the above described duties and imposing a charge on all owners of private wells [known to the District to be the sole source of water for human consumption in the Llagas Subbasin, including the environs of San Martin] for the purpose of assuring safe, healthy and drinkable water and protecting the public health, welfare and safety, has a special relationship with all private well owners in Santa Clara County, and each of them including claimant(s) and has non-delegable duties to assure the public health, welfare and safety with drinkable water uncontaminated by potassium perchlorate, a known herbicide that is toxic to people and animals.

101. In all that it did, the SCVWD was negligent and careless in the performance of its affirmative duties and in violation of its special relationship with the private well owners upon

whom it imposed well charges. The District was literally asleep in the performance of its affirmative duties pursuant to its special relationship with private well owners and users and turned its back on private well owners and users whom it had assumed the obligation to protect by ignoring the obvious:

a. Olin Mathieson's plant used such dangerous and explosive chemicals in the manufacturing of flares on Tennant Road, an area served exclusively by private and public wells for drinking water, that on or about 1973 dangerous and toxic effluent that had been discharged onto the ground into a waste pond exploded. The explosion was of such force that it blew out windows approximately one-quarter of a mile away.

b. Olin's industrial manufacturing operation utilized massive amounts of toxic chemicals, including many chemicals known to the State of California to cause cancer, and that the manufacturing of flares was chemical intensive.

c. The Morgan Hill Fire Department and later the Central Fire District conducted routine inspections of the Olin facility for the purpose of identifying all chemicals which would present a risk to firefighters and that such inventories always showed large amounts of potassium perchlorate, phosphorous, styrene and methylene chloride in use at the plant. At all relevant times these records of inspections and inventories were available as public records to anyone upon request.

d. The same fire records confirm widespread dumping of toxic chemicals into a drainage pond which could only contaminate the soft clay aquifer and the Llagas Creek aquifer which sits below the Olin flare manufacturing and dumping site. Under no circumstances would years of dumped effluent from Olin's flare manufacturing operation evaporate or merely sit on the surface in an unlined pond. The only way it could go was down into the aquifer.

e. In addition, the public record for permits for hauling hazardous substances confirmed the chemicals in use at the Tennant Road site.

f. Despite public knowledge of the dumping of toxic industrial waste into a waste pond in an area served exclusively by well water, the SCVWD allowed the dumping of toxic chemicals hazardous close to human life by Olin to continue unimpeded for decades and which

has created one of the most massive plumes of polluted well water in the United States a mile wide and six miles long, a pollution plume of undrinkable water that is growing every day and one that will take 30 to 50 years to cleanup.

102. To its shame all of the foregoing misconduct and damage occurred under the "nose," oversight, and operational control of the SCVWD which has the responsibility for making sure that a tragedy of this colossal proportion does not occur, especially after the District suffered the embarrassment of the IBM/Fairchild TCE pollution of the Great Oaks Water Company that impacted hundreds of well water families. No one ever imagined the SCVWD would be so incompetent as to "top" that fiasco by allowing the pollution of hundreds, upon hundreds of wells in San Martin by Olin's well known chemical operation.

103. Making the situation worse, despite the public records available in Santa Clara County confirming that Olin dumped toxic chemicals into a waste pond, the SCVWD at no time before January, 2003 ever tested as part of its regular monitoring program for the presence of traces of any of the toxic chemicals used by Olin in its flare manufacturing business.

104. Since the public acknowledgment of dangerous levels of potassium perchlorate in private wells south of the Olin plant and identification of a gigantic plume of pollution that is more than six miles long, the SCVWD has compounded its negligence and carelessness and further violated its affirmative duties to private well owners and its special relationship with private well owners and users by:

a. Continuing to impose a well charge for polluted water that is not safe or healthy for drinking;

b. By falsifying its reports of perchlorate levels in well water by using an artificially reporting cutoff of 4 ppb when at all times the SCVWD has had available to it the ability to test water to .8 ppb and in fact has obtained reports of actual concentrations at significant levels in excess of the EPA's recommended action level of 1 ppb but below 4 ppb, and has concealed the true test results from private well owners. This falsification of test results has had the potential for causing serious harm, when all the SCVWD had to do was to report the actual known and reported test levels of perchlorate and to require that all well water be tested to .8 ppb. Instead

the SCVWD has advised well owners and users that wells with reportable levels of perchlorate above 1 ppb, but below 4 ppb, are "non-detect." In fact the term "non-detect" does not mean that a given well water sample does not contain perchlorate but only means that the SCVWD has ordered tests which automatically report a perchlorate level of less than 4 ppb as "non-detect." Lying to the public, after its dismal failure to properly test groundwater, to pro-actively inspect and control industrial chemical manufacturing operations that dump effluent into open ponds which have exploded and not monitoring water to assure it is healthy and safe to drink, is unforgivable and shameful.

c. By not admitting and acknowledging that private well owners are entitled to know the actual level of perchlorate in their drinking water and not be lied to by being told a well is "non-detect" when it contains measurable amounts of potassium perchlorate at dangerous levels.

d. This misconduct is all the more reprehensible in that the District knows that perchlorate interferes with the thyroid which controls growth, development and metabolism. Small changes in maternal thyroid hormone levels during pregnancy have been associated with reduced IQs. Fetuses, infants and children who experience greater changes in hormone levels may suffer permanent retardation, loss of hearing and speech, or deficits in motor skills. EPA 1998; Brechner 2000. Women whose levels of a particular thyroid hormone measured in the lowest 10 percent of the population during the first trimester of pregnancy were more than 2.5 times as likely to have a child with an IQ of less than 85 and five times as likely to have a child with an IQ of less than 70. Haddow 1999. This was true whether or not these women were hypothyroid. Many had thyroid hormones in the normal range. Pop et al. 1999. Mammalian toxicity of perchlorate was demonstrated as early as 1897, at least in a variety of animals. Further publications on its toxicity in animals occurred in 1936 and 1938. The potent effect of perchlorate on thyroid function (inhibiting iodide uptake) was first demonstrated in animals and humans in 1952. In the early 1960's, with widespread use of perchlorate, severe and fatal toxic reactions (agranulocytosis, aplastic anaemia) began to be reported and led to the discontinuation of perchlorate use. Perchlorate concentrations of 1 ppb [0.01 micrograms per kilogram] in drinking water a day induces significant effects on the levels of thyroid hormones in the mother,

fetus and offspring ot laboratory animals. Crofton 2001. Similar low dose studies have found "a large number of significant effects" on brain and thyroid structure. Argus 2001; EPA 2002. The Arizona Department of Health Services found a significant increase in abnormal levels of a thyroid hormone in infants whose mothers drank perchlorate tainted water from the Colorado River during pregnancy as compared to mothers who had not. Brechner et al. 2000. A study of California newborns found that low levels of perchlorate affect infant thyroid hormone levels. Looking at all infants bom in California in 1996 and comparing the hormone levels of infants whose mothers had drunk perchlorate-contaminated water to those whose mothers had not, the study found a statistically significant effect on infant thyroid hormone levels at perchlorate exposure of 1 to 2 ppb. The effects were more pronounced at higher dose levels. Schwartz 2001.

105. As a direct, proximate and legal cause of the negligence and carelessness of the SCVWD, Plaintiffs have suffered the devaluation of their homes, commercial and agricultural property and the loss of enjoyment of use of such properties, including restraints on, and the inability to, refinance mortgages, all as a result of widespread pollution of drinking water with potassium perchlorate leaching into the drinking water aquifer of the Llagas Subbasin from an industrial chemical flare manufacturing operation conducted by Olin Corporation on Tennant Road, Santa Clara County California.

WHEREFORE, Plaintiffs pray for relief as follows:

1. That judgment be entered in favor of the Plaintiffs;

2. Relief in the form of an order requiring Defendants to remediate the groundwater contamination as alleged herein;

3. Relief in the form of a judicial determination and declaration of the rights of Plaintiffs and the corresponding responsibilities of Defendants;

4. Attorney's fees, expenses and costs of this suit;

5. For damages, according to proof, including general damages, treble damages, and exemplary and punitive damages;

6. For interest, including pre-judgment and post-judgement interest, as permitted by law; and

7. Such additional relief as this Court deems necessary, just and proper.

Dated: 10/20/03

ALEXANDER, HAWES & AUDET, LLP

By: ______________________
Richard Alexander
Jeff Rickard
Ryan M. Hagan
Attorneys for Plaintiffs

**DEMAND FOR JURY TRIAL**

Plaintiffs, GLEN WEBB and GAIL WEBB, hereby demand(s) a trial by jury.

Dated: 10/20/03

ALEXANDER, HAWES & AUDET, LLP

By: ______________________
Richard Alexander
Jeff Rickard
Ryan M. Hagan
Attorneys for Plaintiffs

EXHIBIT A-1

# SUMMONS
*(CITACION JUDICIAL)*

FOR COURT USE ONLY

NOTICE TO DEFENDANT: *(Aviso a Acusado)*
OLIN CORPORATION, a corporation; STANDARD FUSEE CORPORATION, a corporation; ORION SAFETY PRODUCTS, a corporation; SANTA CLARA VALLEY WATER DISTRICT; and DOES 1 through 50, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(A Ud. le esta demandando)*

GLEN WEBB and GAIL WEBB

You have 30 *CALENDAR DAYS* after this summons is served on you to file a typewritten response at this court.

A letter or phone call will not protect you; your typewritten response must be in proper legal form if you want the court to hear your case.

If you do not file your response on time, you may lose the case, and your wages, money and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

***Después** de que le **entreguen** esta **citación** judicial **usted** tiene **un plazo** de 30 **DIAS CALENDARIOS** para **presentar** una **respuesta** escrita a maquina en esta **corte.***

*Una **carta** o una llamada **telefónica** no le **ofrecerá** **protección;** su respuesta escrita a maquina tiene que cumplir con las **formalidades legales apropiadas** si usted **quiere** que la corte escuche su caso.*

*Si usted no **presenta** su respuesta a tiempo, puede **perder** el caso, y le pueden quitar su salario, su dinero y **otras** cosas de su propledad sin aviso adicional por **parte** de la corte.*

*Existen **otros requisitos legales.** Puede que usted quiera llamar a un abogado **inmediatamente.** Si no conoce a un abogado, puede llamar a un **servicio** de refenencia de abogados o a una **oficina** de ayuda legal (vea el **directorio telefónico).***

The name and address of the court is: *(El nombre y direccidn de la corte es)*
Santa Clara County Superior Court
191 North First Street, San Jose CA 95113

CASE NUMBER: *(Numero del Caso)*
103 CV007546

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la direccidn y el numero de telefono del abogado del demandante, o del demandante que no tiene abogado, es)*
Richard Alexander, Esq. (48432)
ALEXANDER, HAWES & AUDET, LLP
152 North Third Street, Suite 600, San Jose, CA 95112
Telephone: 408.289.1776
Facsimile: 408.287.1776

Kiri Torre
Chief Executive Officer/Clerk

DATE: *(Fecha)* OCT 2 2 2003 Clerk, by *(Actuario)* B. CHOPOFF, Deputy *(Delegado)*

[SEAL]



**NOTICE** TO THE **PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

under:
- ☐ CCP 416.10 (corporation)
- ☐ CCP 416.20 (defunct corporation)
- ☐ CCP 416.40 (association or partnership)
- ☐ other:
- ☐ CCP 416.60 (minor)
- ☐ CCP 416.70 (conservatee)
- ☐ CCP 416.90 (individual)

4. ☐ by personal delivery on *(date):*

*Form* Adopted by Rule 982
Judicial Council of California
982(a)(9) [Rev. January 1, 1984]
*Judicial Council Farms for HotDocs* ™
Mandatory Form

(See reverse for Proof of **Service**)
SUMMONS

**CCP 412.20**
B&PC 21710

# EXHIBIT A-2

Richard Alexander, Esq. (48432)
Jeffrey W. Rickard, Esq. (125180)
Ryan M. Hagan, Esq. (200850)
ALEXANDER, HAWES & AUDET, LLP
152 North Third Street, Suite 600
San Jose, CA 95112
Telephone: 408.289.1776
Facsimile: 408.287.1776

Attorneys for Plaintiffs

(ENDORSED) FILED

Oct 23 11 01 AM '03

BY S. Marshall DEPUTY

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| GLEN WEBB and GAIL WEBB,<br><br>Plaintiffs,<br><br>vs.<br><br>OLIN CORPORATION, a corporation; et al.,<br><br>Defendants. | CASE NO: 103CV007546<br><br>**PROOF OF SERVICE OF SUMMONS; COMPLAINT; NOTICE TO LITIGANTS; ADR INFORMATION SHEET AND COMPLEX LITIGATION PILOT PROGRAM DEPARTMENT RULES AND PROCEDURES** |

# PROOF OF SERVICE

I, the undersigned, declare as follows. I am now and at all times herein mentioned have been a citizen of the United States, over the age of eighteen years, and not a party to the within action or cause; I am employed in Santa Clara County, California, and my business address is 152 North Third Street, Suite 600, San Jose, Santa Clara County, California.

On October 24, 2003, I served a copy of the following:

SUMMONS; COMPLAINT; NOTICE TO LITIGATIONS; AND THE SANTA CLARA COUNTY SUPERIOR COURT ALTERNATIVE DISPUTE RESOLUTION INFORMATION SHEET AND COMPLEX LITIGATION PILOT PROGRAM DEPARTMENT RULES AND PROCEDURES

______(by mail) on all parties in said action, by placing a true copy thereof enclosed in a sealed envelope in a designated area for outgoing mail, addressed as set forth below. At Alexander, Hawes & Audet, LLP, mail placed in that designated area is given the correct amount of postage and is deposited that same day in the ordinary course of business in a United States mailbox in the City of San Jose, California.

X (by personal delivery) by causing said document to be personally delivered by courier to the person(s) at the address set forth below.

____ (by Federal Express) by depositing a true copy thereof in a sealed packet for overnight delivery, with charges thereon fully prepaid, in a Federal Express collection box in San Jose, California.

____ (by facsimile transmission) by transmitting said document(s) from our office facsimile machine (408.287.1776) to facsimile machine number(s) shown below. Following transmission, I received a "Transmission Report" from our facsimile machine indicating that the transmission had been transmitted without error.

Randall C. Creech
CREECH, LIEBOW & KRAUS
99 Almaden Boulevard, Eighth Floor
San Jose, CA 95113
Ph: 408.993.9911
Fx: 408.993.1335
*Attys. for Defendant, Olin Corporation*

Keith M. Casto
Earl L. Hagstrom
Sedgwick, Detert, Moran & Arnold
1 Embarcadero Center, 16th Floor
San Francisco, CA 95111-3628
Ph: 415.627.6951
Fx: 415.781.2635
*Attys. for Defendants, Standard Fusee Corporation and Orion Safety Products*

Santa Clara Valley Water District
5750 Almaden Expressway
San Jose, CA 95118
*Def. Santa Clara Valley Water District*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Declaration was executed on 10/28/03, at San Jose, California.

Corene Abrego
Corene Abrego

# PROOF OF SERVICE

I, the undersigned, declare as follows. I am now and at all times herein mentioned have been a citizen of the United States, over the age of eighteen years, and not a party to the within action or cause; I am employed in Santa Clara County, California, and my business address is 152 North Third Street, Suite 600, San Jose, Santa Clara County, California.

On October 30, 2003, I served a copy of the following:

PROOF OF SERVICE RE: SUMMONS; COMPLAINT; NOTICE TO LITIGATIONS; AND THE SANTA CLARA COUNTY SUPERIOR COURT ALTERNATIVE DISPUTE RESOLUTION INFORMATION SHEET AND COMPLEX LITIGATION PILOT PROGRAM DEPARTMENT RULES AND PROCEDURES

V

_A_ (by mail) on all parties in said action, by placing a true copy thereof enclosed in a sealed envelope in a designated area for outgoing mail, addressed as set forth below. At Alexander, Hawes & Audet, LLP, mail placed in that designated area is given the correct amount of postage and is deposited that same day in the ordinary course of business in a United States mailbox in the City of San Jose, California.

______(by personal delivery) by causing said document to be personally delivered by courier to the person(s) at the address set forth below.

______(by Federal Express) by depositing a true copy thereof in a sealed packet for overnight delivery, with charges thereon fully prepaid, in a Federal Express collection box in San Jose, California.

______(by facsimile transmission) by transmitting said document(s) from our office facsimile machine (408.287.1776) to facsimile machine number(s) shown below. Following transmission, I received a "Transmission Report" from our facsimile machine indicating that the transmission had been transmitted without error.

Randall C. Creech
CREECH, LIEBOW & KRAUS
99 Almaden Boulevard, Eighth Floor
San Jose, CA 95113
Ph: 408.993.9911
Fx: 408.993.1335
*Attys. for Defendant, Olin Corporation*

Keith M. Casto
Earl L. Hagstrom
Sedgwick, Detert, Moran & Arnold
1 Embarcadero Center, 16th Floor
San Francisco, CA 95111-3628
Ph: 415.627.6951
Fx: 415.781.2635
*Attys. for Defendants, Standard Fusee Corporation and Orion Safety Products*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Declaration was executed on 10/30/03 at San Jose, California.

Corene Abrego

# EXHIBIT B

Randall C. Creech, Esq. (SBN 65542)
CREECH, LIEBOW & KRAUS
99 Almaden Boulevard, Eighth Floor
San Jose, California 95113
Telephone: 408-993-9911
Facsimile: 408-993-1335

Attorneys for Defendant Olin Corporation

Keith M. Casto, Esq, (SBN 141279)
Earl L. Hagström, Esq. (SBN 150958)
Sedgwick, Detert, Moran & Arnold LLP
1 Embarcadero Center 18th Floor
San Francisco, CA 94111-3628
Telephone: 415-781-7900
Facsimile: 415-781-2635

Attorneys for Defendants Standard Fusee Corporation
d/b/a Orion Safety Products

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GLEN WEBB and GAIL WEBB,<br><br>Plaintiff,<br><br>vs.<br><br>OLIN CORPORATION, et al.,<br><br>Defendants. | Civil Action No. ________________<br><br>**DECLARATION OF RANDALL C. CREECH** |

I, Randall C. Creech, declare as follows:

1. I am a partner at the law firm of CREECH, LIEBOW & KRAUS in San Jose, California. Olin Corporation has retained this firm for the defense of this action. I have personal knowledge of the matters set forth herein and am competent to testify thereto.

2. On November 11, 2003, I obtained from the office of the Santa Clara County Assessor a copy of the most recent tax assessment for the land and improvements for the

property identified by Plaintiff(s) in the Complaint. The assessment was obtained from an electronic database (Property Assessment Information System), available to the public on the Internet. The document was obtained from an electronic database by selecting the property by the street address which was identified by Plaintiff(s) in the Complaint. A true and correct copy of the materials obtained from the Santa Clara County Assessor is attached hereto as Attachment 1.

3. Plaintiff(s) Glen Webb and Gail Webb allege ownership of property located at 14220 Sycamore Avenue, San Martin, California (Complaint, ¶ 5). As set forth in Attachment 1, the Santa Clara County Assessor has assessed the Full Cash Value of the land and improvements at this address to be $406,238.

I declare under penalty of perjury, under the laws of the State of California, that the forgoing is true and correct, and if called upon to testify, I could and would competently do so.

Executed this 21st day of November, 2003, at San Jose, California.

RANDALL C. CREECH

Data as of 11/09/200

Santa Clara County Assessor's Office
Assessment Roll Information Inquiry and Retrieval

Assessment Roll Information for Tax Year 2003 : APN: 825-17-030

DISCLAIMER:
This service has been provided to allow easy access and a visual display of County information. A reasonable effort has been made to ensure the accuracy of the data provided; nevertheless, some information may be out of date or may not be accurate. The County of Santa Clara assumes no responsibility arising from use of this information. ASSOCIATED DATA ARE PROVIDED WITHOUT WARRANTY OF ANY KIND, either expressed or implied, including but not limited to, the implied warranties of merchantability and fitness for a particular purpose. Do not make any business decisions based on this data before validating the data. [Revenue and Taxation Code Section 408.3(c)]

| Situs Address and **Mailing** Address Information | |
|---|---|
| Number of Property Address(es): 1 | Billing Address(es): |
| 14220 Sycamore Av<br>San Martin | 14220 Sycamore Av<br>San Martin Ca 95046-9300 |

| Property Information | | | |
|---|---|---|---|
| Document No. | 11209836 | Transfer Date | **01 / 23 / 1992** |
| Document Type | Grant Deed | Tax Default Date | n/a |

| Tax Rate Area: 87-002 | |
|---|---|
| Morgan Hill \ Unified School 1 | Gavilan Jt(35,43) [ Comm. College 1 |
| Loma Prieta Soil \ Resource Consv. 1 | Gavilan f Water Consv. ] |
| Bay Area Jt(1,7,21,28,38,41,43,48,49,57) [Air Quality Mgmt. ] | South Santa Clara [ Fire Protection ] |
| Area No. 01 (Library Services) [ County Service ] | Area No. 01, Library Benefit Assessment [ County Service ] |
| Santa Clara Valley [ County Water ] | Santa Clara Valley-Zone S-1 [ County Water ] |
| Santa Clara County Importation [ Water-Misc. ] | |

Assessed Values **on: 825-17-030** (Assessed Information as of **6/30/2003**)

| Real Property | | Business | | Exemptions | | Net Assessed Value |
|---|---|---|---|---|---|---|
| Land | $ 209,393 | Fixtures | $ 0 | Homeowner | $ 7,000 | |
| Improvements | $ 196,845 | Structure | $ 0 | Other | $ 0 | |
| | | Personal Prop. | $ 0 | | | |
| Total | $ 406,238 | | $ 0 | | $ 7,000 | $ 399,238 |

EXHIBIT 1