KEVIN O'CONNELL (California State Bar No. 31043)
[koconnell@manatt.com]
MANATT, PHELPS & PHILLIPS, LLP
11355 West Olympic Boulevard
Los Angeles, California 90064-1614
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

IRWIN P. ALTSCHULER (Appearance *Pro Hac Vice* Pending;
D.C. Bar No. 943894)
[altschuleri@gtlaw.com]
GREENBERG TRAURIG, LLP
Suite 500
800 Connecticut Avenue, N.W.
Washington, District of Columbia 20006
Telephone: (202) 331-3100
Facsimile: (202) 331-3101

*Attorneys for Amicus*
INTER-AMERICAN TROPICAL TUNA COMMISSION
("IATTC")

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT**

**SAN FRANCISCO DIVISION**

EARTH ISLAND INSTITUTE, etc., et al.,

Plaintiffs,

vs.

DONALD EVANS, Secretary of Commerce; and WILLIAM T. HOGARTH, Assistant Administrator for the National Marine Fisheries Service,

Defendants.

**E-FILING**

**CASE NO.** C-03-0007-TEH

**INTER-AMERICAN TROPICAL TUNA COMMISSION AMICUS MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Hearing Date: March 29, 2004
Time: 10:00 a.m.
Courtroom: 12

The Honorable Thelton E. Henderson



Dockets.Justia.com

## TABLE OF CONTENTS


Page

1. Introduction .......... 1
2. The Scientific Process .......... 3
3. Direct Mortality Caused By The Fishery Does Not Have A Significant Adverse Impact On Any Depleted Dolphin Stock .......... 5
4. The Only Quantifiable Scientific Data On Levels Of Indirect Mortality Show That The Fishery Is Not Having A Significant Adverse Impact On Any Depleted Dolphin Stock .......... 7
5. The Science And Indirect Mortality -- General .......... 8
6. The Science Regarding Dolphin Abundance, Impacts On The Populations, And What Is Needed For The "Recovery" Of The Stocks Is Wanting And Contains Many Assumptions ..........
7. The Science Does Not Show That Mother-Calf Separation Substantially Increases The Level Of Indirect Dolphin Mortality .......... 17
8. There Is No Credible Scientific Evidence That Stress Is Causing Significant Unobserved Mortality .......... 18
9. The Secretary Performed The Required Research .......... 20
10. The Opinions Of Commerce Staff Do Not Constitute Scientific Evidence .......... 21
11. The IATTC's Role In The Process Was Mandated By The Statute .......... 21
12. Conclusion .......... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Greenpeace Action v. Franklin*,
14 F.3d 1324 (9th Cir. 1993) .... 4

## STATUTES AND REGULATIONS

16 United States Code § 1385(g) .... 1

Department of Commerce, Taking and Importing of Marine Mammals; Decision Regarding the Impact of Purse-Seine Fishing on Depleted Dolphin Stocks", 68 Fed. Reg. 2010 (2003) .... passim

## OTHER AUTHORITIES

Angell, Dr. Marcia, *Science on Trial* (1996) at 92 & 94 .... 4

Feynman, Richard, *The Meaning of It All* (1998) at 76-77 .... 4

IATTC Scientific Report, AR 892 at 5764 .... passim

New England Journal of Medicine (Dec. 1975), quoted in Oxford English Dictionary CD-ROM (1999) .... 23

*Report of the Scientific Research Program Under the International Dolphin Conservation Program Act* (Sept. 17, 2002), AR 862 at 550 .... 7, 12, 13, 16

Tyler, Patrick E., *Leaders Sought a Threat. Spies Get the Blame*, N.Y. Times, February 1, 2004, § 4 (Week in Review), p. 3 .... 4

## MEMORANDUM OF POINTS AND AUTHORITIES

### 1. Introduction.

The Inter-American Tropical Tuna Commission ("IATTC") respectfully requests the Court's leave to file this Amicus Memorandum of Points and Authorities in Support of the Federal Defendants' Motion for Summary Judgment.

The key to this case—its center of gravity—is the science. What does the science show: it shows that the Secretary's Final Finding is correct.

True science has two characteristics: (1) it relies on observed fact; (2) it deals in probabilities, not possibilities. Junk science also has two characteristics: (1) it deals in possibilities, not probabilities; (2) it reaches conclusions that are more encompassing than the evidence will support.

The statute (16 U.S.C. § 1385(g)) commands the Secretary:

> "[T]he Secretary shall . . . make a finding regarding whether the intentional deployment on or encirclement of dolphins with purse seine nets is having a significant adverse impact on any depleted dolphin stock in the eastern tropical Pacific Ocean."

The science required to answer this question breaks down into two components: (1) the scientific evidence concerning direct mortality of dolphins caused by the fishery and (2) the scientific evidence concerning any indirect mortality of dolphins caused by the fishery. The scientific evidence concerning the first component (direct mortality) is clear: the fishery is <u>not</u> having a significant adverse impact on any depleted dolphin stock. The scientific evidence concerning the second component (indirect mortality) is inconclusive: what evidence exists is largely negative and its interpretation highly speculative and intensely contested by scientists. In making his decision, the Secretary started with the known: the science clearly demonstrates that direct mortality caused by the fishery is not

having a significant adverse impact on any depleted dolphin stock. Accordingly, that component of the science required a finding of no significant adverse impact.

Turning to the second component of the science, indirect mortality, the Secretary first examined what quantifiable evidence there was on indirect mortality; that evidence showed that the fishery was not having a significant adverse impact. Then the Secretary turned to the remaining evidence on indirect mortality. That evidence was inconclusive but what there was indicated that indirect effects caused by purse-seine fishing are not impacting dolphins to a degree that would risk or appreciably delay recovery to optimum population levels. That being so, he logically and reasonably began with the science that is known, viz. the science on direct mortality and the science on the quantifiable evidence on indirect mortality. These showed that the fishery is having no significant adverse impact. Then the Secretary examined the remaining evidence on indirect mortality—the evidence whose interpretation is so intensely contested by scientists. The Secretary resolved those issues of interpretation—as he was entitled to do—in favor of finding no significant adverse impact. It was on that basis—the "best available science"—that the Secretary correctly made his Finding that the fishery is having no significant adverse impact.

It is of course not the role of the courts to themselves evaluate the scientific evidence. The courts' role is simply to determine whether the Secretary made a reasoned evaluation of the science. This he clearly did, and his Finding must be upheld.

Significantly, EII does not contend that direct mortality caused by the fishery is having a significant adverse impact on any depleted dolphin stock. EII ignores this component of the relevant science. Instead, EII focuses on indirect mortality; essentially EII contends that the Secretary was required to ignore the science concerning direct mortality and make his Finding solely on the science concerning indirect mortality. However, this position directly contradicts the plain language of the statute. EII's contentions assume that the statute commands the Secretary to base his Finding solely on indirect mortality that may be being caused by the fishery. But the statute (quoted above)

does <u>not</u> command the Secretary to base his Finding solely on the scientific evidence concerning any indirect mortality that <u>may</u> be caused by the fishery. Accordingly, the Secretary correctly considered both the science relevant to direct mortality and the science relevant to indirect mortality. Having done so in a reasoned manner, his Finding must stand.

**2. The Scientific Process.**

Since this case turns on the science, one must understand the nature of the scientific process. As IATTC noted in its first amicus brief, science deals in probabilities, not possibilities. This was succinctly explained by Professor Richard P. Feynman of Cal Tech, Nobel Laureate in Physics and world-famous scientist, in terms of arguments with people who believe in flying saucers:

> "They [the advocates of flying saucers] keep arguing that it is possible. And that's true. It is possible. They do not appreciate that the problem is not to determine whether it's possible or not but whether it's going on or not . . . .
>
> "[T]he problem is *not* what is possible. That's not the problem. The problem is what is probable, what is happening. It does no good to demonstrate again and again that you cannot disprove that there could be a flying saucer. We have to make a judgment about whether it is a flying saucer, whether it is reasonable, whether it is likely. And we do that on the basis of a lot more experience than whether it is just possible, because the number of things that are possible is not fully appreciated by the average individual. And it is also not clear to them how many things that are possible must not be happening. It is impossible that everything that is possible

> is happening." Richard Feynman, *The Meaning of It All* (1998) at 76-77 (emphasis Feynman's).

A second characteristic of science is its "utter reliance" on objective fact. As the executive editor of the New England Journal of Medicine (the world's leading scientific medical journal) has written:

> "Perhaps the most important hallmark of science is its utter reliance on evidence. Furthermore, the evidence must be objectively verifiable. This reliance on concrete evidence distinguishes science from all other human endeavors . . . . In science, the requirement for verifiable evidence must be met, no matter who the researchers or what their credentials. Not even Nobel laureates are permitted to base a scientific conclusion on an educated guess." Dr. Marcia Angell, *Science on Trial* (1996) at 92 & 94.

Dr. Angell emphasizes the danger in science of reaching conclusions that are more encompassing than the evidence will support. (*Id.* at 94 & 95.) She also echoes Feynman's point that true scientists deal in probabilities: "[M]edical researchers almost always speak in terms of probabilities." (*Id.* at 96.)

In contrast, nonscientists often deal in nonrelevant "possibilities". As The New York Times recently noted, the favorite expression of government intelligence analysts who do not know the answer is "The possibility cannot be excluded that ________ [fill in the blank]". (Patrick E. Tyler, *Leaders Sought a Threat. Spies Get the Blame*, N.Y. Times, February 1, 2004, § 4 (Week in Review), p. 3.) This is simply a means of claiming that the "facts" say anything one wants them to say.

The Ninth Circuit recognizes that science deals in probabilities, not possibilities. In *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1330 (9th Cir. 1993), the Department of Commerce had refused to rely upon a "possibility" that pollock fishing had a "significant impact" on the sea lion population. Affirming the Commerce decision, the Ninth Circuit

approved the use of a scientific approach rather than an approach premised on possibilities.

**3. Direct Mortality Caused By The Fishery Does Not Have A Significant Adverse Impact On Any Depleted Dolphin Stock.**

There is no dispute that direct mortality caused by the fishery is not having a significant adverse impact on any depleted dolphin stock. The Secretary's reasoned decision is contained in the Federal Register of January 15, 2003, in a document entitled "Department of Commerce, Taking and Importing of Marine Mammals; Decision Regarding the Impact of Purse-Seine Fishing on Depleted Dolphin Stocks", 68 Fed. Reg. 2010 (2003) (hereafter "DOC *Decision*" or "the *Decision*"). The *Decision* states flatly:

> "[T]he IDCP utilizes 100% observer coverage to obtain dolphin mortality information, so unlike most other fisheries around the world, dolphin mortality is enumerated rather than estimated. Based on these data [the scientific evidence considered], information regarding dolphin mortality in the fishery obtained through the IDCP, and in consideration of the opinions of the Ecosystem Expert Panel, **direct mortality does not exceed PBR, or any other appropriate mortality standard, for any of the depleted dolphin stocks**." (68 Fed. Reg. at 2015 (emphasis added).)

The DOC Decision reached this conclusion in a series of steps as follows. First, it defined the "Direct Mortality Question": "For any depleted stock, does the estimate of the total fishery-attributed dolphin mortality, obtained by adding together estimates of direct mortality and, where appropriate, quantifiable levels of indirect mortality, exceed the mortality standard considered appropriate by the Secretary?" (68 Fed. Reg. at 2015.) The *Decision* then commented:

> "Direct mortality as reported by observers is a known and easily quantifiable impact of the tuna purse seine fishery on depleted ETP dolphin stocks. To answer this question, NOAA Fisheries calculated the potential biological removal (PBR) levels for each depleted dolphin stock in the ETP. The PBR is the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population size. Direct mortality and estimates of indirect mortality (where appropriate) were compared to the PBR levels and other mortality standards for each stock. Additionally, possible changes in the carrying capacity and/or the ecosystem structure of the ETP were considered but deemed scientifically inconclusive." (*Id.* at 2015.)

The DOC *Decision* then stated:

> **"Reported levels of dolphin mortality for each stock have been very low in recent years (far less than PBR levels for approximately a decade)** . . . . For this decision, the PBR standard, an established standard of mortality, provides the best insight into the significance of reported mortality to the dolphin stocks." (*Id.* (emphasis added).)

The *Decision* then compared the most recent annual mortality estimates with the PBR levels and found them well below those levels:

> "In 2001, the most recent year for which annual mortality estimates are available, the total reported mortality was 466 eastern spinner dolphins, 656 northeastern offshore spotted dolphins, and two spotted dolphins. PBR levels

> during this same time period were for 1298 eastern spinner dolphins, 2367 northeastern offshore spotted dolphins, and 1073 coastal spotted dolphins." (*Id.*)

Thus total reported mortality for depleted stocks in 2001 was 1,124 dolphins. This compared to PBR levels of 4,738.

All of the scientific evidence agrees with these findings. For example, the *Report of the Scientific Research Program Under the International Dolphin Conservation Program Act* (Sept. 17, 2002) prepared by NOAA Fisheries (hereafter "NOAA Final Science Report") states:

> "In the last decade . . . technological and procedural improvements and the increasing skills of captains and crews have <u>reduced reported mortality to very low levels</u> relative to dolphin population sizes; currently ship-board observers report fewer than 3,000 dolphins killed per year." (NOAA Final Science Report [at 3; AR 862 at 550] (emphasis added).)

As the DOC *Decision* quoted above noted, there is 100% observer coverage in the fishery. Thus the figures for reported mortality are highly reliable: at all times there is an international, highly trained observer aboard each large purse seine vessel fishing in the EPO. If a dolphin dies during the set, it is known and counted. It is as simple as that. Because the dolphins are inside the net and the net is hauled up to the vessel, it is virtually impossible for a dead dolphin to go unseen.

**4. The Only Quantifiable Scientific Data On Levels Of Indirect Mortality Show That The Fishery Is Not Having A Significant Adverse Impact On Any Depleted Dolphin Stock.**

Science is based upon quantifiable data. As we shall detail below, there is comparatively very little quantifiable data on indirect mortality. The only quantifiable

data on indirect mortality supports the Secretary's Final Finding of no significant adverse impact. Thus the DOC *Decision* states:

> "The only source of quantifiable information on levels of indirect mortality comes from investigations into the separation of cow-calf pairs during fishing operations. Analyses of purse seine sets from 1973 to 1990, in which all killed dolphins were examined, led to the conclusion that there is some separation of calves from their mothers. Based on reasonable assumptions about length of nursing dependency, NOAA Fisheries estimated that mortality was underestimated by 10-15% for spotted dolphins and 6-10% for spinner dolphins in this sample. Reported mortality for 2001, when combined with cow-calf separation estimates, is approximately: 31% of PBR for northeastern offshore spotted dolphin and 39% of PBR for eastern spinner dolphin. There is currently no way to quantify indirect mortality for coastal spotted dolphins. Therefore, direct mortality is based on that reported by the on-board observer programs and is only 0.2% of PBR for coastal spotted dolphin. When reported mortality for 2001 is combined with the estimate of cow-calf separation, quantifiable direct mortality is well below the PBR level for each stock." (DOC *Decision*, 68 Fed. Reg. at 2015 (emphasis added).)

**5. The Science And Indirect Mortality -- General.**

The other scientific evidence concerning indirect mortality is highly speculative and hotly contested by scientists; it is long on "possibilities" and short on "probabilities". This is shown in the Secretary's *Decision* when he states:

"While direct mortality from sources in the tuna fishery causes a known impact on dolphin stocks, there are **possible** means by which the fishery **could be** indirectly impacting dolphins. Therefore, an assessment of indirect effects is relevant to making the final finding. Sources of indirect mortality include cow-calf separation and **may** include other types of effects resulting from chase and capture, which **could** compromise the health of at least some of the dolphins involved. The answer to this question was based on information collected and/or evaluated by NOAA Fisheries, as well as on **opinions** of individual members of a panel of independent scientific experts in veterinary science, physiology, and other stress-related fields (the Indirect Effects Panel).

"In the aggregate, available data **suggest** the **possibility** that purse-seining activities result in indirect effects that negatively impact dolphins. However, available data are **insufficient** to determine whether the fishery is causing indirect effects of sufficient magnitude to either risk recovery or appreciably delay recovery. Completed research has included a combination of field experiments, retrospective analyses, direct observation, and mathematical modeling, to address a broad range of stress-related effects and other factors that **might** lead to unobserved dolphin mortalities. These data, however, are **insufficient** to quantify potential population-level impacts or determine whether population recovery **might** be delayed, because sample sizes were small and baseline data unavailable . . . .

"Notwithstanding these data limitations, NOAA Fisheries examined specific indirect effects that **may** negatively impact dolphin stocks. Specifically, NOAA Fisheries examined the **possibility** that cow-calf pairs are separated during chase and encirclement, causing the subsequent death of the calf. Analyses of purse-seine sets suggests that some separation occurs. However, more conclusive mortality estimates relative to chase do not exist, as direct observations currently are not feasible. Additional mortality associated with separation is **possible** in instances where dolphins are chased but not encircled. However, mortality estimates relative to chase do not exist, as direct observations are not feasible. Even if correct, estimates of confirmed indirect dolphin mortality due to cow-calf separation do not substantially increase the total levels of mortality for each stock.

"Additionally, NOAA Fisheries investigated the frequency with which the fishery interacts with individual dolphins and with the dolphin stocks as a whole each year . . . . NOAA Fisheries estimated that a northeastern offshore spotted dolphin is chased 10.6 and encircled 3.2 times, an eastern spinner dolphin is chased 5.6 and encircled 0.7, and a coastal spotted dolphin is chased 2.0 times and encircled 0.3 times per year on average. Unfortunately, there is much **uncertainty** surrounding these statistically estimated averages. Moreover, there are **insufficient data** to determine the impact of stress and other chase-related effects on dolphin populations . . . .

"Experts noted that there is **inadequate information** to make a determination on the existence or extent of indirect effects, as they relate to dolphin recovery. To assist the Secretary in answering this difficult question, a panel of five experts was asked to address the issue of indirect mortality. All five expert panelists indicated that indirect fishery effects, especially cow-calf separation and increased likelihood of predation, **may** account for the lack of expected dolphin recovery. The strength of their opinions **varied greatly**, however, noting the large amounts of **uncertainty** in the data. The IATTC noted that indirect effects (such as cow-calf separation, elevated stress hormones and enzymes, and heart damage) are **speculative**, given the absence of adequate data. The MMC provided no additional studies, but agreed that ' . . . **existing information does not provide a sufficient basis for quantifying any increased levels of mortality** that occur during chase operations, reproductive failure resulting from stress, facilitated predation, post-release capture myopathy, or disruption of the tuna-dolphin bond.'

"In sum the available information on indirect effects, including much of the information regarding cow-calf separation, is **limited**, **and therefore bars** population-level inferences of the effects of stress on dolphin stocks. Additional research is necessary to better understand these more complex effects on dolphin stocks. Accordingly, **the best available information**, including data on sets per year, mortality attributable to the fishery, indicators of stress in blood, skin and other tissues, cow-calf separation, the Expert

> Panel opinions, and other relevant information, indicates that **indirect effects caused by purse-seine fishing are not impacting dolphins to a degree that would risk or appreciably delay recovery to optimum population levels."** **(**DOC *Decision*, 68 Fed. Reg. at 2015-16 (all emphasis added).)

At the same time, the Record contains evidence that stress and other alleged possible causes of indirect mortality are not having significant effects. For example, the NOAA Final Science Report (at 71) indicates that "several additional lines of investigation" were conducted to address the question of stress and the shortcomings of data including the necropsy study. Among those other lines of investigation, the Report (at 72) indicates that Dr. Edwards' analysis of "energetics models" implied "that fishing activities probably do not significantly increase daily energy costs for spotted dolphins in the ETP".

Likewise, data from aerial photographs of dolphin schools did not show any trend in the proportion of calves to adult dolphins: "No trend in the proportion of juvenile animals was detected between 1987 and 2000". (NOAA Final Science Report at 73.) Another study involving the examination of dolphin skin, a "novel method", yielded "contradictory findings" and was rejected as requiring "further validation". (*Id.* at 72.)

Thus, quite apart from whether the necropsy study was adequate scientifically, other types of studies conducted to assess the impact of stress did not support the conclusion that the fishery had a significant impact on dolphin. Similarly, analysis of blood samples "did not reveal any notable abnormalities in the captured and recaptures dolphins". (*Id.* at 73-74.)

Analysis of skin and core body temperatures indicated "that dolphins appear to be able to regulate body temperatures during chases". (*Id.*) Analysis of movement patterns established that "dolphins are familiar with purse seine operations and can anticipate backdown for release from the net". (*Id.* at 74-75.) Analysis of pregnancy status and

reproductive hormone levels produced “no evidence” to suggest the loss of a fetus during captures or any change that would affect pregnancy or sperm production. (*Id.* at 75.)

In short, many of the studies performed to measure the “unobserved” stressors on dolphins strongly supported the Secretary’s Finding. Therefore, even if other data created a “possibility” of stress-induced effects, the Secretary properly balanced the record evidence.

**6. The Science Regarding Dolphin Abundance, Impacts On The Populations, And What Is Needed For The “Recovery” Of The Stocks Is Wanting And Contains Many Assumptions.**

First, the determination of the current dolphin populations is based upon a research vessel survey. By its very nature, trying to estimate the number of dolphins living in an ocean area the size of the United States, typically using only two research ships, is daunting and difficult. The analysis of the data involves a number of assumptions and has led to highly variable estimates. The IATTC had some concerns about the analysis of the research vessel survey data, and in particular the reported precision of the population estimates, which it listed in its IATTC Scientific Report presented to the Secretary. (See IATTC Scientific Report [at 1; AR 892 at 5764].)

Once one has estimated as best one can the current dolphin populations, the current status of dolphin stocks must be compared with earlier levels to determine if they are growing. But the size of the stocks many years ago, before the fishery began, is unknown. A high degree of guesswork, based on assumptions, is involved in determining these past population levels. But these assumptions about the status of the stocks over 40 years ago drive the conclusions reached about whether “recovery” to these hypothetical levels is occurring. (IATTC Scientific Report [at 3; AR 892 at 5766].)

The high mortality estimates from the early years of the fishery (1959-1972) are based on extrapolations from a small sample of 20 fishing trips. Only three of those were made before 1971, and the data from them were not collected in the framework of a

scientific sampling scheme. Thus, the analysis of whether stocks are recovering hinges on data judged to be of "little or no statistical value" by a committee convened by the National Academy of Sciences of the United States (National Research Council 1992) to review scientific and technical information relevant to the fishery. (*Id.*) This committee assessed the early mortality estimates as follows:

> "Few data are available for the early years of the fishery (Lo and Smith, 1986). Former crewmembers who were concerned about high dolphin mortality provided data for the first two trips, and a government observer provided data for the third. Thus the data do not come from any valid sampling design. Trips were not selected at random or according to any pattern. The accuracy of the data is questionable because no standard procedure was used to collect information, and interpretation of the data cannot be determined to be correct. Estimating the standard errors is especially difficult . . . .
>
> "In summary, the mortality estimates for the period before 1973 (peak values of up to 350,000-653,751 in a year by Perrin, 1968, 1969; Smith, 1979, 1983; Lo and Smith, 1986) **have little or no statistical value**, and the only conclusion that can be based on the data available is that mortality was very high. After a long hearing, the administrative law judge, Hugh Dolan, concluded that many errors had caused dolphin mortality to be seriously overestimated and dolphin abundance to be seriously underestimated by SWFSC in the 1960s and 1970s (Dolan, 1980).

> "Nonetheless, these mortality data were used to calculate estimates of dolphin abundance for 1959-1970; these estimates were used later to conclude that some stocks of dolphins were depleted or were at a given proportion of their original abundance." (IATTC Scientific Report [at 13-14; AR 892 at 5776-5777].)

Notwithstanding these serious flaws in the data, the scientific report of the national marine fisheries service shows that, based on the research vessel survey data, the populations of northeastern spotted dolphins and eastern spinner dolphins are increasing slowly. The simplest and best of the NOAA models of population change shows estimates of northeastern offshore spotted and eastern spinner dolphins growing at rates of 1.7% and 1.4% per year, respectively.

More-complex models showed increasing populations of both stocks prior to 1990; after 1990, this showed stable populations of northeastern spotted and declining populations of eastern spinner dolphins. The EII has seized on the more-complex models to claim that the populations are continuing to decline.

The "two-stage" models, however, exonerate the purse-seine fishery as a cause of the decline. The highest estimates of population size were in 1988-1989 during a period of high observed fishery mortalities (over 80,000 dolphins per year) and the greatest number of sets on dolphins (about 12,000 per year).

How could the fishery be causing this decline during the 1990s? The observed mortality was declining dramatically during this period, so this could not be the cause. Unobserved mortality associated with the fishery also could not be the cause because the number of sets on tuna associated with dolphins, presumed to be the cause of any unobserved mortality to the dolphins, also declined, by about 25%. It would be incongruous if the dolphin populations could flourish and grow when subjected to the high mortalities and the greatest number of sets in the mid- to late-1980s and yet decline

once observed mortalities and the number of sets that would produce unobserved mortalities declined.

The data demonstrate that, if one accepts the models that suggest these populations are not increasing, it is not the fishery that is having an adverse effect on the populations. It should be stressed, however, that when the statements such as "dolphin populations were declining in the 1990s", or that "the time to recovery is 200 years or more", or that "the population growth rates range as low as -2%", these all refer to conclusions based on the two-stage models that exonerate the fishery as a cause of the decline.

In fact, the survey results, taken at face value, indicate that the dolphin stocks have been quite stable over the last 20 years. Also, the NOAA Final Science Report notes that for northeastern offshore spotted dolphins, none of the model runs in which fishery mortality was hypothetically increased performed better than the base model, which included actual reported mortality, and if the future mortality were set at zero, the estimated future population trajectories would be indistinguishable from those with the current mortality level projected into the future. In other words, a level of mortality equal to the current reported level has no detectable impact on the stocks. (IATTC Scientific Report [at 1; AR 892 at 5764].)

The NOAA Final Science Report compares the observed population growth rates with an "expected" maximum recovery rate of 4% per year. However, no dolphin population has been known to increase at a rate that high. Further, the law does not require a 4% recovery rate; a lower rate is acceptable, so long as the fishery is not having a "significant adverse impact". The assumption that the growth rate should be 4%, plus extrapolation from the estimated population sizes from 1979 back to 1959, using the assumed mortality rates, and the absence of any recognized (by NOAA Fisheries) environmental changes that might significantly affect dolphin stocks, leads to the speculation of an unreported mortality of thousands of dolphins. (IATTC Scientific Report [at 2; AR 892 at 5765].)

However, NOAA's Response to IATTC Letter and Scientific Report disavows any scientific necessity to the assumed 4% recovery rate:

> "In making his determination the Secretary can choose 5%, 3% or any other level he deems appropriate. As noted above 4% is the default value set in implementing the MMPA system for managing take of cetaceans. NOAA Fisheries doesn't not [sic.] contend that 4% is a required level of growth to ensure recovery." (NOAA Response to IATTC at 4.)

**7. The Science Does Not Show That Mother-Calf Separation Substantially Increases The Level Of Indirect Dolphin Mortality.**

There is speculation that mothers and calves may be separated during the chase and that the calves then may die. There is no evidence to support this contention of separation during the chase, and much evidence that refutes it from well-known observations of mammalian mothers staying with and protecting their young at the risk of their own lives to the tracking studies of female spotted dolphins with calves demonstrating that the mother-calf bond remained intact even after seven sets over seven days. The Secretary's *Decision* states (in addition to the comments quoted earlier):

> "Notwithstanding these data limitations, NOAA Fisheries examined specific indirect effects that may negatively impact dolphin stocks. Specifically, NOAA Fisheries examined the **possibility** that cow-calf pairs are separated during chase and encirclement, causing the subsequent death of the calf. Analyses of purse-seine sets suggests that some separation occurs. However, more conclusive mortality estimates relative to chase do not exist, as direct observations currently are not feasible. Additional

> mortality associated with separation is **possible** in instances where dolphins are chased but not encircled. However, mortality estimates relative to chase do not exist, as direct observations are not feasible. **Even if correct, estimates of confirmed indirect dolphin mortality due to cow-calf separation do not substantially increase the total levels of mortality for each stock**." (DOC *Decision*, 68 Fed. Reg. at 2016 (emphasis added).)

**8. There Is No Credible Scientific Evidence That Stress Is Causing Significant Unobserved Mortality.**

It has been speculated that the stress resulting from involvement of dolphins in the fishery may have an adverse effect on populations. However, the studies of dolphin necropsies showed no signs of stress in the animals that could be attributed to being chased, and the blood analyses and thermal stress analyses done in the chase-recapture experiments similarly showed no signs of stress. Dolphins that were chased, encircled, and then grabbed by swimmers and placed in a raft for blood sampling showed that the stress hormones and enzymes were at levels from which the dolphins would fully recover from chase and encirclement, and the necropsy study showed that healed heart and muscle lesions are not life-threatening and are commonly seen in dolphins in the wild that are not associated with the purse-seine fishery. (IATTC Scientific Report [at 1-2; AR 892 at 5765].)

Moreover, the NOAA Response to IATTC stated:

> "The IATTC report exaggerates the extent to which the FSR [Final Science Report] concludes that there has been stress resulting from chase and capture and the likelihood that such stress has been having population-level effects. The FSR is consistently conservative in interpreting the findings

> regarding physiological stress, and notes in a number of places that it is not possible to make population-level inferences from such limited data. In one case, in the discussion of capture myopathy as a possible cause of death for some dolphins, the FSR clearly indicated that while it is **possible** that some dolphins may experience this and die as a result, that **to date, no dolphins in this fishery have been identified as exhibiting this response.** (NOAA Response to IATTC at 3 (emphasis added).)

In sum, scant scientific evidence exists for unobserved dolphin mortality as a result of the fishery. And if there were unobserved mortality, it would have to be more than 20 times the observed mortality to explain why the populations were not growing as fast as the postulated 4%. (IATTC Scientific Report [at 3; AR 892 at 5762].)

Moreover, in considering the reasons why a faster growth rate is not occurring, one obvious answer is that changes in the ecosystem have had significant effects on those populations. The abundance data and the IATTC fishery data demonstrate that large changes have indeed occurred for other species of upper-level predators. Based on the survey data, IATTC estimated that over 200,000 more pilot whales, over 750,000 more common dolphins, over 7,000 more Bryde's whales, and more than 70% more yellowfin tuna were added to the ecosystem from 1986-2000. The increases of these populations of large predators could increase competition for fish and squid that the spotted and spinner dolphins feed upon, but, regardless, these changes make it clear that something other than the fishery has caused substantial changes in the biota of the EPO. Equally, that could affect dolphin populations, and of course changes in the abundance of other large predators are likely themselves to have affected dolphin stocks in some way. (IATTC Scientific Report [at 3; AR 892 at 5766].)

Significantly, the observations of ecosystem changes are consistent with the views of the members of the NOAA expert panel on Ecosystem Effects. All of the members of

the Panel agreed that ecosystem variation clearly could have a significant impact on dolphin populations in the eastern Pacific Ocean, and three of them perceived the changes as having a depressing effect on the populations:

> " . . . such changes provide a credible explanation for at least part of the observed slow recovery of dolphin stocks . . . . " Landry.
>
> "Consequently, the argument is persuasive that the carrying capacity of the ETP, relative to the ecologies and life histories of northern offshore spotted dolphins and eastern spinner dolphins, is lower now (and the past several or more years) than it was prior to and during the early phase of the fishery." Stewart.
>
> " . . . require that we do not rule out the possibility that the carrying capacity of the ETP for dolphins has declined and that this has affected the recovery of the population." Barber.

(IATTC Scientific Report [at 3; AR 892 at 5766].)

**9. The Secretary Performed The Required Research.**

In its motion for summary judgment, EII asserts that the Secretary again failed to comply with his congressionally mandated research obligations. This is incorrect. The research was done. This differs significantly from the previous case when some mandated research was, in fact, not done.

The law required NOAA to conduct several stress studies, including "a review of relevant stress-related research and 3-year series of necropsy samples from dolphins obtained by commercial vessels," and "an experiment involving the repeated chasing and capturing of dolphins by means of intentional encirclement" (CHESS). Congress directed that these studies "shall commence on October 1, 1997, and "shall address the question of

whether such encirclement is having a significant adverse impact on any depleted dolphin stock in the [ETP]."

This required research was done as mandated. It is correct that NOAA did not sample the 300 dolphin necropsies that it wanted to, but the law does not require that a certain number of necropsies be done. And the fact that 56 dolphins were sampled and none showed signs of stress is significant. Similarly, with respect to the CHESS studies, NOAA has noted that due to complexity and logistical difficulties, sample sizes were limited. But the experiment was conducted during August and October of 2001, and a number of dolphins were chased, captured, sampled, and recaptured, as mandated by Congress. These tests, involving blood analyses and thermal stress studies, again revealed no indication of abnormal or harmful stress due to being chased.

**10. The Opinions Of Commerce Staff Do Not Constitute Scientific Evidence.**

Unidentified Commerce staff apparently made comments in undated and unsigned briefing papers giving their personal opinions of the science. These were predecisional memos, but EII claims that such notes invalidate the Secretary's decision on the science. This is nonsense. Every large organization has lower-level staff who are constantly giving opinions and advice that their superior officers reject. The files of large law firms, for instance, are filled with memos from junior and mid-level associates giving advice that was rejected by the senior lawyers ultimately responsible for the decisions. The briefing papers in question contain no scientific evidence and certainly do not represent the considered judgments of the officials responsible for the Final Finding. In the end, it is not the opinions of Commerce staff that are important; it is the scientific data and the Secretary's assessment of the data that are crucial.

**11. The IATTC's Role In The Process Was Mandated By The Statute.**

As the Secretary's *Decision* details (DOC *Decision*, 68 Fed. Reg. at 2103 ), the Secretary was required by the statute to consider "information obtained under the IDCP"

and “other relevant information” when making the final finding. To this end, NOAA Fisheries worked with the IATTC to obtain various types of information relevant to this decision. This information included data on the number of dolphin sets made by the fishery and dolphin mortality reported by the IATTC observer program, among other things.

NOAA Fisheries also invited interested members of the public to submit such information for consideration. There was only one submission of outside scientific information by May 1, 2002, the deadline set by NOAA for scientific submissions. This consisted of a review by the IATTC of three previously published NOAA Fisheries papers on the subject of dolphin stress and other indirect effects of the tuna purse seine fishery on dolphins.

NOAA Fisheries submitted its Final Science Report to the IATTC and the MMC for their review as a mechanism by which to provide the Secretary with the best information in making the final finding. The IATTC submitted comments pertaining to the NOAA Fisheries Science Report, as well as additional information and analyses.

There was nothing improper about this; on the contrary, IATTC has deep expertise and experience in the EPO and any body that failed to consult it would have been negligent.

EII seeks to disparage IATTC’s Scientific Report on the ground that it was not peer reviewed. However, the Report was in fact peer reviewed by two eminent scientists, Professor S. Buckland of St. Andrews University, Aberdeen, Scotland, and Dr. A. Parma, Centro Nacional Patagonico, Puerto Madryn, Argentina. (See Letter from Dr. Robin Allen, the Director of IATTC, to Secretary Evans dated October 30, 2002, [at 3; AR 892 at 5763].) A NOAA reviewer of the IATTC Scientific Report complained that Professor Buckland had been “receiving financial compensation from IATTC for most of his career, including a number of years as a member of their staff”, so he could not be considered independent. (See Response to IATTC Letter and Scientific Report (hereafter “NOAA Response to IATTC”) at 1.) This is the “cursory assessment” of the IATTC Scientific

Report prepared by NOAA Fisheries, as described in the Secretary's *Decision.* The document was filed by the Federal Defendants on November 10, 2003, along with several privileged documents released pursuant to the Court's Order dated October 28, 2003. It appears to be document 939a in the Administrative Record. See letter dated November 10, 2003, from Maureen Rudolph, Esq., of the Department of Justice to counsel for EII.) However, in fact, Professor Buckland worked for IATTC for only two years and that was more than 17 years ago. Also, the IATTC had a contract with the Scottish Agricultural Statistics Service for work relating to estimating dolphin stock sizes from 1990 until 1993 when the contract was transferred to the University of St. Andrews. Professor Buckland was the principal investigator. These are not disqualifying contacts. The New England Journal of Medicine (Dec. 1975) defines peer review as follows:

> "In many departments of this Journal the reader will find reports that have passed the muster of peer review. Usually two, but occasionally three or four, experts on the topic of an article will be asked to evaluate its validity, originality and presentation." (Quoted in the Oxford English Dictionary CD-ROM (1999) (emphasis added).)

In any event the Secretary considered the IATTC Scientific Report and gave it whatever weight he determined proper. His *Decision* states:

> "NOAA Fisheries submitted its Final Science Report to the IATTC and the MMC for their review as a mechanism by which to provide the Secretary with the best information in making the final finding . . . . The IATTC submitted comments pertaining to the NOAA Fisheries Science Report, as well as additional information and analyses. NOAA Fisheries considers this information relevant, although it was not able to thoroughly evaluate and verify the information. NOAA Fisheries did, however, prepare a cursory assessment

> of the IATTC's comments for consideration. In summary, the IATTC's comments include in-depth analyses of relevant information and specific comments pertaining [to] depleted dolphin to [sic. and?] the analysis and interpretation of information by NOAA Fisheries. The IATTC's response also concludes that the fishery is not having a significant adverse impact on stocks in the ETP . . . . <u>While this information is relevant and was considered in making the finding</u>, it cannot be weighed as heavily as the information contained in NOAA Fisheries' Final Science Report." (DOC *Decision*, 68 Fed. Reg. at 2013.)

In its motion for summary judgment, EII asserts that "Mexico went to great lengths, both independently and through the Tuna Commission, to ensure that the agencies issued a determination favorable to its interests." EII presents no evidence to support its claim that Mexico used the IATTC for this purpose. It is true that a number of IATTC member countries, including Mexico, had concerns about the ODP process, were very interested in the scientific work being done, and obviously had an interest in the outcome of the finding. Mexico made its interests known to the U.S. government, through appropriate channels, which is normal diplomatic intercourse. It is also true that IATTC made its views known, through appropriate channels, on the scientific work and on the ODP (a decision-making framework). One point on the ODP which must be made, and on which the IATTC commented at the time NOAA was seeking public input on the ODP, was the inappropriateness of establishing a May 1, 2002 deadline for the presentation of scientific information. This procedural device created a situation where a scientific analysis of the NMFS scientific report, which was not concluded until September 2002, would be automatically discounted because it would not be timely. However, IATTC did complete its Scientific Report and submitted it to Secretary Evans as an attachment to Director Allen's letter to the Secretary dated October 30, 2002.

**12. Conclusion.**

We end as we began—with the science. The science is clear that direct mortality from the fishery is not having a significant adverse impact on any depleted dolphin stock. As the Secretary's *Decision* states:

> "Based on these data [the scientific evidence considered], information regarding dolphin mortality in the fishery obtained through the IDCP, and in consideration of the opinions of the Ecosystem Expert Panel, **direct mortality does not exceed PBR, or any other appropriate mortality standard, for any of the depleted dolphin stocks**." (68 Fed. Reg. at 2015 (emphasis added).)

With regard to indirect mortality, the only quantifiable evidence showed that the fishery is not having a significant adverse impact. The remaining data on indirect mortality was inconclusive, but what there was indicated that indirect effects caused by purse-seine fishing are not impacting dolphins to a degree that would risk or appreciably delay recovery to optimum population levels.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

This being the state of the science, the Secretary logically and reasonably began with the science that is known, viz. the science on direct mortality and the science on the quantifiable evidence on indirect mortality. These showed that the fishery is having no significant adverse impact. Then the Secretary examined the remaining evidence on indirect mortality—the evidence whose interpretation is so intensely contested by scientists. The Secretary resolved those issues—as he was entitled to do—in favor of finding no significant adverse impact. It was on that basis—the "best available science"—that the Secretary correctly made his Finding that the fishery is having no significant adverse impact. Accordingly, the Finding must be upheld.

Respectfully submitted,

Dated: February 23, 2004

KEVIN O'CONNELL
MANATT, PHELPS & PHILLIPS, LLP

IRWIN P. ALTSCHULER
GREENBERG TRAURIG, LLP

By: /s/ Kevin O'Connell
Kevin O'Connell
*Attorneys for Amicus*
INTER-AMERICAN TROPICAL TUNA COMMISSION ("IATTC")