Apple Inc. v. Psystar Corporation Doc. 790

DORSEY & WHITNEY LLP
David J. Brezner (SBN 38420)
Todd A. Lorenz (SBN 175950)
Theresa K. Hankes (SBN 221154)
Four Embarcadero Center, Suite 3400
San Francisco, CA 94111-4187
Telephone: (415) 781-1989

Attorneys for Plaintiff
DIONEX CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Dionex Corporation<br><br>Plaintiff,<br><br>v.<br><br>Alltech Associates Inc.<br><br>Defendant. | CASE NO.: C03-1788 SBA<br><br>Before the Hon. Saundra Brown Armstrong<br><br>**DIONEX'S OPENING BRIEF AND EVIDENCE IN SUPPORT OF CLAIM CONSTRUCTION**<br><br>**Hearing Date: May 5, 2004**<br>**Time: 9:00 a.m.**<br>**Courtroom: 3** |



Dockets.Justia.com

## TABLE OF CONTENTS

**(Page)**

**I. Introduction ..... i**

**II. Standard for Claim Construction ..... 1**

**III. Construction of Terms Found in Claims of the '615, '371 and '985 Patents ..... 2**

**A. '615 Patent ..... 2**

**1. "suppressor comprising an ion exchange resin bed" or "said first suppressor ion exchange resin bed" ..... 2**

**2. "means for applying an electrical potential through said first suppressor ion exchange resin bed to electrolyze water and regenerate said suppressor ion exchange resin" ..... 4**

**B. '371 Patent ..... 7**

**1. "suppressor bed comprising ion exchange resin" ..... 7**

**2. "suppressor bed having an inlet section and an outlet section . . . a first electrode in an aqueous solution in an electrode chamber adjacent said suppressor bed inlet section but not said suppressor bed outlet section" ..... 9**

**C. '985 Patent ..... 12**

**1. "suppressor . . . comprising an ion exchange resin bed having exchangeable ions of one charge, positive or negative, serving as a source of suppressing ions" ..... 12**

**2. "said resin bed having an inlet section and an adjacent outlet section, said suppressor defining a liquid sample stream flow path between said resin bed inlet and outlet sections" ..... 13**

**3. "at least one electrode chamber adjacent to said resin bed inlet section but not adjacent said resin bed outlet section" ..... 14**

**4. "a first electrode disposed in said one electrode chamber in electrical communication with but not in direct contact with said flow path" ..... 14**

**5. "second electrode disposed in or adjacent to said suppressor resin bed outlet section in electrical communication with said resin bed outlet section but not in or adjacent to said suppressor bed inlet section" ..... 14**

**6. "second electrode chamber . . . said second electrode being disposed in said second electrode chamber" ..... 15**

**IV. Conclusion ..... 16**

## TABLE OF AUTHORITIES

**(Page)**

**Cases**

Apex Inc. v. Raritan Computer, Inc., 187 F. Supp.2d 141 (S.D.N.Y. 2002) ........ 5

Bell Atl. v. Covad Communications, 262 F.3d 1258 (Fed. Cir. 2001) ........ 2

CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359 (Fed. Cir. 2002) ........ 2, 3

Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335 (Fed. Cir. 1998) ........ 2

Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327 (Fed. Cir. 2004) ........ 6, 8

Johns Hopkins Univ. v. Cellpro Inc., 152 F.3d 1342 (Fed. Cir. 1998) ........ 13, 14, 18

Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996) ........ 2

Renishaw PLC v. Marposs Societa' Per Azioni, 158 F.3d 1243 (Fed. Cir. 1998) ........ 3, 9, 15, 16

Tate Access v. Interface Architectural Resources, 279 F.3d 1357 (Fed. Cir. 2002) ........ 4

Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313 (Fed. Cir. 2002) ........ 11

Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193 (Fed. Cir. 2002) ........ 2

**Statutes**

35 U.S.C. § 112(6) ........ 6

## I. Introduction

Pursuant to Patent Local Rule 4-5, Plaintiff Dionex Corporation ("Dionex") submits the following opening brief and evidence in support of its construction of the asserted claims of the three patents-in-suit, U.S. Patent No. 5,773,615 ("'615 patent"), U.S. Patent No. 6,495,371 ("'371 patent"), and U.S. Patent No. 6,508,985 ("'985 patent"). The '615 patent, '371 patent, and '985 patent are attached to the Declaration of Theresa K. Hankes ("Hankes Decl.") as Exhibits ("Exs.") A, B, and C, respectively.

The claim construction issues relate to "suppressors" used in the field of "ion chromatography." The Background of the Invention section of the '615 patent provides a brief tutorial of this technology. See Hankes Decl. Ex. A, Col. 1:9 – 3:9.

## II. Standard for Claim Construction

Claim construction is a question of law that is decided by the court. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). The court's focus in construing a claim is on the objective test of what one of ordinary skill in the relevant art at the time of the invention would have understood the claim language to mean. Id. at 986. The claim language must always remain the "controlling focus" of claim construction. Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1344 (Fed. Cir. 1998); see also Renishaw PLC v. Marposs Societa' Per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim"); Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1201-02 (Fed. Cir. 2002) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.'"). Indeed, "there is a 'heavy presumption' in favor of the ordinary meaning of claim language as understood by one of ordinary skill in the art." Bell Atl. v. Covad Communications, 262 F.3d 1258, 1268 (Fed. Cir. 2001); CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002).

This heavy presumption may be overcome only where an accused infringer convincingly demonstrates that the term is ambiguous and inconsistent with the specification, that the patentee specifically limited the claim term by clearly assigning the term a different meaning, or that the patentee deliberately surrendered the meaning in distinguishing the claim language from prior art in the

prosecution history. CCS Fitness, 288 F.3d at 1366-67.

## III. Construction of Terms Found in Claims of the '615, '371 and '985 Patents

This section covers Plaintiff's proposed construction of the terms that the parties have determined should be construed by the Court. As the '371 patent and '985 patent share the same specification, where each of these terms appear, the terms should be given the same meaning for each claim.

### A. '615 Patent

#### 1. "suppressor comprising an ion exchange resin bed" or "said first suppressor ion exchange resin bed"

The above term appears in Claim 8 of the '615 patent. Plaintiff's initial construction of this and the other terms discussed in this memorandum is set forth in Section IIA of the parties' Joint Claim Construction and Prehearing Statement. While Plaintiff has made some minor revisions to its initial constructions in the interests of clarity, the Joint Claim Construction and Prehearing Statement is attached to the Hankes Declaration as Exhibit M for the Court's reference. Plaintiff's construction is clearly supported by the claim language itself-- the controlling focus of claim construction. See Renishaw PLC v. Marposs Societa' Per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim"). In Claim 8, a "suppressor comprising an ion exchange resin bed" is described and then referred to as "said first suppressor ion exchange resin bed." See Hankes Decl. Ex. A, Claim 8. Because the term "suppressor" is used to describe and modify the term "bed," it is clear from the context of the claim that the "ion exchange resin bed" claimed is an ion exchange resin bed that serves as a suppressor.

The specification of the '615 patent defines an ion exchange resin bed used for suppression as a "packed bed suppressor" and refers to four patents as describing packed bed suppressors. See Hankes Decl. Ex. A., Col. 1: 25-27 ("Suppression or stripping of the electrolyte is describe in the above prior art references [that is, U.S. Pat. Nos. 3,897,213, 3,920,397, 3,925,019, and 3,926,559] by an ion exchange resin bed commonly referred to as a packed bed suppressor. (PBS)."); Tate Access v. Interface Architectural Resources, 279 F.3d 1357, 1372 (Fed. Cir. 2002) (explaining that art considered by the examiner is intrinsic evidence for claim construction purposes). In the summary of the invention, the patent further states that "[t]he present invention relates to ion chromatography using electrochemical

regeneration of a packed bed suppressor" and that "[m]ethod and apparatus are provided using electrolytic chemical regeneration of a packed bed suppressor containing ion exchanger resin." See Hankes Decl. Ex. A, Col. 3:11-15. In the same section, the patentee equates a "packed bed suppressor" with a "suppressor with an ion exchange resin bed." See Hankes Decl. Ex. A, Col. 3:62-64 ("Apparatus is provided to perform the above packed bed suppressor methods. Such apparatus includes a suppressor with an ion exchange resin bed . . ."). In light of the guidance in Claim 8 itself and the remainder of the specification of the '615 patent, it is clear that both a "suppressor comprising an ion exchange resin bed" and a "suppressor ion exchange resin bed" are, in the context of the '615 patent, packed bed suppressors.

A potential issue is what is excluded from the scope of the terms "suppressor comprising an ion exchange resin bed" or "suppressor ion exchange resin bed." In the intrinsic record, a clear line is delineated between packed bed suppressors and membrane suppressors. The patent specification distinguishes membrane suppressors that use an ion exchange membrane for suppression from packed bed suppressors. See Hankes Decl. Ex. A, Col. 1: 65-Col. 2:1 ("A different form of a suppressor is described and published in U.S. Pat. No. 4,474,664, in which a charged ion exchange membrane in the form of a fiber or sheet is used in place of the resin bed.") and Col. 2:9 - Col. 3:6 (specifically distinguishing membrane suppressors disclosed in U.S. Pat. No. 4,459,357, U.S. Pat. No. 4,403,039, U.S. Pat. No. 4,999,098, and U.S. Pat. No. 5,248,426).

A membrane suppressor that further contains ion exchange particles between spaced membranes in a membrane suppressor is still classified as a membrane suppressor rather than a packed bed suppressor (or suppressor ion exchange resin bed). For example, in U.S. Pat. No. 5,248,426, a membrane suppressor is disclosed having "ion exchange particles packed into the flow channels" between the suppressor membranes. See Hankes Decl. Ex. D (U.S. Pat. No. 5,248,426), Col. 11:20-30. U.S. Pat. No. 5,248,426 is explicitly distinguished as a different form of suppressor in the specification of the '615 patent. See Hankes Decl. Ex. A, Col. 2:60 – Col. 3:6.

In the prosecution history, the Examiner explicitly distinguished suppressors utilizing membranes for suppression from packed bed suppressors in the Examiner's Statement of Reasons for Allowance for the '615 patent. See Hankes Decl. Ex. E ('615 patent prosecution history, Examiner's Statement of Reasons for Allowance attached to Notice of Allowability dated 11/25/97), at 3 ("Rabin et al. [J.

Chromatography vol. 640, 97-109 (1993)] and other prior art methods use electrodialysis across ion exchange membranes for suppression and are not directed to bed suppressor systems."). The Examiner's statement controls due to the fact that the patentee did not elect to object to the statement. See Apex Inc. v. Raritan Computer, Inc., 187 F. Supp.2d 141 (S.D.N.Y. 2002) ("The Examiner's reasons for allowance are absolutely binding on the patentee, absent an objection by the patentee thereto."), vacated on other grounds, 325 F.3d 1364 (Fed. Cir. 2003).

In sum, the term "suppressor comprising an ion exchange resin bed" means an ion exchange resin packed bed suppressor. A membrane suppressor, e.g. one that utilizes membrane suppressor-type membranes to suppress by electrodialysis across a membrane, is not a suppressor ion exchange resin bed even if it includes ion exchange resin.

**2. "means for applying an electrical potential through said first suppressor ion exchange resin bed to electrolyze water and regenerate said suppressor ion exchange resin"**

The above term appears in Claim 8 of the '615 patent. See Hankes Decl. Ex. A, Claim 8. The parties agree that this term is governed by 35 U.S.C. § 112(6). See Hankes Decl. Ex. F (Joint Claim Construction and Prehearing Statement).

According to the Federal Circuit, the "first step in construing a means-plus-function claim limitation is to define the particular function of the claim limitation." Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1333 (Fed. Cir. 2004). In so doing, "[t]he court must construe the function . . . to include the limitations contained in the claim language, and only those limitations." Id. The Federal Circuit further explained: "Ordinary principles of claim construction govern interpretation of this claim language." Id. at 1334.

The general function of the term in question is recited in Claim 8 as follows: "applying an electrical potential through said first suppressor ion exchange resin bed to electrolyze water and regenerate said suppressor ion exchange resin." The claim itself first requires a "water-containing eluent solution." Id. ("(a) a reservoir for a water-containing eluent solution comprising electrolyte"). As is further apparent from the language of the claim, the apparatus is designed such that the water-containing eluent solution flows sequentially through a chromatographic separating means, the suppressor and a

detector. Id. ("Apparatus for analysis of ions in a liquid sample solution comprising a reservoir for a water-containing eluent solution . . . chromatographic separating means . . . for receiving eluent . . . a suppressor in communication with said chromatographic separating means . . . a detector in communication with said suppressor"). It is the water contained in the eluent solution that flows through the chromatographic separating means and the bed that forms the antecedent basis for the water that is electrolyzed by the "means for applying an electrical potential through said first suppressor ion exchange resin bed to electrolyze water . . . ." Id. Thus, based on the claim language read in light of the '615 patent specification, the source of the water that is electrolyzed is the sample stream (eluent solution) flowing to the bed.

Further, the claim language makes it clear that (1) the application of the potential through the bed causes both electrolysis of water (in the bed) and regeneration of the bed and (2) the regeneration referred to in the subject means plus function language is accomplished using ions generated by the electrolysis of water in the bed, not by the use of ions supplied from another source such as an acid or a base. See Hankes Decl. Ex. A, Claim 8 ("applying an electrical potential through . . . resin bed to electrolyze water and regenerate said . . . resin").

The summary of the invention in the '615 patent specification is consistent with Plaintiff's claim construction, i.e., that (1) the application of the potential through the bed causes both electrolysis of water (in the bed) and regeneration of the bed and (2) the regeneration is accomplished using ions generated by the electrolysis of water in the bed, not by the use of ions supplied from another source such as an acid or base. According to the patent specification, "an electrical potential is passed through the packed bed suppressor while flowing an aqueous stream through it to electrolyze water in the stream and thereby create hydronium or hydroxide ions to regenerate the ion exchange resin." See Hankes Decl. Ex. A, Col. 3:19-23. See also id., Col. 5:37-41 ("The configuration is such that with an aqueous stream in the suppressor and the application of power, water in the aqueous stream is electrolyzed to form a source of hydronium ion or hydroxide ion to regenerate the ion exchange resin.").

The specification of the '615 patent itself further makes clear that regeneration is accomplished using ions generated by the electrolysis of water in the bed, not by the use of ions supplied from another source. In the specification, the patentee explicitly distinguished a prior art patent (U.S. Pat. No.

4,999,098) “disclos[ing] a typical regenerant solution (acid or base) flowing in the regenerant flow channels and supplied from a regenerant delivery source.” See id., Col. 2:53-55. The distinction is important as an analysis of U.S. Pat. No. 4,999,098 makes clear the difference between (1) regeneration of resin with ions supplied by electrolysis and (2) regeneration with ions supplied by a flowing acid or base from an external source. See e.g. Hankes Decl. Ex. H (U.S. Pat. No. 4,999,098), Figs. 4 and 5 (depicting these two very different membrane suppressor mechanisms for causing regeneration of the ion exchange resin in the membrane of a membrane suppressor. Figure 4 depicts an embodiment wherein electrolysis supplies the hydronium ion adjacent the membrane for regeneration. Figure 5 depicts an embodiment that does not regenerate using electricity, but rather regenerates by flowing an acid adjacent to the membrane that supplies the hydronium ion for regeneration).

The second step in construing a means-plus-function claim limitation “is to look to the specification and identify the corresponding structure for that function.” Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1334 (Fed. Cir. 2004). In making such an identification, “structure disclosed in the specification is ‘corresponding’ structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.” Id.

In the ‘615 patent, all embodiments disclosed for performing the claimed function involve two spaced electrodes flanking a suppressor bed. See Hankes Decl. Ex. A, Col. 7:14-19 (“An important feature of the suppressor is the use of means for applying an electrical potential across the ion exchange resin. Any number of configurations may be employed so long as the potential is applied to a significant part of the resin for efficient regeneration. In that regard, the anode and cathode should be spaced apart with the majority of the ion exchange resin disposed therebetween”). See also id., Col. 5: 33-35 (“Electrodes, in a form to be described below, are spaced apart in the suppressor with the ion exchange resin disposed between them). There is no disclosure of any membrane suppressor-type membranes between the electrodes and the suppressor bed.

In order to perform the claimed function, the electrodes must be capable of being coupled to a power supply. See id., Col. 5:36-40 (“The configuration is such that with an aqueous stream in the suppressor and the application of power, water in the aqueous stream is electrolyzed to form a source of hydronium ion or hydroxide ion to regenerate the ion exchange resin.”).

For all of the reasons discussed above, the function of the term "means for applying an electrical potential through said first suppressor ion exchange resin bed to electrolyze water and regenerate said suppressor ion exchange resin" is electrolyzing water from the sample stream flowing to the suppressor bed to regenerate the suppressor ion exchange resin using ions supplied by electrolyzing water, not supplied by an acid or a base from an external source. The corresponding structure is two spaced electrodes adjacent to a suppressor ion exchange resin bed, with no intervening membrane suppressor-type membrane; the electrodes are capable of being coupled to a power supply to apply an electrical potential through the suppressor bed to electrolyze water from the sample stream flowing to the suppressor bed to generate hydronium ions and hydroxide ions to convert the exchangeable electrolyte counter-ions to hydronium or hydroxide ions and regenerate the ion exchange resin in the suppressor bed.

**B. '371 Patent**

**1. "suppressor bed comprising ion exchange resin"**

The above term appears in Claim 1 of the '371 patent. An analysis of the claim language itself -- the controlling focus of claim construction – reveals that the "ion exchange resin bed" claimed is an ion exchange resin bed that serves as a suppressor because the term "suppressor" is explicitly used in the claim to describe and modify the term "bed." <u>See</u> <u>Renishaw PLC v. Marposs Societa' Per Azioni</u>, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim"); Hankes Decl. Ex. A, Claim 1 (a "suppressor bed comprising an ion exchange resin" is described and the referred to as "said suppressor bed").

Like the specification of the '615 patent (as described above), the specification of the '371 patent defines an ion exchange resin bed used for suppression as a "packed bed suppressor" and refers to the same four patents as describing packed bed suppressors. <u>See</u> Hankes Decl. Ex. B, Col. 1: 25-28 ("Suppression or stripping of the electrolyte is describe in the above prior art references [that is, U.S. Pat. Nos. 3,897,213, 3,920,397, 3,925,019, and 3,926,559] by an ion exchange resin bed commonly referred to as a packed bed suppressor. (PBS)."). In the description of the invention, the patent further states that "[i]n general, the present invention relates to ion chromatography using continuous electrochemical regeneration of a packed bed suppressor" and that "[m]ethod and apparatus are provided using electrolytic

regeneration of a packed bed suppressor containing ion exchange resin." See Hankes Decl. Ex. B, Col. 7:45-49. In the same section, the patentee equates a "packed bed suppressor" with a "suppressor with an ion exchange resin bed." See Hankes Decl. Ex. B, Col. 8:10-12 ("Apparatus is provided to perform the above continuously regenerated packed bed suppressor methods. Such apparatus includes a suppressor with an ion exchange resin bed . . ."). In light of the guidance in Claim 1 itself and the remainder of the specification of the '371 patent, it is clear that a "suppressor bed comprising an ion exchange resin" or "said suppressor bed" is, in the context of the '371 patent, a packed bed suppressor.

A potential issue is what is excluded from the scope of the terms "suppressor comprising an ion exchange resin bed" or "suppressor ion exchange resin bed." In the intrinsic record, a clear line is delineated between packed bed suppressors and membrane suppressors. The patent specification distinguishes membrane suppressors that use an ion exchange membrane for suppression from packed bed suppressors. See Hankes Decl. Ex. B, Col. 2:54-57 ("A different form of a suppressor is described and published in U.S. Pat. No. 4,474,664, in which a charged ion exchange membrane in the form of a fiber or sheet is used in place of the resin bed.") and Col. 2:65 - Col. 3:63 (specifically distinguishing membrane suppressors disclosed in U.S. Pat. No. 4,459,357, U.S. Pat. No. 4,403,039, U.S. Pat. No. 4,999,098, and U.S. Pat. No. 5,248,426).

A membrane suppressor that further contains ion exchange particles between spaced membranes in a membrane suppressor is still classified as a membrane suppressor, that is, such ion exchange particles do not change the status of a suppressor that uses membranes for suppression from a membrane suppressor rather than a packed bed suppressor (or suppressor ion exchange resin bed). For example, in U.S. Pat. No. 5,248,426, a membrane suppressor is disclosed having "ion exchange particles packed into the flow channels" between the suppressor membranes. See Hankes Decl. Ex. D, Col. 11:20-30. U.S. Pat. No. 5,248,426 is explicitly distinguished as a different form of suppressor in the specification of the '615 patent. See also Hankes Decl. Ex. J (U.S. Pat. No. 5,569,365), Col. 13, Col. 3-5 (patent containing similar disclosure relating to a membrane suppressor having "ion exchange particles packed in the flow channels"; this patent was also overcome during patent prosecution—see Hankes Decl. Ex. K ('371 patent prosecution history, Information Disclosure Citation, dated August 30, 2001)).

In sum, the term "suppressor bed comprising ion exchange resin" means an ion exchange resin

packed bed suppressor. A membrane suppressor, e.g. one that utilizes membrane suppressor-type membranes to suppress by electrodialysis across such membranes, is not a suppressor ion exchange resin bed even if it includes ion exchange resin.

**2. "suppressor bed having an inlet section and an outlet section . . . a first electrode in an aqueous solution in an electrode chamber adjacent said suppressor bed inlet section but not said suppressor bed outlet section"**

The above term appears in Claim 1 of the '371 patent. See Hankes Decl. Ex. B, Claim 1. As the Federal Circuit has held, "an inventor may choose to be his own lexicographer if he defines the specific terms used to describe the invention 'with reasonable clarity, deliberateness, and precision.'" See Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313,1327 (Fed. Cir. 2002).

With regard to the terms "inlet section and outlet section," the patentee's intention to be his own lexicographer could not be clearer. In the specification, the patentee states with reference to Figure 1: "As **defined** herein, the portion of the bed 26 above the line X—X is referred to as the suppressor bed inlet section 26a. Conversely, the portion of the bed below the line X—X is referred to as the suppressor bed outlet section 26b." See Hankes Decl. Ex. B, Col. 11:26-30 (emphasis added); Fig. 1. The patentee further explains that the resin above the line X—X "is predominantly or substantially completely in the form of the cation counter ion of the base used as the electrolyte during separation. Below the line X—X, the resin is predominantly or completely in the hydronium form. The line X—X represents that interface." See Hankes Decl. Ex. B, Col. 11:7-13. The bed 26 shown in Figure 1 is a cation exchange resin bed. See Hankes Decl. Ex. B, Col. 11:58 ("catioin [sic] exchange resin bed").

In accordance with the patentee's definition, if the resin bed is a cation ion exchange bed, the suppressor bed inlet section "is predominantly or substantially completely in the form of the cation counter ion of the base used as the electrolyte during separation", that is, the inlet section is at least predominantly in cation form. Further in accordance with the patentee's definition, if the resin bed is a cation ion exchange bed, the suppressor bed outlet section "is predominantly or completely in the hydronium form", that is, the outlet section is at least predominantly in hydronium form. The ordinary meaning of the term "predominant" is "most common." See Hankes Decl. Ex. G (Excerpt from Webster's II New College Dictionary), 870 ("predominant . . . 2. Most common or conspicuous"). Therefore, in simple terms, according to the patentee, if the resin bed is a cation ion exchange bed, then in

the inlet section the majority of the resin is in cation form and in the outlet section the majority of the resin is in the hydronium form.

The prosecution history of U.S. Patent No. 6,325,976 ("'976 patent") (the parent to the '371 patent) is consistent with the specification of the '371 patent and Plaintiff's interpretation. In the patentee's Amendment and Remarks dated June 8, 2000, the patentee states: "The terms "inlet section" and "outlet section" are defined in the specification in relationship to the line X-X in the drawings. As illustrated in the drawings and present specification, the suppressor bed above (or upstream of) line X-X is **predominately** [sic] or substantially in the form of the cation of the base and the suppressor bed below the line X-X is **predominately** [sic] or completely in the hydronium form." See Hankes Decl. Ex. I ('976 prosecution history, Amendment and Remarks dated June 8, 2000), 6 (emphasis added). The patentee then cited to the exact language in the specification cited above. Thus, during prosecution the patentee expressed a clear intent not to surrender any portion of the scope of the meaning of inlet section and outlet section set forth in the specification. Indeed, far from clearly and unequivocally surrendering scope, the patentee went so far as to again express a clear intent that the word "predominantly" remain a central part of the definition of those terms.

With regards to the term "electrode chamber" in Claim 1, the patent specification clearly shows that the electrode chamber need not be a completely "enclosed" space or housing. In Figure 1 and in the text of the specification describing Figure 1, an electrode chamber is depicted and described in which the chamber is not completely enclosed. See Hankes Decl. Ex. B, Fig. 1 and Col. 10:40 – Col. 11:6. In fact, in the particular embodiment shown in Figure 1, conduits enter and exit the chamber. Claim 1 should be construed to encompass this embodiment, and thus, to not require complete enclosure of the housing that defines the electrode chamber. See Johns Hopkins Univ. v. Cellpro Inc., 152 F.3d 1342, 1355 (Fed. Cir. 1998) (explaining that "[a] patent claim should be construed to encompass at least one disclosed embodiment in the written description portion of the patent specification.").

Thus, as set forth above, the electrode chamber depicted in Figure 1 is not completely "enclosed" because of the conduits entering and exiting the chamber. Further, the chamber depicted in Figure 1 is not completely enclosed because it is open on one side where it contacts a barrier. Id. But for the barrier in that embodiment, the chamber (or housing) would not be separated from the exchange resin. See Hankes

Decl. Ex. B, Col. 10:40-41 ("A barrier 40 separates bed 26 from electrode 42 in the interior of a hollow housing defining electrode chamber 44"). Further, because the "barrier" and the "chamber" in the particular embodiments shown in Figure 1 are described separately, it is clear that the "barrier" in that embodiment is separate and distinct from the "chamber." See Id.

In sum, the term "suppressor bed having an inlet section and an outlet section . . . a first electrode in an aqueous solution in an electrode chamber adjacent said suppressor bed inlet section but not said suppressor bed outlet section" means a suppressor bed having an inlet section and an outlet section. If the resin bed is a cation ion exchange bed, then in the inlet section the majority of the resin is in cation form and in the outlet section the majority of the resin is in the hydronium form. The first electrode extends into an aqueous solution in an opening in a housing adjacent the inlet section but not adjacent the outlet section.

**3. "second electrode chamber is disposed adjacent said suppressor bed outlet section and said second electrode is disposed in said second electrode chamber"**

The above term appears in Claim 7 of the '371 patent. See Hankes Decl. Ex. B, Claim 7. The patent specification clearly shows that the second electrode chamber (as the electrode chamber described directly above) need not be a completely "enclosed" space or housing. In Figure 2 and in the text of the specification describing Figure 2, an embodiment having a second electrode chamber is depicted and described where the second electrode chamber is not completely enclosed. See Hankes Decl. Ex. B, Fig. 2 and Col. 13:29-58. In fact, in the particular embodiment shown in Figure 2, conduits exit the chamber. Id. Claim 7 should be construed to encompass this embodiment, and thus, to not require complete enclosure of the housing that defines the second electrode chamber. See Johns Hopkins Univ. v. Cellpro Inc., 152 F.3d 1342, 1355 (Fed. Cir. 1998) (explaining that "[a] patent claim should be construed to encompass at least one disclosed embodiment in the written description portion of the patent specification.").

Thus, as set forth above, the electrode chamber depicted in Figure 2 is not completely "enclosed" because of the conduits exiting the chamber. Further, the chamber depicted in Figure 2 is not completely enclosed because it is open on one side where it contacts a barrier. Id. But for the barrier in that

embodiment, the chamber would not be separated from the exchange resin. See Hankes Decl. Ex. B, Col. 13:38-40 ("... FIG. 2 includes an electrode chamber 76 containing a second electrode 78 separated by barrier 80 from bed 68.").

In sum, the term "second electrode chamber is disposed adjacent said suppressor bed outlet section and said second electrode is disposed in said second electrode chamber" means a second electrode that extends into an opening in a housing adjacent the suppressor bed outlet section.

### C. '985 Patent

#### 1. "suppressor . . . comprising an ion exchange resin bed having exchangeable ions of one charge, positive or negative, serving as a source of suppressing ions"

The above term appears in Claim 1 of the '985 patent. See Hankes Decl. Ex. C, Claim 1. An analysis of the claim language itself – the controlling focus of claim construction – reveals that the "ion exchange resin bed" claimed is an ion exchange resin bed that serves as a suppressor. See Renishaw PLC v. Marposs Societa' Per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim"). Not only is the term "suppressor" explicitly used in the claim to describe and modify the term "bed," but it is explicitly described that the bed serves as a "source of suppressing ions." See Hankes Decl. Ex. C, Claim 1 (the claim first describes a "suppressor . . . comprising an ion exchange resin bed . . . serving as a source of suppressing ions" and then refers to "said suppressor resin bed.").

Because the '371 patent and the '985 patent share the same specification and because the same prior art referenced above in Section III. B. 1 was cited during prosecution of both patents, the same analysis set forth above in Section III. B. 1 relating to the proper construction of the term "suppressor . . . comprising ion exchange resin" applies with equal force to the proper construction of the same terms where they appear in the '985 patent.

In sum, the term "suppressor . . . comprising an ion exchange resin bed having exchangeable ions of one charge, positive or negative, serving as a source of suppressing ions" means an ion exchange resin packed bed with positive or negative exchangeable ions that serve as a source of suppressing ions. A membrane suppressor, e.g. one that utilizes membrane suppressor-type membranes to suppress by electrodialysis across such membranes, is not a suppressor ion exchange resin bed even if it includes ion

exchange resin.

### 2. "said resin bed having an inlet section and an adjacent outlet section, said suppressor defining a liquid sample stream flow path between said resin bed inlet and outlet sections"

The above term appears in Claim 1 of the '985 patent. See Hankes Decl. Ex. C, Claim 1. Because the '371 patent and the '985 patent share the same specification and the same parent (the '976 patent), the same analysis set forth above in Section III. B. 2 relating to the proper construction of the terms inlet section and outlet section where they appear in the '371 patent applies with equal force to the proper construction of the same terms where they appear in the '985 patent.

That "a liquid sample stream flow path between said resin bed inlet and outlet sections" requires at least a portion of the path of the liquid sample stream to contact each of the inlet and outlet sections is clear from a reading of the language of Claim 1 itself which describes "a liquid sample stream flow path between said resin bed inlet and outlet sections." See Renishaw PLC v. Marposs Societa' Per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim").

An analysis of the specification of the '985 patent supports this construction and provides further clarification. The specification describes an "aqueous liquid stream" that "flows through separator bed" "to form a liquid effluent" before reaching the suppressor. See Hankes Decl. Ex. C, Col. 11:33-45; Fig. 1. According to the specification, "[t]he effluent from separator bed" then "percolates through the cation form resin in inlet bed section . . . until it reaches the hydronium form resin in [outlet] bed section." See Hankes Decl. Ex. C, Col. 12:3-6; Fig. 1. Then, "[t]he suppressed effluent liquid" leaves the bed through the outlet port to the detector. See Hankes Decl. Ex. C, Col. 12:11-14; Fig. 1. Therefore, as the specification describes, the liquid sample stream is the stream flowing from the inlet to the resin bed inlet section to the resin bed outlet section and its outlet to the detector.

In sum, the term "said resin bed having an inlet section and an adjacent outlet section, said suppressor defining a liquid sample stream flow path between said resin bed inlet and outlet sections" means a resin bed having an inlet section that extends to an outlet section. If the resin bed is a cation ion exchange bed, then in the inlet section the resin is predominantly in cation form and in the outlet section the resin is predominantly in the hydronium form. At least a portion of the path of the liquid sample

stream (i.e., the one flowing from the inlet to the resin bed inlet section to the resin bed outlet section and its outlet to the detector) extends between the inlet and outlet sections.

**3. "at least one electrode chamber adjacent to said resin bed inlet section but not adjacent said resin bed outlet section"**

The above term appears in Claim 1 of the '985 patent. See Hankes Decl. Ex. C, Claim 1. Because the '371 patent and the '985 patent share the same specification and the same parent (the '976 patent), the same analysis set forth above in Section III. B. 2 relating to the proper construction of the terms inlet section, outlet section, and electrode chamber where they appear in the '371 patent applies with equal force to the proper construction of the same terms where they appear in the '985 patent.

Therefore, the term "at least one electrode chamber adjacent to said resin bed inlet section but not adjacent said resin bed outlet section" of Claim 1 of the '985 patent means an opening in a housing into which an electrode extends, the opening being adjacent the resin bed inlet section but not adjacent the resin bed outlet section.

**4. "a first electrode disposed in said one electrode chamber in electrical communication with but not in direct contact with said flow path"**

The above term appears in Claim 1 of the '985 patent. See Hankes Decl. Ex. C, Claim 1. No portions of the term appear to be in dispute other than those portions already addressed directly above in Section III. C. 3. See Hankes Decl. Ex. F (Joint Claim Construction and Prehearing Statement).

Thus, the term "a first electrode disposed in said one electrode chamber in electrical communication with but not in direct contact with said flow path" means an electrode extending into an opening in a housing, the electrode being in electrical communication with but not in direct contact with the liquid stream flow path.

**5. "second electrode disposed in or adjacent to said suppressor resin bed outlet section in electrical communication with said resin bed outlet section but not in or adjacent to said suppressor bed inlet section"**

The above term appears in Claim 1 of the '985 patent. See Hankes Decl. Ex. C, Claim 1. No portions of the term appear to be in dispute other than those portions already addressed directly above in

Section III. C. 2. For instance, the term "second electrode" does not appear to be in dispute. See Hankes Decl. Ex. F (Joint Claim Construction and Prehearing Statement). A "second electrode" is described in the specification of the '985 patent. See Hankes Decl. Ex. C, Fig. 1, Fig. 2, Col. 9, 58-65 and Col. 13:29-58.

Thus, the term "second electrode disposed in or adjacent to said suppressor resin bed outlet section in electrical communication with said resin bed outlet section but not in or adjacent to said suppressor bed inlet section" means a second electrode disposed in or adjacent the resin bed outlet section and in electrical communication with the resin bed outlet section but not in or adjacent the resin bed inlet section.

**6. "second electrode chamber . . . said second electrode being disposed in said second electrode chamber"**

The above term appears in Claim 12 of the '985 patent. See Hankes Del. Ex. C, Claim 12. The patent specification clearly shows that the second electrode chamber (as the electrode chamber described directly above) need not be a completely "enclosed" space or housing. In Figure 2 and in the text of the specification describing Figure 2, an embodiment having a second electrode chamber is depicted and described where the second electrode chamber is not completely enclosed. See Hankes Decl. Ex. C, Fig. 2 and Col. 13:29-58. In fact, in the particular embodiment shown in Figure 2, conduits exit the chamber. Claim 12 should be construed to encompass this embodiment, and thus, to not require complete enclosure of the housing that defines the second electrode chamber. See Johns Hopkins Univ. v. Cellpro Inc., 152 F.3d 1342, 1355 (Fed. Cir. 1998) (explaining that "[a] patent claim should be construed to encompass at least one disclosed embodiment in the written description portion of the patent specification.").

Thus, as set forth above, the second electrode chamber depicted in Figure 2 is not completely "enclosed" due to conduits exiting the chamber. Further, the chamber shown in Figure 2 is not completely enclosed because it is open on one side where it contacts a barrier. Id. But for the barrier in that embodiment, the chamber would not be separated from the exchange resin. See Hankes Decl. Ex. C, Col. 13:38-40 (". . . FIG. 2 includes an electrode chamber 76 containing a second electrode 78 separated by barrier 80 from bed 68.").

In sum, the term "second electrode chamber . . . said second electrode being disposed in said second electrode chamber" means a second electrode that extends into an opening in a housing adjacent

the resin bed outlet section.

## IV. Conclusion

For the reasons set forth above, Dionex respectfully requests that this Court enter its Proposed Order on claim construction.

DATED:

DORSEY & WHITNEY LLP

By: ______________/s/_______________
DAVID J. BREZNER

Attorneys for Plaintiff
DIONEX CORPORATION