Apple Inc. v. Psystar Corporation Doc. 866



HELANE L. MORRISON (CA Bar No. 127752)
JOHN S. YUN (CA Bar No. 112260)
CAROLYN A. SAMIERE (CA Bar No. 118353)

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 705-2500
Telecopy: (415) 705-2501

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL A. OFSTEDAHL, ROBERT D. RUTNER and WILLIAM K. KUNCZ,<br><br>Defendants, | Civil Action No. C-02-03685-JW<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW FOR THE REMEDIES TRIAL AGAINST DEFENDANT MICHAEL A. OFSTEDAHL**<br><br>Date: April 30, 2004<br>Time: 9:00 a.m.<br>Judge: James Ware |



Dockets.Justia.com

# FINDINGS OF FACTS AND CONCLUSIONS OF LAW

Pursuant to the Court's scheduling order, plaintiff Securities and Exchange Commission ("Commission") hereby submits the following proposed findings of facts and conclusions of law for the upcoming remedies trial against defendant Michael A. Ofstedahl ("Ofstedahl").

***Findings of Facts:***

1. Defendant Ofstedahl is forty-four years old. He received his degree in business and finance from San Jose State University in 1984.

2. Ofstedahl has known defendant Robert D. Rutner, DDS ("Rutner") since the early 1990s. They met through mutual friends while playing golf. Rutner is Ofstedahl's dentist. Ofstedahl and Rutner have had mutual investments in Whistle Corporation, in Calico Commerce Inc. and in Puma Technology Corporation ("Puma").

3. Ofstedahl was employed by Adaptec, Inc. ("Adaptec") on two separate occasions. Ofstedahl was first employed by Adaptec from late 1993 through 1995. He began as a manager of strategic accounts, became the director of OEM sales, and left as the vice president of strategic accounts. In January 1996, Ofstedahl became the vice president of worldwide sales for Chromatic Research. Ofstedahl was at Chromatic Research for two years.

4. In January 1998, Ofstedahl rejoined Adaptec as the vice president of OEM sales and continued in that role until his employment at Adaptec was terminated in 1999. As the vice president of OEM sales, he reported to Adaptec's then chief operating officer, Robert N. Stephens ("Stephens").

5. On January 5, 1998, Ofstedahl signed an Adaptec certification that he "has read, understands and agrees to comply with Adaptec's Insider Trading Policy, and if applicable, the Insider Trading Compliance Program, copies of which were distributed with this letter." On February 18, 1998, Ofstedahl signed another such certification.

6. Adaptec's Insider Trading Policy stated that no insider shall disclose or tip material non-public information to any other person where such information may be used to profit by trading in Adaptec securities. Ofstedahl previously understood, for many years, that it was illegal to tip inside information. Ofstedahl also understood, for many years, that there were potential criminal and civil sanctions for tipping insider information.

7. During 1998 and 1999, Ofstedahl attended so-called "revenue meetings" at Adaptec. The revenue meetings were held at the beginning of a quarter and then on a weekly basis during the final month of a quarter. During the revenue meeting, Mark Hollyer ("Hollyer") from the finance department would present the revenues of Adaptec's business units, as well as the company's overall expenses.

8. Ofstedahl also attended the weekly staff meetings of Stephens' direct reports. Those meetings would normally occur on Tuesdays and would also include a brief presentation by Hollyer regarding Adaptec's revenues. Ofstedahl would also have a weekly individual meeting with Stephens to discuss issues relating to his department.

9. Before Ofstedahl traveled to Europe in late December 1998, he knew that Adaptec's revenues for the third fiscal quarter of 1998, ending December 31, 1998, would exceed forecasts. On January 4, 1999, Stephens decided with Adaptec's chief executive officer and chief financial officer to issue a pre-announcement that Adaptec's financial results would be better than forecast.

10. On January 5, 1999, Ofstedahl attended the weekly staff meeting with Stephens. On January 5, 1999, Ofstedahl had a one-on-one meeting with Stephens. News of the pre-announcement is the type of information that Stephens would have normally shared with Ofstedahl at that time.

11. During the Summer of 1998, Ofstedahl and Rutner played golf together. At the time, Ofstedahl was very upbeat about Adaptec. In late October 1998, Rutner purchased call options on Adaptec stock prior to its regular earnings announcement. That announcement contained favorable news and Rutner made a profit on his October 1998 Adaptec options purchases.

12. Subsequently, in early December 1998, Ofstedahl and Rutner met at a restaurant in the East Bay. During that meeting, they discussed Ofstedahl's providing financial information to Rutner about Adaptec. If the information would be viewed positively by analysts, Rutner would purchase Adaptec options, make a profit, and split the profits with Ofstedahl.

13. On December 31, 1998, Ofstedahl and Rutner played golf at the Ruby Hills Golf Course with two other players. Ofstedahl talked about Adaptec in general and positive terms. That evening, Ofstedahl and his family came over to Rutner's home for dinner.

14. On the morning of Wednesday, January 6, 1999, Ofstedahl paged Rutner. When Rutner returned the page, Ofstedahl told Rutner that Adaptec would be making a positive announcement or pre-

announcement that afternoon regarding Adaptec's earnings or sales figures.

15. Right after that telephone conversation, Rutner purchased a large number of Adaptec call options in his Charles Schwab & Company ("Charles Schwab") and Morgan Stanley brokerage accounts. Those options expired on the third Friday in January 1999, which was before Adaptec's regularly scheduled earnings announcement. Unless Rutner believed that Adaptec was going to be making a positive pre-announcement, it would have been irrational for him to purchase call options expiring in January 1999; instead, he would have purchased call options expiring in February 1999.

16. Rutner also telephoned his friend and business colleague, William C. Kuncz ("Kuncz"). Rutner told Kuncz that Adaptec would be making a positive announcement or pre-announcement and that he had purchased Adaptec call options. Kuncz then purchased Adaptec stock and call options for approximately $22,500.

17. After the stock markets closed on January 6, 1999, Adaptec issued a press release disclosing its preliminary results for the third fiscal quarter ended December 31, 1998. Adaptec stated that it was announcing its preliminary third quarter results because they significantly exceeded prior street estimates. Adaptec's share price rose significantly on January 7, 1999, and Rutner sold the call options that morning for a nearly $650,000 profit. Kuncz also sold his Adaptec stock and options for a $26,000 profit.

18. Ofstedahl paged Rutner on the morning of January 7, 1999. When Rutner spoke with him by telephone, Ofstedahl said "I told you" and "I hope we got in on this." Rutner responded that they had. Ofstedahl and Rutner then discussed whether Adaptec would issue additional good news and whether they should purchase additional Adaptec call options.

19. Ofstedahl and Rutner met for breakfast at a restaurant on Wednesday, January 13, 1999. During that meeting Rutner falsely told Ofstedahl that the profits from the Adaptec options trading was $100,000. Rutner told Ofstedahl that his share of those profits was $20,000. Rutner lied to Ofstedahl about the amount of the trading profits because he wanted to keep the additional funds for his dental business, which was struggling financially at that time.

20. During the January 13th breakfast meeting, Ofstedahl stated that he believed that Adaptec would provide even better news in its regular earnings announcement. Ofstedahl and Rutner therefore

agreed that they would use the trading profits to buy additional Adaptec call options. On January 13, 1999, Rutner began purchasing Adaptec call options, with a February 1999 expiration date, in his Morgan Stanley account. Rutner sold or let those options expire in February 1999 when the price of Adaptec shares did not rise.

21. At the time of his birthday on February 19, 1999, Rutner spoke by telephone on two occasions with attorneys for the Commission. During those conversations, the Commission's attorneys asked about Rutner's trading in Adaptec. Rutner was evasive or untruthful in his responses to the Commission's attorneys, and did not tell them that Ofstedahl had provided him with information about Adaptec.

22. After those conversations, Rutner telephoned Ofstedahl and said that they had to meet. Ofstedahl and Rutner then met for drinks at the Milpitas Embassy Suites Hotel. Rutner told Ofstedahl that he had been contacted by the Commission and that he did not tell the Commission anything about Ofstedahl other than that he knew him. Ofstedahl and Rutner agreed that because there had been no money transferred between them, the Commission would be unable to do anything if they both denied engaging in misconduct. Rutner felt emotionally "shot" during the meeting, while Ofstedahl seemed shocked.

23. On June 29, 1999, Ofstedahl appeared pursuant to subpoena for sworn testimony during the Commission's investigation into trading in the securities of Adaptec and Puma. During his testimony, Ofstedahl falsely denied that he knew about Rutner's trading in Adaptec call options. He falsely described his communications with Rutner in January 1999 as relating only to golf and falsely denied sharing non-public information about Adaptec with Rutner.

24. In August 2002, the Commission filed this insider trading civil action against Ofstedahl, Rutner and Kuncz. At the same time, the United States Attorney filed a criminal complaint against Ofstedahl for insider trading in the related case of *United States v. Michael A. Ofstedahl*, Criminal Case No. CR-02-20101-JW.

25. Rutner settled the Commission's case against him by consenting to the entry of a final judgment containing a permanent injunction against further violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"). Rutner also agreed to disgorge the

approximately $650,000 in ill-gotten gains from his trading in Adaptec call options on January 6, 1999 and to pay an insider trading penalty of about $350,000. Kuncz settled the Commission's case against him by consenting to the entry of a permanent injunction prohibiting his further violations of Section 10(b) and Rule 10b-5 of the Exchange Act. Kuncz also agreed to disgorge approximately $35,500 as being his profits and losses avoided from his trading in the securities of Adaptec and Puma and to pay an insider trading penalty of approximately $35,500.

26. On November 24, 2003, Ofstedahl pled guilty to a single count of obstruction of justice in the related criminal case. According to his written plea agreement, Ofstedahl agreed that the following facts are true:

> During December of 1998, I learned that Adaptec would exceed its fiscal third quarter forecasts. At some point during one of my many social contacts I had with Mr. Rutner in December 1998, I conveyed that information to him.
>
> On June 29, 1999, I testified under oath at a proceeding before the Securities and Exchange Commission (SEC). As I then knew, the SEC was investigating trades that Mr. Rutner had made in Adaptec shares. During my testimony, SEC staff attorneys asked me questions that directly and indirectly sought information concerning what I had told Mr. Rutner. Through my answers, I intentionally conveyed the false impression that I had not provided information to Mr. Rutner concerning Adaptec's probable fiscal third quarter results when, in fact, I had provided that information to him. I admit that my answers were designed to mislead the SEC staff attorneys.

27. Subsequently, on December 5, 2003, the Commission and Ofstedahl entered into a stipulation authorizing the Court to enter an order finding that "defendant Michael Ofstedahl violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by tipping material nonpublic information to defendant Robert Rutner as alleged in the Complaint." The Commission and Ofstedahl also stipulated that Rutner's profits from Adaptec call option purchases on January 6, 1999 were $648,936. This Court entered the order requested by the Commission and Ofstedahl and set this matter for a one-day remedies trial on April 30, 2004.

28. On March 22, 2004, this Court sentenced Ofstedahl in the related criminal case to six months of home detention, 100 hours of community service, five years of probation and a $100 special assessment. Pursuant to the plea agreement, the Court did not impose a criminal fine in light of the monetary penalty that the Commission will be seeking in the civil remedies trial. The Court also stayed

the home detention order until June 2004 so that Ofstedahl could seek a new job.

29. The next day, March 23, 2004, the Commission took the videotaped depositions of Rutner and Ofstedahl. During his deposition, Ofstedahl generally asserted his Fifth Amendment privilege against self-incrimination in response to questions regarding his Adaptec employment in 1998 and 1999, regarding his communications with Rutner during that time period and regarding his plea agreement.

30. By virtue of Ofstedahl's refusal to answer questions based upon his privilege against self-incrimination, the Court should draw the adverse inference that he knew about the pre-announcement before January 6, 1999, that he tipped Rutner with news of the pre-announcement on January 5, 1999 and that he did so pursuant to a pre-existing arrangement to split profits from Rutner's trading in Adaptec call options. The Court should also infer that Ofstedahl and Rutner agreed to conceal their arrangement during the Commission's investigation of Rutner's Adaptec trading.

31. Ofstedahl possesses significant assets and a high income making capacity. According to his financial disclosures, Ofstedahl has assets of approximately $1,166,000 and liabilities of approximately $506,000 for a net worth of about $660,000. Ofstedahl's claimed liabilities are overstated, however, because they include an informal $115,000 loan from a personal friend and an $85,000 contract for remodeling work. Ofstedahl true net worth may therefore be closer to $860,000.

32. Until recently, Ofstedahl was employed by Velio Corporation as co-chief executive officer and chief executive officer for a $200,000 annual salary. He received a $65,000 retention bonus in January 2004 that he used to purchased a used 2001 Mercedes-Benz S-Class automobile for $51,000.

***Conclusions of Law:***

1. Section 10(b) of the Exchange Act prohibits the use of any "deceptive device" in connection with the purchase or sale of a security. *United States v. O'Hagan*, 521 U.S. 642, 651, 117 S. Ct. 2199, 138 L. Ed. 2d 724 (1997) (citing *United States v. Newman*, 664 F.2d 12, 17 (2d Cir. 1981)). There are two theories of insider trading liability, the classical theory and the misappropriation theory. *Id.* at 651-52.

2. Under the classical theory, a corporate insider with material nonpublic information owes a fiduciary duty to the corporation and its shareholders not to use that information for his own benefit; the insider must therefore refrain from trading to avoid taking unfair advantage of the uninformed

shareholders from whom the insider is buying or selling. *Id.* at 652. An insider includes temporary fiduciaries such as attorneys, accountants and tippees. *Dirks v. S.E.C.*, 463 U.S. 646, 655-56 & n. 14, 103 S. Ct. 3255, 77 L. Ed 2d 911 (1983).

3. Under the misappropriation theory, a corporate outsider engages in a deceptive device by using "confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *O'Hagan*, 521 U.S. at 652. The misappropriation theory "outlaws trading on the basis of nonpublic information by a corporate 'outsider' in breach of a duty owed not to a trading party, but to the source of the information." *Id.* at 653.

4. A corporate insider therefore engages in deceptive and manipulative conduct proscribed by Section 10(b) and Rule 10b-5 if he takes advantage of corporate information that was to be used for a corporate purpose, rather than a personal benefit. *Dirks v. S.E.C.*, 463 U.S. at 654. That proscribed conduct includes passing on material nonpublic corporate information to another individual or "tippee." *Id.* at 655. In that instance, the tippee inherits the tipper's fiduciary duty not to trade on the corporate information. *Id.* at 655-66.

5. The "tippee's duty to disclose or abstain [from trading] is derivative of the insider's duty." *Id.* at 659. The tippee's liability therefore arises when the tipper breaches a fiduciary duty "by disclosing the information to the tippee and the tippee knows or should know that there has been a breach." *Id.* at 660.

6. A "material" fact is information that a reasonable investor would probably desire to know before making an investment decision. A fact is material if there is a substantial likelihood that it would significantly alter the total mix of information available to an investor. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976) (emphasis added).

7. Because "material" information is something that an investor would wish to consider, there is no need to show that the investor's conduct would have actually been different. *Id.* Instead, a materiality analysis requires an assessment of the "'inferences a [reasonable investor] would draw from a given set of facts.'" *Austin v. Loftsgarden*, 675 F.2d 168, 177 (8th Cir. 1982) (quoting *TSC Industries*, 426 U.S. at 450)), *rev'd on other grounds*, 478 U.S. 647 (1986).

8. Although "materiality" involves an assessment of whether a reasonable investor would

consider a piece of information worthy of consideration in light of the information already available, there are objective indicators of "materiality." A pattern of trading after important developments or communications creates the reasonable inference that nonpublic material information has been obtained and is being used. *S.E.C. v. Adler*, 137 F.3d 1325, 1340, 1343 (11th Cir. 1998) (timing of trades and telephone calls); *S.E.C. v. Maio*, 51 F.3d 623, 637 (7th Cir. 1995) (ruling that trading soon after news is received indicates the materiality); *S.E.C. v. Downe*, 969 F. Supp. 149, 154-55 (S.D.N.Y. 1997) (timing of events, conversations and trades).

9. The decision by a person with knowledge of the information to make an unusual purchase or sale is evidence of materiality. *S.E.C. v. Lund*, 570 F. Supp. 1397, 1401 (C.D. Cal. 1983). Additionally, a rapid change in price and trading volume for a stock upon release of the information is another indicator of materiality. *Id.*

10. Ofstedahl's violation of Section 10(b) and Rule 10b-5 of the Exchange Act by tipping material nonpublic information on January 5, 1999 to Rutner has been established by Ofstedahl's December 5, 2003 stipulation to the entry of an order of liability. Although Ofstedahl's liability is undisputed, the egregiousness of his conduct and the degree of scienter underlying his conduct are relevant in determining the proper amount of civil monetary sanctions and the propriety of other equitable relief.

11. Under Section 21A(a)(2) of the Exchange Act, the Court may impose a civil monetary penalty against insider traders and/or tippers which "shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided as a result of such unlawful purchase or sale . . .." 15 U.S.C. § 78u-1(a)(2). The "profit gained" or "loss avoided" is defined by Section 21A of the Exchange Act to be "the difference between the purchase or sale price of the security and the value of that security as measured by the trading price of the security a reasonable period after public dissemination of the nonpublic information." 15 U.S.C. § 78u-1(f).

12. In this case, the parties have stipulated that the profits from Rutner's purchase of Adaptec call options on January 6, 1999 were $648,936. Ofstedahl should pay a civil monetary penalty based upon those gains. 15 U.S.C. § 78u-1(a)(2). Congress enacted treble penalties for insider trading to protect the securities markets by creating a stronger enforcement – and therefore deterrent – mechanism.

According to House Report 98-355:

> The United States securities markets are liquid, efficient and fair. The prices of the vast majority of actively traded securities reflect available public information about companies and the economy. Capital formation and our nation's economic growth and stability depend on investor confidence in the fairness and integrity of our capital markets.
>
> Insider trading threatens these markets by undermining the public's expectations of honest and fair securities markets where all participants play by the same rules. This legislation provides increased sanctions against insider trading in order to increase deterrence of violations.

H.R. Rep. No. 355 at 2.

13. Congress authorized Commission actions seeking treble penalties because other relief, such as injunctions and disgorgement, were inadequate given the huge illegal profits that tempt insiders:

> Although an injunction subjects a defendant to possible criminal contempt proceedings if he violates the law again, the injunction itself serves only a remedial function and does not penalize a defendant for the illegal conduct. Disgorgement of illegal profits has been criticized as an insufficient deterrent, because it merely restores a defendant to his original position without extracting a real penalty for his illegal behavior. The risk of incurring such penalties often fails to outweigh the temptation to convert nonpublic information into enormous profits.

*Id.* at 7-8.

14. Congress intended that civil penalties for insider trading be imposed notwithstanding the imposition of any criminal sanctions in order to provide a deterrent beyond those imposed criminally. Congress "did not intend the penalty provision of [the Insider Trading Sanctions Act] to preclude the use of other remedies available to the government in the context of insider trading, including criminal prosecution." *U.S. v. Marcus Schloss & Co., Inc.*, 724 F. Supp. 1123, 1127-28 (S.D.N.Y. 1989).

15. Where a defendant acts with a high level of scienter by tipping insider information to others so that they can trade on that information, a substantial civil monetary penalty is appropriate. *See S.E.C. v. Falbo*, 14 F. Supp. 2d 508 (S.D.N.Y. 1998) (imposing $50,000 penalty on defendant who used third-party accounts to conceal trading and also tipped others to trade); *S.E.C. v. Ferrero*, 1993 U.S. District LEXIS 21379 *53-54 (imposing maximum penalty of three times disgorgement against defendant Maio for illegal tipping and trading); *S.E.C. v. Clark*, 1989 U.S. District LEXIS 19135, *12-13, *aff'd.* 915 F.2d 439 (9th Cir. 1990) (imposing $75,000 on defendant who also tipped his wife and broker; penalty exceeded total ill-gotten gains of approximately $57,000). *See also S.E.C. v. Sehkri*, 2002 U.S. District

LEXIS 13289, *54-55 (S.D.N.Y. 2002) (ordering stockbrokers to disgorge illegal profits they generated for their clients, and imposing penalty equal to three times disgorgement).

16. Sections 21(d) and 21(e) of the Exchange Act provide the Court with authority to grant the Commission's request for a permanent injunction. Under those statutory provision, a district court shall issue an permanent injunction upon a "proper showing" by the Commission.

17. A "proper showing" is made when the Commission establishes that the defendant's conduct constitutes violations of the federal securities laws and that there is a reasonable likelihood that the violative conduct will recur unless the defendant is enjoined. *S.E.C. v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996); *S.E.C. v. Murphy*, 626 F. 2d 633, 655 (9th Cir. 1980).

18. Whether a likelihood of future violations exists depends upon the totality of circumstances. Of primary significance, is the past illegal conduct of the defendant, from which the Court may infer the likelihood of future violations. *S.E.C. v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975).

19. Other factors to be considered by the Court include the degree of scienter involved, the isolated or recurrent nature of the violation, and the likelihood, due to a defendant's professional occupation, that future violations might occur. *Fehn*, 97 F.3d at 1295-96; *Murphy*, 626 F.2d at 655. The fact that the illegal conduct has ceased does not foreclose injunctive relief. *S.E.C. v. Koracorp Industries, Inc.*, 575 F.2d 692, 698 (9th Cir. 1978).

20. Even after pleading guilty to obstruction of justice and having all other criminal charges against him dismissed by the United States Attorney, Ofstedahl continues to refuse to provide honest testimony regarding his activities in 1998 and 1999. Instead, Ofstedahl asserted his Fifth Amendment privilege against self-incrimination during his March 24, 2004 deposition. The Court should therefore draw the negative inference that Ofstedahl acted with scienter in tipping Rutner about the earnings pre-announcement so that they could share the profits from Rutner's purchases of Adaptec call options. The Court should also draw the negative inference that Ofstedahl provided false testimony during the Commission's investigation and that Ofstedahl's false testimony was not limited to the matters identified in his guilty plea.

21. Ofstedahl's misconduct was egregious in character. Ofstedahl violated his fiduciary duties

as an Adaptec vice president and senior manager by tipping information about Adaptec's quarterly performance and pre-announcement of earnings to Rutner so that Rutner could profit by purchasing Adaptec call options. Besides a long-term friendship, Ofstedahl was also motivated by the desire for personal financial gain through an agreement to share in Rutner's profits.

22. Ofstedahl's misconduct also lasted for a protracted period. He agreed with Rutner in February 1999 to obstruct the Commission's investigation through false testimony. Ofstedahl then provided false testimony to the Commission in June 1999 during its investigation of Rutner's Adaptec trading. Ofstedahl did not start to acknowledge his misconduct until he entered his guilty plea in late November 2003. Even now, he refuses to provide complete and honest testimony regarding his misconduct.

23. In imposing remedies, the Court should take into account Ofstedahl's failure to show any remorse for his misconduct or provide any assurance that such misconduct will not be repeated.

24. In light of the seriousness of Ofstedahl's insider trading violation, his degree of scienter and his failure to demonstrate candor or remorse before the Court, an insider trading penalty is warranted against Ofstedahl under Section 21A(a)(2) of the Exchange Act.

25. In light of the seriousness of Ofstedahl's insider trading violation, his degree of scienter, his failure to demonstrate candor or remorse, and his obvious desire to obtain a high level executive position with another company, a permanent injunction prohibiting Ofstedahl's further violations of Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, is also warranted.

DATED: April 16, 2004

Respectfully submitted,

*John S. Yun*

Helane L. Morrison
John S. Yun
Carolyn A. Samiere
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION