Apple Inc. v. Psystar Corporation Doc. 916 Att. 11

Bryan K. Anderson (SBN 170666)
TRACY J. PHILLIPS (SBN 209505)
SIDLEY AUSTIN BROWN & WOOD LLP
555 California Street, Suite 5000
San Francisco, California 94104
Telephone: (415) 772-1200
Facsimile: (415) 397-4621

BRUCE D. FISCHMAN (*PRO HAC VICE*)
JONATHAN E. KANOV (*PRO HAC VICE*)
FISCHMAN, HARVEY & DUTTON, P.A.
3050 Biscayne Boulevard , Suite 600
Miami, Florida 33137
Telephone: (305) 576-5522
Facsimile: (305) 576-7079

Attorneys for Defendant
SOURCE MEDICAL SOLUTIONS, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MISHA CONSULTING GROUP, INC., a California corporation, d/b/a eBUSINESS DESIGN,<br><br>Plaintiff/CounterDefendant,<br><br>vs.<br><br>SOURCE MEDICAL SOLUTIONS, INC., a Delaware corporation, P. DARYL BROWN, an individual and MICHAEL A. PLAIA, an individual,<br><br>Defendant/CounterPlaintiff. | No. C02-04908 JW (HRL)<br><br>**DEFENDANT SOURCE MEDICAL SOLUTIONS, INC'S NOTICE OF MOTION, MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**Declaration of Jonathan E. Kanov and [Proposed] Order Filed Concurrently Herewith**<br><br>Date: May 10, 2004<br>Time: 9:00 A.M.<br>Place: Courtroom 8<br>Judge: Hon. James Ware<br>Trial Date: July 13, 2004 |



Dockets.Justia.com

## TABLE OF CONTENTS


Page

I. ISSUES TO BE DECIDED .......... 3

II. FACTUAL HISTORY .......... 3

III. PROCEDURAL HISTORY .......... 6

IV. LEGAL STANDARDS .......... 8

V. ARGUMENT .......... 9

A. The Parties' Agreement Called for EBD's Billing to Source to be Capped at Eight Hours/Day Per Employee For Their Time Spent Working on The Development of SourceRad, and as such, There is No Basis for Recovery for Additional Hours Allegedly Worked Over The Daily Cap .......... 9

B. There is No Genuine Issue of Material Fact That EBD is Not Entitled to Any Damages For SOURCE's Hiring of Former EBD Personnel .......... 13

1. Five of the Six Former Employees Were Laid Off by EBD Prior to Their Hiring by SOURCE, and the Other Former Employee Resigned in Advance of An Impending Layoff .......... 14

2. The No Hire Provision Is Invalid and Unenforceable Under Section 16600 of the California Business and Professions Code and Public Policy .......... 16

C. EBD Is Not Entitled to a Joint Copyright Interest In The SourceRad Software .......... 21

VI. CONCLUSION .......... 25

## TABLE OF AUTHORITIES

Page

### CASES

*Aalmuhammed v. Lee*, 202 F. 3d 1227 (9th Cir. 1999) .......... 25

*Ajir v. Exxon Corp.*, 195 W.L. 261411 (N.D. Cal. 1995) .......... 8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 916 L. Ed. 2d 202 (1986) .......... 9

*Application Group, Inc. v. Hunter Group, Inc.*, 61 Cal. App. 4th 881 (1998) .......... 21

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) .......... 8, 9

*Communities for Creative Non-Violence v. Reid*, 490 U.S. 730, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989) .......... 25

*Crossen v. Foremost-McKesson, Inc.*, 537 F. Supp. 1076 (N.D. Cal 1982) .......... 12

*Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244 (1968) .......... 20

*Durham Indus., Inc. v. Tomy Corp..*, 630 F. 2d 905 (2d Cir. 1980) .......... 24

*Eisenberg v. Ins. Co. of North Am.*, 815 F. 2d 1285 (9th Cir. 1987) .......... 8

*Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F. 3d 1211 (9th Cir. 1997) .......... 24

*Farrace v. Mass. Mutual Life Ins. Co.*, 1996 WL 570488 (N.D. Cal. 1996) .......... 8

*Florida ex rel. Butterworth v. Exxon Corp.*, 109 F. 3d 602 (9th Cir. 1997) .......... 12

*Hedging Concepts, Inc. v. First Alliance Mortgage Co.*, 41 Cal. App. 4th 1410 (1996) .......... 11, 12

*Heyde Cos., Inc. v. Dove Healthcare, LLC*, 637 N.W. 2d 437 (Wis. Ct. App. 2001) .......... 18, 19, 20

*Hospital Consultants, Inc. v. Potyka*, 531 S.W. 2d 657 *(Texas Civ. App. 1975)* .......... 18, 19, 20

*Liberty Mutual Ins. Co. v. Gallagher & Co.*, 1994 WL 715613 (N.D. Cal. 1994) .......... 15

*Masson v. New Yorker Magazine, Inc.*,
501 U.S. 496, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991) .......... 9

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) .......... 12

*Metro Traffic Control, Inc. v. Shaddow Tracking Network*,
22 Cal. App. 4th 853 (1994) .......... 20

*Moss, Adams & Co. v. Shilling*,
179 Cal. App. 3d 124 (1986) .......... 15

*Moncharsh v. Blase*,
144 Cal. App. 3d 946 (1993) .......... 16

*North Coast Indus. v. Jason Maxwell, Inc.*,
972 F. 2d 1031 (9th Cir. 1992) .......... 24

*State Farm Fire and Casualty Co. v. Geary*,
699 F. Supp. 756 (N.D. Cal. 1987) .......... 8

*Wal-Noon Corp. v. Hill*,
45 Cal. App. 3d 605 (1975) .......... 12

*Warren v. Fox Family Worldwide, Inc.*,
171 F. Supp. 2d 1057 (C.D. Cal 2001) .......... 25

*Watson Labs, Inc. v. Rhone-Poulenc Rorer, Inc.*,
178 F. Supp. 2d 1099 (C.D. Cal. 2001) .......... 8

*Webb v. West Side District Hosp.*,
144 Cal. App. 3d 946 (1983) .......... 16, 17, 18, 19, 20

*Wilkerson v. Wells Fargo Bank*,
212 Cal. App. 3d 1217 (1989) .......... 12

## STATUTES

17 U.S.C. § 201(b) .......... 25

Cal. Prof. Code § 16600 .......... 16

Fed.R.Civ.P. 56 .......... 2, 8, 9 11

## NOTICE OF MOTION AND MOTION

TO: MISHA CONSULTING GROUP, INC. D/B/A eBUSINESS DESIGN AND TO ITS COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT at 9:00 A.M., on May 10, 2004, or as soon thereafter at the Motion can be heard, at 280 South First Street, San Jose, California, Courtroom 8, SOURCE MEDICAL SOLUTIONS, INC. ("SOURCE") will and hereby does move for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure 56 on the following claims included in Plaintiff MISHA CONSULTING GROUP, INC., d/b/a eBUSINESS DESIGN's ("EBD") Second Amended Complaint:

(1) EBD's claim for damages for additional hours (over 8 hrs./day) worked on the SourceRad project which were never billed or invoiced to SOURCE;

(2) EBD's claim for damages for SOURCE's hiring of former EBD employees who had been released from EBD's employ; and

(3) EBD's claim for damages for an alleged joint copyright ownership in SourceRad.

Source also seeks partial summary judgment on its fifth counterclaim for declaratory relief in relation to the copyright claim.

This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of Jonathan E. Kanov filed concurrently herewith, and such further matters as may be brought to the Court's attention prior to submission of this motion for decision.

## MEMORANDUM OF POINTS AND AUTHORITIES

After over a year of aggressive discovery taken by both parties in this case, including six depositions taken in Atlanta, Birmingham and San Francisco in the last three weeks prior to the cutoff date, discovery closed on April 12, 2004.[1] Although the myriad of factual disputes in this case regarding the development of SourceRad and its functionality prevent a final disposition in this case by summary judgment, SOURCE is seeking summary adjudication of some discrete claims and issues raised by the parties for which there is no genuine issue of material fact, which will help focus the issues to be litigated. This should greatly assist both parties and the Court in conserving valuable resources.

SOURCE is entitled to judgment as a matter of law as to Plaintiff's claim for damages for hours worked by its employees on the SourceRad project that were never billed to SOURCE. The parties' agreement called for EBD's billing to SOURCE to be capped at eight hours/day per employee for their time spent on the development of SourceRad, and as such, there is no genuine issue of material fact that EBD is not entitled to recovery for additional hours allegedly worked over the daily cap. Furthermore, SOURCE is entitled to judgment as a matter of law as to Plaintiff's claim for damages due to SOURCE's hiring six former employees of Plaintiff. Five of the six former employees were laid off prior to the hiring by SOURCE, and the other former employee resigned in advance of an impending lay off. The agreement between the parties does not allow for EBD to be compensated for Source's hiring of these former EBD employees.

Lastly, SOURCE is entitled to judgment as a matter of law as to Plaintiff's alleged joint ownership in any copyright interest in SourceRad pursuant to the purported agreement between the parties. First, the amendment to said agreement specifically states that under no circumstances shall the software and deliverables developed and delivered to SOURCE be deemed to be works of joint

---

[1]. The undersigned has diligently drafted the instant motion after returning to his office on April 12, 2004 from several weeks of depositions taken around the country in this matter. SOURCE is filing its Motion for Partial Summary Judgment pursuant to Fed.R.Civ.P. 56, which provides that summary judgment motions are to be served 10 days before the hearing with or without supporting affidavits. SOURCE notes that Local Rule 56-1 allows for the filing of summary judgment motions pursuant to the timing as laid out in F.R.C.P. 56. However, SOURCE is certainly amenable if the Court desires to reschedule the hearing, and SOURCE will also agree to a shortened time for filing of its Reply if this will aid any of the Court's scheduling concerns.

authorship or any other designation tending to imply that Plaintiff has or retains ownership or authorship rights thereto. Additionally, EBD has repeatedly acknowledged under oath that its contribution to the SourceRad project was a "work made for hire," which renders the employer or other person for whom the work was prepared, SOURCE, the sole author and owner of the copyright.

## I. ISSUES TO BE DECIDED

(1) Whether SOURCE is entitled to judgment as a matter of law as to Plaintiff's claim for damages for hours worked by its employees on the SourceRad project that were never included in invoices submitted to SOURCE, since Amardeep Misha, Plaintiff's Chief Executive Officer who entered into the agreement with SOURCE, has already testified that the parties' agreement capped all billing at 8 hours a day per employee.

(2) Whether SOURCE is entitled to judgment as a matter of law as to Plaintiff's claim for damages due to SOURCE's hiring six former employees of Plaintiff, where five of the six former employees were laid off by Plaintiff months before being hired by SOURCE and the other resigned in advance of an impending layoff.

(3) Whether SOURCE is entitled to judgment as a matter of law as to Plaintiff's alleged joint ownership in any copyright interest in and to SourceRad pursuant to the purported agreement between the parties, whereby EBD acknowledges under oath a "work made for hire," and the first amendment to said agreement states that under no circumstances shall the software and deliverables developed and delivered to SOURCE be deemed to be works of joint authorship or any other designation tending to imply that Plaintiff has or retains ownership or authorship rights thereto.

## II. FACTUAL HISTORY

Defendant SOURCE provides outpatient information management solutions for various healthcare facilities. SOURCE's solutions enable healthcare providers to quickly and easily collect information about their patients using the latest computer technologies, dramatically reducing paperwork and errors associated with more traditional methods of medical documentation. SOURCE has its headquarters and principal place of business in Birmingham, Alabama. Plaintiff

EBD, a computer software consulting and development company, has its headquarters and principal place of business in San Jose, California.

In April, 2001, EBD and SOURCE entered into an oral agreement under which EBD was to provide development, design and testing services to Source Medical for the development of a radiology software application which came to be known as SourceRad. *See* Second Amended Complaint ("SAC") ¶¶ 1, 14. SourceRad was to be a complete web based radiology information management solution for diagnostic imaging centers. *Id.* ¶ 13. EBD's business is to design and write custom software programs – generally software programs needed by businesses to perform specialized functions for which boxed, "off-the-shelf" software is unavailable. *Id.* ¶ 7. Essentially a software boutique, EBD specializes in difficult products. *Id.* EBD's programmers are touted as being among the best in the industry. *Id.* ¶ 4.

A functional, tested version 1.0 of the software was to be delivered by EBD to SOURCE on October 31, 2001, and it had to be rolled out to 140 HealthSouth diagnostic centers between November, 2001 and June, 2002. *See* SOURCE's Amended Answer, Affirmative Defenses and Counterclaims ("Amended Counterclaims") ¶ 28. While Plaintiff is attempting to deflect blame for any of the problems with SourceRad, it is undisputed that SourceRad lacked functionality in many areas, was incomplete, unstable and did not allow the end users to properly and efficiently operate their medical centers. *Id.* at ¶ 36. Some of the plethora of bugs experienced in the software include the inability to schedule a patient, register a patient, insure that the referring physician gets the necessary medical reports (x-ray, CAT scan or the like) and properly bill claims. *See* Dep. of Becky Brown at 41-47, attached to the Declaration of Jonathan E. Kanov in Support of the Motion for Partial Summary Judgment ("Kanov Decl.") as Exhibit A.

Both parties have raised causes of action for breaches of an oral and/or implied contract.[2] It should be noted that while the parties each allege some different terms govern the oral contract

---

[2] Plaintiff is largely seeking recovery of amounts in unpaid invoices over and above the $4,794,306 already paid by SOURCE for EBD's development work. SOURCE is seeking damages which include additional development costs (internal and third party) necessitated by the lack of functionality in the application and lost sales and revenues, in addition to a setoff for amounts EBD overbilled.

between the parties, for purposes of the instant Motion for Summary Judgment, SOURCE will adhere to EBD's version of the contractual terms. Although the Court's April 24, 2003 order dismissed with prejudice Plaintiff's written contractual claims because of SOURCE's lack of acceptance of Plaintiff's written proposal which references and suggests the adoption of contractual terms from a July 31, 2000 Professional Services and Nondisclosure Agreement ("PSNA") between EBD and a non-party to this action, SurgiCenter Information Systems ("SIS"), EBD later amended its Complaint and is now traveling under an oral contact based on those same terms in the EBD-SIS PSNA. SAC at ¶ 20.

EBD billed SOURCE for the SourceRad development on a time and materials basis, sending monthly invoices to SOURCE. SAC ¶ 1. The parties agreed that EBD's charges to SOURCE would be capped at eight hours a day per employee working on the SourceRad project. *See* Dep. of Amardeep Misha, at 213-215, 233-234, attached to Kanov Decl. at B. The invoices which EBD sent to SOURCE reflect this eight hour a day cap per weekday worked and per weekend day worked after November 14, 2001. *Id.* at Ex. C; Document F-3 at Ex. D.

EBD seeks damages for SOURCE'S hiring of six former EBD employees, pursuant to paragraph 11 of the PSNA. SAC ¶¶ 42-46. These individuals are Srinivas Chari, Dharmesh Vora, Ajit Goel, Yogesh Agrawal, Vinod Shetye and Hareesh Pereira. However, even assuming the terms of the PSNA apply, paragraph 11 only prohibits the hiring by SOURCE of any individuals that are "working for and being paid by the party [EBD]." *See* EBD-SIS PSNA attached to Kanov Decl. at Exhibit E. Five of the six former EBD employees at issue (all except Dharmesh Vora) had been laid off by EBD months before approaching SOURCE for work and eventually being hired by SOURCE. *See* Misha Dep. at 243-244 and exhibits 119-123 attached to Kanov Decl. at Exhibit B; Affidavit of SOURCE's Assistant Vice President of Human Resources, Tracy Vebber, which contains hiring dates for these individuals, attached to Kanov Decl. at Exhibit F. Mr. Vora resigned from EBD's employ prior to working for SOURCE, in lieu of an impending layoff. *See* Dep. of Dharmesh Vora at 276: 18-277:23; 284:15-23, attached to Kanov Decl. at Exhibit G. Furthermore, all of these former employees at issue were Indian nationals who were in the United States based on H-1B visas,

which allow American employers to hire educated and/or experienced foreign workers to work in the United States. They all would have been forced to leave the country without gainful employment in a specialty occupation complying with the H-1B visa guidelines. *See* Kanov. Decl.; Ex. F.

Lastly, EBD has raised a cause of action for an accounting based on an alleged joint copyright interest in and to the software. SAC ¶¶ 38-41; 95-99. Pursuant solely to paragraph 7 of the PSNA, EBD alleges it is entitled to retain a joint copyright interest in the software until it receives full payment for its work done on the SourceRad project. *Id.* ¶ 39. EBD is seeking damages in the amount of 50% of any revenues from the sale or license of SourceRad based on this purported joint copyright interest in the software. *Id.* ¶ 97. EBD also filed several applications and ultimately received a copyright registration with the U.S. Copyright Office based on these allegations. *See* Amended Counterclaims Exs. A-E, which are also attached to Kanov Decl. at composite Exhibit H. In all of these filings with the Copyright Office, EBD attested, under oath, that their contribution was a "work made for hire." *Id.* Additionally, paragraph 7 of the PSNA was clearly amended in the First Amendment to the PSNA dated March, 2001, executed by both parties. A copy of First Amendment to PSNA is attached to the Kanov Decl. at Exhibit I. The First Amendment to the PSNA alters paragraph 7 in its entirety and states that "under no circumstances shall the software and deliverables developed and delivered to Client under the Agreement be deemed to be works of joint authorship or any other designation tending to imply that Consultant [EBD] has or attains ownership or authorship rights thereto." *Id.*

## III. PROCEDURAL HISTORY

Plaintiff originally brought suit against SOURCE for alleged breach of contract, quantum meruit, monies for services rendered, account stated and provisional relief. These claims all stemmed from alleged monies owed by Defendant for work provided by Plaintiff in connection with the design and development of SourceRad. Plaintiff also moved for a Right to Attach Order based on its contract claims.

On January 27, 2003, the Court entered an Order Granting Defendant's Motion to Dismiss With Leave to Amend and Denying Plaintiff's Motion for a Right to Attach Order. The Court

dismissed Plaintiff's claims for breach of contract, account stated and provisional relief, holding that Plaintiff cannot properly plead Defendant accepted Plaintiff's written proposal and its terms (included in the EBD-SIS PSNA dated July 31, 2000) by Defendant's e-mail sent on April 24, 2001. *See* Court's January 27, 2003 Order at 6. The Court held that where the parties understood that acceptance of an offer would be signified by a signature, a binding contract does not arise until this is done. *Id.* at 5.

Plaintiff filed its First Amended Complaint on February 26, 2003 against Defendants SOURCE, P. Daryl Brown, SOURCE's Chief Executive Officer, and Michael A. Plaia, SOURCE's Chief Operating Officer. In the First Amended Complaint, Plaintiff alleged breach of written contract, breach of oral contract, quantum meruit, money for services rendered, account stated, provisional relief, copyright infringement, and vicarious and contributory copyright infringement. Defendant SOURCE filed a motion to dismiss Plaintiff's claims for breach of written contract, oral contract, provisional relief and copyright infringement.

On April 24, 2003, the Court entered an Order granting Defendant's Motion to Dismiss. Despite Plaintiff's allegations of e-mail acceptance and that the parties discussed, clarified and agreed orally to the terms of the written Agreement, the Court reiterated that there could be no contract action brought on the written Agreement without the signature requirement being satisfied. *See* Court's April 24, 2003 Order at 6. Hence, the Court dismissed Plaintiff's breach of written contract counts, with prejudice, and dismissed the oral contract counts, with leave to amend. The Court also dismissed Plaintiff's provisional relief claim, with leave to amend, and dismissed the copyright infringement claim, with prejudice.

On May 19, 2003, Plaintiff filed its Second Amended Complaint for breach of oral contract, breach of implied contract, equitable estoppel, other monetary relief, provisional relief and accounting. Defendant's Motion to Dismiss certain claims and for sanctions was denied on July 14, 2003. Defendant's Amended Counterclaims were filed on October 15, 2003, and they include causes of action for breach of oral contract, breach of implied contract, intentional misrepresentation and negligent misrepresentation, with SOURCE seeking compensatory and consequential damages

including, but not limited to, lost revenues and profits, increased costs associated with fixing and completing the software on its own, increased costs from the delay of rolling out the software, overpayment for EBD services and damages to its business reputation. SOURCE also included a fifth counterclaim for declaratory relief seeking a declaration that EBD is not entitled to a joint copyright interest in SourceRad and must relinquish any purported rights, title or interest in and to the SourceRad software.

## IV. LEGAL STANDARDS

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The question in summary judgment motions is whether reasonable minds could differ as to the import of the evidence. *Eisenberg v. Ins. Co. of North Am.*, 815 F. 2d 1285, 1288 (9th Cir. 1987); *Farrace v. Mass. Mutual Life Ins. Co.*, 1996 WL 570488 at *1 (N.D. Cal. 1996). If opposing evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Eisenberg*, 815 F.2d at 1288.

Partial summary judgment that falls short of a final determination, even of a single claim, is authorized by Rule 56 in order to limit the issues to be tried. *State Farm Fire and Casualty Co. v. Geary*, 699 F. Supp. 756, 759 (N.D. Cal. 1987). The purpose of summary judgment is met when the summary adjudication of discrete theories of liability or claimed damages helps to focus the issues to be litigated, thus conserving judicial resources. *See Watson Labs, Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1123 (C.D. Cal. 2001) (court rejected plaintiff's procedural objections to partial summary judgment motion that sought only to narrow the issues on one part of a damage claim); *Ajir v. Exxon Corp.*, 195 WL 261411 at *4 (N.D. Cal. 1995)(concluding that a motion for partial summary judgment may properly be directed to only part of a claim).

A party seeking partial summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Where

the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Id.* On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail simply by pointing out the insufficiency of evidence to support the nonmovant's case. *Id.* The nonmoving party then must set forth "specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 916 L. Ed. 2d 202 (1986); F.R.C.P. 56(e). Thus, entry of summary judgment is mandated against a party if, after adequate time for discovery and upon motion, the party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

In judging evidence at the summary judgment stage, the court must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520, 111 S. Ct. 2419, 2435, 115 L. Ed. 2d 447 (1991). With all of these standards in mind, the court can consider the motion before it. The parties are operating under California law.

## V. **ARGUMENT**

Defendant SOURCE seeks partial summary judgment on three areas of liability alleged in the Second Amended Complaint Plaintiff is not entitled to damages for unbilled hours, as the parties' agreement limits EBD to the invoiced amounts, which were capped at 8 hours/day per employee. Furthermore, Plaintiff is not entitled to damages for SOURCE's hiring of six former EBD employees who were laid off or resigned and who no longer worked for EBD. Lastly, Plaintiff does not have a joint copyright interest in and to SourceRad and is not entitled to any damages as a result thereof.

Since there are no genuine disputed issues of material fact relating to these issues and claims, Source is clearly entitled to prevail as a matter of law, even when viewing the evidence most favorably to Plaintiff.

### A. **The Parties' Agreement Called for EBD's Billing to Source to be Capped at Eight Hours/Day Per Employee For Their Time Spent Working on The Development of SourceRad, and as such, There is No Basis for Recovery for**

## **Additional Hours Allegedly Worked Over The Daily Cap**

Amardeep Misha, Chief Executive Officer and founder of EBD, entered into a billing agreement with SOURCE for the SourceRad project by which each EBD staff member's time billed for the development of SourceRad would be capped at 8 hours per day. *See* Misha Dep. at 213-215; 233-235, attached to Kanov Decl. at Exhibit B. Mr. Misha testified under oath as follows:

> Q. Okay. Was there ever an understanding between the parties that Source Medical was only to bill for eight hours a day.
> A. Source Medical or eBD?
> Q. I'm sorry. That EBD was only to bill for eight hours a day on SourceRad.
> A. I think, when we were working for SIS, Tom Hui – I had a conversation with him where he had said that for him to predict – for his budgeting purposes, to predict how much he should allocate for the work that we were doing it would be helpful if we could bill on an eight hour day cycle. So that was the understanding, and we billed SIS, I think, the first invoice I think may have been on – I'm not sure about this, but the first invoice may not have followed that model, but all other invoices, after that conversation, were on an eight hour billing cycle.
>
> ****
>
> Q. But when was that discussed to be also a part of the SourceRad project?
> A. All the terms that we were following were essentially a carry over from whatever had been agreed with SIS. So those terms carried on.

*See* Misha Dep. at 213-215, attached to Kanov Decl. at Ex. B.

Mr. Misha was asked later in his deposition for the basis for EBD seeking recovery of alleged hours worked over the eight hour/day cap which were never billed or invoiced to SOURCE, and Mr. Misha reaffirmed his previous testimony by stating as follows:

> Q. Okay. But was there any parameter that allowed for, then, the billing of uninvoiced hours, should one of those invoices not be paid in a timely fashion?
> [Objection by Mr. Gerlach.]
> Q. Was that ever part of the parties' agreement?
> A. That the invoices would be paid, yeah, I think it was part of the agreement.
> Q. No, that's not what I'm saying. You previously testified that the parties had an agreement that Source Medical would not be billed, for SourceRad, more than eight hours per day, correct?
> A. Yeah. That was a courtesy I had extended to Tom.

*Id.* at 233-234.

Additionally, there is e-mail correspondence between the parties offering further proof of the agreement capping the number of hours billed to SOURCE for EBD's development work A November 14, 2001 e-mail exchange between Tom Hui, SOURCE'S Chief Technology Officer, and Brian Clark, EBD's Project Manager for SourceRad, indicates EBD has been charging SOURCE eight hours per weekday regardless of actual hours worked and that EBD reached agreement with SOURCE to follow the same procedure for weekend days worked starting after November 14th. *See* Kanov Decl. at Ex. D (document labeled F-3). EBD billed SOURCE for eight hour days even when EBD employees worked less than eight hours on a particular day, as exhibited by an October 1, 2001 e-mail from Alok Bal, an EBD Project Manager. *See id.* Ex. C. In Mr. Bal's e-mail, he says that EBD staff can each bill eight hours on September 11, 2001, even though the offices closed early that day, because the parties have an agreement that SOURCE will be billed eight hours/day regardless of actuals. Mr. Clark also has that same understanding in his portion of the e-mail chain included in Exhibit C.

It is readily apparent that EBD agreed, with its collective eyes wide open, that its compensation on the SourceRad project would be limited to hourly billing for the services of its programmers, developers and other management staff, to be capped at eight hours/day per employee, plus any billable costs. EBD's financial expert witness, Michael Wagner, acknowledges that EBD's invoices to SOURCE reflect a billing of eight hours per weekday worked and per weekend day worked after November 14, 2001, irrespective of the number of hours EBD personnel actually worked. *See* Kanov Decl. at Ex. D at p. 6. Even if, *arguendo*, EBD staff members did work more than eight hours on a particular day, EBD is constrained by its contractual agreement with SOURCE. There is no authority for the proposition that this contractual limit is inoperative with respect to EBD's claim for collection of monies for hours worked over this cap.

The law is well settled in California that there is no equitable basis for an implied-in-law promise to pay the reasonable value of one's services when the parties have an actual agreement covering compensation. *Hedging Concepts, Inc. v. First Alliance Mortgage Co.*, 41 Cal. App. 4th

1410, 1419 (1996)[3]; *see also* 55 California Jurisprudence Third, Restitution, § 19, at 328 *et seq.*; *Id* § 58, and at 375-376 (no ground to imply payment obligation in conflict with express contract). "The reason for the rule is simply that where the parties have freely, fairly and voluntarily bargained for certain benefits in exchange for undertaking certain obligations, it would be inequitable to imply a different liability …." *Wal-Noon Corp. v. Hill*, 45 Cal. App. 3d 605, 613 (1975); *Wilkerson v. Wells Fargo Bank*, 212 Cal. App. 3d 1217, 1227 (1989), *disapproved on other grounds* (inequitable to imply obligation different from those in parties' bargain). Quite simply, there cannot be a valid, express contract and implied contract each embracing the same subject but requiring different results. *Crossen v. Foremost-McKesson, Inc.*, 537 F. Supp. 1076, 1077 (N.D. Cal 1982); *Wal-Noon*, 45 Cal. App. 3d at 613.[4]

When the parties have an actual contract covering a subject, a court cannot – not even under the guise of equity jurisprudence – substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract. *Florida ex rel. Butterworth v. Exxon Corp.*, 109 F. 3d 602, 608-612 (9th Cir. 1997) (when a person makes an agreement with eyes open to be paid a certain amount for his services, that is all he gets). Since both parties agree that there is an oral contract which covers EBD's compensation for its work on the SourceRad project, the terms of said contract will control the subject of compensation. *Id.* at 612 (attorney who agreed not to exceed 425 hours in billing on consolidated antitrust cases is limited to the stated amount, even if he worked more hours in connection with the suit); *see also Hedging Concepts, Inc.*, 41 Cal. App. 4th at 1419-1421. Thus, the parties' contractual term which capped billing at eight hours a day per employee precludes any recovery by EBD of additional hours worked but not invoiced or billed, and SOURCE is entitled to summary judgment as a matter of law. *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)(quoting Rule 56(e) advisory

---

[3] EBD asks for damages pursuant to unbilled hours allegedly worked by its staff in numerous causes of action, including quantum meruit. Quantum meruit is an equitable theory which supplies, by implication and in furtherance of equity, implicitly missing contractual terms. *Hedging Concepts, Inc.*, 41 Cal. App. 4th at 1419. Contractual terms regarding a subject are not implicitly missing when the parties have agreed on express terms regarding that subject. *Id.*

[4] The Court does not have to stretch to make a finding that an actual contract exists between the parties for capping billable hours at eight per day, as attested to by Mr. Misha himself.

committee's note on 1963 amendments) ("purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial'" on some or all issues).

**B. There is No Genuine Issue of Material Fact That EBD is Not Entitled to Any Damages For SOURCE's Hiring of Former EBD Personnel**

EBD's third and fourth causes of action in its Second Amended Complaint for breach of an oral contract and/or implied contract allege that EBD is entitled to damages for SOURCE's hiring of six individuals who were formerly employees of EBD. The sole basis for these damages is paragraph 11 of the EBD-SIS PSNA, which provides for a $75,000 penalty for each violation of the no hiring language. Even assuming in the light most favorable to EBD that the parties traveled under the PSNA, a closer look at the contract language in paragraph 11 reveals that EBD is not entitled to any damages, as the evidence clearly shows that there was no violation of this provision.

The alleged no hiring clause from the PSNA states as follows:

> 11. No Solicitation or Hiring. Either Party or that "Party's Representatives," as defined below, shall not solicit or hire the Other Party's Personnel(s), as defined below, during the term of the work contemplated under this Agreement and for twenty-four (24) months thereafter without the Other Party's prior written consent. If any Party violates this clause of the Agreement and solicits or hires any Personnel(s) before the expiration of the 24-month period specified in this clause, that Party shall, within 5 days of notice, pay the Other Party a fee of Seventy-Five Thousand Dollars ($75,000) for each violation.
>
> ****
>
> For the purpose of this Agreement, the term "Party's Personnel(s)" will include any individual(s) that are working for and being paid for by the Party.

As discussed below, none of the individuals hired by SOURCE were "working for and being paid" by EBD at the time of their hire.

### 1. Five of the Six Former Employees Were Laid Off by EBD Prior to Their Hiring by SOURCE, and the Other Former Employee Resigned in Advance of An Impending Layoff

Plaintiff alleges that SOURCE proceeded to hire away six of EBD's former employees. SAC ¶ 5. However, as stated in the definition of "Party's Personnel(s)," *former employees* are not included in the no hire clause. The six former employees at issue are Srinivas Chari, Hareesh Pereira, Ajit Goel, Yogesh Agrawal, Vinod Shetye and Dharmesh Vora. The first five listed employees were all laid off by EBD months prior to being approached and coming to work for SOURCE, and Dharmesh Vora had resigned in advance of his impending dismissal.[5]

For a large number of EBD employees who worked on SourceRad, once EBD's involvement in the project was over, they were out of a job. *See, e.g.*, Declaration of Vora (Docket No. 33) at pp. 7-8; Declaration of Chari (Docket No. 38) at p. 7; Declaration of Pereira (Docket No. 34) at pp. 7-8. Soon after the six employees at issue began work at EBD, they learned that once a particular project was over, there was a strong likelihood they would be laid off and EBD would simply restaff from India when the next engagement occurred. *Id.*; *see also* Vora Dep. at 277-278 attached to Kanov Decl. at Exhibit G. This had consequences for their ability to remain in the United States, pursuant to their H-1B work visas.

EBD had retained the services of all of the six programmers at issue from India, and these individuals came to the United States through H-1B work visas. A H-1B visa is the most common type of visa used by American employers to obtain employment authorization for foreign workers. It is very popular because it enables American employers to hire educated and/or experienced foreign workers to come work in the United States. In the computer and high tech sectors, the H-1B is an essential business tool. The H-1B is particularly desirable because the American employer can obtain the H-1B without establishing that there is a shortage of qualified American workers.

[5] Unlike any of the other individuals at issue, there is evidence that SOURCE had communications with EBD about the solicitation of Mr. Vora during his employ at EBD. However, review of Plaintiff's Second Amended Complaint reveals that EBD is only seeking damages of $75,000 per employee for each EBD employee whom SOURCE <u>hired</u>. *See* SAC ¶¶ 61-70. Since Mr. Vora had resigned in lieu of an impending release, he was not an EBD employee when ultimately hired by SOURCE, and the PSNA was not violated.

The dates that each employee was released or left EBD and the date of hire by Source Medical are as follows:

| | Date of Release by EBD[6] | Date of Hire by Source Medical[7] |
|---|---|---|
| AGIT GOEL | June 21, 2002 | October 7, 2002 |
| VINOD SHETYE | June 21, 2002 | August 21, 2002 |
| YOGESH AGRAWAL | May 28, 2002 | October 7, 2002 |
| HAREESH PEREIRA | May 8, 2002 | August 19, 2002 |
| SRINIVAS CHARI | May 8, 2002 | August 26, 2002 |
| DHARMESH VORA | July 19, 2002[8] | July 19, 2002 |

In light of these undisputed facts, it is clear that none of the former EBD employees were "working for and being paid by the Party [EBD]" at the time of their hiring by SOURCE.[9]

Paragraph 11 of the PSNA covers two distinct scenarios where a party must pay the purported $75,000 penalty for hiring of the other's personnel. The first, and most obvious, scenario is in the likelihood that SOURCE hires a current EBD employee while the agreement between EBD and SOURCE is still being performed. This clearly is not the case as EBD ceased work for SOURCE in June, 2002 (SAC ¶ 2). The clause also attempts to cover a second scenario where SOURCE hires a current EBD employee within 24 months after the contract between EBD and SOURCE is terminated. Again, this is not operative in the instant case because none were current EBD employees when hired by SOURCE, as five of the six employees at issue were released prior to the end of EBD's engagement with SourceRad, and Vora resigned ahead of a pending release.

---

[6] *See* Kanov Decl. at Ex. B - Misha Dep. at 243-244 and Exhibits 119-123, which includes the COBRA notification forms for five of the six employees indicating their release on the "date of qualifying event."

[7] *See* Affidavit of Tracy Vebber, attached to Kanov Decl. at Exhibit F.

[8] *See* Resignation letter from Vora at Ex. 17 to Vora Dep., attached at Ex. G. Mr. Vora had last been billed out to SOURCE on June 21, 2002 (*see* Kanov Decl., Ex. D - Klausner Expert Report to Kanov Decl., Tab A, Schedule 3(a)) and was told by Mr. Clark at EBD that he would soon be laid off. *See id* at Ex. G at p. 277.

[9] Furthermore, there has been no evidence that any of these individuals were solicited during the time of their employ, other than the contention surrounding Mr. Vora. In any event, EBD does not seek damages in Counts 3 and 4 for solicitation and California law renders antisolicitation covenants void as unlawful business restraints except when their enforcement is necessary to protect trade secrets. *Moss, Adams & Co. v. Shilling*, 179 Cal. App. 3d 124, 130 (1986); *Liberty Mutual Ins. Co. v. Gallagher & Co.*, 1994 WL 715613 at *3 (N.D. Cal. 1994). EBD has not alleged the need to protect any trade secrets.

What the alleged clause does not cover is the scenario present here where SOURCE hired six *former* EBD employees after the contract between EBD and SOURCE had ended. "Party Personnel(s)" is specifically defined to require two elements. First the individual must be "working for the party." Second, the individual must be "being paid" by the party. Hence, this provision precludes the hiring of an employee still employed and actively engaged on a paying project with his original employer. EBD may attempt to argue that some or all of these individuals would have still been working at EBD if SOURCE had paid its invoices timely. However, no such provision is included in the contractual language allegedly agreed upon by the parties, and it is irrelevant to the Court's analysis. Hence, SOURCE is entitled to judgment as a matter of law as to EBD's claims for damages for the hiring of these six former employees.

**2. The No Hire Provision Is Invalid and Unenforceable Under Section 16600 of the California Business and Professions Code and Public Policy**

Additionally, California Business and Professions Code Section 16600 precludes EBD's claims for the hiring of these six individuals. In response to Defendant's Motion to Dismiss the Second Amended Complaint, the Court denied such motion in part by finding that the no hire provision at issue does not violate Section 16600. *See* Order dated July 14, 2003 at 9. The Court held that the no hire clause in this case is nearly identical to the one in *Webb v. West Side District Hosp.*, 144 Cal. App. 3d 946 (1983), *overruled on other grounds by Moncharsh v. Blase*, 144 Cal. App. 3d 946 (1993). However, in light of the additional discovery taken in the case since the Court's ruling, Defendant believes a further analysis of the relevant statutory and case law is warranted.[10]

Defendant relied on the case of *Webb* to support its position that the no hire clause did not violate Section 16600, and the Court said that the clause in this case is nearly identical to the clause in *Webb*, as it is "between two private parties and does not impact an employee's ability to be hired

---

[10] The Court specifically welcomed SOURCE to later file a motion for summary judgment with respect to the fact that five of the former employees were laid off at the time of their hire by SOURCE, since this addressed matters outside of the four corners of the complaint. *See* Order dated July 14, 2003 at 9. SOURCE believes the results of subsequent discovery also impact the Court's Section 16600 analysis, and therefore provides argument herein.

by Defendant, so long as Defendant is willing to pay a fee for such employee." *See* Order dated July 14, 2003 at 9. However, unlike in the instant case, the *Webb* court made key findings before deciding that the clause was not in conflict with California public policy and Section 16600.

The plaintiff in *Webb* operated as an employment agency that provided temporary physicians to work in the emergency room of a hospital that was the only hospital within a forty mile radius. *See Webb*, 144 Cal. App. 3d at 949. The contract between the plaintiff and the hospital contained a "non-interference" provision requiring the hospital to pay a $30,000 fee whenever it hired a physician who was provided by the plaintiff. *Id.* The court upheld the provision, reasoning that the placement fee was necessary to allow the employment agency to maintain its business. *Id.* at 952-53.

In *Webb*, the court recognized that "all parties involved in negotiating the contract agreed that its purpose was not to create a monopoly, but instead to allow the hospital to employ physicians originally recruited by Webb while at the same time protecting Webb against the unfair exploitation of his services." *Id.* at 953. Essential to the determination in *Webb* was the hospital's acknowledgement that it "would have had to pay a placement fee substantially similar to the amount set in Section 2.15 ($30,000 per physician) if it had recruited physicians through employment agencies." *Id.* Based on these facts, the *Webb* court held "[o]n this record, we must find the fees charged to be reasonable and without illegal restraining effect." *Id.*

In the instant case, EBD is not a placement agency, as was the case in *Webb*. EBD's business is to create and design software. SOURCE paid EBD to develop code and produce a working software application. It did not retain EBD for the purpose of acquiring software developers, as opposed to *Webb* where the plaintiff entered into a contract with the hospital specifically for the plaintiff to furnish the hospital with physicians to staff its emergency room.

Additionally, unlike in *Webb*, there is no evidence that SOURCE would have had to pay a placement fee for the hiring of six additional programmers at a substantially similar rate to the $75,000.00 per employee asked for by EBD. Discovery has shown that five of the six former EBD employees were hired by SOURCE in fall or winter of 2002, after having been laid off by EBD, and

the tech market was still mired in a deep funk. There was a glut of unemployed programmers looking for work. There has been no evidence produced in the lengthy discovery in this case, nor can the Court make any such finding, that the alleged $75,000 fee per former employee hired is "substantially similar" to the amount which SOURCE would have had to pay to retain similar junior level software programmers. In fact, SOURCE has never paid or even approximated that fee for any of its programmers. This amount is greater than the yearly salary paid by SOURCE for any of these junior programmers.

Also integral to the finding in *Webb* was that "without recoupment of the recruitment expenses he had incurred, Webb became vulnerable to unfair exploitation of his labors by the hospital." *Id.* at 954. The court clarified this assertion, stating "[t]he interest we find protectable here is limited to the placement services furnished." *Id.* at 954, n. #6. However, in the instant case, Plaintiff's economic interest was not equally valuable and protectable. EBD hired a constant inflow of Indian nationals on H-1B visas as its projects required, and these employees would often be released upon the job's conclusion. *See* Chari Decl. (Docket No. 38) at 7; Vora Dep. at 276-277 attached to Kanov Decl. at Ex. G. Furthermore, Plaintiff is not an employment agency and does not allege to make money by recruiting software developers for placement at SOURCE or any other company. SAC ¶ 7. Most importantly, all of the employees at issue were no longer working for EBD at the time they were hired by SOURCE, as they either were laid off prior to the conclusion of the SourceRad job or resigned. This downsizing by EBD necessitated they quickly find new employment if they wanted to remain in the country under their H-1B visas.

The *Webb* opinion relies in large part on the Texas case *Hospital Consultants, Inc. v. Potyka,* 531 S.W. 2d 657 (Texas Civ. App. 1975), noted as the only case which the *Webb* court discovered with substantially similar facts. However, a glaring difference exists between *Webb* and *Potyka* relevant to the instant case. In *Potyka*, the no hire clause was invalidated in part because the court found it unacceptable that the physicians, whose employment was being restrained, were unaware of the contractual provision restricting them. *Potyka*, 531 S.W. 2d at 664; *see also Heyde Cos., Inc. v. Dove Healthcare, LLC*, 637 N.W. 2d 437, 441-42 (Wis. Ct. App. 2001), *aff'd* 654 N.W. 2d 830

(comparing *Webb* and *Potyka* and finding the facts before them to be more in line with *Potyka* since none of the physical therapists knew their employment was restricted because of their work with Greenbriar, an employment agency). The *Potyka* court held, in pertinent part:

> It is one thing to uphold a restraint as reasonable where it results from an agreement freely entered into by the person whose commercial activities are being restricted. Such a conclusion is the result of the weighing of several policy considerations, not the least of which is our traditional reverence for a person's freedom to contract. But where the restriction on B's freedom results, not from B's voluntary agreement with A, but from A's agreement with C, the difference in the situation and in the policy considerations to be balanced is obvious. In the one case B voluntarily relinquishes his freedom in order to obtain a benefit which, as the time of such relinquishment, he considered desirable. In the other situation B is deprived of his freedom without his acquiescence and with no resulting benefit to him.

*Potyka*, 531 S.W. at 664.

This Court found that since the no-hire clause was between SOURCE and EBD and did not impact an EBD's employee's ability to be hired by Defendant, so long as SOURCE was willing to pay a fee for such employee, the no hire clause at issue did not violate Section 16600 or the public policy of the State of California. However, the present case is more in line with *Potyka* and *Heyde* than with *Webb*, since the no-hire provision in the parties' contract was not known or consented to by affected employees at the time of its execution.

In *Heyde*, a temporary employment agency (Greenbriar) brought an action against a nursing home (Dove) for breach of a no hire contractual provision. *Id.*, 637 N.W. 2d at 438. Per the parties' agreement, Greenbriar provided Dove with physical therapists. *Id.* The therapists worked in Dove's nursing home, but remained Greenbriar employees. *Id.* The agreement contained a provision that prevented Dove from hiring any Greenbriar therapists for up to one year after the agreement expired unless Dove obtained Greenbriar's written consent. *Id.* If Greenbriar gave consent, Dove was required to pay Greenbriar a fee of 50% of the therapist's annual salary. *Id.* Greenbriar therapists were unaware of this provision. *Id.* Shortly after terminating the agreement, Dove hired one current and three former Greenbriar employees. Dove did not seek Greenbriar's written consent, nor did it pay 50% of the employees' salaries in accordance with the no-hire provision. *Id.*

Greenbriar relied on the *Webb* case to support its argument that the no hire provision was enforceable. *Id.* at 441. However, the *Heyde* court found that its case was more in line with *Potyka*, as even though the clause was between two private parties, none of the physical therapists knew their employment was restricted because of their employment at Greenbriar. *Id.* at 442. The court held that "an employee's individual right and freedom to contract may not be restricted by a contract between two employers unless the employee is aware of and consents to the contract." *Id.* (emphasis added). Thus, since the no-hire provision restricted the employment opportunities of Greenbriar employees without their knowledge or consent, it was unenforceable. *Id.*

Furthermore, the no hire provision was not limited to therapists who worked at Dove; rather, Dove was prohibited from hiring any Greenbriar therapists even if that therapist had never worked at Dove. *Id.* Thus, the provision went beyond what was reasonably necessary to protect Greenbriar's interests and thus the clause was unenforceable. *Id.*

Similarly in the instant case, there has been no evidence presented throughout the lengthy discovery process that any of the programmers at issue knew their employment was restricted or consented to same when they accepted employment with EBD. Furthermore, the no hire provision contained in paragraph 11 of the PSNA restricts SOURCE from hiring any personnel working for and being paid by EBD and was not restricted to programmers working on the SourceRad project. This attempted restriction on the mobility of all EBD employees is the exact problem that Section 16600 was drafted to remedy. *Metro Traffic Control, Inc. v. Shaddow Tracking Network*, 22 Cal. App. 4th 853 (1994); *see also Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 255 (1968)(the interests of the employee in his own mobility and betterment are deemed paramount to the competitive business interests of the employers).

In sum, EBD's foundation for the enforceability of the no-hire clause hinges on 1) the necessity of SOURCE to pay similar placement fees to hire workers; 2) whether the restrictions were narrowly tailored to only those individuals who worked on SourceRad; and 3) whether the employees had knowledge and gave consent to the restrictions placed in the agreement between the two employers. There has been no evidence that SOURCE would have had to pay similar fees to

hire programmers in mid to late 2002. The no-hire clause goes well beyond any reasonable restrictions by including all EBD staff, including those who never worked on SourceRad. Furthermore, there is no evidence that these former EBD employees knew and agreed to being so restricted. The no-hire clause is invalid, as California has a low tolerance for any restrictions on mobility, including the forced payment of monies by an employer which would chill employment opportunities. *See Application Group, Inc. v. Hunter Group, Inc.*, 61 Cal. App. 4th 881, 900 (1998). Thus, Section 16600 and California public policy do not allow for enforcement of the no-hire clause at issue.

### C. <u>EBD Is Not Entitled to a Joint Copyright Interest In The SourceRad Software</u>

EBD's stated basis for retaining a joint copyright interest in the software is paragraph 7 of the PSNA, which states as follows:

> 7. <u>Grant Of Rights.</u> Effective upon Consultant's receipt of full payment of all applicable fees set forth in the Proposal (and any amendments to the Proposal), Consultant shall assign and transfer to Client all rights, title and interest, worldwide, in and to the software and Deliverables covered by the Proposal (excluding Third Party Programs, as defined below), including without limitations all intellectual property rights and other property rights (collectively called "IP Rights") that Consultant has in such software and Deliverable as per the Proposal, such that Client will own all right, title and interest in and to the Deliverable as per the Proposal. Consultant shall retain no interest in the IP Rights.

EBD alleges that since it has not been paid in full for its development work on SourceRad, EBD is entitled to a joint copyright interest until such time as it receives full payment. SAC ¶ 6. However, since the inception of the SourceRad project and throughout EBD's involvement, both parties always intended and understood that SOURCE would retain any and all copyright and/or ownership interest in the software and under no circumstances would SourceRad be considered a work of joint authorship. This is supported by the First Amendment to the PSNA executed by Messrs. Hui and Misha in March, 2001, in which Section 7 of the PSNA was amended in its entirety prior to EBD's SourceRad proposal on April 20, 2001, that the parties' agreement be governed by

the terms of the PSNA. *See* Kanov Decl. at Ex. I. The First Amendment to the PSNA reads, in pertinent part:

> Section 7 of the Agreement is amended in its entirety to read as follows:
>
> Effective upon Consultant's receipt of full payment of all applicable fees set forth in this Proposal (and any amendments to the Proposal), Consultant shall (without any further action on the part of any Party) assign and transfer to Client all rights, title and interest, worldwide, in and to the Software and Deliverables covered by the Proposal (excluding Background Technology, as defined below), including without limitation, all intellectual property rights and other property rights (collectively called "IP Rights") that Consultant has in such Software and Deliverables, such that Client will own all right, title and interest in and to the Software and Deliverables. Consultant shall retain no interest in the IP Rights.
>
> *Under no circumstances shall the Software and Deliverables developed and delivered to Client under the Agreement be deemed to be works of joint authorship or any other designation tending to imply that Consultant has or retains ownership or authorship rights thereto.*

*Id.* (emphasis added)

The amended ¶ 7 of the PSNA makes clear that under no circumstances shall the software deliverable be deemed a co-authorship. Hence, the very agreement which EBD contends is operative specifically precludes EBD from retaining a joint copyright interest and/or ownership of the software. *See* Misha Dep. at 218-219 attached to Kanov Decl. as Exhibit B, where he acknowledges entering into this First Amendment to the PSNA. There are also numerous documents drafted by EBD reflecting this understanding and indicating that all copyright interests belonged to SOURCE. *See, e.g.*, Ex. 116 to Misha Dep.; Ex. 78 to Tipnis Dep., both attached to Kanov Decl. as composite Exhibit J.

As an additional basis for granting partial summary judgment, SOURCE directs the Court's attention to the numerous applications filed by EBD with the U.S. Copyright Office. EBD did not file an application for registration of a copyright interest in SourceRad until on or about January 17, 2003, in the midst of the current litigation and without notice to SOURCE. In its original application, EBD represented that it was the sole author of SourceRad, which was listed as a derivative work. *See* Kanov Decl. at Ex. H, specifically document A at §§ 2(a), 6 which is also

attached to Amended Counterclaims. Additionally, EBD noted that its contribution to SourceRad was a "work made for hire." *Id.* at § 2(a). After receiving notification from the U.S. Copyright Office notifying EBD that it was delaying registration because the application for this work included a claim for copyright in "interface" and "business logic," some of which may not be copyrightable, EBD filed another application ("second application") for registration of a copyright interest in SourceRad. *See id.* at document C. In its second application, EBD again noted that its contribution to SourceRad was a "work made for hire." *Id.* at § 2(a). Furthermore, EBD again represented that it was the sole author of SourceRad, which is listed as a derivative work. *Id.* at §§ 2(a), 6. However, now EBD claimed copyright in "additional program code relating to healthcare facility management," without specifying further the details of this new material. *Id.* at § 6(b).

The Copyright Office registered a copyright in SourceRad to EBD, registration number TXu-1-065-223, with an effective date of January 17, 2003. A printout from the U.S. Copyright Office web page is attached to the Kanov, Declaration as Exhibit H at document D. The information contained in both the original application and the second application was certified to be correct by the applicant, Todd Thompson, Esq., counsel/agent for EBD. SOURCE had received no prior notice of the aforementioned applications and registration and did not have a chance to dispute EBD's representations. EBD knew that SOURCE vehemently objected in the instant litigation to EBD's purported claims to a copyright interest in the software.

In its First Amended Complaint, EBD for the first time brought copyright infringement claims against SOURCE and two of its officers, P. Daryl Brown and Michael Plaia. EBD claimed that it was the sole owner of all rights, title and interest in the source code for SourceRad, pursuant to its copyright registration. However, pursuant to SOURCE's Motion to Dismiss, the Court dismissed, with prejudice, the copyright infringement claim against it. *See* Order dated April 24, 2003. The Court held that EBD only alleged the existence of a joint work by asserting "it was hired by Defendant to provide computer software design and programming engineers to Defendant to assist Defendant in creating SourceRad, in which the parties' employees worked together in the creation of SourceRad." *Id.* at 7-8.

On May 19, 2003, EBD filed its Second Amended Complaint in which it now seeks an accounting based on an alleged joint ownership in the copyright to SourceRad software. On July 7, 2003, EBD filed an application for supplementary registration ("supplementary application"), revising its previous stance that is was the sole owner of the software, ostensibly to be consistent with the Court's ruling on its First Amended Complaint. A copy of the supplementary application is attached to the Kanov Declaration as Exhibit H at document E. In its supplementary application, EBD now represented that SOURCE was a coauthor of SourceRad. EBD continues to attest under oath that SourceRad was both a work made for hire and a derivative work, and no information is listed as to the owner, or any permission granted by the owner, of such derivative work. *Id.*

A certificate of copyright registration shifts to the defendant the burden to prove the invalidity of the plaintiff's copyright. *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F. 3d 1211, 1217 (9th Cir. 1997). This is because under the copyright laws, the registration of a copyright certificate constitutes *prima facie* evidence of the validity of a copyright in a judicial proceeding commenced within five years of the copyright's first publication. *Id.*; 17 U.S.C. § 410(c). The presumption of validity can be rebutted by simply offering some evidence or proof to dispute or deny the plaintiff's *prima facie* evidence. *Id.*; *North Coast Indus. v. Jason Maxwell, Inc.*, 972 F. 2d 1031, 1033 (9th Cir. 1992).

SOURCE has rebutted any presumption of validity by informing the Court that the agreement on which EBD solely hinges its joint copyright assertion contains language that makes such a result an impossibility. The Court should then shift the burden of proving validity back to EBD. *Entertainment Research Group*, 122 F.3d at 1218; *Durham Indus., Inc. v. Tomy Corp.*. 630 F. 2d 905, 908-909 (2d Cir. 1980).

In evaluating whether EBD is entitled to a joint copyright interest in the SourceRad software, in addition to the specific contractual language between the parties which bars such a claim, EBD's copyright applications themselves negate their position. In all of its copyright applications, EBD has consistently stated that its contribution to the work was a "work made for hire." It is axiomatic that if a work is made for hire, the employer or other person for whom the work was prepared is

considered the author and owns the copyright. *Communities for Creative Non-Violence v. Reid*, 490 U.S. 730, 737, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989); 17 U.S.C. § 201(b). As stated by the United States Supreme Court in *Reid*, classifying a work as "made for hire" determines the ownership of its copyright and has profound significance for freelance creators, including computer programmers. *Id.*; *see also Warren v. Fox Family Worldwide, Inc.*, 171 F. Supp. 2d 1057, 1070-71 (C.D. Cal 2001) (creator of a work for hire cannot claim beneficial ownership of a copyright in the work). Thus, since EBD repeatedly attested under oath that its contributions to SourceRad were "work for hire," EBD is not entitled to any ownership interest in the copyright.[11]

As a result, SOURCE is entitled to partial summary judgment as to EBD's purported joint interest in SourceRad, and SOURCE requests a ruling that SOURCE is the sole owner of SourceRad and EBD is not entitled to any ownership or copyright interest in and to the software and must relinquish and/or transfer any such purported interests to SOURCE.

## VI. CONCLUSION

For the foregoing reasons, the Court should grant SOURCE's Motion for Partial Summary Judgment.

Dated: April 19.2004

Respectfully Submitted,

FISCHMAN, HARVEY & DUTTON, P.A.

By: s/Jonathan E. Kanov

---

[11] Another factor in deciding whether a contributor may be deemed a coauthor of a joint work is whether the putative coauthors make objective manifestations or a shared intent to be coauthors, such as by denoting the authorship of the *Pirates of Penzance* as "Gilbert and Sullivan." *See Aalmuhammed v. Lee*, 202 F. 3d 1227, 1234 (9th Cir. 1999). The Ninth Circuit goes on to state that objective manifestations are required because, were the mutual intent to be determined by subjective intent, it could be a common instrument of fraud, were one coauthor to hide from the other an intention to take sole credit for the work. *Id.* The contract language between the parties as alleged by EBD, as well as all of the other aforementioned documents, make clear that the parties always intended that SOURCE would be the sole owner of all ownership and copyright interests in and to the software.