Denise M. De Mory (SBN 168076)
Howrey Simon Arnold & White, LLP
525 Market Street, Suite 3600
San Francisco, CA 94105
Tel: (415) 848-4900

Jefferson T. Stamp (SBN 187975)
Attorney at Law
15650-A Vineyard Blvd., #146
Morgan Hill, CA 95037
Tel: (408) 623-8414

Attorneys for Plaintiff
EXCEL INNOVATIONS, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| EXCEL INNOVATIONS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>INDIVOS CORPORATION, SOLIDUS NETWORKS, INC., AND DOES 1 TO 100, inclusive,<br><br>Defendants. | CASE NO. C-03-3125 MMC<br><br>**PLAINTIFF EXCEL INNOVATIONS, INC.'S CORRECTED MEMORANUDUM IN OPPPOSITION TO INDIVOS CORPORATION AND SOLIDUS NETWORKS, INC.'S MOTION FOR SUMMARY JUDGMENT REGARDING PATENT OWNERSHIP**<br><br>Date: May 14, 2004<br>Time: 9:00 a.m.<br>Dept: Courtroom 7<br>Judge: Hon. Maxine M. Chesney |



Dockets.Justia.com

## TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. DISPUTED FACTS ..... 3

A. The Operating Agreements Confirm That Inventors Did Not Contribute Any Patent Rights In Exchange For Equity, And That Excel Paid For The Services Of The Consultants With Its SmartTouch Equity Through The June 17, 1996 Amendment To The Operating Agreement ..... 3

B. The only interest Pare, Lee, and Lapsley ever had in the patents or SmartTouch technology was a financial interest in a future royalty stream to be paid by Excel ..... 5

C. Contrary to Defendants' Assertions, There is No Evidence That The Consulting Agreements Were Terminated Or That Hoffman Told The Inventors They Were Terminated ..... 7

D. Likewise, Contrary to Defendants' Assertions, Hoffman Did Not Represent to the Excel Board That Excel Transferred Title to the Patents to SmartTouch, But Instead That Excel Conferred A License ..... 8

E. The May 8, 1995 Excel/SmartTouch License Did Exist And Explains Excel's and Hoffman's Conduct ..... 10

F. There Is Ample Evidence That Defendants Had Notice of Excel's Rights ..... 10

G. There Are Many Other Instances Where Defendants' Claimed Undisputed Facts Are Not Supported By the Underlying Evidence, Or, Are Contradicted By It. ..... 12

H. DEFENDANTS OFFER INSUFFICIENT EVIDENCE OF HARM FROM OR RELIANCE ON REPRESENTATIONS BY HOFFMAN ..... 13

I. BURDENS OF PROOF AND LEGAL STANDARDS ..... 14

J. DEFENDANTS MISSTATE THE SUMMARY JUDGMENT STANDARD ..... 15

K. INDIVOS DOES NOT HOLD "VALID" LEGAL TITLE ..... 16

1. Excel holds legal title ..... 16

2. Defendants Do Not Hold "Valid" Legal Title ..... 18

3. Excel's Rights Were Not Superseded And No Writing Exists Confirming An Assignment By Excel ..... 19

4. Excel Owns, Or There Are Disputed Questions Of Fact, As to the Patents Filed After The Master Patent ..... 21

L. Indivos' Equitable Claims Fail As A Matter of Law .................................................... 23
III. CONCLUSION ......................................................................................................... 25

## TABLE OF AUTHORITIES

**CASES**

*Alling v. Universal Manufacturing Corp.*, 5 Cal. App. 4th 1412, 1433-34 (1992) ..... 21

*Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574 (Fed. Cir. 1991) ..... 17

Ardisam, Inc. v. Ameristep, Inc., 302 F.Supp. 2d 991 (W.D. WI 2004) ..... 24

*Brookview Condo. Owners' Ass'n v. Heltzer Enterprises-Brookview*, 218 Cal. App. 3d 502, 513, 267 Cal. Rptr. 76 (1990) ..... 25

*Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991) ..... 16

*Crown Die Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24 (1923) ..... 20

*Davis v. Davis*, 26 Cal. 23 (1864) ..... 21

*Enzo Apa & Son, Inc. v. Geapag, A.G.*,134 F.3d 1090 (Fed. Cir. 1998) ..... 20

*Estate of Anderson*, 60 Cal. App. 4th 436, 440 (1997) ..... 15

*Filmtec Corp v. Allied-Signal Inc.*, 939 F.2d 1568 (1991) ..... 17

*FilmTec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568 (Fed. Cir. 1991) ..... 18

*Gaia Techs. v. Reconversion Techs*., 93 F.3d 774, 779-80 (Fed. Cir. 1996) ..... 15

*Green v. Travlers Indem. Co.*, 185 Cal. App. 3d 544 (1986) ..... 25

*Houghton v. South*, 965 F.2d 1532 (1992) ..... 16

*Hulse v. Bonsack Machine Co*, 65 F 864 (4th Cir 1895) ..... 23

*Imatec, Ltd. v. Apple Computer, Inc.*, 81 F.Supp.2d 471 (SD NY 2000) ..... 18

*Peskin v. Phinney*, 182 Cal. App. 632, 636, 6 Cal. Rptr. 389 (1960) ..... 25

*Russell v. Dopp*, 36 Cal. App. 4th 765 (1995) ..... 15

*Wang Laboratories, Inc. v. Mitsubishi Electronics*, 103 F.3d at 1580 (Fed.Cir. 1997) ..... 24

*Westinghouse Electric & Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342, 349 (1924) ..... 20

**STATUTES**

25 U.S.C. § 261 ..... 20

35 U.S.C. Sec. 262 ..... 18

Code Civ. Proc., § 1856 ..... 21

*Freedom Wireless, Inc. v. Boston Communications Group, Inc.*, 220 F. Supp. 16 (D. Mass. 2002) ........ 18

**OTHER AUTHORITIES**

"The Employee-Inventor, 1830-1930," 65 *University of Chicago Law Review* 1127, 1192 (1998). ........ 23

1 Witkin, Summary of California Law, Contracts, §§ 764-790 (9th Ed. 1987) ........ 25

11 Witkin, Summary of California Law, Section 177 ........ 26

California Form Jury Instructions, CACI 337 (Affirmative Defense – Waiver) ........ 25

# I. INTRODUCTION

Defendants' Motion for Summary Judgment marks a major shift from its prior positions and legal theories which were the basis for their unsuccessful Motion to Dismiss and were set forth in their Answer and Counterclaims. Defendants have beat a hasty retreat from the theory that Excel owned the patents, but assigned them to Indivos in the June 16, 1995 Operating Agreement in exchange for equity. Answer at Par. 21. Defendants now contend that Excel held equitable title to the patents, and rely upon the "equities" to preclude Excel from asserting title. This is a complete misconstruction of the law; if Excel held equitable title, it is now entitled to specific performance to obtain legal title. Defendants newly fashioned equitable theories are to no avail. If Excel has legal title, which it does, equitable theories cannot defeat legal title.

The reasons for Defendants' radical shift are obvious. First, inherent in Defendants' prior argument that Excel owned the patents and transferred them in the June, 16, 1995 Operating Agreement is an admission that Excel did in fact own all right title and interest to the patents. Second, the June 16, 1995 Operating Agreement, and subsequent Operating Agreements confirm that: (1) Excel is the only party who conferred any rights to the inventions (a license) in exchange for equity; (2) the other founders contributed nothing but on-going services in exchange for stock (because Excel owned everything); and (3) Excel only conveyed a license. These facts are not and cannot be disputed, and are dispositive against Defendants' Motion, and in support of Excel's Motion.

Defendants' newly advanced equitable theories of estoppel and waiver, or its claim that Excel's title was superseded, do not and cannot change this result. First, in order to reach these issues, the Court must first decide that Excel only holds equitable title. This it is cannot do. Even if it does, however, Defendants' theories are not supported in the law or the facts.

Regarding the waiver and estoppel claims, Defendants rely on a small handful of California cases. In the first instance, Defendants face a legal hurdle they cannot clear: establishing that the theories and cases they cite are applicable in a patent case. There is a significant body of law that deals with equitable estoppel, waiver, and other equitable defenses in patent cases. Defendants entirely failed to cite this authority. The reason: in those cases, the remedy for misrepresentations is an

implied-in-fact license. *Wang Laboratories, Inc. v. Mitsubishi Electronics*, 103 F.3d at 1580 (Fed.Cir. 1997).

Moreover, even under California law, estoppel is an affirmative defense that can only be used defensively, and waiver is an affirmative defense to a breach of contract claim. Thus, even if they did apply, at most they are affirmative defenses to Excel's charges of infringement. And, under California law, Defendants bear the burden of proof on these defenses, which in the case of waiver, must be proven by clear and convincing evidence. Defendants have not and cannot meet this burden. And, even if Defendants have affirmative defenses, the result for Defendants would be that Excel is estopped from asserting infringement claims against Defendants, not that Indivos owns the patents.

With regard to Defendants' theory that Excel's claim equitable title has been superseded by conduct and certain documents, Defendants again are wrong on the law and the facts. Title, equitable or not, cannot be superseded, but can only be transferred by an instrument in writing. And, the Operating Agreements completely undermine the fundamental premises of their claim that "Excel authorized the inventors to assign the patents in exchange for equity."

Recognizing that their original theories are not persuasive, Defendants frequently resorted to the unfortunate tactic of name-calling and finger-pointing. Defendants' Motion includes twenty pages of alleged undisputed facts,[1] and only five pages of legal argument. The legal argument badly misstates the appropriate summary judgment standard and omits any mention of the fact that their equitable claims are affirmative defenses, the legal standards that apply to the defenses, or the burdens they bear to support their arguments. Defendants' spurious contention that the facts they rely upon are undisputed ignores both facts contained within their own supporting documents, and the evidence submitted in support of Excel's Motion, which is incorporated herein by reference in opposition to Defendants' Motion. Defendants' Memorandum creates confusion and maligns Mr. Hoffman in an

[1] Defendants' motion seeks summary judgment on equitable theories that require this court to make factual findings in its favor, and in two instances, under a clear and convincing evidence standard. As noted, their Motion contains 20 pages of a highly argumentative factual recitation. When the rhetoric is removed, there are unquestionably a significant number of factual disputes. Because in large part most of the factual recitation is irrelevant as a matter of law, Excel does not address all the diputed factual assertions, but only disputes facts sufficient to result in the denial of Defendants' Motion. Excel reserves the right to dispute additional facts during later proceedings.

attempt to engender sympathy. Most significantly, even if Defendants factual assertions were true, Defendants' Motion fails. Excel holds title to these patents. No equitable claims can defeat that fact. Defendants' Motion should be denied; and, Excel's Motion should be granted.

## II. DISPUTED FACTS

### A. The Operating Agreements Confirm That Inventors Did Not Contribute Any Patent Rights In Exchange For Equity, And That Excel Paid For The Services Of The Consultants With Its SmartTouch Equity Through The June 17, 1996 Amendment To The Operating Agreement

Defendants contend that Excel instructed the inventors to assign their rights it the patents to SmartTouch in exchange for equity, and that thereafter, their Consulting Agreements were terminated. Defendants' Memorandum at 4-7; 22. The Operating Agreements, on which Defendants otherwise rely, establish that these claims are false, and that because virtually all of Defendants' declarants signed or relied on the Operating Agreements in reaching their conclusions about ownership, Defendants cannot disclaim knowledge of the these facts. The June 16, 1995 Operating Agreement, and all subsequent amendments, establish that Excel is the only party who contributed any rights, and that those rights were a license. The only consideration provided by the other members in exchange for their ownership interest was on-going services. Until the mid-June, 1996, when any new member was admitted, the only ownership interests that were diluted were Excel's and Hoffman's.

Prior to June 16, 1995, the effective date of the first Operating Agreement, two tokenless biometric financial transaction patent applications were already pending: U.S. Patent Application No. 345523 was pending, which ultimately issued as U.S. Patent No. 5,615,277 and U.S. Patent Application No. 442892, which ultimately issued as U.S. Patent No. 5,613,012 (the "Master Patent").

Notwithstanding the fact that the patent applications were already pending, the property Excel contributed to SmartTouch LLC as described in Exhibit A to the June 16, 1995 Operating Agreement made no mention of these patents, but instead indicated that the contribution was "patent and other property rights to certain technology relating to fingerprint identification." Stamp Opp. Decl., Exh. 1 at 25.[2] Hoffman did not contribute any patent rights, but instead contributed $100. *Id.*, Exh. 1 at page

---

[2] Excel realizes that some of the operating agreements are already in declarations, but must re-submit them in their correct form because, consistent with Defendants' attempts to create confusion, Defendants, in depositions, and in support of its

(Continued...)

7. As set forth in Excel's Motion for Partial Summary Judgment, this language, as a matter of law, conferred only a license. Defendants' do not dispute this in their Motion, and realizing this fact, no longer rely on the document as an assignment.

The June 16, 1995 Operating Agreement contains an integration clause, which provides:

> "14.15 ENTIRE AGREEMENT. This Agreement and the Articles of Organization constitute the entire agreement of the Members with respect to, and supersedes all prior written and oral agreements, understandings and negotiations with respect to, the subject matter hereof. *Id.* at 24.

The June 16, 1995 Operating Agreement was attached as Exhibit A to every subsequent Amendment to the Operating Agreement. *Id.*, Exhs. 2-6 at p.1.

Ali Kamarei, David Pare, Jonathon Lee, and Phil Lapsley became members of the LLC by virtue of the first amendment dated to be effective June 30, 1995. *Id.*, Exh. 2 at 1. Kamarei, Pare, Lee, and Lapsley obtained units in the LLC: "*[i]n consideration for services being provided by the undersigned to the LLC.*" *Id.* (emphasis added). Excel and Hoffman's interests were diluted from 99% and 1% to 76.9230 and 0.0770% respectively. *Id.* Pare received a 13% interest, Lee received a 7% interest, and Lapsley received a 0.5% interest. *Id.* The percentage interests that the new members received in SmartTouch correspond exactly to percentages specified in their Consulting Agreements with Excel. Slater Decl., Exh. 25 at 2; Exh. 17; Exh. 54 at 2.

In an amendment dated to be effective August 31, 1995, Pare and Lee's percentage interests were increased to 14.95% and 8.05% (for a total of 23%) again "in consideration for services being provided by the undersigned to the LLC." Stamp Opp. Decl., Exh. 3 at 1. Once again, Excel and Hoffman's interests were diluted, but, significantly, the other members interests were not. *Id.*

In an amendment dated to be effective on January 1, 1996, Stephen Pezzola, Donald Reinke, Tom Maier, Tom Armstrong, Bruce Whitley, Bruce Johnson, and Gizelle Barany, all lawyers at SmartTouch's outside law-firm of Pezzola & Reinke, became members of SmartTouch LLC "in

---

(...Continued)

Motion, have compiled the operating agreements into one exhibit, and have, in each instance, attached as Exhibit A to the Amendments to each Operating Agreement only Exhibit A to the June 16, 1995 Operating Agreement. It is clear from the face of each of the Amendments that what was actually attached as Exhibit A to the Amendments was the entire June 16, 1995 Operating Agreement – not just Exhibit A.

consideration for serviced being provided by the undersigned to the LLC." *Id.*, Exh. 4 at 1-2. In addition, Kamarei, Pare, Lee, and Lapsley's interests were all increased. *Id.* Hoffman and Excel's interests, however, were decreased. *Id.*, Exh. 4.

In an amendment dated to be effective on June 17, 1996, Robert Goldberg, Larry Ginsburg, and Hanna Levenson, Mr. Ginsburg's wife, became members of SmartTouch "in consideration for services being provided by the undersigned to the LLC." *Id.*, Exh. 5 at 1. For the first time, the interests of all the members were diluted to accommodate the new members. *Id.*, Exh. 5.

Consistent with the fact that Excel contributed only a license, and the other founders contributed only services, Indivos' 2000 Audited Financial Statements indicate that the founders received their initial interest in the LLC for no consideration. Stamp Reply Decl., Exh. 2 at INV 012274 at FN 4. Solidus relied on this document in conjunction with the merger. *Id.*, Exh. 6 at 10.

### B. The only interest Pare, Lee, and Lapsley ever had in the patents or SmartTouch technology was a financial interest in a future royalty stream to be paid by Excel.

Defendants also rely on Pare, Lee and Lapsley's claims that they would not have accepted equity in SmartTouch in lieu of salary if they had known Excel was going to retain ownership of the patents. This, as the documents Defendants rely on again demonstrate, is false. Defendants agreed to accept equity fully understanding that Excel would own the patents.

As described in Excel's Motion for Summary Judgment, the December 9, 1994 Pare/Lee Consulting Agreement confirmed Excel owned all Pare and Lee Work Product relating to the biometric tokenless financial transaction invention. The Pare/Lee Consulting Agreement also contained the following term:

> [OmniLock] is the sole inventor of and sole owner of the entire rights, title and interest in and to the United States Pending Patent for Tokenless Security System for Authorizing Access to Secured Computer, summarized in Addendum A attached hereto, *including any derivative patent and/or trademark applications, any issued patents based thereupon or derived therefrom, any continuations, continuations-in-part, any re-issues, and any foreign counterparts thereof* (collectively hereinafter referred to as 'the Technology') and to United States Pending Trademark for 'SmartTouch™'.[3] Slater Decl., Exh. 25 at 1; Exh. 59 at 1.

---

[3] This fact is significant because it forms the basis for Excel's claims to the other thirteen patents at issue in this litigation, and refutes, for the reasons explained below, Defendants' anticipated reply argument that the Court should grant Defendants ownership of the thirteen patents not addressed in Excel's Motion for Partial Summary Judgment.

On March 30, 1995, not long before the Master Patent was filed, Pare, Lee and Excel entered into a written modification of the Pare/Lee Consulting Agreement labeled an Addendum. *Id.*, Exh. 17. In the Addendum, Excel agreed to fix Pare and Lee's compensation, *i.e.*, at 20% at the top of range anticipated in the Pare/Lee Consulting Agreement. *Id.*, Exh. 17. The parties also agreed that "all parties, terms, provisions, and definitions of that [the December 9, 1994] Agreement control over this [Addendum]." Excel still owned all Work Product, and Pare and Lee agreed to take either: (a) the royalty scheme described in the original agreement; or (b) a 20% interest in a new company "in the event that a new corporation (herein "Newco") is formed dedicated to *commercializing the technology*." While Defendants cite this document in support of their assertion that Excel instructed the inventors to assign the patents in exchange for equity (Defendants' Memorandum at 6), this document flatly contradicts that contention.[4]

Lapsley's Consulting Agreement further confirms this. In the Lapsley Agreement, Excel and Lapsley agree that: (1) Excel will own all Work Product; (3) Excel will pay a royalty stream; and that (3) "[i]n the event that a new corporation is formed dedicated to commercializing the Technology, Consultant shall receive an equity interest in said new corporation representing one-half of one person (1/2%) of all the outstanding shares. In such event," consultant will no longer receive a 1/2 % royalty stream from Excel. Slater Decl., Exh. 54.

Defendants claim a letter dated May 17, 1995 from Tom Maier to Pare and Lee supersedes the prior Consulting Agreements.[5] Defendants are incorrect. On May 17, 1995, the only interest that the

---

[4] Notably, Pare and Lee also agree to provide ongoing services to Excel and/or Newco relating to the "Technology," the definition of which is found in the December 9, 1994 agreement and which includes the already filed patent, all continuations, continuations-in-part, and divisional applications.

[5] In their reply papers, Defendants will undoubtedly also rely on a May 12, 1995 Letter from Tom Maier attaching a draft of the May 16, 1995 Operating Agreement, which Excel did not produce until after Defendants filed their Motion. Defendants will also likely devote much effort to claiming additional discovery abuses. Excel assures the Court that there was no intent to hide any documents (as indeed, these documents have appeared on Excel's privilege log for months described as Maier Letter and May 16, 1995 Draft Operating Agreement). In any event, the language that Defendants will rely on is the phrase "Technology Transfer" from that letter. This language, too, is consistent with a license, does not mention the pending patent application, and otherwise fails to evidence an intent to transfer the patents. Instead, consistent with the June 16, 1995 Operating Agreement, this letter merely confirms that Excel did not intend to transfer the "patents," but instead was giving SmartTouch "technology," i.e., "patent and other property rights to certain technology relating to fingerprint identification," so that it could commercialize the patents.

Inventors had in the "patent applications," the "Technology," and "the Work Product" was a royalty stream from Excel, or equity, if a new company was formed. That is the only interest that Pare and Lee could transfer to SmartTouch. Maier's letter first confirms the condition precedent to Pare and Lee receiving equity: "I am pleased to confirm that SmartTouch, LLC has been formed as a California Limited Liability Corporation." *Id.*, Exh. 18. It goes that to say that OmniLock "understands" that Pare and Lee will "assign all *of your* rights under the patent application for the SmartTouch technology to SmartTouch, LLC in exchange for a member's interest in SmartTouch, LLC according to the terms of your March 30, 1995 letter agreement with OmniLock, Inc." *Id.*., Exh. 18 (emphasis added). However inarticulately, Maier was simply confirming that because the "Newco" was formed, Pare and Lee would forego their interest in the patent: their royalty stream, and instead receive equity in SmartTouch. This letter did not alter or modify any pre-existing agreement.[6]

### C. Contrary to Defendants' Assertions, There is No Evidence That The Consulting Agreements Were Terminated Or That Hoffman Told The Inventors They Were Terminated

Several of Defendants' legal theories are premised on the notion Hoffman told the Inventors that the Consulting Agreements were terminated. These claims are unsupported by the record.

For example, on Page 6 of their Memorandum, Defendants state: "[a]s part of the technology 'spin off' to SmartTouch, Hoffman – Excel's CEO, President and controlling shareholder – told the other inventors that their consulting agreements with Excel were terminated, and instructed them to assign the patents to SmartTouch in exchange for an interest in the new company." Defendants cite: the March 30, 1995 Agreement discussed above, and some Lee, Pare, and Lapsley deposition testimony, which does not support Defendants assertions either.

For example, Lee[7] testified that he assumed the agreements were terminated:

---

[6] It must also be noted that Maier was one of the lawyer's involved in drafting the May 8, 1995 SmartTouch/Excel license agreement, which he has affirmed existed as of May 8, 1995 and he believed was operative. (Stamp Opp. Decl. Exh. 7 at 38-85.). The May 8, 1995 SmartTouch/Excel License Agreement contained the conditional assignment clause, which although such conditional assignments turned out to be ineffective in the first instance, explains Maier's word choices.

[7] Bingham, Defendants' counsel, also represent Pare and Lee, and deposed their own clients. Bingham lawyers met with and prepared Pare and Lee for their deposition. Sometimes, notwithstanding the documents, Pare and Lee testified

(Continued...)

Q. And was this – was 15A [the March 30, 1995 Addendum], the agreement that has been marked as 15A, ever terminated?

A. Well, in regards to point four, there wasn't really any – Excel never – or at the time, Omnilock never had us do any additional work, so in effect, it was superseded by other agreements or defactoed the formation of SmartTouch LLC. Slater Decl., Exh. 15 at 145.

And, Pare also assumed the Agreement was terminated:

Q. Okay. *And on what do you base your understanding* that effectively the formation of the LLC terminated your relationship with Excel?
A. That the number of shares I got in the LLC matched exactly the percentage I received under the Omnilock agreement and that the operations of Omnilock were gradually folded down and gotten rid of as time went on and the bill of sale today said A, that I were to forego all interest in – I forget how it was worded, but it seemed to indicate my interest in Excel's piece was to be terminated and instead transferred over to the LLC. Slater Decl., Exh. 16 at 130 (emphasis added).

The cited Lapsley testimony is as follows:

Q. Did you have an understanding as to -- well, we looked at your earlier consulting agreement with Excel when the LLC was formed. Did you have some understanding as to whether or not your consulting duties for Excel would continue or terminate?
A. My understanding was that they were simply no longer operational because we were now working for SmartTouch, LLC.

The testimony does not support Defendants' claims.[8]

### D. Likewise, Contrary to Defendants' Assertions, Hoffman Did Not Represent to the Excel Board That Excel Transferred Title to the Patents to SmartTouch, But Instead That Excel Conferred A License

Defendants' also contend that Hoffman allegedly told the Excel Board that he had transferred title to the patents to Indivos. Defendants' rely, in large part, on the testimony of David Mendelsohn.[9] As set forth in Excel's Motion for Partial Summary Judgment, however, Mr. Mendelsohn testified that Hoffman told Mendelsohn that there was a license between SmartTouch and Excel:

Q. Did you as Chairman and a Board member of Excel hear about this document, this License Agreement between Omnilock and SmartTouch back in 1995?

---

(...Continued)

consistently with Bingham's story in response to Bingham's questions, but as evidenced by this quotation when Pare and Lee were testifying about their understanding of the facts instead of legal conclusions, the truth becomes apparent.

[8] The cited Lee and Pare testimony confirms they understood they exchanged their Excel royalty stream for equity. Their declarations do as well. Pare Decl., ¶5; Lee Decl., ¶6.

[9] Defendants also rely on a Declaration from Harold Silen. Excel has yet to depose Mr. Silen, but given Mr. Mendelsohn's testimony about what Excel disclosed to the Excel Board, that Defendants elected to submit Mr. Silen's declaration in support of this Motion should be noted.

> A. Yes.
>
> Q. How did you hear about it?
>
> A. I understood there was one.
>
> Q. Okay, at the time. How did you come to understand that there was one?
>
> A. Because when I was reviewing the affairs of SmartTouch, I asked if there had been an agreement made from Omnilock to SmartTouch granting the patents, the license for the patents, and I was assured that there had been.

Stamp. Decl., Exh. 3.

Additionally, in response to a question about whether "clear title" meant ownership, Mr. Mendelsohn defined what he meant by "clear title:"

> Q. Now, when you say clear title, do you mean ownership of the patents in SmartTouch?
>
> A. My phrase of clear title, my interpretation of clear title would have been ***unrestricted rights to use it***.

Stamp Decl., Exh. 3 at 13:8-13:12 (emphasis added).

Mr. Mendelsohn also confirmed that Mr. Hoffman disclosed the existence of the license agreement to the Excel Board of Directors:

> Q. Okay. I will represent to you that Mr. Hoffman says that the License Agreement that I've shown you, Hoffman Exhibit 5, was discussed at a Board Meeting of Omnilock in May of 1995. Do you recall such a Board discussion of this License Agreement in May of 1995?
>
> A. Only to the extent that I've already testified, that when I asked if there was an agreement in place, I was assured there was. Stamp Decl., Exh. 3 at 16:15-23.[10]

Defendants also once again rely on the Mendelsohn Declaration that Bingham McCutchen filed in the State Court Voting Trust Action.11 *See* Slater Decl., Exh. 53; Defendants' Memorandum at 17-18. In that Declaration, Mr. Mendelsohn declared that he had never seen the May 8, 1995 License

---

[10] Mr. Mendelsohn verified the existence of the license in other testimony as well. *See, e.g., id*, Exh. 3 at 15:7-10 (Q. Okay. How many contracts did OmniLock/Sports-Mitt/Excel enter into where they license the product to a company they owned? A. This was the first). Although he was testifying about the June 16 Operating Agreement, Mr. Mendelsohn also verified that at the time the License Agreement was signed, Mr. Hoffman was authorized to sign for both Excel and SmartTouch. *Id.*, Exh. 3 at 52:1-3.

[11] Bingham also represented Mr. Mendelsohn in the Voting Trust Action, and submitted the cited declaration.

Agreement, and that he did not believe it existed. *Id.* at ¶26. At his deposition, however, in addition to admitting that the Excel Board was informed of the license, Mr. Mendelsohn conceded under cross-examination that he was not sure, one way or the other, whether he'd seen the License Agreement prior to this litigation. Stamp Decl., Exh. 3 at 147:24-148:2.

### E. The May 8, 1995 Excel/SmartTouch License Did Exist And Explains Excel's and Hoffman's Conduct

Defendants claim that nobody at SmartTouch believed that the May 8, 1995 License Agreement was genuine, but other than by simply denying its existence, Defendants cannot otherwise substantiate these claims. Defendants simply ignore the evidence that it did exist. And, while some of the provisions turned out to be, as a matter of law, ineffective,[12] its existence explains Excel and Hoffman's (and Maier's and Kamarei's) conduct.

Ali Kamarei, SmartTouch's in-house Intellectual Property lawyer, confirmed that the license agreement was negotiated as part of the formation of SmartTouch and executed on or about May 8, 1995. Stamp Opp. Decl., Exh. 8 at 51-122. Kamarei also testified that Pare, Lapsley, and Goia were all aware of the May 8 License Agreement. *Id.* At 88:7-89:13. Kamarei also testified that Lapsley coined the phrase "nuclear weapon" with regard to the ability of Excel to pull-back the patents under the license. *Id.* He also testified that the license was negotiated over a 1 to 2 month period. *Id.* At 56:22-25.

Mr. Maier also confirmed the authenticity and date of the May 8, 1995 License and that it was negotiated in conjunction with the formation of SmartTouch. *Id.*, Exh. 7 at 54, 56. Mr. Maier worked at the law-firm of Pezzola & Reinke, a firm that represented both Excel and SmartTouch.

### F. There Is Ample Evidence That Defendants Had Notice of Excel's Rights

Although Defendants' deny notice of Excel's rights or that Hoffman ever informed them of Excel's claim to the patents, there is ample evidence in the record that they did have notice.

---

[12] For example, it cannot be disputed that the contemplated "conditional assignments" from the Inventors to SmartTouch were ineffective as a matter of law. Nonetheless, the existence of this provision explains much of Hoffman's subsequent conduct.

First, the Operating Agreements themselves evidence Excel's ownership, and that Excel only conferred a license.

Second, as set forth in Excel's Motion for Partial Summary Judgment, Mr. Goia, Mr. Goldberg, and Mr. Ginsburg all had sufficient information to be put on inquiry notice. Excel's SJ Memorandum at 13-14. Notably, Defendants and Mr. Goia, Mr. Goldberg, and Mr. Ginsburg do not dispute this.

Third, as set forth in Excel's Motion, Mr. Mendelsohn, Mr. Silen, and obviously, founders, Pare, Lee and Lapsley, had actual knowledge of Excel's rights to the Work Product and Technology.

Fourth, as set forth in Excel's Motion, Pare specifically told the Invidos Board about his written agreement with Excel prior to the Indivos/Solidus merger.

Fifth, Hoffman testified that he told at least Mr. Fortuno and Mr. Goia, two of Indivo's CEOs, about Excel's rights. Stamp Opp. Decl., Exh. 11 at 458-60, 484-86. Mr. Goia and Mr. Fortuno both deny this, but Hoffman's story is corroborated by the documentary evidence. Hoffman testified that he told Mr. Goia that he would not sign the standard Proprietary Rights agreement because he was concerned about Excel's rights and his obligations to Excel. Mr. Hoffman testified that there was some back and forth, and ultimately, Goia ceded to his demands. Notably, the Proprietary Rights Agreement that Hoffman signed does in fact differ from that signed by Lapsley, Lee, and Pare, in that the Employee Proprietary Rights Agreement excludes from the definition of "Proprietary Information" such "information [in Hoffman's] possession or part of [his] general knowledge prior to this *Agreement* with the Company." Compare Stamp. Decl., Exh. 6 (Hoffman's Agreement) at INV 08811 with Slater Decl, Exh 62 (Pare Agreement) at 5602.[13] Likewise, although Mr. Fortuno now attests only that he knew about Hoffman's alleged claims to the patents, as set forth in detail in Excel's Reply the written record confirms that Hoffman did inform Fortuno, and Indivos, about Excel's rights. Hoffman Decl., at Exh. 1.[14]

---

[13] In yet another instance of misleading statements, Defendants simply ignore this significant provision in their discussion of the agreement at page 12.

[14] Hoffman declared that letters "rtf" in the footer of the notes attached as Exhibit 1 to the Hoffman declaration were Fortuno's initials. This, Hoffman, has learned was wrong. "rtf" stood for "Rich Text Format," and accordingly, Hoffman's Declaration will be corrected. The correction is immaterial to the point of the declaration.

Finally, there other documents in the Indivos files that, if Indivos or its investors, including Mr. Goldberg, had actually conducted the due diligence they claim to have conducted, they would have discovered. For example, Mr. Goldberg declares that he spent several weeks reviewing Indivos' prosecution files before he invested (also evidencing his lack of reliance on Hoffman). Goldberg Decl., ¶2. Indivos has produced a number of boxes of documents that contain prosecution files. Stamp Decl. Opp., ¶10. While Excel cannot say for certain whether these are the same boxes that Mr. Goldberg reviewed, or not, they contain a number of documents that would have suggested to any reviewer that there was an issue as to ownership of the patents. First, and most importantly, there is a draft of the Master Patent Application with a coversheet attached that clearly indicates that the patent application is the property of OmniLock. *Id.*, Exh. 9. In addition, there are a number of additional documents in the prosecution files during the 1995-1997 time-period that should have put any reviewer on notice as to Excel's claims. *Id.*, Exh. 9A.

### G. There Are Many Other Instances Where Defendants' Claimed Undisputed Facts Are Not Supported By the Underlying Evidence, Or, Are Contradicted By It.

The following are just a handful of the many additional examples Defendants' misstatements of fact and failure to support their Motion with evidence sufficient to meet their burden of proof:

In its Introduction at pages 2-3, Defendants claim that in ¶10 of the First Amended Complaint and in Plaintiff's first summary judgment motion, Excel claimed that Hoffman, not Excel owned the patents. This is not true.[15]

Slater Exhibits 32 and 33 do not support Indivos' assertion at page 6 that a consensus emerged at Excel to "spin off" the biometric technology into a new entity and "to have the Inventors assign the patents to the new entity." Instead, for example, Exhibit 32 is a letter written by David Mendelsohn in 1997 to all Excel shareholders in which Mendelsohn states: "Ned Hoffman, acting on behalf of Excel,

---

[15] In one state court action, there was an allegation regarding in Excel's Complaint regarding Hoffman's ownership, but the Complaint sought a declaration that Excel owned the patents. The implications of this have already been explained in Excel's Reply Memorandum in support of its Motion for Partial Summary Judgment.

has also developed, in partnership with several engineers, a product which is designed to enable consumers to pay for goods and services using their fingerprint and a personal identification code."

Defendants attribute documents to Hoffman without any evidentiary support. For example, Defendants say "In Hoffman's presentations to Visa, SmartTouch represented numerous times that the patents were SmartTouch's proprietary technology." In support of this assertion, Defendants cite to Slater Declaration Exhibit 47 which is a presentation to Visa, but which does not indicate the author or the presenter. Exhibit 47 also contains the following Lapsley testimony about the document: "I don't recall it specifically, I recall it generally. It appears to be a presentation we gave to Visa at some point." This hardly qualified as a "Hoffman" Visa Presentation.

Defendants submitted Mr. Johnson's Declaration, but notably, it does not say that Hoffman represented anything, but instead that Kamarei and Lapsley made all the representation to Johnson.

Defendants rely on Slater Exhibit 9 in support of the proposition that "Hoffman and the other Inventors recite under oath that they are the sole, unencumbered *owners* of the technology." The Inventor Declaration, Slater Exhibit 9, contains no such language, but rather affirms that Hoffman, Pare, and Lee are the *inventors*.

Defendants also repeated claim that Hoffman and Excel are one in the same. The evidence submitted in support of Defendants' Motion, however, evidences Defendants' understanding that Excel was an existing and separate entity, and that Defendant treated it as such. For example, the 2000 Settlement Agreement on which Defendants' rely, as described in detail in Excel's Motion for Summary Judgment, goes to great lengths to distinguish Excel, and Hoffman, and their respective separate obligations. Slater Decl., Exh. 6.

### H. DEFENDANTS OFFER INSUFFICIENT EVIDENCE OF HARM FROM OR RELIANCE ON REPRESENTATIONS BY HOFFMAN

Defendants' equitable arguments are premised on the alleged harm resulting from and/or reliance on Hoffman's alleged misrepresentations. Defendants' proffered evidence fails to support these claims.

Defendants have not and cannot allege that Solidus was harmed by virture of its reliance on Hoffman's misrepresentations or that it did rely on Hoffman's representations because Solidus, as

pointed in Excel's Motion, was fully appraised of Excel's claims and all other relevant facts by virture of the various lawsuits that were filed before the merger.

With regard to Indivos' and its investors' alleged reliance, as pointed out above, in addition to claiming that they relied on Hoffman's representations, each of Defendants' declarants, claims to have relied on the Operating Agreements,[16] which as set forth in Excel's Motion for Partial Summary Judgment, and which Defendants' have not seriously contested, merely conferred a license.

As to the alleged harm to Indivos and its investors, investors allegedly relied on Hoffman's representations in their decision to invest. *See, e.g.,* Goldberg Decl., Ginsburg Decl., Fortuno Decl. Relying on Hoffman's statements, so the argument goes, investors were induced to invest over $18,000,000 in Indivos. *Id.* Defendants' problem, however, is that in their efforts to disclaim knowledge of Excel's rights, which Excel disputes, Defendants have established that reliance on the alleged misrepresentations, if any, did not result in any harm to Indivos. Indivos received and spent the over $18,000,000 invested and then failed, totally unencumbered, according to Defendants, by knowledge of Hoffman's alleged misrepresentations. Ginsburg Decl., Exh. 12; Slater Decl, Exh. 53 (Prior Goldberg Decl.).[17]

I. ARGUMENT

Defendants advance four legal arguments in support of their motion, each of which is fatally flawed. Defendants argue that Indivos holds "valid" title to the patents; (2) that Excel's equitable rights under the consulting agreements were superseded; (3) that Excel waived it claim to its "equitable title; and (4) that Excel is estopped from asserting its equitable title claims.

## I. BURDENS OF PROOF AND LEGAL STANDARDS

[16] The only exception to this appears to be Mr. Johnson, who does not attest that he relied on any Hoffman representations, but rather only representations from Kamarei and Lapsley as well as his own review of documents. Johnson Decl.

[17] The Goldberg Declaration is the only declaration that could arguably be construed as suggesting that the post-insolvency announcement lawsuits caused some harm to Indivos or its investors in conjunction with the merger. Goldberg Decl., ¶11 ("Of course, clouding Indivos's title did not increase Indivos's leverage"). During the merger negotiations, however, Mr. Goldberg represented to Mr. Hoffman and others that Hoffman's actions did increase leverage: "Ned, in all sincerety, between your pushing and my negotiating, this has gone much further and we have gotten more than I ever thought possible. So, I give you credit for being the "bad cop" in this dance.). Stamp. Opp. Decl., Exh. 10 at INV 18465.

Defendants omit any mention of the burdens, in some instances substantial, that they bear on the issues raised in their motion.

As to their "valid" title claim, Defendants must prove a proper written assignment of the patents to Indivos and to Solidus. *Gaia Techs. v. Reconversion Techs*., 93 F.3d 774, 779-80 (Fed. Cir. 1996).

As to the claim that Excel's rights were superseded by subsequent conduct, modification of a written contract by conduct is a question of fact, *Daugherty Co. v. Kimberly-Clark Co.*, 14 Cal. App. 3d 151, 158 (1971) (reversing summary judgment because there were disputed questions of fact), and the party asserting the modification by conduct bears the burden of proof by clear and convincing evidence. *Houghton v. Lawton*, 63 Cal. App. 218, 223 (1923).

As to the claim that Excel waived its rights to its "equitable title," Defendants bear the burden of proof by clear and convincing evidence, and wavier is a question of fact. *Brookview Condo. Owners' Ass'n v. Heltzer Enterprises-Brookview*, 218 Cal. App. 3d 88, 99 (1980) ("The waiver of a legal right cannot be established without a clear showing of intent to give up such right. The burden is on the party claiming the waiver 'to prove it by evidence that does not leave the matter doubtful or uncertain and the burden must be satisfied by clear and convincing evidence that does not leave the matter to speculation.'" (citations omitted)).

Finally, as to the claim that Excel is estopped from asserting its equitable title, equitable estoppel is also a question of fact, and Defendants also bear the burden of proof on this issue. *Estate of Anderson*, 60 Cal. App. 4th 436, 440 (1997); *Russell v. Dopp*, 36 Cal. App. 4th 765, 781-82 (1995) (reversing trial court finding of waiver and estoppel due to insufficient factual support and disputed questions of fact).

## J. DEFENDANTS MISSTATE THE SUMMARY JUDGMENT STANDARD

Defendants argue that in order to defeat their Motion, Excel bears the burden of coming forward with sufficient evidence to support a jury verdict in its favor on every essential element. Memorandum at 19. Defendants are wrong.

Defendants bear the burden of proof on every issue raised in their Motion. Thus, Defendants

must come forward with evidence that would entitle them to a directed verdict if the evidence went un-contradicted at trial. *Houghton v. South*, 965 F.2d 1532, 1537 (1992); *see also Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991) ("But - particularly where, as here, the moving party is also the party with the burden of proof on the issue - it is important to remember the non-moving party must produce its significant, probative evidence only after the movant has satisfied its burden of demonstrating there is no genuine issue of material fact."). Defendants, therefore, bear the initial burden of establishing the absence of a genuine issue of fact on each issue material to their claims and affirmative defenses. *Houghton*, 965 F.2d at 1537; *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986).

Not until Defendants come forward with sufficient evidence to support a directed verdict motion does the burden shift to Excel to come forward with evidence to defeat Defendants' Motion. [18] *Houghton*, 965 F.2d at 1537. Only if Defendants have this burden, then, "the plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." *Id.*

## K. INDIVOS DOES NOT HOLD "VALID" LEGAL TITLE

### 1. Excel holds legal title

As explained in Excel's Motion for Partial Summary Judgment, Excel holds legal title to the patents by virtue of the Excel/Hoffman employment agreement and the Pare/Lee Consulting Agreement and the Lapsley Consulting Agreement.

The Excel/Hoffman Employment agreement is a present conveyance of future inventions: "*If the Employer's first option rights have not expired on an Employee work product, the same shall belong to and be the sole and exclusive property of Employer.*" Slater Decl., Exh. 4 at § 2.03(c) (emphasis added); *Filmtec Corp v. Allied-Signal Inc.*, 939 F.2d 1568, 1570 (1991); *Arachnid, Inc. v.*

---

[18] Excel files this opposition to Defendants' Motion based on the discovery that has occurred to date, which constitutes discovery solely initiated by defendants (10 depositions and a number of document subpoenas). In the event that the Court determines that Defendants have met their burden, Plaintiff requests that pursuant to Rule 56(f), the motion be deemed premature and that plaintiffs be allowed to conduct discovery regarding the newly relied upon equitable claims.

*Merit Indus., Inc.*, 939 F.2d 1574, 1577 (Fed. Cir. 1991). Thus, at a minimum, Excel held legal title to the patents at the time the applications were filed.

The "first option rights" did not expire. As provided for in the Excel/Hoffman Employment agreement, Excel filed a patent application and Excel entered into a license agreement with a bona fide third party.[19] This is true whether the Court finds that the May 8, 1995 operating agreement existedor by virtue of the June 16, 1995 Operating Agreement, , as to which there is no dispute, and which merely conferred a license. Defendants only argument appears to be that "Indivos" was not a bona fide third party are unclear, and not credible. All Defendants say is the "[a]nd the second condition was never met because Excel never licensed the patents to a bona fide third party." Regardless of whether the Court relies on the Operating Agreements, or the May 8, 1995 license agreement, it is simply not credible for Defendants to assert, on the one hand, that there was no bona fide third party, and on the other hand, that Excel assigned all their rights to this separate entity, *i.e.*, Indivos, and is therefore deprived of all of its title to the patents. Indivos was a bona fide third party, there was a license, Excel's first option rights never expired; and Excel holds legal title to the patents.[20]

The Pare/Lee and Lapsley Consulting Agreements also constitute a present assignment of future inventions: "all such Work Product shall be: a) reported immediately and in its entirety to Company; and, b) the sole property of Company and shall be owned wholly by Company." Slater Decl., Exh. 25 at 3; Exh. 54 at 2. *Filmtec*, 939 F.2d at 1570; *Arachnid*, 939 F.2d at 1577.[21] Thus, Excel holds legal title by virtue of these agreements as well.

---

[19] As set forth in Excel's Reply Memorandum at p.5, note 5, Excel's rights irrevocably vested upon occurrence of "either" of these events.

[20] The Pare/Lee and Lapsley Consulting Agreements confirm Excel's ownership of the '277 patent application. Slater Decl., Exh. 25 at 1; Exh. 54 at 1.

[21] Defendants cite *Freedom Wireless, Inc. v. Boston Communications Group, Inc.,* 220 F. Supp. 16 (D. Mass. 2002) and rely on the Smegal Declaration in support of their argument. Neither changes the result. In *Freedom Wireless*, the required future act was to assist with establishing ownership, not a future act required in the Consulting Agreements at issue here. Moreover, the future requirement of "establishing ownership" was significant to the Court's ruling because the dispute centered on whether or not the invention at issue actually fell within the scope of the agreement.

With regard to the Smegal Declaration, as explained in Excel's Reply Memorandum, the Court must still examine the true nature of the arrangement, which is a question of law. Indeed, Defendants know and concede this: they've moved to strike the Smegal Declaration because it addresses purely legal issues that fall within the exclusive province of the Court. In any event, as explained in the Smegal Reply Declaration, Defendants take Mr. Smegal's comments out of context.

Because there is no document transferring title from Excel to Indivos, Excel still holds legal title to the patents.[22]

Moreover, if the Court finds that **either** the Hoffman/Excel Employment Agreement, **or** the Consulting Agreements conferred legal title on Excel, then Defendants' Motion must be denied. If either the Hoffman/Excel Employment Agreement, or the Consulting Agreements conferred legal title, then, Excel is a co-owner of the inventions, and Indivos cannot be the owner. 35 U.S.C. Sec. 262.

### 2. Defendants Do Not Hold "Valid" Legal Title

Although they are wrong about the nature of Excel's title, their concession that, at minimum, Excel holds equitable title, is dispositive of Defendants' Motion.

Relying on *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574 (Fed. Cir. 1991), Defendants concede that the Pare/Lee Consulting Ageement,[23] at a minimum, transferred equitable title to Excel. Memorandum at 21. As explained in Arachnid, however, if Excel holds equitable title, it owns "all right title and interst in the patent." Period. Indivos cannot hold valid legal title.

Application of *Arachid* to Defendants' concession definitely yields this result. In Arachnid, the inventors, who worked for another company, promised to assign future inventions to Arachnid in a Consulting Agreement. This promise conferred equitable title to Arachnid. The inventors, however, assigned the patents to a third party, IDEA. IDEA went bankrupt, and KIDDE purchased the "patents" out of the bankruptcy proceeding. Based on the Consulting Agreement, the Court ordered KIDDE to assign the patents to Arachnid. Even if Indivos is right about "equitable" title, then, *Arachnid* compels the result that Excel advanced in its Summary Judgment Motion.

---

[22] Indivos, once again, but significantly less strenuously this time, attempts to rely on the inventor assignments. Because the agreements described above vested legal title in Excel upon conception, thereafter, the inventors had nothing to transfer. "The present assignment of a future invention divests the inventor-assignor of ownership of the invention, and vests ownership, when invented, in the assignee." *Imatec, Ltd. v. Apple Computer, Inc.*, 81 F.Supp.2d 471, 481 (SD NY 2000), *citing FilmTec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1572 (Fed. Cir. 1991). Any subsequent inventor assignment to a third party is a "nullity." *Id*.

[23] The Lapsley Consulting Agreement contains the same language. Slater Decl., Exh. 54 at 2. Defendants make no arguments claiming that it has been changed or modified in any manner.

According to Defendants, in this case, the inventors, who worked for another company, promised to assign future inventions to Excel in a Consulting Agreement. This promise conferred equitable title to Excel. The inventors, however, assigned the patents to a third party, SmartTouch. SmartTouch became insolvent, and Solidus purchased the "patents." Based on the Consulting Agreement, this Court must order Defendants to assign the patents to Excel. Indivos does not hold "valid" legal title.

### 3. Excel's Rights Were Not Superseded And No Writing Exists Confirming An Assignment By Excel

In a section virtually devoid of any legal authority, Indivos argues that Excel's equitable title was superseded by certain documents and events. It is significant to note, that by Defendants' own construct, the Court need not reach this issue unless it finds that Excel only held equitable title.

In any event, Excel's title was not superseded. Defendants' conceded, that at a minimum, Excel held equitable title.[24] Whether the title was equitable or legal, in order to transfer title, Defendants must produce a writing evidencing Excel's unambiguous intent to transfer an undivided interest in the entire right, title and interest to the patent to it. 25 U.S.C. § 261.

The writing requirement was enacted in the Patent Act of 1836, and the well-articulated policies underlying it are inconsistent with Defendants' claims. The writing requirement of 35 U.S.C. Section 261 is intended to provide "certainty" with respect to the ownership of a patent. *Enzo Apa & Son, Inc. v. Geapag, A.G.*,134 F.3d 1090, 1093 (Fed. Cir. 1998). The "purpose and spirit" of the statutory provisions relating to the assignment of patents is to avoid the litigation of disputes. *Crown Die Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 39, 43 S. Ct. 254, 257, 67 L.Ed 516, 521 (1923); *Pope Manufacturing Co. v. Gormully*, 144 U.S. 248, 12 S.Ct. 641; 36 L.Ed. 423. "It was manifestly intended by Congress to surround the conveyance of patent property with safeguards resembling those usually attaching to that of land." *Westinghouse Electric & Mfg. Co. v. Formica*

---

[24] It is irrelevant that Defendants have only admitted that Excel possessed equitable title by virtue of the Consulting Agreement. Excel, as set forth above, asserts that Defendants are wrong, but in any event, holding equitable title by virtue of ownership of Pare, Lee and Lapsley's Work Product, at a minimum, results in co-ownership.

*Insulation Co.*, 266 U.S. 342, 349, 45 S.Ct. 117, 119, 69 L.Ed. 316 (1924). "It should be remembered that we have a statute which makes a writing essential to the assignment or creation of an estate in real property, and that one of the objects of such statute was to render estates secure." *Davis v. Davis*, 26 Cal. 23, 41 (1864).

The only writings that Defendants' rely on to support their claim that Excel's rights have been superseded are the June 16, 1995 Operating Agreement, and a May 17, 1995 letter from Thomas Maier to Pare and Lee. Not only do these documents not support Defendants' theory that Excel's rights were superceded, they confirm the understanding of SmartTouch, Excel, Hoffman, Pare, Lee, Lapsley, Mendelsohn, Silen, and all the subsequent investors in SmartTouch, that Excel was the only party that had any right to transfer any rights to the patents, that it did not do so, and that it only granted Indivos a license to the technology.[25] Moreover, they confirmed Pare and Lee's Declaration and Deposition testimony that Pare and Lee transferred the only interest in the patents that they had: they relinquished a royalty stream in exchange for equity.

In addition, as pointed out above, the Operating Agreements contain an integration clause. The parol evidence rule (Code Civ. Proc., § 1856, subd. (a)) prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter, or add to the terms of an integrated written instrument. *Alling v. Universal Manufacturing Corp.*, 5 Cal. App. 4th 1412, 1433-34 (1992). While the parol evidence rule prohibits introduction of evidence inconsistent with an integrated written agreement, the parol evidence rule does not prohibit reliance of evidence that is not consistent with the terms of an integrated agreement. *Id.* ("an intergrated written agreement may be *explained or supplemented* by evidence of ***consistent*** additional terms.").

And, here, there is evidence of consistent additional terms. There is ample evidence that the May 8, 1995 License Agreement did exist, and that any alleged misrepresentations and Hoffman and

---

[25] The law is clear. As set forth in Excel's Motion for Partial Summary Judgment, the June 16, 1995 Operating Agreement only conferred a license. In fifty pages of briefing, Defendants do little to dispute this other than to say that the language is not limited to fingerprint identification technology and that it generally describes the technology. These arguments were addressed

Excel's conduct can be explained by the May 8 License Agreement.[26] The May 8, 1995 Agreement contained a provision for the inventors to conditionally assign the patents to SmartTouch. While, undoubtedly, this provision was ineffective, i.e., because the inventors did not own anything, they had nothing to assign and their assignments were a nullity, it explains Hoffman, Maier, and Kamarei's actions. Moreover, the existence of the May 8, 1995 License Agreement is consistent with the Operating Agreement in which Excel "contributed" at most a license.

This also explains the "Assignee Rights" language that is included in transfer documents relating to the transfer from SmartTouch LLC to SmartTouch Inc.

In sum, Excel owned the patents by virtue of the above-described agreements. Excel did not assign them to SmartTouch. Instead, Excel granted a license to SmartTouch, as confirmed by the June 16, 1995 Operating Agreement, which is an integrated writing. The existence of the May 8, 1995 License Agreement, albeit an imperfect document, is fully consistent with the Operating Agreement. The Court, as explained in Excel's Motion for Summary Judgment, need not resolve the question of whether or not the May 8, 1995 agreement existed, because there is no assignment from Excel to SmartTouch. But, in terms of Defendants' Motion, the existence of the May 8, 1995 License Agreement both explains Excel and Hoffman's conduct, and at a minimum, creates disputed questions of fact that preclude the entry of summary judgment in Defendants' favor.

### 4. **Excel Owns, Or There Are Disputed Questions Of Fact, As to the Patents Filed After The Master Patent**

Although Defendants do not distinguish between the first two patents and the other thirteen patents in their motion, Defendants may attempt to argue that, at best, Excel is entitled to ownership of the first two patents, and Defendants should prevail on the other thirteen. The Court cannot reach this result, particularly on this record. At a minimum, the existence of the May 8, 1995 creates a question of fact as to any such argument.

---

[26] Defendants make much of the provisions contained in the Recitals to the May 8, 1995 Agreement that they say indicates that Hoffman, not Excel, owns the patents. These, recitals, however, also describe and attach as exhibits the documents that control the ownership issue: the Hoffman/Excel Employment Agreement, and the Pare/Lee and Lapsley Consulting Agreements. Slater Decl., Exh. 25 at Recitals 1.4 and 1.5.

Further, the Pare/Lee Consulting Agreement and the Lapsley Consulting Agreement, the parties agreed that Excel would own any continuations, continuations-in-part, and other related patents:

> Company is the sole inventor of and sole owner of the entire rights, title and interest in and to the United States Pending Patent for Tokenless Security System for Authorizing Access to a Secured Computer, summarized in Addendum A attached hereto, including any derivative patent and/or trademark applications, any issued patents based thereon or derived therefrom, any continuations, any continuations-in-part, any re-issues, and any foreign counterparts thereof (collectively hereinafter referred to as "the Technology") and to United States Pending Trademark for "SmartTouch[tm]".

All of the fifteen patents at issue here are derived from the first patent – they are all continuations, continuations-in-part, or divisionals.

Moreover, it has long been held that an employment agreement, when drawn to require that the employee assign rights to improvements related to a specific patent, may extend forever. This includes the period extending beyond the employee's employment and associatation with the employer.

> "Provisions in employment contracts in which the employee agrees to assign future inventions relating to a particular subject have been held valid. Where the field is reasonably restricted and is reasonably necessary for the protection of the employer's business, the contract may be held valid even without any limitation as to time." *Walker on Patents*, Section 19:43.

The lead case is *Hulse v. Bonsack Machine Co*, 65 F 864 (4th Cir 1895). Hulse, a mechanic, was employed by the Bonsack Machine Company, a manufacturer of cigarette-making machines, under a written contract that claimed 'for the exclusive use of the said company' any 'improvement in cigarette machines' the employee might develop during his employment 'or at any time thereafter.' Hulse did not want to assign an invention he made after leaving Bonsack's employment, but the court concluded the contract compelled it. The opinion's description of the equities of the situation suggested that the judge viewed the main problem in the case as being how to protect the firm's research program from the depredations of this overly enterprising employee." "The Employee-Inventor, 1830-1930," 65 *University of Chicago Law Review* 1127, 1192 (1998).

Finally, at a minimum, Defendants have done nothing to establish separate ownership of the other thirteen patents, and thus, there is really nothing to respond to separately at this point. And, although Excel posits that this issue can be resolved in its favor in accordance with the Consulting Agreement, if the Court disagrees, then the parties must provide additional evidence as to any separate

ownership claims to any later filed patents pursuant to the application rules for continuation, continuations-in-part, and divisional applications. *See, e.g.*, MPEP 306

### L. Indivos' Equitable Claims Fail As A Matter of Law

#### a. The Patent Laws Control The Outcome Of Any Equitable Claims

There is a significant body of law that deals with equitable estoppel, waiver, and other equitable defenses in patent cases. Defendants entirely failed to cite this authority. The reason: in those cases, the remedy for misrepresentations is an implied-in-fact license: "`Legal estoppel' and `equitable estoppel' are 'labels' that describe not different kinds of licenses, but rather different categories of conduct which lead to the same conclusion: an implied license. The label denotes the rationale for reaching the legal result." *Wang Laboratories, Inc. v. Mitsubishi Electronics*, 103 F.3d at 1580 (Fed.Cir. 1997). As the Court in *Wang* explained, "the primary difference between the estoppel analysis in implied license cases and the analysis in equitable estoppel cases is that implied license looks for an affirmative grant of consent or permission to make, use or sell: i.e., a license. Equitable estoppel, on the other hand, focuses on 'misleading' conduct suggesting that the patentee will not enforce patent rights." 103 F.3d at 1581.

The few federal cases that discuss "patent rights" in the context of equitable estoppel recognize that equitable estoppel is merely an affirmative defense yielding at most an implied license, not an affirmative claim upon which one can bypass the writing requirement of 261 to transfer patent ownership. *See, e.g.*, Ardisam, Inc. v. Ameristep, Inc., 302 F.Supp. 2d 991 (W.D. WI 2004) ("one may not sue another under the doctrines of laches or equitable estoppel" rejecting equitable estoppel as a basis for a counterclaim).

#### b. Even if California Law applied, Defendants' estoppel and waiver claims are only affirmative defenses

"[T]he doctrine of estoppel acts defensively only. It operates to prevent one from taking an unfair advantage of another but not to give an unfair advantage to one seeking to invoke the doctrine." *Peskin v. Phinney*, 182 Cal. App. 632, 636, 6 Cal. Rptr. 389 (1960); *Green v. Travlers Indem. Co.*, 185 Cal. App. 3d 544, 555, 230 Cal. Rptr. 13 (1986). "

Waiver is an affirmative defense to a breach of contract claim. 1 Witkin, Summary of California Law, Contracts, §§ 764-790 (9th Ed. 1987); California Form Jury Instructions, CACI 337 (Affirmative Defense – Waiver). Thus, although defendants pull some seemingly helpful language out of a two cases, in addition to being only an affirmative defense, it is questionable how or why this defense would even apply to this situation.

### c. Defendants' Have Failed To Meet There Burden of Coming Forward With Sufficient Evidence To Meet Their Burden

1. Waiver

"The waiver of a legal right cannot be established without a clear showing of intent to give up such right." *Brookview Condo. Owners' Ass'n v. Heltzer Enterprises-Brookview*, 218 Cal. App. 3d 502, 513, 267 Cal. Rptr. 76, 83 (1990). "The burden is on the party claiming the waiver "to prove it by evidence that does not leave the matter doubtful or uncertain and the burden must be satisfied by *clear and convincing evidence* that does not leave the matter to speculation." *Id.*

Defendants have failed to come forward with sufficient evidence to meet their clear and convincing burden. As pointed out above, although Defendants rhetoric may have been sufficient to shift the burden to Excel, the underlying evidence is not.

Defendants' waiver argument omits any discussion about the June 16, 1995, SmartTouch operating agreement, and subsequent amendments, which completely refutes their waiver argument as a matter of law. Under the SmartTouch operating agreement, the only contribution of "patents rights" is made by Excel because it was understood that Excel owned the patents, and that contribution was a license. There was no relinquishment of any rights.

At a minimum, however, there are disputed questions of fact regarding intent. The evidence, which Defendants just ignore, establishing the existence of the May 8, 1995 License Agreement alone creates disputed questions of fact as to Excel's intent. The Motion must be denied as to waiver if the Court even reaches this issue.

2. Estoppel

"Estoppel prevents a person from denying certain facts if he intentionally led another to believe them to be true and to reply upon such belief to his detriment." Defendants' Memorandum at 24. "It

prevents a person from acting in a manner inconsistent with his former position or conduct to the injury of another." *Id.* The elements of estoppel, which is a question of fact, are: (a) a representation or concealment of material facts (b) made with knowledge, actual or virtual, of the facts (c) to a party ignorant, actually or permissibly, of the truth (d) with the intention, actual or virtual, that the latter act upon it, and (e) *the party must have been induced to act upon it*." (emphasis supplied). 11 Witkin, Summary of California Law, Section 177.

Defendants' estoppel claims fail as a matter of law. As set forth in detail above, Indivos claims harm by virtue of its and its investors' alleged reliance on Hoffman's statements. The problem, however, is that the only harm is that Indivos allegedly received $18,000,000 in investments in reliance on these statements, then spent the $18,000,000, became insolvent and failed – and all of this allegedly without any knowledge of Excel's rights. And, for Solidus' part, they were fully aware of the facts before investing, and thus, there is no detrimental reliance or harm on Solidus' part either. The claim fails as a matter of law.

In addition, there is no dispute that Indivos knew the true state of Excel's superior ownership rights to the patents. Indivos clearly knew about the Operating Agreements. There is ample evidence that Indivos' founders knew about the May 8, 1995 License Agreement. Mendelsohn testified that he and Silen knew about the license with SmartTouch. All the founders knew about Excel's ownership of the inventions. And, as detailed above, there are a lot of additional facts that support SmartTouch's knowledge of Excel's rights, including knowledge of both Fortuno and Goia, two SmartTouch CEO's.

Thus, at a minimum, there are disputed questions of fact regarding estoppel.

## III. **CONCLUSION**

For the foregoing reasons, Defendants' Motion should be denied in its entirety. Instead, and as set forth above, Excel's Motion for Partial Summary Judgment should be granted.

Dated: April 23, 2004 By: **/S/**

Denise M. De Mory
Counsel for Plaintiff Excel Innovations, Inc.