Apple Inc. v. Psystar Corporation

Doc. 923 Att. 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

EXCEL INNOVATIONS, INC., )
)
Plaintiff, )
)
vs. ) No. C03-03125 (MMC)
)
INDIVOS CORPORATION, SOLIDUS )
NETWORKS, INC., )
)
Defendants. )
)
)

CERTIFIED COPY

VIDEOTAPED DEPOSITION OF

THOMAS A. MAIER

March 2, 2004

REPORTED BY: JAN LIGUORI HERNANDEZ, CSR 6703 01-346021

LEGALINK®
A WORDWAVE COMPANY

LegaLink San Francisco
601 Van Ness Ave, Suite 2052
San Francisco, CA 94102

tel (415) 359-2040
tel (800) 869-9132
fax (415) 359-2050

www.legalink.com

Dockets.Justia.com

(Whereupon, Maier Exhibit 8 was
marked for identification)

MR. SLATER: Q. Mr. Maier, please take your time looking through that, and when you're done let me know.

A. Am I instructed to read the full document?

Q. Enough to -- why don't you just take a look through it right now, and if I ask you questions where you feel you need to refer to it, we'll go from there.

MR. SLEETH: Make yourself generally familiar with what's in here.

THE WITNESS: Okay, I have reviewed it.

MR. SLATER: Q. All right. You'll see that this document bears a date on it on the last page, page six, of May 8, 1995?

A. Yes.

Q. Do you recall seeing this document around May 1995?

A. My recollection is dim, but I do have a dim recollection.

Q. Please share with me what your recollection is.

A. The agreement, I remember seeing the agreement and being involved in the negotiations of the agreement.

Q. Okay. Share with me -- strike that.
What role did you play in negotiating this agreement?
A. I recall that I was representing Omnilock in connection with the negotiation of this agreement, and that there was another attorney at the time representing SmartTouch.
Q. Was that attorney Ali Kamarei?
A. That's my memory, but my memory's not perfectly clear.
Q. This document bears a date around the time that SmartTouch, LLC was formed; does that sound right to you?
A. Yes.
Q. Okay. And do you know why this agreement was drawn up?
A. We're getting into an area again that may potentially involve attorney-client privilege, and again not just from the SmartTouch side but also certainly from the Excel side, so I'm reluctant to comment.
MR. SLEETH: Let me suggest this, I understand SmartTouch has waived its privilege, is that entirely?
MR. SLATER: In connection with this agreement and any work Mr. Maier did, that's right.

MR. SLEETH: Okay. And so to the extent that you have what you believe are privileged communications with Omnilock, you may assert the attorney-client privilege; however, to the extent that you've participated in discussions with SmartTouch where the purpose and the intent of this agreement was discussed with SmartTouch or in the presence of SmartTouch, that privilege has been waived and you should go ahead and testify as to that.

MR. SLATER: Q. Let's return to the question. Mr. Maier, you recall seeing this agreement around May 1995?

A. Yes.

Q. And you recall that you negotiated it; is that your testimony?

A. That I was involved in the negotiation of it, yes.

Q. Okay. And what do you mean when you say you were involved in the negotiation of it?

A. There may have been other attorneys who were also participating in the negotiation of the agreement on behalf of --

Q. SmartTouch, your client?

A. No, on behalf of Omnilock.

Q. At this point in time was SmartTouch also your

client?
A. I believe the firm at that time was engaged in the formation document -- the creation of the formation documents for SmartTouch.
Q. And that's a formation document you looked at, right?
A. Yes.
Q. And you played a role in creating SmartTouch, didn't you?
A. Yes.
Q. Did you get anything like a conflict waiver letter in connection with this?
A. I believe we did.
Q. Okay. I have not seen one produced, but you recall seeing one?
A. I believe we got one, but my memory is not perfectly clear.
Q. So, you may have and you may not as best you can recall?
A. My memory is not clear.
Q. Okay. When you say you played a role in negotiating this document, please describe for me as best you can what role you played.
A. It was regarded as important at the time that there be separate representation for the two companies.

Another attorney, and I believe it was Ali Kamarei, was representing SmartTouch in connection with the drafting of this document, and our law firm was representing Omnilock.

Q. All right. Either I didn't ask the question right or I didn't hear the answer right.

What was your job in connection with negotiating the document, the business points, the tax implications, all of the above, something else?

A. Yeah, my memory is that I was not simply reviewing the tax issues, but reviewing the document as a whole.

Q. And you felt competent to do that based on your experience and legal training up to that time?

A. With the assistance of the other attorneys in our firm, yes.

Q. What other attorneys, if any, helped negotiate this document?

A. I don't remember exactly who those other attorneys may have been, although I believe Don Reinke would have been involved in the process.

Q. Okay. Any other lawyers as you can recall?

A. Possibly also Bruce Whitley.

Q. Okay. Is that it?

A. Right now I cannot recall any other attorneys

who may have been involved.

Q. All right. How did you first become aware that this agreement was going to be created between the two parties?

A. Again, that gets into an area where I'm also concerned about the attorney-client privilege and communications directly with Omnilock.

Q. Well, for the moment I don't want to know who said what. I just want to know where you heard from that this agreement was going to come into existence.

MR. SLEETH: You can answer that. You just want --

MR. SLATER: Q. I just want a name, also the privilege isn't yours to assert, this man has to stand or fall in his assertion of that privilege, but go ahead.

A. Okay.

MR. SLEETH: This man being?

MR. SLATER: Mr. Sleeth.

MR. SLEETH: It's not my privilege to assert.

MR. SLATER: No, you're defending the witness. Go ahead.

MR. SLEETH: The privilege, Mr. Maier can certainly assert the privilege as well.

MR. SLATER: We'll agree to disagree. Go

ahead.

Q. How did you first come to learn this agreement was going to be negotiated?

A. I believe I would have heard that from Ned Hoffman or from Don Reinke.

Q. Okay. But one of the two?

A. I believe so, but my memory is not perfectly clear.

Q. And when you say -- I believe you've testified a couple of times that you negotiated this document.

A. That I was involved in the negotiation of the document.

Q. I'm sorry, in what sense were -- were you having conversations with Mr. Kamarei about the document?

A. I recall having conversations with him, yes.

Q. Okay. Around what period of time?

A. Again my -- the only basis I would have for pegging a time to those discussions would be the date on the document.

Q. As you recall, do you recall how long it took to negotiate the document?

A. No.

Q. Was it -- do you recall within any range of time?

A. Less than three months and more than two weeks.

Q. And Mr. Kamarei's client was SmartTouch, right?

A. Correct.

Q. Who was directing him as far as you knew in connection with SmartTouch?

A. I don't remember.

Q. Well, who could it have been as best you can recall from the time?

MR. SLEETH: Objection to the extent it calls for speculation.

MR. SLATER: You may answer.

THE WITNESS: Am I instructed not to answer?

MR. SLATER: No.

MR. SLEETH: No, I'll instruct you when you're not to answer.

THE WITNESS: It could have been Ned Hoffman or any of the other equity investors in SmartTouch.

MR. SLATER: Q. In your mind who were the other equity investors?

A. I don't remember.

Q. You don't -- does Mr. Lapsley ring a bell?

A. It rings a bell, although not enough of a bell for me to tie him in directly as an investor in

SmartTouch at that time.

Q. Did you ever have any conversations with anyone from SmartTouch other than Mr. Kamarei in connection with negotiating this document as you've testified?

A. I believe I did, but my memory is not clear.

Q. With whom?

A. And again I don't remember specific names right now.

Q. Do you remember any -- I believe you testified there might have been someone else. Do you remember who that might be?

A. There were other equity investors in SmartTouch at the time. Ned Hoffman I believe had a large stake in SmartTouch. Mr. Mendelsohn may have had a stake also at that point, but beyond that I just don't remember.

Q. Okay. But you do recall having conversations with Mr. Kamarei about the content of this document?

A. Yes.

Q. And did Mr. Kamarei ever express to you who his business contact or who his decision maker was for SmartTouch?

A. I don't remember.

Q. All right. You never said it was Ned Hoffman?

A. Again, I don't remember.
Q. At this stage in the life of the company, do you know who else it could have possibly been?
A. Again, my only recollection is that it may have been one of the other equity investors in SmartTouch.
Q. What's the basis for that recollection?
A. When a new company is formed, often there isn't any immediate hierarchy of responsibility, and the founders each will have input in deciding how the company is operated.
Q. Do you have any recollection from that time of any of the founders besides Ned Hoffman ever saying anything about this agreement?
A. And again, Mr. Mendelsohn is the one name that I dimly remember being involved, but I can't recall any other names right now.
Q. So then it would surprise you to learn if you heard that Mr. Mendelsohn said he saw this agreement for the first time in November '02, that would be different than your recollection?
A. It would be different from my recollection, but it would not be surprising, my recollection is very dim.
Q. All right. Now, did you -- do you have any

recollection of exchanging drafts of the agreements
with Mr. Kamarei?
A. Yes.
Q. All right. Did you keep any of those drafts?
A. The only drafts that I would have retained would be included in the documents that we have already produced. It is possible there may have been other hard copy drafts that were not on our electronic filing system. But as Mr. Sleeth indicated, we do not currently have possession of those.
Q. You don't currently have possession of any of the drafts of this agreement, right?
A. Based on the review that we did in response to the subpoena, my answer is no.
Q. Okay. Who provided as far as you know the first draft of this agreement?
A. Again, I don't remember.
Q. It wasn't you?
A. I'm sorry, I don't remember.
Q. You don't know if it was -- let's look at the agreement itself. Is this agreement representative of your typical work product at the time?
A. There really is no typical work product; of course each project would be specifically tailored to the client's needs.

Q. You understood this was a very important agreement, right?

A. The assumption that I take with all of the documents that I draft is that the agreements are important.

Q. All right. And so you did your utmost drafting this document, right?

A. Well, I --

MR. SLEETH: Well, it assumes facts not in evidence that he drafted it.

MR. SLATER: Q. You did your utmost in negotiating this document, right?

A. Well, I try to put forth my best effort for all the projects I work on for all of my clients.

Q. And you did testify, did you not, that drafts went back and forth?

A. Went back and forth is a bit ambiguous. I believe that we did exchange drafts and go through more than one version of the document when we were working on this with Mr. Kamarei.

Q. Okay. When those were going back and forth, what business points or legal points, if any, do you recall being discussed?

MS. DeMORY: Objection, mischaracterizes prior testimony.

MR. SLATER: Q. You can answer.
A. And again I'm getting slightly concerned about attorney-client privilege.
Q. Let me -- what was discussed with the -- your other client SmartTouch, the firm's other client in this transaction?
MR. SLEETH: I will object to the question as assuming facts not in evidence and as argumentative.
MR. SLATER: Q. You can answer.
MR. SLEETH: But putting aside Counsel's argument, to the extent that there was discussion with counsel for SmartTouch in the negotiations, you can certainly divulge those.
MR. SLATER: Counsel, I'd respectfully request you refrain from speaking objections, just state your objection and we'll press on.
MR. SLEETH: And if you can save your closing argument for trial, I'd appreciate it.
MR. SLATER: Q. You can answer.
A. As to the business point that were discussed, I just don't remember right now what the topics were that we considered as we were negotiating this document.
Q. Do you remember any of the business concepts this might have been discussed or reflected in the

drafts, any of them?
A. I recall that there was a conditional transfer of technology rights to SmartTouch, and that there were negotiations over the conditions that would apply to allow SmartTouch to retain that technology.
Q. And can you relate for me at all the substance of those discussions?
A. It's so many years ago, I just don't have specific recollection.
Q. Don't remember any points where the parties had to compromise or the language had to be redrafted?
A. Again, I have a dim memory that there was negotiation over the conditions under which SmartTouch would be permitted to retain the technology, but I don't remember specific conversations beyond that.
Q. Can you share with me the best you can recall what that dim memory was?
A. Yes, the memory is what I have stated already, that there were negotiations over the transfer of the technology to SmartTouch and the conditions under which SmartTouch would be allowed to retain the technology.
Q. All right. And what of those conditions were negotiated, what component of those?
A. And again, it's many years ago and I just don't remember.

Q. You don't remember any of the components that were negotiated in connection with the conditions as you identified them of the technology transfer; is that right?

A. I recall from having just reviewed the document that there were issues about certain business milestones that SmartTouch would be obligated to achieve in order to retain the technology, and there would be conditions under which the technology would revert to the original grantor if the milestones were not achieved.

Q. Do you recall the issue of these milestones as you've identified them and these conditions ever coming up in any subsequent documents that were prepared for SmartTouch from '95 forward?

A. No.

Q. Is it fair to say that based on your experience that's something that say investors or business partners would want to know about?

A. Again, my involvement with SmartTouch following the negotiation of this document and the formation of SmartTouch was quite limited. The absence of any memory on my part about whether this came up would not reflect whether the existence of this agreement did come up.

Q. Move to strike as non-responsive.

I'm asking you now as a person who has worked with start-up companies and represented investors, based on that experience is it fair to say that an investor or a founder would want to know about an agreement such as this if it was going to participate in SmartTouch?

MR. SLEETH: Assumes facts not in evidence and it also calls for speculation.

MR. SLATER: You can answer.

MS. DeMORY: It's an incomplete hypothetical that calls for expert testimony.

MR. SLATER: You can answer.

THE WITNESS: Mr. Sleeth, am I instructed?

MR. SLEETH: No, no, when I tell you not to answer the question I'm instructing you, but -- and then let me just so you understand, sometimes objections are raised for the record and that doesn't prohibit you from answering the question to the best of your ability and to the extent you can, but if I do instruct you to not answer the question, I'll make that very clear.

THE WITNESS: Uh-huh. I'm sorry, can I have the question read back, please.

MR. SLATER: There's a question in there

somewhere. I'll just reask it.

Q. Mr. Maier, based on your experience, is the existence of an agreement like this something that potential investors or -- in SmartTouch or business partners of SmartTouch would want to know about?

A. Yes.

MS. DeMORY: Same objections.

MR. SLATER: Q. Okay. Did you ever make in the years following this agreement, 1995, did you ever make any effort to share this agreement with any party you understood might have a business relationship with SmartTouch?

A. And my involvement with SmartTouch was extremely limited after the time frame involved. My answer to the question based on that preface would be no.

Q. But your answer is you never made any effort to share this agreement with any investor or business partner; is that right?

A. Correct.

Q. Do you know if Mr. Whitley ever made any effort to share this agreement with any investor or business partner in SmartTouch?

A. I do not know if he made that effort.

Q. Don't know whether he did or he didn't?

A. That is correct.
Q. Before we move on, let's go into the document.
Let's turn -- I believe you testified earlier that you recall some negotiation over the conditions in this document?
A. Yes.
Q. All right. And where -- having gone through the document and having worked with it years ago, where in your mind were those conditions?
MR. SLEETH: Objection, argumentative.
MR. SLATER: I'll reask.
Q. Where in this agreement are the conditions that you identified as having been negotiated, which provisions are they reflected in?
A. I believe that they would have been reflected primarily in Sections 4 and 6; 4 being titled Performance Guarantees and 6 being titled Term and Termination.
Q. Now, I note that this document appears to be initialed for Omnilock, for SmartTouch and for a witness. There's no signature block for you here; do you know why that's so?
A. For me individually?
Q. Sure, yes.
A. I wasn't a party to the agreement.

Q. Mr. Kamarei signed this as a witness, so it appears at least, on page six. Do you know why his signature appears on this and yours doesn't?

A. No.

Q. That was something that you're comfortable with though in the drafting of the document?

MR. SLEETH: Objection, argumentative, mischaracterizes the witness's prior testimony that he drafted the document.

MR. SLATER: I'll reask.

Q. This was something you were comfortable with in connection with your negotiation of the document?

A. I don't remember.

Q. Whether you were or you weren't?

A. That's right.

Q. If you weren't, you would have probably said something based on your prior practice, right?

A. Again, I'm sorry, I just don't remember.

Q. Okay. Let's turn to what you've identified as some of the conditions. That's in Section 4, right?

A. Again, based on a brief review, it appears that Section 4 and Section 6 set out the conditions.

Q. Well, let's start with 4. SmartTouch is obligated here to dedicate its best efforts as you wrote -- as this was written, right?

MR. SLEETH: I'm sorry, those words are?
MR. SLATER: Let me reask that.
Q. It says here "SmartTouch will dedicate Best Efforts to achieve the following performance guarantees"; do you see that?
A. Yes.
Q. Okay. Do you recall who drafted that sentence?
A. No.
Q. Do you recall whether that sentence was negotiated?
A. No.
Q. All right. Did you -- were you comfortable with that sentence as it was written into this final version of the document?
A. Again, I'm sorry, I just don't remember.
Q. Whether you were or you weren't?
A. Yes.
Q. Let's look at 4.1.1; that's one of the conditions you've identified, right?
A. I believe so, yes, but again my memory is very dim on this.
Q. Okay. Do you know why a term of six years as opposed to another period of time was identified?
A. No.

Q. Do you recall any discussion from Mr. Kamarei or any other party as to why six years was picked?
A. No.
Q. Okay. Next it says to generate at least 20 million; do you see that?
A. Yes.
Q. Okay. How was the figure of $20 million arrived at?
A. I don't remember.
Q. There it says "at least"; do you see that?
A. Yes.
Q. Under what circumstance or circumstances would SmartTouch be obligated to pay more than $20 million in connection with this Section 4.1.1?
A. I'm sorry, my mind wandered, would you repeat it?
Q. Sure, let's ask it again. You see 4.1.1 says "Within six Contract Years from the Effective Date, to generate at least $20 Million in annual sales from the Invention"; do you see that?
A. Yes.
Q. All right. Under what circumstance or circumstances as you understood this agreement would SmartTouch have to pay -- I'm sorry, to generate more than $20 million in annual sales from the invention?

A. I don't remember.
Q. As you read the document now, any idea how that milestone might come into play?
A. No.
Q. All right. Do you recall any discussion with SmartTouch or SmartTouch's representative as identified here under what circumstances a figure of more than $20 million in sales might be required to meet the performance guarantee?
A. I'm sorry, I don't remember.
Q. Let's go to 4.1.2, you see there's the same period of time there?
A. Yes.
Q. Any idea how six years was picked as opposed to another period?
A. No.
Q. Here it says "to pay Omnilock an aggregate total of at least $20 million in cash resulting from SmartTouch's commercialization of the Invention"; do you see that?
A. Yes.
Q. Okay. Under what circumstance or circumstances would SmartTouch be obligated to pay more than $20 million to Omnilock?
A. I don't know.

Q. You're the person who negotiated this for Omnilock, right?
A. I participated in the negotiation of this on behalf of Omnilock.
Q. Omnilock was your client, right?
A. In connection with the negotiation of this agreement, that is correct.
Q. $20 million is a lot of money, right?
A. Yes.
Q. And as you read this, this contract you negotiated, there might be circumstances where SmartTouch would be on the hook to pay Omnilock even more than $20 million, right?
A. Again, based on a quick review of this, I would have to say I am not sure.
Q. Whether they would or they wouldn't?
A. That is correct.
Q. Is it -- do you believe that's something SmartTouch would want to know?
A. Yes.
Q. And it's of course something Omnilock would want to know, right?
A. Yes.
Q. But as you read this, you're not sure what the answer is?

A. Again, I don't remember what the answer is. It was many years ago and I just don't recall.

Q. And looking at this doesn't refresh your recollection?

A. No, not in the period that we've spent with it so far.

Q. And your best recollection was that you spent more than two weeks and less than three months negotiating this on behalf of Omnilock, right?

MR. SLEETH: Objection, mischaracterizes the witness's testimony.

MR. SLATER: Q. If it did, correct me.

A. The total time period over which the document was negotiated I believe was more than two weeks but less than three months. We did not spend certainly all of that time working exclusively on this project.

Q. Can you estimate for me within any range of time how many hours you spent working on this document?

A. Again, my recollection is very dim on this point. It is likely to have been between five and twenty hours.

Q. Would you have time sheets that would reflect that?

A. Not that exist currently, no.

Q. That wouldn't exist in any form?

A. I believe that is correct. I believe all of those files have been destroyed. There is some possibility that they may still exist.

Q. All right. Did you send a bill to Omnilock for this work?

A. I don't remember specifically, but that would have been the normal course of our business.

Q. Okay. So, the time might be reflected there if you spent it on this?

A. Yes.

Q. Okay. Let's turn to the first page of this document. Direct your attention please to the recitals; if you could look at the second recital, please. Do you recall whether that was in an early draft or it was modified in a subsequent draft?

A. I don't remember.

Q. You have no recollection of who wrote that language in there in the first instance?

A. That is correct.

Q. But that is language you approved on behalf of Omnilock; is that right?

A. Again, I participated in the negotiation of the document; it probably is a slight mischaracterization to say that I approved it.

Q. You would have passed on your comments to the

other side, that is Mr. Kamarei, if you thought the document was ambiguous or unclear or you just didn't understand it, right?

A. Either I or another attorney at our law firm would have done that.

Q. Okay. But do you have any recollection of doing anything like that, of saying -- forgive me, finish your answer.

A. Again -- my answer is that I don't remember.

Q. You don't remember whether you conveyed at any point in time to anyone this, this or that particular provision is ambiguous, is that right, or I don't understand how it works?

A. Let me rephrase the answer to the prior question. I don't remember whether I made any specific comments on the second recital that you've identified. I do recall that we exchanged comments with Mr. Kamarei, but I don't remember the specific content of those comments.

Q. And you don't recall the concepts or the, even broad terms to which those comments related; is that right?

A. Beyond the points that I've already testified to involving the milestones and the conditional right to retain the technology, that is correct.

Q. Okay. Well, let's look at this recital, the second recital where it says "SmartTouch desires to obtain a non-exclusive, non-assignable, conditional sublicense pertaining to Invention"; do you see that?
A. Yes.
Q. Was that your understanding of SmartTouch's objective at the time?
A. Again, Mr. Kamarei was representing SmartTouch in connection with the negotiation of this agreement, so I didn't have any direct understanding of what SmartTouch's objectives would have been.
Q. Did you have -- you didn't ask him at any point what sort of license SmartTouch wanted, as written here?
A. The point may have come up in negotiations, but I don't remember specifically discussing this recital.
Q. Okay. Based on your understanding at the time, what did you understand Omnilock was giving SmartTouch when it gave it, according to this recital, a non-exclusive sublicense?
A. And again, my recollection is dim. What I recall is that the ability to use the technology was being transferred to SmartTouch, although the ability to use -- that ability was contingent on SmartTouch's

achieving certain business milestones.
Q. Move to strike as non-responsive.
What did you understand SmartTouch was getting when it got as written here a non-exclusive sublicense?
A. And again my memory is very dim on these negotiations, and the best recollection I have is based on the terms of the document in front of me.
Q. You have no -- other than what you've said, you have no understanding of what Omnilock gave SmartTouch when it gave it a non-exclusive sublicense?
A. I believe it gave SmartTouch the right to use the technology, again certain to -- subject to the achievement of certain business milestones.
Q. Same motion.
So, according to this recital at least and as you understood the document, Omnilock had the right to license this technology it's identified here as Ned Hoffman's Tokenless Biometric Computer System invention, it had the right to license this technology to other parties; is that right?
A. The first recital indicates that Omnilock had the ability to grant non-exclusive sublicenses, but we're looking now at the recitals.
Q. Right.
A. And recitals don't establish the substantive

contractual rights as between the parties.

Q. I'm just asking you if that was your understanding of what Omnilock intended to give SmartTouch.

A. And again, beyond what I've testified to, I just don't have a clear recollection.

Q. Why is it -- why does it say non-assignable here, what was Omnilock trying to accomplish by having a non-assignable, conditional sub-license?

MR. SLEETH: I'm going to object to the extent that it calls for attorney-client privilege or attorney work product. To the extent that you communicated what Omnilock was trying to achieve to others, you can testify to that.

THE WITNESS: And I would have concern about attorney-client privilege, the overriding attorney-client privilege I should also say, and I just don't remember.

MR. SLATER: Q. What is your understanding -- what was your understanding in 1995 of what a non-assignable sublicense was?

A. I believe my understanding in 1995 would be the same as it is right now.

Q. Right, we're just picking that date because that's when this agreement happens to have been

written.

A. Sure. That a non-assignable license would have been a license that the licensee cannot assign.

Q. All right. And what was your understanding in 1995 of what a non-exclusive sublicense would be?

A. A non-exclusive sublicense, and again I'm -- my current understanding of what a non-exclusive sublicense would be is a sublicense of technology that is -- that grants rights to use the technology to the sublicensee, but that does not prevent the sublicensor from licensing the technology to other parties.

Q. Have you ever seen any documents where SmartTouch held itself out as owning this invention as its own proprietary technology?

A. No.

Q. Have you ever drafted any documents where SmartTouch held itself out as the exclusive or proprietary owner of this technology?

A. No.

Q. Did you ever draft any documents by which Omnilock or Omnilock's successor Excel contributed its technology to SmartTouch?

A. Again, I don't remember. The agreement that we are currently looking at does provide for a transfer of some rights and technology; beyond that I don't

recall drafting a document that would transfer those rights.

Q. Or participating in the negotiation of a document which would transfer those rights?

A. That is correct.

Q. Or having any role whatsoever in any document where those rights were transferred?

A. Again, not that I can recall, although I will say that my -- that other lawyers in our office may have participated in those kinds of transactions.

Q. Okay. To your knowledge were there ever any amendments or any supplements to this agreement?

A. To my knowledge, no.

Q. Let's look at Section 2, please.

Had a chance to look at it?

A. Oh, I'm sorry.

Q. Sure.

A. Yes.

Q. All right. Do you recall either drafting or commenting on the language of Section 2?

A. Not specifically, no.

Q. Does Section 2.1.1 accurately recite as you understood it in 1995 the grant that Omnilock made in favor of SmartTouch?

A. Again, the document speaks for itself. I

don't recall what my intention may have been in 1995.
Q. Or what Omnilock was trying to accomplish?
A. That is right.
Q. Do you -- can you look at Section 4.2, please.
A. Yes.
Q. Do you recall doing any drafting or any commenting on this section?
A. Again, I don't have specific recollection of commenting or drafting that section.
Q. All right. You see this section calls for quarterly reports?
A. Yes.
Q. Did you ever see in connection with your work with SmartTouch anything like the quarterly reports described in this section?
A. Not to my recollection.
Q. Did you share with SmartTouch's lawyers anything like the template or the sort of information that Omnilock expected from SmartTouch in connection with these quarterly reports?
A. Not to my recollection.
Q. Do you have any information from any source whether any of the quarterly reports called for by this Section 4.2 were ever drafted?
A. None that I know of.

Q. And you've never seen them and you've never heard of them; is that correct?

A. That's correct.

Q. Okay. Did you draft or have drafted any documents that went on that were part of this agreement or that were signed in connection with this agreement?

A. Not that I recall.

Q. Subsidiary documents, for example a financing statement?

A. Not that I recall.

Q. You know what a finance -- have you worked with financing statements before, UCC-1 financing statements?

A. Yes.

Q. Okay. Did you understand this agreement to purport to grant or to by some sort of security interest in favor of Omnilock secured by property of SmartTouch?

A. I'm sorry, can you point me to a place in the agreement.

Q. Well, I'll just ask you, do you know if Omnilock got a security interest in any collateral of SmartTouch in connection with this agreement?

A. No.

Q. And if they had, would you have had a practice

to prepare some sort of security agreement or financing statement?

MR. SLEETH: Objection, calls for speculation, assumes facts not in evidence.

MR. SLATER: Q. You can answer.

A. If we had been instructed by our client to obtain a perfected security interest, it would have been our practice to do some kind of filing to see that the security interests were perfected.

Q. Okay. Let's go to Section 6.5. Can you look at Section 6.5, please?

A. Yes.

Q. Okay. What is meant there when it's written, that first sentence, "All SmartTouch obligations to Omnilock as provided under this Agreement, including all Performance Guarantees, obligations, promises and payments due by SmartTouch to Omnilock pursuant to the terms of this Agreement, shall be guaranteed and secured, by any and all Work Product related to and/or derived from the Consultants, the Consulting Agreements, and the Invention," the text goes on; do you see that?

A. Yes.

Q. All right. Was that intended to create some sort of security interest?

A. Again, I don't remember.
Q. Whether it was or it wasn't?
A. That's correct.
Q. Okay.
MR. SLATER: Want to take a break? Sure.
THE VIDEOGRAPHER: Going off the record, the time is 11:51.
MR. SLATER: Just one more question and then we'll take a break. Let's go back on one minute and then we'll break for lunch.
THE VIDEOGRAPHER: All right. Not going off the record yet, still on the record.
MR. SLATER: Q. Okay. Mr. Maier, do you know why Ned Hoffman signed this agreement for both parties?
A. No.
MR. SLATER: Okay. Let's take a break.
THE VIDEOGRAPHER: Going off the record, the time is 11:52.
(Whereupon, the noon recess was taken)
THE VIDEOGRAPHER: Back on the record, the time is 1:17.
MR. SLATER: Q. All right. Mr. Maier, I'd like to direct your attention back to what we've been talking about for a little while, Exhibit 8, the agreement. Having spent a little while on it, would

you agree it's a pretty poorly drafted document?
MR. SLEETH: Objection, argumentative, you don't have to answer that, instruct you not to answer.
MR. SLATER: On what basis?
MR. SLEETH: Well, I suppose if you're asking him for his opinion as a lawyer, he's not here to render opinions as a lawyer, he's here to act as a percipient witness, and you're --
MR. SLATER: I'll reask.
Q. Do you think this document was poorly drafted?
MR. SLEETH: Same objection, same instruction, you don't have to answer that.
MR. SLATER: Okay. We'll certify that.
Q. Mr. Maier, can you look at Section 3, please.
A. Yes.
Q. Can you read for me please the title of that.
A. "Representations and Warrants of Omnilock and SmartTouch."
Q. What does the warrants refer to?
A. I believe it's a typo and the word should be warranties.
Q. Would you agree there are a number of typos in this document?
A. I haven't had the opportunity to review the document in sufficient detail to reach that decision.

Q. When was the last time you saw it?
A. Well, just before we broke for lunch. Are you --
Q. Sure, let me reask.
A. Yeah.
Q. When was the last time before your deposition today you saw this document?
A. Probably two weeks ago or so.
Q. In what connection?
A. I was looking through some of the documentation that I had been requested under the subpoena.
Q. For what purpose were you looking through those documents?
A. To respond to the subpoena.
Q. Did you look at this document in preparation for your deposition?
A. I looked at it briefly.
Q. In preparation for your deposition?
A. Partly in preparation for the deposition and partly to respond to the subpoena document request.
Q. What --
MR. SLEETH: Let me caution the witness that it's not clear to me that you saw this document or an electronic version. If you did see this document and

it's a signed document, that's fine, but it was my understanding that you'd seen, you know, electronic versions off the computer, but I could be wrong, I just caution you.

MR. SLATER: Q. Well, did you see this -- did you review this agreement in preparation for your deposition?

A. I saw --

MR. SLEETH: The signed agreement?

MR. SLATER: The exhibit we're looking at now.

MR. SLEETH: The signed agreement, that exhibit.

MR. SLATER: Right.

THE WITNESS: I have seen a signed version of the agreement that I believe is a copy of the agreement we are looking at right now.

MR. SLATER: Q. Okay. Well, did you see that in PDF form, when you say you --

A. I saw it in hard copy.

Q. Okay. Were there any section or sections you looked at in connection with your deposition preparation?

A. No, I reviewed the entire agreement briefly.

Q. Okay. Can you estimate within any range how long you spent reading it?

A. Five minutes.
Q. Okay, five minutes. When was the last time you saw it before you found it in connection with the subpoena -- reviewing documents for the subpoena, sorry.
A. Before the review -- before the review in connection with the subpoena, it probably would go back to the time period in which the document was drafted.
Q. May 1995?
A. I believe so, yes.
Q. Okay. So, there's a typo there in Section 3, right?
A. I believe so, yes.
Q. Section 3.1.1, if you could look at that, please. Just the first phrase, it says "Pursuant to the Inventor-Omnilock License Agreement dated May 8, 1995"; do you see that?
A. Yes.
Q. Have you ever seen that document before?
A. I don't remember.
Q. Whether you had or you hadn't?
A. That is correct.
Q. Do you remember whether that agreement was reviewed or discussed in connection with the negotiations for this agreement?

A. I don't remember.

Q. Whether it was or it wasn't?

A. That is right.

Q. All right. Would you have a practice in connection with looking at a license agreement like this if you were drafting or negotiating a sublicense? I'll reask that.

Would it be your normal practice to look at a license agreement like this if you were drafting or negotiating a sublicense?

MR. SLEETH: Assumes facts not in evidence.

THE WITNESS: If I were drafting an agreement and there were reference to another agreement, it would be my normal practice to review that other agreement.

MR. SLATER: Q. Okay. So, to the extent this agreement refers to other agreements, it would be your normal practice to review the agreements attached; is that right?

A. Yes.

Q. Okay. You have no recollection, do you, of participating in the drafting or negotiation or creation of the Inventor/Omnilock License Agreement that's referred to here?

A. If the question is do I have any recollection, the answer would be no.

Q. No, okay. You see it's got the same date as this agreement?

A. I see that the reference here is to May 8, 1995, and that this agreement is also dated May 8, 1995.

Q. Do you know if Mr. Kamarei ever saw the Inventor/Omnilock License Agreement before this agreement here, this Exhibit 8, was drafted?

A. I don't know.

Q. Can you please turn to the third -- forgive me, turn to the first page of the document, the third recital. It says "Omnilock is willing to conditionally grant such a non-exclusive sublicense in pursuant to the terms and conditions set forth hereinbelow"; do you see that?

A. Yes.

Q. Do you know what that recital is trying to say?

A. Again, the agreement speaks for itself. I don't have any independent recollection of what the intent of the parties may have been at the time this was drafted.

Q. So, the phrase "in pursuant," can you shed any light on why those?

A. Oh, the word "in" appears to be improperly

inserted. I believe that it should read "pursuant to."

Q. Would it be your general practice to read documents carefully before letting your clients execute them to look for typographical and other errors?

A. It depends on the time constraints that we were under in order to complete the transaction. And if the time constraints were severe, normally we would simply make best efforts to get a document that was accurate and correct.

Q. Okay. Well, let's talk about, can you look at 7.1, please. Are you there?

A. Yes.

Q. That's on page five. Can you look at 7.1.3, please?

A. Uh-huh.

Q. This says "The indemnity set forth in this Section 11 shall survive the termination of this Agreement"; do you see that?

A. Yes.

Q. What's Section 11?

A. I believe that's an incorrect cross-reference possibly left over from a prior draft, and that the cross-reference should be to this Section 7.

Q. Can you look at 7.10, please. Just read that and let me know when you've had a chance to look at it.

MR. SLEETH: I'm sorry, which? Did we make an error?

MR. SLATER: Q. I'm sorry, page six, page six, 7.10.

A. Yes.

Q. Had a chance to look at that?

A. Not yet.

Q. Oh, please take a moment and look at it.

A. (Witness complies.)

Yes.

Q. What, if any, purchase order was contemplated to be delivered in connection with this agreement?

A. I don't remember.

Q. Do you know whether one was or wasn't?

A. I don't know that.

Q. Either way?

A. I should say I don't remember, that's correct.

Q. Okay. What letter of credit was discussed, if any, between the parties in connection with this agreement?

A. Again, I don't remember.

Q. Whether one was or wasn't?

A. That is right.

Q. Okay. Have you ever seen or heard of a letter of credit between the two parties in connection with

this agreement?
A. Again, I don't remember.
Q. Whether you have or you haven't?
A. That is right.
Q. And have you ever seen or heard of a purchase order between the two parties in connection with this agreement?
A. Again, I don't remember.
Q. Can you think of a circumstance where there might be a purchase order between the two parties of this agreement?
A. Yes.
Q. Did you ever draft a form of one to be used?
A. Not that I can recall.
Q. Okay. The last phrase here -- these phrases here "Purchase Order" and "Letter of Credit," they're supposed to be in this section, right?
A. Again, I don't remember.
Q. Whether they should be or they shouldn't be?
A. That is correct.
Q. Is it possible they could just be phrases used from another agreement imported here and left here?
A. Again, I don't remember. If the question is is it possible, the answer would be it is possible.
Q. Okay. Now, it says, final phrase is "or other

document delivered pursuant to this Agreement"; do you see that phrase?

A. Yes.

Q. What other document was delivered pursuant to this agreement?

A. Again, I don't remember.

Q. Either way, from any party to any party?

A. That's correct.

Q. Okay. Is it fair to say that your memory of this agreement is very dim?

A. Yes.

Q. You don't recall the negotiations over any of the provisions or how they came to be drafted or what business terms might or may not have been discussed; is that fair to say?

A. No, I recall that there were some negotiations to the extent that I have testified to those earlier in the deposition.

Q. Right, forgive me. Other than what you've testified to, you don't recall any other discussions over any other terms, do you?

A. That's correct.

Q. Okay. Were you present when this agreement was signed?

A. I don't remember.

Q. Do you know what happened to this agreement after it was signed? Strike that, let me reask that.
Did you get a signed copy of this agreement after it was signed in the May 1995 time frame?
A. Again, I don't remember.
Q. Whether you did or you didn't?
A. That's right.
Q. What was your practice at the time in terms of keeping documents or keeping copies of documents like this?
A. Our law firm's practice was to get executed documents and put those into a client file.
Q. Okay. But, did you make any effort in that regard, to get an executed copy of this and put it in the client file?
A. Again, I don't remember.
Q. All right. So, it's possible then, isn't it, that this document could have been modified after you last saw it?
A. Again, after I last saw it would indicate after I last saw it in 1995?
Q. That's right.
A. Again, I need to go back to my earlier testimony to say that I don't know what happened to the document after I participated in the negotiations.

Q. So, after your participation ended, the terms could have changed; isn't that possible?

MS. DeMORY: Objection, calls for speculation.

MR. SLATER: Q. Is that possible? You can answer.

MR. SLEETH: I guess I object that it's ambiguous. Are you asking was there a subsequent agreement or are you saying that this agreement may be different as signed from --

MR. SLATER: I'll reask it, I'll reask it, I'll reask it.

Q. You don't remember any of the provisions of this agreement very well; is that correct?

A. Again I stand on my prior testimony about to the extent to which I do remember participating in the drafting of this -- in the negotiation of this agreement.

Q. You don't remember -- as we sit here and having gone through this, you don't remember drafting any particular provision, do you?

A. That is correct.

Q. Okay. So, your memory is such that if the document had been altered or modified after 1995, you wouldn't know because your memory isn't good enough to be able to tell you whether it's been altered or

modified; is that right?

A. That is correct.

Q. Okay. I believe your testimony this morning was to the effect that after this May 1995 time frame, your participation in legal work for SmartTouch dropped off quite a bit; is that correct?

A. That is correct.

Q. Can you identify for me within any range what sort of work you did for SmartTouch after May 1995?

A. The kind of work that I did for SmartTouch after that date would have involved primarily looking at tax issues that would have come up in the formation of the LLC, or potentially the operation of the LLC and the subsequent corporation.

Q. Was there any lawyer at the Pezzola and Reinke firm that had more involvement than you in the legal work for SmartTouch after May 1995?

A. Yes.

Q. Who is that?

A. Bruce Whitley.

Q. Anybody else?

A. I'm not certain of the staffing of the projects for SmartTouch following that date, but it's possible that Don Reinke would also have been involved.

Q. Okay. Anyone else as we go through this?

CERTIFICATE OF REPORTER

I, JAN LIGUORI HERNANDEZ, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript [X]was [ ]was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: March 12, 2004.

Jan Liguori Hernandez
JAN LIGUORI HERNANDEZ, CSR No. 6703