Apple Inc. v. Psystar Corporation Doc. 923 Att. 6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--o0o--

| | |
|---|---|
| EXCEL INNOVATIONS, INC., Plaintiff, | ) |
| vs. | ) Case No. C 03-03125 (MMC) |
| INDIVOS CORPORATION, SOLIDUS NETWORKS, INC., and DOES 1 to 100, inclusive, Defendants. | ) |
| INDIVOS CORPORATION and SOLIDUS NETWORKS, INC. Counterclaimants Counterdefendants, | ) |
| vs. | ) |
| EXCEL INNOVATIONS, INC., NED HOFFMAN, and AVIV LLC, Counterdefendants Counterclaimants. | ) |

CERTIFIED COPY

VIDEOTAPED DEPOSITION OF

ALI KAMAREI

Volume I

(Pages 1 through 406)

March 12, 2004

REPORTED BY: JOHNNA PIPER CSR 11268 JOB 346595

LEGALINK®
A WORDWAVE COMPANY
LegaLink San Francisco
601 Van Ness Ave, Suite 2052
San Francisco, CA 94102
tel (415) 359-2040
tel (800) 869-9132
fax (415) 359-2050
www.legalink.com
GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

Dockets.Justia.com

MR. SLATER: Q. Have you seen this document before?
A. Yes, I have.
Q. Does this document have your initials on each page and your signature on the last page?
A. Yes, it does.
Q. Can you please tell me what the purpose of this document was?
A. I believe that it transfers conditionally an assignment of the inventions from Omnilock to SmartTouch.
Q. Okay. That was what you understood the purpose of this document was?
A. Yes.
Q. And your client in connection with this document was SmartTouch, right?
A. That's correct.
Q. And you did the best job you could for SmartTouch in connection with this document and the transaction embodied in it, right?
A. I did work on it to an extent that would be fair for SmartTouch, correct.
Q. Well, you represented SmartTouch in connection with this agreement; is that right?
A. That is correct, yes.

Q. Okay. Who gave you the assignment to represent SmartTouch in connection with this document?

A. I believe -- I don't know if it was an assignment, but basically, it was, I think, something that we discussed between, I guess, Mr. Hoffman and Mr. Maier.

Q. Relate to me, please, the substance of those discussions.

A. You know, I can't recall exactly what the discussions were, but I don't recall it so that it was something where -- you know, here, you get hired for this. I mean, it was -- you have to appreciate this is a start-up -- you know, even before start-up phase of a company, so everything was very fluid, but I can't recall specifically --

MR. FERDOWS: Just answer the question.

THE WITNESS: -- what the discussions were.

MR. SLATER: Q. Can you identify any level of detail or generality? What topics were discussed when the idea of this agreement first came up?

A. No, not at that point.

Q. Now, you have testified via declaration, have you not, that you participated in negotiations concerning this agreement, right?

A. Yes, I have.

Q. How long did those negotiations take?
A. My recollection is probably a month or two, maybe two months.
Q. A month or two?
A. Yes.
Q. Over those two months, Mr. Maier represented Excel, right?
A. As Omnilock.
Q. Yes.
A. Yes.
Q. Excel's predecessor Omnilock, right?
A. Correct.
Q. Just so we have a clean record, Mr. Maier represented Omnilock in connection with this agreement, right?
A. Yes.
Q. Now, for your side, the SmartTouch side, who was the business person giving you direction in terms of what SmartTouch would or would not accept in the agreement?
A. I think it was probably Mr. Hoffman.
Q. It was Mr. Hoffman, wasn't it?
A. Yes.
Q. Okay. Did you understand who represented -- forgive me. Did you understand who was giving Mr.

Maier business instructions in connection with the agreement, that is, what Excel would or would not accept in connection with the agreement?

A. I would be speculating.

Q. You have no information from any source?

A. No.

MR. FERDOWS: Don't speculate.

MR. SLATER: Q. But you did testify, did you not, that only Mr. Hoffman had authority to sign the agreement for Excel the moment it was signed; is that right?

MR. STAMP: Objection. Assumes facts not in evidence. He never said anything like that.

MR. FERDOWS: Calls for speculation.

THE WITNESS: I'll have to look at the document.

MR. SLATER: Q. Well, I just want to see right now if you have any recollection of ever giving testimony to that effect.

A. I can't recall giving that testimony.

Q. You don't recall whether you did or you didn't or you don't recall doing it?

MR. FERDOWS: It is vague.

THE WITNESS: What is the difference?

MR. SLATER: Sure.

Q. You have no recollection ever telling any court in any connection that only Mr. Hoffman had authority to sign for Excel?

A. I don't recall --

MR. STAMP: Objection. Vague and ambiguous.

THE WITNESS: -- the -- I don't recall making that as a declaration or what have you to a court.

MR. SLATER: Q. And I mean by a declaration, I mean a written declaration.

A. Yes.

Q. You have no recollection of doing that?

A. No, I don't have a recollection of that.

Q. You do recall submitting a declaration in connection with this lawsuit, right?

A. Yes.

Q. Okay. Over the two months that you say this agreement was negotiated --

MR. FERDOWS: I think he said approximately one to two months. Misstates his --

MR. SLATER: I stand corrected.

Q. The negotiations spanned somewhere between one and two months, right?

A. Yes, but the negotiations are very sporadic at this point. They are not daily negotiations.

Q. Do you recall any particular session? Over the phone? In person? Something else?

A. I don't recall.

Q. All right. Whether any such sessions took place?

A. Any, I'm sorry?

Q. Any such sessions took place.

A. Well, I don't recall whether there was one that we sat down together, as you said.

Q. All right. Or you sat down maybe over a phone, over a phone conversation?

A. We probably had a phone conversation.

Q. Do you recall any such conversation?

A. I recall one, maybe two phone conversations, maybe more of them.

Q. Can you relate for me the substance of either of those conversations?

A. I probably recall the first time that I spoke over the phone with Mr. Maier. I know I got introduced -- I think I got introduced to him at that phone conversation and the substance was basically -- you know, some sort of an IP license or conditional assignment or something to that effect. And I think there was another one that was later on, probably at -- in Berkeley, we had a phone conference, I believe,

with, again, Mr. Maier and I think Mr. Hoffman and I were at the SmartTouch office and then Mr. Maier was at his office.

Q. And Mr. Hoffman is the one who introduced you to Mr. Maier, right?

A. I believe so, yes.

Q. Was anyone present on your end of the telephone other than you and Mr. Hoffman?

A. I don't believe so.

Q. Okay. Oftentimes agreements are formed when one party sends another a draft, comments follow, and a document is finally signed. Just with that in mind, who, if you can recall, prepared a first draft of this agreement?

A. I don't recall.

MR. FERDOWS: I just want an objection as to the characterization of how often agreements are signed.

MR. SLATER: You know what, I'll just ask. We'll do this another way.

Q. Someone typed this up, right?

A. Correct.

Q. Who?

A. I don't know.

Q. You have no information from any source?

A. No, I don't.
Q. You don't recall whether Mr. Maier sent you a draft that you may have made some notes on or some electronic notes on or vice versa?
A. I can tell you I didn't work on it, so I didn't type it, but I don't know who else did.
Q. Created electronically or whatever verb you want to use.
A. No.
Q. Do you know where the template for this agreement came from?
A. No, I do not.
Q. Did Mr. Hoffman create it?
A. I do not --
MR. FERDOWS: Calls for speculation.
THE WITNESS: I don't know.
MR. SLATER: Q. All right. You never learned from any source where the initial draft of this agreement came from?
A. That is correct, I don't know.
Q. You have seen, though, in 2003, a document whose template is very similar to this, right?
A. Yes.
Q. Describe that document for me, please.
A. The -- I think the -- you are referring to

the Aviv license.

Q. Excel and Aviv, right?

A. Correct, Excel and Aviv.

Q. What role did you play in connection with the Excel, Aviv license?

A. Essentially, I looked at the agreement which was supposed to be between Excel and Aviv and wanted to -- essentially looked at it and said this is basically the agreement that we used before and so --

MR. STAMP: I would counsel the witness not to disclose any confidential information.

MR. SLATER: Q. Who gave you the agreement?

MR. STAMP: Objection. Privileged information.

THE WITNESS: I would have to assert that privilege.

MR. SLATER: Q. Just so we're clear, I'm not asking what you told, must have been Mr. Hoffman or what he told you. I'm just asking where the template came from.

MR. STAMP: Objection. Attorney/client privileged information.

THE WITNESS: I would assert that privilege.

MR. SLATER: Q. Who is your client in connection with that?

A. It was Aviv.
Q. Okay. Has Aviv ever been known by any other names that you are aware of?
A. Not that I know of.
Q. Have you ever seen the agreement we're looking at here in electronic form?
A. No, I have not.
Q. Never seen it on a computer screen?
A. No, I have not.
Q. All right. Were you a member of the California Bar at the time you worked on this agreement?
A. I believe I was.
Q. Okay. May 1995, first week of May?
A. Yes, I was.
Q. Okay. What month were you admitted to the bar?
A. I believe March or February of '95.
Q. And you felt competent to work on this agreement, right?
A. Well, I was -- did the best that I could do under the circumstances.
Q. You wouldn't have done it if you didn't think you could do a good job, right?
A. I would think that I would be able to do a

good job.

Q. Thank you. But as a matter of fact, there are a lot of flaws in this agreement, aren't there?

A. That would be speculation.

MR. STAMP: Argumentative.

MR. SLATER: Q. You would be speculating?

A. You would be speculating.

Q. I would?

A. Yes.

Q. Well, let's go through it together.

A. Okay.

Q. All right. This agreement says in the recitals that Omnilock has certain rights and interest in and to Ned Hoffman's tokenless --

A. I'm sorry, where are you reading?

Q. Oh, forgive me. The first recital.

A. Okay.

Q. It says, "Omnilock has certain rights and interest in and to Ned Hoffman's tokenless biometric computer system invention."

Do you see that?

A. Yes.

Q. What did you do, if anything, to see what Omnilock's rights were?

A. What Omnilock's rights were?

Q. Yeah, that they had the rights they said they had.

MR. STAMP: Objection. Vague and ambiguous.

MR. SLATER: You can answer.

MR. STAMP: No foundation.

THE WITNESS: Yeah. I can't recall.

MR. SLATER: Q. Whether you did anything, right?

MR. STAMP: Objection. Argumentative.

THE WITNESS: It doesn't mean that I didn't do anything. I just can't recall.

MR. SLATER: Q. Did you come to understand this was a very important agreement for SmartTouch?

A. I don't know if it was characterized as very important, but it was important.

Q. Okay. Can you think of an agreement SmartTouch had that was more important than this in connection with your work for SmartTouch?

A. Well, at the time, it was only this agreement, so at the time, it was, I guess, the important one.

Q. It was both important and only, right?

A. Right.

Q. Okay. So your testimony is you don't recall what, if anything, you did to see what Omnilock's

rights were; is that right?

MR. STAMP: Objection. Vague and ambiguous. No foundation.

MR. FERDOWS: Misstates his testimony.

MR. SLATER: You can answer.

THE WITNESS: I said I don't recall if I did or didn't do anything. Yeah, I can't remember.

MR. SLATER: Q. Did you have a practice at this period of time?

A. No, I did not.

Q. That is, did you have a practice in connection with agreements like this, whether you would look to the underlying documents or not?

MR. FERDOWS: Vague. Calls for speculation.

THE WITNESS: Yeah, I don't know what you mean by "Practice."

MR. SLATER: Q. A way of doing things.

A. No, I didn't have a way of doing things.

Q. All right. Second recital, it says, "SmartTouch desires to obtain a nonexclusive, nonassignable conditional sublicense."

Do you see that?

A. Yes.

Q. What was your understanding of the effect of SmartTouch obtaining a nonexclusive license?

A. Well, first of all, these are in the recitals.

Q. That's right.

A. So these -- you know, the --

Q. We'll get to that. I'm just asking you generally what your understanding was if SmartTouch had a nonexclusive license as opposed to an exclusive one.

MR. STAMP: Objection. Vague and ambiguous as to whether or not this is a hypothetical.

MR. SLATER: You can answer.

THE WITNESS: I can't remember really at that point what was all the discussions that we went through.

MR. SLATER: Move to strike as nonresponsive.

Q. Sir, I'm asking you, did you have an understanding what SmartTouch's rights would be in connection with a nonexclusive license as opposed to an exclusive license?

MR. FERDOWS: He just answered that.

MR. STAMP: Objection.

MR. SLATER: No --

THE WITNESS: I can't remember what my understanding was at that point.

MR. SLATER: There, he answered it that

time.

MR. STAMP: I want to get my objection. Vague and ambiguous.

MR. SLATER: Q. Okay. Have you ever come to learn what the phrase "Nonexclusive" might mean in connection with a license?

A. No, I haven't evaluated.

Q. You have no common understanding one way or the another what the difference might be between a nonexclusive license and an exclusive license; is that correct?

A. With regard to this agreement or just --

Q. Generally.

A. In general. Well, yeah, I understand what the difference between.

Q. What is that understanding?

A. Nonexclusive would be something that other people could share and exclusive would be something that you would be able to use it yourself.

Q. Okay. Nonassignable, at the time this agreement was negotiated, did you have an understanding generally what nonassignable might mean in connection with the license?

MR. STAMP: Objection. Vague and ambiguous.

THE WITNESS: I can't recall --

MR. STAMP: Incomplete hypothetical.

THE WITNESS: -- at that point what was my thoughts.

MR. SLATER: Q. Or whether you had any thoughts on it.

MR. FERDOWS: Let me -- I think what we're going with all of these, so that it is clear, are you asking him whether he understood what these words meant or are you asking him what -- in the context of this agreement, what were they talking about?

MR. SLATER: Both.

MR. FERDOWS: Because -- no --

MR. STAMP: That is why I keep objecting.

MR. FERDOWS: That is vague.

MR. SLATER: No. No, I'll reask.

MR. STAMP: I want to --

(Simultaneous colloquy.)

MR. FERDOWS: Just so the record is clear, because when you asked him about the nonexclusive, I think when he responded, he was responding to the fact that he didn't understand in the context -- he does not remember in the context of this agreement. Today, he does not remember what it meant, but he certainly understands what these terms mean.

MR. SLATER: Well, we'll see.

MR. FERDOWS: And you haven't asked him, did you generally, at that time, understood what these terms mean.

MR. SLATER: Well, you know what, let's clean that up. Let's go back and do that just so we have a clean record and we can press forward.

Q. At the time this agreement was negotiated, did you have a general understanding of what nonexclusive meant?

MR. STAMP: Objection.

THE WITNESS: Yes.

MR. STAMP: Incomplete hypothetical.

MR. SLATER: Q. And what was that understanding?

A. Nonexclusive meant that it was something that other people could share.

Q. Well, isn't it also true that nonexclusive meant other parties not related to SmartTouch could potentially also use whatever SmartTouch was licensing?

A. Now you --

Q. No, I'm asking --

(Simultaneous colloquy.)

MR. STAMP: Objection. Compound. Vague and ambiguous. Incomplete hypothetical.

MR. FERDOWS: Calls for speculation.

MR. SLATER: You can answer.

THE WITNESS: Now you are asking with regard to the contract and I can't remember exactly what I thought about it at that point.

MR. SLATER: Q. Or what obligations or rights it might give SmartTouch?

A. With regard to the question that you asked.

MR. STAMP: Objection. Vague and ambiguous.

MR. SLATER: Q. Okay. At the time, did you have an understanding what nonassignable might mean in connection with a license like this?

MR. STAMP: Objection. Incomplete hypothetical. Vague and ambiguous.

THE WITNESS: That is a hypothetical.

MR. SLATER: You can answer.

THE WITNESS: Depends on the rest of the agreement.

MR. SLATER: Q. No, just in connection with this agreement, did you understand what --

MR. STAMP: Objection. Argumentative. First you said hypothetical --

MR. SLATER: Thank you.

MR. STAMP: -- now you are saying argumentative.

MR. SLATER: Restrict yourself to --

MR. STAMP: Objection. Argumentative.
MR. SLATER: Okay.
THE WITNESS: So what is your question?
MR. SLATER: Q. At the time you negotiated this agreement, did you have an understanding what nonassignable might mean in connection with SmartTouch's rights?
MR. STAMP: Objection. Vague and ambiguous. Incomplete hypothetical.
THE WITNESS: I probably knew, but I can't remember at this point what it was.
MR. SLATER: Q. Okay. And as you sit here today, do you have an understanding what nonassignable might mean in connection with this agreement or with the license granted by this agreement?
A. At this point, no.
Q. Okay. You have no understanding whatsoever?
A. Well, unless I -- because I haven't looked at the agreement, I would have to look at the agreement and try to arrive at a conclusion.
Q. Okay. You negotiated this for SmartTouch, right?
A. That is correct.
Q. When was the last time you looked at this agreement?

A. Probably last year.
Q. In connection with what?
A. I think it was with regard to the declaration that I was filing.
Q. All right. So you looked at it in October 2003. Does that sound about right?
A. Sounds about right.
Q. Okay. Before October 2003, when was the last time you looked at the agreement?
MR. STAMP: Objection. If the attorney -- I mean, if Mr. Kamarei -- objection. Attorney/client privilege. Calls for client --
MR. SLATER: It is our privilege. We'll waive it. You negotiated this for us.
MR. STAMP: You are asking when the last time he looked at it.
MR. SLATER: Well, if he wants to sit here and testify that he gave privileged communications to a party not SmartTouch on an agreement he negotiated, let's hear it.
MR. STAMP: That is not what you are asking. You are asking --
MR. SLATER: Q. When is the last time you saw it before October 2003?
MR. STAMP: Objection.

(Simultaneous colloquy.)

MR. FERDOWS: So that the record is clear, let me just instruct him, if any of these questions go to any communications you had with people other than SmartTouch, then you would be going over the line of the attorney/client privilege, so --

MR. SLATER: Well --

MR. FERDOWS: -- you have to keep that in mind in view of the objections raised by other parties with respect to the attorney/client privilege. Then before answering it, just think about who the communication was with because it may be going over the line and --

MR. SLATER: I'm not asking, just so you know, for any communications right now.

MR. FERDOWS: If it is with SmartTouch, I guess you can go ahead and answer because they are waiving their privilege.

THE WITNESS: Okay.

MR. SLATER: Q. I'm just saying I'm not asking for any communications right now. I'm just asking, when was the last time before October 2003 you remember seeing this agreement?

MR. STAMP: Same objections.

THE WITNESS: Probably the same time frame

that this agreement was signed.

MR. SLATER: Q. May 1995?

A. Correct.

Q. Best you can recall, between May 1995 and October 2003, you didn't see this agreement, right?

A. That's correct.

MR. FERDOWS: Also, just for the record, if you are going to refer back to this declaration, I think it is fair to put the declaration before him. You are asking a lot of questions about the declaration.

MR. SLATER: I certainly will.

MR. FERDOWS: Well, before asking him questions about it because it is not fair to the witness to testify about some declaration when it is not before him. He should have the opportunity to see it before you ask questions about it.

MR. SLATER: I understand your point. I hear what you are saying. I don't agree with you, but I hear what you are saying.

MR. STAMP: He doesn't agree that he needs to be fair.

MR. SLATER: Q. Okay. Do you have a recollection, Mr. Kamarei, as to why this agreement was signed in May 1995?

MR. FERDOWS: Calls for speculation.
THE WITNESS: Vaguely I do, yes.
MR. SLATER: Q. What is that recollection?
MR. STAMP: Objection. Attorney/client privilege.
MR. SLATER: Well, that is rich.
THE WITNESS: I think --
MR. SLATER: It is our privilege.
MR. FERDOWS: Well, let me -- the objection is on behalf of -- are you asking him what was SmartTouch's objective?
MR. SLATER: Yes.
MR. FERDOWS: Is that what you are asking him?
MR. SLATER: Yes.
MR. STAMP: Vague and ambiguous.
MR. SLATER: Q. Was there any time pressure, any urgency, or objective SmartTouch was trying to meet in this period?
A. Well, there was lots of time pressures. There were --
Q. In connection with this agreement?
A. Yes, I believe so.
Q. Okay. It took two months -- between one month and two months to negotiate it, right?

A. Correct. Well, again, the one month to two months, it is not a -- probably from the time that I first spoke to Mr. Maier until when this was signed, I think it took two months, but it is not a proper characterization that it took two months, implying that it was daily, every week, et cetera. Between that -- at that time frame, I was working full time for another law firm. We were trying to meet the deadline on filing patent applications, so there was urgency in all the work that we were doing.

Q. In those -- in that period between one month and two months -- I appreciate you didn't work -- your testimony is you didn't work on this every day all day --

A. Correct.

Q. -- right?

A. Correct.

Q. What business points, if any, do you recall being negotiated?

A. I think the money issue was something that we negotiated. I can't recall. I can't recall what else.

Q. The only issue, as you sit here now, that you can recall being negotiated is the money issue; is that correct?

A. That is the only one I can recall at this point.

Q. What, in your mind, was the money issue?

A. The money issue was the payment that would have to be made for the -- obtaining the assignments.

Q. And what were the substance of the negotiations, as you recall them? What were the positions advanced by each party?

A. I can't recall exactly what the positions were.

Q. Did it concern when the money had to be paid, the amount of money, something else?

A. When the money would have to be paid and I can't recall whether the amount was different or not, but the time, I think, may have been.

Q. Were you ever given any instruction on what SmartTouch wanted to pay as opposed to what it finally agreed to pay?

Let me reask that. Did you ever learn from any source that SmartTouch wanted to pay less in connection with this agreement than it wound up being obligated to pay as the agreement is written?

A. I can't recall.

Q. Okay. You don't recall whether SmartTouch initially offered, say, $1 million or five million or

50,000 or something else?

A. No, I can't recall.

Q. Other than what you have told me, do you recall anything about what you've identified as the money issue?

A. Not that I can recall.

Q. Do you recall any guidance or any suggestions of any sort that Mr. Hoffman gave you in connection with the money issue?

A. I can't recall.

Q. Do you recall any thoughts or comments that you shared with him in connection with the money issue?

A. I can't recall. I would be speculating, but I can't recall specifically.

Q. Do you recall -- I want to move now from business points to legal drafting points, that is, how something might be written as opposed to what its objective was. Do you recall any discussions about any drafting points or anything like that in connection with this agreement?

A. What do you mean by "Drafting points"?

Q. How a particular provision might read, whether a provision should be added.

MR. FERDOWS: Vague. With anyone or --

MR. SLATER: Q. With Mr. Maier, with anyone

on Excel's side of the table.

A. I can't recall.

Q. You don't recall any comments, handwritten, electronic, oral that went back and forth concerning what the agreement should or shouldn't say?

A. I can't recall.

Q. Okay. Do you recall the substance of any of your conversations with Mr. Hoffman about what this agreement should or shouldn't say or what its objectives were?

MR. FERDOWS: At the time? It is vague. Are you talking about seven years ago --

MR. SLATER: At the time it was negotiated.

MR. FERDOWS: -- or ten years ago or something?

MR. STAMP: Objection. Asked and answered.

MR. SLATER: If you don't know -- if you don't recall, you don't recall.

THE WITNESS: If -- yeah, I can't recall.

MR. SLATER: Q. Okay. What, as you understood it, was SmartTouch's business purpose in negotiating this agreement?

MR. STAMP: Objection. Asked and answered.

MR. FERDOWS: Again, it is vague. Do you mean at the time?

MR. SLATER: At the time.

MR. FERDOWS: What does he recall today what the objective was ten -- nine years ago?

MR. SLATER: Yeah. Yeah.

THE WITNESS: You know, basically to be able to obtain an assignment of -- conditional assignment of the inventions that Omnilock owned.

MR. SLATER: Q. That was SmartTouch's objective or is that all that Omnilock was willing to give?

A. I think it was SmartTouch's desire.

Q. As it was conveyed to you or at least as you understood it?

A. The way I understood it, correct.

Q. Okay. This agreement identifies a number of addenda. You'll see that in 1.4, 1.5, 1.6.

A. You mean the addendas 1.4 or --

Q. No. No, they are identified there.

A. Okay. Yes, I do see it.

Q. Did you ever look at any of those addenda in connection with your work on this agreement?

A. I can't recall.

Q. Okay. I'm going to -- between 1995, when you negotiated this, and October 2003, do you have any recollection of sending this agreement to anybody?

A. No, I never had possession of this agreement.
Q. Why not?
A. Because I just never had it.
Q. You worked for SmartTouch, right?
A. Correct.
Q. Did you keep a file while you worked for SmartTouch of things that you did?
A. I believe it wound up with Pezzola & Reinke and they represented SmartTouch, so they were at Pezzola & Reinke.
Q. Let me ask you about that. On the last page here where it says, "Witnessed by"?
A. Uh-huh.
Q. That is your signature, right?
A. That is correct.
Q. When you signed that, where were you, if you recall?
A. Probably at the Berkeley offices of SmartTouch.
Q. Did you actually see Mr. Hoffman sign both places?
A. Yes, I think I did.
Q. Now, with this page in front of you and focusing on the events back then, do you recall why

only Mr. Hoffman signed for both sides?
MR. FERDOWS: Calls for speculation.
THE WITNESS: Yeah, I wouldn't know why he signed for both.
MR. SLATER: Okay.
THE WITNESS: I could guess why.
MR. SLATER: Q. I don't want you to guess. As you sit here, looking at the agreement, having spent a little time going through some of the terms.
A. I wouldn't know why.
Q. After he signed the agreement, you signed it as a witness, right?
A. That is correct.
Q. Why did you feel the need to sign this as a witness?
A. Well, Mr. Hoffman asked me to sign it as a witness and I did.
Q. Do you know if he ever asked Mr. Maier to sign as a witness?
MR. STAMP: Objection. Calls for speculation. Attorney/client privileged information.
THE WITNESS: I wouldn't know.
MR. SLATER: Q. You wouldn't know whether he did or he didn't, right?
A. Correct.

Q. Did it ever strike you as unusual or odd that the lawyer representing SmartTouch signed this, but the lawyer representing Excel did not?

MR. FERDOWS: Misstates the documents. I think he did not sign as a lawyer. He signed as a witness, so --

MR. SLATER: No. No. He signed it, though, didn't he?

MR. FERDOWS: But it is not as a lawyer, so it is a different matter.

MR. SLATER: Q. Did it strike you as odd?

A. Could you repeat the question again?

Q. Sure. Did it strike you as odd that Mr. Maier didn't sign the agreement anywhere?

MR. STAMP: Objection. Vague and ambiguous.

THE WITNESS: It didn't strike me as odd.

MR. SLATER: Q. Okay. Can you please turn to page 2 of the agreement.

A. Okay.

Q. Section two sets out the grant or it says, "Grants of the sublicense." Do you see that?

A. Yes.

Q. To your knowledge --

A. I'm sorry. Where are you talking again?

Q. Oh, forgive me. Page 2, the middle of the

page, header two, grants.

A. Yes.

Q. What did you understand this section was doing?

A. I can't recall what --

Q. Okay.

A. -- what it was at that point, what my thoughts were at that point.

MR. FERDOWS: Just objection for the record. Vague. Please make it clear. You are asking him whether he -- what he recalls today --

MR. SLATER: No. No.

MR. FERDOWS: -- as what this document -- what he was thinking ten years ago or nine years ago.

MR. SLATER: No. No. You made your objection.

Q. At the time you were negotiating this for SmartTouch, does this grant here in Section 2.11 reflect the rights that you thought SmartTouch had obtained in connection with the sublicense?

MR. FERDOWS: Vague. Calls for speculation. Vague.

THE WITNESS: I can't recall at that point what my thought was, but I assume that is what -- you know, the document speaks for itself whatever it does.

MR. SLATER: Q. Did you ever come to understand that this document had been modified in any way?

MR. STAMP: Objection. Vague and ambiguous.

THE WITNESS: I can't recall.

MR. SLATER: Q. Whether there was a rider, an addendum, a termination, something else?

A. I can't recall.

Q. Whether there was or wasn't?

A. Whether there was or wasn't.

MR. FERDOWS: Vague. You mean after the fact that it was signed?

MR. SLATER: Ever. Yeah.

MR. STAMP: Objection. No foundation.

THE WITNESS: Oh, after it was signed?

MR. STAMP: Objection.

MR. SLATER: Forgive me?

THE WITNESS: I wouldn't know.

MR. SLATER: Q. Let's see if we can get a clear record on that. After you saw Mr. Hoffman sign this agreement, did you ever become aware of any effort to add a modification or an addendum to this agreement?

A. No.

Q. Okay. You never heard about that from any source whatsoever?

A. No.
Q. What did you see happen to the agreement after Mr. Hoffman signed it?
A. It was probably on the table. I wouldn't know.
Q. You have no recollection?
A. I have no recollection.
Q. Do you know if he kept a copy of it?
A. I don't know.
MR. STAMP: Objection. Calls for speculation.
MR. SLATER: Q. Do you know if there ever was a file of any sort, electronic, paper, something else maybe, in SmartTouch that contained this agreement?
MR. STAMP: Objection.
THE WITNESS: I wouldn't know.
MR. STAMP: No foundation. Calls for speculation.
THE WITNESS: I wouldn't know.
MR. SLATER: Q. You wouldn't know whether there was or wasn't?
A. That's correct.
Q. Did you ever keep custody of any SmartTouch agreements?

A. No, I did not.
Q. Did you have any method of knowing where they were in case you needed to refer to them?
A. You know, as far as I was concerned, this was a very special project. I mean, I was essentially going to do patent prosecution, so --
MR. FERDOWS: Just answer the question.
MR. SLATER: Move to strike as nonresponsive.
THE WITNESS: -- so, I don't -- no, I never kept anything from this.
MR. SLATER: Q. Let me reask that question. Do you have any idea while you worked at SmartTouch whether there was a file at SmartTouch containing this agreement?
A. I do not know.
Q. Okay. So in the five years you worked at SmartTouch, if someone asked, "Please go find the Excel, SmartTouch agreement," where would you go look?
A. I wouldn't know where to look. Probably go to Pezzola & Reinke.
Q. Okay. But nowhere within SmartTouch you knew of, right?
A. I would not know, correct.
Q. All right. Do you recall writing -- as we

look at this more --

MR. FERDOWS: Excuse me. One second.

MR. SLATER: You want to take a break? Let's just go off. We've been going for a while.

THE VIDEOGRAPHER: Going off the record. The time is 10:40.

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record. The time is 10:48.

MR. SLATER: Please read back the last question and answer.

(Record read by the reporter.)

MR. SLATER: Q. Mr. Kamarei, after the date reflected on this document, May 1995 through October 2003, did you ever discuss this agreement with anyone at SmartTouch?

A. I think we probably did.

Q. Who did you talk to about it?

A. I can't remember whether we talked specifically about it, but I think it was something that was referred to.

MR. SLATER: Move to strike as nonresponsive.

Q. With whom did you discuss the agreement at SmartTouch?

A. Again, we didn't -- discussing is not a proper characterization. We don't specifically sit down and discuss this, but it was something that was referred to or -- referred to in conversations.

MR. SLATER: Move to strike as nonresponsive.

Q. Do you recall any conversations you had with anybody at SmartTouch about this agreement?

MR. FERDOWS: Asked and answered.

THE WITNESS: I can't answer any better than that to say that we didn't discuss it or have conversations about it. What I said was we referred to it.

MR. SLATER: Q. When you say, "We referred to it," who is the "We" in that?

A. I think Mr. Lapsley, Mr. Pare, I can't remember about Jonathan Lee, Mr. Gioia. I'm not quite sure if Mr. Goldberg, but I would -- what I recall was probably at the time, Mr. Gioia.

Q. In what context or what connection did the agreement ever come up?

A. I think we referred to it as the nuclear bomb or the nuclear weapon. That was the word that was used.

Q. Who coined that phrase?

A. I think, actually, it was Phil Lapsley.

Q. Would it surprise you to learn that Phil Lapsley says he's never heard of this agreement before October 2003?

A. I would be surprised, yes.

Q. Would it surprise you if Mr. Pare's testified he's never heard of this agreement?

MR. STAMP: Objection. Mischaracterizes the witness's testimony.

THE WITNESS: I would be surprised.

MR. SLATER: Q. Would it surprise you if Mr. Lee says he never heard of this agreement?

A. I would be surprised, yes.

Q. If we were going to look in the records of SmartTouch for any reference of this agreement or any of the obligations that it created, where, as you recall, might we find references?

MR. FERDOWS: Vague. Speculation. I don't understand the question.

MR. STAMP: Objection. Asked and answered. No foundation.

MR. SLATER: Q. Any document or any corporate minutes, anything else.

A. I never held those documents, so I don't know. As I said, I just did patent prosecution, other

than this one exception. Most everything I did was patent prosecution, so I wouldn't know where the other obligations or corporate minutes, et cetera, would be kept and would they refer to these or not.

Q. Did you ever prepare any corporate minutes?

A. I think I prepared some board minutes early on, yes.

Q. So you did more than patent prosecution?

MR. STAMP: Objection. Argumentative.

THE WITNESS: Again, the -- this is a start-up atmosphere and -- you know, somebody sat there and jotted down some notes. It was not as an officially designated title or what have you. It was just basically -- you know, you sit down and take notes.

MR. SLATER: Q. You created corporate minutes at some point in time, didn't you?

A. I probably did some, yes.

Q. And you did at least some drafting work on a private placement memorandum; is that right?

MR. STAMP: Objection. Asked and answered.

MR. FERDOWS: That misstates his testimony.

MR. SLATER: You just can answer.

THE WITNESS: I had input into a private placement memorandum, that is correct.

MR. FERDOWS: No, I think the question was did you draft it.

THE WITNESS: No, I did not draft it. I did not draft it.

MR. SLATER: Q. My question, let me -- but you had input into it, right?

A. That is correct.

Q. That is your testimony. Okay.

MR. FERDOWS: And just for the record, I think, again, your questions are vague.

MR. SLATER: Counsel --

MR. FERDOWS: This line of questioning is vague because --

MR. SLATER: You can object then, but please confine your -- please avoid the speaking objections. That violates the rules.

Q. Mr. Kamarei, can you please look on page 1, Section 1.1, of the agreement.

A. The 1.1?

Q. Right.

MR. STAMP: Exhibit 3?

MR. SLATER: Yeah, page 1, Section 1.1.

THE WITNESS: Yes.

MR. SLATER: Q. Do you see where it identifies the parties?

A. Yes.
Q. It says, "Omnilock is identified as the master licensee." Do you see that?
A. Yes.
MR. STAMP: Objection. Mischaracterizes the document.
MR. SLATER: Q. And was it your understanding that Omnilock was a master licensee, as used here, of the biometric patent?
MR. STAMP: Objection. No foundation. Vague and ambiguous.
THE WITNESS: I can't remember at that point what was my thoughts about what master license he meant or --
MR. SLATER: Q. Have you developed any thoughts since then on what master licensee meant or was intended to mean?
MR. STAMP: Objection. No foundation.
THE WITNESS: Do you want me to look at it now and try to figure out what it means?
MR. SLATER: Q. I'm asking if you ever developed any understanding over the years.
A. Not really. I don't think we really -- I really thought about it more after this.
Q. But you did come -- strike that.

Did you come to understand that Omnilock held license rights from another party?

MR. STAMP: Objection. No foundation. Vague and ambiguous.

THE WITNESS: I can't recall what --

MR. SLATER: I'll reask.

Q. In connection with this agreement, did you have an understanding as to who owned the underlying patent?

MR. STAMP: Objection. Vague and ambiguous.

THE WITNESS: I did believe that Omnilock owned the patents.

MR. SLATER: Q. In connection with this agreement?

A. Correct.

Q. You didn't think Ned Hoffman owned it?

A. No, I thought Omnilock owned it.

Q. All right. Do you know why it says here in the recitals, "Omnilock has certain rights and interest in and to Ned Hoffman's tokenless biometric computer system invention"?

A. Where is this again?

Q. First recital.

A. Why does it say that?

Q. Yeah.

A. Well, probably -- I can't recall what it was, but --

MR. FERDOWS: Don't recall -- I mean, don't speculate.

MR. SLATER: Counsel --

THE WITNESS: I can't recall as to what it meant at that point or -- could you repeat the question?

MR. FERDOWS: Again, are you asking him today what he thinks today?

MR. SLATER: Counsel, please restrict your --

MR. FERDOWS: I'm just asking you to clarify.

THE WITNESS: I'm aware --

MR. SLATER: You can object to the form of the question. You can instruct on privilege, if you think it is appropriate.

MR. STAMP: I will object on vague and ambiguous grounds.

MR. SLATER: All right.

Q. Did there come a time under your understanding when someone other than Omnilock owned the patents?

A. What time frame are we talking about?

Q. 1995 forward.
A. Well --
MR. STAMP: Objection. Vague and ambiguous.
THE WITNESS: I believe that after that, they were conditionally assigned to SmartTouch.
MR. SLATER: Q. In your mind, after that, what you've identified as the conditional assignment, who or what owned the patents?
MR. STAMP: Objection. Vague and ambiguous.
THE WITNESS: First of all, you are referring to patents and I don't know whether at that point there were any patents.
MR. SLATER: Q. Okay. Who owned the rights to the biometric patents, whether they were in process or granted or issued?
MR. STAMP: Objection. Vague and ambiguous and compound.
THE WITNESS: Okay. Can you just repeat the question one more time with everything in it?
MR. STAMP: Exactly.
MR. SLATER: I'll do it in one sentence.
THE WITNESS: All right.
MR. SLATER: Q. After this agreement, did you ever come to understand or believe that any entity other than Omnilock owned the patents?

MR. STAMP: Objection. Vague and ambiguous.

THE WITNESS: As I stated --

MR. STAMP: No foundation.

THE WITNESS: -- the -- they were assigned to SmartTouch in exchange for whatever obligations that they had to give back to Omnilock.

MR. SLATER: Q. But it is your understanding that Omnilock still owned the patents?

MR. STAMP: Objection. Vague and ambiguous.

THE WITNESS: Well, no, I think that the -- SmartTouch owned the inventions, but it had to perform to keep it.

MR. SLATER: Q. Okay. What did it have to perform, as you understood?

A. Well, whatever the obligations were in the contract.

Q. Did you understand at any level of detail what the general obligations were in connection with this contract?

MR. STAMP: Objection. Vague and ambiguous.

THE WITNESS: The general term was the payment of money at a certain term.

MR. SLATER: Q. Let's look at that. Is that on page 3 of this agreement under performance guarantees?

A. I'm sorry, page 3?
Q. Page 3 of the document, yeah.
MR. FERDOWS: What is the question? I'm sorry.
MR. SLATER: I just want him to turn to page 3.
MR. FERDOWS: Okay.
MR. SLATER: Q. You said there was a monetary obligation SmartTouch had?
A. Yes.
Q. Okay. Is that reflected here in Section 4, as you understood it?
A. I believe so, yes.
Q. And when you -- you testified earlier that money issues were negotiated. That is the only issue you can recall?
A. That is the only one that I can recall.
Q. Is that money issue, as you identified it, reflected in any way in this Section 4?
A. Yes.
Q. Okay. What was the money issue, as you understood it, that is reflected here in Section 4?
A. The $20 million.
Q. Just so we're -- there are two references to $20 million here. Do you see that? 4.11 and 4.12?

A. Oh, yes; uh-huh.
Q. Was it both or was it just one that was negotiated?
MR. STAMP: Objection. Vague and ambiguous. Compound.
THE WITNESS: I can't recall.
MR. SLATER: Q. Do you see 4.12? Let's focus on that first.
A. Uh-huh.
Q. Did you have an understanding of what SmartTouch's obligations were in connection with section 4.1.2?
MR. STAMP: Objection. Vague and ambiguous.
THE WITNESS: I'm sure at that time I understood what it was, yes.
MR. SLATER: Q. Do you have an understanding today what --
A. Other than what I --
MR. FERDOWS: Calls for speculation.
THE WITNESS: -- what I mentioned to you as to what I recall.
MR. SLATER: Q. You have no understanding today of what obligations SmartTouch might have in this connection?
MR. STAMP: Vague and ambiguous.

THE WITNESS: Well, if I have to --

MR. SLATER: You can read the section.

THE WITNESS: Okay.

MR. STAMP: Are you still asking about 4.1.2? Yes?

THE WITNESS: Okay. Well, basically --

MR. FERDOWS: Hold on a second. There is no question.

THE WITNESS: I'm sorry.

MR. SLATER: Q. Having read that, having reflected on your work at SmartTouch and your participation in this agreement, did you have an understanding of what 4.1.2 obligated SmartTouch to do?

A. Again, I can't recall at that point what my thoughts were, but I can tell you from reading --

MR. FERDOWS: That is the question.

MR. SLATER: Q. You don't recall what -- during the course of your time at SmartTouch when you worked there, did you ever convey to anybody what you thought SmartTouch's obligations were in connection with 4.1.2?

A. I can't recall.

Q. Whether you did or you didn't?

A. Whether I did or I didn't.

Q. Did you ever convey to any other party, that

is, a potential investor, a business partner, or the employees, the fact that such an obligation existed for SmartTouch to perform?

A. Do you --

Q. I'll reask that.

A. Yeah.

Q. Did you ever tell anybody that SmartTouch had to pay Excel $20 million?

MR. STAMP: Objection. Vague and ambiguous.

THE WITNESS: I can't recall.

MR. STAMP: No foundation.

MR. SLATER: Q. Whether you did or didn't?

A. Correct.

MR. STAMP: Mischaracterizes the document.

MR. SLATER: Q. Did you ever tell anybody -- do you remember ever dealing with representatives from the Diamond Group or representatives of Don Diamond?

A. Yes, I do.

Q. Did you ever tell anybody affiliated with that organization that SmartTouch had an obligation to pay Omnilock, Excel $20 million?

MR. STAMP: Objection. No foundation.

THE WITNESS: My discussions with Diamond Group essentially revolved around the prosecution of

the patents and, actually, even at that, it was very limited. I mostly --

MR. SLATER: Move to strike as nonresponsive.

Q. Just yes or no, did you ever tell them about any kind of $20 million obligation?

MR. STAMP: Objection. No foundation.

THE WITNESS: Mr. Goldberg was the person who was responsible for SmartTouch.

MR. SLATER: Move to strike as nonresponsive.

Q. Just yes or no. Did you --

(Simultaneous colloquy.)

MR. SLATER: Can you let me finish?

MR. STAMP: Objection. Argumentative.

THE WITNESS: No, I don't recall making any such statement to anybody.

MR. SLATER: Q. Well, do you remember --

MR. FERDOWS: You can explain your answer. Let him testify. I mean, if you --

MR. SLATER: No, you can take him on direct, then.

MR. FERDOWS: No. No. No. If --

MR. SLATER: I just want a "Yes" or "No."

MR. FERDOWS: You know, he is entitled to

give full answers. You can't cut him off.

MR. STAMP: I would like to move to strike the last three questions and answers to the extent that everyone was talking over each other and I don't believe that the record could possibly record this accurately.

MR. FERDOWS: Mr. Slater, I appreciate you want to ask him questions. I'm just saying give him the courtesy to give full answers. If you want the full truth, let him speak fully, not just --

MR. SLATER: You'll get a chance to question him, too.

MR. FERDOWS: You know, I don't intend to ask him any questions.

MR. SLATER: Okay.

MR. FERDOWS: I'm just saying it is fair to the witness -- I think it is fair to the witness to let him speak thoroughly.

MR. SLATER: Let's press on.

MR. STAMP: Let the record show that Mr. Slater does not intend to be fair to the witness. He already said that.

MR. SLATER: Mr. Stamp, I'll appreciate your confining yourself to objections.

MR. STAMP: Confine yourself to asking

questions that we can understand.

MR. SLATER: Q. Mr. Kamarei, do you remember any dealings you might have had with an entity called Catalina or the Catalina Group?

A. Yes, I do.

Q. Did you ever convey to them in any form that SmartTouch had a $20 million obligation that it owed to Omnilock or Excel?

MR. STAMP: Objection. No foundation.

THE WITNESS: My discussions with the patent attorney at Catalina revolved around patent prosecution matters and all those matters were fully disclosed to the patent attorney at Catalina.

MR. SLATER: Q. So did you tell them or not that there might be a $20 million obligation out there that SmartTouch owed to Excel?

MR. STAMP: Objection. No foundation.

THE WITNESS: At that time, Mr. Gioia had specific instructions to everybody not to discuss any matters other than what he specifically told us to discuss with various entities and so essentially, he told me to do -- talk about the patent prosecution matters. That is what the patent attorney is here for. I never had any discussions with either the president or vice presidents of Catalina and therefore we -- I

only disclosed the patent prosecution matters.

MR. SLATER: Move to strike as nonresponsive.

Q. Did you ever tell them, regardless of what your instructions were or were not or what you might have understood them to be, did you ever convey to them in any way that SmartTouch had a $20 million obligation?

MR. STAMP: Objection. No foundation.

MR. SLATER: You can answer.

THE WITNESS: I can't recall that I have.

MR. SLATER: Q. You don't recall that you ever did; is that correct?

A. Correct.

Q. Do you recall any discussions you ever had with any representatives from Visa?

A. I had a --

MR. STAMP: Objection. Vague.

THE WITNESS: -- I believe, a telephonic conversation with -- a brief telephonic conversation with the patent attorney at Visa.

MR. SLATER: Q. Did you ever convey to that attorney in any writing, e-mail, orally, the existence of this agreement or a $20 million obligation?

MR. STAMP: Objection. No foundation.

Compound.

THE WITNESS: I can't recall that I did.

MR. SLATER: Q. Okay. Let's look at 4.1.2. Is it fair to say -- with that section in mind, is it fair to say that $20 million was a lot of money for SmartTouch?

MR. FERDOWS: Speculation.

MR. STAMP: Objection. Vague and ambiguous.

MR. SLATER: Q. Well, did you know anything about SmartTouch's finances in the five years you worked there?

MR. FERDOWS: Well -- but at the time of the agreement or during the five years?

MR. SLATER: Ever. Yeah, ever.

THE WITNESS: Sure; that there was discussions about it, sure.

MR. SLATER: Q. Is it fair to say that $20 million would have been a lot of money for SmartTouch?

MR. FERDOWS: Vague as to time.

MR. SLATER: You can answer.

THE WITNESS: Okay. Well --

MR. STAMP: Objection. Calls for expert --

THE WITNESS: I don't think it would be fair to say it was a lot of money --

MR. SLATER: Okay.

THE WITNESS: -- because -- I mean, there is -- I recall specifically business plans written by Mr. Goldberg projected several hundred million dollars in revenues, so I think in that context, 20 million was not a great big amount of money.

MR. SLATER: Q. You never considered it a lot of money for SmartTouch; is that correct?

A. No, I can't recall that it was a significant issue.

Q. Section 4.1.2 says, in part, "Within six contract years from the effective date, to pay Omnilock an aggregate total of at least $20 million in cash resulting from SmartTouch's commercialization of the invention."

Do you see that?

A. Yes.

Q. Why does it say, "At least $20 million"?

A. I can't recall in the discussions nine years ago as to what it meant at that point.

Q. Do you know whether and under what circumstances, as written here, more than $20 million might have to be paid?

A. Are you asking me for my recollection again?

Q. Yeah.

A. I can't recall, no.

Q. Is there -- as you reflect on your work on this agreement in working at SmartTouch, do you have any understanding from any source what mechanism might exist that would let us determine how much is owed under 4.1.2, whether it is $20 million or a figure more than that?

A. I can't recall.

Q. There is nothing in the agreement that will guide us to that, as you understood, is there?

MR. FERDOWS: I think it calls for speculation.

MR. SLATER: If he understands.

MR. FERDOWS: I don't think he has read the full agreement. I think you just gave it to him and he said the last time he saw this --

MR. SLATER: Please confine yourself just to form objections.

MR. STAMP: Objection. No foundation.

MR. SLATER: You can answer.

THE WITNESS: Again, what is your question?

MR. SLATER: Q. Is there anything in this agreement or any other document that you are aware of that would tell us whether and under what circumstances SmartTouch might owe Omnilock, Excel more than $20 million?

MR. STAMP: Objection. No foundation. Argumentative. You haven't given the witness enough time to look at the document and refused to do so.

MR. SLATER: You can answer.

THE WITNESS: Do you want me to look through the document and tell you or do you want me to tell you from my recollection?

MR. SLATER: Q. Your understanding, your work negotiating the agreement, the years you worked at SmartTouch, yeah.

MR. STAMP: Objection. No foundation. Same objections as before.

THE WITNESS: Again, I haven't seen this document for a long time and so I couldn't remember what the mechanisms were, so I didn't really formulate anything as to -- I wasn't thinking about -- you know, how do we pay Omnilock 20 million.

MR. SLATER: Q. It never came -- never crossed your mind in the five years you worked at SmartTouch, right?

A. Again, I did patent prosecution. I was not responsible for the business side of what SmartTouch did or the corporate side. I essentially did patent prosecution, so no, I did not do -- I didn't think about it.

Q. You never thought about it? Never crossed your mind in the five years you worked there?

MR. STAMP: Objection. No foundation. Argumentative.

MR. FERDOWS: Misstates his testimony also.

MR. SLATER: You can answer.

THE WITNESS: Yeah, again, I don't believe that I thought about it.

MR. SLATER: Q. Okay. Can you please turn to page 2 and look at Section 3?

A. Okay.

Q. Look at the subject header there, it says, "Representations and warrants of Omnilock and SmartTouch." Do you see that?

A. Yes.

Q. Do you know why it says, "Warrants" there?

A. I do not recall, no.

Q. You have no idea what that is intended to mean or why it is there?

MR. STAMP: Objection.

THE WITNESS: Right now, you are talking about?

MR. SLATER: Yeah, right now.

MR. STAMP: No foundation. Argumentative.

THE WITNESS: Do you want me to read the

rest of the section and be able to tell you or -- I can't tell -- I can't tell by the header what "Warrants" means.

MR. SLATER: Q. Okay. Or whether it is even supposed to be there?

MR. STAMP: Objection. No foundation.

THE WITNESS: I can't recall.

MR. FERDOWS: Calls for speculation.

MR. STAMP: Let the record show that Mr. Slater has refused to give the witness an opportunity to read Exhibit 3.

MR. SLATER: Mr. Stamp, would you please contain yourself to form objections.

MR. STAMP: I just want the record to be accurate. I know that you are against that, but that is all I'm trying to do.

MR. SLATER: Q. Look at Section 6.5, please.

MR. FERDOWS: Let me just also --

MR. SLATER: No.

MR. FERDOWS: -- ongoing objection for the record. The document speaks for itself.

MR. SLATER: Right. Please make your objections to my questions.

MR. FERDOWS: The document --

MR. STAMP: Please act professional, Mr. Slater. I would appreciate that.

MR. SLATER: Thank you, Mr. Stamp. Let's move on.

MR. FERDOWS: Do you stipulate to an ongoing -- so I don't interrupt you, stipulate to an ongoing objection that the document speaks for itself and you can't ask him what the document says?

MR. SLATER: No, I don't stipulate to that. Object to my question --

MR. STAMP: I would like to know why you won't let the witness read the document.

MR. SLATER: You'll get a chance to question him.

MR. STAMP: I'm asking you personally a direct question. Why will you not --

MR. SLATER: I'm ignoring your question. We have a deposition here.

MR. STAMP: Why will you not let the witness read the exhibit?

MR. SLATER: We'll get to that.

MR. STAMP: Are you refusing to answer that?

MR. SLATER: That is right, I am.

MR. STAMP: Okay. Good. Thanks.

(Off-the-record discussion between the witness

and his counsel.)

THE WITNESS: Okay.

MR. SLATER: Q. Okay. Can you look at section 6.5, please?

A. Yes.

Q. Read through that and let me know when you are done.

A. Okay.

Q. Having read this, do you ever recall SmartTouch signing anything like a security agreement or a financing statement in connection with this agreement?

A. I can't recall.

Q. Whether they did or they didn't?

A. That is correct.

Q. Okay. Can you turn back to Section 4, please?

A. Okay.

Q. Section 4.1, if you could just read that just so you have it in mind.

MR. STAMP: Thank you, Mr. Pfeiffer, for instructing Mr. Slater to let the witness read the document.

MR. PFEIFFER: I have no idea what that comment was referring to.

MR. STAMP: Oh, I thought you gave him instruction for him to let him read it. I just wanted to thank you. If you didn't, then I withdraw the thanks.

MR. PFEIFFER: I can't even comment on that remarkable observation.

THE WITNESS: Okay.

MR. SLATER: Q. Okay. Does 4.1, as you understood SmartTouch's obligation under this agreement, does it require SmartTouch to dedicate its best efforts to pay Omnilock at least $20 million or is it a guarantee that Omnilock will be paid $20 million, as you understood SmartTouch's obligation?

A. At that time frame?

Q. Uh-huh.

A. I can't recall, again, nine years ago what the thoughts were.

Q. Did you have any thoughts on the topic from nine years to today?

A. Probably not.

MR. FERDOWS: Vague.

MR. SLATER: Q. Okay. Turn to section 3.11, please.

A. 3.11?

Q. That's right. Forgive me, page 2, Section

3, 3.1.1. Just read that 3.1.1 so you have it in mind.
A. Okay.
Q. 3.1.1 states in part that the inventor has granted to Omnilock an exclusive nontransferable license to the invention. Do you see that?
A. Yes.
Q. Is that your understanding of the state of patent ownership on the day this agreement was signed?
A. Again, I can't recall --
MR. STAMP: Objection. Vague and ambiguous.
THE WITNESS: Again, I can't recall what my thoughts were nine years ago about these statements.
MR. SLATER: Q. Or this provision in the contract?
A. Or this provision in the contract.
Q. Ever had any opportunity to reflect on who owned the patents in May 1995?
MR. STAMP: Objection. Vague and ambiguous.
THE WITNESS: Again, I'm sure -- I would be speculating. I'm sure -- you know, we looked at something, but I just can't recall what it was.
MR. STAMP: Also no foundation.
MR. SLATER: Q. Whether you looked at it or --
A. Again, I can't recall whether we looked at

it or not. I would speculate that we have looked at it. I'm sure we've looked at it, but I just can't recall what we looked at.

Q. Okay. May 1995 to the present, did anyone ever tell you, anyone, that Ned Hoffman owned the patent, not Omnilock?

A. I don't believe so. I can't recall.

Q. Okay. Can you look at Section 7.4? That is on page 5.

A. Okay. Do you want me to review it?

Q. Yeah. Why don't you take a look at Section 7.4.

A. Okay.

Q. At the time you negotiated this agreement or thereafter, did you ever form any understanding of what rights or obligations Section 7.4 imposed on SmartTouch?

A. Not that I recall.

Q. Did you ever discuss the effect that Section 7.4 might have on any actions SmartTouch was thinking about taking or that it took?

A. Again, I was mostly involved with patent prosecution afterwards and that was the focus of my work, so I can't -- and I can't recall any discussions about these.

MR. STAMP: I wanted to object to that question as vague and ambiguous.
MR. SLATER: Move to strike as nonresponsive.
Q. Did anyone ever ask you whether Section 7.4 would be a barrier or an inhibition to anything SmartTouch was thinking about doing or that it did?
MR. STAMP: Objection. Vague and ambiguous.
THE WITNESS: Not that I recall.
MR. SLATER: Q. Okay. While you worked at SmartTouch, were there any lawyers working for SmartTouch, that is, in-house or affiliated besides you?
MR. STAMP: Objection. Vague and ambiguous. Compound.
THE WITNESS: I can't recall.
MR. FERDOWS: Misstates his testimony.
THE WITNESS: In-house attorneys, were they working? I can't recall.
MR. SLATER: Q. You were an employee of SmartTouch for a period of time; is that right?
A. That is correct.
Q. Are you aware of any lawyers ever becoming employees of SmartTouch while you were also an employee of SmartTouch?

A. I can't recall because, again, some people I didn't even know who these people are and I don't know what capacity that they had, so I wouldn't be able to answer the question.

Q. Okay. Now, I believe you did testify earlier and you understood that a copy of this agreement was sent to Pezzola & Reinke; is that right?

A. I believe that that was the case.

Q. But you didn't take any steps to make sure, right?

A. I -- no, I did not. In other words, I -- I was not the person to take it to Pezzola & Reinke.

Q. Who did?

A. I don't know.

Q. Do you --

A. I'm just going based on my assumption that since Pezzola & Reinke were the corporate attorneys and the business attorneys that they would have it.

Q. All right. So you don't know whether they ever got a copy or not; is that right?

A. I do not know, correct.

Q. Do you know if this agreement has ever been sent to anybody?

A. Sent meaning what?

MR. STAMP: Objection. Vague and ambiguous.

MR. SLATER: Q. Communicated by telecopier, by overnight courier, by U.S. mail.

MR. STAMP: Objection. Vague and ambiguous.

THE WITNESS: I do not know.

MR. SLATER: Q. Okay. Have you ever sent this agreement to anyone?

A. No, I have not.

Q. Have you ever been asked to send this agreement to anyone?

A. No, I have not.

Q. You appreciate my question spans the entire time from the date it was signed to today?

A. Correct and I wouldn't have that document, so --

Q. You wouldn't have it to send, right?

A. Correct.

Q. But you were aware of its existence?

A. That is correct.

Q. All right. Did you ever ask anyone to send the agreement anywhere?

A. Not that I recall.

MR. STAMP: Objection. Vague and ambiguous.

MR. SLATER: Okay. Let's take a five-minute break, tape change break.

THE VIDEOGRAPHER: Here ends tape No. 1 in

the deposition of Ali Kamarei. The time on the video monitor is 11:18. Going off the record.

(Recess taken.)

THE VIDEOGRAPHER: Here begins tape No. 2 in the deposition of Ali Kamarei. The time on the video monitor is 11:29 and we're back on the record.

MR. SLATER: Q. Mr. Kamarei, having spent some time going through different provisions of this agreement trying to think back as best you could to the time you negotiated it, did you ever come to understand from any source that any statement in this agreement was false?

A. No, I don't believe so.

Q. Did anyone ever tell you, for example, that Ned Hoffman owned the patents?

A. No, I don't believe anybody did.

Q. Did anyone ever tell you that Omnilock owned the patents?

A. I can't recall whether it was -- specifically was told to me, but I recall -- no, I think I just -- nobody told me.

Q. Did anyone ever tell you, for example, in section 3.11, where it states that "Inventor has granted to Omnilock an exclusive nontransferable license," did anyone ever tell you that the inventor,

as defined here, was not the owner of the patent?

MR. STAMP: Objection. No foundation.

THE WITNESS: How is the inventor defined?

MR. SLATER: It means Ned Hoffman. It is at 1.4.

THE WITNESS: And so the -- I'm sorry, what section was it again?

MR. SLATER: 3.11.

MR. STAMP: Objection. Vague and ambiguous.

THE WITNESS: And what do you want me to --

MR. SLATER: Q. Did anyone ever tell you the statement in here to the effect that inventor had granted Omnilock a license, anyone ever tell you that was not true?

MR. STAMP: Objection. Vague and ambiguous.

THE WITNESS: I can't recall.

MR. SLATER: Q. Anyone ever tell you it was inaccurate in any respect?

MR. STAMP: Objection. Vague and ambiguous.

THE WITNESS: No, I don't believe so.

MR. SLATER: Q. Anyone ever tell you that Ned Hoffman was the owner of the patent?

MR. STAMP: Objection. Vague and ambiguous.

THE WITNESS: I don't believe so.

MR. STAMP: No foundation.

MR. SLATER: Q. Did you ever come to understand that SmartTouch was going to change its -- strike that.

After this agreement was signed, did you ever come to understand that SmartTouch was going to change how it held or intended to hold the technology referred to in this agreement?

MR. STAMP: Objection. Vague and ambiguous. Compound.

THE WITNESS: Yeah. Could you be a little more specific?

MR. SLATER: Sure.

Q. Did anyone ever tell you that this agreement was no longer operative in any sense?

A. Not that I recall, no.

MR. STAMP: Objection. Vague and ambiguous.

MR. SLATER: Q. Did anyone ever tell you that this agreement was superseded?

MR. STAMP: Objection. Vague and ambiguous.

THE WITNESS: Superseding to --

MR. SLATER: Superseded.

THE WITNESS: I can't recall, no.

MR. SLATER: Q. Whether they did or they didn't?

MR. STAMP: Objection. Vague and ambiguous.

THE WITNESS: Yeah, probably not, but I can't recall. I'm pretty sure nobody had told me, but I can't specifically recall if anybody did.

MR. SLATER: Q. Is that the sort of thing you might remember if they had?

MR. STAMP: Objection. Vague and ambiguous. No foundation.

THE WITNESS: Maybe --

MR. FERDOWS: Calls for speculation.

THE WITNESS: -- but I'm not sure.

MR. SLATER: Q. Okay. Did you ever ask anyone whether this agreement was still in force after May 1995?

A. I can't recall.

MR. SLATER: Okay. This must be 4, if you could mark that.

(Whereupon, Defendants' Exhibit 4 was marked for identification.)

THE WITNESS: Okay.

MR. SLATER: Q. I'm showing you a one-page document which is a letter in blank addressed --

A. This is --

Q. -- to you from --

A. -- a two-page document.

-- I'm sorry, you testify here, "Indivos knowingly accepted conditional assignments from the inventors of the patents on the invention."

Do you see that?

A. Correct.

Q. What is the basis for that statement?

A. Well, first of all, Indivos had -- Mr. Hoffman basically knew about this and Mr. Hoffman was the manager of the LLC. The -- all the inventors, Mr. Lapsley, Mr. Pare, Mr. Lee, had assigned their inventions to Omnilock and they were eventually board members of -- well, not the LLC, but of the Inc. Later on, we had discussions. We referred to the nuclear weapon. That was essentially the code word that, again, I think Mr. Lapsley came up with that word and he was using it, so -- and this was clearly in front of everybody else and so this was an issue that -- nobody ever said -- nobody ever said, "What are you talking about, a nuclear weapon or nuclear bomb?" So I think it was something that everybody knew about, so everybody who was either a director or officer of SmartTouch --

Q. Knew about it?

A. -- knew about it, correct.

Q. Can you identify for me one board meeting

where the agreement was discussed?

MR. FERDOWS: Lacks foundation. Calls for speculation. Assumes facts.

THE WITNESS: Yeah, I can't recall.

MR. SLATER: Q. Why did the agreement acquire -- if you know, why was it referred to as the nuclear bomb?

A. I think because the -- Mr. Gioia was having difficulty. He was the CEO of the company, I think probably from '96 on. He was having difficulty raising money and I think everybody thought that basically the company will fail and therefore -- you know, the discussion of pulling back the patents came up and that is why it was called the nuclear weapon.

Q. When you say, "The discussion of pulling back the patents came up," with or among whom did it come up?

A. I think it was something that Mr. Pare, Mr. Lapsley, I don't know about Jonathan Lee, but I think certainly Mr. Lapsley and Mr. Pare -- I'm fairly confident Mr. Lapsley used that term and actually coined that term.

Q. You think he is the one who coined it?

A. Correct.

Q. All right. But this entire -- before Mr.

Gioia became CEO, were you ever given an instruction not to disclose the existence of the agreement to anyone?

A. I wouldn't know why somebody would do that. I think it was -- everybody knew about it, so --

Q. How did everyone know about it?

MR. FERDOWS: Asked and answered.

THE WITNESS: You know, I told you the basis of why I think that people knew about it was because people who were either directors or officers of SmartTouch had already assigned their inventions to Omnilock and therefore they knew -- they knew that they had already given their inventions to another entity.

MR. SLATER: Q. But wasn't there a time when they assigned their inventions over to SmartTouch --

MR. STAMP: Objection. No foundation.

MR. SLATER: Q. -- with documents you prepared?

MR. STAMP: Calls for a legal conclusion.

THE WITNESS: That's correct. They filed -- they filed assignments or we filed assignments which essentially was in compliance with the license agreements or the assignment agreements.

MR. STAMP: Is that Exhibit 3?

THE WITNESS: Of Exhibit 3, correct.
MR. SLATER: Q. It was your understanding at the time you prepared the assignment that it was in compliance with Exhibit 3?
A. Yes.
Q. No one ever told you otherwise?
A. No.
Q. You never came to understand otherwise from any conversation with anyone?
A. No, because we never discussed it.
Q. But you did testify, did you not, that you did not know where a copy of this agreement might be found or even if it could be found at SmartTouch; is that right?
A. At what time period?
Q. Any time period.
MR. STAMP: Objection. Misstates the witness's previous testimony.
THE WITNESS: Yeah. Again, this was -- I was not the corporate attorney or the business attorney, et cetera. I just prosecute patents. This was something that would not be in the normal course of what I continued to do at SmartTouch and so --
MR. SLATER: We'll explore that.
Q. So you wouldn't -- the answer to my question

is you were never aware, were you, of anywhere within SmartTouch where you could find a copy of that agreement, right?

A. My assumption was that since Pezzola & Reinke and Mr. Maier was -- were in on the negotiations, that they would have, because they were the corporate attorneys in charge of the incorporation or forming the LLC, et cetera, that they would be holding on to all of these documents.

Q. Well, you were in the negotiations, too, but never kept a copy, right?

MR. STAMP: Argumentative.

THE WITNESS: Because of the limited capacity that I was involved with, I was involved mostly after that in patent prosecution, that this was not something that I would be holding on to.

MR. SLATER: Q. And you didn't know of anyone at SmartTouch who was holding on to it, did you?

A. That is correct.

Q. Okay. Or whether anyone was, right?

A. I do not know.

Q. Paragraph eight, last sentence, you declare here, "Mr. Hoffman was the only person with the authority to sign on behalf of both companies at that time."

CERTIFICATE OF REPORTER

I, Johnna Piper, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript [ ] was [X] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: 3-18-06

Johnna Piper

JOHNNA PIPER, CSR No. 11268