UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EXCEL INNOVATIONS, INC., )
)
Plaintiff, )
vs. ) No C03-03125
)
INDIVOS CORPORATION, SOLIDUS )
NETWORKS, INC., and DOES 1 )
to 100, inclusive, )
)
Defendants. )
)

VIDEOTAPED DEPOSITION OF

NED HOFFMAN

Tuesday, February 3, 2004

Volume III, (Pages 374 - 621)

CERTIFIED COPY

REPORTED BY: BETTY A. CALLIES CSR 11092 (1-345008)



LEGALINK WORD

LegaLink San Francisco
601 Van Ness Ave, Suite 2052
San Francisco, CA 94102

Dockets.Justia.com

conclusion did you come to as to what "best efforts" meant?

MR. BORNSTEIN: Objection; compound; complex; vague and ambiguous.

MS. DE MORY: Calls for a legal conclusion.

THE WITNESS: My understanding from the photocopies that I made, the things that I read, were that it was a very important effort to make, but it did appear in line with what Mr. Lapsley said. It was an important goal but not necessarily an obligation.

MR. PFEIFFER: Q. We were talking about still that first time you spoke with Mr. Lapsley about the sublicense. When was the last time you spoke with Mr. Lapsley about the sublicense prior to November of 2002?

A. I don't remember.

Q. Was it after 1997?

A. Yes.

Q. What do you recall about the timing that makes you say it was after 1997?

A. In 1998, SmartTouch had moved to Allston Way. Mr. Lapsley came to me at that office and said he was concerned about Phil Gioia and said that it was a good thing that there was an alternative if he failed.

Q. Did he explain to you what he meant by there being an alternative if Mr. Gioia failed?

A. Mr. Lapsley used the term "the nuclear weapon." I can't remember. He said that if Mr. Gioia failed, it is a good thing that Excel can keep the patents and said that "nuclear weapons" should be the phrase used.

Q. Is that your best recollection of the words he actually used, or are you paraphrasing?

A. No. That's my recollection of the words.

Q. That's what I want to make clear.

So from this conversation in approximately 1998, you recall verbatim the words that Mr. Lapsley used to you; is that right?

A. No. I recall the words "nuclear weapon."

Q. Do you recall him using words that said Excel can keep the patents?

A. Something to that effect. I believe that what is what I understood he was saying.

Q. I understand. That's why I want to separate out how you interpreted his words and what words he used.

Other than using the words "the nuclear weapon," do you recall him indicating he was referring to the sublicense agreement?

A. I simply remember something along the lines of "I'm glad Excel can keep the patents." I remember that

because he then said the phrase "nuclear weapon." "It's the nuclear weapon."

Q. What was your response?

A. I don't recall saying anything beyond that, beyond what he said to me, and I do think that was all I remember.

Q. That's the last time you spoke with him about the sublicense?

A. No.

MS. DE MORY: Objection; mischaracterizes prior testimony.

MR. PFEIFFER: Q. What did you discuss with Mr. Lapsley the last time you spoke with him regarding the sublicense prior to November of 2002?

A. I believe in the summer of 1999 that Mr. Lapsley took me aside at the office on a couple of occasions and told me he was frustrated and concerned about Mr. Gioia and glad that we had the nuclear weapon.

Q. What did you say to him on those occasions?

A. I don't recall specifically, but I think we both agreed it was a weapon of last resort.

Q. Why did you see it as a weapon of last resort?

A. Well, I understood the term "nuclear weapon" to be something you use as a last resort.

Q. What made you think this was a last resort?

A. Well, my recollection of the license agreement is that certain things had to happen for there to be a breach or termination, and that's what the formula was under the agreement.

Q. What about the fact that certain things had to happen made that a last resort weapon for you?

A. Well, if the best efforts was a goal, not an obligation, then the agreement, if I recall, terminated only if SmartTouch failed as a company.

Q. What do you mean by "failed as a company"?

A. Bankruptcy, insolvency.

Q. What do you mean by "bankruptcy" or "insolvency"?

A. I'm just quoting from the agreement.

MS. DE MORY: Objection; calls for a legal conclusion.

THE WITNESS: I'm just quoting from the agreement.

MR. PFEIFFER: Q. I just want to understand your understanding of what that agreement was, this agreement you signed on behalf of both parties.

A. I understood that if the company notified that it was going into bankruptcy or insolvency, that those -- that would trigger the termination of the

agreement, just what the word said, that if those decisions were made by the company.

Q. So if the company notified that it was going into bankruptcy, that was a triggering event, as you understood it, for termination of the sublicense?

MS. DE MORY: Objection; calls for a legal conclusion.

THE WITNESS: Just reading from the sublicense, my understanding was that is what the agreement says, yes.

MR. PFEIFFER: Q. As you understood this agreement, having signed it for both sides, what did you then understand the significance of the best efforts provision was in terms of terminating the license?

MS. DE MORY: Same objection. Also I'm going to caution you not to disclose communications with counsel, with your counsel.

THE WITNESS: Can you repeat the question, please.

MR. PFEIFFER: Can you read it back, please.

(Whereupon, the record was read by the reporter as follows:

"Question: As you understood this agreement, having signed it for both sides,

what did you then understand the
significance of the best efforts provision
was in terms of terminating the license?")

THE WITNESS: That best efforts alone would not terminate the license.

MR. PFEIFFER: Q. Now, we got into that topic because I asked you whether you took any steps to make sure the company's books at SmartTouch reflected this $20 million obligation.

Do you recall that question earlier?

A. Yes.

Q. So apart from what you've told me about your communications with Mr. Lapsley, did you take any other steps to see that the company's books at SmartTouch reflected this $20 million payment?

A. No.

Q. Now, you became aware at some point that there was an audit done of SmartTouch's books which you believed showed some sort of a malfeasance by Mr. Gioia.

Do you recall that?

A. I recall that I was informed. I learned from David Pare and from Trent Newin that an audit had been conducted and that there was some indication that Mr. Gioia had taken 25- or $30,000.

Q. Do you recall when you learned that?
MS. DE MORY: I believe this was all asked and answered before.
THE WITNESS: I don't remember the date. I don't remember.
MR. PFEIFFER: Q. Actually, I don't think we went into this before.
A. Yeah, I don't remember.
Q. You did know there had been an audit done by an outside auditor then?
A. That is when I learned it, when David Pare and Trent Newin told me.
Q. Do you recall that it was KPMG?
A. I believe they told me it was KPMG that did it.
Q. Did you ask to see the results of that audit?
A. I may have. I don't remember.
Q. Did you ever see the audit results?
A. No.
Q. Did you have any discussions with anyone at KPMG about the audit?
A. No.
Q. Did Indivos ever pay Excel any royalties?
A. No.
Q. Did Excel ever send Indivos any form of demand

or request for royalties?

MR. BORNSTEIN: It's vague and ambiguous.

THE WITNESS: I don't remember. I'd have to look at the agreement to see -- to refresh my memory if we would have done something like that, because I don't remember. I don't think so.

MR. PFEIFFER: Perhaps now is an appropriate time to make the tape change.

VIDEOGRAPHER: This marks the end of videotape number 7 in the deposition of Ned Hoffman. Going off the record. The time is 11:15.

(Whereupon, there was a break taken.)

VIDEOGRAPHER: Back on the record. This marks the beginning of videotape number 8 in the deposition of Ned Hoffman. The time is 11:24.

MR. PFEIFFER: Q. What was Mr. Lapsley's job title as of 1996 at SmartTouch, do you know?

A. I don't remember.

Q. Was he an officer?

A. I'd have to look at the company records. I don't know.

Q. Actually, at the time you were an LLC, did you have officers?

A. I believe I was the manager.

Q. Were there any other people who functioned as

officers?

MS. DE MORY: Objection; mischaracterizes prior testimony.

MR. BORNSTEIN: Also calls for a legal conclusion.

THE WITNESS: I remember myself as a manager. I'd have to look at the company records to see.

MR. PFEIFFER: Q. How about in 1998/1999? Do you know what Mr. Lapsley's job title was at SmartTouch, Inc.?

A. I don't know. It depends on what period. I'm not sure I know what his title was.

Q. Do you recall his job title at any period at SmartTouch, Inc.?

A. I believe he was CFO at some point.

Q. Do you know when that point was?

A. I don't recall the dates.

Q. Do you recall that he was CFO at any point when you talked to him about the sublicense?

A. I don't recall the dates of his being CFO.

Q. Again, do you recall whether he was CFO at any of the times you talked to him about the sublicense?

A. I don't know if -- I don't recall when he was CFO.

Q. Apart from Mr. Lapsley, is there anyone else

that you -- anyone else at SmartTouch, LLC to whom you showed the sublicense agreement?

A. I don't know whether that is what I said.

Q. Actually, let me rephrase that because I recognize now you said you're not sure you ever showed Mr. Lapsley the license.

A. Correct.

Q. Did you ever show the sublicense agreement to anyone at SmartTouch, LLC?

A. I don't remember.

Q. Did you ever show the sublicense agreement to anyone at SmartTouch, Inc. prior to November of 2002?

MS. DE MORY: Objection; vague and ambiguous.

MR. BORNSTEIN: Object to the extent it calls for attorney-client communications.

THE WITNESS: Can you repeat the question, please.

MR. PFEIFFER: Q. Did you ever show the sublicense agreement to anyone at SmartTouch, Inc. prior to November of 2002?

A. The agreement was shown to Phil Gioia.

Q. Was it shown to Mr. Gioia at a time when he was employed by SmartTouch, Inc.?

A. I don't know.

Q. Did you personally show him the sublicense

agreement?

A. Yes.

Q. Please describe to me the circumstances under which you showed Mr. Gioia the sublicense.

A. In his work at the Bay Street Group for Excel.

Q. When was that?

A. I think 1997.

Q. And that was in connection with him attempting to find a buyer for some or all of Excel?

A. I think that's correct.

Q. At that time, sir, we can agree he was not, in fact, working as an employee of SmartTouch, can't we?

A. Yes.

Q. Were there any other occasions when you believe you showed the sublicense agreement to Mr. Gioia?

A. No.

Q. What do you recall about showing the sublicense agreement to Mr. Gioia?

A. Simply that he said to me he wanted to focus on consumer products for his work at Bay Street.

Q. How did it come about that you showed him the sublicense agreement?

A. He was thinking how to structure a deal for a potential buyer.

Q. How did it come -- in what context did you show him the sublicense agreement?

A. He wanted to know Excel's contracts and patents, inventions.

Q. I'm just trying to figure out how you gave him the sublicense. Did you hand him specifically the sublicense agreement and say, "You should read this"?

A. He came to Excel's office and reviewed Excel's contracts and patents.

Q. Were you sitting with him when he did that review?

A. I don't recall if I was there for all of it, but for part of it I might have been. I think so.

Q. Do you know one way or the other?

A. I believe I guided him through the documents and left.

Q. Now, when you say "guided him through the documents," what do you mean?

A. Just pointed out which contracts related to which patents.

Q. Did he review other documents besides patents themselves and contracts? Financials, for example?

A. I don't remember.

Q. Was anyone else present with him other than you when he reviewed documents?

A. I believe Ruth Hamilton.
Q. Was she there throughout his review?
A. I don't know.
Q. Where did this review take place?
A. In Excel's offices.
Q. Which was where?
A. Berkeley.
Q. Was Excel in the same physical location as SmartTouch at that point?
A. There were three offices. SmartTouch had a separate office.
Q. But at the same address?
A. In the same building.
Q. What was the approximate volume of documents, however you can describe it, that you made available to Mr. Gioia to look at?
A. Do you mean pages?
Q. Pages, boxes, inches, feet; however you can best describe it, sir.
A. There were hundreds of pages. I don't know the number.
Q. Could there have been thousands of pages?
A. Maybe one thousand, up to. I don't recall the number.
Q. They weren't numbered or labeled in any way?

A. No.

Q. So it could have been more than a thousand, for all you know?

A. I just said I think it was hundreds, maybe a thousand.

Q. Are you certain it could not have been more than a thousand?

A. No.

Q. Do you know how long Mr. Gioia spent looking at your records?

A. I don't know how many hours.

Q. No knowledge whatsoever of how much time he spent?

A. No.

Q. Do you know when he came and when he left?

A. No.

Q. Did you actually see him review the sublicense agreement?

A. I can't remember.

Q. Did you subsequently have any discussion with him about the sublicense agreement?

MS. DE MORY: Objection; vague and ambiguous as to time.

MR. PFEIFFER: Q. In connection with this review I'm talking about.

A. At some point, yes.
Q. When was that?
A. I don't remember specifically, but around that time, 1997.
Q. What do you recall about that conversation?
A. Mr. Gioia suggested splitting Excel in two.
Q. In that conversation, how did the sublicense agreement get mentioned?
A. I don't recall beyond him recommending that the patents and the contracts on computers should go in one company and consumer products in the other, patents and contracts and consumer products.
Q. Did he specifically mention the sublicense agreement or any of its terms in that conversation?
A. I don't remember. I remember him saying licenses, contracts -- contracts and patents in one for computers. Contracts and patents in the other for consumer products. That's what I remember.
Q. Do you remember specifically discussing with him, you talking, about the sublicense agreement in that conversation?
A. I don't remember, no.
Q. Any other conversations with Mr. Gioia concerning the sublicense prior to the time that he joined SmartTouch?

A. I don't think so, no.

Q. Did he ever tell you, "Hey, I've looked at that sublicense agreement" prior to him joining SmartTouch?

A. He may have. I don't recall.

Q. How about after Mr. Gioia joined SmartTouch. Did you have any conversations -- well, let me go back.

After Mr. Gioia joined SmartTouch, did you ever show him the sublicense?

A. I don't believe so, no.

Q. After Mr. Gioia joined SmartTouch, did you ever discuss with him the sublicense?

A. Yes.

Q. When was that?

A. The summer of '99.

Q. Anybody else present for that conversation in the summer of 1999?

A. I don't remember.

Q. Was there more than one conversation in the summer of 1999?

A. Yes.

Q. How many were there?

A. Maybe two. I don't remember.

Q. How far apart were they?

A. Maybe a month or two apart.

Q. And you believe both were in the summer of 1999?

A. Yes.

Q. Let's start with the first conversation. What do you recall discussing with Mr. Gioia concerning the sublicense agreement in that conversation?

A. Sometime in June, there was a discussion about a presentation of intellectual property to the board.

Q. How did the sublicense agreement come up in that conversation about your IP presentation to the board?

A. My focus of the presentation was on the products and the scope of what the products were that I understood the company could roll out in the marketplace.

Q. Are you finished with your answer?

A. I think so.

Q. How did the sublicense agreement come up, sir?

A. Oh, Mr. Gioia wanted me to follow an agenda, which he drafted for the presentation, and we disagreed on the agenda.

Q. How did that relate to the sublicense agreement?

A. Mr. Gioia wanted to have the board see an agenda that would use the word "ownership," and I told

him that that was a separate discussion of contracts that I was not going to go into since that was not my focus at the company. As he directed me, he wanted me to discuss just the products and the scope.

So I objected to the agenda, and he told me that he would present the relationship between the patents and Excel and SmartTouch separately. He would handle that. I should just focus on describing the products that the company could roll out that would be protected.

Q. What, as best you can recall, did you say to Mr. Gioia in that conversation about using the word "ownership"?

A. I told him that I did not want to discuss anything beyond what he had directed me to focus on, which was the products, how they relate to claims. I think patent insurance he wanted me to discuss also. And he agreed that he would handle anything of a higher order than that focus.

Q. Did you actually mention the sublicense to him in that conversation?

A. Yes. I reminded him that there was a conditional relationship, and he directed me to focus on the substance of the presentation. And he told me he would handle the agenda and he would address all

questions after I left.

Q. Now, when you said to him that there was a conditional relationship, did you explain to him in any more detail what you meant by that?

A. Yes, I did.

Q. What did you say?

A. I reminded him that the intellectual property was being held by SmartTouch as in title and that it was an issue that he would have to explain to the board. And he said he would do that after I finished my presentation about products and claims that protected products and insurance.

Q. Now, you said you told him that SmartTouch held the patents in title. What does that mean, sir?

A. I just told him that if you look up the patents, because they were conditionally assigned. He told me that the analogy he understood was that -- his phrase to me was "It's like owning a house." He said he would have a house, and if he didn't make his mortgage, then the house would go back to the bank.

So he said he wanted to use certain terms in that context, and I said to him, "I'm going to focus on the patent scopes and the products," because he was demanding me, bullying me to focus below the level of what I was advising him he had to notify the board of,

and he told me that's his job. He will handle all those matters and I am to focus on the body of the presentation.

Q. Now, so I'm clear, you were telling him that, in your opinion, he had to advise the board --

A. No.

Q. -- in the summer of 1999?

A. I apologize. I said to him that I was only able to discuss the claims and how they relate to products. He said to me that he would handle anything else. I said, "The agenda you're putting together is part of the story. It needs to be explained more." That I do recall telling him. And he said to me he would handle that.

Q. Well, you told him it needs to be explained more. What did you tell him needed to be explained more?

A. That using his analogy about the house, that if he didn't make his mortgage payments as a homeowner that the house goes back to the bank, and he understood that because he gave me that analogy. And I simply said to him that is something that should be explained to the board, and he told me he would handle that, that I was not to communicate with the board other than to give a brief presentation on what the claims were, how

they related to products. And insurance, I think he also wanted me to talk about.

Q. Now, why would that relationship have to be explained to the board in the summer of 1999 if the license had existed since 1995?

A. When Mr. Gioia came into the company and the board was constituted at his direction, he was very firm that he would handle all communications with the board. And I simply said to him in that meeting in the summer that if he had told them or if he was going to tell them, I was simply going to follow his direction of what the substance of the presentation was supposed to be and that I would understand he would handle anything on the agenda that he wanted to define or explain to the board.

Q. When Mr. Gioia joined the company, are you suggesting that he then appointed the board?

A. I believe my recollection is that when Mr. Gioia came onto the company that he was very clear from the beginning, to me, he stated to me, that he would communicate with the board and that I was to follow his direction.

Q. Sir, that's not my question.

You had said earlier the board was constituted at his direction. Are you suggesting that Mr. Gioia

appointed the board when he joined the company?
A. I can only recall that when he joined the company, he had directed me to follow his lead on the constitution of the board.
Q. Not my question, sir.
MR. BORNSTEIN: Did he appoint board members?
THE WITNESS: My specific recollection is he determined who the chairman would be, and that was what I was referring to when I said the "constitution of the board."
MR. PFEIFFER: Q. There was a board of directors before he arrived, correct?
A. That is correct.
Q. Do you know how the membership of that board compared -- that prior board compared to the board after he joined?
A. I don't remember the specific names, but there was overlap.
Q. Had you made any prior board presentation in which you had described what you viewed as the conditional nature of SmartTouch's interest in the patents?
A. No.
Q. Why not?
A. I did not make any, in my recollection,

presentations to the board prior to Mr. Gioia's joining.

Q. You never made any board presentations of any type prior to Mr. Gioia joining the company?

A. I believe that Mr. Gioia felt the company was unstructured and disorganized.

MS. DE MORY: The question is, did you make any presentations to the board before Mr. Gioia joined the company.

THE WITNESS: No.

MR. PFEIFFER: Q. Did you do anything else to inform the board prior to Mr. Gioia joining the company of the existence of this conditional interest in the patents?

A. Yes.

Q. What did you do?

A. I had spoken to Phil Lapsley, as I had mentioned, and I had spoken to David Pare.

Q. Were they board members at the time you spoke with them?

A. I believe so.

Q. Do you know?

A. I don't specifically remember, no.

Q. Now, we talked about Mr. Lapsley already.

Did you ever show Mr. Pare a copy of the

sublicense agreement?

A. I don't remember.

Q. Now, again in your conversations with Mr. Gioia in the summer of 1999 that you're telling me about, did you ever specifically mention the sublicense agreement to him? You told me about the house buying analogy and all the rest.

A. Yes.

Q. What was Mr. Gioja's response when you mentioned the sublicense agreement?

A. He said he understood the issue and he would handle it in communications with the board.

Q. Were you a board member in the summer of 1999?

A. I believe so.

Q. At the board meeting, did he mention the issue that you've described to the board?

A. Not in my presence.

Q. Were you not there for the whole board meeting?

A. I don't remember.

Q. Did you speak to Mr. Gioia about not mentioning the subject of the sublicense in the board meeting?

MS. DE MORY: Objection; vague and ambiguous as to time.

MR. PFEIFFER. Let me clarify that.
Q. After this June 1999 discussion you had with Mr. Gioia about the agenda, after he didn't mention the sublicense agreement in that following board meeting in your presence, did you go and ask him why not?
A. I did not.
Q. Did you ever ask him subsequent to that board meeting whether he was going to bring it up at another board meeting?
A. No.
Q. Did you ever bring it up again?
A. I'm sorry?
Q. Did you ever bring up the subject of the sublicense agreement again with Mr. Gioia?
A. Yes.
Q. When was that?
A. Later in the summer.
Q. What was the context of that discussion?
A. Mr. Gioia wanted me to sign an inventions assignment agreement.
Q. Had the sublicense agreement come up?
A. I told him I could not sign it.
Q. Why did you tell him you couldn't sign it?
A. Because I reminded him that Excel's rights under the license conflicted with what he wanted me to

sign.

Q. What was his response?

A. "Sign it or I'll fire you and take away your vested stock options."

Q. What did you say in response?

A. I told him that my employment agreement with Excel and Excel's license would not permit me to sign it as he wanted it signed.

Q. Then what happened?

A. He put a deadline of a Friday, and if it wasn't signed, he was going to fire me and take away all vested options.

Q. And what happened?

A. I got an e-mail from Phil Lapsley saying that the deadline had been moved a week and I then heard -- I spoke directly to Mr. Gioia, who told me we will negotiate a compromise. Mr. Gioia said he would negotiate a compromise with me.

Q. Did you negotiate a compromise with Gioia?

A. Yes.

Q. What that was compromise?

A. In the agreement, it says -- somewhere in the beginning, there's a section there that was the compromise language he and I agreed on.

Q. What was your recollection of the nature of

the compromise?

A. That everything I had worked on prior to the signing of that agreement, to the date of that agreement, was not subject to the agreement.

Q. You're certain this was in the summer of 1999?

A. I believe it was in the summer of 1999.

Q. Could it have been 1998?

A. I believe in 1998 there was -- no. This discussion would not have been '98.

Q. Didn't you, in fact, sign an employment agreement with an assignment provision in it in 1998 with SmartTouch?

A. It was a draft. I recall that, yes.

Q. Do you recall it was a draft, or you recall you signed such an employment agreement with an assignment provision in it?

A. I recall that there was no agreement. There was a draft being negotiated. Mr. Gioia said that he would present those to the board and that the board-required approval or the agreements would never be effective. If the board did not approve them, then those drafts were discarded or rendered by the board nonoperative or nonexistent, whatever the term is.

Q. You signed such a document, though, in 1998, didn't you?

A. I recall there was an employment agreement being negotiated and I recall that I did sign something. I recall that there were subsequent amendments that Mr. Gioia required and that it never became effective at his direction. He said those agreements were going to be discarded.

Q. What permitted you to sign a document -- in your mind, permitted you to sign a document with an assignment of inventions provision in 1998 but didn't permit you to sign it in 1999?

A. I'd have to look at the actual language of the '98 agreement to tell you what was discussed, but I recall it was an ongoing discussion, and I think Gioia required that there were several versions signed. I don't have specific memory of each, but he made it clear to me that these were drafts that would be submitted to the board, and discussions and edits were continuing.

Q. He was going to submit -- he had you sign and he signed documents that he was going to submit to the board for approval?

A. That is correct, and he said that -- he told me everything is a draft and is not final until there is an official board approval.

Q. Did you ask for any kind of written

confirmation of that to protect your rights, sir?
A. Of what?
Q. Of the fact that this was a draft and not final when you signed it.
A. Mr. Gioia had just come on board. I trusted him. He told me that any written approval by the board would be in the minutes and would confirm only at that point that the agreements were effective. He told me they were drafts, and that is what I understood.
MS. DE MORY: The question is, did you ask for any written assurances?
THE WITNESS: Of what?
MS. DE MORY: This will all move a lot quicker if you just answer that question.
THE WITNESS: I'm sorry.
MS. DE MORY: Mr. Pfeiffer's question was did you ask for any written assurances.
THE WITNESS: Of what?
MS. DE MORY: Of what Mr. Gioia told you about the agreement.
MR. PFEIFFER: Q. Did you ask for any written assurances from Mr. Gioia about this being a draft and not binding, this document that you were signing before you signed it?
A. I believe that it was stated in a board

meeting. I don't remember the specific language, but I think in one of the board minutes he put it on the record that nothing that wasn't approved by the board would be final. I think that that was the assurance I wanted, and I think it was in a board discussion.

Q. Did the board of SmartTouch, in your understanding, have to approve employment agreements?

A. My understanding directly from Phil Gioia was that they were required for approval; that if they were not unanimously approved by the board, there were no agreements. I was very clear that that was his requirement.

Q. Was that true of SmartTouch during the time that you were president, that employment agreements required board approval?

A. I don't recall that there were any agreements like that before he arrived.

Q. Do you know whether employment agreements at SmartTouch required board approval?

MS. DE MORY: Objection; calls for speculation.

MR. PFEIFFER: Q. Whether you actually entered into any or not, do you recall if they required board approval?

A. I don't know.

Q. How about at Excel? Did employment agreements require board approval at Excel?

A. Yes.

Q. Did any other types of contracts require board approval at Excel or just employment agreements?

MR. BORNSTEIN: Objection to the extent it calls for a legal conclusion.

THE WITNESS: Can you repeat the question?

MR. PFEIFFER: Q. Did any other kinds of contracts require board approval to be effective at Excel?

MS. DE MORY: Objection; calls for a legal conclusion.

THE WITNESS: I'm sorry. Can you repeat it? I'm trying to understand the question.

MR. PFEIFFER: Q. During the time you were running Excel, say, prior to 1999, we'll narrow it as to time, did any other contracts besides employment contracts require board approval at Excel?

MS. DE MORY: Objection; calls for a legal conclusion.

THE WITNESS: Do I answer it?

MR. PFEIFFER: Yes.

MR. BORNSTEIN: If you can.

THE WITNESS: I don't think so, no.

MR. PFEIFFER: Q. What's your basis for that answer?
A. My employment agreement.
MS. DE MORY: Same objection; calls for a legal conclusion.
THE WITNESS: Just my employment agreement.
MR. PFEIFFER: Q. What about your employment agreement leads you to that conclusion?
A. If I recall my employment agreement, the board sets the strategic objectives, and I was responsible for executing them.
Q. Upon reasonable consultation with the board, correct?
A. Correct. If that's what was in the agreement, that's correct.
Q. Did you ultimately end up signing an employment agreement with SmartTouch that you understood not to be a draft?
A. No.
Q. And, again, so I understand it, the holdup on your end in terms of signing this agreement was that there was an assignment provision; is that right?
MR. BORNSTEIN: Vague and ambiguous. Are you talking about '98 or '99 at this point?
MR. PFEIFFER: Well, actually, I think he told

me he signed the one in 1998.

THE WITNESS: It wasn't an agreement. Which year are you speaking of regarding the agreement?

MR. PFEIFFER: Q. I don't want to debate with you what's an agreement and what's not, sir.

In the summer of 1999, this discussion you've been describing having with Mr. Gioia, the hangup from your end in terms of signing this employment agreement he wanted you to sign was that it had an assignment provision?

A. I'm unclear as to whether you're talking about the employment discussions of '98 or the employee assignment agreement of '99. Which of the two are you discussing? I'm unclear.

Q. That's my mistake, sir. I'm sorry.

So in the summer of 1999, this was a separate assignment agreement, not an employment agreement; is that right?

A. Yes.

Q. That was an assignment of your rights in patented technology to SmartTouch; is that right?

MS. DE MORY: Objection; calls for a legal conclusion; calls for speculation; lacks foundation.

THE WITNESS: My understanding was that Mr. Gioia said to me because there were no employment

MR. PFEIFFER: Q. Who were you negotiating your settlement with on the SmartTouch side?
A. Robert Fortuno.
Q. Who was Mr. Fortuno?
A. Chairman.
Q. In your settlement negotiations with Mr. Fortuno, did you bring up the subject of the sublicense agreement?
A. I brought up the subject of Excel's rights, and I don't recall the exact language used, but that did come up, yes.
Q. In as much detail as you can recall, what did you tell Mr. Fortuno with regard to Excel's rights in those settlement negotiations?
A. That I could sign nothing that would affect those rights.
Q. Mr. Fortuno was a lawyer, right?
A. I don't know what his status was with regard to the law at that time.
Q. You don't know whether he was a lawyer by training or not?
A. I know he had a law degree. I didn't at that time anything more. Whether he was practicing or not, I don't know.
Q. Now, did you describe to Mr. Fortuno what

Excel's rights were that you didn't want to affect?

A. I don't remember.

Q. Did he ask you what those rights were?

A. No.

Q. Now, Mr. Fortuno was chairman of the board of SmartTouch and also had a law degree?

A. I believe so, yes.

Q. You told him you couldn't sign anything that would affect Excel's rights?

A. Correct.

Q. Did you explain that that meant Excel's rights to the patented technology, or did you just say Excel's rights?

MS. DE MORY: Objection; asked and answered.

THE WITNESS: I think I was specific with regard to Excel and its patents and its inventions. I think that was the purpose of my mentioning it to him.

MR. PFEIFFER: Q. Well... and I appreciate you're telling me about your purpose. But did your language tell him that you believed Excel had rights in the biometric patents that SmartTouch was using?

A. I believe so, yes. I don't recall the specific words, but I believe so, yes.

Q. And he didn't ask you to see the sublicense agreement, for example?

A. No.
Q. He didn't ask you for anymore details about what Excel's rights in the patents were?
A. He told me that he would propose language and I could edit it depending on what Excel needed.
Q. Was anyone else involved in the negotiations on the SmartTouch side besides Mr. Fortuno?
A. Yes.
Q. Who else?
A. Ross Meter.
Q. Now, Mr. Fortuno told you that he would propose some language and you could edit it depending on what Excel needed?
A. That's, again, not the words. I cannot specifically recall the words, but the sense was that he would provide terminology and I would consider that. I spoke to Dave Mendelsohn, I think, twice during that period with regard to Excel's rights, and that's how I would make a decision.
MS. DE MORY: I'm going to remind you just to answer the question that's asked.
THE WITNESS: All right. Sorry.
MR. PFEIFFER: Q. Did you show proposed language that Mr. Fortuno gave you to Mr. Mendelsohn?
A. I may have. I don't recall.