Apple Inc. v. Psystar Corporation Doc. 1088

KEVIN PIMENTEL State Bar No. 203952
360 6th Avenue–No. 4
San Francisco, California 94118
Telephone: (510) 684-3787

GEORGE B. WASHINGTON, Michigan Bar No. P26201
JODI-MARIE MASLEY, Michigan Bar No. P62116
SHANTA DRIVER, Michigan Bar No. P65007
Scheff & Washington, P.C.
65 Cadillac Square, Suite 3800
Detroit, Michigan 48226
Telephone: (313) 963-1921 / Facsimile: (313) 963-7587

Attorneys for Plaintiffs DAAP, Yvette Felarca, Josie Hyman, and Laura Raya

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEFEND AFFIRMATIVE ACTION PARTY (DAAP), YVETTE FELARCA, JOSIE HYMAN, and LAURA RAYA,<br><br>Plaintiffs,<br><br>-vs-<br><br>JUDICIAL COUNCIL OF THE ASSOCIATED STUDENTS OF THE UNIVERSITY OF CALIFORNIA AT BERKELEY, ASSOCIATED STUDENTS OF THE UNIVERSITY OF CALIFORNIA AT BERKELEY, MIKE DAVIS, BOBBY GREGG, NIKHIL COOPER, AMIT BANERJI, JUSTIN TAYLOR, STEVE MCCARTY, AIDAN ALI-SULLIVAN, DAVID GRUNWALD, NILE TAYLOR, LESLIEANN CACHOLA, ANGEL BREWER, GUNJAN GOEL, REBECCA SIMON, DEVIN JONES, RAMAN GULATI, and RYAN POWELL,<br><br>Defendants. | **VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF** |

Pursuant to the Federal Rules of Civil Procedure, the plaintiffs bring this action pursuant to 42 USC 1983 to redress violations under color of state law of their rights under the First and Fourteenth Amendments to the Constitution of the United States. The plaintiffs state as follows:



Dockets.Justia.com

## INTRODUCTION

1. The plaintiff Yvette Felarca and Josie Hyman are students at the University of California at Berkeley (UCB) and are two of the 20 candidates on the slate of the Defend Affirmative Action Party (DAAP) in the elections for the executive offices and Senate of the Associated Students of the University of California (ASUC). The plaintiff Laura Raya is a student at UCB who voted for Felarca, Hyman, and other DAAP candidates.

2. In campaigning for ASCU office, the plaintiffs exercised their right to speak and to associate together to support proposals to increase minority admissions, to oppose attempts to increase tuition, and to take other steps in favor of minority and other students.

3. The plaintiffs bring this action because after the votes were cast but before they had been counted, the defendant officials of the ASUC, acting under color of state law, rendered a decision imposing an ex post facto disqualification on all 20 candidates on the DAAP slate on grounds that, on their face, violate their rights to free speech, free association, and free assembly and by a procedure that, on its face, violates their right not to be deprived of liberty without due process of law.

4. The defendant officials of the ASUC are now threatening to count the votes in the absence of the DAAP candidates and representatives, which, under the transferable vote system in effect for those elections, will make it impossible at a later date to determine whether the DAAP candidates should be seated as Senators on the ASUC Senate or whether any of the candidates from other parties who are seated should have been so seated.

5. As depriving minority and other students of their rights to free speech and association and due process of law is by definition irreparable harm, the plaintiffs ask the Court to issue a temporary restraining order prohibiting the counting of the votes pending hearing on a motion for a preliminary injunction and upon hearing, to issue preliminary and permanent injunctive relief restraining the defendants from imposing the unconstitutional disqualifications levied upon DAAP and its candidates.

6. Pursuant to 42 USC 1983 and 1988, the plaintiffs also seek attorneys' fees and costs and such other relief as is just and equitable.

## JURISDICTION

7. This Court has jurisdiction over this matter pursuant to 28 USC 1343(3).

## PARTIES

8. The plaintiff Defend Affirmative Action Party (DAAP) is a voluntary, unincorporated association composed of students at the University of California at Berkeley (UCB).

9. The plaintiffs Yvette Felarca and Josie Hyman are students at the UCB and are candidates for the ASUC Executive Officers and Student Senate on the DAAP slate.

10. The plaintiff Laura Raya is a student at the UCB who has cast a ballot for DAAP candidates, including Yvette Felarca and Josie Hyman.

11. The defendant Judicial Council of the ASUC is a non-profit corporation established by and subordinate to the Constitution of the Associated Students of the University of California, a true copy of which is affixed as Exhibit 1.

12. The defendants Mike Davis, Bobby Gregg, Nikhil Cooper, Amit Banerji, Justin Taylor, Steve McCarty, Aidan Ali-Sullivan, David Grunwald, and Nile Taylor are students at UCB, are members of the ASUC Judicial Council, and are sued in their official capacities.

13. The defendants Leslieann Cachola, Angel Brewer, Gunjan Goel, Rebecca Simon, Devin Jones, Raman Gulati and Ryan Powell are students at UCB, are members of the ASUC Election Council, and are sued in their official capacities.

14. The defendant ASUC is a non-profit corporation composed of students at the University of California at Berkeley.

## STATEMENT OF FACTS

15. The Regents of the University of California have asserted that they have delegated governmental functions to the ASUC, including the following:

A. The Regents collect mandatory student activity fees from all students at UCB and remit the proceeds from those fees to the ASUC;

B. The Regents authorize the ASUC to operate the student union building and otherwise use UCB property for the purpose of funding ASUC activities;

C. The Regents authorize the ASUC to disburse funds received from UCB to those student organizations, student publications, and student activities that the ASUC deems appropriate;

D. The Regents have further delegated to the ASUC the right to allocate office space in University properties to student organizations at the university.

E. The Regents retain the right to audit the finances and otherwise maintain financial and other supervision of the ASUC.

F. The Regents authorize designated representative of the ASUC to serve on university committees and otherwise participate in the governance of the University.

16. Under Article 3 of the ASUC Constitution, an elected Student Senate has the legislative and administrative authority over the ASUC.

17. Under Article 7 of the ASUC Constitution, the ASUC must hold elections for the Student Senate once per year.

18. By practice and tradition, students at the UCB have associated together to form political parties to run in the elections for Student Senate.

19. In the Spring 2004 elections, DAAP was one of four parties running a slate of candidates for the Student Senate.

20. The DAAP platform called for the restoration of affirmative action at the University of California, an increase in the number of underrepresented minority students, a decrease in tuition, and a number of other changes.

21. The students at UCB cast votes for the Student Senate on April 13-15, 2004.

22. After those elections were held, Mr. Paul LaFata, a conservative student at UCB, filed a series of charges with the Judicial Council asking for the ex post facto disqualification of DAAP and other parties calling for increased minority representation.

23. On or about April 27, 2004, Mr. LaFata filed the attached "charge sheet" and "preliminary filing" (Ex's 2, 3), asking that all DAAP candidates be disqualified and be prevented from participating in the vote count.

24. At Mr. LaFata's request, a Justice of the Judicial Council issued on an ex parte basis a gag order prohibiting DAAP and any of its candidates from publicly discussing the charges that he had filed against DAAP or from communicating with any of the Justices about the charges (Ex 4).

25. By letter of May 11, 2004 (Ex 5), counsel for the plaintiffs advised the Judicial Council defendants that the charges that Mr. LaFata had filed and the remedy he sought violated rights protected by the First Amendment.

26. On or about May 12, 2004, five of the nine members of the ASUC Judicial Council issued a Decision (Ex 6) dismissing all of Mr. LaFata's charges except for one, which, the Council held, was grounds for disqualifying the DAAP and all of its candidates from the election that had already been held.

27. As partially set forth on pages 5 and 6 of that Decision, the Chair and four Justices decided to disqualify all DAAP candidates on the basis of the following assertions:

A. On April 25, the defendant Michael Davis, the Chair of the Judicial Council, issued an order excluding Mr. Luke Massie, a non-student who was in support of DAAP, from a hearing being held on that day on Mr. LaFata's charges against another minority party on the basis of "facial expressions" by Mr. Massie that the Chair deemed disrespectful.

B. On April 25, Mr. Massie and Ms. Felarca objected to that ruling and, during a break in proceedings, asked other members of the Judicial Council to consider an appeal from the Chair's decision to exclude Mr. Massie from the hearing.

C. As set forth in the Decision of the Judicial Council, the members of the Council were witnesses to and participants in the above events and rendered their decision based on their own recollections, which were not subject to cross examination or testimony of record.

D. According to the Decision of the Judicial Council, the Justices believed that during the course of the attempt to secure that appeal, Mr. Massie and Ms. Felarca made "broad theoretical arguments relating to the protection of democracy," used the word "asses," and questioned the competence of the student judges.

E. The Judicial Council found that these and other statements constituted "badgering," and, on that basis, disqualified all 20 candidates of the DAAP, including 19 candidates who were not alleged to have said anything or even to have been present when these supposedly objectionable remarks were made.

28. The Judicial Council violated the plaintiff Felarca's rights to free speech and association by disqualifying her based upon protected speech.

29. The Judicial Council violated the plaintiff Hyman's and DAAP's rights to free speech and association by disqualifying them on the basis of statements that they did not make and for which many were not even present.

30. As a result of this decision, the plaintiff DAAP and its candidates will not be able to participate in the count of the votes for Student Senate which will occur at an unspecified time within the next few days.

31. Under the single transferable vote system for counting votes that is specified in Article VII, Section 5 of the ASUC Constitution and Title IV of the ASUC By-laws (Ex 7), the exclusion of the DAAP from the vote count will cause irreparable harm in that:

A. During the course of the vote counting, the representatives of all parties, including DAAP, may withdraw candidates, agree to transfer votes to other candidates, and take other steps that will determine how many seats the parties will obtain and the identities of the candidates that are elected to those seats.

B. If DAAP and its representatives are excluded from the vote count, it will be impossible to recreate, at a later date, the choices that DAAP and other parties would have made during the course of the vote count if DAAP had been present and it will thus be impossible to determine which candidates of DAAP or of other parties should serve on the Student Senate over the next academic year.

32. As a result of these threatened actions, the plaintiffs DAAP, Felarca and Hyman will lose their rights to free speech and assembly and the plaintiff Raya and the other students who voted for DAAP will lose their rights to free speech and assembly by being deprived of their votes and by being deprived of any representation on a body that exercises governmental power and authority and that is a forum and platform for the exercise of First Amendment rights.

COUNT ONE

VIOLATION OF FIRST AMENDMENT RIGHTS

33. The allegations of paragraphs one through thirty two are repeated as if fully set forth herein.

34. Under the First Amendment to the Constitution of the United States, the plaintiffs Felarca, Hyman, and all other students at the UCB have a right to freedom of speech and association.

35. The First Amendment rights of the plaintiffs include the right to associate together in the DAAP, the right to become candidates for the Executive Offices and Senate of the ASUC, the right to vote for candidates for the ASUC, and the right, if elected, to serve on the ASUC.

36. In rendering a decision disqualifying the plaintiffs DAAP, Felarca, and Hyman from participating in the vote count and from serving as a Senator on the ASUC, the Judicial Council and the individual defendants who served on the Judicial Council have acted under color of state law.

37. Under the law, the defendants may deprive the plaintiffs of the rights to speak and to vote for, run for, and serve as a Senator on the ASUC only on account of a compelling state interest and only by means that are narrowly tailored to further that interest.

38. By disqualifying Felarca and Hyman on the basis of arguments that she and Massie made in support of an appeal from a decision of the Chair of the Judicial Council, the defendants have deprived Felarca and the DAAP of their right to free speech and free association.

39. By disqualifying DAAP and 19 candidates who are not alleged to have engaged in any misconduct, the defendants have deprived these students of their right to free speech and association.

40. For the reasons set forth above, the actions of the defendants will cause irreparable harm to the plaintiffs and to the students at UCB unless they are restrained by this Court.

Wherefore, the plaintiffs ask that this Court:

A. Enter a temporary restraining order restraining the defendants and their agents, servants and persons acting in concert with them from counting the votes in the ASUC elections pending hearing on a request for a preliminary injunction;

B. Upon hearing, enter a preliminary injunction restraining the defendants and their agents, servants, and persons acting in concert with them from excluding the plaintiffs Felarca and Hyman, and the other DAAP candidates from having votes for them counted and from excluding them from serving on the ASUC Senate;

C. Grant such further relief as is just and equitable.

COUNT TWO

VIOLATION OF DUE PROCESS RIGHTS

41. The allegations of paragraphs one through forty are repeated as if fully set forth herein.

42. The plaintiffs Felarca, Hyman, and all other students at UCB have a right not to be deprived of liberty without due process of law.

43. Felarca, Hyman and the other DAAP candidates have a liberty interest in running for and serving on the ASUC Senate.

44. In depriving the plaintiffs DAAP, Felarca and Hyman of these rights the defendants have violated the plaintiffs' rights to due process of law in the following ways:

A. The plaintiffs were deprived of a fair and impartial trial body because the Justices who decided the case were participants in and witnesses to the events that gave rise to the charges;

B. The plaintiffs were deprived of their right to confront witnesses in that they were prohibited from talking with the Justices to investigate the charges and could not examine or cross examine them at the "hearing" that was held;

C. The plaintiffs were deprived of their right to notice of specific charges in that the charge "badgering" is void for vagueness and sweeps within its terms speech that is constitutionally protected;

45. In rendering a decision disqualifying the plaintiffs DAAP, Felarca, and Hyman from participating in the vote count and from serving as an Executive Officer or Senator on the ASUC, the defendants have acted under color of state law.

46. For the reasons set forth above, the actions of the defendants will cause irreparable harm to the plaintiffs and to the students at UCB unless they are restrained by this Court.

Wherefore, the plaintiffs ask that this Court:

A. Enter a temporary restraining order restraining the defendants and their agents, servants and persons acting in concert with them from counting the votes in the ASUC elections in the absence of DAAP and its representatives pending hearing on a request for a preliminary injunction;

B. Upon hearing, enter a preliminary injunction restraining the defendants and their agents, servants, and persons acting in concert with them from excluding the plaintiffs Felarca, and the other DAAP candidates from having their votes counted and from excluding them from serving on the AUSB Senate;

C. Grant such further relief as is just and equitable.

By the Attorneys for the Plaintiffs,


__________________________________
KEVIN PIMENTEL State Bar No. 203952
360 6th Avenue–No. 4
San Francisco, California 94118
Telephone: (510) 684-3787

__________________________________
GEORGE B. WASHINGTON,* Michigan Bar P26201
JODI-MARIE MASLEY, Mich Bar No. P62116
SHANTA DRIVER, Michigan Bar No. P65007
Scheff & Washington, P.C.
65 Cadillac Square, Suite 3800
Detroit, Michigan 48226
Telephone: (313) 963-1921
Facsimile: (313) 963-7587


** Member of the State Bar of Michigan. An application to appear pro haec vice will be filed.*

**CONSTITUTION OF**
**THE ASSOCIATED STUDENTS OF THE UNIVERSITY OF CALIFORNIA (ASUC)**

As amended by votes of the student body: 26 September 1949, 14 November 1949, 16 May 1950, 12 March 1952, 13 May 1953, 14 December 1955, 23 April 1956, 10 December 1956, 15 April 1957, 9-10 December 1957, 5-6 May 1958, 10 December 1958, 11-12 May 1959, 12-13 May 1960, 18 October 1960, 27-28 April 1961, 9-10 April 1962, 25-26 April 1963, 7-8 December 1964, 6-10 February 1967, 25-27 November 1968, 16-18 April 1969, 3-5 December 1969, 2-5 June 1970, 26-28 April 1971, 15-17 November 1972, 12 March 1973, 16 November 1973, 24 May 1974, 7-9 May 1975, 24-26 November 1975, 21 January 1976, 28-30 April 1976, 22-24 November 1976, 15-17 February 1977, 27-29 April 1977, 23-25 April 1980, 17-19 November 1982, 11-13 April 1984, 13-14 June 1985, 9-11 April 1986, 19-21 November 1986, 1 April 1987, 18-20 November 1987, 13-15 April 1988, 16-18 November 1988, 11-13 April 1990, 8-10 April 1992, 7-9 April 1993, 10-12 November 1994, 10-12 April 1996, 8-10 April, 1997, 7-9 April, 1998, 6-8 April, 1999, 11-13 April 2000, 10-12 April, 2001, and 9-11 April 2002.

## PREAMBLE

*We, the students of the Berkeley campus of the University of California, as an autonomous constituency of the university community, do provide by this Constitution a student government committed to effective student participation in all areas of student concern, that we may, through independent action and in concert with other constituencies of the university community, participate in the formation and the improvement of educational programs, protect full freedom of assembly and expression in the university community, articulate and represent the student interest in the governance of the campus, provide services and coordinate activities for students, and advance our common interests and concerns as students and as citizens, do hereby ordain and establish this Constitution.*

## ARTICLE I - NAME, MEMBERSHIP, AND POSITIONS

SECTION 1: NAME

The name of this Association shall be the *Associated Students of the University of California*, herein called the Association. The abbreviation of the name of the Association shall be the ASUC.

SECTION 2: MEMBERSHIP

Any person registered as a student, or registered as a Fall Extension Student at the University of California at Berkeley may be a member of the Association. All members shall hold equal voting rights in the Association and its subordinate organizations, except as otherwise provided in this Constitution. Subject to other applicable qualifications, all members shall be eligible to hold office in the Association or in any of its subordinate organizations.

SECTION 3: ELECTED AND APPOINTED POSITIONS

In order to assume or remain in an elected, appointed, or confirmed position in the Association, a person must be a registered student at the University of California at Berkeley, unless the position is explicitly designated as non-student, or - for not more than one semester - if the person can demonstrate that s/he is actively working towards the removal of a University imposed impediment of her/his registration for that semester. This provision does not apply to the Summer semester provided that the person intends to be a registered student in the Fall semester.

## ARTICLE II - EXECUTIVE OFFICERS

SECTION 1: GENERAL QUALIFICATIONS, TERM OF OFFICE, VACANCIES

A. The executive officers of the Association shall be a President, an Executive Vice-President, an External Affairs Vice-President, an Academic Affairs Vice-President, and a Student Advocate. They shall be elected

during the Spring semester, and their term of office shall be for one year, beginning the first day of the regular Summer Semester.

B. In the event of a vacancy occurring in any executive officer positions before the end of the normal term, the nomination for replacement shall be made in accordance with the ASUC By-Laws. The Senate shall consider such nominations, and shall, by a two-thirds (2/3) vote of the entire Senate, approve a replacement.

1. The replacement's term shall be for the remainder of the academic year.

2. If the vacancy occurs at least 14 calendar days prior to the Spring regular election, the position shall be included in that election. The person elected shall take office immediately upon certification of election results by the Senate.

SECTION 2: PRESIDENT

The President shall not serve more than two full terms. His/her duties and powers shall be:

A. To serve as the chief representative of the Association, and to monitor the health and well-being of the Association and the student body which it represents.

B. To have the power of veto over legislative actions of the ASUC Senate. Such veto may be overridden by a two-thirds (2/3) vote of the entire Senate, during the semester in which the action takes place. The President must exercise the option of veto within seven (7) days of action by the Senate.

C. To direct by Executive Order the taking of actions which are urgent and necessary to maintain the functioning of the A. S.U.C. until the Senate can again meet. Any such Executive Order automatically expires at the third regular Senate meeting following issuance of the order, or upon termination by the Senate by a majority of those voting, a quorum being present to do business.

D. To carry out any other duties as set forth in this Constitution and/or assigned by the Senate.

SECTION 3: EXECUTIVE VICE-PRESIDENT

The duties and powers of the Executive Vice-President shall be:

A. To serve as the second ranking representative of the Association.

B. To serve as the chairperson of the ASUC Senate.

C. To vote to break a tie vote of the ASUC Senate.

D. To appoint members to committees of the ASUC Senate, with approval by a two-thirds (2/3) vote of the entire Senate.

E. To ensure that actions directed by the Senate are performed.

F. To plan and direct the Senate Leadership Institute.

G. To assume the duties of the President in the event of the resignation, recall, or temporary or permanent disability of the President to perform his/her duties, until such time as a replacement is selected or elected.

H. To determine the need for and the assignment of office and/or storage space and/or equipment to student groups sponsored by the ASUC, subject to the regulations and guidelines and appeals process outlined in the ASUC By-Laws.

I. To carry out any other duties as set forth in this Constitution and/or assigned by the Senate.

SECTION 4: EXTERNAL AFFAIRS VICE-PRESIDENT

The duties and powers of the External Affairs Vice-President shall be:

A. To present the position of the ASUC in matters involving other campuses, schools, and students from outside the University of California at Berkeley.

B. To supervise the lobbies and governmental lobbying actions of the Association, including appointment or nomination of students to positions within the lobbies and on U.C. systemwide committees.

C. To be the ASUC representative to the association of U.C. campuses.

D. To carry out any other duties as set forth in this Constitution and/or assigned by the Senate.

SECTION 5: ACADEMIC AFFAIRS VICE-PRESIDENT

The duties of the Academic Affairs Vice-President shall be:

A. To be generally responsible for ASUC relations with the Academic Senate.

B. To be responsible for the appointment and/or selection of ASUC-chosen student representatives to Academic Senate committees, other university committees on academic matters, and campus administrative committees; to provide facilities and resources for the use of all student representatives; and to replace or request replacement of representatives not performing their duties.

C. To supervise ASUC projects and operations involving academic matters on campus, as assigned by the Senate and the ASUC By-Laws, and to serve as a liaison between the ASUC Senate and sponsored activity groups dealing with academic matters, except for those matters falling under the purview of the Student Advocate.

D. To carry out any other duties as set forth in this Constitution and/or assigned by the Senate.

SECTION 6: STUDENT ADVOCATE

The duties of the Student Advocate shall be:

A. To aid students charged with violations of university, campus, or Association rules, upon request of such students. In addition, the Student Advocate must assist students with Financial Aid problems, grade disputes, and the filing of grievances against members of the campus community.

B. To present the position of the Association in discussions with University or campus administrations concerning student rights, campus rules, and other areas of student conduct.

C. To educate the student body about students' rights, University and Association policies, laws, regulations, and procedures, and to promote awareness of the availability of advice and representation services offered by the Office of the Student Advocate pursuant to this Section.

C. To carry out any other duties as set forth in this Constitution and/or assigned by the Senate.

SECTION 7: RECALL

A. Any executive officer of the ASUC may be subject to recall by presentation to the Senate of a petition signed by at least one thousand (1,000) students and containing a specific statement of the reasons for the proposed removal.

B. At the next regular meeting of the Senate, the period of the recall election shall be set in accordance with Article VII. At that meeting the officer shall be allowed to speak in his/her own defense.

C. If two-thirds (2/3) of the votes cast at the recall election approve, the officer shall be removed from office.

## ARTICLE III - ASUC SENATE

SECTION 1: PURPOSE

A. All legislative and final administrative authority of the Association shall be vested in and exercised by the ASUC Senate, for the promotion of the welfare and interest of the students of the University of California at Berkeley, subject to the limitations enumerated in this Constitution.

SECTION 2: MEMBERSHIP

A. The voting members of the Senate shall be twenty (20) Senators (the entire Senate), elected in accordance with Article VII of this Constitution and the ASUC By-Laws. All seats shall be filled by the Spring regular election with terms of office beginning the first day of the Fall semester and lasting for one year.

B. A Senate Leadership Institute, to provide training and information to new Senators, shall be held at the beginning of each Fall and Spring semester. Requirements for attendance and any penalties for failure to attend, up to and including not being permitted to take office and having a Senate seat declared vacant, shall be as prescribed in the ASUC By-Laws.

SECTION 3: REMOVAL AND REPLACEMENT OF SENATORS

A. A Senator shall be automatically removed from office if:

1. At any time during a semester, s/he has failed to attend sufficient meetings such that s/he will not by the end of the semester, be able to have attended seventy percent (70%) of the regular Senate meetings of a semester. Regular Senate meetings which occurred while s/he was not a Senator, or meetings for which s/he can present to the Executive Vice-President a valid written medical excuse or religious excuse explaining the reason(s) for non-attendance two (2) days before the meeting, shall not be included in calculating the attendance requirement. Attending a meeting shall be defined as presence at the first and final roll calls between the beginning of the meeting and the time scheduled for adjournment according to the agenda, plus presence (defined as a yea, no, or abstention) at sixty percent (60%) of roll calls relating to main motions between those two points in time.

2. At any time during the semester, s/he has failed to meet Standing Committee requirements and/or fails to sit on at least one Standing Committee as specified in the ASUC Administrative Structure By-Laws.

B. Any Senator may be subject to recall by presentation to the Senate of a petition signed by at least one thousand (1,000) students represented by that Senator and containing a specific statement of the reasons for the proposed removal.

1. At the next regular meeting of the Senate, the date(s) of the recall election shall be set in accordance with Article VII. At that meeting, the Senator shall be allowed to speak in his/her own defense.

2. If two-thirds (2/3) of the votes cast at the recall election approve, the Senator shall be removed from office. Only students represented by that Senator may cast votes for or against the recall.

C. Replacement:

1. In the event of a vacancy in the ASUC Senate, the person receiving the greatest number of votes for Senator, who did not become a Senator, shall assume the vacated office.

2. If a Senator is removed from office, that Senator is not eligible to fill the vacated seat within that semester.

SECTION 4: REPRESENTATION

There shall be five (5) representatives to the ASUC Senate:

A. The Alumni Representative shall be an alumnus of the University of California at Berkeley, appointed by the Council of the California Alumni Association, and shall serve at the pleasure of the Council.

B. The Chancellor's Representative shall be appointed by the Chancellor of the Berkeley campus and shall serve at the pleasure of the Chancellor.

C. The Faculty Representative shall be a member of the Academic Senate of the University of California at Berkeley, shall be appointed by the Academic Senate, and shall serve for a term of one (1) year.

D. The two (2) Graduate Assembly representative shall be selected according to the By-Laws of the Graduate Assembly.

SECTION 5: MEETINGS AND QUORUMS

A. A majority of the entire Senate shall constitute a quorum.

B. No meeting held during the Summer semester or during a semester break shall be considered a regular meeting.

C. The ASUC Senate shall hold a special meeting at the call of the President or the Executive Vice-President, or at the written request of any five (5) Senators.

SECTION 6: ATTORNEY GENERAL

The Senate shall select and appoint the Attorney General, who shall be responsible for:

A. Ensuring that all rules, regulations, and procedures passed by the Senate and/or stated in this Constitution are implemented and followed.

B. Investigating charges of violation of this Constitution, the By-Laws of the Association, and all other regulations of the Association.

C. Maintaining the official file of standing policies of the ASUC Senate.

D. Representing the ASUC when it is a party (as the Association) in a Judicial Council suit.

E. Keeping the Senate informed of legal matters involving the Association.

F. Carrying out other duties as set forth in this Constitution and/or assigned by the Senate.

SECTION 7: INITIATIVE AND REFERENDUM

A. Upon the presentation to the Senate of a petition signed by at least one thousand (1,000) students, or by a majority vote of the entire Senate, any questions may be submitted to a vote of the students of University of California at Berkeley. The voting date(s) shall be set in accordance with Article VII.

B. Concurrence of a simple majority of those students voting for or against shall be necessary to pass such questions. Upon passage, such matters may be amended or repealed by a subsequent majority vote by the students of the University of California at Berkeley.

C. In the case of two or more conflicting initiatives or referenda passed concurrently, all non-conflicting parts shall be enacted and the conflicting parts which are part of the measure receiving the highest number of votes shall be enacted.

SECTION 8: ASUC APPOINTMENTS

A. All appointments to positions referred to in this Constitution must be approved by a two-thirds (2/3), vote of the entire Senate, unless otherwise stated. If the Senate votes on and fails to approve the appointment of an individual, that person shall immediately cease holding the position voted on.

B. Executive officers shall advise the Senate of appointments and request votes of approval in a timely fashion. If an executive officer fails to notify the Senate of an appointment within two (2) regular Senate meetings after appointment, the appointee cannot continue in the position until appointment notice is given.

SECTION 9: ASUC ADVOCACY AGENDA

A. The ASUC Senate shall develop at the beginning of its term an ASUC Advocacy Agenda. The Advocacy Agenda shall consist of a series of student concerns to be advocated for by the ASUC Senate for the remainder of its term.

B. The Senate shall approve individual items for the Advocacy Agenda by a two-thirds vote of the entire Senate. Each item on the Advocacy Agenda shall include a series of short, medium, and long-term goals, as well as potential strategies to be employed.

C. The ASUC By-Laws shall contain procedures for implementing the Advocacy Agenda system. The By-Laws shall include, but not be limited to, the following;

1. A procedure through which the ASUC Senate develops and approves the Advocacy Agenda.

2. A Committee structure through which Senators work towards the goals of the Advocacy Agenda. The structure shall include one committee for each Advocacy Agenda item. In addition, each committee shall have ASUC funding.

3. A specific number of student concerns that the Advocacy Agenda must contain.

## ARTICLE IV - JUDICIAL COUNCIL

SECTION 1: AUTHORITY

The Judicial Council of the Association shall be vested with the judicial authority of the Association. The council's authority shall extend to all judicial cases arising under this Constitution, the ASUC By-Laws, official actions of ASUC executive officers, employees, and the Senate, and any matters delegated to the council by the ASUC Senate or this Constitution.

SECTION 2: MEMBERSHIP

A. The Judicial Council shall consist of nine (9) students, nominated by the President. The nominations of the President will then be interviewed by the Constitutional Review Committee of the Senate. The President may nominate any number of individuals to the Judicial Council positions, yet he/she may not nominate fewer than three individuals per available position on the Judicial Council. Following the interviews of the prospective Judicial Council members, Constitutional Review Committee will vote to select the nominees to be sent to the Senate for approval.

B. Members shall have a term of two (2) years, reckoned from the date on which they are confirmed.

C. In the event that the President fails to submit at least three nomination to the Senate within three (3) regular Senate meetings following the occurrence of a vacancy, nominations may be made by any executive officer or Senator. If a Presidential nomination is rejected, the President shall have one (1) regular meeting to introduce another nomination before right of nomination devolves to other executive officers and Senators. If the Senate does not consider a nomination to fill a vacancy within two (2) regular meetings after submission of the nomination, then the Senate must consider the nomination before any further business.

SECTION 3: RULES OF PROCEDURE

The Judicial Council shall frame, approve, and revise, during well-advertised open hearings, rules and procedures for the exercise of its responsibilities. Changes in rules of procedure shall be forwarded to the Senate. Proposed rules shall not be open to amendment by the Senate, except for deletion of individual clauses. Should the Senate fail to reject, by majority vote of the entire Senate, changes within three (3) regular meetings after their receipt by the Senate, the rules will be automatically approved.

SECTION 4: FUNCTIONS AND POWERS

A. To exercise the primary judicial powers of the Association, granting such judicial relief as defined by this Constitution and the By-Laws of the Association.

B. To maintain custody of the current and previous versions of the ASUC Constitution and By-Laws.

C. To review charges of violation of this Constitution, the By-Laws of the Association, and all other regulations of the Association.

D. To request the attendance of those holding positions in the Association, when attendance is needed in a case before the Judicial Council.

E. To revoke the funding of any group found discriminatory under Section 7 of Article VII.

F. To perform other duties as described in this Constitution or assigned by the Senate.

SECTION 5: FINALITY

All decisions of the Judicial Council shall be final unless reversed by subsequent council action.

SECTION 6: REMOVAL FROM OFFICE

A. Any member of the Judicial Council shall be removed from office for malfeasance or dereliction of duty. Charges may be brought by any five (5) Senators.

B. In open session the ASUC Senate shall give equal opportunity to the accused member to defend him/herself as is given to hearing of the accuser(s). Removal shall require a two-thirds (2/3) vote of the entire Senate.

C. Members shall automatically be removed from office for failure to attend seventy percent (70%) of the regular meetings of the Judicial Council in any one (1) semester. The Chairperson of the Judicial Council

shall promptly notify the President and Senate of such a vacancy.

D. Interpretation of this section shall be the sole right of the ASUC Senate.

## ARTICLE V - GRADUATE ASSEMBLY

SECTION 1: PURPOSE

The Graduate Assembly shall speak for the ASUC on matters concerning graduate students. On all other issues, the Graduate Assembly shall forward its position to the ASUC Senate to be dealt with by the Senate within three (3) regular meetings, such position becoming the position of the Senate if not modified or rejected by the Senate within that time.

SECTION 2: CHARTER

The Graduate Assembly shall frame a charter that includes its purpose and limitations for carrying out its functions as established in this Constitution. The charter shall include a section concerning funding. Changes in that section shall require the approval of both the Graduate Assembly and a two-thirds (2/3) vote of the entire Senate.

SECTION 3: MEMBERSHIP

The Graduate Assembly shall be composed of one (1) delegate per each one hundred (100) students or fraction thereof in each department, school, college, or other academic unit within the graduate division, as set forth in its By-Laws. ASUC executive officers and graduate students who are Senators shall be ex-officio, non-voting members of the Graduate Assembly.

SECTION 4: FUNDING

A. The Graduate Assembly shall receive funding each year from the ASUC of an amount at least equal to five-sevenths (5/7) of the total amount of ASUC discretionary fees paid by graduate students, including those enrolled in the School of Law, during the past academic year.

B. If Graduate Assembly expenditures for the year are less than the funding required by Section A, the difference shall be automatically carried over into Graduate Assembly accounts for the following year, such amount to be in addition to funding required by subsection A.

C. The Graduate Assembly shall have the authority to seek non-ASUC funds as it so desires, so long as such action does not conflict with the goals of the entire student body as expressed by this Constitution and does not in any way endanger the tax exempt status of the Association.

D. In times of fiscal emergency, as outlined in Article VI, Graduate Assembly funding shall be decreased in no more than an amount proportional to the decrease in funding of ASUC governmental activities, considered as a whole.

SECTION 5: LIMITATIONS

The Graduate Assembly recognizes the authority of the ASUC Senate to speak for the students of the University of California at Berkeley as a whole.

## ARTICLE VI - FISCAL MATTERS

SECTION 1: SENATE FISCAL AUTHORITY

A. The Senate has sole authority over the ASUC funded budgets of student government operations, operations groups, projects, student services, and activity groups and publications, and is responsible for approving the

overall ASUC budget each year.

B. The Senate may initiate changes in student fees paid to the ASUC, subject to a referendum of the students of the University of California at Berkeley and approval by the Regents.

C. All financial appropriations or revenue reductions require a two-thirds (2/3) vote of the entire Senate for approval.

SECTION 2: SENATE FINANCE OFFICER

The Senate Finance Officer shall be a student appointed by the President, with the following responsibilities:

A. To provide advice and assistance to the Senate Finance Committee and to act for the Finance Committee when the Senate is not in session.

B. To be in charge of the annual budget process for the parts of the Association over which the Senate has sole authority (Section 1).

C. To ensure that student services and operations groups stay within their budgets.

D. To be responsible for other financial matters as are assigned to him/her by the Senate or the Senate Finance Committee.

SECTION 3: SENATE FINANCE COMMITTEE

A. The Senate Finance Committee shall be composed of the Finance Officer, seven (7) Senators, the President and the Executive Vice President.

B. The Senate Finance Committee shall meet at the call of the Executive Vice-President, the Chair of the Finance Committee, the Finance Officer, or any three (3) Senators thereof. Five (5) members shall constitute a quorum.

C. Functions and Powers

   1. The committee shall participate in budget hearings conducted by the Senate Finance Officer to allocate revenues to student activities and services, and report to the Senate a recommended annual budget for the Association.

   2. All new appropriations of funds for Association activities, all modifications to annual appropriations for activities under the sole authority of the Senate (Section l), shall be presented to the Senate Finance Committee for its consideration, and shall then be forwarded to the ASUC Senate for final action.

SECTION 4: BALANCED BUDGET

The budget of the Association must be in balance such that expenditures for the fiscal year do not exceed revenues from that fiscal year, allowing for a surplus if so desired by the Senate.

SECTION 5: FISCAL EMERGENCY

A. If at any time the Senate Finance Officer, President, or any five (5) Senators have reason to believe that expenditures for the fiscal year will exceed revenues from that fiscal year, such person or persons may appeal to the Judicial Council for a full or partial freeze on parts or all of the Association's budget. The Senate shall immediately be notified of such appeal and the reasons for requesting the freeze.

B. Such a freeze shall remain in effect until the Judicial Council Finds that the Senate has taken effective action to balance the budget of the Association.

SECTION 6: SENATE CONTINGENCY FUND

A. The Senate Finance Committee shall recommend the amount allocated to the Senate Contingency Fund during the annual budget process.

B. At the beginning of the fiscal year, the ASUC Senate Contingency Fund shall consist of no less than eight (8) percent of the total amount allocated to activity groups.

C. The ASUC Senate shall establish a Legal Defense Fund, expenditures from which may be authorized only for the purpose of emergency legal action which the Association may undertake. The ASUC Senate shall annually allocate an amount no less than one (1) percent of annual revenues, unless and until the Legal Defense Fund is equal to or greater than ten (10) percent of annual ASUC revenues.

SECTION 7: SPONSORSHIP AND FINANCIAL ALLOCATIONS

A. When a group applies to the ASUC Senate for sponsorship and/or affiliation it shall describe its membership requirements and recruiting methods.

B. When a group submits its budget each year to petition for funding, each group shall describe in writing its membership requirements, recruiting methods, and goals. This information shall be sent to the Senate along with budget requests.

C. The Senate shall not fund any activity or group which discriminates against any student by race, color, religion, marital status, national origin, sex, age, sexual orientation, physical disability, or political activity or belief in its method or recruitment and acceptance for membership.

D. The ASUC Attorney General shall fully investigate, upon receipt of complaint by any member of the ASUC, at his/her own initiative or at the direction of the ASUC Senate, any alleged violation of this section and shall initiate action before the Judicial Council as appropriate. This subsection shall not be deemed to limit in any way the right of any member of the Association to initiate action before the Judicial Council under this section.

SECTION 8: FISCAL ACCOUNTABILITY

A. The ASUC shall specify in the By-laws restrictions on the use of ASUC funds.

B. Those restrictions may be waived with a two-thirds vote of the entire Senate Finance Committee, subject to final approval by the Senate. A waiver granted by the Finance Committee may be overturned by a majority vote of the Senate at the next regular Senate meeting.

C. Any fund waivers must be requested in a standardized document approved by the Finance Committee. This document shall include, but not be limited to: the name of the group requesting, the amount of the waiver, and the reason the waiver is requested.

D. Any time a fund waiver is granted, the standardized form will be included in the agenda packet for the next regular Senate meeting.

## ARTICLE VII - ELECTIONS

SECTION 1: GENERAL

A. Control of all Association elections and related activities shall rest with an Elections Council as empowered by the ASUC By-Laws. All provisions of the By-Laws that conflict with any portion of this Constitution are automatically null and void, including, but not limited to, any By-Law provision regarding regular Fall elections. Those By-Laws referring to the number of Senators or the number of placement of polling places shall be automatically altered to reflect the provisions of this Constitution.

B. Normally, only students currently enrolled at the University of California at Berkeley may vote. However, the Senate may establish procedures allowing voting privileges to persons not currently enrolled who are eligible to register for the following Fall or Spring semester without applying for readmission.

C. One (1) regular Association election shall be held each year during the Spring Semester. No special election shall be held to fill vacancies in elected offices. This shall not be construed to prohibit recall elections.

SECTION 2: ELECTION DATES

A. The specific dates for regular elections and for any special elections shall be set by the ASUC Senate. The election period for special elections must be during the Spring or Fall semester, not on a Saturday or Sunday, and not on an official school holiday. The election period for regular elections must be during the Spring semester, not on a Saturday or Sunday, and not on an official school holiday.

B. The Senate shall set the election (voting) period of a recall election no later than one regular meeting following receipt of the petition. A recall election must be held no later than the second regular Senate meeting following the setting of the voting date(s).

C. The vote on an initiative, referendum, or amendment shall take place at the next regular election following receipt of the petition or vote of the Senate, provided that the date of receipt or Senate vote is before the end of the candidate filing period for that election; otherwise, the vote shall take place at the second regular election thereafter.

SECTION 3: ELECTION PUBLICITY

Notice of an election and full statement of any proposed recalls, initiatives, referenda, and/or amendments shall be published at least once prior to the election period in all established campus newspapers whose fluency of publication is more than once per week.

SECTION 4: SENATE SEATS

Unless changed by referendum, all Senators shall be elected at-large. Nothing in this Constitution shall be construed to prohibit district elections.

SECTION 5: VOTING

A. All voting in Association elections shall be by secret ballot.

B. In each race, the single transferable vote system with fractional transfer of surplus votes shall be used. The voter shall list candidates on his/her ballot in order of preference, until s/he has no further preference between candidates or until s/he runs out of room on the ballot. The ASUC Senate may limit the number of candidates the voter may list; such a limit may not be less than thirteen (13).

C. The Elections Council, or successor agency, shall provide for the placement and operation of polling places at the dining commons, or no more than fifty feet away from the perimeter if a polling place absolutely cannot be installed, of each of the residence hall units owned or managed by the University, including the International House, and excluding, except as provided in the By-Laws, family apartment complexes. These polling places shall be open at a minimum from ten minutes before the opening of the dinner period for each dining facility through thirty minutes after the end of the serving time for the dinner period. Any student

may vote at any one of these polling places.

SECTION 6: CAMPAIGN FINANCE

A. Executive Officer candidates and/or their parties which act in coordination with the candidate are allowed to spend up to $1,000 on their ASUC campaign. Senate candidates and/or their parties which act in coordination with the candidate are allowed to spend up to $200 on their ASUC campaign.

B. These provisions must be administered by a member of the Elections Council.

C. All disputes/arbitration that arise are to be handled solely by the Judicial Council.

D. This amendment overrides any and all campaign finance provisions specified in the by-laws and Constitution.

**- Amended by vote: 11-13 April 2000**

## ARTICLE XIII – ENVIRONMENTAL SUSTAINABILITY

SECTION 1: Purpose

The ASUC shall conserve and protect natural resources by adopting environmental sustainability as a policy.

SECTION 2: Policies

The adopted environmental sustainability policies shall include the following:

A. All copying and printing paper purchased shall be of at least 30% post-consumer recycled content.

B. All ASUC administrative purchases of the same product that exceed two hundred dollars within a period of one fiscal year shall adhere to the following conditions, the purpose being to use more environmentally preferable products: An environmentally preferable product shall be purchased instead of a non-environmentally preferable product if its price falls within ten percent of the price of the non-environmentally preferable product.

   1. For the purposes of this Article, the phrase "environmentally preferable product" shall mean products that have a lesser or reduced effect on human health and the environment when compared with competing products that serve the same purpose. This comparison may consider raw materials acquisition, production, manufacturing, packaging, distribution, reuse, operation, maintenance, or disposal of the product.

SECTION 3: Execution of Policies

The Executive Vice President shall:

A. Oversee the environmental sustainability policies each session and;

B. Generate an annual ASUC report on environmental sustainability policy implementation.

## ARTICLE IX - MEETINGS

SECTION 1: CLOSED SESSION

SECTION 4: RULES OF ORDER

The parliamentary rules governing meetings of the Association shall not be inconsistent with this Constitution or the By-Laws of the Association.

## ARTICLE X - ASUC BY-LAWS

SECTION 1: PURPOSE

The ASUC By-Laws shall supplement this Constitution by establishing such boards, councils, committees, and subordinate organizations as the ASUC Senate deems necessary. The By-Laws shall enumerate powers, duties, and rules pertaining to these official organizations. The By-Laws shall also lay out procedures governing the functions of activities described in the Constitution, and may assign additional duties to executive officers, Senators, and appointees.

SECTION 2: AMENDMENTS

A two-thirds (2/3) vote of the entire Senate shall be necessary to ratify, modify, or suspend portions of the By-Laws. All such actions shall be considered main motions for purposes of Article VIII. The By-Laws may contain provisions prohibiting the suspension of specific portions of the By-Laws.

## ARTICLE XI - BILL OF RIGHTS

SECTION 1: DUE PROCESS AND EQUAL PROTECTION

The ASUC shall not deprive any person of liberty or property without due process of law, nor shall the ASUC deny to any person within its jurisdiction the equal protection of the laws.

SECTION 2: FREEDOM OF EXPRESSION

The ASUC shall make no law respecting an establishment of a religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the ASUC for a redress of grievances.

SECTION 3: RIGHTS OF THE ACCUSED

No person shall be subject for the same offense to be twice put in jeopardy; nor shall be compelled in any case to be a witness against him or herself. The accused shall enjoy the right to a speedy and public trial, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him/her; to have the opportunity to present witnesses; and to have the Assistance of Counsel for his/her defense. The privilege of seeking appeals or rehearings shall not be suspended. The integrity of counsel-client privilege shall not be denied.

SECTION 4: SANCTIONS

Excessive fines shall not be imposed, nor cruel and unusual punishments inflicted. No Bill of Attainder or ex-post facto Law shall be passed.

SECTION 5: FREEDOM OF INFORMATION

All official ASUC documents, records, and other written and recorded information, with the exception of that involving personnel, litigation, or pending investment matters, shall be made accessible to the public upon request. The ASUC must furnish copies of requested information to interested students without undue delay, and may not

# CHARGE SHEET FORM

Fill in all spaces unless otherwise indicated and submit the original to the Office of Student Affairs in Room 400. Attach pages explaining how the alleged violation(s) occurred, giving dates and times when relevant, all supporting evidences or a detailed list of such evidences, statements as to the constitutional, statutory, and/or regulatory provisions allegedly violated, and a separate document explaining why a preliminary injunction is needed, if one is requested. You will be notified if your case is accepted, and will be notified in writing if your case is not. Please type or print clearly. E-mail asucjudicialcouncil@yahoo.com should you require assistance, and to notify the Council that you have filed a charge.

TO: ASUC Judicial Council
FROM: _Paul LaFata________________________________
[You will be recognized as the spokesperson for the complainant before the Council unless otherwise noted in the hearing. JRP 4.7]
ADDRESS _666 Woodmont Avenue________________________
PHONE: _510-665-5555__________ E-MAIL: _cmdrpaul@berkeley.edu_____

I, _Paul LaFata______________________, representing _myself and witnesses in recent *LaFata* v. *Cal-SERVE*__________________, hereby request the ASUC Judicial
[Spokesperson

Council to issue a [X]Direct Judgment [ ]Restraining Order [ ]Writ of Mandamus
[Judicial Remedy sought, see JRP 3.13.1.1.1-3]

against _Defend Affirmative Action Party (DAAP)____________________.
[Person(s) and/or organization]

The named person(s) may be contacted at _502-9072 (Principal)____________________.
[E-mail address and phone number]

I charge the above person(s) with violating _4.13.2.9___________________________
[Title, Article, Section, Clause, Item]

of _ASUC By-laws________________________________________
[ASUC Constitution, By-Law, Rules, Regulation, etc]

as explained in the attached.

_X__ I request and Expedited Hearing.
[Include a separate document explaining why an Expedited Hearing is necessary. See JRP 3.5.3]
____ I am requesting a Preliminary Injunction
_X__ I am requesting a Gag Order. [See JRP 3.7]
[Include a separate document explaining why a Preliminary Injunction is needed. See JRP 3.8]
____ I am requesting witnesses/evidence be subpoenaed
[Include all names and contact information as well as the reasons for the request. See JRP 3.9]
____ I am requesting witness depositions
[Include all names and contact information. See JRP 3.10]
__X_Charge Sheet is filed under seal. Only the Council will see this until such time as it is unsealed.
[Include a separate document explaining why the charge is filed under seal. See JRP 3.6.2.2]

Signed: ______________________________ Date: ____________________

Received: ____________________________ Date: ____________Time: ____
[OSA Director]

Revised 4/04, Chair Mike Davis

ASSOCIATED STUDENTS
of the
UNIVERISTY OF CALIFORNIA
--JUDICIAL COUNCIL--

Preliminary Filing and Motions in the Matter of
*LaFata vs. Defend Affirmative Action Party (DAAP)*

Honorable Justices,

On April 25th, 2004, an acknowledged member of the DAAP ASUC political party did badger and threaten members of the ASUC Judicial Council and witnesses called for testimony before the Judicial Council in the unrelated *LaFata vs. Cal-Students for Equal Rights and a Valid Education.*

**MOTIONS**

**(1) That the charge sheet and contents should be sealed**

If the contents of the charge sheet were made available to the public, the badgering and threatening could be worse for the witnesses, Council, or counsel. Evidence will show a publicized effort to intimidate the Council, counsel, and witnesses in other cases under consideration. The privacy of the filing will help forestall any worsening of the violations.

**(2) That a gag order be issued**

For the same rationale as above, publicity that could move to the Daily Californian or the public in general through dissemination of details may exacerbate the circumstances surrounding the threatening or badgering. This is a precaution to forestall such violations.

**(3) That the hearing be expedited**

The circumstances and material for the case are very brief and straight forward. The Council's docket is quite full already, and substantial delays could harm policy decisions by the Senate before the Spring Sessions concludes. The Council's decisions

will impact the election, which is traditionally concluded before the end of the legislative session so as to permit any adjustments to policy.

**PRELIMINARY FILING**

On the date in question, a member of the gallery knowingly intimidated and threatened members of the summoned witnesses and of the Council itself. This individual identified himself to the Council and to witnesses as a member and representative of the DAAP political party. Signatory of the party, Senator Felarca, was present during these declarations and acknowledged their legitimacy.

This event was not an anomaly. On the date the filing for *LaFata vs. DAAP* was accepted, Senator Felarca telephoned myself and badgered me over matters related to the case. I cautioned her about the law and its consequences for badgering and threatening at which point she discontinued and hung up. During the preliminary hearing for *LaFata vs. Cal-SERVE*, a campaign was organized to intimidate members of the Council, witnesses, and counsel. The Judicial Council was presented with initial evidence of this claim and decided to give a warning and wait for further violations. The events on April 26th constitute a violation of both the Council's and my warnings to DAAP.

The law in question is in place to ensure the justice system of the ASUC is unobstructed in its efforts to interpret and enforce elections laws. This disregard for the justice system, for the Council, and for the ASUC constitutes a harmful violation of this prohibition.

I urge the Council to move forward with an enforcement of this title by observing the penalty for such a breech: elimination from the election proceedings.

# ASUC Judicial Council

La Fata vs. Defend Affirmative Action Party II

**Gag Order**

Issued By Associate Justice Nikhil Cooper

Given the nature of the case and the prior actions of certain parties, I hereby issue this Gag Order as outlined in our rules of procedure (3.7.1-2), to take immediate effect. "Parties involved with the matter may not discuss the matter publicly or with individuals not directly involved in the matter" (3.7.2). Parties are prohibited from interacting with Justices unless a Justice gives express permission. Concerning witnesses, contact can only be made with the permission and under the supervision of a Justice of the ASUC Judicial Council. I strongly urge all parties in this matter to conduct themselves maturely and to be respectful of each other and the members of this council.

**SCHEFF & WASHINGTON, P.C.**
ATTORNEYS AT LAW
65 CADILLAC SQUARE, SUITE 3800
DETROIT, MICHIGAN 48226

EILEEN R. SCHEFF
GEORGE B. WASHINGTON
MIRANDA K.S. MASSIE
JODI-MARIE MASLEY
SHANTA DRIVER

(313) 963-1921
FAX (313) 963-7587

May 11, 2004

Mike Davis
Chair, Judicial Council
Associated Students of University of California
209 Eshelman Hall
Berkeley, California 94720

VIA U.S. MAIL & EMAIL

Dear Mr. Davis:

This letter is to notify you that we are seeking immediate injunctive relief from the United States District Court for the Northern District of California to ensure that all the votes cast by students in the recent ASUC election at UC Berkeley are counted and to stop the Judicial Council's threat to disqualify the Defend Affirmative Action Party (DAAP).

We represent Yvette Felarca and the Berkeley chapter of DAAP in this matter.

The actions of the ASUC Judicial Council threaten to disenfranchise potentially thousands of students by substituting the decision of the Judicial Council for the votes cast by the student electorate. The Council's actions constitute a profound violation of Constitutional norms.

As the United States Supreme Court has repeatedly held, students have the right to free speech and the right to associate together in order to further that speech. See, e.g., *Healy v James*, 408 US 169 (1972). As the Court has also held, the right to run for office—and to vote for the candidates of one's choice—is a fundamental democratic right that may only be abridged by the most compelling state interest. See, e.g., *Storer v Brown*, 415 US 724 (1974).

Less than three years ago, the United States District Court for the Central District of California applied these principles to elections for office in the Associated Students of the University of California at Irvine. The court issued an injunction directing the reinstatement of a Senator who was denied his rightful seat because of an unconstitutional election rule. See *Welker v Cicerone*, 174 F Supp 2d 1055 (2001). As the Court held, any restriction of a candidate's right to run for student office had to be justified by a compelling state interest and could only be accomplished by means that were narrowly tailored to protect that interest. *Id.*

Paul LaFata, whose political opposition to DAAP is well-known, has asked the Council to violate all of these fundamental rights. The court's proceedings so far indicate a willingness and intention, at Paul LaFata's request, to violate rights enumerated in the US Constitution, the Civil Rights Act of 1866, and basic democratic norms.

Mr. LaFata asks the Judicial Council to disqualify the entire slate of Defend Affirmative Action Party candidates and to disenfranchise DAAP voters because, well after the election itself had taken place, a DAAP supporter who was a spectator at the hearing on Mr. LaFata's charges against another UCB student party, CalSERVE, supposedly displayed facial expressions that expressed "surprise and disbelief" to the Council and witnesses. Critical, surprised, and/or disbelieving facial expressions are constitutionally protected expression. See *Essen v Mellon*, 747 F Supp 692 (SD Fla 1990)(ruling unconstitutional a "Decorum Rule" that forbade making facial expressions that manifest approval or disapproval during witness testimony or at any other time).

In the formal Judicial Council hearing on Mr. LaFata's charges on Sunday, May 2, and in subsequent email communications sent to Ms. Yvette Felarca on May 5, 2004, the Judicial Council has clearly threatened to transform frivolous, factually dubious, legally unsupportable and unconstitutional allegations against a DAAP supporter who was a spectator at a hearing concerning another party into grounds for disqualifying a candidate or an entire slate—and thus disenfranchise a sizable section of the electorate. This shows that the Judicial Council does not understand the most basic principles of the First Amendment rights of Free Speech and Association.

The claim by Mr. LaFata that a leaflet distributed by DAAP urging students to attend an earlier hearing concerning another party is evidence of wrongdoing on our clients' part ("badgering the Judicial Council and Mr. LaFata") ought to have set off First Amendment alarm bells in the head of every person involved. Instead, the court accepted the leaflet as "evidence" for Mr. LaFata's unconstitutional line of argument.

Similarly, the claim that the DAAP spectator "badgered" a witness by attempting to talk with this individual about the facts of a case is on its face an attempt to restrict speech, and so is the claim that DAAP supporters attempted to "badger" the tribunal by asking to appeal the decision excluding the spectator from the earlier hearing.

Already, the Council's ex parte issuance of a gag order violates sixty years of Supreme Court precedent protecting the parties' right to comment upon and the public's right to know about on-going judicial proceedings. See *Bridges v State of California*, 314 US 252 (1941). Moreover, the Council's decision to hold a hearing on charges as transparently unlawful as those filed by Mr. LaFata—and the resulting delay in counting the votes—causes injury to the fundamental rights of all students. But Mr. LaFata is asking the Council to take a further step in breach of the law by disqualifying thousands of votes and numerous candidates based on his "charges."

All of this would be comical except that it involves denying students some of the most basic democratic rights of all—the right to speak, associate and vote for the candidates of their own choice.

If the Council or Councilors are represented by an attorney or attorneys, we urge you to share this letter with counsel. Together with our California counsel, Meera Deo, we are currently drafting a complaint for filing against the Judicial Council and its individual members.

We will request a temporary restraining order to stop the Judicial Council action on the case against DAAP. We will request injunctive relief to ensure that all the votes cast by students be counted without further delay. Finally, you should be aware that we will be requesting an award of all attorneys' fees incurred pursuant to the federal statutes providing for mandatory awards in cases of this kind.

Please contact us or have your attorney contact us immediately.

Sincerely,
SCHEFF & WASHINGTON, P.C.

George B. Washington

GW/lf

| | | |
|---|---|---|
| cc: | Bobby Gregg | (by email to: bobbyg@uclink.berkeley.edu) |
| | Nikhil Cooper | (by email to: cooper84@berkeley.edu) |
| | Amit Banerji | (by email to: abanerji@uclink.berkeley.edu) |
| | Justin Taylor | (by email to: justint@uclink.berkeley.edu |
| | Steve McCarty | (by U.S. Mail) |
| | Aidan Ali-Sullivan | (by email to: ali@berkeley.edu) |
| | David Grunwald | (by email to: dsg81@berkeley.edu) |
| | Nile Taylor | (by email to: goddess1@berkeley.edu) |
| | Leslieann Cachola | (by email to: elections@asuc.org) |
| | Angel Brewer | (by email to: assistantchair@asuc.org) |
| | Gunjan Goel | (by email to: pollcoordinator@asuc.org) |
| | Rebecca Simon | (by email to: publicitycoordinator@asuc.org) |
| | Devin Jones | (by email to: technicalcoordinator@asuc.org) |
| | Raman Gulati | (by email to: webmaster@asuc.org) |
| | Ryan Powell | (by email to: attorneygeneral@asuc.org) |
| | Yvette Felarca | (by email to: yfelarca@yahoo.com) |

# Decision of the ASUC Judicial Council

*LaFata vs. Defend Affirmative Action Party II*

May 12th, 2004

By Chair Michael Davis

With whom Senior Associate Justice Robert Gregg IV
And Associate Justices Nikhil Cooper, Amit Banerji, and Aidan Ali-Sulivan join

This Council is faced with an unprecedented decision. We are often brought into election violation cases to determine the guilt or innocence of a candidate or party for a particular violation, and impose the applicable punishment previously determined by the Senate. The violations typically revolve around illegal posting of campaign flyers[1] and failing to note that titles used in endorsements are for identification purposes only.[2] In every case brought before this Council for adjudication as long as I have sat on it,[3] the complainant represents parties or candidates harmed by the actions of others seeking political office. Never before has this Council been involved as a subject of the violation, and for good reason.

Of all five sections of Title IV, encompassing some thirty-four distinct and specific violations, three relate to the Judicial Council, all protecting the Council's authority in the Association. All three occur in Section 2,[4] with the stated "purpose…to hold candidates, parties, and propositions responsible for serious ethical breaches which threaten the validity of the ASUC's commitment to fairness, democracy, and the legal institutions empowered to protect that democracy…"[5] Clause 1 ensures generic orders of the Council are followed, which is further amplified by clause 3, which ensures individuals subpoenaed by the Council provide relevant testimony. Clause 9 provides individual members of the Council a safety shield from any attempts to interfere with their duties to impartially interpret and enforce the statutes of the Association.

It doubtless seems odd, and perhaps unjust, that the focus of the violation would also be the entity charged with determining guilt or innocence and imposing punishment. Our American system of justice is predicated on a jury system, whereby a selected group of peers who have no vested interest in the outcome of the case arrive at the legal truth of the matter, and apply what remedies or punishments are provided for in the governing statutes. This system attempts to provide the fairest hearing possible to the accused by taking

---

[1] Title IV Art. 13 §3 cl. 2 "Systematically or repetitiously and willfully destroying, defacing, covering, moving or removing from their places, posters, signs, banners, leaflets or flyers which advertise functions, meetings, events, or existence of ASUC sponsored student groups and publications."

[2] Title IV Art. 13 §5 cl. 7 "Claiming endorsements without bearing the disclaimer, "Titles for Identification Purposes Only" in the same size font as the majority of the text of the endorsements is written"

[3] October 25, 2000

[4] Title IV Art. 13 §1, 3, 9

[5] Title IV Art 13 §2

individuals who are similar to them, who have no preconceived notions either to the guilt or appropriate punishment of the accused, a clean slate of sorts, open to any and all possible arguments leading to the legal truth. It is then up to the prosecution to prove their case beyond a reasonable doubt to these individuals, with the defense offering counter arguments. This John Stuart Millsian clash of ideas eventually leading to truth works as designed if the meter of truth is neutral to the parties involved. In the jury system, that impartiality is arrived at through the initial ignorance of the jury.

But there is another path to impartiality. The American Court system establishes an extremely knowledgeable entity to oversee the hearing, which by definition is not ignorant of either the laws or the facts of the case. The judge serves to set the boundaries of the Millsian debate and shepherds the jury through complex legal frameworks their ignorance does not *a priori* allow them to know. This would seem to alter the purpose of the jury, tainting its ignorance and thus its neutrality, except that judges are also impartial because they do not care or have a vested interest in the outcome of the case. It is immaterial to them whether one side or the other leaves the courthouse victorious; they need only provide a fair fight.[6]

In many respects, the Council, which must operate as both judge and jury with regards to election violations, operates in the same manner. We typically have very little knowledge of violations that occur outside of what is brought to us in a hearing, forcing us to rely on evidence gathered by the parties and establish the legal truth from these indicators. We are also designed to be experts in the internal law of the Association,[7] and insulated from political pressures in determining our decisions.[8] It would be detrimental to the health of the Association if the branch charged with executing the judiciary function was highly responsive to the political functions, and it is for this reason that we are appointed to terms lasting longer than any other in the Association. It is for this same reason the Election By-Laws place such a heavy penalty on any sort of tampering with the Council. We must be free to make our decisions without pressure or incentive.

---

[6] Rehnquist, William H. The Supreme Court. New York: Vintage Books, 1987. pg. 244 "Most judges have tentative views of the case when they come on the bench, and it would be strange if they did not. A judge will have read the briefs filed by the parties, and probably will have talked to one of his law clerks about the case, or have received a written memorandum from the clerk. A judge who has not prepared at all for oral argument might be more 'open-minded,' but it would be the open-mindedness of ignorance, not impartiality."

[7] ASUC Constitution Article IV §1 "The Judicial Council of the Association shall be vested with the judicial authority of the Association. The council's authority shall extend to all judicial cases arising under this Constitution, the ASUC By-Laws, official actions of the ASUC executive officers, employees, and the Senate, and any matters delegated to the council by the ASUC Senate of this Constitution."
ASUC Constitution Article IV §4 "Functions and Powers" cl. A. "To exercise the primary judicial powers of the Association, granting such judicial relief as defined by this Constitution and the By-Laws of the Association."
cl. C "To review charges of violation of this Constitution, the By-laws of the Association and all other regulations of the Association."
ASUC Constitution Article XIII "Amendments and Interpretation" §2 "All question of interpretation of this Constitution, except for Section 6 of Article IV, shall be decided by the Judicial Council…."

[8] ASUC Constitution Article IV §2 "Membership" cl. B "Members shall have a term of (2) years, reckoned from the date on which they are confirmed."

This insulation adds to the legitimacy of the Council, and any attempt to undermine that legitimacy renders the perpetrator unqualified to hold office in our Association.[9] Even in our insulated position, and even assuming attempted pressuring has no effect given our insulated status or dauntless personalities, the very presence of badgering or threatening calls into question our impartiality. Should we decide in the badger's interest, we would be seen as caving to pressure; should we decide against the badger's interest, we would be seen as retaliating for the badgering incident. In either case, by no fault of our own, our neutrality through impartiality, which establishes our legitimacy, is questionable. When given the option of having a questionable Judicial Council and the election of candidates who have orchestrated that questionability, or having a legitimate Council and the expulsion of candidates who threaten that legitimacy, the By-Laws are unusually clear in the option they take: badgers and jurists are irreconcilable, cannot exist simultaneously in our Association. The Judicial Council, being necessary to the functioning of the Association must be protected, and the candidates must be barred from holding office.[10]

In the case presently before us, several instances of badgering are alleged, so I will speak to these claims in the chronological order in which they occurred.

The first instance of alleged badgering occurred when Senator Yvette Felarca, signatory[11] of the Defend Affirmative Action Party and its presidential candidate, called Mr. Paul LaFata to talk with him about his motivations for bringing law suits against parties involved in the election. According to Mr. LaFata, the exchange became heated until Mr. LaFata warned Senator Felarca that her actions on the phone could constitute badgering of a witness per 4.13.2.9. At this point, Senator Felarca ended the conversation.

The Council does not believe this count constitutes badgering. Mr. LaFata was released from the conversation upon mentioning the statute, and no attempt was made by Senator Felarca to continue the conversation.

The next instance of alleged badgering occurred on the grounds of campus as a flyer was circulated urging people to "Pack the Judicial Council Hearing" indicating "...we will march together to the CalSERVE hearing...[and] make it clear that neither Paul LaFata nor a 9 person appointed Judicial Council has the right to undermine the democratic vote of Cal students!"[12] The flyer then lists Senator Felarca's phone number and e-mail address. Mr. LaFata argued this flyer was an attempt to pressure and intimidate the Council into ruling in favor of CalSERVE, and by extension, in DAAP's similar case.[13]

This Council does not believe this flyer exhibits threatening or badgering characteristics. It only urges the presence of individuals at a hearing to show support for a party in a hearing. So long as individuals are not attempting to badger or threaten witnesses

---

[9] Title IV Art 13 §2 "For this reason, any person, party, candidate, proponent or opponent of a proposition found before the ASUC Judicial Council to have committed the serious ethical breaches stated in this section through the following acts shall be disqualified from all races in the election."

[10] Ibid.

[11] Title IV Art. VI "Party Status" §2 "Party Signatory" "A Party Signatory is any person who has become a Party Signatory though the procedures stated herein. A Party Signatory has the power to act on behalf of the party, and has delegated authority as an agent for all members of that party."

[12] Flyer submitted as eveidence, *LaFata vs. Defend Affirmative Action Party II*

[13] *LaFata vs. CalSERVE II* and *LaFata vs Defend Affirmative Action Party I* both centered on using Association resources to campaign.

or the Council, and are otherwise peaceably assembled,[14] it makes no difference to this Council if five or five hundred individuals are present. Urging individuals to attend a hearing is similarly protected,[15] and this Council sees no reason to invoke 4.13.2.9 unless the urging also includes requests to badger or threaten witnesses or the individual members of the Council.

On the night of the CalSERVE hearing, a representative of the Defend Affirmation Action Party mingled around the room and introduced himself to the assembled people as the spokesperson DAAP would be using in their upcoming hearing. Mr. Luke Massie graciously made his introductions to members of the Council, Mr. LaFata and Mr. LaFata's witnesses. In the process of talking with Mr. LaFata, Mr. Massie allegedly shook Mr. LaFata's hand vigorously, and then refused to let go after the socially accepted interval. While still grasping Mr. LaFata's hand, Mr. Massie inquired as to why Mr. LaFata was bringing the cases to the Council's attention, and where in California Mr. LaFata was from. Mr. LaFata answered, hand still in Mr. Massie's, at which point Mr. Massie belligerently asked Mr. LaFata if Mr. LaFata knew where he was from. When Mr. LaFata answered in the negative, Mr. Massie retorted, "That's right, you don't," threw down Mr. LaFata's hand and stomped away.

The Council does not believe aberrant social behavior or strange question constitute badgering. If Mr. Massie was attempting to intimidate or otherwise rattle Mr. LaFata prior to a hearing in this manner, it is not apparent to this Council and fails our conviction standards.[16]

In introducing himself to Mr. LaFata's witnesses, Mr. Massie inquired as to what the witnesses thought was moral or right about testifying against CalSERVE. The questions were pointed at times, but no attempts were made to alter the testimony of the witnesses.

The witnesses may have felt uncomfortable by the questioning, but so long as attempts were not made to alter the testimony from what the witnesses were going to say, or so long as the witnesses have no reason to feel threatened, this Council sees no reason to invoke 4.13.2.9.

Once the hearing got underway, Mr. LaFata and Ms. Liu[17] began to question witnesses and give oral arguments. Through this period of time, Mr. Massie utilized his very expressive face and minor vocal outbursts to display his disgust with the proceeding's participants. At one point during Ms. Liu's cross-examination of one of Mr. LaFata's witnesses, the Senior Associate Justice requested a recess.[18] Upon returning to the hearing, I allowed the Senior Associate to make a comment to the gallery, encouraging decorous and

---

[14] ASUC Constitution Article XI "Bill of Rights" §2 "Freedom of Expression" "The ASUC shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the ASUC for redress of grievances."

[15] Ibid

[16] Judicial Rules of Procedure Article V "Post-Hearing Procedure" §1 "Judgement" cl. 2 it. 1 "The factual allegation(s) are supported by clear and convincing evidence."
it. 2 "The conduct in question violates a stated provision in the ASUC Constitution or By-Laws."
it. 3 "The remedy arrived at is proportionate to the severity of the offense and in full compliance with the ASUC Constitution and By-Laws."

[17] Spokesperson for CalSERVE

[18] Judicial Rules of Procedure Article IV "Hearing Procedure" §16 "Recesses" "Any Justice may call for a recess at any time during the hearing. The Council must then immediately go into a closed session."

polite behavior generally, and asked Mr. Massie expressly to compose himself as his actions could be construed as threatening. Mr. Massie then incredulously stuck out his tongue.

This is, of course, not badgering or threatening. But it is still "disrespectful behavior or disregard for the formality due the Council."[19] I immediately held Mr. Massie in contempt and expelled him from the hearing.[20] Upon Mr. Massie's refusal to leave, I closed the hearing to the public and moved the proceedings to the second floor of Eshleman Hall to be conducted privately.

This is not badgering either. It could have been argued that the Defend Affirmative Action Party should be disqualified for one of its agents[21] defying "a lawful order from the ASUC Judicial Council,"[22] but it was not argued before this Council so it will not be considered.

While I was on the second floor in a back office, the rest of the Council was on its way up to join me and reconvene the hearing. Once assembled, we decided to re-open the hearing to the public only if Mr. Massie agreed to leave the proceedings. Associate Justice Nile Taylor went downstairs to express our conditions. But Senator Felarca and Mr. Massie, demanding the Council reverse my decision holding Mr. Massie in contempt refused to heed Justice Taylor, and refusing to leave her, followed her up to the second floor. They were met by several members of the Council, who attempted to engage in dialogue with Senator Felarca and Mr. Massie to explain why the contempt citation had been issued and the hearing closed. In an excited state, the DAAP representatives continued their demands that their right to object to the ruling of the Chair and have it heard by the Council *en banc*[23] be exercised, and included broad theoretical arguments relating to the protection of democracy. (It is important to underscore the bellicosity of these arguments, and the manner in which the DAAP representatives interacted with the members of the Council who stayed in the lobby to discuss the matter with them. Foul language, shouting, personal attacks[24] and attempts to enter the second floor lobby doors to force a confrontation with the Council were all used or attempted.) Despite the fact members of the gallery do not have standing to make objections,[25] the Council felt it would smooth things over to appease the aggressors. The objection was considered and my order was summarily affirmed. Upon being told the decision of the Council, the DAAP representatives retreated to the first floor, but not before making their thoughts on our decision and "asses" known. This was all badgering.

---

[19] Judicial Rules of Procedure Article IV "Hearing Procedure" §15 "Behavior of Litigants cl. 3 "Contempt of Council" it. 1(2)

[20] Judicial Rules of Procedure Article IV "Hearing Procedure" §14 "Rulings of the Chairperson" cl 2 "The Chairperson may issue compelling orders to maintain hearing stability."

[21] Title IV Art. 13 §7 "Conduct of Campaigns" cl 1 "All candidates of a party shall be considered equally guilty of a Campaign Rules Violation by an agent of the party acting within the scope of his/her delegated authority."

[22] Title IV Art. 13 §2 cl 1

[23] Judicial Rules of Procedure Article IV "Hearing Procedure" §14 "Rulings of the Chair" cl 3 "All rulings made by the Chairperson during a hearing shall be subject to review by the rest of the Council if an objection is raised. The Chairperson shall explain his/her ruling. A majority vote of the Justices present is necessary to overturn the Chairperson's ruling."

[24] Several times during the altercation, Senator expressed her disbelief that she voted to confirm several members of the Council who no found themselves in disagreement with her.

[25] Judicial Rules of Procedure Article IV "Hearing Procedure" §7 "Spokesperson for Each Party" cl 2 "Only those designated and recognized spokespersons may address the Council during oral arguments to make arguments, present evidence, examine witnesses, and raise objections."

In this situation, the Council is given the unique ability to both know the specifics of the violation first hand and to know the legal standards of that violation. Unfortunately, the Council is also placed in the position of punishing crimes committed against itself. The argument could be made that our insulated position ensures we simply do not care who wins, as we will retain our position from now until well after the expiration of whatever badgering candidate may be elected, and our impartiality therefore remains intact. But this argument rings hallow as detractors may counter that our insulation allows us to abuse our authority without oversight, and disqualify all those who personally offend us, since such offense will then induce us to care about the outcome. There is no way around this. There is no rubric or meter by which we may prove how much we simply do not care who wins or loses. In the end, all we are left with is the statement that our credibility outweighs all other concerns,[26] as 4.13.2.9 codifies, and the remedy to re-establish credibility is to banish the offending party from the Association. It is therefore the unanimous opinion of this Council that the Defend Affirmative Action Party, being found guilty of badgering by the actions of their agent Mr. Massie and their signatory Senator Felarca,[27] shall be disqualified from the 2004 election.

This matter before the Council being concluded, the Gag Order issued by Associate Justice Nikhil Cooper is hereby lifted.

---

[26] It has been argued extensively by many parties across many elections that disqualifying candidates is tantamount to disenfranchising voters. We find this argument to be particularly weak given the disqualification power was granted by the students through their elected leaders to begin with, and that the proportional vote transfer voting laws utilized by the Association allow voters to pick a great many candidates for a single position. Should their first choice be disqualified, the students are still able to express their choice because the vote is then transferred to a different candidate. See Title IV Art. XVI "Tallying of Votes" for more detail.

[27] Title IV Art. VI "Party Status" §2 "Party Signatory" "A Party Signatory is any person who has become a Party Signatory though the procedures stated herein. A Party Signatory has the power to act on behalf of the party, and has delegated authority as an agent for all members of that party."
Title IV Art. 13 §7 "Conduct of Campaigns" cl 1 "All candidates of a party shall be considered equally guilty of a Campaign Rules Violation by an agent of the party acting within the scope of his/her delegated authority."

# ASUC BY-LAWS

## Title IV
## The Quigley-Heilig Elections By-laws

### ARTICLE I: PURPOSE AND INTENT

**1.1 Purpose**

These by-laws provide for the conduct of all ASUC Elections.

**1.2 Equal Protection**

These by-laws are intended to insure ensure that each candidate is afforded an opportunity for election equal to that of any other candidate for that office.

### ARTICLE II - ELECTIONS COUNCIL

**2.1 Purpose and Scope**

1. Control of all ASUC Elections and related activities shall rest with the Elections Council.

2. The authority of the Elections Council shall be limited in scope to only those duties stated in the ASUC Constitution and these by-laws, and those duties essential and imperative in carrying out the same.

**2.2 Membership and Terms**

1. The membership of the Elections Council shall consist of the Elections Council Chair, the Assistant Chair, Poll Coordinator, Ballot Coordinator, and Publicity Coordinator. The ASUC Attorney General shall be an ex-officio member of Elections Council.

2. The terms of all members of the Elections Council shall commence upon their appointment and expire upon the appointment of a new Elections Council Chair.

**2.3 Appointment of Elections Council Members**

1. The Elections Council Chair shall be selected by a Temporary Committee of the ASUC Senate consisting of five (5) ASUC Senators. Any ASUC elected officers may nominate individuals to the position. An Elections Council Chair must be confirmed by a two-thirds (2/3) Vote of the Entire Senate before the Eight Senate meeting of the Fall Semester.

2. The Assistant Chair, Poll Coordinator, Ballot Coordinator, and Publicity Coordinator, shall be appointed to the Elections Council upon the nomination of the Elections Council Chair and the approval of a two-thirds (2/3) Vote of the Entire Senate.

**2.4 Financial Remuneration**

1. Members of the Elections Council shall be compensated for their service. The ASUC will annually determine the Chair's stipend. Half of this stipend will be paid one month after the Chair takes office. The second payment will be disbursed after the ASUC Judicial Council provides

validation of the election results.

2. Other members of the Elections Council shall receive a stipend in an amount determined by the Chair, with the approval of a two-thirds (2/3) vote of the Senate. Financial remuneration of the members of the Elections Council shall be withheld until the ASUC Judicial Council provides validation of the election results.

3. If at any time, it can be shown before the Judicial Council that a member of the Elections Council has been grossly derelict in his/her duties, the Judicial Council shall deny him/her financial remuneration.

**2.5 Conduct and Removal of Elections Council Members**

1. The Elections Council Chair may be removed from office before the expiration of his/her term by a two-thirds (2/3) vote of the Senate for gross dereliction of his/her duties.

2. Any member of the Elections Council may be removed from office before the expiration of his/her term by the Elections Council Chair for gross dereliction of his/her duties.

3. No member of the Elections Council shall support or oppose any candidate, party, or proposition in an ASUC election while serving on the Council. Any member of the Elections Council so doing may be removed from the Elections Council by the Elections Council Chair, or by a two-thirds (2/3) vote of the entire Senate.

**2.6 Duties of the Elections Council Chair**

1. To take the complete administrative charge for all details of ASUC elections and the Elections Council;

2. To nominate additional members of the Council as may be necessary for the efficient administration of the election with the consent of the Senate;

3. To make Temporary Rules as necessary as outlined in Article XII;

4. To advise the Senate on the financial and practical impact of any legislation which may affect the Elections Council or the election;

5. To be in possession of one of the three keys to the ballot boxes as described in Article XVII;

6. To be in charge of issuing warnings for violations of the Election by-laws;

7. To give an Elections Council report, oral or written, at every regular meeting of the Senate;

8. To give an Elections Council report, oral or written, at every regular meeting of the Graduate Assembly and/or its Executive Committee;

9. To coordinate the Mandatory Clean-Up Day, in which all candidates or their designated proxy, are required to attend to clean-up the Campus and Community following the Election, on the Saturday following the Election;

10. To assist the other members of the Elections Council when necessary;

11. To carry out such other functions and duties as required under the ASUC Constitution and by-laws.

**2.7 Duties of the Assistant Elections Council Chair**

1. To assist the Elections Council Chair, to be responsible to him/her, and to aid him/her in his/her duties;

2. To assume the duties of the Elections Council Chair in the event of the resignation, removal, or temporary or permanent disability of the Chair to perform his/her duties, until such time as a replacement is selected;

3. To act as the primary liaison between all candidates and the Council;

4. To conduct, or delegate the conduction of, the Candidates' Meeting;

5. To design and provide all filing forms;

6. To maintain a file of all Council records, papers, forms, reports, or statements filed by each Candidate, party, group, and to serve as secretary to the Elections Council;

7. To inform the ASUC Secretaries as to how to aid persons with problems concerning the elections;

8. To provide appropriate bins for the purpose of recycling unwanted flyers during and prior to the Elections;

9. To act as the Chief Administrator of the Campaign Finance Limits in accordance with Article XIX of this Title:

10. To verify the validity of all filing form information, including candidate names, as outlined in 7.2.6. and to inform affected candidates, so far as possible, of any problems or inconsistencies.

11. To assist the other members of the Elections Council when necessary;

12. To carry out such other functions and duties as required under the ASUC Constitution and By-laws.

**2.8 Duties of the Poll Coordinator**

1. To assist the Elections Council Chair and to be responsible to him/her;

2. To provide sufficient workers and material for each poll;

3. To conduct or delegate the conduction of a Pollworkers' Meeting for the purpose of training the pollworkers;

4. To arrange for transportation of ballots and ballot boxes to and from the polls;

5. To arrange for the setting up and removal of polls and to arrange for a sufficient number of polling booths at polling locations;

6. To arrange for a system to insure that students are able to vote no more than once in each election, either through electronic means, or through marking the voter's UCB Photo ID;

7. To arrange for all other details related to polls;

8. To provide assistance to the Neutral Third Parties in training their pollworkers;

9. To organize any orientation materials, writing and copy for pollworker advertisements, scheduling pollworkers, making a phone list of all pollworkers, making a pollworker application packet;

10 To advertise, interview, and schedule pollworkers and alternates and be responsible for last minute substitutions at the polls;

11. To ensure that proper conduct is maintained in the vicinity of polling sites in accordance with Article 3.4;

12. To assist the other members of the Elections Council when necessary;

13. To carry out such other functions and duties as required under the ASUC Constitution and By-Laws.

**2.9 Duties of the Ballot Coordinator**

1. To assist the Elections Council Chair and to be responsible to him/her;

2. To design the ballot and arrange for its printing and any other details which involve the ballot;

3. To ensure a correct count and watch over the ballots whenever they are being officially handled;

4. To arrange for the tallying of the ballots;

5. To assist the other members of the Elections Council when necessary.

6. To carry out such other functions and duties as required under the ASUC Constitution and by-laws.

**2.10 Duties of the Publicity Coordinator**

1. To assist the Elections Council Chair and to be responsible to him/her;

2. To provide extensive publicity of the candidate filing period and election, in such a manner to ensure that all elements of the campus community will receive equal notice;

3. To place a least a two column inch advertisement in <u>The Daily Californian</u> every day that it is published throughout the candidate filing period and during the election, and any additional times s/he deems necessary;

4. To send flyers out to all of the residence halls, cooperatives, fraternities, sororities, academic departments, student activity groups, and anywhere else that s/he deems necessary by the first day of the filing period and the first day of voting;

5. To place posters on campus anywhere s/he deems necessary throughout the filing period and prior to the election;

6. To publicize the Filing Period and the Election to Graduate Students at UC Berkeley, in conjunction with the Graduate Assembly, including publicizing the right of graduate students to participate in the Elections;

7. To provide other such extensive publicity as s/he deems necessary.

8. To provide extensive publicity prior to the election of all polling places, and times that each will be open;

9. To clearly mark all polling places so that they will be easily identifiable;

10. To publish a full statement of any proposed recalls or propositions at least once prior to the election period in The Daily Californian;

11. To provide for the publication of the Voters' Guide;

12. To assist the other members of the Elections Council when necessary;

13. To carry out such other functions and duties as required under the ASUC Constitution and By-Laws.

**2.11 Election Duties of the ASUC Attorney General**

1. To oversee the election;

2. To investigate alleged violations of these by-laws and to prosecute them before the ASUC Judicial Council.

3. To prosecute any case, at his/her discretion, filed by a third party, even in cases where the plaintiff seeks to dismiss the charge:

4. To act as the representative of Elections Council before the ASUC Judicial Council;

5. To oversee the collection and processing of the ballots;

6. To keep all party registration forms;

7. To ensure that all regulations concerning propositions are followed fully;

8. To deliver all propositions to the Elections Council before the Optional Candidates' Meeting;

9. To be in possession of one of the three keys to the ballot boxes as described in Article XVII;

10. To carry out such other functions and duties as required under the ASUC Constitution and by-laws;

## ARTICLE III - MECHANICS OF THE ELECTION

**3.1 Election Dates**

1. In years when the Spring Break occurs any time prior to the Eleventh (11th) week of classes in the Spring Semester, the Regular ASUC Election shall be held on the second Tuesday, Wednesday, and Thursday of following the Spring Break.

2. In years when the Spring Break occurs any time after the Eleventh (11th) week of classes in the Spring Semester, the Regular ASUC Election shall be held on the Tuesday, Wednesday, and Thursday of the Tenth (10th) Week of classes in the Spring Semester.

**3.2 Poll Locations**

During any Regular ASUC Election, polling places shall be located at the following locations;

1. Campus Polls

1. Upper Sproul Plaza

2. Dwinelle Plaza

3. Wurster Hall, West Entrance

4. Evans Hall, East Entrance

5. Plaza/Walkway between Soda and Etcheverry, south side

6. Genetics and Plant Biology Building, South Plaza

7. Lower Campanile Plaza

8. VLSB-LSA South Entrance

9. Boalt Hall, Courtyard

2 Extended Hour Polls

1. Moffitt Undergraduate Library, South Entrance

2. Recreational Sports Facility

3. Residence Hall Polls (Located at the dining commons, or no more than fifty (50) feet away from the perimeter if a polling place absolutely cannot be installed at the dining commons.)

1. Crossroads Dining Facility

2. Unit III Residence Hall Dining Commons

3. Clark Kerr Campus Residence Hall Dining Commons

4. Foothill Residence Hall Dining Commons

5. International House (immediately inside the West Entrance)

6. Albany Village

4. Elections Council shall place the polls so as to avoid congestion and provide easy access to the voter.

5. Polls may be may be moved from the above locations only to the nearest shelter, and only in the case of inclement weather. In such cases, the Poll Coordinator must place signs at the original locations indicating to where the poll has been moved.

6. The locations of the polls shall be well-publicized before and during the election.

**3.3 Polling Hours**

1. Campus Polls shall open at 9 AM and close at 4:10 PM on each day of the Regular ASUC Election.

2. Extended Hour Polls shall be open at 9 AM and close at 10:00 PM on each day of the Regular ASUC Election.

3. Residence Hall Polls shall open at 5 PM or ten minutes before the opening of the dinner period for that dining facility, whichever is earlier. Residence Hall Polls shall close at 8 PM or thirty minutes after the end of the serving time for the dinner period, whichever is later.

4. No person in line to vote at the time the poll closes shall be prevented from voting at that place and time.

**3.4 Conduct at Polls**

1. There shall be no campaign signs, posters, or other literature or any campaigning within one hundred (100) feet of the polling places when the polls are open.

2. There shall be no loitering at the polls.

3. The Elections Council shall provide sufficient ballot boxes at each poll to avoid crushing of ballots.

**3.5 Staffing of the Polls**

1. Each Poll shall have at least two poll workers and one representative of the Neutral Third Party, unless the Poll Coordinators determines that an unbiased pollworker is able to staff the poll himself/herself (with the Neutral Third Party representative).

## ARTICLE IV - VOTERS' GUIDE

**4.1 Purpose**

The Voters' Guide shall provide an opportunity to candidates, parties, proponents and opponents of propositions to express their opinions on the Elections, and for information to be disbursed to the electorate about the ASUC, the voting procedures, and the candidates and propositions.

**4.2 Specifications**

1. The Voters' Guide shall include at least four (4) 27.9 cm x 43.2 cm (11" x 17") pages containing:

2. The following statement shall appear on the cover of the Voters' Guide in 18 point or greater type:

   "Voters Please Note: The endorsements of the Daily Californian represent only the opinions of the Daily Cal Editorial Board, which may not necessarily represent the racial, sexual, and political diversity of the UC Berkeley student body."

3. The Voters' Guide shall include party and candidate statements, the full text of all propositions and constitutional amendments, an explanation of voting procedures, an explanation of how Preferential Proportional Representation works, and a description of the duties of the Senate and Executive Officers.

**4.3 Distribution**

The distribution of the Voters' Guide shall include, but is not limited to, polling locations, living areas (such as Residence Halls, Fraternities and Sororities, Co-Ops, and student populated apartments) and The Daily Californian.

## ARTICLE V - NEUTRAL THIRD PARTIES

### 5.1 Contract With Third Parties

1. In order to ensure the integrity of the elections, the Elections Council shall contract with a neutral third party to observe and assist in ASUC Elections.

2. The Neutral Third Party may be the League of Women Voters, or any professional or volunteer agency which regularly acts as election overseers, provided the organization is approved by a two-thirds (2/3) Vote of the Entire Senate.

### 5.2 Responsibilities of The Neutral Third Party

1. To staff the Polls, one representative per poll;

2. To distribute ballots at the opening and closing of polls, and throughout the day.

3. To supervise the collection of unmarked ballots when the polls close.

4. To supervise the facing and counting of the ballots, and monitoring the ballots until they are locked using the 3-key security system.

5. To attend and assist the pollworker orientation meetings.

6. To be responsible for opening and closing the polls on time, ensuring pollworkers are present, delivering ballots and other equipment to and from polls, making sure that the polls are in good order, and that regulations are followed.

7. To be present at facings and counting of ballots.

8. To meet any ASUC constitutional provisions, by-laws provisions, or other rules and regulations related to running of the polls.

## ARTICLE VI - PARTY STATUS

### 6.1 Definition of Party

A Party is any group of two or more persons who mutually agree to use the same party name.

### 6.2 Party Signatory

A Party Signatory is any person who has become a Party Signatory through the procedures stated herein. A Party Signatory has the power to act on behalf of the party, and has delegated authority as an agent for all members of that party.

### 6.3 Creation of a New Party

Any student who wishes to create a new party can become the Party Signatory of that party by being the first person to do one of the following.

1. Submit in person to the Attorney General, a written Party Registration Form. One copy of this form will be kept with the Attorney General, and a second copy must be made available to the registrant upon request.

2. Submit to the ASUC Senate a written Party Registration Form Upon receipt of this form, the chair shall announce receipt of the form which will then be entered into the minutes.

**6.4 Transfer of Signatory**

If a Party Signatory of a party wishes to transfer the Party Signatory to another member of the party, s/he may do so by doing one of the following:

1. Submit in person to the Attorney General, a written Transfer of Party Signatory Form for the party. One copy of this form will be kept with the Attorney General, and a second copy must be made available to the registrant upon request; or

2. Submit to the ASUC Senate a written Transfer of Party Signatory Form for the party. Upon receipt of this form, the chair shall announce receipt of the form which will then be entered into the minutes.

**6.5 Preservation of Party Name**

1. To preserve the name of a party, the Party Signatory must do one of the following prior to the end of the Fall Semester of each year:

    a. Submit in person to the Attorney General, a written Party Registration Form. One copy of this form will be kept with the Attorney General, and a second copy must be made available to the registrant upon request; or

    b. Submit to the ASUC Senate a written Party Registration Form. Upon receipt of this form, the chair shall announce receipt of the form which will then be entered into the minutes.

2. If the Party Signatory fails to reregister the party by the end of the Fall Semester, and there are no ASUC elected officers affiliated with the party, then the party is considered to no longer exist, and the party name may be claimed as a new party as outlined in this article.

3. If the Party Signatory fails to reregister the party by the end of the Fall Semester and there are ASUC elected official affiliated with the party, the Attorney General shall announce at the first ASUC Senate meeting of the Spring Semester that the party has not registered, and any elected officers affiliated with that party shall have the opportunity to become Party Signatory by submitting to the Senate a written Party Registration Form. Upon receipt of this form, the chair shall announce receipt of the form which will then be entered into the minutes. If none of the ASUC elected officers affiliated with the party becomes signatory of the party by the end of the meeting, then the party is considered to no longer exist, and the party name may be claimed as a new party as outlined in this article.

**6.6 Similarity of Party Names**

If Attorney General determines that the names of two parties are similar enough to confuse the voters, the party name registered at the earliest date shall retain the name, and the other party shall choose another.

**6.7 Restriction on Party Names**

1. No party may include as a part of its name, the name of, or reference to, any student, faculty, or staff of UC Berkeley without presenting the express written permission of that person, nor may it include, or reference, the name of any registered student group or organization without the permission of at least two signatories of that group. This item shall not be constructed to protect a group whose formation post-dates that of an accused party.

2. Furthermore, in the case of parties based on incidental grouping, including, but not limited to, a Residence Hall, or Academic Department, a signatory may be compelled to relinquish his or her control of the party if it can be shown before the Judicial Council that the party does not exist at the behest of the two or more members of that grouping. The intent of this clause is to prevent "Party hijacking," or the registration of a party name by an outside person or group, in order to prevent a constituency from effectively organizing a party.

3. The Judicial Council shall be empowered to deliver the remedy described in 6.7.2.

4. In the event that a person is compelled to relinquish his or her status as party signatory by this process, the party in question shall cease to exist, and the party name may be claimed as a new party, as outlined in this article.

**6.8 Party Registration and Transfer of Party Signatory Forms**

1. The Party Registration Form shall include the party name, the date submitted, the name and signature of the Party Signatory, and the signature of the Attorney General or Chair of the ASUC Senate (whichever receives the form).

2 The Transfer of Party Signatory Form shall include the party name, the date submitted, the names and signatures of the old and new Party Signatories, and the signature of the Attorney General or Chair of the ASUC Senate (whichever receives the form).

3. The Attorney General shall create Party Registration and Transfer of Party Signatory Forms these forms and make them available to the public, provided that any form containing the required information shall be valid for the purposes of this Article.

**6.9 Party Filing Requirements**

1. In order for a party to file candidates for an election, the Party Signatory must attend the Candidate's Meeting , and the party must pay a filing fee of $20 at the Candidate's Meeting. The Party Signatory may delegate another person to act on behalf of the party.

2. The Party Signatory, or his/her agent, must also complete a Party Filing Form, designed by the Assistant Elections Chair, which shall contain the following information:

    a. The name of the party

    b. Names and contact information for two (2) persons authorized to act on behalf of the party. One of these must be the Party Signatory.

    c. The names of all candidates authorized to run with the party for that election.

3. If a party has not filed with the Elections Council by the Point of No Return in the Candidates' Meeting, then all candidates for that party shall be reclassified as independents.

4. A party may file only one candidate for each executive office.

## ARTICLE VII - CANDIDATES

**7.1 Eligibility**

1. Each candidate must meet the requirements of eligibility for the office for which they are running as stated in the ASUC Constitution.

2. The Elections Council shall verify the student status of each candidate, pursuant to Title VI (Student Status) of the ASUC by-laws.

3. All candidates declared ineligible to run shall be notified by the Elections Council.

**7.2 Candidate Name**

1. A candidate must use his/her name as registered with UC Berkeley, or a shortened version of their registered name, on the ballot.

2. A candidate may have an additional name of no longer than 17 characters in length printed in quotations along with their registered name on the ballot

3. A candidate seeking an office that s/he currently holds may have the term "Incumbent" printed in parentheses along with their registered name on the ballot.

4. A candidate that currently holds an ASUC Elected Office other than the office s/he is seeking may have the name of that office printed in parentheses along with their registered name on the ballot.

5. No candidate may include as a part of his/her name, the name or, or reference to, any student, faculty, or staff of UC Berkeley without presenting the expressed permission of that person in writing to the Election Council by the Point of No Return during the Candidates' Meeting.

6. The Assistant Elections Chair shall verify the validity and legality of all candidate names, as submitted on the filling form by the candidates, and shall inform all affected candidates of any problems or inconsistencies. This shall be done, as far as possible, prior to the Point of No Return, in order to permit corrections. Invalid, illegal, or otherwise misrepresented information discovered after that point shall be subject to the remedies outlined in 13.2.2.

**7.3 Filing**

1. The Filing Period for candidates shall open at 9 AM on the fifth Monday before voting begins(excluding Spring Break),. The Filing Period for candidates shall close at 5 PM on the second Friday of after the Filing Period opens (excluding Spring Break).

2. Candidates for all positions must indicate their desire to run by completing an official Candidate Filing Form during the Filing Period. The Candidate Registration Form shall be provided by the Elections Council and made available to the public.

3. Each candidate must pay a filing fee of $5.00 per candidate, per office, not to be returned unless declared ineligible to run for office, the election is canceled before the results are confirmed, or the candidate withdraws before the Candidate's Meeting. This payment shall be made at the time that the candidate files his/her Candidate Filing Form.

4. Candidate Filing Forms and Party Filing forms must be filed with a representative of the Council.

5. A candidate may withdraw from the election at any time.

6. Party name, candidate order, and endorsements shall not be changed after the close of the Candidates' Meeting, and no candidates shall be added to any party.

**7.4 Candidate Filing Form**

Each candidate shall file a Candidate Filing Form with the Elections Council during the Filing Period. The

Candidate Filing Form shall include;

1. The Candidates name as it appears on their UC Berkeley Student Identification, and their name as it is to appear on the ballot;

2. The Office the Candidate is seeking;

3. The Candidate's Party (if any);

4. Contact information of the candidate;

5. A statement signed by the candidate that he/she is responsible for all information contained in the Election by-laws and the information that will be presented at the Candidate's Meeting.

## ARTICLE VIII - PROPOSITIONS

### 8.1 Definitions

1. Proposition

   A Proposition is any Initiative as described in Article IX and/or Referenda as described in Article X which will be placed before the student body in an ASUC election. A Proposition may be a Constitutional Amendment, creation of a by-law, Student Fee Question, a statement of position of the Student Body, or any other poll that is binding or non-binding on the ASUC or any of its constituent parts.

2. Primary Proponent(s) of a Proposition

   A Primary Proponent of a proposition is any student that submits an Initiative to the Attorney General for circulation, or submits the Initiative Petition to the ASUC Senate, or a sponsor of legislation in the ASUC Senate or Graduate Assembly which places a proposition on the ASUC Election Ballot. The Primary Proponent(s) of any proposition is responsible for the conduct of the campaign in support of the Proposition.

3. Proponent of a Proposition

   A Proponent of a Proposition is any person, including the Primary Proponent(s) of a Proposition, who acts in support of a Proposition by delegation, either explicitly or implicitly, of one or more of the Primary Proponents of that Proposition. This shall include any person who circulates or attempts to circulate an Initiative Petition. This shall not be construed as to include individuals who act in support of a Proposition independently and without the knowledge of the Primary Proponent(s).

4. Primary Opponent(s) of a Proposition

   After the verification of an initiative petition or referendum or the passage of any legislation placing a proposition on a ballot, the Attorney General shall inform the following individuals, in the following order, that they may claim the role of Primary Opponent.

   1. The President

   2. All other ASUC Elected Officers

3. Any signatory of an ASUC sponsored student group

4. Any registered student

The Primary Opponent may then submit to the Elections Council a statement for the Voters Guide, and submit to the Attorney General a statement acknowledging that s/he is responsible for the conduct of the campaign in opposition to the Proposition.

5. Opponent of a Proposition

An Opponent of a Proposition is any person, including the Primary Opponent(s) who acts in opposition to a Proposition by delegation, either explicitly or implicitly, of one or more of the Primary Opponents of that Proposition. This shall not be construed as to include individuals who act in opposition to a Proposition independently and without the knowledge of the Primary Opponent(s).

**8.2 Date of Voting**

The vote on an initiative, referendum, or amendment shall take place at the next regular election following receipt of the petition or vote of the Senate (or Graduate Assembly, as provided herein), provided that the date of receipt or Senate (or Graduate Assembly) vote is before the end of the candidate filing period for that election; otherwise, the vote shall take place at the second regular election thereafter.

**8.3 Proposition Statement Requirements**

The statement of each proposition must be at most two (2) sentences in length. The First sentence may state the issue to be voted on in an unbiased manner. The last sentence shall be a neutrally worded question to which an answer of "yes" or "no" is appropriate.

**8.4 Notification of the Elections Council**

It shall be the responsibility of the Attorney General to provide all of the propositions for each election to the Elections Council before the optional Candidates Meeting.

**8.5 Required Votes for Propositions**

Unless otherwise stated in the Constitution, by-laws, (or in the case of Student Fee Questions, applicable University Policies), a favorable vote of a majority of the votes cast for and against the proposition shall be necessary for adoption of the proposition.

**8.6 Positions Changed by Constitutional Amendment**

1. In the case where a constitutional amendment will delete an elected position and create a different one with substantially the same duties, a person elected to the old position shall be considered elected to the new position if the constitutional amendment passes.

2. The Elections Council shall indicate that such a case exists by titling the position, on the ballot and in its other literature, with a juxtaposition of old and new titles (e.g. "Officer Title X/Officer Title Y").

## ARTICLE IX - INITIATIVE

**9.1 Power of Initiative**

Upon the presentation to the Senate of a petition signed by at least one thousand (1,000) students, any questions may be submitted to a vote of the students of University of California at Berkeley, as set out in these By-Laws.

**9.2 Submission of Initiative to Attorney General**

1. Prior to circulating any petition for an initiative, the Proponent(s) shall submit to the Attorney General the proposed question. If the initiative is a Constitutional Amendment or creates a by-law, the Proponent(s) shall also submit the Amendment or by-law to the Attorney General.

2. The Proponent(s) shall submit a statement to the Attorney General that s/he is the Primary Proponent of the Initiative, and is responsible for the conduct of the campaign in support of the Initiative.

3. The Attorney General shall certify that the question is an impartial and accurate description of the proposal, and shall assign the Initiative an Official Name. If the Initiative is a Constitutional Amendment or creates a by-law, the Attorney General shall prepare an Official Summary of the Initiative. The Attorney General shall confer with the Chancellor or his/her designee for approval of language on questions of student fees.

4. The Attorney General shall create the Initiative Petition and return to the Primary Proponent three (3) copies of the Initiative Petition.

5. The Attorney General shall be available to assist any student interested in writing a proposition.

**9.3 Initiative Petitions**

1. The Initiative Petition shall contain the full title and statement of the proposition as it is to appear on the ballot on each page on which signatures are to appear.

2. If the Initiative is a Constitutional Amendment or creates a by-law, the Initiative Petition shall contain the Official Summary of the Initiative on each page on which signatures are to appear, in Roman type not smaller than 12-point.

3. The Initiative Petition must have room for the signature of each petition signer, his/her printed name, and UC Berkeley Student Identification Number. Signature spaces must be consecutively numbered commencing with the number 1 for each page.

4. Attached to each page of the Initiative Petition on which signatures are to appear shall be any other material not in the text of the proposition which is directly relevant to the proposition.

**9.4 Circulation of Initiative Petition**

1. The Initiative Petition may be circulated by many different people carrying separate, identical Sections.

2. Initiative Petitions may be circulated only by registered UCB students

3. Each petition circulator who obtains signatures must complete a declaration attached to the Initiative Petition stating:

    a. That s/he is a registered UC Berkeley Student;

    b. That the circulator witnessed the appended signatures being written;

c. That to the best of his/her information and belief, each signature is the genuine signature of the person whose name it purports to be.

d. The printed name, address, and telephone number of the circulator soliciting the signatures.

4. If any information given under this statement is false, the entire Section of the Initiative Petition shall not be used.

**9.5 Petition Signatures**

1. Each signer must personally place on the petition his/her signature, printed name, and UC Berkeley Student Identification Number.

2. None of the above may be preprinted on the Initiative Petition. Any signature line which is not legible or complete shall not be counted.

3. Each signer may sign an Initiative Petition only once.

**9.6 Presentation to the Senate**

1. An Initiative Petition shall be considered presented to the Senate and received when it has been both physically presented to either the Attorney General, the Executive Vice President (or the then current Chair of the Senate), or one of their representatives; and its receipt has been announced into the minutes during a Senate meeting.

2. To prevent unauthorized petitions from circulating and unauthorized persons from filing petitions, only the Primary Proponent(s) of an initiative, and persons authorized in writing by one or more of the Primary Proponent(s), may submit Initiative Petitions to the Senate. Any other petitions submitted will be disregarded by the Attorney General.

3. Once submitted, petitions may not be amended except by order of the Judicial Council.

**9.7 Verification of the Petition**

1. The Attorney General and the Ballot Coordinator shall verify that there are a sufficient number of valid signatures on each petition, by checking the student status of each person who signed the petition. Any signatures or pages of signatures not in compliance with this Article shall not be counted towards the 1,000 signature minimum necessary for qualification.

2. If the verifying official discovers that the Initiative Petition submitted lacks 1,000 signatures, the Attorney General shall immediately notify the Primary Proponent(s) and no further action is taken on the Initiative.

3. The Elections Council must preserve the Initiative Petition for the same time period as the Elections Council preserves the ballots for the election for which the Initiative qualified or attempted to qualify for placement on the ballot.

4. If an Initiative Petition has not been verified in time for the Candidates' Meeting, the Initiative shall be treated as valid until the verification is complete.

## ARTICLE X - REFERENDA

**10.1 Power of Referenda**

By a majority vote of the entire Senate, any questions (except a Constitutional Amendment, which pursuant to the Constitution requires a two-thirds vote of the entire Senate) may be submitted to a vote of the students of University of California at Berkeley, as set out in these by-laws.

**10.2 Graduate Assembly Referenda**

By a vote of the Delegates of the Graduate Assembly, any questions may be submitted to be voted on only by graduate and professional students, as set out in these by-laws.

**10.3 Submission to Attorney General**

Prior to adoption by the Senate or the Graduate Assembly, the Attorney General shall certify that the question is an impartial and accurate description of the proposal, and shall assign the Referendum an Official Name. If the Initiative is a Constitutional Amendment or creates a by-law, the Attorney General shall prepare an Official Summary of the Referendum. The Attorney General shall confer with the Chancellor or his/her designee for approval of language on questions of student fees.

## ARTICLE XI - THE INFORMAL SESSION

**11.1** The Elections Council shall hold an optional, non-committal, Informational Session in the three weeks preceding the closing of the Filing Period. The time, location, and agenda of this meeting shall be placed in the Senate Agenda packet of the week prior to its occurrence.

**11.2** Function of the Informational Session:

1. To acquaint all students with the basic structure, functions, and authority of the ASUC;
2. To acquaint students with the culture of the ASUC elections process;
3. To acquaint students with the currently registered student political parties;
4. To answer any and all of the questions students may have about the ASUC and how to become involved within it.

## ARTICLE XII - THE CANDIDATES MEETING

**12.1** The Assistant Elections Council Chair shall hold an optional Candidates Meeting on the first Tuesday of classes following the end of the Filing Period. All candidates are responsible for all information that is disseminated at the meeting. The time, location, and agenda of this meeting shall be placed in the Senate Agenda packet of the week prior to its occurrence.

**12.2 Function of the Candidates Meeting**

1. To acquaint all candidates with the basic structure, functions, and authority of the ASUC and of the Election by-laws;
2. To discuss problems which have arisen in past elections;
3. To discuss ASUC Judicial Council decisions regarding elections;
4. To discuss the administrative details of the election;

5. To arrange the candidate and party names in the order in which they shall appear on the ballot;

6. To explain requirements for each candidate and party statement for the Voter's Guide.

7. To determine which candidates may have endorsements after their names. The only endorsements which shall be allowed are party names, and designation of "Incumbent" or other ASUC office which the Candidate holds.

### 12.3 The Point of No Return

The Point of No Return shall be the point in time immediately preceding the arrangement of the ballot, per 12.2.5. The Assistant Elections Chair, or the person running the Candidates' Meeting, shall announce the approach of the Point of No Return fifteen (15) minutes prior to the arrangement of the ballot. There shall then follow a fifteen (15) minute recess of the Candidates' Meeting, during which last minute changes may be made.

## ARTICLE XIII - CAMPAIGN RULES

**13.1 The purpose of this section is to hold candidates, parties, and propositions responsible for malicious assault on the most fundamental foundation of democracy, and to define and provide equitable remedy for the same. Any person, party, candidate, proponent, or opponent of a proposition found before the ASUC Judicial Council to have committed a malicious assault on the most fundamental foundation of democracy through the following act shall be disqualified from the election and made ineligible to run in any race in any future ASUC election:**

1. Interfering with the proper tallying of votes.

**13.2 The purpose of the following section is to hold candidates, parties, and propositions responsible for serious ethical breaches which threaten the validity of the ASUC's commitment to fairness, democracy, and the legal institutions empowered to protect that democracy, as well as to define and provide equitable remedy for the same. For this reason, any person, party, candidate, proponent or opponent of a proposition found before the ASUC Judicial Council to have committed the serious ethical breaches stated in this section through the following acts shall be disqualified from all races in the election:**

1. Willfully violating a lawful order from the ASUC Judicial Council or Elections Council;

2. Intentionally falsifying information on any Elections Council forms, or in the Voters' Guide;

3. Refusing to appear before the ASUC Judicial Council, if subpoenaed by the Council; the candidate shall be exempt from appearing before the Council if he/she can show a valid medical excuse, out of town commitment, death in the family, employment obligations, or exam/paper due 24 hours following the case. It shall be the Judicial Council's obligation to ascertain the validity of any claim as to the above.

4. Registering fictitious or bogus party names similar to those already in existence, with the intent to create confusion.

5. Receiving five (5) or more censures from the Judicial Council for the same ASUC election;

6. Purchasing paid political advertising, or soliciting unpaid political advertising, in an ASUC-Sponsored Publication.

7. Using ASUC authority, facilities, funds, or resources, including Eshleman Hall, for campaign

purposes, including for long term or bulk storage of campaign materials.

8. Knowingly and actively campaigning within 100 feet of the polls, provided that the polls are properly marked off.

9. Badgering or threatening witnesses subpoenaed for a Judicial Council hearing or Judicial Council members themselves.

10 Obstructing an investigation by the Elections Council or the Attorney General

11. Exceeding the campaign finance spending limits as defined in Article XIX of these By-laws.

12. Interfering with the publication and/or distribution of any publication distributed on campus.

13. Placing literature in University Residence Hall mailboxes unless it bears the full name and address of the recipient.

14. Systematically, repetitiously and/or willfully sliding unsolicited literature under the door of any University Residence Hall resident.

**13.3 The purpose of the following section is to hold candidates, parties, and propositions responsible for interfering with the mission of the ASUC, and for threatening the safety of the campus, and to define and provide equitable remedy for the same. For this reason, any person, party, candidate, proponent or opponent of a proposition found before the ASUC Judicial Council to have interfered with the mission of the ASUC or threatened the safety of the campus through the following acts shall be assessed three (3) to two (2) censures:**

1. Systematically or repetitiously and willfully destroying, defacing, covering, moving or removing from their places, posters, signs, banners, leaflets or flyers of ASUC groups or business operations (such as The Underground, the Store, etc.) which bring revenue to the ASUC.

2. Systematically or repetitiously and willfully destroying, defacing, covering, moving or removing from their places, posters, signs, banners, leaflets or flyers which advertise functions, meetings, events, or existence of ASUC sponsored student groups and publications.

3. Persistently blocking any entrance or tight space, or otherwise significantly restricting the flow of vehicular or pedestrian traffic on campus;

**The lesser penalty of two (2) censures shall be assessed only where the Judicial Council determines that an unfair advantage has been gained, but malice and intent are not factors.**

**13.4 The purpose of the following section is to hold candidates, parties, and propositions responsible for violations of important legal protocols which transcend the internal processes of the ASUC, and to define and provide equitable remedy for the same. For this reason, any person, party, candidate, proponent or opponent of a proposition found before the ASUC Judicial Council to have committed violations of important legal protocols through the following acts shall be assessed two (2) to one (1) censure(s):**

1. Filing malicious, frivolous, or bad faith charges against any candidate or party. If another candidate engages a third party to file such charges, both parties shall be held responsible;

2. Committing, according to established legal standards, libel or slander against another candidate or party;

3. Using e-mail lists or posting boards to campaign, with spam, which is defined as e-mail that does

not meet any of the following conditions:

a. The author has a pre-existing relationship with the recipient(s);

b. The author has permission from the leadership of the organization;

c. The author is a member of the organization.

4. Claiming an endorsement of an individual, group, or party without his/her/its consent. Candidates should,'but are not required, to obtain endorsements in writing.

**The lesser penalty of one (1) censure shall be assessed only where the Judicial Council determines that an unfair advantage has been gained, but malice and intent are not factors.**

**13.5 The purpose of the following section is to hold candidates, parties, and propositions responsible for violations of ASUC Elections Protocol and of University Guidelines, and to provide equitable remedy for the same. For this reason, any person, party, candidate, proponent or opponent of a proposition found before the ASUC Judicial Council to have committed violations of ASUC Elections Protocol and of University Guidelines through the following acts shall be assessed exactly one (1) censure:**

1. Posting campaign literature of any candidate or party on restricted bulletin boards or any structured or natural feature of the campus such as (but not limited to) doors, windows, buildings, surfaces of walkways or roads, Sather Gate, fountains, posts, waste receptacles, fences, or trees. This by-law does not limit posting on campus public access bulletin boards and kiosks, or in areas in which the proper permission has been obtained such as Residence Hall room doors and windows with the resident's permission.

2. Failing to file two (2) copies of all campaign material with the ASUC Elections Council, or in the event that an actual copy can not be submitted, (1) picture of each campaign material, within twenty-four (24) hours of dissemination. The intent of the requirement to turn in copies of campaign material is to make sure that in the event of a Judicial Council case, there will be a record of all relevant literature;

3. Using the Sather Gate or Sather Bridge area to attach, lean, or store campaign related materials;

4. Attaching or leaning sandwich boards, picket signs, or other displays against campus vertical features including but not limited to buildings, doors, fountains, posts and fences, waste receptacles, and trees. This shall no be construed to prohibit the following displays, so long as they are attended by a person within six (6) feet of the display: attended displays where the material is upside-down, boxed, or out of public view, including upside-down pickets and candidate/party "bases" on upper Sproul Plaza; free-standing displays attended by a person or a group or people; and displays touching the ground but attended by a person or a group of people.

5. Willfully placing campaign material in any University building, including classrooms, libraries, and on chalkboards, but excluding the posting of campaign material on public access bulletin boards and kiosks within University Buildings.

6. Failing to attend and participate in the Mandatory Clean-up day that shall be established by the Elections Council on the Saturday following the election.

7. Claiming endorsements without bearing the disclaimer, "Titles for Identification Purposes Only" in the same size font as the majority of the text of the endorsements is written;

8. Failing to turn in Campaign Finance receipts, as required by Article XIX.

9. Interfering with, or campaigning within ten (10) feet of any official Elections Council sandwich boards or banners;

10. Unintentionally falsifying information on any Elections Council forms or in the Voters' Guide.

11. Placing any campaign literature on University Property within the grounds of a Residence Hall. This shall include, but not be limited to, indoor and outdoor walls, waste receptacles, trees, public bulletin boards, and any other space where public posting is prohibited by the Guide to Student Living. This item shall not prohibit the posting of literature inside rooms, including on windows, or on personal bulletin boards, provided in either case that the permission of the affected resident is obtained.

12. Engaging in any campaign solicitation in any dormitory under the jurisdiction of Residential Family Living that would be prohibited as stated in the Guide to Student Living as if it were a commercial solicitation.

### 13.6 Temporary Rules

Temporary rules may be implemented by the Elections Council Chair where an urgent situation necessitates temporary additions, amendments, or a suspension of a portion of these by-laws, provided all candidates are affected equally. A Temporary Rule shall not take effect until approved by a majority vote of the ASUC Judicial Council with at least three (3) members present. These rules must be posted in a designated area of Eshleman Hall so that all candidates have access to them.

### 13.7 Conduct of Campaign

1. All candidates of a party shall be considered equally guilty of a Campaign Rules Violation by an agent of the party acting within the scope of his/her delegated authority.

2. A candidate, but not his/her party, shall be considered guilty of a violation of the Campaign Rules by an agent of that candidate acting within the scope of his/her delegated authority.

3. A candidate or party may deny the action of any individual who violated the Campaign Rules in favor of some candidate, party, or group by denying said violator is his/her agent within twenty-four (24) hours after the violation has been discovered and reported by the Elections Council to the party chair or candidate. This shall be done either in written form or verbally to the Elections Council.

4. It is the intent of this section to hold a candidate or party responsible for violations committed by his/her/their agents if those agents are involved in that general area of the campaign.

5. If any Proponent of a Proposition is found to have violated the By-Laws, the Proposition shall be assessed the corresponding sanction, up to and including the disqualification of the Proposition.

### 13.8 Public Posting of Charges and Responsibility for Correcting Violations

Charge sheets, Judicial Council decisions, and out-of-court settlements related to violations of these Elections By-Laws shall be posted in a designated public location in first floor lobby of Eshleman Hall. Candidates, parties, and all others cited shall be notified by the Attorney General, and are responsible for correcting all violations, if possible to correct, immediately upon notification.

## ARTICLE XIV - ASUC JUDICIAL COUNCIL

### 14.1 Jurisdiction

The ASUC Judicial Council shall have sole jurisdiction in all cases arising under these by-laws.

**14.2 Sanctions**

The ASUC Judicial Council shall be empowered to impose the sanctions specified for violation of the Campaign Rules in these by-laws.

**14.3 Contempt of Court**

The ASUC Judicial Council shall be empowered to impose sanctions without trial in the event of a Campaign Rules violation where the Judicial Council would, in effect, otherwise be plaintiffs, or witnesses for the plaintiff. Items under which this section may be invoked are limited to 13.2.1, 13.2.3, and 13.2.5.

**14.4 Settling Out of Council**

For a violation of a by-law in Article XIII, a sanction can be imposed by mutual written agreement of the Attorney General, the Elections Council Chair, and the individual or party being charged rather than having a Judicial Council hearing. The agreement must contain a waiver preventing any of the signatories or parties they represent from bringing the case before Judicial Council in the future. Any such agreement must be accompanied by a written explanation of the circumstances surrounding the violation and must be approved by a majority vote of the Judicial Council with at least three (3) members present.

**14.5 Statute of Limitations**

1. Sanctions may be assessed against an individual for violating these by-laws at any time, whether the individual has filed for candidacy yet or not. Any sanctions imposed shall be accumulated only until the regularly scheduled ASUC election of that year.

2. The Senate may amend these by-laws at any time during the year. It is the responsibility of the campaigner to obtain the current rules and procedures for campaigning.

3. No amendment to Article XII (Campaign Rules) of these by-laws approved after the Candidates Meeting shall take effect until after the Regular ASUC Election for that Semester.

**14.6** All ASUC Officers shall be obliged ex-officio to answer subpoenas issued by Judicial Council or shall be barred from running in future elections. This stipulation shall apply to any case arising under their term in office. The officer subpoenaed shall be exempt from appearing before the Council if s/he can show a valid medical excuse, out-of-town commitment, death in family, employment obligations or exam/paper due 24 hours following the case. It shall be the Judicial Council's obligation to ascertain the validity of any claim as to the above.

## ARTICLE XV - THE BALLOT

**15.1 Executive Offices**

1. The candidate's party affiliations shall follow his/her name on the ballot.

2. The determination of the order in which the candidate names shall appear on the ballot shall be made as follows:

   a. The roll of all candidates running for office shall be called in any order determined by the Chair.

b. Each name shall then be read separately and a number drawn at random from a container. This number shall be read aloud and recorded by an Elections Council member.

c. Half of the ballots will be printed according to this order, and the other half of the ballots shall have the order of the candidates reversed.

**15.2 Senate Offices**

1. Ballot positions for each party and for independents shall be allocated vertically down the ballot. The order of the names on the ballot shall be arranged vertically down the ballot, with the first ballot position being placed in the top left-hand position. Further positions shall be allocated vertically until the left-column is filled. The second column shall then be filled in a similar manner. The third column shall also be completed in a similar manner.

2. If the number of names allows, space shall be left between the independent candidates and the first party, and between each party.

3. The determination of the order in which the candidate names shall appear on the ballot shall be made for the Senate candidates as follows:

    a. The roll of each party running candidates for Senate shall be called in any order as determined by the Elections Council Chair.

    b. Each party name shall be read separately and a number corresponding to its ballot position shall be drawn at random from a container; this number shall be read aloud and recorded by an Elections Council member. Independents shall receive top ballot position.

    c. The roll of the candidates running independent shall be called in any order determined by the Chair.

    d. Each independent candidate's name shall be read separately and a number corresponding to his/her ballot position shall be drawn at random from a container; this number shall be read aloud and recorded by an Elections Council member.

    e. The order in which the senate candidates' names shall appear within a party shall be determined by the signatory of the party.

    f. Half of the ballots will be printed according to this order, and the other half of the ballots shall have the order of the party reversed and the candidates within each party shall also be reversed.

**15.3 Form of Ballot**

1. A form of ballot shall be provided which allows voters to list candidates in each race in order of preference. The Ballot shall allow the voter to list twenty (20) candidates for each race, or the total number of candidates, whichever is less.

## ARTICLE XVI - TALLYING OF VOTES

**16.1 Ballot Tabulation**

1. Ballot tabulation shall not commence before the expiration of the Statute of Limitations and the close of all pending election cases before Judicial Council. This section does not prohibit the filing of new charges by the Election Council or Attorney General for Campaign Violations

occurring after the commencement of ballot tabulation.

2. The ballot tabulation shall be supervised by the Elections Council Chair and the Attorney General or their representatives.

3. The results of the elections shall be released by the Elections Council Chair and the Attorney General of the ASUC as soon as possible after the final tabulation. The results shall be posted on the ground floor doors of Eshleman Hall as well as in other relevant places so that all persons shall have access to these results.

4. The election results, as certified by the Elections Council, shall become effective by their being read into the Minutes of a Senate Meeting following their certification by the Judicial Council.

### 16.2 Handling of Incomplete and Invalid Votes

1. A vote shall be declared invalid, and excluded from the counting in a particular race, only if there is not one distinguishable preference, determined according to this section, including if the ballot is blank, either in whole or for the particular race. The invalidity of a vote in one race shall not affect its validity in another race.

2. Valid, but incomplete, ballots shall be dropped from further consideration in the counting procedure at the point where all or part of the vote's value must be allocated to its next preference, and there is not further distinguishable preference level.

3. If preferences are skipped on a ballot, lower preferences shall be raised to close the gap. Thus, for a ballot with a first and third but no second preference, the candidate listed as the third preference shall be counted as the second preference.

4. If a particular preference has been assigned to more than one candidate, that preference shall not be counted and shall be treated as skipped preference by the procedure described above.

### 16.3 Majority Vote (The Alternative Vote)

1. The Alternative Vote shall be used for the election of Executive Officers.

2. In this method of election, a value of one (1) vote is assigned to the voter's first preference. A candidate is declared elected when his/her vote total is at least a majority of the valid votes. If a voter's preference is on a candidate with the lowest accrued vote total, and no one has been elected, his/her vote is transferred with full value to the next preferred candidate still in the running.

### 16.4 Tallying the Alternative Vote

1. Each voter's first preference candidate receives one (1) vote.

2. Quota of votes needed to win is

   $$(N+1)/2$$

   Where N is the number of valid first preference votes.

3. If, after all the votes have been transferred, a candidate achieves the quota, s/he is then elected to that office.

4. If, after all the votes have been transferred, no candidate achieves the quota, each candidate with

the least number of votes is eliminated, and s/he shall be ineligible to receive any additional votes.

5. Each vote that belonged to the eliminated candidate(s) transferred to the voter's next preference at full value.

6. If this candidate is one who was previously eliminated, Step 5 is repeated.

7. If the voter has not listed an additional preference or was unable to do so, his/her new vote is exhausted.

8. Steps 3 through 7 are repeated until a candidate achieves quota and is elected.

**16.5 Preferential Proportional Representation (The Single Transferable Vote)**

1. Preferential Proportional Representation shall be used to elect representatives to sit on the Senate, or any other board or council that elects two or more members from the same constituency in any one election.

2. In this method of election, a value of one is assigned to the voter's first preference. The quota for election is the smallest number of votes necessary to elect the required number of candidates. A candidate is elected to a seat if all votes have been transferred and s/he has accrued at least a quota of votes. If the voter's current preference is for a candidate who thus receives more than the quota of votes, the surplus value of his/her vote shall be transferred to his/her next eligible preference. If a voter's current preference is for a candidate eliminated or already elected, the current value of the vote shall be transferred to the voter's next eligible preference.

**16.6 Tallying The Single Transferable Vote**

1. Each voter's first preference candidate receives one (1) vote.

2. Quota of votes needed to win is

$$(N/(S+1))+1$$

where N is the number of valid first preference votes and S is the total number of seats needed to be filled in the election (fractional votes are dropped).

3. If, after all the votes have been transferred, a candidate achieves the quota, then

    a. S/he is elected to a seat and is ineligible to receive any additional votes.

    b. His/her votes are transferred to the voter's next preference at a value of

    $$V(C-Q)/C$$

    where V is the value of the vote when the candidate was elected, C is the candidate's vote-total when elected, and Q is quota.

4. If, after all the votes have been transferred, no candidate achieves the quota, then

    a. Each candidate with the least vote-total is eliminated, and s/he is ineligible to receive any additional votes.

    b. Each voter's vote (which was cast for these candidates) remains at its present value.

5. Each vote that belonged to the eliminated or elected candidate(s) is transferred to the voter's next preference at its present value.

   a. If this candidate is one who was previously eliminated or elected, Step 5 is repeated.

   b. If the voter has not listed any additional preference or was unable to do so, his/her ballot is exhausted.

6. Steps 3 through 5 repeated until

   a. All of the seats are filled by election; or,

   b. At the end of Step 4, if the number of eligible candidates is equal to or less than the number of unfilled seats, then these candidates are elected.

**16.7 Tallying of Ballot Propositions**

The "Yes" and "No" votes for Each Proposition shall be counted.

## ARTICLE XVII - QUALIFICATIONS AND CONDUCT OF VOTERS

**17.1 Eligibility of Voters**

Each member of the ASUC who can sign into the ASUC Elections computer program, present his/her validated UCB photo identification or proof of current class registration and one piece of photo identification, is eligible to vote. Substitute or temporary photo identification cards issued by the Registrar's Office shall be accepted for voting.

**17.2 Voting Procedures**

1. Each voter must sign into the ASUC Elections computer program to vote. If they cannot do so, they may fill out a provisional written ballot, upon acceptance of valid identification as stated in IV.17.1 with a Neutral Third Party at a location designated by the Elections Council.

2. No student shall attempt to vote more than once.

**17.3 Notice to Voters**

A notice containing the information in this Article must be displayed at each polling place.

**17.4 Incentives for Voters**

A ten (10) percent discount on items including textbooks shall be given to all persons who vote in the ASUC election. This discount shall be good for the remainder of the semester. The Elections Council Chair shall work with the ASUC Store Operations Board or their designates to develop the format of the discount slip.

## ARTICLE XVIII - SAFEGUARDS AND ELECTION PROTESTS

**18.1 Storage of Ballots**

All ballots, key punch cards, computer printouts, tally sheets, programs, and databases will be held by the Council until the first day of the Filing Period for the following Regular ASUC Election. After such time

all materials, except the computer printouts and tally sheets may be destroyed unless appeal, recount, or reelection is pending, in which cases they shall be held until the dispute is resolved. The computer printouts must be certified by ASUC Judicial Council and kept permanently, as provided for elsewhere in these By-laws.

### 18.2 The Three Lock System

Each ballot box, as well as all other boxes where current ballots are stored, must be locked at all times that the ballots aren't being used by a three lock system. A member of the Neutral Third Party, the Elections Council Chair, and the Attorney General shall possess one of the three keys to the locks. During the elections, none of these officials may surrender the key to their charge to any other person unless they are unable to perform their duties. In that case, the Elections Council Chair may give his/her key to another member of the Elections Council, or the Attorney General's key may be given to a member of the Judicial Council.

### 18.3 Additional Safeguards

1. The Attorney General of the ASUC shall have the privilege of attending or sending a representative to all polls and places where ballots are kept and tabulated, provided such representative is not a candidate in the election.

2. Observers representing various candidates and parties shall be allowed to be present at all handling, counting, and tabulating operations.

3. This privilege includes the right to inspect all equipment and machinery used for collection, transportation, and tabulation or ballots, but not to do so in a way that interferes unduly with the orderly and efficient operation of the Elections Council.

4. When not being officially handled or tabulated, the ballots must be kept in a neutral, safe location at all times.

### 18.4 New Elections

1. Any student may petition the ASUC Judicial Council to void an election, on grounds of the integrity of the Elections Council, its mismanagement of the election, or the mechanism of the count, prior to the expiration of the Statute of Limitations stated in Article 13.4.2.

2. The Judicial Council shall review the case and submit its finding to the Senate.

3. If the ASUC Judicial Council rules that there was mismanagement, or that there was an unpunished violation, the ASUC Judicial Council may void the election on the grounds that the mismanagement or the unpunished violation substantially affected the outcome of the election.

4. The ASUC Judicial Council may not void an election on any other grounds or by any other procedure, as stated in subsection 3, above..

5. Only the ASUC Judicial Council may void an election.

6. If the Judicial Council voids an election, the Senate shall provide for a new election to be held within four (4) full semester weeks, or as soon as it is feasible.

## ARTICLE XIX:
## DEBERNARDO-GALLAGHER-GRAY-HEILIG-HENCHMAN-QUIGLEY-TAM-WAGAMAN

## CAMPAIGN FINANCE BY-LAWS

**19.1 Intent and Definitions**

1. These By-laws are intended to implement the campaign finance constitutional amendment passed in April 2000.

2. Campaign material is defined as material initiated by a party or candidate, with the intent to contact voters publicly, that explicitly speaks, pleads, or argues in favor of the election or defeat of a candidate or party.

3. Further, materials that are controlled by a candidate's campaign and/or party that mention a candidate's name, a candidate's ballot number, and/or the office a candidate is seeking, shall be defined as explicitly speaking, pleading, or arguing in favor of the election of a candidate. Therefore, it will be included in the definition of campaign material.

4. Electronic mail and telephone calls will be assessed a cost of zero.

5. Accordingly, material that only explicitly advocates a non-campaign function of a party or does not advocate any function of a party, shall not be included in the definition of campaign material.

6. News or editorial articles in a publication not run by a candidate/party, not controlled by candidate/party, not receiving a significant portion of their funding from a candidate/party, or not operating under a specific agreement between the publication and a candidate/party, shall not be included in the definition of campaign material.

7. Any material produced by a group or organization not run by a candidate/party, not controlled by a candidate/party, not receiving a significant portion its funding from a candidate/party, or not operating under a specific agreement between the publications and a candidate/party, shall not be included in the definition of campaign material.

8. Material in which a voter initiates contact, such as a Web site, AIM away message, or telephone request for information, shall not be included in the definition of campaign material. Any funds used for the purposes of designing content on a Web site that falls under Article 19.1.2 and 19.1.3 of these By-laws shall be included in the definition of campaign material.

9. Any negative campaigning shall be assessed toward the candidate/party that produced the material.

**19.2 Enforcement**

1. Enforcement of these By-laws shall be the responsibility of the ASUC Elections Council. The Assistant Chair is the chief administrator of campaign finance restrictions. The public has the right to obtain any candidate's spending information, but the information is not required to be widely disseminated by the Elections Council.

2. It shall be the responsibility of the candidate and/or their parties which act in coordination with the candidate to provide two copies of all campaign material to the Elections Council and a receipt for the purchase of said material within twenty-four (24) hours. If unable to provide a receipt, they may indicate so and instead provide an estimate of fair market value. Receipts must be provided beginning with the Candidates' Meeting and thereafter.

3. The Elections Council shall have the responsibility of determining fair market value for any campaign material not accompanied by a receipt. The interpretation of fair market value may be appealed to the Judicial Council.

4. Campaign materials that count as part of a candidate's spending, must have been produced, or authorized, by the candidate and/or parties which act in coordination with the candidate.

5. Any campaign material advocating, by name, office seeking, or ballot number, more than one candidate, shall have its cost divided equally among all candidates listed on the material.

6. The candidates and/or parties involved in the election shall have the responsibility of providing the Elections Council with all documentation and receipts. Receipts must include information on what was purchased and the amount spent.

7. As with any other violation of the ASUC campaign by-laws, the ASUC Attorney General shall be responsible for investigating alleged violations of these by-laws and prosecuting them before the ASUC Judicial Council.

8. All disputes and/or arbitration that arise over these by-laws shall be handled by the Judicial Council.

**19.3 Spending Limits**

1. Executive officer candidates and/or their parties which act in coordination with the candidate are allowed to spend up to $1,000 on their ASUC campaign. Senate candidates and/or their parties which act in coordination with their candidate are allowed to spend up to $200 on their ASUC campaign.

Updated: March 15, 2002 – James M. Gallagher
Verified: March 15, 2002 – Mario T. De Bernardo