Apple Inc. v. Psystar Corporation Doc. 1134

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AXA ROSENBERG GROUP,

Plaintiff(s),

v.

GULF UNDERWRITERS,

Defendant(s).

______________________________________/

No. C-04-0415 JCS

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION TO STRIKE [Docket Nos. 18, 28, 36]**

## I. INTRODUCTION

On Friday, May 28, 2004, the following motions came on for hearing: 1) Plaintiff Axa Rosenberg's Motion for Partial Summary Judgment Re: Coverage and Allocation ("Plaintiff's Motion"); 2) Defendant's Cross-Motion for Summary Judgment ("Defendant's Motion"); and 3) Plaintiff Axa Rosenberg's Motion to Strike Defendant Gulf's Counterclaim for Declaratory Relief and Certain Insufficient Affirmative Defenses ("the Motion to Strike"). For the reasons stated below, the Court GRANTS IN PART and DENIES IN PART Plaintiff's Motion, GRANTS IN PART and DENIES IN PART Defendant's Motion, DENIES Plaintiff's Motion to Strike, and FURTHER ORDERS that Defendant's Answer and Counterclaim For Declaratory Relief shall be removed from the public record and filed under seal.

//

Dockets.Justia.com

## II. BACKGROUND

### A. Facts[1]

Plaintiff, AXA Rosenberg Group LLC ("AXA"), is a Delaware Limited Liability Company. Complaint at 1. Defendant, Gulf Underwriters Insurance Company ("Gulf"), is a Connecticut corporation. *Id*.; Answer at 2. Gulf issued Directors and Officers Liability and Private Company Indemnification Insurance Policy No. GU 722527 ("Policy") to AXA for the policy period of July 1, 2001, to July 1, 2003. *See* Declaration of Edward H. Lyman in Support of Plaintiff Axa Rosenberg's Notice of Motion and Motion for Partial Summary Judgment Re: Coverage and Allocation. ("Lyman Decl."), ¶ 4 and Policy, Ex. A.[2]

In this action, AXA seeks a declaration that its defense costs and payment of $2.5 million in settlement of claims by an employee of an AXA subsidiary are covered under Insuring Clause C of the Policy, subject to the Policy's deductible. Complaint at 7. AXA also asserts claims for breach of contract and breach of the implied covenant of good faith and fair dealing, seeking as damages $2.5 million to cover the settlement amount, the costs associated with settling the underlying action and attorney's fees incurred by AXA in its efforts to obtain coverage by Gulf. *Id*. Insuring Clause C provides:

> The Insurer will pay on behalf of the Insured Company Loss which exceeds the Retention set forth in Item 4(b) of the Declarations up to the available maximum aggregate Limit of Liability set forth in Item 3(b) of the Declarations, and which Loss is incurred by the Insured Company as the result of any Claim first made against the Insured Company and reported in writing to the Insurer during the Policy Period or the Discovery Period, if purchased for a Wrongful Act.

Policy Section 1.C, Lyman Decl., Ex. A.

---

[1] The parties were unable to agree on a joint statement of undisputed facts. Instead, Plaintiff filed a separate statement of undisputed facts and Defendant filed a lengthy response objecting to Plaintiff's separate statement. In this Order, the Court does not rely on Plaintiff's separate statement and therefore declines to rule on Defendant's objections.

[2] In Defendant's Response to Plaintiff's Separate Statement of Undisputed Material Facts ("Response"), Gulf states that the copy of the Policy attached to the Lyman Declaration is incomplete because it does not include the signed application or endorsement number six. Response at 2. Gulf does not dispute, however, that the Policy attached to the Lyman Declaration accurately represents the provisions at issue in the Motions.

According to AXA's Opening Statement to the Mediator, in March 2003, Releasor[3] was employed as Strategy and Business Development Manager for AXA Rosenberg Global Services ("AXA Global Services"), a wholly-owned subsidiary of AXA. Employer's Opening Statement to the Mediator ("Opening Statement"), Lyman Decl., Ex. F at 1-2. Releasor's immediate supervisor (the "Supervisor") was a CEO of AXA and was also employed by the subsidiary AXA Global Services. *Id.* at 1; Lyman Decl. at ¶ 6. Barr Rosenberg and Kenneth Reid were both principal owners of AXA. *Id.* at 2.

On May 20, 2003, Releasor's counsel sent an eight-page letter to AXA alleging that Releasor was subjected to "aggressive sexual advances" by the Supervisor and "ultimately raped" on a business trip to Paris and London. May 20, 2003 Letter, Lyman Decl., Ex. C. The letter contained detailed allegations concerning the incidents involving the Supervisor and a lengthy description of AXA's allegedly inadequate response. *Id*. In particular, Releasor alleged that AXA "failed to report the incident to the human resources department[,] . . . failed to initiate any competent investigation regarding the incident" and generally failed "to comply with state and federal laws regarding sexual harassment, prevention and investigation, as well as retaliation in the workplace." In conclusion, the Releasor invited AXA to participate in "immediate settlement negotiations," threatening that if AXA did not agree to do so, Releasor would file suit and resolve the matter at trial. *Id.*

On May 28, 2003, AXA provided Releasor with documents collected in the course of its internal investigation of the alleged harassment. Lyman Decl., ¶ 11. Based on these documents, Releasor took the position in a letter to AXA dated June 4, 2003, that due to its "bungled" and "predetermined" investigation, as well as the fact that "AXA has admitted it can no longer work with [Releasor]," AXA was liable for "truly significant damages." June 4, 2003 Letter, Lyman Decl., Ex. D. The Releasor stated that this was a case that would not be resolved "for a severance package, a nominal sum, or for 'apologies'" and that, if AXA was not serious about mediation, she would "simply deal with the case in the courts." *Id.*

Gulf received notice of the Releasor's allegations in a letter dated June 13, 2003, sent to Gulf by AXA's insurance brokers. *See* June 13, 2003 Letter, Barbara Messineo Decl. ("Messineo Decl."), Ex. A.

---

[3] To protect the privacy of the individuals involved, the Court refers to the employee whose claims gave rise to the settlement agreement as "Releasor." The supervisor whose conduct is the subject of these claims is referred to as "Supervisor."



United States District Court
For the Northern District of California

The June 13, 2003 letter enclosed a copy of a June 12, 2003 letter from the Chief Legal Counsel of AXA Global Services stating that AXA "intended to give notice of a potential claim" under the Policy. June 12, 2003 Letter, Messineo Decl., Ex. B. In the June 12, 2003 letter, counsel for AXA Global Services referred to the May 20, 2003 letter to AXA from Releasor's attorney, which he described as follows:

> We received a letter dated May 20, 2003 from a lawyer representing an employee of ours alleging sexual harassment by the former CEO, an officer and/or director of AXA Rosenberg Group LLC and /or its subsidiaries. While there has not been a "civil proceeding commenced by the service of a complaint or similar pleading," or a "written demand for monetary or non-monetary relief," the letter contains an allegation of sexual harassment and a proposal for mediation. This letter also indicates the other side's intention to file an action if AXA Rosenberg does not agree to mediation.

June 12, 2003 Letter, Messineo Decl., Ex. B.

On June 20, 2003, AXA participated in a confidential mediation with Releasor. *Id.* at ¶ 14. Thereafter, AXA sought Gulf's consent to a $2.5 million settlement amount. *Id.* On June 24, 2003, Gulf responded by letter, stating that they would "not assert lack of consent as a defense to coverage should both the Releasor and AXA accept the mediator's proposal of a $2.5 million settlement today." June 24, 2003 Letter, Lymn Decl., Ex. G. At the same time, Gulf reserved its rights under the Policy and noted that there were several significant issues regarding coverage. *Id*. Specifically, Gulf noted that: 1) two of the subsidiaries that Releasor threatened to sue, AXA IM and AXA Inc., apparently were not covered entities under the Policy; 2) coverage was not available for any claim for assault and battery under the Policy; 3) California Insurance Code §533 precluded coverage for intentional sexual harassment; and 4) Supervisor's wrongful act was performed outside the scope of his capacity, and was thus uninsurable under the Policy. Gulf concluded by stating that "AXA and the other Insureds should be aware that coverage for most or all of the settlement may not be available under the Policy." *Id.*

Soon thereafter, in July 2003, AXA and Releasor agreed on a $2.5 million settlement amount for a release of claims, which included "battery, assault, rape, sexual battery, sexual harassment, wrongful termination, retaliation, negligent and intentional infliction of emotional distress and negligent retention" that allegedly caused Releasor "to suffer extreme physical pain, injury and sickness." Settlement Agreement at ¶ 1, Lyman Decl., Ex. K; *see also* Lyman Decl. at ¶ 19. The release covered AXA's "parent corporations

and subsidiaries, as well as all current and former employees, officers, directors, successors, predecessors, assigns, agents, attorneys, insurance providers and other representatives of such entities . . . ." *Id*. at ¶ 2B.

In a letter dated August 20, 2003, AXA responded to Gulf's June 24, 2003 letter and requested indemnity under the Policy. *See* August 20, 2003 Letter, Lyman Decl., Ex. H. In the August 20 letter, AXA rejected Gulf's arguments against coverage. AXA argued that the settlement was covered under the Policy based on provisions covering claims for unlawful employment practices. In particular, AXA cited to the following definition of an "Employment Claim" under the Policy:

> a claim relating to any past, present, or prospective Employee(s) of the Insured Company and alleging Wrongful Employment Practices by one or more of the Insureds.

*Id.* at Policy Sections 2.L. AXA further cited to the specific Wrongful Employment Practices covered under the Policy, which are:

> any actual or alleged: (1) wrongful demotion, dismissal, discharge or termination (either actual or constructive) of employment; (2) employment related misrepresentation; (3) violation of employment laws; (4) *sexual or workplace harassment of any kind*; (5) employment discrimination; (6) wrongful failure to hire or promote; (7) wrongful discipline; (8) wrongful deprivation of career opportunity including a wrongful failure to hire or promote; (9) failure to grant tenure; (10) negligent employment evaluation; (11) Retaliatory Treatment; (12) employment related invasion of privacy; (13) defamatory statements in connection with an employee reference; (14) breach of an implied contract or agreement relating to Wrongful Employment Practices as defined herein; and/or (15) failure to provide adequate workplace or employment policies and procedures.

*Id.* at Policy Section 2.II (emphasis added). AXA also rejected Gulf's arguments concerning the various policy exclusions and California Insurance Code § 533.

In a letter dated November 12, 2003, Gulf notified AXA that it was denying coverage for the settlement sum. Lyman Decl at ¶ 23-24. Instead, it offered to pay AXA $165,000 under the Policy for settlement purposes only. November 12, 2003 Letter, Lyman Decl., Ex. J. Gulf listed five reasons for denying coverage. First, Gulf asserted that coverage was unavailable because no "actual claim" was made against AXA, as required for reimbursement under the Policy. *See* November 12, 2003 Letter, Ex. J to Lyman's Decl. Rather, Gulf stated, the communications from Releasor to AXA amounted only to "potential claims" under the Policy. *Id*. In support of this position, Gulf cited the Insuring Clauses in the Policy, which limit coverage to "Loss incurred by the Insured Person(s) as the result of any Claim . . . ."



United States District Court
For the Northern District of California

*See* Policy Sections 1.A-D, Lyman Decl., Ex. A. The Policy defines a "Claim," in turn, as "a written demand for monetary or non-monetary relief." *Id.* at Policy Section 2.F(1). The Policy's Notice provision provides that when an Insured "become[s] aware of any Wrongful Act that may subsequently give rise to a Claim," the Insured shall give notice of that "potential Claim" to Gulf in accordance therewith. *Id.* at Policy Section 9.B.

Second, Gulf refused to provide coverage on the basis that Releasor's claims were based on conduct that it asserted fell under the Policy's assault and battery exclusion. *See* November 12, 2003 Letter, Ex. J to Lyman's Decl. The relevant provision provides that Gulf shall not be liable to make any payment for Loss in connection with any Claim

> for libel, slander, bodily injury, sickness, disease or death of any person . . .[or for] assault [or] battery . . . however, this exclusion shall not apply to allegations of mental anguish, emotional distress, libel, slander, defamation or invasion of privacy if and only to the extent that such allegations are made as part of any Employment Claim or Securities Claim.

Policy Section 4.A, Lyman Decl., Ex. A.

Third, Gulf denied coverage on the basis that the Policy only provides coverage for loss as the result of a claim for a "Wrongful Act" and the alleged sexual assault was not a "Wrongful Act" because it was outside of Supervisor's scope of authority. *See* November 12, 2003 Letter, Ex. J to Lyman's Decl. *Id.*; *See* Ex. A to Lyman Decl., Policy Sections 1.A-C. The Policy defines "Loss" as "the total amount which the Insured Person(s) become legally obligated to pay as the result of all Claims . . . for covered Wrongful Acts. . ." Policy Section 2.Q, Lyman Decl., Ex. A. A covered "Wrongful Act," in turn, is defined as:

> any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed or attempted, or allegedly committed or attempted, by one or more Director or Officer, individually or collectively, in their respective capacities as such or, with respect to an Employment Claim or a Securities Claim only, an Employee, or with respect to Insuring Clause C only by the Insured Company, or any matter claimed against one or more Director(s) or Officer(s) solely by reason of their status as such.

Ex. A to Lyman Decl., Policy Section 2.HH.

Fourth, Gulf denied coverage under California Insurance Code § 533, which provides that "an insurer is not liable for a loss caused by a willful act of the insured." *See* November 12, 2003 Letter, Ex. J



United States District Court
For the Northern District of California

to Lyman's Decl. Similarly, Gulf argued that Policy Section 4.I(1) would provide another basis to deny coverage. *Id.* This provision provides that Gulf

> shall not be liable to make any payment for Loss in connection with any Claim . . . against an Insured . . . brought about or contributed by . . . any purposeful violation of any statute or regulation by Insured if a judgement or other final adjudication adverse to such Insured establishes such a . . . purposeful violation."

Policy Section 4.I(1), Lyman Decl., Ex. A. Finally, Gulf denied coverage on the basis that the settlement amount was not reasonable. *See* November 12, 2003 Letter, Lyman's Decl. , Ex. J.

AXA filed this action on January 29, 2004.

**B. The Motions**

AXA filed its Motion for Partial Summary Judgment Re: Coverage and Allocation on March 11, 2004. Because the parties were unable to agree on a joint statement of undisputed facts, AXA filed its own separate statement of facts. Gulf opposed Plaintiff's Motion and filed a response to AXA's separate statement of facts. Gulf also filed a separate document entitled "Defendant Gulf Underwriters Insurance Company's Objections," in which Gulf raised various objections to AXA's Motion and separate statement of facts. In the introduction of its Opposition, Gulf stated that the pleading was not only an Opposition but also a separate "cross-motion" for summary judgment. However, Gulf failed to notice the pleading as a motion, as is required under Civil Local Rule 7. The Court then instructed Gulf to file and notice its summary judgment motion. Gulf did so, filing a "Cross-Motion for Summary Judgment" on April 9, 2004. AXA, in turn, objected to the "purported cross-motion," arguing that it was merely a "sham" to allow Gulf to get the last word on AXA's summary judgment motion.

On April 12, 2004, AXA filed a Motion to Strike Gulf's Counterclaim for Declaratory Relief and Certain of Gulf's Affirmative Defenses.

**1. Summary Judgment Motions**

In its summary judgment motion, AXA asks the Court to determine, as a matter of law, that the Policy provides coverage, not subject to allocation, for the amount AXA paid in defense and settlement of Releasor's claims. In support of this position, AXA cites to the Policy provisions discussed in its August 20, 2003 letter (see above) providing coverage for Employment Claims, including claims for "any sexual harassment."

On the other hand, Gulf in its summary judgment motion seeks a declaration that the Policy provides *no* coverage for any payments made to Releasor or for any associated expenses. Defendant's Motion at 2. Gulf invokes the same reasons for denial of coverage it listed in its November 12, 2003 letter (see above). In addition, Gulf argues for the first time that there is no coverage because Releasor was not an employee of AXA but rather, an employee of an AXA subsidiary. Gulf argues in the alternative that if the Court finds that any of the settlement payment is covered, AXA's Motion should be denied as premature and discovery should be conducted on the question of allocation.[4]

**2. Motion to Strike**

In its Motion to Strike, AXA asks the Court to strike Gulf's counterclaim and numerous affirmative defenses asserted by Gulf in its Answer and Counterclaim for Declaratory Relief ("Answer"), filed on March 19, 2004. In its Answer, Gulf asserts a counterclaim for declaratory relief, requesting a declaration that Gulf is not legally obligated to indemnify AXA for any of the settlement amount or, in the alternative, that Gulf is only required to reimburse AXA for that portion of the settlement that is covered under the Policy. AXA asserts that this counterclaim should be stricken because: 1) it is redundant; and 2) it incorporates specific factual allegations – including names of individuals and detailed descriptions of events – that are inconsistent with this Court's order requiring that the summary judgment motions be filed under seal. AXA also challenges sixteen affirmative defenses on the basis that they are "patently insufficient."

Gulf responds that its counterclaim is not a mirror image of AXA's claim and, therefore, is an appropriate vehicle for obtaining relief. Gulf argues further that the facts alleged in support of its counterclaim are much less detailed than the facts contained in its sealed summary judgment motion, and further, that the allegations are not "scandalous," as is required to support a motion to strike under Fed.

---

[4] The allocation provision provides as follows:

> If in a Claim not covered under Insuring Clause C the Insured Persons incur Loss jointly with the Insured Company, or if any Claim the Insureds incur Loss jointly with others or incur both Loss covered under this Policy and Loss not covered under this Policy, the Insureds and the Insurer shall fairly and reasonably allocate such amount between covered Loss and non-covered Loss based on the relative liability exposure of the parties to such covered and non-covered Loss.

Policy Section 8.A., Lyman Decl., Ex. A.



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

R.Civ. P. 12(f). Finally, Gulf argues that AXA's Motion to Strike should be denied as to the affirmative defenses because AXA has provided virtually no meaningful discussion of the various affirmative defenses.

## III. ANALYSIS

### A. Legal Standard

Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the nonmoving party's claim, or to a defense on which the nonmoving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Nissan Fire & Marine Ins. Co. v. Fritz Cos. Inc.*, 210 F.3d 1099 (9th Cir. 2000). Once the movant has made this showing, the burden shifts to the party opposing summary judgment to "designate specific facts showing there is a genuine issue for trial." *Celotex*, 477 U.S. at 323.

In an insurance coverage dispute, the interpretation of the terms of the insurance policy is a question of law for the court. *Bareno v. Employers Life Ins. Co.*, 7 Cal. 3d 881 (1972). California's substantive insurance law governs this diversity case. *State Farm Mut. Auto. Ins. Co. v. Khoe,* 884 F.2d 401, 405 (9th Cir. 1989).

### B. Whether a Claim was Made Against AXA

AXA asserts that Releasor's May 20 and June 4 letters, along with her mediation brief, constitute a "Claim" under the Policy and California law. Plaintiff's Motion at 10-11. Gulf, on the other hand, asserts that Releasor did not make a Claim within the meaning of Policy. Opposition at 7. Rather, Gulf contends that Releasor's letters to AXA regarding mediation constituted only a "potential claim" and therefore, that the settlement is not covered. *Id.* at 7-8. Further, Gulf contends that any demands made at the mediation were made orally and never reduced to writing and thus do not constitute a Claim under the policy. *Id.* at 8. The Court agrees with AXA that Releasor made a Claim, as that term is defined in the Policy.

AXA contends that California case law construing the definition of a "Claim" under insurance policies shows that a claim was made against it in Releasor's May 20 and June 4, 2003 letters and the

mediation brief. In particular, AXA cites two cases that address the definition of a claim, *Williamson & Vollmer Eng'g, Inc. v. Sequoia Ins. Co.*, 64 Cal. App. 3d 261, (1976), and *Phoenix Ins. Co. v. Sukut Constr. Co., Inc.*, 136 Cal. App. 3d 673 (1982).

In *Williamson*, the insured, a small engineering company, had not notified the insurance company in its application for coverage of a letter it had received from an architectural firm for which the insured had performed services notifying insured that its work was deficient and holding insured "responsible for correcting the condition." 64 Cal. App. 3d at 264-269. Subsequently, the insurance company denied coverage as to the loss on the basis that the letter was a "claim" that was required to be disclosed in the application. *Id*. The insured, on the other hand, asserted that the letter was not a "claim" but merely a "notification of displeasure." *Id*. at 270. In addressing whether the loss was covered, the court rejected the argument of the insured as "ridiculous," holding that the letter was a "claim" that was required to be disclosed. *Id*. In reaching this conclusion, the court explained that "[a] claim connotes an assertion of a legal right, as distinguished from a recognition of that right." *Id*. at 269. The court also noted that a "claim" does not require a formal lawsuit. *Id*. at 270.

In *Phoenix Ins. Co. v. Sukut Constr. Co., Inc.*, 136 Cal. App. 3d 673 (1982), the question of whether a particular loss was covered turned on whether a claim had been made during the period in which the policy was in force. There, the insured was an attorney whose client sued him for malpractice after the term of the insurance policy at issue had expired. *Id*. at 675 -676. During the term of the policy, the client met with the attorney and demanded that he work for free to cure the problems created by inadequacies in a mechanics lien that the attorney had drafted. *Id*. at 675. The question addressed was whether this meeting constituted a "claim" such that the insurer was required to defend and potentially indemnify the attorney. *Id*. at 677-678. The court found that it was. *Id*. at 677. The court first defined a claim as ""a demand for something as of right or as due." *Id*. at 677. The court went on to conclude that the meeting was "not a request for an explanation . . . or new services [but rather] a demand that [the attorney] correct and complete work for which payment had already been made." *Id*. at 678.

Here, as in *Williamson* and *Phoenix*, Releasor's letters and mediation brief cannot reasonably be construed as anything but a Claim. First, consistent with these two cases, the Policy defines a Claim as "a written demand for monetary or non-monetary relief." Policy Section 2.F(1), Lyman Decl., Ex. A.

Second, the suggestion that Releasor's letters and mediation brief were mere 'request[s] for an explanation," *see Phoenix*, 136 Cal. App. 3d at 678, or "notification[s] of displeasure," *see Williams*, 64 Cal. App. 3d at 270, is, incorrect. Rather, these communications made clear that Releasor was demanding a monetary settlement based on legal wrongs that were alleged with great specificity.

First, in the May 20 and June 4 letters, Releasor made clear to AXA that she held it responsible for the consequences of the alleged sexual harassment, as well as AXA's allegedly inadequate response, and that she expected the company to pay the resultant damages. May 20 and June 3, 2003 Letters, Ex. C & D to Lyman Decl. In particular, Releasor requested that AXA submit to immediate settlement negotiations and explicitly threatened to sue if AXA did not compensate her for its alleged wrongful acts. May 20, 2003 Letter, Ex. C to Lyman Decl. Subsequently, Releasor sent AXA the June 4 letter to give it "a fair opportunity to understand the charges [she] intend[ed] to raise" in mediation or otherwise and to warn it that "this [was] not a case that w[ould] be resolved for a severance package, a nominal sum, or for apologies." June 4, 2003 Letter, Ex. D to Lyman Decl. Thereafter, Releasor submitted a mediation brief which included detailed allegations and set forth numerous specific legal claims against AXA. *See* June 13, 2003 Mediation Brief, Ex. E to Lyman Decl. Further, Releasor made clear in the mediation brief that if a settlement was not reached, she would "immediately file a lawsuit against not only AXA Rosenberg, but also the other AXA entities involved." *Id.* at 56-57. These written statements clearly constitute a "written demand for monetary or nonmonetary relief."

The fact that Releasor made demands for monetary relief while the claims in *Williamson* and *Phoenix* involved demands for non-monetary relief does not require a different result. *Williamson* and *Phoenix* stand for the proposition that a claim is made where a demand is made for "something" – whether monetary or non-monetary – "as of right or as due." *Phoenix*, 136 Cal. App. 3d at 677. Such a demand was made here.

Gulf's reliance on *Winkler v. Nat'l Union Fire Ins. Co.*, 930 F.2d 1364 (9th Cir. 1991) is misplaced. Defendant's Motion at 8. In *Winkler*, the insurance policy at issue covered actual claims made during the policy period, so long as the insured notified the insurer "as soon as practicable" of the claim. *Id.* at 1366. Alternatively, the policy provided coverage when the insured received "written or oral notice from any third party that it is the intention of such third parties to hold the Directors or Officers responsible for

the results of wrongful acts." *Id*. After the policy period had expired, the insured in *Winkler* sought coverage of a claim that it argued had been asserted during the policy period. *Id*. In particular, the insured cited to a shareholder's meeting in which two individuals who stood to inherit a controlling interest in the insured stated that they would take whatever legal actions necessary to recoup possible losses announced at the meeting. *Id*. Later, the shareholders filed a lawsuit for which the insured sought coverage. *Id*.

The *Winkler* court determined that the statements by the heirs did not constitute an actual claim but rather, a "potential claim," distinguishing between "a claim that a wrongful act has occurred and a claim for payment on account of a wrongful act." *Id*. at 1364. Distinguishing *Williamson*, the court noted that no demand for repayment was ever made to the Board and, aside from general allegations, there was no "concrete assertion of legal right." *Id*. at 1364 n. 4. Because the insured had not given notice of the potential claim during the policy period, the court held, there was no coverage. *Id.* at 1367.

The facts here are clearly distinguishable from the facts in *Winkler*. In her letters and mediation brief, Releasor did not simply make general allegations a wrong had occurred and that she intended to seek redress sometime in the future. Rather, she demanded an immediate settlement and listed the specific legal and factual grounds supporting her demand in great detail. Thus, although the Policy here contains a provision similar to the one in *Winkler* regarding potential claims, *see* Policy Section 9B, Lyman Decl., Ex.A., *Winkler* is not on point.

**C. <u>Assault and Battery Exclusions</u>**

AXA asserts that Exclusion A of the Policy, which excludes insurance coverage for "bodily injury, sickness, . . . assault [or] battery," does not bar coverage under the Policy because the Policy expressly provides coverage for sexual harassment "of any kind." Motion at 16. Gulf, on the other hand, argues that Exclusion A bars coverage with respect to the entire Settlement amount. Opposition at 14. The Court agrees with AXA that the assault and battery exclusions do not apply, but finds that the exclusions for sickness and injury may apply.

Under California law, insurance coverage is "interpreted broadly so as to afford the greatest possible protection to the insured, whereas exclusionary clauses are interpreted narrowly against the insurer." *Mackinnon v. Truck Ins. Exchange*, 31 Cal. 4th 635, 648 (2003); *see also Harris v. Gulf Ins. Co.*, 297 F. Supp. 2d 1220, 1224 (N.D. Cal. 2003). "An insurer cannot escape its basic duty to insure by

means of an exclusionary clause that is unclear" and "any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect." *Mackinnon*, 31 Cal. 4th at 648. Therefore, "the exclusionary clause must be *conspicuous, plain and clear*." *Id.* (italics in original). The California Supreme Court has stated that "this rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim, purportedly excluded." *Id.* "[T]he burden is on the insured to establish that the claim is within the basic scope of coverage and on the insurer to establish that the claim is specifically excluded." *Id.*

Here, the Policy obligated the insurer to pay for loss incurred as the result of any claim for a "Wrongful Act," which includes "Employment Claim[s]" based on "Wrongful Employment Practice[s]." Ex. A to Lyman Decl., Policy Section 1.C, 2 L & II. A "Wrongful Employment Practice" is defined as follows:

> [A]ny actual or alleged: 1) wrongful demotion, dismissal, discharge or termination (either actual or constructive) of employment; 2) employment related misrepresentation; 3) violation of employment laws; 4) *sexual or workplace harassment of any kind*; 5) employment discrimination; 6) wrongful failure to employ or promote; 7) wrongful discipline; 8) wrongful deprivation of career opportunity including a wrongful failure to hire or promote; 9) failure to grant tenure; 10) negligent defamatory statements in connection with an employee reference; 11) Retaliatory Treatment; 12) employment related invasion of privacy; 13) defamatory statements in connection with an employee reference; 14) breach of an implied contract or agreement relating to Wrongful Employment Practices as defined herein; and/or 15) failure to provide adequate workplace or employment policies and procedures.

*Id.*, Policy Section 2II.

Based on Exclusion A, Gulf asks the Court to construe the Policy as covering only certain types of sexual harassment that do not include unwelcome physical contact that might be considered assault and battery. The Court declines to do so. The Policy expressly covers "sexual or workplace harassment of any kind." Therefore, the burden is on Gulf to show that it would have been clear to the insured that the assault and battery exclusions excluded a significant category of sexual harassment claims, that is, those involving physical harassment. *See Mackinnon*, 31 Cal. 4th at 648. Gulf has not met this burden. There is nothing in the Policy to alert the insured that "sexual or workplace harassment of any kind," in fact means "sexual and workplace harassment" of some kinds. Moreover, Gulf's interpretation of Exclusion A fails because it would render illusory the coverage for sexual harassment claims "of any kind." *See Rose v.*



United States District Court
For the Northern District of California

*Chrysler Motors Corp.*, 212 Cal. App. 2d 755, 759 (1963); *Harris v. Gulf Ins. Co.*, No. C 01-4906 CW, 2003 WL 23110387, *1, *3-*5 (N.D. Cal. Dec. 15, 2003).

The cases cited by Gulf in support of a contrary result are distinguishable because none of the insurance policies at issue in those cases contained a provision expressly covering claims based on the alleged wrongful act. *See Am. Empire Surplus Lines Ins. Co. v. Bay Area Cab Lease, Inc.*, 756 F. Supp. 1287, 1290 (N.D. Cal. 1991) (assault and battery exclusion excluded coverage for child molestation); *United Nat'l Ins. Co. v. Waterfront New York Realty Corp.*, 994 F.2d 105, (2d Cir. 1993) (denying coverage for claims arising out rape when the insurance policy contained an assault and battery exclusion); *Northland Ins. Cos. v. Coconut Island Corp.*, 961 F. Supp. 20 (D. Me. 1997) (denying coverage for sexual assault when the policy provided coverage for bodily injury but excluded bodily injury that arises out of an assault and battery.); *Ledbetter v. Concord Gen. Corp.*, 665 So. 2d 116, 1170 (La. 1996) (concluding that the assault and battery exclusion barred coverage for injuries resulting from rape); *Paul v. Montesino*, 535 So. 2d 6 (La. Ct. App. 1988).

Gulf places particular emphasis on *Century Transit Systems, Inc. v. Am. Empire Surplus Lines Ins. Co.*, 42 Cal. App. 4th 121 (1996). That case, like the others cited by Gulf, is not on point. In *Century Transit*, a taxi driver employed by the plaintiff, Century Transit Systems ("Century"), was irritated by a demonstration by a group of gay activists. *Id.* at 123. He got out of his cab and verbally and physically threatened the demonstrators. *Id.* A witness called Century and informed it of the threats, but Century did not take the driver off the street. *Id.* Later the same evening, the cab driver returned to the demonstration with a large flashlight and beat two of the demonstrators, one of whom became unconscious as a result of the beating. *Id.* at 124. The victims sued Century, which tendered defense to its insurance company, American. *Id.* American, however, denied coverage and refused to provide Century with a defense on the basis of a provision excluding coverage for "any claim . . . based on assault and battery." *Id.*

In explaining its holding, the court in *Century* relied on three provisions in the insurance policy. First, it cited the general provision providing coverage for an "occurrence," which was defined, in part, as "'an accident . . . which results in bodily injury . . . neither expected nor intended by the insured.'" *Id.* (quoting policy). Second, the court cited special additional coverage purchased by Century which modified



United States District Court
For the Northern District of California

"occurrence" to include "any intentional act by or at the direction of the insured which results in bodily injury, if such injury arises solely from the use of reasonable force for the purpose of protecting persons or property." *Id*. Finally, the court cited the assault and battery provision. Reading these provisions together, the court concluded that the exclusion was unambiguous, and that it excluded not only the claims for the assault itself but also the related negligence claims based on Century's failure to prevent the assault. *Id*. at 126-128.

The holding of *Century* is entirely consistent with the Court's conclusion here. There, the policy made very clear – not only in the exclusion itself, but also in the provisions defining "occurrence" that an intentional act such as the beating by the cab driver was not covered. The unprovoked attack could not be described as an "accident" or as "reasonable force for the purpose of protecting persons or property" and no reasonable insured could interpret the policy otherwise. In contrast, the Policy here expressly covers "sexual harassment of any kind" – that is, acts that frequently involve physical assault. As a result, a reasonable insured could well believe that the assault and battery exclusion did not apply in cases of sexual harassment. Thus, reading the Policy as a whole, the Court concludes that the assault and battery provision does not apply here. *See Jurd v. Pacific Indem. Co.*, 57 Cal. 2d 699, 704 (1962) (holding that "[i]n the construction of insurance policies, it is the settled rule that the whole of the contract is to be taken together, each clause helping to interpret the other").

On the other hand, the Court finds that the "injury or sickness" exclusions may apply. In contrast to the "assault and battery" exclusions, which focus on the conduct and intent of the insured, the exclusions for "injury" and "sickness" focus on the nature of the harm suffered. Further, whereas the provision covering claims for "sexual harassment of any kind" indicates to the insured that certain types of conduct are covered, it *does not* specify what types of harm are covered. Thus, there is nothing inconsistent between the exclusions for "injury and sickness" and the provision covering sexual harassment.[5] Accordingly, to the

---

[5] The Court notes, however, that pursuant to the Policy, the "injury and sickness" exclusion does *not* apply to "allegations of mental anguish, emotional distress, libel, slander, defamation or invasion of privacy if and only to the extent that such allegations are made as part of any Employment Claim or Securities Claim." Policy, Section 4.A, Lyman Decl., Ex. A.

extent the settlement covers damages for injury and sickness (other than those excepted in the case of Employment Claims), Gulf has no duty to indemnify AXA for the settlement.[6]

**D. Covered Wrongful Act**

Gulf contends that it does not have a duty to indemnify because the underlying acts that gave rise to Releasor's claims are not "covered Wrongful Acts." Gulf offers two reasons in support of its position, both of which fail. First, Gulf argues that Releasor's claims cannot constitute Employment Claims because Releasor was not an employee of AXA but of one of its subsidiaries. As a result, the argument goes, AXA could not be liable for the alleged sexual harassment and there was therefore no "Loss" or "Wrongful Act" as to AXA. Second, Gulf asserts that there can be no coverage because the definition of Wrongful Act requires that the claims be based on acts taken in a director or officer's official capacity, and sexual harassment is, by definition, outside the scope of employment under California law. *See* Lyman Decl., Ex. A, Policy Section 2.HH.

Gulf's first argument is unpersuasive. The policy insures the "Insured Company" – defined as AXA and its subsidiaries. It insures for a "Loss" incurred as a result of any "Claim" made during the relevant time period against the Insured Company for a "Wrongful Act." "Wrongful Act," in turn, is defined as an act by an "Employee" (for Employment Claims) or by the "Insured Company" (for coverage under Clause C).

The Claim here clearly falls within this definition of a Wrongful Act. It is based on an act by an "Employee." The Claim alleges wrongful conduct both by the Supervisor (an employee of AXA Global Services) and by management (employees of AXA) who responded to the allegations on behalf of AXA and its subsidiaries. For the same reasons, the Claim was also based on an act of the "Insured Company." The "Claim" based on these "Wrongful Acts" was asserted against the "Insured Company" because AXA **and** its subsidiaries are the "Insured Company."

As a result, contrary to Gulf's contentions, the Insured Company could be liable for the Wrongful Acts claimed. AXA Global Services would be liable for the acts of its employee, the Supervisor. Both

---

[6] AXA's argument that the bodily injury and sickness exclusions do not apply because Releasor did not explicitly assert a claim labeled "bodily injury" or "sickness" is frivolous, as such claims do not exist. Nor is AXA's reliance on *Harris v. Gulf Ins. Co.*, 2003 WL 23110387 (N.D. Cal. 2003) helpful to AXA. The court in *Harris* was addressing an entirely different exclusion that has no bearing in this case.



United States District Court
For the Northern District of California

Releasor and Supervisor were employees of the same AXA subsidiary, AXA Global Services. Therefore, AXA Global Services, an Insured, could have been liable for claims of sexual harassment on which Releasor prevailed if her claims were litigated. The record reflects that Releasor expressly threatened to sue not only AXA but also the AXA subsidiaries involved. *See* May 20, 2003 Letter at 8, Lyman Decl., Ex. C; *see also* Releasor's Mediation Brief at 14 (stating that if a settlement was not reached, Releasor intended to sue "not only AXA Rosenberg, but also the other AXA entities involved in deciding [Supervisor's] fate within the company (which we understand to include various subsidiaries of AXA Rosenberg, as well as AXA Investment Managers and AXA Group)," Lyman Decl., Ex. E. Similarly, AXA would be liable for the conduct of its management, as alleged in the Claim.

Under these circumstances, it would raise form over substance to argue, as Gulf does, that there were no alleged Wrongful Acts for which the Insured Company would be liable. All of the relevant member companies of the AXA group were the Insured Company. The claimant was an Employee of the Insured Company based on the conduct of an Employee of the Insured Company.

Gulf also asserts that Releasor's claims cannot be covered because they are based on acts that are, by definition, outside of the scope of employment. *See* Opposition at 10 (citing to *Murillo v. Rite Stuff Foods, Inc.*, 65 Cal. App. 4th 833, 852 (1998) for the proposition that sexual harassment is, as a matter of law, outside of the scope of employment even when the harassing employee is the plaintiff's supervisor). According to Gulf, sexual harassment cannot, therefore, constitute a covered Wrongful Act because the definition of a Wrongful Act requires that the conduct that gives rise to the claims be taken in an officer or director's capacity as such. The Court rejects Gulf's position. First, the definition of "Wrongful Act" includes not only acts and omissions of Officers and Directors taken "in their respective capacities as such." It also includes acts and omissions of Employees (in the case of Employment Claims) and acts and omissions of the "Insured Company" (where coverage is under Insuring Clause C). Policy, Section 2.H.H., Lyman Decl., Ex. A. Releasor's claims may be characterized not only as acts and omissions by a Director or Officer but also as acts and omissions by an Employee (because employment claims are at issue) or as acts and omissions of the "Insured Company" (because under both state and federal law, sexual harassment by a supervisor is attributed to the employer). As a result, Releasor's claims are based on Wrongful Acts regardless of whether Supervisor's acts were taken in his official capacity.



United States District Court
For the Northern District of California

Second, even if Releasor's claims were based on "Wrongful Acts" by an Officer or Director, the requirement that these acts be taken in an Officer or Director's official capacity would have to be read out of the Policy in the context of sexual harassment claims. Otherwise, the Court would, in essence, allow the explicit coverage for sexual harassment of any kind to be rendered meaningless by a hidden exclusion which, if enforced, would preclude *any* coverage for most sexual harassment. Such a construction flies in the face of the established rule that insurance contracts are to be construed to protect the reasonable expectations of the insured. *See Castro v. Fireman's Fund Am. Life Ins. Co.*, 206 Cal. App. 3d 1114, 1119 (1988) (holding that it is a basic principle of insurance contract interpretation that doubts, uncertainties, and ambiguities arising out of policy language ordinarily should be resolved in favor of the insured in order to protect his reasonable expectation of coverage).

**E. <u>California Insurance Code Section 533</u>**

Although AXA concedes that California Insurance Code § 533 would bar coverage of any settlement for claims against Supervisor, AXA asserts that § 533 does not come into play here because the claims that were asserted and settled were against AXA and were not based on wilful conduct by AXA. The Court agrees with AXA that to the extent the settlement is for claims against AXA, as opposed to Supervisor, § 533 does not apply. However, as discussed below, there is evidence that at least some of the settlement was in return for a release of claims against Supervisor and therefore, a factual question remains on the subject of allocation.

Section 533 provides that "[a]n insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others." Cal. Ins. Code § 533. "A 'willful act' under section 533 must . . . include a deliberate liability-producing act that the individual, before acting, expected to cause harm." *Smith v. Hughes Aircraft Co.*, 22 F.3d 1432, 1439 (9th Cir. 1993) (citing *Shell Oil Co. V. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715 (1993). The Ninth Circuit has noted that Section 533 "is part of every policy of insurance written in California and that it is equivalent to an exclusionary clause in the policy." *Am. States Ins. Co. v. Borbor*, 826 F.2d 888, 894 (9th Cir. 1987). As an exclusion, "it is to be construed strictly against the insurer and liberally in favor of the insured." *Id.*



United States District Court
For the Northern District of California

In *Coit Drapery Cleaners, Inc. v. Sequoia Ins*. Co., 14 Cal. App. 4th 1595 (1993), a California court addressed the application of § 533 to a claim for sexual harassment. There, the plaintiff was sexually harassed by the founder and president of the company, who was also the major stockholder and head of the board of directors. *Id*. at 1599. It was well-known in the company that the president demanded sexual favors from female employees. *Id*. Indeed, another employee of the company to whom plaintiff had expressed concern about the harassment even acted as a "procuress," attempting to assist the president in his efforts to seduce the plaintiff. *Id*. at 1600. Ultimately, the plaintiff was fired after she refused to comply with the president's demands. *Id*. The plaintiff sued for sexual harassment under California's FEHA and Coit tendered defense to its insurance company, Sequoia. *Id*. at 1601. Sequoia declined to accept the tender on the basis that the plaintiff's sexual harassment and wrongful termination claims were intentional acts for which there could be no duty to defend. *Id*. The underlying action then settled and Coit sued Sequoia. *Id*. The court held a bench trial regarding the duty to defend and initially issued an oral ruling that although the acts of the president and the "procuress" were intentional, and thus could not be covered, the acts of the corporate entity were covered because the corporation did not authorize the sexual harassment. However, in the course of a subsequent jury trial on the question of damages, the court reversed this ruling, finding that the acts of the company, as well as the individuals involved, were intentional. As a result, the court concluded that there was no duty to defend.

On appeal, the court in *Coit* affirmed, concluding that § 533 barred all of the plaintiff's claims against all of the defendants, both individual and corporate. In reaching this conclusion, the court made some broad statements regarding the application of § 533 to claims for sexual harassment. For example, the court stated that:

> We emphasize that we are dealing here with a case in which the acts of sexual harassment alleged are, by their very nature, intentional and wrongful; it would be contrary to public policy to allow a wrongdoer which is directly and strictly liable for such wrongdoing such as Coit, to shift the loss resulting from such an unlawful corporate practice to its insurer.

*Id*. at 1606-1607. Despite this broad language, however, it is evident throughout the opinion, that the court's holding was based not so much on the fact that Coit was strictly liable for sexual harassment under California law but on Coit's affirmative acts ratifying the sexual harassment. In particular, the court made



United States District Court
For the Northern District of California

clear that the "sexual abuse of female employees [by the president] was so widespread, well known and so ratified by the corporation as to constitute intentional corporate policy." *Id*. at 1609. The court further noted that "there was no way Coit, the corporate entity, could have disciplined or supervised its president, chairman of the board and major shareholder" and also, that there was evidence that the board of directors knew about and ratified the president's misconduct. *Id*. at 1606.

A subsequent decision by another California court, *Melugin v. Zurich Canada*, 50 Cal. App. 4th 658 (1996), supports the conclusion that § 533 does not bar coverage for all claims of sexual harassment asserted against corporate defendants, notwithstanding the broad language used in *Coit*. In *Melugin*, the plaintiff in the underlying action sued her employer for sexual harassment and discrimination. *Id*. at 661. The employer tendered defense to its insurance company, Zurich, which refused to provide a defense on the basis that the insurance policy did not cover wrongful discrimination and related torts. *Id*. at 662. The employer sued Zurich and the trial court granted summary judgment in favor of Zurich. *Id*. On appeal, however, the court reversed, expressly distinguishing the facts from those at issue in Coit.

The court of appeal in *Melugin* looked first to the policy, which provided coverage for personal injury resulting from sexual discrimination, "where insurance against same is not prohibited by law." *Id*. at 663. The court went on to determine whether coverage for the plaintiff's claims was prohibited under § 533 on the basis that the employer's acts – as opposed to the acts of the supervisor who allegedly harassed the plaintiff – were "wilful." *Id*. at 666. The court concluded that Zurich was not entitled to summary judgment on this issue because, although the plaintiff alleged that the employer had ratified the supervisor's acts, there was no evidence in the record to support this allegation. *Id*. at 667. In reaching this conclusion, the court distinguished *Coit*, pointing out that the ruling in that case was based on a fully developed factual record establishing ratification by the company. *Id*. at 664. The court also noted that "there could be some acts occurring in the working world which would constitute sexual discrimination in employment, but which would involve only unintentional, negligent conduct for which coverage might exist." *Id*. at 665. *See also Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076 (1993) (reversing summary judgment in favor of an insurer with respect to the duty to defend where parties disputed whether acts of molestation had occurred and thus, court found that there were unresolved factual questions regarding

whether alleged molester might be liable for torts of negligence that were separable for the claims of molestation).

Here, AXA presented evidence that its actions with respect to the alleged sexual harassment were reasonable. *See* Lyman Decl. Gulf did not counter this evidence with any evidence of its own showing that AXA's handling of the matter was unreasonable, much less wilful.[7] Moreover, nothing in the record suggests that the facts here are analogous to those at issue in *Coit*. In particular, there is no evidence that Supervisor could not be disciplined because he was the president, chairman of the board and major shareholder. Nor is there evidence that Supervisor had such an established reputation for sexual harassment as to constitute "an intentional corporate policy." Finally, Gulf does not cite any case in which a court has found wilfulness based on facts such as those at issue here. Accordingly, the Court concludes as a matter of law that § 533 does not apply to the settlement amount to the extent it was for claims against AXA and its insured subsidiaries.

**F. <u>Allocation</u>**

Gulf contends that even if some of the settlement amount is covered, the Policy's allocation clause is applicable because there is evidence that at least some of the $2.5 million was paid to settle claims that are not covered. In particular, Gulf points to the fact that the Settlement Agreement includes a release of Officers and Directors of AXA and its subsidiaries, thus including Supervisor. *See* Settlement Agreement at 2, Lyman Decl., Ex. B. The Court agrees.

The allocation provision provides as follows:

> If in a Claim not covered under Insuring Clause C the Insured Persons incur Loss jointly with the Insured Company, or if any Claim the Insureds incur Loss jointly with others or incur both Loss covered under this Policy and Loss not covered under this Policy, the Insureds and the Insurer shall fairly and reasonably allocate such amount between covered Loss and non-covered Loss based on the relative liability exposure of the parties to such covered and non-covered Loss.

Ex. A to Lyman Decl., Policy Section 8.A. Here, the release of Officers and Directors in the Settlement Agreement releases any claims against the Supervisor whose alleged bad acts are central to Releasor's

---

[7] Gulf does point to the letters of Releasor threatening to sue if AXA did not engage in settlement negotiations and accusing AXA of handling her claims improperly. These letters, however, are lawyers' argument and do not constitute evidence of the underlying conduct at issue in this case.



United States District Court
For the Northern District of California

claims. To the extent AXA obtained in return for the Settlement Payment a release of claims that AXA concedes would be barred under § 533 (that is, any claims against Supervisor based on his alleged conduct), Gulf is entitled to a determination as to how much of the settlement was based on these claims. The Court also concludes that Gulf is entitled to allocation with respect to the sickness and injury exclusions, discussed above.

**G. <u>Motion to Strike</u>**

AXA asks the Court to strike Defendant's counterclaim for declaratory relief and numerous affirmative defenses. The Court declines to do so.

First, Defendant's counterclaim is not a mirror image of Plaintiff's claim for declaratory relief. Defendant requests not only a declaration that the settlement amount is not covered, but also a request for a determination of the portion that *is* covered if the Court should determine that any amount is covered. Defendant is entitled to seek such relief, and, in any event, Plaintiff will not be prejudiced by allowing the counterclaim to stand. *See Iron Mountain Sec. Storage v. Am. Specialty Foods, Inc.,* 457 F. Supp. 1158, 1162 n. 3 (E.D. Pa. 1978).

Second, the Court does not find Defendant's references to specific names and allegations concerning the underlying claim to be "scandalous" within the meaning of Fed. R. Civ. P. 12(f).

Third, it is premature for the Court to determine whether Defendant's affirmative defenses are "patently insufficient," as AXA asserts. Therefore, except to the extent the Court in this Order has addressed AXA's challenges to Defendant's affirmative defenses, the Court declines to rule on the sufficiency of Defendant's affirmative defenses at this stage of the proceeding and on that basis DENIES the Motion to Strike.

Nonetheless, a number of the factual allegations contained in Defendant's Answer are, under the terms of the settlement agreement, confidential. Accordingly, Defendant's Answer shall be withdrawn from the public record and filed under seal.

**IV. <u>CONCLUSION</u>**

Plaintiff's Motion is GRANTED IN PART and DENIED IN PART. Defendant's Motion is GRANTED IN PART and DENIED IN PART. Plaintiff's Motion to Strike is DENIED without prejudice as to Plaintiff's challenges to the sufficiency of Defendant's affirmative defenses. Plaintiff's Motion to Strike



United States District Court
For the Northern District of California

is DENIED with prejudice as to Plaintiff's challenge to Defendant's counterclaim as "redundant" and "scandalous." Defendant's Answer and Counterclaim for Declaratory Relief shall be withdrawn from the public record and filed under seal.

IT IS SO ORDERED.

Dated: June 9, 2004

/s/ Joseph C. Spero
JOSEPH C. SPERO
United States Magistrate Judge



United States District Court
For the Northern District of California