Apple Inc. v. Psystar Corporation Doc. 1268

United States District Court
For the Northern District of California

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**FEROLIE CORPORATION,**

**Plaintiff,**

**v**

**PEN WRITE SYSTEMS, INC dba PENRITE SYSTEMS and ADVANTAGE SALES & MARKETING, LLC,**

**Defendants.**

**No C 03-5092 VRW**

**ORDER**

Ferolie Corporation (Ferolie) operates a food brokerage in metropolitan New York. Compl (Doc # 1) at 3 ¶ 9. Ferolie developed a proprietary retail reporting system known as "MerchantEyes." Id at 13 ¶ 40. Advantage Sales & Marketing (ASM) is a "consortium of local and regional food brokers." Id at 2 ¶ 5. Pen Write Systems, Inc, dba Pen Rite Systems (Pen Rite) provides "computer software, hardware, programming, consulting and technical documentation services." Id at 2 ¶ 4. Pen Rite contracted with ASM for a retail reporting system known

Dockets.Justia.com

as "Advantage Retail Technology System" or "ARTS." Id at 12 ¶ 38.

In this action, Ferolie asserts antitrust and related state law claims against ASM and Pen Rite. ASM and Pen Rite move to dismiss the antitrust claims. See Docs ## 48, 49. Pen Rite also moves to dismiss Ferolie's contractual interference and intentional interference with economic advantage claims. Doc # 48. In the alternative, Pen Rite moves for summary judgment on the antitrust, contractual interference and intentional interference with economic advantage claims. Id.

Ferolie's antitrust claims appear to be ordinary contract disputes and business torts dressed up in the language of antitrust. Not the least of the problems from which the claims suffer is the lack of alleged antitrust injury, that is, injury to competition and not just to Ferolie itself. For that reason, as well as a host of other reasons, Pen Rite and ASM's motions to dismiss the antitrust claims must be GRANTED (Docs ## 48, 49). Pen Rite's motion to dismiss the other state law business torts is also GRANTED (Doc # 48). Because the court concludes that the complaint as framed fails to allege federal claims, Pen Rite's motion for summary judgment (Doc # 48) is DENIED without prejudice.

I

A

The facts set out here are taken from Ferolie's



United States District Court
For the Northern District of California

complaint (Doc # 1) and are taken as true for purposes of the motion to dismiss.

In the late 1990s, the food brokerage industry consolidated “in order to better serve larger” food manufacturers and retailers whose operations were themselves undergoing a “trend for nationalization.” Compl at 4 ¶ 12. In early 1999, ASM sought to become the first national food broker. Id at 5 ¶ 13. Ferolie and several other food brokers from the northeastern region of the country joined ASM in January 2000. Id at 5 ¶ 14. Presently, there are only three national food brokers, and those national food brokers are uniquely equipped to serve national customer accounts. Id at 5 ¶¶ 15, 16. Customers generally do not choose a broker who provides services to a competitor, so the consolidation of the food brokerage industry led to some upheaval as customers sought to align themselves with brokers that did not also service their competitors. Id at 5 ¶ 16.

In 1999, ASM entered into a contract with Pen Rite, under which Pen Rite agreed to sell to ASM the necessary technology for a retail reporting system (“ARTS”). Id at 12 ¶ 38. That retail reporting system involves handheld computers onto which food broker employees input client information, which is later uploaded to a centralized database and made available to clients. ASM’s rights related to ARTS are governed by a master license agreement (Master Agreement) with Pen Rite, dated January 1, 1999. See id, Exh C. The Master Agreement generally prevents ASM from assigning its rights under the Master Agreement but allows ASM to assign such rights to ASM’s subsidiaries, affiliates or other related entities. Id, Exh C at ¶ 10. To

protect the Pen Rite technology, however, the Master Agreement states in pertinent part:

> In the event that the Client's assignee or transferee is involved in the software design and development business or actively markets software that may compete with the Contractor's products, the Contractor reserves the right to terminate this Agreement and any pending Service Orders in order to protect Contractor's intellectual property rights and trade secrets from competitors.

Id. The Master Agreement states furthermore that:

> The Client shall not transfer the programs and license to another party except as provided in Section 10 above or as otherwise provided in writing by the Contractor. If the Client transfers possession of any copy, modification or merged portion of the programs to another party, the Client's license is automatically terminated.

Id, Exh C at ¶ 13.

After becoming an ASM member in 2000, Ferolie first requested that ASM provide it with the Pen Rite technology in mid-2001. Id at 12-13 ¶ 40. Pen Rite considered Ferolie's retail reporting system, MerchantEyes, a direct competitor with the Pen Rite system and thus refused to cooperate with ASM in fulfilling Ferolie's request. Id.

Ferolie and Pen Rite negotiated a solution that allowed Ferolie to become a member of ASM and use the Pen Rite technology on a somewhat limited basis. In a nondisclosure agreement (NDA) in January 2002, Ferolie and Pen Rite agreed to "enhanced and reemphasized protection of [Pen Rite] propriety information from unauthorized use and disclosure." Id at 13 ¶ 41, Exh D. Ferolie agreed not to use the Pen Rite information to compete with Pen Rite, so that the Master Agreement between Pen Rite and ASM would not



United States District Court
For the Northern District of California

be violated. Meanwhile, Ferolie would still have member access to the Pen Rite database and software. Id. Another condition of the NDA was that Ferolie had to transfer its ownership interest in MerchantEyes to a newly-formed limited liability company. Id. Ferolie alleges that it has at all times performed its obligations under the NDA. Id at 14 ¶ 43.

Additionally, in November 2000, Ferolie and two other ASM members instituted legal proceedings against ASM. Id at 6 ¶ 19. In September 2002, the parties negotiated a settlement in which they agreed to terminate Ferolie's ASM membership. Subsequently, ASM and Ferolie entered into an affiliation and services agreement (ASA). Id at 6 ¶¶ 19, 20, Exh B. Under the ASA, ASM is obligated to provide Ferolie with the same services and corporate and sales support that it gives to ASM members, clients and customers. Id at 6 ¶ 20. ASM's obligation to provide services to Ferolie is conditioned on Ferolie's agreement to be bound by any terms and conditions that may be imposed by third-party providers and that are generally applicable to all ASM members. Id, Exh B at ¶ 2(c). Pen Rite was not a party to the settlement or the ASA. See id, Exh B.

In the fall of 2003, Ferolie's client Unilever Bestfoods (UBF) decided to convert from MerchantEyes to the Pen Rite system. Id at 15 ¶ 49. Ferolie requested a number of Pen Rite handheld computer units, which contain the Pen Rite software. Id at 16 ¶ 52. ASM initially responded that it would not provide Ferolie with the handhelds because Pen



United States District Court
For the Northern District of California

Rite did not wish Ferolie to have them. The units were nevertheless sent to Ferolie on October 27, 2003. Id at 17 ¶ 53. After Ferolie reported to ASM that it had received the handhelds, ASM responded that they had been delivered in error and immediately requested the return of the handheld units. Id at 17 ¶ 54.

After this disagreement, Ferolie and ASM worked to negotiate an alternative solution, initially agreeing that Ferolie could use its existing MerchantEyes handhelds to collect information, which would then be turned over to ASM for upload onto the ARTS system. Id at 17 ¶ 55. ASM later informed Ferolie that this solution was not workable, as Pen Rite refused to provide the necessary software to accomplish such uploading. Id at 18 ¶ 56. Ferolie's UBF brokerage team commenced operation on November 3, 2003, allegedly without a mechanism in place for "seamless" retail reporting. Id at 18 ¶ 58.

Pen Rite informed ASM that it would terminate its contract with ASM if ASM allowed Ferolie to have access to the ARTS system. Id at 19 ¶ 62. Ferolie alleges that, as a result of threats and coercion from Pen Rite, ASM has "discontinued all cooperation with Ferolie." Id at 19 ¶ 63. Pen Rite and ASM allegedly have also informed UBF that Ferolie's data would not be available through the ARTS system. Id at 19 ¶ 64.

Ferolie alleges that the dispute over whether it is entitled to receive the Pen Rite handhelds is damaging its business. Ferolie has already lost three major clients: the



United States District Court
For the Northern District of California

Dial Corporation, Church & Dwight and Beech-Nut Nutrition Corporation. Id at 20 ¶ 69. Ferolie alleges that the loss of these clients is "evidence of the disastrous results of ASM's and Pen[]Rite's misconduct." Id. All three of those clients have chosen to contract directly with ASM, rather than continue with Ferolie. See id at 20-21 ¶¶ 71, 73, 75. Ferolie alleges that, at no time during those three clients' negotiations with ASM, did ASM inform those clients about Ferolie's right to provide services that were "seamless" with those provided by ASM. Id at 22 ¶ 78.

In addition to these client losses, Ferolie contends that the alleged misconduct of ASM and Pen Rite have placed Ferolie in danger of losing its account with UBF, which pays it over $6 million in revenue annually. Id at 23 ¶ 80. Ferolie also alleges upon information and belief that it may face similar difficulty with some of its other clients, including Masterfoods USA and Johnson & Johnson. Id. Ferolie contends that its ability to perform for national clients and its reputation in the national marketplace have been irreparably harmed and it "has been forced to operate in an environment of uncertainty." Id at 23 ¶ 82.

**B**

Ferolie filed the complaint (Doc # 1) in this action on November 18, 2003, alleging that ASM and Pen Rite had violated: (1) the Sherman Act § 1; (2) the Sherman Act §



United States District Court
For the Northern District of California

2; and (3) the Cartwright Act (Cal Bus & Prof Code §§ 16700, et seq). Ferolie's complaint further alleges that Pen Rite: (4) has interfered with Ferolie's contract with ASM; (5) has interfered with Ferolie's contract with UBF; and (6) has intentionally interfered with Ferolie's prospective economic advantage. The complaint also alleges that ASM: (7) breached its contract with Ferolie. On the same date that it filed its complaint, Ferolie filed an ex parte motion for a TRO (Doc # 3) and a supporting memorandum (Doc # 4), as well as several supporting declarations (Docs ## 5-8). On December 19, 2003, the court denied Ferolie's application for a TRO. Doc # 45.

On January 5, 2004, Pen Rite filed a motion to dismiss the three antitrust claims, as well as the three state tort claims. Doc # 48. In the alternative, Pen Rite moved for summary judgment on those claims and included a request for judicial notice in support of that summary judgment motion. See id. Also on January 5, 2004, ASM filed a motion to dismiss the three antitrust claims. Doc # 49.

On March 4, 2004, Ferolie submitted a single brief in opposition to the motions filed by both defendants. Doc # 64. Ferolie also filed two declarations in support of its opposition. Docs ## 65, 66. On March 11, 2004, both defendants submitted reply briefs. Docs ## 70, 71. On that same date, ASM filed an objection to the declaration of David Harris (Harris Decl; Doc # 66) and requested that the court strike the declaration. Doc # 72. Also on March 11, Pen Rite filed an objection to the declaration of Antony Ferolie

United States District Court
For the Northern District of California

(A Ferolie Decl; Doc # 65) and requested that the court strike the declaration. Doc # 73. The court took oral argument on the matter on March 25, 2004. Doc # 78.

II

A

Both defendants object to Ferolie's opposition brief (Doc # 64) on the ground that it violates the local rules. See ASM Reply (Doc # 71) at 1:5 n1; Pen Rite Reply (Doc # 70) at 1:2-15. Pen Rite asks that the court strike the opposition brief on this basis. Pen Rite Reply at 1:14-15.

Ferolie's opposition brief is 26 pages long and appears to be written in 11.5-point font. Civ LR 7-3 and 7-4(b) specify that opposition briefs may not exceed a length of 25 pages. Additionally, Civ LR 3-4(c)(2) provides that the type size for papers written on a word processor must be no smaller than 12-point standard font. Given these restrictions, it appears that Ferolie's opposition brief does not comply with the local rules.

This is not the first time that Ferolie has filed papers that failed to adhere to the local rules' requirements. Ferolie's brief filed in support of its application for a TRO was 44 pages in length. In its December 19, 2003, order, the court refused to deny the TRO on the ground that the supporting brief violated the local

rules but cautioned:

> Ferolie, however, should be aware that the court does not lightly excuse blatant violations of the local rules. Ferolie is therefore admonished that is must comply with the local rules, as well as the Federal Rules of Civil Procedure, in all future proceedings relating to this case and that failure to do so may not be so readily overlooked as in this instance.

12/19/03 Ord at 11:21-27.

Ferolie's current violations of the local rules, while perhaps not as flagrant as its violation involving the hefty 44-page TRO memorandum, are puzzling. Given the court's words of caution, it is quite strange that Ferolie seems intent on bending the rules. Regardless of the magnitude of the violation, Ferolie's opposition brief violates the local rules, including the same local rule Ferolie violated last time, as well as flouting the court's explicit instructions that such practices would not be tolerated. In light of Ferolie's somewhat cavalier attitude about procedural constraints, the court would be remiss to allow this violation to slip by without mention.

Although Ferolie has once again failed to comply with the local rules, it would nevertheless be exceedingly harsh to strike the opposition brief entirely. Ferolie's opposition brief is, of course, too long – but it only exceeds the limitation by one page. As the court noted in its previous order, it is greatly preferable to decide a claim on its merits rather than to dispose of it based on an attorney's error in judgment. See 12/19/03 Ord at 11:11-19. Depriving Ferolie of its opportunity to oppose the motions



United States District Court
For the Northern District of California

would probably be unfair to Ferolie under these circumstances. Accordingly, the court DENIES Pen Rite's request to strike the opposition.

The court warns Ferolie, however, that this is the last time it will countenance such violations. In the future, should Ferolie file papers with the court that violate the local rules, those papers will be stricken.

Lack of compliance with local rules governing memoranda is the least of Ferolie's problems. As the court will presently explain, the complaint is a dense and incohesive saga of bad commercial relations between Ferolie and the defendants. If Ferolie expects to proceed with claims of injury to competition, it must allege clearly and succinctly the line of commerce injured and the nature of this injury. As presently drafted, the complaint fails this assignment.

B

In support of its motion, Pen Rite has filed a request for judicial notice (Pen Rite RJN; Doc # 48, Atch 2) of certain documents contained in the court's file, submitted by the parties in connection with Ferolie's application for a TRO. Judicial notice of the documents themselves is appropriate, as they are a part of the public record in this case. But in taking judicial notice of the documents, the court does not adopt the factual findings or assertions in the documents; rather, the court merely acknowledges the

existence and contents of the documents. Taking judicial notice of the documents themselves, as opposed to the truth of their contents, does not controvert the court's duty on a motion to dismiss to accept the plaintiff's version of the facts in the complaint as true. See, e g, California ex rel Lockyer v Mirant Corp, 266 F Supp 2d 1046, 1053 (ND Cal 2003) (Walker, J) (taking judicial notice of documents in public record without adopting their factual assertions).

C

The court must also decide whether it should strike the A Ferolie and Harris declarations. First, Pen Rite moves to strike the A Ferolie declaration on the grounds of lack of foundation, failure to authenticate documents, hearsay and relevance. Pen Rite Obj (Doc # 73) at 1:4-5. Attached to the A Ferolie declaration are two documents, neither of which are signed by Mr Ferolie. See A Ferolie Decl, Exhs A, B. The court agrees with Pen Rite that the A Ferolie declaration should be stricken for a number of reasons. First, Mr Ferolie fails properly to authenticate the documents attached to his declaration, as he does not establish the basis for his personal knowledge of the documents. Second, the declaration and attached documents are not relevant to the pending motions to dismiss. Accordingly, the court SUSTAINS Pen Rite's objection and STRIKES the A Ferolie declaration.

Second, ASM objects to the Harris declaration on the grounds that, in spite of whatever relevance it has to



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Pen Rite's motion for summary judgment, it is nonetheless irrelevant to ASM's motion to dismiss. ASM Obj (Doc # 72). ASM notes that, as a general rule, the court should not consider materials beyond the pleadings in ruling on a motion to dismiss and should not consider filings submitted along with the opposition to such a motion. ASM Obj at 1:7-13. The court agrees with ASM's contention. See Hal Roach Studios, Inc v Richard Feiner & Co, 896 F2d 1542, 1555 n19 (9th Cir 1989) (noting that materials outside the pleadings generally should not be considered); Car Carriers, Inc v Ford Motor Co, 745 F2d 1101, 1106 (7th Cir 1984), cert denied, 470 US 1054 (1985)) (stating that briefs filed in opposition to a motion to dismiss may not be used to amend or embellish the complaint). Accordingly, the court SUSTAINS ASM's objection to the Harris declaration and STRIKES the declaration insofar as it pertains to ASM's motion to dismiss.

**D**

Finally, the court takes up Ferolie's request not to treat Pen Rite's motion as one for summary judgment. Pen Rite argues that, because a good deal of evidence was placed before the court in connection with the TRO, summary judgment is an appropriate action to take at this stage of the proceedings. Pen Rite Mot Dism (Doc # 48) at 9:13-22. Pen Rite further argues that Ferolie has failed to conduct discovery over the past four months since it filed the complaint and it should not now be allowed to request

discovery or a continuance pursuant to FRCP 56(f). See Pen Rite Reply at 3:25-6:8.

The court is unconvinced by Pen Rite's argument for several reasons. First, even the cases cited by Pen Rite support the view that summary judgment before discovery should be employed sparingly. Willmar Poultry Co v Morton-Norwich Products, Inc, 520 F2d 289, 293 (8th Cir 1975).

Second, under FRCP 56(f), the party opposing summary judgment has the burden to proffer sufficient facts to show that the evidence sought exists and that it would prevent summary judgment. Nidds v Schindler Elevator Corp, 113 F3d 912, 920 (9th Cir 1996). In the case at bar, Ferolie has offered the Harris declaration as proof that it is in need of discovery to oppose Pen Rite's motion. Ferolie contends that discovery is necessary on issues related to Pen Rite's knowledge of Ferolie's contracts with ASM, Pen Rite's justifications for refusing to deal with Ferolie and the effects of the defendants' actions on the market. See generally Harris Decl. Ferolie has thus set forth the purposes that further discovery might accomplish in this case. Cf Willmar Poultry, 520 F2d at 297 (denying a Rule 56(f) application when plaintiffs "made no effort to demonstrate what purpose, if any, discovery would accomplish").

Third, this case was filed seven months ago. Both defendants have yet to file an answer to the complaint, and the parties appeared just recently for an initial status conference to set discovery cutoff dates. It is, of course,



United States District Court
For the Northern District of California

greatly preferable to decide an issue on its merits. See Gorlikowski v Tolbert, 52 F3d 1439, 1444 (7th Cir 1995); Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v Louisiana Hydrolec, 854 F2d 1538, 1546 (9th Cir 1988).

Fourth, as explained in the next section, Ferolie has failed adequately to plead its antitrust claims, which are the keystone to this litigation. Under the circumstances, the appropriate course of action is to GRANT Ferolie's request to treat the Pen Rite motion as a motion to dismiss and to DENY without prejudice Pen Rite's motion for summary judgment. Should it be necessary, Pen Rite may resubmit a motion for summary judgment at a later time.

## III

With these preliminaries out of the way, the court can turn to the substantive motions at bar. ASM claims that the complaint fails to allege the elements necessary to support the three antitrust claims. Pen Rite's motion seeks the same relief plus to dismiss the interference with contract and prospective economic advantage claims (all but the breach of contract claim).

The most striking feature of the complaint is its apparent confusion about, or obfuscation of, the line of commerce that Ferolie alleges defendants' conduct affects. Without a clear statement of the affected line of commerce, it is impossible to understand how an antitrust violation accounts for Ferolie's business problem. That problem



United States District Court
For the Northern District of California

appears to be this: The Pen Rite retail reporting system, although allegedly inferior to MerchantEyes (Compl at 13 ¶ 40), is the “cornerstone” for Ferolie services’ “‘seamless’” connection with those of ASM and ASM members (id at 6 ¶ 20). Without this “‘seamless’ connection”, Ferolie cannot meet its clients’ “needs and expectations” (id at 10 ¶ 31) and is losing business (id at 22-23 ¶¶ 69-80).

Ferolie alleges that the Master Agreement between ASM and Pen Rite unreasonably restrains trade and denies Ferolie access to an essential facility for the conduct of its <u>food</u> <u>brokerage</u> business (Count One), while at the same time allowing ASM and Pen Rite “to maintain a monopoly” over <u>retail data reporting</u> (Count Two). In so alleging, Ferolie appears to mix markets in its key antitrust claims.

The court does not understand the complaint to allege that defendants have monopolized food brokerage by denying Ferolie access to ARTS, the alleged essential facility. After all, Pen Rite is not a competitor in food brokerage, and the complaint lacks allegations that could be read to assert monopolization of food brokerage. Thus, Pen Rite’s antitrust liability with respect to food brokerage can be predicated only on § 1 of the Sherman Act, but not § 2. On the other hand, ASM is not a competitor in retail data reporting, and thus cannot be accused of monopolization of that business. ASM’s liability with respect to retail data reporting can rest only on § 1, not § 2.

What the court understands the complaint to allege is monopolization of retail price reporting by means of a

contract that restrains trade in food brokerage. But restraining trade and commerce in one market does not ipso facto monopolize another line of commerce. This market switch seems to be the root of the problem with the complaint at bar.

Ferolie and Pen Rite arguably were competitors in the retail data reporting market, but Ferolie divested itself of MerchantEyes and agreed not to sell that service to ASM members in order to gain access to ARTS. Compl at 13 ¶ 41. Allegedly, access to ARTS has been denied. Conceivably, denial of access to ARTS states a breach of contract claim, but the complaint does not spell out that ASM and Pen Rite have monopolized the retail data reporting market. So, it would seem, there can be no § 2 monopolization claim.

A

FRCP 12(b)(6) motions to dismiss essentially "test whether a cognizable claim has been pleaded in the complaint." Scheid v Fanny Farmer Candy Shops, Inc, 859 F2d 434, 436 (6th Cir 1988). FRCP 8(a), which states that plaintiff's pleadings must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," provides the standard for judging whether such a cognizable claim exists. Lee v City of Los Angeles, 250 F3d 668, 679 (9th Cir 2001). This standard is a liberal one that does not require plaintiff to set forth all the factual details of her claim; rather, all that the standard requires



United States District Court
For the Northern District of California

is that plaintiff give defendant fair notice of the claim and the grounds for making that claim. Leatherman v Tarrant County Narcotics Intell & Coord Unit, 507 US 163, 168 (1993) (citing Conley v Gibson, 355 US 41, 47 (1957)). To this end, plaintiff's complaint should set forth "either direct or inferential allegations with respect to all the material elements of the claim". Wittstock v Van Sile, Inc, 330 F3d 899, 902 (6th Cir 2003).

Under Rule 12(b)(6), a complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [its] to relief." Hughes v Rowe, 449 US 5, 9 (1980) (citing Haines v Kerner, 404 US 519, 520 (1972)); see also Conley, 355 US at 45-46. All material allegations in the complaint must be taken as true and construed in the light most favorable to plaintiff. See In re Silicon Graphics Inc Sec Litig, 183 F3d 970, 980 n10 (9th Cir 1999). The court may also consider documents attached to the complaint in connection with a FRCP 12(b)(6) motion to dismiss. Parks School of Business, Inc v Symington, 51 F3d 1480, 1484 (9th Cir 1995). The court may not, however, consider other documents outside the pleadings. Arpin v Santa Clara Valley Transp Agency, 261 F3d 912, 925 (9th Cir 2001).

**B**

Both defendants have moved to dismiss Ferolie's



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

three antitrust claims. As federal courts (including this one) have frequently stated, antitrust plaintiffs must do more than simply paraphrase the antitrust laws or plead legal conclusions. See, e g, Reiffen v Microsoft Corp, 158 F Supp 2d 1016, 1033 (ND Cal 2001) (Walker, J), aff'd, 42 Fed Appx 464 (Fed Cir 2002). And "if the facts do not at least outline or adumbrate a violation of the Sherman Act, the plaintiffs will get nowhere by dressing them up in the language of antitrust." Car Carriers Inc v Ford Motor Co, 745 F2d 1101, 1106 (7th Cir 1984), cert denied, 470 US 1054 (1985) (internal quotations and citation omitted). In the case at bar, Ferolie has dressed up its ordinary contract and business tort claims so that they masquerade as antitrust claims. Based on numerous defects in those antitrust claims, it is clear that those claims are insufficient and must be dismissed.

1

One of the most glaring defects in each of Ferolie's antitrust claims, pointed out by both ASM and Pen Rite, is that Ferolie has failed to allege "antitrust injury" – in other words, Ferolie has failed to allege a substantial injury to competition, rather than mere injury to itself. "Because the antitrust laws 'were enacted for the protection of competition, not competitors,' the plaintiff must show an anticompetitive impact on the market." Reiffen, 158 F Supp 2d at 1033, quoting Brunswick Corp v Pueblo Bowl-O-Mat, Inc,

429 US 477, 489 (1977). Thus, a plaintiff like Ferolie "must evince a substantially adverse effect on competition in the relevant market to support a viable legal theory." Cowley v Braden Indus, Inc, 613 F2d 751, 755 (9th Cir 1980) (internal quotation and citation omitted). As the Ninth Circuit has emphasized:

> Proof that the defendant's activities had an impact on competition is an absolutely essential element * * * . It is the impact upon competitive conditions in a definable market which distinguishes the antitrust violation from the ordinary business tort.

McGlinchy v Shell Chemical Co, 845 F2d 802, 812-13 (9th Cir 1988). Generally, this requires the plaintiff to allege "actual detrimental competitive effects such as output decreases or price increases." Beverly v Network Solutions, Inc, 1998 US Dist LEXIS 20453, *24 (ND Cal) (Walker, J) (internal quotation and citation omitted), aff'd, 243 F3d 546 (9th Cir 2000).

This injury-to-competition requirement applies both to antitrust claims for damages and those for injunctive relief. See Cargill v Monfort of Colorado, Inc, 479 US 104, 110-11 (1986) (affirming that to have standing to sue for injunctive relief under § 16 of the Clayton Act, plaintiff must allege antitrust injury). If allegations of antitrust injury are lacking, then claims under either §§ 1 or 2 of the Sherman Act are deficient and should be dismissed. McGlinchy, 845 F2d at 811; see Rutman Wine Co v E&J Gallo Winery, 829 F3d 729, 734, 736 (9th Cir 1987) (finding that injury to competition is "indispensable" for Section 1 claims



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

and that "causal antitrust injury" is a "requisite element" of a Section 2 monopolization claim).

In its December 2003 order denying Ferolie's application for a TRO, the court expressed its concern that Ferolie had not suggested that ASM and Pen Rite's supposedly unlawful activities had caused any injury to competition. "Little appears in the lengthy documents filed so far to suggest any injury to competition, as opposed to mere injury to Ferolie." 12/19/03 Ord at 20:8-10. That concern has not been allayed by closer scrutiny of the complaint.

Ferolie's complaint contains numerous factual allegations relating to its own injuries sustained as a result of ASM and Pen Rite's behavior. For example, in its claim under § 1, Ferolie alleges that the defendants' supposedly unlawful conduct "has caused and will continue to cause Ferolie to lose national clients, to lose its reputation and place in the national market, and to be open to future loss of other national clients; essentially, ASM's and Pen[]Rite's conduct has the ability to eliminate Ferolie's competition in the national market." Compl at 27-28 ¶ 99. Allegations of this type are not enough. As courts of this circuit have repeatedly recognized, "injury to the antitrust plaintiff alone is not sufficient to prove injury to competition." <u>Robert's Waikiki U-Drive, Inc v Budget Rent-A-Car Systems, Inc</u>, 732 F2d 1403, 1408 (9th Cir 1984); see also, e g, <u>Beverly</u>, 1998 US Dist LEXIS 20453 at *24-*25 (stating that "[i]njury to a competitor is not sufficient"). The antitrust laws are directed only toward "acts that harm

**allocative efficiency and raise[] the price of goods above their competitive level or diminish[] their quality." <u>Pool Water Products v Olin Corp</u>, 258 F3d 1024, 1034 (9th Cir 2001) (internal quotation and citation omitted). Allegations that the defendant's activity caused a "decrease in one competitor's market share" or "[s]hift[ed] [the plaintiff's] sales to [the defendant] and other competitors in the market" are insufficient; these activities affect competitors, not competition or consumers. Id at 1036. Even "[t]he elimination of a single competitor, without more, does not prove effect" on the market. <u>McGlinchy</u>, 845 F2d at 812. On the contrary, "[a]n obvious side effect of preserving th[e] competitive process is that businesses unable to compete go out of business" or lose business. <u>Reiffin</u>, 158 F Supp 2d at 1034. "This signifies the vigor of competition, not its absence." Id.**

**Ferolie further alleges in its § 2 claim that "[c]lients and customers have been harmed and will be harmed due to loss of competition because, even though Ferolie is their broker of choice, they have been, are being, and will be forced to resort to brokers other than Ferolie that are not as capable in the industry." Compl at 29 ¶ 113. This conclusory allegation, although purporting to address harm to customers of food brokerage firms lies in a cause of action alleging monopolization of <u>retail data reporting</u>. Shifts in consumer sales from one competitor to another are insufficient to allege harm to the market, even when those shifts lie in the same market. Ferolie attempts to bolster**

United States District Court
For the Northern District of California

this spare allegation in its opposition brief by stating that "[t]he complete lack of competition has led to imbalance in the market as to prices." Opp Mot Dism at 21:10-11. Plainly, this argument is directed to the food brokerage business, not the subject of the alleged monopolization, retail reporting services. In any event, the court may not consider statements in Ferolie's opposition when such statements do not appear as allegations in the complaint. See Car Carriers, 745 F2d at 1107. Even were consideration of these allegations proper, Ferolie's vague, conclusory and confusing statement would be insufficient. The statement contains no details regarding what the alleged "imbalance" is, what product or products have been affected and what the precise effect on prices has been.

In short, nothing in the complaint suffices to distinguish the injuries in this case from the injuries caused by ordinary contract disputes or business torts. The facts alleged do not support a showing that ASM and Pen Rite not only hurt Ferolie's business, but also that "the injury is the sort of thing the antitrust laws seek to discourage." Reiffin, 158 F Supp 2d at 1034. All of Ferolie's antitrust claims must fail for this reason alone.

2

Lack of antitrust injury is not the only problem with Ferolie's claim under § 2 of the Sherman Act. Under § 2, an antitrust plaintiff may plead either a monopolization

claim or an attempted monopolization claim. Under the first theory, the plaintiff must show: (1) that the defendant possessed monopoly power in the relevant market; (2) that the defendant acquired such monopoly power willfully, rather than as a consequence of a superior product, business acumen or historical accident; and (3) causal antitrust injury. Sicor Ltd v Cetus Corp, 51 F3d 848, 855 (9th Cir 1995). An attempted monopolization claim requires: (1) a specific intent to control prices or destroy competition; (2) predatory or anticompetitive behavior directed toward accomplishing that purpose; (3) a dangerous probability of success; and (4) causal antitrust injury. Id at 855 n11. Under either theory, proof of antitrust injury is required, so Ferolie's failure adequately to allege such injury is fatal regardless of the type of § 2 claim it seeks to plead.

In any event, it appears from Ferolie's moving papers that it seeks to plead a claim of monopolization, as opposed to attempted monopolization. See Opp Mot Dism at 21:27-22:5. Besides the lack of antitrust injury, an initial problem with this § 2 claim is that it rests on the same purportedly illegal behavior as does the § 1 claim. As the court explains below in section III(B)(3), Ferolie's § 1 claim is fatally flawed. If the conduct alleged in support of a § 1 claim is insufficient to support that claim, then it is also insufficient to support a § 2 claim. Sicor, 51 F3d at 856 (citing Williams v IB Fischer Nevada, 999 F2d 445, 448 (9th Cir 1993) (per curium)).

Even assuming that the court's disposal of

United States District Court
For the Northern District of California

Ferolie's § 1 claim does not undermine its § 2 claim, the § 2 claim would still be insufficient. Both defendants contend that Ferolie's market analysis is insufficient. With respect to the first element of a monopolization claim – possession of monopoly power in the relevant market – "defining the relevant market is indispensable * * *." <u>Thurman v Pay 'N Pack Stores, Inc</u>, 875 F2d 1369, 1373 (9th Cir 1989). Market analysis requires defining the relevant product and geographic markets. Id at 1374. With respect to the former, defining the relevant product market requires identifying the field of competition – "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." Id. Ferolie characterizes the relevant product market as the supply of retail reporting data to national food brokers. See Compl at 3 ¶ 7, 28 ¶ 102. Ferolie further alleges that each national broker constitutes a unique submarket within this market. Id at 28 ¶ 103.

There are several significant problems with this market definition. First, as to ASM, Ferolie fails to allege facts that would show that ASM is a supplier in the relevant market. Rather than being a manufacturer or seller of such retail reporting services, ASM is merely a purchaser of such services from Pen Rite. That ASM sublicenses the technology to some of its members does not make it a "supplier," especially in light of the fact that ASM is constrained by the Master Agreement as to whom it may sublicense. Second, Ferolie does not allege any facts that would prove that Pen

Rite has monopoly power in the market for sale of retail reporting technology to national food brokers. Although Pen Rite sells its technology to one of the three national brokers, this is certainly insufficient to prove that Pen Rite possesses a monopoly over the entire market. Ferolie includes no allegations regarding Pen Rite's actual market share. Third, Ferolie's allegations that Pen Rite is a monopolist in the so-called ASM submarket are without support. Ferolie fails to allege facts that would show that ASM, its members or its clients were limited to choosing Pen Rite as a retail reporting system. Indeed, it seems that they were not so limited, since Ferolie and other ASM members used MerchantEyes even after the Master Agreement with Pen Rite was in place.

But market definition is not Ferolie's only problem under § 2. At the TRO hearing, Ferolie seemed to represent that the crux of its antitrust claims is its contention that the ARTS system is an "essential facility." Despite Ferolie's paradoxical allegation that its own MerchantEyes system is a superior method of retail reporting, it nevertheless asserts that the ARTS system is so indispensable to its business that Ferolie is entitled to access. See Compl at 13 ¶ 40, 28-29 ¶¶ 107, 108. To prove that the ARTS system and related Pen Rite technology constitute an essential facility, Ferolie must allege facts that would show that: (1) the facility is essential; (2) the facility is controlled by a monopolist; (3) a competitor is unable practically or reasonably to duplicate the essential

United States District Court
For the Northern District of California

facility; (4) the facility is denied to a competitor; and (5) it is feasible to provide the facility. Paladin Assoc, Inc v Montana Power Co, 328 F3d 1145, 1162 n21 (9th Cir 2003); City of Anaheim v Southern California Edison Co, 955 F2d 1373, 1380 (9th Cir 1991).

The Pen Rite technology associated with the ARTS system fails to qualify as an essential facility for several reasons. First, as a preliminary matter, ASM cannot be liable to Ferolie under the essential facilities doctrine because Ferolie does not allege that ASM controls the technology. Indeed, Ferolie's complaint admits the opposite, as it alleges that "Pen Rite's hardware and/or software are essential to Ferolie's ability to service its clients and Pen Rite is in exclusive control of this facility." Compl at 28 ¶ 107 (emphasis added). Because control over the essential facility is a prerequisite to liability, ASM cannot be liable to Ferolie under the essential facilities doctrine with respect to the Pen Rite technology.

Second, a facility is essential only if control of the facility carries with it the power to eliminate competition in the downstream market. Alaska Airlines, Inc v United Airlines, Inc, 948 F2d 536, 544 (9th Cir 1991). Although some of Ferolie's customers evidently prefer the Pen Rite technology to Ferolie's MerchantEyes system, it is difficult to understand how refusing Ferolie access to this technology will eliminate Ferolie's ability to compete with Pen Rite in the retail reporting technology market. In seeking access to Pen Rite's technology, Ferolie does not

United States District Court
For the Northern District of California

seek access to a facility that is critical to the development, manufacture or sale of retail reporting systems in general. Rather, Ferolie seeks access to the particular product that Pen Rite has itself developed. Access to that product certainly is not necessary for the development and production of retail reporting software, since it is obvious from the complaint that other forms of such software (like MerchantEyes) are in existence. See, e g, Compl at 13 ¶ 40.

Third, Ferolie is no longer a competitor of Pen Rite and thus does not have standing to demand access to the facility. According to Ferolie, it no longer owns an interest in the MerchantEyes retail reporting system and has agreed not to compete with Pen Rite. See Compl at 13 ¶ 41. Although Ferolie may be capable of competing with Pen Rite, Ferolie is, by its own admission, not currently a competitor in the retail reporting technology market. The Ninth Circuit and courts in this district have held that, to bring an essential facilities claim, the plaintiff must be a competitor of the defendant who allegedly controls the essential facility. Ferguson v Greater Pocatello Chamber of Commerce, Inc, 848 F2d 976, 983 (9th Cir 1988); Stein v Pacific Bell Telephone Co, 173 F Supp 2d 975, 981 (ND Cal 2001) (Illston, J).

Fourth, it is unlikely that allowing Ferolie access to the Pen Rite technology would be feasible. As noted above, Ferolie seeks access not to a means of production or means of placing a product on the market, but rather to Pen Rite's product itself. Ferolie admits in its complaint that

**Pen Rite believed that Ferolie's MerchantEyes system was in direct competition with Pen Rite technology. Guarding and keeping secret such technology is critical to Pen Rite's ability to protect that technology as a trade secret under California law. See Cal Civ Code § 3426.1(d); Vacco Industries, Inc v Van Den Berg, 5 Cal App 4th 34, 50 (1992) (noting that "a trade secret is protectible only so long as it is kept secret by the party creating it"). Should Pen Rite disclose or lose its trade secret, the damage to the company would be irreparable. North Atlantic Instruments, Inc v Haber, 188 F3d 38, 49 (2d Cir 1999) (reasoning that "loss of trade secrets cannot be measured in money damages because a trade secret once lost is, of course, lost forever" (internal citation and quotations omitted)). Although Ferolie no longer uses MerchantEyes, it has certainly demonstrated the capability of developing retail reporting software. Under the circumstances, it would be difficult to find that it is "feasible" for Pen Rite to risk disclosure of its trade secrets to a company known to have the ability to compete with Pen Rite.**

**This same reasoning undermines the alternative refusal to deal theory that Ferolie asserts against Pen Rite. As the Supreme Court recently noted, "as a general matter, the Sherman Act does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." Verizon Communications, Inc v Law Offices of Curtis V Trinko LLP, 124**

United States District Court
For the Northern District of California

S Ct 872, 836 (2004); see also Stein, 173 F Supp 2d at 980 (noting that "the Sherman Act holds that a business generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently"). A refusal to deal theory could be subject to a "limited exception" when, for example, the defendant has previously "voluntarily engaged in a course of dealing with its rivals." Verizon, 124 S Ct at 880. No such allegations concerning Pen Rite are contained in the complaint. Furthermore, as the Ninth Circuit has held, "a monopolist's desire to exclude others from its [protected] work is a presumptively valid business justification for any immediate harm to consumers." Image Techical Services, Inc v Eastman Kodak Co, 125 F3d 1195, 1218 (9th Cir 1997), cert denied, 523 US 1094 (1998). Although such a presumption is rebuttable, Ferolie pleads no facts and makes no argument in its opposition that would show that Pen Rite is not entitled to protection of its intellectual property or that its refusal to deal on this basis is pretextual.

Accordingly, Ferolie's claim of a § 2 monopolization violation under the Sherman Act is inadequate and ought to be dismissed.

3

Ferolie's claim under § 1 of the Sherman Act also suffers from multiple weaknesses. Section 1 prohibits contracts, combinations and conspiracies in restraint of

trade. To establish a claim under § 1, Ferolie must plead facts that would support a finding that: (1) there was a contract, combination or conspiracy; (2) the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; (3) the restraint affected interstate commerce; and (4) injury resulted. Sicor, 51 F3d at 854. Instances of restraints that are per se illegal are rare and generally limited to situations in which the conduct is "manifestly anticompetitive." Continental TV, Inc v GTE Sylvania Inc, 433 US 36, 49-50 (1977). ASM and Pen Rite allege, and Ferolie does not dispute, that this case involves a vertical arrangement between Pen Rite and ASM with respect to the retail reporting technology and that the case should thus be governed by the rule of reason. See Sicor, 51 F3d at 854 (noting that "[v]ertical arrangements are almost always judged by the rule of reason"). As noted above, a rule of reason case under § 1 clearly requires that the plaintiff establish antitrust injury, which Ferolie has not done. See id (commenting that "[u]nder the rule of reason approach, the plaintiff must show an injury to competition, rather than just an injury to plaintiff's business"). But ASM and Pen Rite point out several other weaknesses with the claim that, even had Ferolie alleged antitrust injury, would require dismissal.

First, ASM argues that the alleged conspiracy between ASM and Pen Rite essentially amounts to ASM's agreement to abide by the Master Agreement with Pen Rite. ASM Mot Dism (Doc # 49) at 7:10-10:10. As ASM points out,



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Ferolie does not allege that the Master Agreement itself is unlawful or that ASM could provide Ferolie with access to ARTS or other Pen Rite technology without violating the Master Agreement. Id at 7:1-5. Ferolie claims in its opposition brief that its claims of conspiracy are based on its contention that ASM and Pen Rite entered into the contract with the express intent of foreclosing any company other than Pen Rite from providing retail reporting services to ASM clients. Opp Mot Dism at 14:3-8. But Ferolie fails to provide a citation to any allegation in the complaint that would support this contention, and the court has been unable to find such an allegation. As it stands, therefore, the only contract or conspiracy that Ferolie has adequately alleged is ASM's agreement to abide by the Master Agreement and the alleged conspiracy between ASM and Pen Rite to breach the Ferolie-ASM agreement.

These allegations are not enough. First, the Master Agreement is a contract that pre-dated Ferolie's own relationship with ASM. The contract requires that ASM obtain approval from Pen Rite before licensing the Pen Rite technology to a Pen Rite competitor. See Compl, Exh C at ¶¶ 10, 13. Nowhere in the Master Agreement do ASM and Pen Rite agree that ASM's member brokers are prohibited from use of other retail reporting technology. Indeed, Ferolie's own allegations would contradict any assumptions to the contrary, since Ferolie asserts that other ASM members used MerchantEyes up until the time of the ASM/Ferolie arbitration. Compl at 13 ¶ 40. Pen Rite's later attempts to

enforce the Master Agreement and ASM's subsequent agreement to abide by that agreement cannot, on these facts, be considered unreasonable. See Fast Food Fabricators v McDonald's Corp, 1980 US Dist LEXIS 9404, *11-*12 (ND Cal) (Peckham, J) (finding that the alleged conspiracy regarding a pre-existing contract arrangement between franchisor and franchisee was the kind of "commonplace business activity" that would not, without more facts to the contrary, be an unreasonable restraint on trade).

Similarly, Ferolie's allegations regarding the alleged conspiracy to breach the Ferolie/ASM agreement are insufficient. Essentially, Ferolie complains that the defendants, ASM in particular, have "failed to do that which their contracts require." UNR Indus, Inc v Continental Ins Co, 607 F Supp 855, 861 (ND Ill 1984) (Hart, J). In UNR, the district court reasoned that if such behavior is wrongful, it is wrongful because it represents a breach of contract and not because it affects competition. Id. As such, there is an "essential difference between an agreement not to compete and an agreement not to honor contracts * * *." Id.

The Ninth Circuit cited UNR in its decision in Newman v Universal Pictures, 813 F2d 1519 (9th Cir 1987). In that case, the well-known film actor Paul Newman, as well as several other plaintiffs, alleged that several major motion picture studios had conspired to fix the percentage of video cassette revenue paid to actors. The appellate court, in affirming the district court's decision to dismiss the claims under Rule 12(b)(6), stated that "[plaintiffs'] fundamental



United States District Court
For the Northern District of California

problem is that [they] entered into the contracts [with the studios] before the alleged conspiracy began. The subsequent conspiracy could not have affected the competition for [plaintiffs'] services at the time the contracts were made." Id at 1522.

In the case at bar, the Master Agreement was in place long before the alleged conspiracy to breach ASM's contract with Ferolie began. Ferolie attempts to distinguish Newman by contending that the conspiracy in the case at bar began with the Master Agreement and not after the contract was signed. But as noted above, Ferolie fails to plead any facts that would support such a contention. In short, there is no basis for concluding from the factual allegations in Ferolie's complaint that ASM and Pen Rite's purported "conspiracy" was unreasonable or constituted the type of conspiracy that the antitrust laws were designed to prevent.

ASM also argues that Ferolie's § 1 conspiracy claim is barred under the so-called Copperweld doctrine. As ASM argues, Ferolie's claims in the complaint essentially relate to Ferolie's inability to access the ARTS system and other related Pen Rite technology. Further, ASM's rights with respect to the ARTS system and the attendant technology are defined by the Master Agreement it holds with Pen Rite. The Master Agreement limits ASM's ability to license Pen Rite's technology. See ASM Mot Dism at 10:16-21; see also Compl, Exh C at ¶¶ 10, 13.

In Copperweld Corp v Independence Tube Corp, the Supreme Court held that, for purposes of § 1, a parent



United States District Court
For the Northern District of California

company and its subsidiary were incapable of conspiring with each other, based on their unity of interest and common objectives. Copperweld, 467 US 752, 771. This court applied the Copperweld doctrine in Levi Case Co, Inc v ATS Products, Inc, 788 F Supp 428 (ND Cal 1992) (Walker, J). In that case, plaintiff's antitrust claim was premised on its contention that its contract troubles were due to the defendants' efforts to monopolize a submarket through the use of patents owned by one of the defendants. Id at 430. The court explained Copperweld as follows:

> Copperweld's holding was based upon, and further supports, the more general proposition that coordinated activity by parties who lack independent sources of economic power and separate interests does not warrant judicial scrutiny* * * * The [Supreme] Court sought to focus antitrust scrutiny on concerted action only if that action deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands.

Levi Case, 788 F Supp at 430-31 (internal quotation and citation omitted). The court went on to find that "it strains credibility to argue that [the patent holder] and [the exclusive licensee] had any independent decisionmaking authority regarding the exploitation of the patent." Id at 432. The court also emphasized that it would be difficult to conclude that "any concerted activity the two defendants might take with regard to the patent would coalesce economic power previously directed at disparate goals." Id.

Applying this reasoning to the present case makes clear that Ferolie's antitrust claim is further flawed. It might be true that ASM and Pen Rite constitute independent

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

**sources of economic power with respect to their power in the separate lines of commerce of food brokerage and retail reporting services. Nevertheless, the two defendants do not possess independent economic power with respect to the technology that enables the ARTS system. Whatever “power” over the ARTS technology ASM possesses is derived from Pen Rite. Without Pen Rite’s license and authorization, ASM would have no power to use, much less give other entities access to, the Pen Rite technology. Thus, ASM cannot properly be characterized as an “independent center of decisionmaking” with respect to Pen Rite’s technology.**

**Ferolie argues that a licensee and a licensor are capable of conspiracy if their agreement “deprives the marketplace of independent actors.” Opp Mot Dism at 15:16-18. Ferolie relies on <u>Townshend v Rockwell Int’l Corp</u>, 2000 US Dist LEXIS 5070 (ND Cal) (Armstrong, J), for this proposition. Even were the <u>Townshend</u> decision binding authority, the court would nevertheless find the reasoning inapplicable to the case at bar. In <u>Townshend</u>, the allegations involved a patent holder and licensee conspiring fraudulently to obtain invalid patents, use those patents as leverage to acquire other technology and bar competitor access to the patents. Id at *17-*18. No such far-ranging conspiracy to expand market power is alleged here, and, as the court has already pointed out, ASM has little to contribute to such a conspiracy, given its lack of power over the relevant technology.**

**In short, Ferolie’s § 1 claim is as flawed as its §**

2 claim. Thus, that claim should also be dismissed.

**4**

Both defendants also argue that Ferolie's Cartwright Act claims must be dismissed. Pen Rite argues that Ferolie, as a New Jersey corporation, has no standing to bring a claim under the Cartwright Act. Pen Rite Mot Dism at 13:6-14:16. ASM contends that the Cartwright Act is interpreted coextensively with the Sherman Act and that dismissal of the Sherman Act claims also mandates dismissal of the Cartwright Act claims. ASM Mot Dism at 14:1-9.

The Ninth Circuit has often recognized that "Cartwright Act claims raise basically the same issues as do Sherman Act claims." McGlinchy, 845 F2d at 811 n4. Thus, resolution of the federal antitrust claims also resolves the state law claims. Pool Water, 258 F3d at 1034 n6; McGlinchy, 845 F2d at 811 n4. It is clear, therefore, that the court should dismiss the Cartwright Act claims for the same reasons it dismisses the Sherman Act claims and need not address Pen Rite's rather peculiar standing argument.

Accordingly, the court GRANTS ASM and Pen Rite's motions to dismiss (Docs ## 48, 49) with respect to the two Sherman Act claims and with respect to the Cartwright Act claim.

/

/

/



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

C

Pen Rite also moves to dismiss Ferolie's two claims for interference with contract and Ferolie's claim for intentional interference with economic advantage. The court agrees with Pen Rite that all three of those claims should be dismissed.

With respect to the first two claims, Ferolie alleges that Pen Rite's activity interfered with Ferolie's contracts with ASM and with UBF. To state a claim for interference with contract, Ferolie must plead facts that demonstrate: (1) existence of a valid contract; (2) Pen Rite's knowledge of the contract; (3) Pen Rite's intentional action designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damages. Quelamine Co, Inc v Stewart Title Guaranty Co, 19 Cal 4th 26, 55 (1998). Pen Rite first argues that it has produced evidence that Pen Rite had no knowledge of the ASA agreement Ferolie had with ASM or of Ferolie's contract with UBF. Pen Rite Mot Dism at 21:28-22:8. But as stated above, the court treats this as a motion to dismiss and not as a motion for summary judgment and thus does not consider documents outside the pleadings. Regardless of the evidence Pen Rite may have produced regarding knowledge, Ferolie has pled that Pen Rite had knowledge of the ASA. Compl at 31 ¶ 127. Similarly, Ferolie has pled that Pen Rite had specific knowledge of

United States District Court
For the Northern District of California

Ferolie's obligations to provide retail reporting services to UBF. Id at 32 ¶ 134. Thus, lack of knowledge does not provide a proper basis for dismissal of these claims, at least at this juncture.

Second, Pen Rite argues that Ferolie must plead and prove that Pen Rite's actions were unjustified. Pen Rite Mot at 22:9-23:2. Pen Rite claims that its refusal to allow ASM to give Ferolie the Pen Rite technology was justified so that Pen Rite could continue to protect its trade secrets. Id. It is true that interference with contract does not require that the defendant's primary purpose be disruption of the contract. Quelamine, 19 Cal 4th at 56. But not every interference with contract is wrongful:

> If the actor is not acting criminally nor with fraud or violence or other means wrongful in themselves but is endeavoring to advance some interest of his own, the fact that he is aware that he will cause interference with the plaintiff's contract may be regarded as such a minor and incidental consequence and so far removed from the defendant's objective that as against the plaintiff the interference may be found to be not improper.

Id at 56. In the case at bar, Ferolie's complaint admits the legitimate interest Pen Rite had in refusing to allow ASM to give the technology to Ferolie: Pen Rite did not want Ferolie, a fellow software developer, to have access to its technology. Given that the facts as Ferolie pleads them reveal that Pen Rite acted to advance its own interests, any interference with the ASA and the UBF contract is fairly characterized as "a minor and incidental consequence" of Pen Rite's actions to protect its technology. Ferolie's

interference with contract claims do not contain any factual allegations that otherwise make Pen Rite's refusal a wrongful means of protecting intellectual property. Thus, the interference with contract claims should be dismissed.

Ferolie also pleads an intentional interference with economic advantage claim against Pen Rite. To state such a claim, Ferolie must plead facts that would show: (1) an economic relationship between Ferolie and some third party, with the probability of future economic benefit to Ferolie; (2) Pen Rite's knowledge of the relationship; (3) intentional acts by Pen Rite designed to disrupt the relationship; (4) conduct by Pen Rite that is wrongful by some legal measure other than the fact of the interference itself; (5) actual disruption of the relationship; (6) economic harm to the plaintiff proximately caused by the acts of Pen Rite. Korea Supply Co v Lockheed Martin Corp, 29 Cal 4th 1134, 1153 (2003). Ferolie's claim for tortious interference is apparently based on its relationship with UBF. Comp at 33 ¶¶ 140-42, 144.

Pen Rite contends that this claim is defective for several reasons. First, Pen Rite argues that Ferolie has failed to allege any independently wrongful conduct. Pen Rite Mot Dism at 23:19-24:11. As noted in Korea Supply, a plaintiff like Ferolie must "plead that the defendant engaged in an independently wrongful act." Korea Supply, 29 Cal 4th at 1158. An act is not independently wrongful merely because the defendant acted with improper motive; rather, it is only independently wrongful if it is unlawful. Id at 1156 (citing



United States District Court
For the Northern District of California

Della Penna v Toyota Motor Sales, USA, Inc, 11 Cal 4th 376, 392 (1995)). Here, Ferolie alleges that "Pen Rite has acted wrongfully by entering into a contract with Ferolie to provide Ferolie with certain services, including access to the ARTS system, and making misrepresentations to Ferolie that compelled Ferolie to divest its own proprietary retail data reporting system * * * and give up its ability to sell that system." Comp at 33 ¶ 143. This allegation, while it does not specifically allege the precise reason this conduct is illegal, is probably enough to survive a motion to dismiss. The allegation might fairly be read as alleging that Pen Rite engaged in fraudulent misrepresentation.

Nevertheless, Ferolie's claim must still be dismissed. Ferolie's complaint fails to allege that any economic damages have resulted from the alleged disruption in its relationship with UBF. The complaint alleges that Ferolie commenced service on its UBF contract without any mechanism for "seamless" retail reporting. Compl at 33 ¶ 144. Ferolie also alleges that it is in imminent jeopardy of losing UBF as a client and that such a loss would be "devastating," as it would cost Ferolie more than $6 million in annual revenue. Id at 26 ¶¶ 89, 90. But nowhere does Ferolie allege that it has suffered any actual, nonspeculative economic damage as a result of Pen Rite's wrongful behavior. And "appreciable, nonspeculative, present injury is an essential element of a tort cause of action." Aas v San Diego Cty Superior Ct, 24 Cal 4th 627, 646 (2000). Thus, the intentional interference with prospective economic



United States District Court
For the Northern District of California

advantage claim is infirm and must be dismissed.

Accordingly, because Ferolie has failed successfully to plead all the elements required for its interference with contract claims and its intentional interference with economic advantage claim, Pen Rite's motion to dismiss must be GRANTED (Doc # 48).

IV

For the foregoing reasons, ASM and Pen Rite's motions to dismiss (Docs ## 48, 49) are GRANTED in their entirety. The three antitrust claims, two interference with contract claims and intentional interference with economic advantage claim are all DISMISSED. Ferolie is given leave to amend the complaint to assert causes of action that are not conclusively precluded by the court's analysis in this order. Such an amended complaint should be filed within 60 days of the date of this order. Additionally, Pen Rite's motion for summary judgment (Doc # 48) is DENIED without prejudice.

IT IS SO ORDERED.

_____________/s/_______________
VAUGHN R WALKER
United States District Judge



United States District Court
For the Northern District of California