Apple Inc. v. Psystar Corporation

Doc. 1347

JARED BOBROW (Bar No. 133712)
NICHOLAS BROWN (Bar No. 198210)
DAVID POLLOCK (Bar No. 217546)
WEIL, GOTSHAL & MANGES LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

Attorneys for Plaintiff
Neothermia Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEOTHERMIA CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>RUBICOR MEDICAL, INC.,<br><br>Defendant. | **Case No. C-03-4277 (VRW)**<br><br>**CONFIDENTIAL DECLARATION OF PHILIP E. EGGERS IN SUPPORT OF NEOTHERMIA'S OPPOSITION TO RUBICOR'S MOTION FOR SUMMARY JUDGMENT ON NEOTHERMIA'S CLAIMS FOR BREACH OF CONTRACT** |

**LODGED WITH REQUEST TO BE FILED UNDER SEAL**

**Contains Highly-Confidential Material Under The Protective Order**



Dockets.Justia.com

I, Philip E. Eggers, declare:

1. I am the Chief Technical Officer and a director of plaintiff Neothermia Corporation ("Neothermia"). I submit this declaration in opposition to Rubicor's Motion for Summary Judgment on Neothermia's Claims For Breach Of The Non-Disclosure Agreement. I have personal knowledge of the facts set forth in this declaration and would competently testify to them under oath if called as a witness.

2. I hold a Bachelor of Science Degree (Physics), a Master of Science Degree (Physics), and an M.B.A. Degree (Systems Management), all from The Ohio State University. I have been actively involved in research and development in conjunction with the field of medical instrumentation and methodology and am named as an inventor of over 135 U.S. patents and over 20 U.S. applications for patent. I have been actively involved in the field of electrosurgery since 1978. I am a named inventor on U.S. Patent No. 6,514,248, which Neothermia has asserted against Rubicor in this action.

3. I am a co-founder of Neothermia. Neothermia is a privately held company that is dedicated to designing, developing, and marketing advanced and innovative minimally invasive electrosurgical systems for diagnostic and therapeutic applications in select cancer markets, particularly breast cancer.

4. When I was introduced to Rubicor in July of 1998, I was told that Neothermia and Rubicor might want to discuss their technology because both companies were developing devices for minimally invasive breast cancer treatment.

5. After an initial dinner meeting on July 23, 1998, Neothermia and Rubicor executed a non-disclosure agreement on July 24, 1998. Attached hereto as Exhibit A is a true and correct copy of the non-disclosure agreement.

6. On July 27, 1998, promptly after securing the protection of the non-disclosure agreement, Neothermia sent Rubicor documents that included Neothermia proprietary information. Attached hereto as Exhibit B and C are true and correct copies of documents Neothermia sent to Rubicor. This disclosure included a letter from me to Dr. Vetter, one of Rubicor's principals, that included Neothermia proprietary technology and advantages it offered

over known techniques. *See, e.g.,* Exhibit C at NEO 02381

; *Id.* at NEO 02375 REDACTED

; *Id.* at NEO 02375-76 (describing Neothermia's "novel approach to minimizing the risk of implantation metastasis during biopsy procedures"); *see also* NEO 02378. This July 27, 1998 disclosure of proprietary information also included a confidential "overview" of Neothermia and the business opportunity it was targeting. *See* Exhibit B at NEO 02282-02329.

7. In the written material I provided to Rubicor pursuant to the non-disclosure agreement, I disclosed at least the following proprietary information:

REDACTED

**8.** This information was proprietary to Neothermia when it was disclosed to Rubicor. It had not been disclosed to anyone outside Neothermia who did not have an obligation to keep it confidential. My practice at the time was to secure a confidentiality agreement – oral, written, or both – before disclosing Neothermia's proprietary information to anyone outside Neothermia, and I am not aware of any instances where this practice was not followed.

9. On August 25, 1998, a month after disclosing documents to Rubicor that included Neothermia proprietary information, , a Neothermia colleague of mine and I met with Rubicor's principals, Dr. James Vetter and Dr. Roberta Lee, and its office manager, Natalie Hyland. The meeting was confidential under the non-disclosure agreement.

10. It was apparent to me at the August 1998 meeting that Rubicor had been working on a mechanical approach to obtaining biopsies of cancerous or suspect tissue, but was interested in incorporating Neothermia's electrosurgical technology into its design. Particularly, Rubicor was interested in using

REDACTED

11. It also was apparent to me at the August 1998 meeting that Rubicor's principals had no real experience or knowledge regarding the design of electrosurgical devices.

REDACTED

12. On September 24, 1998, I sent a letter concerning communications Neothermia had with Rubicor to Dr. Vetter, a true and correct copy of which is attached hereto as Exhibit D. I understand that Rubicor claims that this letter "admits that it was Rubicor who disclosed to Neothermia the idea of rotating a cutting electrode around a tumor to be excised." This is incorrect. As I state in the letter, the REDACTED was Neothermia's. In fact, I was in possession of the concept of

REDACTED

long before I was ever introduced to Rubicor. Attached hereto as Exhibit E is a true and correct copy of a memorandum that I wrote in 1997 – months before my discussions with Rubicor – that describes this concept. Under the non-disclosure agreement, I orally disclosed the concept of

REDACTED

This is what I referred to as "the Rubicor concept" in the letter.

**13.** I do not have access to information about Rubicor's internal notes or documentation of its receipt or review of Neothermia's proprietary information. I understand that Neothermia's attorneys do not have this information either, as Rubicor has refused to produce its internal documents in this litigation. If I or Neothermia's attorneys were able to review Rubicor's internal documentation about its review and receipt of Neothermia's proprietary information, I would expect us to be able to determine in much more detail how and when Rubicor used Neothermia's proprietary information. I would also expect us to be able to test whether Rubicor actually believed this information was in the public domain at the time Rubicor received it from us.

**14.** I have reviewed the information available on Rubicor's internet site. A picture of Rubicor's EnCapsule Breast Biopsy Device taken from that internet site is set forth below:



The Rubicor internet site describes the procedure used to isolate a targeted volume of tissue using the EnCapsule device. Rubicor's illustration of this procedure, taken from its internet site, are reproduced below:




These illustrations, and the accompanying description on the internet site, show that Rubicor's EnCapsule device incorporates several of the Neothermia concepts that I disclosed to Rubicor, including:

REDACTED

Attached hereto as Exhibit F are true and correct copies of printouts from "www.rubicor.com" illustrating and describing procedures for using the EnCapsule device.

**15.** I do not have access to information about Rubicor's design or development of its EnCapsule devices, other than through what I can infer from public information such as Rubicor's internet site. I understand that Neothermia's attorneys do not have this information either, as Rubicor has refused to produce its internal documents in this litigation. If I or Neothermia's attorneys were able to review Rubicor's design and development documentation for the EnCapsule device, I would expect us to be able to determine in much more detail how and when Rubicor incorporated Neothermia's proprietary information into its EnCapsule device, and to test whether Rubicor believed that the concepts disclosed by Neothermia were generally known to the public.

16. I have reviewed Rubicor's '362 patent,[1] which states that it was filed on September 3, 1998. Rubicor's '362 patent is generally directed at minimally invasive breast biopsy techniques. *See* Exhibit F at 1:5-10; 4:42-49. Rubicor's patent also notes that a "major concern" in the breast biopsy field "is the possibility of tumor dissemination." *Id.* at 3:36-37. Rubicor's patent states that an object of the invention it claims is to "safely excise suspicious lesions from the breast," and to provide "devices and methods that remove the entire lesion intact with the minimum amount of normal tissue surrounding the lesion needed to provide adequate margins." *Id.* at 4:42-49. It explains how the cancer treatment technique it describes can help "markedly decrease" the probability of "seeding the surrounding tissue with potentially abnormal cells." *Id.* at 13:55-64. And while Rubicor's patent application is focused on descriptions of mechanical cutting technologies, it states in the summary of the invention that "the cutting tool" of the invention "may comprise an electrosurgical blade." *Id.* at 6:34-39. The electrosurgical cutting element pictured in Rubicor's patent application is a side-firing blade. *Id.* at Fig. 6, Fig. 1C, 12:50-55. Thus, Rubicor's patent incorporates several of the proprietary concepts that I disclosed to Rubicor pursuant to a non-disclosure agreement in the month and a half before Rubicor filed its patent application, including

REDACTED

17. I do not have access to information or documentation about the preparation and filing of Rubicor's patent application, other than through what I can infer from public information such as Rubicor's patent. I understand that Neothermia's attorneys do not have this information either, as Rubicor has refused to produce documents in this litigation. If I or Neothermia's attorneys were able to review the documentation regarding the preparation and filing of Rubicor's patent application, as well as its pre-September 3, 1998 design and development records, I would expect us to be able to determine in much more detail how and

[1] U.S. Patent No. 6,022,362, issued February 8, 2000, attached as Exhibit G.

when Rubicor incorporated Neothermia's proprietary information into its patent application, and to test whether Rubicor believed that the concepts disclosed by Neothermia were generally known to the public.

18. **The Okada Reference.**[2] The Okada reference describes a flexible tube-based electrosurgical instrument that is designed to be inserted into the intestines or other parts of the body cavity, not for insertion into tissue, like the breast. *See* Exhibit H [Okada at 1:4-6; 1:38-45; 3:26-30]. The Okada instrument does not have a pointed tip at the end. *Id.* at Fig. 1, Fig. 9. The Okada reference does show a side-firing arch-shaped electrode, but this electrode is housed in a flexible insulating tube, made of a material such as Teflon, which can be snaked into a body cavity. Thus, unlike the devices we disclosed to Rubicor, the electrode in the Okada device is not housed in a rigid shaft that could penetrate tissue, and could not be used for penetrating breast tissue. *Id.* at 3:26-30, Fig. 1. The Okada reference does not disclose

REDACTED

19. **The Fischer Reference.**[3] The Fischer reference describes an electrosurgical instrument used for cervical conization. It is specifically designed so that it cannot penetrate into the body, but instead is inserted into the vagina and used to excise a conical section of tissue from the cervix. *See* Exhibit I [Fischer at 1:15-18; 1:52-55] (Summary of the Invention describing "an electrosurgical instrument for the excision of a tissue specimen from the transformation zone of the uterine cervix"); *Id.* at 2:16-37. The instrument has a blunt tip, designed to be inserted into the cervix, and a "stop arm 12" to stop further insertion. *Id.* at 1:58-62, 2:22-27 (describing insertion "until the stop arm abuts the endocervix"). The Fischer

[2] U.S. Patent No. 3,910,279, issued October 7, 1975, attached as Exhibit H.

[3] U.S. Patent No. 5,554,159, issued September 10, 1996, attached as Exhibit I.

instrument cannot be used to penetrate breast tissue for minimally invasive breast cancer treatment. Even if the instrument were capable of being used to penetrate breast tissue, no surgeon would cut a conical section out of the surface of the breast when attempting to perform minimally invasive surgery – yet this is all that the Fischer instrument could be used to do. The Fisher reference does not disclose

REDACTED

20. **The Lorentzen Reference.**[4] The Lorentzen reference describes the testing of an electrosurgical instrument in fresh calf-liver, not breast tissue in a living patient. It does show an instrument designed to penetrate into tissue and electrosurgically cut. *See* Exhibit. J [Lorentzen at 223]. However, the instrument it describes is quite different from Neothermia's concept of a side-firing electrosurgical cutting element. In the Lorentzen device, the electrosurgical electrode emerges from the tip of the instrument, rather than the side. This electrode is supported only at one end, not both ends as in the arch-shaped side-firing electrode, and hence it deforms as it cuts. *Id.* at 221-22 (explaining that a circular loop electrode excises an ellipsoid mass of tissue, while a semi-ellipsoid loop excises an almost circular mass of tissue). The Lorentzen article also describes a very early-stage investigation where the electrode loop permanently deformed, and where the electrosurgical cuts produced steam and smoke. As the article notes, "the loop electrode has not yet been used in vivo, and several questions remain unanswered ... animal studies are warranted to further evaluate the performance of the loop electrode." *Id* at 223-24. The Lorentzen article does not disclose

REDACTED

[4] "The Loop Electrode: In Vitro Evaluation of a Device for Ultrasound-Guided Interstitial Tissue Ablation Using Radio Frequency ElectroSurgery", Acad Radio, Vol. 3 pp. 219-224, 1996, attached as Exhibit J.

REDACTED

21. **The Valleylab Reference.**[5] The Valleylab reference describes a device which is designed to penetrate into body tissue and which contains a side-firing electrosurgical cutting element. However, the Valleylab reference does not disclose the concept of REDACTED Instead, the Valleylab reference is directed at prostate surgery. *See* Exhibit K at NEO 568 ("An interstitial resector, described herein, may be used for surgery on the prostate."). The Valleylab reference also does not disclose

REDACTED

22. **The Burbank Reference.**[6] The Burbank reference does discuss the concept of using electrosurgical cutting techniques for minimally invasive breast cancer treatment. However, the Burbank reference does not disclose the concept of

REDACTED In fact, the Burbank reference teaches the opposite –

This creates a risk of metastasis by seeding cancer cells along the insertion and withdrawal path of the instrument. Moreover, the Burbank reference does not disclose the

[5] UK patent No. 2,311,468, published October 1, 1997, attached as Exhibit K.
[6] U.S. Patent No. 6,331,166, issued December 18, 2001, attached as Exhibit L.

REDACTED

23. **The Bovie Reference**[7] The 1931 Bovie patent discusses electrosurgical cutting. It does not disclose

REDACTED

24. **Neothermia's' 798 Patent**[8] The '798 patent, of which I am the named inventor, describes a device which is used to cut tissue and seal blood vessels as they are transected, but it does not describe electrosurgical cutting and is not an electrosurgical device, since electric current does not pass from the device into the tissue. Thus, the '798 patent does not disclose

treatment

manner tl

REDACTED

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 15, 2004 at Telluride Mountain Village, Colorado.

Philip E. Eggers

[7] U.S. Patent No. 1,813,902, attached as Exhibit M.

[8] U.S. Patent Nos. 5,611,798, attached as Exhibit N.