T. D. BOLLING, JR., SBN 33236
MARJORIE E. MANNING, SBN 118643
**BOLLING, WALTER & GAWTHROP**
A Professional Corporation
8880 Cal Center Drive, Suite 400
Sacramento, California 95826
Telephone No. (916) 369-0777
Telecopier No. (916) 369-2698

Attorneys for Defendants
TECTONICS ENGINEERING AND CONTRACTING, INC.
AND JOHN MICHAEL HERATY,

Apple Inc. v. Psystar Corporation Doc. 1815

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LARRY TOTTEN, as CHAIRMAN and JOSE MORENO as CO-CHAIRMAN of the BOARD OF TRUSTEES FOR THE LABORERS HEALTH AND WELFARE TRUST FUND FOR NORTHERN CALIFORNIA; LABORERS VACATION-HOLIDAY TRUST FUND FOR NORTHERN CALIFORNIA; LABORERS PENSION TRUST FUND FOR NORTHERN CALIFORNIA; and LABORERS TRAINING AND RETRAINING TRUST FUND FOR NORTHERN CALIFORNIA,

Plaintiffs,

v.

TECTONICS ENGINEERING AND CONTRACTING, INC. dba TECTONICS CORNERSTONE WEST, a California corporation; and JOHN MICHAEL HERATY, an individual,

Defendants.
_____________________________________/

**CASE NO. CIV. C-03-4299 WHO**

**DEFENDANT TECTONICS ENGINEERING & CONTRACTING, INC.'S TRIAL BRIEF**

**TRIAL DATE: September 20, 2004**
**TIME: 11:00 a.m.**
**COURTROOM: 9, 19th Floor**
**JUDGE: Hon. William H. Alsop**

**PRETRIAL CONF.**
**DATE: September 7, 2004**
**TIME: 9:00 a.m.**



Dockets.Justia.com

## INTRODUCTION/SUMMARY OF ARGUMENT

The complaint in this action, filed September 22, 2003, includes two claims for relief against defendants Tectonics Engineering & Contracting, Inc. (TEC) and John Michael Heraty (Heraty), majority shareholder and president of TEC. The first claim is for breach of a collective bargaining agreement that TEC entered with the Northern California District Council of Laborers, an affiliate of the Laborers' International Union of North America AFL-CIO (hereinafter "Union") in December 1999. That collective bargaining agreement incorporated a provision of the Laborers' Master Agreement that the Associated General Contractors of California, Inc. (hereinafter, "AGC") entered with the Union in July 1999, which obligated employers to pay monthly contributions to four trust funds. Plaintiffs contend that TEC and Heraty breached the 1999 collective bargaining agreement by failing to make trust fund payments that were due for the months of January, March, April and May 2003. The second claim for relief seeks a mandatory injunction, ordering defendants to allow an audit of TEC's records.

Federal substantive law applies in actions to enforce labor contracts, although the court may look to state law for guidance. *Seymour v. Hull & Maryland Engineering*, 605 F.2d 1105, 1109 (9th. Cir. 1979). Under Ninth Circuit authority, neither TEC nor Heraty is liable for the alleged unpaid contributions.

In August 2001, TEC sold its assets to a partnership, Cornerstone Flooring & Linings West dba *Tectonics/Cornerstone West* (hereinafter "the Partnership"). Prior to the asset sale, TEC had made all payments due the trust funds.

TEC ceased operations and had no employees after the Partnership acquired its assets. The Partnership employed most of TEC's work force, including Union laborers and foremen, and used the equipment and supplies it purchased from TEC in continuing the same business operations as TEC had conducted prior to the asset sale. Under the terms of the asset purchase agreement, the Partnership was responsible for all obligations of the business after the asset sale. The Partnership was not the alter ego of TEC. The majority partners and managing partner had never been employed by TEC, nor did they have any

involvement in TEC's business prior to the asset sale. Heraty retired on or about August 3, 2001 and had no involvement whatsoever in the business of the Partnership.

The AGC and Union entered a new Laborers' Master Agreement on October 22, 2001. This Agreement increased the amount of contributions employers were obligated to pay to the trust funds. But the collective bargaining agreement that TEC entered with the Union in December 1999 did not incorporate any provisions of the new Laborers Master Agreement nor was TEC, or Heraty, notified that the Union intended to negotiate a new master agreement with the AGC.

Although the collective bargaining agreement TEC entered with the Union in December 1999 did not incorporate any of the provisions of the new Laborers' Master Agreement, the Partnership paid contributions due the Trust Funds through December 2002. The defaults that are the subject of plaintiffs' claims occurred in 2003. As the successor employer, the Partnership would be liable for the unpaid Trust Fund contributions if there was an obligation to pay the contributions when the defaults occurred in 2003.

There is no evidence to justify piercing TEC's corporate veil to impose liability on Heraty. In the first place, TEC is not liable for the unpaid contributions. Moreover, the separate identity of the corporation and its shareholders was maintained, the corporation was adequately capitalized and operated as an entity without any fraudulent intent, and recognition of the corporation's separate existence is not an injustice to plaintiffs.

Defendants are not contractually bound to provide plaintiffs' auditor with access to TEC's business records which were transferred to the Partnership along with TEC's other assets. Even if TEC were contractually obligated to make its business records available for review by plaintiffs' auditor, plaintiffs have waived that right. Plaintiffs never requested an audit before the complaint in this action was filed in September 2003. After the complaint was served, Heraty made all of TEC's records in his possession available for review by plaintiffs until discovery closed in this case.

Most, but not all, essential facts are undisputed. See Stipulated Facts in the parties'

Joint Proposed Final Pretrial Order and Joint Exhibit List.[1] The undisputed facts as well as other facts supported by the evidence will be summarized below.

## FACTUAL BACKGROUND

Plaintiff Larry Totten is the Chairman and plaintiff Jose Moreno is Co-Chairman of the Board of Trustees for the Laborer's Health and Welfare Trust Fund for Northern California, Laborers' Vacation-Holiday Trust Fund for Northern California, Laborers' Pension Trust Fund for Northern California, and Laborers' Training and Retraining Trust Fund for Northern California (hereinafter collectively "Trust Funds"). The Trust Funds were established by Trust Agreements dated March 4, 1953, which were amended and modified on August 2, 1963, April 1, 1985, June 4, 1963, November 19, 1968 and December 31, 1975. SF 1-2.[2] See Ex. 34 (1975 Trust Agreements).

In July 1953, the AGC and Union entered into a Laborers' Master Agreement which obligated individual employers to pay hourly contributions to the Trust Funds for each hour paid for and/or worked by laborers and foreman. SF 3. The Laborers' Master Agreement was amended by agreement of the AGC and Union in 1956, 1957, 1959, 1961, 1962, 1965, 1968, 1971, 1974, 1977, 1980, 1983, 1986, 1988, 1992 and 1996. SF 4.

On July 9, 1999, the AGC and Union entered into a Laborers' Master Agreement. Section 32 of this Laborers' Master Agreement provided in the first and second paragraphs: "This Agreement shall be effective as of the 28th day of June, 1999, and remain in effect without reopening for any purpose until the 30th day of June, 2002, and shall continue from year to year thereafter, unless either of the Collective Bargaining Representatives shall give written notice to the other of a desire to change the wages, hours and working conditions hereof, not more than ninety (90) and not less than sixty (60) days prior to June 30 of any

---

[1] The parties have stipulated to waive authentication requirements with respect to each exhibit, but have reserved the right to make all other obligations. See § V in Joint Proposed Final Pretrial Order.

[2] "SF" followed by a number refers to a stipulated fact in the Joint Proposed Pretrial Conference Order.

succeeding year. [¶] The parties to this Agreement recognize the necessity of assuring the competitive position of the parties within the industry during the terms of this Agreement. Consistent with that recognition, the parties will continually monitor the effectiveness of this Agreement relative to specific geographic or market area and will endeavor, by mutual agreement, to initiate such modifications to the Agreement during its term as may be necessary to assure the work opportunities of the employees and the competitive position of the Individual Employers." SF 5; Ex. 2.

The 1999-2002 LMA provided in § 1: "This Agreement shall apply to any employee who performs work falling within the presently recognized jurisdiction of those Local Unions of the Laborers' International Union of North America affiliated with the Northern California District Council of Laborers; except that this Agreement shall not apply to superintendents, assistant superintendents, general foremen, . . . timekeepers, messenger persons, confidential employees and office help." Ex. 2; § 1A(3).

Section 18 of the 1999-2002 LMA specified wage rates for laborers and foremen in Supplement No. 1 which was incorporated in § 18 of the LMA. SF 6. Section 28A of the 1999-2002 LMA specified sums for employers to pay to the Trust Funds. SF 7; Ex. 2.[3]

TEC is a California C corporation that was formed in September 1979 to install special floor coverings ("specialty protective coatings") in industrial and commercial buildings. SF 8. Initially, there were three shareholders: Heraty, James J. Falls (Falls) and Donald Cecchettini. Heraty and Falls became the sole shareholders in 1987. Heraty, who owned 69% of TEC's shares, was president and Falls, who owned 31% of the shares, was vice-president of the company in 2001. SF 21-22.

TEC was based in Lincoln, California. The company was profitable, and it had a

---

[3] Section 28A provided that for each hour paid for and/or worked by members of the Union, each employer shall pay a specified sum to the Trust Funds. Each of the Trust Funds are administered by the Laborers' Funds Administrative Office of Northern California, Inc. (hereinafter, "Laborers' Funds Administrative Office"). The Laborers' Funds Administrative Office required each employer to submit a monthly report for each fund, specifying the hours worked by each covered employee.

substantial share of the special floor coverings business in Northern California due to the quality of its work.

TEC employed laborers and foremen who were members of the Union for the purpose of installing special floor coverings. SF 9. TEC was not a member of the AGC, but it recognized the Union as the bargaining representative of the laborers and foremen it employed. SF 10-11. Thus TEC negotiated collective bargaining agreements with the Union. SF 12.

In December 1999, TEC entered into a collective bargaining agreement with the Union which provided, *inter alia*: "*** This Collective Bargaining Agreement applies to work performed by Tectonics in its current industry and area of practice, i.e. Specialty Protective Coatings. The parties attach hereto and incorporate herein by reference the Laborers' Master Agreement between the Northern District Council of Laborers and the Associated General Contractors of California, 1999-2002. The parties agree that the term of the Laborers' Master Agreement will govern the terms and conditions of the employment of the employees working for Tectonics, Inc. in its current industry and area of practice unless such terms and provisions are superseded by agreements set forth herein." SF 13; Ex. 1.

The collective bargaining agreement TEC entered with the Union in December 1999 stated in paragraph 1 that the parties "agree to modify Section 32 of the collective bargaining agreement relating to the effective and termination date by deleting Section 32." Paragraph 1 incorporated without change the first and second paragraphs of § 32 of the 1999-2002 LMA. SF 14. Paragraph 9 stated: "The parties agree that Section 16B in the Master Agreement on Page #29 is deleted in its entirety from this Agreement and not applicable to [TEC]." SF 16.

The collective bargaining agreement TEC entered with the Union in December 1999 specified wages and benefits in paragraphs 2-5. SF 15. The collective bargaining agreement provided in paragraph 3, "Wages and Benefits," that "[f]or work covered by the Davis Bacon Act or the California equivalent thereof, the wages and benefits established by the

Laborers' Master Agreement shall be applied by Tectonics."[4] Paragraph 3 then specified wages and benefits, including the amount of Trust Fund contributions for work on jobs performed on jobs under contracts other than government contracts.

It also is undisputed that the collective bargaining agreement TEC entered with the Union in 1999 incorporated §7B of the 1999-2002 LMA which provided: "Each individual Employer, upon request of any Trust Fund specified in this Agreement, shall permit a Trust Fund Auditor to review any and all records relevant to the enforcement of the provisions of this Agreement pertaining to the Trust Funds. Such review shall be permitted not less than ten (10) working days after demand." SF 17.

Daniel L. Hess contacted Heraty in 2000 and inquired if TEC was for sale. Hess disclosed that he was inquiring on behalf of himself and Louis A. Kaufman. Heraty learned that Hess resided in Indiana and Kaufman's residence was in Louisville, Kentucky. Heraty also learned that Hess and Kaufman were principals in Cornerstone Industries, Corp., based in Louisville, which conducted a floor covering business in the mid-west and other parts of the country but not California. Hess advised that he and Kaufman wanted to enter the California market. Hess made clear at the outset that he and Kaufman wanted to purchase TEC's assets rather than acquire Heraty's and Fall's shares. However, Hess and Kaufman wanted to acquire the right to use the name "Tectonics" along with its good will and tangible assets. Heraty, who was 69 years old and planning to retire, was interested. Falls, who was younger, was also interested in selling the company, but he wanted to continue in the special floor coverings business in Northern California.

Negotiations commenced in early 2001. Hess and Kaufman were represented in the negotiations by Stites & Harbison, a law firm with offices in Louisville, Kentucky. TEC was represented by Murphy, Austin, Adams & Schoenfeld (MAAS), a law firm based in Sacramento. Jeff Curcio was the MAAS partner who conducted the negotiations with Stites

---

[4] The Davis Bacon Act, 40 U.S.C. §§3141 et seq. (formerly 40 U.S.C. §§276 et seq.) provides that for every contract to which the federal government is a party, the contractor and subcontractor are required to pay minimum wages established by the Secretary of Labor. The provisions of California Labor Code §§1770 are the state law "equivalent" of the Davis Bacon Act.

& Harbison. However, Heraty and Falls communicated directly with Hess and Kaufman during the negotiations.

At an early stage of the negotiations, Falls advised Kaufman and Hess that he wanted to continue in the protective floor coverings business after Heraty retired. Since neither Hess nor Kaufman intended to move to California, they offered to employ Falls to manage field operations of the new company in the event negotiations were successful. They also assured Falls that he would receive an equity position in an organization formed to acquire TEC.

Kaufman and Hess were advised during negotiations that TEC was party to a collective bargaining agreement with the Union. They were also advised of TEC's obligation to pay contributions to the trust funds.

Hess and Kaufman made clear that Cornerstone Industries, Corp. was not affiliated with any union and they did not want to be a union employer in California. However, they learned that TEC did a substantial amount of business with general contractors who were union employers. Thus Hess and Kaufman realized their new venture would not be successful if they hired nonunion laborers. Hess and Kaufman also understood that to give the new company the best chance of success, it should employ TEC's staff including Union laborers and foremen.

When it appeared agreement on essential terms probably would be achieved, Kaufman and Hess formed the Partnership pursuant to a written partnership agreement. The partnership agreement provides the name of the partnership is "Cornerstone Flooring & Linings West dba Tectonics/Cornerstone West." SF 23; Ex. 4. The agreement identified the partners as:

Louis A. Kaufman LLC, a Kentucky limited liability company

Daniel L. Hess LLC, an Indiana limited liability company

McDermott LLC, One California limited liability company

Floor Doctor LLC, a California limited liability company[5]

The agreement provided Kaufman's and Hess' limited liability companies each owned 35% of the Partnership, McDermott's limited liability company had a 20% interest and Falls' limited liability company (Floor Doctor) held a 10% interest. In §4.6, the partnership agreement designated Kaufman as managing partner in his individual capacity. Section 1.1 states the business of the Partnership was "to acquire and operate an industrial floor protection service." The partnership agreement was signed by Kaufman, Hess, McDermott and Falls on July 25, 2001, the date the agreement became effective according to its terms.

After negotiations were completed on or about July 31, 2001, TEC and the Partnership entered into several agreements in connection with the sale of TEC's assets on August 3, 2001.[6] SF 28. These agreements included the following:

**Asset Purchase Agreement**, Ex. 5

**Bill of Sale**, Esq. 6

**Assignment & Assumption Agreement**, Ex. 7;

**Falls' Employment Agreement**, Ex. 8;

**Management Agreement**, Ex. 9;

**Lease Assignment**, Ex. 10;

**Noncompetition Agreement** executed by **Heraty**, Ex 11;

**Noncompetition Agreement** executed by **Falls**, Ex. 12.

There were several schedules referred to in the **Asset Purchase Agreement** (hereinafter, "**Asset Agreement**") including

Schedule 1.1 "Excluded Assets," Ex. 13;

Schedule 1.3a "Accounts Payable," Ex. 14;

---

[5] Peter McDermott, an associate of Hess was a member of the limited liability company that bears his name. Falls was the sole member of Floor Doctor LLC. SF 24.

[6] "**Cornerstone Flooring & Linings West**" was identified as "Buyer" and TEC was identified as "Seller" in pertinent agreements.

Schedule 2.8 "Employment and Labor Matters," Ex. 15;

Schedule 2.16 "Fixed Assets," Ex. 16;

Schedule 2.27 "Inventory," Ex. 17;

Schedule 2.28 "Accounts Receivable," Ex. 18

The **Asset Agreement,** which was the core document, provided the effective date of the sale was July 31 and the closing date was August 3, 2001. Heraty and Falls executed the agreements on August 3, 2001. Ex. 5; SF 28.

The **Asset Agreement**, in Article I, Purchase and Sale of Assets, Section 1.1(a), described the assets to be transferred to the Buyer by the Seller as including "**all of the assets, properties and rights owned by the Seller** or in which the Seller has any right or interest of every type and description, real, personal and mixed, tangible and intangible, confirmed or contingent (other than the **Excluded Assets** as hereinafter defined), including, without limitation, cash on hand and in banks, business agreements, property, Inventory (as defined in Section 2.27), the Accounts Receivable (as defined in Section 2.28), goodwill, supplier lists, customer lists, licenses and permits, processes, service marks, know-how, show-how, trade secrets, telephone numbers, Internet domain names, software (including, without limitation, documentation and related source and object codes), licenses thereto, computers and computer equipment, files and other records, systems and processes, security deposits, contracts, arrangements and understandings, oral and written, formal and informal, for work to be performed and/or services to be provided, real estate and interest therein, leasehold and other improvements, machines, machinery, equipment, furniture, fixtures, supplies, all rights and claims under insurance policies and other contracts of whatever nature, all causes of action, claims and demands of every nature relating to the assumed Liabilities, Contracts and Leases (as hereinafter defined), the **right to use the name 'Tectonics Engineering and Contracting' or any derivative thereof**, and all other assets, properties and rights of every kind and nature owned by the Seller, whether or not specifically referred to in the Agreement (collectively, the 'Transferred Assets'), all with the intention that the **Business shall be transferred to the Buyer as a going concern**."

(Emphasis added.)[8]

The consideration the Partnership agreed to pay for TEC's assets was specified in Section 1.2 of the **Asset Agreement**. The consideration included an initial payment of $299,199.33 to Wells Fargo Bank on the day of closing,[9] twelve monthly payments of $15,000 each beginning September 1, 2001 and ending August 1, 2002, and assumption of the "Assumed Liabilities" pursuant to Section 1.3 of the **Asset Agreement**. Section 1.3, "Assumption of Liabilities," provided in relevant part that Buyer would assume the **accounts payable** listed on Schedule 1.3(a)[10] and "**obligations and liabilities arising from operation of the business after the Effective Date . . .**"

The **Asset Agreement** provided, in Section 2.8, Employment and Labor Matters, paragraph (a):

> "Schedule 2.8 lists all employees and officers of the Seller on the date hereof, along with the amount of the current annual salaries and total compensation paid or due for services to such employee or officer for the most recent fiscal year end and the year to date and a full and complete description of any commitments to any such employees and officers with respect to compensation payable thereafter. To the best knowledge of the Seller, no key employee or group of employees has any plans to terminate employment with the Seller."

Section 2.8 also provided, in paragraph (b), that "[e]xcept as set forth on Schedule 2.8, the Seller is not a party to or bound by any collective bargaining agreement with any labor organization, group or association covering any of its employees . . ."

Schedule 2.8 to the Asset Agreement included a face sheet and a letter dated March 29, 2001 to Heraty, from Don R. Payne, Business Manager of the Union, captioned "Letter of Understanding to the 1999-2002 Laborers' Master Agreement Covering Privately Funded

---

[8] The "Excluded Assets" were listed in Schedule 1.1. The only "assets" identified in the schedule were a few personal items of Heraty and two office employees, Debbie Bruns and Helen Johnston. See Ex. 13.

[9] This payment was to satisfy a debt TEC owed the Bank pursuant to a line of credit. See Ex. 14.

[10] The accounts payable listed on Schedule 1.3(a) were in the total amount $743,480.44. See Ex. 14.

Work," Ex. 19. The face page of Schedule 2.8 stated: "Tectonics is bound by a Collective Bargaining Agreement with the Laborers' Union under a Master Agreement and Letter of Understanding." The Letter of Understanding confirmed an adjustment in the schedule of wages and fringe benefits for privately funded work. See Ex. 15.

Schedule 2.8 also included an Employee Record Report for each of TEC's 35 employees as of June 15, 2001. Each Report disclosed the employee's salary and identified employees who were members of the Union. Of the 35 employees, 28 were members of the Union; the rest were management, clerical and sales staff. See Exhibits 15 & 20.

The Bill of Sale, Ex. 6, transferred to the Partnership all of TEC's rights and interests in the **accounts receivable** listed in Schedule 2.28, the fixed assets listed in Schedule 2.16, Ex. 16, the inventory listed in Schedule 2.27, Ex. 17, as well as all other "Transferred Assets" specified in the **Asset Agreement**. The accounts receivable listed in Schedule 2.28 exceeded $1 million. See Ex. 18.

The **Assignment and Assumption Agreement**, Ex. 7, was the instrument that assigned to the Partnership all of TEC's interest in uncompleted contracts that were capable of being assigned without the approval or consent of any party thereto other than TEC, its interest in "retainage payments" (i.e. money withheld by customers pending performance of contracts) and its licenses and bank accounts. However, jobs in progress at the time of closing were excluded from the Assignment and Assumption Agreement, because those contracts could not be assigned without the consent of the customer and the parties anticipated customers (general contractors) would be unwilling to consent to assignment of TEC's obligations to a new company.

TEC could not complete the unfinished contracts for several reasons. First, the Partnership would acquire all of TEC's assets at closing. Second, Heraty planned to retire and Falls had agreed to join the Partnership as a general partner and employee. Third, the **noncompetition agreements** prohibited TEC's shareholders, Heraty and Falls, from participating in any business which would be in competition with the Partnership for two years after the asset sale. See § 1.2 of Exhibits 11 and 12.

Thus the parties agreed TEC would appoint the Partnership as its agent to complete the unfinished contracts pursuant to the terms of the **Management Agreement**, Ex. 9, which provided in relevant part:

**"PRELIMINARY STATEMENTS:**

***

"The Company [TEC] is a party to certain contracts for the sale and installation of its products and the rendering of its services listed on <u>Schedule A</u> (the 'Managed Contracts').

"After the closing of the transactions contemplated in the **Asset Agreement**, the Company will not have sufficient assets or management level employees to complete the Managed Contracts and desires to engage the Agent [the Partnership] as its agent to complete the contracts.

**"AGREEMENTS:**

"In consideration of the foregoing Preliminary Statements and the mutual covenants, representations, warranties and agreements set forth in this Agreement and the Asset Agreement..., the parties hereby agree as follows:

"1. <u>Appointment</u>. The Company hereby appoints and designates Agent, and Agent accepts such appointment as the Company's exclusive Agent for each of the Managed Contracts. The Company agrees to use its best efforts to provide all employees reasonably requested by Agent in connection with the completion of the Managed Contracts ... . In connection with the completion of the Managed Contracts, **Agent agrees to pay** on the Company's behalf **all costs for employees provided by the Company** and provide all materials, tools, supplies, equipment, insurance... at its sole cost and expense. **Agent, at its sole cost and expense, shall cause to be timely prepared on the Company's behalf any employment-related tax returns, pay the union contract benefit and trust fund payments related to the Managed Contracts and other reports on behalf of the Company in connection with the Managed Contracts. The Agent shall be entitled to collect all amounts due to the Company** in connection with the Managed Contracts including change orders and retentions."

***

"3. Management Fee. The Agent shall be entitled to receive as compensation for its services hereunder, the amount due to the Company under the Managed Contracts less the amount paid on the Company's behalf in connection with the administration of the Managed Contracts... .

"4. Management Term. The term of this Agreement and the appointment of Agent as an agent of the Company shall commence on the date hereof and shall terminate with the first to occur (1) July 31, 2004 or (2) the completion of the Managed Contracts.

*** (Emphasis added)

The asset sale closed on or about August 3, 2001, the date Heraty and Falls executed the agreements. See SF 28. Prior to closing, TEC had submitted all reports and paid all contributions to the trust funds required under § 28A of the 1999-2002 LMA, which was one of the provisions incorporated in the collective bargaining agreement TEC entered with the Union in December 1999.

Neither Kaufman, Hess or his associate, McDermott, was provided any benefit other than the consideration provided in the **Asset Agreement** and other agreements associated with the sale. It is undisputed that TEC never provided any compensation directly to Kaufman, Hess or McDermott. SF 3. Moreover, neither Kaufman, Hess nor McDermott received compensation from TEC indirectly. It also is undisputed that neither Kaufman, Hess nor McDermott had an ownership interest in TEC. SF 32.

On August 3, 2001, the Partnership acquired TEC's assets, pursuant to the terms of the **Asset Agreement** and related agreements, and commenced operating a protective floor coverings business in the name "*Tectonics/Cornerstone West*."[11] The Partnership used the

---

[11] The Partnership paid TEC's debt to Wells Fargo Bank, pursuant to Section 1.2 of the **Asset Agreement**, took possession of TEC's facility in Lincoln as well as its equipment, business records (including accounts receivable) and bank accounts, commenced doing business as "*Tectonics/Cornerstone West*." The Partnership also performed its obligation, under Section 1.2 of the **Asset Agreement**, to pay $15,000 per month to TEC commencing in September 2001 and ending in August 2002.

assets it acquired from TEC in its protective floor coverings business. SF 34.

TEC ceased operations and had no employees after the Partnership acquired its assets on August 3, 2001. Heraty retired on or about August 3, 2001. SF 31. He never had an ownership interest in the Partnership; nor has Heraty ever been employed by the Partnership in any capacity or participated in management of Partnership business.

Falls was employed by the Partnership as senior vice president of operations pursuant to the written **Employment Agreement** he entered into with the Partnership on August 3, 2001. SF 35; Ex. 8. In addition to Falls, the Partnership employed 27 of TEC's 35-member work force after the asset sale. See Ex. 2.8 (TEC Employee Record Reports), Ex. 19 (Partnership Wage and Withholding Report to EDD for quarter that ended September 30, 2001) and Ex. 20 (Employee List Summary Exhibit). The former members of TEC's work force included Union laborers and foremen. SF 36. Of the 27 laborers and foremen that were employed by TEC as of June 15, 2001, twenty were employed by the Partnership immediately after the asset sale. See Exhibits 15, 19 and 20.

At the end of the last quarter of 2001, 24 of TEC's former work force remained on the payroll of the Partnership. See Exhibits 15, 20 and 21. As of June 30, 2002, the Partnership continued to employ 21 former TEC employees, including 15 Union laborers and foremen. See Exhibits 15, 20 and 22. At the end of the year 2002, 18 members of TEC's former work force continued employment with the Partnership, including 14 Union laborers and foremen. See Exhibits 15, 20 and 23. In 2003, the Partnership still employed 15 Union workers who had been on TEC's payroll prior to the asset sale and two employees were not members of the Union. See Exhibits 15, 20 and 24.

On October 16, 2001, the AGC and Union entered into the "2002-2006 Laborers Master Agreement, "effective July 1, 2002. SF 18; Ex. 3. The 2002-2006 LMA states in the initial paragraph that. it modifies, amends and changes the prior master agreements commencing with the Agreement dated June 4, 1952 through the Agreement dated June 14, 1996. <u>Ibid.</u> But the 2002-2006 LMA does not purport to modify, amend or change the 1999-2002 LMA, Ex. 2.

Section 28A of the 2002-2006 LMA provides for increases in the amount of contributions to the trust funds commencing June 24, 2002. SF 19. Section 7B of the 2002-2006 LMA is identical to §7B of the 1999-2002 LMA. SF 20.

The Union did not give TEC, or Heraty individually, notice of its intention to modify, amend or change the collective bargaining agreement it entered with TEC in December 1996. Nor did TEC, or Heraty individually, receive notice from the Union or AGC of a desire to change any of the provisions in the 1999-2002 LMA.

Whether the AGC or Union gave notice to the Partnership of a desire to change the terms of the collective bargaining agreement or LMA is unknown to defendants. However, it is undisputed that after the asset sale closed in August 2001, the Partnership submitted monthly reports to the Laborer's Funds Administrative Office through May 2003. SF 37. But the May 2003 report was the last report submitted to the Laborers' Funds Administrative Office concerning Union laborers and foremen employed by the Partnership. SF 38.

The Partnership paid contributions due the Trust Funds for each month after the Partnership acquired TEC's assets through December 2002 and also for February 2003. SF 39. However, the Partnership failed to pay the full amount due the Trust Funds for January 2003, and failed to pay any contributions to the Trust Funds for March, April and May 2003. SF 40.

Although it has not conducted any business, maintained an office, or had any employees since August 3, 2001, TEC has continued its active status with the California Secretary of State. The company is one of the defendants named in two construction defect cases which are being defended by its insurance company. TEC also was involved in a dispute with the Partnership which was the subject of a commercial arbitration proceeding in the American Arbitration Association. That matter has been resolved. However, the construction defect cases are still pending, and it is necessary for TEC to retain its active status with the California Secretary of State in order to have standing to defend these actions.

///

## ARGUMENT

## I.

## TEC WAS NOT OBLIGATED TO PAY CONTRIBUTIONS TO THE TRUST FUNDS IN 2003

### A. The 1999 Short-Form CBA Did Not Obligate The Employer To Pay Trust Fund Contributions After June 24, 2002

The initial paragraph in the short-form collective bargaining agreement that TEC entered with the Union in December 1999 provided in relevant part:

> "*** This Collective Bargaining Agreement applies to work performed by Tectonics in its current industry and area of practice, i.e., Specialty Protective Coatings. The parties attach hereto and incorporate herein by reference the Laborers' Master Agreement between the Northern District Council of Laborers and the Associated General Contractors of California, 1999-2002. The parties agree that the terms of the Laborers' Master Agreement will govern the terms and conditions of employment of the employees working for Tectonics, Inc. in its current industry and area of practice unless such terms and provisions are superseded by agreements set forth herein."

The next paragraph set forth **modifications** of the **1999-2002 LMA**:

> "1. The parties agree to modify Section 32 of the Collective Bargaining Agreement relating to the effective and termination date by deleting Section 32. For the purposes of this Collective Bargaining Agreement, Section 32 shall now read as follows:
>
> 'This Agreement shall be effective as of the date of its execution and remain in effect without reopening for any purpose until the 30th day of June 2002 and shall continue from year-to-year thereafter unless either of the parties hereto shall give written notice to the other of a desire to change the wages, hours and working conditions hereof not more than ninety (90) and not less than sixty (60) days prior to June 30th of any succeeding year.'
>
> 'The parties to this Agreement recognize the necessity of assuring the competitive position of the parties within the industry during the terms of this Agreement. Consistent with that recognition, the parties will continually monitor the effectiveness of this Agreement relative to specific geographic or market are and will endeavor, by mutual agreement, to initiate such modifications to the Agreement during its term as may be necessary to assure the work opportunities of the employees and the competitive position of the employer.'"

The only reasonable construction of paragraph 1 is that the parties intended for the short-form agreement to incorporate the termination and other provisions in section 32 of the 1999-2002 LMA, as modified in the short-form agreement.

Where, as here, a collective bargaining agreement provides it will continue in effect unless one party gives the other party notice of a desire to modify the agreement, the notice terminates the contract. *IAM. Dist. Lodge No. 94 v. ILWU, Local 13*, 781 F.2d 685, 691 (9th Cir. 1986), citing *Seymour v. Coughlin Co.*, 609 F.2d 346, 350-351 (9th Cir. 1979), *Cert. denied*, 446 U.S. 1957, 64 L.Ed.2d 816 (1980) ("approving use of notice of modification in terminating contract in *East Bay Union of Machinists, Local 1304 v. Fiberboard Paper Prods. Corp.*, 285 F.Supp. 282, 287 (N.D. Cal. 1968)" *aff'd mem.*, 435 F.2d 556 (9th Cir. 1970)). *ILWU, Local 13* also quoted with approval the policy underlying the notice of modification rule explained in *Broad Home Systems, Inc. v. International Brotherhood of Firemen*, 607 F.2d 1104, 1109 (5th Cir. 1979):

> "'It is inconceivable that either party wishing to avoid a breakdown of [bargaining] relations would have intended that the contract continue in force unless efforts to change the contract were successful, or unless both sides wanted to terminate the contract. The side *not* desiring a change could refuse to agree . . .. Each side could stand entrenched knowing the contract would continue as it was. The side desiring to alter the terms or conditions of the relationship would never have a prayer of success.'"

*ILWU, Local 13*, 781 F.2d at 691.

Here, neither TEC nor the Union gave notice to the other party of a desire to modify the 1999 short-form agreement. But it is undisputed that the AGC and Union negotiated a new agreement, i.e. the 2002-2006 LMA.

Where a short-form agreement provides it shall continue in effect for the same term as a master labor agreement "and for any renewals or extensions thereof . . ., unless and until either party gives the other notice of its desire to terminate," the employer is bound by the terms of a modified or renewed master agreement, unless the employer or union gives the other party written notice of a desire to terminate the short-form agreement. See *Const. Teamsters, Etc. v. Con Form Const. Corp.*, 657 F.2d 1101, 1103, distinguishing *Seymour*,

supra, 609 F.2d 346, in holding: "It is clear that a signatory to a Short-Form Agreement can agree to be bound by future modifications, extensions and renewals of an MLA."

The issue here then is whether paragraph 1 of the short-form collective bargaining agreement that TEC entered with the Union in December 1999 may reasonably be construed as incorporating the 2002-2006 LMA. Clearly, such construction would not be consistent with the intent of the parties as manifested in the short-form agreement. Although paragraph 1 of the short-form agreement provided the parties, "by mutual agreement," would initiate modifications during its term, there is no language in paragraph 1, or elsewhere in the short-form agreement, that purports to incorporate renewals, modifications, or extensions of the 1999-2002 LMA. Moreover, as noted earlier, the 2002-2006 LMA does not purport to be a modification or amendment of the 1999-2002 LMA.

**B. Even If The 1999 Short-Form CBA Could Be Construed As Incorporating The 2002-2006 LMA, TEC Would Not Be Liable For Unpaid Trust Fund Contributions Because It Did Not Have Any Employees After The Asset Sale Closed In August 2001**

As noted above, the 1999 short-form collective bargaining agreement provides "[t]he parties agree that the terms of the Laborers' Master Agreement will govern the terms and conditions of employment of the **employees working for Tectonics, Inc. in its current industry and area of practice** . . ." (Emphasis added.) TEC ceased doing business and did not have any employees after the asset sale closed in August 2001, much less any employees who were members of the Union. Therefore, it is crystal clear that TEC is not liable for trust fund contributions that the Partnership allegedly failed to pay in 2003.

**C. The Partnership Is Not The Alter Ego of TEC**

Federal law imposes liability on both a predecessor and successor employer, under a collective bargaining agreement the former entered with a union, where the predecessor and successor are deemed "*alter egos*." The "'alter ego' theory requires a threshold showing" that the predecessor and successor "constitute a single employer." *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th. Cir. 1994). "The criteria for determining whether two firms constitute a single employer are (1) common ownership, (2)

common management, (3) interrelation of operations, and (4) centralized control of labor relations." *Nor-Cal Plumbing*, 48 F.3d at 1471. See *J. M. Tanaka Const., Inc. v. NLRB*, 675 F.2d 1029, 1034 (9th. Cir. 1982); *NLRB v. Don Burgess Constr. Corp.*, 596 F.2d 378, 284 (9th. Cir. 1979), *Cert. denied*, 444 U.S. 940, 62 L.Ed.2d. 306 (1979). Centralized control of labor relations is the most important factor, "which can be demonstrated either by showing common control of day-to-day labor matters . . . , or by showing that the person in charge of the union company's labor relations made the decision that the second company would be non-union, . . ." *Nor-Cal Plumbing*, 48 F.3d at 1471. But establishing that the predecessor and successor constitute a single employer is not enough. The plaintiff must also show that the successor company "was created in 'an attempt to avoid the obligations of [the predecessor's] collective bargaining agreement through a sham transaction or a technical change in operations.'" *Nor-Cal Plumbing*, 48 F.3d at 1472 (quoting *A. Dariano & Sons, Inc. v. District Council of Painters No. 33*, 869 F.2d 514, 518 (9th. Cir. 1989)).

In the instant case, the evidence falls far short of establishing TEC and the Partnership were a single employer. Heraty, who owned 69% of TEC's shares, did not have any ownership interest in the Partnership; nor did Heraty participate in management of the Partnership's affairs. Since TEC had no employees after the asset sale, there could be no centralized control of labor relations. Moreover, the evidence summarized above would dispel any suggestion that the Partnership was created to avoid TEC's obligations under the collective bargaining agreement.

## II.

## IF THE 2002-2006 LMA APPLIES, THE PARTNERSHIP IS LIABLE FOR THE UNPAID CONTRIBUTIONS

Although a successor employer is bound to recognize and bargain with a union with whom its predecessor had a contract, the successor employer ordinarily is not bound by the substantive provisions of a collective bargaining agreement its predecessor had with the union which the successor did not agree to or assume. *Audit Services, Inc. v. Rolfson*, 641 F.2d 757, 763 (9th. Cir.1981), citing *NLRB v. Burns Security Services*, 406 U.S. 272, 284,

32 L.Ed.2d. 61 (1972). However, as the Supreme Court noted in *Burns*,

> "In many cases, of course, successor employers will find it advantageous not only to recognize and bargain with the union but also to observe the pre-existing contract rather than to face uncertainty and turmoil. Also, in a variety of circumstances involving a merger, stock acquisition, reorganization or **assets purchase**, the Board might properly find **as a matter of fact** that the successor had assumed the obligations under the old contract."

406 U.S. at 291 (emphasis added). Thus the successor employer is bound by the terms of the predecessor's collective bargaining agreement, including the obligation to pay contributions to a trust fund(s), if the successor acts as if it was a party to the agreement. *Audit Services,* 641 F.3d at 763.

In *Kallmann v. NLRB*, 640 F.2d 1094 (9th. Cir. 1981), the Ninth Circuit held a successor employer is deemed to have assumed the obligations under its predecessor's agreement with a union, if the successor hires most of its employees from the predecessor employer's work force and conducts essentially the same business as the predecessor. *Kallmann*, 640 F.2d at 1100. Later decisions instruct that to determine whether the successor company is engaged in essentially the same business as the predecessor the court should consider the following factors:

> "[a] there has a substantial continuity of the same business operations; [b] the new employer uses the same plants; [c] the same or substantially the same workforce is employed; [d] the same jobs exist under the same working conditions; [e] the same supervisors are employed; [f] the same machinery, equipment, and methods of production are used; and [g] the same product is manufactured or the same service [is] offered."

*Trustees for Alaska Laborers v. Ferrell*, 312 F.2d 512, 515 (9th. Cir. 1987) (quoting *NLRB v. Jeffreys Lithograph Co.*, 752 F.2d 459, 463 (9th. Cir. 1985)). Continuity of employment is the single most important factor. *Audit Services*, 641 F.2d at 763.

Here, in §1.3(a) of the **Asset Agreement**, the Partnership expressly assumed the obligations and liabilities arising from operation of the business after July 31, 2001. In the **Management Agreement**, the Partnership expressly assumed the obligation to pay contributions to the trust funds with respect to union employees who worked on the

unfinished contracts. Aside from these agreements, the Partnership continued the same business as TEC had conducted, using the equipment it had acquired from TEC and offering the same service, i.e., installation of protective floor coverings. Moreover, Cornerstone Flooring & Linings West employed most of TEC's work force in the same positions they held while employed by TEC.

## III.

## HERATY IS NOT PERSONALLY LIABLE FOR THE UNPAID TRUST FUND CONTRIBUTIONS

To impose liability on Heraty for the unpaid trust fund contributions, plaintiffs would have the initial burden of showing that TEC is liable for the unpaid contributions. If they were able to overcome this hurdle (which they cannot), plaintiffs would have to proffer evidence sufficient to justify piercing TEC's corporate veil. As with their claim against TEC, federal common law applies. *Local 159*, 185 F.3d at 985; *Audit Services*, 641 F.2d at 764; *Seymour v. Hull & Maryland Engineering,* supra, 605 F.2d at 1111.

In deciding whether the corporate veil should be pierced, the court considers three factors:

> "'[1] the amount of respect given to the separate identity of the corporation by its shareholders, [2] the degree of injustice visited on the litigants by recognition of the corporate entity, and [3] the fraudulent intent of the incorporators.'" *Nor-Cal Plumbing,* 48 F.3d at 1475 (quoting *Seymour v. Hull & Maryland Engineering,* 605 F.2d at 1111); *Audit Services*, 641 F.2d at 764.

Here, there is no evidence to support any of these factors.

## IV.

## PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF

Plaintiffs' second claim for relief seeks a mandatory injunction ordering defendants "to permit plaintiffs' auditor access to the books and records of defendant, in order to permit plaintiffs to verify the precise amounts owed by defendant to the Trust Funds." Cplt., ¶ 18. The purported grounds for injunctive relief are alleged in paragraph 17: "Pursuant to the terms and conditions of the trust agreements and Master Agreement, which expressly

incorporates the trust agreements, defendants are required to allow plaintiffs access to their books and records to determine the amount of Trust Funds contributions due and owing.. . . Despite demand by Plaintiff to allow its auditors to inspect the books and records of defendants which is renewed by virtue of this Complaint, defendants failed and refused to allow Plaintiffs' auditors access to its books and records to determine the amount of Trust Fund contributions due and owing in accordance with the provisions of written trust agreements. These allegations are false.

**A. <u>Plaintiffs Had No Right To Audit TEC's Records After The 1999-2002 LMA Was Replaced By The 2002-2006 LMA</u>**

It is undisputed that the collective bargaining agreement TEC entered with the Union in December 1999 incorporated § 7B of the 1999-2002 LMA which required each individual employer to permit a Trust Fund Auditor, within ten working days after demand, to review any and all records relative to enforcement of the provisions of the Master Agreement pertaining to the Trust Funds. It is also undisputed that § 7B of the 2002-2006 LMA that the AGC entered with the Union October 16, 2001, effective July 1, 2002, is identical to § 7B of the 1999-2002 LMA. However, the 2002-2006 LMA was a new agreement between the AGC and Union, which did not purport to be a modification or amendment of the 1999-2002 LMA. But even if the 2002-2006 LMA could be construed as modification or amendment of the 1999-2002 LMA, § 7B would not apply to TEC. This is so, because the 1999-2002 LMA was terminated no later than July 1, 2002, the effective date of the 2002-2006 LMA, and the collective bargaining agreement TEC entered with the Union cannot be reasonably be construed as incorporating the new LMA.

**B. <u>Plaintiffs Waived Any Right They May Have Had To Audi TEC's Records</u>**

As discussed above, the complaint in this action was filed September 22, 2003. Prior to filing the complaint, plaintiffs did **not** ask defendants to allow an audit of TEC's records. Moreover, TEC and Heraty gave plaintiffs the opportunity to inspect all records in their possession in March 2004 and thereafter until discovery closed.

**CONCLUSION**

Defendants respectfully submit that plaintiffs' claims should be denied for the reasons set forth above, and each defendant should have judgment against plaintiffs and awarded their attorney's fees and costs.

Dated: August 30, 2004

BOLLING, WALTER & GAWTHROP

By: ____________________

T. D. BOLLING, JR.

Attorney for Defendants

F:\Data\ATTYS\TDB\CORNERSTONE\TOTTEN v TECTONICS\PLEADING\TRBRIEF.03.wpd