Apple Inc. v. Psystar Corporation Doc. 2276

Geri Lynn Green (SBN 127709)
LAW OFFICES OF GERI LYNN GREEN
5214-F Diamond Hts. Blvd., #332
San Francisco, CA 94131-2118
T: (415) 575-3235
F: (415) 648-7648

Attorneys for Plaintiffs
SHANELL RENEE STEWART, MARY PAYNE,
HERLINDA ARROYO-DE HERNANDEZ and
CAROL BIRDSONG

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANELL RENEE STEWART, MARY PAYNE, HERLINDA ARROYO-DE HERNANDEZ and CAROL BIRDSONG,<br><br>Plaintiffs,<br>v.<br><br>KATHLEEN HAWK SAWYER, ROBERT M. HARO, MICHAEL BENOV, PAUL SCHULTZ, JOHNSIE DONALDSON, SHEILA CLARK, FEDERAL BUREAU OF PRISONS, and Does 1-100, inclusive.<br><br>Defendants. | Case No.: C 01-4058 MJJ<br>**E-FILING**<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**Introduction**

Federal Defendants move for Summary Judgement on the following grounds: 1) Arroyo's Alien Tort Claim should be dismissed on grounds of sovereign immunity, and because Arroyo has failed to state a cognizable claim under the statute as a matter of law; 2) that plaintiffs have failed to exhaust administrative remedies as to their *Bivens* claims and that federal defendants enjoy qualified immunity



Dockets.Justia.com

as to the FTCA claims; and 3) that plaintiffs have failed to prove a breach of duty to support their negligence claim. Each assertion will be addressed in turn.

Federal Defendants have turned a blind eye at the problem of prison rape. While admittedly, staff on inmate rape, may have not been a significant problem before the numbers of female inmates swelled over the last 15 or 20 years, the dangers posed to female inmate populations have become all too clear. Notwithstanding the numerous criminal and civil prosecutions of BOP staff at the institution for sexual misconduct with inmates (Attachments to Motion for Judicial Notice), and the ongoing significant warning signs concerning the sexual predatory acts of Johnsie Donaldson, federal defendants failed to take any steps to protect their inmates. Their failure to protect inmates from a suspected predator, adequately investigate, discipline or prosecute him for his crimes, resulted in the serial rapes of these inmates and fostered a prison environment of tolerance.

**Statement of Facts**

Defendant Johnsie Randle Donaldson was hired by the BOP on September 25, 1988, as a GS-9 Recreation Specialist. He was transferred into the FCI Dublin on January 10, 2000. He was initially assigned within the Main Women's Facility of the FCI. He remained within the working environment of the Women's Section of the FCI for the next 10 and one half months. Warden Schultz transferred Mr. Donaldson from the Womens' Facility of FCI to the FDC - Jail (Male) Facility on November 23, 2000, seven weeks after a violent and brutal sexual assault he perpetrated upon Herlinda DeHernandez Arroyo, eight months after the first of many complaints of his sexually predatory behavior with prisoners. (Shultz Deposition at p. 169-173, 202; Dec. of George Sullivan.)

Mr. Donaldson worked in isolation from other staff and immediate staff supervision. He had access with keys to areas of the Education Department and Gymnasium which provided spaces for secrecy and privacy. Warden Schultz took no action with respect to Mr. Donaldson to result in his

detachment from access to female inmates, until November 23, 2000, in violation of Program Statement 5234.04. (Schultz Dep. 169-174; 202; Dec. of George Sullivan; Exhibit B..)

Not only is Warden Schultz' inaction in these respects non-compliant with PS 5324.04, he failed to follow the mandates of the Sexual Abuse/Assault Specialty Training and protect the inmates in his charge.(Exhibit G; Declaration of George Sullivan.)

As Mr. Donaldson was left to his own scheduling, impulses and probably encouraged by not being held accountable to date, during June and July of 2000 he had sexual abuse encounters with female inmate Mary Annette Payne. These sexual encounters of fellatio and cunnilingus should have been "Prevented" in Compliance with 5324.04 by Mr. Donaldson's earlier removal from the presence of and control over female inmates. Mr. Donaldson had sexual abuse/assault encounters with inmate Carol Ann Birdsong, a mentally disabled person, in June or July 2000, and inmate Shannell Renee Stewart in September and October 2000. (Declaration of George Sullivan, Declarations of Payne, Arroyo and Birdsong.)

Just before his transfer to the FDC Jail on November 23, 2000, on November 18, 2000, Mr. Donaldson sexually assaulted inmate Esmeralda Hermosillo Lopez. (Declaration of George Sullivan.)

Further, failure to act to remove Mr. Donaldson from access to female inmates until November 23, 2000, enabled the vicious, violent sexual assault on inmate Herlinda Arroyo de Hernandez, an inmate of FCI and a citizen of Mexico, who reported the sexual assault on her by Mr. Donaldson on October 11, 2000. (Declaration of George Sullivan.)

It was not until she submitted to Polygraph Examination on November 21, 2000, which resulted in "No Deception Indicated" on relevant questions that he was transferred from the FCI Women's Section to the FDC a men's facility at the institution. He stayed there until his arrest by FBI Agents on February 16, 2001 at the San Jose Airport as he was preparing to leave California. While

charged by way of complaint, the prosecution failed to secure an indictment and conviction. Donaldson simply walked away resigning his position on March 7, 2001, almost one year after the first complaint of sexual misconduct. (Declaration of George Sullivan.)

Reporting methods at the prison discouraged reporting of sexual abuse/assault as the calls are toll calls for which the inmate must pay. (Carol Birdsong's Dec.; Payne Dec. Arroyo Dec. Sullivan Declaration.)

Indeed, inmate Herlinda Arroyo de Hernandez, a victim of a vicious sexual assault by Mr. Donaldson, could not call because she thought she needed money in her commissary account to do so. Indeed, BOP has not even promulgated a system-wide policy for such telephone hotlines for female inmates victimized by staff. (Schultz Dep. 112-115; Declaration of George Sullivan.)

Warden Schultz and his specified management staff who are to be directly involved in issues of sexual abuse/assaults of female inmates, failed completely to take actions necessary to protect the female inmates; prevent their being sexually abused/assaulted; and toward complying with the intent, spirit, and actual wording of BOP PROGRAM STATEMENT 5324.04. (Declaration of George Sullivan.)

Failure on the part of the FCI Wardens to fully implement the intent, spirit and wording of PS 5324.04 has resulted in continuation of the sexual abuse/assaults of the female inmates of the institution. (Declaration of George Sullivan.)

## I. SUMMARY JUDGMENT SHOULD NOT BE GRANTED ON THE BIVENS CLAIMS BASED ON A CLAIM THAT PLAINTIFFS DID NOT EXHAUST THEIR ADMINISTRATIVE REMEDIES[1]

---

1

Plaintiffs recognize and assert that motion for summary judgment is not the appropriate vehicle for raising exhaustion issues, that the appropriate vehicle is a nonenumerated motion under Fed. R. Civ. P. 12(b) rather than a summary judgment motion. *Irvin v. Zamora*, 161 F. Supp. 2d 1125 (D. Cal., 2001)

Defendants argue that this court should grant their summary judgement motion as to all non-FTCA claims as to all plaintiffs for their failure to exhaust their administrative remedies. Plaintiffs maintain that Defendants are estopped from asserting exhaustion as an affirmative defense as claims for monetary damages. As those claims were not grievable at the time these claims arose. Consequently, there was no available administrative remedy to exhaust. Any administrative remedies which this Court may be deem to have been "available," at the time the claims arose, any failure to exhaust was justified, and hence is not a bar to this suit.

The exhaustion requirement of the PLRA is intended to serve a number of purposes, including deterring frivolous lawsuits and creating an administrative record allowing courts to evaluate the relative merits of claims. *Wyatt v. Leonard*, 193 F.3d 876, 878-79 (11th Cir. 1999). The most relevant purpose of the exhaustion requirement as it relates to the instant case, however, is that exhaustion allows prison officials to receive notice of complaints so that they can take proper action. *Jackson v. District of Columbia*, 254 F.3d 262, 269 (D.C. Cir. 2001) (among purposes of PLRA is "relieving courts of the burden of lawsuits filed before prison officials have had an opportunity to resolve prisoner grievances on their own"). *Gomez v. Winslow*, 177 F. Supp. 2d 977, 982 (D. Cal., 2001.)

Here, all defendants reported the incidents of sexual assault and misconduct, providing prison officials with notice that they had been sexually assaulted. They subsequently agreed to testify and some plaintiffs were subpoenaed to testify at the grand jury. Their reports resulted in a criminal prosecution. (See Attachments to Motion for Judicial Notice.) Furthermore, plaintiffs were consistently told by BOP employees, SIS, OIG, and FBI investigators not to discuss these matters with anyone at the prison. (Declarations of Plaintiffs.) Those claims which were not for monetary relief were exhausted to the extent possible. They did as they were directed to do by the administrative relief policy the orientation materials, BOP staff, OIG investigators and the FBI. In *Lewis v. Gagne*, 281

F.Supp.2d 429, 434-35 (N.D.N.Y. 2003) the court gave great weight to the fact that the facility's own actions showed that it addressed and investigated problems that were not presented through the grievance system. *Id.* 281 F.Supp.2d at 434. Such was the case here.

### A. Defendants Are Estopped from Claiming Failure to Exhaust as an Affirmative Defense as No Such Administrative Relief Was Made Available to Plaintiffs.

The PLRA's exhaustion requirement is set forth in "§ 1997e(a) creates a defense - defendants have the burden of raising and proving the absence of exhaustion." *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003). Because, under *Wyatt*, the burden of raising and proving non-exhaustion lies with Defendants, not Plaintiffs, Defendants have failed to meet their burden. Here, all plaintiffs exhausted all available administrative remedies. *Wheeler v. Townsend*, 100 Fed. Appx. 670, 671-672 (9th Cir., 2004)

BOP regulations in force at the time state that "Requests or Appeals will not be accepted under the Administrative Remedy Program for claims for which other administrative procedures have been established, including tort claims." 28 C.F.R § 542.16(b) (deleted Aug. 6, 2002). Regulations required BOP staff to instruct the prisoner that exclusively monetary claims are to be pursued under the FTCA and would not accept administrative requests for monetary damages. (Program Statement § 1330.13 10/7/97.) (Exhibit A and Declaration of Geri Lynn Green filed under Seal.) Accordingly, Defendants are estopped from claiming failure to exhaust as an affirmative defense.

Remedies may be made unavailable in a variety of ways, for instance: by obstruction by prison staff *Dale v. Lappin*, 376 F.3d 652, 654-56 (7th Cir. 2004) (per curiam) (holding denial of necessary forms would make remedies unavailable); *Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir. 2003) (noting defendants' concession that denial of grievance forms, in a system that required using the form, made the remedy unavailable to the plaintiff); *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001) (holding that prisoner who could not get grievance forms from prison officials had sufficiently alleged

exhaustion. The failure to inform prisoners about remedies' existence, or misinforming prisoners about their availability or operation, may make them unavailable. *Brown v. Croak*, 312 F.3d 109, 112-13 (3d Cir. 2002) (holding that if security officials told the plaintiff to wait for completion of an investigation before grieving, and then never informing him of its completion, the grievance system was unavailable to him); *Miller v. Tanner*, 196 F.3d 1190 (11th Cir. 1999) (holding that grievance decision that stated it was non-appealable need not have been appealed); *Lane v. Doan,* 287 F.Supp.2d 210, 212 (W.D.N.Y. 2003) (holding that exhaustion is excused where the plaintiff is led to believe the complaint is not a grievance matter or would otherwise be investigated, or that administrative remedies are unavailable.)

Here, plaintiffs were told by BOP staff and outside investigators not to tell anyone about this until after the investigation. They were told that they could not file administrative remedies for claims involving monetary damages. They were told that they could not receive relief while the matter was under investigation. They were not told how to file a sensitive BP-9 or 10. They testified before the grand jury and have never been informed as to the status to of the investigation. (Declarations of Plaintiffs Payne, Arroyo and Birdsong.)

In *Giano v. Goord*, 380 F.3d 670 (2d Cir., 2004), the Second Circuit held that, in certain situations, administrative remedies may not be "available," 42 U.S.C. § 1997e(a), to prisoners seeking redress of their grievances where the prisoner obtains a favorable disposition of his grievance, only to find, after the time for filing an administrative appeal has expired, that the relief he had won was not forthcoming. *Ibid.* Ms. Birdsong, attempted to get administrative relief for the trauma she was suffering as a result of the cross-gender pat searches. She obtained the relief she requested. She was evaluated for the exemption. But, long after the time period elapsed she was denied the exemption. (See Exhibit C, Pat Search Exemption Evaluation)

Accordingly, Defendants are estopped from raising exhaustion as an affirmative defense and there are certainly triable issues of fact as to the question of whether there was any available remedy or procedure.

### B. Alternatively, If this Court Finds That Plaintiffs Failed to Exhaust, That Failure Was Due to the Fact That to Properly Exhaust Was Justified

Even if this Court finds that exhaustion was available, plaintiffs acted reasonably in their attempts to exhaust. *Rodriguez v. Westchester County Jail Correctional Dep't*, 372 F.3d 485, 487 (2d Cir. 2004) In *Rodriguez*, the court held that the plaintiff's belief that he did not have to exhaust an excessive force claim was reasonable, since the court had adopted the same view until reversed by the Supreme Court in *Porter v. Nussle*, 534 U.S. 516 (2002).

Here, the sexual assaults occurred, more than a year prior to the high court's ruling in *Porter* on February 26, 2002. Accordingly, plaintiffs were directed by prison staff that the sexual assaults were not proper subjects for administrative relief. When *Porter* was decided administrative relief was no longer available to them on the sexual assault issue. Furthermore, all plaintiffs but Ms. Birdsong had been released or moved out of FCI Dublin and the lawsuit already filed.

Plaintiffs were not told that they could or should file a sensitive request or appeal. (Payne Dec.) All plaintiffs reported the sexual assaults to the OIG, SIS, and/or FBI. The warden, and OIA were aware of and involved in the investigation process. (Decs.of plaintiffs.)

If the grievance process actually results in an investigation of an issue, it should be deemed exhausted no matter how well or badly the prisoner set it out, since the purpose of exhaustion will clearly have been served. *Baskerville v. Blot*, 224 F.Supp.2d. 723, 730 (S.D.N.Y. 2002) (applying "time and opportunity" rationale to hold that plaintiff exhausted as to issues that were actually investigated as a result of his grievance).

Complaints that were in fact reviewed at the highest levels of the agency satisfy the exhaustion

requirement even if they were not processed through the grievance system. *Camp v. Brennan*, 219 F.3d 279 (3rd Cir. 2000) (holding that use of force allegation that was investigated and rejected by Secretary of Correction's office need not be further exhausted); *Perez v. Blot*, 195 F.Supp.2d 539, 542-46 (S.D.N.Y. 2002) (holding requirement might be satisfied where plaintiff alleged he complained to various prison officials and to Inspector General, whose investigation resulted in referral of officer for criminal prosecution); *Noguera v. Hasty*, 2000 U.S. Dist. LEXIS 11956, 99 Civ. 8786, 2000 WL 1011563 at 11 (S.D.N.Y. July 21, 2000) (holding that as plaintiff sought only monetary damages, plaintiff's efforts were sufficient to exhaust administrative remedies, even if exhaustion were required, as plaintiff had orally complained, promptly put her complaint in writing when requested, and fully cooperated with the ensuing investigation), *report and recommendation adopted in part*, 2001 WL 243535 (S.D.N.Y., Mar. 12, 2001).

Plaintiffs' reports to SIS, OIG, FBI and the warden, as well as the grievances they were allowed to file did present the relevant factual circumstances giving rise to the potential claims. This was sufficient to put prison officials on notice of possible problems. The facts were investigated by the OIG and FBI and developed, and the prison had an opportunity to exercise its discretion or correct any errors as appropriate under the circumstances. Plaintiffs' grievances were sufficient under the circumstances to put the prison on notice of the potential claims and to fulfill the basic purposes of the exhaustion requirement. As long as the basic purposes of exhaustion are fulfilled, there does not appear to be any reason to require a prisoner plaintiff to present fully developed legal and factual claims at the administrative level. *Irvin v. Zamora,* 161 F. Supp. 2d 1125, 1134-1135 (D. Cal., 2001)

Accordingly, there are triable issues of fact as to the question of whether there was any failure to exhaust was justifiable.

### C. In Arguendo, If this Court Finds That Administrative Relief Was Available and Unexhausted, and That Plaintiffs Did Not Have Appropriate Justification, the

**Administrative Relief Procedure in Place at That Time for Sexual Assault Was So Convoluted as to Render it Unconstitutional**.

Inmates continue to retain a right to access the courts and receive due process. If a system is in place that only allows access to those that can navigate its incoherent rubric of incongruent and ambiguous directions and rules, it has failed to provide due process. These women were vulnerable. They were at the mercy of their jailers. In order for a system of justice to pass constitutional muster, it must be accessible.

## II. TRIABLE ISSUES OF FACT REQUIRE DENIAL OF DEFENDANT'S QUALIFIED IMMUNITY CLAIMS.

Federal defendants argue that the individual federal defendants deserve qualified immunity from plaintiff's constitutional claims. Specifically federal defendants argue that a policy allowing Cross-gender pat searches and supervision do not violate any clearly established Fourth Amendment or Equal Protection right; that Federal Defendants deserve qualified immunity from Plaintiffs Eighth Amendment claims due to a failure of evidence of deliberate indifference; that plaintiffs have no evidence of retaliation as a result of exercising their First Amendment rights; and that cross-gender supervision does not violate any clearly established right to equal protection. In accordance with this argument, federal defendants maintain that they deserve summary judgement on Plaintiffs's constitutional claims because "an individual federal officer cannot be liable for a constitutional tort solely based on *respondeat superior*." (MSJ p. 13: 20-21)

Law enforcement officers, including prison guards, enjoy qualified immunity from civil damage suits unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982). Under this standard, summary judgment based on qualified immunity is improper if, under the plaintiff's version of the facts, and in light of the clearly established law, a

reasonable officer could not have believed his conduct was lawful. See *Grossman v. City of Portland*, 33 F.3d 1200, 1208 (9th Cir. 1994). Thus, "an official's claim of qualified immunity will be defeated if, 'in the light of pre-existing law' the unlawfulness of his conduct was 'apparent.'" *Id*.

The appropriate approach was set out in *Schwenk v. Hartford*, 204 F.3d 1187, 1196 (9th Cir., 2000) the court must "determine whether a reasonable officer could have believed lawful the particular conduct at issue."

Accordingly, once a defendant claims that he is entitled to qualified immunity, the court is to determine "not only the currently applicable law, but whether that law was clearly established at the time an action occurred." *Harlow*, 457 U.S. at 818. In *Siegert v. Gilley*, 500 U.S. 226, 231, 114 L. Ed. 2d 277, 111 S. Ct. 1789 (1991), the Supreme Court set forth the "proper analytical framework" for making that determination. In that case, the Court held that a necessary precursor to determining whether the right in question was "clearly established" at the time is the "threshold" inquiry whether the plaintiff has in fact asserted a violation of that right. *Id*. at 231-32. Only after the court concludes that the plaintiff has sufficiently stated a claim for the violation of his rights is the court to determine whether "the contours of the allegedly violated right were sufficiently clear that a reasonable official would understand that what he [was] doing violated that right." *Liston*, 120 F.3d at 975 (citing O*solinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996)). Deciding "this purely legal question permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on the merits." *Siegert*, 500 U.S. at 232; see also *Knox*, 124 F.3d at 1107 ("If a plaintiff fails to allege a violation of clearly established law, the court need not even reach the other issues presented regarding qualified immunity.").

Therefore, the summary judgment motion should be denied if: (1) Plaintiffs alleged an actual

violation of their rights; and (2) "the contours of the allegedly violated right were sufficiently clear that a reasonable official would understand that what he [was] doing violated that right." *Liston*, 120 F.3d at 975 (citing *Osolinski*, 92 F.3d 934 at 936).

**A. Defendants Were Deliberately Indifferent to the Need to Protect Female Inmates from Donaldson's Sexual Assaults.**

Federal defendants maintain that Plaintiffs offer no evidence that the federal defendants knew Donaldson was likely to sexually assault inmates. Federal Defendants have failed to address the fact that Schultz and Captain Hogans were well aware of Donaldson's sexual exploits. They had received a number of complaints, allegations, and rumors. Schultz was further well aware of the numerous sexual misconduct convictions his staff had endured within a short time before these incidents. Schultz knew that Donaldson's job enabled him to be in close contact with female inmates without any supervision. Schultz also knew that pending the investigation into the complaints against Donaldson for sexual misconduct, he could have transferred him to the men's facility in order to ensure the protection of the inmates in his care. But, instead, he chose to do nothing. (Schultz Dep. 169-173.)

The Eighth Amendment imposes duties on prison officials, to provide humane conditions of confinement; including adequate food, clothing, shelter, and medical care, and they must "take reasonable measures to guarantee the safety of the inmates," *Hudson v. Palmer*, 468 U.S. 517, 526, 527, 82 L. Ed. 2d 393, 104 S. Ct. 3194 (1984); *Washington v. Harper*, 494 U.S. 210, 225, 108 L. Ed. 2d 178, 110 S. Ct. 1028 (1990); *Estelle v. Gamble*, 429 U.S. 97, 103, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976).

That has been interpreted to mean that, prison officials have a duty to protect prisoners from violenc. *Cortes Quinones v. Jimenez Nettleship*, 842 F.2d 556, 558 (1st Cir. 1987) cert. denied, 488 U.S. 823 (1988); The court voiced particular concern over the fact that the prison environment had stripped them of virtually every means of self protection and foreclosed their access to outside aid, the

government and its officials are not free to let the state of nature take its course. y *Hudson v. Palmer, supra,* at 526; *Estelle, supra,* 429 U.S. at 103_104. The rape of a prisoner serves no "legitimate penological objective," *Hudson v. Palmer, supra,* at 548 (STEVENS, J., concurring in part and dissenting in part), and it is inopposite to "'evolving standards of decency,'" *Estelle*, supra, at 102.

Certainly when the rapist is prison staff, the officials have an even greater duty to protect the inmate. A prison official should not escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted. The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health, and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk. *Farmer v. Brennan*, 511 U.S. 825, 128 L. Ed. 2d 811, 114 S. Ct. 1970.511 U.S. 825, 843 (1994)

If, for example, prison officials were aware that inmate "rape was so common and uncontrolled that some potential victims dared not sleep [but] instead . . . would leave their beds and spend the night clinging to the bars nearest the guards' station," *Hutto v. Finney*, 437 U.S. 678, 681_682, n. 3, 57 L. Ed. 2d 522, 98 S. Ct. 2565 (1978), it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom. Cf. *Helling v. McKinney*, 509 U.S. 25, 33, 125 L. Ed. 2d 22, 113 S. Ct. 2475 (observing that the Eighth Amendment requires a remedy for exposure of inmates to "infectious maladies" such as hepatitis and venereal disease "even though the possible infection might not affect all of those exposed"); "*Commonwealth v. Welansky*, 316 Mass. 383, 55 N.E.2d 902 (1944) (affirming conviction for manslaughter under a law requiring reckless or wanton conduct of a nightclub owner who failed to protect patrons from a fire, even though the owner

did not know in advance who would light the match that ignited the fire or which patrons would lose their lives); *State v. Julius*, 185 W. Va. 422, 431, 432, 408 S.E.2d 1, 10, 11 (1991) (holding that a defendant may be held criminally liable for injury to an unanticipated victim)." *Farmer v. Brennan*, 511 U.S. 825, 843_844 (U.S., 1994)

Here, there were numerous rumors, complaints, and reports that Donaldson was a sexual predator. (Scultz Dep. at p. 169-173.) Both are deemed to be warning signs by the BOP. (See Exhibit G.) Allegations of sexual abuse trigger the requirement as set forth in the Policy Statement to isolate the assailant. (See Exhibit B, PS 5234.04) Warden Schultz neither isolated, nor took any steps to protect his inmates from this suspected sexual predator. This in the face of four criminal convictions of his staff for sexual misconduct with prisoners. Clearly, the number of instances of criminal acts by his staff put him on notice that his institutional culture may be promoting an indifference to the prisoner's human dignity. The institution's history coupled with the rumors, allegations and complaints against Donaldson put him on notice. His failure to follow the procedure of isolating the assailant during the investigation was indicative of his indifference to the entire problem.

Further indication of the institution's indifference, is the pat search evaluation for Carol Birdsong. (Exhibit C) What more would be necessary to trigger an exemption than what Ms. Birdsong experienced. If Ms. Birdsong was not entitled to an exemption who would be. Triable issues of fact require summary judgment to be denied.

**B. First Amendment.**

Plaintiffs were afraid to come forward. They were told not to talk about the incidents, or to file administrative relief. Thereby, telling them that if they must not exercise their First Amendment Rights. (Plaintiffs Declaration; Declaration of Geri Lynn Green under Seal.) Hence there remain triable issues of fact

**C. Cross Gender Searches and Supervision violate Plaintiffs Fourth Amendment and Equal Protection Rights.**

Federal Defendants rely on *Somers v. Thurman* 109 F.3d 614, 619 (9th Cir. 1997) and *Johnson v. Whelan*, 69 F.3d 144, 145 (7th Cir. 1995) for the proposition that Plaintiffs' Fourth Amendment claims have no constitutional basis. Such reliance is misplaced.

Neither case concerned the cross-gender pat searches of female inmates. Visual searches while unpleasant, are not equated to manhandling.

The *Johnson* Court, the only court to find that prisoners have no Fourth Amendment rights, rejected the Fourth Amendment claim concerning intimate cross-gender supervision *of men* based upon the proliferation of prisoner violence, a valid penological reason. No such reason exists here.

While inmates may lose many freedoms at the prison gate, they retain at least some of their constitutional rights while confined. *Turner v. Safley*, 482 U.S. 78, 84, 96 L. Ed. 2d 64, 107 S. Ct. 2254 (1987). Prisoners are to "be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." *Hudson v. Palmer*, *supra,* 468 U.S. at 523.

It is clear that under the law of this circuit, incarcerated prisoners retain a limited Fourth Amendment right to bodily privacy. *Michenfelder v. Sumner*, 860 F.2d 328, 333 (9th Cir. 1988); see also *Jordan v. Gardner*, 986 F.2d 1521, 1524 (9th Cir. 1993) (en banc). Fourth Amendment questions are reviewed for reasonableness. *Bell v. Wolfish*, 441 U.S. 520, 545, 559, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979.) In assessing the reasonableness of a search of a prison inmate, courts must consider the manner in which the search was conducted, by considering four factors: (1) the scope of the intrusion; (2) the manner in which the search is conducted; (3) the justification for initiating the search; and (4) the place in which the search is conducted. *Id.*; *Vaughan v. Ricketts*, 859 F.2d 736, 740 (9th Cir. 1988).

The standard of review was set forth by the Court in *Turner*. Specifically, "when a prison

regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. Four factors are relevant in deciding whether or not a regulation is reasonable. First, there must be a sufficient connection between the regulation and the governmental interest used to justify the regulation. *Id.* Second, the availability of alternative means of exercising the right at issue must be considered. *Id.* at 90. Third, consideration is required of the impact that accommodating the asserted right would have on guards, other inmates, and prison resources. *Id.* Fourth, the availability of ready alternatives to the regulation should be considered. *Id.* The Court stressed that this last factor is not a "'least restrictive alternative' test," id., but rather a *de minimis* test: if there is an alternative available at only a *de minimis* cost to prison objectives, that is evidence of an unreasonable regulation. *Id.* at 91.

It has long been recognized that male inmates and female inmates "are not similarly situated." Different" inmates require different security measures, not solely because of their gender, but because of different security concerns.*Timm v. Gunter*, 917 F.2d 1093, 1103 (8th Cir., 1990).

The differences to be considered at a female institution, the number and age of the inmates, the kinds of crimes committed by them, the length of sentences, and the frequency of incidents involving violence, escapes, or contraband. *Timm,* at 1103. See *Williams v. Lane*, 851 F.2d 867, 881 (7th Cir. 1988) ("unequal treatment among inmates . . . is justified if it bears a rational relation to legitimate penal interest [sic]").

As was found to be the case in *Jordan, supra,* at p. 1527, "it is evident that the cross-gender clothed body searches are "unnecessary." Particularly random, non-emergency searches."

That is supported by the record in this case. Linda Thomas is the Administrator for the Correctional Services Branch of the Bureau of Prisons. She has primary oversight for policy development and creation for security and operation concern. (Exhibit D.) She testified at page 50 -

52 that she was unaware of any reason why there was not a policy requiring, where possible pat searches be conducted by same gender staff.

Furthermore, Warden Schultz testified that of the 275 staff members at the institution, 40% were female. (Exhibit E p. 25, 49.) He also testified that the pat searches were done on a random basis by any one of the staff members, including counselors, education personnel, medical personnel, and Unicor employees. (Exhibit E p. 33.) The searches during the time he was warden turned up drugs on two or three occasions (Exhibit E 35), perfume, lipstick, lighters, matches and clothes, but no weapons. (Exhibit E 33-34.) Inmates are to be searched when leaving the dining hall by anyone who felt so inclined. (Exhibit E 36.)

A prison regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational or where it is an "exaggerated response" to security concerns. *Turner v. Safley*, *supra,* at p. 89.

Here, the policy allowing male guards to regularly pat search inmates known to have been sexually abused by Donaldson bore no rational connection to a legitimate penological objective, and was an overly restrictive method of achieving a goal when other obvious alternatives were available, hence qualified immunity should not be available. 40% of the staff were women. The possiblility of violence was non-existent. There was simply no reasons justifying the prison's refusal to provide Plaintiff Birdsong and the other women sexually assaulted with a pat search exemption. Warden Schultz did not have any rules or schedules to ensure reasonableness of the searches of women as they came out of the dining hall. It was nothing short of a free for all. That was simply unconscionable.

Unless, Dublin can demonstrate that their pat search policy is reasonably related to legitimate security concerns or a penological goal for Sexual Assault victims, there is no entitlement to qualified immunity.

Certainly, at the point that Ms. Birdsong requested her pat search exemption after reporting the sexual abuse by Donaldson, there was no legitimate reason to continue to torment her with manhandling. To deny her an exemption was unreasonable and in violation of clearly established rights to privacy. If she did not qualifiy for an exemption, who would?

Because the cross-gender pat searches were reasonable, there remain triable issues of fact.

## III. FEDERAL DEFENDANTS DID BREACH A DUTY OF CARE RESULTING IN PLAINTIFFS INJURIES.

Under the FTCA, the question of liability is determined with reference to state law. 28 U.S.C. § 2674; *Gallea v. United States*, 779 F.2d 1403, 1404 (9th Cir. 1986); *Louie v. United States*, 776 F.2d 819, 824 (9th Cir. 1985).

In considering the existence of a duty in a given case, under California law, several factors must be considered, including "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." *Rowland v. Christian*, 69 Cal. 2d 108, 113, 70 Cal. Rptr. 97, 100, 443 P.2d 561 (1968).

The FTCA waives the government's immunity from suit only for personal injuries caused by an "employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). California law of *respondeat superior* defines the scope of employment very broadly. *Kimberly M. Cobbs v. Los Angeles Unified School Dist.*, 196 Cal. App. 3d 1506, 242 Cal. Rptr. 612, 617 (1987) (citing *Alma v. Oakland Unified School Dist.*, 123 Cal. App. 3d 133, 139, 176 Cal. Rptr. 287 (1981)); *Proietti v. Civiletti*, 603 F.2d 88, 90 (9th Cir. 1979). An employee need not be engaged in

the ultimate object of his employment at the time of the wrongful act for liability to be attributed to the employer but the employer is not vicariously liable if the employee substantially deviates from his duties for personal purposes. *Kimberly M.*, 196 Cal. App. 3d 1506, 242 Cal. Rptr. at 617. "'The determination as to whether an employee committed a tort during the course of his employment turns on whether "1) the act performed was either required or 'incident to his duties' . . ., or 2) the employee's misconduct could be reasonably foreseen by the employer in any event." [Citation]'" *Jeffrey Scott E. v. Central Baptist Church*, 197 Cal. App. 3d 718, 243 Cal. Rptr. 128, 129 (1988) (quoting *Martinez v. Hagopian*, 182 Cal. App. 3d 1223, 1228, 227 Cal. Rptr. 763 (1986)). See *Doggett v. United States*, 875 F.2d 684, 688 (9th Cir., 1988)

California Government Code section 815.2, subdivision (a)[2] imposes governmental liability for injuries proximately caused by acts of employees within the scope of employment. Therefore, in order to avoid vicarious liability, the BOP must show Donaldson's actions were beyond the scope of his employment.

Scope of employment is normally a question of fact. (*Ducey v. Argo Sales Co.* (1979) 25 Cal.3d 707, 722 [159 Cal.Rptr. 835, 602 P.2d 755].) In *White v. County of Orange*, 166 Cal. App. 3d 566, 212 Cal. Rptr. 493 (1985) . An officer who used his official authority to stop a female and then rape her was held to be acting within the scope of his employment.

The test as to is whether a tort is committed during the course of employment turns on "'whether or not: (1) the act performed was either required or "incident to his duties" [citation] or (2) the employee's conduct could be reasonably foreseen by the employer in any event [citations].'" ( *Id.*,

2 Government Code section 815.2, subdivision (a) states: A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."

at p. 139.) Based on the interpretation of the term "incident to his duties", the *White* court determined that a police officer is entrusted with a great deal of authority. As such, the police officer carries the authority of the law with him into the community. The officer's method of dealing with this authority is certainly incidental to his duties; indeed, it is an integral part of them. Here, “the wrongful acts flowed from the very exercise of this authority.” *White v. County of Orange*, *supra,* 166 Cal. App. 3d at 571.

The employer/government must be responsible for acts done during the exercise of this authority. In *Clark Equipment Co. v. Wheat* (1979) 92 Cal.App.3d 503 [154 Cal.Rptr. 874], the court, quoting the Restatement Second of Agency, stated: "If the principal places the agent in a position to defraud, and the third person relies upon his apparent authority to make the representations, the principal is liable even though the agent was acting for his own purposes [citations]. The theory is that the agents' position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him. It is immaterial that the principal receives no benefits from the transaction. [Citation.]" (*Clark, supra,* 92 Cal.App.3d 503, 521, italics deleted.)

Here, plaintiffs were in defendants' control. They were not at liberty to resist Donaldson's advances or his abuse. They were even more at his mercy and the mercy of his employers than was the plaintiff in *White.* And federal defendants' had a duty to protect plaintiffs from harm. They had a duty to keep a suspected sexual predator from assaulting and abusing them.

Because the government placed Donaldson in this position of authority, and did not take reasonable measures to protect and make safe its inmates, under California law it should be liable for his actions. (*White* at 572.)

The use of authority is incidental to the duties of a police officer just like it is incidental to a correctional officer. And just like with police officers, the government enjoys tremendous benefits

from the inmate's respect for that authority. Therefore, it must suffer the consequences when the authority is abused. *Id.*

Under the FTCA the United States is liable in tort "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. *Doggett v. United States*, 875 F.2d 684, 689 (9th Cir., 1988)

In the case of law enforcement functions, liability is determined by analogy to state and municipal entities. *Doggett v. United States*, 875 F.2d 684, 689 (9th Cir., 1988)

Title 15 of the California Code of Regulations § 3401.5 prohibits correctional staff sexual misconduct, unreasonable invasions of privacy and retaliation for complaints of sexual misconduct. Furthermore, under California law, sexual activity by a staff member of a detention facility is a public offense. (Cal. Pen.Code § 289.5)

The California Constitution Art I § 17 (2004) states: “Cruel or unusual punishment may not be inflicted or excessive fines imposed.” California Penal Code section 2650 states: The person of a prisoner sentenced to imprisonment in the State prison is under the protection of the law, and any injury to his person, not authorized by law, is punishable in the same manner as if he were not convicted or sentenced.”

Certainly, in accordance with the federal mandates, California law follows suit imposes a duty on the part of prison officials to protect inmates from harm. The elements of a cause of action for negligence are: "(a) a legal duty to use due care; (b) a breach of such legal duty; [and] (c) the breach as the proximate or legal cause of the resulting injury." (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 732, pp. 60-61 and cases cited therein; italics in original.)

Here, there was a legal duty to protect inmates from harm. Defendants breached that duty by failing to keep a suspected sexual predator away from vulnerable female inmates. They further

breached their duty in failing to provide for the inmates that needed it, safe refuge from continuing harm, such as exemptions from cross-gender pat searches. The breach caused the women to be sexually assaulted. But for their breach of the duty to protect inmates from harm, these women would not have been sexually assaulted.

The term "proximate cause" includes two basic components: one is the policy considerations and "causation in fact." Causation in fact asks whether the defendant's negligent conduct was the 'necessary antecedent' to the injury, without which no injury would have occurred. Here, clearly, the hiring of Donaldson can be deemed a "substantial factor" (and thus a cause-in-fact) in bringing about plaintiffs' injury.

In California, an employer may be liable to a third person for negligently hiring an incompetent or unfit employee. *Underwriters Inc. Co. v. Purdie* (1983) 145 Cal.App.3d 57, 68-69 [193 Cal.Rptr. 248].) California follows the rule set forth in the Restatement Second of Agency section 213, which provides in pertinent part: "A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless: ... [P] (b) in the employment of improper persons or instrumentalities in work involving risk of harm to others[.]"

Comment (d) to this Restatement section reads in pertinent part:

> "The principal may be negligent because he has reason to know that the servant or other agent, because of his qualities, is likely to harm others in view of the work ... entrusted to him. ... [P] An agent, although otherwise competent, may be incompetent because of his reckless or vicious disposition, and if a principal, without exercising due care in selection, employs a vicious person to do an act which necessarily brings him in contact with others while in the performance of a duty, he is subject to liability for harm caused by the vicious propensity. ... [P] If ... the risk exists because of the quality of the employee, there is liability only to the extent that the harm is caused by the quality of the employee which the employer had reason to suppose would be likely to cause harm."

( Rest.2d Agency, supra, § 213, com. d, italics added.)

The fact that Warden Shultz, OIA, OIG, and FBI had complaints that Donaldson was a sexual

predator preying upon female inmates at the facility presents triable issues of material fact regarding whether the BOP and its employees had reason to believe he was unfit or whether they failed to use reasonable care in investigating him or providing adequate supervision. (*Evan F. v. Hughson United Methodist Church*, 8 Cal. App. 4th 828, 843 (Cal. Ct. App., 1992).

Indeed, the court found "It is true that a clear mandate appears in the Torture Victim Protection Act of 1991, 106 Stat 73, providing authority that "establish[es] an unambiguous and modern basis for" federal claims of torture and extrajudicial killing, H. R. Rep. No. 102-367, pt. 1, p 3 (1991)." *Sosa v. Alvarez-Machain*, *supra,* at p. 2763.

**IV. INDIVIDUAL FEDERAL DEFENDANTS ARE LIABLE UNDER THE ALIEN TORT CLAIM ACT.**

Plaintiffs agree that the United States cannot be sued under the Alien Tort Claim Act. However, the individual federal defendants are proper subjects. Defendants maintain that the Supreme Court in deciding *Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2765-2766 (U.S., 2004) recently, limited causes of action available under 28 U.S.C. §1350, the Alien Tort Claims Act, to 1) offenses against ambassadors; 2) violation of safe conduct; and 3) individual actions "arising out of prize captures and piracy" on the high seas. Such is not an adequate analysis of the *Sosa* opinion. While true that the *Sosa* court chastised the 9th Circuit for going to far in finding violations of international norms, the court did not only limit Alien Tort Claims to those three areas of law.

Whatever the ultimate criteria for accepting a cause of action subject to jurisdiction under § 1350, we are persuaded that federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted. See, e.g., *United States v. Smith*, 18 U.S. 153, 5 Wheat. 153, 163-180, 5 L. Ed. 57 (1820) (illustrating the specificity with which the law of nations defined piracy). This limit upon judicial recognition is generally consistent

with the reasoning of many of the courts and judges who faced the issue before it reached this Court. See *Filartiga v. Pena-Irala*, 630 F.2d 876, 890 (2nd Circuit 1980) ("[F]or purposes of civil liability, the torturer has become--like the pirate and slave trader before him–hostis humani generis, an enemy of all mankind"); *Tel-Oren v. Libyan Arab Republic*, 233 U.S. App. D.C. 384, 726 F.2d 774, 781 (CADC 1984) (Edwards, J., concurring) (suggesting that the "limits of section 1350's reach" be defined by "a handful of heinous actions--each of which violates definable, universal and obligatory norms"); see also *In re Estate of Marcos Human Rights Litigation*, 25 F.3d 1467, 1475 (9th Cir.1994) ("Actionable violations of international law must be of a norm that is specific, universal, and obligatory"). And the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts. *Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2765-2766 (U.S., 2004)

The Court found torture to so qualify, “It is true that a clear mandate appears in the Torture Victim Protection Act of 1991, 106 Stat 73, providing authority that "establish[es] an unambiguous and modern basis for" federal claims of torture and extrajudicial killing, H. R. Rep. No. 102-367, pt. 1, p 3 (1991).” *Sosa v. Alvarez-Machain*, *supra,* at p. 2763.

Hence, claims arising out of physical torture continue to be actionable under the ATCA and its companion act, the Torture Victims Protection Act ("TVPA"), Pub.L. No. 102-256, 106 Stat. 73 (1991), see *Sosa v. Alvarez-Machain.*, 159 L. Ed. 2d 718, 124 S. Ct. 2739 (2004);

Rape can be a form of torture. See *Farmer v. Brennan*, 511 U.S. 825, 852, 854, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994) (Blackmun, J., concurring) (describing brutal prison rape as "the equivalent of" and "nothing less than torture"); Kadic v. Karadzic, 70 F.3d 232, 242 (2d Cir. 1995) (describing allegations of "murder, rape, forced impregnation, and other forms of torture" (emphasis added)); *In re*

*Extradition of Suarez-Mason*, 694 F. Supp. 676, 682 (N.D. Cal. 1988) (stating that "shock sessions were interspersed with rapes and other forms of torture". Fostering an environment that encourages such behavior is equally as actionable. Hence, *Sosa* does not prohibit the ATCA of action against the individuals for prison rape of an alien.

**Conclusion**

For the foregoing reasons, Defendants' summary judgment motion should be denied.

DATED this 12th day of October 2004

Respectfully submitted,

**LAW OFFICES OF GERI LYNN GREEN**

-S-

Geri Lynn Green (SBN 127709)
5214-F Diamond Hts. Blvd., #332
San Francisco, CA 94131-2118

Attorney for Plaintiffs

**Table of Contents**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. SUMMARY JUDGMENT SHOULD NOT BE GRANTED ON THE BIVENS CLAIMS BASED ON A CLAIM THAT PLAINTIFFS DID NOT EXHAUST THEIR ADMINISTRATIVE REMEDIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A. Defendants Are Estopped from Claiming Failure to Exhaust as an Affirmative Defense as No Such Administrative Relief Was Made Available to Plaintiffs. . . . . . . . . . . . . . . 6

B. Alternatively, If this Court Finds That Plaintiffs Failed to Exhaust, That Failure Was Due to the Fact That to Properly Exhaust Was Justified . . . . . . . . . . . . . . . . . . . . . . . . . 8

C. In Arguendo, If this Court Finds That Administrative Relief Was Available and Unexhausted, and That Plaintiffs Did Not Have Appropriate Justification, the Administrative Relief Procedure in Place at That Time for Sexual Assault Was So Convoluted as to Render it Unconstitutional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II. TRIABLE ISSUES OF FACT REQUIRE DENIAL OF DEFENDANT'S QUALIFIED IMMUNITY CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

A. Defendants Were Deliberately Indifferent to the Need to Protect Female Inmates from Donaldson's Sexual Assaults. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

B. First Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

C. Cross Gender Searches and Supervision violate Plaintiffs Fourth Amendment and Equal Protection Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

III. FEDERAL DEFENDANTS DID BREACH A DUTY OF CARE RESULTING IN PLAINTIFFS INJURIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV. INDIVIDUAL FEDERAL DEFENDANTS ARE LIABLE UNDER THE ALIEN TORT CLAIM ACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

## FEDERAL CASES


*Baskerville v. Blot*, 224 F.Supp.2d 723 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Bell v. Wolfish*, 441 U.S. 520, 60 L.Ed.2d 447, [99 S.Ct. 1861] . . . . . . . . . . . . . . . . . . 15

*Brown v. Croak*, 312 F.3d 109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Camp v. Brennan*, 219 F.3d 279 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cortes Quinones v. Jimenez Nettleship*, 842 F.2d 556 (1st Cir. 1987) . . . . . . . . . . . . . 12

*Dale v. Lappin*, 376 F.3d 652 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Doggett v. United States*, 875 F.2d 684 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Estate of Marcos Human Rights Litigation*, 25 F.3d 1467 . . . . . . . . . . . . . . . . . . 24

*Estelle v. Gamble*, 429 U.S. 97, 50 L.Ed.2d 251, [97 S.Ct. 285] . . . . . . . . . . . . . . . . . . 12

*In re Extradition of Suarez-Mason*, 694 F.Supp. 676 . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Farmer v. Brennan*, 511 U.S. 825, 128 L.Ed.2d 811, [114 S.Ct. 1970.511] . . . . . . . . . 13

*Filartiga v. Pena-Irala*, 630 F.2d 876 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Gallea v. United States*, 779 F.2d 1403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Giano v. Goord*, 380 F.3d 670 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Gomez v. Winslow*, 177 F.Supp.2d 977 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Grossman v. City of Portland*, 33 F.3d 1200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Harlow v. Fitzgerald*, 457 U.S. 800, 73 L.Ed.2d 396, [102 S.Ct. 2727] . . . . . . . . . . . . 10

*Helling v. McKinney*, 509 U.S. 25, 125 L.Ed.2d 22, [113 S.Ct. 2475] . . . . . . . . . . . . . 13

*Hudson v. Palmer*, 468 U.S. 517, 82 L.Ed.2d 393, [104 S.Ct. 3194] . . . . . . . . . . . . . . 12

*Hutto v. Finney*, 437 U.S. 678, 57 L.Ed.2d 522, [98 S.Ct. 2565] . . . . . . . . . . . . . . . . 13

*Irvin v. Zamora*, 161 F.Supp.2d 1125 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Jackson v. District of Columbia*, 254 F.3d 262 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Johnson v. Whelan*, 69 F.3d 144 . . . . . . . . . . 14

*Jordan v. Gardner*, 986 F.2d 1521 . . . . . . . . . . 15

*Kadic v. Karadzic*, 70 F.3d 232 . . . . . . . . . . 25

*Knox*, 124 F.3d at 1107 . . . . . . . . . . 11

*Lane v. Doan*, 287 F.Supp.2d 210 . . . . . . . . . . 7

*Lewis v. Gagne*, 281 F.Supp.2d 429 . . . . . . . . . . 5

*Liston*, 120 F.3d at 975 . . . . . . . . . . 11

*Louie v. United States*, 776 F.2d 819 . . . . . . . . . . 18

*Michenfelder v. Sumner*, 860 F.2d 328 . . . . . . . . . . 15

*Miller v. Norris*, 247 F.3d 736 . . . . . . . . . . 6

*Miller v. Tanner*, 196 F.3d 1190 . . . . . . . . . . 7

*Mitchell v. Horn*, 318 F.3d 523 . . . . . . . . . . 6

*Noguera v. Hasty*, 2000 U.S.Dist. LEXIS 11956, 99 Civ. 8786, [2000 WL 1011563] . . . . . . . . . . 9

*Perez v. Blot*, 195 F.Supp.2d 539 . . . . . . . . . . 9

*Porter v. Nussle*, 534 U.S. 516 . . . . . . . . . . 8

*Proietti v. Civiletti*, 603 F.2d 88 . . . . . . . . . . 18

*Rodriguez v. Westchester County Jail Correctional Department*, 372 F.3d 485 . . . . . . 8

*Schwenk v. Hartford*, 204 F.3d 1187 . . . . . . . . . . 11

*Siegert v. Gilley*, 500 U.S. 226, 114 L.Ed.2d 277, [111 S.Ct. 1789] . . . . . . . . . . 11

*Somers v. Thurman*, 109 F.3d 614 . . . . . . . . . . 14

*Sosa v. Alvarez-Machain*, 124 S.Ct. 2739 . . . . . . . . . . 23

*Telegraph-Oren v. Libyan Arab Republic*, 233 U.S.App.D.C. 384, 726 F.2d 774 . . . . 24

*Turner v. Safley*, 482 U.S. 78, 96 L.Ed.2d 64, [107 S.Ct. 2254] . . . . . . . . . . 15

*United States v. Smith*, 18 U.S. 153, 5 Wheat. 153 [5 L.Ed. 57] . . . . . . . . . . . . . . . . . 23

*Vaughan v. Ricketts*, 859 F.2d 736 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Washington v. Harper*, 494 U.S. 210, 108 L.Ed.2d 178, [110 S.Ct. 1028] . . . . . . . . . . 12

*Williams v. Lane*, 851 F.2d 867 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Wyatt v. Leonard*, 193 F.3d 876 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Wyatt v. Terhune*, 315 F.3d 1108 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**STATE CASES**

*Alma v. Oakland Unified School District*, 123 Cal.App.3d 133, 176 Cal.Rptr.287 . . . 18

*Clark Equipment Co. v. Wheat* (1979) 92 Cal.App.3d 503 [154 Cal.Rptr.874] . . . . . . 20

*Ducey v. Argo Sales Co.* (1979) 25 Cal.3d 707,[159 Cal.Rptr. 835, [602 P.2d 755] . . 19

*Evan F. v. Hughson United Methodist Church*, 8 Cal.App.4th 828 . . . . . . . . . . . . . . . 23

*Jeffrey Scott E. v. Central Baptist Church*, 197 Cal.App.3d 718, 243 Cal.Rptr.128 . . . 19

*Kimberly M. Cobbs v. Los Angeles Unified School District*, 196 Cal.App.3d 1506, 242 Cal.Rptr. 612 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Martinez v. Hagopian*, 182 Cal.App.3d 1223, 227 Cal.Rptr. 763 . . . . . . . . . . . . . . . . . 19

*Rowland v. Christian*, 69 Cal.2d 108, 70 Cal.Rptr. 97 [443 P.2d 561] . . . . . . . . . . . . . 18

*Underwriters Inc. Co. v. Purdie* (1983) 145 Cal.App.3d 57,[193 Cal.Rptr.248] . . . . . 22

*White v. County of Orange*, 166 Cal.App.3d 566, 212 Cal.Rptr. 493 . . . . . . . . . . . . . . 19

**FEDERAL STATUTES**

42 U.S.C. § 1997e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

28 C.F.R. § 542.16(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 U.S.C. §1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

28 U.S.C. §1350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

28 U.S.C. §2674 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

28 U.S.C. § 2674 21

Fed. R. Civ. P. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Torture Victims Protection Act ("TVPA"), Pub.L. No. 102-256, 106 Stat. 73 . . . . . . . 24

**STATE STATUTES**

Cal. Pen.Code § 289.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

California Penal Code section 2650 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

California Code of Regulations § 3401.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

California Government Code section 815.2, subdivision . . . . . . . . . . . . . . . . . . . . . . . 19

Government Code section 815.2, subdivision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**MISCELLANEOUS**

Restatement Second of Agency section 213 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22