Apple Inc. v. Psystar Corporation Doc. 2278

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANELL RENEE STEWART, MARY PAYNE, HERLINDA ARROYO-DE HERNANDEZ and CAROL BIRDSONG<br><br>Plaintiffs,<br><br>v.<br><br>KATHLEEN HAWK SAWYER, ROBERT M. HARO, MICHAEL BENOV, PAUL SCHULTZ, JOHNSIE DONALDSON, SHEILA CLARK, FEDERAL BUREAU OF PRISONS, **UNITED STATES OF AMERICA**, and Does 2-100, inclusive.<br><br>Defendants. | CASE No.: C 01-04058 MJJ |

**AFFIDAVIT OF GEORGE EARL SULLIVAN**

**I. Introduction**

Personally appeared before the undersigned officer, duly authorized to administer oaths, George Earl Sullivan, who, upon first being duly sworn, deposes and states on oath as follows:

1. After graduating from high school in May 1949, I served 4 years with the U.S. Navy during the Korean War. My career in Corrections began on April 3, 1955 as a Correctional Officer at the Oregon State Penitentiary (OSP). Between October 10, 1955 and December 26, 1962 (7+ years), I served at OSP as an Inmate Counselor with a caseload of 525+ inmates, writing Case History Summaries and Progress Reports and managing the custody/ classification/work assignments/ self-improvement programs and counseling needs of my caseload. During those 7+ years I attended Willamette University, Salem, Oregon as a work/study student majoring in sociology/psychology. I graduated on June 3, 1962, receiving a Bachelor of Arts Degree.



Dockets.Justia.com

2. At OSP between December 26, 1962 and July 5, 1967 (4 years, 6 months) I served as Deputy Warden in charge of Inmate Treatment Programs and Chairman of the Classification Committee. On July 5, 1967 I was transferred to the Oregon State Correctional Institution (OSCI) as Assistant Superintendent in charge of Inmate Treatment Programs and Chairman of the Classification Committee: I held that position until August 16, 1969 (2+ years). On August 16, 1969 I was appointed Superintendent/Warden of the Oregon State Correctional Institution and held that position until December 31, 1984 (15 years, 4 months), when I retired from Oregon Corrections after 30 years service. Between January 7, 1985 and October 1, 1987 (2 years, 9 months) I served as Warden of the Penitentiary of New Mexico. From February 13, 1989 to January 20, 1994 (5 years), I served with the Colorado Department of Corrections as Deputy Director in charge of Statewide Prison Operations, (20-correctional facilities); Statewide Parole Services; Statewide Community Corrections Programs; Inmate Classification System; Religious Programs and Food Service Operations.

3. I have toured/audited 177 adult correctional facilities throughout my career. In October, 1978 I was trained as an "Auditor" to conduct audits of jails and adult correctional facilities, measuring the facilities' levels and quality of compliance with the Manual of Standards for Adult Correctional Institutions[1] (prisons) and/or the Manual of Standards for Adult Local Detention Facilities[2] (jails). The Standards contained in these Manuals are commonly referred to as "ACA Standards". These Manuals of Standards are maintained current through biennial promulgation of a Standards Supplement[3].

---

[1] See EXHIBIT A, Reference Item #1.

[2] See EXHIBIT A, Reference Item #2.

[3] See EXHIBIT A, Reference Item #3.

In conducting those audits, I represented the American Correctional Association and the Commission on Accreditation for Corrections.

4. I have also audited 106 county, state and federal penitentiaries and correctional facilities of the United States and federal correctional institutions of Canada. Sixty (60) of those audits were formal "Accreditation Audits" requiring written Audit Reports to the Commission on Accreditation for Corrections. Such audits were conducted by teams of 2, 3, or 4, selected corrections professionals who served as "Visiting Committees". I served as Chairman of those Visiting Committees in all but two of those audits.

5. An audit is a comprehensive, intrusive analysis of a facility's Policies; Procedures; Practices; Staff Training Programs; Physical Plant Conditions; Programs providing Medical Care, Food Services, Religious Services, Education, Vocational Training, Visiting/Mail; Productive Work; Security Operations including the Segregation Units and Use of Force practices; and Quality of Life Conditions for detainees/inmates and staff. All such are measured against requirements of established national, professional Correctional Standards. Standards presented within the various Manuals of Standards are promulgated by the American Correctional Association in cooperation with the Commission on Accreditation for Corrections. The Standards are considered by the Corrections Profession to be "state-of-the-art correctional practices and guidelines for improvement". Obviously, they are not presented as defining nor establishing "constitutional minima" for detention/correctional institution or jail operations.

6. I have been a Professional/Gold Card Member of the American Correctional Association for the past 41 years. I have worked closely with the American Correctional Association and the Commission on Accreditation for Corrections as Standards for Adult Correctional Institutions have evolved and matured. I

served on a Task Force which developed an "Accreditation Facility Performance Inventory" questionnaire to assess changes in Institution conditions, or improved working conditions and quality of life for staff and inmates, as a result of involvement in the Accreditation process.

7. I served on a Commission on Accreditation/American Correctional Association Special Task Force to develop Accreditation procedures for Maximum Security Correctional Facilities, at the then Maximum Security United States Penitentiary, Marion, Illinois.

8. An American Correctional Association publication titled PROTECTIVE CUSTODY was developed by a Task Force of nationally recognized corrections professionals. I was privileged to serve on that Task Force as Coordinator of Research and Data for the Western United States.

9. As the Manual of Standards for Adult Correctional Institutions progressed from its First Edition Publication to the Second Edition, I served on the Resource Committee to advance the Manual. I was assigned to submit recommendations for revision/updating of five (5) chapters of the Manual: Chapters on Food Services, Sanitation and Hygiene, Medical and Health Care Services, Inmate Rights, Inmate Rules and Discipline. My recommendations were all adopted and those five (5) Chapters were published in the Second Edition and have, with very minor changes, continued into the current Fourth Edition.

10. I have also served as a Professional Corrections Consultant And Expert Witness, and conducted operational reviews of jails and correctional facilities on behalf of the United States Department of Justice, Civil Rights Division; Law Enforcement Assistance Administration; the National Institute of Corrections; several State and County Departments of Corrections and Departments of Law; private correctional corporations; private attorneys and law firms; and at the requests of Executives having Facility oversight

authority. Consequently, I am familiar with and have personal knowledge and experience with Canadian and U.S. Federal, State, County, City and private correctional facilities throughout the United States.

11. I consider myself competent to render opinions as to the duties, responsibilities, policies and operations required of Correctional Facilities such as the Federal Correctional Facility (FCI), Dublin, California, operated by the United States Bureau of Prisons (BOP).

12. My opinions in this case are formed on the bases of my education, knowledge, training, research, teaching, lecturing, audits of jails, correctional facilities and penitentiaries, careful review/study of documents listed in **EXHIBIT A**, and my over 49 years career experiences in corrections operations and management.

13. Many if not most U.S. Federal Bureau of Prisons' (BOP) **PROGRAM STATEMENTS** (Policy documents) direct and guide performance expectations throughout BOP facilities and operations. A reader frequently encounters as a first paragraph of a **PROGRAM STATEMENT** the heading "**PURPOSE AND SCOPE.** To implement policies, procedures, and guidelines to protect the public and maintain a secure, safe and orderly living and working environment for inmates and staff." (Emphasis supplied.) **INSTITUTION SUPPLEMENTS** (Procedures documents) are promulgated at local level operations for correctional staff in all Bureau Institutions, recognizing differences among institutions that vary in missions and security levels.

14. BOP **PROGRAM STATEMENT** Number 5324.04 dated 12/31/97 Sexual Abuse/Assault Prevention and Intervention Programs, is the primary BOP promulgation relevant in this Case. The Federal Correctional Institution, Dublin, California **INSTITUTION SUPPLEMENT** for that **PROGRAM STATEMENT** carries Number DUB5324.04 (B) dated 06/30/99 and rescinded FCI Dublin's first promulgation under that **PROGRAM**

**STATEMENT** which was dated 05/28/98. **INSTITUTION SUPPLEMENT** (C) was promulgated 06/15/00.

15. **PROGRAM STATEMENT** (PS) 5324.04 reads, in part, at Page 1, Para. 1:

> "PURPOSE AND SCOPE.
>
> "...Forceful and pressured sexual interactions are among the most serious threats to inmate safety and institutional order. Victims may suffer physical and psychological harm, and could be infected with a life-threatening disease. (Emphasis supplied.)
>
> "Consequently, each institution is required to have a Sexual Abuse/ Assault Prevention and Intervention Program that includes several major elements:
>
> a. prevention,
> b. prompt and effective intervention to address the safety and treatment needs of inmate victims if an assault occurs, and
> c. investigation, discipline, and prosecution of assailant(s)." (Emphasis supplied.)

Further, on Page 1, at Paragraph 2:

> "PROGRAM OBJECTIVES.
>
> "c. All allegations of Sexual Abuse/Assault will be promptly and effectively reported and investigated." (Emphasis supplied.)

Further, on Page 4,

> "b. Staff-on-Inmate Sexual Abuse/Assault. Engaging in, or attempting to engage in a sexual act with any inmate or the intentional touching of an inmate's genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to abuse, humiliate, harrass, degrade, arouse, or gratify the sexual desire of any person. Sexual acts or contacts between an inmate and a staff member, even when no objections are raised, are always illegal." (Emphasis supplied.)

Further, at Page 6,

> "8. PROMPT AND EFFECTIVE INTERVENTION. Staff sensitivity toward inmates who are victims of sexual abuse/assault is critical. Staff shall take seriously all statements from inmates that they have been victims of sexual assaults and respond supportively and non-judgmentally (see the Sexual Abuse/Assault Crisis Intervention Protocol [Attachment A}). Any inmate who alleges that he or she has been sexually assaulted shall be offered immediate protection from the assailant and will be referred for a medical examination as well as a clinical assessment of the potential for suicide or other related symptomatology. (Emphasis supplied.)

a. Referral. Using Attachment A as a guide, staff shall provide services to victims and shall conduct investigations of sexual abuse/assault incidents... (Emphasis supplied.)

b. When a staff member(s) is alleged to be the perpetrator of inmate sexual abuse/assault, the Warden shall be advised immediately. The Warden shall refer the incident directly to the Office of Internal Affairs (OIA) and OIA, in turn, shall refer the matter to the Office of Inspector General (OIG). The Warden may also refer the matter to the FBI (or other appropriate law enforcement agency). The timely reporting of all incidents and allegations is of paramount importance.

"2. Non-Business Hours. During the evening and night shifts, when the potential for sexual assaults is greater, staff shall immediately notify the Operations Lieutenant, who shall notify the SIS, Health Services Staff, the Duty Officer, and the Chief Psychologist or on-call Psychologist. Correctional Services staff shall immediately provide for the physical safety (e.g., separating the assailant from the victim) of the inmate who reports being sexually assaulted. Health Services and Psychology Services staff shall promptly inform the Duty Officer of their initial findings and treatment recommendations. (Emphasis supplied.) '

**PROGRAM STATEMENT** PS 5324.04 Attachment A reads, in part, at Page 2, II.,

"**A. Early Intervention Techniques (all staff)**

1. It is important that all contact with a sexual assault victim be sensitive, supportive, and non-judgmental.

2. It is not necessary to make a judgment about whether or not a sexual assault occurred.

3. Identify the inmate victim(s) and remove them from the immediate area; ...

On Page 3 of Attachment A,

"**C. Collect evidence from assailant - (Correctional Services - Health Services staff).**

1. Identify the assailant if possible and isolate the assailant, whenever possible, pending further investigation." (Emphasis supplied.)

16. BOP **PROGRAM STATEMENT** 5324.04 with its Attachment A are very clear in setting forth the expectations of the Director of the BOP in all instances of sexual abuse/assault. As an Auditor of American Correctional Association Standards, if I were to Audit the performance of the Warden and his staff designated to handle Sexual Abuse/Assaults on Inmates by Staff, against the

requirements of this **PROGRAM STATEMENT**, a finding of "In Non-Compliance" would have to be entered. Rationale and justifications for such a finding are set forth in the following paragraphs.

17. Named Defendant Johnsie Randle Donaldson was hired by the BOP on September 25, 1988 as a GS-9 Recreation Specialist. He was transferred into the FCI Dublin on January 10, 2000. He was initially assigned within the Main Women's Facility of the FCI as such is separate from the FPC - Federal Prison Camp and FDC - Jail adjacent to FCI. He remained within the working environment of the Women's Section of the FCI for the next 10 and one half months: Warden Schultz transferred Mr. Donaldson from the Womens's Facility of FCI to the FDC - Jail (Male) Facility on November 23, 2000. He was transferred after an interview and polygraph of a female inmate at the FCI. Mr. Mike Hill was Mr. Donaldson's Supervisor as Recreation Supervisor. FCI Dublin is rated by the BOP as a "Low Level Institution".

18. Mr. Donaldson had several performance issues shortly after his arrival at FCI Dublin. He admitted to improperly and illegally using a U.S. Government credit card, a matter excused by his coming forth and admitting his behavior and making prompt restitution. He had subsequent performance failure by not properly securing the gymnasium area under his supervision upon his leaving the Institution after completing his shift at night. (Warden Schultz Deposition at pages 164 through 171 and pages 202 and 203.)

19. Warden Schultz was, on March 9, 2000, advised that Mr. Donaldson was being investigated for sexual involvement with female inmate Brenda Anderson. The investigation was being conducted by Department of Justice, Office of Inspector General, Special Agent (SA) Bill J. Bournazos. SA Bournazos interviewed female inmate Louella McCormick on March 9, 2000 and recorded his report of that interview on March 10, 2000. He recorded that female inmate

informant Louella McCormick advised him that Mr. Donaldson and inmate victim Brenda Anderson engaged in oral sexual contact on February 26, 2000. She, inmate Brenda Anderson, reportedly threatened Mr. Donaldson after the sexual encounter that if he did not do as she says "she will be on a bus and he will be going to jail." Also on March 9, 2000, FCI Special Investigation Supervisor (SIS) Lieutenant Tanya Swepson and SIS Lieutenant Wes Pummill showed OIG SA Bournazos a lighter that was reported as one of 40 lighters Mr. Donaldson had brought into the Institution. (Introducing dangerous contraband into the Institution) The lighters were reportedly brought into the Institution in plastic sandwich bags in numbers of 5. The lighters are reportedly sold to inmates within the Institution for $20-25; they are used to light incense while they smoke marijuana. (OIG Documents 00014, 00015, 00027, 00210.)

20. Warden Schultz and Captain Norris Hogans each received undated and unsigned "Inmate Report To Staff Member" forms advising that female inmate Anderson and Mr. Donaldson were having sex. The Reports are separately hand printed, but context is identical. They both read:

> "Monday through Wednesday inmate (redacted) and inmate Mary Payne be in recrecation (sic.) barn on those days along with Staff Donaldson From 5:30 to 8:45. Inmate (redacted) and Mr. Donaldson are having sex. In the place for sex he bring her lighters, perfume, men cologne, negligee and etc... There sex take place in Education build on Saturday afternoon and when he are working recrecation (sic.) by himself. Inmate Payne are their watch dog." (OIG 00016, 00017, 00019 and 00020)

Identification of the author of these two documents would be very simple with minimal staff investigative effort, providing a source for immediate inquiry and to justify prompt action to isolate Mr. Donaldson from the female inmates and the women's sections of the Institution. (It may be that the identification process occurred and the author was found to be female inmate Louella McCormick who was interviewed by SA Bournazos on March 9, 2000.)

Compliance with **PROGRAM STATEMENT** 5324.04 should have resulted in the immediate transfer of Mr. Donaldson from the FCI Women's Unit to the FDC-Jail pending investigation as of March 9, 2000 when Warden Schultz was advised of the investigation of Mr. Donaldson by SA Bournazos. Such reassisgnment would have precluded his further sexual abuse/assaults of other female inmates as set forth in the following.

21. SA Bournazos was also advised by the reporting inmate that Mr. Donaldson was "line dancing" and playing basketball with the inmate victim, Brenda Anderson. During an interview of Mr. Donaldson on June 13, 2000 by SA Bournazos, Mr. Donaldson admitted being in the Institution during the "line dancing" program and to playing basketball with an inmate. Mr. Donaldson denied being "romantically involved" with the female inmate and denied bringing contraband into the Institution. During that interview, Mr. Donaldson requested representation by a Union Representative and refused to take a polygraph examination. (OIG 00038, 00039.)

22. Another opportunity for justification, if one was needed, to remove Mr. Donaldson from the women inmates of FCI came on March 16, 2000 and on March 18, 2000 when Mr. Donaldson sent handwritten memos to FCI SIS Lieutenant Swepson advising of rumors he had heard concerning himself, denying guilt, and inviting her to "please look into this for me! I am willing to take a lie detector test." (OIG 00025 and 00026.)

23. Mr. Donaldson also signed a statement dated June 13, 2000 in which he wrote:

> "On January 10, 1999 (sic.) I reported to work at FCI Dublin. I am a Recreation Specialist. I was in training on February 8 and 9, 1999 (sic.) and on annual leave during February 10, 11, 12, 1999. (sic.) During this week of training and leave, I believe I came to the institution one occasion to play basketball with other staff. On the following Tuesday, February 15, 1999 (sic.) I reported to work inside the institution. Unicor Officer approached me and informed me that he

heard that a recreation staff got walked out of the institution the previous week... They also told me that I gave the items to (redacted) in the Education Department in return for oral sex. After hearing the rumors, I wrote a memo to SIS detailing what I heard... I also want to add that I received a letter from an unidentified Inmate saying that she wanted to get it on with me. I was also recently approached by another inmate (redacted) who gave me some candy and made a remark as to her being the 'queen bee' and 'think about me while you are sucking on this piece of candy'. I remember being present during an inmate Dance but cannot remember the date. I also remember playing basketball with (redacted) on another occasion. I can not remember the date." (OIG 00040 through 00044.)

These documents present a question which is unanswered in documents available to me, whether or not Mr. Donaldson submitted the letter he claims to have received and whether or not he turned in the candy given to him and whether or not he filed Misconduct Reports on the inmates to whom he alludes.

24. In spite of all of this incriminating information with documents; the fact that Mr. Donaldson usually worked in isolation from other staff and immediate staff supervision; the fact that he had access with keys to areas of the Education Department and Gymnasium (Recreation Barn) which provided spaces for secrecy and privacy; Warden Schultz testified in Deposition that he took no action with respect to Mr. Donaldson to result in his detachment from access to female inmates, until November 23, 2000. (Warden Schultz' Deposition pages 169 through 173 and 202 and 203.) Not only is Warden Schultz' inaction in these respects Non-Compliant with PS 5324.04, he failed to protect his female inmates from the continuing sexual abuse and sexual assaults by Mr. Donaldson. To me, an old Warden of many years, such performance by a Warden is unconscionable.

25. As Mr. Donaldson was left to his own scheduling, impulses and probably encouraged by not being held accountable to date, during June and July of 2000 records reveal that he had at least three (3) sexual abuse encounters with female inmate Mary Annette Payne. These sexual encounters of fellatio and cunnilingus should have been "Prevented" in Compliance with 5324.04 by Mr.

Donaldson’s earlier removal from the presence of and control over female inmates. (OIG 00224, 00225, and 00226.) Records also reveal Mr. Donaldson had sexual abuse/assault encounters with inmate Carol Ann Birdsong, a mentally disabled person, in June or July 2000, and inmate Shannell Renee Stewart in September and October 2000. (USA 05122, FBI 12.)

26. An “ABBREVIATED REPORT OF INVESTIGATION - SYNOPSIS” dated August 7, 2000, written by the OIG SA sets forth: “The evidence developed failed to corroborate the allegations that Donaldson and (redacted) were romantically involved and that he was bringing contraband into the institution for her.” I simply cannot understand how such a significant investigation by such a significantly titled investigator could come to such a conclusion in the face of all testimony and evidence available. (OIG 00045.) It is evident to me from documents provided to me that the investigation to that point was incomplete; ignored verifiable leads; and appears to have provided “coverup” for FCI Management Staff involved. Among other things, the Investigating Agent acknowledged in a “MEMORANDUM OF INVESTIGATION RE: Interview of BOP Inmate, dated June 16, 2000 in OIG Document 00058” that he was lied to by the inmate. I have no documents indicating follow-up investigation concerning the inmate’s lies. Even so, there was certainly enough information available to Warden Schultz on which to base a reassignment of Mr. Donaldson from direct supervision over female inmates as an action of “Prevention” and “Protection” for the inmates. Yet, no action was taken until November 23, 2000.

27. Just before his transfer to the FDC Jail on November 23, 2000, records reveal that on November 18, 2000 Mr. Donaldson sexually assaulted inmate Esmeralda Hermosillo Lopez. (OIG 00227 and 00228.)

28. Further, failure to act to remove Mr. Donaldson from access to female inmates until November 23, 2000, enabled the vicious, violent sexual assault

on inmate Herlinda Arroyo de Hernandez, an inmate of FCI and a citizen of Mexico, who reported the sexual assault on her by Mr. Donaldson on October 11, 2000. She submitted to Polygraph Examination on November 21, 2000 which resulted in "No Deception Indicated" on relevant questions. (OIG 00229 and 00230.) Mr. Donaldson continued work within the FCI Women's Section during the pendency of the investigation of that assault, which eventually led to Mr. Donaldson's transfer to FDC November 23 and his subsequent arrest by FBI Agents on February 16, 2001 at the San Jose Airport as he was preparing to leave California. He was arrested at 12:05 PM aboard Southwest Airlines Flight 382. He was booked into the Alameda County Jail.

29. Documents provided to me further reveal that charges against Mr. Donaldson were Dismissed Without Prejudice by the U.S. Attorney's Office in January 2002. Mr. Donaldson had resigned his position with the BOP on March 7, 2001. (OIG 00286 and 00293.)

30. Obviously, staff of one institution readily talk with staff of another institution. The word quickly spreads that Mr. Donaldson was not held accountable for his sexual abuse and assaults on many female inmates of FCI Dublin. The decision not to prosecute Mr. Donaldson has a direct and far reaching impact on BOP staff and particularly those of facilities housing female inmates, and, if known, on the female inmate victims themselves. Any deterrent value that could be obtained from prosecution was lost. Staff who may be inclined to similar behavior can easily conclude that if they become involved with a female inmate they, too, will not be held accountable. Documents, texts, news media reports and multiple official prison sources as well as legal issues in Courts persist in making the Case that sexual abuse and assaults of female inmates in America's prisons is a continuing and

growing horror within our prisons. Failure to prosecute assailants/offenders is a contributor to the horrendous problem.

31. As a parenthetic issue, but also perhaps quite reflective of BOP and FCI Management failure to fully consider the sexual abuse/assaults of female inmates, is the subject of access for female inmate victim reporting. FCI Dublin, at least as of August 30, 2001, apparently posts at unknown locations throughout the institution, a document printed in Spanish and English which reads:

> "**IMPORTANT INFORMATION FOR ALL INMATES:** You should know - if you have been the victim of sexual abuse or sexual contact by another inmate or staff member, or wish to report this kind of behavior, you are encouraged to advise any institution employee.
>
> "If you do not wish to contact staff in the institution, you may contact the Office of Inspector General (OIG). A hotline has been added to the telephone lists of all inmates at the main institution and camp.
>
> "The OIG hotline number for the San Francisco Field Office is (650) 876-9058., signed by Michael L. Benov, Warden, 8/30/01"

Warden Schultz testified in Deposition that the initial efforts to establish a hotline to OIG for the inmates had some early problems which were later resolved resulting in the telephone number now provided to inmates. He reports that this number is automatically made available to each inmate through the inmate telephone system. Warden Schultz also makes it clear in Deposition that an inmate using this number has to pay for the phone call from their institution commissary accounts. (Deposition page 112 and page 113.)

32. Requiring inmates to pay collect telephone call charges to use a "hotline" to notify the OIG that they are victims of sexual abuse/assault, is not only extremely chilling to such reporting, it appears to me that either absolutely no thought was given to the issue or it is intended that such reporting be discouraged. Inmate Herlinda Arroyo de Hernandez, a victim of a vicious sexual assault by Mr. Donaldson, told the OIG Investigator:

> "Arroyo claimed that she wanted to call the direct OIG number but thought she needed money in her commissary account to do so. After a few sleepless nights she decided to report the incident to her unit manager."

Interestingly, as concerned for sexual abuse/assaults as the BOP reflects itself as being in **PROGRAM STATEMENT** 5324.04, there is no mention of a telephone hotline being made available to female inmates. Also, BOP **PROGRAM STATEMENT** 5264.07 dated January 31, 2002, Telephone Regulations For Inmates, makes no provision for inmates to have access to telephone hotlines to report anything, not to mention sexual abuse/assaults.

33. As one notes the hundreds of millions of dollars annually budgeted to the BOP for its staffing and operations, it becomes very difficult to understand why a female inmate victim of sexual assault/abuse must seek approval from a staff person to make a phone call to the OIG to report the abuse/assault. It can usually be expected at that point in her life the last thing a female inmate needs to do is to confront the questions of a staff person in order to report her pain and torture. The inmate minimally should be afforded the opportunity for a toll free telephone call to the OIG or similar "outside" authority. The toll free number should be well published throughout the institution and the fact that it is toll free should be completely underscored. Absent such an endeavor, claims of being concerned over female inmate sexual abuse/assaults somehow rings hollow.

34. It is my opinion that Warden Schultz and his specified management staff who are to be directly involved in issues of sexual abuse/assaults of female inmates, failed completely to take actions necessary to protect the female inmates; prevent their being sexually abused/assaulted; and toward complying with the intent, spirit, and actual wording of BOP **PROGRAM STATEMENT** 5324.04. In my opinion, such malfeasance and inattention to such a highly significant

issue in a contemporary American prison housing female inmates, by the Warden of that prison, is incomprehensible to me.

35. I have been a Warden of prisons for over 20 years and I know exactly how a Warden should perform when an inmate under his/her authority has been sexually abused/assaulted. There is no excuse nor justification whatsoever for not immediately removing the alleged assailant from the institution pending an immediate and thorough investigation. If the identified perpetrator is an inmate, that inmate is immediately placed in secure Administrative Segregation. If the identified perpetrator is a staff member, that staff member is to be immediately removed from the institution to another job assignment or placed on Administrative Leave, pending an immediate, thorough investigation. In this Case, reassignment of Mr. Donaldson was an action available to the Warden, within the discretion of his Office, which he finally exercised 10 months too late.

36. I do not read in any of the BOP **PROGRAM STATEMENTS** that a Warden and his executive staff are in any way bridled, precluded or instructed to do nothing but defer to outside agencies, I.e. FBI, OIG, etc. the authority to investigate within or otherwise to manage his/her institution. In this Case, in my opinion, neither the OIG nor the FBI bear direct responsibility for the safety and well-being of the female inmates. That is a responsibility which is directed solely to the Warden, his executive staff and the managers of the institution. My opinion in this Case is: for the Warden, Associate Warden, Captain, SIS and others involved in these cases to defer the immediate investigative processes to protect the female inmates, to outside agencies, wash their hands of the matters; and do nothing else; is absolutely unacceptable and is <u>shocking</u>. If that is what they understand and interpret

their responsibilities to be, the BOP has a major communication or management problem.

37. In my opinion, to permit Mr. Donaldson to continue his work within the Women's Section of FCI Dublin after March 9, 2000 is not only malfeasance but constitutes deliberate indifference. Outside authorities such as the OIG and FBI and other investigative resources of the Department of Justice and Bureau of Prisons should be fully utilized to assure thorough investigation and ultimate prosecution of perpetrators of sexual abuse/assault within the prison. The Warden and his/her staff have the more immediate investigative need to discern whether or not an act of sexual abuse/assault has occurred and if the perpetrator can be identified that he/she be immediately removed from the arena. I cannot understand any thought or inaction otherwise.

38. In my opinion, every correctional facility housing female inmates should provide toll free telephone access to those inmates for use in reporting any victimization by sexual abuse/assault. To do less is to fail to recognize such a critical need. With even cursory study, the BOP **PROGRAM STATEMENT** 5324.04 seems to me to clearly identify the potential problem by setting forth: "Forceful and pressured sexual interactions are among the most serious threats to inmate safety and institutional order." Warden Schultz and his management staff have probably carefully studied that BOP **PROGRAM STATEMENT** and an **INSTITUTION SUPPLEMENT** to implement the **PROGRAM STATEMENT** was developed and approved by the Regional Director. Thus, it appears to me there is a good understanding of the problem potential and it is equally evident to me that at FCI Dublin the understanding has not been translated into responsible actions.

39. This is not an "out-of-the-blue" new subject to FCI Dublin. Documents provided to me identify many recent past years prosecutions of FCI Dublin staff for sexual activity with inmates. The FCI Warden must immediately and

fully implement the intent, spirit and wording of PS 5324.04 and thus put an end to sexual abuse/assaults of the female inmates of the institution. The Warden must stop deferring to other agencies the immediate investigations needed to isolate perpetrators and to protect the inmates and conduct such immediate investigative needs through his/her own resources. Locking inmate victims into Protective Custody as a "Protective" action again chills the reporting process and is Non-Compliant with contemporary correctional practices. Remove the perpetrators, not the victims.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and of my personal knowledge or experience, or based on my review and study. (28 USC § 1746.) Executed on October 7, 2004 in Salem, Marion County, Oregon

________________S/____________

George E. Sullivan

Sworn to and subscribed before me

this ____ day of ___________, 2004.

___________________________________

Notary Public

My Commission Expires _____________.

Never told of the ultimate resolution of the case.