THOMAS F. CASEY III, COUNTY COUNSEL (SBN 47562)
By: Michael P. Murphy, Chief Deputy (SBN 083887)
By: Miruni Soosaipillai, Deputy (SBN 160858)
By: Timothy Fox, Deputy (SBN 190084)
Hall of Justice and Records
400 County Center, 6th Floor
Redwood City, CA 94063
Telephone: (650) 363-1960
Fax: (650) 363-4034

Attorneys for Defendant
COUNTY OF SAN MATEO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OSCAR BRAUN, ANDREA BRAUN and the OSCAR BRAUN TRUST DATED 1996, et al.,

Plaintiffs,

vs.

COUNTY OF SAN MATEO

Defendant.

Case No. CV 03-03415

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR ADJUDICATION**

Date: November 9, 2004
Time: 9:30 a.m.
Dept: Hon. Martin J. Jenkins

TRIAL DATE: FEBRUARY 14, 2005



Dockets.Justia.com

## TABLE OF CONTENTS

**Page(s)**


I. INTRODUCTION ........ 1

II. ARGUMENT ........ 2

A. Plaintiffs Have Not Established that a Majority of the Board Acted Unconstitutionally, as Required for Entity Liability Under *Monell* ........ 2

B. Plaintiffs Have Not Established that the Board of Supervisors' Action Was in Retaliation for the Exercise of First Amendment Rights ........ 3

1. Evidence of Temporal Proximity ........ 6

2. Evidence of Supervisors Expressing Disagreement with Mr. Braun. ........ 7

3. Evidence of False and Pretextual Reasons for Board's Decision. ........ 7

4. Evidence of Personal Animus by the Board Against Mr. Braun. ........ 8

5. Evidence of Disparate Treatment ........ 9

6. Evidence of Political Alignment Between Appellant and Board of Supervisors ........ 9

C. Plaintiffs' Equal Protection Claim Fails Because They Cannot Establish That They Have Been Intentionally and Irrationally Treated Differently ........ 11

D. Plaintiffs Have Failed to Establish Either a Procedural or Substantive Due Process Claim ........ 13

1. Any Substantive Due Process Claim Relating to Interference With Property Rights Is Barred by Ninth Circuit Authority ........ 13

2. A Substantive Due Process Claim Relating to the Amount of the Fees Is Mooted by the Settlement of the State Court Lawsuit Between The Parties ........ 14

III. CONCLUSION ........ 15

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Armendariz v. Penman*
75 F.3d 1311 (9th Cir. 1996) .......... 2, 12, 14

*Buckley v. Valeo*
424 U.S. 1, 96 S.Ct. 612 (1976) .......... 10

*City of Cleburne v. Cleburne Living Ctr., Inc.*
473 U.S. 432, 105 S.Ct. 3249 (1985) .......... 11

*Doe v. Madison School Dist. No. 321*
177 F.3d 789 (9th Cir. 1999). .......... 15

*Freeman v. City of Santa Ana*
68 F.3d 1180 (9th Cir. 1995) .......... 11

*GTE California, Inc. v. Federal Communications Comm'n.*
39 F.3d 940 (9th Cir. 1994) .......... 15

*Heller v. Doe by Doe*
509 U.S. 312, 113 S.Ct. 2637 (1993) .......... 11

*Kanaoka v. City of Arroyo Grande*
17 F.3d 1227 (9th Cir. 1994) .......... 3, 9

*Lake Coal Co. v. Roberts & Schaefer Co.*
474 U.S. 120, 106 S.Ct. 553 (1985) .......... 15

*Lake Nacimiento Ranch Co. v. County of San Luis Obispo*
841 F.2d 872, 879 (9th Cir. 1987) .......... 1, 3

*Monell v. New York City Dept. of Soc. Svcs.,*
436 U.S. 658, 98 S.Ct. 2018 (1978) .......... 2, 3

*Mount Elliott Cemetery Ass'n v. City of Troy*
171 F.3d 398 (6th Cir. 1999) .......... 3

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*
429 U.S. 274, 97 S.Ct. 568 (1977) .......... 11

*Oyler v. Boles*
368 U.S. 448, 82 S.Ct. 501, 505 (1962) .......... 11

*Pembaur v. City of Cincinnati*
475 U.S. 469, 106 S.Ct. 1292 (1986) .......... 3

*Powell v. McCormack*
395 U.S. 486, 89 S.Ct. 1944 (1969) .......... 15

*Squaw Valley Dev. Co. v. Goldberg*
375 F.3d 936 (9th Cir. 2004) .......... 11, 12, 13

**<u>TABLE OF AUTHORITIES</u>: (continued)** **<u>Page(s)</u>**

*Village of Willowbrook v. Olech*
528 U.S. 562, 120 S.Ct. 1073 (2000) .......... 11

*Williams v. Philadelphia Housing Authority Police Dept.*
380 F.3d 751 (3rd Cir. 2004) .......... 7

**<u>California Cases</u>**

*Paul for Council v. Hanyecz*
85 Cal. App. 4th 1356, 102 Cal. Rptr. 2d 864 (2001) .......... 10

**<u>Statutes</u>**

California Government Code § 25005 .......... 3

California Government Code § 84308(c) .......... 10

**<u>Other Authorities</u>**

San Mateo County Ordinance Code § 2.205.020 .......... 10

## I. INTRODUCTION

Plaintiffs' Opposition is replete with allegations that are irrelevant to the legal issue framed by this motion: Did a *majority* of the Board of Supervisors act in retaliation for Oscar Braun's past speech? While conceding this is their burden, plaintiffs cannot point to any evidence that a majority of the Board made its decision on anything other than a conclusion that Mr. Braun was a permit violator who needed to pay the fees to legalize his structures. Even taking the opposition evidence at face value, this case is now about whether there is a reasonable factual basis for the naked inference that a majority of the Board acted in retaliation against Oscar Braun *when it merely enforced the literal terms ordinances and resolutions that had all been enacted by June 2, 1998*, long before this dispute ever came before the Board.

Putting aside the essential rationality of enforcing the written laws, taking the record in the light most favorable to plaintiffs, at best they have shown that *one* member of the Board, Mike Nevin, made an insensitive remark about plaintiff Oscar Braun months before the Board hearing, and that another member of the Board, Richard Gordon, disagreed with Mr. Braun on an unrelated matter exactly once in the past.[1] However, there are five members of the Board, and as established in defendant's moving papers, the Board can act only by majority vote. Plaintiffs were obligated to produce evidence that a *majority* of the Board held ill will toward them. Thus, evidence merely as to two Supervisors is insufficient to establish the requisite elements of County liability under *Lake Nacimiento Ranch Co. v. County of San Luis Obispo,* 841 F.2d 872, 879 (9th Cir. 1987), *cert. denied,* 488 U.S. 827, 109 S.Ct. 79 (1988) (summary judgment for County on Section 1983 claim; plaintiff "presented no material evidence that the County approved" of one supervisor's allegedly unlawful vote). Here, the Board vote was unanimous, yet plaintiffs have not even adduced evidence that Mr. Gordon's and Mr. Nevin's alleged hostility toward Mr. Braun was even known to the other three board members (Rose Jacobs Gibson, Mark Church, and Jerry Hill), much less that they shared these sentiments.

Defendants, of course, dispute that the two alleged incidents relating to individual Supervisors

---

[1] Of course, when the Court reads the letter in question, it will come to the necessary conclusion that it is not evidence of animus or ill will. Rather, it is merely evidence that the Supervisor in question politely and firmly disagreed with Oscar Braun. If this constitutes proof of animus, every elected official regularly harbors the same animus against large swaths of their constituents. Rather, more rationally, the polite disagreement stated in the letter does not rise to proof of an animus-based decision on the Brauns' permit application over a year later.

constitute evidence of animus, much less evidence that these members decided the permit appeal in retaliation against Oscar Braun. However, the Court need not decide what was in the minds of these two Board members. Rather, because plaintiffs' burden was to establish that a *majority* of the Board acted in retaliation for political speech, the Court may simply dismiss plaintiffs' evidence as to merely two members as inadequate to carry that burden. Despite being given an opportunity to do so, Plaintiffs have failed to establish that a majority of the Board bears ill-will toward any of the plaintiffs.[2] Accordingly, there are no material disputed facts, and the action may be summarily adjudicated in Defendants' favor.

As to plaintiffs' Equal Protection claim, Ninth Circuit law imposes on plaintiffs a burden to present specific evidence of other landowners whose situations were similar but whose outcomes were substantially different. Plaintiffs have failed to present evidence that even a single similarly situated landowner was treated differently. This is the essence of a *disparate* treatment claim. They also have failed to produce evidence that a majority of the Board acted out of personal animosity.

Finally, despite having pled a *procedural* Due Process claim, plaintiffs now characterize it as a *substantive* Due Process claim. Fortunately, Plaintiffs' late change of tack makes the Court's decision much easier, as the Ninth Circuit does not recognize substantive Due Process claims in the land use arena. *Armendariz v. Penman*, 75 F.3d 1311, 1325–26 (9th Cir. 1996). In any event, no substantive Due Process right was violated. The claim is also moot, as plaintiffs *settled* their claim for fees.

Accordingly, the action should be summarily adjudicated in the County's favor.

## II. ARGUMENT

### A. Plaintiffs Have Not Established that a Majority of the Board Acted Unconstitutionally, as Required for Entity Liability Under *Monell*

Plaintiffs have conceded that their claims must be analyzed under *Monell v. New York City Dept. of Soc. Svcs.*, 436 U.S. 658, 98 S.Ct. 2018 (1978). As established by defendants' moving papers, under *Monell*, a "final policymaker" must have committed or ratified a Section 1983 violation for the entity to

[2] Plaintiffs' only attempt at adducing evidence against the majority of the Board is to state that four members of the Board received *de minimis* campaign contributions from one of the permit appellants as far back as 1997. However, this is a complete *non sequitur*. Plaintiffs are required to show the Board held *personal animosity* against Oscar Braun and retaliated against him for his speech. Presenting meager evidence of bias for reasons *other than* First Amendment retaliation or animus toward Mr. Braun affords no evidence of the retaliation claim they have pled.

be liable. Plaintiffs also concede, as they must, that the only final policymaker relevant to the instant motion is the five-member Board of Supervisors. *See* Opposition at 11:21–12:2. Plaintiffs' concession is not merely that the Board's motive is the only relevant motive. It is also that the Board's *action* is the only relevant *action*. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–83, 106 S.Ct. 1292 (1986) ("[M]unicipal liability under § 1983 attaches where — and only where — a deliberate choice *to follow a course of action* is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." (Emphasis added).)

In conceding that this is the appropriate measure, plaintiffs have bitten off more than they can chew. For Section 1983 purposes, "[t]he Board of Supervisors may only establish official policy by a majority of the Supervisors." *Lake Nacimiento Ranch Co.,* 841 F.2d at 879 (citing Cal. Gov't Code § 25005 and affirming summary judgment in favor of County on Section 1983 claim where the plaintiff "presented no material evidence that the County approved" of one supervisor's allegedly unlawful participation in a board vote on the proposed project); *Kanaoka v. City of Arroyo Grande,* 17 F.3d 1227, 1239 (9th Cir. 1994) (councilmember "did not have final decisionmaking authority because the City Council must adopt a general plan by a majority vote"); *accord Mount Elliott Cemetery Ass'n v. City of Troy*, 171 F.3d 398, 406–07 (6th Cir. 1999). Here, all actions taken by the five-member Board of Supervisors with regard to plaintiffs' permit proceedings were taken by unanimous vote. (RJN ¶5 at 17:10–13; RJN ¶6 at 2:12–16.) Absent evidence that a majority (*i.e.*, at least three Board members) acted in an unconstitutional manner, plaintiffs have not established the basis for entity liability under *Monell*.

**B. Plaintiffs Have Not Established that the Board of Supervisors' Action Was in Retaliation for the Exercise of First Amendment Rights**

Plaintiffs have utterly failed to present evidence from which any reasonable inference of retaliation can be drawn against a majority of the Board. As plaintiffs have conceded, the relevant County conduct for purposes of this motion is the conduct of the Board of Supervisors. Further, plaintiffs do not contest (or even acknowledge for that matter) that official policy for section 1983 purposes may only be established by a *majority* of the members of the Board of Supervisors. *Lake Nacimiento Ranch Co.*, 841 F.2d at 879; *Kanaoka*, 17 F.3d at 1239. It is understandable why plaintiffs would choose to ignore this basic requirement, since the evidence upon which plaintiffs rely consists of isolated and unconnected

events that, with one exception, involve less than a majority of the members of the Board. That exception — one contribution of $400 by Lenore Roberts to the political campaign of one supervisor in 1997, and intermittent annual contributions of $100 to the campaign committees of other Board members thereafter — simply confirms that plaintiffs are grasping at straws.

For purposes of this motion, defendants have conceded that the members of the Board knew of the plaintiffs' speech activities. As plaintiffs themselves note, however, mere knowledge of protected speech is not enough; substantial and credible evidence of retaliatory motive, whether direct or circumstantial, is essential. Unable to show retaliatory motive on the part of a majority of the Board through evidence, they apparently hope that if their speech is portrayed as "scathing" enough, the evidentiary threshold will simply disappear, because (their argument would go) any adverse action must necessarily have been taken in response to "scathing" speech. This is not the law.

Here, the Board had before it the simple question of whether plaintiffs, who had built numerous illegal structures without permits, were required to secure all zoning, building and environmental health permits necessary to legalize the construction, and pay the fees specified by ordinances and resolutions of the Board for their failure to obtain the required permits prior to building. *Plaintiffs* chose to convert the hearing to a referendum on the past exercise of their First Amendment rights by submitting a letter (dated December 26, 2001) which catalogued their disagreements with County policy, and which paid no better than lip service to the merits of the permit matter before the Board for decision. The fact that plaintiffs (or other parties to the proceeding for that matter) may have attempted to divert from the merits of the permit application did not relieve plaintiffs of their evidentiary burden to demonstrate retaliatory motive on behalf of a majority of the Board.[3] There is no evidence that a *majority* of the Board acted for any reason other than those specifically stated in Resolution No. 65454. (RJN, Exh. 2, CSM 00238–39.)

Plaintiffs first suggest that retaliatory motive can be inferred from the fact that the Board denied

---

[3] As plaintiffs have themselves noted, even if retaliatory motive could be established, defendant can nevertheless prevail if it can establish that the same decision would have been reached anyway. When plaintiffs refused to pay the fees set by ordinance and resolution, the Board was left with no choice but to decline to issue permits, unless ignoring its own rules and regulations can be said to have been a choice. There is no doubt that the decision would have been the same even without Oscar Braun's history of speech on matters of public interest. By flatly refusing to pay the fees set by ordinance (*see* Braun Decl. at ¶ 27), Mr. Braun made the Board's decision very easy, and made any retaliatory motives irrelevant.

plaintiffs' permit applications even though the Planning Commission had approved them. Plaintiffs assert that the appeal from the Planning Commission was taken by certain "political enemies of the Brauns" who "cited Mr. Braun's First Amendment activities as reasons to deny the permit." (Opposition at 13:11–15.) The implication here is that, because the Board reversed a Planning Commission decision favorable to plaintiffs, such reversal must necessarily have occurred for improper reasons urged by others. The plaintiffs have rewritten history in order to make this argument. First, the Planning Commission's decision was not the "approval" that plaintiffs suggest it was. In fact, the approval included 26 conditions, among them the requirements to pay $7,440 in investigation fees to the Planning Division and to pay Building Investigation fees as required by Section 9041 of the County Building Regulations — the very fees to which Mr. Braun later objected to the Board of Supervisors. (Burnes Decl. ¶ 6.) Second, while plaintiffs now unreservedly embrace the decision of the Planning Commission, in Mr. Braun's letter of December 26, 2001, submitted to the Board at the outset of the Board proceedings, Mr. Braun requested that the Board uphold the decision of the Planning Commission "without conditions or mitigation measures," further stating that "[a]pplicants do not concur with the Mitigation Measures for Case #PLN 1999-0079, a project to legalize Moon Acres agricultural structures." (RJN, Exh. 2, pp. CSM 00095–96.)[4] Thus, plaintiffs' claim to this Court that they sought merely to uphold the Planning Commission's decision is just plain wrong. Rather, *plaintiffs sought to have the Board of Supervisors overturn the 26 conditions* that the Planning Commission had placed on "approval," including the payment of the fees that the Brauns flatly refused to pay. The Board's decision was thus not a reversal; it was a reaffirmation of the 26 conditions, and another way of restating that the Brauns would get no legalization permits until they paid the fees set by ordinance and resolution.

Even though plaintiffs attempted to turn the Board meetings into a referendum on unrelated First Amendment activities, and certain speakers referred to plaintiffs' politics, there is absolutely no evidence

[4] Plaintiffs draw a simplistic distinction between the Planning Commission's conditional approval and the Board's denial because of plaintiffs' refusal to pay fees. There is virtually no difference between the two decisions. A conditional approval is just that; if the condition fails, the permit fails. Thus, plaintiffs were in no worse position with a denial by the Board based on their refusal to pay fees than they would have been by failing to meet the Planning Commission's condition requiring those same fees. In neither case would the plaintiffs have had valid permits. Tellingly, the Brauns argued *against* the Planning Commission's imposition of conditions and fees. (RJN, Exh. 2, pp. CSM 00095–96.)

that the Board considered anything other than the merits. (RJN, Exh. 2, CSM 00238–39.) Far from defending the Planning Commission, Oscar Braun was asking the Board to *ignore* the ordinances and resolutions regarding the fees for permits for already-built illegal structures.

Plaintiffs strain to cobble together unrelated facts in order to make the case that improper motivation by the Board may be inferred. Plaintiffs' effort is entirely unconvincing.

**1. Evidence of Temporal Proximity**

Plaintiffs claim the mere proximity in time between the Board's action and their exercise of free speech rights entitle them to an inference of retaliatory motivation. Not so. The cases make clear that temporal proximity may provide a basis for inferring retaliatory conduct *when proximity suggests a causal link* between the exercise of a protected right and the action against the person exercising the right. Here, because the Board did not control the timing of its action to coincide with Mr. Braun's exercise of speech rights, plaintiffs are entitled to no inference of motive.

To establish that proximity, plaintiffs point to: (1) plaintiff Oscar Braun's December 26, 2001, letter; (2) testimony by appellant Lenore Roberts during the proceedings before the Board of Supervisors (described by plaintiffs as irrelevant to the proceedings before the Board)[5]; (3) a pending appeal to the Board of Supervisors with regard to a permit issued with regard to the Devil's Slide project; and (4) Mr. Braun's speech activities from the early 1990s.[6] Plaintiffs manufactured this temporal proximity by using the legalization process as *their* platform to raise issues unrelated to permits and fees. Plaintiffs blame the timing of the appeal on the Board — which has no control over who appeals and when.

To establish that the Board had retaliatory motivations, the proper inquiry here should be whether *the initial legalization proceedings in 1998* were (1) temporally related to plaintiffs' exercise of their First Amendment rights and (2) instituted at the Board's behest. Plaintiffs have presented no evidence

[5] The true irony is that plaintiff Oscar Braun himself set the stage with his letter of December 26, 2001, which focused virtually entirely on these extraneous issues, paying only lip service to the actual merits of the appeal. Even though *both* parties sought to inject extraneous matters into the proceedings, the Board kept its eye on the ball and dealt with the matter before it — the permits to legalize plaintiffs' illegal construction — and ruled on that basis. RJN, Exh. 2, CSM 00238–39.

[6] Oscar Braun claims to have been a prominent public critic since the early 1990s. This is therefore a case in which temporal proximity simply does not work to establish retaliatory motivation — *any* enforcement would have been proximate to one of Mr. Braun's "scathing" critiques. The law cannot be that any effort to legalize his structures between 1990 and the present would be proximate to his speech activities merely because it would have coincided with his latest op-ed piece or letter to the editor. Such a rule would exempt vocal citizens from any government enforcement.

(because there is none) that the Board had any role in instituting the process that began with a citizen complaint in February 1998.

Where, as here, the hearing was to address plaintiffs' building and zoning violations, and the evidence is clear that it was *plaintiffs themselves* who then injected the issue of their past exercise of First Amendment rights into the proceedings, creating the temporality of which they now seek to take advantage, an inference of retaliation should not be drawn *because it speaks not at all to the County's state of mind in making the decision*.[7] One cannot start a knife fight and then complain of having been stabbed, especially when suing the person called in to break it up.

**2. Evidence of Supervisors Expressing Disagreement with Mr. Braun.**

The "public dispute" with Supervisor Richard Gordon on which plaintiffs rely as evidence of retaliatory motive occurred in an exchange of letters in August of 2000, over a year before the Board proceedings. Further, the so-called "public dispute" involved only one Supervisor. As noted in defendant's opening brief, Supervisor Gordon has a First Amendment right, as well as an obligation as a public official, to speak out on matters of public interest. Devil's Slide is just such a matter of public interest. It flies in the face of reason to draw an inference from this *one letter* that Supervisor Gordon harbored sufficient ill will to retaliate against a constituent. That inference would also ironically have a chilling effect on all supervisors' right and obligation to speak out on public affairs.

In any event, plaintiffs' evidence fails because it involves only one member of the Board. There is no evidence the other members even knew of this exchange. Absent evidence that a majority of Board members disagreed with Mr. Braun, the evidence fails to meet plaintiffs' burden.

**3. Evidence of False and Pretextual Reasons for Board's Decision.**

Plaintiffs' argument that there are false and pre-textual reasons for the Board's decision is remarkable only for the complete absence of any evidence to support it. The fact is that the Board clearly

---

[7] Plaintiffs cite *Williams v. Philadelphia Housing Authority Police Dept.*, 380 F.3d 751, 759 (3rd Cir. 2004), a case upholding a summary judgment in favor of defendants in an ADA retaliation case, for the proposition that temporal proximity alone is sufficient to overcome a plaintiff's burden to prove retaliatory motive in some cases. The *Williams* court goes on to say, however, that the timing of the alleged retaliatory action must be "'unusually suggestive of a retaliatory motive before a causal link will be inferred.'" *Williams*, 380 F.3d at 759 (citations omitted). There is nothing regarding the timing of the Board's action here that is "unusually suggestive" of a causal link.

set out its reasons for denying the permits to legalize plaintiffs' unpermitted construction in Resolution No. 65454, adopted on July 23, 2002. (RJN, Exh. 2, CSM 00238–39.) Those reasons are unrebutted by plaintiffs' evidence, which establishes neither its falsehood nor its pretextuality.

Further, plaintiffs' claim that "the only stated reason for charging Mr. Braun all building fees up front was the false allegation that he never paid his application fees" (Opposition 18:9–10) is demonstrably incorrect. The Board's discussion leading to the decision to require payment of all fees as a predicate to obtaining the permits that would give plaintiffs' structures legal status is set forth in the transcript of proceedings from the Board's hearing of January 15, 2002. (RJN, Exh. 3, CSM 00363–71.) This discussion makes clear that the driving force behind the decision was a concern that, unless all fees were collected at the time the planning permits were issued, plaintiffs would lack the incentive to complete the legalization process by obtaining all required building permits. Further, the transcripts of April 16, 2002 (RJN, Exh. 4), June 18, 2002 (RJN, Exh. 5), and July 23, 2002 (RJN, Exh. 6) make it abundantly clear that the Board's desire was to bring the matter to resolution with the issuance of the required planning permits upon payment of all fees due and owing. In fact, the Board sought to facilitate resolution of the matter by directing staff to meet with plaintiffs' counsel to try to resolve differences with regard to the fees. (RJN, Exh. 4, CSM 00307–13.) Only *after* plaintiffs had indicated their disagreement with the amount of the fees to be paid did the Board move to a decision to deny the permits. (RJN, Exh. 6.) Why would the Board have gone to such lengths if it intended summarily to deny plaintiffs the permits they sought? The power to obtain the permits was always in plaintiffs' hands.

In short, plaintiffs cite no evidence of pretext. In truth, all evidence is to the contrary.

**4. Evidence of Personal Animus by the Board Against Mr. Braun.**

Again, plaintiffs believe that they can avoid summary judgment by demonstrating that one member of the Board harbored personal animus against Mr. Braun. The proffered evidence is that Supervisor Nevin referred to Oscar Braun as an "asshole" when speaking with Braun's attorney on a matter unrelated to the permit application, which was not then before the Board.[8] However, it does not constitute

[8] In fact, at the time the comment was allegedly made, plaintiffs' permit applications were still pending before the Planning Commission. They had not even yet been appealed to the Board. *See* Hannig Decl. at ¶ 3; Burnes Decl. at ¶ 6–7. There is no evidence that Mr. Nevin knew that plaintiffs had applied for permits until three and a half months after this comment.

direct evidence of animus, because it does not evince that Supervisor Nevin wished Mr. Braun ill will or he held hostility toward him or his legal interests. Supervisor Nevin's alleged comment raises, at best, the inference that he found Mr. Braun to be an unpleasant person, not that he is hostile to his legal interests. In any event, it cannot under any theory serve as evidence from which an inference can be drawn that *any other member of the Board* harbors the same feeling toward Mr. Braun. For the reasons discussed in defendant's Opening Brief, and reiterated above, such animus must be demonstrably held by a *majority of the Board* for plaintiffs to proceed to trial. *See Kanaoka*, 17 F.3d at 1239. Plaintiffs lack the evidence that the rest of the Board even knew of Mr. Nevin's statement or its motivation. They further lack evidence that the Board's action was based on this personal dislike.

**5. Evidence of Disparate Treatment.**

Plaintiffs lack any evidence of disparate treatment. It cannot be stated more plainly. Their only evidence, discussed below, is an interrogatory response in which the County indicates that no other permit applicant was required to pay building permit fees in advance of getting a planning permit. As described below, this is inadequate to prove disparate treatment, because it merely establishes that such a situation was "rare" or even "unique," which is conceptually different from "disparate." So far as the record is concerned, plaintiffs were unique because there were no other similarly situated persons. This is not "disparate treatment," because no one received *better* treatment despite a similar situation.

**6. Evidence of Political Alignment Between Appellant and Board of Supervisors.**

Plaintiffs next argue that the fact that Lenore Roberts has contributed to the political campaign of four of five Board members is evidence of a "political alignment" between appellant Lenore Roberts and the Board of Supervisors. Plaintiffs also point to evidence that Supervisor Gordon had made a contribution to the Committee for Green Foothills, which Ms. Roberts represents, as further evidence of this "political alignment."[9] Once again, the irony of plaintiffs' argument cannot go unnoticed, since both of the acts that plaintiffs complain of are classic examples of First Amendment rights.

[9] Plaintiffs' legal theory is literally unprecedented. Plaintiffs cite no authority for the proposition that "political alignment" constitutes circumstantial evidence of retaliatory motivation. This is not surprising, as the Board's alleged motivation to favor one of the permit appellants is conceptually different from its motivation to *punish* Mr. Braun for his speech. Evidence that the Board favored the appellant because of her "political alignment" actually cuts against the argument that the decision was made on the basis of retaliation for Mr. Braun's past speech on matters of public concern. The Court should not allow evidence of one fact ("political alignment") to substitute for missing evidence another fact (animus or ill will).

The making of a political campaign contribution is a type of political speech. *Paul for Council v. Hanyecz*, 85 Cal. App. 4th 1356, 1365, 102 Cal. Rptr. 2d 864 (2001). "A contribution serves as a general expression of support for the candidate and his views, . . . ." *Buckley v. Valeo*, 424 U.S. 1, 21, 96 S.Ct. 612, 635 (1976). Defendants do not suggest that a payment or contribution may never be large enough, under a given set of circumstances, to amount to a *quid pro quo* which could taint a decision, and government at all levels have adopted laws to prevent such abuse. Defendant is aware of no law, however, that prohibits political contributions from individuals in amounts as low as $100 or $400, and is further aware of no law that requires Board members to recuse themselves from any decision involving a party or participant who has contributed such a *de minimis* amount.[10] Here, other than a single contribution in 1997, on no occasion has Ms. Roberts contributed more than $100 in a twelve month period to the campaigns of any member of the Board. As far as state law is concerned, no bias arises from that fact alone. In any event, the best inference that can be drawn from Ms. Roberts's contributions on behalf of the Committee for Green Foothills is that the Supervisors may be sympathetic to the goals of the organization. That is a far cry from any inference that contributions motivated Board members to retaliate against plaintiffs. Plaintiffs are required to show the Board held some *personal animosity against Oscar Braun*, not that it had a tenuous reason to like Ms. Roberts.

The crux of a retaliation claim is establishing that the decision maker specifically used government action to punish and deter plaintiffs' exercise of their First Amendment rights. Following plaintiffs' argument to its logical conclusion means the Board would have ruled for Ms. Roberts even if Oscar Braun were a complete unknown, making the alleged retaliatory motive irrelevant.[11] *See Mt. Healthy*

[10] The County has recognized the potential for such abuse, and has established a $1,000 annual maximum for campaign contributions to Board members. S.M.C. Ord. Code § 2.205.020 (Supp. Request for Judicial Notice, Exh. 1.). Under state law, certain non-elected public officials are disqualified from participating in decisions involving parties who have made contributions totaling $250 or more in the preceding 12 months. Cal. Gov't Code § 84308(c). Here, the amounts pointed to as "evidence" of political alignment do not even rise to the materiality threshold for bias under the applicable law.

[11] Of course, the County denies that the permit application was decided on any basis other than the strict letter of the ordinances and resolutions relating to zoning, permitting, and investigation fees. Plaintiffs' evidence itself leads to the conclusion that the outcome was based on the permit violations — which even the Brauns concede existed — and the dispassionate application of the Board's ordinances and resolutions setting the investigation fee. (RJN, Exh. 2, CSM 00238–39.) However, defendant can show it is entitled to judgment by pointing out that *even the inferences* proposed by plaintiffs do not rationally follow from the evidence in the record, whether or not such evidence is disputed. While the inference that the permit application was denied based on favoritism is absurd from a factual standpoint and vigorously disputed, plaintiffs' opposition cannot establish a triable issue because what plaintiffs infer is not a logical conclusion from the evidence.

*City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568 (1977). Again, importantly, the record is devoid of evidence that three members of the Board cared in the slightest about Mr. Braun's political activities. As far as the evidence in the record is concerned, at least three, and possibly all five, members of the Board of Supervisors have *no opinion at all* of Oscar Braun, because he has produced no evidence to the contrary. Their opinion of Ms. Roberts, even if proved, advances plaintiffs' case for retaliation not one iota.

### C. Plaintiffs' Equal Protection Claim Fails Because They Cannot Establish That They Have Been Intentionally and Irrationally Treated Differently

Plaintiffs' claim for "selective enforcement" under *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073 (2000) requires more than simply showing that they were the first to be subjected to a particular form of government enforcement. They must show, with specific evidence, that they were the first *among similarly situated persons* to experience such treatment. The Equal Protection Clause ensures that "all persons *similarly situated* should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249 (1985) (emphasis added). Because the County legitimately may choose to enforce its laws against plaintiffs rather than other property owners so long as the decision is not arbitrary, *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 505 (1962), and because governmental decisions are afforded "a strong presumption of validity," *Heller v. Doe by Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637 (1993), the Court must not make the decision as to rational basis in a total factual vacuum, as plaintiffs would have the Court do. The burden was on plaintiffs to establish an *Olech* tort by specifically demonstrating that they have been "intentionally treated differently *from others similarly situated* and that there is no rational basis for the *difference* in treatment." *Village of Willowbrook*, 528 U.S. at 564 (emphasis added). Additionally, plaintiffs must show that the named defendant — here, a majority of the Board of Supervisors — was motivated by animus. *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 948 (9th Cir. 2004). They have failed to meet either burden.

It is not sufficient merely to state in general terms (as plaintiffs do in a single paragraph of their brief) that other landowners experienced different results. "Selective enforcement of valid laws, without more, does not make the defendants' action irrational . . . ." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187–88 (9th Cir. 1995). Even taking plaintiffs' evidentiary offer as true (that no other person seeking

legalization in the 15 preceding years was asked to pay building fees before planning permits would be issued), at best they have pointed out the obvious — that their case was relatively unusual. But the claim is not for "unusual treatment" or even "unique treatment"; it is for "*disparate* treatment." The claim is also not for "unusual enforcement" or "infrequent enforcement"; it is for "*selective* enforcement." It is thus the Brauns' burden to establish that their treatment was disparate (*i.e.*, different from) the treatment of similarly situated others, and that the government *selected* them for enforcement on an improper basis. The cited interrogatory response does not establish that anyone else was similarly situated, or the basis for their better treatment. *Squaw Valley Dev. Co.*, 375 F.3d at 945 ("Squaw Valley has specifically not provided any evidence regarding the identity of these landowners; let alone evidence that they are as large, have the same or worse histories of non-compliance, have the same level of activity on their property, or that they disputed . . . regulatory suggestions. *Simply put, disparate treatment of these landowners cannot form the basis of Squaw Valley's equal protection claim.*" (Emphasis added.)) The Brauns bore a burden to establish similarity with other legalization permit applicants in the Coastal Zone. Plaintiffs have presented no evidence of better-treated, similarly-situated others.

Finally, plaintiffs have not established that the requirement that their illegal buildings comply with permit requirements was malicious, irrational, or plainly arbitrary. The County has proffered several rational bases for any uniqueness in treatment, particularly regarding action with a view toward its specific past experience with the Brauns. In this case it was the Braun's *violation* of the laws that brought the issue to the government's attention in the first place, not a voluntary permit application prior to building. These rational bases remain unrebutted by the Opposition. The County can defeat an Equal Protection claim merely by showing that its permit requirements bear a rational relation to legitimate state interests. The public's interest in preventing safety and sanitation hazards by enforcing planning, zoning, and environmental health is well-established. *See Armendariz*, 75 F.3d at 1328. Furthermore, the imposition of investigation fees against plaintiffs is rationally related to the policy of offsetting the cost of using County personnel to seek out and inspect illegal buildings and land uses. There is no evidence to defeat this rational relationship between the fees and the County's burden of investigating illegal structures such as plaintiffs'.

Plaintiffs still make much of the fact that they were required to pay *all* of the fees before their

structures would be legalized. Their sole evidence is that no other landowner has been required to do so. Again, in the absence of evidence of *similarly situated* others, their claim fails. However, even unique treatment of the Brauns would not have been irrational. The County was entitled to require full payment of building fees in light of its specific past experience with the Brauns with regard to their non-compliance with land use laws. A permit applicant who applies *before* starting to build is not a law-breaker and need not be treated in anticipation they will break the law again. A legalization applicant like the Brauns, who have not followed permit requirements, may rationally be treated in the anticipation they may abandon the process, fail to pay, and continue illegal use of unpermitted structures. This was clearly the rational motivating concern behind the decision to require that plaintiffs complete the legalization process by obtaining all required building permits. (RJN, Exh. 3, CSM 00363–71.) Thus, requiring them to pay all fees at the outset, prior to the actual issuance of permits, was not irrational. "[M]ore formal regulatory enforcement is a rational way to deal with a [plaintiff] perceived to dispute less formal regulatory suggestions." *Squaw Valley Dev. Co.*, 375 F.3d at 945. Moreover, there is no valid dispute that permit fees must be paid at some point. Plaintiffs have articulated no theory as to why conditioning the approval of planning permits on the concurrent payment of overdue building permit fees caused them any injury. Until their structures were properly permitted and fully paid, they would have remained in the same status — illegal. Whether they paid the fees all at once or six months apart makes no difference to their illegal status or to Plaintiffs' "right" to maintain or use these structures.[12] Thus, the order in which the fees were to be paid does not constitute a constitutional tort.

### D. Plaintiffs Have Failed to Establish Either a Procedural or Substantive Due Process Claim

#### 1. Any Substantive Due Process Claim Relating to Interference With Property Rights Is Barred by Ninth Circuit Authority

Plaintiffs titled their Third Count "Violation of Procedural Due Process." Despite having pled a

[12] Defendant is puzzled by plaintiffs' claim — notably devoid of *any* factual support in the declarations — that the proceedings before the Board prevented a sale or refinance of the property. *See* Opposition at 9:4–11. Unless the Brauns intended to engage in real estate or bank fraud by not disclosing the presence of unpermitted structures to potential buyers or lenders, the legal status of the property remained the same before, during, and after the Board's action. Moreover, it seems surprising that the parties to a "pending" $25 million real estate deal scuttled it over approximately $30,000 in disputed fees, unless plaintiffs failed to act reasonably to mitigate. It appears there are good reasons why these facts are not attested to in any of the declarations.

*procedural* Due Process claim, plaintiffs now characterize it as a *substantive* Due Process claim. Plaintiffs' late change of tack makes the Court's decision even easier, as the Ninth Circuit does not recognize substantive Due Process claims in the land use arena, because such rights are addressed by a more specific provision of the Constitution. *Armendariz v. Penman*, 75 F.3d 1311, 1325–26 (9th Cir. 1996) ("We have held that substantive due process claims based on governmental interference with property rights are foreclosed by the Fifth Amendment's Takings Clause.") Here, the fact that plaintiffs are attempting an "end-run" around the Fifth Amendment by stating their claim as "substantive due process" is made clearer by the fact that plaintiffs' claims of injury are closely akin to Takings claims. *See* Opposition at 8:19–9:14 (*e.g.*, "The Board of Supervisors abatement order instantly down zoned the Brauns [*sic*] Moon Acres Ranch land use from a residential farm Regional Management Coastal Zone property to a non-developable Open Space Coastal Zone parcel.") While this statement is untrue and totally without evidence,[13] the Court may dismiss this claim, however characterized.

**2. A Substantive Due Process Claim Relating to the Amount of the Fees Is Mooted by the Settlement of the State Court Lawsuit Between The Parties**

Even if the Court were to recognize a substantive Due Process claim, it is meritless. Plaintiffs attempt to run away from their pleadings not merely by changing the claim, but also by changing the conduct complained of. Rather than proceed with the theory pled, plaintiffs now assert that their claim is "based on the Board's having charged fees in excess if that allowed by State law." (Opposition at 24:20–21.) On July 2, 2004, plaintiffs and defendant entered into a Settlement Agreement resolving a state court lawsuit arising out of the same Board action that constituted the basis of this lawsuit. (Declaration of Michael P. Murphy ("Murphy Decl.") at ¶ 1.) Paragraph 1 of the Settlement Agreement provides:

> Plaintiffs will pay the additional amount of $12,000 to defendant County of San Mateo by July 1, 2004, in advance if a decision on the issuance of planning permits by the County. This will constitute full payment of all permit and investigation fees, for each and every permit which is the subject of this action, including planning permits, building permits and environmental health permits.

[13] Plaintiffs completely mischaracterize the abatement order at issue. *See* Opposition at 8:19–9:11. That order, if enforced, would have compelled plaintiffs to disconnect the septic and water lines *to the illegal mobile home*, not to the Brauns' own residence. *See* Exh. 12 to Braun Decl. Defendant persist in this hyperbole, with which their factual account is replete. However, this claim was settled by the parties in the prior mandamus proceeding. *See* Exh. "A" to Declaration of Michael P. Murphy. The argument that their entire property was "down zoned" to open space preserve would be comical, were it not already barred by *Penman* and plaintiffs' own settlement with the County.

*Id.*, at ¶ 2, Exh. "A." All fees have been paid, the Settlement Agreement has never been rescinded, and remains in full force and effect. *Id.* at ¶ 3.

"The jurisdiction of federal courts depends on the existence of a case or controversy." *GTE California, Inc. v. Federal Communications Comm'n.*, 39 F.3d 940, 945 (9th Cir. 1994). Ordinarily, a "party must maintain a live controversy through all stages of the litigation process." *Doe v. Madison School Dist. No. 321*, 177 F.3d 789, 797 (9th Cir. 1999). The settlement of a plaintiff's claim moots an action. *See Lake Coal Co. v. Roberts & Schaefer Co.*, 474 U.S. 120, 106 S.Ct. 553 (1985). A case may be moot as to some issues, even though it remains "live" as to others. *Powell v. McCormack*, 395 U.S. 486, 497, 89 S.Ct. 1944, 1951 (1969). Here, whether or not other claims are ultimately dismissed, it is clear that the settlement of plaintiffs' claims for overpayment of fees moots plaintiffs' substantive Due Process claim, as that claim has been articulated by plaintiffs themselves in their Opposition to defendant's motion. For that reason, the claim should be dismissed.

Moreover, this argument that the investigation fees were invalid as a matter of state law completely undercuts the argument that the Board of Supervisors acted with retaliatory motive. By asserting that the fee ordinance was invalid, plaintiffs are conceding that their damages arose not from the retaliatory motive or animus of the Board, *but from the illegality of the investigation fee itself*. Even according to plaintiffs' theory, the Board's animosity was irrelevant to plaintiffs' injury, because the problem giving rise to plaintiffs' injury was the prior enactment of an illegal investigation fee. This case is no longer about animosity, even according to plaintiffs' contorted theory.

**III. CONCLUSION**

Plaintiffs have failed to meet their burden on any of their causes of action. Defendant County of San Mateo requests that its motion for summary judgment, or summary adjudication, be granted.

Dated: October 26, 2004

THOMAS F. CASEY III, COUNTY COUNSEL

By: /s/
Michael P. Murphy, Chief Deputy

Attorneys for Defendant
COUNTY OF SAN MATEO