Apple Inc. v. Psystar Corporation

Doc. 2399 Att. 3



Stroock & Stroock – Mr. Weingarten

# BEFORE THE PUBLIC UTILITIES COMMISSION
## OF THE
## STATE OF CALIFORNIA

ADMINISTRATIVE LAW JUDGE SARAH R. THOMAS AND
CHARLOTTE F. TERKEURST, presiding.

| | |
|---|---|
| Order Instituting Investigation into the Gas Market Activities of Southern California Gas Company, San Diego Gas and Electric, Southwest Gas, Pacific Gas and Electric, and Southern California Edison and their impact on the Gas Price Spikes experienced at the California Border from March 2000 through May 2001. | **LAW & MOTION**<br><br>I.02-11-040 |
| Order Instituting Investigation whether San Diego Gas & Electric Company, Southern California Gas Company and their holding company, Sempra Energy, respondents, have complied with relevant statutes and Commission decisions, pertaining to respondents' holding company systems and affiliate activities. | I.03-02-033 |

REPORTER'S TRANSCRIPT
San Francisco, California
February 13, 2004
Pages 99 - 211
Volume 4

Reported by: Lydia R. Radovich, CSR No. 9223
Leslie G. Cooper, CSR No. 9215
Ana M. Gonzalez, CSR No. 11320

PUBLIC UTILITIES COMMISSION, STATE OF CALIFORNIA
505 Van Ness Avenue, San Francisco, California 94102

Exhibit M 189

Dockets.Justia.com

# INDEX



| Exhibits: | Iden. | Evid. |
| --- | --- | --- |
| A | 101 | |

| Recesses: | Page |
| --- | --- |
| Morning | 140 |
| Noon | 148 |
| Afternoon | 190 |



**Additional Appearances:**


WALKER A. MATTHEWS
Attorney At Law
SOUTHERN CALIFORNIA EDISON COMPANY
2244 Walnut Grove Avenue
Rosemead, CA 90504
(626) 302-6879
Fax# - (626) 302-3990
Appearing for Southern California Edison Company
Interested Party
walker.matthews@sce.com

SAN FRANCISCO, CALIFORNIA, FEBRUARY 13, 2004 - 10:05 A.M.

* * * * *

ADMINISTRATIVE LAW JUDGE THOMAS: We'll be on the record. This is a discovery hearing in connection with the gas border price investigation. It's I. 02-11-040.

Judge TerKeurst and I are here to determine what documents were produced by Sempra Sempra Energy Resources and Sempra Energy Trading in response to the Edison discovery requests, and to determine whether production was adequate, given the discovery responses.

There may be some other issues that Edison wished to raise today, and we can make a record of those as we go forward.

Let's have appearances, starting at my far left.

MR. THORP: Thank you, your Honor. Michael Thorp, representing SoCal Gas and SDG&E.

MR. LICHTBLAU: Eric Lichtblau, representing Sempra Energy and Sempra Energy Resources.

MR. YUDKOWSKY: Alan Z. Yudkowsky, Stroock & Stroock & Lavan, LLP, specially appearing on behalf of Sempra Energy Trading Corp.

MR. MATTHEWS: Walker Matthews, appearing on behalf of Southern California Edison Company.

MR. BASS: Leon Bass, on behalf of Southern California Edison Company.

And with SCE today are two members of our consulting group, The Brattle Group: Steve Levine, and Elizabeth Lacey.

ALJ THOMAS: Welcome to everyone.

MR. LICHTBLAU: Mr. Yudkowsky mentioned I should also note that we're specially appearing as well.

ALJ THOMAS: Mr. Bass, I understand that you have a presentation that you'd like to go through. That's fine with me, if you'd just start that right now.

MR. BASS: Okay. Very good. We do have a presentation to discuss the status of discovery. What it will discuss is the purpose of our discovery; in particular, the original discovery requests, which tracked very carefully the issues that were in the April 16 Scoping Memo issued by the Commission; in particular, Issue 2, that pertains to the affiliates.

ALJ THOMAS: Let me just say that, as I said off the record, I'm not prepared to revisist any discovery rulings that I made with regard to the scope of the discovery requests. We do have Judge TerKeurst here, and we can consult as we go along as to whether she has concerns about those rulings, but I did not envision the date -- the proceeding today to be an opportunity for parties to reframe the discovery. We would be going on the latest discovery requests as were agreed to and litigated during the various hearings on this matter, but I'm going to allow you to make your presentation, so at least we know what you're contending, and then we can consult as we go along today.

MR. BASS: Thank you, your Honor.

MR. YUDKOWSKY: Your Honor, if I may interrupt --

Mr. Bass, do you have another copy? We don't have

adequate copies.

MR. BASS: I believe we do.

ALJ THOMAS: Let's be off the record.

(Off the record)

ALJ THOMAS: Back on the record.

We've now handed copies around.

Proceed, Mr. Bass.

MR. BASS: All right. As I was indicating, what our presentation does show is the purpose of our discovery; and in particular, the production in response to discovery. And the production was in response to revised discovery requests.

We will start. Mr. Levine will proceed on this. And, as I had indicated off the record, the remainder of the SCE team will interject from time to time in all likelihood on this presentation, but we will try move forward as quickly and expeditiously as we can.

ALJ THOMAS: And we'll mark the presentation itself as Exhibit A to this hearing; and it will be appended to the transcript, so you do not need to go through it verbatim, because you will assume that it will be part of the record.

(Exhibit No. A was marked for identification.)

MS. LEVINE: Okay. By means of introduction, I just want to start by saying that it was really Issue 2 of the Scoping Memo that drove a lot of our initial data requests. Some of the requests have to do with other issues in the Scoping Memo, but by and large what we're talking about here today is really getting at Issue 2, which, just briefly, you

know, we're looking to see whether utility affiliates or their parent company played a role in causing the increase in border prices. And along with that: did Sempra Corporation's Energy Risk Management Department play a role? That's in A. And, you know: did SoCal Gas SDG&E and SET share information? That was our starting point. And, you know, we wrote our questions with that starting point.

On Slide 3 here, we just tried to frame that. If the Commission wants to answer the questions that are in Issue 2, from our point of view, the following four buckets of information are needed from Sempra Energy, the corporation, Sempra Energy Trading and Resources.

And the first big area is communication. And I'm really focusing on the second sub bullet under communication: communication between subsidiaries and the corporation.

And, you know, the concern here is that corporate employees learn about -- or the possibility that corporate employees could learn about utility activities, and then use that information to position unregulated affiliates to benefit from the utility activities. In our view, the Scoping Memo asked us to pursue this, and a lot of the discovery requests have to do with that issue.

We have a specific example of what the concern is here. And this example gets at Sempra Corporation's Energy Risk Management Department. That is a group that is headed by an individual named Mark Randall. He's a corporate employee. He is somebody who sits on the SoCal Gas -- the utility Gas Acquisition Committee. And this is a committee

that oversees the activity of the Gas Acquisition Department of SoCal Gas. And the concern is that, in that position, he learns information that's not available to the rest of the market. And -- but his role, from a corporate point of view, is to oversee the risk management activities of every subsidiary of the corporation, so --

MR. LICHTBLAU: Your Honor, I apologize. Can I interrupt for a moment?

As I flip through this, in trying to listen at the same time -- this is a 48-page document. And I've grown concerned that I don't think it is appropriate to put this on the record at this point. This should be made in a motion. For us to attempt to absorb and respond to a 48-page presentation with zero advance notice on any of these issues, I think, creates some due-process concerns. And I understand you haven't indicated you're going to rule on it, but I don't see the point of even getting it in the record.

ALJ THOMAS: I think it was clear that we were going to go through this in some detail today. I'm pleased that there's a presentation, just so that we can follow along. So I'm going to overrule your objection.

If there are concerns with regard to specific points that are being made along the way, I can understand that you might have some objections, but I'm not going to object to an organized presentation at this point in time.

MR. LICHTBLAU: None of these specific issues were raised in their letters. And this was the concern I had from the beginning. They wrote very general letters that they

were concerned with discovery, without ever meeting and conferring with us on any of these issues. So we were left --

ALJ THOMAS: What we were going to do today was go through all the discovery today. And you're right. This is a little afield of this issue, because we're not referring to a particular discovery request in what was produced on response, but I think by way of background, it's helpful to know.

For example, I have just learned why it is there were so many questions about risk management. And it's probably not something that I fully understood until the witness just explained that point. So, by way of background, it's helpful.

Let's go through it. See where we get. And you can renew your objection if there are additional concerns, but we've just barely gotten into this, so let's let the gentleman continue.

MR. YUDKOWSKY: Your Honor, just for the record, I will join Mr. Lichtblau's objection.

ALJ THOMAS: Your objections are overruled.

Go ahead, Mr. Levine.

MS. LEVINE: Okay. So our specific example just has do with the Energy Risk Management Department, which just seems like an entity that is privy to information that's not available to the market. And we just want to see the communications between that department and the different subsidiaries of Sempra Corporation.

And as we're going to get to -- we have seen a very limited amount of production with respect to that issue. We've seen a couple of e-mails from Mr. Randall, but -- well, we'll come back to that, but I think from our point of view, this issue of communication is one of the important ones.

ALJ THOMAS: Mr. Bass, does the current discovery request get at this information?

MR. BASS: No. And we will address that. The problem with -- when you say "current," I am assuming you're meaning the revised --

ALJ THOMAS: Right.

MR. BASS: -- amended discovery request.

It does not get to it fully. And that is the concern SCE has. We have addressed that in this -- in this presentation, and we will get to it.

ALJ THOMAS: Why don't you just give me the --

MS. LEVINE: We have some of the questions. We have some of the questions.

ALJ THOMAS: Give me the "Reader's Digest version." What happened in the course of reframing the discovery that you contend cut off your ability to get this information?

MS. LEVINE: Sure. I think -- and you can correct me if I'm wrong. I think some of our initial requests to the corporation specifically asked for communications from the Energy Risk Management Department to the different subsidiaries; and then we had another question that did the reverse: from the subsidiaries to the Energy Risk Management Department.

I think at some point, that question got revised in the revised set. And I think it more limited it to the Energy Risk Management Oversight Committee.

There's a -- there's a separate -- there's a corporate department called "Energy Risk Management." Then Sempra Corporation has something called "the Energy Risk Management Oversight Committee," of which Mr. Randall is also a member. So there is a committee at Sempra Corporation that oversees energy risk management issues.

And I think in our revised set, we just asked for communications from the committee to the subsidiaries, as opposed to the department.

ALJ THOMAS: That wasn't in response to any ruling I made, though. I mean, my recollection is that my concern was you were asking for every communication, regardless of whether it related to gas prices or not. And the narrowing was in response to that concern; not so much -- I have no recollection of changing it as a result of some concerns that you were asking about "X" entity versus the committee. So to the extent that you've narrowed your discovery not in response to a ruling I made, I can't help you.

MR. BASS: Well, respectfully, your Honor, when you made the ruling after our October 30th hearing on the jurisdictional -- the legal issues --

ALJ THOMAS: Mm-hm.

MR. BASS: -- the jurisdictional issues, there were a couple of guidelines that you provided; but naturally, you urged the parties to come together to try to negotiate this

and to come to a resolution, which is what usually will happen in a proceeding. However, this proceeding has been fraught with difficulties in that regard, as you've seen by all the letters and the motions and the pleadings, et cetera. And what resulted, basically, was SCE's good faith the next day of revising these was met with objections, and no answers or production at all.

At that point, we -- "we" being SCE -- were attempting to try to get testimony out. Testimony was due December 10. So in the spirit of trying to get something -- some information from which we could get testimony, we did a cut -- a 24-hour cut -- of our revised data requests, with that purpose in mind.

And, as you know from the pleadings, that was met with objections. And we never did get production, but it wasn't our intention -- we knew at the time that we were limiting our ability to really address -- look at and address the issues in the Scoping Memo, particularly Issue 2, with our cut. And it was very difficult. It was probably almost impossible for us, in that October 30 hearing, to go through and carefully identify exactly how those questions should have been reframed, if they needed to be reframed at all. And that led to the problems that we have here.

ALJ THOMAS: Let's be off the record for a second.

(Off the record)

ALJ THOMAS: On the record.

MR. BASS: If I could, the bottom line looking at the production that SET was given by the affiliates and the

holding company, which is here next to me to the right, two small piles; one may be nine inches, the other may be four inches with a lot of blank paper in between the documents. The production does not allow SCE to address the issues within the Scoping Memo Issue 2 at all. It is entirely inadequate for us to even start to try to look at those questions. That this the bottom line.

ALJ THOMAS: You have two piles, one is nine inches thick. Whose production is that?

MR. BASS: Right now looking at it this looks like Sempra Energy Corp, Sempra Energy. And this appears to be SET.

For the record also, we did have spreadsheets of data that were provided to us by Sempra Energy Trading. They encompass a lot more paper than we do have here, but they were provided electronically. And basically it is a matter of just downloading that information. It does not take an extended -- long period of time to do that.

ALJ THOMAS: All right.

ALJ TERKEURST: Let me say something that Judge Thomas and I were just talking about while we were off the record. I'm coming into this fairly new. I've not had the pleasure of going through this blow by blow like Judge Thomas has, but I am going to have the pleasure of hearing the case.

I have that perspective and that interest in having the discovery produced, the information that is needed, to develop a record for the Commission to fulfill the goals of the investigation that it initiated.

As we go through this today, that will be my perspective. I will be more interested in has the information been provided that allows meaningful testimony to be submitted. If not, I'm going to be more interested in getting that than who approved it when and who should have done something that they didn't do. It is different than if it were civil matter where who produced discovery or didn't produce discovery might play a bigger role that it is going to today.

ALJ THOMAS: I think one of the reasons why Judge TerKeurst and I ruled as we did in this hearing is that I found out after these motions were made that there had been virtually no testimony offered on the nonutility activities. And that obviously gave me concern that no discovery had been produced. It could be, as you say, you can assume that we will assume that there may be nothing with regard to these entities. But the idea that there was virtually no testimony on it gave me concern, because I had never seen the discovery itself.

And so understanding that the Commission has to have a record, has to have at least the opportunity to weigh what the evidence is, or isn't, and the fact that there is sounds like there is virtually no testimony on the Sempra entities' activities, other than the utility, that is what prompted our concerns, and that is why we're here today.

So I know you all have -- you can assume that. You can make whatever record you want, and maybe not do it all day long, but make your record at a convenient point, if

you want to make a statement. I'm looking at you, Mr. Lichtblau and Mr. Yudkowsky. If you want to make a general objection to this process, you are welcome to do that rather than doing individual objections all day long.

I think the baseline concern is that we need to give the Commission adequate information to do its job. And Judge TerKeurst's bottom line interest, and I believe the Assigned Commissioner's bottom line interest, is having adequate information. When I found out there was virtually no information provided, I was really concerned that the Commission wouldn't have the opportunity to do its job.

Any way, if you want to make a statement.

MR. LICHTBLAU: A few comments. Now several points have been made since my initial comment. But one on the issue of no testimony, I do think it is safe to assume if Edison concludes that there was no wrongdoing, there will never be testimony. They are only going to submit testimony if they can prove something wrong.

ALJ THOMAS: But we're not at that point. What they are telling us now not that I've done an investigation, found nothing wrong. They don't have adequate information.

MR. LICHTBLAU: Particularly when we get to the discovery, it was done, which was the purpose of a hearing. I think it will come forth that we have produced documents. If there is an absence of documents, it is not discovery -- we'll just get there. I want to also respond to a specific point, ERMOC versus Energy Risk Management.

Because I have the original request and the

revised request, and with all due respect, the change from ERMOC -- from Energy Risk Management to ERMOC was made voluntarily, it was nothing that we asked for, nothing that you asked for.

And I understand it to the extent that -- whether or not that would increase the production, I would have to go back and check. But it seems to claim that this was done in some attempt to narrow the discovery. If you compare what was served on the 31st than what was originally served, what was done was 30 questions were broken into 43 and a few words were changed.

ALJ THOMAS: You can assume that that whole history is something I'm aware of. We've had extensive briefing on what happened after that initial hearing and what was done to narrow or not narrow.

MR. LICHTBLAU: I want to make clear that this distinction was not the result of anything we invested, and for us to have to go back to conduct additional discovery because Edison changed its words seems inappropriate and unduly burdensome. I'm not saying you are ordering this at this point.

ALJ TERKEURST: As I said, the bottom line is do we have the information we need.

MR. LICHTBLAU: We are also dealing with -- my client is a third party. We've gone to great time and expense to respond to subpoenas in good faith. And to have the questions reworded and have to go back to 50 employees and go back through emails and files all over again because Edison

didn't word its request carefully, does not seem appropriate. And I think the burden far outweighs the probative value given what we've seen out there and what has been produced.

ALJ THOMAS: Why don't we assume you will have a standing objection to any rewording of a question today that goes back to either an earlier version, or that attempts to modify a version, that Edison stipulated to somewhere along the line rather than handle these individually. I'm assuming you will have a standing objection.

MR. LICHTBLAU: That is fine.

ALJ THOMAS: Mr. Yudkowsky, you will have a standing objection?

MR. YUDKOWSKY: I will interpose that objection.

ALJ THOMAS: Mr. Levine.

MR. THORP: Judge Thomas, I will add one point, not a standing objection.

Judge TerKeurst, I think you make an interesting point that -- and I appreciate hearing your perspective -- that your concern is that the Commission gets the information that it needs. And I would just say as part of this process, I would ask you to keep in mind that the Commission should have the information it needs, but at this same time anyone who is being accused of doing something wrong should have a full and fair opportunity to respond.

I know that that is not in front of us since we've already talked about Mr. Bass' letter, but I see where you are going with your comments about the information it needs. It sounds like there may be some additional testimony. If

there is, we clearly should have a full and fair opportunity to respond to anything additional that is submitted by Edison.

ALJ TERKEURST: I understand your concern.

MR. YUDKOWSKY: If I may, just before Mr. Levine begins again, just in support of my standing objection, I would like to note that I would like the opportunity at some point, when it is convenient for both of you, to make a statement with respect to the diligence of our search.

It seems to me, based on Mr. Bass' comments on the record that is before both of you, that it is really the adequacy of our search and the documents that we have produced that is at issue here. And I would like to be able to have the opportunity to address you with respect to the search that SET conducted in that regard.

ALJ THOMAS: I think there are two issues. One is adequacy of the search and the other is perhaps the framing of the questions. But I'll give you an opportunity, or you can -- I assume you will say we made a reasonable and diligent search, this is what we found. And Mr. Lichtblau would say the same.

MR. YUDKOWSKY: I would like the opportunity, if I may, to take the Court through the specifics of the search that we went through.

ALJ THOMAS: We will do that at a later point.

Mr. Levine.

MR. LEVINE: I'm going to try to speed up and ultimately --

ALJ THOMAS: Good.

MR. LEVINE: -- get to the production. I do want to finish with these four categories.

My second category is clearly related to communication it gets at decision-making. With respect to Issue 2 in the Scoping Memo, again we feel that part of what needs to be done is understand which individuals at the corporate level were involved in the decisions of the subsidiaries. How did corporate employees communicate with the subsidiaries.

ALJ THOMAS: Did you get any information in this area? It doesn't indicate on the slide.

MR. BASS: Let me think.

MR. LEVINE: It is clearly related to the prior issue we talked about. We've seen far little interest from the Energy Risk Management Department, which is Mr. Randle, and I think three employees that work with him.

Separately from that, I don't think we've seen very much in the way of kind of -- by the way, one issue we're having, we don't necessarily know who these employees would be at the corporate level. But I think when you look at the most senior people in the corporation, I think it is fair to say we've seen very little from some of them with senior people, and how they interact with the senior managers of the utilities and senior managers of the unregulated affiliates.

ALJ THOMAS: Mr. Bass, have you done depositions to get at that information to state who was involved in X, Y,

and Z, identify all persons who might have been?

MR. BASS: We conducted depositions of utility personnel.

ALJ THOMAS: As to the other entities?

MR. BASS: No, because we did not have any discovery, any written discovery, from which to conduct depositions. We -- our intention as has been communicated to the affiliates and to SoCalGas was to, for instance, take a deposition of Mr. Randle. But we have not received any discovery sufficient enough for us to conduct a worthwhile deposition of Mr. Randle.

ALJ THOMAS: It just seems to me for purposes of this question on what individuals were involved in decisions, how did they communicate, all of that might be an appropriate subject of depositions. And I would be prepared to order depositions in this area and suspect that some will come to this hearing.

MR. BASS: In order really to conduct an effective deposition, there needs to be some documents from which we can ask questions. That has been a problem.

MR. THORP: Your Honor, I would like to raise one point. We got Edison saying that they need to find out who communicates with whom within the Sempra Energy organization, who shares information, all the things they've got on the chart that we've got here. That sounds just like the affiliate transaction review that the Commission does on a regular basis. It really --

ALJ THOMAS: Let's not get -- I mean that is a whole

other issue here. Let's just assume we're trying to recover what discovery was done. I'm not going to be able to rule whether something was outside the scope of this proceeding. Let's try to move this along and get through the presentation.

I'm asking as to each of these on Slide 3, what do you have and what do you think you need?

MR. LEVINE: To answer that, I think we're weakest on the first two bullets. And then with data we're going to talk about more -- we started to get data from Sempra Energy Trading -- we've been having trouble interpreting, so we've had to go back for follow-ups. And indeed some of the data that was produced did not include items that we specifically asked for, and I'll get to that later.

And market position, the last two bullets, data and market position, are just -- it is really the information that allows us to understand what happened, what assets were used, how was money either made or not made. And I think on that front, like I said, we started to get data, I think, on the last thing, market position.

We have an issue, we're trying to understand the El Dorado plant and -- I think it is or intention to do follow-ups on that because that is a plant that is owned by Sempra Energy Resources.

And we want to understand better just how that might have affected the incentives of the corporate entity as a whole. Do you have anything on that?

MS. LACEY: Yeah. I guess what I would say is

El Dorado is a plant that's partially owned by Sempra Energy Resources. We know it sells into California electricity markets. And that ties El Dorado back to the Scoping Memo, which raises the effects of border -- of the electricity market on border prices as an issue to be investigated here.

ALJ THOMAS: Let's assume that you're correct that you need more on this page. What do you want us to do? What do you want us to order? What specific things do you need to do to get what you believe you need to present an adequate record to the Commission?

MR. BASS: That the original data requests be reviewed by the affiliates and responded to by the affiliates; a search conducted based on those original data requests; and they respond to them with production, if they find it.

ALJ THOMAS: And the original data requests are in tab what of this binder?

MS. LEVINE: I think the only thing I would add to that: I think, you know, the e-mail communications from, you know, some of these departments, like energy risk management, you know, Mark Randall and the people he works with, to the subsidiaries and from the subsidiaries to that department would certainly be of specific importance.

And then it's really just a matter of, you know, trying to identify individuals at the corporate level who also are weighing in on kind of strategic decisions of the subsidiaries, and the communications back and forth between them, you know. And that would include, you know, senior people of the corporation.

ALJ THOMAS: Let's be off the record

(Off the record)

ALJ THOMAS: We'll be back on the record.

Go ahead. Let's go to the next page.

MS. LEVINE: Sure. Slides 4 through 11 all go together. And I'm not going to go through each of them individually.

I would just mention that, you know, just to get at this idea of why communication is so important, we've attached a series of documents here. And, in our view, they suggest just -- they suggest the interaction between corporate employees and utility employees. And so, you know, it just -- it's just part of this. When we see these documents, we -- it's -- these not are suggesting to us that the corporate employees are involved in the strategic decision of the utilities, and with unregulated affiliates as well. And so this is what's just motivating, you know, our view that you need to see these communications to evaluate what's happening here.

ALJ TER KEURST: Let me ask just an administrative question. Some of these are marked "Protected." Are they documents that should not be in a public transcript?

MR. BASS: We have not --

MR. THORP: If they are protected materials that SoCal Gas or SDG&E have produced, the answer is yes, your Honor.

ALJ THOMAS: We can seal them. We'll just put them in an envelope and append it to the transcript. The reporter

and I can work out how we do that.

MR. LICHTBLAU: I hate to raise a silly issue, but I've never signed a nondisclosure agreement. So, technically, I guess I shouldn't be looking at SoCal Gas documents.

ALJ THOMAS: All right. And the -- if you're concerned about that, hand that back.

MR. LICHTBLAU: Well, I mean, you know, that's -- although -- this is being used to discuss my clients, so it puts me in a difficult position, but I don't want to be in violation of the Protective Order.

ALJ THOMAS: Does anybody have any concern that Counsel look at this document today? Anyone?

I see no objection.

All right. Go ahead, Mr. Lichtblau, and review it.

All right. Go ahead, Mr. Levine.

MS. LEVINE: Okay. With that, I'm going --

MR. BASS: Yes.

MS. LEVINE: I'm going to go to page 12.

MR. THORP: Your Honor, I guess I would just ask one further question. I don't have a problem with Mr/ Lichtblau having that information. We can work out having him sign a nondisclosure agreement, but is there anyone else in the room that's received one of these, or I guess anyone else in the room since Edison's publicizing it who has not signed a nondisclosure agreement?

MR. BASS: First of all, this document has not been

disseminated outside of this room.

And I was going to ask -- because it was my understanding that the affiliates as well as the utility counsel had signed nondisclosure agreements or nondisclosure certificates, but if there is anyone else who has not, I guess they need to come forward now.

ALJ THOMAS: I've heard no response.

So let's go ahead, Mr. Levine.

MS. LEVINE: Slides 12 through 14 are just three tables that -- all it's doing is it's showing how our original requests, in our view, tie to the Scoping Memo. So I'm not going to -- I'm not going to go through with this in any detail, but you know, in our view, we've asked questions that we think, you know, are legitimately tied to what the Scoping Memo was asking for.

ALJ THOMAS: And I take it these have all been shortened or circumscribed? These questions have all been altered in some way since the original set was served?

MR. LEVINE: From the original? Yeah, these are. Actually, what we've got on the right, the third column here is the original request numbers. So this is just -- this just pertains to the original request, as opposed to any revisions that were done.

ALJ THOMAS: But what you're saying is that the original questions are no longer in the discovery requests?

MR. BASS: I'm sorry?

ALJ THOMAS: These requests (indicating) have not been responded to, because they were taken out of the original

requests, or limited in some way?

MR. BASS: What this slide is showing, your Honor, doesn't get to your question.

What this is showing is what requests pertain to what categories of information that we talked to.

As soon as Mr. Levine finishes with this, he's going straight to your question, which is talking about SET, and what questions -- revised questions were responded to, and what the production was.

ALJ THOMAS: All right. Go ahead, Mr. Levine.

MR. BASS: And another point I wanted to make is: at this point in time, there has not been a discussion on the record of any protected materials that are within the slide presentation that we have here, and we'll make every effort for there not to be a discussion.

ALJ THOMAS: Thank you.

MS. LEVINE: Okay. So I'm going to just jump to Slide 16, which is just a summary of where we think the discovery stands. And we've got two sets of requests to SET. And, as you'll see, there's a series that have been responded to, and then there's a larger series that have not been responded to.

Going over to Slide 17 --

MR. YUDKOWSKY: Your Honor, I'm sorry to interrupt. And I would hope that Mr. Bass would correct Mr. Levine.

MR. BASS: I was about to do so, but you jumped in. I'll let you do it.

MR. YUDKOWSKY: It's a gross distortion to suggest

that this is where discovery stands at this point, but with that comment, I'll allow Mr. Bass to correct the record.

MR. BASS: Thank you, Mr. Yudkowsky.

What I was going to indicate here is that, while the no-response category --

Page 16, Will.

-- is listing several numbers there, what has transpired here is that I, on behalf of SCE, prioritized groups of questions in an effort to at least get some information.

The first group that I prioritized you see in responses received: 2a, 2b, et cetera, and also in Set 2, 1 and 2.

Then, following that, I identified another group of questions by priority that we wanted responses to. I met and conferred with Mr. Yudkowsky and one of his colleagues at his firm. And it was agreed that those -- that group of questions would be responded to.

That is still pending. I have received communication from SET that they will be responding to that group of questions on February 16.

Our meet and confer, by the way, was on or about, I believe, January 9th. And their production on the second group was -- is set for February 16.

There is then a third group of questions which we have not yet reviewed, met, and conferred on, which would then complete all the questions that we propounded to SET.

Our concern, however, was based on time. And

March 17 is quickly coming. And, you know, the February 16 date does not give us very much time to even review that second bucket of questions, much less continue on and get production on the third bucket of questions.

I hope that clarifies the record satisfactorily.

ALJ THOMAS: Go ahead, Mr. Levine.

MS. LEVINE: I apologize about that. I think I just have a view of this as to whether I've seen documents or not, so I didn't mean any distortion.

Just going on, 17 and 18 are just -- they're laying out -- and these are amended requests. And it's kind of getting at the same issue we were discussing earlier, which is just communications from the corporation to, in this case, SET, and the reverse: from SET to the corporation.

And it's just -- it's trying to get at the issues we were identifying earlier in the Scoping Memo; trying to understand whether or not the corporation's playing a role here. And these questions we're listing out on 17 and 18, this is a -- this is a case where we have not yet seen documents; but as Leon or as Mr. Bass said, the discovery's pending.

ALJ THOMAS: It's hard to imagine that there wouldn't be responsive documents in this area, just given the questions; so I assume you'll be producing documents. Is that correct?

MR. YUDKOWSKY: We will be producing what we have that's responsive. I'm not in a position to make a representation as to the quantity. I can make a

representation as to what we did in looking for those documents.

ALJ THOMAS: Same with you, Mr. Lichtblau. There will be documents produced in response with regard to --

MR. LICHTBLAU: Well, are these -- these are the --

MR. BASS: This is SET.

ALJ THOMAS: Oh, to SET. I can --

MR. LICHTBLAU: There is similar discovery to the parent, and we have responded to it.

ALJ THOMAS: Got you.

Go ahead, Mr. Levine.

MS. LEVINE: So I'm going to just slip over to Slide 19. I think I've said this, but it just kind of spells it out a little bit more. You know, what we would expect to see is communications between SET and Sempra Corporation's VP of Energy Risk Management, possibly the CFO, and again, possibly other corporate personnel. We just -- we don't necessarily know who they are, regarding risk management issues in Western gas and electricity markets.

We'd also expect to see communications between SET and, you know, the senior managers of the corporation, possibly other corporate personnel, again, regarding Western gas and electricity markets, and kind of the decision making and strategies that were implemented during, you know, our period.

And just finally, I think, you know, communication within SET is also potentially important. The requests we just looked at don't specifically get at that issue, but I

think if you get communication within SET, potentially, that will shed some light on how the corporation is involved in decision making.

ALJ THOMAS: Were there requests that sought internal information?

MS. LEVINE: I believe so.

MS. LACEY: I think certainly in the original set of requests, there were requests to Sempra Energy Trading that would have gotten their strategies in Western gas and electric markets. And so internal communications from SET would have been responsive to those requests.

MS. LEVINE: I'm going to go over to Slide 20, which is just a request for an organization chart. And I think all I'll say is: we just have some concerns as to how comprehensive this chart that's provided on the next page, on what would be Slide 21 -- how comprehensive it is. And it's only because we've seen some e-mails with individuals identified who are not showing up on this organization chart.

And the reason why we just want to make sure we get everybody -- or everybody who's involved specifically in Western power and gas markets -- is just: that will inform us a little bit as to, you know, who we might expect to see communications from.

ALJ THOMAS: Are there other charts, Mr. Yudkowsky?

MR. YUDKOWSKY: This is the only organization chart that was maintained during the relative -- the relevant time period.

That said, we are providing a list of individuals

to Mr. Bass.

And that goes to a larger point. And that is: there are discovery mechanisms which can get at this information. And we have been and continue to be available to Mr. Bass and his colleagues to answer his questions. And to the extent that he asks a question, and we provide a responsive document, and that's not sufficient, he can follow up with us; and when he has, we have met and conferred. And we will provide what's appropriate.

ALJ THOMAS: Go ahead, Mr. Levine.

MS. LEVINE: Okay. On Slide 22, we're showing our Amended Question 1-2, which is asking about the prices that existed, the natural gas price spikes, any alleged gas price manipulation.

And in response to this, we got one document. And it's on the next page.

MR. BASS: You can explain it.

MS. LEVINE: Yeah. The document -- it's a little confusing. It's certainly hard to read here. You'll see it's dated November 19th, 2003. We think it's because it was printed out in 2003. I think some of the text in the lower portion -- the comments section down at the bottom -- is discussing a March 2000 NYMEX gas contract. So we think this is probably a February 2000 document.

You know, I think our -- the only thing we're a little concerned about here is just that there is one document. And it looks like something that's done weekly. And we've only gotten one of them. And certainly, you know,

it's February 2000. It's kind of early on in our period. And I think we're -- we're curious to know whether there are other documents like this that extend throughout the period.

ALJ THOMAS: It also strikes me that it makes -- it just seems impossible that only one document would be responsive to these requests, given that the requests are all documents analyzing natural gas prices at the border during the discovery period. It just defies logic that these would be the -- this would be the only document that would be responsive, so I am concerned about that one.

Go ahead, Mr. Levine.

MS. LEVINE: Okay. I'm going to go to Slide 24. And I just want to -- Slide 24 is just recapping some of the data issues. We asked for the data. And I think SET has provided information in response to the data. And really this is just getting at gas and electricity sales and purchases, financial transactions.

And what happened here is just that we had a fairly specific response where, for example, we asked for gains and losses related to the financial transactions. And I think the responses came -- I think -- a couple weeks before our testimony was due. So I think it's a couple weeks before December 10th. And, you know, we got the responses. And the gains and losses were not provided. And we just couldn't interpret the data. It was hard for us to tell which side of the transaction SET was on. So we didn't feel comfortable trying to calculate the gains and losses from the data that was provided.

In the meantime, we've had follow-ups. And some of the follow-ups have resulted in data that, you know, satisfies us, but we're still waiting for some of the other spreadsheets to be provided that contain the gains and losses. And so, you know, I'm just pointing out that this is something we asked for, I think, a few weeks ago. And it's pending.

ALJ THOMAS: What do you mean by saying some data does not seem valid, even after follow-up?

MS. LEVINE: Yeah. And that's what this table's getting at. On the physical side, with respect to sales and purchases, the data request asks for prices.

And it's just when you look at the data that's provided -- and we've got a little excerpt of the table here -- and you look at the price column, the prices don't seem like they can possibly be right. There's zeroes in them.

So, you know, we're just -- we're having trouble interpreting it. And it requires more follow-up. I think that's the only point we want to make.

ALJ THOMAS: I'm just wondering if a deposition might be the better way to go about figuring out how to interpret this sort of report.

Mr. Bass.

MR. BASS: Well --

ALJ THOMAS: Just a suggestion.

MR. BASS: Okay. One clarification. I think Mr. Levine indicated that a response asked for -- or provided

gains and losses.

Our request originally -- and even the revised request -- asked for gains and losses. The data that we initially received did not have it.

We asked for it again. We were provided some, I believe, but not all.

And so we have had to ask again. And that's where it's pending now. We have yet to get a second response as to our second request for those gains and losses. Would that be --

ALJ THOMAS: So you got some gain/loss information?

MS. LEVINE: Yeah.

ALJ THOMAS: For some trades?

MS. LEVINE: For some types of financial-instrument swaps. And we're waiting for this equivalent.

ALJ THOMAS: And does that information exist, Mr. Yudkowsky?

MR. YUDKOWSKY: Yes, that information exists. And that information will be provideded in the --

But let me also correct the record here. This -- it was produced in November. We didn't hear until January that they had some concern about interpretation, when that concern was raised by Mr. Bass. We addressed the concern by doing a rerun; adding additional columns, where necessary; also giving him definitions for some of the headers that you see there that they had difficulty interpreting, so that they would understand what those refer to and what each column referred to.

And again, we've been cooperative throughout the process. So I'm not sure that a deposition is necessary; it's more communication with Mr. Bass and his colleagues that will allow us to answer the question that he needs answered.

ALJ THOMAS: Right, but if they asked for gains/losses, and they exist and weren't produced, which is what I'm hearing, there seems to have been a lack of cooperation on the part of Sempra Energy Trading.

MR. YUDKOWSKY: I'm being told by my colleague, Mr. Hecht, who was intimately involved with this, that the gains and losses on options are not readily available, and it was something that we had to determine a methodology to derive, so that we could create this column for -- for SoCal Edison.

ALJ THOMAS: Right, but at least they exist now. The information hasn't yet been produced. It should be produced, it sounds like. There's no question that it should be produced.

So the question then becomes how best to get at other questions about what these price figures mean. It is a little confusing when one looks at a price that's listed as zero.

MR. YUDKOWSKY: Respectfully --

ALJ THOMAS: And it --

MR. YUDKOWSKY: I'm sorry, your Honor. Respectfully, I would assume that that was the purpose of Mr. Bass having his consultants involved in this process, who are more familiar with the way the markets work.

ALJ THOMAS: Right. Their consultants are saying it doesn't make sense that the price is zero, so there needs to be some follow-up, I assume.

Mr. Levine, is that right?

MS. LEVINE: Yeah, we do need to keep following up on these.

MR. BASS: We have followed up on these. And response from SET is pending regarding our latest follow-up questions.

ALJ THOMAS: All right. Let's go ahead, Mr. Levine.

MS. LEVINE: Okay. On Slide 25 there's a series of questions. Most of them are getting at risk management reports of SET, which really -- it's -- these risk management reports, the reason we want them is because, you know, we just looked at -- you know, we just talked about the data that we're getting, but with the reports, it helps us interpret the data that we're seeing.

And, you know, I think these reports are -- I mean, in the case of SoCal Gas, for example, they report these -- they have these risk management reports periodically. And SoCal Gas has produced them. And we're hoping to see the same type of information from SET.

I suppose -- I suppose these are still pending. Is that right?

ALJ THOMAS: Mr. Yudkowsky, what's the status on these responses?

MR. YUDKOWSKY: On Question No. 114, my notes indicate -- and these are the daily, weekly, monthly, and quarterly position reports -- is that we are waiting for --

to hear back from Mr. Bass with respect to a certain narrowing of this request.

We have explained to Mr. Bass that daily position reports run in excess of 3- to 400 pages per day and, for the time period of the request, could well exceed 300,000 pages. We have yet to hear on this and other issues from Mr. Bass as to what he wants to do with respect to that.

As to Questions 138 and 139, which deal with risk management reports, net open position reports, and value and risk reports, to the extent that, again, they're seeking position reports, that's subsumed in the earlier question.

To the extent they're looking for these individual reports, this is part of what we are looking at now for the production that is scheduled for next week, as part of that tranche that Mr. Bass identified in his priority list.

ALJ THOMAS: This what in the list?

MR. YUDKOWSKY: This grouping. I should say "this grouping" in his priority list.

And to the extent that they exist -- and I'm not sure that those reports exist -- then, separate and apart from the daily position reports, we will produce them.

There is another issue with respect to that, and that is our concern which was discussed with your Honor in the November 13th telephonic hearing. And at that time, we were concerned that subsumed within this question is a request for what we consider to be all ordinary risk management.

After all, Sempra Energy Trading Corporation is a

trading company. The heart of what we do is risk management. And we were concerned about the overbreadth of this request.

Your Honor had specifically excluded ordinary risk management from the -- from our search, and we are proceeding accordingly.

ALJ THOMAS: What about the next one?

MR. YUDKOWSKY: If your Honor will give me a moment.

Skipping ahead, Questions 230 and 231 are similar, except with respect to electricity. They're similar to the request for the daily, weekly, monthly, and quarterly position reports. Again, we are waiting to hear back from Mr. Bass with respect to what limitations, if any, we can impose on that production.

MR. BASS: Once again, your Honor, we were negotiating, as you indicated, with SET; but it continues to be our position that the data requests that we initially drafted that asked for a wider scope of documents are those that are necessary to really be able to address Issue 2. That is the reason that at the time your Honors asked for a status of discovery report, that we sent that extensive letter outlining what the status was, and asking that we have a hearing like this.

Pending a hearing like this, I have not gotten back to SET on the negotiation, because it didn't seem to make sense to continue that without some kind of direction from the Commission on this.

ALJ THOMAS: Okay. Understood.

Let's hear from Mr. Levine on the Sempra corporate

production.

MS. LEVINE: Okay. So I'll skip over to Slide 27. I'll attempt to summarize this. Again, this is my understanding.

There is a series of questions that -- we have received documents or narrative responses. We're going to walk through some of that production, and just show you where we have some concerns.

There is a second category where, again, it gets out risk management activities. And I don't think we've seen documents produced in response to these.

Again, I think that risk management policy is the same type of risk management reports we were just discussing, but we're asking it from the corporation's time.

The third category here, I think what happened is that there is a series of questions where the questions were narrowed down to just focus on whether the documents that we were being requested reference increased gas prices or GCIM savings.

ALJ THOMAS: GCIM?

MR. LEVINE: Yes, Gas Cost Incentive Mechanism.

Do you want to say anything more about that account?

MR. BASS: Initially the category was much broader than what we were asking for. But in the course of negotiations with Mr. Lichtblau, and in the attempt, once again, to get anything that we could from which we could examine the issues and perhaps draft testimony, we agreed to

the increased gas prices of GCIM savings, a narrowing of the scope Sempra was seeking us to do.

From the beginning we were dissatisfied with that narrowing. We believe that it wasn't going to get to the issues listed in the Scoping Memo, but in an attempt to try to get something, that is what we did.

ALJ THOMAS: Was that a narrowing that you did voluntarily in response to the other side or was it something that I ordered?

MR. BASS: It was -- you kind of theoretically indicated that there should be a narrowing in some way. We provided a more specific definition of market conditions with respect to SET which was provided by Mr. O'Laughlin. And in the negotiations with Mr. Lichtblau, we tried to negotiate in the spirit of that.

ALJ THOMAS: What is the problem now with the narrowing? Are you proposing that it be unnarrowed or broadened?

MR. LEVINE: I think what happened has been we did get -- okay. That's right.

I think most of these responses, if I get it right, they reference Questions 29 and 35; and I think 29 actually makes up most of this pile here. What 29 is, is a lot of it is -- it's really Sempra Corporate's media strategy or media materials related to the price spikes.

ALJ THOMAS: So sort of useless material?

MR. LEVINE: Yeah. I think the hope more was to see, again, kind of corporate communications on various topics.

ALJ THOMAS: I don't mean it is useless, but in your view it doesn't advance your view of the case.

MR. LEVINE: I don't think there is much we can do with that.

MR. BASS: It does not allow us to issues.

ALJ THOMAS: Not germane to the issues.

MR. LICHTBLAU: Your Honor, if I could briefly respond to that comment. The packets that I gather you didn't get that I referenced in the letter, contain some of the documents that were produced in response to this that are not corporate media. Those are the documents out there that are not -- the request didn't say not to produce the media relations. So of course we were required to do that to comply.

ALJ THOMAS: Right.

MR. LICHTBLAU: But there were the number of companies that were the types of internal corporate analysis that they are asking for in addition to these media documents.

ALJ THOMAS: Let's be off the record for a second.

(Off the record)

ALJ THOMAS: Let's be back on the record.

Just to reiterate, I suspect that we will have to sit down and go through each of the requests and responses in a linear way. So to the extent Mr. Lichtblau or Mr. Yudkowsky, you have objections to the characterizations of what was produced, we will be going through that in specific detail probably on another day. But I do want to allow Edison to get through this presentation just so that

Judge TerKeurst and I have the overview.

So do not -- I will assume you have a standing objection to any characterization of what was produced, and we can go through those individually once we get to that.

MR. LEVINE: Just to round out 27, the fourth category, there is a series of questions on the issue of washed trading or misrepresenting of prices, and actually that is not Issue 2 of the Scoping Memo. I think there might be another issue, but the Scoping Memo asks for it. I think the responses are just referring us to FERC filings that have been made, as opposed to providing any corporate documents on it.

ALJ THOMAS: All right.

MR. LEVINE: On 28, this is just -- we touched on this earlier, this is a question about the documents we requested from the Energy Risk Management Oversight Committee. I think I mentioned how our original questions were more in the initial Risk Management Department. And what you are seeing on 1-8 -- which you can go to the next slide -- there are two emails that have been produced. Mark Randle, the first one, is to James Harrigan, who is SoCalGas' head of gas acquisition.

MR. BASS: We're not going to put up the protected materials slide on the wall, in case there is somebody who hasn't signed a certificate of notice.

ALJ TERKEURST: Let me ask: In general, is there any objection to them referring to the fact that they got an email from one person to another as long as they don't

discuss the content of the email?

MR. LICHTBLAU: No.

MR. THORP: There is no objection to the existence of the document. It would be the content, your Honor.

MR. LEVINE: The second one is from Mark Randle to Debra Reed. And there is a whole series of other people on here, which I believe they are the other members of the Energy Risk Management Oversight Committee.

But I think more broadly what this is suggesting to us is that we need to see Mr. Randle's other emails to the subsidiaries about their risk management activities, and understand the role he played.

ALJ THOMAS: Okay. Agreed.

MR. LEVINE: I was going to go to Slide 31 next.

MR. BASS: Actually, go to 21.

Go to No. 36, please.

MR. LEVINE: Slide 36, there we are asking for documents prepared for distributed, presented in any meeting of Sempra's Board of Directors. And the pages that follow show what was produced.

They are heavily redacted, and it just struck us that these are the documents that possibly reveal, kind of the combined corporate entity strategy, and would allow us to understand whether the corporation played a role in the price spikes as was asked in the Scoping Memo. So I guess that is it, really. They are heavily redacted. That is the bottom line.

There is another document that follows which is a

presentation called SDG&E Update. It was also apparently presented to the board of directors too, and it too was heavily redacted.

ALJ THOMAS: What I would say, and Judge TerKeurst just said to me, and I was thinking the very same thing, these might be an area where we might want to do an in-camera review of the documents to determine whether the redactions are sufficiently responsive to the request.

Okay.

MR. LEVINE: So I guess I'll skip over to Slide 45.

Really what we expect to see from discovery is communications between corporate employees, and some of the subsidiaries such as SoCalGas, and the other subsidiaries as well, communications both ways.

ALJ THOMAS: Are you saying there wasn't any?

MR. LEVINE: I think it is fair to say we haven't seen a lot in that respect. I don't think we've seen hardly anything.

Then the last -- I'll touch on Sempra Energy Resources, which is Slide 47, just briefly.

I think here, and Elizabeth mentioned this earlier, most of our -- what we want to understand better is the El Dorado plant, which Sempra Energy is part owner of the plant. And what we're hearing, and I think we've learned it through discovery, that although they are an owner, they don't procure gas. I don't think they operate the plant, and I don't think they market the electricity. But I think we have some sense, based on just some other public filings

we've seen, is that Sempra Energy Trading is involved in the procurement for the plant. So I think really this is an area where we just need to do more follow-ups in order to understand it better.

The last slide is just a slide that was produced in discovery. It just shows for us why we want to understand El Dorado a little better because -- we will leave it at that, I guess.

So the SER discoveries is more ongoing than anything else.

ALJ THOMAS: That gets us to the end of the slide presentation. Why don't we do this: Let's take a 10-minute break.

(Recess taken)

ALJ THOMAS: On the record.

We're now going to go through the Sempra Energy Trading discovery requests.

And, Mr. Bass, Question No. 1 is an item that is responding you are going to get a response from Trading in the future; is that correct?

MR. BASS: It is either one that is about to be responded to or one that has yet to be negotiated between SCE and Sempra Energy Trading.

ALJ THOMAS: Let's then have you address Question 2.

MR. YUDKOWSKY: Your Honor, if I may, before we get into specifics, I had requested before the opportunity to make a statement. And I think it is critical that your Honors understand the process by which Sempra Energy Trading

has reviewed documents and some of the problems that we face on a going-forward basis.

First of all, I want to say outright that we have not withheld documents on the basis of privilege or any other issue that would require a privilege. So there should not be a situation when Mr. Bass or others of his colleagues suggest that there is an expectation on their part that the documents existed, that we have withheld documents, that we have deemed them to be responsive. We have produced, nothing has been with withheld.

But to explain, if I may, the process that we went through. First of all, in concert with Mr. Bass and his colleagues, we reached an agreement, I will explain, with respect to the natural gas request; that the analog applies equally as well to the electricity side of the business. But he asked us to identify the individuals that were involved in what we call the "Western" book, which would be California, actually indeed it is far greater than California. But your Honor previously ruled that the Western book was the appropriate place to be looking for responsive documents.

And in that regard, we identified to him all traders, all marketers, all schedulers, and the managing director for that book. And analog applies, as I said before, on the electricity side of the business.

Based on that agreement with Mr. Bass, we went forward and we asked each of these individuals for the relevant time period to search their personnel files. We asked them to search their electronic files, and by that I

mean files that are kept on their individual computers. We asked them to look at their email that is currently accessible and stored on their individual computers.

Where applicable, we also conducted a search of the legal department's central files where various agreements and the things that the legal department would be involved in were restored.

And, lastly, we looked for a central repository, to the extent that that was implicated, which deals with the transaction documents and the transactions of that that the company enters into. Those kinds of things would be typically confirms, and settlements, trade blotters, wire transfers, if they exist.

This is the universe that we looked at. And we asked each of these individuals to search all of these areas with respect to each of the requests that we're now about to discuss. And so it's important that you understand that that is the universe, before we discuss what the question was and what it is we produced.

Two other issues, because they will come up, if not today, they will certainly come up in the future, that you need to be aware about. One is with respect to email. As I just said, we've asked these individuals to search the email that is currently available to them. SET has emailed that, for the most part -- and Mr. Hecht can correct me if I misstate this -- for the relevant time periods, these emails are on backup tapes.

ALJ THOMAS: We spoke about these early on in these

discovery hearings, did we not?

MR. YUDKOWSKY: I think that is correct. I'm not sure if we spoke about them on the record. I think we may have spoke about them during the telephonic hearing in November.

But it is important to understand that this is not an archiving system, as some have discussed, this is a disaster recovery system. Our disaster recovery system by definition is intended to recover data at any time in the future disaster. By contrast, a disaster recovery system is designed simply for the incident when you come into the office in the morning, you turn on your computer and there is nothing there, you have some place to go to restore what was on your computer from the time period before.

The difference is critical. And that is as we go back through the process to look at these archived -- or these tapes, these backup tapes, we have determined that some of them are not in very good condition. It is not easy to restore those, and restoring these tapes is the first step in trying to recover these emails.

So what it is urgent that the Court understand in this regard is that this is a burdensome and time-consuming process. So to the extent that emails during the relevant period can be restored, it takes an enormous amount of time to do so for each of the individuals that we would need to be sufficient.

That is the first issue is the emails. You are right, we did discuss them briefly before.

ALJ THOMAS: So I'm memorializing the order on the

record, the order was that you search these backup tapes for responsive documents during the relevant period as we defined it in the -- as defined in discovery request?

MR. YUDKOWSKY: Your Honor, that is my recollection of your order. But if that is your order today, I will simply say that we are prepared to do what we can, but there is only so much we can do so quickly. And we can provide, if necessary, declarations or affidavits and testimony from our outside vendor that will describe to the Court the process and how long it takes. It is not -- this is where I want to be clear. This is not a situation where you have a room full of documents, and we simply need to throw more bodies at it to review it. This is a situation where you are dealing with backup technology, it has to be restored, it takes a period of time to restore. And, yes, it can be done, but it will take a long time to do it. It will be enormously expensive. But the primary issue for you to focus on is the length of time it will take us to do that.

Similarly, when we talk about audio recordings, and we have not gone there yet, it is important that you understand that process as well. Audio recordings are stored in digital format by date and location. There is no other index information there.

So, yes, we can locate a digital audio recording from a particular time frame. We can find the date; we can find the turret or the seat location where it was recorded. We have no idea who is on that tape. And so to the extent that SCE wants to press forward with audio recordings, we

have to locate the individuals, potential individuals.

And there is one request that calls for audio recordings. We would have to locate the potential individuals involved, find out during the relevant time period where they sat, locate all of those tapes, have those tapes duplicated because only one exists of each of those tapes. It is a proprietary digital system, so it cannot listen to anything other than the system in which it was created.

We have less than a handful of those PCs set up to do that process. And those -- that system is used in the ordinary course of business, so we would have to take one or two of those away to do this process and keep enough so that the company can continue to operate in the course of its business.

And once we got to that point, you would have to listen, or we would have to listen to each tape in its entirety in the hopes that there would be some identification by individuals speaking on those tapes as to who was talking to whom. And I would submit that in most cases, it is our experience from talking to the traders involved, that they know their counterparties. By that I mean other traders with whom they speak quite well. And so you will not find a situation necessarily where it says, hi, this is so and so from Sempra Energy Trading calling; and the other person on the other side will say I'm so and so from SoCalGas.

It is an extraordinarily difficult and time-consuming process to go through that on a chance that we

may find responsive date. I wanted to make sure that your Honors were clear on that, as we go through this process of -- not just for today, but in the future, with respect to these data requests, that some of the things we can do, and will do some of the things, are difficult to do. We can undertake them, although they would be extraordinarily expensive to do so. But the very important net effect of all of this is it will take an enormous amount of time to get through all of this. I'm not sure whatever it is we might be able to produce at the end of the day will get to Edison in time for them to use.

ALJ THOMAS: Let me make sure that you put on the record your understanding of my order with respect to searching the backup email tapes was.

MR. YUDKOWSKY: My understanding, and I'll let Mr. Hecht -- who was also on the phone at that time -- correct me if I'm wrong, but we had agreed to search what was currently available on the -- on each of the relevant individuals' computers. So, in other words, if they were emails from the relevant time period that still exists that we could get through right away and search.

MR. HECHT: Just to clarify, my recollection of that conversation is that while we had discussed this issue, that there had not been necessarily a definitive ruling one way or the other.

And the agreement that my colleague was just referencing was not during the telephonic hearing with your Honor, rather a discussion between myself and

Mr. Yudkowsky and Mr. Bass from Edison ] where we had agreed for the parameters of writing responsive documents.

This was back on November 13th; and in order to provide responsive documents by November 24th, ten days later, as your Honor had ordered, that we would look at the e-mails readily accessible at the -- at that time, that go back to the time period in question.

ALJ THOMAS: Okay. I remember this conversation very distinctly, because we talked about the fact that e-mails tend to be where all the best information often turns up. Documents, memos, correspondence, e-mails -- that's where the meat, often, of many cases tends to be. That was my experience as a litigator over many years. And so therefore, I remember distinctly saying e-mails are where all the good stuff is; and therefore, you will search the backup tapes.

You indicated that there was a time concern with regard to that, that that would be time consuming; but there was never an agreement that you did not have to search those. And that's true with regard to both Mr. Lichtblau's clients as well as Mr. Yudkowsky's clients.

So let me make clear now on the record, that that was my intent and is my intent that the backup e-mail tapes be searched. And it sounds like you're engaged in or at least understand what the process will be to do that, but that is clearly the Order.

MR. YUDKOWSKY: And, your Honor, just to follow up on what I said before, we -- we now understand that that's your

Honor's Order, but bear in mind that this is not something, when we get to one of Mr. Bass' other requests, and that is when all of this discovery will be produced, that you can order us to engage in this -- and we will undertake to do so in good faith, but we will not be able to comply in short order.

And we can produce whatever testimony on the record that is necessary to demonstrate to the Court why that is so, but we are -- we have competent vendors looking at this issue. And we can only move as fast as we can get them to move. And, in looking into this issue and in discussing it with other vendors, it -- no one else could move it faster. Again, it's not a situation where we can throw more bodies at it to move the process along.

ALJ THOMAS: Mr. Lichtblau, did you understand the Court's Order to be to look back into the tapes?

MR. LICHTBLAU: I don't believe that there are such tapes for my client, so it didn't affect me, so I didn't concentrate on that.

ALJ THOMAS: Okay. Great. It's now noon. Let's be off the record.

(Off the record)

ALJ THOMAS: We'll be on the record.

We'll be off the record now from 12:00 to 1:30, at which time Judge TerKeurst and I will be back to continue this process.

(Whereupon, at the hour of 12:00 p.m., a recess was taken until 1:30 p.m.)
* * * * * ]

AFTERNOON SESSION - 1:36 P.M.

* * * * *

ALJ THOMAS: We'll be on the record.

MR. LICHTBLAU: Your Honor, I'm sorry. Before we go to Question 2a, I had asked if I could make a brief remark.

ALJ THOMAS: Sure. Go right ahead.

MR. LICHTBLAU: I'm sorry. I just want to go back to the procedural posture of what we're doing here. The Scoping Memo, on page 8, requires the parties to attempt to resolve any discovery disputes with a good-faith meet-and-confer.

The disputes that were presented with respect to Sempra Energy in that presentation are all new. There's -- we have not met and conferred on these issues. Some of them, there was a meet-and-confer back on November 14th, and Edison and I chose to withdraw the questions or chose not to pursue it, and could have brought a motion at any time or come back and continue negotiations. So I don't feel that the procedure of bringing forth new issues for the first time at a hearing is appropriate.

ALJ THOMAS: Let's assume that we're in a slightly different mode than we would be if we were at the beginning of the case, and we were just embarking on discovery for the first time. We've been down this road for many months now. The hearings are looming. The Commission has this independent -- and Judge TerKeurst have this independent obligation to develop a record. We're looking at what we're getting, and hearing representations of Edison. And there just isn't enough there. So we're sort of in a different

mode than we would be if we were just starting this from scratch.

I understand your concerns, but let's try to go through this process. See if we can get anywhere with it. You can, again, have whatever standing objection you want to the process, but I just feel like we've sort of gone down that road already, and we're beyond being able to send you off and negotiate, and need to take a little more control of the process.

MR. LICHTBLAU: Right, but at the same time, we're putting my client at a disadvantage for not having had the normal opportunity to review their issues, to analyze them, and to respond to them in a normal fashion.

ALJ THOMAS: And to the extent that you can't respond today, that will be understood. I mean, you can only tell us today what you're prepared to tell us, but let's try to work through this. See how far we get. See if we make any headway.

And if you have additional issues you need to bring up, you can bring them up next week, when you've had a chance to confer further with your client; but my preference would be to try to go through the process of getting through these.

Okay?

MR. YUDKOWSKY: Your Honor, one last point. We'll begin this process as you requested. And this goes to the discussion we were having prior to the luncheon break with respect to the e-mail search and the -- of the backup tapes,

and restoring those backup tapes. We would ask that your Honor direct that Edison reimburse us, as is required under the Evidence Code, for the cost of restoring those backup tapes and providing them with this information.

ALJ THOMAS: We'll take that up at a future time.

All right. Mr. Bass, we were on Question 2a.

MR. BASS: 2a, which would be -- perhaps that question should be read into the record. Do you have it with you right there? Is that it?

ALJ TER KEURST: Let's go off the record.

(Off the record)

ALJ TER KEURST: On the record.

MR. BASS: Okay.

ALJ TER KEURST: So we'll identify that we're referring to --

MR. BASS: And then we were talking about data -- Amended Data Request, SCE to SET, No. 1, Question 2b -- no -- 2a. Excuse me. And that question reads,.

Please provide all documents analyzing the natural gas prices that existed at the California border during the discovery period.

Now, the production that we received is as follows. And, Mr. Levine, can you describe what it is?

MS. LEVINE: Yeah. This is the one that we talked about in the presentation. It's this Weekly Natural Gas Update. It's one document.

ALJ THOMAS: Is the document even of any use to you?

MS. LEVINE: I think the issue with it is it's -- it looks like it must be a February 2000 document, which is really right before the run-up in prices that really kind of started in May 2000, and got, you know, worse later that winter. So it's not particularly useful for us.

ALJ THOMAS: If you had those for the period at issue, though, would they be of use?

MS. LEVINE: Yeah, I think so. There's a section at the bottom where they have comments on -- like this one actually, I don't think, refers directly to California, but it looks like it may refer to other areas, so it's -- I guess it's dependent on what's typically reported in these.

ALJ THOMAS: And, Mr. Yudkowsky, is the Sempra Energy Trading Weekly Natural Gas Update a document that was produced on weekly basis during the relevant period?

MR. YUDKOWSKY: Well, first of all, your Honor, let me correct the record once again. The Amended Question 2a was amended further, by agreement with Mr. Bass, to read as follows.

> Please provide all formal analyses of or documents discussing reasons, rationales, or explanations for changes in natural gas prices at the California border during the subject period.

So that's what we're discussing right now. And I will tell your Honor that these -- this document here is the only document of its kind that we could locate that happened

to be retained by one of the individuals who performed a diligent search I mentioned earlier. Whether these documents were provided in weekly fashion or not, the fact is that they were not retained. And all we are required to do under the discovery rules is to look for it and, if we find it, produce it. And this is what we've found, and this is all that exists.

ALJ TER KEURST: This appears to be an electronic document. Is that correct?

MR. HECHT: I believe it's either -- it's -- most likely, it's some type of PDF document.

ALJ TER KEURST: Well, I suspect it's not PDF for it to have the November 19th date on it, 2003.

MR. HECHT: Oh, that's right. When I said "PDF," I meant in the original electronic. It appears to have contained a date code such that, when it printed, it generated November 19th, 2003.

ALJ TER KEURST: All right. So the individual had retained it in electronic form?

MR. YUDKOWSKY: That's correct.

MR. HECHT: That's correct.

ALJ TER KEURST: Is this something that -- there might be other versions of it, if you go back and search your e-mail files?

MR. HECHT: This document -- my recollection is that this document, when located, was not located in e-mail format. So it doesn't -- this issue we discussed earlier of back up e-mails and whether or not they had been searched

would not be pertinent to this particular document.

This was -- an individual located this document in electronic form on their computer, on their hard drive. And earlier I stated "PDF." I don't know for certain what format it was in, but whether it was a Microsoft Word document, a PowerPoint document, whatever it was, it existed on their computer, and we were given a copy.

MR. YUDKOWSKY: And to answer your question more directly, with respect to those e-mails that we did search that are currently available, we did not find any attachments such as these.

ALJ THOMAS: Are these Weekly Natural Gas Updates available in any form today? In hard copy? In some computer somewhere?

MR. YUDKOWSKY: The problem with the question is that we don't know -- or let me answer it: we have not through our search located this in any form in any of the areas that we have reviewed. So I guess the short answer to the question is no.

MR. BASS: I would like to note, your Honors, that our original Data Request No. 2, which was not divided into subsections, states as follows. Please -- it's a lot wider in scope. It says,

Please provide all documents,
including any internal memos, e-mails,
presentations, graphs, charts, or
meeting minutes in your possession
that refer to gas market conditions in

Western U.S. gas markets during the
subject period. Your response should
include but not be limited to all
documents that discuss or analyze gas
prices, alleged gas price manipulation
in the Western U.S. physical and
forward gas market, or the behavior of
other participants in the Western U.S.
physical and forward gas markets.

Now, when this was discussed during the telephonic hearing, we -- "we" being SCE -- provided an explanation of what Western U.S. physical and forward gas markets were. And it was at least, I believe, a 12-point document that provided more specificity as to that.

However, this question was getting to what we were seeking. And it tracked, again, Issue No. 2. I wanted to at least state this on the record: that this was what we were trying to get to in order to be able to address Issue No. 2 in the Scoping Memo.

ALJ THOMAS: Mr. Levine, what do you think you need here?

MR. LEVINE: I mean, I think I -- just thinking for a second. I mean, it would almost be nice to see if there were communications between their gas traders in Western gas markets who, you know, are following the markets and are, you know, maybe communicating what they're seeing.

ALJ THOMAS: So are you looking more for sort of systematic documents? Are you looking for the kinds of

documents that would have been generated just -- where someone was actually discussing the issue in depth?

I mean, my impression is -- and let me just take away -- what you're telling me is that this natural gas update is probably not what you were looking for; and what you were looking for were instances where people within the company were actually discussing the situation with the prices and what it meant, and what the implications were, et cetera?

MS. LEVINE: Yeah. I mean, I think that's probably right.

I'm just trying to think if there is any analogy. I mean, an example is in -- you know, I think SoCal Gas, in their production, it's a public document. I think somebody there wrote a paper about what they were seeing in the markets in early December.

You know, I think things like that, where, if anybody who was actually participating in the markets was, you know, sending e-mails about what they were seeing, you know, if anybody at the company was asking -- you know, I mean obviously, in December 2000 this was an extraordinary period. You would think that people would be kind of back and forth, communicating. You know. What's happening here? So I think that's probably what we had in mind when we wrote up the question.

That said, if there is kind of systematic, formal stuff like the Weekly Natural Gas Update, that may be useful, too.

MR. HECHT: Your Honor, to the extent that those types of -- in addition to the systematic-type documents, which obviously we searched for, because we produced one, wherever it was located. To the extent that the question is getting to those more type of informal communications among traders or market participants at SET, that's what we understood the question, even as revised by our discussions with Mr. Bass, to implicate; and those are the types of documents we searched for in response to that question.

ALJ THOMAS: But have you looked at the old e-mail tapes?

MR. HECHT: Well, again, Mr. Yudkowsky addressed that issue. We have not had the opportunity. Because of the timing issues, we have not had the opportunity to look at the e-mails that only exist on the tapes. So to the extent e-mails still exist today, we did look at them, and looked at them for the very issue that Mr. Levine has just identified.

ALJ THOMAS: And isn't it most likely that contemporaneous discussions would be on the tapes; that people wouldn't have kept e-mails from years ago on their C drives, or they wouldn't be on their server?

MR. HECHT: I'd be speculating. I'd be speculating.

ALJ THOMAS: All right. I suspect -- and, I mean, my gut reaction as I read this is that there's more there probably, and that it's probably where the tapes are; that this is archived material, because you're not likely to have a lot. I don't save e-mails from three years ago.

MR. HECHT: I -- I wouldn't disagree with that