assessment. I would not be surprised if they're even on the tapes. And of course, without looking at the tapes, it's impossible to know this definitively, but based on my impressions from having spoken with traders, it would not surprise me if such materials do not exist even on the tapes.

ALJ THOMAS: It just strikes me that it's like talking about the Energy Crisis in California, and saying nobody at this Commission had any e-mails -- sent any e-mails discussing the Energy Crisis. It just seems unlikely that that would be the case.

MR. HECHT: Given the nature of -- it's difficult to answer that question without describing the nature of SET almost in a physical sense. The people who would have those types of conversations with one another sit at a desk that does not look at all unlike this table, next to one another. And they would not necessarily -- to the extent that they were having communications with one another about the prices that they were seeing in the market, they would not necessarily be by e-mail and, in fact, most likely would not be by e-mail. They would turn to one another and speak with one another.

ALJ THOMAS: How large is this trading floor or trading entity? How many employees? How many -- how physically large is the facility where most of them are operating?

MR. HECHT: There are a total of -- all employees, there's a couple hundred employees.

ALJ THOMAS: As of the dates we're looking at here.





Dockets.Justia.com

MR. HECHT: At any one time, there were maybe approximately 200 employees companywide. Sitting on the trading floor, perhaps -- it's difficult to say; perhaps 60.

ALJ THOMAS: And how large is this?

MR. HECHT: The trading floor is maybe this room times three.

ALJ THOMAS: So Hearing Room D times three.

ALJ TER KEURST: And they weren't doing any analyses? I mean, you're saying that their communications were verbal? They weren't preparing reports or analyzing the situation?

MR. HECHT: Again, that -- I can't testify for them, but that would be my -- that would not be inconsistent with my understanding of the way that they conduct their business.

ALJ THOMAS: And who are -- what is your role or what was your role in the company?

MR. HECHT: I'm outside counsel.

ALJ THOMAS: Okay. So you're their lawyer in New York?

MR. HECHT: That's correct.

ALJ THOMAS: Within house lawyer, or outside counsel?

MR. HECHT: No. I -- I -- I --

MR. YUDKOWSKY: He's my colleague in New York. We have offices on both coasts.

ALJ THOMAS: Got you.

ALJ TER KEURST: And is there a research arm of the company that might be producing analyses like Edison has requested?

MR. HECHT: There is a -- there is -- there is no

formal research group of the company.

There is -- the closest thing is there is a group of employees that produce weather forecasts. And they forecast -- so they're forecasting anticipated supply and demand in connection with weather.

ALJ THOMAS: Who was producing these natural gas updates, then, along the lines of what we saw in the packet? Was that a research group, or was that the traders on the floor, or was that somebody else producing that?

MR. HECHT: I don't know the answer to that question generally.

I can say that with respect to this specific document, I happen to know that. Because it's a single document, I happen to know the story behind it. The -- one of the individuals who was a member of the group of employees that we agreed to search as part of the diligent search had, on a single occasion, helped prepare one of these. It was the only time he ever did it. And that's why this document was on his computer. And that's why it was turned over and produced.

ALJ TER KEURST: So you don't know who did these?

MR. HECHT: I don't know if there were other -- I don't know if that type of document was generated on any other occasion, and if so --

ALJ TER KEURST: It certainly implies that by the very title.

MR. HECHT: I would agree that that's the case, but I don't know beyond this document, which is, again, the only

one we located like it. I can't speak to that.

ALJ THOMAS: Is there anyone here you've brought with you that could tell us whether this existed in more volume? Do you have anybody from SET with you?

MR. HECHT: No.

MR. YUDKOWSKY: We do not. I mean, we can make a phone call.

ALJ THOMAS: We may need your custodian of records here next time, then, just because Mr. Bass did make that point that if you don't have an expert, someone that is familiar with what records exist within the company may need to be here when we resume on Tuesday.

MR. YUDKOWSKY: Again, your Honor, let me take you back to the point I made before. It's that, irrespective of the frequency of this, whether it existed at the time or not, the fact of the matter is if it no longer exists, even if we can establish for your Honor through a custodian of records that this was produced on weekly basis during a particular time frame, the fact that no one retained it ends the inquiry. We can't recreate something that no longer exists.

ALJ THOMAS: It just concerns me that we can't even address the fundamental question of whether something called "Weekly Natural Gas Update" actually was prepared weekly. I mean, we don't even have the most basic information about this. And so until we have the most basic information about it, I don't know that I can be satisfied that enough has been done to try to --

MR. YUDKOWSKY: Well, again, your Honor --

ALJ THOMAS: -- find relevant documents.

MR. YUDKOWSKY: I'm sorry for interrupting you.

ALJ THOMAS: That's all right.

MR. YUDKOWSKY: We can provide that information to you, but if, in the context -- through the course of our search, we can't find these documents any other place, I'm not sure how providing that you that information helps you determine whether or not they exist now.

MR. BASS: May I be heard, your Honor --

ALJ THOMAS: Sure.

MR. BASS: -- just briefly?

I think this discussion demonstrates that there may be value to revisiting the original data-request question, because there's a big question mark as to whether things or documents or information were withheld as a result of the change -- the revision of the data request. I mean -- and it's much -- now I think we've shown that the original data request was for the purpose of trying to address the issues in the Scoping Memo. And I think there is -- it's real uncertain here whether or not we were missing something that is relevant as a result of having had to narrow the request.

MR. HECHT: Your Honor, I believe I addressed that point a few moments ago when I explained that -- after hearing Mr. Levine's explanation of the spirit of the request, that that spirit comported with our understanding of what the request was getting at. So in this particular -- in this particular instance, I don't think that the case is that

what Edison is describing as a lack of documents is attributed to the scope of the question itself.

ALJ THOMAS: Off the record.

(Off the record)

ALJ THOMAS: On the record.

We've had a long off-the-record discussion, and I think we've -- from the Judges here have agreed that the best course at this point would be for you, Mr. Bass, to know this custodian of record depositions of Sempra Energy Trading, to try to get at what existed in this area, what sorts of documents were developed and then pursue whether any of them still exist.

MR. BASS: With respect to that, I would agree that, perhaps, a custodian of records deposition or -- of all the custodians of records who would be responsible for the types of documents and information we're looking for would be appropriate.

My concerns would be, one: Without a lot of documents available to us, we're kind of taking a stab in the dark here. I understand that that just very well may be reality. But --

ALJ THOMAS: I think it is.

MR. BASS: Given that, with a deposition, if it is met with resistance and opposition, a lot of objections, instructions not to answer, we could end up being in the same place we are now having expended a lot of resources basically for not a whole lot, and that is our concern.

The other concern is that doing something like

this will take time.

ALJ THOMAS: If you have any other alternative proposals for how to solve this, I'm ready and willing to listen to them, but I'm not hearing any, and it seems like this may be the only course.

MR. BASS: I think your suggestion is a good one. I'm voicing my concerns on the record that if we do so, we're going to need time to do it and the opportunity also to push back if there is resistance.

ALJ THOMAS: Understood.

ALJ TERKEURST: I think in the meantime we need to pursue the search of the emails. Don't delay on that, and we'll probably come back to that before the end of this hearing.

We don't need to wait for a deposition to know that these questions include the archived emails that you have not searched so far.

ALJ THOMAS: What's the next question, Mr. Bass?

MR. BASS: 8-A.

ALJ TERKEURST: Which one?

MR. BASS: It's Question 8-A, which was the revised -- an amended question.

ALJ TERKEURST: So our prior discussion applies to all of 2, 2-A, -B and -C.

MR. BASS: 2-A and -B.

ALJ TERKEURST: There are 2-A and -B.

MR. BASS: We've pretty much addressed it. I am going from Mr. Yudkowsky's responses to those data requests, and,

yes, we've pretty much -- we've reviewed that for 2-A and -B.

One thing, if I could, your Honor: One thing I was thinking of as an alternative would be for SET to basically copy what is in their files that could possibly be relevant and may be reviewed either in-camera by the ALJ's or reviewed by us and then we start from there.

That could be a possibility if, indeed, they have, you know, documents in their files.

MR. YUDKOWSKY: Your Honor, I'm not sure I understand what Mr. Bass is suggesting. It sounds on its face that he would like us to go back to the company and copy everything in the company's files and provide it either for this Court or to himself. I trust that's not what he suggested.

MR. BASS: Well, not copy everything inside, but copy all that would be possibly relevant to the questions that are being asked. I guess what I'm trying to point out is there's really a need for a custodian of records to be here today --

ALJ THOMAS: I agree with that.

MR. BASS: -- for us to move forward.

ALJ TERKEURST: I don't know that he or she needed to be here today, but I think for the next hearing we do need -- it would be helpful if we decide to continue with the hearing in the way we're doing it that we have a custodian of records here.

MR. BASS: And I guess what I was suggesting is that if we don't have a custodian of records, the next best thing would be just to bring what you got and then let's look at it, but one or the other.

Otherwise, even when we go down to Question 8, I think we're going to revisit the same issues.

MR. YUDKOWSKY: And, your Honor, even if we have a custodian of records here, if Mr. Bass cannot articulate what it is that he's looking for even with the assistance of his consultant, I'm not sure that a custodian of records is going to help him.

And bear in mind again that our client is located in Stanford, Connecticut. To bring multiple custodians of records here on a fishing expedition without anything beforehand other than the notion that why don't you just give us everything that you think might be relevant to the issues here is patently inappropriate. It would be inappropriate in a court. It would be inappropriate before this Commission.

MR. BASS: The point I was trying to make, though, perhaps inarticulately, is that we need some guidance here that could be provided by custodians of record if they were available.

ALJ THOMAS: I would reject any objection based on the argument that we don't have the authority to have you bring a custodian. But if we have authority to order discovery in the case of third parties, which I believe we do, we've already resolved that on the earlier motion. We also have the authority, I believe, to order a custodian be here to facilitate that process.

So if what you're saying, Mr. Yudkowsky, is that you're not willing to bring a custodian of records here to assist us in this process, I need to know that.

MR. YUDKOWSKY: That's not what I'm saying at all, your Honor. What I was saying is that in order for a custodian of record or multiple custodians of record to be of efficient use to your Honor and to Mr. Bass, we need to refine the issues that have been directed to them and to us.

And the point that I was making before is that we're now being told that they need guidance. They have consultants. It's their burden to ask the questions. It's our burden to respond to them.

We're not intending or trying to be obstreperous, but we can't continue to just simply disadvantage our clients by going on a fishing expedition because they aren't clear yet on where they're heading.

And let me say one more point: What we've been talking about here are communications, and I'm not sure who the custodian of records would be when it comes to what communications occurred between the trader sitting on the trading floor.

MR. HECHT: The only people who can speak to that are the traders themselves. A custodian exists in the sense of someone who's familiar with what are SET's -- the issues Mr. Yudkowsky was speaking to earlier today:

How does SET retain email? for what periods of time does that email exist? But it will not -- that custodian cannot speak to the content of those communications; only the parties to those communications themselves have any knowledge of that subject.

MR. BASS: And that's where we would start, with the

email: What email exists? where is it? how is it kept? All those things, I think, are very important and necessary for us to know.

ALJ THOMAS: I think we're breaking down into these generalities. Why don't we try to address this question itself.

The question is: With regard to documents provided to any state or government agency during the discovery period, what did you get in response? what would you have expected to get that you didn't get?

And, Mr. Levine, maybe you can help.

MR. LEVINE: We're at 8-A here. And I think 8-A has been -- I think there's been three separate sets of things that have been provided.

The first one -- I'm looking at the Bates numbers. It's SET 0013 through SET 369.

It's a series of emails presumably from SET employees to trade publications, and so it appears to be their reporting of prices to gas trade publications that report prices and do surveys of market participants.

And I think generally this is what we'd expect to see. I don't think we have any real issues with this. I don't -- we don't know who this was provided to, which state or government agency. There's no kind of cover letter or anything, but other than that, it's a series of emails.

ALJ THOMAS: Is it basically stuff that just isn't particularly useful in preparing your case or is it useful stuff?

MR. LEVINE: Yeah, I mean, it would be useful -- it's useful for investigating this issue which is in the scoping memo on misreporting of prices.

ALJ THOMAS: Okay. So you said you've got three categories of documents. What was the second one?

MR. LEVINE: The second one is a series of audiotapes, which I believe -- I actually have not listened to them, but I believe they're just tapes of traders.

MS. LACEY: I have listened to them. They're tapes of SET employees talking to index publishers about prices. There are five audio files all together.

ALJ THOMAS: What's the third category?

MR. LEVINE: The third category, I think, is -- yeah, it's their filings to the FERC on this issue. I think they --

ALJ THOMAS: Public filings.

MR. LEVINE: Yeah, public filings.

ALJ THOMAS: And what are you looking for? What do you think you're looking for?

MR. LEVINE: I think generally this was responsive.

ALJ THOMAS: All right. Do we need to talk about it further? If you think that what you got was responsive, let's not talk about it here.

MR. LEVINE: The only thing -- we don't know who these were provided to, which state or government agency.

MR. HECHT: Your Honor, I think that --

ALJ THOMAS: Could we have you identify?

MR. HECHT: I can respond on the record that the

documents, the FERC report -- the document that indicates that it was provided to FERC was provided to FERC. The other documents were provided to the Commodity Futures Trading Commission.

ALJ THOMAS: All right. Anything further that you need?

MR. LEVINE: No.

ALJ THOMAS: Okay. What next?

MR. BASS: 15.

ALJ THOMAS: All right.

MR. BASS: No. 15 as amended states as follows. First it asks for electronic records:

> "Please provide the following data for gas purchases and sales in or around California, including, but not limited to purchases and sales at Topock."

ALJ THOMAS: We'll give that to the court reporter. It's a list of locations during the discovery period.

MR. BASS: During the discovery period.

ALJ THOMAS: And then asks for some specific information: price, information about the price, et cetera.

MR. BASS: However, this was amended further per discussions with Mr. Yudkowsky --

ALJ THOMAS: Are you okay with the amendment?

MR. BASS: -- of the subject period.

And, yes, I believe we're okay with the amendment to the subject period as opposed to the discovery period.

ALJ THOMAS: All right.

What did you get in response?

MR. LEVINE: For this one we got, I believe, one spreadsheet. So it was provided electronically.

And, actually, I think this is -- I think we discussed this one in the presentation. The issue we raise is just that we're having trouble interpreting the prices.

ALJ THOMAS: That was the one where the price was zero?

MR. LEVINE: Yeah.

MR. HECHT: I would just note for the record that Edison has contacted us with questions about -- with certain questions about some of the spreadsheets provided in response to this or some similar questions.

The issue that they raised earlier this morning at this hearing about the prices is not one that they've raised with us before. But if they would contact us after this hearing to discuss it further, we would be happy to attempt to answer any questions that they have.

ALJ THOMAS: I'm going to order you to answer any and all questions that they have about what this spreadsheet means in interpreting the data and what the headings in the columns mean and that why X column is or isn't there and any questions that they have. That will be the order.

Is that satisfactory, Mr. Bass and Mr. Levine?

MR. BASS: I think that there may be, perhaps, an easier solution.

MR. LEVINE: Yeah, I was going to suggest one thing that could be provided -- it would be useful -- is just these

are all purchases and sales of gas in this case.

They could provide the total dollars received for when they sold gas, the total dollars paid for when they purchased. That would be another way to do this.

What's happening here is in some cases I think they're providing adders to an index price, so it's kind of forcing us to try to have to figure out the price; whereas, if they just gave us the dollar amounts associated with the transactions, we would kind of be able to back into the prices.

MR. HECHT: Your Honor, in those instances where there's a price that's based off of an index, we have -- it's correct that we've provided -- it's not necessarily an adder. It's a differential because it could be either an addition or a subtraction.

I will endeavor to find out whether or not SET keeps records of what the historical index prices were. It's my understanding that they may not, and, therefore, they may not be any better situated than anyone else to retrieve that publicly available historical information to calculate a price.

ALJ THOMAS: But if you have that information and -- so I'll order you to make a reasonable diligent search for that and, if you have it, to provide it. But talk to the other side. Why don't both sides talk to each other so that what you give Mr. Levine is what he needs.

ALJ TERKEURST: Would you have data regarding the total received or paid?

MR. HECHT: No, your Honor, we do not; however, it's a simple matter of multiplying total price times total quantity.

ALJ TERKEURST: Assuming you have the total price.

MR. HECHT: That assumes though -- exactly.

ALJ TERKEURST: If you kept records regarding the total paid, then you can back the price out of that.

MR. HECHT: That would be correct if those records exist. Again, we will find that out.

ALJ THOMAS: Anything else with regard to this question?

MR. LEVINE: No.

MR. BASS: No, your Honor.

ALJ THOMAS: What's the next one?

MR. BASS: No. 16. Again, I'll summarize assuming that the court reporter will get the full text at a later time.

This is asking for data for gas purchases and sales in western-producing basins. And then there are Subcategories A through H which we were looking for.

ALJ THOMAS: What did you get and what do you think you need, Mr. Levine?

MR. LEVINE: Actually, I think this is -- I think we're basically in the same position as we were with the last question. I think we -- it's just a matter of interpreting the prices. I think it's same issue as with the last question. We got a spreadsheet--

ALJ THOMAS: Is there also a issue of the adders or

the subtracters so you can't tell what the actual price was?

MR. LEVINE: Yeah.

ALJ THOMAS: Is it understood, Mr. Hecht, that you will determine whether the actual prices can be determined and you will furnish that information to Edison and its expert and also that you will be available to make your company -- clients available to answer any questions about what the meaning of the spreadsheet is?

MR. HECHT: Yes, your Honor.

ALJ THOMAS: All right. That will be the order.

ALJ TERKEURST: And also if you have totals, that you would provide those as well, total dollar amounts.

MR. HECHT: Yes.

ALJ THOMAS: What's next?

MR. BASS: No. 18. And then this is a request for electronic data.

And I think we received a spreadsheet, but it was asking for transaction data for each gas futures forward or option contract or other hedging instrument with a settlement location in various basins within California or at the California border during the subject period with subcategories.

ALJ THOMAS: Mr. Levine.

MR. LEVINE: As I understand it, we got two spreadsheets. One was related to gas swaps. The other one was related to gas options.

And I think what happened is, yeah, we had requested -- I think the request explicitly asks for gains

and losses and we did not receive those. In part, the question asks for gains or losses, so we did not receive those in the spreadsheets.

There's been follow-up, and we have received one new spreadsheet in response which was for the gas swaps where gains and losses have been provided. So we're waiting for the option spreadsheet to be updated.

ALJ THOMAS: Those exist, Mr. Hecht?

MR. HECHT: Again, your Honor, that was the issue we discussed this morning. And I believe -- that are -- they do not -- they did not exist.

I believe that SET has been able to construct the methodology to report that, and I will confirm that and we'll produce that as -- if so, we'll produce that next week.

ALJ THOMAS: All right.

MR. BASS: That's all on 18.

No. 29: This is requesting organizational charts for SET's trading operations during the discovery period, identifying by name and title the individuals involved in SET's trading operations and provide job descriptions for each position.

MR. LEVINE: Yeah, this case we got the one chart that we had in our presentation, and we had a concern that we weren't sure that everybody who's part of the relevant trading operations were identified here.

I think, in addition, we don't have a date on this document. I think those are the -- okay. Right. So, yeah, we don't have job descriptions for these different folks

identified on the chart.

ALJ THOMAS: Is that something you can furnish, Mr. Yudkowsky and Mr. Hecht?

MR. HECHT: Your Honor, in the second bucket of document requests, there were questions specifically directed at that very information, and SET is in the process of preparing responses to those questions.

ALJ THOMAS: So you'll give them the date of this document, this organization chart, SET 0406?

MR. HECHT: I'm sorry if we had a misunderstanding.

This document speaks for itself. If it does not have a date on it, I don't know that we can provide a date.

I was -- my earlier comment was directed towards Edison's inquiries as to whether all trading personnel related to west natural gas and west electricity are accounted for on this organization chart and what those individuals' titles and roles in the organization are.

ALJ THOMAS: Why don't you also attempt to determine what the date of this document was. It's an organization chart. Somebody might be able to look at it and tell you when these people were in these jobs.

Is that acceptable?

MR. YUDKOWSKY: That's fine, your Honor.

ALJ THOMAS: Is there anything else on this one?

MR. LEVINE: No.

MR. BASS: No. Then we move to 33-A. And this is a long one.

It asks for all documents prepared by SET, e.g.,

any communications, emails, memos, presentations and reports prepared by SET that were sent, presented or made available to SoCalGas during the subject period concerning -- and then there are 18 categories.

ALJ THOMAS: Okay. What I'm looking at is the amended which only says concerning market conditions or any Sempra subsidiaries' plans. So --

MR. BASS: I'm reading directly from the supplemental responses of Sempra Energy Trading.

ALJ THOMAS: Let's be off the record.

(Off the record)

ALJ THOMAS: On the record.

We've clarified there was a supplementation to the question, and we'll give that 18 -- list of 18 subcategories to the court reporter, and she'll append it to the transcript.

It's in the form of an email from.

MR. BASS: Well, actually it was from me, but it was written by Mr. O'Loughlin who happened to be on that telephonic conference.

ALJ THOMAS: To Mr. Yudkowsky.

MR. BASS: Well, it was to the service list.

ALJ THOMAS: We'll give it to you after the hearing, Madam Court Reporter.

All right. What did you get in response and what do you need?

MR. LEVINE: In this case we've got four letters from Stephanie Katz of Sempra Energy Trading Corporation to

Mr. Gwoon of Southern California Gas Company that are related to -- it looks like basically requests for storage capacity. So --

ALJ THOMAS: Essentially material that isn't particularly useful?

MR. LEVINE: I mean, I view it as responsive to the question.

ALJ THOMAS: What do you think you need?

MR. LEVINE: I don't have any reason to believe there's more. You know, I don't know. I mean, I think it's basically responsive.

ALJ THOMAS: All right. Again, if it's responsive, we don't need to talk about it today, so let's just skip over the ones that are responsive.

If there isn't anything further that we need to order, then I don't see any reason to talk about it here today.

So if there isn't something that seems obvious to you that would exist, Mr. Levine, or you don't have concerns, Mr. Bass, about the response, let's just pass over it.

MR. BASS: Okay.

ALJ THOMAS: Okay.

MR. THORP: Your Honor, I've just been informed by Ms. Zafar that she's got an even earlier plane than I do. I'm just wondering if we might soon have some sort of breaking point where we can quickly discuss schedule.

ALJ THOMAS: Let's be off the record.

(Off the record)

ALJ THOMAS: On the record.

We've discussed scheduling off the record, and we will have a hearing on the pending motions to compel next Thursday at 2 p.m. by telephonic conference call.

Getting back to Question 33(a), Mr. Bass, you had indicated off the record that you thought it might be appropriate to have the custodian of records deposition that I had ordered with regard to Question 2 also extend to Question 33.

MR. BASS: 33(b).

ALJ THOMAS: Can you elaborate.

MR. BASS: Looking at both 33(a) and 33(b), they are related questions. And it seemed that while right now SCE doesn't have any evidence that indicates that the four letters that were produced in response to 33(a) are -- that there is more than the four letters produced in response, it appears -- it seems to us that these are the kinds of questions where the knowledge of the custodian of records would be helpful to determine whether indeed there are more documents in the possession of SET that would be responsive.

ALJ THOMAS: This does strike me as something similar to Question 2. So I would agree that a custodian of records would be appropriate. That will be the order.

Next one that is -- that is both Questions 33(a) and 33(b).

Now, 34(a) and 34(b) I have a feeling there may be similar issues. I'll let Mr. Levine respond as to what it is that was produced to 34(a).

MR. LEVINE: There are a series of documents that basically we are going to go the other way from SoCalGas to Sempra Energy Trading. There are emails here, it looks like it is similar information, it has to do with requests for storage information on some of them. There is a whole series of them.

MR. BASS: 34(a) is asking for documents prepared by SoCalGas that were entered or made available to SET during the subject period.

ALJ THOMAS: You want to continue -- extend the custodian of records deposition to those as well?

MR. BASS: Yes, I would.

ALJ THOMAS: Did you get anything in response here?

MR. LEVINE: Like I said, it is negotiations for storage and other items. It is responsive.

ALJ TERKEURST: Are they documents or emails?

MR. LEVINE: Some of them are documents like the ones -- that contract. But there are emails here from SoCalGas to Sempra Energy Trading that apparently were located, so a bunch of them are emails.

ALJ THOMAS: All right. Given that the custodian of records deposition is going to happen any way, why don't you cover the issues in 34(a) and (b).

MR. BASS: Mr. Levine, did you cover 34(b) and what was produced?

ALJ THOMAS: The same question except it goes to SDG&E.

ALJ TERKEURST: I have a question. In comparing some

of the responses that you've gotten, do you see any possible discrepancies wherein in response to one question you get emails, but in the response to another question you don't get emails?

MR. LEVINE: I mean that one we just looked at previously, 33(a), these were not emails, the four letters I mentioned.

MR. BASS: We got no email.

MR. LEVINE: They were letters, in this one emails appear.

MR. YUDKOWSKY: As a point of clarification, the request is prepared by SoCalGas. These are emails to SoCalGas to SET. That is why there are responsive documents here, and there are not responsive documents to previous question.

ALJ THOMAS: But it raises a question in my mind that presumably the reason that you were able to produce them was someone had saved those emails. If they saved those emails, why aren't there emails on some of the other questions?

MR. HECHT: Again, as we discussed earlier, it would go to the -- since we are talking about emails as they exist today, going back to a time period three to four years prior, it is just a matter of what someone had elected to save or not save.

ALJ THOMAS: Well, let's have a deposition occur, and you can probe that, Mr. Bass, and --

MR. HECHT: Your Honor, in connection with that very question, given that we're talking about a deposition of

custodian of records in relation to questions that are primarily focused on communications, whether they be emails, memos, representations, et cetera, are we -- a point of clarification: Are we talking about an IT professional who can speak to these email issues and what would be retained and what wouldn't be retained? Or are we talking about a custodian of records in the sense that someone would know the content of communications?

ALJ THOMAS: Let's be off the record.

(Off the record)

ALJ THOMAS: On the record.

We talked off the record about the process that was used to gather documents.

Mr. Hecht, Mr. Yudkowsky, you made a representation to me off the record what you did was you had individual clients -- individual traders search their on computers for companies that were responsive. There wasn't one person at the client that coordinated the effort, coordinated the effort of gathering responsive documents; is that correct?

MR. HECHT: That is correct. It goes beyond their computers, but also searching all relevant sources of files that Mr. Yudkowsky explained earlier in this hearing.

ALJ THOMAS: Mr. Bass.

MR. BASS: I'm sorry, your Honor, I was dealing with other notes. The question pending is what again?

ALJ THOMAS: He was reiterating the way they did the search is that they had each individual list a response.

MR. BASS: 34(a) and (b), each individual trader or fairly high-level client.

MR. HECHT: Traders, marketers, schedulers and the managing director of that group.

ALJ THOMAS: Do their own searches of those, their individual records, computer and otherwise. So the custodian of records deposition won't necessarily get you at what you need. So if you have any proposals for --

MR. BASS: Would it be appropriate to get a declaration from those individuals on how the search was conducted, how they conducted their search, so that we would understand what was reviewed, what was looked at; and perhaps by that see that it was complete or that something was missing, that one failed to look at emails and looked at individual files?

Again, I'm stepping in the dark a little bit and speculating. Perhaps that would shortcut having to do a deposition if we got declarations from these individuals indicating that they were asked to do a search and that -- what kind of search they conducted.

I guess the only other concern I would have would be to ensure that all the individuals who might have documents responsive to these requests were included and asked. And I'm not sure how to get to that, other than to know who the individuals are at SET that -- and what it is they do.

ALJ THOMAS: Do you have a good enough handle, Mr. Levine, on who does what at the company to be able to

determine from some written -- some declaration that they provide that all of the relevant people were asked to do this search?

MR. LEVINE: Um -- .

ALJ THOMAS: It is not a huge operation in terms of the number of people.

MR. LEVINE: That kind of goes back to the organization chart. We see the people who are on that chart, but we just don't know how comprehensive that chart is. Even some of the emails we've just been discussing contain the names of people. I think I mentioned several letters were from Stephanie Katz, she doesn't show up on this organization chart. I don't know if this really reflects all their western gas and power traders.

ALJ TERKEURST: Is there an issue as well regarding when documents that might have been responsive to these data requests that are no longer available, when they were deleted or discarded or whatever?

ALJ THOMAS: From your perspective there might be, because things would have been destroyed in the ordinary course, presumably.

MR. HECHT: That is the case, your Honor, it would have been ordinary course. In fact, there has been document preservation instructions that have come out of the general counsel's office of Sempra Energy shortly after the time period at issue.

ALJ THOMAS: Do you have that information?

MR. BASS: Not that I'm aware of.

MR. MATTHEWS: Sempra Energy, we do we have a document from Sempra Energy that presumably covers --

MR. HECHT: We provided that document preservation policy as well.

MR. BASS: We did. I know we do from SoCalGas. This is from Sempra Energy, yes. We do have a Records Management Retention Policy.

ALJ THOMAS: That is what you were referring to, Mr. Hecht?

MR. HECHT: I was referring to that, and additionally there were other instructions that were given specifically to preserve western gas and electric business-related documents.

MR. BASS: Was that produced?

MR. HECHT: I'll confirm whether it was or wasn't. I don't know that it was specifically asked for. If you are requesting it now, we can provide it to you.

MR. BASS: We did request records management retention policies.

ALJ THOMAS: It doesn't matter. He has agreed to produce it, let's have him produce it.

MR. HECHT: That is fine.

MR. BASS: One thing I'm noting, and pardon me for being distracted, on 15 and 16, we were asking for gas purchases and sales. And it has come to my attention regarding that that it appears that perhaps SET's outside auditor would be analyzing and have information as to those transactions.

ALJ THOMAS: You mean their accountant?

MR. BASS: Yes. I'm wondering if that is a source of information that would be available to us?

ALJ THOMAS: You probably have to subpoena their accountant. Like a big 8, or big 2, whatever it is nowadays, accounting firm?

MR. BASS: From what I understand, ORA has reviewed the outside -- for instance, this is an example, ORA reviews the outside CPA workpapers in most GRCs. Perhaps similar types of workpapers will be available from SET's outside auditors.

ALJ THOMAS: If they were in the possession of the company -- I mean I just had a big case where the utility turned over a lot of materials from their outside auditors because they were in the records of the company. I don't know what we've done with regard to outside auditors where they are only in the possession of the outside auditor. We can investigate that ourselves, Judge TerKeurst and I, to see if we've had a policy that requires a utility, or in this case a nonutility, or a third party, to produce information that is only in the possession of auditor.

I suspect the subpoena to auditors might be appropriate.

MR. BASS: I was going to say this is something we're going to explore.

ALJ THOMAS: Off the record.

(Off the record)

ALJ THOMAS: We will be on the record.

What we've done is agreed that counsel for SET,

Mr. Yudkowsky or Mr. Hecht, will furnish a declaration of counsel that specifies, lists each person that was requested to get documents, what the instructions were, to the extent you know what it is that they searched, a list of what it is that they searched. The declaration will be under penalty of perjury and furnished to Mr. Bass.

And Mr. Bass can involve me or Judge TerKeurst at that time if needed. Is that acceptable?

MR. BASS: That is acceptable, your Honor.

MR. HECHT: Acceptable, your Honor.

ALJ THOMAS: Off the record.

(Off the record)

ALJ THOMAS: On the record.

So there are no additional questions in the first set to SET, Mr. Bass; is that correct

MR. BASS: For the first tier, the first bucket of questions to SET, correct, for Set No. 1, correct?

ALJ THOMAS: When you say "the first bucket," what you mean is SET has agreed to produce additional documents that you have not yet seen. What you were addressing today were the documents heretofore produced?

MR. BASS: That is correct. In addition to another document production which is pending, there is a third tier of questions that have yet to be -- that SET and SCE have not yet met and conferred on.

ALJ THOMAS: All we addressed today was the material that has already been produced without prejudice to your rights to come back and argue about additional material that

has not yet been produced, okay?

MR. BASS: Correct. With the exception of Set No. 2, Nos. 1 and 2, which we are about to get to.

ALJ THOMAS: On Set No. 2. This is version dated 10/31/03, Question No. 1 asked for electricity purchases in various locations, and asked for price and other information.

Is that a question as to which there is concern?

MR. LEVINE: It is the same issue as with the gas, which is we did get data, but I think it is just a similar case where we can't also interpret the prices.

ALJ THOMAS: So the order will be the same as the order was with regard to the others which is that, Counsel, you will be available, and make anybody that you need to make available within SET to answer questions, interpretive questions, about the spreadsheet, what they mean, what a particular column is titled, what it is, interpretations of the prices, et cetera. Is that acceptable?

MR. YUDKOWSKY: Yes, it is, your Honor.

ALJ THOMAS: To the extent that the price is not the actual price, it has adders, or subtracters, and you have an ability to devise what the actual historical price was, you will also provide that information?

MR. HECHT: If -- my understanding is our obligation was to provide that information if we have it readily available.

ALJ THOMAS: If you have it available with reasonable diligence.

MR. HECHT: The reason I raise the distinction is if

for example, if SET keeps no record of those transactions, it is the exact same boat as anyone else in the world with the ability to go to the library to look at the publications to find out what the published prices were at these times.

ALJ THOMAS: If it is actually easily available to go to Edison, then, no, you will not have the ability to go to library. If you have materials, or they do, "they" being SET, that would allow them to devise this information more readily. Edison or some other third party then you should go ahead and do that. Is that acceptable?

MR. HECHT: Yes.

ALJ TERKEURST: As we talked previously, if you have information regarding the total dollar amounts, even though that is not on the list here, you should provide that as a way to possibly back out the price.

ALJ THOMAS: Is that acceptable?

MR. HECHT: Yes, it is.

ALJ THOMAS: Next.

MR. BASS: No. 2, I think is the same issues.

MR. LEVINE: Yes. I think for 2 we got two spreadsheets, one for electricity options and one for electricity swaps. But the first round they did not have gains and losses. Since then I believe we've gotten the electricity swaps with the gains and losses updated, so we've got a new vision of that spreadsheet.

We're just waiting for an updated spreadsheet with respect to the options.

ALJ THOMAS: The same order will apply, that is if

Edison has interpretative questions, you will endeavor to respond to them. Is that acceptable?

MR. HECHT: Yes, that is acceptable.

ALJ THOMAS: Anything else under that item?

MR. LEVINE: No.

MR. BASS: So that would complete what I've called the first bucket.

ALJ THOMAS: As to SET?

MR. BASS: As to SET.

ALJ THOMAS: Let's be off the record.

(Off the record) ]

ALJ THOMAS: Let's take ten minutes. We'll be back here at 20 after.

(Recess taken)

ALJ THOMAS: Let's be on the record.

Just to memorialize what we did before the break, we agreed -- and, Mr. Yudkowsky, correct me if I'm wrong -- that the second bucket of production by SET will happen on the 17th of the February.

And then, as to the third bucket, the Order will be that the parties meet and confer on those questions sometime next Tuesday, the 17th, or Wednesday, the 18th.

MR. BASS: Yes.

ALJ THOMAS: Is that acceptable?

MR. YUDKOWSKY: It is, your Honor.

One other point goes to a subject I raised before the last break; and that is the production. I just wanted your Honors to be aware that, as we start down this road, we

expect that the cost of restoring these e-mails for search will be in excess of several hundred thousand dollars. And so that is something, by way of motion, we will seek to recover from Edison, pursuant to the appropriate rules.

MR. BASS: I was going to indicate, your Honor, that Edison would be receptive to paying for reasonable costs on the SET conducting a search. Hearing several hundred thousand dollars strikes me -- makes me wonder about the term "reasonable."

ALJ THOMAS: I don't have anything in front of me right now on that, so let's just shelve that.

MR. BASS: Nor do I.

ALJ THOMAS: I understand on both sides it's going to be an issue. And we'll deal with it when it comes up.

MR. YUDKOWSKY: That's fine, your Honor.

ALJ TER KEURST: Actually, it raises a question in my mind. You talked about how long it was going to take, and that you would provide declarations or something to that effect. What do you have in mind? Because I don't want it to take any longer than is absolutely necessary. I mean, this proceeding is already slipping and slipping and slipping. And it's of some dismay to me that we're still talking about sometime in the future beginning to do this search that, in my mind, should have already happened.

MR. YUDKOWSKY: Well, two things, your Honor. First of all, let me clarify the record. We have already begun the search, which is why I can speak with some authority as to the cost. So we have not simply ignored this process. We

have begun to restore e-mails. And that's why I can tell you how long it will take now.

As -- with respect to Judge Thomas' Order today, I will go back to the vendor on Tuesday, and I will ask the appropriate questions. And, if your Honor would like, we can submit a declaration from the vendor that will explain both the time and the cost for restoring this e-mail. And bear in mind --

ALJ THOMAS: Let's do that immediately, because if you get down the road and you're spending massive amounts of money, and neither side knows who's paying for it, I think we're going to have a problem. So why don't you get that -- an estimate, and a description of what the work entails -- immediately?

And also file your motion immediately, so that I can rule on that, maybe at that Thursday conference call at 2:00.

MR. YUDKOWSKY: We will do that.

ALJ THOMAS: And "immediately" meaning so that I have it first thing Thursday morning.

MR. BASS: SCE would like the opportunity, of course, to review that motion and respond to that motion.

Another clarification I will make to -- just to make the record clear: SCE will consider paying reasonable costs. And I have to -- we have to look at this. I have to check with my superiors as well, and also the law in this regard.

ALJ THOMAS: Right, okay. That will be the Order.

Let's try to get that issue resolved as soon as possible.

MR. YUDKOWSKY: Okay. We'll do that, your Honor.

ALJ THOMAS: Okay. With that, Mr. Yudkowsky, you're free to take off.

And we'll move on now to the motion as to Sempra, Mr. Lichtblau.

MR. BASS: Another issue about scheduling, your Honor. Is it going to be that any other hearings on this, if we do have it, will happen on Thursday, as opposed to Tuesday or Wednesday?

ALJ THOMAS: That's right.

MR. BASS: Correct? And that leads me to the SoCal Gas/SCE motions, discovery motions. If we're going to be up here, that might as well be here.

ALJ THOMAS: Okay. We'll just set -- we'll just a have that motion argument take place at 2:00, so that the folks that aren't here any longer --

MR. BASS: Be it telephonically or in person --

ALJ THOMAS: In person.

MR. BASS: Okay. I think Mr. Thorp would like to be aware of that.

ALJ THOMAS: Off the record.

(Off the record)

ALJ THOMAS: On the record.

I will make sure that Mr. Thorp knows that he can appear telephonically at the Thursday at 2:00 hearing, if need be.

On the Sempra motion, I am now looking at the

discovery request, which was the request that you were going to address first.

MR. LICHTBLAU: Well -- and, your Honor, I think it makes sense to use the document that I circulated by e-mail. I have more copies mere. And I reason I say that that is what I did is I -- some requests were revised, and others weren't. And in this one, I quoted the most recent version for each one, plus, in brackets beneath it, any oral agreements that weren't in writing, so that -- yes. So this way, we don't have to bounce back and forth between different documents to determine what the latest request was.

ALJ THOMAS: All right. This is a letter that was hand-delivered to me and Judge TerKeurst on February 12th. I have it in front of me. Let's go with the first item that is of concern to Edison.

Off the record.

(Off the record)

ALJ THOMAS: We'll be on the record.

So the first question is Question No. 1, organization charts for Sempra's holding-company-level management. And what did you get; and what do you need?

MS. LEVINE: We did get two documents which are organization charts. And it does appear like in Question 1 that it's holding-company-level management. And so that does appear to be responsive.

I think 1 and 2a and 2b really all go together, because I think they all responded, you know, that the organization chart -- these two documents were the response.

ALJ THOMAS: Mr. Lichtblau's letter put them together --

MS. LEVINE: Yeah.

ALJ THOMAS: -- conveniently.

MS. LEVINE: Yeah. I think the chart is the response for these three questions.

ALJ THOMAS: So what you're asking for is a list of individuals?

MS. LEVINE: Yeah. And I think that's where I was going to go next, is that you'll see 2a is,

> Please identify all individuals employed by Sempra at the holding-company level who were responsible for overseeing, reviewing, approving, or managing the activities.

And I guess that's where we're wondering if we need a more comprehensive organization chart. And I can give you an example.

The org. chart shows Mark Randall as the vice president of Energy Risk Management, but as we understand it -- and I think it's in Mr. Engle's (phonetic) testimony -- there are also three individuals that work with him. And I assume that they are also responsible for overseeing and reviewing activities of the subsidiaries.

MR. LICHTBLAU: They're not. And if -- that's all explained in Mr. Randall's testimony. The risk management group does not have any responsibility for overseeing, approving, managing the activities of subsidiaries. All they

do is set risk management policies and set value of risk levels. The individual decisions of the companies are made by the companies. They don't seek approval of their actions from risk management group.

ALJ THOMAS: By the way, I'll overrule your objection based on CCP 2031(m). We've already ruled that we're going to take up these discovery matters, and they're -- the fact that they may not have sought resolution sooner is water under the bridge at this point. We've already decided that we're going to go forward, so to the extent that you have any objections based on that section of the CCP, the objections are overruled, Mr. Lichtblau.

On the specific response that Mr. Lichtblau gave, Mr. Bass, any comment?

MR. BASS: Well, what we are seeking here -- you mean regarding -- I think what Mr. Levine indicated is that the organizational charts that we have here are basically incomplete, and not providing what it is that was asked for. And that's what we're seeking.

MR. LICHTBLAU: Right.

ALJ THOMAS: Have you furnished, Mr. Lichtblau, a list of all individuals at the holding-company level who were --

What you're saying is no one was responsible for overseeing, reviewing, approving, or managing the activities?

MR. LICHTBLAU: No. I'm -- it's -- if you go to the first page, there are -- there is one individual, Ed Guiles, who is responsible, and is the only person at the holding company with those responsibilities with respect to the

utilities.

And there's one other individual, Don Felsinger. And he's the only person at the holding company with responsibility for the affiliates.

And, I mean, this is the kind of thing that, had we met and conferred, I could have easily explained at any time.

ALJ THOMAS: Let's be off the record.

(Off the record)

ALJ THOMAS: We'll be on the record.

So Mr. Lichtblau has now identified Ed Guiles as the only person responsible for overseeing, reviewing, and approving or managing the activities in response to Question 2a.

Is there a concern, Mr. Bass or Mr. Levine?

MS. LEVINE: Yeah. I think we're probably focusing on the word "reviewing."

You know, it's my understanding that each of the subsidiaries conducts their own risk management transactions. And it would be my understanding that it may be true that they calculate what's called a VaR, or a value at risk, but I think they do it for each of the subsidiaries.

But I think they do it for each of the subsidiaries, and I would guess that that's what this Energy Risk Management Department does. They review it by subsidiary, and they calculate value-of-risk statistics. And it just seems as if it's not just Mr. Randall, but his three employees who are involved reviewing the risk, the risk

position of each of the subsidiaries

ALJ THOMAS: Would a deposition help here, Mr. Bass?

MR. BASS: Well, it sounds like if we could identify who those individuals were, yes.

MR. LICHTBLAU: Well, I mean, I think this sounds like this -- first let me make one correction because I forgot that the ERMOC committee does have some oversight, and they are all listed on this chart. Every member of the ERMOC is.

ALJ THOMAS: Spell that.

MR. LICHTBLAU: The Energy Risk Management Oversight Committee. And in a later question we identified all the officers on that committee, and they're all on the chart.

But if their only question here is they would like to know the names of the people in Mark Randall's group, rather than debating whether or not they fit this question, I can get the names of the people in Mark Randall's group.

MR. LEVINE: That's good. We definitely want that, but I think we're still back at this word "reviewing." I think the issue is just whether there's corporate employees who reviewed the activities of the subsidiaries.

ALJ THOMAS: If you knew that, what would do you with it?

MR. LEVINE: I mean, it goes back to -- there's a sense in which it goes back to the issue of who's weighing in on strategic decisions of each of the subsidiaries and, you know, what kind of a communication may there be from the corporate entity, all employees down to the subsidiaries, which, in our view, is getting a scoping memo issued too as

to whether or not the corporation played a role in the price spikes that were observed.

ALJ THOMAS: Mr. Lichtblau, have you identified all individuals who were responsible for reviewing activities of SET, et cetera?

MR. LICHTBLAU: It is my understanding -- I will go back and verify that there is nobody not on this chart who would be responsible whose duties would involve reviewing the activities of the subsidiaries.

ALJ TERKEURST: Do you know what the responsibilities are of the individuals who were in Eric Randall -- is that his name?

MR. LICHTBLAU: Mark Randall.

ALJ TERKEURST: Mark Randall, in his group?

MR. LICHTBLAU: I'd have to go back to Mark to talk about exactly what they do and whether they -- so the answer is, no, I don't have personal knowledge of what the individuals underneath Mark do versus what he does.

ALJ TERKEURST: Would that be useful information, Mr. Bass?

MR. BASS: Yes. And I'm sitting here thinking about a possible deposition of Mark Randall, which I indicated previously that we had noticed. However, it was taken off calendar because of the lack of documents.

If we go through this and get additional documents, I think a deposition of Mr. Randall would be worthwhile and might get to some of these questions we're talking about now.

ALJ THOMAS: It sounds to me as if this question is going to be resolved by deposition. If you need an additional list of people and want to give a more specific definition of what you meant by "reviewing," I'm fine with having you do that.

And the order to Mr. Lichtblau will be that he make a reasonably diligent attempt to identify such people with the refinement on it the definition of, quote, reviewing. But that's, I feel, all I can do with regard to 2 today.

MR. BASS: The only thing I would add to that there, I believe I heard Mr. Lichtblau correctly that there are three individuals --

MR. LICHTBLAU: I don't know if there's three.

MR. BASS: I'm sorry. Mr. Lichtblau didn't say it. Mr. Levine did -- that we have some information that indicates -- from Mr. Randall's testimony that there are three individuals on his staff. And we would like the identities of those three individuals.

ALJ TERKEURST: I assume you mean during the period in question?

MR. BASS: Yes, during the period in question.

ALJ THOMAS: Refine this question. I'd rather you just talk about -- this is one where I think some additional discussion. You, Mr. Levine, and Mr. Bass, can get on the phone with Mr. Lichtblau and explain what you need, and hopefully Mr. Lichtblau will be amenable to responding. I'm ordering you to, in good faith, respond.

MR. LICHTBLAU: That's sort of been my position from the beginning. This is an example of something we served long ago and never received one follow-up question about it.

ALJ THOMAS: Okay. You've made that point, and you made it in your letter, and I understand your concerns, but we've sort of -- we're beyond that how because we've decided to go forward with this.

MR. LICHTBLAU: Sorry if I'm sounding like a broken record.

ALJ THOMAS: That's all right.

Is there anything further on 2-B?

MR. BASS: No, your Honor.

ALJ THOMAS: What's the next one?

MR. BASS: That would be No. 4, asking for the identity of each individual that was a member of Sempra's Energy Risk Management Oversight Committee during the discovery period.

ALJ THOMAS: What's the issue here?

MR. BASS: Okay. I've been informed by Mr. Levine that for Questions 4, 5, 6 and 7 we're okay with them, and we can move on to 8.

ALJ THOMAS: Great.

MR. BASS: Question 8 asks for all documents concerning any communications from or by Sempra's Energy Risk Management Oversight Committee to SoCalGas, SDG&E, SER or SET during the discovery period that we received. Mr. Levine.

MR. LEVINE: This is the one we discussed in the presentation that there were two emails provided to this

question -- in response to this question.

The first was an email to SoCalGas, to James Harrigan, and the second is an email to Deborah Reed, and both emails were circulated to all the members of the Energy Risk Management Oversight Committee.

And I think generally we agreed these were responsive, but I think at this point what -- we'd like to see the communications between -- all the communications between Mr. Randall and all the subsidiaries regarding risk management activities in western gas and power markets.

ALJ TERKEURST: Is there an issue with these companies regarding retention of emails, possibly what we discussed previously regarding SET?

ALJ THOMAS: Are your emails backed up on tape?

MR. LICHTBLAU: They are not for this period of time.

ALJ THOMAS: So for this period of time are there any emails that could be harvested from any archival material?

MR. LICHTBLAU: The only emails are the emails on people's individual computers, and we searched all of those, but there was no -- the holding company had no back-up system at the time.

ALJ THOMAS: You've looked at the servers and all that to determine whether there's anything other that the people's individual PCs or desktop computers that would contain information?

MR. LICHTBLAU: I'll have to go back and see exactly how we verified there was no other way. But I've been told. I have no reason to doubt that there is no backup.

MR. BASS: I'm a little confused because I thought what was said previously that there was a requirement to retain documents shortly following the start of the subject period, was there not?

Was there any requirement to retain documents -- pursuant to the document retention policy, wasn't there an order that there be documents retained in response to an investigation that was transpiring?

MR. LICHTBLAU: I don't know the answer to that, but to the extent there was --

ALJ THOMAS: Mr. Yudkowsky stated that as to his clients, those clients were instructed to retain documents. And it would make sense that there would have been a similar order with regard to your client. I'd like you to ascertain whether there was any such order.

MR. LICHTBLAU: Yeah, and I will certainly do that, and I would assume to the extent there was it was complied with.

ALJ THOMAS: Let's verify.

MR. LICHTBLAU: Yeah.

MR. BASS: In fact, to be clear about this -- because my memory is refreshed -- this was raised in depositions of personnel at SoCalGas. And there was an order to all Sempra companies to retain documents after a certain date -- and I don't recall this certain date -- response to an investigation initiated by the California Attorney General's office.

And it was represented at depositions of SoCalGas

personnel that that was done there at SoCalGas, so the question would be was it also done at Sempra Energy Corporation.

MR. LICHTBLAU: I'll have to check. I don't even know what date that you're referring to on that. I mean, if you know the date --

MR. BASS: Yeah, I can easily provide the date. I'd have to go back to our records and get it.

ALJ TERKEURST: I would have the same question regarding Sempra Energy resources.

MR. BASS: Yes, it would be.

ALJ THOMAS: Which is also Mr. Lichtblau's client.

I mean, it seems to me that rather than having Mr. Bass go back and look at his records, let's have you respond in some sort of declaration form or written form/ discovery response to the general question of whether there was an order to your clients to retain documents related to this gas price spike period, what the order was and what was done in response. It seems like a fair question.

MR. LICHTBLAU: I can certainly check.

ALJ THOMAS: Thank you.

MR. LICHTBLAU: I'll do that.

ALJ TERKEURST: I'm going to go off on another tangent: There was the reference made to an investigation undertaken by the Attorney General's office.

MR. BASS: Yes, ma'am.

ALJ TERKEURST: Have you pursued what documents were provided to them?

MR. BASS: No, we haven't to my knowledge, no.

ALJ THOMAS: Although, didn't you request any documents on certain issues provided to any state or other governmental entity?

MR. BASS: Yes, we did ask that question.

ALJ THOMAS: And wouldn't the State Attorney General qualify?

MR. BASS: And I would certainly believe it would be in that category. A question may have only been asked to SoCalGas. I don't remember off the top and neither does Ms. Lacey or Mr. Levine.

ALJ TERKEURST: There was a question earlier.

ALJ THOMAS: As to SET.

MR. BASS: SET that was asked.

MR. LICHTBLAU: There were certain questions regarding wash trading and false reporting to Sempra Energy in the nature of communications with government agencies. Those are questions to which we've objected.

ALJ THOMAS: On what grounds?

MR. LICHTBLAU: Well, if we want to move forward to those --

ALJ THOMAS: Let's just wrap up this tangent while we're on it.

MR. LICHTBLAU: What questions were they? I mean, the basic ground was that it's fishing. Sempra Energy is a holding company. It's not a trader. So we don't report to trading publications. And also you'd have to look at each of the questions individually. I think they start at 23.

Some of them aren't specific to California in any way. Some of them aren't specific to gas, and so we just felt that this was overbroad, fishing and also not related to the issues in the scoping memo that seem pertinent to Sempra Energy, which is the conduit issue.

This is the general issue of -- I forget which part of the scoping memo, but it's not an issue that had anything to do with Sempra. So it didn't seem appropriate to be asking these kinds of questions from a third party, particularly to the breadth that they weren't narrowed to California. They weren't narrowed to the gas markets.

ALJ THOMAS: Let's just back up a little bit.

It seems to me that if the California Attorney General investigated this issue, there may be documents in its possession that would be germane, and this really goes more to what you're doing than what I'm doing. I'm just wondering if you could pursue that directly with the AG's office.

MR. BASS: We will certainly inquire, but I think that's separate and apart from what we're doing here.

ALJ TERKEURST: Would they have access?

MR. BASS: That's another question that would have to be answered, and I don't know the answer to that.

ALJ THOMAS: Turning back to Question 8, Question 8 asked for documents concerning any communications from or by Sempra Energy's Risk Management Oversight Committee to a number of Sempra entities, and in response Sempra Corp produced two documents.

MR. BASS: Two emails.

ALJ THOMAS: My gut reaction is here similar to where it was on Question 2 in the set to SET, that it seems odd that there would only be two documents.

MR. BASS: And another question added to that is: Why would these two documents be saved and no other documents be saved?

ALJ THOMAS: So the question then becomes: How do we get at that? I'm wondering if a deposition wouldn't be appropriate.

MR. BASS: I think I would start with, again, as I suggested previously to -- with respect to SET, what about declarations from those who conducted searches that we know who they were and what searches they conducted? ]

ALJ THOMAS: And I ordered SET to have an attorney's declaration listing all of the parties that were asked to conduct searches of the records. I would be prepared to make the same order with regard to your client, Mr. Lichtblau.

MR. LICHTBLAU: I don't see -- I don't see --

ALJ THOMAS: Listing all the folks who were directed to search the records and what it is those folks did, what records were searched.

MR. LICHTBLAU: Yeah. I don't think that should be a problem.

ALJ TERKEURST: This would be both for Sempra Energy and Sempra Energy Resources, while we are at it.

ALJ THOMAS: I suspect there is a question as to SER in here?

MR. BASS: There are some layer questions with SER that we asked.

MR. MATTHEWS: None of -- a lot of those requests were deleted in the interest of moving discovery forward. One of the approaches to providing the entire discovery was to address your concerns, in order to narrow discovery, but also to narrow it in order to get everything moving forward. There are a number of requests that we deleted that we haven't discussed today that the only reason why they were deleted in the first place was to try to get discovery moving forward.

We are at the point now -- I've heard some discussions regarding moving some dates back. I think those are requests, though we haven't talked about them today, we would be interested in considering.

ALJ THOMAS: Why don't we just have this discussion be about Sempra, the parent company, for the sake of clarification. We will deal with SER separately. We will do this exercise with regard to them, not today obviously because we've only got five minutes on the record.

Mr. Lichtblau can provide that declaration as I've already described it as to Questions 8 and 9.

MR. MATTHEWS: There is another thing I wanted to add, your Honor, that is you were seeking thoughts about other approaches that could be taken here. And one thought that I had was that, as I understand it, these searches were done primarily by employees at Sempra. And with respect to SET's production of those searches were done by traders and

employees at SET.

And a situation like this where some questions have arisen regarding the earnestness of this search, I think it might be appropriate for the attorneys to do the searches, that is the reviewing of possible responsive documents, rather than the employees who are not attorneys, who are not legally trained, frankly, who know the issues in this case, in order determine whether something is truly responsive.

ALJ THOMAS: Let's be off the record.

(Off the record)

ALJ THOMAS: On the record.

MR. LICHTBLAU: With respect to Questions 8 and 9, every member of the Energy Risk Management Oversight Committee was contacted, as were their assistants, by Mark Randle, who is the primary member and the keeper of the group. He had extensive conversations with them about the types of documents he has and types of documents he would expect everybody else to have. Everybody knew what they were supposed to look for and provided us everything in their files that was responsive.

That is the best I can give you. I think that -- I can't imagine there would be anything we have that we didn't get.

ALJ THOMAS: Was the search though conducted by counsel for the company or by employees?

MR. LICHTBLAU: The individuals or their assistants checked the actual documents.

ALJ THOMAS: Were you over there?

MR. LICHTBLAU: I wasn't personally involved.

ALJ THOMAS: Were any of the lawyers representing them over there supervising the search?

MR. LICHTBLAU: Like sitting in their office watching what they were doing?

ALJ THOMAS: Actually going through their files or any of that?

MR. LICHTBLAU: Going through their files, no.

MR. BASS: One thing we are focusing now are on emails. We do have other documents that we can deal with in meet and confer on Thursday when we revisit this again.

ALJ THOMAS: I've ordered the parties -- I will order the parties sometime Tuesday or Wednesday to meet and confer on these questions, because you will have that time. I think that would be productive.

One more thing that came up that Judge TerKeurst asked while you were out of the room, Mr. Lichtblau, with regard to the questions that were asked about Sempra's Energy Risk Management Oversight Committee. There were also questions on the same topics that were asked -- not as to the Risk Management Oversight Committee, but to employees in the Risk Management Department.

And Judge TerKeurst, I understand your concern is those should be expanded back to include not just the Oversight Committee, but the other more broader list of risk management personnel; is that correct?

ALJ TERKEURST: Yes.

ALJ THOMAS: So why don't you meet and confer with

that understanding.

MR. BASS: Okay. We were going to have to meet and confer on Tuesday, but I will confer with you with after the hearing as to what time, Eric, all right?

MR. LICHTBLAU: I'm not sure that I will know what time I can be available.

ALJ THOMAS: It is now 4:00. We need to wrap it up. Is there anything that has to be said today?

ALJ TERKEURST: Or anything that would help make Tuesday and Wednesday go smoother for you that you need us to weigh in on?

MR. BASS: Not that I can think of right now. I think we covered just about everything. The schedule has been covered, whatever, the room to do it on Tuesday and Wednesday, and we have the Thursday hearing. I can't think of anything else at the moment.

ALJ THOMAS: Thursday's hearing will resume at 10 a.m. We will need a reporter, and one will be here at the Commission.

Mr. Thorp, I will let him know that he can call in at 2:00.

We will be off the record.

(Whereupon, at the hour of 4:03 p.m., this matter having been continued to 10:00 a.m., February 19, 2003 at San Francisco, California, the Commission then adjourned.)

**BEFORE THE PUBLIC UTILITIES COMMISSION
OF THE
STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Investigation into the Gas Market Activities of Southern California Gas Company, San Diego Gas and Electric, Southwest Gas, Pacific Gas and Electric, and Southern California Edison and their impact on the Gas Price Spikes experienced at the California Border from March 2000 through May 2001. | Investigation 02-11-040 |
| Order Instituting Investigation into the Gas Market Activities of Southern California Gas Company, San Diego Gas and Electric, Southwest Gas, Pacific Gas and Electric, and Southern California Edison and their impact on the Gas Price Spikes experienced at the California Border from March 2000 through May 2001. | Investigation 03-02-033 |

## CERTIFICATION OF TRANSCRIPT OF PROCEEDING

I, Lydia R. Radovich, Certified Shorthand Reporter No. 9223, in and for the State of California, do hereby certify that the pages of this transcript reported by me comprise a full, true and correct transcript of the testimony and proceedings held in the above-captioned matter on February 13, 2004

I further certify that I have no interest in the events of the matter or the outcome of the proceeding.

EXECUTED this 13th day of February 2004.

Lydia R. Radovich
RPR, CSR No. 9223

**BEFORE THE PUBLIC UTILITIES COMMISSION**
**OF THE**
**STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Investigation into the Gas Market Activities of Southern California Gas Company, San Diego Gas and Electric, Southwest Gas, Pacific Gas and Electric, and Southern California Edison and their impact on the Gas Price Spikes experienced at the California Border from March 2000 through May 2001. | **Law and Motion**<br><br>Investigation I.02-11-040 |
| Order Instituting Investigation into the Gas Market Activities of Southern California Gas Company, San Diego Gas and Electric, Southwest Gas, Pacific Gas and Electric, and Southern California Edison and their impact on the Gas Price Spikes experienced at the California Border from March 2000 through May 2001. | Investigation I. 03-02-033 |

**CERTIFICATION OF TRANSCRIPT OF PROCEEDING**

I, Leslie Cooper, Certified Shorthand Reporter No. 9215, in and for the State of California do hereby certify that the pages of this transcript reported by me comprise a full, true and correct transcript of the testimony and proceedings held in the above-captioned matter on February 13, 2004.

I further certify that I have no interest in the events of the matter or the outcome of the proceeding.

EXECUTED this 13th day of February 2004.

Leslie Cooper, CSR 9215

**BEFORE THE PUBLIC UTILITIES COMMISSION
OF THE
STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Investigation into the Gas Market Activities of Southern California Gas Company, San Diego Gas and Electric, Southwest Gas, Pacific Gas and Electric, and Southern California Edison and their impact on the Gas Price Spikes experienced at the California Border from March 2000 through May 2001. | Investigation 02-11-040 |
| Order Instituting Investigation into the Gas Market Activities of Southern California Gas Company, San Diego Gas and Electric, Southwest Gas, Pacific Gas and Electric, and Southern California Edison and their impact on the Gas Price Spikes experienced at the California Border from March 2000 through May 2001. | Investigation 03-02-033 |

**CERTIFICATION OF TRANSCRIPT OF PROCEEDING**

I, Ana M. Gonzalez, Certified Shorthand Reporter No. 11320, in and for the State of California, do hereby certify that the pages of this transcript reported by me comprise a full, true and correct transcript of the testimony and proceedings held in the above-captioned matter on February 13, 2004.

I further certify that I have no interest in the events of the matter or the outcome of the proceeding.

EXECUTED this 13th day of February 2004.

Ana M. Gonzalez
Ana M. Gonzalez
RPR, CSR No. 11320