Apple Inc. v. Psystar Corporation Doc. 2920

Alan R. Plutzik (State Bar No. 077785)
Kathryn A. Schofield (State Bar No. 202939)
BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
2125 Oak Grove Road, Suite 120
Walnut Creek, California 94598
Telephone: (925) 945-0200
Facsimile: (925) 945-8792

Andrew M. Schatz
Jeffrey S. Nobel
Justin S. Kudler
SCHATZ & NOBEL, P.C.
One Corporate Center
20 Church Street, Suite 1700
Hartford, Connecticut 06103
Telephone: (860) 493-6292
Facsimile: (860) 493-6290

Attorneys for Lead Plaintiff Garry Crabtree

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re FIRST VIRTUAL COMMUNICATIONS, INC. SECURITIES LITIGATION. | Master File No. C-04-3585 FMS |
| This Document Relates To:<br><br>ALL ACTIONS. | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><u>CLASS ACTION</u> |



Dockets.Justia.com

Lead Plaintiff Garry Crabtree ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following facts for this Amended Consolidated Class Action Complaint (the "Complaint"), based upon the investigation conducted by Lead Counsel, including, among other things, a review and analysis of press releases, news reports, public filings with the United States Securities and Exchange Commission (the "SEC"), documents filed with the U.S. Bankruptcy Court, and interviews with former employees of First Virtual Communications, Inc.

## I. NATURE OF THE ACTION

1. This is a class action on behalf of all persons who purchased the common stock (the "Shares") of First Virtual Communications, Inc. ("First Virtual" or the "Company") from March 29, 2004 through and including August 23, 2004 (the "Class Period" and the "Class"). Excluded from the Class are Defendants, members of Defendants' immediate families, any entity in which any Defendant has a controlling interest, and the legal representatives, heirs, successors or assigns of any such excluded person (the "Class").

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over this action pursuant to (i) Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa *et seq.* (the "Exchange Act"); and/or (ii) 28 U.S.C. §§ 1331 and 1337. The claims asserted in the Complaint arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated by the SEC.

3. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). First Virtual's principal executive office was located during the Class Period at 3200 Bridge Parkway, Suite 202, Redwood City, California, 94065, and a substantial part of the events or omissions giving rise to the claims complained of herein occurred in this District.

4. In connection with the wrongs alleged herein, Defendants used the instrumentalities of interstate commerce, including the United States mails, interstate wire and telephone facilities, and the facilities of the national securities markets.

## III. THE PARTIES

5. Lead Plaintiff Garry Crabtree purchased Shares during the Class Period, as set forth in a Certification of Named Plaintiff previously filed with the Court, and has suffered losses as a result of the wrongdoing more particularly described herein.

6. During the Class Period, Defendant Jonathan Morgan ("Morgan") was employed by First Virtual as its Chief Executive Officer and President, and was a member of First Virtual's Board of Directors.

7. During the Class Period, Defendant Truman Cole ("Cole") was employed by First Virtual as its Chief Financial Officer and Vice President (including as its Principal Financial and Accounting Officer).

8. Defendants Morgan and Cole are sometimes hereinafter collectively referred to as the "Individual Defendants."

9. At all relevant times to this litigation, First Virtual was a corporation organized under the laws of the State of Delaware. On or about January 6, 2005, First Virtual effectively ceased operations, and on January 20, 2005, the Company filed for bankruptcy. Due to the operation of the automatic stay provisions of the U.S. Bankruptcy laws, First Virtual has not been named as a Defendant in this Complaint, and was dismissed from this litigation, without prejudice.

10. At all times relevant to this Complaint, Silicon Valley Bank ("Silicon Valley Bank" or "Silicon") was a wholly owned subsidiary of Silicon Valley Bancshares (which trades on the NASDAQ under the ticker "SIVB"), with offices located at 3003 Tasman Drive, Santa Clara, California, 95054.

## IV. CONFIDENTIAL WITNESSES

11. Many of the factual allegations contained in this Complaint are attributable to the results of interviews with the following former employees of First Virtual, who provided information on a confidential basis:

(a) Confidential Witness "A": Confidential Witness "A" was employed by First Virtual as a Director of Marketing from approximately May 2003 to May 2004. During the employment of Confidential Witness "A" at First Virtual, the witness was responsible for directing

the Company's marketing plans for the Company's Government Education, Enterprise and Service Provider markets, and reported to Defendants Morgan and Cole, and individuals employed as the Company's Vice President of Marketing (there were three different people that held this title during the period of employment of the witness).

(b) Confidential Witness "B": Confidential Witness "B" was employed by First Virtual as a marketing consultant for the Company from approximately November 2003 to approximately December 15, 2004, and reported directly to Defendant Morgan.

(c) Confidential Witness "C": Confidential Witness "C" was employed by First Virtual as a Vice President of Marketing for the Company from prior to the beginning of the Class Period to approximately April 2004, and reported directly to Defendant Morgan.

(d) Confidential Witness "D": Confidential Witness "D" was employed by First Virtual as a Chief Technology Officer, Vice President of Worldwide Customer Support, and Vice President of Engineering from approximately May 2000 to September 2003, and reported directly to Defendant Morgan.

(e) Confidential Witness "E": Confidential Witness "E" was employed by First Virtual as a consultant to the Company's sales and sales operations groups from approximately November 2003 to approximately May 2004, and reported directly to Defendants Morgan and Cole.

(f) Confidential Witness "F": Confidential Witness "F" was employed by First Virtual from May 2004 to January 2005 as an Executive Account Manager, and reported to Gary McGuire (a Vice President).

(g) Confidential Witness "G": Confidential Witness "G" was employed by First Virtual from February 2004 to January 2005 as a Defense Account Manager for the Navy, NATO and Marine Corp., and reported to Gary McGuire (a Vice President).

(h) Confidential Witness "H": Confidential Witness "H" was employed by First Virtual from approximately March 2000 to January 2005 as a Director of Worldwide Technical Sales, and reported to Defendant Morgan, Frank Kaplan (Vice President of Worldwide Sales) and Confidential Witness P (Chief Technology Officer and Vice President of Technical Business).

(i) Confidential Witness "I": Confidential Witness "I" was employed by First Virtual from approximately March 2002 to January 2005 as a senior salesperson for Federal Sales, and reported to Defendant Morgan.

(j) Confidential Witness "J": Confidential Witness "J" was employed by First Virtual from approximately April 2003 to February 2004 as a Senior Product Manager and as a Senior Marketing Manager. This witness reported to Confidential Witness "A" and Roger Wallman (Director of Product Management).

(k) Confidential Witness "K": Confidential Witness "K" was employed by First Virtual from approximately May 2002 to January 2005 as a Creative Services Manager, and reported to Confidential Witness "A" and Confidential Witness "C" and Vice President of Worldwide Sales Robert Romano.

(l) Confidential Witness "L": Confidential Witness "L" was employed by First Virtual from approximately August 1999 to January 2005 as a Marketing Manager, and reported to Confidential Witness "A" and Confidential Witness "C".

(m) Confidential Witness "M": Confidential Witness "M" was employed by First Virtual from approximately March 2000 to January 2005 as a Director of Engineering, and reported to the Company's Director of Engineering (held by three different people during the period of employment).

(n) Confidential Witness "N": Confidential Witness "N" was employed by First Virtual from approximately 1996 to approximately April 2004, and reported to the Company's Vice Presidents of Worldwide Sales (held by Ray Cavanaugh, Robert Romano and Frank Kaplan during the period of employment).

(o) Confidential Witness "O": Confidential Witness "O" was employed by First Virtual from approximately 1997 to January 2005 as a U.S. Government Maintenance Account Manager.

(p) Confidential Witness "P": Confidential Witness "P" was employed by First Virtual from approximately 1994 to January 2005 as a Chief Technology Officer and Vice President of Technical Support and Professional Services, and reported to Defendant Morgan.

## V. FACTUAL BACKGROUND

### A. The Company's Business and Products

12. At all times relevant to this litigation, the Company marketed its products to enterprise customers, including business customers, government users, education and healthcare providers, as well as service providers, including AT&T, Verizon, NTT, China Telecom and Chunghwa Telecom. The Company's software revenues – over 61 percent of 2003 revenue – primarily consisted of revenue from the sale of licenses for the "Click to Meet" software product line. Support services revenue (consisting of software license subscriptions, hardware maintenance, training, installation, and consulting) accounted for over 30 percent of 2003 revenue, and was supported mainly by "Click to Meet" software sales. At all times relevant to this litigation, "Click to Meet" was marketed as a product that facilitated video conference calls.

### B. The Prior Securities Fraud Violations of Ungermann and First Virtual

13. Ralph K. Ungermann was the Company's founder. As reported in the Company's annual report for the year ended December 31, 2003 (which was filed with the SEC on Form 10-K on April 15, 2003 and signed by the Individual Defendants), the SEC brought charges against Ungermann and the Company (as well as two other senior executives) in a November 2002 complaint (the "SEC Complaint") for causing First Virtual to report overstated earnings and revenues, and then selling First Virtual stock prior to the issuance of correct financial information. The SEC Complaint alleged, *inter alia*, that First Virtual overstated its revenue (by 114%) and earnings (by approximately $3.2 million) in violation of generally accepted accounting principles caused by reporting financial results attributable to agreements with distributors that provided the distributors with the right to return the Company's products, and that First Virtual had concealed these agreements from its auditors, despite being specifically asked about them. The SEC Complaint further alleged that, in February 1999, after the false earnings release, the defendants sold a total of 330,000 shares of First Virtual stock, reaping illegal insider trading profits. Then, in April 1999, after the Company's auditors learned of the return rights that First Virtual had granted, the Company filed an annual report on Form 10-K that correctly reported First Virtual's fourth

quarter and annual revenue and earnings; after the announcement of First Virtual's correct financial results, First Virtual's stock price immediately dropped by approximately 60%. In October 2002, the Company entered into an agreement with Mr. Ungermann pursuant to which the Company retained Mr. Ungermann's services as Executive Chairman of the Board and as the Company's "principal high-level interface with its major customers" from October 1, 2002 through March 31, 2004. On December 2, 2002, in SEC Litigation Release No. 17869/ Accounting and Auditing Release No. 1679, the SEC announced that (i) it had found that First Virtual had materially overstated its 1998 financial results, and that First Virtual had consented to the issuance of a "cease and desist" order, which required First Virtual to cease and desist from violating Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder and (ii) in order to settle the claims in the SEC Complaint, the First Virtual employees named as defendants had collectively agreed to pay the SEC approximately $620,000 in disgorgement of ill-gotten gains, approximately $115,000 in prejudgment interest, and an additional approximately $620,000 as a civil money penalty.

## VI. THE MATERIAL MISREPRESENTATIONS DURING THE CLASS PERIOD

### A. Misrepresentations Concerning First Virtual's Historical Financial Results

14. The Class Period in this case begins on March 29, 2004. On that date, First Virtual filed its annual report for the year-ended December 31, 2003 with the SEC on Form 10-K (the "2003 10-K"). The 2003 10-K was signed by each of the Individual Defendants.

15. In the 2003 10-K, First Virtual reported, *inter alia*, its annual revenues for 2000, 2001, 2002 and 2003, including annual 2003 revenues of $21.323 million, annual 2002 revenues of $24.414 million, annual 2001 revenues of $27.661 million, and annual 2000 revenues of $40.011 million, as well as the specific results for each quarter of 2003.

16. In addition, the 2003 10-K stated that AT&T was one of the Company's largest customers in 2001, 2002 and 2003, and that its business with AT&T accounted for more than 10% of the Company's 2001, 2002 and 2003 revenues.

17. The 2003 10-K also set forth the Company's revenue recognition policy with respect to the sale of the Company's products:

> *Revenue Recognition*
>
> The Company applies the provisions of Statement of Position 97-2, "Software Revenue Recognition," to all transactions involving the sale of software products and hardware transactions where the software is not incidental. For hardware transactions where software is incidental, the Company applies the provisions of SEC Staff Accounting Bulletin 101, "Revenue Recognition."
>
> Revenue from the license of the Company's software products and sale of hardware products is recognized when persuasive evidence of an arrangement exists, the product has been delivered and title has transferred, the fee is fixed or determinable, and collection of the resulting receivable is reasonably assured, and, if applicable, upon acceptance when acceptance criteria are specified or upon expiration of the acceptance period.

18. On April 30, 2004, First Virtual issued a press release which announced that the Company's:

> Audit Committee is in the process of reviewing certain irregular sales transactions. Most of the transactions currently under review involve its sales operations in China. The Company has made personnel changes in China as a result of these transactions. The investigation was initiated as a result of the Company becoming aware of several of these transactions, and subsequently notifying its Audit Committee and its independent auditors. The Audit Committee has engaged independent counsel to conduct the investigation which is at its early stages. . . . The effect of the irregular sales transactions on the unaudited interim results for the quarter ended March 31, 2004 and on previously issued annual and quarterly financial statements, if any, has not been determined, and it is not known whether the Company will be required to restate prior period financial statements.

The press release also disclosed that, due to the investigation, the Company would not be able to release its first quarter (*i.e.*, the quarter ended March 31, 2004) earnings as previously scheduled (for May 4, 2004) or file its quarterly report for the first quarter on Form 10-Q as previously scheduled (for May 17, 2004). On the same day, April 30, 2004, First Virtual further reported that NASDAQ had halted the trading of First Virtual stock. The April 30, 2004 press release listed Defendant Cole as the contact person.

19. The market reacted adversely to the information reported on April 30, 2004, causing the price of the Company's stock to fall nearly 40% from its previous day's closing price of $2.54 to $1.59, on unusually high volume of more than 23 million shares.

20. By a press release dated May 19, 2004, the Company announced, *inter alia*, that it had received a letter from NASDAQ representing that the Company's securities were subject to delisting from the NASDAQ SmallCap Market, due to, *inter alia*, the failure of the Company to file its quarterly report for the period ended March 31, 2004. The May 19, 2004 press release further reported that the Audit Committee's investigation of the Company's sales transactions, previously reported on April 30, 2004, was still ongoing, and listed Defendant Cole as the contact person for information concerning these matters.

21. In reaction to this May 19, 2004 announcement, the price of First Virtual stock fell sharply to $1.37, decreasing 18.9% from its previous day's closing price of $1.69.

22. On August 17, 2004, in an SEC filing on Form 8-K (signed by Defendant Cole), First Virtual reported, *inter alia*, additional information concerning the special investigation being conducted by the Audit Committee:

> In April 2004, we announced that the audit committee of our board of directors had initiated a special investigation as a result of the identification by management of several irregular sales transactions, most of which had occurred in our Asia operations. . . . The special investigation is still ongoing; however, the portion of the investigation with respect to the initially identified transactions that took place in Asia is now substantially complete. The audit committee and its special independent counsel are still in the process of completing the investigation for certain other identified transactions and have requested information with respect to additional transactions which took place in areas outside of Asia. There is no way to know whether the investigation will result in a restatement of our financial reports or results of operations for any of our previously reported periods; however, based on the results of the investigation completed to date, no matters have arisen which would require a restatement of previously issued financial statements.

23. First Virtual further disclosed in the August 17, 2004 8-K that, prior to the April 30, 2004 disclosure of the Audit Committee investigation, the Individual Defendants had renewed their $8,000,000 of insurance coverage under a directors and officers insurance policy (the "D&O Policy"), and had been required to pay insurances premiums of approximately $1.2 million – more than twice the premiums of approximately $550,000 that had previously been required – for the renewal of the D&O Policy. Indeed, as evidenced by their March 21, 2005 filing in the Company's bankruptcy proceedings, the Individual Defendants had **already** arranged for the Company to pay these exorbitant premiums no later than April 29, 2004.

24. The August 17, 2004 8-K also reported that, as a consequence of the Audit Committee investigation, the Company would have to pay an additional $4 million in investigative costs (for lawyers and forensic accountants), and that these investigative costs "have put a severe strain on our cash resources [and] it will be essential for us to restructure our line of credit facility and other obligations, reduce our expenses and raise additional capital in the near future in order to continue to operate." As subsequently disclosed in the Company's bankruptcy filings, this investigation ended up costing the Company approximately $5 million.

25. In reaction to this August 17, 2004 SEC filing, the price of First Virtual stock again fell sharply to $0.52, decreasing by approximately 24.6% on August 17, 2004 from its closing price on August 16, 2004 of $0.69, on volume that was approximately 243% higher than the previous day's trading volume.

26. The Class Period in this case ends on August 23, 2004. On August 24, 2004, before the market opened, First Virtual issued a press release reporting that the Company had been notified that its request for an extension to comply with NASDAQ's listing requirements had been denied, and, as a result, the Company's securities would be de-listed effective with the commencement of trading on August 25, 2004.

27. In reaction to this August 24, 2004 press release, the price of First Virtual stock again fell sharply to $0.37, decreasing by approximately 47.1% on August 24, 2004 from its closing price on August 23, 2004 of $0.70, on volume of over 1,030,000 shares – approximately 32 times higher than the previous day's trading volume.

28. On November 18, 2004, in an SEC filing on Form 8-K (signed by Defendant Morgan), First Virtual reported that Defendant Cole and Andrew Morrison (the Company's Corporate Controller) had resigned from First Virtual. According to Confidential Witness B, Defendant Cole had to resign on November 18, 2004 because he refused to sign the November 19, 2004 8-K, described in paragraph 29 below.

29. On the next day, November 19, 2004, in an SEC filing on Form 8-K (signed by Defendant Morgan), First Virtual *inter alia,* reported the following information:

(a) The November 19, 2004 8-K disclosed that the special investigation of its audit committee had been completed, and it would be necessary for First Virtual to restate its financial results for the years ended December 31, 2001, December 31, 2002 and December 31, 2003, as well as the quarterly interim financial statements for the quarters ended March 31, June 30, September 30 and December 31 of each of those years.

(b) The November 19, 2004 8-K further disclosed that the Company had also prematurely recognized revenue from contracts with one of its U.S. customers (*i.e.*, in addition to improper revenue recognition attributable to sales transactions in the Company's operations in China):

> The audit committee determined that revenues related to contracts with one of our U.S. customers were prematurely recognized in a quarter preceding the quarter in which the transactions should have been recognized under applicable revenue recognition rules, American Institute of Certified Public Accountants' Statement of Position 97-2 (SOP 97-2), "Software Revenue Recognition" and Securities and Exchange Commission Staff Accounting Bulletin 104 (SAB 104), "Revenue Recognition." Under SOP 97-2 and SAB 104, a requirement for revenue recognition is the occurrence of acceptance or expiration of the acceptance period when acceptance criteria are specified. The audit committee's investigation revealed that the acceptance requirement was not met in the quarters in which revenue was recognized for certain transactions relating to purchases of product by the U.S. customer.

According to Confidential Witness D, AT&T Corporation was the "U.S. customer" referred to by First Virtual and the Individual Defendants in the Company's November 19, 2004 8-K as being involved in certain sales transactions with First Virtual in which the Company prematurely recognized revenue.

(c) The November 19, 2004 8-K further disclosed that the audit committee's investigation had adversely affected, and would continue to adversely affect, the Company's relationship with its customers and the Company's ability to generate revenue and sales:

> [A]s a result of the special investigation, our customers have questioned our financial viability, resulting, we believe, in reduced product sales. In addition, as a result of the restatement of our financial results, our customers may continue to question our financial viability and to also question our integrity, which could materially adversely affect our business, financial

> condition and results of operations. We cannot determine the extent to which our revenue may be adversely impacted by the results of the special investigation and the restatement of our financial results.

30. The 2003 10-K was false and misleading when issued because, as disclosed by First Virtual and the Individual Defendants, and as more particularly alleged above, First Virtual and the Individual Defendants admitted that the Company's annual and quarterly financial statements for 2001, 2002 and 2003 had been prepared and issued in violation of GAAP, and accordingly, needed to be restated. The errors in the Company's financial statements contained in the 2003 10-K were primarily attributable to two areas: (i) improper sales transactions and improper revenue recognition from its operations in China; and (ii) improper sales transactions and improper revenue recognition from transactions in its U.S operations.

31. According to Confidential Witness A, the revenue that was improperly recognized and reported by First Virtual from its operations in China arose from the conduct of Mr. Bing Liao, First Virtual's Vice President of Asia Operations, working out of the Company's China office. Mr. Liao engaged in various types of improper sales transactions:

(a) According to Confidential Witnesses A and C, the Company recognized revenue from orders obtained by Mr. Liao that provided the reseller/customer with the right to return the products if the reseller/customer was unable to sell the products. According to Confidential Witness A, Defendant Cole learned these facts from Soek Yie Phan, a First Virtual accountant working in the Company's California office, when Soek Yie Phan received an e-mail from Mr. Liao informing the Company that he had sold the products to the reseller/customer with a right of return. One of these resellers was "Thumb Access," an Asian company, and Mr. Liao confirmed the "side deal" in an e-mail to Mr. Ken Lee of Thumb Access. Defendant Cole and Defendant Morgan told Confidential Witness C that they knew that Mr. Liao had sold products to customers with a right of return.

(b) The Company recognized revenue in connection with purported orders from fictitious customers. According to Confidential Witness B, in approximately the end of February 2004, Defendant Morgan said that he had learned that Mr. Liao was sending in orders from fictitious customers (*i.e.*, customers that did not really exist, or that were actually companies that he

and his wife, Ratna Widjaja, owned), and was using funds from overseas bank accounts that he controlled to pay for these orders. According to Confidential Witness E, on or about March 23, 2004, the Company's sales operations group was preparing to receive a wire transfer from a customer that had purportedly purchased the Company's product from Mr. Liao. When the paperwork was received as part of the bank verification process, several members of the Company's sales operations group determined that the funds were coming from a bank account controlled by Mr. Liao. Mr. Liao was then contacted by the Company, and he acknowledged that the payments had come out of his own bank account. When Confidential Witness E told Defendant Cole about this transaction, Cole said that this was not the first time that Liao had done this. Confidential Witness E immediately took Defendant Cole to meet with Defendant Morgan on this issue, and Defendant Morgan was fully informed about the transaction. In addition, according Confidential Witness B, Soek Yie Phan also knew about these activities of Mr. Liao (Soek Yie Phan reported directly to Defendant Cole). Confidential Witness D similarly confirmed that the Company had booked sales made by Mr. Liao to a purported reseller, when, in fact, Mr. Liao's wife actually had purchased the product.

(c) According to Confidential Witness M, Mr. Liao was entering into side deals for the sale of software serial numbers for certain "Click to Meet" upgrades.

(d) In its April 30, 2004 press release, the Company reported that "personnel changes" in China were made as a result of the improper sales transactions. In the Company's August 16, 2004 8-K, the Company and the Individual Defendants admitted that Mr. Liao was terminated from First Virtual as a result of the Company's discovery of his improper sales conduct. According to Confidential Witness K, Mr. Liao was terminated by First Virtual in March 2004, prior to the issuance of the 2003 10-K.

(e) According to Confidential Witness K, First Virtual sent an information technology ("IT") employee to China in March 2004 to confiscate records regarding Mr. Liao's activities as part of the Company's investigation concerning Mr. Liao.

(f) According to Confidential Witness F, Mr. Liao made improper sales of licenses to multiple customers using the same license number. The Company was repeatedly made

aware of the fact that Mr. Liao had made sales of licenses to multiple customers using the same license number as a result of the fact that different customers called the Company for technical support, and had been assigned the same license number.

32. According to Confidential Witnesses B, D, and E, the improper revenue recognition arising out of the Company's U.S. operations was attributable to the conduct of Sean Tyrrell and Bill Gunter, both employed as Vice Presidents of Sales for First Virtual, who worked together:

(a) First, according to Confidential Witness B, Bill Gunter (Vice President of U.S. Sales) and Sean Tyrrell (Vice President of U.S. Sales) had been entering into improper "side deals" with customers. According to Confidential Witness H, First Virtual "officially" would not sell "Click to Meet" licenses in small quantities, and "officially" required customers to purchase "Click to Meet" licenses in lots of at least 100; however, many customers who wanted to purchase "Click to Meet" did not need a 100 user license (for example, the customer did not have a need to have 100 employees use the "Click to Meet" product). As a result, Mr. Gunter and Mr. Tyrrell would allow these customers to enter into "side deals," under which the customer would sign a purchase order for the official minimum number of licenses, and, in exchange, Mr. Gunter and Mr. Tyrrell would agree on behalf of the Company that the customer would only have to pay for the number of licenses that it actually needed, and would not have to pay for the remaining licenses that it did not need (or, could pay the Company at a future date for the remaining licenses if the customer determined in the future that it later needed the additional licenses). According to Confidential Witness B, Defendant Cole admitted to Confidential Witness E that Cole had been aware of these "side deals," and had stated that he (Defendant Cole) had "a drawer full of them."

(b) Second, the Company had improperly and prematurely recognized revenue from sales transactions with AT&T through the use of "backdated" documents. According to Confidential Witnesses D and H, Sean Tyrrell was able to convince AT&T to provide First Virtual with "backdated" paperwork, which (falsely) stated that First Virtual had completed the installation of previously ordered products on dates that were prior to the last dates of various fiscal quarters, in order to purportedly justify the Company's recognition of revenue in a particular quarter. According to Confidential Witness N, Defendant Cole made all decisions regarding revenue

recognition for sales made to AT&T (as well as all revenue recognition decisions for all products sold).

(c) Third, according to Confidential Witnesses J, M, O and P, Tyrrell made many sales to customers based on false representations concerning the attributes and capability of its products. For example, one of these transactions arose from a large order from AT&T for both the Company's "Click to Meet" software product and the Company's hardware; at the time the order was obtained, First Virtual falsely represented to AT&T that the products ordered would be compatible with AT&T's ATM (ATM stands for asynchronous transfer mode) networks. However, First Virtual did not yet have a product that was compatible with AT&T's ATM networks, and was subsequently only able to provide a prototype (named "Click to Meet Premiere") that was not compatible with AT&T's ATM networks. According to Confidential Witness N, Defendant Morgan participated in the sales process in which the Company falsely promised that the Company's hardware and software products ordered would be compatible with AT&T's ATM networks. Indeed, in certain filings made in the Company's bankruptcy proceedings, dated February 8 and March 9, 2005, AT&T asserted that First Virtual breached its contract with AT&T – and exposed AT&T to liability in the tens or hundreds of millions of dollars – by failing to complete certain promised feature changes with respect to the Click to Meet product. According to Confidential Witness O, as a direct result of the many false representations by Tyrrell and Gunter concerning the attributes of the Company's products (*i.e.*, the product did not work as represented), customers made many product returns, and the amount of these product returns were quantified in internal reports known as "negative commission reports;" these "negative commission reports" were prepared every quarter for, and distributed to, Defendants Morgan and Cole, as well as Tyrrell and Gunter.

33. In addition, the facts alleged above, individually and/or collectively, give rise to a strong inference that First Virtual and the Individual Defendants knew or recklessly disregarded the fact that Mr. Liao, Mr. Tyrrell and Mr. Gunter had engaged in the improper sales conduct that was underlying the Company's need to restate the Company's 2001, 2002 and 2003 financial results, prior to the issuance of the 2003 10-K.

**B. Misrepresentations That First Virtual Had Been Awarded A "U.S. Federal Government Contract" By The U.S. Air Force For "Click to Meet"**

34. In the 2003 10-K, First Virtual represented, *inter alia*, that while various agencies of the U.S. Government used its "Click to Meet" product, the Company had not made any direct sales to the United States government; instead, First Virtual had only been able to sell its "Click to Meet" products to resellers that ultimately sold the "Click to Meet" product to the United States government.

35. On Tuesday, March 30, 2004, the Company issued a press release which reported that First Virtual had been awarded a Blanket Purchase Agreement with the U.S. Department of Defense for "Click to Meet" (the "BPA"). According to Defendant Morgan (who made the following statement in the March 30, 2004 press release), the BPA purportedly enabled all agencies of the Department of Defense to purchase "Click to Meet":

> We are now able to extend a powerful and interoperable communications infrastructure to the entire Department of Defense and its constituents. This blanket purchase agreement now makes it easier and more affordable for the support, administrative and intelligence agencies to purchase Click to Meet.

36. On Tuesday, April 6, 2004, before the stock market opened, First Virtual issued the following press release (the "April 6 Release"):

> First Virtual Communications Awarded Contract To Supply Click to Meet to U.S. Air Force Headquarters.
>
> Through the Air Force Pentagon Communications Agency contract award, First Virtual will provide Click to Meet software to support classified voice, video and data communications.
>
> First Virtual Communications, Inc. (Nasdaq: FVCX - News), a premier provider of infrastructure and solutions for real-time, rich media communications, today announced that the company has been awarded a U.S. Federal Government contract to provide its award-winning Click to Meet(TM) rich media web communications to the U.S. Air Force. Through this award, the Air Force Pentagon Communications Agency (AFPCA) will have access to real-time voice, video and data collaboration services provided as a managed service.
>
> Jonathan Morgan, president and CEO of First Virtual Communications commented, "We continue to demonstrate our leadership in Department of Defense (DoD) command and control applications, and this AFPCA award ensures that our Air Force has the communications infrastructure necessary to share intelligence and prepare and respond rapidly in critical situations.

> Click to Meet provides the interoperable, scalable and easy-to-use solutions necessary to meet the critical requirements of the U.S. Air Force Pentagon Communications Agency. We are proud to have been chosen to join AFPCA in meeting the demands of this imperative mission."
>
> * * * *
>
> Supporting about 7,500 Defense Department users in the region, AFPCA provides a full range of unclassified and classified, mission-essential IT services. Customers served by AFPCA include officials at Air Force Headquarters, the Office of the Secretary of the Air Force, the Joint Chiefs of Staff, the National Military Command Center (NMCC), plus several other government agencies who work with DoD.
>
> Click to Meet has a strong, proven track record in mission-critical DoD applications, with over 10,000 ports deployed as part of the DoD's Defense Collaborative Tool Suite (DCTS). First Virtual's Click to Meet Conference Server is the interoperability standard for the DCTS multi-point audio and video solution. First Virtual also participates in many other programs and testing laboratories, including the Internet Voice Distribution System (IVoDS) program for the NASA Marshall Space Flight Center; Battle Video Teleconferencing (BVTC) program for the US Army Fort Monmouth, NJ; and the Joint En-route Mission Planning and Rehearsal System Near-Term (JEMPRS-NT) program for Joint Forces Command (JFCOM).

37. According to Confidential Witnesses A and I, each of the Individual Defendants participated in the drafting of, and approved the contents of, the April 6 Release.

38. In reaction to the April 6 Release, the price of First Virtual common stock rose over 67% from a closing price of $2.33 per share on April 5, 2004 to a closing price of $3.91 per share on April 6, 2004 on unusually high volume (over 25 million shares, or over 16 times the trading volume of April 5, 2004).

39. On April 6, 2004, Bloomberg issued the following report concerning the April 6 Release:

> Shares of First Virtual Communications, Inc., which makes video-conferencing software, rose 68% after the company said it was awarded a contract by the U.S. government. The shares were the leading gainers on the Nasdaq Stock Market.
>
> The contract is to provide classified video-conferencing systems to about 7,500 U.S. Air Force users. The contract is part of a strategy by the company to sell to government customers, Chief Executive Jonathan Morgan said.
>
> "We have announced in the past two weeks a very significant focus on the government and specifically the Department of Defense, " he said. "Getting access to one of the pieces of the U.S. Government and the U.S. military, mainly the Air Force, it's a huge win for us."

40. The April 6 Press Release was false and misleading when made because First Virtual had not been awarded a "U.S. Federal Government contract" to provide its "Click to Meet" product to the U.S. Air Force:

(a) According to Confidential Witnesses A, E, I, and O, First Virtual had not been awarded a "U.S. Federal Government contract" to provide its "Click to Meet" product to the U.S. Air Force.

(b) In addition, as evidenced by a document entitled, "All Contract Actions for First Virtual Communications 1994-2004" (which was transmitted by the Department of Defense's Office of Freedom of Information and Security Review, in response to a January 2005 Freedom of Information Act request), the Department of Defense had no record of any contract having been awarded by the U.S. Federal Government to First Virtual in 2004 to provide any products or services to the U.S. Air Force. A Senior Advisor of Information and Privacy from the Department of Defense's Office of Freedom of Information and Security Review confirmed that if a contract to provide a product to the U.S. Air Force had actually been awarded to First Virtual, then such a contract would be listed on the document entitled, "All Contract Actions for First Virtual Communications 1994-2004."

(c) Similarly, in connection with its January 20, 2005 Chapter 11 Bankruptcy petition, First Virtual filed a schedule listing its contracts (the "Schedule"). Although other contracts to provide military-related goods and services appear on the Schedule, there is no contract listed on the Schedule between First Virtual and U.S. Federal Government to provide any goods or service to the Air Force.

(d) In February 2005, First Virtual filed a copy of the February 21, 2005 asset purchase agreement (under which RADvision Ltd. purchased the Company's "Click to Meet" product and substantially all other assets from First Virtual) with the U.S. Bankruptcy Court. Schedule 3.06(b) to that asset purchase agreement (entitled "Government Contracts; Defaults") purports to list all of First Virtual's government contracts, but fails to contain any reference whatsoever to any purported contract between First Virtual and the U.S. Federal Government to provide any goods or service to the Air Force.

41. The following facts, individually and/or collectively, give rise to a strong inference that First Virtual and the Individual Defendants knew or recklessly disregarded the fact that First Virtual had not been awarded a "U.S. Federal Government contract" to provide its "Click to Meet" product to the U.S. Air Force prior to and at the time of issuance of the April 6 Release:

(a) According to Confidential Witness L, in March 2004, Defendants Morgan and Cole approved of a plan referred to within First Virtual as "Operation Thunder." Under the "Operation Thunder" plan, First Virtual would, beginning in late March, 2004, issue a press release each week that would mislead the public concerning the purported success of the Company with respect to its efforts to obtain government contracts with the U.S. military. According to Confidential Witness L, "Operation Thunder" was designed to start small and then build momentum with the issuance of a significant press release concerning the purported success of the Company's products. According to Confidential Witness A, the decision to conduct "Operation Thunder" was the culmination of a process that began in approximately February 2004. Specifically, on February 8 or 9, 2004, the Company conducted an internal sales conference in California and announced to the participants that due to the Company's dismal sales for 2003, the Company's marketing employees had decided to implement a new strategy for First Virtual: First Virtual would heavily market itself as a government platform company (*i.e.*, a company that sold products that were designed to serve the needs of government agencies) to attract the attention of government agencies, and even planned to change its name. (The decision to change the focus of its marketing was the result of an internal study of the entire Company conducted in November and December 2003, designed to identify the problems within its sales groups). First Virtual employees, along with Vigon/Ellis (a marketing firm), BroadPR (a public relations firm), and other consultants, then spent the next several weeks designing the Company's "re-branding plan." The Company's March 30, 2004 press release (described at paragraph 35, above) was the first press release issued pursuant to "Operation Thunder," and the April 6 Release was the second press release issued in accordance with "Operation Thunder."

(b) According to Confidential Witnesses A and I, each of the Individual Defendants participated in the drafting of, and approved the contents of, the April 6 Release. In

addition, according to Confidential Witness I, the witness spoke with Defendant Morgan while Defendant Morgan was drafting the April 6 Release, and Defendant Morgan knew that First Virtual had not been awarded a contract by the U.S. Federal Government to supply any goods or services to the Air Force.

**C. Silicon Valley Bank**

42. On or about April 3, 2003, Silicon Valley Bank (the "Bank") entered into a Loan and Security Agreement with First Virtual (the "Agreement"), which, *inter alia,* allowed First Virtual to borrow up to $3.0 million.

43. Also on or about April 3, 2003, in connection with the Agreement, the Bank was issued certain warrants to purchase First Virtual stock. The warrant agreement was signed by Defendants Morgan and Cole on behalf of the Company and by Chris Stedman on behalf of the Bank (the "Warrant"). The total number of shares that the Bank could purchase pursuant to the Warrant was 56,250 shares (adjusted for First Virtual's 1 for 5 reverse stock split on June 30, 2003).

44. According to Confidential Witnesses G and H, Defendant Morgan's brother-in-law was employed at the Bank and was one of the Bank employees who administered the relationship between the Bank and First Virtual.

45. Pursuant to the express terms of the Agreement with the Bank, First Virtual was contractually obligated to provide the Bank with material, non-public information with respect to the Company's business and financial condition on a regular basis. For example:

(a) Under Section 3.10 of the Agreement with the Bank, First Virtual was obligated to "promptly inform" the Bank of any proceeding or investigation affecting First Virtual involving any single claim of $50,000 or more, or involving $100,000 or more in the aggregate.

(b) Section 4.6 of the Agreement obligated First Virtual to notify the Bank of all disputes or claims regarding its Accounts (*i.e.*, all accounts receivable and other sums owing to First Virtual).

(c) Section 5.3 of the Agreement required First Virtual to provide the Bank with the following written reports:

(i) Monthly transaction reports and schedules of collections (within fifteen days after the end of each month);

(ii) Monthly accounts receivable agings, aged by invoice date (within fifteen days after the end of each month);

(iii) Monthly accounts payable agings, aged by invoice date, and outstanding or held check registers, if any (within fifteen days after the end of each month);

(iv) Monthly reconciliations of accounts receivable agings (aged by invoice date), transaction reports, and general ledger (within fifteen days after the end of each month);

(v) Monthly unaudited financial statements, as soon as available, and in any event within thirty days after the end of each month;

(vi) Monthly Compliance Certificates, within thirty days after the end of each month, in such form as Silicon shall reasonably specify, signed by the Chief Financial Officer of First Virtual, certifying that as of the end of such month, First Virtual was in full compliance with all of the terms and conditions of the Agreement, (or, if First Virtual was not in such full compliance, specifying the nature and period of existence of such non-compliance), and setting forth calculations showing compliance (or non-compliance, as the case may be) with the financial covenants set forth in the Agreement and such other information as Silicon shall reasonably request, including, without limitation, a statement that at the end of such month there were no held checks;

(vii) Quarterly unaudited financial statements, as soon as available, and in any event within forty-five days after the end of each fiscal quarter;

(viii) Annual operating budgets (including income statements, balance sheets and cash flow statements, by month) for the upcoming fiscal year of First Virtual within thirty days prior to the end of each fiscal year;

(ix) Annual financial statements, as soon as available, and in any event within 120 days following the end of First Virtual's fiscal year, certified by, and with an unqualified opinion of, independent certified public accountants acceptable to the Bank;

(x) "such other written reports with respect to Borrower (including budgets, sales projections, operating plans and other financial documentation), as Silicon shall from time to time specify in its good faith business judgment."

(d) In Section 5.4 of the Loan and Security Agreement, the Bank represented that it:

> AGREES TO TAKE REASONABLE STEPS TO TREAT ALL MATERIAL, NON-PUBLIC INFORMATION REGARDING BORROWER AND THE OPERATIONS, ASSETS, AND EXISTING AND CONTEMPLATED BUSINESS PLANS OF BORROWER IN A CONFIDENTIAL MANNER

46. On April 27, 2004, just three days before the Company's April 30, 2004 press release described above announcing that the Audit Committee had been investigating the Company's irregular sales transactions, the Bank sold all of the 56,250 shares of First Virtual stock that it had purchased pursuant to the Warrant. This sale of stock by the Bank was unusual in timing and amount, as the Bank sold all of its shares purchased pursuant to the Warrant, and prior to this sale, the Bank had never sold any of shares of First Virtual stock.

47. Pursuant to the familial relationship between the Bank and Defendant Morgan, and the reporting requirements of the Loan and Security Agreement, the Bank was in possession of material, non-public information concerning the Company prior to its sale of First Virtual stock, including but not limited to the (a) commencement of the investigation by the Company's Audit

Committee described above and (b) payment of the exorbitant insurance premiums described above.

**D. First Virtual's Bankruptcy**

48. On January 10, 2005, in an SEC filing on Form 8-K (signed by Defendant Morgan), First Virtual reported that it had "indefinitely furloughed all of our employees" due to the Company's "deteriorating liquidity situation."

49. On January 20, 2005, in an SEC filing on Form 8-K (signed by Defendant Morgan), First Virtual reported that on January 20, 2005, the Company had filed for bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Northern District of California, San Francisco Division.

50. On March 15, 2005, First Virtual completed a sale of substantially all of its assets for $7.15 million in cash and assumption of certain liabilities. RADvision, Ltd. purchased the assets. As part of the sale, Defendant Morgan received, *inter alia,* $200,000 and 20,000 RADvision stock options.

**E. No Safe Harbor**

51. The statutory safe harbor provided for "forward-looking statements" under certain circumstances does not apply to the misrepresentations identified in this Complaint because the statements were misrepresentations of historical facts or current or past conditions.

52. To the extent any of the misrepresentations identified in this Complaint are deemed to be forward-looking statements, the statutory safe harbor does not apply because First Virtual and the Individual Defendants did not specifically identify those statements as forward-looking statements and the statements were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward looking statements.

53. To the extent that the statutory safe harbor does apply to any statements pleaded herein, the Individual Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the Individual Defendants knew that the particular forward-looking statement was false, and/or the forward-looking statement was

authorized and/or approved by an executive officer of First Virtual who knew that those statements were false when made.

### F. Class Action Allegations

54. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of the Class.

55. The members of the Class are so numerous that joinder of all members of the Class is impractical. While the exact number of Class Members is unknown to the Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff reasonably believes that there are thousands of members of the Class located throughout the United States. As of March 15, 2004, approximately 14,564,271 Shares were issued and outstanding. During the Class Period, the Shares were actively traded on the NASDAQ Small-Cap Market under the designations "FVCX," "FVCXE," and "FVCCE."

56. Plaintiff's claims are typical of the claims of the other members of the Class because the damages suffered by Plaintiff and all Class Members arise from and were caused by the same or similar misrepresentations and omissions made by or chargeable to the Individual Defendants as alleged herein. Plaintiff does not have interests antagonistic to, or in conflict with, the Class.

57. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by the acts alleged herein;

(b) whether First Virtual and the Individual Defendants misrepresented and/or failed to disclose material facts in the Company's press releases, annual reports, and quarterly reports, as more particularly described above;

(c) whether the market price of the Company's Shares was artificially inflated during the Class Period due to the material misrepresentations and/or nondisclosures complained of herein; and

(d) whether the members of the Class have sustained damages, and, if so, the proper measure of such damages.

58. Plaintiff will fairly and adequately protect the interests of the other members of the Class, and Plaintiff has retained counsel competent and experienced in class and securities litigation to further ensure such protection and intend to prosecute this action vigorously.

59. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is so numerous and geographically dispersed that it would be impracticable for each member of the Class to bring a separate action or to be joined in an individual action. The individual damages of any member of the Class may be relatively small when measured against the potential costs of bringing this action, and thus make the expense and burden of this litigation unjustifiable for individual actions. In this class action, the Court can determine the rights of all members of the Class with judicial economy.

60. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the stock of the Company traded in an efficient market, as it traded at a high weekly volume, was followed and reported on by securities analysts, had numerous market makers, was eligible to file SEC registration form S-3, and there are empirical facts showing a cause and effect relationship between unexpected corporate events or financial news and an immediate response in the stock price;

(d) the misrepresentations and omissions alleged would tend to mislead a reasonable investor concerning First Virtual's business and/or financial condition; and

(e) Plaintiff and members of the Class purchased their First Virtual stock at prices that were artificially inflated due to Defendants' material misrepresentations and omissions.

61. There will be no difficulty in the management of this litigation which would preclude its maintenance as a class action. The names and addresses of the record owners of the Shares purchased during the Class Period are available from the Company's transfer agent. Notice can be provided to such record owners and all Class Members by a combination of published

notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

## VII. CLAIMS FOR RELIEF

### COUNT I

**(Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)**

62. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

63. This Count is asserted against the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

64. During the Class Period, the Individual Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (a) conceal the adverse facts concerning the Company's operations, particularly with respect to its business and financial condition; (b) artificially inflate and maintain the market price of First Virtual common stock; and (c) caused Plaintiff and the other members of the Class to purchase First Virtual common stock at inflated prices, thus causing injury to Plaintiff and the other members of the Class.

65. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Individual Defendants participated directly or indirectly in the preparation and/or issuance of the SEC filings, press releases and other statements and documents described above, all of which were designed to and did influence the market for First Virtual common stock. Such reports, filings,

releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about First Virtual's business and financial results.

66. The Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, the Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of the Individual Defendants were committed willfully or with reckless disregard for the truth. In addition, each Individual Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above. As alleged herein, the Individual Defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, by virtue of their receipt of information reflecting the true facts regarding First Virtual, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning First Virtual, participated in the fraudulent scheme alleged herein.

67. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of First Virtual common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning First Virtual's business and financial condition that were concealed by the Individual Defendants, Plaintiff and the other members of the Class purchased First Virtual common stock at artificially inflated prices and relied upon the price of the stock, the integrity of the market for the stock and/or upon statements disseminated by the Individual Defendants and were damaged thereby.

68. The misrepresentations and misconduct directly and proximately caused injury and damages to Plaintiff and the Class. The price of First Virtual stock was artificially inflated throughout the Class Period. The price of First Virtual stock decreased upon disclosure of the true facts which had been concealed. Plaintiff and the Class purchased their First Virtual stock when the price of that stock was artificially inflated, and held stock at the time of the disclosures of the true facts. The loss suffered by Plaintiffs and the Class was caused by the misrepresentations by the Company and the Individual Defendants. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value of First Virtual stock was substantially lower than the prices paid by Plaintiff and the other members of the Class.

69. By reason of the conduct alleged herein, the Individual Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10-5 promulgated thereunder and caused injury and damages to Plaintiff and the other members of the Class.

## **COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

70. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71. During the Class Period, because of their position of control and authority as senior officers and directors of First Virtual, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings that First Virtual disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause First Virtual to engage in the wrongful acts complained herein. Therefore, the Individual Defendants were "controlling persons" of First Virtual within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged that artificially inflated the market price of First Virtual common stock.

72. As controlling persons of First Virtual, the Individual Defendants are liable pursuant to Section 20 of the Exchange Act for the violations of First Virtual.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

(a) Determining that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, and certifying the named class Plaintiff;

(b) Requiring the Individual Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

(c) Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

(d) Awarding such other and further relief as this Court may deem just and proper.

## VIII. JURY DEMAND

Plaintiff demands a trial by jury.

Dated: April 29, 2005

BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP

Kathryn A. Schofield
Attorneys for Plaintiff

BRAMSON, PLUTZIK, MAHLER &
BIRKHAEUSER, LLP
Alan R. Plutzik
Kathryn A. Schofield
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0200

SCHATZ & NOBEL, P.C.
Andrew M. Schatz
Jeffrey S. Nobel
Justin S. Kudler
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT 06103
Telephone: (860) 493-6292

Attorneys for Lead Plaintiff Gary Crabtree

Additional Plaintiffs' Attorneys:

MILBERG WEISS BERSHAD & SCHULMAN, LLP
Jeff S. Westerman
Elizabeth P. Lin
355 South Grand Avenue, Suite 4170
Los Angeles, CA 90071
Telephone: (213) 617-1200