PAMELA E. COGAN (SBN 105089)
KATHRYN C. CURRY (SBN 157099)
ERIN A. CORNELL (SBN 227135)
ROPERS, MAJESKI, KOHN & BENTLEY
1001 Marshall Street
Redwood City, CA 94063
Telephone: (650) 364-8200
Facsimile: (650) 780-1701

Attorneys for Defendant
LIBERTY LIFE ASSURANCE COMPANY OF BOSTON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL CREMIN,

Plaintiff,

v.

McKESSON CORPORATION EMPLOYEES' LONG TERM DISABILITY BENEFIT PLAN, LIBERTY LIFE ASSURANCE COMPANY OF BOSTON,

Defendants.

CASE NO. C 04-04394 CW

**LIBERTY LIFE ASSURANCE COMPANY OF BOSTON'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS CROSS MOTION AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: STANDARD OF REVIEW**

Date: May 27, 2005
Time: 10:00 a.m.
Judge: Hon. Claudia Wilkin

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Apple Inc. v. Psystar Corporation
Doc. 2932



Dockets.Justia.com

## TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 1

A. DESCRIPTION OF PLAINTIFF ..... 1

B. CREMIN SUBMITS A CLAIM FOR DISABILITY BENEFITS ..... 2

C. PREFERRED WORKS RECEIVES OFFICE NOTES FROM DR. KARALIS AND DR. GERSHENGORN ..... 2

D. CREMIN'S CLAIM FOR LONG TERM DISABILITY BENEFITS IS APPROVED ..... 3

E. LIBERTY BECOMES THE CLAIMS ADMINISTRATOR FOR THE McKESSON PLAN ..... 4

F. DR. GERSHENGORN PROVIDES UPDATED MEDICAL INFORMATION ..... 5

G. CREMIN'S CLAIM IS REFERRED TO LIBERTY'S MANAGED DISABILITY SERVICES UNIT FOR A MEDICAL REVIEW ..... 7

H. LIBERTY CONTINUES TO MONITOR THE CLAIM ..... 7

I. CREMIN'S CLAIM FOR LONG TERM DISABILITY BENEFITS IS DENIED ..... 10

J. LIBERTY REQUESTS A PSYCHIATRIC PHYSICIAN REVIEW ..... 11

K. LIBERTY UPHOLDS THE DENIAL OF CREMIN'S CLAIM FOR DISABILITY BENEFITS ..... 12

III. THE MCKESSON PLAN ..... 13

IV. LEGAL ARGUMENT ..... 15

A. THE APPLICABLE STANDARD OF REVIEW IS AN ABUSE OF DISCRETION ..... 15

A. LIBERTY'S ROLE AS BOTH CLAIMS ADMINISTRATOR AND INSURER DOES NOT AFFECT THE STANDARD OF REVIEW ..... 15

1. Liberty Conducted a Thorough and Fair Investigation of the Claim ..... 16

2. Liberty Was Not Looking for a Way to Deny the Claim ..... 17

3. Liberty's Denial Was Not Based On An Obviously Erroneous Findings ..... 18

4. Liberty Provided Plaintiff With A Full and Fair Review on Appeal ..... 19

5. Liberty Was Not Required To Obtain An Independent Medical Examination Before Denying Plaintiff's Claim ..... 20

B. LIBERTY APPLIED THE PROPER DEFINITION OF DISABILITY AND OTHER APPLICABLE PLAN TERMS ..... 22

1. Liberty Applied The Correct Definition of Disability ..... 22

2. The McKesson Plan Requires Objective Medical Evidence and Regular and Continuous Care of a Physician ..... 23


Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

**TABLE OF CONTENTS**
**(continued)**


**Page**

C. LIBERTY CONSIDERED ALL OF THE MEDICAL INFORMATION BEFORE MAKING A DECISION ........ 24

II. CONCLUSION ........ 26


Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Atwood v. Newmont Gold Co.*, 45 F.3d 1317-1322 (9th Cir. 1995) ........ 15

*Bendixen v. Standard Insurance Co.*, 185 F.3d 939, 943-944 (9th Cir. 1999) ........ 15

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822-833, 123 S. Ct. (1965) ........ 22

*Boomis v. Metropolitan Life Insurance Co.*, 970 F. Supp. 584 (E.D. Mich. 1997) ........ 22

*Boyd v. Trustees of United Mine Workers Health and Retirement Fund*, 873 F.2d 57 (5th Cir. 1989) ........ 22

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989) ........ 15

*Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 63 F. Supp. 2d 1145, 1156 (C.D.Cal. 1999) ........ 20, 24

*Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 878 (9th Cir. 2004) ........ 20, 24, 25

*Kearney v. Standard Insurance Co.*, 175 F.3d 1084 (9th Cir. 1999) ........ 15

*Kocsis v. Standard Insurance Co.*, 142 F. Supp. 2d 241 (D.Conn. 2001) ........ 21

*Madden v. ITT Long Term Disability Plan*, 914 F.2d 1279 (9th Cir. 1990) ........ 22

*McDaniel v. The Chevron Corp.*, 203 F.3d 1099, 1105 (9th Cir. 2000) ........ 15

*Miller v. Metropolitan Life Insurance Co.*, 925 F.2d 979 (6th Cir. 1991) ........ 21

*Scott v. Prudential Insurance Co. of America*, 2005 U.S. Dist. LEXIS 1251 (W.D.Mich. 2005) ........ 20

*Stith v. Prudential Insurance Co. of America*, 2005 U.S. Dist. LEXIS 2000 (D.N.J. 2005) ........ 20

*Tremain v. Bell Industrial, Inc.*, 196 F.3d 970 (9th Cir. 1999) ........ 15

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

## FEDERAL STATUTES

29 C.F.R. 2560.503-1 (1997) ........ 20

29 C.F.R. 2560.503-1(b) ........ 19

29 C.F.R. 2560.503-1(g) ........ 19

Section 503 of ERISA, 29 U.S.C. § 1133 ........ 19

## I. INTRODUCTION

This ERISA action arises out of the discontinuation of long-term disability benefits to plaintiff Michael Cremin ("Cremin") under the McKesson HBOC Inc. Employees Long Term. Disability Plan. ("McKesson Plan.") Plaintiff received long-term disability benefits from August 1998 through July 7, 2000 when it was determined that plaintiff was no longer "disabled" within the meaning of the McKesson Plan.. Prior to January 1, 2000, the McKesson Plan was self-insured. On January 1, 2000, pursuant to a Reserve Buy Out Agreement, Liberty Life Assurance Company of Boston ("Liberty") became responsible for the administration and payment of Cremin's claim. Plaintiff now seeks review of Liberty's decision, which is entitled to review by this court for an abuse of discretion. The McKesson Plan clearly and unambiguously confers discretion on Liberty to interpret the Plan and to determine plaintiff's eligibility for benefits. Although Liberty was the claims administrator and responsible for payment of the claim after January 1, 2000, there is no material or probative evidence that Liberty breached its fiduciary obligations to plaintiff that would alter the standard of review. Accordingly, the applicable standard of review is abuse of discretion

## II. STATEMENT OF FACTS

### A. DESCRIPTION OF PLAINTIFF

Cremin received a Bachelor of Science degree in Business Administration from the University of San Francisco in 1971 and an MBA from Golden Gate University in 1977. (Ex. C to McGee Decl., pp. CF-300, CF-0486.)[1] He began working at The McKesson Corporation ("McKesson") in 1980 as a Manager of Financial Analysis. By 1986 he was promoted to Director of Profitability Analyst. (CF-0300.) In 1988, he had a heart attack. (CF-0546.) Thereafter, Cremin returned to work full-time as a Director of Profitability Analyst for ten years until he left due to alleged anxiety on or about January 26, 1998. (CF-0456.) He returned to part-time work on February 10, 1998. (CF-0561.) After seven months he was told he either had to return to work full-time or move to another department. (CF-0118.) He took a vacation and then filed for disability. (CF-0118, CF-0456, CF-0539.)

[1] Hereinafter all referenced to Exhibit C, the claim file, shall be referred to as "CF."

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

### B. CREMIN SUBMITS A CLAIM FOR DISABILITY BENEFITS

On September 21, 1998, Cremin submitted a claim for long-term disability benefits under the McKesson Plan. Cremin reported the nature of his disability was coronary artery disease and anxiety. (CF-0539.) His attending physician was cardiologist, Kent Gershengorn, M.D. (CF-0539.) A Physician's Statement was also included with Cremin's Disability Claim form. (CF-0541.) Although Cremin had identified his treating physician as Dr. Gershengorn, Dr. Karalis completed it on September 10, 1998. (CF-0541.) Dr. Karalis diagnosed Cremin with severe anxiety disorder. (CF-0541.) On October 6, 1998, Preferred Works (the claims administrator) received another Physician's Statement from Dr. Karalis dated September 21, 1998. (CF-0512.) Cremin's estimated return to work date was now October 21, 1998. (CF-0512.)

On or around October 1998, Preferred Works also received copies of two Doctor's Certificates completed by Dr. Gershengorn on <u>February 4, 1998</u> and <u>April 23, 1998</u>. (CF-0504.) On February 4, 1998, Dr. Gershengorn reported Cremin had a heart attack and was now under extreme emotional stress relating to personal issues and a heavy workload. (CF-0504.) The diagnoses were coronary artery disease and anxiety. (CF-0504.) His estimated return to work date was February 16, 1998.[2] (CF-0504.)

### C. PREFERRED WORKS RECEIVES OFFICE NOTES FROM DR. KARALIS AND DR. GERSHENGORN

On or around October 1998, Preferred Works received the office notes from Dr. Karalis:

- On September 9, 1998, Dr. Karalis noted Cremin had a heart attack in 1988 and even though he had only begun treating him that day, Dr. Karalis indicated Cremin had been anxious ever since. Cremin appeared distractible, fearful and concerned about future heart attacks. His mood was mixed between anxious and depressed. <u>Cremin felt</u> he was totally unable to work. (CF-0499.)

- On September 21, 1998, Dr. Karalis reported Cremin was doing self-relaxation and was feeling better. Cremin had mild resistance, however, because <u>he felt</u> it was so hard to work at an anxious level. (CF-0499.)

On or around October 1998, Preferred Works also received further office notes and test results from Dr. Gershengorn. (CF-0480 to CF-0498)

- On January 24, 1997, Cremin reported he was feeling well but had recently developed back and hip pain. (CF-0485.)

---
[2] Cremin returned to work part-time on February 16, 1998.



Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

- In June 1997 Cremin began taking Xanax for sleep. (CF-0484.) Also in June 1997, Cremin stated he was feeling well and had begun a formal exercise program. He had no chest pain currently. (CF0485.)

- Dr. Gershengorn reported Cremin complained of chest pain and tightness on 12 occasions that would last for about 10 minutes. Cremin had increased stress due to a recent burglary and fire at his home. His coronary artery disease was stable but Cremin still had high periods of stress. (CF-0483.)

- On January 23, 1998, Cremin underwent a treadmill exercise tolerance test. The treadmill test impression was negative for myocardial ischemia at 91% predicted heart rate. Cremin had good functional capacity. (CF-0496.)

- On February 9, 1998, Dr. Gershengorn reported Cremin's recent problems appeared to be stabilized and he could now return to work for 6 hours a day, 3 days a week. (CF-0488.)

- On or around March 1998, Dr. Gershengorn noted Cremin had returned to work part-time. Although his cholesterol levels were elevated, his anxiety was better and he was to return to full-time work by May 1998. (CF-0482.)

- On August 4, 1998, Dr. Gershengorn noted Cremin spoke with his employer about changing his work situation. He was feeling well in his current 20-hour work week schedule, but he was still under stress. He had no chest pain. (CF-0480.)

Preferred Works continued to investigate Cremin's claim for eligibility and continued to receive Physician's Statements from Dr. Karalis. (CF-0414, CF-0433, CF-0452, CF-0460.) His diagnosis remained severe anxiety disorder. (CF-0465.) The "objective finding" was "anxious." (CF-0465.) The "subjective findings" were "anxiety, depression, insomnia, etc." (CF-0465.) Each listed the same diagnosis – anxiety disorder – and findings, but kept extending Cremin's return to work date. (CF-0414, CF-0433, CF-0452, CF-0460.)

### D. CREMIN'S CLAIM FOR LONG TERM DISABILITY BENEFITS IS APPROVED

On April 20, 1999, Preferred Works approved Cremin's his claim for long term disability benefits beginning July 26, 1998. (CF-0394 to CF-0395.) Cremin was advised that if he remained totally disabled for 24 months, his benefits would continue if objective medical evidence showed he was not only prevented from performing any occupation for which he was reasonably qualified by training, education and experience. It was also requested that Cremin apply for Social Security benefits. (CF-0394.)

On May 21, 1999, Cremin applied for Social Security benefits. (CF-0374.) On August 16, 1999, the Social Security Administration sent Cremin an award letter, informing him that his

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

claim was approved in the amount of $1,455 per month. (CF-0352.) On December 13, 1999 Preferred Works received another Physician's Statement, completed by Dr. Karalis on November 24, 1999. (CF-0323.) The estimated return to work date was now February 1, 2000. (CF-0323.)

### E. LIBERTY BECOMES THE CLAIMS ADMINISTRATOR FOR THE McKESSON PLAN

On January 1, 2000, Liberty became the Claim Administrator for the McKesson Plan. (CF-0325.) Liberty reviewed all medical records and continued to monitor the claim, including periodically requesting updated medical information from plaintiff's treating physicians.

On March 10, 2000, Liberty received a Restrictions Form and an Attending Physician's Statement completed by Dr. Karalis on March 6, 2000. (CF-0301 to CF-0303.) Dr. Karalis indicated Cremin saw him only as needed for his diagnosis of anxiety disorder. (CF-0301.) Although Dr. Karalis was asked to provide specific restrictions and limitations for the period February 1, 2000 to May 1, 2000, Dr. Karalis simply stated, "totally disabled." (CF-0301.) Under "objective medical findings" Dr. Karalis wrote, "anxiety, depression, agitation." (CF-0301.) In the Attending Physician's Statement, Dr. Karalis reported Cremin's diagnosis was anxiety disorder with a concurrent condition of cardiac impairment. (CF-0302.) His last visit was March 6, 2000. (CF-0302.) He indicated no cardiac impairment. (CF-0303.) The proposed treatment plan was "psychotherapy/prognosis-poor/on cardiac meds only." (CF-0303.) Dr. Karalis reported no "physical impairment" but a Class 5 mental impairment, meaning Cremin had significant loss of psychological, physiological, personal, and social adjustment. (CF-0303.) Dr. Karalis also provided office notes for the period October 15, 1998 to March 6, 2000. (CF-0304 to CF-0309.) These were very brief notes, indicating only that Cremin remained anxious and fearful of sudden death for which Dr. Karalis provided "supportive therapy." (CF-0304 to CF-0309.)

On March 10, 2000, Liberty also received a Mental Disorder Questionnaire completed by Dr. Karalis eight months earlier on June 21, 1999. (CF-0314 to CF-0318.) Cremin was receiving supportive therapy from Dr. Karalis. (CF-0314.) Currently Cremin had a fearful, constricted affect, moderate severe anxiety, and isolation but good intellect function. (CF-0315.) Cremin could perform daily activities but was careful not to overstress himself physically. (CF-0316.)

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

He did not have good adaptation to work or work-like situations because he was fearful, anxious and depressed. (CF-0317.) He was currently taking cardiac medications. (CF-0318.) The diagnosis was anxiety disorder and the prognosis was poor. (CF-0318.) Dr. Karalis reported Cremin was totally disabled for at least another 3 years. (CF-0318.)

On May 9, 2000, Liberty received a completed Activities Questionnaire from Cremin. (CF-0296 to CF-0298.) He was able to perform the activities of daily living and he could also perform most household activities, except cooking, washing floors or cleaning bathrooms. (CF-0296.) He was able to drive and travel by bus or plane. (CF-0297.) He said the number of times he left the house in a day or week varied. (CF-0297.) He sometimes went to the mall or to a friend's house or restaurant. (CF-0297.) He was not able to pursue his hobbies. (CF-0297.) He slept 1 to 4 hours each night and occasionally took a nap during the day. (CF-0297.) <u>He was able to walk 3 miles for one hour but he was not able to participate in an exercise program</u>. (CF-0297.) His daily routine consisted of getting up, feeding and exercising the dog, getting dressed, eating, listening to the radio, walking the dog again, eating and then bed. (CF-0298.)

Based on the information provided, Liberty continued to pay the claim and monitored the claim by periodically requesting updated medical records and forms. On March 27, 2001, Liberty received an Attending Physician's Statement, completed by Dr. Karalis on <u>March 20, 2001</u>. (CF-0279, CF-0282.) The primary diagnosis was anxiety disorder and the prognosis was poor. (CF-0279.) Cremin last saw Dr. Karalis on <u>March 20, 2001</u>. (CF-0279.) The estimated return to work date was "<u>never</u>." (CF-0279.) The treatment plan was psychotherapy as needed. (CF-0282.) This was a Class 5 physical limitation and there was no cardiac impairment. (CF-0282.)

Liberty also received a Mental Status Functional Capacities form, completed by Dr. Karalis on March 20, 2001. (CF-0280.) In support of the various restrictions and limitations Dr. Karalis simply stated, "totally disabled." (CF-0280.) In an equally vague Restrictions Form, received the same day, Dr. Karalis stated Cremin's estimated return to work date was "never." (cf-0281.) Under restrictions and limitations, Dr. Karalis wrote, "no work at all." (CF-0281.)

### F. <u>DR. GERSHENGORN PROVIDES UPDATED MEDICAL INFORMATION</u>

On December 17, 2001, Liberty received updated medical information from Dr.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Gershengorn including a Physical Capacities form and office notes. (CF-0016, CF-0269 to CF-0275.) In the Physical Capacities form completed on December 4, 2001, Dr. Gershengorn stated Cremin could work 8 hours per workday. He could also sit for 8 hours per day with routine breaks, stand for 2 hours, walk or kneel for one hour, climb stairs for half an hour and perform on the job driving for 4 hours in an 8-hour workday. He could not squat, bend at the waist or climb ladders. Further, he could push, pull and reach above the shoulder for half an hour. He could reach at shoulder level for 1 hour and below shoulder level for 2 hours in an 8-hour workday and could lifting and carry 20 to 30 pound range, 6 times a day. (CF-0269.) Dr. Gershengorn also provided office notes from July 21, 2000 to October 30, 2001. (CF-0270 to CF-0271; CF-0274.)

On February 4, 2002, Cremin completed an Activities Questionnaire. (CF-0257 to CF-0259.) He stated he was able to walk or sit for 1 hour. He took 2-hour naps during the day. He spent 16 hours each day in bed. He was able to drive in a car for about 1 hour. He left the house 2 to 3 times each week, and 1 to 2 times on the weekends and went to the mall once a year. He went outdoors 3 to 4 times per week. (CF-0257.) He was unable to exercise or pursue his hobbies. (CF-0258.) Cremin claimed he could not to perform his own or any occupation because of job-related stress that caused anxiety, which created heart-related problems. (CF-0258.)

On February 7, 2002, Liberty spoke with Cremin about his claim. Liberty informed him that from a cardiac perspective, based on Dr. Gershengorn's information, he was not disabled from any occupation. (CF-0015.) Cremin was asked about his plans to return to work in his own or any type of work and he responded that he had been thinking about returning but had torn some ligaments in his ankle while exercising and he was just getting over that injury. He also informed Liberty he was undergoing cardiac testing at the end of the month. Liberty said it would speak to him after the testing to find out the results. Liberty further informed him that at this point, the only issue potentially restricting him was anxiety and depression. (CF-0015.)

On February 13, 2002, Liberty received updated medical information from Dr. Karalis. He saw Cremin on March 20, 2001, July 19, 2001 and February 5, 2002. Dr. Karalis incorporated by reference his March 20, 2001 Attending Physician's Statement and said the information contained in it was correct and reflective of Cremin's current status. Cremin's estimated return to



Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

work date remained "never." Dr. Karalis only provided "supportive therapy." (CF-0247.)

## G. CREMIN'S CLAIM IS REFERRED TO LIBERTY'S MANAGED DISABILITY SERVICES UNIT FOR A MEDICAL REVIEW

On March 9, 2002, Liberty sent the claim file to its Managed Disability Services Unit ("MDS") for a medical review. (CF-0014; CF-0246; CF-0229.) Susan Leonardos, R.N. reviewed the claim file and medical records. (CF-0246.) Nurse Leonardos concluded based on her review that there was no objective evidence from Dr. Karalis to support his restrictions and limitations regarding Cremin's functional capacity. (CF-0229.)

On March 14, 2002, Nurse Leonardos telephoned Dr. Karalis to discuss the claim. During the conversation, Dr. Karalis confirmed he had not prescribed Cremin any antidepressant or anti-anxiety medications due to his cardiac condition. Dr. Karalis reported that overall Cremin was improved, that he only saw Cremin every few months and that he had never been in therapy. Nurse Leonardos explained to Dr. Karalis that to qualify for disability benefits, Cremin must be in active treatment and there must be objective medical evidence to disability. (CF-0228.)

On March 25, 2002, Nurse Leonardos spoke with Cremin regarding his claim. He reported he had undergone an angiogram 10 days earlier but he was unable to relay any information regarding its findings, except that he had blockages. He had another appointment that week with his cardiologist to discuss a treatment plan. He further reported he had no energy and suffered chest pains when walking up stairs. Cremin also said he saw his psychiatrist sporadically and had cancelled an appointment with Dr. Karalis due to cardiac testing. Dr. Karalis had given him instructions on how to handle stress. Cremin then stated he would rather have a nurse receive the information from Dr. Gershengorn because he could only relay it in "amateur terms." Based on their conversation Nurse Leonardos felt Cremin did not seem motivated to resume work at McKesson but could function in some other capacity. (CF-0227.)

## H. LIBERTY CONTINUES TO MONITOR THE CLAIM

On April 11, 2002, Liberty received the surveillance report regarding Cremin for surveillance performed on March 28, March 29 and March 30, 2002. (CF-0233 to CF-0243.) On March 28, 2002, Cremin was seen leaving his residence in his car and traveling to a grocery store

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

and fabric store in Daly City. He was seen entering and exiting his vehicle, walking and driving in a normal and natural manner. (CF-0235.) On March 29, 2002, Cremin was seen retrieving an object from his car, entering and exiting his car and walking into and out of his residence while talking on the phone in a normal and natural manner. (CF-0235.) On March 30, 2002, Cremin was seen driving to a private residence in San Francisco, again entering and exiting his car, walking, standing and driving in a normal and natural manner. (CF-0235.)

On May 7, 2002, Liberty requested updated medical information from Dr. Gershengorn. In this letter, Liberty noted Dr. Gershengorn had previously indicated Cremin was capable of working an 8-hour day (sitting 8 hours, standing 2 hours, walking 1 hour, climbing stairs for one-half hour with routine breaks and lifting up to 30 pounds 6 times a day). (CF-0224.) That day, Liberty also learned the State Medical Board had put Dr. Karalis on probation and that he had completed his probation on June 9, 1998 – only three months before he began treating plaintiff. He had also been a member of the State Bar of California, but was put on probation on November 20, 1990 due to Medicaid fraud. He completed this probation in 1995 and voluntarily resigned on November 10, 1997. (CF-0215.)

On July 30, 2002, Liberty received the requested updated medical information from Dr. Gershengorn. (CF-0186 to CF-0214.) Laboratory tests from February 22, 2002 showed an abnormal record due to the anteroseptal infarction, age undetermined and ST abnormality. His blood pressure decreased from 140/87 to 123/74 and his oxygen saturation was 100%. There were no significant EKG changes from baseline or suggestive of Dipyridamole induced ischemia. (CF-0189.) On March 11, 2002 Cremin underwent an exam that showed his lungs were clear bilaterally. His heart size and mediastinal contours were normal and no infiltrates were noted. (CF-0191.) Cremin also had blood tests on June 17, 2002 that demonstrated he had an average risk for cardiac problems. (CF-0198.) Dr. Gershengorn also provided office notes from May 8, 2001 to June 10, 2002. Cremin complained of chest pain and Dr. Gershengorn's impression was coronary artery disease. (CF-0211 to CF-0214.)

On August 6, 2002, Nurse Leonardos again spoke with Dr. Karalis. Dr. Karalis told her he had not seen Cremin for a few months and there had not been an appointment since his last

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

note of February 2002. When asked about a possible return to work, Dr. Karalis again noted he had not seen Cremin. He stated he was not saying that Cremin could not return to work and agreed that Cremin may very well have sedentary capacity. (CF-0175.)

On August 13, 2002, Liberty received updated office notes from Dr. Karalis. (CF-0170 to CF-0172.) On February 5, 2002, Cremin was complaining of chest pain everyday, especially when he was involved in any mild activity. He had an ongoing fear of dying from a heart attack. Supportive therapy was given. Despite Dr. Karalis' representations to Susan Leonardos on August 7, 2002 that he had not seen Cremin since February 2002, the office notes reported a visit on April 11, 2002, May 22, 2002, and August 6, 2002—the day before Nurse Leonardos spoke to Dr. Karalis. On April 11, 2002, Cremin was still fearful of sudden death and supportive therapy was again given. On May 22, 2002, Cremin was taking a TAM holistic approach to mental stress control to help his cardiovascular disease. Cremin was optimistic that he could avoid another heart attack. (CF-0170.) On August 6, 2002, the day before Susan spoke with Dr. Karalis, Cremin stated , "I'm either depressed or the medication (cardiac) is a problem. There is no way I can do any work." (CF-0172.)

After reviewing Cremin's file, Nurse Leonardos found that Cremin should be able to perform sedentary activity but recommended Liberty obtain specific restrictions and limitations from Cremin's cardiologist, which she did. (CF-0173.) After two requests for medical records on May 7, 2002 and July 5, 2002, Liberty finally received a Functional Capacities form, completed by Dr. Gershengorn on August 12, 2002. (CF-0169, CF-0220, CF-0224.) No restrictions were given for sitting. Cremin could stand for 1/3 to 2/3 of the day. He could also walk up to 1/3 of the day. There were restrictions for more physical types of activities and these restrictions were based on Cremin's positive stress test. (CF-0169.) Nurse Leonardos reviewed the medical information provided by Dr. Gershengorn and concluded Dr. Gershengorn appeared to support sedentary activity. (CF-0005) Nurse Leonardos also reviewed the records from Dr. Karalis and noted they also did not support total disability. (CF-0005 )

After obtaining information from Drs. Karalis and Gershengorn, Liberty requested that a Transferable Skills Analysis and Labor Market Survey be performed. (CF-0165 to CF-0166.) On

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

August 23, 2002, Liberty received the report. (CF-0165 to CF-0166.) Several vocational alternatives were identified that were consistent with Cremin's education, work experience and skills. These occupations fell within the sedentary work category and typically allowed the opportunity to change positions throughout the work day. (CF-0166.)

## I. CREMIN'S CLAIM FOR LONG TERM DISABILITY BENEFITS IS DENIED

On August 30, 2002, Liberty sent Cremin a letter informing him his claim for long term disability benefits was denied effective September 1, 2002 because it was determined he was capable of performing occupations outside his previous position and he did not meet the definition of disability beyond August 31, 2002. (CF-0156 to CF-0161.) A copy of the Transferable Skills Analysis and Labor Market Report was enclosed with this letter. (CF-0159.)

On September 13, 2002, Liberty sent Cremin a copy of the claim file, per his request. (CF-0144, CF-0155.) On October 15, 2002, Liberty received Cremin's request for an appeal of Liberty's decision. The letter contained no additional medical information but Cremin indicated he would send it as soon as possible. (CF-0154.) The entire claim file was then sent to Liberty's Appeal Review Unit on October 18, 2002 for an independent review. (CF-0145.) On October 21, 2002 Liberty requested copies of the surveillance videos to send to Cremin, per his request. (CF-0151.) On October 21, 2002, it was also noted that Liberty had sent Cremin a copy of the McKesson Plan. (CF-0144.)

On October 24, 2002, Liberty received a letter from Cremin along with a letter from Dr. Karalis dated October 18, 2002. CF-0140 to CF-0143.) Dr. Karalis disagreed with Liberty's determination that Cremin was not totally disabled. (CF-0141 to CF-0143.) On November 6, 2002, Liberty sent Cremin a letter updating him on the status of his appeal. He was advised his file was currently being reviewed in the Appeal Review Unit and a determination should be made within 20 business days. (CF-0138.) That same day a medical referral form was completed for a physician review of Cremin's claim. (CF-0119.)

On November 21, 2002, Cremin informed Liberty that his cardiologist was not in agreement with Liberty's decision to terminate his disability benefits. (CF-0134.) Cremin stated

he was sending additional medical information. (CF-0134.) Liberty informed him he needed to provide the additional information as soon as possible. (CF-0134.)

On November 22, 2002 Cremin sent a letter to Liberty confirming receipt of a copy of his claim file. (CF-0135.) Also on November 22, 2002, Liberty received a second surveillance report. (CF-0124 to CF-0133.) Surveillance was conducted on November 6, November 7, November 8, November 9 and November 10, 2002. (CF-0125 to CF-0126.) On November 26, 2002, Liberty sent Cremin a letter enclosing a copy of the surveillance videos he had previously requested. (CF-0122.)

### J. <u>LIBERTY REQUESTS A PSYCHIATRIC PHYSICIAN REVIEW</u>

After receiving Dr. Karalis' letter in which he changed his earlier position, Liberty recommended a psychiatrist review the information in the file. (CF-0118.) On November 30, 2002, Liberty received the report prepared by psychiatrist Peter Mirkin, M.D., M.B.A., LLC. (CF-0109 to CF-0116.) Dr. Mirkin reported the psychiatric information provided to support Cremin's claim that he was unable to perform full-time work in a sedentary occupation consisted of subjective symptoms and fears that he had reported to Dr. Karalis, who had taken very little clinical action to manage these claimed symptoms. Moreover, there was no valid reason not to have prescribed psychotropic medication. (CF-0109.) Depression and coronary artery disease were not mutually exclusive and both conditions should have been treated actively if they were truly causing Cremin problems. (CF-0114.) Studies show that post-heart attack patients with untreated or ineffectively treated depression were three times more likely than effectively treated patients to suffer a second heart attack. (CF-0116.) Supportive psychotherapy was not warranted for someone like Cremin who claimed overwhelming anxiety that limited his capacity to function. Furthermore, based on the information from his cardiac evaluations and the notes of Dr. Gershengorn, there was no indication of imminent threat of his cardiac disease. (CF-0109.) There were also some communication discrepancies with Dr. Karalis that raised concerns about the accuracy of information he recorded in his notes. (CF-0110.) Dr. Mirkin further noted that if Cremin was as disturbed by his symptoms as claimed, there was no indication in his records that Dr. Karalis considered the use of psychotropic medication or consulted Dr. Gershengorn about



Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

the need to do so. (CF-0115.) According to his notes on April 20, 1998, Dr. Gershengorn considered using antidepressants but there was no indication of a discussion about this with Dr. Karalis. (CF-0111.) From that standpoint, the statement in his letter to Cremin to the effect that, "you do not possess the stabilization of moods and control of psychiatric symptomatolgy required to have predictably stable cognitive functioning to perform these jobs, which assumes full cognitive functioning" appeared inaccurate because it was not supported in his office notes. Further, there did not appear to be any particular medical event or change in his symptoms that would have led to a sudden increase in his concerns about another heart attack. The major change that resulted in Cremin's leaving work appeared to be when he was presented with the need to either return to full-time work, change his job or leave the company. (CF-0110.)

Moreover, despite Dr. Karalis' opinion in his October 18, 2002 letter that Liberty's analysis was incomplete, Dr. Mirkin stated it was apparent from Liberty's August 30, 2002 letter to Cremin and in other notes and letters in the file that the evaluation of Cremin's functional capacity involved much more than the single abstraction from Dr. Gershengorn's form in coming to the conclusion that Cremin had sedentary work capacity. (CF-0115.)

## K. LIBERTY UPHOLDS THE DENIAL OF CREMIN'S CLAIM FOR DISABILITY BENEFITS

On December 6, 2002, Liberty sent Cremin a letter upholding the denial of his claim for disability benefits. (CF-0102 to CF-0106.) Cremin had not provided additional medical information to support his appeal. Based on the length of time and the amount of information he had requested and received, he had sufficient time to appeal. (CF-0103.) Based on the information in the file, Liberty determined he was able to perform the duties of his own occupation. Liberty advised that Liberty's decision was now final and his claim would remain closed. (CF-0105.)

On December 21, 2002, Cremin sent Liberty a letter from Dr. Gershengorn. (CF-0084 to CF-0085.) This letter was addressed to Cremin and was dated December 4, 2002. (CF-0085.) On December 31, 2002 Liberty sent Cremin a letter stating that, pursuant to ERISA regulations, he was afforded the opportunity to appeal the denial of his claim and to submit additional

documentation to support his claim. (CF-0083.) Cremin had exhausted his administrative remedies under ERISA and his claim remained closed. (CF-0083.)

## III. THE MCKESSON PLAN

On December 1, 1976, McKesson Corporation established the McKesson Plan. (Ex. A to McGee Decl., pp. Plan-001.)[3] As a benefit of his employment, plaintiff became a participant in the McKesson Plan. The McKesson Plan provides in part:

> The Plan Administrator shall have the exclusive rights to interpret the terms and provisions of the Plan and to determine any and all questions arising thereunder or in connection with the administration. . . . (Plan-0097.)

The Plan defines "Disability" as:

> 'Disability' shall mean any physical or mental condition arising from an illness, pregnancy or injury which renders a Participant incapable of performing work. During the first twenty-four (24) months of Disability, a Participant must be unable to perform the work of his or her regular occupation or any reasonably related occupation, and must not, except as provided in Section 3.4 [rehabilitative employment], be performing work or services of any kind for remuneration. After twenty-four (24) months of Disability, a Participant must be unable to perform the work of any occupation for which he or she is or becomes reasonably qualified by training, education or experience, and, in addition, be receiving Social Security benefits on account of his or her disability." (Plan-0022.)

The Plan also provides:

> "No Participant shall be entitled to a Disability benefit if his or her Disability arises out of, relates to, is caused by or results from the following:
>
> * * *
>
> D) an illness or injury for which he or she is not under the regular and continuous care and treatment of a Physician, unless such regular and continuous care and treatment are not medically indicated given the nature of Disability..." (Plan-034.)

The Plan also provides:

> "Eligibility for Disability benefits shall terminate upon the occurrence of any of the following events, or on the earliest of the following:
>
> * * *

[3] Hereinafter all references to Exhibit A, the McKesson Plan, shall be referred to as "Plan."



Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

> B) the day on which the Disability no longer exists, as determined by the Plan Administrator;
>
> * * *
>
> G) The Participant is no longer under the regular and continuous case and treatment of a Physician, unless such regular and continuous care and treatment are not medically indicated given the nature of the Disability, or the Participant refused to follow or rejects the treatment plan recommended by the attending Physician, unless such treatment plan is disputed in good faith and on the written advice of another physician." (Plan-0040.)

Prior to January 1, 2000, the McKesson Plan was self-insured by McKesson HBOC, Inc. and the third party claims' administrator was Preferred Works. (Decl. of McGee ¶ 2.) On January 1, 2000, Liberty issued a Group Disability Income Policy to McKesson HBOC, Inc. insuring the Plan with respect to claims <u>incurred after</u> January 1, 2000. (Decl. of McGee ¶ 3.) Effective January 1, 2000, Liberty also entered into a Reserve Buy Out Agreement ("RBO Agreement") with McKesson HBOC, Inc., the McKesson Plan and McKesson HBOC, Inc. Employees' Long Term Disability Plan Trust. (Decl. of McGee ¶ 4.)

The RBO Agreement provided in part:

> As of the effective date of this Agreement Liberty will make all decisions as to coverage, amount and continued eligibility of benefit payments with respect to all Claimants. Liberty has the right to investigate these claims arising under the Plan and the Employer, the Plan and/or Trust hereby assign to Liberty all of their rights to investigate these claims. The provisions in the Plan regarding proof of loss and notice of claim will apply to such claims. **Liberty has the authority in its sole discretion to construe the terms of the Plan and to determine benefit eligibility with respect to persons claiming benefits under the Plan and pursuant to this Agreement. Decisions of Liberty regarding construction of the terms of the Plan and benefit eligibility are conclusive and binding.**" (Exhibit B to McGee Decl., pp. LC-003, emphasis added.)

Pursuant to the RBO Agreement Liberty agreed to assume the claims administration and payment obligations for designated Claimants. (Decl. of McGee ¶ 4.) Pursuant to the Agreement, Liberty Life took over the claim's administration and payment obligations for plaintiff's claim on January 1, 2000 and the claim file maintained by Preferred Works was transferred to Liberty. (Decl. of McGee ¶ 6.)

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

## IV. LEGAL ARGUMENT

### A. THE APPLICABLE STANDARD OF REVIEW IS AN ABUSE OF DISCRETION

A claims administrator's decision to deny benefits under an ERISA plan is entitled to review under an abuse of discretion standard if the plan confers discretionary authority on the claims administrator to construe the terms of the plan and to determine benefit eligibility. (Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 103 L.Ed.2d 80, 109 S.Ct. 948 (1989).) Here, it is undisputed the Plan delegated to Liberty, through the RBO Agreement, sole discretion to construe the terms of the plan and determine a claimant's continued eligibility for disability benefits. (LC-003, Plan-0022, Plan-0097.) This language is sufficiently clear to overcome the presumption of de novo review and merit application of the deferential abuse of discretion standard of review. (See, McDaniel v. The Chevron Corp., 203 F.3d 1099, 1107 (9th Cir. 2000); also, Bendixen v. Standard Ins. Co., 185 F.3d 939 (9th Cir. 1999); Kearney v. Standard Ins. Co., 175 F.3d 1084 (9th Cir. 1999) (en banc).)

### A. LIBERTY'S ROLE AS BOTH CLAIMS ADMINISTRATOR AND INSURER DOES NOT AFFECT THE STANDARD OF REVIEW

Although the Ninth Circuit has held that an "apparent" conflict of interest exists whenever a claims administrator is responsible for both funding and paying claims (Tremain v. Bell Indus., Inc., 196 F.3d 970, 976 (9th Cir. 1999), such apparent conflict, standing alone, does not affect the standard of review. (McDaniel v. The Chevron Plan, supra, 203 F.3d at 1108; Bendixen v. Standard Ins. Co., supra, 185 F.3d 943-944.) In order to show that the conflict affected the insurer's decision to deny benefits, the insured must present "material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary." (Atwood v. Newmont Gold Co., 45 F.3d 1317, 1322 (9th Cir. 1995); McDaniel, 203 F.3d at 1108.) Otherwise, the court will review the administrator's decision under the traditional abuse of discretion standard. (Atwood, 45 F.3d at 1322; McDaniel, 203 F.3d at 1108-1109.)

Here, there is no material, probative evidence that Liberty breached its fiduciary obligations to plaintiff. Liberty provided plaintiff with a full and fair review. Liberty kept

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

plaintiff informed as the status of his claim and the reasons for its decisions. Liberty requested and considered all relevant medical and non-medical information received and maintained a proper dialogue with plaintiff and his treating physicians throughout the claim.

### 1. <u>Liberty Conducted a Thorough and Fair Investigation of the Claim</u>

Liberty conducted a complete and fair investigation of the claim. Liberty regularly and timely requested updated medical records from his two identified treating physicians, including updated office notes and completion of relevant forms before rendering a decision. Liberty also considered all of the information that it received. When Liberty was apprised that additional tests would be performed, Liberty followed-up and requested, received and evaluated all tests and records. Indeed, when Liberty made its decision, it had all of the medical records and opinions of his doctors before making its decision. Liberty waited over three months and had to send two requests to Dr. Gershengorn to obtain requested records and completion of a Physical Capacities form before its initial denial. Moreover, in the two letters to Dr. Gershengorn, Liberty specifically asked Dr. Gershengorn to comment whether his opinion as to Cremin's functional capacity had changed since December 2001, wherein he stated Cremin was able to sit 8 hours a day, stand 2 hours a day, walk 1 hour and lift up to 30 lbs six times a day. (CF-0269, CF-0224, CF-0220.) Dr. Gershengorn did not respond to Liberty's request, but did indicate on the Functional Capacities form that Cremin had no restrictions for sitting, he could stand for 1/3 to 2/3 of the day and he could walk up to 1/3 of the day. (CF-0169.) Thus, plaintiff's argument that Liberty did not obtain relevant evidence is without basis. The records shows Liberty had requested and received all medical records from plaintiff's doctors and, therefore, the fact Liberty concluded the information did not show adequate proof of disability is not evidence that Liberty failed to conduct a full or thorough investigation of the claim.

The <u>only</u> information plaintiff complains Liberty did not consider was the letter of Dr. Gershengorn. This is not evidence of an actual conflict because Liberty did not receive the letter until December 21, 2002 **after** it had already made its final decision on appeal and the claim was closed. Liberty was under a 60-day legal time constraint within which it had to render a final decision. Thus, the decision had to made by December 15, 2002. The record shows plaintiff was



Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

given adequate time to submit information to support his appeal and plaintiff was notified several times to do so. Liberty advised plaintiff on October 21, 2002 that he had thirty days within which to submit additional information to be considered on appeal. On November 21, 2002, the appeal review consultant notified plaintiff that if he wished to have additional information considered he needed to send the information as soon as possible. Plaintiff was given over three months to submit the information. Accordingly, Liberty's rendering of a decision prior to receipt of Dr. Gershengorn's letter is not material or probative evidence that Liberty was acting under a conflict of interest. Because the letter was submitted after the claim was closed, it is therefore not part of the administrative record and cannot even be considered by this court.

2. **Liberty Was Not Looking for a Way to Deny the Claim**

The administrative record refutes plaintiff's argument that Liberty was looking for a way to deny the claim in spite of the medical information it had received. Plaintiff completely ignores the fact that Liberty continued to pay and investigate the claim even after Dr. Gershengorn had indicated that plaintiff could work an eight-hour day in December 2001. (CF-0269.) After receiving that information from Dr. Gershengorn, Liberty had all the medical records reviewed by a registered nurse. Although Nurse Leonardos concluded, based on her review, that there was no objective medical evidence in the claim file to support a disability from a cardiac or psychiatric standpoint, she determined it was necessary to talk with Dr. Karalis, which she did on two separate occasions. She also spoke with plaintiff and informed him of her findings. Nurse Leonardos told plaintiff in February 2002 that from a cardiac standpoint it appeared he could return to work and the only question was whether he was disabled due to anxiety and depression. (CF-0015.) Plaintiff acknowledged during this conversation that he considering retraining to return to work, but could not do so at the time because he was recovering from a torn ligament in his ankle he sustained while exercising. (CF-0015.) The claim was denied only after a registered nurse had reviewed all of the medical information and Dr. Karalis reported to her on August 7, 2002 that he was unable to state whether plaintiff could or could not work because he had not seen him since February 2002. Based on the notes and information provided by Dr. Karalis, Liberty concluded that there was not enough information to support a lack of function from a

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

psychiatric perspective. Liberty did not deny the claim until after it had received all of the requested medical records from plaintiff's treating physicians and a vocational analysis identifying occupations plaintiff could perform within the restrictions and limitations identified by Dr. Gershengorn on August 20, 2002.

Liberty's claim note stating that the file was out of office with all other McKesson files is not evidence of an actual conflict of interest. That claim note is taken out of context and cannot reasonably construed to mean that Liberty was looking for a way to deny all McKesson claims as plaintiff argues. There are other, more likely explanation for the comment such as an audit of the claims by an outside service at the behest of the Plan sponsor, McKesson. Indeed, the note states that the files were <u>not</u> in Liberty's office and does not support an inference that Liberty was conducting the review. (CF-0226.) Further, plaintiff's unreasonable interpretation of the claim note is refuted by the administrative record and Liberty's handling of the claim.

**3. <u>Liberty's Denial Was Not Based On An Obviously Erroneous Findings</u>**

Liberty did not rely on erroneous information to deny the claim or in upholding the denial as plaintiff asserts. Plaintiff counsel's unqualified medical opinion is not only inadmissible, it is refuted by the administrative record, which shows that plaintiff was prescribed Xanax years earlier in 1997 -- <u>before his claim</u> -- to help him sleep. (CF-0484.) Before denying the claim, Dr. Karalis confirmed on several different occasions that plaintiff was not taking medication for his psychiatric problems. (CF-0228, CF-0175.) Further, neither Dr. Karalis, nor Dr. Gershengorn has ever stated that the Xanax was prescribed for treatment of plaintiff's psychiatric conditions. It is also unreasonable to believe that Dr. Mirkin, a psychiatrist, would expressly note in his report that plaintiff was taking Xanax (as well as other cardiac medications), yet then remark plaintiff was not taking a psychotrophic medication if the Xanax had been prescribed as a psychiatric medication. (CF-0109 to CF-0116.)

Moreover, Liberty also did not, as plaintiff repeatedly asserts, deny the claim solely because plaintiff was not taking any psychiatric medications. Rather, the claim was denied on the basis that the medical records did not indicate a level of anxiety or depression that precluded plaintiff from returning to work in another occupation. As set forth in Liberty's denial letter, the

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

conclusion was based <u>in part</u> on the fact that plaintiff saw his psychiatrist sporadically <u>and</u> was not on psychiatric medication. (CF-0156 to CF-0161) Prior to denying the claim, Liberty confirmed with Dr. Karalis on numerous occasions that plaintiff had not been prescribed any psychiatric medications and that his treatment was "supportive therapy only." Cremin himself also confirmed before the denial that he was seeing Dr. Karalis only sporadically.

**4. <u>Liberty Provided Plaintiff With A Full and Fair Review on Appeal</u>**

At the time plaintiff's claim was filed, Section 503 of ERISA, 29 U.S.C. § 1133, required all employee benefit plans to establish a reasonable claims procedure under which participants and beneficiaries may file benefit claims. (See also 29 C.F.R. 2560.503-1(b).) U.S. Department of Labor regulations further provided that notice be given in writing to any participant or beneficiary whose claim for benefits has been denied, that the plan offer an opportunity to appeal the decision and allow the participant or beneficiary to obtain a full and fair review of the claim and its denial. (29 C.F.R. 2560.503-1(g).) To ensure a full and fair review, the notice must specify reason(s) for the denial, refer to any pertinent provisions of the plan, describe any additional material or information necessary to perfect the claim with an explanation. Here, Liberty set forth in detail the reasons and bases for its denial and quoted the applicable plan language and summarized the medical records, reports and other documents relied on. (CF 0156 to CF-0161.) Liberty also identified what information was needed to perfect the claim. (CF-0160.) Liberty's denial letter discussed <u>the lack of treatment and lack of psychotrophy medication</u>. Thus, Liberty's denial letter, which fully complied with the ERISA requirements and regulations existing at the time, provided plaintiff with the opportunity to ensure a full and fair review.

Also contrary to Cremin's assertions, Liberty did provide him with all the information used in the determination of his claim for disability benefits. Liberty sent Cremin a letter on August 30, 2002, informing him that his claim for long-term disability benefits was terminated as of September 1, 2002 based on medical records from Drs. Gershengorn and Karalis, a nurse review, and a vocational analysis. (CF-0156 to CF-0161.) Liberty enclosed the Vocational Analysis and Labor Market Survey with the denial letter. After Cremin requested the information



Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

used to support Liberty's decision and a copy of the Plan, Liberty sent him a complete copy of the claim file as well as a copy of the McKesson Plan, which plaintiff acknowledged receiving. (CF-0135.) The March 2002 surveillance reports were contained in the claim file sent to plaintiff.

The fact that Liberty did not send plaintiff a copy of Dr. Mirkin's report or the surveillance conducted on appeal is not evidence of an actual conflict of interest. Plaintiff never requested the information generated on appeal, nor was Liberty obligated to provide it. (29 C.F.R. 2560.503-1 (1997).) Moreover, contrary to plaintiff's assertions, the reasons for the denial did not change on appeal. Neither Dr. Mirkin's opinion, nor the November 2002 surveillance provided the basis for a new reason to deny the claim. Dr. Mirkin did not even review the November 2002 surveillance DVD or reports or rely on them in reaching his opinion on appeal. (CF-0109 to CF-0116.) The initial decision to deny the claim was simply further supported by Dr. Mirkin's opinion, which Liberty obtained after Dr. Kiralis refuted Liberty's conclusions and findings. It did not serve as a basis for asserting a new reason for denying the claim so it was not necessary for plaintiff to receive the opinion a full and fair review. The cases cited by plaintiff are, therefore inapplicable.

**5. Liberty Was Not Required To Obtain An Independent Medical Examination Before Denying Plaintiff's Claim**

Liberty was not required to obtain an independent medical examination before denying plaintiff's claim and the failure to do so here is not evidence that Liberty was acting under a conflict of interest. The Plan does not require an independent medical examination be performed, only that one may be requested. (Plan-0044 and Plan-0046.) ERISA also does not require the insurer to have the claimant independently examined. (Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 63 F.Supp.2d 1145, 1158 (C.D.Cal. 1999), *affirmed* Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869 (9th Cir. 2004); Stith v. Prudential Ins. Co. of Am., 2005 U.S. Dist. LEXIS 2000, 26, fn 3 (D.N.J. 2005) ["no legal requirement that a plan administrator require an independent medical examination prior to finally adjudicating a claim for disability benefits under an ERISA-governed plan."]; Scott v. Prudential Ins. Co. of Am., 2005 U.S. Dist. LEXIS 1251, 14-15 (W.D.Mich. 2005) [Finding "courts routinely affirm administrative

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

decisions in ERISA cases that are made solely on the basis of a document review."]; Kocsis v. Standard Ins. Co., 142 F.Supp.2d 241, 254-55 (D.Conn. 2001) ["Because the Plan does not require an independent examination, it is not per se unreasonable. . .to deny the plaintiff benefits without requesting an independent medical examination, in light of Standard's file review by two independent medical examiners."].)

Plaintiff's assertion that Liberty was required to obtain evidence to support his claim (e.g. obtain an independent psychiatric evaluation) is also without merit. It is not inappropriate for an insurance company to place an initial burden of proof on claimants and, therefore, is not a basis for establishing a conflict of interest. (Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 985 (6th Cir. 1991).) Moreover, under the circumstances here an independent psychiatric examination was not required before it denied the claim in August 2002, because Liberty had all the information and records necessary to make an informed decision. Indeed, Dr. Gershegorn had indicated plaintiff had functional work capacity (CF-0269 and CF-0169) and Dr. Kiralis stated if plaintiff could work he may have sedentary work capacity. (CF-0015.) Further, in February 2002, plaintiff told Liberty he was considering retraining but could not do so because he had torn an ankle ligament while exercising. (CF-0015.) Thus, at the time Liberty denied the claim there was no conflicting medical evidence or opinions that would require an IPE to resolve.

Nor was an independent psychiatric evaluation required on appeal. After plaintiff appealed the denial and submitted a letter from Dr. Karalis, Liberty had the claim file and medical records reviewed by psychiatrist Peter Mirkim, M.D. In his report, Dr. Mirkim specifically addressed the opinions of Dr. Karalis' October 18, 2002 letter. (CF-0114 to CF-0116.) Based upon his review of the medical records, Dr. Mirkin concluded that the psychiatric information that supports Cremin's claim that he was unable to perform full-time work in a sedentary occupation consisted of subjective symptoms and fears that he reported to Dr. Karalis. The only clinical intervention that Dr. Karalis had taken, according to his records, was to provide "supportive psychotherapy." Such treatment is warranted for people with mild anxiety or with fears based on inadequate information, not for people who claim overwhelming anxiety that limits their capacity to function. Dr. Mirkin also concluded that based on the information from



Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Cremin's cardiac evaluations and notes of Dr. Gershengorn there was no indication of imminent threat from his cardiac disease.

## B. LIBERTY APPLIED THE PROPER DEFINITION OF DISABILITY AND OTHER APPLICABLE PLAN TERMS

### 1. Liberty Applied The Correct Definition of Disability

Contrary to plaintiff's assertions, Liberty applied the correct definition of disability from the McKesson Plan in making its claims determination. The definition cited by plaintiff in his moving papers was expressly set forth in the denial letter and on appeal. Contrary to plaintiff's assertions, the McKesson Plan did not state that an award of social security benefits was conclusive proof of disability. Accordingly, plaintiff's reliance on Boyd v. Trustees of United Mine Workers Health and Retirement Fund, 873 F.2d 57 (5th Cir. 1989) is misplaced because the plan in that case the plan expressly provided that receipt of social security was conclusive evidence of disability. Here, the receipt of social security benefits was one of two conditions for establishing disability. The other condition was that plaintiff was incapable of performing work of any occupation for which he or she becomes reasonably qualified by training, education and experience. (Plan-0022.) The second condition of disability is not met simply because plaintiff received social security benefits. Plaintiff's award of social security benefits is wholly irrelevant to the issue of whether he was "disabled" within the meaning of the McKesson Plan. (See, Black & Decker Disability Plan v. Nord, 538 U.S. 822, 123 S. Ct. 1965; 155 L. Ed. 2d 1034 (2003); Madden v. ITT Long Term Disability Plan, supra, 914 F.2d at 1287; Boomis v. Metropolitan Life Ins. Co., 970 F.Supp. 584, 590 (E.D. Mich. 1997).) It is well established that a social security determination is not binding upon an ERISA administrator where, as is here, the ERISA Plan has a different definition of disability and different evidence may have been presented in the two proceedings. (Madden, supra, 914 F.2d at 1287; Boomis, supra, at 590.) Employers have a "large leeway" to design plans, so unlike a Social Security claim, the validity of a claim is "likely to turn in large part on interpretation of terms in the plan at issue" rather than on a uniform set of criteria." (Black & Decker Disability Plan v. Nord, 538 U.S. 822, 833 (2003).)

Although the definitions of disability are similar, they are not identical. (See, Black &

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

Decker v. Nord, 538 U.S. at 832-833, noting critical differences.) Further, the evidence submitted in support of a Social Security award is different from the information obtained by a claims administrator. Social Security also applies a treating physician rule, which the United States Supreme Court has recently held is inapplicable to ERISA disability claims. (Black and Decker v. Nord, supra, 538 U.S. 822.) Thus, the social security standards are unique and different from an ERISA disability claim, which is governed by the terms of the contract. Plaintiff has failed to present any evidence that Social Security reviewed or reevaluated plaintiff's claim since its initial determination in January 1999 – more than three years before Liberty's denial.

Liberty's reference to "sedentary capacity" was not improper, nor inconsistent with the terms of the McKesson Plan. Here, the McKesson Plan, unlike the case relied on by plaintiff in his motion, did not define disability as "the inability to perform the material and substantial duties of any occupation." Rather, the McKesson Plan defined disability in terms of an inability to work. (Plan- 022.) Accordingly, Liberty's reference to plaintiff's sedentary work capacity was not inconsistent with the terms of the Plan and is not evidence of a conflict of interest.

**2. The McKesson Plan Requires Objective Medical Evidence and Regular and Continuous Care of a Physician**

Contrary to plaintiff's assertions, the McKesson Plan expressly requires objective medical evidence to support the determination of Disability: "Pursuant to the procedures established by the Plan Administrator, a determination shall be made whether a Disability exists with respect to a Participant on the basis of objective medical evidence." (Plan-0071, emphasis added.) Accordingly, Liberty's references to and statements regarding the lack of objective medical evidence were not improper and are not a valid basis for finding a conflict of interest.

Contrary to plaintiff's assertions, Liberty's references to plaintiff's lack of treatment and sporadic visits to his treating physicians were consistent with the express terms of the Plan. The Plan requires that a claimant must be under the regular and continuous care and treatment of a Physician in order to continue receiving disability benefits. (Plan-0079.) The Plan also provides that benefits will terminate if the Claimant is no longer under the regular and continuous care of a physician unless such regular and continuous care and treatment are not medically indicated given

the nature of the disability. (Plan-0079.) Here, Nurse Leonardos and Dr. Mirkin specifically noted that if plaintiff was as depressed and anxious as he claimed, then more psychiatric treatments would have been required. Thus, Liberty properly considered whether the exception to the continuous and regular treatment applied, which it concluded it did not. Further, before denying the claim the lack of regular care or treatment was confirmed by Liberty on numerous occasions before the denial. Both Dr. Karalis and plaintiff admitted his psychiatric treatment was sporadic and Dr. Karalis confirmed he had not prescribed any medications for Cremin's psychiatric disorder. Accordingly, there is no evidence of a conflict of interest.

## C. LIBERTY CONSIDERED ALL OF THE MEDICAL INFORMATION BEFORE MAKING A DECISION

The record demonstrates that Liberty properly considered all of the medical records and non-medical information received before denying the claim. Because the records and opinions were considered by Liberty, the standard of review is not affected. (Jordon, supra, 63 F.Supp.2d. at 1156.) "That the administrator ultimately rejects the applicant's physicians' views does not establish that it 'ignored' them." (Jordan, supra, 370 F.3d at 878. Liberty's denial was supported by the information it had received during its investigation, including the medical records and the information provided by Dr. Karalis and Dr. Gesrhengorn. On December 4, 2001, Dr. Gershengorn stated plaintiff could sit for hour hours a day with breaks and that he could work eight hours a day. (CF-0269.) On February 7, 2002, Liberty informed plaintiff that based on the information it received from Dr. Gergengorn he was not disabled from a cardiac perspective. During that conversation with Liberty, plaintiff told Liberty he was considering retraining so he could return to some kind of work, but he had torn some ligaments in his ankle while he was exercising. The records received by Liberty from Dr. Gershengorn in August 2002, including the Functional Capacity Form, indicated that plaintiff had demonstrated functional capacity and a vocational analysis identified occupations that plaintiff could perform without the identified restrictions and limitations.

Further, prior to the denial, Liberty spoke with Dr. Karalis on August 6, 2002 about the claim. During this conversation, Dr. Karalis stated he could not give an opinion as to plaintiff's



Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

ability to work because he had not seen him since February 2002 and that he may well have sedentary capacity to work. Although Liberty received updated office notes from Dr. Karalis after its conversation with him and before the initial denial (indicating that he had treated plaintiff several times since February 2002, including the day before he spoke with Liberty), Dr. Karalis never opined in those records that plaintiff could not return to work, only that plaintiff reported on August 6, 2002 that he could not return to work.

Liberty considered and reviewed the new records as well as the information received from Dr. Gershengorn before its denial. Although Liberty disagreed with Dr. Karalis' opinions rendered on appeal, this is not evidence of an actual conflict of interest. It is not material, probative evidence of a conflict of interest simply because the claim administrator rejects a treating physician's conclusion. (Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869 (9th Cir. 2004).) In Jordan, the Ninth Circuit held, "Where the applicant's physicians depend entirely on the patient's pain reports for their diagnoses, their *ipse dixit* cannot be unchallengeable. That would shift the discretion form the administrator, as the Plan requires to the physicians chosen by the applicant, who depend for their diagnoses on the applicant's reports to them of pain." (Id. at 878.) Likewise, here, it was unreasonable for Liberty to disagree with Dr. Mirkin's opinions of appeal which were based exclusively on plaintiff's self-reported capabilities. Moreover, here, it was entirely reasonable for Liberty to give more weight to the opinion of Dr. Mirkin for numerous reasons. Dr. Mirkin went through and analyzed in significant detail the reasons and basis for his disagreements with Dr. Kiralis' opinions which were wholly conclusory. Further, Dr. Kiralis' opinion was based on his speculation that Dr. Gershengorn's report was misinterpreted by Liberty. Dr. Karalis' credibility was also called into question when he told Liberty on August 6, 2002 that he had not seen plaintiff since February 2002 and then submitted records showing he had seen him the day before. Finally, the State Medical Board had put Dr. Karalis on probation and that he had completed his probation on June 9, 1998 – only three months before he began treating plaintiff. (CF-0215.) He had also been a member of the State Bar of California placed on probation on November 20, 1990 due to Medicaid fraud. (CF-0215.)

Finally, the "overwhelming" evidence that plaintiff asserts supports his claim was not only

considered by Liberty, it does not support a finding that Cremin was disabled within the meaning of the policy. The only evidence to which plaintiff refers is the Social Security Award rendered almost four years earlier, Dr. Karalis' GAF score given on March 20, 2001 and February 2002, and the surveillance. As set forth above, the Social Security Award was remote in time and based on different criteria. The reliance on the GAF scores is misplaced because Dr. Karalis told Liberty in August 2002 that plaintiff might have sedentary work capacity. Further, Dr. Mirkin specifically noted in his report that Dr. Kiralis' opinions on appeal were based on the results of a Zung Depression and Anxiety Test, which was a self-rating method (e.g. based on plaintiff's subjective reports) as opposed to the more reliable clinician rating scales, which Dr. Kiralis did not use. Thus, there was little, if any, objective evidence to support a finding that plaintiff was "disabled" within the meaning of the policy and Liberty's decision is not evidence of a conflict of interest.

## II. CONCLUSION

For the reasons set forth herein, the applicable standard of review to be applied by this court is an abuse of discretion.

Dated: April 29, 2005

ROPERS, MAJESKI, KOHN & BENTLEY

By: ______________________
PAMELA E. COGAN
KATHRYN C. CURRY
ERIN A. CORNELL
Attorneys for Defendant
LIBERTY LIFE ASSURANCE COMPANY OF BOSTON

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City