Apple Inc. v. Psystar Corporation Doc. 2974 Att. 2

BURTON F. BOLTUCH (SBN 070211)
LAW OFFICES OF BURTON F. BOLTUCH
555 12th Street, Suite 1440
Oakland, CA 94607-4046
Telephone: (510) 844-3415
Facsimile: (510) 444-3401
E-Mail: bboltuch@workplacelaw.biz

Attorneys for Defendants APPLIED FUSION, INC.; JEFF MUSGROVE; MOHAMMED ANSARI and GEORGE SILVA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUANG-KUI DONG,<br><br>Plaintiff,<br><br>vs.<br><br>APPLIED FUSION, INC., JEFF MUSGROVE, PATRICK DAVIS, MOHAMMED ANSARI, GEORGE SILVA, GREGORY GEDDIS, CITY OF SAN LEANDRO, OFFICER R LOPEZ and DOES 1 through 5, inclusive,<br><br>Defendants. | Case No.: C-03-3698 SI ADR<br><br>DECLARATION OF RON MUSGROVE IN SUPPORT OF MOTION OF DEFENDANTS APPLIED FUSION, INC.; JEFF MUSGROVE; MOHAMMED ANSARI AND GREG GEDDIS FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF THE ISSUES<br><br>Hearing Date: June 10, 2005<br>Hearing Time: 9:00 a.m.<br>Courtroom: 10 (19th Floor)<br>Trial Date: August 8, 2005 |

I, RON MUSGROVE, hereby declare and state as follows:

1. I, Ron Musgrove, have personal knowledge of the facts set forth in this Declaration, except for those facts stated on information and belief. If called to testify as a witness in this matter, I am competent to so testify and would testify to the facts set forth in this Declaration.

2. At all times relevant to this case, I have been the CEO of Applied Fusion, Inc. ("AFI"), whose business address is 1915 Republic Avenue, San Leandro, California 94577.

3. In 1972, I founded Emcee Enterprises which was incorporated in late 1973. In 1979, the name of the business was changed to Applied Fusion, Inc. At all times since 1972, I have been the owner and hands-on CEO of AFI. In 1973, my son, Jeff Musgrove, joined me at AFI. He has been AFI's President for about twelve years. AFI's started as a machining and fabrication shop with its primary customers being Physics International, Lawrence Livermore Laboratory, G.E. Nuclear Energy and a few start-up companies in what is now known as the Silicon Valley.

4. In 1978, AFI purchased its first Electronic Beam Welding System and then one year later heavily invested in laser technology. At that time, most engineers and designers knew little of these manufacturing and welding advancements. AFI had to sell and promote these new options. In fact, AFI was a pioneer in the United States with respect to both welding technologies. Since 1978, AFI has continued to invest in this field. Along with Computer Numeric Control ("CNC") welding (laser and electron beam), for AFI to be a leader in the field, it had to have machinery that could give such control to allow welding to often be a final operation. That is why AFI has continued to invest in people and in state-of-the-art machinery. AFI is now a national leader in the manufacture and welding of complex assemblies of vacuum chambers for wafer processing, surgical tools and implants, satellite components and a wide variety of proprietary hardware and components for high tech industries.

5. AFI has always recognized that its employees are its greatest asset. The safety of the employees had been and continues to be AFI's highest priority. In fact, the AFI Employee Handbook lists AFI's goals in order of priority, as follows:

a. A safe workplace and safety-minded employees.

b Product quality.

c. On time delivery of product.

d. Continuous investment in machinery and technology.

e. Training of employees and the sharing of knowledge and expertise.

f. Being profitable and sharing those profits with employees.

g. Paying top wages with good benefits.

h. Creating a working environment that employees will look forward to each work day.

6. On February 15, 2005, my deposition was taken in this case. Attached to this Declaration as Exhibit A, and incorporated hereby by reference as if fully set forth herein, are true and correct copies of various pages of my deposition.

7. Attached to this Declaration as Exhibit B, and incorporated hereby by reference as if fully set forth herein, are true and correct copies of various pages of the AFI Employee Handbook, including the pages setting forth the goals and the policy regarding the prohibition on harassment and discrimination.

8. Jeff Musgrove and I have always been committed to a workplace free of harassment, discrimination and retaliation. AFI does not allow any abusive or threatening conduct at the workplace. The current workforce is multi-national and multi-ethnic, including Caucasian, African-American, Chinese, Mexican, Filipino, Fijian, Dutch, Indonesian, Portuguese, Spanish and Italian. The workforce in October, 2002 was similarly multi-national and multi-ethnic.

9. As noted above, the AFI Employee Handbook contains an explicit statement of zero tolerance for harassment, discrimination and retaliation. On or about July 14, 1997, AFI issued a policy statement on harassment and discrimination. Attached to this Declaration as Exhibit C, and incorporated herein by reference as if fully set forth herein, is a true and correct copy of the July 14, 1997 policy statement.

10. I have reviewed the personnel file of Dong. As is the practice of AFI for new employees, Dong was provided and acknowledged receiving the AFI Employee Handbook. Attached to this Declaration as Exhibit D, and incorporated herein by reference as if fully set forth herein, are true and correct copies of the documents executed by Dong acknowledging these policies.

11. On or about April 18, 2000, Dong applied for a job and was then hired as a machinist with AFI. I have reviewed the job application of Dong. On the last page, Dong

acknowledged that the position, if he was hired, was as an at-will employee. Upon his hiring, Dong again acknowledged his at-will employment status and was provided and acknowledged receipt of the Employee Handbook, as noted above. Attached to this Declaration as Exhibit E, and incorporated herein by reference as if fully set forth herein, is a true and correct copy of the above-noted pages of Dong's job application.

12. I was a friend of the father of Stewart Alexander. In fact, Stewart Alexander's father was one of my best friends. Prior to October, 2002, I was aware that Stewart Alexander was accused of killing three meat inspectors at his place of employment. I now know that Stewart Alexander has been convicted of killing the three meat inspectors. In October, 2002, because of my personal knowledge of the Alexander murders, and because of AFI's commitment to maintaining a safe workplace, AFI was especially cautious about protecting the workforce and not take any chances about possible workplace violence.

13. On October 7, 2002, when my son and I discussed summoning the police to investigate the situation, and on October 10 when it was decided to terminate Dong, I was not aware of any complaints by Dong to Silva on October 4 about Frank Levering, nor was I aware of any alleged complaints by Dong on October 7 to Ansari or Geddis about Pat Davis. The decision to call the police on October 7 and the decision to terminate Dong on October 10 were not in retaliation for any complaints Dong allegedly made.

14. The decision to call the police on October 7, 2002 was based solely on the good faith belief of Jeff and I that Dong had possibly made threats to kill others and himself, on our belief that the police were better trained to evaluate the psychological state of Dong, and on AFI's desire to ensure the safety of AFI employees.

15. Dong was terminated for the comments he has admitted he made on October 4 about killing himself if he could not timely learn the CNC machine and what was reported to Jeff on October 7 about Dong shooting Pat Davis, Frank Levering and others, and then himself. Jeff and I made the decision to terminate Dong.

16. Attached to this Declaration as Exhibit F, and incorporated herein as if fully set forth herein, is a true and correct copy of a document executed by me setting forth changes to my

deposition testimony and the explanation for the changes.

17. AFI has already recognized that its employees are its great asset. The safety of our employees has been and continues to be AFI's highest priority. The AFI lists AFI's goals and places "a safe workplace" and "safety-minded employees" at the top of the list.

18. AFI and I are committed to a workplace free of harassment, discrimination and retaliation. It is the corporate philosophy of AFI that AFI will not allow any abusive or threatening conduct at the workplace. Our current workforce is multi-national and multi-ethnic and includes employees whose heritage is Chinese, Mexican, Filipino, Fijian, Dutch, Indonesian, Portuguese, Spanish and Italian. In October, 2002, the workforce was similarly multi-national and multi-ethnic.

19. If Jeff and/or I had received the same information, from Ansari, Geddis or any other employee, about any employee – Caucasian, African-American, Chinese, Mexican, Filipino, Fijian, Dutch, Indonesian, Portuguese, Jewish, Catholic, Indian, Muslim, or any other employee -- AFI would have done the exact same thing, investigate to the extent possible by speaking to the employees and then summon the police, if appropriate. Dong was not singled-out and was not retaliated against. His being Chinese had absolutely no part in the decision to call the police or to terminate him.

20. AFI did not fabricate any story about Dong threatening employees or to kill himself when the police were called. AFI acted based on the information it had received on October 7, 2002.

21. On October 7, 2002, when the police were called, and on October 10, 2002, when Dong was terminated, AFI did not consider that Dong was "trouble," as alleged in Paragraph 41 of the Second Amended Complaint. Rather, as noted in my deposition and in this Declaration, AFI was concerned on October 7 about possible workplace violence.

22. There is no truth to the allegation of Dong that he was terminated from AFI because he made complaints about unlawful employment practices by AFI and/or complained about racial and ethnic harassment.

23. AFI was not motivated by malice, jealousy, vindictiveness, retaliation and/or a

desire to employ another in the position which Dong held.

24. AFI did not have Dong institutionalized. AFI summoned the police. I have been informed that the police made an independent determination that there was probable cause to detain Dong and to have Dong transported for evaluation at John George Pavilion.

25. AFI did not accuse Dong of having a mental disorder or accuse him of being gravely ill. AFI, as noted in this Declaration, summoned the police department to have the police department evaluate the situation.

I, Ron Musgrove, hereby declare under penalty of perjury, pursuant to the laws of the State of California and the laws of the Untied States, that the above Declaration, consisting of this typewritten page and five other typewritten pages, is true and correct, except for those matters stated on information and belief, and as to those matters, I believe them to be true.

Executed on this 5th day of May, 2005, in San Leandro, California.

[signature]

Ron Musgrove

EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CERTIFIED COPY

| | | |
|---|---|---|
| GUAN-KUI DONG, | ) | |
| Plaintiff, | ) | |
| vs. | ) | NO. C-03-3698 S1 ADR |
| APPLIED FUSION, INC., JEFF MUSGROVE, PATRICK DAVIS, MOHAMMED ANSARI, GEORGE SILVA, GREGORY GEDDIS, CITY OF SAN LEANDRO, OFFICER LOPEZ and DOES 1 through 5, Inclusive, | ) | |
| Defendants. | ) | |

# DEPOSITION OF RON MUSGROVE

DATE: February 15, 2005

TIME: 11:55 a.m.

LOCATION: MEYERS NAVE RIBACK SILVER & WILSON
555 12th Street, 16th Floor
Oakland, California

REPORTED BY: Melissa Roen Williams, CSR, RPR
Certified Shorthand Reporter
License Number 12284

A P P E A R A N C E S

For the Plaintiff: PREMIER LAW GROUP, PLLC
BY: DARRYL PARKER, Attorney-At-Law
AGC Building, Suite 705
1200 Westlake Avenue N
Seattle, California 98109
(206)285-1743

For the Defendants APPLIED FUSION, INC.; JEFF MUSGROVE; PATRICK DAVIS; MOHAMMED ANSARI; GEORGE SILVA; GREGORY GEDDIS:
LAW OFFICES OF BURTON F. BOLTUCH
BY: BURTON F. BOLTUCH, Attorney-At-Law
The 555 City Center Building
555 12th Street, Suite 1440
Oakland, California 94607
(510)844-3415

For the Defendants CITY OF SAN LEANDRO, OFFICER LOPEZ:
MEYERS NAVE RIBACK SILVER & WILSON
BY: JENNIFER C. ADDAMS, Attorney-At-Law
555 12th Street, Suite 1500
Oakland, California 94607
(510)808-2000

# I N D E X


| | PAGE |
|---|---|
| By Mr. Parker | 4 |
| By Mr. Boltuch | 30 |
| Further Examination by Mr. Parker | 34 |


# E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|

(There were no exhibits marked for identification.)

RON MUSGROVE,

having been first duly sworn by the Certified Shorthand Reporter to tell the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION BY MR. PARKER

BY MR. PARKER:

Q Would you state your full name, please, and your middle name for the record.

A Ron R. Musgrove, R-o-n, R, period, M-u-s-g-r-o-v-e.

Q What's your current position at Applied Fusion?

A I'm sorry?

Q Your current position at Applied Fusion.

A I'm the CEO.

Q Do you have any other positions or interest in the company?

A That's pretty complete itself.

Q Okay. And CEO means "chief executive officer"?

A Right.

Q And so Applied Fusion is a private corporation?

A Right.

Q Does Applied Fusion have a profit sharing

efficient. When you're slow, people really drag their feet.

Q Right. Okay. Were you present at Applied Fusion on October 7?

A In the morning, but I had left and gone home.

Q When did you leave in the morning?

A I don't know. I generally leave at 10:00 or 10:30.

Q Were you notified at any time on October 7th that Mr. Dong had made a threat against any employee?

A Yes.

Q How were you notified?

A Jeff called me.

Q Telephone call?

A Yes.

Q And was it a one-on-one telephone call?

A Yes.

Q And what did he say to you?

A He repeated what he had been told by Moe and Geddis.

Q Did Jeff tell you that Moe and Geddis had spoken to him directly?

A No, not at that time.

Q Did he ever tell you that Moe and Jeff -- Moe and Greg had spoken to him directly?

Q Had he called the police, in your knowledge, at the time he made the phone call?

A No. He waited for me to concur that it was a critical matter and we needed the professional help of a policeman. We're not trained to do that sort of thing.

Q So you suggested to Jeff to call the police?

A I not only suggested. I said, yes, we should call the police. Either you call them or I'll call them.

Q Okay. So did Jeff say he thought he should call the police?

A Oh, yeah. We concurred.

Q Okay. And did you participate in calling the police?

A No.

Q Okay. You just left it to Jeff?

A He's competent.

Q And that ended the conversation, or did you talk about anything else?

A Oh, I just said, well, call me later, when you find out what happens, you know, after the police officers arrive. Just call and check back later. I offered to come back down, but he said he didn't think it was necessary.

Q Okay. And did Jeff call you back?

Mr. Dong was going to do something to Jeff?

A To Jeff?

Q Yes.

A I was at home. Jeff can handle himself.

Q Did you ever consider that Mr. Dong may do something before the police could get there?

A I don't think so.

Q Did you know Mr. Dong personally?

A No.

Q Had you ever spoken to him personally?

A At work?

Q Yes.

A Oh, yes, often.

Q And did you ever have any problems with him?

A I don't have problems with anybody. If I have problems with them, they probably won't be working very long there.

Q Do you have a recollection of Mr. Dong ever getting upset or losing his temper in your presence?

A He was kind of weird, but I didn't see him get upset.

We don't allow anybody to be abusive or harm other people. In 33 years, we've never had another employee strike an employee. And we set that example, Jeff -- myself and Jeff. So we don't have many

problems. We don't have any thefts, we don't have any -- you get little clashes once in a while, but they're nothing.

Q Have you ever had any problems with employees feeling they're being discriminated against?

A No, never.

Q And did you ever talk to George Silva about this incident?

A About what, please?

Q The October 7th incident, where the threats were made.

Did you ever talk to George Silva about that?

A You mean subsequently?

Q Yes.

A Oh, certainly.

Q When was the first time you spoke to him about the October 7th?

A Oh, I wouldn't know that. But I talk to George almost everyday. He's the number two man. And policy is that we document things that are extraordinary and that we keep the harmony, and it's very effective. We're a profitable shop because everybody works so hard.

Q Did Jeff ever show you any notes that he took?

A That Jeff took?

Q Yes.

A I don't think Jeff made any notes. Not to my knowledge.

Q Is it Jeff's practice to make notes of conversations that he has with employees?

A He would. It's all of our practice to do that over the last dozen years or so. But I don't know if he made any specifically for this.

Q Do you know of any reason why he would not make notes of this incident?

A Well, for one thing, as soon as he knew about it, he called me and he called the police, and it was sort of out of our hands. But he may have made notes afterwards. I don't know.

Q Okay. You haven't seen any personally though?

A I don't remember any.

MR. BOLTUCH: To my knowledge, Mr. Parker, there are no notes.

THE WITNESS: Yeah. I don't think so.

MR. BOLTUCH: We've turned over to you every note we have. And I specifically asked my clients if there's anything else. So there's nothing that's been withheld for any reason.

MR. PARKER: I'm not implying --

MR. BOLTUCH: I know. I'm just letting you --

BY MR. PARKER:

Q Did you speak to George about threats on October 7th, 2002? Meaning on the date.

A No.

Q Did you speak to George about the threats that were made on October 7th before making a decision to terminate Mr. Dong?

A I didn't talk to George at all.

Q Did you speak to Greg Geddis at all yourself?

A I only spoke to Jeff.

Q Did Jeff tell you that the -- did Jeff tell you that he had called the police?

A Jeff called the police after I -- after we hung up our conversation. It was our concurrence -- we already mentioned that -- that the police should be notified.

Q Did Jeff ever tell you that the police weren't going to come, they weren't going to show up?

A San Leandro police always respond.

Q So that didn't happen? He never told you that he called the police and they said, no, we're not coming?

A San Leandro police are very responsive. They always come within minutes.

Q Have you had occasion to call the San Leandro Police Department prior to October 7th, 2002?

MR. BOLTUCH: Pertaining to AFI business?

MR. PARKER: Of course.

THE WITNESS: Well, sure. There's been burglaries and traffic problems.

BY MR. PARKER:

Q Have you ever had to call the police because of an employee problem?

A I don't ever recall for an employee. Most things we can manage ourselves.

Q Did Jeff tell you that an ambulance had showed up with the police?

A No, not until the ambulance went away and either Jeff or I communicated back about what was happening.

Q Okay. Let's assume that you and Jeff were speaking after the incident had concluded.

Did Jeff tell you that an ambulance had come?

A Yeah. Jeff is the only one I talked to, so he would have had to have told me.

Q Did he tell you why an ambulance was called?

A The police thought Dong was dangerous.

Q So the police made the decision to call the ambulance?

A Oh, absolutely.

Q Did Jeff tell you that Mr. Dong was taken away

in the ambulance?

A Well, yes. Jeff had to tell me, because he was the only one that I talked to.

By the way, if the police had said, Ron or Jeff, this guy is all right, it was just a little incident, and took the toolbox, he could have gone back to work. It was the police who used their professional training to incarcerate Mr. Dong at the hospital.

Q And that's based on what Jeff told you?

A Based on what the police told us.

Q Okay. So have you spoken to the police about this incident?

A Pardon me?

Q Have you spoken to the police about this incident?

A I talked to Joe Kitchen about it, the chief of police.

Q Okay. When did you speak to Joe Kitchen?

A Sometime afterward, when Jeff suggested we get a restraining order. And I said, well -- against Dong. I said, well, it's probably not a bad idea, but we can't get that through to a judge until we get a police report. And so I -- they wouldn't release the police report. It was 5150, is it?

So I talked to Joe Kitchen because -- you

know, San Leandro is a small community. I said, this is absurd. We've got a potential problem on our hands, and we can't get a police report to get a restraining order for this guy. And he said there was nothing he could do about it. That's California law.

Q Did Joe Kitchen tell you that the police had made a decision that Mr. Dong was dangerous?

A Mr. Dong was what?

Q Dangerous.

A No. I don't think they ever said that. They just thought that he should go for evaluation.

Q You made a statement earlier that if the police had said it was okay for him to go back to work, you would have let him go back to work.

Is that a true statement?

A I think we would have, yeah.

Q And did the police tell you you should not let him go back to work?

A I didn't talk to the police. The police acted entirely on their own. Jeff and I stayed out of it. Turned over Dong to the police, and they made those decisions after talking to him.

Q I'm just trying to get from you how you know that, how you know that the police made this decision on their own.

A Well, you think George Silva or one of the other machinists is going to make the police decision?

Q I don't know. I'm just asking you, how do you know this?

A The police had it all. We stayed out of it. It was absolutely up to the police to call the ambulance, evaluate Dong, and do whatever they wanted -- thought they should do.

Q Now, you wanted to get a restraining order against Mr. Dong; correct?

A Jeff -- it would have been a good idea.

Q Did you want to get a restraining order against Mr. Dong because of something the police told you?

A No.

Q Did you have any information that Mr. Dong had done anything after the 7th that caused you concern?

MR. BOLTUCH: Could you repeat the question please, Mr. Parker.

BY MR. PARKER:

Q When you were thinking about getting the restraining order, did you have any information that Mr. Dong had done anything after October 7th that caused you concern?

A No.

Q I want to show you what's been marked as Exhibit 1 to Mr. Silva's --

MR. BOLTUCH: I have a copy. Which AFI bates stamp number?

MR. PARKER: I want to refer you to 419.

MR. BOLTUCH: So we're looking at AFI 419, produced in discovery?

MR. PARKER: Yes.

MR. BOLTUCH: Okay.

THE WITNESS: Okay.

BY MR. PARKER:

Q Have you seen this exhibit before? 419.

A I'm sure I have. That's Susan's writing.

Q Did you participate at all in any conversation with Fremont Hospital?

MR. BOLTUCH: As reflected in this document or ever?

MR. PARKER: On October 10th, 2002.

THE WITNESS: I don't know what prompted this, this call here. I received -- the hospital apparently called Jeff regarding Dong's -- it must have been --

MR. BOLTUCH: If you don't know what prompted this, just --

THE WITNESS: I don't know that.

BY MR. PARKER:

Q You did not speak at all to Fremont Hospital?
A No.
Q And you did not speak to John George Hospital either?
A No.
MR. BOLTUCH: About Mr. Dong, you mean?
MR. PARKER: About Mr. Dong. Thank you, Counsel.
THE WITNESS: No.
BY MR. PARKER:
Q Could you turn to page 426.
MR. BOLTUCH: AFI 426?
BY MR. PARKER:
Q Yes. Of Exhibit 1.
Do you recognize that document?
A No, I don't. But there again, that's Susan's writing.
Q Do you know if Susan spoke to John George Hospital?
A It looks like --
MR. BOLTUCH: Don't guess. He asked you, do you know she did?
THE WITNESS: No, I don't know that.
BY MR. PARKER:
Q What's Susan's last name?

A Barroerro.

Q Is she Jeff's secretary?

A Mine.

Q Oh, your secretary. Had she told you she spoke to John George Hospital?

A I can't recall. I might have asked her to.

Q Did she tell you she spoke to Fremont Hospital or a person at Fremont Hospital?

A Two and a half years later, I just can't recall. I just don't remember.

Q Okay. Could you look at page 427.

MR. BOLTUCH: AFI 427?

MR. PARKER: Yes.

THE WITNESS: That's my writing.

BY MR. PARKER:

Q And what is the purpose of this document? Do you know?

A It was a request for a police report.

Q And were you requesting a police report because you wanted to get a restraining order?

A Could be. What is the date? 10-30. That's two weeks later, three weeks later.

For lack of a police report, we didn't want Dong to come back unescorted to get his toolboxes. We were concerned about it.

Q Did you ask the police what you should do with Mr. Dong's toolbox?

A No. I didn't talk to the police. I just -- you know, just send in this application, this request.

Q And did you get a response to this request?

A No. I don't recall a response at all.

Q Exhibit Number 428 --

MR. BOLTUCH: AFI 428?

BY MR. PARKER:

Q Yes. Whose handwriting is that document in?

A That's Susan's again. Very distinctive left-hander.

Q Did you have to approve this document, 428?

A Of course. I approve all hiring and firing.

Q Okay. And do you know when this document was created?

MR. BOLTUCH: Are you asking does he know when Ms. Barroerro wrote this document?

MR. PARKER: Yes.

MR. BOLTUCH: Other than looking at the document or --

THE WITNESS: No, I don't. I don't see a date on there either.

BY MR. PARKER:

Q There's not a -- on your standard hiring

remember it wasn't the first time -- that he was going to shoot other people, including then himself. And by the way, Moe is a very, very credible person.

Q Just so --

A So his -- I mean, if it would have been somebody else, I may not have taken it at such a high level.

Q I just wanted to know what Jeff told you. So Jeff relayed what George had told him?

A Yeah. I don't know -- I can't remember specifically. But would I ask his opinion, how legitimate it was.

Q What did Jeff say?

A Jeff concurred, because there was some other incidents in the previous days or a week ago that --

Q Is there anything that you knew of personally that led you to be concerned about shootings at work?

A Uh-huh.

Q Is that a yes?

A My best friend's son killed three meat inspectors in San Leandro.

Q That occurred prior to October 7th, 2002?

A Yeah, a couple years ago. A year earlier.

Q Why did you concur with Jeff that it would be appropriate to call the San Leandro police?

A Because what they call "postal," workplace shootings and murders, were just all over the place. That goes even for murder with vehicles. You know, they don't have to have a gun. You can have a car.

Q Did you or your son discuss in this telephone conversation whether the Musgroves were competent to make an evaluation of Mr. Dong? And if so, what did you discuss?

A I can't remember specifically, but we certainly don't feel that we're competent to go and evaluate somebody's threats. You know, not to the point of murder. The guy says he's going to punch somebody, well, maybe that would be a different intervention.

Q Okay. And when you told Jeff you agreed that the police should be called, why did you make that decision?

A Because it would have been -- if something happened, we would be totally liable for being negligent and not getting the professional help of the police. I mean, if Dong did do something and we knew about it, we knew the threats, Christ, we'd be sued forever.

Q Other than calling the police, did Applied Fusion -- strike that.

Other than calling the police and whenever the police interviewed the employees, did Applied Fusion

have any role in the decision to put Mr. Dong in this ambulance?

A Absolutely none.

Q And you said that there was a consideration about possibly getting a TRO against Mr. Dong?

A A what, please?

Q A temporary restraining order. You said you thought about the possibility?

A Well, we would have liked to get one, but with a 5150, it was not going to happen.

Q Okay. And that would be --

A Privacy act.

Q -- to prevent the come back? That would be to prevent him to come back?

A Right.

Q And the decision to fire Mr. Dong, whose decision was that?

A That would have been mine, but with concurrence from Jeff.

Q But it was your decision?

A Yes. Hiring and firing I reserve absolutely since day one when we started the business.

Q Did Mr. Dong's race have anything to do with the decision to fire him?

A Absolutely not. We had two other Orientals.

We have a dozen different ethnic groups of people working with us.

Q Did Mr. Dong's ethnicity have anything to do with the decision to terminate him?

A No. Absolutely not.

Q When you decided to fire Mr. Dong, did you even know that a couple days before he had complained about Frank?

A I -- I knew there was something going on, but I didn't -- I just thought it was just two personalities had just clashed a little bit.

Q Did Mr. Dong's complaint about Frank Levering have anything to do with the decision to terminate Mr. Dong?

A No.

Q Was there any reason to terminate Mr. Dong other than your belief that he had made the threats on October 7?

A No. That was solely the reason.

Q I have nothing else. Maybe Ms. Addams or you, Mr. Parker?

MS. ADDAMS: I don't have anything.

FURTHER EXAMINATION BY MR. PARKER

BY MR. PARKER:

Q There was one thing I thought of that slipped

STATE OF CALIFORNIA )
) ss.
COUNTY OF SANTA CLARA )

I, MELISSA ROEN WILLIAMS, Certified Shorthand Reporter for the State of California, hereby certify that the witness in the foregoing deposition,

RON MUSGROVE,

was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause, and that the foregoing is a full, true, and correct transcript of the proceedings had at the taking of said deposition, reported to the best of my ability and transcribed under my direction.

Date: February 25, 2005 [signature]
CSR NO. 12284

# EXHIBIT B

APPLIED FUSION INC.

1915 REPUBLIC AVE
SAN LEANDRO, CA 94577
510-351-8314

# EMPLOYEE MANUAL

AFI0601

# APPLIED FUSION INC.

## EMPLOYEE MANUAL

### CONTENTS


| | |
|---|---|
| SECTION I | APPLIED FUSION INC. HISTORY |
| SECTION II | EMPLOYEE HANDBOOK |
| SECTION III | SAFETY POLICIES AND PROCEDURES FOR INJURY AND ACCIDENT PREVENTION |
| SECTION IV | PROFIT SHARING PLAN SUMMARY DESCRIPTION<br>BENEFICIARY FORM |
| SECTION V | EMPLOYEE HIRE FORMS<br>RECEIPT FOR EMPLOYEE MANUAL |

It must be noted here that skilled, long term employees are recognized as AFI's greatest assets. Following is a listing of managers and technicians who have contributed to AFI's success for more than ten years:

| NAME | START DATE | YEARS AS OF 1998 |
|---|---|---|
| Ron Musgrove | 1972 | 26 |
| Jeff Musgrove | 1973 | 25 |
| Tom Wood | 1974 | 24 |
| Ron Holton | 1974 | 24 |
| George Silva | 1977 | 21 |
| Clifford Lowe | 1979 | 19 |
| Craig Kerr | 1980 | 18 |
| Mark Gravatt | 1981 | 17 |
| Jack Sullins | 1984 | 14 |
| Richard Sturman | 1984 | 14 |
| Rigoberto Quintanilla | 1984 | 14 |
| Ron Calbreath | 1986 | 12 |
| Leonard Morey | 1986 | 12 |
| Jim Bakken | 1986 | 12 |
| Jim Sutton | 1988 | 10 |
| Jim Warner | 1988 | 10 |

This is an incredible average of plus 17 years.

Many others have been here less than 10 years and have also contributed to AFI's position. Even a "newcomer" soon becomes an important part of our team and is relied on for his/her personal efforts.

It should be remembered that Ron Musgrove started the Company but it was all of you good employees that helped build it to the reputation it now enjoys.

AFI's goals and priorities are listed below in order of priority:

1. A safe workplace and safety minded employees.
2. Product quality.
3. On time delivery of product.
4. Continuous investment in machinery and technology.
5. Training of employees and the sharing of knowledge and expertise.
6. Being profitable and sharing those profits with employees.
7. Paying top wages with good benefits.
8. Creating a working environment that employees will look forward to each work day.

# STATEMENT OF CORPORATE POLICY ON HARASSMENT AND DISCRIMINATION

APPLIED FUSION INC. EXPRESSLY PROHIBITS ANY EMPLOYEE, REGARDLESS OF STATUS, FROM ENGAGING IN ANY SORT OF HARASSMENT OR DISCRIMINATORY ACTIONS FOR WHATEVER REASONS, DELIBERATE, INCIDENTAL, JOKINGLY, OR EVEN UNINTENTIONALLY, AGAINST OTHER EMPLOYEES OR VISITORS TO OUR FACILITIES FOR ANY PURPOSE.

THESE ACTIONS, VERBAL OR PHYSICAL, INCLUDE BUT ARE NOT LIMITED TO ANY ATTACK ON ANY PERSON BECAUSE OF THEIR SEX OR SEXUAL ORIENTATION, RACE, ETHNIC ORIGIN, PHYSICAL HANDICAP, RELIGIOUS BELIEFS, PERMANENT EFFECTS OF PREVIOUS DRUG OR SUBSTANCE ABUSE, OR ANY OTHER CONCEIVABLE MENTAL OR PHYSICAL INADEQUACIES THAT MAY BE PERCEIVED BY ANY EMPLOYEE OF AFI.

ANY EMPLOYEE EVEN "SENSING" SUCH HARASSMENT MUST REPORT THIS INCIDENT IMMEDIATELY TO THEIR SUPERVISOR OR AN OFFICER OF THE COMPANY. THE SUPERVISOR OR OFFICER WILL RECORD ALL OF THE PARTICULARS AND WILL, IN THE SAME DAY, NOTIFY THE PRESIDENT OR CEO. IT IS THE PLEDGE OF THE PRESIDENT AND THE CEO TO IMMEDIATELY EVALUATE THE SITUATION AND TAKE WHATEVER ACTION APPEARS TO BE APPROPRIATE WITHOUT DELAY.

VIOLATORS OF THIS POLICY WILL BE SUBJECT TO DISCIPLINARY ACTION INCLUDING DISCHARGE.

**MANAGEMENT FOOTNOTE**

THIS IS A VERY ONEROUS LEGAL ISSUE. BECAUSE OF THE MANY CLAIMS THAT ARE DIFFICULT, IF NOT IMPOSSIBLE TO PROVE, COUPLED BY THE WILLINGNESS OF LAWYERS TO PURSUE SUCH CLAIMS ON A CONTINGENCY BASIS, HOPING, IF NOTHING LESS, THAT THIS THREAT WILL BRING AN OUT-OF-COURT SETTLEMENT WITH THE COMPANY AS "DEEP POCKETS".

FOR THESE REASONS AND FOR THE SECURITY OF THE COMPANY (AND YOUR JOB) ALL EMPLOYEES MUST COMPLY WITH THE LETTER OF THE LAW AND CONDUCT THEMSELVES ACCORDINGLY. EVEN A SLIGHTLY OVERHEARD CONVERSATION CAN BE MISCONSTRUED AS HARASSMENT OR DISCRIMINATION. PLEASE BE POLITE, CAUTIOUS, CAREFUL AND CONSIDERATE OF ALL OTHERS AT ALL TIMES.

FURTHERMORE, APPLIED FUSION INC. WILL NOT DO BUSINESS WITH ANY COMPANY THAT PRACTICES ANY KIND OF DISCRIMINATION.

EXHIBIT C

Engineering, CNC Fabrication
Electron Beam & LASER Services
Micro-Welding & Drilling

APPLIED FUSION INC.

1915 REPUBLIC AVENUE
SAN LEANDRO, CA 94577
(510) 351-8314
(510) 351-4511
Fax: (510) 351-0692

July 14, 1997

Memo TO ALL EMPLOYEES
Subject: REMINDER OF ANTI-HARASSMENT POLICY

First - many people said thanks for the recent bonus and you're all welcome! All of you earned it through your hard work and cooperation. As long as business is good and our employees continue to work safely and productively, contain costs via efficient use of supplies and consumables, these bonuses and profit sharing should continue through the next year.

We call all be especially proud of the good working relationship among each and every employee and the high morale it brings. It makes everyone's job a little easier to have helpful and courteous people to work with. We have daily visitors to our shops and they notice and remark how busy our workers are and how compatible they are. This gives customers added confidence in our ability to produce quality products on time. And they pay us well for this performance level - hence bonuses and good wages.

As we near 100 employees with a total variety of ethnic, religious, age, sex and all other governmental determined classifications, I want to remind everyone that stringent laws and rules of behavior to others (harassment) are imposed on the Company and each individual.

These laws are onerous and interpretation is unlimited. While the Company can and does set policy, only you as individuals can be enforcers. AFI has never had a problem in the past and I don't expect any harassment in any form (review the Employee Manual page 8b ) in the future. None will be tolerated and the Company will react to even a hint of same.

I vehemently oppose these laws as an individual but as a manager I am forced to demand compliance. I love a good joke and good humor in the shop is a healthy item. Respect is the keyword and frankly it always has been. The world has changed dramatically in my 60 years and real or imagined sensitivities now become contentious and protective litigation subjects. Please be careful.

Please be advised that management would like to see all shop employees in steel-toed shoes or boots.

Ron Musgrove

AFI0600

EXHIBIT D

# RECEIPT FOR EMPLOYEE MANUAL

I HAVE RECEIVED A COPY OF THE APPLIED FUSION INC. EMPLOYEE MANUAL WHICH INCLUDES: A) THE EMPLOYEE HANDBOOK - REVISED 1997 EDITION, B) THE SAFETY POLICIES AND PROCEDURES FOR INJURY AND ACCIDENT PREVENTION, AND C) THE PROFIT SHARING PLAN SUMMARY DESCRIPTION WITH BENEFICIARY FORM, WHICH SPECIFY POLICIES, PRACTICES, AND REGULATIONS. I HAVE **READ, UNDERSTAND, AND AGREE TO COMPLY WITH** THESE POLICIES, PRACTICES, AND REGULATIONS DURING MY EMPLOYMENT WITH THE COMPANY.

I ALSO ACKNOWLEDGE THAT I WILL BE RESPONSIBLE FOR COMPLYING WITH FUTURE CHANGES IN SAID POLICIES, PRACTICES, AND REGULATIONS AS MAY OCCUR FROM TIME TO TIME, WHETHER OR NOT I HAVE SIGNED AN ACKNOWLEDGMENT FOR SUCH CHANGES OR DISAGREE WITH SAME.

I AGREE TO RETURN THIS COPY OF THE EMPLOYEE MANUAL UPON TERMINATION OF MY EMPLOYMENT.

[signature] 4/24/00

EMPLOYEE SIGNATURE DATE

NOTE:

SPECIAL ATTENTION MUST BE PAID TO THE SECTIONS OF THE EMPLOYEE HANDBOOK DESCRIBING COMPANY POLICY REGARDING SAFETY, HARASSMENT AND DISCRIMINATION. THESE ARE VERY SENSITIVE, LEGAL LIABILITY ISSUES AND IF THE COMPANY EVEN "PERCEIVES", FOR ANY REASONS, THAT A VIOLATION MAY HAVE OCCURRED, IT WILL BE JUSTIFIED IN IMMEDIATELY REACTING WITH A LAY OFF WITH OUT PAY OR, IN THE WORST CASE, TERMINATION.

**THIS "RECEIPT FOR EMPLOYEE MANUAL" MUST BE SIGNED, DATED, AND RETURNED TO THE MAIN OFFICE AT 1915 REPUBLIC AVENUE.**

# AT WILL EMPLOYMENT

AS A RESULT OF THE MANY LAWSUITS BEING BROUGHT AGAINST EMPLOYERS BY TERMINATED OR RESIGNED EMPLOYEES, IT BECOMES NECESSARY FOR APPLIED FUSION, INC. TO WRITE THIS DISCLAIMER. ALL EMPLOYEES MUST SIGN THIS DOCUMENT WITH THE UNDERSTANDING THAT NO EMPLOYEE HAS A CONTRACT FOR LIFELONG EMPLOYMENT AND SUCH HAS NOT BEEN IMPLIED BY ANYONE IN MANAGEMENT.

*"I UNDERSTAND THAT MY EMPLOYMENT AT APPLIED FUSION, INC. IS NOT A "CONTRACT OF EMPLOYMENT".*

*THE COMPANY AND THE EMPLOYEE HAVE THE SAME RIGHTS TO END THIS EMPLOYMENT AT ANY TIME FOR ANY REASON(S).*

*I UNDERSTAND THAT ANY ORAL OR WRITTEN STATEMENTS TO THE CONTRARY BY ANYONE AT APPLIED FUSION, INC. INCLUDING ITS OFFICERS ARE HEREBY EXPRESSLY DISAVOWED."*

THE COMPANY ALSO RESERVES THE RIGHT TO CHANGE, INTERPRET, WITHDRAW, OR ADD TO THE POLICIES, BENEFITS, OR RULES OF THE COMPANY WITHOUT PRIOR NOTICE OR APPROVAL OF ANY EMPLOYEE.

THIS DOES NOT ALTER ANY ATTITUDES OR POLICIES APPLIED FUSION, INC. HAS HELD THROUGH THE YEARS AND DOES NOT AFFECT ANYONE'S JOB OR POSITION. THIS IS STRICTLY A DOCUMENT REQUIRED TO PROTECT THE WELFARE OF THE COMPANY AND ITS EXISTING EMPLOYEES IN THE FUTURE.

[signature] 4/24/00

EMPLOYEE SIGNATURE DATE

EXHIBIT E

# APPLICATION FOR EMPLOYMENT

We consider applicants for all positions without regard to race, color, religion, creed, gender, national origin, age, disability, marital or veteran status, or any other legally protected status.

**(PLEASE PRINT)**

| Position(s) Applied For | Date of Application |
|---|---|
| Journeman Machinist | 4/18/00 |

How Did You Learn About Us?

☐ Advertisement ☐ Friend ☐ Inquiry

☐ Employment Agency ☐ Relative ☐ Other ______________

| Last Name | First Name | Middle Name |
|---|---|---|
| DONG | Guang | Kui |

| Address Number Street | City | State | Zip Code |
|---|---|---|---|
| 2337-21st AVE APT. C | Oakland | CA | 94606 |

| Telephone Number(s) | Social Security Number |
|---|---|
| 510 533-0872 | 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 |

Best time to contact you at home is: any time AM PM

If you are under 18 years of age, can you provide required proof of your eligibility to work? ☐ Yes ☐ No

Have you ever filed an application with us before? ☐ Yes ☑ No
If Yes, give date ______

Have you ever been employed with us before? ☐ Yes ☑ No
If Yes, give date ______

Do any of your friends or relatives, other than spouse, work here? ☐ Yes ☑ No
If Yes, state name, relationship and location ______

Are you currently employed? ☐ Yes ☑ No

May we contact your present employer? ☑ Yes ☐ No

Are you prevented from lawfully becoming employed in this country because of Visa or Immigration Status? ☑ Yes ☐ No
*Proof of citizenship or immigration status will be required upon employment.*

Date available for work ___/___/___ What is your desired salary range? $19 or ~~[illegible]~~

Are you available to work: ☑ Full Time (Please indicate (1) (2) 3 shift)
☐ Part Time (Please indicate Mornings Afternoon Evenings)
☐ Temporary (Please indicate dates available ___/___ - ___/___)

Are you currently on "lay-off" status and subject to recall? ☐ Yes ☐ No

Can you travel if a job requires it? ☑ Yes ☐ No

WE ARE AN EQUAL OPPORTUNITY EMPLOYER

AFI0404

NAME: ______ POSITION: ______ DATE: ______

## APPLICANT'S STATEMENT

I certify that answers given herein are true and complete.

I authorize investigation of all statements contained in this application for employment as may be necessary in arriving at an employment decision.

This application for employment shall be considered active for a period of time not to exceed 45 days. Any applicant wishing to be considered for employment beyond this time period should inquire as to whether or not applications are being accepted at that time.

I hereby understand and acknowledge that, unless otherwise defined by applicable law, any employment relationship with this organization is of an *"at will"* nature, which means that the Employee may resign at any time and the Employer may discharge Employee at any time with or without cause. It is further understood that this *"at will"* employment relationship may not be changed by any written document or by conduct unless such change is specifically acknowledged in writing by an authorized executive of this organization.

In the event of employment, I understand that false or misleading information given in my application or interview(s) may result in discharge. I understand, also, that I am required to abide by all rules and regulations of the employer.

Highly recomended By X Employer, good Manual Machinisi Doing Tooling & Prototype Maching 4-21-00 Pat [illegible]

OK TO START ASAP. George M [illegible]

4/18

JOSEPH AT HEAT & CONTROL INC.

VERY GOOD MANUEL MACHINIST VERY DEPENDABLE, AND ONE OF HIS BEST WORKERS. THE ONLY REASON HE WAS LAY OFF IS THAT HE DID NOT HAVE SENIORITY OVER THE OTHER MACHINIST JOSEPH ALSO SAID THAT GUANG IS VERY GOOD ON THE VTLS. AND HAS SOME CNC EXP.

AFI0407

Signature of Applicant

Date

This Application For Employment is sold for general use throughout the United States. Amsterdam Printing and Litho assumes no responsibility for the use of said form or any questions which, when asked by the employer of the job applicant, may violate State and/or Federal Law.

Rev 11/98

Re-order Form #31613 for plain forms and #31623 for imprinted forms.
© Copyright 1998 Amsterdam Printing and Litho • Amsterdam, NY 12010 • To Re-order Call 1-800-833-6231

AMSTERDAM