BURTON F. BOLTUCH (SBN 070211)
LAW OFFICES OF BURTON F. BOLTUCH
555 12th Street, Suite 1440
Oakland, CA 94607-4046
Telephone: (510) 844-3415
Facsimile: (510) 444-3401
E-Mail: bboltuch@workplacelaw.biz

Attorneys for Defendants APPLIED FUSION, INC.; JEFF MUSGROVE; MOHAMMED ANSARI and GEORGE SILVA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

Apple Inc. v. Psystar Corporation — Doc. 2974 Att. 3

| | |
|---|---|
| GUANG-KUI DONG,<br>Plaintiff,<br>vs.<br>APPLIED FUSION, INC., JEFF MUSGROVE, PATRICK DAVIS, MOHAMMED ANSARI, GEORGE SILVA, GREGORY GEDDIS, CITY OF SAN LEANDRO, OFFICER R LOPEZ and DOES 1 through 5, inclusive,<br>Defendants. | Case No.: C-03-3698 SI ADR<br><br>DECLARATION OF GEORGE SILVA IN SUPPORT OF MOTION OF DEFENDANTS APPLIED FUSION, INC.; JEFF MUSGROVE; MOHAMMED ANSARI AND GREG GEDDIS FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF THE ISSUES<br><br>Hearing Date: June 10, 2005<br>Hearing Time: 9:00 a.m.<br>Courtroom: 10 (19th Floor)<br>Trial Date: August 8, 2005 |

I, GEORGE MARSHALL SILVA, JR., hereby declare and state as follows:

1. I, George Marshall Silva, Jr., I have personal knowledge of the facts set forth in this Declaration, except for those facts stated on information and belief. If called to testify as a witness in this matter, I am competent to so testify and would testify to the facts set forth in this Declaration

2. I am employed by Applied Fusion, Inc. ("AFI"). My business address is 1915 Republic Avenue, San Leandro, California 94577. I have been employed by AFI since

approximately October 12, 1977. I am one of the defendants in the above-referenced case.

3. I am currently the Vice President of Manufacturing for AFI and have held that position for approximately seven (7) years.

4. In 2000, I interviewed Plaintiff Guang-Kui Dong ("Dong ") and recommended that he be hired. After receiving permission from the owner of AFI, I hired Mr. Dong.

5. On February 6, 2004, my deposition was taken in this matter.

6. It is my customary practice at AFI to take notes, often contemporaneously, of significant events. Attached to this Declaration as Exhibit A, and incorporated herein by reference as though fully set forth herein, are true and correct copies of various notes involving Dong that I took during the period October 1 through October 7, 2002. (Document Nos. AFI 0415-0418, 0422 and 0424.) It is my understanding that these notes were produced to Mr. Dong's attorney, Darryl Parker. During my deposition, Mr. Parker questioned me about these notes. The document marked AFI0424 contains notes taken by me on October 1, 2002. As set forth in the transcript of my deposition and as noted in this Declaration, I spoke with Pat Davis on October 1 about the amount of time Dong took on Job E-8127. Apparently, Dong did not follow AFI's instructions for his job. As set forth in the document, Pat Davis said he would speak with Dong about the matter. As Vice President of Manufacturing, I am aware of discipline that is imposed on employees. Dong was not disciplined for this incident. This is how AFI deals with such situations for all employees, unless AFI can demonstrate that the employee intentionally caused the problem.

7. On October 4, 2002, at approximately 9:30 a.m., Dong asked if he could speak to me. The document marked "AFI0415" contains notes I took on October 4, 2002 of that conversation. As set forth in my deposition and in the note, Dong said that he believed that Frank Levering was saying things behind Dong's back. However, Dong admitted to me that he did not even know if Frank Levering was even talking about Dong, but Dong just "believed" that Frank Levering did not like him because of his "yellow" skin. AFI has a very strict policy of zero tolerance for harassment, discrimination and retaliation. Neither AFI nor I will tolerate any employee taking any action against or speaking about any other employee because of the

employee's race, sex, nationality or any other such basis. Thus, I told Dong on October 4 that I would have Frank Levering come to my office and I would talk with Frank Levering, either with or without Dong. Dong told me that it was not necessary for me to speak with Levering. Nevertheless, as I testified at my deposition, I did speak to Levering. At no time did I gather any information from Frank Levering that these actions of Frank Levering were motivated or based on Dong being Chinese. The documents identified as AFI0415 and AFI05416 contain my notes taken on October 4, 2002.

8. At approximately 9:30 to 10:00 a.m. on October 7, 2002, I did speak with Frank Levering. I asked him what had been going on, if anything between Dong and Levering. My notes regarding these conversations were taken on October 7 and are identified as "AFI0417" and "AFI0418." On October 7, 2002, I informed Frank Levering that he should do nothing to cause any issues with Dong. I told Levering that if he had any issues with Dong, he was to come to get me so I could resolve the issues.

9. As I testified during my deposition, when I spoke to Dong on October 4, 2002, Dong criticized Frank Levering about the amount of time that Dong believed Levering had taken to learn machining. Dong normally worked the Bullard machine, rather than the CNC machine. During this conversation on October 4, 2002, Dong stated that if he could not timely learn the CNC machine, he would kill himself. As I have testified, at that time, I did not think that Dong was serious. However, on October 7, 2002, after Mohammed Ansari and Gregory came into my office and reported Dong's threats on October 7, 2002 to shoot Frank Levering, Pat Davis, others and then himself, I immediately realized that it was my obligation to report all of the events to Jeff Musgrove, the President of AFI.

10. As I testified, on October 7, 2002, I reported to Jeff Musgrove what Ansari and Geddis had told me about Dong's threats on October 7. I also told Jeff Musgrove on October 7, 2002 about Dong's comments on October 4, 2002 about possibly killing himself. Jeff Musgrove told me that I should have kept him informed of this immediately.

11. It is my understanding that, after I spoke to Jeff Musgrove, Jeff Musgrove individually spoke to Mohammed Ansari and Greg Geddis to personally ascertain their versions

of the events. He also spoke with me and, as I testified, asked me to watch Dong while he evaluated the situation. I also understand that Jeff Musgrove's investigation included speaking with Dong.

12. I have now been informed that Dong is alleging that he was complaining on October 7, 2002 about being forced to work on the Bullard machine at a time that his work-related injury prevented him from doing so. As I testified, Dong made this complaint to me in either January or February, 2002. When Dong stated to me early in 2002 that he could not work the Bullard machine because he was still recuperating from a work-related injury, I immediately instructed Pat Davis to not have Dong work on the Bullard machine until Dong was physically able to do so. Whatever concerns Dong had about this issue, the matter was fully resolved by the end of February, 2002 and Dong was able from that date to work on the Bullard machine.

13. The document identified AFI0422 contains my notes of October 7, 2002 briefly summarizing what Mohammed Ansari and Greg Geddis told me. Because of the urgency of the situation, my notes for this occasion are not as detailed as on other occasions. However, as set forth in the notes, I was informed by Ansari and Geddis that both had separately heard Dong make threats on October 7 to shoot employees and then himself.

14. I was not involved in speaking to the police.

15. Dong was not terminated because AFI desired to replace him. It was not until at least approximately six (6) months after Dong's termination that AFI first hired another machinist.

16. As Vice President of Manufacturing, I have a practice when one employee complains about another employee. The practice is to speak to the individuals and, if necessary, get the individuals together to resolve the issue, whatever it may be. If there are complaints, I investigate the complaints. That is why I spoke to Frank Levering after Dong had made his comments to me on October 4, 2002.

17. Mr. Dong's race and/or ethnicity had absolutely no part in my decision to speak to Jeff Musgrove on October 7, 2002. The fact that Mr. Dong had complained on October 4 about Frank Levering possibly talking behind Dong's back had absolutely no role in my decision to

speak to Jeff Musgrove on October 7, 2002. The only reason I spoke to Jeff Musgrove on October 7 about Dong was because of what Mohammed Ansari and Greg Geddis had reported to me, and because on October 7 I realized the significance of Dong's comments to me on October 4, 2002 about killing himself. I wanted the owners of AFI to know what had been reported to me so the owners could make the appropriate decision. I know that the safety and health of all employees is crucial to Jeff Musgrove and Ron Musgrove. As I testified at my deposition, "[a]ny time anybody's life is in danger is a deep urgency." (See page 33 of my deposition.)

18. I have no information or facts which would lead me to believe that either Mohammed Ansari and/or Greg Geddis fabricated the story about Dong that they reported to me on October 7, 2002.

I, George Marshall Silva, Jr., hereby declare under penalty of perjury, pursuant to the laws of the State of California and the laws of the Untied States, that the above Declaration, consisting of this typewritten page and four other typewritten pages, is true and correct, except for those matters stated on information and belief, and as to those matters, I believe them to be true.

Executed on this 4TH day of May, 2005, in San Leandro, California.

George Marshall Silva Jr

George Marshall Silva, Jr.

# EXHIBIT A

GMS NOTES

GENUS LIDS →

**Applied Fusion Inc. – Daily Job Hours Report**

Name DONG G K Date 10/1/02

| | Job No. | Craft | Customer | Reg. Hours | O.T. Hours |
|---|---|---|---|---|---|
| | E8166-1 | MS | Hamilton | 2.00 | |
| | ~~E8150 MS~~ | | | | |
| | E8127 | MS | GENUS | 5 | |
| 4 | E8150 | MS | MRC | 1 | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | I m. 1st leave | | |
| 8 | | | | | |

Safety Hours

Maint. Hours

Job O.H. Hours

Training Hours

Totals 8

**Note:**
***This Is A Critical Job Report, Please Turn In Daily.***

ORIGINAL 1982 - REVISED 1/96

10/1/02

I TALKED TO PAT ABOUT THE TIME GUANG HAS ON E-8127 GENUS JOB HE HAS PUT A TOTAL OF 7 HRS ON THIS JOB THIS WEEK JUST TO DRILL 4 HOLES! PATS RESPONSE WAS THAT GUANG DID NOT USE THE SET UP THAT WAS ALREADY ON THE MACHINE HE RE SET THE JOB UP. & why PAT DIDNT KNOW! PAT DID QUESTIONED GUANG why HE WOULD BREAK DOWN A SET UP THAT WOULD WORK FOR HIS JOB. AT THAT TIME GUANG WAS NOT HAPPY THAT PAT HAD QUESTIONED HIM. I DID ASK PAT IF HE GAVE GUANG HIS INSTRUCTIONS & HE SAID YES BUT GUANG DID NOT LISTEN TO HIM. I THEN TOLD PAT THAT IF HE WANTED I WOULD TALK TO GUANG MYSELF IF GUANG IS NOT GOING TO FOLLOW ~~OUR~~ YOUR INSTRUCTIONS PAT THEN SAID HE WOULD LET ME KNOW IF THERE IS

AFI0424

GMS NOTES 10/4/02

FRIDAY @ 9:30 GUANG ASKED IF HE CAN TALK TO ME ABOUT FRANK. I SAID COME IN & TALK & HE PROCEEDED TO SAY THAT FRANK IS ALWAY SAYING THINGS BEHIND HIS BACK & THE OTHER DAY HE WAS YELLING TO RIGO HEY BABY HEY BABY & SO I ASKED GUANG IF FRANK WAS TALKING TO HIM & HE SAID I DONT KNOW I JUST KNOW THAT HE DOESN'T LIKE ME BECAUSE OF MY SKIN "YELLOW" SO I TOLD GUANG I CAN PULL HIM INTO THE OFFICE MONDAY AND HAVE A TALK WITH THE BOTH OF YOU OR I CAN TRY TO CATCH

FRANK! THEN GUANG SAID FRANK JUST DONT LIKE THE COLOR OF MY SKIN! AT THIS TIME I TOLD GUANG TO LET ME KNOW WHEN SOMETHING HAPPEN THEN ILL TAKE CARE OF IT. I ALSO TOLD GUANG THAT IF FRANK IS DOING THIS I WILL PUT A END TO IT!

GUANG ALSO TALKED ABOUT FRANKS SKILLS -V- HIS SKILLS AND SAID THAT HE NEEDED TO HAVE MORE TIME ON THE CNC'S & THAT IF HE SPENDS 6 MO LEARNING THEM HE WILL BE GOOD AT IT!

10/7/02

MONDAY @ ~ 9:30/10:00
I ASKED FRANK WHAT'S BEEN GOING ON WITH GUANG & RISO & HIM & HE SAID THAT HE HAS BEEN IGNORING GUANG FOR A LONG TIME BECAUSE THATS ALL GUANG DOES IS STARE HIM DOWN EVERY TIME THAT HE IS BY HIM ALTHOUGH ABOUT A WEEK AGO FRANK SAID THAT HE PUT HIS FINGER INTO HIS NOSE WHEN GUANG WAS STARING AT HIM THEN GUANG LOOKED THE OTHER WAY! AT THIS TIME I TOLD FRANK NOT TO DO ANYTHING TO CAUSE ANY MORE ISSUES JUST

COME & GET ME SO THAT I CAN SEE FOR MYSELF WHAT'S GOING ON.

GMS NOTE: WHEN TALKING W/FRANK HE NEVER BROUGHT UP RACE OR COLOR OF SKIN! GMS

GMS NOTES 10/7

MID DAY MO & GREG INFORMED ME THAT GUANG HAD MADE STATEMENTS TO THE BOTH OF THEM THAT HE WAS GOING TO BRING A GUN TO AFI AND SHOOT EVERYBODY AND THEN KILL HIMSELF! IMMEDIATELY RAN OVER TO JEFF'S OFFICE AND TOLD HIM. JEFF THEN CALL THE POLICE. I ALSO LET PAT DAVIS KNOW WHAT WAS GOING ON.
AT THIS POINT I KEPT A WATCH ON GUANG UNTIL THE POLICE CAME.

NOTE: GUANG DID NAME PAT & FRANK ESP.

AFI0422