BURTON F. BOLTUCH (SBN 070211)
LAW OFFICES OF BURTON F. BOLTUCH
555 12th Street, Suite 1440
Oakland, CA 94607-4046
Telephone: (510) 844-3415
Facsimile: (510) 444-3401
E-Mail: bboltuch@workplacelaw.biz

Attorneys for Defendants APPLIED FUSION, INC.; JEFF MUSGROVE; MOHAMMED ANSARI and GEORGE SILVA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GUANG-KUI DONG,

Plaintiff,

vs.

APPLIED FUSION, INC., JEFF MUSGROVE, PATRICK DAVIS, MOHAMMED ANSARI, GEORGE SILVA, GREGORY GEDDIS, CITY OF SAN LEANDRO, OFFICER R LOPEZ and DOES 1 through 5, inclusive,

Defendants.

Case No.: C-03-3698 SI ADR

DECLARATION OF GREG GEDDIS IN SUPPORT OF MOTION OF DEFENDANTS APPLIED FUSION, INC.; JEFF MUSGROVE; MOHAMMED ANSARI AND GREG GEDDIS FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF THE ISSUES

Hearing Date: June 10, 2005
Hearing Time: 9:00 a.m.
Courtroom: 10 (19th Floor)
Trial Date: August 8, 2005

Apple Inc. v. Psystar Corporation Doc. 2974 Att. 4

I, GREGORY GEDDIS, hereby declare and state as follows:

1. I, Gregory Geddis, have personal knowledge of the facts set forth in this Declaration, except for those facts stated on information and belief. If called to testify as a witness in this matter, I am competent to so testify and would testify to the facts set forth in this Declaration.

2. I have been employed by Applied Fusion, Inc. ("AFI") since approximately 1999. My business address is 1915 Republic Avenue, San Leandro, California 94577. I am one of the defendants in the above-referenced case.

3. On February 6, 2004, my deposition was taken in this case. Attached to this Declaration as Exhibit A, and incorporated herein by reference as though fully set forth herein, are true and correct copies of various pages of my deposition. Attached to this Declaration as Exhibit B, and incorporated herein by reference as though fully set forth herein, is a true and correct copy of the deponent signature page executed by me on April 7, 2004, with the attached list of corrections to my deposition and the explanation for the changes.

4. As set forth in the transcript of my deposition, on Monday, October 7, 2002, I had a conversation with Plaintiff Guang-Kui Dong ("Dong") during which I heard him state that he was going to kill Pat [Davis] and going to kill himself. I know that Dong has denied making these threats on October 7. There is no doubt that, on October 7, 2002, I spoke with Mohammed Ansari. Ansari and I discussed that we had both separately heard Dong make threats on October 7 to shoot others and then to shoot himself.

5. Because of the comments made to us by Dong, Ansari and I both went to see George Silva, the Vice President of Manufacturing of AFI. As set forth in the transcript of my deposition, Ansari and I informed Silva of the statements by Dong on October 7.

6. I have been informed that George Silva then reported these events to Jeff Musgrove, the President of AFI. Sometime later that morning, Jeff Musgrove approached me and questioned me about what I had heard Dong say about shooting others and then himself. I confirmed to Jeff Musgrove the comments by Dong about threatening to shoot other employees and himself. It was evident to me that Jeff Musgrove was seeking to verify what had occurred.

7. Later on October 7, 2002, I was summoned to the office of AFI. In the office were police officers from the San Leandro police department. I did not know that the police were coming before I was called to the office. The police asked me what I observed and had heard involving Dong. I informed the police, as set forth in my deposition, that I had heard Dong threaten to kill Pat Davis and himself.

8. At no time on October 7 when I reported the events to George Silva, to Jeff Musgrove or to the police were my statements about Dong false. I was reporting what I had observed and heard. I did not make the reports because of any hostility toward Dong nor to have him arrested, detained or terminated. At no time did I request that Dong be detained or arrested or institutionalized in a mental hospital or any other medical facility. My sole purpose was to inform management of the events so management could take any action it deemed appropriate.

9. At no time were my actions on October 7, 2002, with respect to Dong, based, in whole or in part, on any intent to "vex, injure and/or annoy" Dong, nor did I report the events because I desired to cause Dong emotional distress, humiliation, hardship or embarrassment.

10. I was not asked my opinion whether Dong should be terminated nor did I participate in that decision.

I, Gregory Geddis, hereby declare under penalty of perjury, pursuant to the laws of the State of California and the laws of the Untied States, that the above Declaration, consisting of this typewritten page and two other typewritten pages, is true and correct, except for those matters stated on information and belief, and as to those matters, I believe them to be true.

Executed on this 4 day of May, 2005, in San Leandro, California.

Greg Geddis

Gregory Geddis

EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

| | |
|---|---|
| GUANG KUI DONG,<br>Plaintiff,<br>vs.<br>APPLIED FUSION INC., et al.,<br>Defendants. | CASE NO. C 03-3698 SI ADR |

CERTIFIED COPY

**DEPOSITION OF GREGORY GEDDIS**

DATE: February 6, 2004 (Friday)

TIME: 12:37 p.m.

LOCATION: Applied Fusion
1915 Republic Avenue
San Leandro, CA 94577

DEPOSITION REPORTER: Sarah A. Martinez
Certified Shorthand Reporter #12815

# INDEX


| EXAMINATION BY: | PAGE |
|---|---|
| Darryl Parker, Esq. | 4 |
| Burton Boltuch, Esq. | 46 |
| Appearance Page | 3 |
| Exhibit Page | None |
| Certified Questions | None |
| Deponent Signature Page | 51 |
| Deponent Signature Waiver | 52 |
| Reporter's Certificate Page | 53 |
| Witness Letter | 54 |
| Changes and/or Corrections | 55 |
| Attorney's Notes | 56 |

**A P P E A R A N C E S**

For the Plaintiff: Premier Law Group, LLC
Attorneys at Law
6333 N.E. Radford Drive
Suite 3511
Seattle, WA 98115-8716

By: DARRYL PARKER, ESQ.

PHONE: (206)849-5273
FAX: (206)281-7930

For the Defendants: Law Offices of Burton F. Boltuch
Attorneys at Law
555 12th Street
Suite 1440
Oakland, CA 94607-4046

By: BURTON BOLTUCH, ESQ.

PHONE: (510)844-3415
FAX: (510)444-3401

Also Present: Mr. Guang Kui Dong
Mr. Robert Terris
Mr. Ron Musgrove

Q. Was it in the morning?
A. It seemed like it was early in the morning.
Q. Was it before your first break?
A. No, I think it was after break.
Q. And when do you take your first break?
A. 9:00.
Q. When do you take your second break?
A. 11:30.
Q. Was it before your second break?
A. I believe so.
Q. And were you working at the Olympia machine?
A. Yes.
Q. And Mr. Dong came up to you, while you were standing at the Olympia machine?
A. Yes.
Q. What did he say?
A. He was very fed up with Pat and said he's going to kill Pat and he's going to kill himself, and that's what -- that's what this is all about.
Q. Did he say anything else?
A. No.
Q. Are you sure?
A. Positive.
Q. Did he say why he was going to kill Pat?
A. No. No.

Q. Did he say why he was going to kill himself?
A. No.
Q. Did he say how he was going to kill Pat?
A. Yes.
Q. What did he say?
A. He said he's going to shoot Pat and then shoot himself.
Q. And did he make the sign of a gun with his hand?
A. Yes, sir.
Q. And did he make the sign of a gun with his hand, and point it to his head?
A. Yes, sir.
Q. And was anyone else present when he said that to you?
A. No.
Q. Was anyone else standing in the area?
A. I believe Mohammed was there, because I was turned to talk to Mo about it, and apparently Mo heard about it, too. That's when we decided we should do something.
MR. BOLTUCH: Just answer the question. The question was, was anybody in the area.
THE WITNESS: No.
(BY MR. PARKER)

A. Yeah. Yes, I did.
Q. And who did you tell?
A. George.
Q. Did you tell George, before you spoke to Mo?
A. No.
Q. Why not?
A. I went over to tell Mo, because he's pretty much like my supervisor; not by contents, but I work with him a lot, so I kind of shared with him what he had said, and I guess, apparently, he had said the same thing to Mo. So he had told two people.
Q. How do you know this?
A. Because we talked, me and Mo talked.
Q. What did Mo tell you?
A. He just said, "Wow, he just said the same thing to me."
Q. And then you went and told George Silva?
A. Yeah.
Q. Did Mo go with you?
A. Yeah.
Q. So you both went to tell George Silva?
A. Yeah.
Q. What did you tell him?
A. That he threatened to kill Pat Davis and himself.

Q. Did you tell anybody else?
A. No.
Q. Did you think that -- did he ever say he was going to shoot anyone else, besides Pat Davis?
A. Frank.
Q. He said he was going to shoot Frank, too?
A. Yeah.
Q. So he said more than you initially said?
MR. BOLTUCH: Are you talking about that day?
THE WITNESS: It started out him wanting to shoot Frank, then as soon as he started, somebody was going to shoot somebody else, that's when we put the red flag up and decided it could be a little serious.
(BY MR. PARKER)
Q. When he said to you, on the 7th, that he was going to kill Pat Davis, did he say that he was going to kill Frank on that day, as well?
A. No. It was now only Pat.
Q. So specifically, what did you tell George Silva?
A. That he made a threat that he was going to get a gun and shoot Pat Davis and shoot himself.
Q. Did you tell him anything else?
A. No, that was.
Q. Did you turn around and go back to your work

A. Sure, he did. I don't know for a fact.
Q. And do you know what his job was during that time?
A. Henry is an inspector.
Q. At some point during the day of October 7th, the police showed up, correct?
A. Yes.
Q. Did you know the police were coming, before they showed up?
A. No.
Q. Did you know that the police had been called, before they showed up?
A. No.
Q. What did you tell the police, if anything?
MR. BOLTUCH: Objection. Assumes facts not in evidence, that he spoke to the police.
(BY MR. PARKER)
Q. You spoke to the police, did you not?
A. We got called over to the office.
Q. What did you tell the police?
A. What I told you.
Q. Tell me, specifically.
A. I told them that he threatened to kill Pat Davis and then kill himself.
Q. Was Mo present when you talked to the police?

A. Yes.

Q. Were you both talking to the police at the same time?

A. No, we were in the same room together, but we gave separate reports. We didn't talk at the same time.

Q. Could you hear Mo's report?

A. Yeah.

Q. Was he close enough to hear your report?

A. Yeah.

Q. And how many officers were there?

A. Two.

Q. Can you describe them?

A. No.

Q. Can you even tell if they were male or female?

A. That's easy, yeah. They were both males.

Q. Did the officers ask you any questions?

A. Just asked what happened.

Q. And you told them that he made a threat against Pat Davis?

A. Yes.

Q. That he was going to shoot him and then shoot himself?

A. Yes.

Q. Did you give any other information to the officers?

Mr. Dong was prejudice against white men. Do you remember that question?

A. Yeah.

Q. Did you ever hear Mr. Dong use any expression towards others, that had a racial context? Yes or no.

A. Yes.

Q. What did Mr. Dong say, and about whom did he say it?

A. Now, don't quote me, because I might be wrong. I don't know the different terminology.

Q. Tell me what he said. You don't have to make any conclusion what it is.

A. He said he's from Singapore, and from Hong Kong he doesn't like people from Hong Kong. Chinese people are no good, I think it was, "Hong Kong people no good."

Q. Did he say anything else about Hong Kong people?

A. He said, "They'll stab you in the back."

Q. Say that again.

A. He said, "They'll stab you in the back." I don't even know what nationality Henry is. I don't know.

Q. Did you ever hear Mr. Dong say anything using the term "yellow skin"?

A. Every day.

Q. Yes or no.
A. Yes.
Q. What did he say?
A. Anything that would come up, yellow skin.
Q. Give me a specific you remember about yellow skin.
A. So many times.
Q. Just take a breath. Go ahead. Just think. Either about a person or event.
A. Okay. The machines over there -- there's a couple machines that they never trained him on, and he thought they didn't train him on those machines because he had yellow skin.
Q. And he told you that?
A. Yes, sir.
Q. To the best of your knowledge, what words did Mr. Dong use about training and yellow skin?
A. He said, "They're not training me on that machine because I have yellow skin." And I don't really understand any of that, personally.
Q. When he made these comments, saying that the reason something was happening was because of yellow skin, did you ever say anything, in response?
A. Yes.
Q. What did you say to him?

STATE OF CALIFORNIA )
) ss.
COUNTY OF SOLANO )

The witness, GREGORY GEDDIS, in the foregoing deposition, personally appeared before me, Sarah A. Martinez, a Certified Shorthand Reporter in and for the State of California.

Said witness was then and there at the time and place previously stated, by me, placed under oath to tell the truth, the whole truth and nothing but the truth in the testimony given on the date of the within deposition.

The testimony of the witness and all questions and remarks requested by Counsel was reported by me at the time and place therein named, and thereafter, under my direction and control, caused to be transcribed into typewritten form by means of Computer-Aided Transcription.

I am a Certified Shorthand Reporter licensed by the State of California. I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the case named in the within caption, and that I am not related to any party thereto.

IN WITNESS WHEREOF, I have hereunto affixed my signature to this 24th day of February 2004.

Sarah A. Martinez
Certified Shorthand Reporter #12815

# EXHIBIT B

**DEPONENT SIGNATURE PAGE**

I hereby certify that I have read my deposition, made those changes and/or corrections I deem necessary, and approve the same as now written.

Executed this 7 day of April, 2004 by:

Greg Geddis
______________________________
Greg Geddis
______________________________
GREGORY GEDDIS
Under Penalty of Perjury

I certify that the within transcript was by the above-named witness, GREGORY GEDDIS, thereafter read over, corrected and signed, and by the same witness declared to be his/her deposition in said action.

IN WITNESS WHEREOF, I hereunto set my hand and affixed my official seal of office in the County of ________________, State of ________________, this 7 day of April, 2004.

______________________________
~~Notary Public~~ Admin Exec

# CORRECTIONS TO THE DEPOSITION OF GREGORY GEDDIS

Deposition Date: February 6, 2004

| Page | Line | Change As Follows |
|---|---|---|
| 12 | 2 | I don't think so, except we may have all been in the same area. |
| 13 | 2 | Oh, yeah, we spoke sometimes during the breaks. |
| 14 | 17 | . . . Mohammed may have heard it too. |
| 17 | 22 | Yes. After Mr. Dong was fired. |
| 23 | 5 | Delete the word "No" |
| 24 | 23 | Positive. He vented and he said the thing about killing Pat and himself. |
| 30 | 24 | No, other than what had just occurred. |
| 32 | 10 | . . . almost a daily thing . . . . |
| 32 | 14 | That was almost a daily thing. |
| 35 | 1 | That was basically it. |
| 35 | 25 | I think about ten to fifteen minutes. |
| 36 | 11 | Yes, I believe so. |
| 38 | 7 | No, until after the lawsuit was filed. |
| 38 | 10 | No, I did not know until recently. |
| 40 | 5 | I said I didn't know if Applied Fusion was hiring. |
| 42 | 25 | Yes, I believe so. |
| 47 | 25 | It seemed like he said it almost every day. |