BURTON F. BOLTUCH (SBN 070211)
LAW OFFICES OF BURTON F. BOLTUCH
555 12th Street, Suite 1440
Oakland, CA 94607-4046
Telephone: (510) 844-3415
Facsimile: (510) 444-3401
E-Mail: bboltuch@workplacelaw.biz

Attorneys for Defendants APPLIED FUSION, INC.; JEFF MUSGROVE; MOHAMMED ANSARI and GEORGE SILVA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

Apple Inc. v. Psystar Corporation
Doc. 2974 Att. 5

| | |
|---|---|
| GUANG-KUI DONG,<br><br>Plaintiff,<br><br>vs.<br><br>APPLIED FUSION, INC., JEFF MUSGROVE, PATRICK DAVIS, MOHAMMED ANSARI, GEORGE SILVA, GREGORY GEDDIS, CITY OF SAN LEANDRO, OFFICER R LOPEZ and DOES 1 through 5, inclusive,<br><br>Defendants. | Case No.: C-03-3698 SI ADR<br><br>DECLARATION OF JEFF MUSGROVE IN SUPPORT OF MOTION OF DEFENDANTS APPLIED FUSION, INC.; JEFF MUSGROVE; MOHAMMED ANSARI AND GREG GEDDIS FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF THE ISSUES<br><br>Hearing Date: June 10, 2005<br>Hearing Time: 9:00 a.m.<br>Courtroom: 10 (19th Floor)<br>Trial Date: August 8, 2005 |

I, JEFF MUSGROVE, hereby declare and state as follows:

1. I, Jeff Musgrove, have personal knowledge of the facts set forth in this Declaration, except for those facts stated on information and belief. If called to testify as a witness in this matter, I am competent to so testify and would testify to the facts set forth in this Declaration.

2. I have been the President of Applied Fusion, Inc. ("AFI") for approximately the last twelve years. My business address is 1915 Republic Avenue, San Leandro, California

94577. I have been employed by AFI since approximately October 12, 1977. I am one of the defendants in the above-referenced case. My father, Ron Musgrove, is the CEO of AFI.

3. I have reviewed the personnel file of Dong. Although I am aware he periodically made mistakes drilling parts, he was not disciplined for such mistakes. As is typical at AFI, when an employee makes a mistake with respect to the drilling or manufacture of parts, we discuss the mistake with the employee and if possible correct the mistake. Discipline would be imposed if AFI had a legitimate belief that the employee deliberately sabotaged the work.

4. On February 15, 2005, my deposition was taken in this case. Attached to this Declaration as Exhibit A, and incorporated herein by reference as though fully set forth herein, are true and correct copies of various pages of my deposition.

5. Attached to this Declaration as Exhibit B and incorporated herein by reference as though fully set forth herein, is a true and correct copy of the document executed by me on April 16, 2005, setting forth the corrections to my deposition, all of which are spelling corrections.

6. I was the person who summoned the police on October 7, 2002 regarding Plaintiff Guang-Kui Dong ("Dong"). The decision to call the police and the decision to terminate Dong were not in any way in retaliation for any complaints Dong had allegedly made about AFI or its practices. The decision to summon the police on October 7, 2002 was not based in any way on any reports from Frank Levering or on Frank Levering's interactions with Dong. In fact, it was not until sometime after October 10, 2002 that I even learned that Dong (a) had made comments to George Silva, the Vice President of Manufacturing for AFI, on October 4 about Frank Levering's alleged harassing Dong, or (b) was asserting that he had complained on October 7 about Pat Davis requiring him to work in January and February, 2002 on the Bullard machine.

7. The decision to call the police on October 7, 2002 was based solely on my good faith belief that Dong had possibly made threats to kill others and himself, on my belief that the police were better trained to evaluate the psychological state of Dong, and on my desire to ensure the safety of AFI employees.

8. As I testified during my deposition, on October 7, 2002, George Silva, Vice President of Manufacturing, informed me that two AFI employees, Mohammed Ansari and Greg Geddis, had reported to Silva that Dong had threatened to kill Pat Davis and others, and then kill himself. After speaking with Silva, I determined that an investigation by me was warranted. I separately spoke with Ansari and Geddis. After each confirmed to me what they had heard Dong state, I then spoke with Dong. As I testified at my deposition, Dong was evasive. Because I will not jeopardize the health and safety of any AFI employee, and because I could not ascertain Dong's mental state, I informed my father that I felt it would be appropriate to contact the police. He concurred and I immediately contacted the police. AFI could not take a chance, despite Dong's denials, with the health and safety of the employees.

9. Sometime soon after the noon hour on October 7, Officer Lopez of the San Leandro Police Department arrived at AFI. I spoke with Officer Lopez. Mohammed Ansari and Greg Geddis were summoned and questioned by Officer Lopez. Officer Lopez and I then went across the street to where Dong was working. I observed Officer Lopez speaking with Dong.

10. Both my father and I were friends of the father of Stewart Alexander. Stewart Alexander's father was one of my father's best friends. Stewart Alexander has been convicted of the murder of three meat inspectors at his company's work site. Because of my personal knowledge of the shooting of the three meat inspectors, on October 7, 2002, I was especially concerned about workplace violence and protecting the AFI employees.

11. As I testified at my deposition, when I learned, on October 7, 2002, from George Silva that Dong had made comments on October 4, 2002 about killing himself, I believe that Silva should have told me about this on October 4. The fact that I was told on October 7 about threats on October 4 and October 7, 2002 had a cumulative affect.

12. AFI has always recognized that its employees are its greatest asset. The safety of our employees has been and continues to be AFI's highest priority. The AFI Handbook lists AFI's goals and places "a safe work place and safety-minded employees" at the top of the list.

13. My father and I are committed to a workplace free of harassment, discrimination and retaliation. It is our corporate philosophy that we will not allow any abusive or threatening

conduct at the workplace. The AFI Employee Handbook contains an explicit statement about AFI's zero tolerance for harassment, discrimination or retaliation. Our current workforce is multi-national and multi-ethnic including employees whose heritage is Caucasian, African-American, Chinese, Mexican, Filipino, Fijian, Dutch, Indonesian, Portuguese, Spanish and Italian. In October, 2002, our workforce was similarly multi-national and multi-ethnic. I am familiar with the July 14, 1997 policy statement prohibiting harassment and discrimination at the workplace.

14. The decision to terminate Dong was made on October 10, 2002 by my father and me. The termination letter, Dong's final check and various other cessation of employment documents were sent to Dong on October 11, 2002. Dong was terminated for the comments he made on October 4 about killing himself if he could not timely learn the CNC machine and for the comments reported to me on October 7, 2002 about Dong shooting Pat Davis, Frank Levering and others, and then himself. I now know that Dong has admitted making the comments on October 4, which confirms our decision. I now know that Officer Lopez has testified that he independently believed that there was probable cause to detain Dong and have Dong transported for evaluation. I have been informed that, after Dong was transported to John George Pavilion, he was evaluated and the medical professionals at that institution independently determined that there was sufficient basis to detain him pursuant to Section 5150. I have been informed that the psychiatrist and other medical professionals at Fremont Hospital made an independent decision that Dong should be detained for further evaluation.

15. Prior to the events in October, 2002, Dong was a competent machinist and received the normal incremental wage increases and bonuses afforded other AFI employees.

16. Greg Geddis, Mohammed Ansari and George Silva were not involved in the decision to terminate Dong. If I had received the same information, from Ansari, Geddis or any other employee, about any employee – Caucasian, African-American, Chinese, Filipino, Portuguese, Jewish, Catholic, Indian, Muslim, or any other employee -- AFI would have done the exact same thing, investigate to the extent possible by speaking to the employees and then summon the San Leandro police, if appropriate. Dong was not singled out and was not retaliated

against. His being Chinese had absolutely no part in the decision to call the police or to terminate him.

17. I have just learned that Dong, in response to an interrogatory, is now asserting that I did not sit down with him on October 7, 2002. That is true. I spoke with him when we were both standing up. When I spoke with Dong on October 7, 2002 and at all other times I have spoken to Dong when he was an employee of AFI, I have never needed an interpreter. Dong speaks sufficient English for me to understand him. Dong never indicated to me while he was employed at AFI that he had any difficulty understanding me.

18. I never asked the police to arrest Dong or detain Dong. None of my actions on October 7, 2002 were taken with the intent to have Dong arrested or detained. My actions on October 7, 2002 were taken to prevent any possible workplace violence and to have the police utilize their experience and training and make the appropriate decision.

I, Jeff Musgrove, hereby declare under penalty of perjury, pursuant to the laws of the State of California and the laws of the Untied States, that the above Declaration, consisting of this typewritten page and four other typewritten pages, is true and correct, except for those matters stated on information and belief, and as to those matters, I believe them to be true.

Executed on this 4 day of May, 2005, in San Leandro, California.

Jeff E Musgrove

Jeff Musgrove

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GUAN-KUI DONG, | ) | CERTIFIED COPY |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. C-03-3698 S1 ADR |
| | ) | |
| APPLIED FUSION, INC., JEFF MUSGROVE, PATRICK DAVIS, MOHAMMED ANSARI, GEORGE SILVA, GREGORY GEDDIS, CITY OF SAN LEANDRO, OFFICER LOPEZ and DOES 1 through 5, Inclusive, | ) | |
| | ) | |
| Defendants. | ) | |

DEPOSITION OF JEFFREY MUSGROVE

| | |
|---|---|
| DATE: | March 9, 2005 |
| TIME: | 9:36 a.m. |
| LOCATION: | MEYERS NAVE RIBACK SILVER & WILSON<br>555 12th Street, 16th Floor<br>Oakland, California |
| REPORTED BY: | Melissa Roen Williams, CSR, RPR<br>Certified Shorthand Reporter<br>License Number 12284 |

A P P E A R A N C E S

For the Plaintiff: PREMIER LAW GROUP, PLLC
BY: DARRYL PARKER, Attorney-At-Law
AGC Building, Suite 705
1200 Westlake Avenue N
Seattle, California 98109
(206)285-1743

For the Defendants APPLIED FUSION, INC.; JEFF MUSGROVE; PATRICK DAVIS; MOHAMMED ANSARI; GEORGE SILVA; GREGORY GEDDIS:
LAW OFFICES OF BURTON F. BOLTUCH
BY: BURTON F. BOLTUCH, Attorney-At-Law
The 555 City Center Building
555 12th Street, Suite 1440
Oakland, California 94607
(510)844-3415

For the Defendants CITY OF SAN LEANDRO, OFFICER LOPEZ:
MEYERS NAVE RIBACK SILVER & WILSON
BY: JENNIFER C. ADDAMS, Attorney-At-Law
555 12th Street, Suite 1500
Oakland, California 94607
(510)808-2000

INDEX

PAGE

By Mr. Parker.............................4

By Mr. Boltuch...........................73

By Ms. Addams............................82

Further Examination by Mr. Boltuch.........83

EXHIBITS

NO. DESCRIPTION PAGE

(There were no exhibits marked for identification.)

said in this room? Do you understand that?
A Yes.
Q And it will be put into a booklet form, and you'll be able to read your deposition transcript, the same as you've read other depositions in this case.
Do you understand that?
A Yes.
Q And you're entitled to make any changes you deem fit.
Do you understand that?
A Yes.
Q What's your current position at Applied Fusion?
A President.
Q How long have you been president of Applied Fusion?
A Twelve years maybe.
Q And do you supervise George Silva?
A Yes.
Q Do you supervise Pat Davis?
A Yes.
Q Supervise anybody else?
MR. BOLTUCH: Objection; vague and ambiguous.
You mean directly or ultimately?
BY MR. PARKER:

Q Yes.
A Did I work?
Q Yes.
A 7:30 to 5:30, 6:00. They vary.
Q Did George Silva tell you on October 7th, 2002 that he had received information that Guan-Kui Dong had made a threat against employees at Applied Fusion?
A Yes.
Q And was this a face-to-face conversation?
A Yes.
Q Did where the conversation take place?
A My office.
Q And did George Silva initiate the conversation?
A Yes.
Q Did you make any notes of the conversation?
A No.
Q Did you note the time of the conversation?
A No.
Q Did you -- do you know whether it was in the morning or the afternoon?
A Late morning.
Q And was anyone else present besides you and George during this conversation?
A No.

Q Tell me what George told you.

A He told me that -- that Greg and Moe had concerns and mentioned to him that Guan had threatened to kill individuals in the shop: Frank Levering, Pat, and others in the shop, including himself. And that he also had mentioned the previous Friday when he had a conversation with him that he was frustrated or something about running a machine, or if he couldn't learn a CNC machine or something, that he would kill himself.

He made mention to it, and I got on George about it. I said, "Why didn't you tell me this then and there if this guy is that unstable?" And George says, "You know, I didn't even think anything of it at that time, until Moe and Greg told me about what he said just awhile ago, and now it looks like there's a problem." So that's when I acted.

Q Did -- did George describe to you the conversation he had with Guan-Kui Dong where he made the comment about if he couldn't learn the CNC machine, he would kill himself?

MR. BOLTUCH: Objection. What do you mean? Describe it? He just testified what George told him.

BY MR. PARKER:

Q I'm not asking that. I understand that.

Did he describe the conversation that he was having with Mr. Dong at the time he stated this was the case?

MR. BOLTUCH: Is it the context you're trying to find out?

BY MR. PARKER:

Q Yes. Did he -- I don't mean to confuse you. But he's relaying to you a conversation that he had with Mr. Dong; correct? On October the 4th?

A Yes.

Q And he tells you that during this conversation, Mr. Dong says, "If I couldn't learn the CNC machine, I would kill myself"?

A Right.

Q Did he describe to you the rest of the conversation that he had with Mr. Dong?

A I'm sure he did, but I don't remember all the details. I don't recall.

Q Do you know what context Mr. Dong made the statement, "If I couldn't learn the CNC machine, I would kill myself"?

A At this point I don't recall. I was focused on that one issue.

Q And your recollection of the events of October 7th that you're testifying to now, is that

purely from memory?

A Repeat the question, please.

Q The events that you've just testified about on October 7th, where you had the conversation with George Silva, are you relaying that information simply from your memory?

A Yes.

Q Is there a document that helps you remember this conversation between yourself and George Silva?

MR. BOLTUCH: Objection. He said he has a memory. He's not indicated he needs any help.

BY MR. PARKER:

Q I'm not asking him does he need help. I'm asking, is there any document that you believe would help you remember what happened on October 7th, 2002?

MR. BOLTUCH: Same objection. He hasn't indicated he needs any help.

MR. PARKER: Could you answer the question, please.

THE WITNESS: No.

BY MR. PARKER:

Q Did you speak to George Silva about his deposition testimony prior to your deposition?

A Repeat the question, please.

Q Did you speak to George Silva about his

deposition testimony prior to you coming here today to give your deposition?

A No.

Q Did you speak to Ron Musgrove about his deposition testimony prior to you coming here and giving your deposition?

A No.

Q And why didn't you make notes of this conversation that you had with George Silva?

MR. BOLTUCH: Would you repeat the question, please, Mr. Parker.

BY MR. PARKER:

Q Why did you not make notes of the conversation you had with George Silva that you just referred to?

A I didn't feel it was necessary.

Q After you had the conversation with George Silva, what did you then do?

A I then went out, and I wanted to -- I went to talk to Greg and Moe, and I wanted to get their version, confirm what George told me. And they told me exactly what George told me, and they wanted to get that out in their own words. And I went back to my office, sat down, thought about it for a few minutes.

And then I went back across the street, and I went -- quietly went out to Guan, asked him to shut his

machine off, and I pulled him out into the alleyway. I told him to come out into the alleyway discretely and -- where nobody can see. I didn't want to cause a disturbance or anything. And so it was just him and I.

And then I asked him -- I confronted him. I said, "Are you threatening to kill people in the shop, my employees?"

And he said -- are you asking me what he said or what I did at that point? I lost track.

Q Well, I asked you what you did. You can complete your answer, and then I'll direct you a little more specifically.

MR. BOLTUCH: Well, the day is long. When did you want him to stop?

MR. PARKER: You can stop right after completing your answer about what Dr. Dong said, and then I'll direct you specifically.

THE WITNESS: Okay. So where do I stop then?

MR. BOLTUCH: You just said, "Are you threatening to kill my employees in the shop?" And I guess what he's asking you is what, if anything, did Mr. Dong reply; correct?

BY MR. PARKER:

Q Correct. What, if anything, did Mr. Dong reply?

A Okay. At that point Dong seemed very agitated and squirmish. He really tried hard to avoid my question, because I asked him directly. And he started rambling on about other things that were indirectly related to my question.

I said, "Dong, I asked you a simple question." And he continued to avoid the question. He started talking about the jobs, jobs being specific jobs in the shop, work related things. I said, "That's not what I asked you."

MR. BOLTUCH: You said you wanted to direct him now, Mr. Parker?

BY MR. PARKER:

Q I want you to finish your conversation with Dr. Dong. Finish telling me what you said to him and what he said to you before leaving him.

A Because he was so evasive in answering my question -- he didn't even say, no, I never said anything like that -- that raised a lot of suspicion in my mind that he wasn't even able to answer me directly a yes or no. And at that point I let him go. I said, "Okay, Dong. Go on back to your machine."

Q Why didn't you insist on an answer to your question?

A I did. Three times.

Q Why did you let him go back to work without insisting that he give you an answer?

MR. BOLTUCH: Objection; asked and answered. Go ahead.

THE WITNESS: Because I didn't want to agitate him any more than he already seemed.

BY MR. PARKER:

Q Okay. And while he was avoiding your questions, you said he seemed agitated.

How did that manifest itself?

A He did not expect me to confront him.

Q What did you observe -- what did you physically observe in his face or mannerisms that you considered to be evidence of agitation?

A His body was squirmish, and he was -- his eyes were very shifty. He didn't look straight at me. He turned very pale.

Q Anything else?

A He got sweaty, you know.

Q Did you have -- at the time you had the conversation with him, did you have information that the way he was going to kill other employees was by shooting them?

A Can you repeat the question, please.

Q At the time that you confronted Mr. Dong and

asked him the questions you just described, did you have information that the method that he was going to use to kill employees was to shoot them?

A Yes.

Q Did you ask him Dong whether he had a weapon?

A Yes, I did.

Q And what did he say?

A No.

Q Did you ask Mr. Dong whether or not he was angry at Pat Davis?

A I don't recall.

Q Did you ask Mr. Dong whether or not he was angry at Frank Levering?

A No.

Q After you spoke to George Silva, you said the next thing that you did was you spoke to Greg and Mohammed; correct?

A Yeah.

Q Your conversation with Greg, where did that take place?

A In the shop.

Q Where in the shop?

A At his machine.

Q You went up to him while he was working at his machine?

Q Then what did you do?
A And we discussed the matter, and we both agreed that we should call the police right away.
Q And did you do that?
A Yeah.
Q Did you place the call yourself?
A Yes, I believe so.
Q And what did you tell the police?
A I told them we have a situation on hand, that we have an employee that threatened to kill people in the shop.
Q Anything else?
A And that we need them to come down right away, and we need him to be searched. And that was it.
Q Why didn't you just ask Mr. Dong to leave the premises?
A Because that may have made matters worse, if he was ready to do so.
Q It was just a choice that you made?
A Yeah. I didn't want to raise more suspicion.
Q And after you hung up -- strike that.
After you told the police this, what did the police say?
A They said they'd be down right away.
Q Did they ask you any questions?

police that you wanted the police to remove Mr. Dong from your premises?

A Repeat the question.

Q Did you ever state to the police that you wanted Mr. Dong removed from the premises of Applied Fusion?

A Yes, I may have.

Q And when did you say that?

A When I talked to them in my office.

Q Did you tell the police you wanted Mr. Dong arrested?

A I don't recall that.

Q Did you want Mr. Dong arrested?

A I didn't know what to do with him, frankly.

Q I understand that. But I'm asking you, did you want him to be arrested? Is that why you called the police?

MR. BOLTUCH: Objection; assumes a fact not in evidence, that he was thinking about that.

BY MR. PARKER:

Q That's my question to you. Did you call the police because you wanted Mr. Dong arrested?

A No.

Q When the police arrived, did you tell them that you wanted Mr. Dong arrested?

A No.

Q At that time that -- at that time that you felt it necessary to call the police, did you have it in your mind that you were going to terminate Mr. Dong?

A No.

Q Did you ever decide that you were going to terminate Mr. Dong?

A Yes.

Q And by "terminate," I mean his employment.

Did you ever decide that you were going to terminate his employment?

A Yes.

Q And when did you decide that?

A A couple days after.

Q And why did you decide that a couple days after?

A Because he's -- determined he's too dangerous to have in the shop, and he's a threat to my workforce. He's imposed a lot of stress on the people he worked around, anxiety, which increases a lot of safety hazards in the shop, working around machinery; tremendous amount of preoccupation, which downgrades productivity in a major way.

Q Did you know that Mr. Dong -- strike that.

When the ambulance arrived, how long did the

A No.

Q At the time that you made the decision to terminate Mr. Dong, did you consult with anybody?

A Yes.

Q And who was that?

A My dad.

Q Did you consult with anyone else?

A No.

Q Did you get any input from anyone else?

MR. BOLTUCH: Other than what he's testified about today?

BY MR. PARKER:

Q No. I'm talking about at the time you were thinking about terminating Mr. Dong, did anyone else come up to you and say "I think he should be terminated" or anything of that nature?

A No.

Q After you decided to terminate Mr. Dong's employment, did you draft a letter?

A Yes.

Q I want to show you what was marked as Exhibit 1 to Ms. Barroerro's deposition.

MR. BOLTUCH: Let the record reflect he's showing the witness a letter on Applied Fusion letterhead dated October 10, 2002, apparently signed by

indicate that you thought Mr. Dong was dangerous?

MR. BOLTUCH: Objection; asked and answered.

Go ahead, Mr. Musgrove.

THE WITNESS: I told them he made verbal threats of killing people in the shop.

BY MR. PARKER:

Q Other than that, did you give them any specifics as to why you thought Mr. Dong was dangerous?

A No.

Q That's all the questions I have.

MR. BOLTUCH: Off the record for a second.

(Counsel and witness confer.)

EXAMINATION BY MR. BOLTUCH

BY MR. BOLTUCH:

Q I have a few questions, please. Mr. Musgrove, I'd like you to look at AFI 413, which is Barroerro Exhibit 2.

Do you see that? The termination letter.

A Yes.

Q Okay. And read that letter to yourself. When you're done reading it, let me know, please.

A Okay.

Q Having read that letter now, what is your best recollection when you and your father decided to terminate Mr. Dong?

A October 9.
Q And why do you say October 9? Is there something in the letter that confirms that in your mind?
A Well, we won't send out a paycheck, a final check, until the decision is made.
Q Also, Mr. Musgrove, Mr. Parker asked you several questions about time frames with respect to October 7th.
Were you looking at your watch from the moment Mr. Silva came to your office until the ambulance came?
A No.
Q Okay. Do you have a specific recollection about the time the various events transpired?
A No.
Q You used phrases like twenty minutes, ten minutes.
Are those guesstimates, or are those accurate times?
A Guesstimates.
Q I'm going to ask you about a couple of specifics. You said that after you spoke to Mr. Silva, you went into the shop and you spoke to Greg and you also spoke to Moe.
Do you remember that testimony?
A Yes.

Q Okay. So what words did Dong use?
A He always used "yellow skin."
Q You also testified that on October 7th, after the police started speak to Mr. Dong, there came a point where you briefly went back to your office.
Do you remember that?
A Yes.
Q Okay. Why did you go back to your office?
A I don't recall why. I had some things to do, but I don't recall why.
Q All right. I'm going to ask you certain questions now, Mr. Musgrove, based on the allegations in Mr. Dong's second amended complaint.
When -- is it correct that you and your father jointly decided to fire Mr. Dong?
A Yes.
Q When that decision was made -- I'm just speaking for you -- was Mr. Dong's race in any way a part of that decision?
A Absolutely not.
Q Was his ethnicity in any way a part of that decision?
A No.
Q Was a desire to hire another employee in place of Mr. Dong a factor at all in the decision to terminate

him?

A No. I'm married to an Asian, Burt.

Q I didn't know that.

Was the fact that Mr. Dong had spoken to you on the three occasions you mentioned about yellow skin in any way a factor in the decision to terminate Mr. Dong?

A No.

Q Was the fact that Mr. Dong had been earlier in his career at Applied Fusion injured on the job a factor in any way in the decision of terminating him?

A No.

Q When you fired Mr. Dong in October 2002, did you have any knowledge that the allegations of Mr. Ansari were false?

A Repeat the question, please.

Q Sure. When you decided to fire Mr. Dong on about October 9, 2002, did you have any knowledge that the allegations by Mohammed Ansari against Mr. Dong were false?

A No.

Q When you decided to fire Mr. Dong on or about October 9, 2002, did you have any knowledge that the allegations of Mr.Geddis against Mr. Dong were false?

A No.

Q At any time on October 7th, 2002, did you do anything to restrain Mr. Dong from leaving the premises by -- against his will?
A No.
Q Did you have anything to -- other than calling the police and doing what you said by leading them over to speak to Mr. Dong, did you in any way indicate to the police that they should transport Mr. Dong in the ambulance?
A No.
Q Until the police told you that they were transporting Mr. Dong to a psychiatric facility, did you have any knowledge that was going to occur?
A No.
Q Okay. Why did you and/or your father turn this over to the police?
A We just know that we can't -- this is a police matter. We can't take these things into our own hands.
Q Did you feel you had the competence to evaluate Mr. Dong?
A Repeat the question.
Q Did you feel you personally had the competence to evaluate Mr. Dong?
A No.
Q Okay. I don't know if that -- I kind of

STATE OF CALIFORNIA )
) ss.
COUNTY OF SANTA CLARA )

I, MELISSA ROEN WILLIAMS, Certified Shorthand Reporter for the State of California, hereby certify that the witness in the foregoing deposition,

JEFFREY MUSGROVE,

was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause, and that the foregoing is a full, true, and correct transcript of the proceedings had at the taking of said deposition, reported to the best of my ability and transcribed under my direction.

Date: March 23, 2005 Melissa Roen Williams

CSR NO. 12284

EXHIBIT B

Pursuant to SECTION 2025(q)(1) of the Code of Civil Procedure of the State of California, I hereby certify that I have read my deposition, made those changes and corrections I deem necessary, and approve the same as now written, with the changes indicated below:

Dated this 6 day of APRIL, 2006.

Under Penalty of Perjury

1. Throughout the deposition, Plaintiff's name is spelled "GUAN." I believe it should be spelled "GUANG."



330a2019-7582-4a72-a4ef-25f4bdef7e7a