BURTON F. BOLTUCH (SBN 070211)
LAW OFFICES OF BURTON F. BOLTUCH
555 12th Street, Suite 1440
Oakland, CA 94607-4046
Telephone: (510) 844-3415
Facsimile: (510) 444-3401
E-Mail: bboltuch@workplacelaw.biz

Attorneys for Defendants APPLIED FUSION, INC.; JEFF MUSGROVE; MOHAMMED ANSARI and GEORGE SILVA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUANG-KUI DONG,<br><br>Plaintiff,<br><br>vs.<br><br>APPLIED FUSION, INC., JEFF MUSGROVE, PATRICK DAVIS, MOHAMMED ANSARI, GEORGE SILVA, GREGORY GEDDIS, CITY OF SAN LEANDRO, OFFICER R LOPEZ and DOES 1 through 5, inclusive,<br><br>Defendants. | Case No.: C-03-3698 SI ADR<br><br>DECLARATION OF MOHAMMED ALID ANSARI IN SUPPORT OF MOTION OF DEFENDANTS APPLIED FUSION, INC.; JEFF MUSGROVE; MOHAMMED ANSARI AND GREG GEDDIS FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF THE ISSUES<br><br>Hearing Date: June 10, 2005<br>Hearing Time: 9:00 a.m.<br>Courtroom: 10 (19th Floor)<br>Trial Date: August 8, 2005 |

Apple Inc. v. Psystar Corporation Doc. 2974 Att. 6

I, MOHAMMED ALID ANSARI, hereby declare and state as follows:

1. I, Mohammed Alid Ansari, have personal knowledge of the facts set forth in this Declaration, except for those facts stated on information and belief. If called to testify as a witness in this matter, I am competent to so testify and would testify to the facts set forth in this Declaration.

2. I am employed by Applied Fusion, Inc. ("AFI"). My business address is 1915 Republic Avenue, San Leandro, California 94577. I have been employed by AFI since approximately February, 1993. I am one of the defendants in the above-referenced case.

3. I was born in the Fiji Islands and am now a citizen of the United States.

4. On February 6, 2004, my deposition was taken in this matter. Attached to this Declaration as Exhibit A, and incorporated herein by reference as though fully set forth herein, are true and correct copies of various pages of my depositions.

5. Attached to this Declaration as Exhibit B, and incorporated herein by reference as though fully set forth herein, is a true and correct copy of a one page typewritten statement prepared by me regarding the events of October 7, 2002 involving Plaintiff Dong. It is my understanding that this document, marked as Document No. "AFI0423," was produced to Dong's attorneys. Mr. Dong's attorney, Darryl Parker, questioned me about this document during my deposition.

6. Attached to this Declaration as Exhibit C, and incorporated herein by reference as though fully set forth herein, is a true and correct copy of the deponent signature page executed by me on April 7, 2004, with a list of the few corrections to my deposition and the explanation for the changes. Most of the changes were grammatical clarifications.

7. I understand that Dong is denying that he made threats on October 7, 2002 to kill Pat Davis and others, and to then kill himself. However, he made these statements to me about killing others and then himself. After speaking with Greg Geddis, and after learning from Geddis that Geddis had heard similar comments, Geddis and I reported the events to George Silva.

8. I have been informed that George Silva then reported these events to Jeff Musgrove, the President of AFI.

9. On October 7, 2002, I confirmed to Jeff Musgrove that Dong had made a statement about shooting others and himself. Also, on October 7, I was called to the office of AFI. In the office were police officers from the San Leandro police department. I did not know that the police were coming before I was called to the office. The police asked me what I

observed and had heard Dong say on October 7. I informed the police, as set forth in my deposition, that I had heard Dong threaten to kill himself and other employees.

10. At no time on October 7, when I reported the events to George Silva, to Jeff Musgrove or to the police, did I believe that my statements about Dong were false. I was reporting what I had observed and heard. I did not make the reports because of any hostility toward Dong nor to have him arrested, detained or terminated. At no time did I ask that Dong be detained or arrested or institutionalized in a mental hospital or any other medical facility. My sole purpose was to inform management of the events so management could take any action it deemed appropriate.

11. At no time were my actions on October 7, 2002, with respect to Dong, based, in whole or in part, on any intent to "vex, injure and/or annoy" Dong, nor did I report the events because I desired to cause Dong emotional distress, humiliation, hardship or embarrassment.

12. I was not asked my opinion whether Dong should be terminated nor did I participate in that decision.

I, Mohammed Alid Ansari, hereby declare under penalty of perjury, pursuant to the laws of the State of California and the laws of the Untied States, that the above Declaration, consisting of this typewritten page and two other typewritten pages, is true and correct, except for those matters stated on information and belief, and as to those matters, I believe them to be true.

Executed on this 5 day of May, 2005, in San Leandro, California.

Mohammed Alid Ansari

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

| | |
|---|---|
| GUANG KUI DONG,<br>Plaintiff,<br>vs.<br>APPLIED FUSION INC., et al.,<br>Defendants | CASE NO. C 03-3698 SI ADR |

CERTIFIED COPY

**DEPOSITION OF MOHAMMED ANSARI**

DATE: February 6, 2004 (Friday)

TIME: 10:09 a.m.

LOCATION: Applied Fusion
1915 Republic Avenue
San Leandro, CA 94577

DEPOSITION REPORTER: Sarah A. Martinez
Certified Shorthand Reporter #12815

## INDEX


| EXAMINATION BY: | PAGE |
|---|---|
| Darryl Parker, Esq. | 5 |
| Appearance Page | 3 |
| Exhibit Page | None |
| Certified Questions | None |
| Deponent Signature Page | 87 |
| Deponent Signature Waiver | 88 |
| Reporter's Certificate Page | 89 |
| Witness Letter | 90 |
| Changes and/or Corrections | 91 |
| Attorney's Notes | 92 |

# APPEARANCES

For the Plaintiff:

Premier Law Group, LLC
Attorneys at Law
6333 N.E. Radford Drive
Suite 3511
Seattle, WA 98115-8716

By: DARRYL PARKER, ESQ.

PHONE: (206)849-5273
FAX: (206)281-7930

For the Defendants:

Law Offices of Burton F. Boltuch
Attorneys at Law
555 12th Street
Suite 1440
Oakland, CA 94607-4046

By: BURTON BOLTUCH, ESQ.

PHONE: (510)844-3415
FAX: (510)444-3401

Also Present:

Mr. Guang Kui Dong
Mr. Robert Terris
Mr. Ron Musgrove

# E X H I B I T S

For the Plaintiff: Page

| Exhibit | Page |
| --- | --- |
| A - Typed notes by Mohammed Ansari | 46 |

finished typing it?

A. What did I do, I gave it to Mr. Musgrove.

Q. Did you show it to anybody else?

A. No, I don't remember showing it to anybody else, other than him.

Q. Did you have a conversation with him, when you gave him the document?

A. No, I didn't. I just said I wrote down what happened that day and gave it to him.

Q. The first line of the document, it says, "On the morning of 10/7/02 Mr. Dong called me and furiously complained about his supervisor Mr. Pat Davis."

Do you see that?

A. Yes.

Q. Did he call you on the telephone?

A. No.

Q. What do you mean by "he called"?

A. He called me over to his machine.

Q. What time of day was this?

A. It was morning. I don't remember the day and the time. It was somewhere in the morning.

Q. And by "morning," what's the earliest time it could have been?

A. Somewhere around 9:00; 8:30, 9:00.

Q. And was Pat Davis at work that day?

A. He was making up that people are hating him so they are asking him to do more than what he should be doing.

Something else was on his mind and he was saying those things, and I was not going to come to Mr. Musgrove's office and make a fool of myself, that he always complains about yellow skin, yellow skin.

Q. And what did he say when you said that?

A. He said, "No, I take care of my own problem. I bring a gun and shoot them all and I shoot myself," and he pointed like that with -- made a gesture like a gun with his hand.

MR. BOLTUCH: Excuse me, Mr. Ansari, would you describe, in words, how you used your hand. Describe what Mr. Dong did.

THE WITNESS: He made a gesture holding three fingers towards his palm, and the index finger pointing out, and the thumb standing up, like a gun would be, and he said he would shoot them all and he'll shoot himself.

MR. BOLTUCH: Where did you move your hand?

THE WITNESS: He moved his hand towards his head.

(BY MR. PARKER)

Q. Did he say anything else, at that point?

A. No. I don't know if he said anything, because

that was like -- I was not in myself when he said that. I was scared.

Q. What were you thinking? Did you think he was really going to bring a gun to the office?

A. Yes, I did.

Q. And tell me why you thought that.

A. Because the way he was acting, the way his demeanor was, the way he was outrageous and he felt everybody was out to get him. He was acting psycho, and I felt like he was going to do that. As a matter of fact, if he had a gun at that time, he might have shot a bunch of people.

Q. Did you think he had a gun on him at the time?

A. No, I didn't.

Q. And why didn't you think he had a gun on him at the time?

A. Why didn't I?

Q. Why? Why did you think he did not have a gun?

A. I didn't put two and two together at that time. I didn't check him.

Q. Did you look at his person, to see if he had anything that he could hide a gun on?

A. No, I didn't. I don't remember I did.

Q. And what did you say to him after he said that?

A. I didn't say anything. I walked away from his

machine, I went to my area, and I was distraught, a lot. And for a minute, I could not think of anything, then I was shaking my head. I had probably heard enough. I am here to do my job. I am not here to take other people's problems, and what he said threw me off, so I was shaking my head.

And one of my coworkers was with me, was training him on another machine, he asked me what happened, and I said there was a problem, there's problems around here, and he asked me -- he had seen me going to -- which is Greg Geddis, he seen me go in there to Mr. Dong's area, and he said, "What happened?"

So I said, "No, a lot of problems."

And he said, "Did he threaten to shoot somebody?"

And I said, "Yes." And I asked him, "How do you know?"

And he said he had made almost the same kind of statement to him.

Q. Did you ask him, "What did he say?"

MR. BOLTUCH: Did he ask Mr. Geddis what Mr. Dong said? Is that what you're trying to ask?

THE WITNESS: I asked Mr. Geddis -- no, I didn't ask Mr. Geddis, he asked me what had happened, and I told him what Mr. Dong had said. And Geddis

objected, he said, yes, that's the same thing -- he said the same thing to him, too, on separate occasions.

(BY MR. PARKER)

Q. When he said that, did you ask him, "What did he say?"

A. I probably asked him, yes.

Q. And what did he tell you?

A. He said he -- he told me that it had something to do with a gun, bringing a gun and shooting some people and shooting himself.

MR. BOLTUCH: When you're saying "he," to the extent when you answer, if you can, give the person's name, it may make things a little clearer.

THE WITNESS: Mr. Dong told Greg that Mr. Dong would bring a gun and shoot some people, and he would shoot himself, something to that effect.

(BY MR. PARKER)

Q. Did Greg tell you that Mr. Dong had said this on the same day that Mr. Dong had had this conversation?

A. I don't remember that. I don't remember that.

(Whereupon, Mr. Jeff Musgrove departs the deposition.)

A. I was a little bit distraught, and I don't know too much about that, so all I wanted to do is calm down a little bit.

about the statement?

A. Can you ask that again?

Q. After Mr. Dong made the statement to you that he was going to bring a gun to work, did you have any plans to tell management about that statement, prior to speaking to Greg?

A. No, I didn't. I did not want to tell anybody about that.

Q. Is it true that after you spoke to Greg, that is when you decided you would go to management and tell management what happened?

A. Because two people heard the same thing on different occasions, I thought something is series there.

Q. Did you bring Greg with you to go to management?

A. I don't remember. I don't think so. I wanted to tell my side of the story. I saw something dangerous, a volcano about to erupt. I wanted to bring it to the attention of the management. They had to do whatever they had to do. If something did happen, if I had lived, I would have said that I told them, they didn't do anything.

Q. Did Greg come with you to tell management about what happened?

that Mr. Dong was going to do something to you?

A. I wrote it down here.

Q. I know what you wrote down here. Did you ever tell him that?

A. I don't think I told him that.

Q. At some point, the police came, correct?

A. Uh-huh

Q. On October 7th?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. Did you speak to the police?

A. They spoke to me. They called us in the office and talked to us.

Q. Who went to the office?

A. Greg Geddis and I were called in the same office, same time.

Q. With a police officer?

A. With two police officers.

Q. Was anyone else present?

A. I believe Jeff Musgrove was there, too.

Q. Anybody else?

A. I don't think anybody else was there.

Q. What did the police officer ask you?

A. I don't exactly remember.

Q. What did you tell the police officer?
A. I told them exactly what he had told me, and they asked me a few questions, which I don't remember, but they asked me a few questions, and I answered them.
Q. Did you tell the police officers that Mr. Dong had been acting strangely for a long time?
A. I don't remember that I told them that. They asked me about that day, and I told them about that day.
Q. Did you ever tell the police officers how Mr. Dong had been acting for six months?
A. No.
Q. Did they ask you about how Mr. Dong had been acting for the last six months?
A. I don't remember that.
Q. Did you tell the police officers anything about Mr. Dong being prejudice against white men?
A. I don't remember if they asked me anything about that.
Q. Did you tell them anything about that?
A. I don't think so.
Q. Did you tell them about Mr. Dong making comments about people on the job not liking him because of his yellow skin?
A. I don't think I told them that.
Q. Did you tell them about any incidents that

reason to fear Mr. Dong?

A. No.

Q. When the police came, did you tell the police -- did the police ask you why you thought Mr. Dong had made the threat?

MR. BOLTUCH: Could the question be read back. I lost it. Please.

(Question, page 82, lines 3-5, were read by the court reporter.)

MR. BOLTUCH: Objection. Compound. You said did he ask and did he tell.

Which one are you asking, Mr. Parker?

MR. PARKER: I'll start again.

(BY MR. PARKER)

Q. Did the police ask you if you knew why Mr. Dong had made the threat?

A. I don't remember they asked me that question.

Q. Did you tell the police why you felt Mr. Dong had made the threat?

A. I don't remember telling them. I told them what Mr. Dong had said.

Q. Did the police ask you for what period of time Mr. Dong had been acting this way?

A. I don't remember them asking that question.

Q. Did you tell them for what period of time?

STATE OF CALIFORNIA )
                    ) ss.
COUNTY OF SOLANO    )

The witness, MOHAMMED ANSARI, in the foregoing deposition, personally appeared before me, Sarah A. Martinez, a Certified Shorthand Reporter in and for the State of California.

Said witness was then and there at the time and place previously stated, by me, placed under oath to tell the truth, the whole truth and nothing but the truth in the testimony given on the date of the within deposition.

The testimony of the witness and all questions and remarks requested by Counsel was reported by me at the time and place therein named, and thereafter, under my direction and control, caused to be transcribed into typewritten form by means of Computer-Aided Transcription.

I am a Certified Shorthand Reporter licensed by the State of California. I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the case named in the within caption, and that I am not related to any party thereto.

IN WITNESS WHEREOF, I have hereunto affixed my signature to this 24th day of February 2004.

Sarah A. Martinez

Sarah A. Martinez
Certified Shorthand Reporter #12815

# EXHIBIT B

## TO WHOM IT MAY CONCERN

On the morning of 10/07/02 Mr. Dong called me and furiously complained about his supervisor Mr. Pat Davis. I tried to calm him down and assured him that nothing was of concern since every one was under pressure to ship the part and he was not being singled out. All my efforts was going in vein and he was growing more and furious and unstable to a point he started shivering with rage, so I advised him to talk to the owner Jeff Musgrove, assuring him that this company has an open door policy. He refused saying his English was not good to which I suggested he take Henry (who speaks the Mandarin dialect as Mr. Dong) with him to which he mentioned " No Henry no good, he Hong Kong ... he Hong Kong, Hong Kong people suck white man's dick." Finally I offered to go with him myself provided he had a valid and legitimate complain and not some fabricated and speculated story because his proof to me was that he had seen two or three of them together laughing and giggling after which Mr. Davis came directly to me. Mr. Dong at this point replied " No I will solve my own problem I get a gun and shoot Pat and every one and shoot myself."
Given his demeanor, instability and psychotic behavior, the geopolitical situations and the recent chain of events that had taken place abroad and locally, the fact that Mr. Dong had in earlier conversations told me, when he found out that I invest in the stock market, how he had lost his total savings when the economy went south, was the doings of the white men. Some months ago when a US spy plane was shot down off of main land China Mr. Dong expressed great dissatisfaction saying that the white men hate "yellow skin". I took his threat seriously and truly feared for my life and the life of others. That day I was training one of my junior employees Gregory Geddis on a new machine and when I went back to my machine I shook my head and uttered "problems all over". Mr. Gregory spontaneously responded What! Did Gown threat to kill some body? I replied, How do you know? Mr. Geddis told me that Dong had made threats that he would get a gun and shoot certain individuals. At this point I made up my mind to at least let the upper management know about this situation should they choose to seek some professional remedy.
Mr. Dong was a very respected and valuable employee with great talents. He used to be entrusted with very expansive and critical jobs that many people would not be allowed to even touch or work on. Mr. Dong would express great satisfaction and gratitude for the opportunity and environment to learn and work on new projects and exotic materials that he had never worked on and receiving extra checks during bonus times.
The fact that he lost his job at AFI is the result of his own doings, his own choice.

I would like to remain anonymous as much as possible since I feel still that Mr. Dong is a threat to us.

Mohammed Ansari.

EXHIBIT C

## DEPONENT SIGNATURE PAGE

I hereby certify that I have read my deposition, made those changes and/or corrections I deem necessary, and approve the same as now written.

Executed this 7TH day of APRIL, 2004 by:

MOHAMMED ANSARI

MOHAMMED ANSARI
Under Penalty of Perjury

I certify that the within transcript was by the above-named witness, MOHAMMED ANSARI, thereafter read over, corrected and signed, and by the same witness declared to be his/her deposition in said action.

IN WITNESS WHEREOF, I hereunto set my hand and affixed my official seal of office in the County of ________________, State of ________________, this 7 day of April, 2004.

~~Notary Public~~ Admin Exec.

CORRECTIONS TO THE DEPOSITION OF
MOHAMMED ANSARI

Deposition Date: February 6, 2004

| Page | Line | Change As Follows |
|---|---|---|
| 10 | 1 | Change the word "recommended" to "informed" |
| 16 | 19 | Change "interfere" to "interact closely" |
| 30 | 1 | Change "prejudice" to "prejudiced" |
| 30 | 4 | Yes, I felt that on October 2002. |
| 30 | 23 | No, the day that he threatened others. |
| 42 | 12 | Sometime last year, I'm not sure when. |
| 46 | 3 | No. I cannot name any person whom I can absolutely say overhead these comments. |
| 69 | 9 | Yes, he did, but he was still critical. |
| 71 | 5 | I did tell him that or I told the police officer in front of Jeff. |
| 83 | 4 | No, I don't think so. |
| 85 | 17 | He thought many people were prejudiced against him . . . |