Apple Inc. v. Psystar Corporation
Doc. 3219 Att. 1

# Exhibit B

Dockets.Justia.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

ALLIED NORTH AMERICA INSURANCE BROKERAGE CORP. OF CALIFORNIA,

Plaintiff,

vs.

Case No.C-04-2527 MJJ

WOODRUFF-SAWYER, a California corporation; DERMOD HOUWELING, an individual

Defendants.

CERTIFIED COPY

DEPOSITION OF
DERMOD HOUWELING

Monday, August 9, 2004
Volume I
(Pages 1 - 271)

REPORTED BY: KELLI COMBS, CSR 7705

LEGALINK®
A WORDWAVE COMPANY
LegaLink San Francisco
601 Van Ness Ave, Suite 2052
San Francisco, CA 94102
tel (415) 359-2040
tel (800) 869-9132
fax (415) 359-2050
www.legalink.com
GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

the objection merits that you not respond.

Okay?

A Okay.

Q Otherwise, just wait for them to be done.

If you need the question read back, sometimes counsel's objections can be long, and if it interrupts your thought process, feel free to ask the court reporter to read the question back at any time.

Fair enough?

A Okay.

Q When did you start with Defendant Woodruff-Sawyer?

A June 15th. Tuesday, June 15th.

Q Tell me what you did that day. When you left your house, where is the first place you went?

A I went to Allied's office in Fremont.

Q What time did you arrive?

A I don't recall exactly, but probably around 7:30.

Q Had you had any telephone calls that you made or were made to you relating to business prior to the time you got to the Allied office?

A Not that I recall.

Q So you got there at 7:30, and then what did you do?

A I think I sat around and waited for a meeting to -- that was taking place to end so that I could get -- make contact with Jim Untiedt.

Q And about how long did you wait?

A 40 minutes, 45. I must have got there a little bit before 8:00, quarter to 8:00. It was about 45 minutes, I think.

Q Did you make or receive any calls during that time?

A Don't recall.

Q And then about what time did you meet with Mr. Untiedt?

A Somewhere around 8:30 in the morning.

Q Was anyone else there?

A No, just he and I in his office.

Q How long was that meeting?

A 15 minutes. Yeah, I don't think I said -- about 15 -- 10 minutes, very brief.

Q And were you in his office the whole time for that meeting?

A Yes, I was.

Q And then what did you do?

A Then I was walked out of the office out the front door.

Q Well, you mentioned you were walked out of the

office. Did Mr. Untiedt offer to walk with you and continue talking?

A I don't know if we continued to talk or not.

Q Did he order you to leave?

A He said -- I believe he probably said, "Let's go," something like that. But it was clear in my mind that he was going to -- I was not going back to my office.

Q Did he ask you if you were giving two weeks' notice?

A No.

Q Did you give two weeks' notice?

A No.

Q Then where did you go after you left Allied's store?

A I went to Woodruff-Sawyer's office in San Francisco.

Q How long did that take you?

A 45 minutes to an hour.

Q Were you driving?

A Yes.

Q Did you make any calls during the drive?

A No.

Q Did anybody call you while you were driving?

A Didn't have a cell phone.

Q So you turned your Allied cell phone in?
A Yes.
Q And you didn't have a personal cell phone?
A That's correct.
Q When you got to Woodruff-Sawyer's office, what did you do?
A I introduced myself -- or I went and stopped and saw Stan Loar, CEO. Then I went -- then he took me upstairs, I believe, and introduced me to John Ward, and we started plans on communicating to clients and prospects the news of the day.
Q About what time did you arrive at Woodruff-Sawyer?
A I would say around 9:30, quarter to 10:00.
Q Now, you mentioned you started plans on communications to clients. You had already sent Mr. Ward an E-mail list for him to use for announcements the previous day, correct?
A That's correct.
Q And when did you first discuss announcements with Woodruff-Sawyer?
A Probably on -- I don't recall.
Q Was it more than a month before?
A No, it was not.
Q Who was in the room when you started your

Q Did you have any computer disks with you that day?

A I had no computer disks with me that day.

Q Had you attempted to E-mail yourself anything to Woodruff-Sawyer as of June 15th?

A I didn't have -- when I arrived there, somewhere in the morning I was given an E-mail address. I didn't have that before that.

Q Had you E-mailed files to anyone else other than the mailing list we've talked about to Mr. Ward?

A Just the mailing list.

MR. LOUDERBACK: You want to make sure she's done with the question before you answer. I know you're anticipating where she's going, but then you kind of step on each other. So let her finish, and she'll wait until you're done with your answer.

Okay?

THE WITNESS: Okay.

MS. WIRTH: It seems it makes it faster, but it doesn't.

BY MS. WIRTH:

Q So you're back at your desk. What did you do next?

A I don't recall.

Q Did you call anybody that day?

A I may have.

Q Who did you call?

A My recollection is after the -- the notice -- notices were faxed out, and I believe as I was being introduced around the office or shortly thereafter that was being taken care of by an employee, I called, let's see, Phyllis at G&S's office, Gonsalves & Stronck, I called Bev, I don't know her last name, at Overaa's office, and I called Paula Clarkin at Amoroso's office.

Q What did you say to Phyllis at Gonsalves & Stronck?

A I asked if she had received a fax from me.

Q And what did she say?

A "Oh, my" -- something to the effect, "Oh, my God, yes."

Q Did she say anything else?

A Exclamations of surprise I guess would describe it.

Q Did she say anything else?

A I said, "Has Bill seen it?"

She said, "Yes," and said, "Here he is."

Because he was standing at her desk.

Q And that's Bill Stronck?

A That's correct.

Q Did you talk to him then?

A Yes, I did.

Q You were there when Mr. Stronck testified he hadn't talked to you prior to the time you walked in his door that day.

Do you remember that?

A I remember that.

Q He wasn't telling the truth? Is that what you're saying?

A -- I don't know what he --

MR. LOUDERBACK: Objection; calls for speculation as to what was in his mind and what he remembered. Don't speculate. It's argumentative --

BY MS. WIRTH:

Q Was Mr. Stronck's statement that he hadn't talked to you until you walked in the door with the broker of record letters a true one?

MR. LOUDERBACK: Can I have that question read back, please?

(Record read as follows:

"Q Was Mr. Stronck's statement that he hadn't talked to you until you walked in the door with the broker of record letters a true one?")

MR. LOUDERBACK: Well, I'm going to object to

the "true" being argumentative. Whether it was accurate or not, you can testify to that. You don't know what was going on in his mind. You can answer the question, though, given that limitation.

THE WITNESS: His statement was inaccurate.

BY MS. WIRTH:

Q What did he say to you on the phone?

A Said, "What's going on?"

Q What did you say?

A I said, "I have made a change. I'm going to -- I'm now at Woodruff-Sawyer. They are a broker in San Francisco."

He made some comment about, "Is that where this guy Cam Dickinson is?"

Q And is that where Cam Dickinson is?

A Yes.

Q What else did you say?

A And I don't recall exactly all that was said, but it was to the effect of it's a construction-focused office. He acknowledged that, knowing Cam, and he said, "What do we need to do to, you know, switch over?"

Q What did you say?

A I said, "You need broker of record letters signed. I'll send them down."

Q How long was the conversation with

Mr. Stronck?
A Five minutes at the most.
Q Did he say anything else?
A I don't recall. He may have.
Q Did you tell him anything about Woodruff-Sawyer's expertise other than what you have just told me?
A No, that's about all I said about it.
Q And --
A Something in what he said indicated that he knew who Woodruff-Sawyer was.
Q Did you talk to anybody else at Gonsalves & Stronck?
MR. LOUDERBACK: On that day?
MS. WIRTH: On that day?
THE WITNESS: Yes.
BY MS. WIRTH:
Q Who?
A When I went down to pick up the broker of record letters later that afternoon, I talked to Bill.
Q Anyone else?
A Talked to Phyllis. I believe Keith Gonsalves was in the office.
Q And what time did you go to Gonsalves & Stronck?

A Probably around 3:30.

Q Backing up, after you finished the phone call with Phyllis at Gonsalves & Stronck where you also talked to Mr. Stronck, what did you do next?

A I believe I talked to Bev at Overaa's office and asked her the same question, "Did you receive a fax for Jerry Overaa," and --

Q What did she say?

A She said yes.

Q What else did you say?

A I said, "Did he -- did it get to Jerry?"

And she said, "Yes, it did."

I said, "I'll be in my office this afternoon."

Q Anything else said on that phone call?

A No, not that I recall.

Q Was your next act to call Paula Clarkin at Amoroso?

A No. Actually, that was the first person I called.

Q So that would be before your conversation with Phyllis and Bill?

A That's correct.

Q What did you say in the conversation with Paula at Amoroso?

A "Did you receive a fax? Did it get to Dana?"

She wanted to talk about it.

And I said, "Well, I'm in my office if Dana wants to call."

Q What did she ask you?

A "What's going on?"

Q And your response was?

A I had moved.

Q You said nothing else, just "I moved"?

A I don't recall saying anything else. I didn't....

Q And then you said again, "I'll be in my office all afternoon"?

A No, I said, "I'm in my office."

Q So first you talked to Paula, then you talked to Phyllis and Bill, then you talked to Bev at Overaa.

What happened next?

A I started getting some phone calls. I got a phone call from Dana McManus.

Q How long was that discussion?

A Five minutes.

He wanted to know what it was all about.

I told him that I decided to move to Woodruff-Sawyer. I'm sure I said something that they are a very good construction broker. I might have mentioned -- I'm sure I mentioned that John Lambersen

A Yes.

Q When was the first time you discussed that with him?

A I think it was the end of the first week of June.

Q In person or on the phone?

A On the phone.

Q Let's take a step back for a minute.

When is the first time that you talked to anybody at Woodruff-Sawyer regarding possible employment?

MR. LOUDERBACK: At Woodruff-Sawyer?

MS. WIRTH: Yes, at Woodruff-Sawyer.

THE WITNESS: I telephoned -- it was the -- I believe it was the last week of April. I placed a phone call to Chuck Shoemaker inquiring if he had a moment to have a cup of coffee.

BY MS. WIRTH:

Q What happened next?

A We met in San Francisco around 2:45 in the afternoon.

Q That same day?

A Same day. Where I -- yeah. We met that day.

Q What did you tell him?

A I told him that I saw his notice in the -- I

don't know where that book of lists or that list appeared, but there was an article in a trade journal of some sort that showed Woodruff-Sawyer was the number one employer for its size group in the Bay Area, I believe it was the Bay Area. Maybe it included all of Northern California.

I told him that caught my eye, and I was just wondering if he would like to have a conversation about the possibility -- if I decided, would they be interested in talking to me about working for them.

Q Did you tell them what your book of business was?

A No.

Q Did you hand them any documents?

A No. Business card.

Q And what did Mr. Shoemaker say?

A He said -- he told me a little bit about his operation, how they were organized. He told me that they would be interested in something -- "of course we would be interested in talking to you if you are so inclined."

Q How long was the meeting?

A 15 minutes.

Q Was anyone else there?

A No, just the two of us.

Q What else was said?

MR. LOUDERBACK: Well, that assumes facts not in evidence. If anything else was said, you can tell her.

Go ahead.

THE WITNESS: The conversation from my point of view was I wanted to take a look at Chuck Shoemaker face to face, size him up a little bit and just see whether or not he was somebody that I would be comfortable having a conversation with in the future.

BY MS. WIRTH:

Q Did you share any goals that you might have had for your desired income?

A No.

Q Did he share any goals for what he would want out of producers?

A No.

Q What was the next contact between you and Woodruff-Sawyer?

A I believe it was in approximately the middle of May I received a telephone call from Chuck Shoemaker on my cell phone. I had -- in the meantime I had gone on vacation, and I was back from vacation for a week or so, and he wanted to say hello and see what was up. And that phone call took place approximately May 15th or

somewhere in that neighborhood.

Q In the first conversation you had where you had a cup of coffee the last week of April, did you tell him you were going to be on vacation?

A Yes.

Q Had you agreed as to when the next time would be that he would contact you or you would contact him?

A I think I probably said, "I'll call you when I get back from vacation."

Q And when did you get back from vacation?

A 12th, 10th. 10th maybe of May. I'm not sure exactly of the date.

Q In between the time you got back and the time he called, you hadn't called him?

A That's correct.

Q So what was discussed in the telephone conversation on May 15th?

A I explained to Chuck that subsequent to our conversation, I pulled out my contracts and took a look at them, and I noticed that I had restrictive covenants that expired on June 1st, and I did not want to have any conversations with him prior to June 1st. I told him I would call him back after June 1st.

Q Did you give him a copy of the contracts you were looking at?

A No. It was a cell phone. I was in my car.
Q What happened next?
A The next contact I had with Woodruff-Sawyer was June 1st.
Q Who called who?
A I called Chuck, asked him if he had time to get together. We agreed to meet for lunch.
Q That day?
A That day.
Q Anybody else present?
A No.
Q At that point did you share with him what your financial goals were?
A No.
Q Did he share with you what his financial goals were?
A Not his personal financial goals, but we talked in terms of philosophies.
MR. LOUDERBACK: I'm going to object to the terminology as the financial goals as being ambiguous.
BY MS. WIRTH:
Q Did either party mention S.J. Amoroso?
A No. As a matter of fact, Mr. Shoemaker said to me, "Do not mention any clients that you have. We cannot talk about clients."

people within his company. We arranged to -- for me to meet with the chairman of the board and the president for coffee, and I believe that took place on the 2nd, Wednesday the 2nd.

Q And who is the chairman of the board?

A Oh, God. Doug.

MR. SHOEMAKER: Doug Morton.

THE WITNESS: Doug Morton.

BY MS. WIRTH:

Q How about the president?

A Susan Hunt.

Q As of the 2nd, had you given Woodruff-Sawyer a copy of your contracts?

A I don't recall when I gave him a copy of the contracts, but I did -- a copy of the contracts was made available to Woodruff-Sawyer.

Q And how long was the meeting with Doug Morton and Susan Hunt?

A About an hour.

Q Anybody else present?

A No.

Q Did the name S.J. Amoroso come up at all in that meeting?

A No.

Q Did Overaa come up?

A No.

Q Gonsalves & Stronck?

A No.

Q What did you tell Mr. Morton and Miss Hunt?

A I think they were sizing me up more in terms of personality and the fit within their organization.

I was sizing them up in terms of were they reasonable people, were they good people? Did they run a good organization? Was the organization as good as the reports said?

In order to do that, we -- I gave them my life story, so to speak, who I was and what my family was, and they told me about how they manage people within their organization and what their goals were for the organization and what the strengths of Woodruff-Sawyer was and the construction and the other specialty areas that they have within their organization.

Q What were Woodruff-Sawyer's strengths that they told you about in the construction industry?

A They didn't spend a lot of time on the construction, but I -- you know, they were very proud of the progress that the construction division had made. They spoke highly of Chuck, they spoke highly of the clientele that they had within it. They said that they felt that they had good clients at Woodruff-Sawyer.

Q Anything else?

A We discussed the fact they were the number one writer of directors' and officers' insurance within the country. They were a very significant high tech writer, and they felt they had a good operation here in San Francisco and in Portland handling construction accounts.

Q As of when you were meeting with them, did you have any idea what position might be available at Woodruff-Sawyer?

A No.

Q And after you met with the two of them, what did you do?

A I went back -- went back to work.

Q What was the next contact between you and Woodruff-Sawyer?

A Wednesday. The next meeting was Wednesday the 9th, as I recall.

Q And who called who to set it up?

A I called Chuck.

Q And who did you meet with on the 9th?

A I met with Houston Knox, I met with Stan Loar, I met with Chuck.

Q You said you talked to John Lambersen about possibly switching to Woodruff-Sawyer. Was this before

your meeting on Wednesday the 9th?

A Yes, it was.

Q And you called him --

A I don't think I talked to him in terms of switching to Woodruff-Sawyer. I think I asked him what he thought of Woodruff-Sawyer.

Q Okay. And what did he tell you?

A He said they seemed to do a good job handling accounts.

Q Anything else?

A Just -- I don't recall specifically, but the gist of the conversation, which was pretty short, was they are a good operation.

Q What did you tell him about why you were asking the question, if anything?

A I don't recall telling him anything other than I'm thinking.

Q How long was the meeting on Wednesday the 9th?

A Two or three hours.

Q Were clients discussed at all?

A No.

Q Was salary discussed at all?

A Yes.

Q And what was discussed?

A My -- what I would like to see in terms of an

agreement.

Q And what did you tell him?

A I believe I told him I would like to get a $200,000 salary.

Q Anything else?

A I said if accounts follow, I'd be interested in being compensated in some way.

Q Anything else?

A I think I said that I'd be interested in who would handle accounts.

Q Anything else?

A Can you go back to the original question? I'm not sure what "anything else" is referring to anymore.

Q Did you tell him what you would like to see in terms of your compensation?

A Oh, okay. I think I talked in terms of deferring money.

Q So deferred income to another tax year?

A Yes.

Q Did you tell him anything else about what you would like to see in terms of your compensation?

A I don't believe so, no.

Q Was it your understanding in that meeting on June 9th that Woodruff-Sawyer would be pleased with an arrangement under which you received $200,000 in salary

if you didn't have any clients that followed you?

MR. LOUDERBACK: Objection; don't speculate as to what you might understand their thinking. If they told you that in that discussion, you can -- you can relate that.

THE WITNESS: I have no idea what --

BY MS. WIRTH:

Q Was there any discussion at all about what happened if nobody followed you?

A The discussion was -- was broad and somewhat far reaching. We talked about backgrounds and skills and the ability for me to mentor other people, to act as a resource within their organization because of the 30 years' experience that I have in this business.

Q What was said about the likelihood that clients might follow you to Woodruff-Sawyer, if anything?

A Nothing in terms of the likelihood.

Q Did you talk about the identities of anybody who might follow you?

A No. I don't believe at this point it was necessary to say who the clients were. I think everybody knew who I handled. We did not use the names.

Q Did you say anything about what the volume of business was that any of the clients were as a whole?

A I probably alluded to the fact that on the clients that I handled, it ranged as high as a million three. I may have said that. I would have done something to -- to at that point in our discussions be specific, more specific about these accounts.

Q Do you recall what specifically you said about the clients that may have ranged as high as a million three?

A No. There was some total.

Q Did you tell them how many clients that represented?

A No.

Q Were there any clients of Woodruff-Sawyer that Woodruff-Sawyer told you they were interested in having you service as of June 9th?

A Not in those terms, no.

Q What did they say about that subject?

A We talked about the similarity of general building contractors. We had a conversation about our competition with Overaa, so Chuck was aware of that, that we had been successful in that broker selection. So he knew that that was one of the accounts that I serviced. And --

Q And what did you say about the competition as to Overaa?

A What did I say about it?
Q Yes.
A Nothing. It was just a fact.
Q When was the next conversation with Woodruff-Sawyer?
A That would have been the -- there probably was a telephone conversation that we missed that I didn't mention to you sometime between the meeting on the 2nd and the meeting on the 9th. Chuck and I would have had a telephone conversation in anticipation of getting together on the 9th.
Q And when was that, approximately?
A I do not recall when that was, but it was either on Thursday, Friday or Monday of the following week.
Q Who called who?
A I would have called Chuck.
Q Where were you when you called?
A I have no idea.
Q Were you --
Do you know if you were at work or at home or in the car?
A I have no idea. I do not think I would have called from work.
Q How long was that conversation?

Q Had that been discussed somewhat, that you knew that a statement would be made about defense or indemnity for any claims?

A Standard I believe in the business when one producer moves to another company, there is an indemnity involved. It was a standard item that Allied would give to anybody that came to Allied.

Q To the best of your recollection, there had been no discussion that you wanted defense and indemnity?

A No, I -- I expected it.

Q And did you give Woodruff-Sawyer all three agreements you had, the stock purchase agreement, the producer agreement and the termination agreement?

A No, I did not.

Q What did you give them?

A Stock purchase agreement and the producer agreement.

Q Did you give them anything else relating to your employment?

A No.

Q How did you receive the June 11th, 2004 letter that is the first three pages of Exhibit 2?

A It was delivered to my house.

Q And was anything attached to the first three

Woodruff-Sawyer has known all along that Mr. Houweling took documents, and he did it while he was a Woodruff-Sawyer employee.

MR. LOUDERBACK: Well, I don't think that you can argue on the record -- there is no evidence to that effect. That's your argument, maybe your opening statement/closing argument, but it's not at all apparent to me, and I'm not sure how your question relates to your speech right now.

MS. WIRTH: I'm not required to tell you that, Counsel, just as I didn't interrupt your firm when you were deposing Mr. Untiedt.

MR. LOUDERBACK: I think the questions of Mr. Untiedt were -- directly involved the injunction, and it was evident that he was speculating, so I mean, I don't think that's at all -- that that was all improper.

MS. WIRTH: Are you instructing the witness not to answer?

MR. LOUDERBACK: Of course not, but let's just try to stay in the ambit of where the discovery should be allowed.

MS. WIRTH: Can we read the question back to the witness, please?

(Record read as follows:

"Q During the interview

process and at any time before you walked in the door and started employment at Woodruff-Sawyer, did you tell Woodruff-Sawyer that you were not returning documents to Allied because they contained some language that you believe predated your beginning of your employment with Allied?")

THE WITNESS: No.

BY MS. WIRTH:

Q When was the first time that you told Woodruff-Sawyer that you had kept in your possession computer data that Allied claimed was its?

MR. LOUDERBACK: Well, that assumes facts not in evidence that that was ever said to Woodruff-Sawyer. You can answer the question, though.

THE WITNESS: I think the first conversation with Woodruff-Sawyer about documents was when they called me in saying that there is an attorney involved.

MR. LOUDERBACK: Okay. And just -- Counsel is not going to want you to give any testimony where the attorneys are present, your counsel is present, so that's the attorney/client privilege. But -- so don't

say anything that was said in front of your attorneys.

THE WITNESS: Excuse me. May I change that answer? There was a conversation with Woodruff-Sawyer.

BY MS. WIRTH:

Q And when was that?

A And I think -- it had to be on the 9th. That was the major meeting date that we had.

And it had to do with notifying Allied about documents, and they instructed me to -- I think they instructed me to do it in writing in my termination notice, and I didn't include it. I probably should have but I didn't.

Q And what was it that you were instructed to include in writing?

A Well, we have to give back any documents that are on there. I had a conversation with them about working at home, and in the due course of that I had documents and ...

Q So on the 9th, Woodruff-Sawyer told you that you were to in writing offer to give back all documents that were Allied's in -- before you left?

A I think they suggested something, but there wasn't a command of some sort, say this on your -- when you get out. It was "Make sure that it gets addressed."

Q On the disk also are a number of documents

BY MS. WIRTH:

Q Right.

What this relates to is E-mails that we claimed were sent to Woodruff-Sawyer on June 19th. And if you'll look at --

Have you ever seen Exhibit 4 before?

A No.

Q Has anyone at Woodruff-Sawyer ever talked to you about examining your E-mail account?

A They said stay away from opening E-mail accounts that I had sent -- those E-mails that I sent from home to the office, they said don't open them.

Q And when did they say that?

A Oh, when was this sent? The -- probably shortly after the end of the week. Probably the 18th, 19th somewhere, it all cooked up and became an issue.

I had forgotten all about these things, so maybe it was longer than that. Maybe it was into July before it became an issue. But somehow I had forgotten about these things, and so I was surprised.

Q Okay.

Well, this shows E-mails that are sent on June 14th. Are you seeing that on page 3?

A Is that the date on the left-hand side?

Q Correct.

don't recall off the top of my head.

Q Okay.

You E-mailed a list to John Ward on Monday, June 14th, 2002, at 4:39; is that correct?

A Yes.

Q I take it you had already made up your decision to leave as of that time?

A Yes.

Q When did you make your mind up?

A Would have been after -- Friday night after receiving the offer Friday night.

Q So you think you made your decision on Friday night?

A Yes, I was -- yeah, Friday night.

Q Who did you first tell at Woodruff-Sawyer that you were going to join them?

A Cam Dickinson, probably.

Q And when did you do that?

A Friday night.

Q Who else did you tell that you were joining Woodruff-Sawyer from the time you got the offer until Monday, June 14th?

A I didn't see anybody else from Woodruff-Sawyer. Family.

Q Why Cam Dickinson as opposed to someone else?

because you're getting into something, when you are talking about the attorneys' minds, you know what is in the attorneys' minds from what they have told you.

She again is asking you, is there any time when attorneys were not present when you talked to personnel at Woodruff-Sawyer. The way you start off sounds like you're talking about what the attorneys are saying.

THE WITNESS: Yes. I'm trying to differentiate.

There was a time -- I don't remember what day, two days, four days later, where we were talking about not, you know, not touching the computer, and there weren't that many days until the computer was picked up, so that was four, five days. So it was before -- before the computer was picked up, but probably the 27th, 28th, somewhere in that area, I would presume.

BY MS. WIRTH:

Q Wasn't the computer picked up on July 2nd?

A 1st, I believe. Was it -- I don't remember.

Q Wasn't it Friday night?

A Then that's the 2nd, yeah.

Q Okay.

So from June 24th to July 2nd is seven days, correct?

A Yeah.

Q And can you tell me when in there at that time period you were told not to look at the computer anymore?

A I cannot give you a specific date.

MS. WIRTH: Okay. I'm going to switch topics for a minute and mark something as Exhibit 9.

(Plaintiffs' Exhibit No. 9 marked for identification.)

BY MS. WIRTH:

Q Have you seen Exhibit 9 before?

A Oh, yeah.

Q And the whole idea of selling the shares of stock of Allied back to the company or to James Untiedt started with you; is that correct?

A Say again, I'm sorry.

Q It was your idea to sell your shares of stock back to the company, correct?

A No.

Q Whose idea was it?

A Allied's.

Q Well, it says here, "This proposal is made to reflect my stepping down and relinquishing my ownership of Allied stock."

Is that something that Allied had suggested?

A Yes.

Q And in response to what request from you?

A More money.

Q What were you making at the time you made the request?

A 150,000.

Q And the business was losing money at that time, correct?

A Yes.

Q And you were the president?

A Yes.

Q How much had you estimated that you were going to bring over with you when you joined Allied?

A About 500,000.

Q And what was your goal for 2001 at Allied?

A I don't recall.

Q But you missed the goal, didn't you?

A Yes.

Q How many --

Other than Overaa at Allied, how many accounts did you have that you had not previously serviced at ABD?

A Are you asking the question how many new pieces of business did I handle at Allied?

Q Tell you what, I'm not trying to make this a

marked for identification.)

MS. WIRTH: And 22.

(Plaintiff's Exhibit No. 22
marked for identification.)

BY MS. WIRTH:

Q And at least I believe that Exhibit 22 is the first document referred to on Exhibit 21, 2004, "Course Of Construction".

Do you see that?

A Say again?

Q I believe that Exhibit 22 is the first document that's referred to on Exhibit 20 where it says "2004 course of construction 3-2."

Do you see that?

A Okay.

Q Why were you E-mailing yourself Exhibit 22?

MR. LOUDERBACK: Objection; assumes facts. Excuse me, lack of foundation.

If you remember, you can tell her.

THE WITNESS: My role at Allied was to make sure that all of the accounts got renewed in March, April and June of this past year. Much of the information and organization of the information was shared, and as I look at these names here on this May 21st, they almost have the same names as the other

documents that went home.

MR. LOUDERBACK: What exhibit is that you just referred to?

THE WITNESS: 20. 19 and 20.

MR. LOUDERBACK: Good.

THE WITNESS: What -- what -- what documents went home were based on what the need was for either servicing Overaa directly, either reviewing their program and making modifications to it, or sometimes I would send documents home that I could incorporate in other documents in order to complete the background documents for the proposal, which the Amoroso proposal was coming up on June 1st.

We had incorporated a law-sensitive program with Overaa on April 1st. Lynne O'Connell, she had never renewed a loss sensitive program, so she didn't know how to tell the story. She had a -- was provided a template for a proposal form, but it didn't address the issue of how do you tell the client about a deductible program.

I had done Overaa's two years before when we went to a deductible program, and I did Overaa's again this year when it renewed. I took those documents from Overaa, which allowed me to tell the story of what the coverages were and what the terms and conditions were