Apple Inc. v. Psystar Corporation
Doc. 3219 Att. 2

# Exhibit C

Dockets.Justia.com

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

| | | |
|---|---|---|
| ALLIED NORTH AMERICA INSURANCE BROKERAGE CORP. OF CALIFORNIA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. C 04-2527-MJJ |
| WOODRUFF-SAWYER, a California corporation; DERMOD HOUWELING, an individual, | ) | |
| Defendants. | ) | |

Deposition of

CHARLES R. SHOEMAKER, CPCU

Thursday, January 6, 2005

CERTIFIED COPY

Reported by:

JEANNETTE M.T.L. DARE, CSR No. 7061 (1-361388B)

Q. At the time that you extended the offer to Mr. Houweling that's contained in Exhibit 1, what did you believe Mr. Houweling's book of business was that he would bring with him?

A. I was aware of the three customers that he handled. And everybody in the industry knew that he had S.J. Amoroso for 30 years, that Gonsalves & Stronck was a long-time customer since they spun off, and that he handled Overaa.

Q. And what did you believe those three -- the commissions from those three clients were on an annual business?

A. I just guessed at a million dollars.

Q. What did you guess for Gonsalves & Stronck?

A. I don't recall getting down to a specific account-by-account basis.

Q. When is the first time you spoke with Mr. Houweling about potential employment with Woodruff-Sawyer?

A. Derm called me on, let's say, the third week of April. I can't recall the exact date. It was just a call out of the blue, asking me if I would have a cup of coffee with him. I agreed to do that that afternoon.

Q. And what did he say to you?

MR. URDAN: Excuse me. During the telephone

A. I don't recall.
Q. The next page, page 3, says:
"As we have discussed, Woodruff-Sawyer is aware that you have entered into agreements with your former employer, Allied Group, that purport to restrict your post-employment activities."
Do you see that?
A. Yes.
Q. Why are you calling Allied a former employer at this point?
A. It's just the way I wrote the letter. It was on the presumption that he was going to accept our offer.
Q. And why would you have presumed that?
A. I just felt that he was going to accept our offer. Nothing more.
Q. Did you know what offer, if any, he had from ABD?
A. Yes, I did.
Q. And what was it?
A. I don't remember the exact terms of that, to be honest with you.
Q. Did he give you a copy?
A. Yes, he gave me a one-page outline of what

ABD had offered.

Q. Is it attached anywhere to Exhibit 1?

A. No.

Q. Has it been provided to your counsel?

A. I believe it has.

MS. WIRTH: Counsel, do you know if that's been produced?

MR. SCHNEIDER: I've never seen it, to my knowledge.

THE WITNESS: It was in all the stuff I sent you.

MS. WIRTH: Q. Was there a date on the offer from ABD?

A. I don't recall.

Q. Do you know when Mr. Houweling had received the offer?

A. No, I don't.

Q. Was it before June 1, your lunch?

MR. URDAN: Objection; calls for speculation.

THE WITNESS: I don't know.

MS. WIRTH: Q. Do you have any memory at all as to when Mr. Houweling told you he actually had an offer?

A. He gave that document to me the morning of June 2nd or 3rd, when I introduced him to Stan Loar --

I'm sorry -- Doug Morton and Susan Hunt.

Q. The next sentence of the paragraph we're talking about states:

"Subject to your compliance with the foregoing section, Woodruff-Sawyer agrees that it will defend and indemnify you against any claim by your former employer alleging a violation of such restrictive covenants based on work undertaken at the direction of W.S."

Do you see that?

A. Yes.

Q. Has Woodruff-Sawyer ever taken the position that it is not going to defend and indemnify Mr. Houweling?

A. Repeat the question, please.

Q. Has Woodruff-Sawyer ever taken the position that it is not going to defend and indemnify Mr. Houweling?

A. I don't believe so.

I'd like to go back to a question on this. This language was language provided by our attorneys, so I would say that a lot of those paragraphs were language provided by counsel and incorporated into the document when I drafted it.

that Houweling had received a letter from Allied's attorney stating that he had Allied confidential information in his possession?

A. We became aware that we had several documents that had come from Allied's attorneys when I returned from vacation.

Q. That was on the 21st?

A. I was in the office on the afternoon of the 22nd.

Q. What did you do to determine whether or not Houweling had Allied confidential information in his possession?

A. What did I do?

Q. Yes.

A. I don't recall doing anything.

Q. You didn't walk up to Mr. Houweling, and say, "Did you return all Allied documents"?

A. I believe the first discussion we had about anything of that was with counsel the morning after the 23rd.

MR. SCHNEIDER: And I would caution you, at this point, not to disclose any information with counsel in answering these questions.

MS. WIRTH: Q. Other than conversations you may have had with counsel, did you ever tell Derm that