Apple Inc. v. Psystar Corporation Doc. 3297


DAVID A. WIMMER (State Bar No. 155792)
MELISSA G. TURAI (State Bar No. 224470)
**SWERDLOW FLORENCE SANCHEZ SWERDLOW & WIMMER**
A Law Corporation
9401 Wilshire Blvd., Suite 828
Beverly Hills, California 90212
Telephone: (310) 288-3980
Facsimile: (310) 273-8680

Attorneys for Defendant
JETBLUE AIRWAYS CORPORATION

SWERDLOW FLORENCE
SANCHEZ SWERDLOW & WIMMER
9401 WILSHIRE BLVD., SUITE 828
BEVERLY HILLS, CALIFORNIA 90212
TEL (310) 288-3980 • FAX (310) 273-8680

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| SHAWN GRANBERRY,<br>Plaintiff,<br>vs.<br>JETBLUE AIRWAYS,<br>Defendant. | CASE NO. C 04 0845 JSW (EMC)<br><br>Date: September 30, 2005<br>Time: 9:00 a.m.<br>Courtroom.: 17<br><br>**DECLARATION OF MELISSA G. TURAI IN SUPPORT OF DEFENDANT JETBLUE AIRWAYS CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE FOR SUMMARY ADJUDICATION**<br><br>The Hon. Jeffrey S. White, Dept. 2<br>Action Filed: March 1, 2004<br><br>Discovery Cutoff: June 30, 2005<br>Motion Cutoff: September 9, 2005<br>Trial Date: November 28, 2005 |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /



Dockets.Justia.com

SWERDLOW FLORENCE
SANCHEZ SWERDLOW & WIMMER
9401 WILSHIRE BLVD., SUITE 828
BEVERLY HILLS, CALIFORNIA 90212
TEL (310) 288-3980 • FAX (310) 273-8680

# DECLARATION OF MELISSA G. TURAI

I, Melissa G. Turai, declare as follows:

1. I am an attorney duly admitted to practice before this Court. I am an associate with Swerdlow Florence Sanchez Swerdlow & Wimmer, attorneys of record for JetBlue Airways Corporation. If called as a witness, I could and would competently testify to all facts within my personal knowledge except where stated upon information and belief. This declaration is submitted in support of Defendant JetBlue Airways Corporation's Motion for Summary Judgment, or in the Alternative for Summary Adjudication.

2. As one of the primary attorneys representing JetBlue in this action, I know that Granberry produced the Crewmember Route Map in response to Defendant's First Request for Production of Documents.

3. On October 15, 2004, I attended the deposition of Plaintiff Shawn Granberry in this action. Attached hereto as Attachment "A" are true and correct copies of the pages from the transcript of the deposition of Mr. Granberry, and exhibits thereto that are cited in the Memorandum of Points and Authorities of Defendant's Motion for Summary Judgment, or in the Alternative for Summary Adjudication filed concurrently herewith.

4. On November 22, 2004, I attended the deposition of Rajeev Singh in this action. Attached hereto as Attachment "B" are true and correct copies of the pages from the transcript of the deposition of Mr. Singh that are cited in the Memorandum of Points and Authorities of Defendant's Motion for Summary Judgment, or in the Alternative for Summary Adjudication filed concurrently herewith.

5. On June 9, 2005, I attended the deposition of Kevin Hoover in this action. Attached hereto as Attachment "C" are true and correct copies of the pages from the transcript of the deposition of Mr. Hoover that are cited in the Memorandum of Points and Authorities of Defendant's Motion for Summary Judgment, or in the Alternative for Summary Adjudication filed concurrently herewith.

6. As one of the primary attorneys representing JetBlue in this action, I received Granberry's Notice of Charge of Discrimination dated December 8, 2003. Attached hereto as Attachment "D" is a true and correct copy of this Notice of Charge of Discrimination.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED this 25th day of August 2005, at Beverly Hills, California.

Melissa G. Turai

SWERDLOW FLORENCE
SANCHEZ SWERDLOW & WIMMER
9401 WILSHIRE BLVD., SUITE 828
BEVERLY HILLS, CALIFORNIA 90212
TEL (310) 288-3980 • FAX (310) 273-8680

# ATTACHMENT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

SHAWN GRANBERRY, )
)
Plaintiff, )
)
vs. ) No. C 04 0845 JSW
)
JETBLUE AIRWAYS, )
)
Defendant. )
)

CERTIFIED COPY

VIDEOTAPED DEPOSITION OF
SHAWN DaMAR GRANBERRY
Emeryville, California
October 15, 2004

MARTIN M. HOROWITZ
CERTIFIED SHORTHAND REPORTERS
1937 SOUTH BEVERLY GLEN BOULEVARD
SUITE 47
LOS ANGELES, CALIFORNIA 90025
(310) 475-0209

REPORTED BY:
Sybil Susan Garcia
Certified Shorthand Reporter
License Number 5668

Q. Did you ever discuss your marital problems with any of your JetBlue colleagues?

A. Maybe in casual conversation; you know, you talk about the wives and the boyfriend, et cetera.

Q. But do you remember having any substantive conversation about your marital problems with any JetBlue colleagues?

A. I think I may have talked to Michele about my marital problems.

Q. What did you and Michele discuss about your marital problems?

A. I think I did tell her on one of our training trips what I was going through in terms of my marriage and pending divorce.

Q. When was this discussion?

A. I don't recall the exact date.

Q. 2003, 2002, 2001?

A. We went to a training one time to New York. I think we talked about it during the whole trip. We took a whole trip together.

Q. Just the two of you?

A. Yeah, we both (unintelligible), for the same training session.

Q. What did you tell Michele about the marital problems that you were experiencing?

A. I can't remember the exact conversation, I mean talked about --

Q. As best --

A. (Overlapping voices)

Q. As best you can recall.

MR. COLE: Counsel, you're cutting -- you're talking over his response and he was trying to get out his words.

BY MR. WIMMER:

Q. As best you can recall, tell me what you said to Michele Steiner about your marital troubles.

A. I believe I told her how long I had been married and that -- I had talked about my son and I talked about the decision for a divorce. And that was pretty much the gist of the conversation.

Q. And what was Ms. Steiner's response?

A. She was very comforting and, you know, said sometimes those things happen.

Q. Would you agree that she was concerned about your situation?

MR. COLE: Objection, the question calls for speculation.

You can respond.

THE WITNESS: I would say at the time, yes.

///// /////

A. Okay.

Q. Your first date of employment was 9-11-2001; correct?

A. Yes, September 11th, 2001, yes.

Q. Your last date of employment was July 28th, 2003; correct?

A. I thought it was the 27th but two thousand -- July -- I thought it was July 27, 2003 but ...

Q. You were told by Michele Steiner that you were being terminated on July 27th, 2003?

A. I don't have a calendar in front of me. That's the date I recall. I'm not sure of the exact date.

MR. COLE: Counsel, before we get into this new area, can we go off the record for a second?

MR. WIMMER: Sure, let's go off the record.

THE VIDEOGRAPHER: Off the record at 12:05 p.m.

(Off-the-record discussion)

THE VIDEOGRAPHER: Back on the record at 12:06 p.m.

MR. WIMMER: Would you please mark that.

(WHEREUPON, Defendant's Exhibit E was marked for identification.)

BY MR. WIMMER:

Q. Showing you, sir, what's been marked as Exhibit E, is Exhibit E the employment application that you

submitted to JetBlue Airways?
A. (Examining document) It looks like it, yes.
Q. And is all the handwriting on Page 1 your handwriting?
A. Yes.
Q. Is all the handwriting on Page 2 your handwriting?
A. Yes.
Q. Is all the handwriting and check marks on Page 3 your handwriting and check marks?
A. Yes.
Q. And is all the handwriting on Page 4 your handwriting?
A. Yes.
Q. Is all the handwriting on Page 5 --
MR. COLE: Is there a Page 5?
THE WITNESS: I don't see a Page 5.
MS. TURAI: Is the last page missing?
MR. COLE: I only have Page 4 -- four pages also.
BY MR. WIMMER:
Q. The final page that you're looking at before you, sir, that's the page that has a signature block on the lower third of the page underneath Terms of Employment?

A. Yes.
Q. And is that your signature underneath Terms of Employment?
A. Yes, it is.
Q. And is your Social Security number 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?
A. Yes.
Q. And did you write that Social Security number in your handwriting?
A. Yes, I did.
Q. And did you sign this document applying for employment with JetBlue on August 5th, 2001?
A. I believe that was the day.
Q. Who is Hilda Dockery?
A. I mentioned it earlier, a part of the Oakland Black Chamber of Commerce at the time.
Q. And she was one of your references?
A. Yes.
Q. And Omar Krashna was also a member of the Oakland Black Chamber of Commerce?
A. Yes.
Q. This shows that you worked for Southwest Airlines from January 1992 through December 1999?
A. Yes.
Q. Why did you leave Southwest Airlines?
A. I left Southwest Airlines to work on the OMV

Q. With whom did you interview at the Plaza Hotel in Oakland?

A. I believe my interview was with Elizabeth.

Q. Just the two of you one-on-one?

A. There was more than Elizabeth there. I can't recall who was all there. I do remember Elizabeth.

Q. Do you have any notes of that interview?

A. No, I do not.

Q. Were you given any documents at that interview?

A. I can't recall.

Q. What were you told about JetBlue during that interview?

A. I was told it was a company -- a new airline, a going airline, somewhere where you would be treated fairly and -- and if you lived up to your end of the bargain and worked, you know, to a satisfactory level, you would always have a job.

Q. Were you told anything else about JetBlue?

A. A little bit of historical information, when they were started, who it was started by, about the air bus, the new planes; just general information like that.

Q. Do you remember asking any questions of Elizabeth?

A. I believe I asked her if I make it through the hiring process, what time were the shifts so I'd know if

it was morning or night.

Q. Did you ask her anything else?

A. I don't recall.

Q. Have you now told me everything you remember about the interview with Elizabeth at the Plaza Hotel in Oakland?

A. That's all I can remember at this time, yes.

Q. Was your next -- was it Elizabeth who told you that if you worked to a satisfactory level, you would always have a job?

A. I can't recall exactly. She emphasized the family environment at JetBlue and -- and then basically said, yeah, you work, you know, there's going to be a job here for you.

Q. What specifically did she say?

A. I can't remember the specifics.

Q. Was your next contact with JetBlue after your interview at the Plaza Hotel when you received your offer letter?

A. I can't remember exactly. It seems like I remember a two-phased interview, a first interview -- like two interviews.

Q. On the same day?

A. I can't remember whether it was the same day or a callback, I can't recall exactly.

Q. Did she tell you the salary or a wage rate?

A. I believe the wage rate was talked about during the actual interview.

Q. Do you remember what you were told about the wage rate?

A. I believe the starting salary was $12 an hour and part-time 20 hours a week.

Q. Were you offered any benefits when you began your employment with JetBlue as a part-time customer service agent?

A. Flight benefits. And I wasn't sure about the medical coverage, I believe it may -- she said that would be talked about later. There is medical coverage but it would be talked about in detail later, at a later time.

Q. In the second interview you mentioned that JetBlue values were discussed. What do you remember about that discussion of JetBlue's values?

A. I can't remember the details of the discussion.

Q. What's your understanding as you sit here today based on your complete employment with JetBlue about what JetBlue's values are?

A. I believe that the values stand for that if you work to a satisfactory level and do your job, you'll have a job with JetBlue. And while being at JetBlue or

working for JetBlue, you will be treated fairly and provided a healthy atmosphere to work in; and if everyone lived up to this, then the airline would be successful.

Q. What else do you understand to be JetBlue's values?

A. I can't recall the exact -- the exact values at this time.

(WHEREUPON, Defendant's Exhibit G was marked for identification.)

MS. TURAI: Do you have two copies?

THE WITNESS: Yes (handing). (Examining document)

BY MR. WIMMER:

Q. Showing you what's been marked as Exhibit G, is Exhibit G a true and correct copy of the August 21, 2001 offer letter sent to you from JetBlue?

A. Yes, this does look like it.

Q. And if you turn to the last page underneath the signature block that says "I hereby accept employment as a Ground Customer Service Crewmember and agree to the terms and conditions contained in this letter," is that your signature?

A. Yes, it is.

Q. In the first paragraph on the first page in

bold it refers to training that will begin the day after September 11th and will continue for two weeks in Oakland. Did you train -- excuse me. Did you attend that new employee training in September 2001?

A. It didn't -- it didn't happen that week. What happened was that during our orientation when we were in New York before we came back for training, September 11th happened. So we were actually -- we couldn't leave New York, we were literally trapped in New York for about I would say four, at the most five days. So the whole training schedule was rescheduled whenever we could return.

Q. When you first reported to work, you started on Monday, September 10th?

A. Yeah, the flight left I believe the evening of Monday, September 10th.

Q. A flight from Oakland to JFK?

A. Yeah, for orientation the following morning.

Q. And did you in fact undergo orientation in New York City?

A. The orientation was interrupted, in the middle of the orientation September 11th happened, the (unintelligible) and the buildings started to fall.

Q. Was that orientation ever rescheduled?

A. I believe it was rescheduled sometime later.

Q. Did you attend the rescheduled orientation?

A. Yes.

Q. Was that held in JFK?

A. No. I can't remember exactly -- I think they rescheduled it for Oakland at a later date because we didn't get our orientation completed that day.

Q. The first orientation that occurred in New York --

A. Yes.

Q. -- that was interrupted by the terrorist attacks on 9-11, what do you remember being told about your employment at that orientation?

A. Basically what was said in the interviews, you know, reiterated that JetBlue was a great place to work, we were very fortunate to be there, that we were selected from a high number of applications; and went over a little history of the company, how it was started and how long it had been in business; and then, once again, if you work satisfactory and live up to your end of the bargain, that you would always have a job with JetBlue and, you know, reiterated you'll always be treated fairly because the company believes in treating, you know, its crew members fairly.

It talked about certain things like there's no name badges for anyone, so everyone is seen, you know,

Q. What do you remember being said to you during your orientation here in Oakland?

A. I don't remember all the detail. It was a broad overview of the company but it went over a lot of details, a lot of details. I can't remember the specifics but it was, once again, the history of the company, how the company made money, the per-mile procedures, all those type of things, a lot of detailed information.

Q. Do you remember anything else being said to you about your employment during this orientation here in Oakland?

A. Well, the same thing was reiterated --

Q. What's that?

A. -- the same thing was reiterated, that, you know, if you work satisfactory, you will always have a job at JetBlue, it's a family environment, wants you to feel comfortable here, and if we -- if we work at this level, the company will be successful, that you will be treated fairly; and JetBlue firmly believes in treating people fairly and having an atmosphere that includes everyone; and a big congratulations, you know, congratulations on actually making it.

Q. Who specifically said here in Oakland at the orientation that if you work to a satisfactory level,

you would remain employed with the company?

A. I can't remember who exactly.

Q. Did anyone throughout any of your orientation settings say what it meant to work to a satisfactory level?

A. No, that was --

Q. No one went into detail about what a satisfactory level meant?

A. No.

Q. You -- you knew that throughout your employment, you were free to quit at any time; right?

A. Yes, I mean -- yes. That's true with all jobs, isn't it? Okay.

Q. Did Michele Steiner speak during this orientation in Oakland?

A. I can't recall, I can't recall.

Q. Do you remember Michele Steiner telling the new employees at this orientation in Oakland that she as the station manager required all incidents to be reported to her?

A. No, I don't recall.

Q. Do you remember Michele Steiner saying during the orientation in Oakland that as the general manager of Oakland she needed to know everything that happened at her station?

BY MR. WIMMER:

Q. Do you remember what was said about safety during your orientation here in Oakland?

A. I don't remember the exact words, no.

Q. Generally do you remember what was said about safety during your orientation at Oakland?

A. I remember the phrase: Always work safe. I remember that being used.

Q. What did that -- strike that.

What were you told always work safe meant to JetBlue?

A. I remember when they said always work safe that, remember, safety is the first priority; that unlike some other airlines it was brought up that even if the plane doesn't leave on time, the importance is always to work safe. That's basically what I remember from that conversation.

Q. In fact, you were told during orientation that safety was the number one value to this airline; correct?

A. I don't recall it being said it was the number one value, they were just all the five values; it wasn't no priority to them.

Q. Were you ever told during your employment at JetBlue that safety was JetBlue's number one value?

A. Yes.

Q. Who told you during your employment that safety was the number one value at this airline?

A. My first supervisor.

Q. Who was that?

A. Andrew Schweibert.

Q. Did you ever tell your employees that safety was the number one value for this airline?

A. Yes.

Q. How many times did you tell your employees that safety was this airline's number one value?

A. Actually quite a few times during the briefings.

Q. And did you ever tell your employees that if there was a safety incident, you needed to know about it?

A. Yes.

Q. And did you tell your employees that if there was any type of accident that occurred, you needed to know about it?

A. Yes.

Q. Why did you tell them that?

A. Because it was my job at that time -- as supervisor, it was my responsibility to follow up on all accidents.

Q. Did you also know that it was, as part of your job as supervisor, your duty to let Michele Steiner, the general manager, know of any incidents that occurred?

A. You said accident first, now you said incidents, so --

Q. Let me --

A. -- are you referring to one and the same?

Q. Let me break it down. Did you know while you were a supervisor that part of your job was to tell Michele Steiner of any accidents that occurred?

A. I realize -- you know, it was my job to make sure that she found out. I didn't actually have to tell her, it was to make sure that she found out about accidents that occurred, yes.

Q. Well, let me be very clear.

A. Okay.

Q. Was it your job to tell Michele Steiner of any accidents that occurred under your watch?

A. It was my job to make sure she found out. I didn't actually -- it was my job to make sure she found out about the incidents, yes.

Q. Did Michele Steiner ever tell you that she needed to know from you personally of any accidents that occurred under your watch?

A. Yes.

Q. And did Michele Steiner also tell you that she needed to know personally from you any safety-related incidents that occurred under your watch?

A. Yes.

Q. And did Michele Steiner also tell you that she needed to learn personally from you of any incidents involving ground support equipment that occurred under your watch?

A. You're saying personally from me. It doesn't always mean personally from me.

Q. I'm asking --

A. There were several supervisors there that could have let Michele know about it. So I don't agree with the personal from me.

Q. My question was: Did Michele Steiner ever tell you that she needed to learn personally from you any incidents that occurred involving ground support equipment during your watch?

MR. COLE: And, Mr. Granberry, you're acting as though you're having some confusion with his question --

MR. WIMMER: Well, let's not clarify and let's not -- if you have an objection, Mr. Cole, please state your objection --

MR. COLE: The witness has indicated --

MR. WIMMER: -- please state your objection and

do not have a speaking objection.

MR. COLE: He has indicated he has some confusion --

MR. WIMMER: I'm not aware of any confusion.

MR. COLE: I'm just cautioning the witness to make sure you understand the question before responding --

MR. WIMMER: He's a UC Berkeley attendee. I'm sure he has the intelligence to tell me when he doesn't understand a question.

BY MR. WIMMER:

Q. So let me ask you the question, sir. Did Michele Steiner ever tell you that you have to personally report to her any incident involving ground support equipment that occurred on your watch?

A. Ask the question one more time.

MR. WIMMER: Read it back, please.

(Record read, as follows:

Did Michele Steiner ever tell you that you have to personally report to her any incident involving ground support equipment that occurred on your watch?)

THE WITNESS: In that form of the question, I'm going to have to say no.

/////                /////

BY MR. WIMMER:

Q. Were you ever told by Michele Steiner that you needed to personally report to her any damage to ground support equipment that occurred on your watch?

A. Yes.

Q. When did she tell you that?

A. I'm not sure when she told me that.

Q. Was it in 2001?

A. No, it would have been in 2003.

Q. When in 2003 did Michele Steiner tell you that you needed to personally report to her any damage to ground service equipment that occurred during your watch?

A. Once again, you're using the word personal, so I need to clarify that. Report to her -- reask the question, I'm sorry.

Q. When did Ms. Steiner tell you that you needed to personally inform her of any damage to ground service equipment that occurred during your watch?

A. I can't recall the exact date.

Q. Was it in 2003, 2002, 2001?

A. Somewhere in 2003.

Q. How many months before you were terminated did she tell you that?

A. I can't recall the exact month, can't recall

the exact month.

Q. Was it --

A. Within a three-month period.

Q. Were you told at orientation at Oakland that it was negligence not to report any accident to the company?

A. Ask the question one more time.

Q. Were you told during your orientation in Oakland -- strike that.

Were you told during your training in Oakland that it was negligence not to report to the company an accident that occurred?

A. Just so I can clarify, you switched from orientation to training; correct? To training, not orientation?

Q. Correct.

A. They're two separate things.

Q. Correct.

A. Okay. During training, yes.

Q. What specifically were you told?

A. I can't remember the exact words.

Q. Were you also told during your training that it was negligence not to report incidents to the general manager?

A. I don't recall that.

Q. Were you told that it was negligence not to report safety-related incidents to the station general manager?
A. No.
Q. Were you told it was negligence not to report damage -- equipment damage to the general manager?
A. No.
Q. Were you ever told at any time that your employment with JetBlue was guaranteed for life, no conditions attached?
A. No.
Q. Were you ever told that you could never ever be fired?
A. No.
Q. Were you ever told that JetBlue would always be in business and you would always have a job?
A. No.
Q. Were you ever made any promise that you'll have a job for at least X number of years?
A. No.
Q. When you first began your employment with JetBlue, you started as a part-time ramp agent at $12 per hour; correct?
A. I believe it's ground customer service agent is the proper title but -- ground customer service agent,

MR. COLE: Before we go on with Exhibit I, this appears to be a partial document and it says THE BLUE BOOK, looks like Page 13. If you're going to add this as an exhibit, I'd like to see the entire document.

MR. WIMMER: You will.

MR. COLE: Well --

BY MR. WIMMER:

Q. Let's focus on this exhibit, Exhibit I, Mr. Granberry. Is that your handwriting of the word Shawn Granberry?

A. Yes.

Q. And is that your signature?

A. Yes.

Q. And above date, is that your handwriting, 9/28/01?

A. I'm not sure about the date handwriting.

(WHEREUPON, Defendant's Exhibit J was marked for identification.)

BY MR. WIMMER:

Q. When you received the employee handbook for which you signed as indicated by Exhibit I, did you have any discussion with anybody at the company about that employee handbook?

MR. COLE: Objection to the question; it assumes facts not in evidence, mischaracterizes the

either had in front of you or were sharing at this meeting with Mr. Schweibert?

A. I believe it was the handbook.

Q. Do you remember what version of the handbook it was?

A. No, I don't.

Q. Do you remember when this meeting occurred: 2001, 2002, 2003?

A. 2001.

(WHEREUPON, Defendant's Exhibit K was marked for identification.)

THE WITNESS: (Examining document)

BY MR. WIMMER:

Q. Showing you what's been marked as Exhibit K, the title of which is "The Blue Book CREW HANDBOOK Effective January 2003," have you ever seen this document before?

A. Yes.

Q. When was the first time you saw this document?

A. I don't recall the first time I saw it.

Q. Was it in 2003?

A. I don't recall the exact year I saw this document.

Q. You received this document during your employment; correct?

A. I don't know if I received it directly or -- I know there was one at the station.

Q. This Blue Book crew handbook, effective January 2003, where at the station was this document maintained?

A. It was -- one was kept in the supervisor's office. I believe one was also kept in both supervisors' office, so the ground and the customer service office.

Q. And at the time you were the ground supervisor?

A. Yes.

Q. So this was kept in your office?

A. Yes.

Q. And was this also available online?

A. Yes, most of these documents were available online.

Q. Did you ever present this crew handbook to your subordinate crew members; in other words, those crew members who worked for you?

MR. COLE: Are you asking him whether he ever presented this effective January 2003 handbook to his crew members?

MR. WIMMER: Thank you.

BY MR. WIMMER:

Q. Did you ever present what's before you as Exhibit K, the 2003 -- January 2003 crew handbook, to

company?

A. Yes.

Q. Were there any other benefits that you received?

A. Those are the benefits I recall. There may have been more, those are the ones I recall.

Q. How is it that you changed from part-time status to full-time status, how did that come about as you understand it?

A. If I recall correctly, the flights increased, which called for longer hours to be worked. So most of the part-time employees there were offered a full-time position, meaning 40 hours a week, and I was one of the ones that accepted. So I believe it was because of flight increases.

Q. So you were given the same offer to increase to part-time as -- excuse me.

You were given the same offer to increase to full-time as were the other part-time employees?

A. That was my understanding, that it was offered to everybody.

Q. How then did you become a supervisor?

A. A job posting opened up and I was one of the individuals that applied for the supervisor position. So it becomes a job posting and then you apply for the

position.

Q. And was that the first job posting to which you applied?

A. Clarify the question, please.

Q. Had you ever applied for any other jobs at JetBlue prior to this job posting for the supervisor?

A. That was the only job I applied for besides my initial position as a customer service agent.

Q. So, in other words, once you started your employment at JetBlue, the first job posting to which you applied was the supervisor position which you received?

A. Yes.

Q. What was the job process for getting that supervisor position? You applied for the job posting, and then take me through the rest of the sequence.

MR. COLE: Again, you're asking him the sequence that he went through?

MR. WIMMER: Absolutely, yes.

MR. COLE: Okay.

THE WITNESS: The sequence I went through was you fill out the application, at some point you receive a e-mail from the HR department saying your application has been accepted; sometime after that you're given an interview date and you interview for the position, and

there are -- I believe I had two interviews.

BY MR. WIMMER:

Q. With whom?

A. Elizabeth McCune and Michele Steiner. I believe the first one was with Elizabeth McCune and the second one was with Michele Steiner and Elizabeth McCune.

Q. And then what happens?

A. And then once the two interviews take place, you wait to hear whether you received the job or didn't get the job.

Q. Do you know who the other candidates were against whom you were competing for this supervisor position?

A. I don't recall. Applicants applied from all over, all over the country. So I mean -- I don't even know how many applicants there were.

Q. You don't know who you were up against --

A. Right.

Q. -- for the supervisor job?

A. Correct.

Q. What do you remember from your interview with Michele and Elizabeth for the supervisor position?

A. I don't recall any details about the interview. I remember some of the questions: What would make you a

BY MR. WIMMER:

Q. Other than the training that you've already described, after you attended the POL training in New York City did you have any other supervisory training?

A. So that I understand the question, so after the POL training, after that point did I receive any training after I came back from POL?

Q. Correct.

A. I would say no, no standardized trainings. But I mean every day was a training, you know, in conversations with my superiors, so -- so I can't say I had any standardized training like the POL. I was actually due for another training and I was terminated before I went.

Q. How would you describe the relationship that you and Michele Steiner had when you went back to New York?

A. For the POL training?

Q. For the POL.

A. For the POL. I think we had a healthy relationship, I think we had a healthy relationship. I felt she respected my work and what I stood for and I respected, you know, her -- the job she was doing.

Q. Why do you think she respected you in your work?

A. I feel I did a good job, I feel I was a very good supervisor, I felt I kept the crew member morale at a high level. Our numbers were some of the best in the country in what we did in terms of our bag errors and our turn times for the planes, and I felt I was doing a very good job. I never received a complaint from her until the day I was terminated.

Q. What makes you think that she respected you?

A. Just in the way she dealt with me. It was a level of respect, you know.

Q. Was she ever pejorative or demeaning toward you?

A. Yes. It didn't come to well after the POL training, though, well after the POL. So post-POL, fine; later on things changed drastically.

Q. Towards your termination?

A. No, later on in my employment at JetBlue, pre-termination.

Q. How many months before your termination did your relationship with Michele Steiner change?

A. I'll say within the last two to three months.

Q. How would you characterize the change in your relationship with Ms. Steiner in the last two or three months of your employment with JetBlue?

A. Well, I began to discuss with Ms. Steiner the

the question, go ahead and respond.

THE WITNESS: Could you ask the question one more time and clarify it, please.

BY MR. WIMMER:

Q. You said that you discussed with Michele Steiner that other supervisors were receiving other things that you were not receiving. What did you tell her other supervisors were receiving that you were not receiving?

A. I discussed several station supervisors were able to park up-front parking at the airport. I was never given up-front parking.

I mentioned that I had to use my personal cell phone in JetBlue business and I was never given a company cell phone.

I mentioned that decisions were being made about crew members that answered directly to me that I was totally being left out of. I felt that was unfair, that wasn't going on with other supervisors. Serious decisions, like terminations. People that answered directly to me that I didn't even know was terminated, you know, so -- I mean crew members would know before me that the person didn't work there anymore.

Seniority, some things happened with our seniority. I questioned her about I was the first

supervisor in terms of seniority, yet I was given last order of seniority because she decided to change the rules to her own rules that now it's not how long you worked for the company -- not how long you been in your job title, like it's done throughout the system, that now it's decided that it's how long you been with the company. So I explained to her -- so a supervisor --

MR. COLE: (Inaudible)

THE WITNESS: Okay, all right.

MR. COLE: Is there anything else that you talked to her about?

THE WITNESS: It was a long list, it was a long list.

BY MR. WIMMER:

Q. What else was on your list that you discussed with her?

A. Well, in terms of the seniority question, we discussed why was I put last in seniority when I was the supervisor and I had helped, you know, train the other -- other supervisors at the job; yet now when it comes to seniority -- which is your vacation, your days off, all of those things that are pretty important -- that now I was last in seniority. I wanted to know, you know, basically -- basically why.

Q. What did she tell you?

A. That's the way it's going to be. Tough.

Q. Those were her words?

A. That's the way it's going to be. Those weren't the exact words but that's what was conveyed to me. Tough. That's the way it's going to be. It's going to be -- I decided it's going to be the time you spent with the company. So my thing was -- so --

MR. COLE: You've answered the question.

THE WITNESS: Okay.

BY MR. WIMMER:

Q. Were there any other items that you discussed with Michele Steiner?

A. The parking, the phone -- I'm trying to think out loud so I can remember -- the seniority question.

Yes, I also discussed the picking of leads. Leads agents are the ones that help run the ramp. I was being left out of the decision of the leads. And I was responsible for their decisions but yet I had no say-so in the choosing of the leads, and I felt that that was wrong and I just wanted to know why. The other supervisors were able to have input, why don't I get any input.

Q. Anything else that you discussed with Michele Steiner?

A. That's all I can recall at this point.

problems I saw in terms of discrimination at the station as well as the way I felt I was being treated differently and being discriminated against. There were several things that other supervisors received that I didn't receive. There were several situations where I felt I was being harassed.

And I talked to her about it, and nothing was ever done, you know, and I started to ask questions why. And I started questions about the difference that crew members were being treated -- you know, Caucasian crew members were given preference over African-American crew members; I mean some serious differences in the way they were being treated, and especially in terms of -- I don't want to call it punishment but, you know, what happens when your attendance isn't well or something happens, you know, the corrective action for an African-American was greatly different than some of the Caucasian employees, so ...

Q. What supervisors received other things that you think you did not receive?

MR. COLE: Hold on. I'm just going to object to the vagueness of the question. When you say received other things, what are you referring to.

MR. WIMMER: I'm using his words.

MR. COLE: Well, go ahead; if you understand

Q. Who was provided up-front parking?

A. Kevin Hoover, Rudy Lucero, Rhonda Blair.

Q. Anyone else?

A. At the point of our discussion, I don't believe so.

Q. Did Ms. Steiner ever tell you why those three individuals were provided up-front parking but not you?

A. She never gave me an answer. I asked. I asked her to rotate, she said no. That was it.

Q. Do you as you sit here today know why those three individuals were given up-front parking?

MR. COLE: Other than what he's already testified to?

THE WITNESS: At that point I felt it was discrimination. I felt that because they're Caucasian, they get preferential treatment; and because I'm a black man, I don't get preferential treatment. And I wanted to know why, that was what the conversation was about. I explained to her my job was being --

MR. COLE: (Gesturing)

THE WITNESS: Okay.

BY MR. WIMMER:

Q. Was Kevin Hoover a station supervisor before you were?

A. Yes.

Q. Was Rudy Lucero a station supervisor before you?
A. Yes.
Q. Was Rhonda Blair a station supervisor before you?
A. Yes.
Q. Did Michele Steiner ever tell you that they had up-front parking because they had their station supervisor position before you did?
A. No.
Q. As you think about it now that these three folks were station supervisors before you, do you still believe it was race discrimination that they receive up-front parking when you did not?
A. Yes.
Q. Which station supervisors, if any, were provided company cell phones?
A. My best recollection is everyone except me.
Q. All other station supervisors other than you were given a company-provided cell phone?
A. To the best of my recollection, I believe everyone else had a company cell phone.
Q. Did you ever ask for a company-provided cell phone?
A. Yes, I did.

Q. Whom did you ask?
A. Michele Steiner.
Q. And what did she tell you?
A. She really never gave me an answer. It was an e-mail, she never really gave me an answer.
Q. It was an e-mail you sent to her?
A. E-mail and verbal, both, both requested a company cell phone; because my bill was getting --
MR. COLE: (Gesturing)
THE WITNESS: Oh, okay.
MR. COLE: You've answered the question.
BY MR. WIMMER:
Q. Why did you want a company-provided cell phone?
A. Because that was part of your -- the things you needed to be a effective supervisor, is to have a phone. I used my -- because you're on call 24 hours a day. So I wanted to -- I had to use my personal cell phone. And the crew members call you on your -- they're able to call supervisors on their cell phones, so ...
Q. How do you know that other station supervisors were provided company-provided cell phones?
A. We worked together every day, it was on their hips, it was on their -- they had it, it was right in front of me. They had it.
Q. But how do you know that that supervisor's cell

phone was a company-provided cell phone?

A. Because I was there when they picked up their cell phones. They came and they were shipped to the station on the ramp, they came in through my department, and I delivered them upstairs to be handed out.

Q. And every other station supervisor had a company-provided cell phone except for you?

A. To my best --

MR. COLE: The question's been asked and answered.

You can answer it again.

THE WITNESS: To the best of my recollection.

BY MR. WIMMER:

Q. You discussed with Michele Steiner the change in how seniority was calculated?

A. Yes.

Q. When you first became a station supervisor, how was a station supervisor's seniority calculated?

A. I was told systemwide it's done by how long you are at that position.

I didn't have to deal with the issue when I first became a supervisor because the supervisor had been in the position longer than me; so it never really came into effect at all, you know. Kevin Hoover was the other supervisor. So it never came into effect, that

problem, until other supervisors were hired, that's when it came into -- and it was like that until that change happened. So I was in higher seniority to that point, then it just changed.

Q. And the change was that Michele, as you understand it, changed from looking at your seniority in position to now looking at company longevity as one's seniority?

A. I wouldn't say longevity, it was your time employed with the company as your seniority as a supervisor. Even though you're in another position. So your seniority would transfer into another position, which is not how it's done systemwide.

Q. Just so I'm understanding this --

A. Yeah.

Q. -- once you became a station supervisor, initially you believed that your seniority was based on your time in that specific position?

A. Yes.

Q. And then after becoming a station supervisor, the method of calculating the supervisor's seniority changed; correct?

A. Yes.

Q. And the change was that now one's seniority was based on one's date of hire; correct?

A. We had an understanding that to this point it was done with your time in the position.

Q. I understand that.

A. Okay.

Q. But then it changes?

A. Then it changed.

Q. And the change was instead of looking at your time in position, now Michele looked at your overall total length of employment with the company?

A. Yes.

Q. And Michele's looking at one's overall total length of employment with the company applied to all of the station supervisors; correct?

A. Well, I was the only one affected because the other supervisors were hired in that order, the customer service supervisors were hired in that order. I was the only one affected because I was mainly handling the ground area. And the other supervisors were hired well after I was hired, way after I was hired, so I was really the only one that that rule affected. It didn't affect the other supervisors because their time with the company reflected their time as supervisors, so ...

Q. And since you were hired before these other supervisors, your seniority actually increased by the change Michele implemented --

A. No.

Q. -- correct?

A. No, it decreased; the other way, decreased. I went to the last -- bottom of the barrel: last days off, last to pick vacations, last in everything. After I had basically trained the other supervisors how to be supervisors and actually recommended them for their supervisors' job, then I was put the last -- bottom of the barrel.

Q. At the time you became a station supervisor -- at the time you became a station supervisor, the other station supervisors at the time were Rhonda Blair; correct?

A. Yes.

Q. Kevin Hoover?

A. Yes.

Q. And Rudy Lucero; correct?

A. Yes.

Q. Who was hired by the company first, you or Rhonda Blair?

A. Rhonda Blair was hired by the company first.

Q. Who was hired by the company first, you or Kevin Hoover?

A. Kevin Hoover was hired by the company first.

Q. And who was hired by the company first, you or

Rudy Lucero?

A. Rudy Lucero.

Q. What was the decision-making that you believe you were excluded from by Michele?

A. The decisions I was excluded from was the termination of Willie Green. That was an agent there that was terminated that I had had a private meeting with Michele about my concerns about Mr. Green and --

MR. COLE: He just asked who --

THE WITNESS: Okay.

MR. COLE: -- what were the decision-makings you felt you were --

THE WITNESS: Okay.

MR. COLE: -- excluded from.

THE WITNESS: Also in lead interviews, the leads that were chosen; I didn't even know there were interviews. About changing of the leads, that decision.

And there were some smaller policy changes at the station that I wasn't kept in the loop about that affected the department that I worked in.

BY MR. WIMMER:

Q. Such as?

A. I can't recall, but just the smaller ones.

Q. Did you pick Glenn Harris to be a lead?

A. It was -- leads weren't just picked by myself,

we -- it was all the supervisors came together, we looked at the leads, and we presented them to Michele Steiner. The final decision was Michele Steiner. I recommended Glenn as a lead with the other supervisors.

Q. You and the other supervisors recommended Glenn Harris as a lead?

A. Yes.

Q. And did Michele Steiner follow your recommendation?

A. Yes, she did.

Q. What other recommendations did you make to Michele Steiner while you were station supervisor?

A. Michele --

MR. COLE: I'm sorry. What other recommendations?

MR. WIMMER: Yes, sir.

MR. COLE: For employment or for --

MR. WIMMER: (Gesturing)

MR. COLE: Well, I believe the question is hopelessly vague.

If but you can respond --

THE WITNESS: I can't remember all of the recommendations I made to Michele. We talked on basically a daily basis. I can't remember all of them.

///// /////

BY MR. WIMMER:

Q. You have told me you recommended Glenn Harris to be a lead. Were there any other recommendations that you considered to be key recommendations that you made during your employment to Michele Steiner?

A. Most of the recommendations that were made were made as -- the supervisors met and we discussed it first and then we presented it to Michele, just to make sure it wasn't -- another supervisor didn't disagree with a recommendation or a policy change. So we'd normally meet as supervisors and then present it to Michele for her final approval or denial, either way.

Q. Who made the decision to terminate Willie Green?

A. I'm not sure.

Q. Do you know why Willy Green was terminated?

A. I'm not sure of the exact reasons why he was terminated.

Q. Do you have any knowledge as to why Willie Green was terminated?

A. I know why he -- they -- a suspicion of -- they sent him on a drug test, that's what I do know.

Q. Those drug test results were not shared with you?

A. No, they were not.

Q. Are you aware of employee privacy reasons why you were not shown a fellow crew member's drug test results?
A. I was a station supervisor; he was a crew member there, reported directly to me. And it was basically my job to recommend the drug test, because I dealt with him every day, and I had a private meeting with Michele about this issue.
Q. Do you know why Willie Green was sent for a drug test?
A. I was totally kept out of the loop. And he worked directly for me, that's what my point is.
Q. Who sent Willie Green for the drug test?
A. I do not know.
Q. Were you present at the time that Willie Green was sent for the drug test?
A. I do not know when he was sent. I didn't work that day, I'm not sure when he was sent.
Q. Do you know what the results of Mr. Green's drug test were?
A. I do not know the results.
Q. Do you know to whom those results were provided?
A. No, I do not.
(Off-the-record discussion)

THE VIDEOGRAPHER: Off the record at 3:17 p.m.

(Recess)

THE VIDEOGRAPHER: Back on the record at 3:27 p.m.

BY MR. WIMMER:

Q. Mr. Granberry, were you aware that Willie Green was taking drugs?

MR. COLE: Objection, assumes facts not in evidence.

You can respond.

THE WITNESS: It was not clear.

BY MR. WIMMER:

Q. Did you have some suspicion that he was abusing drugs?

A. I met with Michele about a suspicion and how to deal with that.

Q. And did you tell Michele that you had a suspicion that Willie Green was using drugs?

A. Yes, we had had a discussion about suspicion of Mr. Green using drugs.

Q. And you told her that you personally had a suspicion that he was using drugs; correct?

MR. COLE: Asked and answered.

You can respond.

THE WITNESS: Yes, I told her I had a