suspicion. I came -- sat down with her and came up with a game plan on how to deal with the situation because I felt that our JetBlue values taught us to help people, not to throw them on the street. When we saw what was going on, we know his personality, it was our responsibility to help Mr. Green with his problem. And we sat down and came up with a game plan to deal with it and --

MR. COLE: You've answered the question.

THE WITNESS: Okay.

BY MR. WIMMER:

Q. Did you tell any other supervisors that you had a suspicion that Mr. Green was taking drugs?

A. Only with Ms. Steiner.

Q. Have you ever heard the phrase zero tolerance?

A. I believe that's one of the -- part of the training in the drug awareness.

Q. And you're also aware that Willie Green was an FAA-regulated employee?

A. I'm not sure what you mean by FAA-regulated employee.

Q. Are you aware if -- are you aware if Mr. -- strike that.

Are you aware if once the company had a reasonable suspicion of Mr. Green using drugs, the

Q. How many tickets did you receive for that?
A. I remember one in particular. I was being harassed by the maintenance supervisor about parking there and he said he would talk to Michele Steiner. And she said I couldn't park there, what he said. So he called me and had me ticketed.
Q. When you had -- how many times did you tell Michele Steiner you thought you were being discriminated against because of your race?
A. I would say at least three times, but the main was one -- one meeting we had about -- I'd say about a month before my termination when I went over all of the issues, all the issues. Before it was just I'm not being treated fairly. But the month before we had a sit-down meeting, just her and I, and I went over details: boom, boom, this is what -- boom, boom, boom, boom.
Q. The first time you told her you were not being treated fairly, did you tell her that you were not being treated fairly because of your race?
A. The first time was: I'm not being treated fairly, and I want to know why I'm not being treated fairly.
Q. Did you tell her that you believed it was because of your race?

A. No, the first time I didn't say race, the first time I said: I feel I'm being treated unfairly.

Q. When was this first conversation with Ms. Steiner?

A. I can't recall exactly, roughly five months before I was terminated.

Q. Do you have any notes of this conversation?

A. No, I do not.

Q. Did you ever send her an e-mail recapping, summarizing the conversation?

A. Those were face-to-face conversations.

Q. Just the two of you?

A. Yes.

Q. When was the second such meeting?

A. I can't recall the exact date.

Q. How long after the first meeting?

A. Probably about a month later.

Q. What did you tell Ms. Steiner in the first meeting about why you felt you were not being treated fairly?

A. I felt I was being left out of some important decisions at the station, I wanted to know why. I felt I didn't know some information that other supervisors knew, I wanted to know why. I still had the parking issue at that point also. Those were the main issues --

and the company phone.

Q. Any of those issues resolved after the first meeting?

A. No.

Q. So a month later you have a second meeting with her?

A. Yes.

Q. Do you tell her in the second meeting that you think you're being treated unfairly because of your race?

A. Yes.

Q. So that's the first time you tell her you think you're being treated differently because of your race, is in that second meeting?

A. Well, I came to that conclusion because after she didn't respond to the first meeting, I said it must be race because I gave you all the complaints. I said what was going on, I said I'm being treated unfairly. Now it got to the point where I feel it's because of my race and I couldn't see what other reason. I was doing a good job, I had never been disciplined in any way, never been written up, nothing, never been complaints about the job I was doing. I was just being treated unfairly.

Q. How far in advance of your termination was the

The lead issue was the main conversation because I had been totally left out of the lead decision and I felt that -- I didn't know why. I was like how can we do interviews and people leave that respond or answer directly to me and I have no say-so. I mean I work with them every day, see what they do every day, I know their work habits the best, so there's no way I should be left out of the -- out of the conversation.

So the phone again, the seniority issue, and that's all I can recall off the top of my head.

Q. And do you believe each of those issues is a race-based issue?

A. I felt that the reason it wasn't corrected was because of race, yes.

Q. Did you tell Ms. Steiner in this third meeting that you believed you were the subject of race discrimination?

A. Yes.

MR. COLE: Objection, the question is asked and answered.

BY MR. WIMMER:

Q. What did Ms. Steiner say to you in response to your raising the Willie Green matter?

A. She became highly upset.

Q. What did she say?

Q. Did Ms. Steiner ever tell you why you were not included as part of the lead decision-making?
A. She didn't give me an answer. She didn't give me an answer.
Q. Did you ever complain to anyone at JetBlue about race discrimination other than Michele Steiner?
A. Yes, I did have discussions with other people about the discrimination in the station.
Q. With whom else did you discuss this issue?
A. I had discussions with another station supervisor.
Q. Who's that?
A. Sybil Carter Love.
Q. With whom else?
A. And I also had some discussions with my former supervisor asking for his advice.
Q. Who's that?
A. Andrew Schweibert.
Q. Anyone else?
A. Those are the two I discussed ...
Q. Did you ever call corporate human resources to complain about discrimination?
A. No, I did not.
Q. Did you ever send an e-mail to corporate HR to complain about race discrimination?

A. No.

I was trying to deal with it in the station myself and not mess up our station, I wanted the station to run smoothly, so I was trying to deal with it internally and not bring in corporate so we could work through this. I felt it could be worked through, I felt in the end it would be worked through, we can get through this.

Q. Did you ever take any steps to contact anyone at a corporate level to complain about race discrimination?

A. No.

I thought it was best to handle it within the station. Michele had a philosophy of let's handle everything in the station. Don't go to corporate, handle everything within the station first, corporate is the last resort. We got to handle this inside the station. And I was following her policy and her philosophy at the Oakland station.

Q. What's your understanding of the complaint procedure that was available to you to go to corporate to complain about alleged discrimination?

A. I'm not sure of the exact procedure at this time or what the report procedure is, I'm not sure.

Q. Where would you have looked to find out what

around in June 2003?

A. I can't remember the exact names of the leads that was being switched around.

Q. Who was involved in the process to switch the leads? Was it the other station supervisors?

A. I believe the interviews was Michele Steiner and Masheeva Zachary. I'm not sure if any other supervisors were included in the interview process.

Q. Did anyone ever tell you why you were not included in that decision-making process?

A. It was only Michele that could have gave me an answer and I don't think she ever gave me an answer. Basically: You're not included.

Q. Did you ever consider calling Elizabeth McCune to discuss your claim of race discrimination?

A. It hadn't got to that point. I was still trying to rectify and deal with the situation in-house with Michele Steiner directly before it got to that point. So I was dealing with Michele Steiner directly as my general manager at that point.

Q. Did you ever consider going to Michele Steiner's boss to discuss your claim of race discrimination?

A. It hadn't gotten to that point. I was still dealing with Michele Steiner at that point and it hadn't

planned to spend my career with. Being an airline career guy, I had planned to spend my career with JetBlue Airways.

Q. And a few pages on, there's the Leadership Assessment portion.

A. Are you going to give me a page number or --

Q. The heading on the top is Leadership Assessment, How well do I live the Values.

A. Okay. No, leadership assessment continued (inaudible). Yes.

Q. And the second page of that leadership assessment is headed Integrity. Do you see that?

A. Yes.

Q. And the third page are other comments.

A. Yes.

Q. In those other comments you wrote, quote:

"I have been blessed to work under a great manager that is willing to teach so I can grow and gain skills for future growth."

Close quote.

The great manager whom you were referring to was Michele Steiner; correct?

A. Yes.

Q. Why did you believe when you completed this assessment that Michele Steiner was a great manager?

A. I felt -- I have felt and still feel Michele is a good general manager. She had her flaw with allowing the discriminatory acts to happen; but in terms of her airline knowledge and her experience with the airline -- she's been with the airline for many, many years, more than I've been on this earth -- and I felt she knows her job well.

I didn't agree with her on the discriminatory things that were happening, but I wanted to work with her to correct these issues. I didn't feel that affected her doing her job, but I felt those were things I could help her with and help correct within the station because I felt they were unfair, but I didn't want to leave the company or anything like that.

Q. Did you at any point in your self-assessment discuss your concern about Ms. Steiner's alleged racial discrimination?

A. No, that would be keeping it outside confidential -- because this is the intranet; it would go straight to corporate, the intranet, so you don't know who reads these things. So I wanted to make sure the way I handled it was in-house the way Michele wants us to handle things.

Q. You wrote she's willing to teach so you can grow and gain skills for future growth. Why did you

A. It wasn't required to do a drug test. That was like if you sat down and cut the seat with your pants, he needed to go for a drug test. That's not procedure. When you're driving in an accident, you had to go for a drug -- drug test. It wasn't called for.

Q. Are you aware of any other case at the company in which an employee has broken the rear -- excuse me -- broken the window of a tug?

A. I can't recall offhand. I mean it was a lot of tugs, so I don't know if a window had been broken or not.

Q. After Michele Steiner learned -- strike that.

Do you know how Michele Steiner first learned of the broken window in the tug?

A. I don't know. I would think from the weekly report or walking -- or walking on the ramp maybe, I don't know. Like I say, I don't know.

Q. After she learned of the broken window on the tug, she had a one-on-one meeting with you; correct?

A. I don't recall a one-on-one meeting with me about ...

Q. Do you recall a meeting with Michele Steiner in which she told you she had finished her investigation into this incident?

A. No, I do not recall.

Q. Do you recall a one-on-one meeting with Michele Steiner in which she asked you why you did not report to her immediately this incident having had occurred?

A. I don't recall that.

Q. Do you recall in this one-on-one meeting with Michele Steiner that you apologized to her for having not reported the incident with the tug to her?

A. I don't --

MR. COLE: Objection; the question mischaracterizes the witness's testimony, assumes facts not in evidence.

You can respond.

THE WITNESS: I don't recall that.

BY MR. WIMMER:

Q. Do you recall a one-on-one meeting with Michele Steiner in which she told you she does not expect to see damaged equipment on the ramp?

A. No, I do not recall that.

Q. Do you recall having a one-on-one meeting with Michele Steiner after the tug broke the window in which she told you that you must report to her any incident?

A. I don't recall that.

Q. Do you recall having a one-on-one discussion with Michele Steiner regarding the tug and the broken window in the tug at all?

A. No, there was no one-on-one discussion regarding the window in the tug.

Q. Was there a group supervisors meeting that Michele Steiner convened after the tug broken window incident?

A. The only meeting I recall is the station supervisor meeting, and I'm not sure how far after that that was.

Q. The person to whom you gave the repair order relating to the tug, was that person a JetBlue crew member or was that a business partner, an outside vendor or contractor?

A. Outside vendor.

Q. With which company; do you know?

A. I don't remember the whole name of the company, it's A.P. -- I don't know if it's A.P. Maintenance or A.P. -- I'm not sure of the name, the full name of the company.

Q. The group station supervisor meeting that occurred after the tug broken window incident, did that meeting occur on July 22nd, 2003?

A. I'm not sure of the exact date.

Q. Did that meeting occur approximately three days before the incidents with the air hose and the bag cart?

A. I don't remember the exact date of the meeting.

Q. I'm not asking for the exact date, I'm asking for the placement in time of that meeting and the air hose and bag cart incidents.

A. I don't remember the exact number of days.

Q. Was it less than a week that the -- let me ask a complete question, I apologize. Strike that.

Did the amount of time that elapsed between the station supervisor meeting that Ms. Steiner called and the air hose and bag cart incidents, was that elapsed time less than one week?

A. In that area I'm not sure. It could have been over one week, it could have been one week or less than one week. Within that week spectrum.

Q. Let's focus on this station supervisor meeting with Ms. Steiner. Did Ms. Steiner call a mandatory station supervisor meeting?

A. All station supervisor meetings were mandatory.

Q. Was this a prescheduled station supervisor meeting or a specially scheduled station supervisor meeting with Ms. Steiner?

A. It was about time for our regular meetings. You know, we met once a month, so it was time for a normal station supervisor meeting.

Q. Where was this station supervisor meeting held with Ms. Steiner in late July of 2003?

A. In the JetBlue conference room at the Oakland Airport.

Q. And that conference room has an oval table in it; correct?

A. It's a conference table, I can't remember if it was oval or square.

Q. And at this station supervisor meeting, where did Ms. Steiner sit?

A. I can't remember where she sat.

Q. Where did you sit relative to Ms. Steiner?

A. I don't remember.

Q. Do you remember what you wore that day?

A. No, I can't remember what I wore that day.

Q. Do you remember if you were wearing a hat that day?

A. I can't remember.

Q. Do you remember who else was present at that station supervisor meeting?

A. The other station supervisors.

Q. Tell me the names of the people whom you remember being present at that station supervisor meeting.

A. Kevin Hoover, Rhonda Blair, Sybil Carter Love, Rajeev Singh, Pat Higgins, and I believe Mash- -- yes, Masheeva Zachary. That's who I recall being there.

Q. Was Rudy present at this meeting?
A. I thought I said Rudy.
Q. You remember Rudy as being present there?
A. Yeah. I thought I listed Rudy when you asked me the first time.
Q. About what time of day was this station supervisor meeting held?
A. I remember it being evening because I was off work, I was -- my shift was over, so I remember it being evening.
Q. What do you remember Ms. Steiner saying at this station supervisor meeting?
A. I can't remember all the details. It was a pretty long meeting.
Q. Let me ask you this. How many days after the tug broken window incident was this station supervisor meeting?
A. I don't recall the time difference between them.
Q. Was it a matter of a day or two, a week, a week or two between the tug's window having been broken and this station supervisor meeting?
A. I already answered, I said within like a week or so. Same answer.
Q. What did Michele Steiner say at this station

supervisor meeting?

A. I can't remember the details of what she said. It was a heated meeting.

MR. COLE: You've answered the question.

THE WITNESS: Okay.

BY MR. WIMMER:

Q. Do you remember anything that she said in that meeting as you sit here today?

A. I remember she was very heated.

Q. What do --

A. That's what I really remember about the meeting.

Q. What do you mean that Ms. Steiner was very heated?

A. She was yelling at all the supervisors and cussing at all the supervisors. That's what stands out in my head.

Q. What do you remember her saying?

A. The gist of the meeting was we need to get the station together and, you know, lots of yelling and lots of profanity.

Q. Was anyone else yelling other than Ms. Steiner?

A. No, she spoke the whole meeting, spoke just about -- solely for most of the meeting she spoke to the supervisors.

Q. And how long did the meeting last?
A. I would say roughly two hours, could have been longer.
Q. And for this two-hour-plus meeting, how much of the time was she yelling?
A. On and off, on and off.
Q. What percentage of the meeting was she yelling?
A. I can't give you a percentage --
Q. More than half?
A. -- but she was talking, yelling, talking, yelling.
I don't know a percentage, I can't tell you a percentage.
Q. What cuss words did she use in this meeting?
A. I normally don't use profanity, so I don't like to --
Q. What cuss words did she use?
A. Fucking, need to get this fucking station together, I need to know fucking everything. Mainly fucking.
Q. Do you remember her using the word fucking in any other situation that day other than referring to the fucking station and her needing to know fucking everything?
A. She used it in and out of the conversation in

terms of talking about what she saw the direction the station needs to be going in.

Q. What did she say about that?

A. I can't remember the details.

Q. As best you can remember, generally, what did she talk about during this station supervisor meeting that lasted for at least two hours?

A. See, a lot of issues were -- most of the issues in that meeting were customer service issues, so it didn't really directly impact me. Though I was listening, they didn't -- I didn't even know really everything she was talking about because I never -- I didn't have to deal with those issues in and out every day. So I didn't realize, you know, or understand completely some of those issues in terms of, you know, ticketing and dealing with the customers and boarding at the gate. You know, I mainly at that point was dealing with a majority of ground -- ground issues.

Q. Did anything that Michele Steiner said during that day deal with you and your area of operation?

A. The only thing I recall her saying is the need to -- to -- she had mentioned the need to have the equipment repaired or be on top of having to have equipment repaired on either a more timely basis, which is -- no control over mechanics, whatever time it take

them to fix it -- and coming up with a system where it was -- the repairs were tracked a little tighter.

Q. Did Ms. Steiner say anything else that you remember during this meeting?

A. That's all I recall.

Q. Have you now told me everything you remember Ms. Steiner saying during this station supervisor meeting --

A. Yes.

Q. -- shortly before the termination of your employment?

A. That is all I recall.

Q. During this station supervisor meeting, did Ms. Steiner discuss cash bags?

A. Excuse me, can you repeat the question?

Q. During the station supervisor meeting, did Ms. Steiner discuss cash bags?

A. I don't recall.

Q. During the station supervisor meeting, did Ms. Steiner discuss sales reports?

A. I don't recall.

Q. During the station supervisor meeting, did Ms. Steiner discuss attendance issues?

A. I don't recall attendance issues. I recall supervisor PTO requests, which is kind of like

BY MR. WIMMER:

Q. What do you remember her saying about the need to do briefings?

A. Didn't say anything, she was just talking --

Q. What do you remember her saying about that subject?

A. I believe she -- I can recall her just saying we need to have our briefings. That was the gist of it.

Q. How many days after this station supervisor meeting did the air hose incident occur?

A. I don't know the exact number of days.

Q. Tell me what happened involving that air hose start.

MR. COLE: Objection, the question calls for a narrative. I'm not going to allow him to do a narrative, Counsel. You have to ask him a question.

BY MR. WIMMER:

Q. Were you personally involved in the air hose start situation?

A. I was -- give me more details about which air hose -- I dealt with a lot of air hose situations.

Q. On July 25th, 2003, did you establish an air hose connection to a JetBlue aircraft?

A. I can't remember the exact date but I did do an air start, it's called, on that day.

Q. And did that air start disconnect from the aircraft?

A. The -- it didn't completely disconnect. The hose disconnected from the clamp.

Q. And what was the result, what happened as a result of that disconnection?

A. It didn't affect the flight at all -- start the plane and it left -- it didn't affect the flight at all.

Q. Did the hose (indicating), fly around, wave around?

A. When it disconnected, the hose flew around but then it was turned off (unintelligible); the air start was complete.

Q. When the hose flew around, did it strike the aircraft at any time?

A. I didn't see it strike the aircraft.

Q. Were you personally there on the ground at the time this air hose disconnected?

A. I was next to the hose.

Q. Did you ever tell Ms. Steiner that the air hose disconnected from the aircraft?

A. No. Rajeev Singh told me he would take care of it. He was the supervisor on duty -- Rajeev Singh was the other station supervisor during the air start, he said he would take care of it.

Q. On that same day, a bag cart tipped over; correct?

A. On the same flight, yes.

Q. Is it dangerous when an air hose disconnects?

A. It is much more dangerous when the clamp, the steel clamp disconnects from the airplane. In that situation, the steel clamp did not disconnect, it left the steel connected to the airplane. So just the rubber part of the hose swung around a little bit, it wasn't the metal part. The metal part is what's dangerous.

Q. And when the hose itself swung around in this case, is there any danger involved in that situation?

A. I would say very little because it's just a rubber hose and it was turned immediately off. So very little, very little.

Q. Did you ever observe the rubber hose strike the aircraft?

A. No, I did not.

Q. When the hose disconnected from the aircraft, was the power still on to that hose?

A. Yes, yes.

Q. And how much force is used, if you know, through that air hose?

A. I don't know the amount of force.

Q. The air hose is used to help start the

aircraft's jet engines; correct?

A. Yes.

Q. Did you personally observe the bag cart incident --

A. No, I did not.

Q. -- for that aircraft?

A. No, I did not.

Q. How did you learn that the bag cart hit the belt loader and tipped over?

A. After it happened, I turned around and saw the tipped -- the bag cart tipped over.

Q. You were driving the bag cart?

A. No, I was on top of the belt loader getting into the aircraft to unload the bags, so my back was to the whole thing.

Q. And how did you know it had tipped over?

A. I turned around and saw it, saw it tipped over.

Q. Did you hear it first or did you turn around first and see it tip over?

MR. COLE: Wait a minute. Objection, mischaracterizes the witness's testimony.

Would you rephrase your question, please.

THE WITNESS: Could you please rephrase the question.

///// /////

BY MR. WIMMER:

Q. You were on the belt loader?

A. (Nods head)

Q. Were you in the belly of the aircraft at the time?

A. No, I was climbing to get into the belly of the aircraft.

Q. And what -- did anything cause you to turn around?

A. Yes, I could hear a noise, a noise.

Q. What noise -- how would you describe the noise that you heard?

A. It sounded like a bag cart flipping over. I mean I've been -- have been working the job for many years, so I know what a bag cart flipping over sounds like.

Q. And when you looked around, what did you see?

A. When I looked around, I saw that the cart had flipped over and had slid into the belt loader.

Q. And what did you do?

A. We immediately checked to make sure the agent was okay; but he was okay, just the cart had flipped over. We assembled a team to flip the cart back over, we checked to make sure everything was okay, and we continued to work the flight. There was no damage -- no

right?

A. I was still working.

Q. Okay. While you were working, were you the ground supervisor -- the station supervisor in charge of that flight?

A. No, station supervisor's in charge of the whole airport. I mean I -- station supervisors are station supervisors. So the answer is no, I was a station supervisor.

Q. Was there any specific supervisor in charge of that flight loading and unloading --

A. (Overlapping voices) Sorry. You want to finish the question? Could you ask the question one more time?

Q. Was there any specific supervisor who was in charge of the ramp activity for that flight?

A. Station supervisors are station supervisors, so one doesn't have, you know, jurisdiction over the other. We can all work each other's departments. So there's three supervisors working that flight -- equally working that flight.

Q. Was Rajeev responsible for provisionings that flight, was that his area of responsibility?

A. No.

Earlier in the day I called Rajeev to help out

on the ramp on that flight because we had several planes down at the same time and was -- we couldn't handle that many flights down the same time; and we were using a irregular gate, we wasn't using one of our gates. So Rajeev had came to help assist to turn the flight, you know, on the ramp.

Q. Why was Phillip working down on the ramp that day?

A. Rajeev called Phillip over for additional help.

Q. Do you know why?

A. I would say because he --

MR. COLE: Calls -- objection, calls for speculation.

If you know why, go ahead and testify.

THE WITNESS: I'm not sure why.

BY MR. WIMMER:

Q. Did you call Rajeev to help you with that flight?

A. Yes, I did call Rajeev.

Q. Did you call Rajeev because you knew you needed assistance with the ramp operations for that flight?

A. I called Rajeev because we didn't have the staff to handle three planes down at the same time, so I requested the help of as many station supervisors as possible to help with the flight. And Rajeev came to

help. He's really one of the only ones free enough to come, to come help with the flight.

Q. And at the time he came to help, he was actually assigned to provisioning?

A. No, he's a station supervisor, so he comes and helps flights also. He's a station supervisor.

Q. But the day that you called him to come help you on the ramp, he was not assigned to the ramp that day, was he?

A. He's a station supervisor. So, yes, he was assigned to the ramp. He's assigned to customer service, the ramp and provisioning. He's a station supervisor.

Q. On the day that we're discussing here, is it your testimony that Rajeev was assigned to work on the ramp?

MR. COLE: Objection, the question has been asked and answered.

You can answer it one more time.

THE WITNESS: Rajeev Singh is a station supervisor. We aren't set up in certain areas at all. We help out where we need to in the station.

BY MR. WIMMER:

Q. But you each have a primary area of responsibility; would you agree with that?

Q. Were you aware of there ever being any mishaps during your employment for which Michele Steiner was not informed?

A. I don't know.

Q. For all of the incidents that you are personally aware of having occurred at JetBlue, is it your understanding that Michele Steiner was informed about each of those incidents?

MR. COLE: Calls for speculation.

THE WITNESS: I can't say for sure that she knew about every incident, I don't know if she knew about every incident.

BY MR. WIMMER:

Q. Have you ever heard Michele Steiner make a racist comment?

A. No, I haven't heard her make a racial comment.

Q. Have you ever heard any station supervisors make racist comments during your employment with JetBlue?

A. Not racist per se but perverted comment racist -- I would say racist, yes.

Q. How many different racist comments did you hear station supervisors make during your employment with JetBlue?

A. I only witnessed one in particular.

Q. And what was Kevin's reaction when you told him it was not proper for him to make a joke like that?

A. I believe he apologized.

Q. Was Michele Steiner present when Kevin Hoover told this joke?

A. No.

Q. Did you ever complain to anyone at JetBlue about the joke that Kevin Hoover told?

A. No, it was dealt with on the spot and never had a problem after that.

Q. Why did you not report the air hose start incident directly to Michele Steiner?

A. After the flight was over, Rajeev and I had a station supervisor meeting after the flight and we decided that he would do the incident report and report -- I mean the whole flight, the cart, the hose is one flight -- do the incident report as well as follow up; because once we looked at the air start, we saw that just two screws were loose and we'd follow up with A.P. -- because I would be getting off in the next few minutes -- he would follow up with A.P. about repairing the holes.

Q. What's A.P.?

A. A.P. is the name of the -- I don't remember the full name. It's the name of the mechanics, vendor

company.

Q. You were getting off and leaving town shortly?

A. I was getting off and then my days off were to follow.

Q. And where were you going on those days off?

A. I was going to a family reunion.

Q. In Las Vegas?

A. Yes, in Las Vegas.

Q. And did Rajeev tell you that he thought you needed to personally report the incident to Michele Steiner?

A. No, he said he would take care of it. He said: I'll take care of it.

Q. Do you remember Rajeev saying that you should report the incident because he had to go to the hospital?

A. No, he did not. I don't recall that at all.

Q. Did Rajeev ever tell you that he had to first go see his mother in the hospital?

A. No, he did not.

Q. Did Michele Steiner call you on your cell phone that -- excuse me.

Did Michele Steiner call you on your cell phone after the air start hose and the bag cart incident occurred?

A. The only call I received was a few days later while I was in Las Vegas at my family reunion.

Q. And was that Michele Steiner calling you on your cell phone?

A. Yes, it was.

Q. And what did she tell you?

A. All she said was: How are you doing? Do you have anything to talk to me about? And I said no. Then I said: Is there anything you want me -- to talk to me about? I have about an hour before the family dinner, and let me know -- I have time to talk now, this would be a good time for me, so -- and her response was: No, you're due back on Sunday morning, I'll talk to you then. And that's -- that was the end of the conversation.

Q. How would you characterize Ms. Steiner's tone during that conversation?

A. Just a regular -- regular -- regular phone call.

Q. The day of the air hose/bag cart incidents, who left first, you or Rajeev?

MR. COLE: Who left what -- objection, vague. Who left where first?

BY MR. WIMMER:

Q. Who left work first that day?

A. I'm not sure, I'm not sure.

Q. Did you ever follow up with Rajeev to see if in fact he had reported those two incidents, the air hose and the bag cart incidents, to Ms. Steiner?

A. No, my first day back to work was my meeting with Michele in the morning, and that's the morning I was terminated. That was my first day back from the incident, so I didn't know whether it had been -- I hadn't been at the airport at all, so ...

Q. Between the time that you left to go to Vegas and your termination meeting with Michele Steiner, you had no contact with Rajeev?

A. I hadn't talked to Rajeev.

Q. The meeting with Michele Steiner, at which time your employment was terminated, occurred on what day?

A. I'm not sure what day that was.

Q. What day of the week?

A. I'm not sure what day of the week it was.

Q. Was it on the day that you returned from Las Vegas or the day after you returned from Las Vegas?

A. I believe it was the first -- my first -- my first morning at work.

Q. What time did you and Michele have your meeting?

A. I believe my shift starts around 5:00 in the

morning, 4:30, I get there about 4:30 in the morning. And I believe Michele called me up, I would say roughly 6:00 a.m., in that range. I had been at work for about a hour, hour and a half, about 6:00 a.m. She actually called me a little earlier but I was still working, and I told her I'd be up as soon as I can. And when I came up ...

So around 6:00 a.m., I think, in that rough window.

Q. You went up to Michele Steiner's office about 6:00 a.m. that morning?

A. I went to her office and she pulled me -- told me to come into the conference room.

Q. And who was present in the conference room?

A. Michele Steiner, Rodney Griffin and myself.

Q. Who's Rodney Griffin?

A. A lead agent.

Q. Did you take any notes of this meeting?

A. No, I did not.

Q. Did you tape record the meeting?

A. No, I did not.

Q. Have you ever tape recorded any conversations with anyone at JetBlue?

A. No.

Q. Who started the meeting?

A. Michele.

Q. What did she tell you?

A. I don't recall all the details. She asked me about the incident with the air start and the cart tipping over.

And I explained to her that Rajeev said he was going to do the incident report. And Rajeev, when he says he's going to do something, he normally does it. You know, he's not the type to not do anything. So to the best of my knowledge, I thought the report was done.

MR. COLE: He wants to know what was said.

THE WITNESS: Okay.

That's what I was explaining to Michele when she asked me. So she asked me what had happened and I explained that -- what had happened during the flight: the cart flipped over, my back was turned, we disconnected the hose; after the flight we had a meeting, Rajeev said he would do the incident report.

BY MR. WIMMER:

Q. This is what you had told Michele?

A. Yes.

Q. What else did you tell Michele?

A. She then asked me about the broken glass in the tug, and I explained to her what happened with the tug. I said I just happened to be walking back to the office,

I saw Armondo cleaning up the glass. And I asked him what had happened. He explained to me what had happened. There was a witness there, too. She explained to me what had happened and --

Q. Is this what you're telling Michele?

MR. COLE: Counsel, you're interrupting his response.

BY MR. WIMMER:

Q. Is this what you're telling Michele?

A. This is the --

MR. COLE: Finish your response before answering his next question.

THE WITNESS: Okay.

So I explained to her what happened: that the tongue of the cart had went forward a little bit, tipped the glass causing the glass to shatter. It was a, you know, kind of a freak thing that happens because the glass is shatterproof, (unintelligible) shatter very easily, and I ordered it for repair and hopefully the window will be in soon, you know. And that was pretty much the gist of my explanation.

BY MR. WIMMER:

Q. What did Michele say in response?

A. Her response was: Why didn't you do the report? And I explained to her that Rajeev said he was

going to do the report.

I mean I wasn't the only one standing there, there were witnesses there that Rajeev said he was going to do the report in front of. We were sitting together talking about how to handle the incident and he said he was going to do the report. So this was my first knowledge that -- and I told her I thought the report had been done, I said the report should be done. I mean Rajeev normally follows up on what he says he's going to do and -- but I had no knowledge of it because that was my first morning back at work, so I hadn't been in contact.

Q. What did Michele say in response?

A. She said it was your responsibility to do the report. I was like: No, it's not, we're station supervisors, we're all station supervisors.

And this has happened in the past. When something happens, the station supervisors meet and one of them does the incident report. In this case Rajeev was a witness, I didn't even see what happened with the cart, he was the eyewitness, he was standing there when the cart flipped over right in front of him. So he decided to do the report.

And Phillip Waukazoo reported directly to him, so it was his call on how to handle Phillip anyway. So

I was like why am I here, Rajeev needs to be in this meeting --

Q. What other --

A. -- at that point.

Q. What other employees directly reported to Rajeev?

A. The whole station directly reported to Rajeev technically as station supervisors. Rajeev did have responsibilities over provisioning as well as over operations. But as a station supervisor, Rajeev really in particular worked all of this; he worked customer service, ramp, operations, provisioning, wherever he was needed at.

Q. Was Rajeev present when the air hose disconnected?

A. Yes.

Q. You're certain about that?

A. Yes.

Q. You saw him with your own two eyes?

A. Yeah, we all work in -- yes.

Q. What else was said in the meeting with you and Michele and Rodney?

A. After that she said: Give me your keys and badge, you're terminated.

Q. Did she say why you were being terminated?

2004.

The total number of tapes used was five. Master tapes of today's deposition will remain in the custody of McMahon & Associates.

Off the record at 7:14 p.m.

(Off the record)

THE REPORTER: Copy of the transcript?

MR. COLE: Yes, please.

(Whereupon, the deposition of Shawn DaMar Granberry was concluded at 7:14 p.m. this date.)

---o0o---

I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date ____________________

________________________________________

SHAWN DaMAR GRANBERRY

1

STATE OF CALIFORNIA )
) ss.
COUNTY OF SANTA CLARA )

I, SYBIL SUSAN GARCIA, a Certified Shorthand Reporter in and for the State of California, hereby certify that the witness in the foregoing deposition,

SHAWN DaMAR GRANBERRY,

was by me duly sworn to tell the truth, the whole truth and nothing but the truth in the within-entitled cause, and that the foregoing is a full, true and correct transcript of the proceedings had at the taking of said deposition, reported to the best of my ability and transcribed under my direction.

Date October 27, 2004 Sybil Susan Garcia
CSR Number 5668

# EXHIBIT E

# JetBlue Airways
## New York

**AN EQUAL OPPORTUNITY EMPLOYER**

**GENERAL INFORMATION:** This section must be complete in order to be considered.

Social Security Number: 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

Have you been previously interviewed by JetBlue Airways: ☐ Yes ☒ No
When: Where: Position:

Have you been previously employed by JetBlue Airways or attended a JetBlue training class? ☐ Yes ☒ No
When: Where: Position:

Position applied for in order of Preference ("Any" is not acceptable.)
1. Ramp Agent

Today's Date: 8/5/01
Date Available: open

Minimum Salary Expected: open

Are you age 20 or over? ☒ Yes ☐ No
Age, if "no":

Name: Last: Granberry First: Shawn Middle: DaMar
Phone (Home): (510) 581-1512 Phone (Business): (510) 616-1357

Address: Number: 6042 Street: Bellingham Dr. Apt.: City: Castro Valley State: Ca. Zip Code: 94552

Will you be able to establish authorization to work in the U.S. at time of hire: ☒ Yes ☐ No

**EMPLOYMENT HISTORY:**

LIST ALL WORK EXPERIENCE **WITHIN THE LAST TEN YEARS** AND ALL APPLICABLE EXPERIENCE PRIOR TO THAT (INCLUDE U.S. MILITARY SERVICE AND PERIODS OF UNEMPLOYMENT). **PILOT APPLICANTS MUST INCLUDE ALL FLYING POSITIONS EVER HELD.** BEGIN WITH PRESENT POSITION AND WORK BACK TO YOUR FIRST POSITION. IF THERE WERE PERIODS WHEN YOU WERE SELF-EMPLOYED OR UNEMPLOYED, LIST NAME AND ADDRESS OF PERSON(S) (NOT A RELATIVE) WHO CAN VERIFY. IF ADDITIONAL SPACE IS REQUIRED, ATTACH AN EXTRA SHEET, INCLUDING THE INFORMATION SPECIFIED BELOW.

Most recent job (1) Period: Mo/Yr
From: 1/00
present

Company Name: Crabtree Graphics
Company Address: 2605 Macdonald Ave. Richmond, Ca. 98004
City: Richmond State: Ca. Zip Code: 98004
Starting Salary: comm.
Ending Salary:
Supervisor's Name and Phone Number: Derek Butler (510) 232-8815
Job Title: Account Executive
Specific Duties: Outside sales
Reasons for leaving: present

Most recent job (2) Period: Mo/Yr
From: 1/92
To: 12/99

Company Name: Southwest Airlines
Company Address: Term #2 Oakland Airport
City: Oakland State: Ca. Zip Code: 94605
Starting Salary: 6.50
Ending Salary: 12.50
Supervisor's Name and Phone Number: Greg Green (510) 563-1085
Job Title: Ramp Agent
Specific Duties: Unload Aircraft, guide Aircraft and tow aircraft.
Reasons for leaving: Return to school

PENGAD-Bayonne, N. J.
DEFENDANT'S EXHIBIT
10.15.04
GRANBERRY

JB10/99

| Most recent job (3) Period: Mo/Yr | Company Name: 2-Tuff-E-Nuff Prod. | Starting Salary: 7.00 | Ending Salary: 11.00 | Supervisor's Name and Phone Number: Thomas McElroy (50) 635-7496 |
|---|---|---|---|---|
| From: 1/86 | Company Address: Lowell st. | Job Title: Cargo Handler | | Reasons for leaving: Began working at Southwest Airlines |
| To: 1/92 | Oakland, Ca. 94609 | Specific Duties: Unload Shipments and stock in areas. | | |
| | City: Oakland State: Ca. Zip Code: 94609 | | | |

| Most recent job (4) Period: Mo/Yr | Company Name | Starting Salary | Ending Salary | Supervisor's Name and Phone Number ( ) |
|---|---|---|---|---|
| From: | Company Address | Job Title: | | Reasons for leaving |
| To: | | Specific Duties: | | |
| | City State Zip Code | | | |

| Most recent job (5) Period: Mo/Yr | Company Name | Starting Salary | Ending Salary | Supervisor's Name and Phone Number ( ) |
|---|---|---|---|---|
| From: | Company Address | Job Title: | | Reasons for leaving |
| To: | | Specific Duties: | | |
| | City State Zip Code | | | |

We may contact the employers listed above unless you indicate a present employer you do not want us to contact.

Check box if you do **NOT** want us to contact your present employer ☐
Reason(s):

| EDUCATION: | Name of School | Location | Phone Number | Circle Grade or Years of schooling completed | Type of Degree | Major/Minor | If did not graduate state why | Grade Average |
|---|---|---|---|---|---|---|---|---|
| G.E.D. | | | | | | | | |
| High School | Saint Mary's | Berkeley | (510) 526-9[illegible] | 9 10 11 (12) | general | " " | | 3.0 |
| College/University | U.C Berkeley | Berkeley | " " (642-6000) | 1 2 3 (4) | B.S | Afro/Econ | still have 3 classes | 3.3 |
| Graduate School | | | | 5 6 7 8 | | | | |
| Business, Technical, Other | | | | | | | | |
| Professional License/Certifications | | | | | | | | |

JB10/99

| In case of emergency, notify | Relationship (optional) | Address: Number | Street | City | State | Zip Code | Phone |
|---|---|---|---|---|---|---|---|
| Toni McElroy | Mother | 6725 | Arenal St. | Oakland | Ca. | 94605 | (510) 632-1019 |

**MILITARY SERVICE RECORD AND RESERVE STATUS:**

U.S. ARMED FORCES RECORD ☐ Air Force ☐ Army ☐ Marines ☐ Navy ☐ Coast Guard

Serial No.: n/a Rank ______ Induction Date: ______ Discharge Date: ______

MILITARY RESERVE: n/a ☐ Air Force ☐ Air National Guard of U.S. ☐ Army ☐ National Guard of U.S. ☐ Marines ☐ Navy ☐ Coast Guard Status: ☐ Active ☐ Standby ☐ Inactive ☐ Retired

Skills Used or Special Training: n/a

**REFERENCES:** List Personal References (Other Than Relatives or Former Employers Listed Above) Who Know Your Abilities.

| Name | (Number, Street, City, State, Zip Code) | Home Phone | Work Phone | Occupation | Years Known |
|---|---|---|---|---|---|
| (1) Hilda Dickey | | (510) 383-9690 | (510) 383-9690 | Party planner travel agent | 2 yrs |
| (2) Omar Krashna | | (510) 332-8455 | (510) 306-4029 | attorney | 15 yrs |

JETBLUE AIRWAYS USE ONLY

| INTERVIEWED BY: | FOR (JOB TITLE) | LOCATION | DATE INTERVIEWED | FOR FA/CSA HT. WT. | DATE NOTIFIED | DISP/REASON |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

1. Have you ever been convicted of any crimes or offenses identified below (see Disqualifying Crimes Section below) within the last 10 years? ☐ Yes ☑ No

DISQUALIFYING CRIMES

Forgery of certificates, false marking of aircrafts and other aircraft registration violations; Interference with air navigation; Improper transportation of a hazardous material; Aircraft piracy; Interference with flight crew members or flight attendants; Commission of certain crimes aboard an aircraft in flight; Carrying a weapon or explosive aboard an aircraft; Conveying false information and threats; Aircraft piracy outside the special aircraft jurisdiction of the United States; Lighting violations involving transporting controlled substances; Unlawful entry into an aircraft or airport area that serves air carriers or foreign air carriers contrary to established security requirements; The destruction of an aircraft or aircraft facility; murder; assault with intent to murder, Espionage; Sedition; Kidnapping or hostage taking; Treason; Rape or aggravated sexual abuse; Unlawful possession, use, sale, distribution, or manufacture of an explosive weapon; Extortion; Armed robbery; Distribution of, or intent to distribute, a controlled substance; Felony arson; Conspiracy or attempt to commit any of these criminal acts; Or a finding of not guilty by reason of insanity for any of these criminal acts.

2. Are you on Parole, Probation, or under suspended sentence for a commission of a Felony? ☐ Yes ☑ No
3. Have you been convicted of a Felony Criminal Violation in the past 5 years? ☐ Yes ☑ No
4 Have you engaged in the illegal use, possession, sale or transfer of narcotics or illicit drugs during the past 5 years? ☐ Yes ☑ No
5. Do you have a pending serious criminal charge (eq. Murder, rape, robbery, burglary, physical assault, sale and distribution of drugs, or weapons violations)? ☐ Yes ☑ No

**MECHANICAL:**

List Your Experience in Months and Types of Equipment Which You Maintained. n/a

| License Held and Number | | Months | Equipment – Include Reciprocating, Turbo Prop and Turbo Jet Engines |
|---|---|---|---|
| A&P | Line Maintenance | | |
| | Aircraft Overhaul/Structural | | |
| | Engine Overhaul | | |
| F/E | Electronic/Avionics | | |
| FCC Radio | Heavy Checks (B&C) | | |
| Other | Manufacturing | | |

Can you read and work with blueprints: ☐ Yes ☐ No Do you own a complete set of tools: ☐ Yes ☐ No If yes, Value:

**DISPATCH:**

License Number ____________

**OFFICE:**

Computer Experience: (In years) In The Following:

| | | | | |
|---|---|---|---|---|
| CICS ____ | Mainframe ____ | LAN ____ | WAN ____ | Dbase/DB2 ____ |
| IDMS ____ | WordPerfect 8 | Lotus ____ | Paradox ____ | C/C++ ____ |
| PC 10 | Windows 5 | Other Computer (specify) ____ | | |

**TERMS OF EMPLOYMENT** I authorize investigation of all statements contained in this application and I certify that this information is true and correct, and release all parties from all liability for any damage that may result from this investigation. I understand that at all times, the manufacture, use, sale, possession, distribution or transfer of illegal drugs, controlled substances or unauthorized use of alcohol on premises during the operating hours of those premises is strictly prohibited and that failure to comply will result in termination. I understand that misrepresentation or omission of facts called for is cause for immediate dismissal without recourse. I agree to submit to a physical examination(s) by a doctor(s) designated by the Company, either prior to and/or during the course of employment whenever the Company so requests. I agree to sign a release and submit to a drug screen at a clinic designated by JetBlue Airways and understand that confirmed positive test results will eliminate the opportunity for employment. I agree to sign a release permitting JetBlue Airways to obtain records under the FAA Drug Free Workplace Act and Alcohol Misuse Prevention Programs pertaining to me, created and maintained by a prior employer. If accepted for employment or training, I agree to abide by all present and future guidelines of JetBlue both with respect to work performance and standards of personal conduct. If employed, I understand that my employment is for an indefinite period of time; that I have not been promised continued employment by JetBlue Airways for any definite, specified period of time (excluding JetBlue InFlight 2000 Crew) and that my employment may be terminated at any time for any reason. I understand that completion of this employment application form does not constitute any type of employment agreement or contract. I understand that I am required to comply fully with all personal identification and employment eligibility requirements of the Immigration Reform and Control Act and that failure to do so will result in termination. All right, title and interest, including without limitation, all copyrights and patents, in and to any material produced or inventions developed by me which affect or relate to the Company's business or affect or relate to the airline industry shall vest in the Company and I shall have no personal right, title or interest whatsoever therein.

[signature]
Signature

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
Social Security Number

8/5/01
Date

JB10/99

# EXHIBIT G

jetBlue

August 21, 2001

Shawn Granberry
6042 Bellingham Drive
Castro Valley, CA 94552

Dear Shawn:

On behalf of everyone at JetBlue Airways, we would like to extend to you an offer to join JetBlue as a member of our Part-time Ground Operations Crew member in our Oakland blue city. As a member of the JetBlue team, you have the unique opportunity to be a part of a carrier unlike any other airline in U.S. aviation history. We look forward to having you as a part of our crew. **Your start and orientation date is Monday, September 10, 2001 at our Kew Gardens Headquarters, 80-02 Kew Gardens Road, 6th floor. Time is: 7:30am – 5:00pm. Lunch will be provided. Business attire please. Hotel and flight reservations will be forwarded to you before this date. Training will begin the day after September 11th, for 2 weeks, 9:00am – 5:00pm in Oakland, place To be determined.**

As a Ground Operations Crewmember, you will be assigned duties during which you may be asked at various times to perform or assist in all areas customer service and fleet service operations. Additionally, you will be required to attend classes, meetings, etc. as deemed necessary to fulfill Federal Aviation Administration and JetBlue operational requirements. You may also be asked to participate in promotional and/or publicity assignments.

JetBlue guarantees that you and your fellow crewmembers will receive fair treatment while employed by JetBlue. This means that neither JetBlue, its officers, or its agents shall unlawfully discriminate against you on account of race, sex, religion, national origin, age, disability, or any other grounds proscribed by Federal, State, or Local laws.

As discussed more fully below, this letter contains a basic outline of the benefits and responsibilities associated with being a member of JetBlue's Customer Service Crew. Specifics regarding benefits, policies, and other aspects of employment at JetBlue, identified herein and otherwise, are available upon request.

DEFENDANT'S EXHIBIT G 10.15.04 PENGAD-Bayonne, N. J.

**Our Commitment to You**

At JetBlue Airways, we realize that the airline's success depends on having good Ground Operation Crewmembers who are happy and feel like a part of a team. JetBlue takes steps to ensure its Ground Operations Crewmembers are content

and, accordingly, makes a commitment to each crewmember, including you, as to what you can expect from JetBlue as an employer. Below are the benefits and protections you will receive as a Ground Operations Crewmember of JetBlue:

- **Base and Premium Pay.** You will receive 12.00 per hour (plus any applicable shift premium) for the first 40 hours worked each week and one and one-half times that rate for each hour worked over 40 in a week.

- **Merit Pay and Wage Increases.** JetBlue, at its option, may increase your individual hourly pay above the rates listed above in certain circumstances but will notify you in writing if such an increase were to occur. Overall wage rates for Customer Service Crewmembers may be increased on a yearly basis by JetBlue, at its option, based on current market data and cost-of-living standards.

- **Profit Sharing.** A percentage of JetBlue's profits will be shared with crewmembers each year. You will be eligible to participate in the airline's Profit Sharing Plan.

- **Paid Time Off.** You will be given Paid Time Off to use for vacations, holidays, sick leave, and personal days. This flexible benefit provides a set amount of time each year from which you may choose when and for what reasons you take time off. If you work a part-time schedule, PTO hours earned will be pro-rated based on your actual hours worked. PTO may be used for time missed due to vacation, illness, or personal reasons provided proper notice is given and in accordance with JetBlue's PTO rules. For more information please refer to JetBlue's PTO policy.

- **Travel Benefits.** You and your immediate family members will be eligible for JetBlue's flight benefits. That means unlimited standby on JetBlue flights, and passes with other airlines based on agreements. And, because we know not everyone has a traditional family, a designated buddy/significant other will also be eligible for flight benefits.

- **Leaves of Absence.** You may be granted leaves of absence in certain situations as provided for in JetBlue's leaves of absence policy. These leaves include Family and Medical Leave Act leave, Medical leave for sickness or injury not covered by FMLA, Jury Duty, Bereavement leave, Military leave, and, in exceptional circumstances, an unpaid personal leave of absence. JetBlue's leave of absence policy is explained in JetBlue's Blue Book and additional information is

available upon request. You may be required to use available PTO during the leaves listed above if appropriate.

**Insurance Benefits**

JetBlue will make additional information available to you regarding all of the insurance benefits listed below after you have commenced your employment with JetBlue. The terms and conditions of all of the plans listed below are separately contained in the individual plans which are subject to periodic change.

- **Employee Assistance Program.** You will be eligible to use JetBlue's Employee Assistance Program which provides you access to a trained counselor to help you with financial issues, substance abuse, emotional or relationship issues, legal questions, and child and elderly care planning.

In addition, JetBlue offers the following protections to make your employment with JetBlue positive and meaningful:

- **Seniority.** Your seniority will be based on your length of service as a Ground Operations Crewmember with JetBlue as determined by your date of hire. All assignments, reassignments, and use of PTO will be based on seniority. The relative seniority of Customer Service Crewmember with the same date of hire shall be based on their respective dates of birth.

- **Open Door Policy.** If, during your employment, you have any problems, concerns, or questions regarding JetBlue or your employment, you are encouraged to approach members of management at reasonable times. You should first consult with your Ground Customer Service Coach, if practical, after which you may approach your next level manager, in order to adequately resolve any issues you may have.

- **Dispute Resolution.** In the unlikely event that the open door policy or other discussions are not adequate to resolve any difference of opinion or dispute regarding the items contained in this letter or other terms of employment with JetBlue, you and JetBlue hereby agree to try in good faith to settle the dispute by mediation administered by the American Arbitration Association under its rules. If the parties fail to reach a solution within sixty days of commencing mediation, either you or JetBlue may submit the matter to arbitration by a single arbitrator in the city where you are based in accordance with the rules of the American Arbitration Association. The judgment of the arbitrator will be final, binding, and conclusive upon the parties.

In exchange for these commitments, JetBlue expects certain things from you as a crewmember. This creates a balance. In this regard, it is expected that both you and JetBlue will work well together. Of course, either you or JetBlue can end the employment relationship at anytime should either party not live up to the expectations of the other.

**Your Commitment to JetBlue**

As a member of the JetBlue crew, you are asked to live up to some high performance expectations and personal conduct standards in exchange for the benefits associated with being a JetBlue crewmember. To help you do that, we offer these guidelines of JetBlue's expectations and standards:

- Your performance and conduct should support our values of Safety, Caring, Integrity, Fun, Passion, and our goals of Customer satisfaction and profitability.

- An airline must run on time and that starts from the inside-out! Your fellow crewmembers, our Customers, and JetBlue expect and rely on you to report to work on time, fit for duty and to perform your job to the best of your ability.

- You are asked to dress appropriately, practice teamwork with your fellow crewmembers, follow established policies and procedures, and conduct yourself in a way that reflects positively on the company.

- Your behavior on the job affects our Customer's experience and the ability of your fellow crewmembers to accomplish their jobs safely and be successful. There are certain types of behaviors that we cannot allow to occur at JetBlue, and which may result in an immediate dismissal. These include but are not limited to: falsification of reports, records or forms; material violations of any law, rule, or regulation; use or possession of intoxicants and/or drugs; fraud, dishonesty, negligence, or incompetence; insubordination; any type of harassment of fellow employees; unauthorized use or removal of company property; revealing confidential information without authorization; repeated performance problems; possession of firearms; and violation of safety guidelines.

In addition to the expectations and standards listed above, JetBlue's Blue Book discusses in more detail specific JetBlue polices of which you should be aware and are expected to follow. Further, with regard to both the benefits and expectations outlined in this letter, it should be noted that while detailed, this letter is not comprehensive and does not discuss every aspect of the at-will