Family members must have valid personal identification, such as a driver's license or passport.

## Baggage
Pass travelers are subject to the same weight, size, number, and carry-on item limitations as paying customers. Under no circumstances may Pass travelers ask for or be granted exceptions to JetBlue's or any other airline's baggage policies.

## Eligibility for Travel Privileges
Active full-time and part-time Crewmembers are eligible for unlimited, space-available travel on any JetBlue flight or route. Eligibility begins on the first day of employment. Space-available passes are free-of-charge.

## Qualified Eligible Dependents
Spouses, significant others and parents of Crewmembers are eligible for the same pass privileges as Crewmembers.

Children of Crewmembers are eligible for the same on-line pass privileges as Crewmembers. Eligible children include:

- Crewmember's birth children
- Legally adopted children
- Stepchildren
- Foster children

NOTE: To be eligible for pass travel as an unaccompanied minor, children of Crewmembers must be at least 5 years of age. Children, ages 5 through 11, can travel unaccompanied only on nonstop flights, unless they are traveling with a person who is age 12 or older.

NOTE: All eligible dependents must be enrolled through the People Department at the time of the Crewmember's employment. Any changes in the family (*i.e.,* divorce, addition of a child, etc.) must be reported to the People Department to keep accurate records for the purposes of benefits and pass privileges.

## Buddy Passes

- Two round-trip passes are provided for each distribution period.
- Buddy passes are taxable to the Crewmember when used.
- Passes may be used anywhere on the JetBlue system.
- A pass may be used only through the date noted on the pass, regardless of when the trip originated. Passes are good for one year from date of issuance and generally will not be extended for any reason.
- If a Crewmember's pass privileges have been revoked, he/she is not eligible to receive buddy passes.



Dockets.Justia.com

- Buddy passes may not be sold. Doing so will result in corrective action up to and including termination.

- Lost or stolen passes will not be reissued.

- Any misuse of buddy passes could mean revocation of all pass privileges for a Crewmember or other corrective action up to and including termination.
  - The JetBlue Crewmember is responsible for ensuring that all rules pertaining to space-available travel are followed.

**Abuse of Pass Privileges**

The use of pass travel is a privilege offered to JetBlue Crewmembers and immediate family members. In order to retain this privilege, there are certain guidelines that must be met. Anyone traveling on passes is expected to behave in a professional and courteous manner. Deviation from these guidelines may result in corrective action up to and including termination.

Below is a list of examples of prohibited conduct that will subject a Crewmember to corrective action up to and including termination. ***This is not an all-inclusive list.***

- Sale of a pass or passes.
- Use or attempted use of a space-available pass on a date on which a reservation has been made. Once a reservation has been made, a person may not cancel the reservation and travel on that or any other flight on that date with a space-available pass.
- Falsification of company records or documents and/or any other action taken by a Crewmember or eligible dependent that is intended to mislead, defraud, impede, or avoid the detection of any violation of these policies.
- The exchange of passes at check-in which results in augmenting the travel benefit, upgrading the classification of, or extending the validity dates of a pass.
- Reserving, booking, or otherwise blocking seats so as to prevent their sale to revenue customers and thus increase the likelihood of seat availability for space-available travel.
- Being argumentative, uncooperative, or otherwise interfering with the duties and responsibilities of airline personnel.
- Asking for or demanding special services or accommodations (other than as required for a medical reason or disability).
- Loud or disruptive behavior of a Crewmember or family member in view of customers, either on airport property or onboard the aircraft.
- Use of travel privileges for business other than JetBlue company business.
- Tampering with, altering, or changing a pass authorization or ticket.
- Intoxication on airport property or onboard the airplane, or consumption of alcohol while in uniform.
- Use of travel privileges by an unauthorized person.
- Refusal to produce ID or otherwise comply with ticketing and/or check in procedures.
- Misrepresentation of eligibility.
- Traveling on a pass without obtaining proper authorization.

- Use of passes by a Crewmember or his/her eligible dependents during disciplinary suspension or while pass privileges are suspended.
- Disregard for codes of conduct while traveling on employment-related passes.

Any abuse of pass privileges must be documented in an irregularity report. Each department will handle each case individually, in conjunction with the People Department, and notify the Pass Bureau of the final decision.

## Crewmember Business Travel

Each department will have their Administrative Assistants make all hotel and rental car reservations. A list of the crew hotels where JetBlue has a direct bill account already set up is located on the Intranet Pass Bureau website. Please call the Crewleader of the Pass Bureau in the People Department should any problems accessing this information occur.

Airfare transportation will be handled through the Pass Bureau. Any travel expense over $500 will require approve from the President of JetBlue.

Please notify the Crewleader of the Pass Bureau in the People Department at least 7 days in advance if an off-line ticket needs to be purchased in order to obtain the least expensive fares.

Crewmember business travel expenses will be different for each department. Per Diem, hotel expenses, etc. will be decided at a department level and should be discussed with a Crewleader before business travel begins.

Misuse of expenses on Company business will result in discipline up to and including termination.

# Other Important Information

## No Solicitation/No Distribution

The conducting of non-JetBlue business, such as canvassing, collection of funds, pledges, circulation of petitions, solicitation of memberships, or similar types of activity including the use of e-mail and electronic communication for such purposes is not permitted during the working time of either the Crewmember doing the soliciting or the Crewmember being solicited. The distribution of non-JetBlue literature, leaflets, letters or other written materials, including those distributed via e-mail or other forms of electronic communications by any Crewmember is not permitted during the working time of either the distributing Crewmember or the Crewmember to whom the non-JetBlue literature is being distributed.

# Safety

JetBlue adheres to all local, state and federal laws and guidelines, and will make all attempts to create a safe working environment for its Crewmembers and customers. The federal Occupational Safety and Health Act (OSHA), which ensures a safe work environment, outlines the general responsibilities of the Company and Crewmembers. The Company is responsible for:

- Eliminating recognized hazards in the workplace that could cause death or serious harm.
- Complying with safety and health standards.
- Correcting safety and health violations.
- Keeping records and making periodic reports on work-related deaths, injuries, and illnesses.

At JetBlue, local management has primary responsibility for ensuring that no physical safety hazards exist in work areas.

Crewmembers are responsible for their own safe actions and conduct. They are expected to comply with any established Company and airport safety rules and procedures; as well as all applicable federal, state and local regulations.

# Workers' Compensation

JetBlue realizes that even a safety-conscious person may still experience an on-the-job injury. When Crewmembers become injured while at work, they may be eligible to receive benefits under our workers' compensation insurance program. The injury must be promptly reported, usually within 24 hours, to be considered eligible for this coverage. JetBlue pays for the entire cost of the workers' compensation insurance coverage.

When an injury does occur on the job, it must be reported to the Crewleader or Benefits Department immediately. Any injury, no matter how slight it may seem, needs to be reported in detail to the Crewleader and the Benefits department. At the time the report is filed, the Crewmember may decide whether medical attention is necessary, and if needed, must visit approved medical facilities. Regardless of whether the Crewmember sees a physician at the time of injury or not, a report must be completed and kept on file.

Neither JetBlue nor the insurance carrier will be liable for payment of workers' compensation benefits for injuries that occur during a Crewmember's voluntary participation in any off-duty recreational, social or sports activity sponsored by JetBlue.

When a Crewmember takes a leave of absence for a work-related injury, the Crewmember must submit a current healthcare provider's certification to the People Department on a bi-weekly basis. A Crewmember must submit to the People Department a completed Release to Return to Work form from his/her healthcare provider before the Crewmember will be allowed to return to work. Failure to provide a Release to Return to Work form, or failure to return to work as scheduled once released may result in employment termination. Absences from work due to work-related injuries will run concurrently with leaves taken under federal and/or state family and medical leave laws.

# Drug Abuse in the Workplace

JetBlue Airways, as a commercial air carrier and federal contractor, is committed to the safety of its customers and Crewmembers, and therefore, will take all reasonable precautions to prevent injury and loss of life and / or property. An important first step towards this goal is to maintain a drug-free workplace. JetBlue Airways complies with the federal Drug-Free Workplace Act of 1988 and applicable state employee privacy laws.

The illegal use, manufacture, distribution, sale, or possession of narcotics, drugs or controlled substances (including inhalants containing controlled substances) while on the job or on company property will result in termination of employment with JetBlue. JetBlue also restricts certain items such as drug paraphernalia and / or literature promoting illegal drug or substance use from being brought on company property.

The abuse of prescription drugs to the extent that job performance or safety is compromised is prohibited. Corrective action in this area will be determined on an individual basis.

Regardless of the position applied for, all applicants are required to submit to a pre-employment drug screen at a clinic designated by JetBlue. All offers of employment are contingent upon successful completion of the drug test. If the applicant refuses to take a drug test; tests positive for illegal drugs; or is found to have tampered with, adulterated, or substituted his / her urine specimen, he / she will be eliminated from consideration for employment and / or terminated from employment with JetBlue.

Crewmembers who perform safety-sensitive functions as specified under the DOT / FAA Anti-Drug Program will be subject to testing under the JetBlue policy related to that program.

Random drug tests may also be performed for all Crewmembers who work in operational areas.

## Arrests and Convictions

The arrest of any Crewmember for a drug-related offense will result in immediate suspension of the Crewmember, pending investigation.

If a Crewmember is convicted of, or pleads guilty or no contest to, a violation of a criminal drug statute, the Crewmember must notify his Crewleader no later than 5 days after the conviction or plea. A Crewmember's conviction of any drug-related criminal felony, or a Crewmember's guilty or no contest plea to any criminal drug statute or drug-related criminal felony, whether the criminal act occurred on or off Company premises, will result in termination of employment with JetBlue.

## Alcohol Abuse in the Workplace

Whether a Crewmember is on or off-duty, JetBlue Airways prohibits the unauthorized use of alcoholic beverages on JetBlue's premises during normal business hours or operation; such use may result in termination of employment with JetBlue.

Any use of alcohol that adversely affects a Crewmember's job performance is not acceptable and may result in disciplinary action up to and including termination of employment with JetBlue.

*Crewmembers in certain positions are subject to the additional requirements of the Department of Transportation (DOT) / FAA Alcohol Misuse Prevention Program (AAMP),*

*including alcohol testing.*

## Disruptive Activity

JetBlue expects everyone to take precautions to provide a safe workplace and to protect all Crewmembers and our customers. JetBlue's policy prohibits all forms of threats, harassment or intimidation of Crewmembers including verbal, physical or psychological assaults by any Crewmember against another Crewmember, customer or vendor. Crewmembers should follow the Company's policies and FAA standard operating procedures for dealing with and reporting disruptive activity in the immediate work area.

To file a report, please see the Report and Complaint procedures as described within these guidelines, talk to a Crewleader, or contact the People Department directly.

## Workplace Violence

JetBlue believes all Crewmembers should be treated with dignity and respect. Acts or threats of physical violence, including intimidation, harassment and/or coercion, which involve or affect JetBlue Crewmembers, operations or property, customers, vendors, suppliers, or airport personnel will not be tolerated. This prohibition against threats and acts of violence applies to all persons involved in JetBlue's operations.

Workplace violence is any intentional conduct which is sufficiently severe, offensive or intimidating to cause individuals to reasonably fear for their personal safety or the safety of their family, friends and/or property such that employment conditions are altered or a hostile, abusive or intimidating work environment is created for one or several Crewmembers.

Specific examples of conduct, which may be considered threats or acts of violence under this guideline, include, but are not limited to, the following:

- Threatening physical or aggressive contact directed toward another individual;
- Threatening an individual or his/her family, friends or property with physical harm;
- Intentional destruction or threat of destruction of Company property or another's property;
- Harassing or threatening phone calls;
- Surveillance or stalking; or
- Veiled threats of physical harm or like intimidation.

Any instances of violence must be reported to a Crewleader and/or the People Department. JetBlue will promptly respond to an incident or suggestion of violence, and will fully investigate. Any person who engages in a threat or violent action may be

removed from the premises as quickly as safety permits and may be required, at our discretion, to be on a leave of absence pending the outcome of an investigation into the incident.

When threats are made, or acts of violence are committed, a judgment will be made by JetBlue as to what actions are appropriate, including possible medical evaluation and/or corrective action. Under this guideline, decisions may be needed to prevent a threat from being carried out, a violent act from occurring or a life-threatening situation from developing.

Violation of this guideline, by any individual, will lead to corrective and/or legal action as appropriate.

If you have any questions or concerns about workplace violence, please contact the People Department.

# Handguns/Weapons in the Workplace

Unless specifically authorized in writing by an Officer of the Company (*i.e.*, a Vice President, President, etc.) possession of firearms, incendiary devices and/or weapons of any kind on Company property (whether leased or owned) is strictly prohibited. Violation of this guideline may be grounds for corrective action up to and including termination.

If you have any questions or concerns about this guideline, please contact the People Department.

# Internet and Computer Use

The Internet provides vast communication possibilities; anything said "on-line" might reach millions of people all over the world. Any communication coming from JetBlue is directly associated with JetBlue Airways Corporation and its reputation. We should always conduct our on-line communications with that thought in mind.

Crewmembers are urged to be especially careful regarding the transmission of sensitive or confidential JetBlue information via the Internet, and posting messages to Internet discussion groups is generally discouraged. Avoid all discussion of the operations of the Company, unless authority has been given to participate in such communications.

Crewmembers should protect any company-owned or provided personal computers to ensure that its data, software and hardware are not damaged or misused. Each Crewmember is responsible for maintaining the confidentially of his/her passwords and assumes responsibility for all activity performed with the use of his/her identification codes or passwords.

## Electronic Mail

Electronic mail (Email) is employed as a communications tool for JetBlue. This technology offers an efficient method of conducting business and has become an intrinsic part of our business environment. Our objective is (1) to create a Company-wide standard to ensure that the use of this resource is related to business purposes, (2)

to avoid disruption of activities, and (3) to inform Crewmembers about confidentiality, privacy, and acceptable use.

## Confidentiality

It is important for Crewmembers to understand the limitations on the scope of the confidentiality protecting access and exposure of documents. In the normal course of business, the Network Administrator has access to Email to monitor the performance of the service. Further, Email is part of the JetBlue computer network and, as such, messages in the system will be copied to a separate (and retrievable) storage media, which may survive the deletion of the message by the recipient. Email is Company property, which, in turn, means that all messages sent or received are also the property of JetBlue.

## Privacy

JetBlue reserves the right to access, retrieve and read Email for any legitimate business, audit or legal purpose, including, but not limited to, retrieving business information, troubleshooting hardware and software problems, preventing system misuse and Crewmember misconduct. All Email, even that which is protected by password, should be considered by both the sender and the recipient to be accessible to management.

## Appropriate Use

Access to Email at JetBlue is a privilege and is accompanied by certain responsibilities. Email is subject to all the same laws, policies and practices that apply to the use of other means of communications, such as telephones and paper records. Users are expected to be ethical and prudent in the manner in which Email is used.

Email which promotes personal or outside business enterprises is forbidden, as is the content of which may be reasonably considered to be offensive, disruptive or harassing to any co-workers or other recipients, whether or not that individual is the addressee. Offensive content includes, but is not necessarily limited to, reference to gender, race, national or ethnic origin, or comments that might offend on the basis of age, sexual orientation, religious or political beliefs, or physical impairment.

Crewmembers who become aware of a violation of this or other Company guidelines which involves Email or Internet Access should notify the People Department.

## Accessing the Email of Others

Crewmembers are not authorized to retrieve or read any Email not sent to them, unless prior approval has been granted by the addressee or by a Crewleader.

## Software

All software provided with the computer is licensed to the Company. Due to potential corporate liability, no software may be added to any Company-provided computer without prior consent from the Information Technology (IT) Department.

Inappropriate use of the corporate network is not acceptable. Users may not utilize the corporate network or e-mail system for the distribution of offensive or inappropriate data, pictures or information. Writing, redistribution or downloading inappropriate or offensive material is in direct conflict with the Company values and may be deemed grounds for corrective action, up to and including dismissal.

### Personal Use

Any computer hardware, software, Email, Internet or other electronic equipment or services made available to Crewmembers is expected to be used for the conduct of Company business on Company time. Crewmembers should not abuse or misuse the privileges that are being provided. Any use of JetBlue equipment for personal purposes must be done on an occasional or limited basis, and always within JetBlue's values and guidelines. Such use must not result in additional expense to JetBlue, cause any harm to JetBlue or our customers, or cause any loss in productivity with regards to the Crewmember's work.

### Call Monitoring

In order to effectively evaluate performance and ensure consistency in the message to existing and prospective customers, random call monitoring may be part of the ongoing performance review process for Crewmembers in customer contact departments. Call monitoring affords Crewleaders the opportunity to provide immediate, specific performance feedback, as well as assist with the coaching and development of Crewmembers. The phone calls will not be recorded, and any information will be used for internal purposes only. Any call monitoring conducted will be in accordance with all applicable laws.

### Company Property

All information found on the Company network server, computers, and telecommunications systems is the sole property of JetBlue and may not be copied or redistributed without the express written consent of the Company.

## Crewmember Privacy

From time to time, JetBlue may conduct internal investigations pertaining to security, auditing or work-related matters. Crewmembers are required to cooperate fully with and assist in these investigations, if requested to do so. Whenever necessary in the Company's discretion, work areas (i.e., desks, file cabinets, etc.), lockers, Company property, Company vehicles, work tools (i.e., email system, voicemail system, etc.), and personal belongings (i.e. brief cases, handbags, etc.) may be subject to a search without notice. Crewmembers are required to cooperate.

JetBlue will generally try to obtain a Crewmember's consent before conducting a search of work areas or personal belongings, but may not be able to do so.

## Contact with the Press/Media

JetBlue's reputation is built upon our track record for excellent service. The active participation and cooperation of every Crewmember is required to maintain this reputation.

It is JetBlue's policy that all communications regarding the Company to any member of the media (press, print or electronic publications, radio, or television) come from the Executive Office. This includes domestic and foreign political organizations, the media, activist groups and the like.

Any Crewmember who has any communication with any organization as described above or does not follow the procedures regarding outside contacts, including "no comment" without specific authorization from the Executive Office, will be subject to appropriate disciplinary action.

# EXHIBIT O

# Drug and Alcohol Awareness Handout

People

jetBlue VALUES

Performance Prosperity

Lisa Ruehle, Drug Program Manager
lisa.ruehle@jetblue.com; 646-734-2084

PENGAD-Bayonne, N. J.
DEFENDANT'S EXHIBIT
O
10.15.04
GRANBERRY

## GOAL OF THIS TRAINING

Leaders will be able to follow the appropriate process of ordering a reasonable suspicion test.

## PURPOSE OF THIS TRAINING

- Leaders will be aware of the Zero Tolerance policy
- Leaders will be aware of the alcohol use policy
- Leaders will recognize the noticeable signs and symptoms of drug and alcohol abuse or misuse
- Leaders will follow the appropriate process to order a "reasonable suspicion test"
- Leaders will proactively prevent substance abuse of their crewmembers

## WHAT THIS TRAINING WILL NOT DO

It will *not* qualify you to be an expert in recognizing or diagnosing specific drug use or related disorders

## STATISTICS: SCOPE OF THE EPIDEMIC

- One out of every 10 Americans has an alcohol problem
- One out of every 12 Americans has a problem with illicit drugs
- Drug and alcohol abusers are involved in four times the number of workplace accidents as non-abusers
- Each and every day, 2700 planes, boats, and automobiles are engaged in the activity of smuggling illegal drugs into the U.S.
- $150 billion is grossed annually from the sale of illegal drugs
- On average, an addicted employee costs his company $8600 a year
- The average absentee rate of an addicted employee is 22 days per year

## JETBLUE'S COMMITMENT

Drug and alcohol abuse is a threat to both the company and the crewmember. The drug and alcohol policy outlined is necessary to:

- Maintain safe company operations by establishing a drug and alcohol free environment to minimize the possibility of a substance abuse related accident
- Identify crewmembers who may need assistance with substance abuse problems
- Provide an effective deterrent against experimentation and use of illegal drugs
- Help ensure crewmember productivity
- Guard against liability resulting from the actions of impaired crewmembers
- Protect company property and other crewmembers against theft by persons who steal to support a drug habit
- Deter illegal activities
- Comply with the U.S. Department of Transportation Regulations for Drug and Alcohol Testing, the Drug-Free Workplace Act of 1988, and other applicable state and federal safety programs

jetBlue AIRWAYS

**Post-Incident/Accident/Unsafe Actions Testing**

- When a crewmember is involved in a mishap resulting in physical damage to persons, equipment or facilities.
- Testing must be done as soon as possible if the crewmember's performance either:
    - contributed to, or
    - cannot be completely discounted as a contribution to the incident.

Immediate contact must be made with the **Drug Program Manager**, 646-734-2084, or **Safety**, through System Operations.

**Permission *not* to test must be obtained from the Drug Program Manager & Vice President of Safety.**

Testing must be completed within two (2) hours after the incident. If completely documented, and with just cause, attempts can be made for up to (8) hours for alcohol and (32) hours for drug.

Crewmembers may NOT return to duty until negative results are received!

Crewmembers must remain readily available for testing following an incident, or will be deemed as to have refused to submit to testing.

DOT testing MUST be authorized by the Drug Program Manager.

If you are unable to reach Drug Program Manager, FirstLab can be reached 24-hours per day/ 7 days a week at 1-800-732-3784 for emergency testing facilities in your area.

**SIGNS AND SYMPTOMS OF POSSIBLE SUBSTANCE ABUSE**

- Drastic swings in work performance
- Strained relations with fellow Crew Members
- Absenteeism
- Decrease in performance
- Stuffy or runny nose
- Dilated/constricted pupils
- Restless, anxious
- Aggressive
- Exaggerated physical movements
- Changes in sleeping and eating habits
- Profuse sweating, shallow breathing
- Smell of alcohol
- Vomiting drooling, acting drunk

Reasonable Suspicion testing requires evaluation by two supervisors, one of which has been to supervisor training and has remained current with the training.

# *LEADER INFORMATION...CARING FOR THE USER*

# *REASONABLE SUSPICION*

**It is important to realize...**

*that if someone shows one or more indicators (signs and symptoms) of substance abuse, this alone does not mean that he or she is abusing drugs and/or alcohol. Other non-substance related behaviors may mimic drug use; such as fatigue, stress, or emotional problems. You must at all times protect the rights of the crewmember.*

## REASONABLE SUSPICION TESTING

A reasonable suspicion test may be ordered if a crewmember shows signs and symptoms of substance abuse. Reasonable suspicion testing can be broadly defined as incident-driven drug or alcohol testing where the incident can be:

- The overt signs and symptoms of impairment, or
- Physical evidence of drug/alcohol use, such as possession of drug paraphernalia, possession of alcohol, or
- A pattern of deteriorating job performance, or
- Accidents or incidents which may involve a human error in judgment and/or performance may trigger testing.

Reasonable suspicion is based on specific, contemporaneous, articulable observations.

To ensure that you protect the rights of the crewmember while maintaining commitment to JetBlue, you are responsible for following an appropriate process prior to ordering a reasonable suspicion test:

- ✓ Recognize signs and symptoms
- ✓ Document
- ✓ Formal One-on-One
- ✓ Ensure Safety

The first step in the process is recognition of signs or symptoms.

## OBSERVED BEHAVIOR GUIDELINES

*Job Knowledge:*
Technical skills are not current, doesn't understand regulations, misuses equipment, doesn't retain instructions, needs constant supervision, doesn't understand or follow safety/security procedures, requires frequent instruction or assistance, learns very slowly, unable to work independently.

*Quality of Work:*
Makes mistakes, disorganized, requires frequent checking by others, makes little effort to check own work, work frequently needs to be redone.

*Productivity:*
Low volume of work, takes many breaks, waste time, needs constant reminders to complete work, doesn't complete assigned tasks, overwhelmed by realistic workload, unavailable for extra work, and cannot increase workload when needed, volatile, easily upset, inconsistent work place.

*Working with People:*
Poor listening skills, inability to communicate, uncooperative, projects negative attitude to customers and the public, unable to resolve conflicts, openly mistrusts many people, edgy, easily and frequently angered or hurt, slows work of others, complains, is hostile, argues, stimulates complaints from co-workers, blames others.

*Dependability:*
Doesn't follow procedures, misses deadlines, rigid inflexible behavior, excessive sick leave, unauthorized leave.

*Personal Appearance:*
Comes to work inappropriately dressed, does not appear healthy or physically capable, (i.e., slurred speech, unsteady gait, blood-shot eyes, sleepy), appears unclean or unwashed at beginning of work, no regular change of clothes, offensive odors such as bad breath or body odor.

*Attendance:*
Takes extended weekends (Monday/Friday absences), consistently late, leaves early, absent from work station, excessive sick leave, takes unauthorized leave, repeated absences.

*Problem Solving:*
Solutions which are presented are usually ineffective, rarely follows through and checks for results, can't handle complex assignments, tends to ignore problems or delegate inappropriately, relies too heavily on others to complete the work, cannot define the problem, covers up the problem, blames others.

*Judgment:*
Makes decisions without regarding available information, will not reverse decisions in face of mistakes, insensitive, tactless, does not use common sense, illogical reasons for behaviors, violates confidentiality, poor ability to size up situations, does not understand the whole picture, takes inappropriate actions, inattentive to safety procedures.

## WARNING SIGNS OF A SUBSTANCE ABUSING CREWMEMBER

| | |
|---|---|
| ***General Behavior Changes***<br>Inappropriate giggling/laughter<br>Obscene language & gestures<br>Increased irritability<br>Inappropriate verbal responses<br>Defensiveness about alcohol/drug use<br>Temper outburst<br>Hypersensitivity<br>Suicide attempt<br>Hyperactivity<br>Bizarre & uncontrollable actions<br>Time & place disorientation<br>Withdrawn behavior<br>Fights with co-workers<br>Extreme apathy and talk about suicide | ***Behaviors at Home***<br>Missing money or objects that could easily be converted into cash<br>House supply of prescription drugs dwindling for no apparent reason<br>Increased time spent alone in room<br>Possession of drug paraphernalia<br>Deterioration in family relationships and communication<br>Frequent absence from home<br>Changing group of friends |
| ***Work Attendance***<br>Lateness at work<br>Leaving work after lunch<br>Frequent call-ins | ***Work Performance***<br>Drop in productivity<br>Inconsistent daily work<br>Shortened attention span<br>Decreased ability to think/solve problems |

A substance abusing crewmember can result in compromised safety of other crewmembers, workload shift among the department, endangered future business from customers, increase cost of benefits for all crewmembers, and health dangers for the abusing individual.

As a leader, you are responsible for *documentation* when you first notice the change in behavior.

## DOCUMENTATION

There is a saying that, **"If it is not on paper, it did not happen."**

A written report should be made every time a person is suspected of drug use while on duty based on:

- Actions, Appearance, Conduct, Physical Evidence

***Even if no action is being taken at this time, to be considered in future situations, there must be supportive documentation.***

- Write down exactly the behaviors you have observed and the impact of those behaviors; what you saw and what you heard
- Be factual; DO NOT DIAGNOSE
- Keep a detailed record of the incident, including what was said. Write the incident report as soon as possible
- Confiscate physical evidence (such as drugs, paraphernalia, empty or full containers of alcohol, etc.) and turn over to management, security or legal department

## LEADERSHIP DO'S AND DON'TS

| Do... | Don't... |
|---|---|
| • Note changes in work/behavioral patterns<br>• Clearly communicate job performance standards for each position to the crewmember<br>• Document all unacceptable behavior, attendance, and performance which does not meet established standards<br>• Level with crewmember as to how serious the deteriorating job performance is<br>• Be firm and be honest | • Don't play role of amateur diagnostician<br>• Don't discuss the drug problem with the crewmember<br>• Don't cover up for the crewmember<br>• Don't be apologetic<br>• Don't accept excuses |

**Remember,** substance abuse is a disease that can be treated. As a leader, you owe it to the crewmember and JetBlue to encourage the individual to utilize available assistance. Let them know that our Values do not allow us to tolerate poor job performance or compromise safety. Do not provide a shield for a troubled crewmember.

## DON'T BE AN "ENABLER"

By failing to accept an active role in identifying substance abuse in the workplace, you, as management, are forced to accept partial responsibility for prolonging the problem, and for the increasing costs associated.

As a leader at JetBlue, you are working on the front line to interpret and enforce JetBlue's drug-free workplace policy. Enabling occurs when leaders or co-workers knowingly contribute to drug or alcohol abuse by making it easy or possible for an abuser to carry on with his or her abusive behavior.

Sample "acts" of enabling:

- Ignoring a crewmember's performance or productivity when it is obviously below expected minimum standards
- Allowing a fear of discussion to permit you to ignore a problem
- Allowing personal friendships or loyalties to dissuade you from taking corrective action
- Covering up for a co-worker's substance abuse
- Picking up the additional work created by a substance abuser who is not carrying their share of the load

## CHALLENGES FOR THE ABUSER

Tolerance – the road to addiction

1. The same dose will eventually produce diminishing effects
2. A steadily larger dose is needed to produce the same effect

Denial --

Withdrawal – an immediate challenge

- Short-term - "hangover"
- Long-term - quite serious, medical supervision is needed; Delirium Tremens (which can be fatal) may occur

**INCIDENT REPORT FORM**

The incident report form is to be completed by the leader as a guideline for the determination to order a drug and/or alcohol screen for a crewmember that is not "fit for duty" and probable cause exists to test, or a crewmember has been involved in an accident/incident or unsafe action subject to drug/alcohol testing. Each management representative is to complete his/her form. A form is located on the following three pages for your use.

# Incident Report Form

## REASONABLE CAUSE OBSERVATION CHECKLIST
*(STRICTLY CONFIDENTIAL)*

**This checklist is intended to assist in referring for reasonable suspicion testing.**

______________________________________________
**CREWMEMBER** **PERIOD OF EVALUATION**

______________________________________________
**SUPERVISIOR # 1 NAME** **TELEPHONE**

______________________________________________
**SUPERVISOR # 2 NAME** **TELEPHONE**

______________________________________________
**Is this Crew Member in a safety-sensitive position? If so, what position?**

______________________________________________
**Has the Crew Member manifested any of the following behaviors?**

***Indicate (D) if documentation exists.***

**A. QUALITY OF WORK**

YES NO
____ ____ 1. Clear refusal to do assigned tasks
____ ____ 2. Significant increase in errors
____ ____ 3. Repeated errors in spite of increased guidance
____ ____ 4. Reduced quantity of work
____ ____ 5. Inconsistent "up and down" quantity or quality of work
____ ____ 6. Behavior that disrupts work flow
____ ____ 7. Procrastination on significant decisions or tasks
____ ____ 8. More than usual supervision necessary
____ ____ 9. Frequent, unsupported explanations for poor work performance
____ ____ 10. Noticeable change in written or verbal communication
____ ____ 11. Other (please specify) ______________________________

**B. INTERPERSONAL WORK RELATIONSHIPS**

YES NO
____ ____ 1. Significant change in relations with co-workers, supervisors, others
____ ____ 2. Frequent or intense arguments
____ ____ 3. Verbal abusiveness
____ ____ 4. Physical Abusiveness
____ ____ 5. Persistently withdrawn or less involved with people
____ ____ 6. Intentional avoidance of supervisor
____ ____ 7. Expressions of frustration or discontent
____ ____ 8. Change in frequency or nature of complaints
____ ____ 9. Complaints by co-workers or subordinates
____ ____ 10. Cynical, "distrustful of human nature" comments
____ ____ 11. Unusual sensitivity to advice or critique of work
____ ____ 12. Unpredictable response to supervision
____ ____ 13. Passive-aggressive attitude or behavior, doing things "behind your back"

## C. GENERAL JOB PERFORMANCE

| YES | NO | | |
|---|---|---|---|
| ___ | ___ | 1. | Excessive **unauthorized** absences (number in last 12 months ____) |
| ___ | ___ | 2. | Excessive **authorized** absences (number in last 12 months ____) |
| ___ | ___ | 3. | Excessive use of sick leave in last 12 months (number ____) |
| ___ | ___ | 4. | Frequent Monday/Friday absence or other pattern |
| ___ | ___ | 5. | Frequent unexplained disappearances |
| ___ | ___ | 6. | Excessive "extension" of breaks or lunch |
| ___ | ___ | 7. | Frequently leaves work early (number of days per week/month___) |
| ___ | ___ | 8. | Increased concern about, or actual incidents of, safety offenses involving the crewmember (please provide Safety Reports) |
| ___ | ___ | 9. | Experiences or causes job accidents/incidents/unsafe actions |
| ___ | ___ | 10. | Major changes in duties or responsibilities |
| ___ | ___ | 11. | Interferences with, or ignores established procedures |
| ___ | ___ | 12. | Inability to follow through on job performance recommendation |

## D. PHYSICAL and PERSONAL CHANGES

| YES | NO | | |
|---|---|---|---|
| ___ | ___ | 1. | Possession of drugs and/or alcohol |
| ___ | ___ | 2. | Smell of alcohol on breath, sweat, etc. |
| ___ | ___ | 3. | Changes in or unusual personal appearance (dress, hygiene) |
| ___ | ___ | 4. | Changes in or unusual speech (incoherent, stuttering, loud) |
| ___ | ___ | 5. | Changes in or unusual physical mannerisms (gesture, posture) |
| ___ | ___ | 6. | Changes in or unusual facial expressions |
| ___ | ___ | 7. | Changes in or unusual level of activity – much reduced or increased |
| ___ | ___ | 8. | Changes in or unusual topics of conversation |
| ___ | ___ | 9. | Engages in detailed discussions about death, suicide, or harming someone |
| ___ | ___ | 10. | Increasingly irritable or tearful |
| ___ | ___ | 11. | Persistently boisterous or rambunctious |
| ___ | ___ | 12. | Unpredictable or out-of-context displays of emotion |
| ___ | ___ | 13. | Unusual fears |
| ___ | ___ | 14. | Lacks appropriate caution |
| ___ | ___ | 15. | Engages in detailed discussion about obtaining or using drugs and/or alcohol |
| ___ | ___ | 16. | Has personal relationship problems (spouse, mate, children, in-laws) |
| ___ | ___ | 17. | Has received professional assistance for emotional or physical problems |
| ___ | ___ | 18. | Makes unfounded accusations toward others (has feelings of persecution) |
| ___ | ___ | 19. | Secretive or furtive |
| ___ | ___ | 20. | Memory problems (difficulty recalling instructions, past behaviors) |
| ___ | ___ | 21. | Frequent colds, flu, or other illnesses |
| ___ | ___ | 22. | Comes to work with alcohol on breath |
| ___ | ___ | 23. | Excessive fatigue |
| ___ | ___ | 24 | Makes unreliable or false statements |
| ___ | ___ | 25. | Unrealistic self-appraisal or grandiose statements |
| ___ | ___ | 26. | Temper tantrums or angry outbursts |
| ___ | ___ | 27. | Demanding, rigid, inflexible |
| ___ | ___ | 28. | Major change in physical health |
| ___ | ___ | 29. | Concerns about sexual behavior or sexual harassment |

# EXHIBIT P

Complete

| | |
|---|---|
| Name: Shawn Granberry | Date of Hire: 9/10/01 |
| Completed self assessment needs to arrive no later than: | |

The Self Assessment is designed to learn how you see your responsibilities and accomplishments for 2002. The purpose of the Self Assessment is to facilitate an open dialogue between you, the JetBlue Crewmember and your Crewleader to identify your accomplishments over the preceding year and your desires for advancement within our great company.

**Instructions:**

- Please take the time to complete the questions below.
- Return this completed form to your Crewleader by the date listed above.

1. Please list your major accomplishments during the year 2002: Designed a shift system which fully covers our OAK operation and allows for dual ops with serious attendance hits.
2. Trained a team of great leads agents that are now moving on to greater situations.
3. Created a work environment that allows an open door atmosphere and a feeling of team work.

4. Please list any initiatives / objectives not accomplished or results that were less than desired: I tried to create an overtime percentage less than 3 % but was unable.

5. Please describe the values / skills that contribute to your success in your position: I am very much a people person. I truly believe that hard work pays off. I care deeply for my co-workers and fun is a must. I have a true passion for what I do and always display integrity.

6. Please list the values / skills you feel can be strengthened to improve your performance and / or increase job effectiveness: I feel I could of put some additional training together that would created a safer work environment.

DEFENDANT'S EXHIBIT P
10.15.04
GRANBERRY
PENGAD-Bayonne, N.J.

**SECTION 1 – EVALUATING THE FLIGHT – *Crewmember Self Assessment***
*How do I think I am doing?*

7. What is your career vision with JetBlue? I want continue to grow at Jetblue. I believe I have the skills to one day become a good manager on to V.P. level and maybe beyond.

8. What training and / or project opportunities would you like to pursue? I would like to receive has much training as I can. Leadership takes work and training is very important in becoming a good leader. I have already attended the POL training and look forward to going to some more technical training.

9. What would you like your goals to be for 2003? My goal in 2003 is build a team that allows the OAK crew to be the best in system across the board. Also to create a safe and very productive work environment that allows the crew members to have fun.

Using the rating system below please read through each rating definition and select the appropriate category that best reflects your performance for 2002.

| OVERALL – EVALUATING THE FLIGHT | RE Regularly Exceeds Performance Expectations | MA Meets All Performance Expectations | MM Meets Most Performance Expectations | FM Fails to Meet Performance Expectations |
|---|---|---|---|---|
| How do you rate your job performance in 2002? | | x | | |

3\1



RATING SYSTEM

| | |
|---|---|
| RE | ***Regularly Exceeds Performance Expectations*** These Crewmembers are those who have made special contributions to the organization. Their overall performance regularly exceeds performance standards and supports the achievement of JetBlue's business plan and values. These Crewmembers add important value to the organization. |
| MA | ***Meets All Performance Expectations*** These individuals are solid performers who meet all performance standards of the job and sometimes exceed requirements. Crewmembers receiving this rating adhere to the values of the organization and perform their duties in a complete, accurate manner. |
| MM | ***Meets Most Performance Expectations*** These individuals show ability for successful performance after achieving some improvement. They meet most of the performance standards required for their job functions; however, some essential job requirements were not met. Overall this Crewmember has the potential to add value to JetBlue, |
| FM | ***Fails To Meet Performance Expectations*** These individuals are not satisfactorily contributing to the organization because they have not met the performance standards required for their job function. This Crewmember may not be a "fit" for the job assignment. |

Please add any additional comments or insight you might have which can enhance or further your position.
I am proud to be working at Jetblue Airways. I have been in the airline industry my entire adult life. Jetblue is just a great place to work. I look forward to working with my team to make OAK a super station and doing our part to make Jetblue the best airline in the world.

## SECTION 2 – FLYING in FORMATION – 320 Leadership Assessment
*How well do I live the Values?*

| | |
|---|---|
| Name of Crewmember Being Rated: Shawn Granberry | Completed By: |
| | ☐ Crewleader ☐ Peer / Customer |
| Submit Completed Survey to: Shawn Granberry | |
| Completed Survey Needs to Arrive No Later Than: | ☐ Crewmember X Self |

Thank you for participating in the 320 Leadership Assessment! Your feedback provides a significant opportunity for the Crewmember being profiled to improve individual effectiveness with regard to JetBlue's Values. To preserve anonymity, your responses will be combined with the feedback from other individuals in your category. The combined feedback will be compared with the self-evaluation in the overall performance assessment. We encourage you to be thoughtful in your evaluations and take the time to provide constructive written comments.

**Instructions:**

- Please keep your feedback confidential.
- Complete the form by checking the appropriate rating for each category; rating system is listed below.
- Please provide written comments to the questions on page two.
- Return the survey to the individual listed above by the "no later than" date.

**RE– Regularly Exceeds Performance Expectations**
**MA–Meets All Performance Expectations**
**MM–Meets Most Performance Expectations**
**FM –Fails To Meet Performance Expectations**
**NA – No chance to observe (this rating is not a low score)**

**VALUE DEFINITIONS**

| SAFETY | RE | MA | MM | FM | NA |
|---|---|---|---|---|---|
| Supports compliance with all regulatory guidelines | | | x | | |
| Is committed to safety first | | x | | | |
| Sets & maintains high standards | | x | | | |
| Does not compromise safety in making business decisions | | x | | | |
| Ensures sense of security for co-workers and customers | | x | | | |
| Comments/Examples: | | | | | |

| CARING | RE | MA | MM | FM | NA |
|---|---|---|---|---|---|
| Maintains respectful relationships with internal/external customers | | x | | | |
| Is a role model at work | | x | | | |
| Embraces a healthy balance between work and family | | | x | | |
| Takes responsibility for personal and company growth | | x | | | |
| Comments/Examples: | | | | | |

1/2

| INTEGRITY | RE | MA | MM | FM | NA |
|---|---|---|---|---|---|
| Exhibits honesty and trust in all aspects of the job | | x | | | |
| Unwilling to compromise the values for short term results | | x | | | |
| Possesses and demonstrates broad business knowledge | | | x | | |
| Is committed to self improvement | | x | | | |
| Challenges the status quo (pushes back when necessary) | | x | | | |
| Comments/Examples: | | | | | |

## SECTION 2 – 320 LEADERSHIP ASSESSMENT CONTINUED

| FUN | RE | MA | MM | FM | NA |
|---|---|---|---|---|---|
| Exhibits a sense of humor and is able to laugh at self | x | | | | |
| Adds to customer experience through humor | x | | | | |
| Converts a negative situation into a positive customer experience | | x | | | |
| Creates a friendly environment where taking risks is okay | | x | | | |
| Demonstrates/creates enthusiasm for the job | | x | | | |
| Comments/Examples: | | | | | |

| PASSION | RE | MA | MM | FM | NA |
|---|---|---|---|---|---|
| Celebrates diverse needs of co-workers and customers | | x | | | |
| Champions team spirit | x | | | | |
| Shows excitement and eagerness to break down barriers | | x | | | |
| Craves and delivers good performance | | x | | | |
| Comments/Examples: | | | | | |

| OVERALL – FLYING in FORMATION | RE | MA | MM | FM | NA |
|---|---|---|---|---|---|
| Overall rating for living the Values | | x | | | |

IF THIS IS A SELF ASSESSMENT, PLEASE DISREGARD THE QUESTIONS BELOW. Please take a moment to fill out the comments section. Please give your comments careful consideration, ensuring they are constructive in nature.

List this person's three most positive qualities with regard to overall effectiveness:

Describe the three most important things this person could improve to increase overall effectiveness:

Other comments: I am proud to work a Jetblue Airways. I have worked in the Airline industry my entire adult life. Jetblue is one of the best companies in the world to work for. I am dedicated to self improvement and doing the best job that I can to improve our overall operation. I have been blessed to work under a great manager that is willing to teach so I can grow and gain skills for future growth. I look forward to growing with Jetblue and the sky is the limit.

*Appraising Crewleader will complete Section 3 –* **Charting the Course,** *by documenting the crewmember's initiatives and accomplishments and providing a rating for each category (People, Performance, Prosperity). Averaging the ratings for each category, the Crewleader will give an overall rating of the Crewmember's accomplishments in 2002.*

| | |
|---|---|
| RE | ***Regularly Exceeds Performance Expectations***<br>These Crewmembers are those who have made special contributions to the organization. Their overall performance regularly exceeds performance standards and supports the achievement of JetBlue's business plan and values. These Crewmembers add important value to the organization. |
| MA | ***Meets All Performance Expectations***<br>These individuals are solid performers who meet all performance standards of the job and sometimes exceed requirements. Crewmembers receiving this rating adhere to the values of the organization and perform their duties in a complete, accurate manner. |
| MM | ***Meets Most Performance Expectations***<br>These individuals show ability for successful performance after achieving some improvement. They meet most of the performance standards required for their job functions; however, some essential job requirements were not met. Overall this Crewmember has the potential to add value to JetBlue. |
| FM | ***Fails To Meet Performance Expectations***<br>These individuals are not satisfactorily contributing to the organization because they have not met the performance standards required for their job function. This Crewmember may not be a "fit" for the job assignment. |

**PEOPLE**
**Initiatives and accomplishments focus**

- Recruiting "good fit" crewmembers. Departmental crewmember turn over rate
- Positive work environment and culture
- Crewmember recognition for results
- Investment of time and resources in developing self and crewmembers
- Good leadership, role model, leads people effectively and lives the values

| What were the Crewmember's initiatives in 2002? | What were the outcomes, accomplishments and / or successes of the Crewmember in 2002? (Be specific) |
|---|---|
| Created a positive work environment | Shawn has certainly developed his Crew into a strong and successful Team |
| Developed good Leads | 90 % of our Crew have the goal to become Leads and Supervisors. I would like Shawn to embrace and develop the other 10% |
| | Rating MA |

## SECTION 4 – DEBRIEFING THE FLIGHT – *Overall Performance Assessment*

Place overall assessments from Sections 1, 2, 3 in the appropriate boxes below. Once you, the appraising manager, have collected all the data, you must make an overall performance assessment.

| | RE | MA | MM | FM |
|---|---|---|---|---|
| **Self Assessment** (Section 1) | | X | | |
| **320 Leadership Assessment** (Section 2) | | | X | |
| **Initiatives / Accomplishment Assessment** (Section 3) | | X | | |
| **Overall Assessment** (Section 4) | | | X | |

Crewleader's Comments:

Shawn has a good working knowledge of ground operations and I would like to see him utilize his Airport training more. He has helped develop a strong Team and support Crew; at times he relies too much on them.
He is always willing to work shoulder to shoulder with his Team and does not expect them to do anything he is not prepared to do himself. He needs to be more proactive and not reactive.

Shawn is dedicated and loyal to our Station and JetBlue.

**Michele Steiner March 5, 2003**

Departmental Head's Signature and Date

Departmental VP's signature and Date

**2% Increase**

Crewmember's Comments:

# ATTACHMENT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---oOo---

COPY

SHAWN GRANBERRY,

Plaintiff,

vs. No. C04 0845 JSW

JETBLUE AIRWAYS,

Defendants.

____________________________________//

Pages 1 through 173, inclusive.

DEPOSITION OF RAJEEV SINGH

November 22, 2004

VOLUME I

Reported by:
BRIDGET M. MATTOS, CSR No. 11410
236 West Portal Avenue, #137
San Francisco, California 94127
Phone: (415) 710-2501
Fax: (415) 682-7656

window?
A. I don't know.
Q. Was the shattered window ever discussed in any meeting?
A. Yes.
Q. When was it discussed in a meeting?
A. I don't remember the exact date of the meeting. But I do know it was after she found out we had a -- she found out about the window that we had a meeting.
Q. Was the meeting specifically for the window, or did it involve other things?
A. We had other issues as well, but that was one of the main points of the meeting.
Q. And when you say, "one of the main points," what was one of the main points of the meeting?
A. The main point of the meeting was that she demanded to know everything that happens in the station, regardless of how little or how big it is.
Q. How long was this meeting?
A. I don't remember. It went on.
Q. For a couple hours?
A. Yes.
Q. And was Michele swearing during the meeting?
A. Yes.

investigation?

A. Yes.

Q. You don't believe it should be rushed to a decision?

A. Say that one more time.

Q. You didn't believe that there should be a rush to such a decision?

MS. TURAI: Objection. It's argumentative.

MR. COLE: Q. You can answer.

A. I don't know.

Q. You have no opinion on that?

A. I have no opinion on it, yes.

Q. Mr. Singh, there was a second incident involving a loose hose that occurred on or about July 25th of 2003, this was an air hose incident. Are you familiar with that incident?

A. Yes.

Q. And can you tell me how you're familiar with that incident?

A. I was present.

Q. And approximately what time did this incident take place?

A. I'm not quite sure of the exact time.

Q. Approximate time.

A. Approximate time would be somewhere around

Q. And where was the provision warehouse located relative to the plane that was being pushed out?

A. As far as the exact distance, I could not give that to you, but it was quite -- it was on the other side of the airport, if you're familiar with --

Q. Did Mr. Granberry tell you why he needed your services?

A. Yes.

Q. And what reason did he give you?

A. We were going to have another aircraft on the ground, which would have put three aircrafts on the ground at that time, which is not a normal thing for us, and therefore, he needed more manpower to do that.

Q. And you were trained, were you not, in ground operations?

A. Yes.

Q. And you had worked before in ground operations?

A. Yes.

Q. And you also had worked before as a ground operations supervisor; isn't that true?

MS. TURAI: That's argumentative, and it misstates the witness's testimony. Objection.

MR. COLE: Q. You can respond.

A. You'll have to rephrase that because I was not

named ground operations ramp supervisor, I filled in occasionally for PTO when I answered that previously.

Q. Yes. You had previously worked or served as a ground operations supervisor on a temporary basis?

A. Correct.

MS. TURAI: Objection.

THE WITNESS: On a couple occasions.

MR. COLE: Q. And so Mr. Granberry asked you to come over and assist; is that correct?

A. Yes.

Q. You came over to assist, what happened then?

A. Which time frame are you talking about, as we're done with the flight, as it was coming in?

Q. Let me -- Shawn Granberry was there, you were there, was anyone else there?

A. Yes.

Q. Who else?

MS. TURAI: Objection. This is vague. Are you still talking about when the air hose accident occurred?

MR. COLE: Q. I'm asking who came over, who was present to assist in pushing out the plane. You said there was a team.

A. Yes. A team of Shawn Granberry, myself, I requested the help of Phillip Waukazoo, who's in my

department as well, and I believe Shawn had one of his crew members, Peik, P-E-I-K, Larson.

Q. Anyone else?

A. Not that I can remember.

Q. Phillip Waukazoo was someone who worked for you in provisions?

A. Correct.

Q. Okay. So what did the team do when you -- when all of you arrived?

MS. TURAI: Objection. This assumes facts not in evidence, it's vague and ambiguous.

MR. COLE: Okay.

Q. You said there was a -- that the team consisted of the four of you. Yes?

A. Yes.

Q. What did you do when you gathered?

A. Initially, when the flight came in, we were bringing in that flight to a gate we don't usually use.

Q. And that was gate what?

A. I don't remember.

Q. Okay. So you brought the flight to a gate you don't usually use, what happened then?

A. Before the flight, we set up our gate, meaning we brought our equipment, which is belt loaders.

Q. I'm sorry, you brought out equipment?

A. We unloaded the bags from the rear of the aircraft, there's a forward compartment and a rear compartment. We off-loaded the rear compartment first, and we continued working the flight, we had bags in the forward compartment as well in which we were in the process of doing. Shawn was on a belt loader, I guided him in, which is a safety practice that we have on the ramp.
Q. So you followed the standard safety practice, Shawn was on the belt loader and you guided him in?
A. Yes.
Q. What happened then?
A. As I completed guiding him in, I was chalking the front driver's side tire, and we had an incident at that point.
Q. When you say you "had an incident," this is after you were setting the front driver's side tire?
A. This is as I was in the process of chalking the front tires.
Q. What was the incident?
A. Phillip Waukazoo was on a bag cart -- tug pulling, if I'm not mistaken, I'm not completely sure how many carts he had in total, but I believe it was three. He came around to position the bag carts behind the belt loader, for some reason he -- I don't know

what he was doing, either he was speeding or he didn't take that corner very well, it was a new gate, and he flipped the last bag cart, the bag cart hit the belt loader, Shawn was still seated on the belt loader at that point.

Q. Okay. So the rear of the -- the rear baggage cart hit the belt loader on which Shawn Granberry was on?

A. Yes. He was on that, and I was bent down, I was chalking the tires.

Q. Okay. Now, did you see everything that you just described occurring?

A. No.

Q. What did you see?

A. I -- when it happened, the bag cart had struck the belt loader.

Q. Did you see the bag cart strike the belt loader?

A. No.

Q. Did you see the bag cart turn over?

A. After the fact, yes.

Q. You saw it turned over?

A. Yes.

Q. What I want to know is, did you see it as it turned over?

A. No.
Q. What happened next?
A. Well, the way I came to know about it, obviously, because the belt loader was less than two inches from my body and --
Q. So how did you come to know about it?
A. Because I almost got hit by it, and I looked at Shawn to see, you know, what's going on. Then I saw the belt, the bag cart flipped over.
Q. Did the belt loader move as a result --
A. Yes.
Q. -- of being hit by the bag cart?
A. Yes.
Q. And how far did it move?
A. It moved enough to where the belt loader, the end of the belt loader was about five, ten inches from the engine.
Q. Okay. What I am asking, though, Mr. Singh, is, how far did the impact -- how far did the belt loader move as a result of the impact with the bag cart?
MS. TURAI: If you know.
THE WITNESS: I can't give you --
MR. COLE: Q. Well, you were -- as I understood your testimony, you were right directly in

were okay?

A. Yeah, he was close to me.

Q. All right. Now, when Phil Waukazoo walked over and asked you if you were okay, you asked him what happened, what did he say?

A. I don't remember the exact words, but he did say, you know, "I was bringing those carts around and Peik was rushing me."

Q. Did he say anything else?

A. Not that I remember.

Q. What happened next?

A. We got into -- Shawn and I got into the flipped over bag cart and took all the bags out and put it -- you know, put it over, so we can put it in --

Q. So you turned it back on its wheels?

A. Not right away, we had to take the bags out first.

Q. So you took the bags out, and then you put the baggage cart back on its wheels?

A. Upright, yes.

Q. And then you put the bags back on?

A. No.

Q. You took the bags off, put the baggage cart on its wheels and then what?

A. And pushed it to the side because it was inop.

Q. Because?
A. It was -- it was inop.
Q. Inoperable?
A. Yes.
Q. That means damaged; right?
A. Correct.
Q. What happened next?
A. We continued working the flight.
Q. Continuing loading and unloading baggage?
A. Right. After we took out all the bags, made the cart upright, pushed it aside, Phillip ran the bags to the baggage carousel for the inbound customers to claim their bags, we got -- for the outbound customers, we got bags from the bag room, started loading those bags onto the aircraft, serviced the lavatories, serviced the bottle of water, hooked up the tow bar, hooked up the push back tug, hooked up our communications headset, at that point we were ready to go.
Q. So you guys were real busy in a very short period of time?
A. Yes, very busy.
Q. When you were -- did all these things -- were there any incidents during that process?
A. No.

Q. What happened next?
A. We were ready to push out the plane, I was wing walking, I do not remember who the other wing walker was on the other side.
Q. What's wing walking?
A. Wing walker's responsibility to -- to divert any kind of traffic, no vehicles, whatnot, from driving behind the aircraft as we're pushing out, that was my responsibility.
Q. So the wing walker walks on the ground?
A. Wing walker exactly, walked underneath the wing.
Q. To make sure there's clearance?
A. To give the signals to other airport tenants not to drive behind or -- or be anywhere near our aircraft because we're ready to push.
Q. What happened next?
A. At that point, usually it comes from the captain, requested an air start, Shawn Granberry, you know, was notified an air start is needed for that aircraft, Shawn hooked up the air start and was by the unit not where it was hooked up, it's quite a bit ways away because it's a long hose, he was by the unit, and I turned around, I saw that it started flapping.
Q. And when you say, "It started flapping," what

are you referring to the "it"?
A. The air start hose, it had got disconnected from the aircraft and was just flapping up and down.
Q. Did you observe it hit anyone?
A. No.
Q. So the hose did not hit anyone?
A. No.
Q. Did the hose do any damage to the aircraft?
MS. TURAI: Objection; lacks foundation, if he saw the hose the whole time or not.
MR. COLE: Q. You can respond.
A. I didn't check the aircraft, nor do I know if there was any damage.
MR. COLE: I need to take a break.
(Brief recess taken.)
MR. COLE: Q. Okay. Was anything done to stop the hose from flapping?
A. Shawn turned it off at the unit.
Q. At the unit?
A. Yes.
Q. He was able to do that without difficulty?
A. That, I'm not sure of, but he did turn it off.
Q. Did you observe him having any difficulty turning off the hose?
A. I'm not too familiar with that piece of

equipment myself, and I was underneath the wing at that point, and I don't know.

Q. Okay. Did he appear to be having any difficulty turning it off?

A. I don't know.

Q. What happened next?

A. I believe we had succeeded in -- well, the air start is used to start the engine.

Q. So the engine was getting ready to start?

A. I believe we -- at that point we had succeeded in getting it turned on, the engine, start on the engine.

Q. What happened next?

A. Shawn turned it off.

Q. Turned off the hose?

A. Turned off the hose, and once it stopped, you know, flapping around, he picked it up and rolled it back into the unit, and we proceeded to push out the flight.

Q. So did the flight leave on time?

A. That, I'm not sure of.

Q. You're not sure one way or the other?

A. Yeah, I'm not sure of that.

Q. Was there anything else that you had not described that was part of the incidents, the baggage

cart and the air hose?

A. Not that I can recall.

Q. Now, after the flight was pushed off and left, was there any further discussion about what had occurred?

A. I had to leave, I had a prior engagement.

Q. You had to leave?

A. I had to leave right away, and I had explained that to Shawn when he called me to ask me for help.

Q. What did you tell Shawn that you had to do?

A. I had to take my mom to the hospital, and as soon as we pushed out that flight, all I said to Shawn is, "You got it," and he said, "Yeah," and I left.

Q. What hospital did your mom go to?

A. Washington Hospital in Fremont.

Q. Was this an emergency?

A. Yes, she was having a hysterectomy.

Q. Was this a scheduled or elective surgery? Was it scheduled surgery?

A. Scheduled, yes.

Q. And was she having surgery that day?

A. I'm not really sure, I think she went in for tests that day.

Q. She was going in for tests?

A. Yes.

A. Absolutely. I didn't see a need for it, but absolutely.

MS. TURAI: Okay. That's it. I don't have any other questions.

MR. COLE: I could keep you here for another 10 minutes or so, but I'm finished.

(Whereupon the deposition proceedings were concluded at 4:25 p.m.)

________________________________________

RAJEEV SINGH

---oOo---

State of California )
City and County of San Francisco )

I, Bridget M. Mattos, hereby certify that the witness in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth and nothing but the truth in the within entitled cause; that said deposition was taken at the time and place herein named; that the deposition is a true record of the witness's testimony as reported to the best of my ability by me, a duly certified shorthand reporter and disinterested person, and was thereafter transcribed under my direction into typewriting by computer; that the witness was given an opportunity to read, correct and sign the deposition.

I further certify that I am not interested in the outcome of said action nor connected with or related to any of the parties in said action nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunder subscribed my hand on November 22, 2004.

Bridget M Mattos

BRIDGET M. MATTOS, CSR NO. 11410

# ATTACHMENT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

SHAWN GRANBERRY, Plaintiff,

vs.

JET BLUE AIRWAYS, Defendants.

No. C04-0845 BZ

COPY

Deposition of

KEVIN HOOVER

Thursday, June 9, 2005

NOTICING ATTORNEY: RUFUS L. COLE

REPORTED BY: JANICE M. JOBE, CSR NO. 4734

GOLDEN GATE REPORTERS LLC
35 Mitchell Boulevard, Suite 8
San Rafael, CA 94903-2010
(415) 491-4611 * 1-800-442-4611
FAX (415) 491-4635

email: ggr35@depos.com web: http:/www.depos.com

printed/copied on recycled paper

A. I actually still have my day planner from that year and have it written down on the 22nd of July, 2003, that there was a supervisor's meeting.

Q. Are there any notes in that day planner?

A. I do not have any notes.

Q. Does your day planner reflect who was in attendance at that meeting?

A. No.

Q. Does your day planner have any other information about that meeting?

A. No.

Q. You seem to hesitate.

A. Well, because there's notes there, but they're not -- it could be from any meeting and they're notes about payroll and things that were not discussed at that meeting.

Q. Do you recall what was discussed at that meeting?

A. I sure do.

Q. And why is it that you seem to recall this particular meeting?

A. Because it was a meeting where it was called at the very last minute, and there was no note taking at that meeting because Michele did a lot of yelling and was very angry.

A. I can't even guess.

Q. Okay. Do you recall having a sense that the meeting was on short notice?

A. Yes.

Q. Do you recall having a sense that the meeting was called because Michele was angry?

A. Yes.

Q. And do you recall that the meeting was to discuss multiple topics -- strike that.

Do you recall that during the meeting, multiple topics were discussed?

A. Not that I recall.

Q. What topics do you recall being discussed at the meeting?

A. Reporting of incidents, supervisors' responsibility to communicate with one another, to communicate with Michele whenever there was an incident, whether it be verbal or written in an email, on the phone, in person. She was very specific.

Q. I just want to make sure I have everything. Reporting of incidents, supervisors' responsibility to communicate with one another?

A. (Witness nods head.)

Q. Responsibility for reporting incidents to Michele?

A. (Witness nods head.)

Q. Anything else that you recall?

A. Not that I recall, no.

Q. Do you recall having a sense that Michele was angry before entering that meeting?

A. Yes.

Q. How did you know she was angry?

A. In the tone of the email.

Q. What did that email say?

A. It instructed us to be in the conference room at that specific date, at that specific time, and because it was short notice, I figured that she was angry.

Q. Before entering the meeting, did you have any idea as to why Michele was angry?

A. I did not.

Q. Did anyone indicate why Michele was angry?

MS. TURAI: Objection; vague as to time.

THE WITNESS: Not to me. No, not to me, no one indicated that to me.

MR. COLE: Q. Before entering the meeting, did you have any idea what would be discussed?

A. No, I did not.

Q. Do you conduct supervisor meetings as general manager?

THE COURT REPORTER: For the record, would both Counsel like a copy of the deposition transcript?

MR. COLE: Yes.

MS. TURAI: Yes.

(Deposition adjourned at 5:15 p.m.)

--oOo--

______________________________

KEVIN HOOVER

CERTIFICATION OF DEPOSITION OFFICER

I, JANICE M. JOBE, duly authorized to administer oaths pursuant to Section 2093 (b) of the California Code of Civil Procedure, hereby certify that the witness in the foregoing deposition was by me sworn to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was thereafter transcribed by means of computer-aided transcription; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, or in any way interested in the outcome of this cause named in said caption.

Dated this 28th day of June, 2005.

JANICE M. JOBE, CSR 4734

# ATTACHMENT D

EEOC FORM 131 (5/01)

# U. S. Equal Employment Opportunity Commission

CEO
JET BLUE AIRWAYS, INC.
Post Office Box 17435
Salt Lake City, UT 84117

PERSON FILING CHARGE

**Shawn Granberry**

THIS PERSON *(check one or both)*

[X] Claims To Be Aggrieved

[ ] Is Filing on Behalf of Other(s)

EEOC CHARGE NO.

**376-2004-00170**

## NOTICE OF CHARGE OF DISCRIMINATION

*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act

[ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act

[ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [X] No action is required by you at this time.
2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.
3. [ ] Please provide by a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.
4. [ ] Please respond fully by to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.
5. [ ] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by
to
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

Julian F. Melendrez,
Investigator Support Asst
*EEOC Representative*
*Telephone:* (510) 637-3242

Oakland Local Office
1301 Clay Street
Suite 1170-N
Oakland, CA 94612

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] RACE [ ] COLOR [X] SEX [ ] RELIGION [ ] NATIONAL ORIGIN [ ] AGE [ ] DISABILITY [X] RETALIATION [ ] OTHER

**See enclosed copy of statement.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| Dec 08, 2003 | Joyce A. Hendy, Director | |