William R. Hopkins SBN 170122
WELLS & HOPKINS,
1628 Tiburon Blvd.
Tiburon, CA 94920
Telephone: (415) 724-4784
Facsimile: (415) 366-2179

Attorneys for Plaintiff
TRACI CHARLES

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

TRACI CHARLES

Plaintiff

vs.

NIKE, INC., and DOES 1-10, inclusive,

Defendants.

Case No.: C 05 00044 EDL

DECLARATION OF PLAINTIFF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

DATE: November 29, 2005
TIME: 9:00 AM
DEPT: Courtroom E, 15th Floor
JUDGE: Hon. Elizabeth D. Laporte

Complaint Filed: November 16, 2004



Dockets.Justia.com

I, TRACI CHARLES, declare and state that the matters stated herein are of my own personal knowledge. If called to testify, I would testify competently to the following:

1. I began me employment with Defendant NIKE, INC, on or about January 6, 1997, working in its Niketown San Francisco retail store.
2. Accelerated Training Program In or around April 7, 1999, Plaintiff learned of a new program in the Niketown store called the Accelerated Training Program. Plaintiff learned that accelerated training program prepared employees for a managerial role. The accelerated training program helps to better position employees for opportunities within the company. During Plaintiff's period of employment, however, only three Asian Males were allowed to participate and two became business managers. -9.
3. Up until November of 2000, in addition to her position with Nike, Plaintiff continued to work her part-time position with UPS, which did not allow her to works evenings at Niketown. She learned that a managerial role would require her to work evenings. Thus, Plaintiff quit her 8 year employment with.
4. In early December of 2000, Plaintiff asked Store Manager Cal Dowers about moving into management and about entering the accelerated training program. Dowers advised Plaintiff that he had been informed about her quitting her UPS position, and stated to Plaintiff, " Well, let me talk to Stephanie Comllie," who he reported to. Dowers never provided her with any response.
5. In December of 2000, Plaintiff then interviewed for and obtained an operations assistant, and began working in that capacity in January of 2001, reporting to Mara Ott [Caucasian] the operations manager. Plaintiff understood that this position would provide her with more exposure to store operations, and thus would enable her to move to higher positions.
6. From that point on, Plaintiff regularly discussed her interested in becoming a manager and entering accelerated training with management. Manager Mara Ott acknowledges Plaintiff expressing her desire to move into management.

7. Plaintiff observed that Dowers began to grow annoyed with her inquiries about attaining a managerial position. On one such occasion in November 2003, Dowers abruptly told Plaintiff “management has to approach you,” referring to the accelerated training program.

8. Then, in the second week of January, 2004, Plaintiff learned that store associate Johnny Wong had entered the accelerated training program. When Plaintiff asked Wong had management approach him, he responded, “no, I just went to Cal [Dowers] and asked him and Cal told me yes.” Plaintiff’s

<u>2001</u>

9. <u>Mid Year (Feb., 2001) and End Year (June, 2001) Performance Evaluation[1]</u> Plaintiff did not receive any negative ratings on these evaluations; instead, she received mostly “achieves” ratings (indicated by the box marked “A.” Also see last page where overall rating is “A”.) During these reviews, Plaintiff reiterated her desire to go into management. Attached hereto as Exh A is a true and correct copy of that document. (Bate “P0038”), Manager Mara Ott indicates that “Possible Next Assignment” is Business Manager.” It further indicates that her “readiness rating” to move into Manager is “now” to “6 to 12 months.” At this juncture, Plaintiff had not had any corrective action, and was thus otherwise eligible for accelerated training.

10. <u>December 19, 2001 Record of Coaching:</u> On December 19, 2001, Plaintiff had a meeting with Mara Ott in which she received a document referred to as a record of coaching, which had not been presented to Plaintiff as a disciplinary measure..(i.e., “During which I communicated my expectations of your performance, as well as your expectations for my performance . . . .we agreed that going forward, you will continue to strive for increased professionalism . .” ) Plaintiff’s Dec, para 10, A true and correct copy of that document is attached hereto as Exhibit B. The meeting was represented to Plaintiff as being a sit-down to review expectations, as the document doesn’t cite her for doing something wrong. Id. Importantly, as of the close of 2001, there is nothing other than this

---

[1] Plaintiff received two evaluations each year: one “mid-year,” (Feb); and, one “end-year,” (June/July). Both evaluations are provided on the same document,. Exh A hereto.

December 19, 2001 document that Defendant can point to that supports any performance concerns in 2001.

<u>2002</u>

11. <u>February , 2002 Mid_Year Performance Evaluation</u> In Plaintiff's mid-year, 2002 evaluation, Plaintiff received all "Achieves" ratings[2]. A true and correct copy of that document is attached hereto as Exhibit C (Bate "P0034," "Mid-Year Only " Section, Ott comments: "With her nearly six years of work history with Nike she has played many roles and has a wide skill set . . ." But, Ott then notes, " During this time her level of support to the team player roles and professional communications has been varied and inconsistent." This comment came as a complete surprise to Plaintiff as she had not been told prior to this time that there concerns with some aspect of her performance.. (Also see 2001 evaluations)

12. <u>March and April (2002) 1-on-1 meeting with Manager[3]</u> In Plaintiff's March, 2002 1-on-1 meeting with Ott, Ott noted "She ahs shown overall improvements in her consistency in all aspects of her work, please continue." And, then in the April, 2002 meeting, Ott noted "Traci has made the most improvement in the last 300 days in the area of professionalism . . . Good inter team communication as well." A true and correct copy is attached hereto as Exhibit C, Plaintiff's Dec "P 0033") Based on this feedback, Plaintiff again asked managers Ott and Dowers about entering the accelerated training program and whether she could bee considered for a managerial role, but did not receive any response.

13. <u>June 6, 2002</u> <u>Kyle Quan incident in which Kyle also raised his voice</u> On June 6, 2002, Kyle Quan (operations assistant) was to relieve Plaintiff for break. While Plaintiff was explaining a transaction to manager Layton, Quan grew impatient and raised his voice at Plaintiff demanding that she hurry

---

[2] As provided in the performance evaluation, "Achieves" means "met and may in some cases exceed performance objective and development expectations. Achieved quality results in a position with high standards for accountabilities and competencies." The only higher rating to achieve is "Excel."

up and go on break. Plaintiff raised her voice back at Quan, asking him to wait a few moments.. Plaintiff received a note to file, while Quan did not.

14. End year July 2002 Performance Evaluation The "end-year" July 2002 evaluation (A true and correct copy is attached hereto as Exhibit C) . was completed on July 10, 2002, but notably makes no reference to the June 6, 2002 Kyle Quan incident. Instead, Ott provides in the "End-Year Only" section: "Traci has made the consistent improvements in the following areas since her mid year review; attendance, communication to the building as well as inter team. Professionalism, commitment to deadlines, results orientation. I am proud of the work she done. I believe she is on the way to taking her skills to the next level if she maintains this pattern of hard work and improvement. . . She was selected to be the mentor for the new cashiers[4] going forward . . ." Her overall rating again was Achieves.

15. Plaintiff receives a performance raise, effective August 19, 2002 In addition to her annual performance based raise, Plaintiff then received another performance based raise from Mara Ott, effective August 19, 2002. A true and correct copy is attached hereto as Exhibit E

16. Plaintiff discusses July 2002 evaluation with Managers Alycia Gonzalez and Cal Dowers By July, 2002, it had now been 12 months since the End-Year, 2001 evaluation in which Ott noted that Plaintiff would be moving to Business Manager in 6 to 12 months. During this past period, Plaintiff had continued to regularly inquire about moving into management, asking managers Cal Dowers, Mara Ott and Alycia Gonzalez. After having received the over all "achieves" ratings in July, 2002, rather than the higher "Excel" rating, Plaintiff felt that she was being deliberately held back from advancing into management and thus became more vocal about her not being considered for management.. When Dowers did not respond, Plaintiff asked Dowers could she speak with his boss,

---

[3] Plaintiff had monthly 1-on-1 meetings with manager Ott. These meetings are reflected on the evaluation. (See Exh C, Plaintiff's Dec "P 0033")

to which Dowers sternly replied, "you need to be careful about who you talk to." Dowers would again repeat this admonishment on two other occasions. Id.

17. As Plaintiff became more vocal, she observed the demeanor of Ott and Dowers towards her became very negative and callous.

18. September of 2002 " Record of Coaching" Then, on September 17, 2002, Plaintiff was having a casual conversation with manager, Jason Farley, who then asked her what she thought of the new "jet sorter." Plaintiff commented frankly that she "hated" the jet sorter. Mara Ott was seated only a few feet away, but said nothing. Over two weeks later, however, in October of 2002, Plaintiff was surprised when she was handed a "record of coaching" from Manager Mara Ott. (A true and correct copy is attached hereto as Exhibit D, Dec of Plaintiff,) Manager Jason Farley, the manager to whom she was speaking, never mentioned this as a concern. Ott noted in the Record of Coaching that Plaintiff's "performance has not met Nike Standard," and "over the past several months has shown patterns of inconsistencies in area of professionalism." Plaintiff was surprised given that she had just received a performance raise (August, 2002), followed by favorable reviews just two months earlier (July 10, 2002's end-year comment)

19. December 16, 2002, Store had a shortage of $1,500 On December 16, 2002, Plaintiff was assigned as the closing operations person, which meant she was closing the register. Per Manager Farley's instructions, Plaintiff picked up $1500, ran it through the Jest Sorter, placed the money in an envelope and put it in the safe. Id. Others were present and also had access to the safe. Id The money was later missing and an Investigation followed.

2003

20. January 13, 2003 Plaintiff's Letter to HR, Melissa Marks Plaintiff wrote a letter dated January 13, 2003 to HR Manager Melissa Marks from Nike

---

[4] This reference to her mentor role over new cashiers is significant, given that (as discussed below), Defendant's Memo criticizes her for issues with the cash register closing. Plaintiff also developed a training check list for cashiers. (See below)

Headquarters, Beaverton, Oregon, in response to what she felt to be an unfairly conducted investigation into the December 16, 2002 incident, that wrongfully targeted her for the loss. In that letter, however, and against Cal Dowers' repeated admonishment not to report above him, Plaintiff reported, "I don't feel comfortable at the store and believe I have no resources that I think want to hear my side of the story." A true and correct copy is attached hereto as Exhibit F

21. January 17, 2003 Written Reminder given to Plaintiff on February 15, 2003 On February 15, 2003, Dowers personally handed Plaintiff a "written reminder [for] performance," dated January 17, 2003, which was just a few days after the date of Plaintiff's written report (see above) to headquarters HR -- over Dowers' objections to do so. A true and correct copy is attached hereto as Exhibit G, Ott was on leave during this time. This document –signed by Cal Dowers— contained numerous blatant and significant errors, including a reference to a "meeting" between Plaintiff and Ott, which purportedly occurred on January 17, 2003 in which they purportedly discussed "how [plaintiff's] performance has not met Nike standards." Such a meeting never occurred. In fact, there were numerous other erroneous references in that "written reminder," including the reference to attendance, vault count, shortages report. (Defendant falsely portray Plaintiff as having a record of attendance issues. In January 6, 1999, Plaintiff received a "written reminder for attendance" from Gary Sandfield, her manager during her position as cashier. Plaintiff was working at UPS during that period of time. From that January 6, 1999 reminder up until this February 15, 2003, however, Plaintiff had not received any form of write-up for attendance.. Moreover, the February 15, 2003 reference to attendance was inaccurate.

22. Plaintiff's February, 2003 Conversation with HR Manager MarksIn a letter dated February 20, 2003 to HR Manager Melissa Marks, plaintiff commented on those errors. A true and correct copy is attached hereto as Exh H. Plaintiff also that she felt that her managers, including Dowers, were

trying to terminate her (2nd para) Within a day, Plaintiff also had a discussion with Marks. In that conversation, Plaintiff expanded on why she felt she was being treated differently. Specifically, complained that Mara Ott [Caucasian] was discriminating against Plaintiff because of her race in many aspects of Plaintiff's employment, including her not being allowed to move into management. Plaintiff then provided Marks with the recent examples.

23. Plaintiff's February 27, 2003 meeting with Ott On February 27, 2003, just days after Plaintiff's complaint to Marks, Plaintiff met with Ott, at which time Ott gave Plaintiff the "corrected" written reminder, dated February 15, 2003. That purportedly corrected version states at the beginning: "The purpose of this memo is to provide you with a summary of our meeting on February 15, 2003…". During the conversation, Ott spoke to Plaintiff in a very negative tone. Plaintiff stated to Ott that this is retaliation for what Plaintiff had reported to Marks. . Ott then threatened that she could write Plaintiff up for more performance issues. Plaintiff then remained quiet and did not respond further.

24. In April of 2003, plaintiff begins seeing doctor Roberts re stress from work At this time, Plaintiff felt threatened by both Dowers and Ott. Plaintiff also felt extreme disappointment about what now seemed to be unattainable aspirations to move into management. In April of 2003, she began seeing Dr. David Roberts (psychiatrist) for stress, anxiety and depression. Plaintiff began to see him for treatment at least once a week.

25. July 19, 2003 "End-year Review" Plaintiff did not receive a February–Mid Year Review for 2003. Notwithstanding, Ott notes in the "Midyear only" section: "As the midyear came, Traci did receive a written reminder for performance." Then, it notes, however: "She has continued to deliver good performance in working with the cashiers as well as supporting customer service department during the entire first half of the year." A true and correct copy is attached hereto as Exhibit I (Bate "Nike 0779") Then, the 'Year-End only " comment (for July, 2003), Ott provides : "Dramatic

improvements in her performance have been made since February . . .Customers are leaving with a positive impression in our environment and that is due to her . . ." It also references her "hard work and commitment to cashiers." "I would like to recognize her improvements in cash handling." "I have been receiving positive feedback on her performance from other managers. I have enjoyed working with her and see her acting professionally yet still challenge us as managers." She received a year end performance rating again of "Achieves."Exh I, Plaintiff then asked Ott to explain why Ott had commended Plaintiff for her "cash handling," yet on page one of the evaluation (Bate "Nike 0777") had given Plaintiff only a "M" (meets expectation) in the "financial performance" Section.[5] It was noteworthy that Plaintiff had received "Achieves" in this area in the previous two years. (See previous performance evaluations) Ott did not, however, provide Plaintiff with any explanation as to this material inconsistency; instead, she ignored Plaintiff's request and moved on to other parts of the evaluation. . Plaintiff then asked Ott to identify what issues were there around Plaintiff's cash handling. In a very negative tone, Ott abruptly responded, "maybe we should have this meeting later," dismissing Plaintiff to leave, which she did. . Plaintiff did not raise her voice at Ott. Plaintiff, still fearful that she would be falsely written up again for something, simply left.

26. July 22, 2003, Ott and Dowers meet with Plaintiff On July 22, 2003, Plaintiff is called into a meeting with Ott and Dowers. They began discussing the review. Plaintiff sought clarification from Cal Dowers as to what concerns there were, if any, with her cash handling issues. Plaintiff had not received any negative feedback on cash handling issues, yet her rating in this area had gone down from "Achieves" to "M" (meets expectations.) Id. Plaintiff again repeated her desire to move into management and accelerated training and thus sought clarification as to what she needed to work on

---

[5] The "financial performance" category encompasses these very issues of cash handling, training cashiers, store reports, which is what Plaintiff was praised for in the later sections of her evaluation. Plaintiff's Dec.

so as to raise her ratings. Then, in the presence of Plaintiff, Ott told Dowers that Plaintiff was yelling at her and was not receptive to feedback. Ott's comments came as a total surprise to Plaintiff. Plaintiff told Dowers that Ott's statements were not true. Ott then left the meeting. Plaintiff began crying and stated to Dowers that Ott treats Black people differently and that Plaintiff needed to move out of Ott's department immediately. Dowers did not have any response and the discussion ended. Id. Plaintiff did not receive the final warning at this time, nor even a reference to it, until February of 2004.

27. <u>December of 2003 Meeting with Ott re Accounting Error</u> On December 19, 2003, while closing the register system ("POS"), Plaintiff inadvertently erred in making a deposit entry, causing a $240 error in the system. Plaintiff discovered the error and immediately reported it Assistant Store Manager Veronica Morillo, then to Dowers on the following morning. Id., 27 No one had even indicated to Plaintiff that this error would subject her to some form of discipline until December 24, 2003, when Ott called Plaintiff in for a meeting. Id. Ott then handed Plaintiff a "Note to file," which Plaintiff reviewed during the meeting. Id. Plaintiff immediately observed errors in the document. (A true and correct copy is attached hereto as Exh J. Exh J is different from Def's Exh 15 to Dec. of Ott). In that initial "note to file," Ott accuses Plaintiff of having "tried to hide it" and having "tried to conceal the error in hopes that you will be able to fix it and did not report the problem to a manager." (Paragraphs 1 and 2 of <u>Exh J to Plaintiff's Dec</u>.) When Ott learned that Plaintiff had properly reported the incident to a manager, Ott then removed those references and gave Plaintiff the revised "Note to file." (Defendant's Exh 15 to Dec. of Ott.) Importantly, however, this Note to File was the first reference that Plaintiff had seen of a "Final Warning," and a purported "similar error last year." Plaintiff was never told what the "similar error last year" referred to.

28. <u>2004</u>

29. January, 2004 , Plaintiff complains to Melissa Marks: Shortly after receiving the Final Warning notice from Ott, Plaintiff contacted HR manager Marks at headquarters. Plaintiff complained that she had not been given such a final warning back in July, 2003, as referenced on the document. At this time, Plaintiff had learned that Johnny Wong had entered the accelerated training program. Plaintiff reported to Marks that she had asked management, including Dowers, repeatedly about accelerated training, but was told that management had to ask you. Plaintiff reported to Marks that the process for entering into accelerated training program and into management was unfair and unclear. Marks informed Plaintiff that a telephone conference meeting ("a facilitated discussion") would be set up with Marks, Plaintiff and Ott, to discuss all of Plaintiff's concerns regarding Marks.

30. February 1, 2004 PTO incident The operations team held the responsibility of making Paid Time Off entries. Plaintiff called into work on Sunday, February 1, 2004, the day that payroll was processed for the preceding week, and simply stated to another operations assistant, "I'm just calling in to make sure I got paid for the 27th ," which was a day Plaintiff had taken off due to a family medical issue. Id. Plaintiff did not receive any statement, write-up or indication from anyone that she had done something wrong until her meeting with Ott and Dowers on February 24, 2004.

31. Nonexistent February 7, 2004 Meeting Defendant references a meeting between Plaintiff and Ott that purportedly took place on February 7, 2004, and also refers to a document (Exhibit 19 to Def.'s Dec of Ott) that purportedly provides Ott's personal type-written notes of that conversation, which were apparently modified on February 10, 2004. Plaintiff did not have any such conversation with Ott on February 7, 2004 and the notes are false.

32. February 10, 2004 Mid-year Performance Review As noted in this mid-year evaluation, Plaintiff was absent on medical leave following her surgery, July 29, 2003. See "1-on-1 feedback" references (Bate "P0044," Exh. 20 to Def. Dec of Ott, referencing Plaintiff's absences due to surgery and

subsequent medical leave. As Ott noted, she missed periods of work, and was late on certain occasions, due to health reasons. During the evaluation, Ott displayed a very negative demeanor and tone towards Plaintiff. Plaintiff expressed to Ott that she felt very uncomfortable having a one on one conversation with Ott, as Plaintiff felt that Ott was going to falsely write-up Plaintiff for something that Plaintiff may or may not say in the meeting. Plaintiff simply signed her review (February 10, 2004) without expressing any comments, and the meeting concluded.

33. Plaintiff communicated with HR Manager Marks on Febraury 10, 2004, at which time, Marks informed Plaintiff that there would be a facilitated telephone discussion [mediation] with Marks , Ott and Plaintiff, but that facilitated discussion never took place. It was Plaintiff's understanding, however, that such a discussion was to occur in which Plaintiff's complaints of discrimination would be addressed. February 13, 2004 On February 13, 2004, Plaintiff, as part of her regular duties, was beginning the register closing process. She learned that Managers Alex DeSilva and Charles Wang had already begun closing the registers, which was not their role. Plaintiff also knew that Wang was not experienced in closing, and that DeSilva did not perform closing. Id. Plaintiff immediately observed that the two managers had left unaccounted for money in the jet sorter. Id., 33. Knowing that this would produce a serious accounting issue, Plaintiff contacted Ott (the only person she could reach within her chain of command) at home to bring this to her attention. Ott had already accused Plaintiff earlier of not properly reporting such concerns (i.e., the December 19, 2003, register accounting error – see above) (i.e., the January, 2003 $1,500 shortage -- see above) Plaintiff thus explained to Ott that she was observing something that was going to create a major accounting problem and that Ott needed to know about this. Plaintiff did not raise her voice at Ott. Id. Ott never gave any indication that Plaintiff had done something inappropriate by calling her. DeSilva explains that the only reason she was even closing down a register was because "Charles [Wing] was

really excited because he had learned how to close the registers down the previous night with another op assistant…" Defendant reasons that DeSilva was training Wang, but, as noted in the performance evaluations, Plaintiff headed the register training program.

34. February 18, 2004 Zone Chart On February 18, 2004, Plaintiff followed the steps for attaining coverage for her lunch break, which including obtaining approval from Manager Melissa Layton. Pl Dec, Para 34 Plaintiff followed the same routine she had always following since 2001. All employees regularly deviated from the zone chart schedule due to the fact that there is constantly someone needing coverage throughout the day, which creates a constant deviation from the chart. Defendant maintain s that Plaintiff caused another employee to take lunch late; but, conversely, it was because of other employee deviations from the zone chart that Plaintiff was routinely required take her lunch break late. As reflected in Defendant's memorandum there was no indication to Plaintiff that she had done something wrong that day until she met with Ott and Dowers days later on February 24, 2004.

35. February 18, 2004 Plaintiff meets with Dr. Roberts On February 18, 2004, Plaintiff had her regularly weekly meeting with Dr. Roberts. Plaintiff discussed that her work environment was becoming extremely stressful for her.

36. February 20, 2004 Cash register 7 and 8 incident On February 20, 2004, Plaintiff was performing register closing procedures. Manager Melissa Layton instructed Plaintiff to start the process of closing the registers at 5:30 pm. Most of the [operation assistants] ops would start asking managers to close around 5:30, 6, 6:30. Moreover, operations assistant calls a manager to find out can I close, then find out from the manager which register to start closing. Thus, Plaintiff had only closed registers under the approval and direction of the manager. No one indicated to Plaintiff that she had done something wrong. According to Defendant, Ott and Dowers received complaints from

managers Layton and DeSilva about Plaintiff carrying “the entire day’s deposit” of $12,000 around the store. Plaintiff could not have been carrying the entire day’s deposit when, as it acknowledges earlier, there were registers that remained open; secondly, it would have been impossible for Layton and DeSilva to simply observe how much money she was carrying. According to Defendant, Layton and DeSilva complained that Plaintiff appeared confused and had reported a “significant shortage at one of the registers.” Shortages in registers are caused by the cashiers and not Plaintiff (operations assistant) whose role is simply to pick up the money. When Plaintiff observed the shortage, she immediately reported the concern to Manager Layton. Then, on the following morning, Plaintiff reported what occurred to Ott and Dower. Id. Plaintiff was given no indication that she had done something wrong. Defendant states that Layton and DeSilva “had to spend hours trying to reconcile the cash and registers.” This is not true. The store was closed in a timely manner. More importantly, “trying to reconcile the cash and registers” meant that Plaintiff, DeSilva and Layton were reviewing an error that had been made by the cashiers assigned to those registers.

37. <u>Plaintiff’s February 23, 2004 Conversation with Dowers</u>As of Monday, February 23, 2004, no one had given Plaintiff any indication that she had done something wrong with respect to PTO, the Zone Chart or the February 20, 2004 closing. Ott had been extremely hostile towards Plaintiff that day, and Plaintiff was experiencing very severe anxiety. Id. Per Marks’ instructions regarding the chain of command, Plaintiff called Dowers to express her concerns that her work environment under Ott was becoming very stressful for her. Id. Plaintiff also reiterated her concerns to Dowers that Ott was treating Plaintiff differently because of her race. Plaintiff explained that because of this stress in her working environment, her physician and psychiatrist were discussing changing her medication because her feelings of anxiety and depression were resurfacing again. Plaintiff asked Dowers whether something could be done to change her situation under Ott. Dowers did not provide any

responses, nor did he give Plaintiff any indication that he was going to take any responsive measures.

38. Plaintiff's February 24, 2004 meeting with Dowers and Ott About midway through Plaintiff's work day on February 24, 2004, she was called to meet with Dowers and Ott. For the first time, Plaintiff was told that there was a problem surrounding her call regarding the PTO, the zone chart and the February 13 and February 20, 2004 closing. Plaintiff explained her version of the story, but Dowers and Ott, in a very abusive manner, accused her of not being truthful. Dowers maintained that she was untruthful. Plaintiff explained that she could not under what they thought she was being untruthful about. Plaintiff did not have an understanding that she would be terminated: At the conclusion of the meeting, Plaintiff was told that she was suspended with pay, but was not given any indication that she would be terminated. Ott and Dowers told Plaintiff only that they were going to continue to discuss the things we found –referring to the February 20, 2004 incident, and that they would have a follow-up meeting. Similar to how she was treated in the earlier investigation involving the missing $1,500, Plaintiff assumed that they would investigate and discover that she had not done anything wrong.  Dowers simply told her that they would have a conversation in person again on February 28, 2004. Importantly, the only final warning that Plaintiff had been given was dated July 23, 2003. (see above) The final warning was dated back in July of 2003, and there was no mention of it in Plaintiff's February, 2004 mid-year review.  Ott also notes that the time line for the corrective action depends on what is stated in the document itself.  As such, there was no indication that Plaintiff was still on final warning as of February 24, 2004. Plaintiff's Dec, para 38 Moreover, Ott had not given Plaintiff some indication prior to February 24, 2004 that there were problems.

39. Traci speaks to Marks on the February 24, 2004 Plaintiff felt very intimidated by the conversation with Dowers and Ott. She was still anticipating that HR Manager Marks would still intervene to set-up the facilitated discussion with Ott.. Plaintiff contacted Marks on February 24, 2004 to  follow-up with Marks and to also challenge Dowers and Ott's criticisms of her during the meeting.   Marks,

however, merely told Plaintiff to raise these issues with Dowers. Plaintiff was surprised because she had assumed that Marks would take steps to resolve the concerns with Ott.. Prior to sending the March 1, 2004 termination letter, Marks never did anything to inform Plaintiff that she was going to be terminated.

40. February 28, 2004, Leave Request Form Plaintiff's anxiety and depression deteriorated and she did not feel well enough to sit through another intimidating and abusive meeting with Dowers and Ott. Pl. Dec, para 39 After Dr. Roberts reviewed her condition, he medically released her on stress leave. Id. Plaintiff submitted a FMLA leave act request form, which both Marks and Dowers received on February 28, 2004. There was nothing improper about the format of Plaintiffs' request for medical leave. Marks never instructed anyone to take any follow-up steps in response to the request for medical leave. Prior to receiving this form, Dowers had not provided Plaintiff with any indication that she would be terminated. The termination letter was not sent until March 1, 2004.

I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge.

DATED: November 8, 2005

By: ________________________________

TRACI CHARLES